# EXHIBIT 5



Nexia Certification

- 1 -

FRAUD → CONTEXT → BEFORE SOA

SO ↓

→ POST-SOA →

LITTLE HAS CHANGED
→ NO RGTN REDUCTION
→ STILL ONLY REPORTED FRAUD
→ SOA VERY EXPENSIVE BUT RE. FRAUD NOT WORKING
→ COST 6% REVENUE / $600bn p.a.

FRAUD STILL ENDEMIC → DESPITE →
→ SOA 404 CERTIFICATION OF INT. CONTROLS
→ AUDIT OF MANAGEMENT ASSERT INT GN
→ SOA OTHER GOVERNANCE CHANGES (INDEPE; RETTON GAIN ETC)

WHY?
→ CHANGES NOT ADDRESSING THE "ROOT CAUSES"
→ WITHOUT A FOCUS ON PEOPLE, FRAUD WILL STILL OCCUR
→ PEOPLE WILL FIND A WAY TO CIRCUMVENT CONTROLS
→ CAN'T ERADICATE IT, BUT YOU CAN'T EFFECTIVELY REDUCE RISK UNLESS THE PEOPLE ISSUES ARE ADDRESS

FOCUS ON 'PEOPLE'
→ WHO COMMITS FRAUD
→ WHY PEOPLE COMMIT FRAUD — OPPORTUNITY
→ WHAT PEOPLE DO WITH $$ — SELF-RATIONALIZATION
   WHEN THEY COMMIT FRAUD
→ WHAT SPENDING PATTERNS LOOK LIKE POST FRAUD
→ DESIGN REVIEW OF SPENDING PATTERNS TO CONFIRM CONSISTENT WITH INCOME AND ELIMINATE PEOPLE AS POTENTIAL FRAUDSTERS

- 2 -

FRAUD DEFINITION
→ SCOPE OF ECONOMIC CRIME COVERED BY FRAUD
→ ILLUSTRATE WITH HIGH-PROFILE EXAMPLES / USES
→ COMMON THEMES EMERGING — HOW/WHO/WHY
→ STATS ON "WHO" WAS INVOLVED IN FRAUD
   — LEVEL OF SENIORITY IN COMPANY
   — INTERNAL / EXTERNAL PARTIES
   — NO. OF PEOPLE INVOLVED / COMPLEXITY

CIRCUMSTANCES CREATING OPP FOR FRAUD
→ EXTERNAL / MARKET SITUATION ⟶ DOT COM BOOM / STOCK BOOM
→ FINANCIAL INSTRUMENTS / ACCOUNTING COMPLEXITIES / VALUATION
→ TECHNOLOGY
→ MANAGEMENT REWARD MECHANISMS — BASED ON STOCK
→ LACK OF INDEPENDENCE — ADVISORS / AUDITORS VALUE
→ CORPORATE GREED
→ LACK OF ACCOUNTABILITY

WHAT GOT CRACKED DOWN BY STATUTE / REGULATION
→ BUSH 10 POINT PLAN
→ SOA 2002
→ SEC RULES
   IMPROVED GOVERNANCE / ACCOUNTABILITY
   IMPROVED INDEPENDENCE
   MANAGEMENT CERTIFICATION OF INT GN.
   AND/OR CERTIFICATION OF INT CON'S
   INT. AUDIT STANDARDS
   TRANSPARENCY IN STOCK ACQ BY MGT.
   PCAOB SET UP
   INTRODUCED WHISTLEBLOWER PROVISIONS



**- 2.4 -**
(CONT'D)

**SO... WHAT'S STILL 'OPEN' - WHERE ARE THESE EXPOSURES?**
→ MOST RECENT EVIDENCE OF FRAUD POST SOA?
→ GAPS IN LAW/REGULATION - STILL
→ WHAT DOES OPPORTUNITY LOOK LIKE NOW?
→ ARE (RECENT) FRAUDS SIMILAR TO PRE-2002 ONES?
→ WHAT CAN STILL BE IMPROVED?
→ WHERE ARE THERE STILL EXPOSURES?

**WHAT DOES THIS TELL US?**
→ WE HAVE CLOSED DOWN MANY/MOST OF THE CIRCUMSTANCES THAT CREATE OPPORTUNITIES FOR FRAUD AND PROCESSES WHICH AVOID, CONDONE OR SUFFER IT, BUT...
→ IT STILL HANGS
→ SO... WHAT STILL NEEDS TO BE ADDRESSED TO MINIMISE FRAUD RISK?

**- 5 -**

**ACTIONS TO MINIMISE THE RISK OF FRAUD**
→ ENSURE THE CONTROL ENVIRONMENT IN BOTH DESIGN + OPERATION CONFORMS TO BEST PRACTICE POLICIES + PROCEDURES TO MINIMISE FRAUD RISK
→ ENSURE ADEQUATE (INDEPENDENT) MONITORING ACTIVITIES EXIST OVER BOTH PREVENTION AND DETECTION CONTROLS
→ UNDERSTAND FRAUD RISK BETTER - WHERE IT COULD BE PERPETRATED; HOW, BY WHOM, AND
→ ENSURE ANTI-FRAUD CONTROLS ARE PROPERLY DESIGNED AND EFFECTIVELY OPERATED TO PREVENT, DETECT OR MITIGATE FRAUD
→ CONTINUOUSLY MONITOR 'AT RISK' FRAUD AREAS THROUGH A SERIES OF FRAUD INDICATORS OR BUSINESS RULES EXAMINING TRANSACTIONS PROCESSED
→ ELIMINATE EXECUTIVES/STAFF IN 'AT RISK' POSITIONS (AUTHORITY/FUNCTION/PROCESS) - BY CONFIRMING CONTINUOUSLY THAT THEY ARE NOT ENJOYING A FINANCIAL LIFESTYLE INCONSISTENT WITH THEIR INCOME

**WHAT CAN BE FIXED SYSTEMICALLY?**
→ GREATER FOCUS ON DETAILED OPERATIONAL STANDARDS
→ MORE STRUCTURED RISK ASSESSMENT, BY EXPERTS
→ GREATER CONNECTIVITY BETWEEN KEY RISKS + CONTROLS
→ MORE STRUCTURED MONITORING, CONTINUOUSLY, OF FRAUD RISK AREAS
→ MORE FOCUS ON INDEPENDENCE + ACCOUNTABILITY THROUGH SEGREGATION OF DUTIES

**WHAT'S STILL 'MISSING'**
→ PEOPLE COMMIT FRAUD
→ PEOPLE WHO COMMIT FRAUD ENJOY THE BENEFITS
→ BENEFITS FROM FRAUD CAN BE SEEN/EVIDENCED BY FRAUDSTERS LIFESTYLE AND SPENDING PATTERNS
→ MOST EFFECTIVE ANTI-FRAUD ARRANGEMENTS WILL NEED TO ELIMINATE 'PEOPLE' RISK BY VALIDATING AND CONTINUOUSLY MONITORING INTEGRITY OF PEOPLE IN POSITIONS OF TRUST

MVI/Palaxar - PI
181



**CONTEXT TO... THE SOLUTION – NEXIA CERTIFICATION**
→ HOW ARE COMPANIES CURRENTLY PROTECTED?
→ WHAT ARE THE GAPS IN CURRENT COVERAGE?
→ HOW DOES NC ADDRESS THE GAPS?
→ COULDN'T THE 'GAPS' BE ADDRESSED BY EXTENDING EXISTING COVERAGE (eg D+O)?

