## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

| | |
|---|---|
| MIRABILIS VENTURES, INC. and<br>NEXIA STRATEGY CORPORATION,<br><br>Plaintiffs,<br>-vs-<br><br>PALAXAR GROUP, LLC;<br>PALAXAR HOLDINGS, LLC;<br>FRANK HAILSTONES; EDITH<br>CURRY a/k/a EDITH BROADHEAD;<br>and FICTITIOUS DEFENDANT 1;<br>FICTITIOUS DEFENDANT 2;<br>FICTITIOUS DEFENDANT 3;<br>FICTITIOUS DEFENDANT 4;<br>FICTITIOUS DEFENDANT 5;<br>FICTITIOUS DEFENDANT 6;<br>FICTITIOUS DEFENDANT 7;<br>FICTITIOUS DEFENDANT 8,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)   CASE NO.: 6:07-CV-1788-ORL-28-KRS<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## DEFENDANTS' JOINT MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Defendants PALAXAR GROUP, LLC ("PALAXAR"), PALAXAR HOLDINGS, LLC ("PALAXAR HOLDINGS"), FRANK HAILSTONES ("HAILSTONES"), and EDITH CURRY, a/k/a EDITH BROADHEAD ("CURRY") (collectively "Defendants"), by and through their respective undersigned attorneys, submit this their Joint Memorandum of Law in Opposition to Plaintiffs' Motion for Preliminary Injunction.

## I.    STATEMENT OF FACTS

During the relevant time period, Plaintiff MIRABILIS VENTURES, INC. ("MIRABILIS") was an equity fund that invested in a variety of ventures. *See* Plaintiffs' Complaint ("Compl") at ¶ 12. During this same time, Plaintiff NEXIA STRATEGY



EXHIBIT
A

CORPORATION ("NEXIA"), a wholly owned subsidiary of MIRABILIS, provided a broad range of general business consulting services. *See* Compl at ¶ 13.

Frank Amodeo, a self-proclaimed venture capitalist, held complete and exclusive control over the day-to-day affairs and operations of both MIRABILIS and NEXIA. *See* Affidavit of FRANK HAILSTONES, contemporaneously filed herewith ("Hail Aff."), at ¶ 9. Amodeo was the only Class "A" shareholder of MIRABILIS. He had voting control of MIRABILIS, which owned all the shares of NEXIA. *See* Hail Aff. at ¶ 9. Frank Amodeo attended and directed almost all of the Board meetings. He appointed and replaced officers and directors at his pleasure. He controlled all financial and administrative decisions for MIRABILIS and NEXIA. *See* Hail Aff. at ¶ 22. As the ultimate decision-maker for MIRABILIS and NEXIA, Amodeo frequently disregarded corporate formalities, but occasionally got Board approval for his actions. *See* Hail Aff. at ¶ 24.

On October 12, 2007, Plaintiffs filed suit against Defendants CURRY, HAILSTONES, PALAXAR, and PALAXAR HOLDINGS. CURRY and HAILSTONES are alleged to have invented an anti-fraud certification program, known as Nexia Certification Program ("Nexia Certification"), while they were involved with MIRABILIS and NEXIA. *See* Compl at ¶ 16. In connection with their departures from MIRABILIS and NEXIA, CURRY and HAILSTONES are alleged to have stolen Nexia Certification, purportedly in violation of their employment contracts and fiduciary duties. *See* Compl at ¶¶ 21-33. MIRABILIS and NEXIA now seek injunctive relief against Defendants from selling, marketing, or offering Nexia Certification.

Plaintiffs' allegations are not supported either by the evidence or applicable law. Significantly, Plaintiffs never owned the intellectual property rights to Nexia Certification. CURRY was the inventor and owner of the patent encompassing Nexia Certification. In fact, to leave no doubt as to the ownership status of Nexia Certification, MIRABILIS assigned and

191456_6.doc

- 2 -

disclaimed any rights, title, and interest it may have otherwise had in Nexia Certification in favor of CURRY. Two agreements evidence this transfer – an assignment agreement dated August 1, 2006, between MIRABILIS and CURRY, HAILSTONES, Laurie Holtz, and Michael Dement (the "Assignment Agreement"), and a separation agreement dated October 26, 2006 between MIRABILIS and CURRY (the "Separation Agreement"). These agreements were extensively negotiated. Each was personally approved by Frank Amodeo, Laurie Holtz (Chairman of MIRABILIS' Board), and Richard Berman (a MIRABILIS Board member and its Chief Legal Counsel). *See* Hail Aff. at ¶¶ 27-28, 36-38; and the Affidavit of Defendant EDITH CURRY, contemporaneously filed herewith ("Curry Aff."), at ¶¶ 15-19.

Before her involvement with MIRABILIS and NEXIA, CURRY had created a method for using individuals' personal financial behavior to assess those individuals' suitability for positions of trust. Curry Aff. at ¶ 5. Before her involvement with MIRABILIS and NEXIA, CURRY had sought to commercialize this algorithm with Michael Dement. *See* Curry Aff. at ¶ 5. CURRY was hired by Frank Amodeo, around June 2005, to establish and manage NEXIA's headquarters, at which a call center, insurance operations, PEO processing, and benefits administration would be located. *See* Curry Aff. at ¶ 6. Amodeo eventually decided that NEXIA's headquarters would be located in Richmond, Virginia. CURRY's employment by NEXIA had nothing to do with the algorithm CURRY had already created and had been seeking to commercialize. *See* Curry Aff. at ¶ 6.

However, once Frank Amodeo became aware of CURRY's prior work in early 2006, he expressed interest in it. Amodeo suggested that MIRABILIS and NEXIA could fund the development and commercialization of the algorithm for CURRY if she successfully set up the Richmond Call Center/PEO operations. Afterwards, CURRY, HAILSTONES, and others at

191456_6.doc

MIRABILIS and NEXIA, starting referring to the algorithm as the "Nexia Certification Program." *See* Curry Aff. at ¶ 9.

