UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

MIRABILIS VENTURES, INC. and    )
NEXIA STRATEGY CORPORATION,     )
                                )
            Plaintiffs,         )
                                )
-vs-                            )   CASE NO.:  6:07-CV-1788-ORL-28-KRS
                                )
PALAXAR GROUP, LLC;             )
PALAXAR HOLDINGS, LLC;          )
FRANK HAILSTONES; EDITH         )
CURRY a/k/a EDITH BROADHEAD;    )
and FICTICIOUS DEFENDANT 1;     )
FICTICIOUS DEFENDANT 2;         )
FICTICIOUS DEFENDANT 3;         )
FICTICIOUS DEFENDANT 4;         )
FICTICIOUS DEFENDANT 5;         )
FICTICIOUS DEFENDANT 6;         )
FICTICIOUS DEFENDANT 7;         )
FICTICIOUS DEFENDANT 8          )
                                )
            Defendants.         )
_____ )

## AFFIDAVIT OF EDITH CURRY BROADHEAD

Edith Curry Broadhead, being duly sworn, deposes and says:

1.      My name is Edie Curry Broadhead.  I am a Defendant in this action and over the age of 21 years and competent to testify in make the statements contained herein.

2.      I make this Affidavit in opposition to Plaintiffs' Motion for Preliminary Injunction.  I have reviewed the Complaint, Plaintiffs' Motion for Preliminary Injunction, and the Declaration of Jodi Jaimon, including all of its exhibits.  Except as otherwise noted, all of the facts set forth in this Affidavit are known to me personally and, if called as a witness, I would testify competently to them.



3.    The Palaxar Group, LLC ("Palaxar"), a defendant in this action, is a limited liability company organized under the laws of the Commonwealth of Virginia on September 11, 2006. Palaxar Holdings, LLC, also a defendant in this action, is a limited liability company organized under the laws of the Commonwealth of Virginia on December 18, 2006. I became a member of the Palaxar Holdings, LLC as of January 17, 2007. The only other member of Palaxar Holdings, LLC, is Terrence Chu. Frank Hailstones is not and has never been a member, owner, employee or agent of Palaxar or Palaxar Holdings, LLC.

4.    Beginning on June 1, 2005 until October 31, 2006, I was employed by Plaintiff Nexia Strategy Corporation ("Nexia"). From January 1, 2006, until my separation from Nexia on October 31, 2006, I held the title of President of Nexia. From October, 2005, until my separation from Nexia and Mirabilis on October 31, 2006, I served on the Board of Directors of Plaintiff Mirabilis Ventures, Inc. ("Mirabilis") and held the title of Secretary/Treasurer of Mirabilis.

5.    I have an MBA, a law degree and am a member in good standing of the Ohio Bar. Prior to my involvement with Mirabilis and Nexia, I held management positions with Capital One Services, Inc., and Nestle Frozen Food. I also spent four years with the Department of Defense as a member of the Defense Personnel Security Research and Education Center ("PERSEREC"). At PERSEREC, I participated in the creation of a method for using individuals' personal financial behavior to assess those individuals' suitability for positions of trust. The method consists of a process and an algorithm which was called the "Illegal Uses and Sources of Funds" ("IUSF"). After leaving government service, I began to formulate, but never fully developed, a commercial application and use of the IUSF. Mike Dement and I had

2

conversations about the creation of a commercial application of IUSF before either of us became involved with either Mirabilis or Nexia.

      6.    My employment by Nexia in June, 2005, was unconnected to IUSF or the invention of any product of any kind. In 2005, I was recruited and hired by Frank Amodeo ("Amodeo") to perform general consulting and negotiating for Mirabilis/Nexia and was specifically tasked to establish and operate a Richmond Office for Mirabilis/Nexia consisting of a call center and the accounting, payroll, insurance, benefits and other 'regulated industries' services of the professional employer organizations ("PEO's") owned by Mirabilis. The only written employment agreement I entered into during my association with Mirabilis and Nexia was my Employment Agreement with Nexia dated June 1, 2005. A true and correct copy of that Agreement is attached as pages 67-78 of Exhibit 4 to the Declaration of Jodi Jaimon. That Employment Agreement lists my duties exclusively as: AThe business development and/or management of any current or prospective client-related activities,@ and, A[t]he development and/or management of the Virginia branch of Nexia Strategy Corporation.@ The Agreement contains no reference to IUSF or inventions of any kind.

