## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

MIRABILIS VENTURES, INC. and ) 
NEXIA STRATEGY CORPORATION, )
)
      Plaintiffs, )
)
-vs- )   CASE NO.: 6:07-CV-1788-ORL-28-KRS
)
PALAXAR GROUP, LLC; )
PALAXAR HOLDINGS, LLC; )
FRANK HAILSTONES; EDITH )
CURRY a/k/a EDITH BROADHEAD; )
and FICTITIOUS DEFENDANT 1; )
FICTITIOUS DEFENDANT 2; )
FICTITIOUS DEFENDANT 3; )
FICTITIOUS DEFENDANT 4; )
FICTITIOUS DEFENDANT 5; )
FICTITIOUS DEFENDANT 6; )
FICTITIOUS DEFENDANT 7; )
FICTITIOUS DEFENDANT 8 )
)
      Defendants. )
)

## AFFIDAVIT OF FRANK HAILSTONES

COUNTY OF SURREY    )
UNITED KINGDOM    )

    I, FRANK HAILSTONES, having been duly sworn according to law, hereby

depose and say:

    1.    My name is FRANK HAILSTONES. I am a Defendant in this action and

over the age of 21 and fully competent to testify in these proceedings.

    2.    I make this Affidavit in opposition to Plaintiffs' Motion for Preliminary

Injunction. I have reviewed the Complaint, Plaintiffs' Motion for Preliminary Injunction,

and the Declaration of Jodi Jaiman, including all of its exhibits. Except as otherwise



noted, all of the facts set forth in this Affidavit are known to me personally and, if called as a witness, I would testify competently to them.

3.     As will be more fully described in greater detail below, I executed, as the President of Plaintiff MIRABILIS VENTURES, INC. ("MIRABILIS"), the August 1, 2006 Assignment Agreement, attached as Exhibit "A" to Defendant EDITH CURRY's ("CURRY") Answer and Affirmative Defenses, and the October 31, 2006 Confidential Separation Agreement, attached as Exhibit "B" to Defendant CURRY's Answer and Affirmative Defenses (the "Separation Agreement"). To the best of my knowledge and belief, I did so with full authority on behalf of MIRABILIS. I did so pursuant to the **Based on** express prior direction of Frank Amodeo as to both agreements and with the express **Hearsay** approval of Richard Berman, corporate counsel for MIRABILIS at the time, on the Separation Agreement. I did so then believing, and still believing, that it was in the best interest of MIRABILIS at the time to enter into these agreements. I did so in good faith to discharge my duties and responsibilities to MIRABILIS and Plaintiff NEXIA STRATEGY CORPORATION ("NEXIA"). While an officer and director of Plaintiffs MIRABILIS and NEXIA I never at any time conspired, confederated, or agreed with Defendant CURRY or others to promote or favor their interests, or my own personal interest, over the interest of either Plaintiff MIRABILIS or Plaintiff NEXIA.

4.     I have never been a member, employee, or otherwise had an interest in Defendants PALAXAR GROUP, LLC ("PALAXAR") or PALAXAR HOLDINGS, LLC ("PALAXAR HOLDINGS").

5.     I have never received payment of any monies for any reason from or on account of PALAXAR or PALAXAR HOLDINGS.

190124_8

6.     Before joining MIRABILIS, I had spent seventeen (17) years with the international accounting and consulting firm, known as Pricewaterhouse when I began, that later became PricewaterhouseCoopers before I left ("PWC"). During that time, the expertise I developed was in the area of business governance solutions. While at PWC, I led and conducted internal audits in a range of sectors and managed PWC's Europe, Middle East and Africa Internal Audit practice. I led PWC's Global Team that developed the PWC internal audit methodology and supporting technologies. I also worked in business risk management and led PWC's business risk assessment approach using collaborative technology.

7.     In 2001, upon leaving PWC, I co-founded Axena, Inc. ("Axena"), a Florida corporation. In addition to being a major shareholder of Axena, I was also its Chairman and Chief Executive Officer. Axena developed and provided corporate governance software and services to businesses around the world. I specifically designed and implemented processes to support compliance with the new Sarbanes-Oxley Act requirements.

8.     Beginning early in 2005, Axena entered into discussions with Plaintiff MIRABILIS to design and develop a new risk management software program to be sold to professional employer organizations ("PEO"). As a result of that collaboration, by October 2005, MIRABILIS had acquired twenty-five percent (25%) of the shares in Axena.

9.     While the Chairman and CEO of Axena, all of my discussions, negotiations, and dealings with MIRABILIS regarding its investment in Axena were either with Frank Amodeo or through MIRABILIS officers whom I understood

190124_B

**No Personal
Knowledge**

represented or were taking their directions from Amodeo. Frank Amodeo was not a

director or officer of MIRABILIS, but I nevertheless understood he was the only Class

"A" shareholder of MIRABILIS and thus held voting control of MIRABILIS. I further

understood that MIRABILIS owned one hundred percent (100%) of the shares in Plaintiff

NEXIA. During my negotiations on behalf of Axena, I soon recognized that Amodeo

was effectively the ultimate decision-maker for both MIRABILIS and NEXIA. On many

occasions, I was informed both by Amodeo and others that he was responsible for      **Hearsay**

funding MIRABILIS and NEXIA. Because he controlled the funding of both companies,

I observed that Frank Amodeo asserted exclusive and personal control over the day-to-

day affairs of MIRABILIS and NEXIA.

10.    On or around October 3, 2005, after MIRABILIS' investment in Axena

was finalized, I began working with MIRABILIS in addition to continuing my Axena

duties. Within a month or so, Frank Amodeo advised me that I would be taking on a lead    **Hearsay**

consulting role with regards to NEXIA. I never received any formal correspondence or

documentation, such as a job description, concerning this change; nor were there any

changes to my terms and conditions of employment. Rather, Amodeo merely unilaterally

informed me that I would be leading the consulting business of NEXIA. In accordance

with Amodeo's direction, I did so. EDITH CURRY was at that time and remained until    **Hearsay**

October 27, 2006, the President and CEO of NEXIA. In a subsequent conversation with

her, however, I learned that she had been completely unaware of the change in my

responsibilities regarding NEXIA.

11.    Through my consulting role with regards to NEXIA, I began working with

CURRY. It was my understanding that as NEXIA's President, CURRY was tasked with

160124_8

**No Personal
Knowledge**

establishing and managing NEXIA's headquarters in Richmond, Virginia, at which a call

center, insurance operations, PEO processing, and benefits administration would be

located.

    12.   The scope and areas of business contemplated for NEXIA were outlined in

the first NEXIA draft consulting business plan, in November 2005.  CURRY then

informed me that she had other relevant background which would be useful in the context

of the proposed Nexia Governance and Compliance and the Forensic and Investigative

Services solutions.  I learned she had a particularly rich background with regard to anti-    **Hearsay**

fraud measures.  CURRY advised me that prior to becoming involved with MIRABILIS

or NEXIA, she had worked for a government research agency that had created a method

for using individuals' personal financial behavior to assess those individuals' suitability

for positions of trust.

    13.   According to CURRY, she and Michael Dement had been attempting to

commercialize their anti-fraud methodology since before their involvement with NEXIA    **Hearsay**

or MIRABILIS.

    14.   In late November 2005, during a meeting between CURRY, Michael

Dement, and me, I first discussed with them what would later become "Nexia

Certification."  Curry advised that we would have to seek permission from her former    **Hearsay**

employer before we could discuss it beyond concept stage.  That permission was not

obtained by her until January 2006.  Following that, for the next several months, we then

developed the underlying methodology and an outline of what ought to be necessary for

packaging and marketing the potential product, which CURRY had already partially

invented.

190124_8

15. Eventually, CURRY informed me that Frank Amodeo had agreed to fund

**Hearsay**

the development and commercialization of this product in exchange for a license from

CURRY to use the process.

16. I eagerly assisted CURRY with the development and commercialization of

this product because I saw the collateral consulting and commercial opportunities that it

could possibly bring for NEXIA. In 2006, once Amodeo had agreed to start funding it,   **Hearsay**

we began to call the potential new product "Nexia Certification." Never however did

anyone suggest that someone other than CURRY was responsible for creating the

product. Everyone I knew clearly acknowledged her as being the inventor of the product

and that it had been conceived before her time with MIRABILIS and NEXIA.

17. In the early months of the latter half of 2006, CURRY was still working

much of the time at Frank Amodeo's direction on implementing his plan for NEXIA to   **Hearsay**

open a headquarters in Richmond, Virginia. That facility was anticipated to perform all

the functions that are as outlined in paragraph 11 above for the benefit of the

MIRABILIS network of entities.

18. On January 2, 2006, I became the Chief Executive Officer of MIRABILIS.

This happened when Frank Amodeo called me into his office where a meeting of senior

MIRABILIS executives was already taking place. Amodeo personally informed me of

his decision to appoint me as CEO of MIRABILIS. He said that his rationale was that   **Hearsay**

MIRABILIS needed to build a proper infrastructure of policies, systems, and controls.

He thought my background was most relevant and best suited me for such a task. Again,

I neither received nor reviewed any correspondence or documentation concerning my

appointment as CEO. Similarly, I was not given a job description, and nothing changed

190124_8

- 6 -

about my terms and conditions of employment. Frank Amodeo just unilaterally appointed me and it was done.

19.     I held the title of either the President or the CEO of MIRABILIS from January 2, 2006 until December 31, 2006. I also served as a member of the Board of Directors for MIRABILIS from January 26, 2006 until January 31, 2007, the date of my separation from MIRABILIS.

20.     Frank Amodeo frequently appointed and replaced officers of MIRABILIS and NEXIA. To my knowledge, he never sought prior Board action or approval, so it was difficult for me to keep track of how my title may have changed. For example, on or around May 1, 2006, I was shown a new organizational chart by Fernando Simo, a member of the MIRABILIS Board of Directors. The organizational chart reflected that Frank Amodeo was taking over as the President and CEO of MIRABILIS. Shortly thereafter, this change was confirmed to me by Laurie Holtz, the Chairman of the MIRABILIS Board. Later, however, I was asked by Frank Amodeo to remain as President of MIRABILIS, pro-tem in title, so that MIRABILIS' ongoing deals would not be disturbed.

