**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | |
|---|---|
| MIRABILIS VENTURES, INC. and NEXIA STRATEGY CORPORATION,<br><br>                  Plaintiffs,<br>-vs.-<br><br>PALAXAR GROUP, LLC;<br>PALAXAR HOLDINGS, LLC;<br>FRANK HAILSTONES; EDITH CURRY<br>a/k/a EDITH BROADHEAD; and TERENCE<br>CHU,<br><br>                 Defendants,<br><br>vs.<br><br>MIRABILIS VENTURES, INC., et al.<br><br>                Counterclaim and Third<br>                Party Defendants. | Case No.: 6:07-CV-1788-ORL-28-GJK |

## DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW

Defendants Palaxar Group, LLC ("Palaxar Group"), Palaxar Holdings, LLC ("Palaxar"), Frank Hailstones ("Hailstones") and Edith Curry ("Curry") (collectively "Defendants"), by and through their undersigned counsel, respectfully move this Court—pursuant to Fed.R.Civ.P. 56—for summary judgment on Plaintiffs' claims, as there are no genuine issues of material fact and Defendants are entitled to judgment as a matter of law. In support, Defendants rely on the Affidavit of Edith Curry in Support of Motion for Summary Judgment ("Curry Aff. #2); Affidavit of Frank Hailstones in Support of Motion for Summary Judgment ("Hailstones Aff. #2"); Affidavit of Laurie Holtz in Support of Motion for Summary Judgment ("Holtz Aff. #2); Defendants' Joint Memorandum in

1

Opposition to Plaintiffs' Motion for Preliminary Injunction filed January 23, 2008 with its accompanying Affidavits in Support, including those of Curry ("Curry Aff. #1) and Hailstones ("Hailstones #1"), and the Exhibits thereto; Defendants Answers and Affirmative Defenses and the Exhibits thereto; and several Exhibits to the Declaration of Jodi Jaiman filed January 4, 2008 in this case.[1]  Defendants further state as follows:

## I.   **INTRODUCTION**

On October 12, 2007, Plaintiffs Mirabilis Ventures, Inc. ("MVI") and Nexia Strategy Corporation ("Nexia") filed their original Complaint and Motion for Preliminary Injunction.  The gravamen of the Complaint is that Curry, while employed by the Plaintiff corporations, was tasked with developing an anti-fraud certification program known as "Nexia Certification" for the benefit of Plaintiff; that Curry and Hailstones developed Nexia Certification using confidential and proprietary information gathered from Plaintiffs; and that Curry and Hailstones then misappropriated Nexia Certification for their own benefit using a newly created corporation, Palaxar.

Immediately upon filing the Complaint, Plaintiffs issued a series of inflammatory press releases.  Then two of their attorneys, a former employee, and a process server flew across the country where, at a conference of audit managers, they staged a confrontational public "process-serving party" transparently designed to besmirch the reputations of Hailstones and Curry in front of their professional colleagues and to intimidate them from cooperating with the ongoing federal criminal investigation of MVI and its principal, Frank Amodeo ("Amodeo").  Yet when Plaintiffs' Motion for

---

[1] Defendants submit (by overnight courier) along with this Motion an Appendix in hard copy which contains all the documents relied on herein at the noted Tab Number, designated as "App. Tab" followed by the appropriate Tab Number.  In addition, Defendants submit a CD version of the Motion in electronic form containing hyperlinks to the Exhibits.

Preliminary Injunction was called before this Court, their case was revealed as little more than a series of statements either completely devoid of evidentiary support or as to which Plaintiffs submitted what must fairly be described as a combination of rank hearsay and outright sham testimony.[2]   By contrast, the material facts as to which Defendants submitted overwhelming evidence have not been—and indeed cannot be—disputed.

Curry conceived of the idea for the so-called Nexia Certification years before her involvement with MVI and Nexia.   During her brief association with Nexia and MVI, Curry shared her concept with Amodeo, who agreed to fund further development and commercialization of the product in exchange for a license for Plaintiffs to use it.   It soon was apparent, however, that neither MVI nor Nexia could possibly participate in the commercialization of Curry's anti-fraud certification concept, because both companies were controlled by Amodeo, a disbarred attorney with a federal felony conviction for fraud.   So that there could be no confusion as to the ownership and rights to use Nexia Certification, Curry requested and MVI agreed to assign to Curry, in writing, any claim of ownership it might have had to "Nexia Certification" in return for a royalty-free, world-wide, paid-up license to use the eventual product.   When Curry's employment with

---

[2] The sole evidentiary support for Plaintiffs' Motion for Preliminary Injunction was the Declaration of Jodi Jaiman, the current President of MVI, who was not involved in the subject matter of this case and whose supposed "personal knowledge" was based on her review of corporate documents, the vast majority of which are irrelevant to the case or support *Defendants'* position.  Beyond her incompetence as a witness, Jaiman's testimony was, in certain instances, outright false.  For example, Jaiman testified that Plaintiffs paid over $1 million in salaries attributable to the development of Nexia Certification, but that testimony was directly contradicted by sworn testimony from the very employees at issue.  And this case is not Jaiman's debut as a mouthpiece for MVI's false representations to courts.  For example, the claims against MVI in the case of HKS, Inc. v. Diamond Jaxx Properties, et al., Case No. 3-07CV0577-L (N.D. Texas) were dismissed without prejudice on the ground that the Court lacked personal jurisdiction over MVI in Texas.  That decision rested on Jaiman's sworn Affidavit that MVI had never maintained an office, employees or agents in Texas.  Jaiman Aff. at ¶ 11, attached as Exhibit 2 to Curry Aff. #2.  That affidavit was false, as demonstrated by Curry Aff. #2 at ¶ 6 (App. Tab A) and its accompanying Ex. 3 (App. Tab A-3) which plainly shows emails to and from officers of "Mirabilis Houston" and relevant pages from a June 2006 Newsletter listing Houston as a regional office of MVI.