**HOW ARE COMPANIES CURRENTLY COVERED RE FRAUD?**
SO -
→ RE PEOPLE, D+O INSURANCE PROTECTS AGAINST WRONGFUL ACTS CLAIMS AGAINST DIRECTORS + OFFICERS ACTING IN SCOPE OF THEIR PROFESSIONAL DUTIES
→ BUT... COVERAGE MAY BE INCOMPLETE – IT MAY
  - EXCLUDE SECURITIES CLAIMS
  - DEFENCE COSTS MAY BE EXCLUDED – WHOLE/PART
  - EXCLUDE FRAUD
  - EXCLUDE CRIMINAL ACTS
  - BE RESCINDABLE DUE TO MATERIAL MISREP'N

**THERE ARE, FOR MANY, 'GAPS' IN PROTECTION AGAINST COST OF FRAUD**
→ FOR MANY COMPANIES D+O WILL BE INADEQUATE PROTECTION AGAINST THE COST OF FRAUD
→ D+O COVERAGE IS EXPENSIVE (EXAMPLES)
→ D+O COVERAGE IS NOT INDIVIDUAL DIRECTOR OR OFFICER RISK-ASSESSED

**"GAPS" ARE IMPACTING (i) COST & (ii) REPUTATION & CONSEQUENCES**
(CONCLUSION)
→ D+O DOES NOT COVER THE NON-FINANCIAL IMPACT OF FRAUD – REPUTATION DAMAGE + CONSEQUENT LOSS OF BUSINESS + REGULATORY ACTION (FINES? CLOSE DOWN) etc BANKRUPTCY
→ MANY COMPANIES DO NOT CLAIM ON D+O (IMPACTS PREMIUMS/MAKES FRAUD PUBLIC) WHEN FRAUD IS PERPETRATED
→ (TOO) MANY FRAUD PERPETRATORS ESCAPE TO GO RE-OFFEND (POTENTIALLY) ELSEWHERE / AGAIN TO 'KEEP IT QUIET', AND SOME GOT 'GOLDEN HANDSHAKES' TO SIGN NDA'S (EVIDENCE?)

**CURRENT INSURANCE OFFERS (VERY) LIMITED PROTECTION**
→ DO WE HAVE ANY EVIDENCE TO SUPPORT COST TO BUSINESS FROM FRAUD NOT COVERED BY D+O INSURANCE
→ WHAT WAS UNINSURED LOSS AT ENRON/WORLDCOM (STOCKHOLDER LOSS FOR EXAMPLE)
→ ANY STATS ON D+O INSURANCE COST / IMPACT ON PREMIUMS FROM FRAUD CLAIMS?

**"REAL" ISSUE NOT BEING ADDRESSED OR MITIGATED EFFECTIVELY**
→ NEED TO LOOK AT A 2-DIMENSIONAL APPROACH GOING FORWARD TO PROTECT STAKEHOLDERS
  (i) REDUCE THE 'PEOPLE' RISK BY CERTIFYING PEOPLE IN 'POSITIONS OF TRUST'
  (ii) TRANSFER THE RISK THROUGH INSURANCE – INSURE PEOPLE AGAINST FRAUD ACTS & COST TO BUSINESS

MVII/Palaxar – P1
182

NEXIA
CERTIFICATION
FAQ

WHO IS IT AIMED AT?
INDIVIDUALS? CORPORATIONS?
WHO WILL BE THE (ULTIMATE) PAYER (CORP./INDIV.)?

HOW IS IT ACQUIRED?
APPLICATION? EXAMINATION? INTERVIEW?

WHAT EXACTLY GETS EXAMINED /REVIEWED FINANCIALLY

WHAT IS INCLUDED AND
COVERED IN NC? WHATS DIFFERENT
FROM D+O? IS CONSEQUENTIAL LOSS COVERED?

WHAT ARE THE (INTRINSIC)
BENEFITS FROM NC OVER EXISTING
INSURANCE PRODUCTS? INDIVIDUAL AND CORPORATE
STOCKHOLDERS?

WHO BENEFITS AND HOW? (LIST BENEFITS
BY STAKEHOLDER - EXECUTIVES, SHAREHOLDERS, CORPORATE BODY)

HOW IS IT MAINTAINED?
PERIODIC/ CONTINUOUS REVIEW?
ANNUAL SUBSCRIPTION OR FEE?

HOW IS IT PRICED - INITIAL
CERTIFICATION AND CONTINUING
CERTIFICATION? HOW DO NSC
PRICE IT TO MANAGE OUR RISK?

HOW ARE THE INDIVIDUALS'
"RIGHTS" PROTECTED? (DATA
PROTECTION)? WHAT GUARANTEES
CAN NSC GIVE OVER DATA SECURITY /CONFIDENTIALITY

UNDER WHAT CIRCUMSTANCES
WOULD NC BE REFUSED
AND/OR WITHDRAWN?

WHO DETERMINES IF NSC
WILL BE GRANTED /MAINTAINED?
WILL NSC PUBLISH ACCEPTABILITY
CRITERIA?

WHO WILL BE ADVISED IF AN APPLICATION
FAILS OR IS WITHDRAWN? INDIVIDUAL
CONCERNED ONLY? REASONS GIVEN?

WHAT ARE NSC RESPONSIBILITIES (IF ANY)
TO CORPORATIONS WHO EMPLOY NC INDIVIDUALS?

MVI/Palaxar - PI
183

NEXIA CERTIFICATION

(QUESTION)

1  Nexia Certification covers those "employees
in positions of trust"
   (i) what about international companies
       with employees overseas in positions of
       trust? Does NC only apply to US based citizens?
   (ii) how many (%) would need to
        subscribe to NC to give the corporate
        body a level of comfort?

2  Is certifying the 'people' enough? Don't we
need to offer a suite (end to end) of Anti-Fraud
products to include risk assessment, control
validation and people. NC will only eliminate
individual executives, not cover the risk of the
organization.
So, (i) what is the focus of the offering(s)?
    (ii) Can we offer NC on its own and if
         so will it be seen as limited in a
         corporate sense?
    (iii) even if (ii) above were true, are we
          quessing any revenues by not incl
          other anti-fraud solutions?

3  What would be covered by NC within
the definition of "fraud" – we need to
be clear especially in the insurance product
context

4  What would be covered as 'fraud risk'
– the amount defrauded as the cost of
fraud including consequential damages
(loss of business due to reputation damage
etc)

5  How do we address the issue of companies
not wishing to go public on fraud? Will NC
require us to make it public

6   From an employment law perspective, can companies make NC a condition of employment retrospectively?

7   From a marketing perspective, is the intention to create a NC "Institute" - like a professional body? If so, would the certified executives just get the NC or would be wish to incorporate some form of training, examination, CE to raise their level of awareness, understanding of best anti-fraud practices? We make the be evangelists? Maybe a good sell to Corporations too - in addition to being NC they are also certified as experts in Anti-Fraud which brings benefit to the company.

8   Will we offer a product only to listed Companies? Is there a niche market for large privately-held companies, or companies excluded under SoA?

9   Are there certain industries 'higher-risk' of fraud? Or certain transactions/processes which would help our targeting efforts when we launch NC?

10   Do we see NC replacing D·O insurance or a complement to it? How will the insurance industry (?) be impacted in terms of D·O

net revenues by NC. (11) view NC as an
opportunity or a threat (especially those not
carrying it - who would lose out if their
clients switched to NC from D+O.)?

11   How do we price NC? Do we see it as
higher or lower cost than D+O? Presumably,
clients will still need D+O as NC will
not cover all of the risks currently? Or,
should we price a new insurance product to
include D+O and NC?

12   What are the exposures Nexin faces if
it refuses certification or withdraws it?
How can we best protect ourselves?

13   What do we need to do to demonstrate
Nexin Strategy Cooperative integrity and
maintain it? Does NC need to be
separate from MVI? Does NSC not need to
be in greater control of its sphere of business to
protect the brand NC? What if a MVI
project went wrong / performed so wrong? Or, an
MVI executive or retired executive was
charged with fraud? We are aware of several
"issues" with our retired already - do they
alone not (potentially) compromise the integrity
of NC.