CURRY and Frank Amodeo began to have frequent discussions about the subject. Amodeo assured CURRY that he would fund the development of Nexia Certification as well as a separate set of companies in Virginia that would market it. *See* Curry Aff. at ¶¶ 9-10. In return, CURRY agreed that MIRABILIS and NEXIA could license Nexia Certification. None of these discussions, however, were reduced to writing. *See* Curry Aff. at ¶ 10. MIRABILIS and NEXIA did begin investing in the development of Nexia Certification, but limited to paying legal fees, travel costs, and other similar costs. Neither MIRABILIS nor NEXIA ever paid for separate office space. Neither hired any employees to work solely on Nexia Certification. *See* Curry Aff. at ¶ 11.

On or around July 28, 2006, EDITH CURRY and Frank Amodeo had a meeting. They discussed the ownership of Nexia Certification. Amodeo acknowledged that CURRY owned all rights and title to it and, at her request, he even signed a handwritten note to that effect. *See* Curry Aff. at ¶ 15; Hail Aff. at ¶ 27; Exh. "B" to Hail Aff. CURRY took this handwritten note to Scott Goldberg, an attorney then working in-house for MIRABILIS (and now one of Plaintiffs' counsel!). Goldberg thereafter drafted the Assignment Agreement to confirm her ownership of Nexia Certification. *See* Curry Aff. at ¶ 16; Hail Aff. at ¶ 28; Exh. "A" to CURRY's Answer and Affirmative Defenses ("Curry Answ."). A few days later, Frank Amodeo, in the presence of CURRY, directed HAILSTONES to execute the Assignment Agreement on behalf of MIRABILIS. *See* Curry Aff. at ¶ 16; Hail Aff. at ¶ 28.

In exchange for the investments that MIRABILIS and NEXIA made, CURRY agreed MIRABILIS' designated affiliate would have a "world-wide, royalty-free, fully paid up,

perpetual, irrevocable, non-exclusive license" to use Nexia Certification. The precise terms are included in the Assignment Agreement. *See* Hail Aff. at ¶ 29; Exh. "A" to Curry Answ.

Early in September 2006, Frank Amodeo informed HAILSTONES and CURRY that MIRABILIS would stop funding the Richmond operations as of October 15, 2006. *See* Hail Aff. at ¶ 35; Curry Aff. at ¶ 17. CURRY immediately began negotiating a separation agreement for herself. *See* Curry Aff. at ¶¶ 17-18; Hail Aff. at ¶ 36. CURRY communicated extensively with Frank Amodeo, Richard Berman (a MIRABILIS Board member and its Executive Vice President and Chief Legal Counsel), and Laurie Holtz (Chairman of MIRABILIS' Board). *See* Curry Aff. at ¶¶ 17-18; Exh. "E" to Curry Aff; Hail Aff. at ¶ 36; Exh. "D" to Hail Aff. Other MIRABILIS employees and senior employees of affiliated companies were also aware of CURRY's negotiations. *See* Curry Aff. at ¶ 18; Hail Aff. at ¶ 37.

HAILSTONES became involved in the later stages of the negotiations between CURRY and MIRABILIS. On or around October 26, 2006, Laurie Holtz and HAILSTONES received an email from Richard Berman stating his opinion that the final deal represented "fair value." *See* Hail Aff. at ¶ 38. On or around that same day, HAILSTONES signed the Separation Agreement that had been drafted by Richard Berman and approved by Frank Amodeo. *See* Hail Aff. at ¶ 38; Exh. "B" to Curry Answ.

The Separation Agreement reconfirmed that all rights, title, and interest in Nexia Certification belonged to EDITH CURRY. *See* Hail Aff. at ¶ 41; Exh. "B" to Curry Answ. The Separation Agreement contemplated that CURRY would create a new entity for the purpose of advancing Nexia Certification and performing consulting work. *See* Hail Aff. at ¶ 41; Curry Aff. at ¶ 19; Exh. "B" to Curry Answ. Her new entity (PALAXAR) would execute a note in the amount of $500,000.00 to be paid to a new MIRABILIS entity from the first profits it earned. *See* Hail Aff. at ¶ 41; Curry Aff. at ¶ 19; Exh. "B" to Curry Answ. The two would then engage

191456_6.doc

- 5 -

in a "joint venture" from which the gross revenues would be shared equally. *See* Hail Aff. at ¶ 41; Curry Aff. at ¶ 19; Exh. "B" to Curry Answ.

In accordance with the Assignment Agreement and Separation Agreement, CURRY had formed Defendants, PALAXAR and PALAXAR HOLDINGS, to develop and market Nexia Certification. *See* Curry Aff. at ¶ 21. HAILSTONES, on behalf of NEXIA, maintained contact with CURRY after she left. He did so in an effort to implement the terms of her Separation Agreement and to generate business for NEXIA. *See* Curry Aff. at ¶ 21; Hail Aff. at ¶¶ 43-44. Frank Amodeo and the MIRABILIS Board were fully aware of HAILSTONES' and CURRY's attempts to commercialize Nexia Certification following CURRY's departure from NEXIA. *See* Hail Aff. at ¶ 43-44.

Around early January 2007, Frank Amodeo announced that MIRABILIS would no longer fund NEXIA at all and that HAILSTONES' consulting position would therefore be eliminated. *See* Hail Aff. at ¶ 48. In late January 2007, HAILSTONES negotiated a termination and release package for himself from MIRABILIS and NEXIA. His negotiations were with Amodeo, Mark Bernet, and Bill Walsh. *See* Hail Aff. at ¶ 51; pages 19-21 of Exhibit "4" to the Declaration of Jodi Jaiman ("Jaiman Dec."). On January 31, 2006, HAILSTONES left MIRABILIS, but MIRABILIS has never fulfilled any of its obligations to him under the termination and release package to which it had agreed. *See* Hail Aff. at ¶ 51.