**No Personal Knowledge**

      7.    I understood that, during the time I was employed by Mirabilis and Nexia, Frank Amodeo was the only Class "A" shareholder of Mirabilis and that he held voting control of the company. I also understood that Amodeo owned one hundred percent (100%) of the shares in Nexia. Amodeo told me, and I was informed by others that Amodeo had also told them, that he was responsible for funding Mirabilis and Nexia. I observed that Amodeo asserted exclusive and personal control over the day-to-day affairs of Mirabilis and Nexia.

**Hearsay**

3

8.      While I was at Mirabilis/Nexia, I met Frank Hailstones, who was President of Mirabilis, and Laurie Holtz, who was Chairman of Mirabilis' Board of Directors. I learned that Hailstones was a former executive of PricewaterhouseCoopers with an expertise in corporate governance. Prior to joining Mirabilis, Hailstones had designed and implemented processes to support compliance with the new Sarbanes-Oxley Act requirements. Holtz was a CPA with extensive experience in investigative accounting. I determined that Hailstones and Holtz could contribute additional details that would allow me to refine the development of a commercial application of the IUSF program. Accordingly, in late 2005, I began to consider presenting to Frank Amodeo, as a business opportunity, the development of a commercial application of IUSF.

9.      On January 4, 2006, seven months after I had begun my employment with Nexia/Mirabilis, I met with an official of PERSEREC. This was to assure myself that PERSEREC policies or procedures would not prevent my disclosure of IUSF to non-DoD personnel for the purpose of developing a commercial application of the algorithm. After meeting with PERSEREC and determining my contemplated disclosures were not prohibited, I met with Frank Amodeo. I asked Amodeo if he would be interested in funding the development and commercialization of the IUSF program. Amodeo agreed that he (and/or Mirabilis/Nexia) would be willing to fund the development of the IUSF product in return for a license to use it and **Hearsay** on the condition that we, at Nexia, successfully set up the Richmond Call Center and PEO operations. At that point, I, and others at Mirabilis and Nexia, began to refer to IUSF as the "Nexia Certification Program." The handwritten notes and power-point slides concerning the so-called Nexia Certification that are attached as pages 2 through 10 and 30 through 71 of Exhibit 5

4

to the Declaration of Jodi Jaimon, reflect almost exclusively ideas and materials Frank Hailstones and I developed before ever joining Mirabilis/Nexia.

10.    I had further discussions with Frank Amodeo in which he assured me that he would (i) fund the commercialization and development and marketing of my algorithm, (ii) fund a group of new companies in Virginia focused on regulated industries such as insurance and banking/finance as well as Nexia Certification, (iii) not be a stockholder or otherwise have **Hearsay** control over the new Virginia companies except as a creditor and (iv) that I would be President of the new companies that would be formed to hold the regulated industries and market Nexia Certification.   In return for fulfilling those commitments, I would grant Nexia Strategy Corporation the exclusive rights to use Nexia Certification. None of these discussions was ever reduced to writing. I never agreed (in writing or otherwise) nor was it ever suggested to me that I was expected assign ownership of the IUSF product to Mirabilis or to Nexia.

11.    Over the course of several months, Mirabilis and/or Nexia made certain investments in developing the commercial application and marketing of the "Nexia Certification Program." These investments took the form of paying legal fees, travel costs and other similar costs. In addition, Frank Hailstones, Laurie Holtz and, to a much lesser extent, a few other employees at Nexia/Mirabilis assisted me in developing the commercialization of Nexia Certification. However, at no time, did Mirabilis or Nexia pay for separate office space or hire any employees to work solely on the Nexia Certification Program. In fact, all of the people who worked for Mirabilis or Nexia in Richmond were hired to work on setting up a call center and PEO processing center. It was understood that the first duty of each person was to help Mirabilis complete its expansion to Richmond.  They were instructed to assist in setting up the new companies that Amodeo had stated he intended to establish in Richmond.  The February 28, **Hearsay**

5

2008, e-mail from Marty Flynn to me, which is attached as pages 3 – 4 of Exhibit 7 to the Declaration of Jodi Jaimon, is illustrative of the various tasks that the Richmond employees were directed to accomplish.