**Hearsay**

21.     My confusion over my status as President of MIRABILIS is further illustrated by the written action of the shareholders of NEXIA dated December 13, 2006, copy of which is attached as pages 1-3 of Exhibit "1" to the Declaration of Jodi Jaiman. This written action was signed by Fernando Simo as the President of MIRABILIS, a position that he had been appointed to on November 20, 2006 at a MIRABILIS Board meeting. To my understanding, however, Simo was not to officially become President of MIRABILIS until January 1, 2007. Curiously therefore, although Fernando Simo signed

190124_8

the December 13th written action as President of MIRABILIS, I believe that I was actually still the President of MIRABILIS on the date of that action, in title if not in fact.

22.     Frank Amodeo's style of personal dominance over all corporate affairs of the MIRABILIS entities made corporate offices and directorships much more akin to titles than actual roles and positions of real authority and responsibility. Throughout the tenure of my involvement with MIRABILIS and NEXIA, Frank Amodeo maintained tight control over the affairs of both companies. Although he often claimed to be merely a "consultant" for MIRABILIS, Frank Amodeo attended and directed the actions of most of the Board meetings, appointed and replaced chief officers at his pleasure, and made all significant financial and administrative decisions for MIRABILIS and NEXIA. Everyone involved with MIRABILIS and NEXIA knew and acknowledged that Amodeo was the ultimate decision-maker for all transactions involving MIRABILIS and NEXIA.

**Mental Operation**     23.     For example, on May 11, 2006, Jay Stollenwerk sent a surprisingly draconian email to all key employees of MIRABILIS, NEXIA, and other related entities. Remarkably, the email informed them that no one should pay any bills. Frank Amodeo would henceforth handle all disbursements and be solely responsible for all payments. The email further indicated, "At this time no one is authorized to spend, commit to, or incur a debt on behalf of any of our entities. Please communicate this to everyone within our network of companies." A true and correct copy of this email is attached hereto as Exhibit "A."

24.     Frank Amodeo infrequently got Board approval for his actions. When he did, however, it was typically to ratify actions that he had already taken or transactions to which he had already committed the companies.

190124_8

25.     Once I had become involved with NEXIA and got acquainted with EDITH CURRY, she and I oftentimes commiserated about the difficulties of working for Frank Amodeo.  Implementing Amodeo's unpredictable, unilateral, and seemingly arbitrary decisions frequently proved quite challenging.

26.     My work with Frank Amodeo was particularly problematical given my positions of apparent authority.  Even though I was ostensibly the President and/or CEO of MIRABILIS and NEXIA in the year 2006, I was not allowed to participate in the development of the MIRABILIS vision or strategy.  I was kept completely out of or, at most, on the extreme periphery of corporate finance and banking transactions.  Often I found myself unaware of what was happening with MIRABILIS and NEXIA and remained uncertain as to the future plans for either company.  For example, Frank Amodeo made all decisions regarding acquisitions, related investments, and the MIRABILIS investment profile.  Once these decisions were communicated to the officers of the affected companies, such as me, Amodeo directed us how to engage in negotiations with the potential acquisition or investment candidates.  All contractual documentation would then be developed in accordance with his directives.  Frequently, however, both before and after documentation had been prepared, commitments we had already made were subsequently ignored or Frank Amodeo precluded us from fulfilling them.  This made it extremely difficult to maintain credibility with potential acquisition or investment candidates.

27.     On or around July 28, 2006, EDITH CURRY informed me that she had had extensive discussions with Frank Amodeo, during which he reaffirmed that Nexia **Hearsay** Certification belonged to her.  She told me that Amodeo even signed a handwritten note

- 9 -

190124_8

indicating that CURRY owned all the rights to the antifraud software program she had   **Hearsay**

been developing known as Nexia Certification.  CURRY showed me the handwritten

note at that time.  A true and correct copy of this handwritten note is attached hereto as

Exhibit "B."   **No Personal Knowledge**

28.   My understanding was that on or about August 1, 2006, CURRY gave the

handwritten note to Scott Goldberg, an attorney working for MIRABILIS, who is now

representing Plaintiffs in this very case.  Scott Goldberg then drafted an assignment

agreement between MIRABILIS, as the assignor, and me, Curry, Laurie Holtz, and

Michael Dement, as the assignees.  Within a matter of days, Frank Amodeo personally   **Hearsay**

instructed me to sign the Assignment Agreement on behalf of MIRABILIS.  EDITH

CURRY was present when Amodeo told me to sign.  A true and correct copy of the

Assignment Agreement is attached as Exhibit "A" to the Answer and Affirmative

Defenses of Defendant CURRY.  I had no hand in initiating, negotiating, or drafting the

Assignment Agreement.  Since executing the Assignment Agreement, I have had no

ownership interest in Nexia Certification, because, well before I left MIRABILIS, I

personally signed another written assignment that transferred all the rights in Nexia

Certification to CURRY alone.

29.   Although the Assignment Agreement assigned Nexia Certification to

CURRY, the Agreement further provided that MIRABILIS would retain a "world-wide,

royalty-free, fully paid up, perpetual, irrevocable, non-exclusive license" to use Nexia

Certification. See Section 3 of Exhibit "A" to Defendant CURRY's Answer and

Affirmative Defenses.  To the extent MIRABILIS may have thereafter continued to

invest in the research and development of Nexia Certification, it did so in conjunction

190124_8

- 10 -

with CURRY. The rationale for this continued investment was that the development and sale of Nexia Certification was in NEXIA's best interest. We thought it would create an excellent opportunity for NEXIA to provide substantial collateral consulting services to Nexia Certification customers.

**Mental Operation**

30.    Jodi Jaiman, who has filed the sole Declaration in support of Plaintiffs' Motion for Preliminary Injunction, has no personal knowledge of and was in no way involved with the negotiation, drafting, or signing of the Assignment Agreement. In fact, Jaiman was not on the Board of Directors for MIRABILIS or NEXIA during the relevant time period. According to the minutes and resolutions attached to her Declaration as Exhibit "1," Jodi Jaiman never became President of MIRABILIS until March 2007. She only became President of NEXIA quite recently in October 2007 when it was reinstated with the Florida Secretary of State as an active corporation. To my knowledge, Jaiman was neither one of the senior executives nor a key player of either company during 2006. She is little more than an after the fact caretaker.

31.    I understand that on September 11, 2006, Defendant PALAXAR was formed as a limited liability company in Virginia. I have further learned that on December 18, 2006, another Virginia limited liability company, Defendant PALAXAR HOLDINGS, was formed. CURRY has told me she is a member of both PALAXAR and PALAXAR HOLDINGS. To my knowledge, the only other member of PALAXAR or PALAXAR HOLDINGS is Terrence Chu. I was not involved in the organization of either company, nor have I been a member of either company. I have assisted PALAXAR since leaving MIRABILIS and am quite interested in it eventually succeeding with Nexia Certification, even though to date I have realized no monetary

190124_B

benefit and neither CURRY nor PALAXAR is otherwise obligated to me as a result of my assistance.   CURRY and I continue to work together and help each other out occasionally on various ventures, besides Nexia Certification, that we separately own. No money has changed hands between us, however, as a result of any of this work or assistance.

32.   In that vein, I organized a company in the United Kingdom, where I reside, using the name Palaxar EMEA. CURRY is a director with me of Palaxar EMEA. My hope has been that I can one day distribute the Nexia Certification anti-fraud program in Europe under the Palaxar name should the program ever take off in the United States. Unfortunately that has yet to happen. I actually have gone no farther than registering the Palaxar name in the United Kingdom. PALAXAR has referenced it on PALAXAR's website as being its "London Office" although no legal or financial connection actually exists yet between the companies. Palaxar EMEA has never had a bank account, never actually done any business, has no capital, and has not realized a penny of revenue.

33.   Contained within Exhibit "8" to Jodi Jaiman's Declaration, on pages 42 and 47 are two biographical descriptions in conference brochures that appear to indentify me as being a co-founder of PALAXAR.  This is unfortunately untrue and, strictly speaking, is misleading.  As noted above, I have assisted CURRY from time to time in helping PALAXAR and PALAXAR HOLDINGS get off the ground, but was not a founder or a member of either. The materials in Exhibit 8 to Jodi Jaiman's Declaration got disseminated by the organizers of the respective conferences regrettably before I ever recognized there might be any need to correct them.

190124_8

34.    It is my understanding that Frank Amodeo, Laurie Holtz, Richard Berman, and other members of the MIRABILIS Board of Directors were aware at the time that CURRY was planning to form PALAXAR in Virginia. As early as June 2006, Laurie Holtz presented an update of the plans concerning Nexia Certification to Frank Amodeo which referenced the use of a new name for a company in Virginia – "'Palastar' (Not Nexia Certified)." A true and correct copy of this presentation is attached hereto as Exhibit "C."

35.    Around early September 2006, Frank Amodeo unilaterally decided that MIRABILIS would stop funding the Richmond facility and that NEXIA would no longer have operations there. Amodeo personally informed me that he would only fund fifty percent (50%) of the Richmond operations through January 1, 2007. This level of funding would only sustain the five Richmond individuals on payroll full-time through October 15, 2006 unless the Richmond operation itself generated fifty percent (50%) of the required funding. This arrangement effectively gave EDITH CURRY and her Richmond colleagues six weeks' notice, from September 5, 2006 until October 15, 2006, that MIRABILIS intended to cease funding NEXIA's headquarters in Richmond.

36.    Upon hearing of the reduction in funding from MIRABILIS, EDITH CURRY attempted to negotiate a separation agreement for her and the Richmond team. She dealt with Frank Amodeo, Richard Berman, and Laurie Holtz. A true and correct copy of a series of e-mails reflecting these negotiations is attached hereto as Exhibit "D." At that time, Richard Berman was a member of the MIRABILIS Board of Directors, an Executive Vice President, and the Chief Legal Counsel for MIRABILIS. Laurie Holtz was a MIRABILIS board member and the Chairman of its Board of Directors.

190124_8

**Mental Operation**              **Conclusory**

37.     I am also aware that a number of other MIRABILIS or Amodeo

associated-companies senior employees had knowledge of and were involved with the

negotiations leading up to CURRY's Separation Agreement.   These include senior

employees working for Common Paymaster, the MIRABILIS human resources function;

Shane Cobb, the COO of Common Paymaster; Phil Kaprow, the attorney for AQMI

Strategy, which was a company Frank Amodeo used to "consult" with MIRABILIS; Dan

Myers, who worked for AQMI Strategy; and Jay Stollenwerk and Shane Williams, both

of whom acted as personal assistants for Frank Amodeo.   Stollenwerk and Williams

collectively functioned as Frank Amodeo's "email-box" because Amodeo did not use

email directly.