Nexia and MVI ended, Curry and MVI executed a written Separation Agreement which reiterated that MVI and Nexia relinquished, "all right title and interest in and to the Nexia Certification program" to Curry in return for significant consideration designed to compensate MVI and/or Nexia for any investment they had made in the development of the product.[3]

In short, the undisputed facts utterly belie Plaintiffs' allegations that Curry, Hailstones and Palaxar misappropriated Nexia Certification. Curry owns and has always owned the intellectual property underlying Nexia Certification. Any claim of interest Plaintiffs might have had in Nexia Certification they assigned to her in 2006 for good value. Because each count of the Complaint is dependent on proof that Plaintiffs–rather than Curry–are the rightful owners of Nexia Certification, they cannot prevail in their lawsuit. Curry, Hailstones and Palaxar are entitled to judgment as a matter of law.

## II.    STATEMENT OF UNDISPUTED FACTS

1.    During the time period relevant to the Complaint, MVI was an equity fund that invested in a variety of ventures. Second Amended Complaint ("SAC") at ¶ 12. Nexia is a wholly-owned subsidiary of MVI. SAC at ¶ 2, 13.

2.    During the time period relevant to the complaint, Frank Amodeo held complete and exclusive control over the affairs and operations of both MVI and Nexia. See Hailstones Aff. #1 at ¶9 (App. Tab E); Curry Aff. #1 at ¶7 (App. Tab F); Ex. 3 to Holtz Aff. #2 (June, 2006 Narrative dictated by Frank Amodeo) (App. Tab C-3). On February

---

[3]  These dispositive agreements (one of which was drafted by Plaintiffs' former counsel Scott Goldberg) were not even mentioned in Plaintiffs' original complaint. Instead, Defendants attached them to their answers and filed a Motion for Judgment on the Pleadings predicated on them. In response to the crystal clarity of the two written agreements under which, as Plaintiffs' and their counsel well knew, Defendants had been open and notoriously operating during the prior 12 months, Plaintiffs amended their Complaint to allege that Hailstones and Curry themselves had drafted and executed the agreements without authorization, approval, or ratification of the MVI Board of Directors. These allegations are both utterly false and completely devoid of legal significance.

15, 2005, Amodeo signed the <u>Minutes of a Special Joint Meeting of the Directors and Shareholders of MVI</u> as the Sole Director and Shareholder.  See Ex. 6 to Curry Aff. #2. (App. Tab A-6).  As of August 26, 2005, Amodeo held at least 24,000 shares of MVI Class "A" voting capital common stock.  See <u>Amodeo Financial Statement</u> attached as Exhibit 1 to Holtz Aff. #2 (App. Tab C-1).  Those shares are non-transferable other than to the AQMI Trust.  See <u>MVI Shareholders Agreement,</u> included as Exhibit 1 to Curry Aff. #2, at ¶ 1.05 (App. Tab A-1).  Amodeo controlled the voting shares of MVI, and the company was operated in a manner fully consistent with Amodeo's self-proclaimed status as its owner.  <u>Hailstones Aff. #1 at ¶9</u> (App. Tab E); <u>Curry Aff. #1 at ¶7</u> (App. Tab F).  Amodeo attended and/or directed the actions of most MVI Board meetings, appointed and replaced officers and directors at his pleasure, and made significant financial and administrative decisions for MVI and Nexia.  See <u>Hailstones Aff. #1 at ¶22</u> (App. Tab E).  Amodeo infrequently got Board approval for his actions.  When he did, it was typically to ratify actions that he had already taken or transactions to which he had already committed MVI or its affiliated companies.  See <u>Hailstones Aff. #1 at ¶24</u> (App. Tab E).

3.      Hailstones was employed by MVI from October, 2005, until January 31, 2007. Hailstones was President of MVI from January 2, 2006 until December 31, 2006, and he was President of Nexia from October 27, 2006, through January 31, 2007.   Hailstones served on the MVI Board of Directors from January 25, 2006, until January 31, 2007. See <u>Hailstones Aff. at ¶¶ 18-19</u> (App. Tab E); <u>SAC at ¶ 14</u>.  Hailstones had ***no written employment agreement*** with either MVI or Nexia.  See Hailstones Aff. #2 at ¶ 3 (App. Tab B).

5

4.      As President of MVI, Hailstones was authorized to sign and execute, in the name of the corporation, contracts and agreements that had been authorized by the shareholders of the corporation.  See Bylaws of Nexia Strategy Corp., Decl. of Jaiman, Ex. 2, at ¶ 4.09 (App. Tab G).

5.      Before joining MVI, Hailstones spent seventeen years with the international accounting/consulting firm PricewaterhouseCoopers ("PWC") where he developed an expertise in corporate governance solutions and led a Global Team that developed the PWC internal audit methodology and supporting technologies.  See Hailstones Aff. #1 at ¶6 (App. Tab E). Later, Hailstones co-founded Axena, Inc. ("Axena"), a corporation that developed and provided corporate governance software and services to businesses worldwide.  See *id.* at ¶ 7 (App. Tab E).

6.      Curry was employed by Nexia from June 1, 2005, until October 31, 2006.  From October, 2005, until October 2006, Curry was Secretary/Treasurer of MVI and served on its Board of Directors.  See Curry Aff. #1 at ¶4 (App. Tab F).

7.      Prior to her involvement with MVI and Nexia, Curry had created a method for using individuals' personal financial behavior to assess those individuals' suitability for positions of trust.  The method consists of a process and an algorithm which she called "Illegal Uses and Sources of Funds" ("IUSF").  Before Curry joined MVI and Nexia, Curry and Michael Dement began to formulate a commercial application and use of the IUSF.  See Curry Aff. #1 at ¶ 5 (App. Tab F).

8.      In or about June, 2005, Curry was hired by Amodeo as a Senior Regional Officer to establish and manage Nexia's headquarters in Richmond, Virginia, which would include a call center, insurance operations, PEO processing, and benefits administration.

Curry's hiring by Nexia was unrelated to the IUSF invention or the invention of any product of any kind. See Curry Aff. #1 at ¶6 (App. Tab F). Curry and Nexia entered into a written Employment Agreement which contains no reference to IUSF, Nexia Certification or inventions of any kind. It lists Curry's duties exclusively as: "The business development and/or management of any current or prospective client-related activities," and, "[t]he development and/or management of the Virginia branch of Nexia Strategy Corporation." See id; (App. Tab F); see also Ex. 4 to Decl. of Jaiman pp. 67-78.