14   Are we able to offer NC overseas or just USA?

15   We need to work flow the NC process to show
     process steps and scope/coverage

16   How much interpretation is required of the
     NC algorithm results? Does it require specialist
     knowledge/skill on NSC-side? How much
     validation — extent, time & cost is required
     of algorithm results? What % of cases
     require investigative follow-up?

17   What is the NSC cost of set up and
     maintenance of NC? What costs are
     included
        —  Data Center  — Investment  } Building
                                         Hardware
                                         Software
        —  Access to Databases
        —  Processing Costs
           Insurance indemnity costs
     What are the processing costs per individual
     at PBSOK (?) & how would NSC project the
     for equivalent NC?

18   How do we protect NSC against loss of use/
     access to the DD algorithms?

19   Have we finalized contractual access to
     DD algorithms?

20   Do we have a (pro forma) NC application
     Template yet? When will we have one ready
     to pilot with NCgc staff?

MVI/Palaxar - P1
187

21. What exactly is covered/treated that might be termed "non-financial" but still questionable behavior. For example, DUI - is this an illustration of financial irresponsibility? What about criminal / non-financial issues that surface? Where do we draw the line in terms of ethical / integrity standards? Where do we draw the line between ethics and morality?

22. How do we protect NSC from claims arising from the above issues being reported to the company or law enforcement agencies?

23. We need to write a 1/2 pager on NC as collateral

24. We need to do a Risk Assessment of NC soon as



# MVI Business Review
## Business Critical Issues for Immediate Resolution

*February 18 2006*

NEXIA STRATEGY CORPORATION

©NexiaStrategy2006



# Agenda

Background

Headline Issues

## Key Issues, Considerations and Recommendations

- Structure - Domain Management
- Management of the Affiliate and Subsidiary network
- Connectivity between Acquisition, Integration and Operational Management
- Systems and Procedures
- Accounting Arrangements
- Resourcing of Key Functions
- Accountability
- Control

Key Recommendations Summary



# Background

MVI has come a long way in a very short period of time; less than 18 months after the company was formed it has grown to a network of over 100 companies - 48 of whom are revenue generating - and is currently on target for a $800m run rate on revenues for 2006.

Common Paymaster now has over 2000 employees in a myriad of industries ranging from PEO's to Construction and continues to grow apace. We have come a long way.

However, our success in such a short space of time has brought with it a number of pressures, not least of which are the stresses it has put on both our people and our systems to cope with both the pace of change and the scale and complexity of operations we now have. Put simply, we have outgrown our existing business operations infrastructure.

*It has become increasingly apparent over recent weeks that there are a number of (inter-connected) recurring weaknesses which need to be addressed as a matter of some urgency if we are to maintain and enhance the value we have already created, retain our best people and provide a more robust and stable platform for future growth.*

The purpose of this Paper is to highlight the key issues which need immediate attention if we are to develop and embed more effectively an organizational structure, systems and procedures, suitably resourced, to ensure an economic, efficient and effective operation that provides a stable and flexible platform upon which to grow the MVI business.

If these issues do not get addressed, we are in serious danger of losing created value, good people, and investor confidence



# Headline Issues

- **Inefficient and ineffective structure** – inefficient organization of support functions e.g. IT, Accounting, Legal resulting in additional time and cost to produce in many instances inferior services

- **Significant deficiencies in our management of the affiliate and Subsidiary network** – inadequate attention to managing investments to deliver invested objectives

- **Lack of focus on domain expertise and management** - organizationally, the business structure model does not recognize the importance of domain expertise in the effective management of industry verticals.

- **Poor connectivity between acquisition, integration and operational management** – insufficient planning, scoping and interfacing of the MVI groups to ensure a smooth and seamless acquisition and conversion to (integrated) subsidiary status

- **Inadequate systems and procedures** – planning, budgeting, monitoring, and reporting at both MVI and within the network to support efficient and effective operations

- **Significant Accounting deficiencies** – accounting arrangements wholly inadequate for an organization of MVI's size and company network spread

- **Key functions under-resourced** – both in terms of numbers and competencies, and too many "square pegs/round holes" in key positions

- **Lack of accountability** – inadequate definition and clarity of individuals' roles and responsibilities, and insufficient supervision and management of operating units by a number of designated executives

- **Inadequate control mechanisms** – too much emphasis on control of payroll and of cash spend; by themselves, inadequate mechanisms to control spend particularly in the absence of a budgetary control or commitment accounting system, and staff hiring weaknesses

MVI/Palaxar - P1
192

## Key Issue, Discussion Points & Recommendation



1. **Inefficient and Ineffective Business Structure – inadequate focus on domain expertise and management in running companies**

• Geographic structure on its own not conducive to effective business management
• MD's at Regional level unlikely to possess all of the required domain business knowledge & expertise to run multi–industry businesses
• Regional structure makes leveraging domain experience or capacity/capability more difficult
• Regional structure has a place – local community presence; local focal point for businesses in network; local business environment knowledge –but should be subsidiary to domain management
• Domain / Portfolio management will provide the best platform for business returns and cost optimization through economies of scale

**Recommendation:** MVI move to a portfolio domain/geographic model with domain the principal business management basis. Each business vertical should be set up as a domain with a domain holding company and domain management expertise – DEO, DOO, DFO – reporting through to MVI Corporate Management functions



Restructuring Principles

Key Components of the Architecture

# Domain Portfolio Management Model

# Shared Service Centers

# Corporate Management

# Regional Office Management

MVI/Palaxar – Pl
194



MVI/Palaxar - PI
195





MVI/Palaxar - PI
197



## Business Restructuring Principles

### (Re) Defined Companies Structure

**Segregate Revenue Generating Businesses** – Define those companies in the network which were acquired to / now defined as revenue generators from external business (to MVI Internal Market). These companies need to be actively supported including MVI 'hands-on' day to day management, monitoring and reporting

**Manage Investments as Investments** – the remaining companies are either investments or service companies. Companies acquired to, or now deemed to be investments should be managed as such
– Board representation to protect and enhance invested value but operationally managed by the companies own management

**Service Companies** – the remaining companies are there to support the MVI network, either shelf companies awaiting business import or companies which deliver services to MVI network and who have no / little external business, e.g. Common Paymaster.

### MVI Corporate Management Role

**Business Strategy** – interpretation of business direction from the overall MVI vision translated into acquisition strategy, acquisition characteristics, business metrics and overall direction.

**Corporate Management Framework** – policies and procedures through which the businesses operate to in order to ensure corporate standards are maintained

**Corporate Integration Framework** – operationalizing the acquisition and integration of acquired businesses

**Corporate Oversight** – monitoring the delivery of business operations and delivery of business objectives and targets through the domain/geography network.





*Business Restructuring Principles*

**Portfolio Management Model**

**Management by Domain Experts** -- who understand business metrics and are able to promote and share best practice in their business verticals, leveraging domain expertise, pooling knowledge about efficient and effective business practices across different geographical regions, and sharing knowledge about customers, opportunities and markets.

**Leveraging Assets and Reducing costs** - the benefits from leveraging asset capacity/capability, economies of scale and elimination of duplicated effort can optimize use of collective resources and reduce costs.

**Standardized Business Platforms** - the benefits from more efficient centralized business platforms can deliver greater consistency, timely and accurate information.

**Shared Service Centers**

**Reducing costs and avoiding duplication of effort** - economies of scale and elimination of duplicated effort through avoiding each business replicating common services can streamline and simplify services to reduce costs.

**Shared Platforms** - sharing best practice in business and HR processes, leveraging HR expertise, pooling knowledge about what works across different parts of the organization and different geographical regions, and sharing knowledge about customers and markets.

**Improving quality of service to customers** - the benefits from more efficient processes can deliver greater consistency, timely and accurate information and advice to customers. Sharing services can also help to reduce competition and rivalry between different parts of the business.



*Business Restructuring Principles*

**Regional Office Management**

**Geographic reach and local representation** – economies of scale and elimination of duplicated effort through avoiding each business replicating common services can streamline and simplify services to reduce costs.