HAILSTONES has never been a member or employee of either PALAXAR or PALAXAR HOLDINGS. *See* Hail Aff. at ¶¶ 4, 31. Since leaving MIRABILIS on January 31, 2007, HAILSTONES has received no remuneration relating to Nexia Certification from CURRY, PALAXAR, PALAXAR HOLDINGS, or any other sources. *See* Hail Aff. at ¶ 54. HAILSTONES currently has no financial interest in Nexia Certification. *See* Hail Aff. at ¶ 54.

191456_6.doc

In continuing the development of Nexia Certification, CURRY is acting consistent with the terms of her Separation Agreement from MIRABILIS and NEXIA. However, at this time, she has yet to realize any revenues from Nexia Certification, and therefore, no payments on the $500,000.00 note have been made. *See* Hail Aff. at ¶ 54; Curry Aff. at ¶ 23. Moreover, MIRABLIS has not fulfilled its obligations under CURRY's Separation Agreement. MIRABILIS is a defunct corporation and has failed to set up a new entity to which the $500,000.00 note could be drawn. PALAXAR has nevertheless always attempted to honor its obligation under CURRY's Separation Agreement. *See* Curry Aff. at ¶ 22.

## II.    ARGUMENT

In the case at bar, Plaintiffs are not entitled to a preliminary injunction. The purpose of a preliminary injunction is to protect against irreparable injury and preserve the status quo until the district court renders a meaningful decision on the merits. Northeastern Fla. Chapter of the Ass'n of Gen. Contractors v. City of Jacksonville, 896 F.2d 1283, 1284 (11th Cir. 1990); U.S. v. Lambert, 695 F.2d 536, 539-40 (11th Cir. 1983); Baker v. School Bd. of Marion County, Fla., 487 F.Supp. 380, 382 (M.D. Fla. 1980). A district court may grant a preliminary injunction only if the moving party shows that: (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest. Klay v. United Healthgroup, Inc., 376 F.3d 1092, 1097 (11th Cir. 2004); Anheuser-Busch, Inc. v. A-B Distributors, Inc., 910 F.Supp. 587, 589 (M.D.Fla. 1995); Doctors Hospital of Sarasota, Inc. v. Califano, 455 F.Supp. 476, 478 (M.D. Fla. 1978). "A preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the burden of

191456_6.doc

persuasion as to each of the four prerequisites." <u>Siegel v. LePore</u>, 234 F.3d 1163, 1176 (11th Cir. 2000) (citations omitted).

Plaintiffs cannot carry their burden in showing that they meet any of the four elements required for the issuance of a preliminary injunction. First, Plaintiffs will suffer no irreparable harm if the injunction is not granted. To make a showing of irreparable harm, which is "the sine qua non of injunctive relief," the movant must demonstrate an injury that "is neither remote nor speculative" but instead "actual and imminent." <u>Siegel</u>, 234 F.3d at 1176 (citations omitted). In addition, an injury is "irreparable" only if it cannot be remedied by money damages – "[t]he possibility that adequate compensatory or other corrective relief will be available...weighs heavily against a claim of irreparable harm." <u>United States v. Jefferson County</u>, 720 F.2d 1511, 1520 (11th Cir. 1983). The injuries alleged by Plaintiffs can be remedied by money damages. Second, the threatened injury to Defendants should an injunction be granted is much greater than might be suffered by Plaintiffs in the absence of an injunction. At this time, Plaintiffs, as defunct companies, have no ability or means to develop or market Nexia Certification. Defendants have both the means and ability to do so. Third, the issuance of an injunction would be adverse to the public interest. Development and marketing of Nexia Certification will benefit the public. Use of this program in the business community will reduce corruption and increase employee and management accountability. Fourth, and finally, Plaintiffs cannot show that they have a substantial likelihood of success on the merits. Under patent law, Plaintiffs MIRABILIS and NEXIA never had any intellectual property rights in Nexia Certification. Even assuming arguendo that Plaintiffs did, they executed valid and binding assignment documents transferring all rights to CURRY.

191456_6.doc

## A.     Plaintiffs Will Suffer No Irreparable Injury If an Injunction Is Not Granted

The Eleventh Circuit has emphasized that "[a] showing of irreparable injury is the *sine qua non* of injunctive relief" and that "the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper." Siegel, 234 F.3d at 1176 (citations omitted); see also Baker, 487 F.Supp. at 382 ("the principal and overriding prerequisite is, nevertheless, the existence of irreparable injury resulting from an inadequate remedy at law").   "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." Jefferson County, 720 F.2d at 1520.[1]   In addition, to make a showing of irreparable harm, the movant must demonstrate an injury that "is neither remote nor speculative" but instead "actual and imminent." Siegel, 234 F.3d at 1176.

In this case, neither Plaintiff is still an active business.  Neither is capable of using Nexia Certification even if it owned the program.   Indeed, NEXIA found it necessary to revive its corporate existence with the State of Florida at the eleventh hour simply to pursue this lawsuit. *See* Compl at ¶ 2; Curry Aff. at ¶ 22.  The record shows, of course, that Defendants thus far have not made a penny utilizing Nexia Certification.  As such, any potential harm at present is neither "actual nor imminent," but rather "remote and speculative."    Siegel, 234 F.3d at 1176.

---

[1]   See also Northeastern Florida Chapter of Ass'n of General Contractors of America v. City of Jacksonville, Fla, 896 F.2d 1283, 1286 (11th Cir. 1990) (concluding that plaintiff had failed to demonstrate irreparable injury entitling it to preliminary injunction where it was unclear that injured persons could not obtain adequate relief by money damages following full trial); Overstreet v. Lexington-Fayette Urban County Government, 305 F.3d 566, 579 (6th Cir. 2002) ("The fact that an individual may lose his income for some extended period of time does not result in irreparable harm, as income wrongly withheld may be recovered through monetary damages"); Faculty Senate of Florida Int'l University v. Winn, 477 F.Supp.2d 1198, 1208 (S.D.Fla. 2007) ("Irreparable harm is injury for which a monetary award cannot be adequate compensation.") (citation omitted).