12.     By the end of March 2006, I had several discussions with outside advisors, including attorneys, about going forward with a commercial offering of Nexia Certification. Because the certification product was essentially going to be marketed as a stamp of approval for good governance and anti-fraud, I was informed that, as a practical matter, every officer, director and shareholder (collectively "Control Individuals") of the company offering the certification **Hearsay** product and its affiliates should go through the certification process themselves and that all of the Control Individuals must be clear of any serious negative financial or criminal history. It was clear that many of the officers and directors of Mirabilis would not be willing to go through the thorough detailed financial disclosure and investigation process that certification would entail. Furthermore, because Mirabilis' business plan revolved around acquiring distressed businesses, many of which had suffered mismanagement and fraud prior to being acquired, it would have been virtually impossible for Nexia Certification to establish a credible position as a company that stood for good governance and anti-fraud if it had been affiliated with such companies – i.e. as a subsidiary of Mirabilis. We had also determined that a primary market for the certification product would be banks, thrifts, trust companies and their affiliates. Service providers for these institutions are covered by Federal Deposit Insurance Corporation Act, a provision of which prohibits a person convicted of a criminal offense involving dishonesty, breach of trust or money laundering from participating in the affairs of the institution. By this time, I had learned that Frank Amodeo (a) has a federal felony conviction for fraud; (b) was disbarred in Georgia; and (3) filed personal bankruptcy. As a result, it became apparent that Frank Amodeo could not be

6

involved with or have control over the company that offered Nexia Certification, even as a shareholder or major creditor. Faced with this state of affairs, Mirabilis Chairman Holtz, Mirabilis President Hailstones, and I concluded that it would be necessary to create a new entity, independent of any of the entities with which Amodeo was involved, to bring Nexia Certification to market.

13.     During the first week of June, 2006, I prepared a power-point presentation which described the plan for placing Nexia Certification in a new, independent company which "may be regulated" and "must remain beyond reproach." A true copy of that presentation is attached hereto as Exhibit "A." I sent this presentation to Laurie Holtz who arranged to share it with Frank Amodeo. Laurie Holtz told me that he had, in fact, met with Amodeo and made a formal presentation to him during which he explained that it would be necessary to create a new, independent entity to achieve the commercialization of Nexia Certification; that the LeClair Ryan law firm had been engaged to form the new entity; and that all the shareholders in the new entity would need to be "Nexia Certified," i.e., free of any serious negative financial or criminal history.

**Hearsay**

14.     On June 26, 2006, Laurie Holtz called me and told me that Frank Amodeo had agreed that Nexia Certification should be placed in a new, independent company as Holtz, Hailstones, and I had recommended. Holtz told me that we needed to present a Nexia Certification business plan to Amodeo and Frank Hailstones during the week of July 11, 2006; that he, Amodeo would not be part of the management of the new corporation; and that he would fund Nexia Certification upon completion of the sale of Amodeo-owned PEOs to Gevity. Attached as Exhibit "B" is a true and correct copy of a June 26, 2006, e-mail from me to Frank

**Hearsay**

7

**Based on
Hearsay**

Hailstones and Rama Inguva which confirms this conversation with Laurie Holtz. In the e-mail,

Frank Amodeo is referred to as F1 and Frank Hailstones is referred to as F2.

      15.    On July 28, 2006, I personally met with Frank Amodeo in Orlando,

Florida. Amodeo agreed that I would separate from Mirabilis and take Nexia Certification with

me to be further developed and marketed by a new and independent company. He said this was

in accordance with the general terms that had been presented to him by Holtz. Amodeo also   **Hearsay**

offered to fund the company that would be set up to pursue development of the Nexia

Certification Program, but requested that I remain with Mirabilis through the end of the year to

ensure that the Richmond facility got up and running correctly. I agreed to remain through the

end of the year. I also asked Amodeo to confirm in writing that Nexia Certification belonged to

me. He unhesitatingly agreed to this. I then wrote the handwritten document, a true reproduction

of which is attached hereto as Exhibit "C", that reads:

> July 28, '06. Because Edie Curry is the Earth Goddess, Mirabilis
> and Nexia Strategy Corp., its successors and assigns, surrenders
> (sic) all rights, ownership, and interest in Nexia Certification
> effective this date.