38.     I became more personally involved in the later stages of negotiations over

the Separation Agreement between EDITH CURRY and MIRABILIS as those talks

became fractious.   I signed the Separation Agreement on October 26, 2006 in my

capacity as President of MIRABILIS after Richard Berman sent me and Laurie Holtz an **Privileged**

email stating that the final deal represented "fair value" and after Frank Amodeo told me **Hearsay**

he approved it.   Accordingly, only following extensive negotiations involving EDITH

CURRY, Richard Berman, Laurie Holtz, and Frank Amodeo, did I sign the Separation

Agreement.   A true and correct copy of CURRY's Separation Agreement is attached as

Exhibit "B" to Defendant CURRY's Answer and Affirmative Defenses. I had no part in

actually drafting either the initial terms or the final Separation Agreement.   To the best of

my knowledge, Richard Berman, counsel to MIRABILIS, did all drafting.   Once

prepared, the terms were approved by Frank Amodeo.   **Based on Hearsay**

- 14 -

39.     Even though the Separation Agreement states "Draft of Letter of Intent to

Edie Curry," it was intended by both parties to be the final document, which was to be

**Conclusory**

legally binding on CURRY and MIRABILIS. On November 14, 2006, I wrote an email

to Diana Kristona and copied Matthew Mokwa, Shane Cobb, and Richard Berman. The

email stated that I wanted to re-execute the Separation Agreement because it stated it was      **Hearsay**

in "draft" form.   However, I acknowledged that no changes had been made to the

Separation Agreement and that we would be merely re-executing it on "headed

notepaper."   In response, Richard Berman stated, "We can re-sign on nice paper but the

fact is that all parties already signed the agreement and I believe would be bound to it      **Privileged**

anyway."  As such, the Separation Agreement was never resigned to indicate that it was

not merely a "draft." A true and correct copy of this chain of emails is attached hereto as

Exhibit "E."                                                                    **Mental Operation**

40.     Again, to the best of my knowledge, Jodi Jaiman, who filed her

Declaration in support of Plaintiffs' Motion for Preliminary Injunction, has no personal

knowledge of and was in no way involved with the negotiation, drafting, or signing of the

Separation Agreement.

41.     The Separation Agreement confirmed that MIRABILIS had assigned all

rights, title, and interest in Nexia Certification to EDITH CURRY.  See Exhibit "B" to

Defendant CURRY's Answer and Affirmative Defenses at ¶ 1.   The Separation

Agreement provides that EDITH CURRY would retain her right as an independent

contractor to participate in transactions that she brought to MIRABILIS.  See Exhibit "B"

to Defendant CURRY's Answer and Affirmative Defenses at ¶ 5.   In addition, the

Separation Agreement contemplates that CURRY would create a new entity for the

**Conclusory**

- 15 -

## Conclusory

purpose of advancing Nexia Certification and performing consulting work. <u>See</u> Exhibit "B" to Defendant CURRY's Answer and Affirmative Defenses at ¶ 6. <u>This new entity</u> <u>would then execute a note in the amount of $500,000.00 to be paid to a second new entity</u> <u>from the first profits it earned.</u> <u>See</u> Exhibit "B" to Defendant CURRY's Answer and Affirmative Defenses at ¶ 6. <u>These two new entities would then engage in a "joint</u> <u>venture" from which the gross revenues would be shared equally.</u> <u>See</u> Exhibit "B" to Defendant CURRY's Answer and Affirmative Defenses at ¶ 7.

42. On December 13, 2006, Mirabilis, the sole shareholder of NEXIA, executed a written resolution, a true and correct copy of which is attached as Exhibit "1" to the Declaration of Jodi Jaiman. This resolution states, "BE IT RESOLVED, that except as otherwise set forth herein, the shareholders do hereby ratify and approve and effectuate all actions taken by the Board of Directors and Officers of the Corporation from the date of inception through December 13, 2006." This resolution was signed by Fernando Simo as the President of MIRABILIS, the NEXIA shareholder.

43. After CURRY left NEXIA, in October 2006, I maintained contact with her in my capacity as President/CEO of NEXIA. I intended to implement the terms of her Separation Agreement and to generate business for NEXIA that would benefit MIRABILIS. Specifically, on December 15, 2006, with CURRY and her then colleagues I attended and participated in a presentation to Wachovia Securities in Richmond for a potential consulting assignment opportunity that had originally been identified by CURRY. This assignment would have involved both CURRY and her colleagues and NEXIA. <u>Frank Amodeo and other senior executives at MIRABILIS and NEXIA were</u> <u>aware of my presence in Richmond and my involvement in this presentation.</u>

**Mental Operation**

- 16 -

Unfortunately, to my knowledge, the presentation did not result in any business for either CURRY or NEXIA.

44.     The Wachovia presentation was unquestionably a NEXIA sanctioned trip on my part. My travel arrangements to Richmond were made through MIRABILIS travel. Furthermore, while I was in Richmond, I telephoned into a MIRABILIS meeting of Board members that was taking place to discuss the funding of potential NEXIA investments in three companies. One of those companies, Certus, had a deadline that day for making a down payment pursuant to agreed terms. Frank Amodeo was present at the meeting. During my participation by telephone in the meeting, in mentioning the reason for my absence, I explicitly referenced my presence in Richmond with CURRY. I stated we were in pursuit of the consulting opportunity for NEXIA. At no time did Frank Amodeo or any of the other members of the MIRABILIS Board voice some object to my involvement in developing Nexia consulting opportunities with CURRY. Indeed, because MIRABILIS and/or NEXIA had invested in supporting the development of Nexia Certification, the Separation Agreement had been structured to enable MIRABILIS and NEXIA to recover their agreed upon investment costs should CURRY and her colleagues have benefited and been successful in taking the program to market.

45.     Despite my intention to remain with NEXIA, around mid-December 2006, the future operational status of NEXIA, and hence my position as its President and CEO, were called into question. The MIRABILIS Board decided that no potential NEXIA investments should proceed forward. This decision came as a result of both the failure to identify funding for the investments and NEXIA's lack of the means to service the cost of any funding if it could have been found. From that point forward, the decision not to

- 17 -

190124_8

invest in NEXIA, together with the pending significant downsizing of MIRABILIS, as a result of both the proposed sale of the PEO businesses and the focus on making MIRABILIS cash-neutral in 2007, raised in my mind the question as to whether any rationale remained for MIRABILIS having a consulting business.

46.     On December 28, 2006, a special meeting of the Board of Directors of MIRABILIS was held. I attended the entire meeting by telephone. A copy of the minutes is attached as pages 47-49 of Exhibit "1" to the Declaration of Jodi Jaiman. During this meeting, the Board discussed funding issues, tax issues, and the status of the sale of the PEO assets. As to the sale of the PEO assets, the minutes state:

> Holtz said that the PEO sales are another example of the control that Frank Amodeo has over [Mirabilis]. Holtz said that Mr. Amodeo has always had control of [Mirabilis], but that he was to turn control of [Mirabilis] over to professional business managers and an independent board of directors. So far, this has not happened, but the current Board needs to take steps to assure that it occurs.

Ex. "1" to Declaration of Jodi Jaiman, p. 47.

47.     These minutes once again demonstrate Frank Amodeo's obsessive control over all aspects of MIRABILIS and NEXIA. The Board, including myself, was very frustrated about how the operations of MIRABILIS and NEXIA were being seemingly manipulated by Amodeo.                                     **Mental Operation**

48.     In early January 2007, immediately following the holiday break, the staff of NEXIA was released or reallocated without any prior consultation or notice to me. I had no input, knowledge, or involvement in the decision. Shortly thereafter, Fernando Simo, the CEO of MIRABILIS, advised me that he had been told by Marty Flynn, an     **Hearsay** employee of Common Paymaster, that my salary was being reduced, from $180,000     — annually to nothing. My only possible compensation would be if I continued with

MIRABILIS as a director at my then-existing director fees of $72,000 per annum. This

decision was later rescinded at the request of Fernando Simo, and I was offered a second

tier role as a "strategist" for MIRABILIS. I was also advised that NEXIA had become

non-operational and my position was therefore eliminated. This was subsequently

memorialized in my release package.

**Based on Hearsay** —

49.     On January 17, 2007, I attended another special meeting of the Board of

Directors of MIRABILIS, this time in person. A copy of the minutes is attached as pages

50-51 of Exhibit "1" to the Declaration of Jodi Jaiman. The Board discussed the sale of

the PEO assets and its lack of control or understanding of that transaction. The minutes

provide:

> Mr. Simo then explained that the Board is increasingly concerned that it
> does not have control over its affairs. Mr. Holtz and Mr. Hailstones
> reminded the Board that they had prepared draft questions with the
> intention of having them presented to Mr. Amodeo, but that to date the
> questions have not been presented. Mr. Bernet noted that presenting the
> questions to Mr. Amodeo first would entail a lengthy meeting and then a
> substantial amount of time locating and reviewing documents that Mr.
> Amodeo will reference in his responses. Mr. Hailstones noted that it is
> incumbent on the Board to at least attempt to identify all of its obligations
> (whether arising under employment agreements with Common Paymaster
> Corporation, guarantees, etc.) and then try to deal with them. Mr. Bernet
> reported that to date he is simply responding to issues as they arise, and
> that the only way to attempt to assemble all of the obligations to which
> Mr. Hailstones referred would be to continue to attempt to investigate and
> locate . . . Mr. Hailstones said that he will re-send the list of questions he
> and Mr. Holtz had developed to Mr. Bernet, so that they can be put into a
> proper format, supplemented and then provided to Mr. Amodeo.

Ex. "1" to the Declaration of Jodi Jaiman, page 50-51.

50.     The minutes further reflect, "Mr. Simo said that Mr. Amodeo wants to

meet with the Board on January 30, 2007, presumably to announce that he will exercise

formal control over the company." Ex. "1" to the Declaration of Jodi Jaiman, page 51.

190124_8

51.   On or about this time, it was evident to me that I no longer had a viable career path in consulting at MIRABILIS. I negotiated a termination deal and release with Frank Amodeo, Mark Bernet, the General Counsel of MIRABILIS, and Bill Walsh, the CFO of MIRABILIS. The deal included three months of salary and health benefits. The deal also provided that Axena, which, after the sale of the majority of its assets to FoxT in October 2006, had become only a shell of a company, would be returned to me. On January 31, 2007, I left MIRABILIS. Unfortunately, MIRABILIS has to date paid none of the severance it agreed to pay me and has otherwise failed to honor the terms of the agreement I reached with it.