9.      In early 2006, Amodeo learned of Curry's earlier work creating the anti-fraud process/algorithm known as IUSF. He suggested that MVI would fund the development and commercialization of the product if Curry successfully established the Richmond operation. In exchange, Curry would give MVI and Nexia a license to use the product. These discussions were not reduced to writing. See Curry Aff. #1 at ¶10 (App. Tab F).

10.      The IUSF product was given the working title "Nexia Certification" only *after* Amodeo had agreed to start funding the commercialization of the anti-fraud product in return for a license to use it. See Curry Aff #1 at ¶9 (App. Tab F). At this point, Hailstones began assisting Curry with the development and commercialization of the anti-fraud product, believing it could bring significant collateral consulting and commercial opportunities to Nexia. See Hailstones Aff. #1 at ¶16 (App. Tab E). In refining the development of Nexia Certification while employed by Plaintiffs, Curry and Hailstones relied exclusively on knowledge, expertise, and materials they had acquired before they became associated with Plaintiffs or on information that was readily and publicly available. They did not gather, use, or rely on information that belonged to Nexia. See Curry Aff. #2 at ¶ 3 (App. Tab A).

11.    MVI and Nexia invested in the development of "Nexia Certification," but their investment was limited to legal fees, travel costs, and the like.  Curry, Hailstones, Laurie Holtz, and a few other Nexia employees contributed some of their time to the development of the product.  However, neither MVI nor Nexia  paid for separate office space or hired any employees to work solely on the development of Nexia Certification. See Curry Aff #1 at ¶11 (App. Tab F).

12.    Never during the employment of Curry and Hailstones, nor at any time prior to the filing of this lawsuit, did anyone at MVI or Nexia assert an ownership interest in Nexia Certification.  Id. at ¶¶10, 24 (App. Tab F). Nexia Certification was not listed as an asset on Nexia's balance sheet.  See Ex. 4 to Curry Aff. #2 (App. Tab A-4).  Neither Curry nor Hailstones agreed to name Nexia or MVI as the "owner" of the patent or to assign the rights to the Nexia patent application.  See Curry Aff. #2 at ¶ 4 (App. Tab A); Hailstones Aff. #2 at ¶ 4 (App. Tab B).

13.    By June, 2006, it was apparent that neither MVI nor Nexia could be involved with the commercialization of Nexia Certification, because both companies were controlled by Amodeo, a disbarred attorney who had a federal fraud conviction and had filed personal bankruptcy.  Curry Aff. #1 at 12 (App. Tab F).  Curry, Hailstones, Holtz, and Amodeo agreed that a new entity would be created to commercialize Nexia Certification and that all shareholders in the new entity would be "Nexia Certified," i.e. free of any serious negative financial or criminal history.  Id. at ¶¶12-14 (App. Tab F).

14.    On or about July 28, 2006, Curry and Amodeo met to discuss the plan for Nexia Certification.  Amodeo acknowledged that Curry owned Nexia Certification.  To ensure that there would be no question as to her exclusive ownership of Nexia Certification,

Curry asked Amodeo to sign a handwritten note to that effect. He did so. Curry Aff. #1 at ¶15 (App. Tab F) and Ex. C thereto (App. Tab F-Ex. C).

15.     Curry took this handwritten note to Scott Goldberg, an attorney then working in-house for MVI. Goldberg drafted the Assignment Agreement, attached as Exhibit A to Curry's Answer and Affirmative Defenses filed November 21, 2007 ("Assignment Agreement") (App. Tab F-Ex. D). See Curry Aff. #1 at 16 (App. Tab F); Hailstones Aff. #1 at ¶28 (App. Tab G). The Assignment Agreement was then executed by Hailstones, as President of MVI, in the presence of and at the express direction of Amodeo. *Id.* The Assignment Agreement provided that, in exchange for MVI's assignment, MVI's designated affiliate would have a "world-wide, royalty-free, fully paid up, perpetual, irrevocable, non-exclusive license" to use the resulting product. See Assignment Agreement (App. Tab F-Ex. D).

16.     In early September, 2006, Amodeo announced that MVI would cut the funding of Nexia's Richmond operation in October 2006. Curry Aff. #1 at ¶17 (App. Tab F) Hailstones Aff. #1 at ¶35 (App. Tab E). Curry then began negotiating the terms of an agreement for her separation from Nexia and MVI. Curry Aff. #1 at ¶17 (App. Tab F Hailstones Aff. #1 at ¶36 (App. Tab E). She communicated extensively with Amodeo, Richard Berman (MVI Board Member, Executive Vice-President, and Chief Legal Counsel), and Laurie Holtz (then Chairman of the Board of MVI). Id. The negotiations, which were conducted at arms length and were, at times, heated, are documented in a series of emails between and among the parties. See Ex. D to Hailstones Aff. #1 (App. Tab E-Ex.D).

17.     Hailstones became involved in the negotiations after they were underway. Several iterations of a proposed separation terms were circulated.  On or about October 11, 2006, Richard Berman determined that the final iteration of the terms of Curry's separation were "very fair."  Berman drafted a written agreement memorializing those terms. Curry signed the Separation Agreement on October 20, 2006.  Hailstones signed the Separation Agreement on October 26, 2006, only after Berman had determined it to be "fair" and after Amodeo authorized him to do so.  See Hailstones Aff. #1 at ¶38. (App. Tab F) and Exhibit D thereto.

18.     The Separation Agreement provided that Curry would create a new entity for the purpose of advancing the anti-fraud solution product, and that her new entity (which became Palaxar) would execute a note in the amount of $500,000 from the first profits it earned to be paid to a new MVI entity.  The two new entities would then work together in a planned joint venture from which the gross profits would be shared.  See Curry Aff. #1 at ¶ 19 (App. Tab F) and Separation Agreement.  Curry also agreed to waive existing claims she had against MVI, including claims to severance payments.    Moreover, the agreement provided:

> [T]he obligations of this Agreement shall survive as shall the restrictions contained in the Common Paymaster Employment Agreement as to you as employee thereunder, ***except to the extent necessary to permit you to . . . fully market and develop and market the Nexia Certification Program***.