**Local** – sharing best practice in business and HR processes, leveraging HR expertise, pooling knowledge about what works across different parts of the organization and different geographical regions, and sharing knowledge about customers and markets.

**Improving quality of service to customers** – the benefits from more efficient processes can deliver greater consistency, timely and accurate information and advice to customers. Sharing services can also help to reduce competition and rivalry between different parts of the business.

NE[X]IA

*Key Issue, Discussion Points & Recommendation*

2. Significant deficiencies in our management of the affiliate and Subsidiary network

- No 'rear view mirror' once deals are completed
- Poor deal data and deal document recording and referencing
- Difficult to determine rationale for investment retrospectively
- Management by Crises mode - reactive
- Inadequate contact forum for surfacing issues in Co. network
- Lack of specificity in setting MVI objectives
- Inadequate monitoring of performance – financial & business
- No structured processes for local management – financial – deficiencies processes e.g. business planning and budgeting

Recommendation:

# Key Issue, Discussion Points & Recommendation

**3. Poor Connectivity between Acquisition, integration and Operational Management**

- Inadequate due diligence in some instances historically
- Too many instances of negotiation at deal signing
- Incomplete processes – missing steps
- Lack of overall ownership in deals, or operationally circumvented
- Integration process fragmented and poorly integrated
- Communications lacking – over-reliant on F1 channel
- Over reliance on a few key individuals
- Too many changes in deals, by too many people, too often
- Poor handover arrangements

<u>**Recommendation:**</u>

# Key Issue, Discussion Points & Recommendation

## 4. Inadequate Systems and Procedures

- Absence of clearly articulated and communicated MVI business plan
- Absence of robust business plans for most affiliates and subsidiaries
- Budget process lacking – resulting in inability to manage businesses locally
- Companies not operating to any discrete targets – inability to monitor & evaluate performance
- No commitment system – control to cash inadequate for effective control
- MVI budgetary control mechanisms lacking effectiveness
- Reporting processes absent – Affiliate/Subsidiary to MVI

Recommendation:

# Key Issue, Discussion Points & Recommendation

## 5. Significant Accounting Deficiencies

- Historic failure to specify accounting arrangements / method of accounting
- Number of different accounting systems within network - inefficient
- Failure to ensure accounting entries maintained up to date
- No regular or reliable accounting records for reporting purposes
- Backlog of accounting transactions – Affiliate / Subsidiary to MVI e.g. LOC recording and monthly entries – incomplete/misleading picture presented
- Inadequate accounting support to date – numbers/competencies

Recommendation:

# Key Issue, Discussion Points & Recommendation

## 6. Key Functions Under-Resourced

- **PEO Sales Engine** – Key business driver not adequately addressed or sufficiently resourced to deliver significant growth targets
- **Acquisition** – Needs more professionals in this key area
- **Accounting** – Insufficient staff at MVI level, and lacking expertise in key businesses, Too many unqualified staff put in positions of authority they are not suited or qualified for
- **Integration** – insufficient resources to deal with historic acquisition issues. Also, too much focus on dealing with small deal issues
- **Executive support** – Senior executives dealing with too much administrative Issues. Need to create an Executive Office and staff up.
- **HR** – Lacking key competencies – numbers and quality of staff
- **IT** – Inability to service current business infrastructure effectively
- **Facilities Management** – Needs a professional Property/Facilities Manager

**Recommendation:**

# Key Issue, Discussion Points & Recommendation

## 7. Lack of Accountability

- No infrastructure to support accountability
- We need to create an infrastructure and a culture of accountability
- Need an Organization Chart with clear roles, responsibilities and reporting lines as a minimum to create the accountability platform
- Need Job Descriptions for all (initially, senior) staff
- Need to create Personal Plans and Targets for senior executives
- Need to create a management information system to support Performance Management
- Need to create an Appraisal & Counseling System to review staff performance in a structured and consistent manner
- Culturally, need to create reporting disciplines and enforce them

Recommendation:

# Key Issue, Discussion Points & Recommendation

## 8. Inadequate Control Mechanisms

- Failure of MVI to specify and/or manage companies to credit limits
- No effective budgeting or budgetary control system
- No commitment accounting system
- Key control points not clearly identified and segregation of duties not assured
- Lack of clarity in who can commit MVI / companies in the network
- Inadequate controls over payroll – both hiring and staff start dates/payroll recognition
- Inadequate asset control – no asset register
- Insurance coverage incomplete – carrying uncovered risks
- Funds wiring process not adequately secured
- Inadequate management of AR to ensure all invoiced and collected on time

Recommendation:

# Fraud and Economic Crime

## PwC Economic Crime Survey Nov 2005

- Some 45% of companies worldwide have fallen victim to economic crime
- Companies around the world, on average, reported suffering 8 fraud incidents since 2003, larger companies reported an average of 12 incidents
- 38% to 60% of the companies in each of the sectors reported significant frauds.
- Since 2003, there has been a 71% increase in the number reporting corruption & bribery, a 133% increase in the number reporting money laundering, and a 140% increase in the number reporting financial misrepresentation.
- The average financial damage to companies from tangible frauds (i.e., asset misappropriation, false pretences, and counterfeiting) was US$ 1.7 million
- 40% of companies indicated that they had suffered significant 'collateral damage

## ACFE, "2002 Report to the Nation, Occupational Fraud and Abuse

(1) the average company loses the equivalent of 6 % of its revenue to fraud and
(2) fraud accounts for $600 billion in losses annually.

# Greatest Fraud Risks



## Risky Business

What specific types of institutional fraud present the greatest risk to companies today?

Conflicts of interest (i.e., purchase/sales schemes)  **63%**

Fraudulent financial statements  **57%**

Billing schemes  **31%**

Expense and reimbursements schemes  **29%**

Bribery/economic extortion  **25%**

Inventory and non-cash asset misuse  **20%**

Conflicts of interest (63 percent), fraudulent financial statements (57 percent) and billing schemes (31 percent) were seen as the greatest fraud risk areas.

Examples of fraud that garnered at least 20 percent support were expense and reimbursement schemes (29 percent), bribery/economic extortion (25 percent) and inventory and non-cash asset misuse (20 percent)

Oversight Systems Fraud Report 2005

MVI/Palaxar – P1
209

# Circumstances that foster Fraud

Most frauds reported involved;

- a lack of adequate internal controls (opportunity)
- the need to maintain an expensive lifestyle (incentive), and
- the perpetrator's lack of awareness that their actions were wrong (self-rationalisation).

and......

....most fraud (34%) is still detected by chance (e.g., through tip-offs).

OPPORTUNITY

INCENTIVE

SELF RATIONALIZATION

MVI/Palaxar - Pl
210

# Stopping Institutional Fraud

Forty-one percent of professional fraud examiners identified the need for a strong tone from the top of the organization as the most effective means in preventing or deterrent institutional fraud. Visible prosecution was the next most popular response garnering 22 percent support, followed by internal controls and technology-enabled monitoring, each receiving support from 17 percent. Manual quarterly audits and government regulation received only minimal support, earning two and one percent, respectively (see: Tactics for fraud prevention graph).

Oversight Systems Fraud Report 2005

## Tactics for Fraud Prevention



What measure is most effective in preventing or deterring institutional fraud?