Moreover, should Defendants succeed in marketing Nexia Certification, Plaintiffs will still have the ability to seek an award of monetary damages against them.

Particularly indicative of a lack of irreparable harm is the timing of Plaintiffs' filing this very action. A delay in seeking preliminary injunction weighs against a finding of irreparable harm because it "tends to neutralize any presumption [of] irreparable harm pending trial, and such delay alone may justify denial of a preliminary injunction." Seiko Kabushiki Kaisha v. Swiss Watch International, Inc., 188 F.Supp.2d 1350, 1355-56 (S.D. Fla. 2002) (citations omitted); see also Hi-Tech Pharmaceuticals, Inc. v. Herbal Health Products, Inc., 311 F.Supp.2d 1353, 1357-58 (N.D. Ga. 2004); Mobile County Water, Sewer and Fire Protection Authority, Inc. v. Mobile Area Water and Sewer System, Inc., No. 07-0357-WS-M, 2007 WL 3208587, *6 (S.D. Ala. Oct. 29, 2007); GoNannies, Inc. v. Goupair.Com, Inc., 464 F.Supp.2d 603, 609 (N.D.Tex. 2006). Plaintiffs waited over nine months until they filed suit in state court on October 12, 2007. They moved for a preliminary injunction at that time, yet Plaintiffs did nothing to bring the motion before the state court for hearing. Nor did Plaintiffs seek to have their Motion for Preliminary Injunction once the action was removed from state court. This Court, of its own volition, has set the matter down for a hearing thereby forcing Plaintiffs to address the issue. Such unjustified delay undercuts any sense of urgency and demonstrates that a preliminary injunction is not warranted. Seiko Kabushiki Kaisha, 188 F.Supp.2d at 1355-56.

**B.      The Threatened Injury to Plaintiffs Does Not Outweigh the Possible Damages to Defendants**

In balancing whether the threatened injury to a movant for preliminary injunctive relief outweighs the potential damage to the adverse party, the focus must be on any harm that will occur between the grant of the injunction and a final trial on the merits. See Alabama v. U.S. Army Corps of Engineers, 424 F.3d 1117, 1133-34 (11th Cir. 2005) (citing United States v.

191456_6.doc

Lambert, 695 F.2d 536, 539-40 (11th Cir. 1983)). In this case, neither Plaintiff is in any position to market Nexia Certification. CURRY alone possesses the algorithms necessary to make Nexia Certification work. *See* Curry Aff. at ¶¶ 5, 18. Practically speaking therefore Plaintiffs are incapable of promoting or utilizing the program. Conversely, although PALAXAR has no contracts pending at the present time, it intends to market Nexia Certification to governmental and business entities. If an injunction is not entered, there can be no detrimental effect on Plaintiffs MIRABILIS and NEXIA. Such an injunction, if entered however, would be devastating to the legitimate business interests of Defendants CURRY, PALAXAR, and PALAXAR HOLDINGS. Moreover, as more fully explained above, even if Plaintiff prevails and Defendants are somehow found to have wrongfully profited from Nexia Certification between now and a trial on the merits, then Plaintiffs may always be made whole by recovery of monetary damages.

**C.     The Issuance of an Injunction Would be Adverse to the Public Interest**

The third essential showing is that an injunction – if entered – will not be adverse to the public interest. Klay v. United Healthgroup, Inc., 376 F.3d 1092, 1097 (11th Cir. 2004). More specifically, the Court must balance the threat of irreparable injury to plaintiff with whatever harm the preliminary injunction will cause to the public interest. Wilkes v. Internal Revenue Service Jacksonville Dist., 509 F.Supp. 305, 309 (M.D. Fla. 1981). This Court has emphasized that if there is any doubt as to whether a public interest is threatened, "*the Court must rule on the side of that public interest.*" Martinez v. School Bd. of Hillsborough County, Fla., 675 F.Supp. 1574, 1582 (M.D. Fla. 1987). In disputes between private litigants, this factor is often of little moment. The case now at bar is different. The public unquestionably has an interest in this action and, once again, Plaintiffs MIRABILIS and NEXIA are incapable of showing that the grant of an injunction will further that interest.

191456_6.doc

Nexia Certification is a process for evaluating individuals' personal financial behavior to assess those individuals' suitability for positions of trust and to preemptively identify risks to the integrity of organizations. *See* Curry Aff. ¶ 23. It is designed to ferret out fraudulent and corrupt individuals before they are able to inflict significant damage upon the organization with which they are affiliated. In pilot projects recently conducted by PALAXAR for government agencies and private security firms, Nexia Certification has proved remarkably successful in indentifying individuals unsuitable for positions of trust. *See* Curry Aff. ¶ 23. Consequently, this product appears to have tremendous potential for furthering both public and private financial welfare.

Only as a result of actual daily use in the field once Nexia Certification has been placed on the market can latent bugs be uncovered, potential enhancements be identified, and further improvements then become a reality. The public interest demands this product be deployed in the marketplace without undue delay. Plaintiffs' Motion for Preliminary Injunction seeks to effect such a delay. Any injunction is thus contrary to the public interest and is due to be denied.