>           _____
>           Frank Amodeo

>           _____
>           Date

While we were there together, Amodeo added in his own handwriting:

> subject to subsequent economic negotiations of reasonableness
> reflecting actual investment and non disclosure until public
> Mirabilis Ventures shareholders on 1/1/07.

He then signed and dated the document.

      16.    Shortly after my receipt of this document signed by Frank Amodeo, I

carried a copy of it to the Mirabilis offices in Orlando and handed a copy of it to Scott Goldberg

8

who was then an attorney for Mirabilis. Mr. Goldberg is now a partner in Goldberg Bates, PLLC, one of the law firms that filed this lawsuit. I asked that Mr. Goldberg prepare formal papers allowing any rights to the various intellectual properties associated with Nexia Certification to be assigned by Mirabilis to its four inventors, *i.e.*, Michael Dement, Frank Hailstones, Laurie Holtz, and me. This resulted in the preparation of the Assignment Agreement, dated August 1, 2006 which is attached as Exhibit "A" to my Answer and Affirmative Defenses in this action. Attorney Goldberg personally handed me the Assignment Agreement which was then executed by Frank Hailstones, as President of Mirabilis, at the conference table outside Mr. Amodeo's office at the Mirabilis offices in Orlando. The Assignment was executed by Hailstones in my presence and in the presence of and at the express direction of Frank Amodeo.

**Hearsay**

Although the Assignment Agreement assigned Nexia Certification to me and the other three inventors (Dement, Holtz, and Hailstones), the Agreement further provided that Mirabilis would retain a "world-wide, royalty-free, fully paid up, perpetual, irrevocable, non-exclusive license" to use Nexia Certification. At my request, Scott Goldberg also prepared an agreement pursuant to which the other three of the four inventors to whom Mirabilis had relinquished all rights to Nexia Certification, in turn, assigned their rights to Nexia Certification to me, individually. A true and correct copy of that Agreement, as executed, is attached hereto as Exhibit "D." This was done so that if the product was ever marketed, it could be done without association with or the taint of Amodeo, Mirabilis, or any other ventures associated with him.

17.     In early September 2006, I was informed that Mirabilis, at the direction of **Hearsay** Amodeo, would be closing several of its operations, including the Richmond operation which housed Nexia. I soon began negotiating with Laurie Holtz, Frank Hailstones, Richard Berman, and Frank Amodeo the terms of an agreement for me to separate from Nexia and Mirabilis. At

9

that time, Richard Berman was a member of the Mirabilis Board of Directors, an Executive Vice President, and the Chief Legal Counsel for Mirabilis. Holtz was Chairman of the Board of Mirabilis, and Hailstones was President of Mirabilis.

18.    Between September 8 and October 31, 2006, literally scores of emails (some of which are collectively attached hereto as Exhibit "E") illustrate the process of negotiation that led to the Separation Agreement between Nexia, Mirabilis, and me. Multiple references to meetings and discussions with Frank Amodeo indicate that he was not only fully aware of the progress of the negotiations but was contributing to them and in some cases redirecting and disrupting them. At one point my frustration with Amodeo's continuing to change previously agreed upon terms overcame me to the point that I even suggested the eventual product of the Nexia Certification intellectual property should be allowed to "die on the vine." See page 14 of Exhibit E. In addition to Messrs. Holtz, Hailstones, Berman and Amodeo, numerous other employees of Mirabilis and its subsidiaries participated in and/or were aware of those negotiations. These employees included Philip S. Kaprow, an attorney who was then General Counsel of AQMI Strategy Corporation (Amodeo's consulting company) and had formerly been General Counsel of Mirabilis. Matt Mokwa, the attorney for Common Paymaster Corporation at that time, knew of our negotiation. Shane Williams, Senior Vice President of Nexia Strategy and Jay Stollenwerk, Senior Vice President of Nexia Strategy, who together functioned as conduits for all of Frank Amodeo's email were also well aware of what was transpiring. Aaron Bates and Scott Goldberg, two of the attorneys who filed this lawsuit against me, were also attorneys for Mirabilis and/or its subsidiaries at the time the Separation Agreement was negotiated and executed by the parties, and I believe, but do not know for certain, that they knew as well.