52.   On Saturday, October 13, 2007, EDITH CURRY and I were preparing for a presentation we were going to give the next day, Sunday, October 14, at an anti-fraud professional symposium in Scottsdale, Arizona. The presentation did not involve Nexia Certification. On that day, CURRY informed me that she had received a telephone call from an Orlando Sentinel reporter concerning the fact that she and I had just been sued by MIRABILIS. No one at MIRABILIS or NEXIA had ever previously tried to contact us concerning any potential dispute or claims. CURRY and I were thus quite shocked to find out that a lawsuit had been filed, a press release had been issued by Plaintiffs, and the story picked up by the media.

53.   On Monday morning, October 15, CURRY and I were approaching the site of the conference where approximately forty attendees of the symposium were having breakfast. Immediately outside, we were confronted by a group consisting of Aaron Bates, Plaintiffs' counsel who filed this current lawsuit, Matthew Mokwa, a former MIRABILIS attorney, Yaniv Amar, a former MIRABILIS employee, and an

180124_8

unidentified process server.  CURRY and I were served with copies of the lawsuit. Matthew Mokwa then held up the front-page article from the Orlando Sentinel and in a loud voice ridiculed and embarrassed CURRY and me in front of everyone.  Yaniv Amar also exchanged some hostile words with CURRY.  Their attendance and show-boating at the symposium were clearly designed for no other purpose than to embarrass me and CURRY and damage our reputations.  I have been honorably employed many years in assisting companies internationally to prevent and detect fraud.  As a consultant my reputation is all I have to sell.  By their egregious premeditated conduct, Plaintiffs and their counsel have attempted and partially succeeded in permanently damaging my good reputation.

**Conclusory**

54.    In continuing the development of Nexia Certification, Defendant CURRY has merely been fulfilling the terms of her Separation Agreement.  To the best of my knowledge, however, at this time, Nexia Certification has resulted in no revenues to Defendants CURRY, PALAXAR, or PALAXAR HOLDINGS and therefore, no payments on the $500,000.00 note are due to be made.  I have certainly yet to profit in any way from Nexia Certification and I currently have no personal financial interest whatsoever in the Nexia Certification product.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed on this 15 day of January, 2008, at 15 OLD BAILEY LONDON, ENGLAND EC4

Frank Hailstones

Before me
CONOR FUNSTON
Solicitor

Brocenell & Guiliani (UK) LLP       -21-
15 old Baily London EC4 7EF

190124_6

Exhibit "D" to Affidavit of Frank Hailstones
Pages 15-18

**Frank Hailstones**

**From:** Richard E. Berman [reb@bermankean.com]
**Sent:** 09 October 2006 18:12
**To:** Frank Hailstones (M); lholtz@rachlin.com
**Subject:** FW: Edie Curry                    **Privileged**

Please scroll down. My comments are in Capital Letters following those made by Edie.

Richard E. Berman, Esq.
Berman, Kean & Riguera, P.A.
2101 W. Commercial Blvd., Ste 2800
Fort Lauderdale, FL 33309
**Supreme Court Certified Mediator**
(954) 735-0000  Fax: (954) 735-3636
REB@BermanKean.com

This e-mail message, including attachments, if any, is intended only for the person to whom, or entity to which, it is addressed and may contain confidential and/or privileged material. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail, destroy all copies of the original message, and do not disseminate it further. If you are the intended recipient, but do not wish to receive communications through this medium, please advise the sender immediately.

**From:** Richard E. Berman
**Sent:** Monday, October 09, 2006 12:54 PM
**To:** Richard E. Berman
**Subject:** RE: Edie Curry

Richard E. Berman, Esq.
Berman, Kean & Riguera, P.A.
2101 W. Commercial Blvd., Ste 2800
Fort Lauderdale, FL 33309
**Supreme Court Certified Mediator**
(954) 735-0000  Fax: (954) 735-3636
REB@BermanKean.com

This e-mail message, including attachments, if any, is intended only for the person to whom, or entity to which, it is addressed and may contain confidential and/or privileged material. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail, destroy all copies of the original message, and do not disseminate it further. If you are the intended recipient, but do not wish to receive communications through this medium, please advise the sender immediately.

**From:** Frank Hailstones (M) [mailto:fhailstones@nexiastrategy.com]
**Sent:** Monday, October 09, 2006 11:45 AM
**To:** lholtz@rachlin.com; Richard E. Berman
**Subject:** FW: Edie Curry

Latest

**From:** Edie Curry
**Sent:** Monday, October 09, 2006 10:25 AM
**To:** Frank Hailstones (M)
**Subject:** RE: Edie Curry

This is a reaffirmation of the offer to be made to Edie after extensive discussion with Frank and Laurie. All right, title and interest in and to the Nexia Certification program would be assigned to Edie [Edie Curry] Agreed.

1.  As compensation for the foregoing, Edie and any new entity that she may form for the purpose of advancing Nexia Certification shall execute a Note payable to a charitable foundation to be formed by Mirabilis in the amount of $2.5M with interest at prime + 2% which shall accrue from the date of execution until paid. Payment of the Note shall be made to the charitable foundation to be formed from future revenues derived (%of gross sales) from the Nexia Certification program[Edie Curry] .Any payments made to Mirabilis or its designee should be based on Mirabilis' "investment" in the Certification product to date. The investment appears to be primarily the salaries of myself, Scott Hannah, Mark Wickersham, Tony Santillo and Jaqueline Poliquin and legal fees and expenses directly related to the patenting of the Certification program. I don't have a total of all of these costs. However, for sake of discussion, let's assume salaries total $600,000 since January 2006 and legal fees and expenses total $150,000. I believe half of the salary expense should be allocated to Mirabilis for the fact that Tony, Mark, Scott and Jacquelec were hired to set up the office in Richmond an spent a large part of their time during the first 4.5 months trying to accomplish that and then unwinding that. That makes the total attributable to the Certification program $450,000. Based on what a venture capital firm might charge in interest or have for an expected return on its funds that were at risk for an average of 4.5 months, I suggest a 50% permium, so the total to be repayed should be $675,000. The actual amount can be adjusted based on the actual, reasonable and necessary figures Mirabilis is able to document (for example, a lot of the legal fees are still outstanding). This amount can be paid to a foundation, but it must be a 501 (c) (3) foundation jointly agreed upon by Mirabilis and me and must benefit children in the U.S. NOT A MATTER OF COSTS. ENABLES HER TO CREATE A SUCCESS OR EVERYONE LOSES. IF THE 2.5m CAN'T BE PAID THEN IT MEANS THAT NEXIA STRATEGY HAD NO CHANCE OF SUCCESS. THIS IS A CHANCE FOR HER TO BECOME VERY WEALTHY. EITHER VERY GOOD OR WORTHLESS. IT SHOULDN'T STAND IN THE WAY OF HER OPPORTUNITY TO SUCCEED. IF SHE DOES NOT, IT COSTS HER NOTHING. IF SHE DOES, THIS IS A MEANINGLESS NUMBER. HOWEVER, AFTER DISCUSSION AND JUXTAPOSITION OF SUMS OWED TO HER, SOME OF WHICH ARE DOCUMENTED, INCLUDING NOTE PAYMENT AND SEVERANCE PAY, A COMPLETE BREAK-CLEAN-BY BOTH PARTIES SEEMS REASONABLE. THIS WOULD INCLUDE HER GIVING UP HER SHARES IN MIRABILIS AND ANY AFFILIATE, RESIGNING FROM ALL POSITIONS, ETC. ALSO, IT WAS NOTED THAT SINCE SHE IS CONCERNED ABOUT MIRABILIS AFFILIATION, SHE IS BETTER OFF NOT BEING A SHAREHOLDER.

2.  Nexia Strategy shall work with the Nexia Certification program and the profits from this joint venture shall be shared[Edie Curry] .Sharing of profits with a consulting group is theoretically fine, but this product will be highly involved with financial/banking and insurance companies and regulations. Banks and their affiliates will also be a primary target for this product. Because of various banking and insurance regulations, including Gramm-Leach Bliley's security regulations, FDICIA, and the PATRIOT Act, this program cannot have any association with companies or individuals that have any history of fraud or other criminal activity. Even without such regulations, such an association would be fatal in the marketplace. Therefore, affiliates of Mirabilis cannot be involved with this product. If Nexia was spun off and did not have any shareholders or controlling parties with such a history, an alliance might be possible. Similarly, if Nexia consultants were to form a separate company that was not affiliated with Mirabilis and did not have any controlling shareholders or employees with a history of fraud or other criminal activity, there would be the possibility of an alliance (a consulting affiliate or subsidiary of Fox Technology might be a real possibility). However, I would prefer that this issue be dealt with separately outside of the agreement for the Certification. WE COULD SET UP NEXIA CONSULTING, A SEPARATE COMPANY AND % OF NET PROFITS TO MIRABILIS. STAND ALONE WITH PROFITS BACK TO MIRABILIS FOR LOAN AND BACK TO MIRABILIS. THIS COULD BE DONE, BUT MAY INTERPLAY WITH CLEAN BREAK CONCEPT.

3.  Edie shall retain all of her Mirabilis Stock subject to the same terms and limitations as other

**Privileged**

**Privileged**

# Privileged

Mirabilis shareholders
[Edie Curry] Fine  FORFEITS ALL STOCK.
4.   Edie shall retain the right, as an independent contractor, to participate in transactions that
she may bring to Mirabilis or one of its affiliates or subsidiaries in the future, on mutually
agreeable terms.
[Edie Curry] Fine
5.   Edie shall resign from all offices and directorships that she may hold in Mirabilis or any of its
subsidiaries or affiliates.
[Edie Curry] Fine
6.   All obligations of Mirabilis, Common Paymaster or any other affiliate or subsidiary of Mirabilis
pursuant to any employment agreement that Edie has shall be null, void and of no further
force or effect and Edie shall execute a general release in favor of all such entities. [Edie
Curry] Agree that my employment contract and all obligations shall be null and void.  Agree
that I will execute a general release as to employment matters, but will want Mirabilis to
indemnify me for any liability arising from my actions as an officer or Board member of
Mirabilis.  Release should not cover issues not relating to employment or duties as a Board
member .  The covenants and restrictions of the employment agreement(s) as applied to
Edie, except for Nexia Strategy, shall remain in full force and effect in accordance with their
terms.[Edie Curry] This contradicts first sentence and not sure what you are trying to
accomplish here.  BE SPECIFIC AS TO RESTRICTIONS.  THERE IS NOT A CONFLICT.