Exhibit B to Curry's Answer and Affirmative Defenses at ¶ 8.

19.     In accordance with the Assignment Agreement and Separation Agreement, Curry formed Defendant Palaxar to develop and market her anti-fraud solution product.  See Curry Aff. #1 at ¶ 21 (App. Tab F).  Hailstones, on behalf of Nexia, maintained contact

with Curry in an effort to implement the terms of her Separation Agreement and to generate business for Nexia.   See id.; Hailstones Aff. #1 at ¶ 43-44 (App. Tab E). Amodeo and the Board of MVI were fully aware of Hailstones' and Curry's continuing efforts to commercialize the anti-fraud solution program after Curry's departure, and did nothing to discourage them.  See Hailstones Aff. #2 at ¶ 7 (App. Tab B); Holtz Aff. #2  at ¶ 8 (App. Tab C).

20.     At the start of January 2007, Amodeo unilaterally announced that MVI would no longer fund Nexia.  With Nexia's demise, Hailstones' consulting position was eliminated, resulting in his constructive termination.  See Hailstones Aff. #1 at ¶ 48 (App. Tab E).

21.     Hailstones is not and has never been a member or employee of Palaxar Group or Palaxar.  See Hailstones Aff. #1 at ¶¶ 4, 31 (App. Tab E).  Since leaving MVI on January 31, 2007, Hailstones has received no remuneration relating to the anti-fraud solution product from Curry, either Palaxar entity, or any other source.  Hailstones has no financial interest in Nexia Certification.  Hailstones Aff. #1 at ¶ 54 (App. Tab E).

22.     In continuing her development of the anti-fraud solution product, Curry is acting consistently with her Separation Agreement and, along with Palaxar, Curry has continuously tried to honor that agreement.  See Curry Aff. #1 at ¶ 22 (App. Tab F). MVI has fulfilled none of its concomitant obligations.  Curry has realized no revenue from the anti-fraud solution product.  Because MVI set up no entity to which a note could be paid, Curry cannot honor that provision.  See Curry Aff. #1 at ¶ 23 (App. Tab F).

23.     In early 2007, Nexia was dissolved.  Only the day before this lawsuit was filed, Nexia was reborn.   Its Board of Directors (consisting solely of Jodi Jaiman) authorized the reinstatement of Nexia for the sole purpose of filing lawsuits "to collect assets of the

corporation," and specifically this lawsuit.  See <u>Minutes of Special Meeting of the Board of Directors of Nexia Strategy Corporation dated October 11, 2007</u>, Exhibit H to this Motion.  (App. Tab H).  In the words of its attorney during oral argument on Plaintiffs' Motion for Preliminary Injunction, "Nexia is not in the anti-fraud business anymore. . . . Nexia is in the liquidation business."  <u>Tr. at 15-16</u> (Exhibit D to this Motion) (App. Tab D).

I.   **LAW AND ARGUMENT**

In the Second Amended Complaint, Plaintiffs brought claims against Curry and Hailstones for (1) breach of contract; (2) breach of fiduciary duty; (3) misappropriation of trade secrets pursuant to Florida's Uniform Trade Secrets Act; (4) conversion; (5) civil conspiracy; and (6) unjust enrichment.  Plaintiffs' claims all depend on their ability to establish ownership of "Nexia Certification."  Because Plaintiffs cannot prove ownership, there remain no genuine issues of material fact and Defendants are entitled to judgment as a matter of law.

A.   **The Standard for Summary Judgment**

Summary judgment is appropriate where the evidence shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Hampton v. City of South Miami,* 186 Fed. App'x. 967, 986 (11th Cir. 2006); *Royal Surplus Lines Ins. Co. v. Coachman Indust., Inc.,* 184 Fed. App'x 894, 899 (11th Cir. 2006).  Along with this Motion, Defendants submit overwhelming evidence demonstrating the absence of any genuine issue of material fact.  They are entitled to judgment as a matter of law.

**B.** **Plaintiffs' Claims Fail Because, Under Patent Law, Neither Nexia Nor MVI Ever Owned the Invention Referred to as "Nexia Certification."**

This is a dispute over the ownership of intellectual property and patent rights and, as such, is appropriately evaluated under principles of intellectual property and patent law. When the Court applies the applicable law to the undisputed facts, Plaintiffs' claims necessarily fail.[4]

Common to each of Plaintiffs' claims, regardless how those claims are styled, are the allegations that: Curry was "tasked" with creating Nexia Certification while she was employed by Nexia; Curry and Hailstones in fact developed the product using Plaintiffs' confidential and proprietary information; Curry agreed to obtain a patent for the product in the name of and for the benefit of Nexia; MVI paid all fees associated with the product's development and patent application; Curry then failed to patent the product in Nexia's name; and she, together with Hailstones and Palaxar, instead converted it to their own use. SAC at ¶¶16-20 and 23-37.

Defendants submit substantial evidence to disprove Plaintiffs' allegations as to the timing and circumstances of Curry's invention of Nexia Certification and the extent of MVI's financial contribution to the process. But even under Plaintiffs' unsupported version of the facts, their claims are precluded under applicable law. Critical to the analysis is Plaintiffs' acknowledgement that Curry invented Nexia Certification. As the inventor of Nexia Certification, Curry is the presumptive owner of the right to patent it and exclusively to use the invention. Schwartz, Patent Law and Practice, 96 and 42. As a matter of federal statutory law, patent rights are assignable only *in writing*. 35 U.S.C. §

---

5 This argument is addressed in greater detail at pages 13-16 of Defendants' Joint Memorandum in Opposition to Plaintiffs' Motion for Preliminary Injunction, which is incorporated by reference herein.

261.  Curry never assigned ownership of Nexia Certification to Plaintiffs.  Plaintiffs do not even allege that the required written assignment exists.  That is because it doesn't.