Clearly established strong tone at the top of the organization — 41%

Visible prosecution (and conviction) of perpetrators — 22%

Stringent and highly restrictive internal controls — 17%

Technology-enabled continuous monitoring of all financial transactions — 17%

Thorough, manual quarterly or yearly audits — 2%

Government regulation — 1%

MVI/Palaxar - PI
211



...Houston, we have a problem...;

...and Nexia has a solution...the Nexia Anti-Fraud Building Blocks



## The Nexia Anti-Fraud Building Blocks

MVI/Palaxor - PI
213

# Economic Crimes : Scope & Definitions

**I**

| Economic Crime or Fraud | Generic terms used in this survey to denote wrongful or criminal activities to or in an organisation, intended to result in the gain of money or benefits for the perpetrator(s). |
| --- | --- |
| Asset Misappropriation (inc. embezzlement by employees) | The theft of company assets (including monetary assets/cash or supplies and equipment by company directors, others in fiduciary positions or an employee for their own benefit. |
| False Pretences (inc. Confidence Game) | The intentional action of a perpetrator to deceive those in fiduciary positions and make a personal or financial gain. |
| Financial Misrepresentation | Company accounts are altered or presented in such a way that they do not reflect the true value or financial activities of the company. |
| Corruption & Bribery (inc. racketeering & extortion) | Typically, the unlawful use of an official position to gain an advantage in contravention of duty. This can involve the promise of an economic benefit or other favour, the use of intimidation or blackmail. It can also refer to the acceptance of such inducements. |
| Insider Trading (only asked to listed companies) | Trading of securities by a person inside a company based on non-public information. |
| Money Laundering | Actions intended to legitimise the proceeds of crime by disguising their true origin. |
| Counterfeiting (inc. product piracy, industrial espionage) | This includes the illegal copying and/or distribution of false goods in breach of patent or copyright, and the creation of false currency notes and coins with the intention of passing them off as genuine. It also includes the illegal acquisition of trade secrets or company information. |

# The Nexia Fraud Solutions Set

Nexia offers an end-to-end Anti-Fraud solution which covers: policies and procedures; risk assessment; controls effectiveness; ongoing monitoring; and, executive integrity as follows:

## Anti Fraud Controls Environment

**Anti-Fraud Controls**

**Fraud Risk**

**Executive Ethical and Integrity Certification**



**Effective Segregation of Duties**

**Continuous Monitoring**

MVI/Palaxar - Pl
215

# Nexia Fraud Solution Set Criteria

- End-to-End Anti-Fraud Solution Set
- Unique offering(s) to differentiate from competitor offerings
- Clearly articulated and demonstrable added-value client benefits
- Fast time to market
- Modular solutions set connected for sales pull-through
- Package-able and replicable for ease of roll-out and to maintain delivery consistency and Nexia quality standards
- Global applicability
- Scalable in implementation
- Minimum US$XX million within three years

MVI/Palaxar - Pl
216



MVI/Palaxar - PI
217



The Nexia Anti-Fraud Building Blocks

6 EXECUTIVE INTEGRITY & ETHICAL BEHAVIOR
5 CONTIGUOUS MONITORING
4 SEGREGATION OF DUTIES
3 Anti-Fraud CONTROLS
2 Fraud RISK ASSESSMENT
1 Anti-Fraud CONTROL ENVIRONMENT



# 1 Anti-Fraud CONTROL ENVIRONMENT

MVI/Palaxar - P1
219



# 1. Anti-Fraud CONTROL ENVIRONMENT

The control environment refers to such intangibles as integrity, ethical values and competence of the entity's people, and management's philosophy and operating style, but it also covers more concrete expressions of these intangibles, such as the way management assigns authority and responsibility, and organizes and develops its people.

In addition, the control environment sets out the role of the audit committee and board of directors.

The control environment has a pervasive influence on the way business activities are structured, objectives are established and risks assessed. It also influences risk assessment, control activities, information and communication systems, and monitoring activities.

The control environment is not static; it is influenced by the entity's history and culture and in turn influences the "control consciousness" of its people in performing their day-to-day activities. Since 90% of the frauds occur at the senior executive level the establishment of strong antifraud programs and controls is an essential component of a healthy control environment.

## 1 Anti-Fraud CONTROL ENVIRONMENT

Nexia has developed a comprehensive approach to assessing the effectiveness of the organization's Anti-Fraud Control Environment, based on

• a review of the organization's anti-fraud policies and procedures for completeness and relevance

• an organization–wide Survey based on the COSO Integrated Control framework, focused particularly on anti-fraud controls, to establish the level of awareness, understanding, and consensus on their effectiveness. The Nexia Axenaware™ Survey which is web-based and anonymous, contains a series of control statements drafted by Nexia experts in this area, which are tailored for each organization's unique characteristics. It is a proven efficient and effective tool for capturing the input from a large and disparate group, is easy to access and complete (20 to 25 mins.) and provides the data for an excellent in-depth assessment

• interviews with selected senior executives and staff to follow-up on identified weaknesses and gaps for remediation

The output from this exercise is a Controls Environment Remediation Plan

MVI/Palaxar - Pi
221



MVI/Palaxar - PI
222





## 2 Fraud RISK ASSESSMENT

MVI/Palaxar - PI
224

## 2 Fraud RISK ASSESSMENT

The essential elements of an effective fraud risk assessment include:

• A systematic (rather than haphazard) assessment process
• Consideration of potential fraud schemes and scenarios
• Assessment of risk at company-wide, significant business unit and significant account levels
• Evaluation of the likelihood and significance of each risk to the organization
• Assessment of exposure arising from each of the categories of fraud risk
• Testing of the effectiveness of the risk assessment process by internal audit
• Documented oversight by the audit committee, including consideration of the risk of override of controls by management

Organizations will need to reach their own conclusions with respect to the cost of controlling a risk compared to the benefits of mitigating or eliminating that risk. However, an organization should have a documented process that assesses, identifies and evaluates fraud risk.

MVI/Palaxar - PI
225



## 2 Fraud Risk Assessment

### Fraud Risk Assessment

Organizations should consider the potential for fraud as part of their enterprise-wide risk assessment process or risk management program.

To be effective, management should perform fraud risk assessments on;

- a comprehensive and recurring basis rather than in an informal or haphazard manner.
- when special circumstances arise, such as changed operating environments, new products and markets, and corporate restructurings (The COSO Framework)

The nature and extent of management's risk assessment activities should be commensurate with the size of the entity and complexity of its operations (for example, the risk assessment process is likely to be less formal and less structured in smaller, centralized entities).

Fraud risk assessment expands upon traditional risk assessment. It is scheme and scenario based rather than based on control risk or inherent risk. The assessment should consider the various ways that fraud and misconduct can occur by and against the company.



## 2 Fraud Risk Assessment

Management's assessment of fraud risk should be at the company-wide, business unit and significant account levels and assessment of fraud risk should include:

- the potential for fraudulent financial reporting in terms of the vulnerability of the entity to fraud and its potential impact on financial statements. (Sarbanes-Oxley §103 requires the independent auditor's evaluation of internal controls to address controls to ensure that "receipts and expenditures of issuers are being made only in accordance with authorization of management and the directors."

- misappropriation of assets

- unauthorized or improper receipts and expenditures

- vulnerability to management override

- potential schemes to circumvent existing control activities, which may require additional compensating control activities.

- the risk of fraud by senior management or the board because "fraud of any magnitude on the part of senior management" constitutes a significant deficiency and is a strong indicator of a material weakness as stated in §126 of the PCAOB Auditing Standard.

- incentives and pressures on management to commit fraud §36 of SAS 9914.