**D.     Plaintiffs Do Not Have a Substantial Likelihood of Success on the Merits**

Even if Plaintiffs could somehow satisfy the other three factors for granting preliminary relief, Plaintiffs' are still incapable of showing a "substantial likelihood of success on the merits." In this action, Plaintiffs are frustrated by both the law and the facts. A party cannot assert patent rights over a patent that it does not possess. Herbert F. Schwartz, <u>Patent Law and Practice</u>, 43, n. 8 (5th ed., BNA Books 2006) (citing <u>Prima Tek II, L.L.C. v. A-Roo Co.</u>, 222 F.3d 1372, 1382 (Fed. Cir. 2000)). Under principles of black letter patent law, neither MIRABILIS nor NEXIA had an ownership interest in Nexia Certification. Neither can claim therefore that it was somehow misappropriated. <u>Even if Plaintiffs had in fact the prior ownership they now claim, the evidence conclusively demonstrates that Plaintiffs validly assigned away such interest as a result of arms length negotiations with Defendant CURRY.</u> Finally, Plaintiffs

191456_6.doc

- 12 -

cannot enforce a restrictive covenant concerning Nexia Certification when they are no longer continuing in the area or line of business in which Nexia Certification would be marketed and sold. § 542.33(2)(a), Fla. Stat. (2006)

### 1. Neither NEXIA Nor MIRABILIS Ever Had Intellectual Property Rights in the Invention of the So-called "Nexia Certification."

#### A. *As a Matter of Law an Inventor Owns the Right to Obtain a Patent Absent an Effective Transfer or Obligation to Assign.*

It is beyond dispute that CURRY conceived of the so-called Nexia Certification invention well before her involvement with MIRABILIS and NEXIA. *See* Curry Aff. at ¶ 5. While "inventorship" and "ownership" are not identical for patent law purposes, inventorship must provide the starting point for determining ownership of patent rights. In the case at bar, Defendant CURRY is the inventor. Curry Aff. ¶¶ 5, 9, 16. "The inventor or inventors named on an issued patent are presumed to be the true and only inventors." Schwartz, Patent Law and Practice, 96 (citing Board of Educ. v. American Bioscience, 333 F.3d 1330, 1337 (Fed. Cir. 2003)). Absent an effective transfer or the obligation to assign the patent rights, "[a] patent gives its owner the right to exclude others from making, using, offering for sale, selling, or importing the patented invention." Schwartz, Patent Law and Practice, 42 (citing Banks v. Unisys Corp., 228 F.3d 1357, 1359 (Fed. Cir. 2000)). Finally, U.S. law provides that "[a]pplications for patents, patents, or any interest therein, shall be assignable in law by an instrument *in writing*." 35 U.S.C. § 261 (emphasis added).

As a creature of federal statutory law, a patent can be transferred only as provided by such law. U.S. v. Solomon, 825 F.2d 1292, 1296 (9th Cir. 1987) (quoting 35 U.S.C. § 261) ("The rules governing the transfer and assignment of patent rights clearly envision a scheme of written assignment by providing that patents 'shall be assignable in law by an instrument in writing.'"); see also Valmet Paper Machinery, Inc. v. Beloit Corp., 868 F.Supp. 1085, 1087

(W.D. Wis. 1994); Herman v. William Brooks Shoe Co., No. 94 CIV. 8232(PKL), 1995 WL

303592, *1 (S.D.N.Y. May 18, 1995). Any patent assignment must be in writing, and that

writing must show a clear and unmistakable intent to transfer ownership and be signed by the

patentee or his/her assigns or legal representatives. 35 U.S.C. § 261; see also Dynamic

Manufacturing Inc. v. Craze, No. 2:97CV1165, 1998 WL 241201, at *5 (E.D. Va. Feb. 23,

1998). An assignment from CURRY in favor of Plaintiffs does not exist.

>    B.    *Even Though CURRY and HAILSTONES were Employed by NEXIA and MIRABILIS, They Never Transferred Any Rights Concerning Nexia Certification to Plaintiffs.*

CURRY conceived of the invention prior to her employment by NEXIA and this case

arises in the context of her subsequent employment relationship. Florida, like most states,

follows pre-Erie United States Supreme Court decisions involving ownership of inventive rights.

See Teets v. Chromalloy Gas Turbine Corp., 83 F.3d 403 (Fed. Cir. 1996), cert. denied, 519 U.S.

1009, 136 L. Ed. 2d 402, 117 S. Ct. 513 (1996) (citing State Bd. of Educ. v. Bourne, 7 So.2d

838, 839-40 (1942)). The general rule is that employees own the patent rights to their

inventions, even though the inventions are conceived or reduced to practice during employment.

Teets, 83 F.3d at 407 (applying Florida law) ("Consistent with the presumption that the inventor

owns his invention, an individual owns the patent rights even though the invention was

conceived and/or reduced to practice during the course of employment."); Banks v. Unisys

Corp., 228 F.3d 1357, 1359 (Fed. Cir. 2000); Texas Co. v. Gulf Refining Co., 26 F.2d 394, 396-

97 (5th Cir. 1928) ("An independent invention, made by one while acting as another's employee,

not due to any suggestion made by the employer, belongs to the inventor."). An exception to the

general rule exists for those employees who have essentially agreed to sell or hire out their

inventive faculties. "[A]n employer seeking patent rights to an employee's invention must prove

that 'the contract of employment by express terms or unequivocal inference shows that the

191456_6.doc

- 14 -

employee was hired for the express purpose of producing the thing patented.'" City of Cocoa v. Leffler, 803 So.2d 869 (Fla. 5th DCA 2002) (quoting State Board of Education v. Bourne, 7 So.2d 838 (Fla. 1942)); see also Teets, 83 F.3d at 407 (applying Florida law) ("Under these rules, a Florida employer can not claim ownership of an employee's invention 'unless the contract of employment by express terms or unequivocal inference shows that the employee was hired for the express purpose of producing the thing patented'").

MIRABILIS' employment of CURRY was wholly unrelated to Nexia Certification or the invention of a product or process of any kind.  Instead, CURRY was hired to perform general consulting and negotiating for MIRABILIS.  She was ultimately made responsible for establishing and operating a Richmond Office for NEXIA consisting of the accounting, payroll, insurance, benefits and other "regulated industries" services. See Curry Aff. at ¶ 6.  Plaintiffs have not made – indeed, they cannot make – the required showing that CURRY's employment was for the specific purpose of inventing Nexia Certification.  Rather, during her brief association with NEXIA and MIRABILIS, CURRY did offer to license the invention she brought with her to MIRABILIS and NEXIA in return for MIRABILIS' and NEXIA's agreement to fund its further development. See Curry Aff. at ¶¶ 9-10.