**Mental Operation**

10

19.     On October 20, 2006, I signed the Confidential Separation Agreement (the "Separation Agreement") that established the terms of my separation from Mirabilis and all its affiliate companies, effective October 31, 2006. A true and correct copy of the Separation Agreement is attached as Exhibit "B" to Defendant Curry's Answer and Affirmative Defenses in this action. When it was presented to me, the Separation Agreement had already been executed by Frank Hailstones on behalf of Mirabilis. Upon signing the Separation Agreement, I faxed it back to Mirabilis headquarters in Orlando. The "draft" header on the agreement was ignored by all at the time. We treated the executed copy as final and binding. The Separation Agreement confirmed that Mirabilis had assigned all rights, title, and interest in Nexia Certification to me. See Exhibit "B" to Defendant Curry's Answer and Affirmative Defenses at ¶ 1. The Separation Agreement provides that I would retain my right as an independent contractor to participate in transactions that I brought to Mirabilis. See Exhibit "B" to Defendant Curry's Answer and Affirmative Defenses at ¶ 5. In addition, the Separation Agreement contemplates that I would create a new entity for the purpose of advancing Nexia Certification and performing consulting work. See Exhibit "B" to Defendant Curry's Answer and Affirmative Defenses at ¶ 6. This new entity would then execute a note in the amount of $500,000.00 to be paid to a second new entity from the first profits it earned. See Exhibit "B" to Defendant Curry's Answer and Affirmative Defenses at ¶ 6. These two new entities would then engage in a "joint venture" from which the gross revenues would be shared equally. See Exhibit "B" to Defendant Curry's Answer and Affirmative Defenses at ¶ 7. The Separation Agreement also provides that I would waive existing claims I had against Mirabilis, including claims to severance payments. See Exhibit "B" to Defendant Curry's Answer and Affirmative Defenses at ¶ 8.

11

20.     I now realize I misspoke in my email dated March 2, 2006 (attached as pages 2 – 3 of Exhibit 7 to the Declaration of Jodi Jaimon), when I stated that Nexia Strategy Corporation owned the patent and trademark rights for the "Nexia Certification Program." That statement was simply erroneous. At that time the patent applications had not yet been prepared or filed. No final understanding had yet been reached concerning the extent of Nexia's role, if any, in developing IUSF. The intellectual property rights never belonged to Nexia. At that time, I had nothing but my verbal understanding with Frank Amodeo that if he funded the **Hearsay** development of the product, I would grant a license to the Mirabilis companies. That understanding was formalized and superseded by the Assignment Agreement and my Separation Agreement.                                                                            **Conclusory**

21.     Consistent with the terms of the Separation Agreement, I set up Palaxar Group, LLC, as "NewCo A," which was intended to be for the purpose of advancing Nexia Certification and performing consulting work. Following my separation from Mirabilis/Nexia, I met with Frank Hailstones, in his capacity as President of Nexia Strategy, several times for joint client proposal and marketing meetings. These both took place in person and by means of teleconference, and occurred throughout October, November and December of 2006. Specifically, on December 15, 2006, Hailstones and I made a joint presentation to Wachovia Securities in Richmond for a consulting assignment. Unfortunately, the presentation did not result in any business for Palaxar or Nexia.

**No Personal Knowledge**     22.     By contrast, since no later than January of 2007, Nexia and/or Mirabilis have abandoned their obligations under the Separation Agreement. At the end of December, 2006, I understood Nexia ceased operations. In January, 2007, I heard all of its employees were **Hearsay** terminated or reassigned. I am aware of no efforts having been made by Nexia to form a

12

separate company clear of any of its controlling shareholders or employees who had a history of fraud or other criminal activity. I have been provided no consulting support or expertise as originally promised under the Separation Agreement. Indeed, Nexia was allowed to be dissolved as a Florida corporation and has only been reinstated to facilitate the filing of this lawsuit. A printout from the Florida Secretary of State's official corporate records website showing the reinstatement of Nexia Strategy Corporation effective October 11, 2007 is attached hereto as Exhibit "F". The October 11, 2007, Minutes of Special Meeting of the Board of Directors of Nexia Strategy Corporation, attached as pages 8-9 of Exhibit 1 to the Declaration of Jodi Jaimon, memorializes the Nexia Board's resolution "authoriz[ing] and approv[ing] the reinstatement of the Corporation for the purpose of filing and maintaining lawsuits against third-parties . . ."