**Privileged**  THE INTENTION WAS THAT SHE WOULD NOT COMPLETE AND WOULD NOT SOLICIT
EMPLOYEES AS PER HER AGREEMENT WITH COMMON PAYMASTER, BUT THAT SHE
WOULD RELEASE MIRABILIS. HER REQUEST TO EXCEPT MATTERS ON WHICH SHE
WORKED AS AN OFFICER AND BOARD MEMBER IS APPROPRIATE AND IS COVERED
BY D& O INSURANCE ALREADY IN PLACE.

7.   I would also like a promissory note from Mirabilis to pay me $2,300,000 over five
years at 7% interest. I earned a fee of approximately $3,000,000 for negotiating Presidion's
obligations with Bob Gaines and Fred Sandlin  Frank Amodeo requested that I take in the
form of a note for $500,000 and stock supposedly worth $2,000,000 in lieu of that fee.  I
agreed to do this in good faith based on Frank's assertions that Frank was going to make
things right.  Frank's companies later acquired the assets of Presidion and stopped payment
on the note and made the stock essentially valueless.  While I might chalk this up to "that's
the way it sometimes goes", the fact of the matter is that Mirabilis and its shareholders
benefited directly from this at my expense.  If I am being asked to pay something to Mirabilis

**Privileged**  to make things right, I should be able to expect similar treatment and believe I have a better
claim to do so. I would also like an agreement that specifically states what I am entitled to be
paid for bringing the AEM deal into Mirabilis.  FOUNDATION FOR BASIS OF FEE
UNCERTAIN. WE RECOMMEND CLEAN BREAK.

8.   All existing Richmond employees shall remain employed under their current employment
agreements with Common Paymaster and shall report to Frank Hailstones, who shall be
responsible to assign to them at least 25 hours per week of billable time. These employees
shall be permitted to provide  assistance to Edie on the Nexia Certification program after
completion of their assigned duties to Mr. Hailstones. [Edie Curry] They should be offered
the option to have their contracts voided since Mirabilis hired them to set up a call

**Privileged**  center/factoring group in Richmond.  SEVERANCE ISSUES ONLY.  THEY CAN QUIT IF
THEY WANT.  THE PROMISE IS FOR THAT OF EMPLOYMENT AND THEY ARE
SUBJECT TO BEING RE-ASSIGNED.  IF THEY DON'T WANT TO WORK FOR COMMON
PAYMASTER THEY CAN ALWAYS RESIGN THUS WE DO NOT HAVE TO GRANT THEM
ANY NEW RIGHTS.

9.   The foregoing shall not impact Tom Broadhead in any manner whose Employment
Agreement shall remain in full force and effect in accordance with its terms and who shall also
retain all right title and interest in and to his stock in Mirabilis on the same terms and
limitations as other shareholders in said entity[Edie Curry] . Agreed

From: Frank Hailstones (M)
Sent: Thu 10/5/2006 6:19 PM
To: Edie Curry
Subject: FW: Edie Curry

Edie

This is what we have from the latest round of discussions. I will call you later to discuss

Frank

**From:** Richard E. Berman [mailto:reb@bermankean.com]
**Sent:** Wednesday, October 04, 2006 12:31 PM
**To:** Frank Hailstones (M)
**Cc:** lholtz@rachlin.com
**Subject:** Edie Curry

This is a reaffirmation of the offer to be made to Edie after extensive discussion with Frank and Laurie.

1. All right, title and interest in and to the Nexia Certification program would be assigned to Edie

2. As compensation for the foregoing, Edie and any new entity that she may form for the purpose of advancing Nexia Certification shall execute a Note payable to a charitable foundation to be formed by Mirabilis in the amount of $2.5M with interest at prime + 2% which shall accrue from the date of execution until paid. Payment of the Note shall be made to the charitable foundation to be formed from future revenues derived (%of gross sales) from the Nexia Certification program

3. Nexia Strategy shall work with the Nexia Certification program and the profits from this joint venture shall be shared

4. Edie shall retain all of her Mirabilis Stock subject to the same terms and limitations as other Mirabilis shareholders

5. Edie shall retain the right, as an independent contractor, to participate in transactions that she may bring to Mirabilis or one of its affiliates or subsidiaries in the future, on mutually agreeable terms.

6. Edie shall resign from all offices and directorships that she may hold in Mirabilis or any of its subsidiaries or affiliates.

7. All obligations of Mirabilis, Common Paymaster or any other affiliate or subsidiary of Mirabilis pursuant to any employment agreement that Edie has shall be null, void and of no further force or effect and Edie shall execute a general release in favor of all such entities. The covenants and restrictions of the employment agreement(s) as applied to Edie, except for Nexia Strategy, shall remain in full force and effect in accordance with their terms.

8. All existing Richmond employees shall remain employed under their current employment agreements with Common Paymaster and shall report to Frank Hailstones, who shall be responsible to assign to them at least 25 hours per week of billable time. These employees shall be permitted to provide assistance to Edie on the Nexia Certification program after completion of their assigned duties to Mr. Hailstones.

9. The foregoing shall not impact Tom Broadhead in any manner whose Employment Agreement shall remain in full force and effect in accordance with its terms and who shall also retain all right title and interest in and to his stock in Mirabilis on the same terms and limitations as other shareholders in said entity

Richard E. Berman, Esq.
Berman, Kean & Riguera, P.A.
2101 W. Commercial Blvd., Ste. 2800
Fort Lauderdale, FL 33309
(954) 735-3636   Fax: (954) 735-3636

Exhibit "D" to Affidavit of Frank Hailstones
Pages 23-36

**Frank Hailstones**

| From: | Frank Hailstones (M) |
|---|---|
| Sent: | 11 October 2006 09:54 |
| To: | Richard E. Berman; lholtz@rachlin.com |
| Subject: | RE: Edie Curry |

Richard

I am tavelling to day - Houston and San Fran

I spoke to Edie last night. Outlined the terms; she is waiting to see them in writing

Can you run past Frank and email them to her. I will then call and follow up

Thanks

Frank Hailstones
CEO
111 N Orange Ave
Orlando
32801
407 517 7760 (Office)
407 592 5586 (Mobile)


-----Original Message-----
From: Richard E. Berman [mailto:reb@bermankean.com]
Sent: Tue 10/10/2006 9:55 AM
To: Frank Hailstones (M); lholtz@rachlin.com
Subject: RE: Edie Curry

Will wait to hear from you.

Richard E. Berman, Esq.
Berman, Kean & Riguera, P.A.
2101 W. Commercial Blvd., Ste 2800
Fort Lauderdale, FL 33309
Supreme Court Certified Mediator
(954) 735-0000    Fax: (954) 735-3636
REB@BermanKean.com

This e-mail message, including attachments, if any, is intended only for the person to
whom, or entity to which, it is addressed and may contain confidential and/or
privileged material. Any unauthorized review, use, disclosure or distribution is
prohibited. If you are not the intended recipient, please contact the sender by reply
e-mail, destroy all copies of the original message, and do not disseminate it further.
If you are the intended recipient, but do not wish to receive communications through
this medium, please advise the sender immediately.


From: Frank Hailstones (M) [mailto:fhailstones@nexiastrategy.com]
Sent: Monday, October 09, 2006 7:52 PM
To: Richard E. Berman; lholtz@rachlin.com
Subject: RE: Edie Curry


Did not get enough Irtime with Frank today to discuss
Am seeing him am so will pick up then
Told Edie we were working on it
Will let you know soon as
Thx

1

```
-----Original Message-----
From:    Richard E. Berman [mailto:reb@bermankean.com]
Sent:    Mon Oct 09 13:10:21 2006
To:      Frank Hailstones (M); lholtz@rachlin.com
Subject:       FW: Edie Curry
```

Please scroll down.  My comments are in Capital Letters following those
made by Edie.

Richard E. Berman, Esq.
Berman, Kean & Riguera, P.A.
2101 W. Commercial Blvd., Ste 2800
Fort Lauderdale, FL 33309
Supreme Court Certified Mediator
(954) 735-0000    Fax: (954) 735-3636
REB@BermanKean.com

This e-mail message, including attachments, if any, is intended only for
the person to whom, or entity to which, it is addressed and may contain
confidential and/or privileged material. Any unauthorized review, use,
disclosure or distribution is prohibited. If you are not the intended
recipient, please contact the sender by reply e-mail, destroy all copies
of the original message, and do not disseminate it further. If you are
the intended recipient, but do not wish to receive communications
through this medium, please advise the sender immediately.

From: Richard E. Berman
Sent: Monday, October 09, 2006 12:54 PM
To: Richard E. Berman
Subject: RE: Edie Curry

Richard E. Berman, Esq.
Berman, Kean & Riguera, P.A.
2101 W. Commercial Blvd., Ste 2800
Fort Lauderdale, FL 33309
Supreme Court Certified Mediator
(954) 735-0000    Fax: (954) 735-3636
REB@BermanKean.com

This e-mail message, including attachments, if any, is intended only for
the person to whom, or entity to which, it is addressed and may contain
confidential and/or privileged material. Any unauthorized review, use,
disclosure or distribution is prohibited. If you are not the intended
recipient, please contact the sender by reply e-mail, destroy all copies
of the original message, and do not disseminate it further. If you are
the intended recipient, but do not wish to receive communications
through this medium, please advise the sender immediately.

From: Frank Hailstones (M) [mailto:fhailstones@nexiastrategy.com]
Sent: Monday, October 09, 2006 11:45 AM
To: lholtz@rachlin.com; Richard E. Berman
Subject: FW: Edie Curry

Latest

From: Edie Curry
Sent: Monday, October 09, 2006 10:25 AM
To: Frank Hailstones (M)
Subject: RE: Edie Curry


This is a reaffirmation of the offer to be made to Edie after extensive
discussion with Frank  and Laurie.

All right, title and interest in and to the Nexia Certification program
would be assigned to Edie
[Edie Curry] Agreed.