Equally unavailing is the suggestion that Plaintiffs acquired an ownership interest in Curry's invention because she and Hailstones pursued the development and commercialization of Nexia Certification while in Plaintiffs' employ and with their financial assistance.  "[A]n employer seeking patent rights to an employee's invention must prove that 'the contract of employment by express terms or unequivocal inference shows that the employee was hired for the express purpose of producing the thing patented.'"  *City of Cocoa v. Leffler*, 803 So.2d 869 (Fla. 5th DCA 2002) (quoting *State Board of Education v. Bourne*, 7 So.2d 838 (Fla. 1942).  The undisputed facts show that Curry was hired to perform tasks wholly unrelated to Nexia Certification or any other invention.  Hailstones employment by Plaintiffs, which was not even memorialized in a signed agreement, was also entirely unrelated to the invention of Nexia Certification.[5]

In short, Plaintiffs never owned the rights to Nexia Certification.  The invention and the right to patent and use it always belonged to Curry.  See Curry Aff. #2 at ¶8 and Ex. 5 thereto.  Because all of Plaintiffs' claims depend on Defendants' alleged wrongful misappropriation and use of Nexia Certification – and because Curry's possession and use of that invention were entirely lawful – Plaintiffs' claims fail as a matter of law.

---

[5]  The fact that Plaintiffs may, to a greater or lesser extent, have financed the development of Nexia Certification during the tenure of Curry's and Hailstones' employment is irrelevant to the legal analysis of the ownership issue.  Indeed, an employer could always be deemed to have contributed to the financing of an employee's invention to the extent it paid the employee a salary, yet the employee retains ownership of the invention save an express agreement to the contrary in the contract of employment.  See *Teets v. Chromalloy Gas Turbine Corp.*, 83 F.3d 403, 407 (Fed. Cir. 1996), *cert. denied*, 519 U.S. 1009 (1996).

**C.    Plaintiffs' Claims Fail Because They Relinquished any Claims to Nexia Certification by The Assignment and Separation Agreements.**

Beyond the dispositive effect of patent law on Plaintiffs' claims, two written agreements unmistakably establish Curry's rightful claim to the invention.   Either agreement alone is sufficient to defeat each of Plaintiffs' claims for relief.  Together, they are an impenetrable firewall barring the Complaint.

Faced with the existence and clarity of the agreements—and the undisputed fact that Defendants, in obvious reliance on the agreements, have, for months, been openly acting pursuant to their terms—Plaintiffs now posit that both the Assignment Agreement and Separation Agreement are void because they were not approved by the shareholders and directors of MVI and Nexia.   In support, Plaintiffs rely on Fla. Stat. § 607.0832, which deals with board actions involving interested directors, and Fla. Stat. § 607.1202, which deals with transactions involving the sale of substantially all the assets of the corporation. See Tr. at p. 10-13.  Neither statute is applicable to either agreement.

Plaintiffs assert that Fla. Stat. § 607.0832, "says specifically that if you've got a conflict of interest, if you're going to make an assignment to yourself, basically, it must be authorized, approved or ratified by a vote of the board of directors." See Tr. at p.14 (App. Tab D).   ***The statute says no such thing.***  Section 607.0832 deals with the validity of board or committee actions in which an interested director participates.[6]  If a director

---

[6]  Fla. Stat. § 607.0832 provides, in pertinent part:

(1) No contract or other transaction between a corporation and one or more of its directors . . . shall be void or voidable because of such relationship or interest, because such director or directors are present at the meeting of the board of directors or a committee thereof which authorizes, approves, or ratifies such contract or transaction, or because his or their votes are counted for such purpose, if:

***participates in a board action*** in which he or she has an interest, then § 607.0832 requires the director to either disclose the relationship to the board or obtain the authorization of the shareholders, ***unless*** the contract is fair and reasonable as to the corporation at the time it is authorized. "The statute does not state that an individual board member must go before the board of directors for a particular transaction." <u>In re Thurman</u>, 121 B.R. 888, 891 (N.D. Fla. 1990). Section 607.0832 did not require Hailstones or Curry to take the Assignment Agreement or the Separation Agreement before the MVI board of directors.[7]

Plaintiffs' are also incorrect in suggesting that the Assignment and Separation Agreements are voidable under Fla. Stat. § 607.1202, which requires board and shareholder approval when a corporation disposes of "all, or substantially all, of its property . . . ." Nexia Certification was the property of Curry, not MVI or Nexia. Curry

---

(a) The fact of such relationship or interest is disclosed or known to the board . . . which authorizes, approves or ratifies the contract . . .

(b) The fact of such relationship or interest is disclosed or known to the shareholders entitled to vote and they authorize, approve, or ratify such contract . . .

(c) The contract or transaction is fair and reasonable as to the corporation at the time it is authorized . . .

[7]  To be sure, even if Section 607.0832 did apply as Plaintiffs erroneously claim, it would not void the agreements, because both were approved by the controlling shareholder and both were fair to the corporation. Amodeo signed a handwritten note surrendering to Curry any claimed interest MVI had in Nexia Certification (<u>Curry Aff. #1 at 15</u> and <u>Ex. C</u> thereto) and then instructed Hailstones to execute the Assignment Agreement that implemented his directive. <u>Curry Aff. #1 at 16</u> (App. Tab F); <u>Hailstones Aff. #1 at 28</u> (App. Tab E). After participating in extensive negotiations, Amodeo approved the written Separation Agreement drafted by Berman. <u>Hailstones Aff. #1 at 28</u> (App. Tab E). The shareholders of Nexia, in fact, formally ratified both agreements in the <u>Written Action of the Shareholders dated December 13, 2006</u>.

Both agreements were unquestionably fair to Plaintiffs. Curry invented Nexia Certification, and neither MVI nor Nexia had any legal claim to it. Nor was either corporation in any position to commercialize Nexia Certification given Amodeo's criminal record. <u>Curry Aff. #1 at 12-14</u>. Yet under the <u>Assignment Agreement</u>, MVI received a world-wide, royalty free license to use the eventual product. In the <u>Separation Agreement</u>, MVI, for the second time, "gave up" that to which it was not entitled— ownership in Nexia Certification—and, in return, received a $500,000 note and a share in future profits which represented the negotiated settlement value of MVI's investment in the product's development as set off against Curry waiver of her right to severance pay stemming from MVI's unilateral decision to effectively terminate her employment. As MVI General Counsel Berman declared at the time the Separation Agreement was authorized, it was "very fair." <u>Hailstones Aff. #1 at 38</u> (referring to <u>email of Richard Berman dated October 11, 2006</u>) (App. Tab E).

was the inventor of Nexia Certification and, therefore, its presumptive owner.   She

neither assigned her invention to Plaintiff in writing, See 35 U.S.C. §261, nor did her

employment contract, "by express terms or unequivocal inference" show that Plaintiffs

hired her "for the express purpose of producing [Nexia Certification]." See *City of Cocoa*

*v. Leffler*, *supra*.   Nexia Certification was never listed on Plaintiffs' balance sheet, See

Curry Aff. #2 at ¶ 7 and its accompanying Exhibit 4, nor did MVI or Nexia ever assert

any ownership interest in Nexia Certification during the more than one year after

execution of the Assignment and Separation Agreements. See Curry Aff. #2 at ¶ 4;

Hailstones Aff. #2 at ¶ 4.   Florida law did not require approval of either agreement.