MVI/Palaxar - PI
227



## 2 Fraud RISK ASSESSMENT

Sarbanes-Oxley (SOA) Anti-Fraud Requirements - Evaluation of Control Deficiencies

The lack of an adequately designed, documented and tested system of control activities addressing each of the identified fraud risks is a strong indicator of a significant deficiency. Deficiencies in the control of specific frauds, whether individually or in the aggregate, should be evaluated to determine if they constitute a material weakness, as follows;

- Internal Control Deficiency: the design or operation of a control does not allow management or employees, in the normal course of performing their assigned functions, to prevent or detect *misstatements of the annual or interim financial statements on a timely basis*

- Significant Deficiency: could be a single deficiency, or a combination of deficiencies, that results in *more than a remote likelihood* that a misstatement of the annual or interim financial statements that is *more than inconsequential in amount* will not be prevented or detected

- Material Weakness: is a significant deficiency that, by itself, or in combination with other significant deficiencies, results in *more than a remote likelihood that a material misstatement of* the annual or interim financial statements will not be prevented or detected

# 2 Fraud RISK ASSESSMENT

For SOA, fraud needs to be assessed within a standard assessment framework;
- the level of likelihood of fraud (probable, reasonably possible and remote)
- the level of significance of fraud (inconsequential, more than inconsequential or material) for example, as follows;

| Control Deficiency | Likelihood of Financial Misstatement | Materiality |
|---|---|---|
| Minor Deficiency | More than remote? NO | Inconsequential<br>*Less than $250,000* |
| Significant Deficiency | More than remote? YES | More than Inconsequential<br>Greater than $500,000<br>But less than $3,000,000 I/S<br>But less than $4,000,000 BS |
| Material Weakness | More than remote? YES | Material<br>Greater than $3,000,000 I/S<br>Greater than $4,000,000 BS |



## 2 Fraud RISK ASSESSMENT

### "At least" Significant Deficiencies

- Selection and application of accounting policies
- **Antifraud programs and controls**
- Non-routine and nonsystematic
- Period end financial reporting process, including journal entries

### "Strong Indicator" of Material Weakness

- Restatement of previously issued financials
- Material audit adjustments
- Ineffective audit committee
- Ineffective internal audit or risk assessment function
- Ineffective regulatory compliance function
- **Fraud of any magnitude by senior management**
- Failure to timely correct significant deficiencies

MVI/Palaxar - PI
230

# Extracts from the Nexia Fraud Library

By Process

By Type of Risk

| # | Risk | Business Process Risk | Infrastructure Risk | Specific Fraud Area Risk |
|---|------|------------------------|----------------------|---------------------------|
| 1 | Consultancy and commission payments are not reviewed on a regular basis | Accounts Payable/Supplier Pa | Policies & Procedures | Bribery/Corruption |
| 2 | Failure to review the expense accounts of sales staff for heavy entertaining | Accounts Payable/Supplier Pa | Investigation/Manageme | Embezzlement |
| 3 | Poor segregation of duties | Accounts Payable/Supplier Pa | Policies & Procedures | General |
| 4 | Failure to segregate banking and sales ledger duties | Accounts Payable/Supplier Pa | Policies & Procedures | General |
| 5 | Failure to maintain cheque logs | Accounts Payable/Supplier Pa | Investigation/Manageme | Embezzlement |
| 6 | Cheques stored in an insecure area | Accounts Payable/Supplier Pa | Investigation/Manageme | Embezzlement |
| 7 | No control in place over the issuing of cheques | Accounts Payable/Supplier Pa | Investigation/Manageme | Embezzlement |
| 8 | No controls in place over journal adjustments | Accounts Payable/Supplier Pa | Investigation/Manageme | Embezzlement |
| 9 | Lack of regular audits and reconciliations between original books of entry and control accounts | Accounts Payable/Supplier Pa | Investigation/Manageme | Embezzlement |
| 10 | Failure to review year end and post year end adjustments | Accounts Payable/Supplier Pa | Investigation/Manageme | Embezzlement |
| 11 | Lack of an independent Audit Committee | Accounts Payable/Supplier Pa | Policies & Procedures | General |
| 12 | Failure to match GRNs with invoices and copies of order forms | Accounts Payable/Supplier Pa | Policies & Procedures | General |
| 13 | Failure to check GRNs and purchases against budgeted outlay for a period | Accounts Payable/Supplier Pa | Policies & Procedures | Materials Theft |
| 14 | Failure to analyse spending on suppliers | Accounts Payable/Supplier Pa | Investigation/Manageme | Embezzlement |
| 15 | Lack of a properly maintained central register of approved suppliers, with procedures for adding/removing suppliers | Accounts Payable/Supplier Pa | Policies & Procedures | Embezzlement |
| 16 | Failure to monitor payments made | Accounts Payable/Supplier Pa | Investigation/Manageme | Bribery/Corruption |
| 17 | Failure to reconcile sales orders to invoices | Accounts Payable/Supplier Pa | Investigation/Manageme | Embezzlement |
| 18 | Failure to store and prepare bank transfer forms in a secure area? | Accounts Payable/Supplier Pa | Investigation/Manageme | Embezzlement |
| 19 | Failure to adequate monitor contract negotiations and the terms of contracts concluded | Accounts Payable/Supplier Pa | Investigation/Manageme | Bribery/Corruption |
| 20 | Failure to ensure Payroll is reviewed | Accounts Payable/Supplier Pa | Investigation/Manageme | Embezzlement |
| 21 | Lack of procedures and controls in place for entering by employees on the payroll | Accounts Payable/Supplier Pa | Policies & Procedures | Embezzlement |
| 22 | Failure to regularly original receipts in supports of claims for expenses | Accounts Payable/Supplier Pa | Policies & Procedures | Embezzlement |
| 23 | Inadequate variance analysis of key performance indicators | Accounts Payable/Supplier Pa | Policies & Procedures | Embezzlement |
| 24 | Failure to maintain a secure register of authorised signatures | Asset Management | Investigation/Manageme | Embezzlement |
| 25 | Poor controls and management over payment and credit terms | Asset Management | Investigation/Manageme | Embezzlement |
| 26 | Lack of control over access to the accounts payable and masterfile systems | Accounts Payable/Supplier Pa | Investigation/Manageme | Embezzlement |
| 27 | Failure to ensure previous episodes of fraud are used as lessons for current practice | Asset Management | Policies & Procedures | Embezzlement |
| 28 | Absence of a policy on barring Trading (i.e. the trading of company sensitive information) | Asset Management | Policies & Procedures | Bribery/Corruption |
| 29 | Lack of a validation procedure for dealing with compensation and insurance claims | Asset Management | Policies & Procedures | Intellectual Property |
| 30 | Failure to define the level of risk acceptance in material terms | Asset Management | Investigation/Manageme | Materials Theft |
| 31 | Failure to ensure all patents are registered in the company name | Asset Management | Investigation/Manageme | Embezzlement |
| 32 | Lack of an Information Security policy | Asset Management | Awareness | General |
| 33 | Failure to ensure all patents etc are registered in the company name | Asset Management | Policies & Procedures | Intellectual Property |
| 34 | Failure to maintain a register of patents and other copyrights/trademarked property | Asset Management | Investigation/Manageme | Intellectual Property |
| 35 | Lack of clearly defined boundaries to the site | Asset Management | Investigation/Manageme | Intellectual Property |
| 36 | Lack of detail in permitted/disallowed access | Asset Management | Investigation/Manageme | Intellectual Property |
| 37 | Perimeter security is inadequate to prevent unauthorised access | Inventories | Investigation/Manageme | Materials Theft |
| 38 | Failure to address any particular risk in the surrounding area (e.g. hostile community) | Inventories | Investigation/Manageme | Materials Theft |
| 39 | Gate/perimeter security is inadequate for the number of people and vehicle movements | Inventories | Investigation/Manageme | Materials Theft |
|  | Failure to adequately seal the gates at night or adequately protect points of entry while the site is not in operation | Inventories | Investigation/Manageme | Materials Theft |



# 2 Fraud RISK ASSESSMENT

## Fraud Risk Assessment

**INSTRUCTIONS:** Score each of the following Business Processes and Sub-Processes in the context of Fraud Risk.

### Order to Cash (edit)

**Agenda:** (edit)

| | Misappropriation of Assets | Management Override | Unauthorized Trans'ns | Control Circumvents |
|---|---|---|---|---|
| | (3) More than Remote<br>(2) Remote<br>(1) Less than Remote | | | |
| 1. Customer Master File Maintenance | | | | |
| 2. Pricing & Order Proc'g | | | | |
| 3. Invoicing | | | | |
| 4. Sales on Consignment | | | | |
| 5. Credit and Collections | | | | |
| 6. Allowances for Doubtful debts | | | | |
| 7. Returns Revenue Recognition | | | | |