CURRY never assigned ownership of the Nexia Certification invention to MIRABILIS or NEXIA. The required written document does not exist. See Curry Aff. at ¶ 10.  NEXIA and MIRABILIS do not own any rights in the invention.  Each count of the Complaint is dependent on a showing that Plaintiffs – rather than CURRY – own the intellectual property referred to as Nexia Certification.  As a result, Plaintiffs cannot prevail.  In fact, the only existing documentation of any assignments of rights is the one *from* MIRABILIS, on behalf of itself and all of its affiliates (including NEXIA), quit claiming all rights *to* CURRY.

191456_6.doc

Furthermore, Plaintiffs also assert that HAILSTONES was hired to develop Nexia Certification on behalf of Plaintiffs based on the employment contracts into which he entered. This argument is even more incredulous. No employment contract between HAILSTONES and either of the Plaintiffs has been made of record. *See* Exh. "4" to Jaiman Dec.   Rather, Exhibit "4" to the Declaration of Jodi Jaiman contains two unsigned employment agreements between HAILSTONES and Common Paymasters Corporation ("Common Paymaster") and portions of what seems to be a Common Paymaster Employee Handbook signed and initialed by HAILSTONES. These documents are entirely irrelevant to the case at bar. Common Paymaster is not a party to this lawsuit, and therefore, these alleged employment agreements and handbooks cannot be enforced now against HAILSTONES.

As noted above, absent a valid assignment or transfer or a showing that HAILSTONES was hired for the specific purpose of making the invention at issue, he would retain all inventive rights. City of Cocoa, 803 So.2d at 869; Teets, 83 F.3d at 407. Of course, Common Paymasters is not a party to this suit, but even if so, HAILSTONES was not hired to invent Nexia Certification and, moreover, has never assigned or transferred any rights to Nexia Certification to MIRABILIS, NEXIA, or Common Paymaster. No relationship has been shown to exist between Nexia Certification and Common Paymaster. All claims to Nexia Certification premised on the unsigned Common Paymaster employment agreements or the Employee Handbook signed by HAILSTONES are unfounded.

        C.     *NEXIA Never had any Lawful Right to Nexia Certification, and Therefore it had Nothing to Transfer, making the "Assignment" Documents Little More than a Confirmation of Rights.*

In their response to Defendants' Joint Motion for Judgment on the Pleadings, Plaintiffs have now attacked the validity of the assignment documents attached to Defendants' motion as

being invalid and unlawfully obtained.   Because CURRY already owned the intellectual property, of course, no assignment was even necessary.

CURRY nevertheless became concerned that MIRABILIS and NEXIA might claim they had an ownership interest in Nexia Certification.  CURRY thus obtained from Frank Amodeo an agreement to assign to her whatever interest the companies might unjustifiably claim in the invention. *See* Exh. "C" to Curry Aff.  The agreement was reduced to writing, eventually taking the form of the Assignment Agreement, dated August 1, 2006, drafted by attorney Scott Goldberg who was, at the time, in house counsel to MIRABILIS.  Incredibly, Goldberg is now a principal in the law firm that filed this suit, yet the Assignment Agreement he drafted was never called to the Court's attention or brought to light until Defendants were forced to do so! *See* Curry Aff. at ¶ 16 and Exh. "A" to Curry Answ.  Later, in a separate assignment, the other three persons named as inventors in the MIRABILIS Assignment Agreement, in turn, quit claimed any interest they might have in the invention to CURRY. *See* Exh. "D" to Curry Aff.  CURRY unquestionably has thus been the sole owner.

In yet further confirmation, when CURRY's employment with NEXIA and MIRABILIS ended in October 2006, the Separation Agreement executed by the parties reiterated MIRABILIS and NEXIA had previously assigned, "all right title and interest in and to the Nexia Certification program" to CURRY in return for significant consideration designed to compensate MIRABILIS and NEXIA for any investment they may have made in the development of the product.  The two agreements, albeit unnecessary, thus conclusively confirm that Plaintiffs' motion for preliminary injunction is unfounded and ill-conceived.

2.     **The Clear Evidence Establishes that Plaintiffs Validly Assigned to CURRY Any Interest They May Have Had in NEXIA**

Given this circumstance, Plaintiffs assert in the Declaration of Jodi Jaiman that the documents assigning Nexia Certification to CURRY are invalid and ineffective. Plaintiffs now claim these documents were never authorized by MIRABILIS. *See* Jaiman Dec. at ¶ 8(f). The evidence shows otherwise. Moreover, Jodi Jaiman, Plaintiffs' sole witness, lacks the personal knowledge required to provide admissible evidence on this issue. Her Declaration is incompetent on this point, consisting of rank hearsay and speculation.

Toward the end of her tenure at MIRABILIS and NEXIA, EDITH CURRY negotiated her Separation Agreement. It resulted from ongoing discussions between CURRY, Frank Amodeo, Laurie Holtz, Richard Berman, and HAILSTONES. A major topic of their negotiations was Nexia Certification. CURRY knew that she owned the rights to Nexia Certification as its inventor and already had the Assignment Agreement, but nevertheless wanted to further ensure that MIRABILIS and NEXIA could make no subsequent claim to her invention. Therefore, as part of her separation negotiations, CURRY had MIRABILIS confirm once again its intent to assign to her all rights in Nexia Certification. CURRY had already given an unlimited license for NEXIA to exploit the product in the future. MIRABILIS had provided some support towards marketing Nexia Certification, CURRY ultimately promised in the Separation Agreement to pay MIRABILIS' designee $500,000.00 out of the product's future profits and she agreed to waive all other claims that she had against either MIRABILIS or NEXIA. *See* Curry Aff. at ¶ 19.