23.     Since the time of the Separation Agreement, I have expended thousands of dollars in travel costs, marketing and legal fees to support Palaxar and the certification program. In addition, I personally paid from my own funds more than $20,000 of expenses for the development of Nexia Certification which expenses were incurred before my separation from Nexia. I did this because certain invoices were never paid by Nexia, despite Nexia's agreement to do so. To date no revenues or profits or fees of any kind have been paid to or received by me or to any other person or entity from Palaxar, the certification program or any other program associated with Nexia Certification. However, in pilot projects recently conducted by Palaxar for government agencies and private security firms, Nexia Certification proved extremely successful in discovering individuals who are unsuitable for positions of trust. Up until the time this lawsuit was filed -- accompanied by Mirabilis-issued press releases and blog sites -- Palaxar was engaged in active negotiations, the details of which are subject to non-disclosure

13

agreements, with large two large defense contractors regarding potential joint contracts pursuant to which Palaxar would stand to earn upwards of $5 million dollars.

24.    Before learning of this lawsuit, I had no reason to believe that Mirabilis or Nexia questioned the validity of the Assignment Agreement or the Separation Agreement. In fact, I never would have imagined that Mirabilis or Nexia might raise any question whatsoever as to my ownership of the so-called Nexia Certification intellectual property. My first realization of that claim came when I received a phone call on October 12, 2007, from an Orlando Sentinel reporter informing me that I had been sued by Mirabilis. The following Monday morning, in Scottsdale, Arizona, a day after Frank Hailstones and I had made presentations at an anti-fraud symposium, Hailstones and I were approaching and within earshot of approximately 40 of the symposium attendees, when we were personally confronted by attorney Aaron Bates, who filed this lawsuit, former Mirabilis attorney Matt Mokwa, former Mirabilis employee Yaniv Amar, and an unidentified process server. In a manner clearly designed to demean me and Frank Hailstones before conference attendees and organizers, Mokwa held up a copy of the Orlando Sentinel featuring the banner headline: "Mirabilis Files Suit Against Former Executives." In a loud voice, Mokwa announced for all to hear: "See, you are on the front page of the paper for stealing assets." When I pointed out that the intellectual property transfer at issue was the **Hearsay** subject of three agreements, Amar responded, "I don't care about any bullshit agreements. $220 million is missing while you were in charge and now you are here selling anti-fraud solutions. Where did the money go?" Before this disruptive and embarrassing public confrontation, which occurred 12 months after I left Mirablis, no one from or representing Mirabilis or Nexia had so much as phoned or written to me to express any concern whatsoever over the issue of Nexia Certification.

14

25.    I am aware, and it has been widely reported in the press, that Amodeo, Mirabilis and others are under criminal investigation by the United States Attorney's Office for the Middle District of Florida. Indeed, the minutes of the Mirabilis Board of Directors meeting of December 28, 2006 reveal that a discussion was held on that date concerning the receipt of "target letters" by several Mirabilis employees. Those Minutes are attached as pages 47-49 of Exhibit 1 to the Declaration of Jodi Jaimon). In May, 2007, I met with the Assistant United States Attorney supervising that criminal investigation and agents from the Internal Revenue Service. I answered all of their questions and provided them with relevant documents. My cooperation with the government is known to Amodeo and others at Mirabilis.

FURTHER AFFIANT SAYETH NAUGHT.

Edith Curry Broadhead

On this ____ day of January, 2008, before me personally appeared Edith Curry Broadhead, known to me to be the person executing the foregoing, and stated that foregoing is true and correct to the best of her knowledge, information, and belief.

Notary Public

KEVIN JEROME ROGERS
Notary Public
Commonwealth of Virginia
7022327
My Commission Expires Jul 31, 2010

15

Exhibit "E" to Affidavit of Edie Curry
Pages 17 & 18

**From:** Edie Curry
**Sent:** Monday, October 09, 2006 10:25 AM
**To:** Frank Hailstones (M)
**Subject:** RE: Edie Curry

This is a reaffirmation of the offer to be made to Edie after extensive discussion with Frank and Laurie.
All right, title and interest in and to the Nexia Certification program would be assigned to Edie
[Edie Curry] Agreed.