1.                    As compensation for the foregoing, Edie and any new
entity that she may form for the purpose of advancing Nexia
Certification shall execute a Note payable to a charitable foundation to
be formed by Mirabilis in the amount of $2.5M with interest at prime +
2% which shall accrue from the date of execution until paid.  Payment of
the Note shall be made to the charitable foundation to be formed from
future revenues derived (%of gross sales) from the Nexia Certification
program[Edie Curry] .Any payments made to Mirabilis or its designee
should be based on Mirabilis' "investment" in the Certification product
to date.  The investment appears to be primarily the salaries of myself,
Scott Hannah, Mark Wickersham, Tony Santillo and Jaqueline Poliquin and
legal fees and expenses directly related to the patenting of the
Certification program.  I don't have a total of all of these costs.
However, for sake of discussion, let's assume salaries total $600,000
since january 2006 and legal fees and expenses total $150,000.  I
believe half of the salary expense should be allocated to Mirabilis for
the fact that Tony, Mark, Scott and Jacqueline were hired to set up the
office in Richmond an spent a large part of their time during the first
4.5 months trying to accomplish that and then unwinding that.  That
makes the total attributable to the Certification program $450,000.
Based on what a venture capital firm might charge in interest or have
for an expected return on its funds that were at risk for an average of
4.5 months, I suggest a 50% permium, so the total to be repayed should
be $675,000.  The actual amount can be adjusted based on the actual,
reasonable and necessary figures Mirabilis is able to document (for
example, a lot of the legal fees are still outstanding).  This amount
can be paid to a foundation, but it must be a 501 (c) (3) foundation
jointly agreed upon by Mirabilis and me and must benefit children in the
U.S.  NOT A MATTER OF COSTS.  ENABLES HER TO CREATE A SUCCESS OR
EVERYONE LOSES.  IF THE 2.5m CAN'T BE PAID THEN IT MEANS THAT NEXIA
STRATEGY HAD NO CHANCE OF SUCCESS.  THIS IS A CHANCE FOR HER TO BECOME
VERY WEALTHY.  EITHER VERY GOOD OR WORTHLESS.  IT SHOULDN'T STAND IN THE
WAY OF HER OPPORTUNITY TO SUCCEED.  IF SHE DOES NOT, IT COSTS HER
NOTHING.  IF SHE DOES, THIS IS  A MEANINGLESS NUMBER.  HOWEVER, AFTER
DISCUSSION AND JUXTAPOSITION OF SUMS OWED TO HER, SOME OF WHICH ARE
DOCUMENTED, INCLUDING NOTE PAYMENT AND SEVERANCE PAY, A COMPLETE
BREAK-CLEAN-BY BOTH PARTIES SEEMS REASONABLE.  THIS WOULD INCLUDE HER
GIVING UP HER SHARES IN MIRABILIS AND ANY AFFILIATE, RESIGNING FROM ALL
POSITIONS, ETC.  ALSO, IT WAS NOTED THAT SINCE SHE IS CONCERNED ABOUT
MIRABLILS AFFILIATION, SHE IS BETTER OFF NOT BEING A SHAREHOLDER.

**Privileged**

2.                    Nexia Strategy shall work with the Nexia
Certification program and the profits from this joint venture shall be
shared[Edie Curry] .Sharing of profits with a consulting group is
theoretically fine, but this product will be highly involved with
financial/banking and insurance companies and regulations.  Banks and
their affiliates will also be a primary target for this product.
Because of various banking and insurance regulations, including
Gramm-Leach Bliley's security regulations, FDICIA, and the PATRIOT Act,
this program cannot have any association with companies or individuals
that have any history of fraud or other criminal activity.  Even without
such regulations, such an association would be fatal in the marketplace.
Therefore, affiliates of Mirabilis cannot be involved with this product.

3

If Nexia was spun off and did not have any shareholders or controlling
parties with such a history, an alliance might be possible. Similarly,
if Nexia consultants were to form a separate company that was not
affiliated with Mirabilis and did not have any controlling shareholders
or employees with a history of fraud or other criminal activity, there
would be the possibility of an alliance (a consulting affiliate or
subsidiary of Fox Technology might be a real possibility). However, I
would prefer that this issue be dealt with separately outside of the
agreement for the Certification. WE COULD SET UP NEXIA CONSULTING, A
SEPARATE COMPANY AND  % OF NET PROFITS TO MIRABILIS.  STAND ALONE WITH
PROFITS BACK TO MIRABILIS FOR LOAN AND BACK TO MIRABILIS.  THIS COULD BE
DONE, BUT MAY INTERPLAY WITH CLEAN BREAK CONCEPT.

3.              Edie shall retain all of her Mirabilis Stock
subject to the same terms and limitations as other Mirabilis
shareholders
[Edie Curry] Fine  <u>FORFEITS ALL STOCK.</u>

**Privileged**

4.              Edie shall retain the right, as an independent
contractor, to participate in transactions that she may bring to
Mirabilis or one of its affiliates or subsidiaries in the future, on
mutually agreeable terms.
[Edie Curry] Fine

5.              Edie shall resign from all offices and
directorships that she may hold in Mirabilis or any of its subsidiaries
or affiliates.
[Edie Curry] Fine

6.              All obligations of Mirabilis, Common Paymaster or
any other affiliate or subsidiary of Mirabilis pursuant to any
employment agreement that Edie has shall be null, void and of no further
force or effect and Edie shall execute a general release in favor of all
such entities.  [Edie Curry] Agree that my employment contract and all
obligations shall be null and void.  Agree that I will execute a general
release as to employment matters, but will want Mirabilis to indemnify
me for any liability arising from my actions as an officer or Board
member of Mirabilis.  Release should not cover issues not relating to
employment or duties as a Board member .  The covenants and
restrictions of the employment agreement(s) as applied to Edie, except
for Nexia Strategy, shall remain in full force and effect in accordance
with their terms.[Edie Curry] This contradicts first sentence and not
sure what you are trying to accomplish here.  BE SPECIFIC AS TO
RESTRICTIONS.  THERE IS NOT A CONFLICT. THE INTENTION WAS THAT SHE WOULD
NOT COMPLETE AND WOULD NOT SOLICIT EMPLOYEES AS PER HER AGREEMENT WITH
COMMON PAYMASTER, BUT THAT SHE WOULD RELEASE MIRABILIS.  HER REQUEST TO
EXCEPT MATTERS ON WHICH SHE WORKED AS AN OFFICER AND BOARD MEMBER IS
APPROPRIATE AND IS COVERED BY D& O INSURANCE ALREADY IN PLACE.

**Privileged**

7.              I would also like a promissory note from
Mirabilis to pay me $2,300,000 over five years at 7% interest.  I earned
a fee of approximately $3,000,000 for negotiating Presidion's
obligations with Bob Gaines and Fred Sandlin  Frank Amodeo requested
that I take in the form of a note for $500,000 and stock supposedly
worth $2,000,000 in lieu of that fee.  I agreed to do this in good faith
based on Frank's assertions that Frank was going to make things right.
Frank's companies later acquired the assets of Presidion and stopped
payment on the note and made the stock essentially valueless.  While I
might chalk this up to "that's the way it sometimes goes", the fact of
the matter is that Mirabilis and its shareholders benefited directly
from this at my expense.  If I am being asked to pay something to
Mirabilis to make things right, I should be able to expect similar
treatment and believe I have a better claim to do so.  I would also like
an agreement that specifically states what I am entitled to be paid for
bringing the AEM deal into Mirabilis.   <u>FOUNDATION FOR BASIS OF FEE</u>
UNCERTAIN. WE RECOMMEND CLEAN BREAK.

**Privileged**

8.              All existing Richmond employees shall remain
employed under their current employment agreements with Common Paymaster
and shall report to Frank Hailstones, who shall be responsible to assign

4

to them at least 25 hours per week of billable time. These employees
shall be permitted to provide  assistance to Edie on the Nexia
Certification program after  completion of their assigned duties to Mr.
Hailstones. [Edie Curry] They should be offerred the option to have
their contracts voided since Mirabilis hired them to set up a call
center/factoring group in Richmond.   SEVERANCE ISSUES ONLY.   THEY CAN
QUIT IF THEY WANT.   THE PROMISE IS FOR THAT OF EMPLOYMENT AND THEY ARE
SUBJECT TO BEING RE-ASSIGNED.  IF THEY DON'T WANT TO WORK FOR COMMON
PAYMASTER THEY CAN ALWAYS RESIGN THUS WE DO NOT HAVE TO GRANT THEM ANY
NEW RIGHTS.                                                        **Privileged**

9.           The foregoing shall not impact Tom Broadhead in any
manner whose Employment Agreement shall remain in full force and effect
in accordance with its terms and who shall also retain all right title
and interest in and to his stock in Mirabilis on the same terms and
limitations as other shareholders in said entity[Edie Curry] . Agreed

---

From: Frank Hailstones (M)
Sent: Thu 10/5/2006 6:19 PM
To: Edie Curry
Subject: FW: Edie Curry

Edie


This is what we have from the latest round of discussions. I will call
you later to discuss


Frank

---

From: Richard E. Berman [mailto:reb@bermankean.com]
Sent: Wednesday, October 04, 2006 12:31 PM
To: Frank Hailstones (M)
Cc: lholtz@rachlin.com
Subject: Edie Curry


This is a reaffirmation of the offer to be made to Edie after extensive
discussion with Frank  and Laurie.


1.           All right, title and interest in and to the Nexia
Certification program would be assigned to Edie

2.           As compensation for the foregoing, Edie and any new
entity that she may form for the purpose of advancing Nexia
Certification shall execute a Note payable to a charitable foundation to
be formed by Mirabilis in the amount of $2.5M with interest at prime +
2% which shall accrue from the date of execution until paid.  Payment of
the Note shall be made to the charitable foundation to be formed from
future revenues derived (%of gross sales) from the Nexia Certification
program

3.           Nexia Strategy shall work with the Nexia
Certification program and the profits from this joint venture shall be

5

shared

4.              Edie shall retain all of her Mirabilis Stock
subject to the same terms and limitations as other Mirabilis
shareholders

5.              Edie shall retain the right, as an independent
contractor, to participate in transactions that she may bring to
Mirabilis or one of its affiliates or subsidiaries in the future, on
mutually agreeable terms.

6.              Edie shall resign from all offices and
directorships that she may hold in Mirabilis or any of its subsidiaries
or affiliates.

7.              All obligations of Mirabilis, Common Paymaster or
any other affiliate or subsidiary of Mirabilis pursuant to any
employment agreement that Edie has shall be null, void and of no further
force or effect and Edie shall execute a general release in favor of all
such entities.  The covenants and restrictions of the employment
agreement(s) as applied to Edie, except for Nexia Strategy, shall remain
in full force and effect in accordance with their terms.