**D.      Each of Plaintiffs' Individual Claims Fails as a Matter of Law.**

1.      Breach of Contract

Plaintiffs allege that Curry and Hailstones breached a confidentiality provision in

their employment contracts by disclosing and communicating confidential information to

others by marketing "Nexia Certification."   Pursuant to Florida law, the elements of a

breach of contract are: (1) a valid contract, (2) a material breach, and (3) damage. *Border*

*Collie Rescue, Inc. v. Ryan*, 418 F. Supp. 2d 1330, 1342 (M.D. Fla. 2006).   Plaintiffs

cannot possibly prove a breach of contract.

Hailstones never executed an employment contract with *either* Plaintiff and Curry

never executed an employment contract with MVI.   Absent a valid contract, there can be

no breach or damages resulting from a breach.   Curry's employment agreement with

Nexia contained a confidentiality provision, but the undisputed facts show that she did

not breach it.   Curry owned Nexia Certification.   Accordingly, her marketing of the anti-

fraud solution product cannot and did not violate the confidentiality provision.   In

addition, Curry's Separation Agreement specifically permitted the use of Plaintiffs'

claimed confidential information so long as it was "to fully develop and market" her anti-fraud solution program.   Exhibit B to Curry's Answer and Affirmative Defenses filed November 21, 2007 at ¶ 8

    2.    <u>Breach of Fiduciary Duty</u>

Plaintiffs claim that Curry and Hailstones breached their fiduciary duty through self dealing and the use of Plainiffs' personal property for their own benefit by "drafting and signing documents purporting to transfer Nexia Certification to themselves . . . without the authorization, approval or ratification of the Board of Directors" <u>SAC at ¶45</u>. The elements of a breach of fiduciary duty claim are: (1) the existence of a fiduciary duty; (2) breach of that duty; and (3) damage proximately caused by that breach. *Border Collie Rescue,* 418 F. Supp. 2d at 1342. The undisputed facts establish that neither Curry nor Hailstones breached a fiduciary duty to plaintiffs.

First, there is no support for the underlying factual premise of Plaintiffs' fiduciary duty argument. Nexia Certification was not the property of Plaintiffs; it belonged to Curry. Curry did not use ***Plaintiffs'*** property for her own benefit. To the contrary, she allowed Plaintiffs to benefit from the use of ***her*** property by granting them a license. Second, neither Curry nor Hailstones drafted either the Assignment Agreement or the Separation Agreement. The Assignment Agreement was drafted by MVI attorney Goldberg and the Separation Agreement was drafted by MVI General Counsel Berman. Hailstones signed both agreements pursuant to his actual and apparent authority as President of MVI on the authorization of controlling shareholder Amodeo, MVI Board Chairman Holtz and MVI Board member and General Counsel Berman. Accordingly, the stated factual predicate for Plaintiffs' claim of self-dealing is non-existent.

Equally flawed is Plaintiffs' fundamental assumption that because Curry was a director and officer of MVI, she owed a fiduciary duty in connection with the execution of the Assignment and Separation Agreements. "Florida law has long recognized that corporate officers and directors owe duties of loyalty and a duty of care to the corporation." *Welt v. Jacobson (In re Aqua Clear Techs., Inc.)*, 361 B.R. 567, 575 (Bankr.S.D.Fla.2007) (citing *Cohen v. Hattaway,* 595 So.2d 105 (Fla. 5th DCA 1992); *B & J Holding Corp. v. Weiss,* 353 So.2d 141 (Fla. 3rd DCA 1978)). But in order for the duties of loyalty and care to come into play, it must first be established that a director or officer was acting in his or her ***fiduciary capacity*** when engaging in a particular transaction. Curry was undoubtedly acting in her individual capacity, not in her fiduciary capacity, in executing both the Assignment and Separation Agreements.

*In re Thurman*, 121 B.R. 888 (N.D. Fla. 1990) is illustrative. Thurman had a loan with First National Bank of Northwest Florida ("FNB") which was collateralized by a large tract of real estate. Thurman later became a member of FNB's board of directors. While a director, Thurman persuaded the bank's president to release the bank's lien on part of the collaterized property. When Thurman's loan eventually went into default and the remaining property was insufficient to pay off the amount owed, the bank sought to set aside the release of lien, contending that the transaction in which the lien was released constituted a breach of Thurman's fiduciary duty as a director of the bank. The court disagreed, holding that in order for liability to attach, "Thurman must have been acting in his fiduciary capacity when the alleged defalcation occurred." *Id.* at 890. The court explained:

> Thuman was [not] acting in his fiduciary capacity when he
> asked the president of the bank for a release; he was acting

> as any other debtor. Since he was acting as an ordinary
> debtor, he did not breach any fiduciary duty to FNB when
> he obtained the partial release.

Although, as a director of MVI, Curry owed a fiduciary duty to the company, she owed no such duty when negotiating and executing the Assignment and Separation Agreements. Curry engaged in those transactions, not as a fiduciary of MVI, but rather in her individual capacity as the inventor of Nexia Certification and as a soon-to-be former employee whose position was adverse to MVI and Nexia.   She had no fiduciary duty to Plaintiffs under these circumstances.