Submit    View Results



## 2 Fraud RISK ASSESSMENT

**ARENA**avenue

### SOA Fraud Risk Assessment

**INSTRUCTIONS:** Score each process/sub process in terms of fraud risk - Likelihood and Significance.

### Order to Cash (edit)

| | Likelihood | Significance |
|---|---|---|
| | (3) probable | |
| | (2) reasonably possible | |
| | (1) remote | |
| 1. **Customer Master File Maintenance** (Frank Halls...) | ☒ | ☒ |
| 2. Pricing & Order Proc'g (Frank Halls...) | ☒ | ☒ |
| 3. Invoicing (Frank Halls...) | | ☒ |
| 4. Sales on Consignment (Frank Halls...) | ☒ | ☒ |
| 5. Credit and Collections (Frank Halls...) | ☒ | ☒ |
| 6. Allowances for Doubtful debts (Frank Halls...) | | ☒ |
| 7. Returns Revenue Recognition (Frank Halls...) | | ☒ |
| 8. Incentive Programs (Frank Halls...) | | ☒ |

Submit     View Results

## 2 Fraud RISK ASSESSMENT

Nexia has developed a comprehensive approach to assessing the organization's Fraud Risks, based on;

• mapping the organization's business processes to the Nexia Axenaware ™ library of fraud risks by process and creating a unique organization-specific library of potential fraud risks — both company-wide and SOA specific

• an organization-wide Fraud Risk Survey using extracts from the above in order to identify and establish the consensus on the key risk areas

• Risk Workshop(s) at either or all of Corporate, Business Process, Financial Statement level to engage the (selected) key players in a more detailed risk assessment exercise, and to identify appropriate controls required to prevent or detect identified key fraud risks

• interviews with selected senior executives and staff to follow-up on identified key risks and map out remediation plans

The output from this exercise is a Key Fraud Risk Remediation Plan

MVI/Palaxar - PI
234



3 Anti-Fraud CONTROLS

MVI/Palaxar - PI
235

# 3 Anti-Fraud CONTROLS

## Control Activities

Once the fraud risk assessment has taken place, the organization should identify the control activities implemented to mitigate the identified fraud risk. In the context of an antifraud management program, control activities are those actions taken by management to identify, prevent and mitigate fraudulent financial reporting or misuse of an organization's assets. Antifraud control activities should occur throughout the organization, at all levels and in all functions. They include a range of activities as diverse as approvals, authorizations, verifications, reconciliations, segregation of duties, reviews of operating performance and security of assets.

Management should evaluate whether appropriate internal controls have been implemented in any areas management has identified as posing a higher risk of fraudulent activity (such as revenue recognition and non-standard journal entries), as well as controls over the entity's financial reporting process and the potential for management override. Because of the importance of information technology in supporting operations and the processing of transactions, management also needs to implement and maintain appropriate controls, whether automated or manual, over computer-generated information.

The environment in which an entity operates affects the fraud risks to which it is exposed and may present unique external reporting requirements, or special legal or regulatory requirements. An entity's antifraud program must consider whether the controls implemented are adequate to address all of the individual entity's specific business activities; whether these controls are properly designed for the purposes of detecting, deterring and mitigating the particular fraud risks to which the entity is exposed; and whether these controls are being applied properly to sufficiently address the entity's unique business operations and fraud risks.

## 3 Anti-Fraud CONTROLS

### Control Activities

### Design and Documentation

Management should design the necessary control activities to respond to the assessed fraud risks.

The necessary control activities should be documented in a manner that will ensure that each of the significant fraud exposures identified during the risk assessment process has been adequately mitigated.

This is generally done through a linking or mapping process of the business procedure, relating the risk of potential misstatement to the control activities and then to the relevant financial statement assertions. The audit committee should evidence its oversight and approval of the adequacy of the design and operating effectiveness of the control activities in minutes of its meetings.

Internal audit or a third party working on behalf of the audit committee should evaluate the effectiveness of the design of control activities through a walk-through.

MVI/Palaxar - PI
237

Case 6:07-cv-01788-JA-GJK    Document 24-6    Filed 01/04/08    Page 60 of 71

## 3 Anti-Fraud CONTROLS

| ID | Process | Sub-Process | Controls |
|----|---------|-------------|----------|
| 1 | Fraud Policies and Organizational Awareness | Policies & Procedures | Fraud & Investigation, Business Ethics and Conflict of Interest policies circulated to all staff |
| 2 | Fraud Policies and Organizational Awareness | Policies & Procedures | Business Ethics policy with the Employment Conditions and Job Descriptions circulated to all staff |
| 3 | Fraud Policies and Organizational Awareness | Policies & Procedures | Conflict of Interest Policy clear and well communicated |
| 4 | Fraud Policies and Organizational Awareness | Policies & Procedures | Conflict of Interest Policy actively monitored and enforced |
| 5 | Fraud Policies and Organizational Awareness | Policies & Procedures | Clear policy on dealing with Competitors Clearly defined policies regarding the prosecution of fraud and theft circulated to all staff |
| 6 | Fraud Policies and Organizational Awareness | Policies & Procedures | Clear policies on treatment of employees who have reported fraud to protect them from being victimised |
| 7 | Fraud Policies and Organizational Awareness | Policies & Procedures | Anti-money laundering policy established |
| 8 | Fraud Policies and Organizational Awareness | Policies & Procedures | Whistle-blowing policy established whereby individuals may (anonymously if desired) report suspected incidences of fraud |
| 9 | Fraud Policies and Organizational Awareness | Policies & Procedures | Telephone calls may be recorded and electronic communication monitored |
| 10 | Fraud Policies and Organizational Awareness | Policies & Procedures | Regular checks for electronic surveillance devices, especially in the Boardroom and offices |
| 11 | Fraud Policies and Organizational Awareness | Policies & Procedures | Independent Audit Committee |
| 12 | Fraud Policies and Organizational Awareness | Policies & Procedures | Independent Audit/Compliance Function reporting directly to the Board of Directors or other independent forum |
| 13 | Fraud Policies and Organizational Awareness | Policies & Procedures | Level of risk acceptance defined in material terms |
| 14 | Fraud Policies and Organizational Awareness | Awareness & Communications and Training | Effective communication within the company on fraud issues |

\Controls Master \ Risk_Master \ Sheet2 \ Sheet3

## 3. Anti-Fraud CONTROLS

Nexia has developed a comprehensive approach to assessing the adequacy of an organization's Anti-Fraud Controls, based on;

• mapping the organization's business processes to the Nexia Axenaware™ library of fraud controls by process and creating a unique organization-specific library of potential fraud controls – both company-wide and SOA specific
• an organization–wide controls review leveraging on the Fraud Risk Survey in order to identify the existence of adequate controls in the identified key risk areas
• a Fraud Controls Survey to capture views and evaluate the effectiveness of controls in protecting against, detecting or mitigating the impact of fraud
• Risk Workshop(s) at identified Corporate, Business Process, Financial Statement level to engage the (selected) key players in a more detailed assessment exercise, and to develop appropriate controls to fill gaps in areas of identified key fraud risks
• interviews with selected senior executives and staff to follow-up on identified gaps in key controls and map out remediation plans

The output from this exercise is a Key Fraud Control Remediation Plan



## 4 SEGREGATION OF DUTIES

### Segregation of Duties

Segregation of duties is a basic, key internal control and one of the most difficult to achieve. It is used to ensure that errors or irregularities are prevented or detected on a timely basis by employees in the normal course of business. Segregation of duties provides two benefits: 1) a deliberate fraud is more difficult because it requires collusion of two or more persons, and 2) it is much more likely that innocent errors will be found. At the most basic level, it means that no single individual should have control over two or more phases of a transaction or operation. Management should assign responsibilities to ensure a crosscheck of duties.