One starting point for CURRY's negotiation of the Separation Agreement was, of course, the Assignment Agreement. The initial acknowledgment of CURRY's ownership of the patent

rights been evidenced by the handwritten note signed by Frank Amodeo on July 28, 2006[2] (Exh. "C" to Curry Aff), later incorporated into the formal Assignment Agreement prepared by Scott Goldberg, counsel to MIRABILIS.[3]  *See* Exh. "B" to Curry Answ.; Curry Aff. at ¶ 16.  The Assignment Agreement had been executed by HAILSTONES, MIRABILIS' President, at the express direction of Frank Amodeo. *See* Hail Aff. at ¶ 28; Curry Aff. at ¶ 16.

CURRY's Separation Agreement followed extensive discussions over several weeks. The final terms and the document itself were drafted by Richard Berman and then approved by Frank Amodeo.   *See* Hail Aff. at ¶ 16.  HAILSTONES signed the Separation Agreement only after Richard Berman assured HAILSTONES and Laurie Holtz in an e-mail, that, in Berman's opinion, the final deal terms was "very fair."[4] *See* page 29 of Exh. "D" to Hail Aff; Curry Aff. at ¶ 18.  Also attached as Exh. E to Curry's Aff. and as Exh. D to Hail Aff. are many of the e-mails that reflect the back and forth negotiations between CURRY, Holtz, Berman, and HAILSTONES.

Regardless of whether MIRABILIS or NEXIA had any justification under patent law to claim rights in Nexia Certification (which they plainly did not), the evidence in this case shows that MIRABILIS validly assigned away any such rights.  That is confirmed in the Assignment Agreement.  It is further confirmed in the Separation Agreement.  Both were prepared with the

---

[2]  The note read in pertinent part: "Mirabilis and Nexia Strategy Corp., it successors and assigns, surrenders (sic) all rights, ownership, and interest in Nexia Certification effective this date."

[3]  Although the initial assignment was to CURRY, Laurie Holtz, Michael Dement and FRANK HAILSTONES, as noted above, Holtz, Dement and HAILSTONES later assigned their interests to CURRY.

[4]  According to HAILSTONES and CURRY, the CURRY separation agreement was known to and/or reviewed by Jay Stollenwerk, Shane Williams, Frank Amodeo, Laurie Holtz, Richard Berman, Fernando Simo, Marty Flynn (in his capacity as President of Common Paymaster Corporation), Diana Kristona, Phil Kaprow (in his capacity as Corporate Counsel for AQMI Strategy and Secretary for MIRABILIS Ventures) and James Sadrianna.  Hail Aff. at ¶ 37; Curry Aff. at ¶ 18.  CURRY also believes that her separation agreement also was reviewed by Matthew Mokwa (in his capacity as Corporate Counsel for Common Paymaster Corporation), Scott Goldberg and Aaron Bates, all of whom are attorneys at the law firm who represents Plaintiffs in this case.  Curry Aff. at ¶ 18.

191456_6.doc

knowledge and under the direction of Frank Amodeo, the company's ultimate owner, its upper management and senior officers, and company counsel.

> A.    *No Board Approval was Necessary for MIRABILIS or NEXIA to Enter Into the Purported "Assignment" Agreements.*

Plaintiffs also contend that the purported "assignment" documents are invalid because they were never approved by the Board of Directors. This argument is specious. First, Board approval could not have been required. Nexia Certification was never an asset of either Plaintiff and therefore could not have made up "all or a significant portion" of the assets of either so as to trigger a statutory requirement for Board approval. Second, MIRABILIS' controlling shareholder approved both agreements, thus obviating the need for Board approval by either or both Plaintiffs. Third, both agreements between the companies and CURRY were fair and all negotiations took place at arms' length, thereby vitiating any need for Board approval. Finally, the Bylaws of both MIRABILIS and NEXIA provide that the President "may sign and execute, in the name of the Corporation, deeds, mortgages, bonds, contracts, agreements and other instruments duly authorized by the Board of Directors (*or the shareholders, as the case may be*)." (Emphasis added.) See Section 4.09 of the Bylaws, Exh. "2" to Jaiman Dec.

Significantly, the only Class "A" shareholder of MIRABILIS, Frank Amodeo, approved the Assignment Agreement and the Separation Agreement. Amodeo expressly directed HAILSTONES, then the President of MIRABILIS, to execute the agreements. HAILSTONES did. This shareholder directive avoided any need for action by the MIRABILIS Board and precludes Plaintiffs from now attempting to question the authority of HAILSTONES. In turn, MIRABILIS was the sole shareholder of NEXIA, thereby removing the need for consideration or approval of the action by NEXIA's Board.

191466_6.doc

Beyond peradventure, Defendant CURRY, and she alone, owns any interest in Nexia Certification. Plaintiffs' ill-founded claims are certain to fail as a matter of law.

**3.      Plaintiffs Do Not Have a Substantial Likelihood of Success on the Merits Because They No Longer Continue Business in the Same Area or Line of Business and Cannot Utilize Nexia Certification**

Finally, in the case at bar, Plaintiffs are apparently seeking to enforce the non-compete and non-disclosure agreements to which CURRY and HAILSTONES allegedly agreed.[5] However, Plaintiffs do not have the capability or means to use Nexia Certification. Rather, Plaintiffs are defunct companies merely seeking to hoard Nexia Certification for themselves. Under Florida law, a court will only grant injunctive relief to enforce a restrictive covenant if the employer continues to carry on business in the area or line of business that is the subject of the action to enforce the restrictive covenant. An employee may agree with her or his employer, "to refrain from carrying on or engaging in a similar business and from soliciting old customers of such employer within a reasonably limited time and area, *and so long as such employer, continues to carry on a like business therein.*"   §  542.33(2)(a), Fla. Stat. (2006) (emphasis added). Because Plaintiffs are seeking to enjoin Defendants CURRY and HAILSTONES from violating their employment agreements, this Court must therefore consider "the fact that the person seeking enforcement no longer continues in business in the area or line of business that is the subject of the action to enforce the restrictive covenant."   §  542.335(1)(g)(2), Fla. Stat. (2006).