1.  As compensation for the foregoing, Edie and any new entity that she may form for the purpose of advancing Nexia Certification shall execute a Note payable to a charitable foundation to be formed by Mirabilis in the amount of $2.5M with interest at prime + 2% which shall accrue from the date of execution until paid. Payment of the Note shall be made to the charitable foundation to be formed from future revenues derived (%of gross sales) from the Nexia Certification program[Edie Curry] .Any payments made to Mirabilis or its designee should be based on Mirabilis' "investment" in the Certification product to date. The investment appears to be primarily the salaries of myself, Scott Hannah, Mark Wickersham, Tony Santillo and Jaqueline Poliquin and legal fees and expenses directly related to the patenting of the Certification program. I don't have a total of all of these costs. However, for sake of discussion, let's assume salaries total $600,000 since January 2006 and legal fees and expenses total $150,000. I believe half of the salary expense should be allocated to Mirabilis for the fact that Tony, Mark, Scott and Jacqueline were hired to set up the office in Richmond an spent a large part of their time during the first 4.5 months trying to accomplish that and then unwinding that. That makes the total attributable to the Certification program $450,000. Based on what a venture capital firm might charge in interest or have for an expected return on its funds that were at risk for an average of 4.5 months, I suggest a 50% permium, so the total to be repayed should:be $675,000. The actual amount can be adjusted based on the actual, reasonable and necessary figures Mirabilis is able to document (for example, a lot of the legal fees are still outstanding). This amount can be paid to a foundation, but it must be a 501 (c)`(3) foundation jointly agreed upon by Mirabilis and me and must benefit children in the U.S. NOT A MATTER OF COSTS. ENABLES HER TO CREATE A SUCCESS OR EVERYONE LOSES. IF THE 2.5m CAN'T BE PAID THEN IT MEANS THAT NEXIA STRATEGY HAD NO CHANCE OF SUCCESS. THIS IS A CHANCE FOR HER TO BECOME VERY WEALTHY. EITHER VERY GOOD OR WORTHLESS. IT SHOULDN'T STAND IN THE WAY OF HER OPPORTUNITY TO SUCCEED. IF SHE DOES NOT, IT COSTS HER NOTHING. IF SHE DOES, THIS IS A MEANINGLESS NUMBER. HOWEVER, AFTER DISCUSSION AND JUXTAPOSITION OF SUMS OWED TO HER, SOME OF WHICH ARE DOCUMENTED, INCLUDING NOTE PAYMENT AND SEVERANCE PAY, A COMPLETE BREAK-CLEAN-BY BOTH PARTIES SEEMS REASONABLE. THIS WOULD INCLUDE HER GIVING UP HER SHARES IN MIRABILIS AND ANY AFFILIATE, RESIGNING FROM ALL POSITIONS, ETC. ALSO, IT WAS NOTED THAT SINCE SHE IS CONCERNED ABOUT MIRABLILS AFFILIATION, SHE IS BETTER OFF NOT BEING A SHAREHOLDER.

**Privileged**

2.  Nexia Strategy shall work with the Nexia Certification program and the profits from this joint venture shall be shared[Edie Curry] .Sharing of profits with a consulting group is theoretically fine, but this product will be highly involved with financial/banking and insurance companies and regulations. Banks and their affiliates will also be a primary target for this product. Because of various banking and insurance regulations, including Gramm-Leach Bliley's security regulations, FDICIA, and the PATRIOT Act, this program cannot have any association with companies or individuals that have any history of fraud or other criminal activity. Even without such regulations, such an association would be fatal in the marketplace. Therefore, affiliates of Mirabilis cannot be involved with this product. If Nexia was spun off and did not have any shareholders or controlling parties with such a history, an alliance might be possible. Similarly, if Nexia consultants were to form a separate company that was not affiliated with Mirabilis and did not have any controlling shareholders or employees with a history of fraud or other criminal activity, there would be the possibility of an alliance (a consulting affiliate or subsidiary of Fox Technology might be a real possibility). However, I would prefer that this issue be dealt with separately outside of the agreement for the Certification. WE COULD SET UP NEXIA CONSULTING, A SEPARATE COMPANY AND % OF NET PROFITS TO MIRABILIS. STAND ALONE WITH PROFITS BACK TO MIRABILIS FOR LOAN AND BACK TO MIRABILIS. THIS COULD BE DONE, BUT MAY INTERPLAY WITH CLEAN BREAK CONCEPT.