8.              All existing Richmond employees shall remain
employed under their current employment agreements with Common Paymaster
and shall report to Frank Hailstones, who shall be responsible to assign
to them at least 25 hours per week of billable time. These employees
shall be permitted to provide  assistance to Edie on the Nexia
Certification program after  completion of their assigned duties to Mr.
Hailstones.

9.              The foregoing shall not impact Tom Broadhead in any
manner whose Employment Agreement shall remain in full force and effect
in accordance with its terms and who shall also retain all right title
and interest in and to his stock in Mirabilis on the same terms and
limitations as other shareholders in said entity


Richard E. Berman, Esq.

Berman, Kean & Riguera, P.A.

2101 W. Commercial Blvd., Ste. 2800

Fort Lauderdale, FL 33309

(954) 735-3636    Fax: (954) 735-3636


</HTML>

## Frank Hailstones

**From:**    Richard E. Berman [reb@bermankean.com]
**Sent:**    11 October 2006 16:19
**To:**      Frank Hailstones (M)
**Subject:** RE: Edie Curry / Richmond

I concur that it is very fair and will provide such a writing.                **Privileged**

Richard E. Berman, Esq.
Berman, Kean & Riguera, P.A.
2101 W. Commercial Blvd., Ste 2800
Fort Lauderdale, FL 33309
**Supreme Court Certified Mediator**
(954) 735-0000   Fax: (954) 735-3636
REB@BermanKean.com

This e-mail message, including attachments, if any, is intended only for the person to whom, or entity to which, it is
addressed and may contain confidential and/or privileged material. Any unauthorized review, use, disclosure or
distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail, destroy all
copies of the original message, and do not disseminate it further. If you are the intended recipient, but do not wish to
receive communications through this medium, please advise the sender immediately.

**From:** Frank Hailstones (M) [mailto:fhailstones@nexiastrategy.com]
**Sent:** Tuesday, October 10, 2006 9:03 PM
**To:** Richard E. Berman
**Subject:** Edie Curry / Richmond

Richard

I spoke with Laurie who was fine with the latest proposal;can I suggest you write up my notes by way of a formal offer
and run it past Frank. I will prime Edie re its contents tonight

Frank Hailstones
CEO
111 N Orange Ave
Orlando
32801
407 517 7760 (Office)
407 592 5586 (Mobile)

## Frank Hailstones

**From:**    Richard E. Berman [reb@bermankean.com]
**Sent:**    11 October 2006 16:18
**To:**      Frank Hailstones (M); lholtz@rachlin.com
**Subject:** RE: Edie Curry

I believe it all to be fair. I will review the terms with Frank.                **Privileged**

Richard E. Berman, Esq.
Berman, Kean & Riguera, P.A.
2101 W. Commercial Blvd., Ste 2800
Fort Lauderdale, FL 33309
**Supreme Court Certified Mediator**
(954) 735-0000   Fax: (954) 735-3636
REB@BermanKean.com

This e-mail message, including attachments, if any, is intended only for the person to whom, or entity to which, it is
addressed and may contain confidential and/or privileged material. Any unauthorized review, use, disclosure or
distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail, destroy all
copies of the original message, and do not disseminate it further. If you are the intended recipient, but do not wish to
receive communications through this medium, please advise the sender immediately.

**From:** Frank Hailstones (M) [mailto:fhailstones@nexiastrategy.com]
**Sent:** Wednesday, October 11, 2006 4:54 AM
**To:** Richard E. Berman; lholtz@rachlin.com
**Subject:** RE: Edie Curry

Richard

I am tavelling to day - Houston and San Fran

I spoke to Edie last night. Outlined the terms; she is waiting to see them in writing

Can you run past Frank and email them to her. I will then call and follow up

Thanks

Frank Hailstones
CEO
111 N Orange Ave
Orlando
32801
407 517 7760 (Office)
407 592 5586 (Mobile)

-----Original Message-----
**From:** Richard E. Berman [mailto:reb@bermankean.com]
**Sent:** Tue 10/10/2006 9:55 AM
**To:** Frank Hailstones (M); lholtz@rachlin.com
**Subject:** RE: Edie Curry

Will wait to hear from you.

Richard E. Berman, Esq.
Berman, Kean & Riguera, P.A.
2101 W. Commercial Blvd., Ste 2800
Fort Lauderdale, FL 33309
Supreme Court Certified Mediator
(954) 735-0000  Fax: (954) 735-3636
REB@BermanKean.com

This e-mail message, including attachments, if any, is intended only for
the person to whom, or entity to which, it is addressed and may contain
confidential and/or privileged material. Any unauthorized review, use,
disclosure or distribution is prohibited. If you are not the intended
recipient, please contact the sender by reply e-mail, destroy all copies
of the original message, and do not disseminate it further. If you are
the intended recipient, but do not wish to receive communications
through this medium, please advise the sender immediately.

---

From: Frank Hailstones (M) [mailto:fhailstones@nexiastrategy.com]
Sent: Monday, October 09, 2006 7:52 PM
To: Richard E. Berman; lholtz@rachlin.com
Subject: RE: Edie Curry


Did not get enough lrtime with Frank today to discuss
Am seeing him am so will pick up then
Told Edie we were working on it
Will let you know soon as
Thx

    -----Original Message-----
From:   Richard E. Berman [mailto:reb@bermankean.com]
Sent:   Mon Oct 09 13:10:21 2006
To:     Frank Hailstones (M); lholtz@rachlin.com
Subject:    FW: Edie Curry

Please scroll down. My comments are in Capital Letters following those
made by Edie.

Richard E. Berman, Esq.
Berman, Kean & Riguera, P.A.
2101 W. Commercial Blvd., Ste 2800
Fort Lauderdale, FL 33309
Supreme Court Certified Mediator
(954) 735-0000  Fax: (954) 735-3636
REB@BermanKean.com

This e-mail message, including attachments, if any, is intended only for
the person to whom, or entity to which, it is addressed and may contain
confidential and/or privileged material. Any unauthorized review, use,
disclosure or distribution is prohibited. If you are not the intended
recipient, please contact the sender by reply e-mail, destroy all copies
of the original message, and do not disseminate it further. If you are
the intended recipient, but do not wish to receive communications
through this medium, please advise the sender immediately.

---

From: Richard E. Berman
Sent: Monday, October 09, 2006 12:54 PM

To: Richard E. Berman
Subject: RE: Edie Curry


Richard E. Berman, Esq.
Berman, Kean & Riguera, P.A.
2101 W. Commercial Blvd., Ste 2800
Fort Lauderdale, FL 33309
Supreme Court Certified Mediator
(954) 735-0000  Fax: (954) 735-3636
REB@BermanKean.com

This e-mail message, including attachments, if any, is intended only for
the person to whom, or entity to which, it is addressed and may contain
confidential and/or privileged material. Any unauthorized review, use,
disclosure or distribution is prohibited. If you are not the intended
recipient, please contact the sender by reply e-mail, destroy all copies
of the original message, and do not disseminate it further. If you are
the intended recipient, but do not wish to receive communications
through this medium, please advise the sender immediately.

---

From: Frank Hailstones (M) [mailto:fhailstones@nexiastrategy.com]
Sent: Monday, October 09, 2006 11:45 AM
To: lholtz@rachlin.com; Richard E. Berman
Subject: FW: Edie Curry


Latest

---

From: Edie Curry
Sent: Monday, October 09, 2006 10:25 AM
To: Frank Hailstones (M)
Subject: RE: Edie Curry


This is a reaffirmation of the offer to be made to Edie after extensive
discussion with Frank  and Laurie.

All right, title and interest in and to the Nexia Certification program
would be assigned to Edie
[Edie Curry] Agreed.

1.        As compensation for the foregoing, Edie and any new
entity that she may form for the purpose of advancing Nexia
Certification shall execute a Note payable to a charitable foundation to
be formed by Mirabilis in the amount of $2.5M with interest at prime +
2% which shall accrue from the date of execution until paid.  Payment of
the Note shall be made to the charitable foundation to be formed from
future revenues derived (%of gross sales) from the Nexia Certification
program[Edie Curry] .Any payments made to Mirabilis or its designee
should be based on Mirabilis' "investment" in the Certification product
to date.  The investment appears to be primarily the salaries of myself,
Scott Hannah, Mark Wickersham, Tony Santillo and Jaqueline Poliquin and
legal fees and expenses directly related to the patenting of the

Certification program. I don't have a total of all of these costs.
However, for sake of discussion, let's assume salaries total $600,000
since january 2006 and legal fees and expenses total $150,000.  I
believe half of the salary expense should be allocated to Mirabilis for
the fact that Tony, Mark, Scott and Jacqueline were hired to set up the
office in Richmond an spent a large part of their time during the first
4.5 months trying to accomplish that and then unwinding that.  That
makes the total attributable to the Certification program $450,000.
Based on what a venture capital firm might charge in interest or have
for an expected return on its funds that were at risk for an average of
4.5 months, I suggest a 50% permium, so the total to be repayed should
be $675,000. The actual amount can be adjusted based on the actual,
reasonable and necessary figures Mirabilis is able to document (for
example, a lot of the legal fees are still outstanding).  This amount
can be paid to a foundation, but it must be a 501 (c) (3) foundation
jointly agreed upon by Mirabilis and me and must benefit children in the
U.S.  NOT A MATTER OF COSTS.  ENABLES HER TO CREATE A SUCCESS OR
EVERYONE LOSES.  IF THE 2.5m CAN'T BE PAID THEN IT MEANS THAT NEXIA
STRATEGY HAD NO CHANCE OF SUCCESS.  THIS IS A CHANCE FOR HER TO BECOME
VERY WEALTHY.  EITHER VERY GOOD OR WORTHLESS.  IT SHOULDN'T STAND IN THE
WAY OF HER OPPORTUNITY TO SUCCEED.  IF SHE DOES NOT, IT COSTS HER
NOTHING.  IF SHE DOES, THIS IS  A MEANINGLESS NUMBER.  HOWEVER, AFTER
DISCUSSION AND JUXTAPOSITION OF SUMS OWED TO HER, SOME OF WHICH ARE
DOCUMENTED, INCLUDING NOTE PAYMENT AND SEVERANCE PAY, A COMPLETE
BREAK-CLEAN-BY BOTH PARTIES SEEMS REASONABLE.  THIS WOULD INCLUDE HER
GIVING UP HER SHARES IN MIRABILIS AND ANY AFFILIATE, RESIGNING FROM ALL
POSITIONS, ETC.  ALSO, IT WAS NOTED THAT SINCE SHE IS CONCERNED ABOUT
MIRABLILS AFFILIATION, SHE IS BETTER OFF NOT BEING A SHAREHOLDER.