    3.    Misappropriation of Trade Secrets and Confidential Information

Plaintiffs' third claim is that Hailstones and Curry misappropriated Plaintiffs' trade secrets and confidential information, including information concerning Nexia Certification.   "To show a misappropriation of a trade secret under Florida law, a claimant must prove: (1) the plaintiff possessed secret information and took reasonable steps to protect its secrecy and (2) the secret it possessed was misappropriated." *Border Collie Rescue, Inc. v. Ryan*, 418 F. Supp. 2d 1330, 1338 (M.D. Fla. 2006).[8]

---

[8] Under Florida's Uniform Trade Secrets Act, a trade secret is information that:

> (1)    derives actual or potential independent economic value from not being generally known to, and not being readily ascertainable through proper means by, other persons who can obtain economic value from its disclosure or use; and

> (2)    is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Fla. Stat. § 688.002(4).  Misappropriation occurs when a trade secret is disclosed or used without consent by an individual who obtained the knowledge of the secret through improper means "or had reason to know that her or his knowledge of the trade secret . . . was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use."  Fla. Stat. § 688.002(2) (cited in *Jadael Inc. v. Elliott*, No. 6:05-cv-1623-Orl-DAB, 2007 U.S. Dist. LEXIS 63696, *20 (M.D. Fla. Aug. 29, 2007)).

Plaintiffs cannot transform information into "trade secrets" simply by calling it so. See *Border Collie Rescue*, *supra*, where the plaintiff "attempt[ed] to classify broad categories of documents as trade secrets, yet fail[ed] to provide supporting evidence or testimony that these items constitute trade secrets under Florida law." *Id.* The court found that the "conclusory allegations amount to nothing more than rank speculation and are the type of conjecture which is insufficient to withstand a motion for summary judgment." *Id.* at 1339. The same situation is before the Court here.

The record establishes that Curry invented the anti-fraud solution she brought with her to Nexia and that no information Curry and Hailstones used to refine the product was confidential or proprietary to MVI or Nexia. In an abundance of caution, Curry obtained assignments for the intellectual property she owned, and she obtained permission to use it in her Separation Agreement. See <u>Exhibit B to Curry's Answer and Affirmative Defenses filed November 21, 2007 at ¶ 8</u>. Neither MVI nor Nexia used ***any*** efforts, much less "reasonable [efforts] under the circumstances," to maintain the secrecy or prevent use of supposed trade secrets during the year prior to the filing of this action as required by Florida's Uniform Trade Secrets Act. It is clear that neither Curry nor Hailstones "misappropriated" anything. Because Plaintiffs cannot establish that anything Curry, Hailstones, or Palaxar used was a trade secret or confidential information, Plaintiffs' cannot prevail under a trade secrets theory.

4.   Conversion

Conversion is an unauthorized act that deprives another of his property permanently or indefinitely. *Border Collie Rescue*, 418 F. Supp. 2d at 1341 (quoting *Shelby Mut. Ins. Co. of Shelby, Ohio v. Crin Press, Inc.*, 481 So. 2d 501, 503 (Fla. 2d Dist. 1985)). "The classic expression of conversion under Florida law is 'the wrongful

deprivation of a person of property to the possession of which he is entitled.'" *Corpofin, C.A. v. Santella,* No. 96-1679-CIV, 1999 U.S. Dist. LEXIS 23389, *14 (S.D. Fla. 1999) (quoting *Star Fruit Co. v. Eagle Lake Growers, Inc.,* 33 So. 2d 858, 860 (Fla. 1948)).

Plaintiffs' conversion claim is premised on the notion that they invested substantial sums in the development of Nexia Certification with the understanding that Curry would obtain a patent in their name and assign the patent rights to them. Her failure to do so and the subsequent use of Nexia Certification, so they allege, constitutes the conversion of both the Nexia product and the sums they invested in its development. SAC at ¶¶ 54-57.   But the intellectual property known as Nexia Certification always belonged to Curry, as did the right to patent and use it. Accordingly, Plaintiffs were not "entitled" to it and there is no basis for a conversion claim.   To the extent Plaintiffs allege Defendants converted trade secrets, that claim is preempted by the Florida Uniform Trade Secrets Act under which, as demonstrated above, Plaintiffs' claims fail as a matter of law. *Allegiance Healthcare Corp. v. Coleman,* 232 F.Supp.2d 1329, 1335 (S.D. Fla. 2002) (quoting Fla. Stat. § 688.008(1) ("[T]he UTSA 'displaces conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret.'").

5.   Civil Conspiracy

Civil conspiracy requires proof of an underlying tort.   *Border Collie Rescue, supra,* 418 F. Supp. 2d at 1339.  Because, as demonstrated herein, none of Plaintiffs' tort claims can survive summary judgment, the Court should also grant summary judgment in favor of Defendants on Plaintiffs' claim of civil conspiracy.

6.     Injunctive Relief

Plaintiffs seek permanently to enjoin Curry's and Hailstones' use of Nexia Certification based on purported violations of non-compete and non-disclosure agreements to which they contend Curry and Hailstones are bound.  In fact, Hailstones— who was not a party to any employment agreement with either Plaintiff—is simply not subject to such restrictions and therefore cannot violate them.  Curry's employment agreement with Nexia does contain such restrictions.  Were it determined that Curry took proprietary information belonging to Plaintiffs (which she plainly did not), Plaintiffs still would not be entitled to injunctive relief since they no longer continue in the same line of business in which the supposedly misappropriated property would be marketed and sold. § 542.33(2)(a), Fla. Stat. (2006).  As Plaintiffs' attorney proclaimed during the hearing on the Motion for Preliminary Injunction: "Nexia is not in the anti-fraud business anymore." Tr. at 15-16.  Plaintiffs have neither the capability nor means to use or market Nexia Certification.  Thus, Florida law precludes them from enforcing restrictive covenants.