If a single person can carry out and conceal errors and/or irregularities in the course of performing their day-to-day activities they have generally been assigned or allowed access to incompatible duties or responsibilities . Some examples of incompatible duties are:

v   Authorizing a transaction, receiving and maintaining custody of the asset that resulted from the transaction.

v   Receiving checks (payment on account) and approving write-offs.

v   Depositing cash and reconciling bank statements.

v   Approving time cards and having custody of pay checks.

v   Having unlimited access to assets, accounting records and computer terminals and programs. For instance having access and using checks as the source documents to post to accounting records rather than using a check log or receipts.



4 SEGREGATION OF DUTIES

## Segregation of Duties

There are four general categories of duties or responsibilities which are examined when segregation of duties are discussed:

• authorization

• custody

• record keeping

• reconciliation

In an ideal system, different employees would perform each of these four major functions. In other words, no one person should have control of two or more of these responsibilities. The more negotiable the asset, the greater the need for proper segregation of duties - especially when dealing with cash, negotiable checks and inventories.

In those instances where duties cannot be fully segregated, mitigating or compensating controls must be established. Mitigating or compensating controls are additional procedures designed to reduce the risk of errors or irregularities

MVI/Palaxar - PI
241



4 SEGREGATION OF DUTIES

**Authorization:** the process of reviewing and approving transactions or operations.
Some examples are:

v  Verifying cash collections and daily balancing reports.
v  Approving purchase requisitions or purchase orders.
v  Approving time sheets, payroll certifications, leave requests and cumulative leave records.
v  Approving change orders, computer system design or programming changes.

**Custody:** having access to or control over any physical asset such as cash, checks, equipment, supplies, or materials.
Some examples are:

v  Access to any funds, through the collection of funds, or processing of payments.
v  Access to safes, lock boxes, file cabinets or other places where money, checks or other assets are stored.  >   Custodian of a petty cash or change fund.
v  Receiving any goods or services.  >   Maintaining inventories.
v  Handling or distributing pay checks/advices, limited purchase checks or other checks.

## 4 SEGREGATION OF DUTIES.



**Record Keeping:** the process of creating and maintaining records of revenues, expenditures, inventories, and personnel transactions. These may be manual records or records maintained in automated computer systems. Some examples are:

v  Preparing cash receipt back-ups or billings, purchase requisitions, payroll certifications, and leave records.

v  Entering charges or posting payments to an accounts receivable system.

v  Maintaining inventory records.

**Reconciliation:** verifying the processing or recording of transactions to ensure that all transactions are valid, properly authorized and properly recorded on a timely basis. This includes following up on any differences or discrepancies identified. Examples are:

v  Comparing billing documents to billing summaries.

v  Comparing funds collected to accounts receivable postings.

v  Comparing collections to deposits.

v  Performing surprise counts of funds.

v  Comparing payroll certifications to payroll summaries;  >  Performing physical inventory counts.

v  Comparing inventory changes to amounts purchased and sold.

v  Reconciling departmental records of revenue, expenditure, and payroll transactions to the PeopleSoft management reports.



## 4 SEGREGATION OF DUTIES

Nexia has a relationship with Fox Technologies who have developed a software product (see attached) to automate the effectiveness of an organization's Anti-Fraud Controls, based on;

• mapping the organization's business processes to the Nexia Axenaware™ library of fraud controls by process and creating a unique organization-specific library of potential fraud controls – both company-wide and SOA specific

• an organization-wide controls review leveraging on the Fraud Risk Survey in order to identify the existence of adequate controls in the identified key risk areas

• a Fraud Controls Survey to capture views and evaluate the effectiveness of controls in protecting against, detecting or mitigating the impact of fraud

• Risk Workshop(s) at identified Corporate, Business Process, Financial Statement level to engage the (selected) key players in a more detailed assessment exercise, and to develop appropriate controls to fill gaps in areas of identified key fraud risks

• interviews with selected senior executives and staff to follow-up on identified key gaps and map out remediation plans

The output from this exercise is a <u>Key Fraud Control Remediation Plan</u>



## 4 SEGREGATION OF DUTIES

### Segregation of Duties Proactive Detection for Mitigating Controls

This is a solution for real-time identification of segregation of duties violations across multiple financial systems. It strengthens internal controls by monitoring all of the financial systems and analyzing every transaction for mistakes and violations as they occur.

For example, the system will alert you if a single employee has entered and approved an invoice, made a requisition and approved it, or ordered and received goods.

Once the system notifies the appropriate person, the organization can quickly validate the activity or correct the problem.

You can set ERP controls at a level that enables employees to get their work done efficiently without sacrificing the quality of your processes and data. The system continuously monitors 100 percent of transactions to alleviate mistakes and violations.

<u>Sample Order-to-Cash Integrity Checks</u>

- Customer order entered by the same person who approves or maintains customer
- Credit information or who has ability to maintain customer addresses.
- Shipment shipped by the same person who placed the customer order and/or picked the order
- Cash application was applied by the same person who created the invoice and/or entered the cash receipt.
- Return authorization processed by the same person who entered the original order.



## 4 EXECUTIVE INTEGRITY & ETHICAL BEHAVIOR

MVI/Palaxar - PI
246



# 4 EXECUTIVE INTEGRITY & ETHICAL BEHAVIOR

The concept is to complete the end-to-end solution, having already covered policies and procedures, risks, controls and monitoring/enforcement tools with a focus on the other key factor in fraud – the human angle, and the potential for people to commit fraud. This product is focused on the Ethical and Integrity Standards of executives.

The intention is to develop a unique product which;

- leverages existing academic research on the human condition (psychology) as it applies to this area
- utilizes existing algorithms and predictive databases which we will get access to
- captures financial and lifestyle data voluntarily completed by (senior) executives, and
- identifies potential 'at risk' fraud candidates.

Target market is major corporations and the value proposition is to prevent and detect (human) fraud risk.

We are exploring the added value of;

- creating a Certified/Accreditation Program which we would seek to get franked at government / Professional Body level
- offering accreditation at individual and corporate level
- backing our certification with insurance ( '..we remove your fraud risk..')

Charging basis to be developed but needs to reflect the cost of insurance (risk) and likely to include;

- Consulting Fee (per head)
- Certification Fee ( initial)
- Re-Certification Fee (annual or sooner)

# 4 EXECUTIVE INTEGRITY & ETHICAL BEHAVIOR

The term "Code of Ethics" is defined in the SEC's Final Rule entitled "Disclosure Required by Sections 406 and 407 of the Sarbanes-Oxley Act of 2002" as written standards that are reasonably designed to deter wrongdoing and to promote:

• Honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships
• Full, fair, accurate, timely and understandable disclosure in reports and documents that a registrant files with, or submits to, the SEC and in other public communications made by the registrant
• Compliance with applicable governmental laws, rules and regulations
• The prompt internal reporting of violations of the code to an appropriate person or persons identified in the code
• Description of what constitutes fraudulent behavior
• Accountability for adherence to the code and the sanctions to be imposed on those who breach it

The Code of Ethics as set out above applies to the company's principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions. If it has not adopted such a code of ethics, it must explain why. The NYSE and NASDAQ rules require the adoption and public disclosure of a code of business conduct and ethics that applies to all directors, officers and employees and outlines specific topics that must be addressed.

## Key Questions for Nexia in developing Scope of Service

1. Definition of what will be included in-scope – anti-fraud or economic crime (see PwC Survey definitions)?

2. Will we include Anti-Money Laundering in the Solutions set?

3. Are we promoting 'Fraud' solutions per se or 'Fraud' solutions primarily/just in the context of Sarbanes-Oxley?

4. What skills sets are required to deliver these solutions?

5. How do we take the solutions to market?

6. Who do we target as the buyer – Board level?

MVI/Palaxar - PI
249