Plaintiffs are defunct corporations. They are out of business and are not now engaged in the provision of anti-fraud solutions. When this lawsuit was filed, NEXIA was a dissolved corporation. *See* Compl at ¶ 2. According to the minutes of the October 11, 2007 special

---

[5] As discussed above, the employment contracts and agreements attached as Exh. "F" to the Declaration of Jodi Jaiman do not contain any employment agreements between HAILSTONES and MIRABILIS or NEXIA. The employment contracts and employee handbook with HAILSTONES' signatures or initials are both with Common Paymaster, a non-party to this lawsuit.

meeting of the NEXIA Board of Directors, NEXIA was only reinstated "for the purpose of filing and maintaining lawsuits against third-parties to re-acquire and collect assets of the Corporation." *See* page 8 of Exh. "1" to Jaiman Dec. Plaintiffs accordingly seek to prevent Defendants from using Nexia Certification even though Plaintiffs cannot. Plaintiffs' Motion for Preliminary Injunction must be denied on the grounds that Plaintiffs no longer continue in the same area or line of business. They do not now market and sell anti-fraud solutions products, such as Nexia Certification. Florida law precludes them from enforcing their restrictive covenants against their former employees, HAILSTONES and CURRY.

E.     **Assuming Arguendo that Plaintiffs are Entitled to a Preliminary Injunction, Plaintiffs will have to Post a Substantial Bond**

Even if Plaintiffs were entitled to preliminary injunctive relief, they would still be required to post a bond in the amount of the loss of revenue that will be occasioned by Defendants' inability to effectively carry out its business. See Hoechst Diafoil Co. v Nan Ya Plastics Corp., 174 F.3d 411, 421 (4th Cir. 1999) ("In fixing the amount of an injunction bond, a district court should be guided by the purpose underlying Rule 65(c), Fed.R.Civ.P., which is to provide a mechanism for reimbursing the enjoined party for harm it suffers as result of an improvidently issued injunction; consequently, the amount of the bond ordinarily depends on the gravity of the potential harm to the enjoined party."). CURRY estimates that the loss of business that a preliminary injunction would cause to her, PALAXAR, and PALAXAR HOLDINGS to be quite substantial. *See* Curry Aff. at ¶ 23.

In setting a bond, this Court should also consider the damage to Defendants' reputation and goodwill. See Equipment & Systems for Industry, Inc. v. Zevetchin, 864 F.Supp. 253, 258 (D. Mass. 1994) (stating that a bond should be determined in light of the potential lost revenues and how a preliminary injunction "may curtail [defendants'] future earnings by eroding their

191466_6.doc

reputation and good will in the industry"). Defendants CURRY and HAILSTONES work in an industry in which they assist companies in preventing and detecting fraud. Plaintiffs have accused CURRY and HAILSTONES of misappropriating Nexia Certification. A preliminary injunction, premised on such a charge, will certainly damage Defendants' reputations and goodwill in the industry thereby eroding their future earning potential. *See* Hail Aff. at ¶ 53. Any preliminary injunction should therefore be conditioned on Plaintiffs posting a substantial bond.

### III.    CONCLUSION

WHEREFORE, for the reasons set forth above, Defendants PALAXAR GROUP, LLC, PALAXAR HOLDINGS, LLC, FRANK HAILSTONES, and EDITH CURRY, pray this Honorable Court will enter its Order denying Plaintiffs' Motion for Preliminary Injunction, and awarding Defendants their reasonable attorneys' fees and costs, together with such other and further relief as this Court deems just, equitable, and proper under the circumstances.

191456_6.doc

Respectfully submitted,

**RASKIN & RASKIN, P.A.**
2601 South Bayshore Drive
Suite 725
Miami, Florida 33133
Telephone: (305) 444-3400
Facsimile: (305) 445-0266
Attorneys for Defendants Edith Curry,
Palaxar Group, LLC and Palaxar Holdings, LLC

**LITCHFORD & CHRISTOPHER**
Professional Association
Bank of America Center
390 North Orange Avenue
Post Office Box 1549
Orlando, Florida 32802
Telephone: (407) 422-6600
Telecopier: (407) 841-0325
Attorneys for Defendant Frank Hailstones

By: /s/ Martin R. Raskin
   MARTIN R. RASKIN, Trial Counsel
   Florida Bar No. 315206
   mraskin@raskinlaw.com
   JANE SERENE RASKIN
   Florida Bar No. 848689
   jraskin@raskinlaw.com

By: /s/ Donald E. Christopher
   Donald E. Christopher, Trial Counsel
   Florida Bar No. 250831
   dchristopher@litchfordchristopher.com
   Christine M. Ho
   Florida Bar No. 844853
   cho@litchfordchristopher.com

Craig S. Warkol, Esquire
BRACEWELL & GIULIANI LLP
1177 Avenue of the Americas
New York, N.Y. 10036
Telephone: (212) 508-6100
Facsimile: (212) 938-3850
Craig.warkol@bgllp.com
Attorneys for Defendant Frank Hailstones

## CERTIFICATE OF SERVICE

    I HEREBY CERTIFY that a true and correct copy of the foregoing Defendants' Joint Memorandum of Law in Opposition to Plaintiffs' Motion for Preliminary Injunction has been furnished by Electronic Mail on January 15, 2008 to:

    Aaron C. Bates, Esquire
    abates@goldbergbates.com

    J. Russell Campbell, Esquire
    rcampbell@balch.com

        /s/ Donald E. Christopher

191456_6.doc