**Privileged**

3.  Edie shall retain all of her Mirabilis Stock subject to the same terms and limitations as other Mirabilis shareholders
[Edie Curry] Fine FORFEITS ALL STOCK.

4.  Edie shall retain the right, as an independent contractor, to participate in transactions that she may

5.   Edie shall resign from all offices and directorships that she may hold in Mirabilis or any of its subsidiaries or affiliates.
[Edie Curry] Fine

6.   All obligations of Mirabilis, Common Paymaster or any other affiliate or subsidiary of Mirabilis pursuant to any employment agreement that Edie has shall be null, void and of no further force or effect and Edie shall execute a general release in favor of all such entities. [Edie Curry] Agree that my employment contract and all obligations shall be null and void. Agree that I will execute a general release as to employment matters, but will want Mirabilis to indemnify me for any liability arising from my actions as an officer or Board member of Mirabilis. Release should not cover issues not relating to employment or duties as a Board member. The covenants and restrictions of the employment agreement(s) as applied to Edie, except for Nexia Strategy, shall remain in full force and effect in accordance with their terms.[Edie Curry] This contradicts first sentence and not sure what you are trying to accomplish here. BE SPECIFIC AS TO RESTRICTIONS. THERE IS NOT A CONFLICT. THE INTENTION WAS THAT SHE WOULD NOT COMPLETE AND WOULD NOT SOLICIT EMPLOYEES AS PER HER AGREEMENT WITH COMMON PAYMASTER, BUT THAT SHE WOULD RELEASE MIRABILIS. HER REQUEST TO EXCEPT MATTERS ON WHICH SHE WORKED AS AN OFFICER AND BOARD MEMBER IS APPROPRIATE AND IS COVERED BY D& O INSURANCE ALREADY IN PLACE.

**Privileged**

7.   I would also like a promissory note from Mirabilis to pay me $2,300,000 over five years at 7% interest. I earned a fee of approximately $3,000,000 for negotiating Presidion's obligations with Bob Gaines and Fred Sandlin Frank Amodeo requested that I take in the form of a note for $500,000 and stock supposedly worth $2,000,000 in lieu of that fee. I agreed to do this in good faith based on Frank's assertions that Frank was going to make things right. Frank's companies later acquired the assets of Presidion and stopped payment on the note and made the stock essentially valueless. While I might chalk this up to "that's the way it sometimes goes", the fact of the matter is that Mirabilis and its shareholders benefited directly from this at my expense. If I am being asked to pay something to Mirabilis to make things right, I should be able to expect similar treatment and believe I have a better claim to do so. I would also like an agreement that specifically states what I am entitled to be paid for bringing the AEM deal into Mirabilis. FOUNDATION FOR BASIS OF FEE UNCERTAIN. WE RECOMMEND CLEAN BREAK.

**Privileged**

8.   All existing Richmond employees shall remain employed under their current employment agreements with Common Paymaster and shall report to Frank Hailstones, who shall be responsible to assign to them at least 25 hours per week of billable time. These employees shall be permitted to provide assistance to Edie on the Nexia Certification program after completion of their assigned duties to Mr. Hailstones. [Edie Curry] They should be offered the option to have their contracts voided since Mirabilis hired them to set up a call center/factoring group in Richmond. SEVERANCE ISSUES ONLY. THEY CAN QUIT IF THEY WANT. THE PROMISE IS FOR THAT OF EMPLOYMENT AND THEY ARE SUBJECT TO BEING RE-ASSIGNED. IF THEY DON'T WANT TO WORK FOR COMMON PAYMASTER THEY CAN ALWAYS RESIGN THUS WE DO NOT HAVE TO GRANT THEM ANY NEW RIGHTS.

**Privileged**

9.   The foregoing shall not impact Tom Broadhead in any manner whose Employment Agreement shall remain in full force and effect in accordance with its terms and who shall also retain all right title and interest in and to his stock in Mirabilis on the same terms and limitations as other shareholders in said entity[Edie Curry]. Agreed

---

**From:** Frank Hailstones (M)
**Sent:** Thu 10/5/2006 6:19 PM
**To:** Edie Curry
**Subject:** FW: Edie Curry

Edie

This is what we have from the latest round of discussions. I will call you later to discuss

Frank

---

**From:** Richard E. Berman [mailto:reb@bermankean.com]