**Privileged**

2.          Nexia Strategy shall work with the Nexia
Certification program and the profits from this joint venture shall be
shared[Edie Curry] .Sharing of profits with a consulting group is
theoretically fine, but this product will be highly involved with
financial/banking and insurance companies and regulations.  Banks and
their affiliates will also be a primary target for this product.
Because of various banking and insurance regulations, including
Gramm-Leach Bliley's security regulations, FDICIA, and the PATRIOT Act,
this program cannot have any association with companies or individuals
that have any history of fraud or other criminal activity.  Even without
such regulations, such an association would be fatal in the marketplace.
Therefore, affiliates of Mirabilis cannot be involved with this product.
If Nexia was spun off and did not have any shareholders or controlling
parties with such a history, an alliance might be possible.  Similarly,
if Nexia consultants were to form a separate company that was not
affiliated with Mirabilis and did not have any controlling shareholders
or employees with a history of fraud or other criminal activity, there
would be the possibility of an alliance (a consulting affiliate or
subsidiary of Fox Technology might be a real possibility).  However, I
would prefer that this issue be dealt with separately outside of the
agreement for the Certification.  WE COULD SET UP NEXIA CONSULTING, A
SEPARATE COMPANY AND  % OF NET PROFITS TO MIRABILIS.  STAND ALONE WITH
PROFITS BACK TO MIRABILIS FOR LOAN AND BACK TO MIRABILIS.  THIS COULD BE
DONE, BUT MAY INTERPLAY WITH CLEAN BREAK CONCEPT.

**Privileged**

3.          Edie shall retain all of her Mirabilis Stock
subject to the same terms and limitations as other Mirabilis
shareholders
[Edie Curry] Fine  FORFEITS ALL STOCK.

**Privileged**

4.          Edie shall retain the right, as an independent
contractor, to participate in transactions that she may bring to
Mirabilis or one of its affiliates or subsidiaries in the future, on
mutually agreeable terms.
[Edie Curry] Fine

5.          Edie shall resign from all offices and

directorships that she may hold in Mirabilis or any of its subsidiaries
or affiliates.
[Edie Curry] Fine

6.          All obligations of Mirabilis, Common Paymaster or
any other affiliate or subsidiary of Mirabilis pursuant to any
employment agreement that Edie has shall be null, void and of no further
force or effect and Edie shall execute a general release in favor of all
such entities. [Edie Curry] Agree that my employment contract and all
obligations shall be null and void.  Agree that I will execute a general
release as to employment matters, but will want Mirabilis to indemnify
me for any liability arising from my actions as an officer or Board
member of Mirabilis.  Release should not cover issues not relating to
employment or duties as a Board member .  The covenants and
restrictions of the employment agreement(s) as applied to Edie, except
for Nexia Strategy, shall remain in full force and effect in accordance
with their terms.[Edie Curry] This contradicts first sentence and not
sure what you are trying to accomplish here.  BE SPECIFIC AS TO
RESTRICTIONS.  THERE IS NOT A CONFLICT. THE INTENTION WAS THAT SHE WOULD
NOT COMPLETE AND WOULD NOT SOLICIT EMPLOYEES AS PER HER AGREEMENT WITH
COMMON PAYMASTER, BUT THAT SHE WOULD RELEASE MIRABILIS. HER REQUEST TO
EXCEPT MATTERS ON WHICH SHE WORKED AS AN OFFICER AND BOARD MEMBER IS
APPROPRIATE AND IS COVERED BY D& O INSURANCE ALREADY IN PLACE.

**Privileged**

7.          I would also like a promissory note from
Mirabilis to pay me $2,300,000 over five years at 7% interest.  I earned
a fee of approximately $3,000,000 for negotiating Presidion's
obligations with Bob Gaines and Fred Sandlin  Frank Amodeo requested
that I take in the form of a note for $500,000 and stock supposedly
worth $2,000,000 in lieu of that fee.  I agreed to do this in good faith
based on Frank's assertions that Frank was going to make things right.
Frank's companies later acquired the assets of Presidion and stopped
payment on the note and made the stock essentially valueless.  While I
might chalk this up to "that's the way it sometimes goes", the fact of
the matter is that Mirabilis and its shareholders benefited directly
from this at my expense.  If I am being asked to pay something to
Mirabilis to make things right, I should be able to expect similar
treatment and believe I have a better claim to do so. I would also like
an agreement that specifically states what I am entitled to be paid for
bringing the AEM deal into Mirabilis.  FOUNDATION FOR BASIS OF FEE
UNCERTAIN. WE RECOMMEND CLEAN BREAK.

**Privileged**

8.          All existing Richmond employees shall remain
employed under their current employment agreements with Common Paymaster
and shall report to Frank Hailstones, who shall be responsible to assign
to them at least 25 hours per week of billable time. These employees
shall be permitted to provide  assistance to Edie on the Nexia
Certification program after  completion of their assigned duties to Mr.
Hailstones. [Edie Curry] They should be offerred the option to have
their contracts voided since Mirabilis hired them to set up a call
center/factoring group in Richmond.  SEVERANCE ISSUES ONLY.  THEY CAN
QUIT IF THEY WANT.  THE PROMISE IS FOR THAT OF EMPLOYMENT AND THEY ARE
SUBJECT TO BEING RE-ASSIGNED. IF THEY DON'T WANT TO WORK FOR COMMON
PAYMASTER THEY CAN ALWAYS RESIGN THUS WE DO NOT HAVE TO GRANT THEM ANY
NEW RIGHTS.

**Privileged**

9.          The foregoing shall not impact Tom Broadhead in any
manner whose Employment Agreement shall remain in full force and effect
in accordance with its terms and who shall also retain all right title
and interest in and to his stock in Mirabilis on the same terms and
limitations as other shareholders in said entity[Edie Curry] . Agreed

From: Frank Hailstones (M)
Sent: Thu 10/5/2006 6:19 PM
To: Edie Curry
Subject: FW: Edie Curry

Edie

This is what we have from the latest round of discussions. I will call
you later to discuss

Frank

From: Richard E. Berman [mailto:reb@bermankean.com]
Sent: Wednesday, October 04, 2006 12:31 PM
To: Frank Hailstones (M)
Cc: lholtz@rachlin.com
Subject: Edie Curry

This is a reaffirmation of the offer to be made to Edie after extensive
discussion with Frank and Laurie.

1.          All right, title and interest in and to the Nexia
Certification program would be assigned to Edie

2.          As compensation for the foregoing, Edie and any new
entity that she may form for the purpose of advancing Nexia
Certification shall execute a Note payable to a charitable foundation to
be formed by Mirabilis in the amount of $2.5M with interest at prime +
2% which shall accrue from the date of execution until paid. Payment of
the Note shall be made to the charitable foundation to be formed from
future revenues derived (%of gross sales) from the Nexia Certification
program

3.          Nexia Strategy shall work with the Nexia
Certification program and the profits from this joint venture shall be
shared

4.          Edie shall retain all of her Mirabilis Stock
subject to the same terms and limitations as other Mirabilis
shareholders

5.          Edie shall retain the right, as an independent
contractor, to participate in transactions that she may bring to
Mirabilis or one of its affiliates or subsidiaries in the future, on
mutually agreeable terms.

6.          Edie shall resign from all offices and
directorships that she may hold in Mirabilis or any of its subsidiaries
or affiliates.

7.          All obligations of Mirabilis, Common Paymaster or
any other affiliate or subsidiary of Mirabilis pursuant to any

employment agreement that Edie has shall be null, void and of no further force or effect and Edie shall execute a general release in favor of all such entities. The covenants and restrictions of the employment agreement(s) as applied to Edie, except for Nexia Strategy, shall remain in full force and effect in accordance with their terms.

8.        All existing Richmond employees shall remain employed under their current employment agreements with Common Paymaster and shall report to Frank Hailstones, who shall be responsible to assign to them at least 25 hours per week of billable time. These employees shall be permitted to provide assistance to Edie on the Nexia Certification program after completion of their assigned duties to Mr. Hailstones.

9.        The foregoing shall not impact Tom Broadhead in any manner whose Employment Agreement shall remain in full force and effect in accordance with its terms and who shall also retain all right title and interest in and to his stock in Mirabilis on the same terms and limitations as other shareholders in said entity

Richard E. Berman, Esq.

Berman, Kean & Riguera, P.A.

2101 W. Commercial Blvd., Ste. 2800

Fort Lauderdale, FL 33309

(954) 735-3636   Fax: (954) 735-3636

</HTML

</HTML

Exhibit "E" to Affidavit of Frank Hailstones

**From:** Richard E. Berman
**Sent:** Tuesday, November 14, 2006 5:00 PM
**To:** Frank Hailstones (M); Diana Kristona
**Cc:** Matthew Mokwa; Shane Cobb
**Subject:** RE: Edith Curry

We can re-sign on nice paper but the fact is that all parties already signed the
agreement and I believe would be bound to it anyway.

Richard E. Berman, Esq.
Berman, Kean & Riguera, P.A.                                              **Privileged**
2101 W. Commercial Blvd., Ste 2800
Fort Lauderdale, FL 33309
**Supreme Court Certified Mediator**
(954) 735-0000   Fax: (954) 735-3636
REB@BermanKean.com


This e-mail message, including attachments, if any, is intended only for the
person to whom, or entity to which, it is addressed and may contain confidential
and/or privileged material. Any unauthorized review, use, disclosure or
distribution is prohibited. If you are not the intended recipient, please contact the
sender by reply e-mail, destroy all copies of the original message, and do not
disseminate it further. If you are the intended recipient, but do not wish to
receive communications through this medium, please advise the sender
immediately.


**From:** Frank Hailstones (M) [mailto:fhailstones@nexiastrategy.com]
**Sent:** Tuesday, November 14, 2006 4:54 PM
**To:** Diana Kristona
**Cc:** Matthew Mokwa; Shane Cobb; Richard E. Berman
**Subject:** RE: Edith Curry

Diana

I have already covered this with 2 or 3 people in CPC over the last couple of weeks, but
for certainty, clarity and completeness, Edie resigned wef October 31.

The Letter you refer to was finalized, initially in draft so we had an agreed position, but I
understand was not formalized further, but is now being put on headed notepaper to be
re-signed

So, she should have been paid utl 31 October agreed with Melinda as correct on 5
November payroll which is cut-off 5 days prior

Frank