7.     Unjust Enrichment

Plaintiffs' unjust enrichment claim is based on the notion that it is inequitable for Curry and Hailstones to retain and use the benefits of Nexia Certification without paying for them. But Curry alone owns Nexia Certification and her retention and use of it is entirely just.  In addition, Plaintiffs waived this claim by breaching Curry's Separation agreement in failing to establish a new Nexia entity to which Palaxar could pay, as agreed, $500,000 from Palaxar's first receipts of profits.  Nexia's failure to create a new entity killed any joint venture which would have shared the profits of the eventual anti-fraud solution product.  Finally, to the extent Plaintiffs' claim for unjust enrichment is

based on the alleged misappropriation of trade secrets, the claim—like conversion—is preempted by the Florida Uniform Trade Secrets Act. "Because FUTSA expressly authorizes a plaintiff to recover for the 'unjust enrichment caused by misappropriation' a claim for unjust enrichment is indistinguishable from the remedy under the statute and therefore is preempted." *New Lenox Industries, Inc. v. Fenton*, 510 F. Supp. 2d 893, 910 (M.D. Fla. 2007) (dismissing unjust enrichment claim).

    8.  <u>The Economic Loss Rule</u>

    Given that Plaintiffs' tort claims are based on the same conduct as alleged in their breach of contract claim, the economic loss rule should bar recovery on the tort claims. "Pursuant to Florida law, the economic loss rule provides that parties to a contract can only seek tort damages if conduct occurs that establishes a tort distinguishable from or independent of the breach of contract." *Royal Surplus Lines Ins. Co. v. Coachmen Indust., Inc.*, 184 Fed. App'x. 894, 902 (11th Cir. 2006) (internal quotations omitted). See *Jones v. Childers*, 18 F.3d 899, 904 (11th Cir. 1994); See *also HTP, Ltd. v. Lineas Aereas Costerricenses, S.A.* 685 So. 2d 1238, 1239 (Fla. 1996) (an independent tort survives the economic loss rule only if it "requires proof of facts separate and distinct from the breach of contract").

    The Eleventh Circuit has recognized that Florida law clearly holds that the economic loss rule applies "'where the parties are in contractual privity and one seeks to recover damages in tort for matters arising from the contract.'" *Royal Surplus Lines,* 184 Fed. App'x. at 902 (quoting *Indem. Ins. Co of N.A., v. Am. Aviation, Inc.,* 891 So. 2d 532, 536 (Fla. 2004)). The economic loss rule "proceeds from the theory that courts must preserve well-defined conceptual and practical distinctions between the body of law

relating to contract damages and tort damages, so that contracting parties may rely confidentially on their allocations of risk without fear that their counterparts will seek to recoup contract damages through tort actions." *Jones v. Childers*, 18 F.2d 899, 904 (11th Cir. 1994). Parties to a contract may recover tort damages only if conduct "establishes a 'tort distinguishable from or independent from the breach of contract.'" *Id.* at 904. Because Plaintiffs do not even allege conduct separate from the breach of contract, Defendants are entitled to summary judgment on all Plaintiffs' tort claims.

## CONCLUSION

For all the reasons set forth herein, and for those set forth in Defendants' Joint Memorandum of Law in Opposition to Plaintiffs' Motion for Preliminary Injunction, Defendants respectfully urge this Court to find that there remains no genuine issue of material fact to be tried, and Defendants are entitled to summary judgment on all of Plaintiff's claims against them, and that the Court award attorneys' fees and costs to Defendants.

Respectfully submitted,

/s/ Martin R. Raskin

KATHLEEN B. HAVENER
HAHN LOESER + PARKS LLP
Suite 3300, 200 Public Square
Cleveland, OH 44114
Telephone: (216) 274-2297
Facsimile: (216) 241-2824
kbhavener@hahnlaw.com

Attorneys for Defendants Curry, Hailstones,
Palaxar Group, LLC and Palaxar Holdings,
LLC

MARTIN R. RASKIN
Florida Bar No. 315206
JANE SERENE RASKIN
Florida Bar No. 848689
RASKIN & RASKIN, P.A.
2601 South Bayshore Drive
Suite 725
Miami, Florida 33133
Telephone: (305) 444-3400
Facsimile: (305) 445-0266
mraskin@raskinlaw.com

Attorneys for Defendant Curry,
Palaxar Group, LLC and Palaxar
Holdings, LLC

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 17, 2008, I electronically filed the foregoing Joint Motion for and Memorandum of Law in Support of Summary Judgment of Defendants Edith Curry, Frank Hailstones, Palaxar Group, LLC, and Palaxar Holdings, LLC with the Clerk of Court using the CM/ECF system which will send a notice of electric filing to all participants in CM/ECF system in this matter:

I further certify that on March 17, 2008, a copy of the foregoing, along with an Appendix and CD version of the hyperlinked document has been furnished by U.S. Mail to the following:

J. Russell Campbell
Allen Estes
Banch & Bingham, LLP
PO Box 306
Birmingham, AL 35201

Counsel for Plaintiffs/Counterclaim
Defendants


Jason H. Klein
Jack C. McElroy
Shutts and Bowen, LLP
300 S. Orange Avenue
Suite 1000
Orlando, FL 32801
jmcelroy@shutts.com
jklein@shutts.com

Counsel for Third Party Defendant AQMI
Strategy

Aaron C. Bates
Goldberg Bates PLLC
3660 Maguire Boulevard
Suite 102
Orlando, Florida 32802

Counsel for Plaintiffs/Counterclaim
Defendants


L. Reed Bloodworth
Darryl M Bloodworth
Dean Mead Egerton Bloodworth, et al.
800 North Magnolia Avenue, Suite 1500
P.O. Box 2346
Orlando, FL 32802-2346

Counsel for Third Party Defendant Robert
Pollack

James R, Lussier
Mateer & Harbert, PA
225 East Robinson Street, Suite 600
P.O. Box 2854
Orlando, FL 32802-2854

Counsel for Wellington Capital Group, Inc.

John Edwin Fisher
Fisher Rushmer Werrenrath Dickson
Talley Dunlap
P.O. Box 712
Orlando, FL
Tel 407 843-2111
Fax 407-422-1080

Counsel for Third Party Defendants Aaron
Bates and Matthew Mokwa

Frank Amodeo
614 Lake Avenue
Orlando, Florida 32801

Third Party Defendant

James Sadrianna
10025 Chatham Oaks Court
Orlando, FL 32836

Third Party Defendant

Yaniv Amar
3475 Mystic Point Drive
Aventura, FL 33180

Third Party Defendant

Terence Chu
5637 Country Hills Lane
Glen Allen, VA 23059

Defendant

/s/ Kathleen B. Havener____
KATHLEEN B. HAVENER