UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

In re:                                              :
                                                    :
MIRABILIS VENTURES, INC.          :          Case No. 6:08-bk-04327-KSJ

**UNITED STATES' MOTION TO DISMISS**
**INSTANT CASE BASED UPON ITS BAD FAITH FILING[1]**

The United States of America, by and through the undersigned Assistant

United States Attorney, pursuant to Sections 105(a), 305(a), and 1112 of the

Bankruptcy Code,[2] moves this Court to dismiss the instant case based upon its

bad faith filing, and in support thereof, states as follows:

**Background**

1.      On May 28, 2008, debtor Mirabilis Ventures, Inc. (Mirabilis) and

related debtor Hoth Holdings LLC (Hoth) filed for bankruptcy in the Middle District

of Florida.  Related debtor AEM, Inc. (AEM) filed for bankruptcy on

June 5, 2008.

2.      The United States submits that the facts contain herein, as well as

the attached affidavits, establish that the instant bankruptcy and the related

bankruptcies were filed in bad faith.

3.      Attached as Exhibits A and B are affidavits from Jodi Jaiman (the

Mirabilis president until Mr. Cuthill took over as president) and Jay Stollenwerk (a

member of the board of directors until Mr. Cuthill took over as president)[3] setting

---

[1]  Identical motions are being filed in two related bankruptcy cases: In re: Hoth
Holdings, LLC (Hoth Holdings), Case No. 6:08-bk-04328-KSJ, and In re: AEM, Inc.
(AEM), Case No. 6:08-bk-04681-KSJ.

[2]  The United States has already sought to intervene in this proceeding
through it filed Motion to Intervene and Stay the Instant Case.  Dkt. No.  48.

[3]  This motion contains the original signed affidavits as attachments.  Copies
of the affidavits are attached to the motions being filed in the two related bankruptcy

forth the basis of the bankruptcy.  They have both stated that the sole reason for

the filing of the bankruptcies was to save the litigation so that Amodeo could pay

back the IRS for Amodeo's benefit in the grand jury investigation.[4]  Additionally,

Jaiman states in her affidavit that almost all of the creditors were paid before the

bankruptcy was filed.  Stollenwerk states in his affidavit that all but two of the

creditors were paid before the bankruptcy was filed.

     4.      On May 14, 2008, prior to the institution of the instant case, debtors

counsel, Scott Shuker and Elizabeth Green met with representatives of the office

of the United States Attorney, the Internal Revenue Service (IRS), and the office

of the United States Trustee.  The facts set forth in paragraph 3 above are

corroborated by this meeting.  Debtor's counsel explained that they had been

hired by Frank L. Amodeo, the controlling person of debtor Mirabilis and the

related debtors, and were considering whether to file a Chapter 11 bankruptcy for

Mirabilis.  They advised that the board of directors at that time, Jodi Jaiman,

Shane Williams, and Jay Stollenwerk, would appoint another individual as the

sole member of the board of directors and then resign.  The new member of the

board of directors would then appoint William Cuthill as president of Mirabilis.  At

that time, debtor's counsel stated that the sole reason for the filing of the

---

cases.

    [4]  As previously set forth in the United States' three motions to intervene and
stay the bankruptcy cases, on August 6, 2008, Amodeo, the person who controlled
debtor Hoth and related debtors Mirabilis and AEM until the filing of the related
bankruptcy cases, was indicted for conspiracy, failure to remit payroll taxes, wire
fraud, and obstruction of an agency investigation.  Case No. 08-cr-176-Orl-28GJK.
The Indictment contains forfeiture provisions which seek to forfeit, inter alia, to the
United States all assets of debtor Hoth and related debtors Mirabilis and AEM.  On
September 23, 2008, Amodeo pled guilty to five of the twenty-seven counts of the
Indictment and faces up to twenty-five years imprisonment plus fines, restitution, and
forfeiture of assets.

bankruptcy in the instant case and related cases was to use the bankruptcy to continue civil litigation which, if settled or won, would provide funds for Frank Amodeo to pay the Internal Revenue Service some of the $181million he owed the IRS.  It was represented that the logic behind paying the IRS with the bankruptcy assets was to allow Amodeo to present this information to the sentencing judge in a potential criminal case against Amodeo, in the hope that he could receive a more lenient sentence.  (Exhibit C, McCabe affidavit).[5]  The United States advised Shuker and Green against filing the instant related bankruptcy cases.

5.     On June 23, 2008, this Court held a status conference in the instant case.  At that time, the United States expressed concern over the propriety of the bankruptcy filing based on a perceived improper reason for the bankruptcy filing. (Exhibit D, Tr. pp. 16-17).  The United States advised this Court of the reason for the bankruptcy as stated by debtor's counsel at the prior meeting.  During the hearing, Ms. Green denied that the stated reason provided the basis of the bankruptcy; rather, she stated to this Court that the "goal of this bankruptcy was to marshal the assets, analyze them, determine what those assets were and distribute them to creditors, whoever those creditors may be."  (Exhibit D, Tr. p. 19).  She further stated that "I believe the response that Mr. Shuker made was in response to well what will Mr. Amodeo get.  And the answer is nothing.  Mr. Amodeo isn't related to this bankruptcy.  It was allegedly possible that if money went back to the Service that might benefit him, but that was not the reason for the filing."  Id.  Despite Ms. Green's statements to the contrary, it is clear that this

---

[5]  Additionally, Ken Meeker, an Assistant United States Trustee, was present at this meeting and can advise this Court of his recollection of the meeting.

case and the related bankruptcies were filed in bad faith, i.e., for the sole

purpose of gaining funds to pay back unpaid payroll taxes owed to the IRS in

order to gain a perceived advantage in a criminal case.

6.     The United States, therefore, requests that this Court dismiss the

instant case, as it was filed in bad faith.

## MEMORANDUM OF LAW

Dismissal of a Chapter 11 bankruptcy case is required pursuant to

11 U.S.C. § 1112(b)(1) where the "movant establishes cause" and "unusual

circumstances specifically identified by the court that establish that the requested

conversion or dismissal is not in the best interests of creditors and the estate" are

absent. In re Joyce, Don & Associates, Case No. 2008 WL 343265, *2 (Bankr.

M.D. Fla. January 30, 2008) (Judge Briskman).  "Cause" includes "substantial or

continuing loss to or diminution of the estate and the absence of a reasonable

likelihood of rehabilitation." Id. (citing 11 U.S.C. § 1112( b)(4)(A)).  A court is

empowered to sua sponte dismiss a case pursuant to 11 U.S.C. § 305(a) to

prevent abuse of the bankruptcy system.  Id.

Although " good faith" is required for confirmation of a reorganization plan,

11 U.S.C. § 1129(a)(3), Chapter 11 does not expressly condition the right to file

or maintain a proceeding on the "good faith" of the debtor at the time the

proceeding is initiated.  In re Albany Partners, Ltd., 749 F.2d 670, 674 (11th Cir.

1984).  Good faith, however, is an implicit requirement for filing for bankruptcy

protection.  In re Joyce, Don & Associates, 2008 WL 343265, at *2 (citing

Phoenix Piccadilly, Ltd. v. Life Ins. Co. of Va. (In re Phoenix Piccadilly, Ltd.),

849 F.2d 1393, 1394 (11th Cir.1988)); Shell Oil Co. v. Waldron (In re Waldron),

785 F.2d 936, 941 (11th Cir.1986).  The bankruptcy laws are "intended to give a

'fresh start' to the 'honest but unfortunate debtor.'" In re Joyce, Don & Associates, 2008 WL 343265, at *2 (quoting Marrama v. Citizens Bank of Mass., 127 S.Ct. 1105, 1116 (2007)).  A petition filed in bad faith is subject to dismissal. In re Joyce, Don & Associates, 2008 WL 343265, at *2 (citing State Street Houses, Inc. v. N.Y. State Urban Dev. Corp. (In re State Street Houses, Inc.), 356 F.3d 1345, 1347 (11th Cir. 2004)); The Bal Harbour Club, Inc. v. AVA Dev., Inc. (In re Bal Harbour Club, Inc.), 316 F.3d 1192, 1195 (11th Cir. 2003); In re Phoenix Piccadilly, Ltd., 849 F.2d at 1395.

Section 1112(b) of the Code permits a bankruptcy court to convert or dismiss a case for "cause".  The determination of cause under § 1112(b) is "subject to judicial discretion under the circumstances of each case."  In re Albany Partners, Ltd., 749 F.2d at 674 (quoting In the Matter of Nancant, 8 B.R. 1005, 1006 (Bankr. D.Mass. 1981)).  "The equitable nature of this determination supports the construction that a debtor's lack of 'good faith' may constitute cause for dismissal of a petition."  Id.  "In finding a lack of good faith, courts have emphasized an intent to abuse the judicial process and the purposes of the reorganization provisions."  Albany Partners, 749 F.2d at 674.  "Particularly when there is no realistic possibility of an effective reorganization, dismissal of the petition for lack of good faith is appropriate."  Id. (citing In re Eden Associates, 13 B.R. 578, 583-85 (Bankr. S.D.N.Y. 1981)); In re Victory Construction Co., Inc., 9 B.R. 549, 555-56, 558, 564-65 (Bankr. C.D.Cal. 1981); In re G-2 Realty Trust, 6 B.R. 549, 552-54 (Bankr. D.Mass. 1980); In re Dutch Flat Investment Co., 6 B.R. 470, 471-72 (Bankr. N.D.Cal. 1980); In the Matter of Levinsky, 23 B.R. 210, 219-220 (Bankr. E.D.N.Y. 1982); In the Matter of Northwest Recreational Activities, Inc., 4 B.R. 36, 38-40 (Bankr. N.D.Ga. 1980).

5

"The provision lists nine examples of cause, but the list is not exhaustive."
<u>Albany Partners</u>, 749 F.2d at 674.  "The pertinent legislative history states that
'[t]he court will be able to consider other factors as they arise, and use its
equitable powers to reach an appropriate result in individual cases.'" <u>Id</u>. (citing
H.R.Rep. No. 595, 95 Cong., 1st Sess. 406 (1977), U.S.C.C.A.N. 1978, pp. 5787,
6362).  The circumstantial factors evidencing bad faith include:

    i.     The debtor has only one asset in which it does not hold legal title;

    ii.    The debtor has few unsecured creditors who claims are small in
          relation to the claims of the secured creditors;

    iii.   The debtor has few employees;

    iv.   The property is the subject of a foreclosure action as a result of
          arrearages on the debt;

    v.     The debtor's financial problems involve essentially a dispute
          between the debtor and the secured creditors which can be
          resolved in a state court action; and

    vi.   The timing of the debtor's filing evidences an intent to delay or
          frustrate the legitimate efforts of the debtor's secured creditors to
          enforce their rights.

<u>In re Joyce, Don & Associates</u>, 2008 WL 343265, at *2 (citing <u>In re Phoenix
Picadilly, Ltd.</u>, 849 F.2d at 1394-95).  This list of factors is "non-exhaustive and
not to be rigidly applied...." <u>Id.</u> (citing <u>In re State Street Houses, Inc.</u>, 356 F.3d at
1347).

In <u>In re Joyce, Don & Associates</u>, Judge Briskman analyzed the nine
factors and concluded that the case was filed in bad faith.  In so concluding,
Judge Briskman found that the debtor filed for bankruptcy protection immediately

before a foreclosure sale was to take place; the debtor's only creditors of consequence were the secured creditors who held liens on four parcels of real property; there were no unsecured creditors or employees; the debtor had no personal assets; the debtor had no income; there was no reasonable likelihood of the debtor's rehabilitation; and there was a continuing diminution of the estate. Id.

The United States submits that the instant case is similar to in may respects to In re Joyce, Don & Associates and that the following factors establish the bad faith filing:

1.    The debtor has no employees other than Mr. Cuthill;

2.    There is no intent to reorganize and conduct business;

3.    The debtor has virtually no assets other than litigation, much of which appears to be frivolous, and all of the assets are subject to criminal forfeiture;

4.    The timing of the filing of the instant case was in part a result of a breach of contract action in another jurisdiction relating to property owned by Hoth Holdings, a subsidiary of the debtor;

5.    There is substantial evidence that the sole reason for the filing of the bankruptcy in the instant case and related cases was to use the bankruptcy to continue civil litigation which, if settled or won, would provide funds for Frank Amodeo to pay the Internal Revenue Service some of the $181 million he owed the IRS.  The logic behind paying the IRS with the bankruptcy assets was to allow Amodeo to present this information to the sentencing judge in a

potential criminal case against Amodeo, with the hope that he could
receive a more lenient sentence;

6.      The assets of the debtor will be used primarily to pay the hourly
        fees of the "president" and debtor's counsel; and

7.      The estate is subject to substantial and continuing diminution. Most
        of the creditors were paid prior to the institution of the bankruptcy
        proceedings.  Most of the major creditors remaining in this case are
        companies controlled by Amodeo and appear to be an effort by him
        to regain the stolen payroll tax money.

Additionally, Amodeo, the individual who controlled the debtor until this
case was filed has been indicted and has pled guilty to five of the charges in the
Indictment.  Bankruptcy should not be "a haven for wrongdoers." See In re:
McMullen, 386 F.3d 320, 325 (1st Cir. 2004); In re Davis, 194 F.3d 570, 573-74
(5th Cir. 1999); In re Universal Life Church, Inc., 128 F.3d 1294, 1297 (9th Cir.
1997); In re Bilzerian,146 B.R. 871, 873 (Bankr. M.D. Fla.).

Moreover, these bankruptcies were filed after Mirabilis had notice of the
civil forfeiture case and after the government had seized most of the
non-litigation assets.  The filing of a bankruptcy petition causes an automatic stay
to go into effect preventing creditors from commencing or continuing legal
proceedings in connection with their pre-petition claims against the debtor or
property of the estate.  11 U.S.C. § 362(a).  Section 362(b) of contains a list of
actions exempted from the automatic stay, including an exemption for
governmental units or organizations to exercise their police and regulatory

powers. 11 U.S.C. § 362(b)(4);[6] see also Chao v. Hospital Staffing Services, Inc., 270 F.3d 374, 386 (Paragraph 4 [of Section 362(b)] excepts commencement or continuation of actions and proceedings by governmental units to enforce police of regulatory powers).  The United States takes the position that, pursuant to section 362(b)(4), the automatic stay neither bars the commencement of a its criminal forfeiture case not the continuation of its civil forfeiture action filed before the bankruptcy was commenced, United States v. Real Property located at 614 Lake Avenue, et al., Case No. 6:08-cv-670-Orl-22KRS, because both are an exercise of the federal government's police power.

Specifically, section 362(b)(4) provides, in relevant part, that the filing of a bankruptcy petition does not operate as a stay:

> under paragraph (1), (2), (3), or (6) of subsection (a) of this section, of the commencement or continuation of an action or proceeding by a governmental unit ... to enforce such governmental unit's ... police and regulatory power, including the enforcement of a judgment other than a money judgment, obtained in an action or proceeding by the governmental unit to enforce such governmental unit's ... police or regulatory power.

11 U.S.C. § 362(b)(4).[7]

The United States submits that it has established cause for dismissal exists pursuant to 11 U.S .C. § 1112(b).  Dismissal is in the best interests of the creditors and the estate.  The filing is an abuse of the judicial system and the

---

[6]  The theory of this exemption is because bankruptcy should not be "a haven for wrongdoers," the automatic stay should not prevent governmental regulatory, police and criminal actions from proceeding.  3 Collier on Bankruptcy ¶ 362.05 [5][a], at 362-54 (15th ed.1996).  See also, In re: McMullen, 386 F.3d at 325; In re Davis, 194 F.3d at 573-74; In re Universal Life Church, Inc., 128 F.3d at 1297; In re Bilzerian, 146 B.R. at 873.

[7]  "In 1998, § 362(b)(4) was amended by combining §§ 362(b)(4) and (5) and expanding the scope of the exception to cover proceedings 'to obtain possession of property of the estate . . . or to exercise control over property of the estate.'" In re Chapman, 264 B.R. 565, 570 (9th Cir. BAP 2001) (citations omitted).

purposes of Chapter 11.  The United States submits that this case should be dismissed pursuant to 11 U.S.C. §§ 1112(b), 105(a), and 305(a)(1).

C.     **CONCLUSION**

Accordingly, the United States submits that this Court should dismiss the instant case.

Respectfully submitted,

ROBERT E. O'NEILL
United States Attorney

By:     *I. Randall Gold*
Assistant United States Attorney
Deputy Chief, Orlando Division
Florida Bar Number 0268062
501 W. Church Street, Suite 300
Orlando, Florida 32805
Telephone:   407/648-7500
Facsimile: 407/648-7643
E-Mail:     randy.gold@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on September 23, 2008, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

All participants in the CM/ECF System

I hereby certify that on September 23, 2008, a true copy of the foregoing, together with any exhibits, has been furnished by mail to the following non-CM/ECF participants:

See attached matrix.

*s/ I. Randall Gold*
I. Randall Gold
Assistant United States Attorney
Deputy Chief, Orlando Division
Florida Bar No. 268062
501 W. Church Street - Suite 300
Orlando, Florida 32805
Telephone:   (407) 648-7500
Facsimile: (407) 648-7643
E-mail: randy.gold@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

MIRABILIS VENTURES, INC. and
NEXIA STRATEGY CORPORATION,

     Plaintiffs,

v.                        CASE NO.: 6:07-CV-1788-ORL-28-KRS

PALAXAR GROUP, LLC;
PALAXAR HOLDINGS, LLC;
FRANK HAILSTONES; EDITH CURRY
a/k/a EDITH BROADHEAD; and
FICTITIOUS DEFENDANTS 1-8.

     Defendants.

## DECLARATION OF JODI JAIMAN

    1.    My name is Jodi Jaiman. I am a resident of Orange County, Florida. I am over

the age of 19 and of sound mind.

    2.    I am currently the president of Mirabilis Ventures, Inc ("Mirabilis") and Nexia

Strategy Corporation ("Nexia").

    3.    I am currently the sole director of Nexia.

    4.    Mirabilis is the sole shareholder of Nexia.

    5.    I have reviewed the Complaint, Defendants' Answers, and Exhibits A and B to

Defendants' Answers.

    6.    I have also reviewed the meeting minutes for the Board of Directors Meetings and

Shareholders' Meetings for Mirabilis and Nexia from the beginning of 2006 through the present

date.



EXHIBIT
1

7.     Neither the Board of Directors for Mirabilis nor Nexia authorized, approved or ratified the transactions reflected in Exhibits A or B to Defendants' Answers.

8.     Mirabilis, in its capacity as the sole shareholder of Nexia, did not authorize, approve, or ratify the transactions reflected in Exhibits A or B to Defendants' Answers.

9.     Further, the By-laws for both Mirabilis and Nexia prohibit the transactions reflected in Exhibits A and B to Defendants' Answers without the authorization, approval or ratification of the Board of Directors.

10.     Frank Hailstones did not have the authority to execute Exhibits A and B to Defendants' Answers on behalf of Mirabilis or Nexia without the authorization, approval or ratification of the Board of Directors for Mirabilis and Nexia.

11.     Additionally, Frank Hailstones did not have the authority to execute Exhibits A and B to Defendants' Answers on behalf of Mirabilis or Nexia without the authorization, approval or ratification of Mirabilis, in its capacity as the sole shareholder of Nexia.

12.     The facts set forth in this declaration are based on my personal knowledge or knowledge available to me in my capacity as president of Mirabilis.

13.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the facts set forth in this declaration are true to the best of my knowledge.

Jodi Jaiman

Date: Dec. 5, 2007

## MINUTES OF

## NEXIA STRATEGY CORPORATION

## SPECIAL JOINT MEETING OF DIRECTORS AND SHAREHOLDERS

### April 22, 2005

A special joint meeting of the directors and shareholders of NEXIA STRATEGY CORPORATION was held at 20 N. Orange Avenue, Orlando, Florida 32801 on April 22, 2005, at 9:00 am.  All of the directors and shareholders were present.  Frank Amodeo acted as Chairman of the meeting.

Upon motion duly made and seconded, the following resolution was unanimously adopted:

RESOLVED, the Company is authorized to open a General Business account.

RESOLVED, that DAN MYERS shall be the authorized and appointed signatory on said account.

RESOLVED, that DAN MYERS is hereby authorized and directed to take all such actions as he shall deem necessary or advisable to carry out the foregoing resolutions.

There being no further business, the meeting was adjourned at 9:55 am.


_____
Frank Amodeo, Chairman

### WAIVER AND CONSENT
The undersigned, being all the shareholders and directors of  Nexia Strategy Corporation, hereby waive notice of the Special Joint Meeting of the Board of Directors and Shareholders held on April 22, 2005, and consent to all actions taken thereat.


_____
Frank Amodeo, Sole Director and Shareholder

STATE OF FLORIDA
COUNTY OF ORANGE

The foregoing was acknowledged before me this _____ day of _____, 2005 by FRANK AMODEO, who is personally known to me or who has produced _____ as identification and who did take an oath, and deposes and says that the matters and things contained therein are true and correct.

_____
Print: _____
Notary Public, State of Florida
My Commission Expires: _____
My Commission No. _____

# EXHIBIT 1

MVI/Pataxar - PI
001

## WRITTEN ACTION OF THE SHAREHOLDERS
## OF
## NEXIA STRATEGY CORPORATION

### December 13, 2006

The undersigned, being and constituting all of the Shareholders of **NEXIA STRATEGY CORPORATION**, a Florida corporation (the "Corporation"), pursuant to Florida Statutes, and on this the 13th day of December, 2006, do hereby consent to the following actions to be taken without a meeting of the Shareholders of this Corporation:

**WHEREAS,** the Shareholders wish to correct prior resolutions and ratify actions taken by the Board of Directors and Officers of the Corporation prior to the date of these resolutions.

### NOW, THEREFORE:

**BE IT RESOLVED,** that except as otherwise set forth herein, the Shareholders do hereby ratify and approve and effectuate all actions taken by the Board of Directors and Officers of the Corporation from the date of inception through December 13, 2006; and be it,

**FURTHER RESOLVED,** that the Shareholders confirm and ratify the following corporate events, corrections and transactions:

1.     The Shareholders do hereby acknowledge that the "Minutes of the First Meeting of the Incorporator of Nexia Strategy Corporation", dated April 20, 2005, contains certain mistakes, and that in fact Mr. Lawrence Haber was the incorporator of the Corporation, not Frank Amodeo, pursuant to the Articles of Incorporation of the Corporation. Edith Curry mistakenly did not sign the Minutes; although consented to the actions thereat. Furthermore, Frank Amodeo was elected to the Corporation's Board of Directors by the incorporator to serve on the Board of Directors together with Mr. Haber.

2.     The Shareholders do hereby acknowledge that the "Minutes of the First Meeting of the Board of Directors of Nexia Strategy Corporation", dated April 20, 2005, contains certain mistakes, and that Frank Amodeo was not the sole director of the Corporation, and that in fact both Mr. Amodeo and Mr. Haber were the only two (2) directors of the Corporation. Additionally, the date on page 6 of these meeting minutes should be April 20, 2005, and not April 20, 2003 which was a mistake. Furthermore, although the Waiver of Notice of the First Meeting of the Board of Directors of Nexia Strategy Corporation is not contained in the corporate book, all of the directors consented to the actions taken thereat.

3.     The Shareholders do hereby acknowledge that the "Bylaws of Nexia Strategy Corporation", dated April 18, 2005, should state under Section 3.11 that the initial number of directors shall be Two (2). Furthermore, it is acknowledged that the correct date for the execution of the bylaws should be April 20, 2005.

4.     The Shareholders acknowledge that Mr. Amodeo was the sole shareholder of One Thousand (1,000) shares of common stock of the Corporation, which represented One Hundred Percent (100%) of all issued and outstanding shares of common stock of the Corporation, as of April 20, 2005.

MVI/Palaxar – P1
002

5.    The Shareholders acknowledge, confirm and ratify the Stock Purchase Agreement which was executed on June 30, 2005, by and between Frank Amodeo and Mirabilis Ventures, Inc., a Nevada corporation, whereby Mr. Amodeo sold all of his stock in the Corporation to Mirabilis Ventures, Inc., entitling Mirabilis Ventures, Inc. to One Hundred Percent (100%) of all issued and outstanding shares of common stock of the Corporation, as of June 30, 2005. Furthermore, on this date, Mr. Amodeo was removed as an officer of the Corporation and as a director of the Corporation, leaving only one sole director, Lawrence Haber.

6.    The Shareholders acknowledge, confirm and ratify the cancellation of Stock Certificate Number 1, which was issued to Frank Amodeo on April 20, 2005 for One Thousand Shares (1,000) shares of common stock, and further do hereby acknowledge, confirm and ratify the issuance of Stock Certificate Number 2 to Mirabilis Ventures, Inc. on June 30, 2005 for One Thousand Shares (1,000) shares of common stock of the Corporation.

7.    The Shareholders acknowledge, confirm and ratify the change of address for the Corporation to 111 North Orange Avenue, Suite 2000, Orlando, Florida 32801, which was mailed off to the Florida Secretary of State on October 19, 2006.

8.    The Shareholders acknowledge, confirm, adopt and ratify the removal of Edie Curry, Dr. Robert Pollack and Dan Myers as officers of the Corporation, and the addition of Frank Hailstones as President, Secretary and Treasurer and Esta Tanenbaum as Vice President of the Corporation pursuant to the Articles of Amendment which were filed with the Florida Secretary of State on October 27, 2006.

and be it,

FURTHER RESOLVED, the Shareholders do hereby agree to, and authorize, the removal of Lawrence Haber as director of the Corporation; and be it,

FURTHER RESOLVED, that the Shareholders do hereby authorize and appoint the following persons to serve on the Board of Directors of the Corporation commencing immediately and continuing thereafter until such time as their successors have been nominated, qualified, and elected:

Fernando Simo
Frank Hailstones
Laurie Holtz

and be it,

FURTHER RESOLVED, that any one of the directors, or any officer, of this Corporation be and they hereby are each and all authorized and directed in the name, and on behalf, of this Corporation to carry out and fulfill the purposes and intent of the Resolutions contained herein including, but not limited to, the documents and instruments set forth in these Resolutions.

Execution of this certificate by the undersigned, constituting all of the Shareholders of the Corporation, waives any requirement of a formal annual meeting or formal notice to conduct the business referred to herein.

MVI/Palaxar - PI
003

This written consent may be executed in one or more identical counterparts and shall be effective upon execution of counterparts by unanimous consent of the Shareholders of the Corporation.

Dated: December 13, 2006

SHAREHOLDERS:

Signature:
Mirabilis Ventures, Inc., a Nevada corporation
By:      Fernando Simo
Its:     President

MVP/Palaxar – PI
004

12/21/2006  15:06      3854162400                    NE FAX                              PAGE  02/04

## NEXIA STRATEGY CORPORATION

## MEETING OF THE BOARD OF DIRECTORS

### December 21, 2006

A meeting of the Board of Directors of Nexia Strategy Corporation, a Florida corporation (the "Corporation"), was held at 111 N. Orange Avenue, Suite 2000, Orlando, Florida 32801 on December 21, 2006, at 10:00 am. All of the directors were present, having waived notice of the meeting. Frank Hailstones acted as Chairman of the meeting.

The Chairman called the meeting to order and announced that this meeting was held pursuant to written waiver of notice and consent to the holding of this meeting. The waiver and consent was presented to this meeting and, on a motion duly made, seconded, and unanimously carried, was made a part of the records and ordered inserted in the Corporation's Corporate Book immediately preceding the records of this meeting.

Upon motion duly made, seconded and approved by the Board of Directors, the following resolutions were unanimously adopted, ratified and approved:

RESOLVED, that the Board of Directors do hereby ratify and adopt the following Shareholders' resolutions made pursuant to the "Written Actions of the Shareholders" dated December 13, 2006:

The confirmation and ratification of the change of address for the Corporation to 111 North Orange Avenue, Suite 2000, Orlando, Florida 32801, which was mailed off to the Florida Secretary of State on October 19, 2006.

The confirmation and ratification of the removal of Edie Curry, Dr. Robert Pollack and Dan Myers as officers of the Corporation, and the addition of Frank Hailstones as President, Secretary and Treasurer and Esta Tanenbaum as Vice President of the Corporation pursuant to the Articles of Amendment which were filed with the Florida Secretary of State on October 27, 2006, which are also hereby ratified and confirmed.



and be it;

FURTHER RESOLVED, that the Board of Directors do hereby agree to, and authorize, the removal of Frank Hailstones as Secretary and Treasurer of the Corporation, and furthermore, the Board of Directors do hereby authorize and appoint the following persons to serve as, and continue to serve as, officers of the Corporation commencing immediately and continuing thereafter until such time as their successors have been nominated, qualified, and elected:

| | |
|---|---|
| Frank Hailstones | - President and CEO |
| Esta Tanenbaum | - Vice President and Secretary |
| William F. Walsh | - Treasurer |

and be it;

MVI/Palaxar - PI
005

12/21/2885  15:86    3854162488                    NE FAX                                    PAGE  03/84

FURTHER RESOLVED, that the Board of Directors do hereby authorize and approve that, effective immediately, Paul Glover and Daniel Myers shall be removed as signatories on any and all bank accounts opened on behalf of, and in the name of, the Corporation, and be it;

FURTHER RESOLVED, that the Board of Directors do hereby agree that, effective immediately, Fernando Simo and William F. Walsh shall be authorized and appointed as signatories together with Frank Hailstones, on any and all bank accounts opened on behalf of, and in the name of, the Corporation, and be it;

FURTHER RESOLVED, that the directors or any of the officers of the Corporation, are hereby authorized and directed to take any and all such actions and to execute and deliver any and all such additional agreements, documents and instruments as they may deem necessary and appropriate to carry out the foregoing resolutions.

There being no further business, the meeting was adjourned at 10:30 am.

DIRECTORS:


Signature:                                      Signature:
Name: Frank Hailstones                          Name: Laurie Holtz
Its:    Chairman, Director                      Its:    Director


Signature:
Name: Fernando Simo
Its:    Director

MVI/Palaxar - PI
006

## NEXIA STRATEGY CORPORATION

### WAIVER AND CONSENT OF NOTICE OF
### MEETING OF THE BOARD OF DIRECTORS

The undersigned, constituting all of the directors of Nexia Strategy Corporation, do
hereby waive notice and call of the time, place and purpose of the Meeting of the Board of
Directors and hereby consent that the time and place for holding said meeting shall be 10:00 am on
the 21st day of December, 2006, at 111 North Orange Avenue, Suite 2000, Orlando, Florida
32801, and do hereby further consent to all actions taken thereat.

Date:  December 21, 2006

Signature:                                         Signature:
Name: Frank Hailstones                             Name: Laurie Holtz
Its:    Chairman, Director                         Its:    Director


Signature:
Name: Fernando Simo
Its:    Director

MVI/Palaxar - PI
007

## MINUTES OF SPECIAL MEETING OF
## THE BOARD OF DIRECTORS OF
## NEXIA STRATEGY CORPORATION

This special meeting of the Board of Directors of Nexia Strategy Corporation, a Florida corporation (the "Corporation"), was convened at 1:15 p.m. on October 11, 2007.

Present at the meeting was Jodi Jaiman, the Sole Director of the Corporation, which constituted all of the Directors of the Corporation. All Directors have waived notice of the meeting, and such waiver has been made a part of these minutes. Jodi Jaiman was appointed Chairman of the meeting.

The Chairman called the meeting to order and stated that all of the Directors were present for the conduct of business.

**NOW, THEREFORE,** upon motion duly made, seconded, and approved by the Board of Directors, the following resolutions were unanimously adopted:

**RESOLVED,** that the Board of Directors do hereby authorize and approve the reinstatement of the Corporation for the purpose of filing and maintaining lawsuits against third-parties to re-acquire and collect assets of the Corporation, and do hereby authorize the officers and directors to file the appropriate documents with the Florida Secretary of State effectuating this reinstatement; and be it,

**FURTHER RESOLVED,** that the Board of Directors do hereby acknowledge, authorize and approve the removal, and/or accept the resignations, of Frank Hailstones as President and CEO, Esta Tanenbaum as Vice President and Secretary, and Bill Walsh as Treasurer of the Corporation, as well as any and all other officers that may have been in office for the Corporation prior to the date of these resolutions, effective as of the date of this resolution or date of resignation (whichever is earlier); and be it,

**FURTHER RESOLVED,** that the Board of Directors do hereby adopt, ratify and approve the following individuals to serve as the officers of the Corporation with such appointment effective as of the date of this resolution, and continuing thereafter until such time as they have been removed, they have resigned, or their successors have been nominated, qualified, elected and/or appointed:

| Jodi Jaiman | - President |
| Shane Williams | - Vice President |
| Jay Stollenwerk | - Treasurer and Secretary |

and be it,

**FURTHER RESOLVED,** that the Board of Directors do hereby authorize and approve retaining the law firms of Goldberg Bates, PLLC and Balch & Bingham, LLP to pursue all

lawsuits and causes of action on behalf of, and available to, the Corporation against Palaxar Group, LLC and Palaxar Holdings, LLC and any of their respective subsidiaries and affiliates and Palaxar's officers, directors, employees, agents, or representatives as directed by the Corporation; and be it,

FURTHER RESOLVED, that the Board of Directors do hereby authorize and approve the removal of the current Registered Agent, if any, and do hereby authorize and appoint the law firm of Goldberg Bates, PLLC as Registered Agent of the Corporation, effective immediately; and be it,

FURTHER RESOLVED, that the Board of Directors do hereby expressly agree that the Corporation shall indemnify and hold Jodi Jaiman, Shane Williams and Jay Stollenwerk harmless from any and all actions, claims, liabilities and causes of actions of any kind or nature which may be asserted against them in connection with their services on behalf of the Corporation; and be it,

FURTHER RESOLVED, that any acting officer of the Corporation, or their designee, shall be, and hereby is, authorized, empowered, and directed in the name of and on the behalf of the Corporation, to take all such additional actions and to execute and deliver such additional agreements, documents and instruments as he or she may deem necessary or appropriate to implement the provisions of the foregoing resolutions, the authority for the taking of such action and the execution and delivery of such agreements, documents, and instruments to be conclusively evidenced thereby.

There being no further business before the meeting, the meeting was adjourned at 1:30 p.m.

DIRECTOR:

By: Jodi Jaimah, Sole Director

MVI/Palaxar - PI
069

## WAIVER OF NOTICE OF
## SPECIAL MEETING OF THE BOARD OF DIRECTORS OF
## NEXIA STRATEGY CORPORATION

The undersigned, constituting all of the Board of Directors of Nexia Strategy Corporation, a Florida corporation, do hereby waive notice and call of the time, place and purpose of the Special Meeting of the Board of Directors, and hereby consent that the time and place for holding said meeting shall be 1:15 p.m. on the 11th day of October, 2007, at 3660 Maguire Boulevard, Suite 103, Orlando, Florida, and do hereby further consent to all actions taken thereat.

DIRECTOR:

By_____
Jodi Jaiman, Sole Director

MVI/Paloxar - PI
010

WEDNESDAY, OCTOBER 17, 2007

## Palaxar Lawsuit

*This news release was originally distributed on October 15, 2007.*

Orlando, FL —Orlando-based private equity fund Mirabilis Ventures, Inc. has filed a lawsuit and a preliminary injunction against Palaxar, LLC and its founding members, Frank Hailstones and Edith Curry, to enjoin them from utilizing property, trade secrets and confidential/proprietary information that rightfully belongs to Mirabilis. Hailstones and Curry were formerly CEO and Executive Vice President, respectively, of Mirabilis Ventures, Inc.

According to its Web site, Palaxar provides clients with anti-fraud solutions. According to the lawsuit, these solutions are based on research, studies, strategies and software products developed while Hailstones and Curry were employed by Mirabilis. Mirabilis is seeking approximately $20 million in damages.

Hailstones and Curry were served today with the lawsuit during an anti-fraud symposium in Scottsdale, Arizona, a necessary action given Hailstones's residence in the United Kingdom. Hailstones and Curry were featured speakers at the symposium; their presentation titled, "Dealing With a Likely Fraud Situation: Audit Management's Responsibilities."

The lawsuit against Palaxar is among a series of actions by Mirabilis to collect unpaid loans made to other companies as well as assets absconded with by former Mirabilis officers. Mirabilis recently announced it has divested all operating and non-financial assets. Proceeds from its asset sales and collection actions have been assigned to the Internal Revenue Service (IRS) until a determination can be made if Mirabilis is liable for unpaid payroll taxes incurred by Presidion Solutions, Inc., to which Mirabilis was a creditor and vendor. Presidion was dissolved on July 1, 2007. Frank Hailstones and Edith Curry were officers of Mirabilis during the two years Mirabilis had business relationships with Presidion and during which Presidion subsidiaries failed to pay $173 million in payroll taxes.

SHOULD THE ORLANDO SENTINEL RE-POST DELETED COMMENTS ABOUT MIRABILIS?

○ Yes
○ No

Vote | Show results

Votes so far: 112
Hours left to vote: 22

Join the Conversation
Contact Mirabilis Ventures
2007 W-2 Forms
Digg it

CATEGORIES

atlantic american (2)
cadent (1)
common paymaster (1)
mirabilis hr (1)
palaxar (3)
paradyme (1)
presidion (4)
stratis (2)

ARCHIVE

▼ 2008 (5)
   February (3)
   January (2)
► 2007 (17)



ADD THIS BLOG TO MY
Technorati FAVORITES

Subscribe in a reader                    2/29/2008 4:16 AM

Nexia Strategy Corporation
**Profit & Loss**
2006

| Nexia Consulting 2007 | Jan 2006 | Feb 2006 | Mar 2006 | Apr 2006 | May 2006 | Jun 2006 | FIRST HALF-YEAR | Jul 2006 | Aug 2006 | Sep-06 | Oct-06 | Nov-06 | Dec-06 | SECOND HALF-YEAR | FULL YEAR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Income | | | | | | | | | | | | | | | |
| 4010 · Sales | $ 37,093 | $ 19,443 | $ 9,462 | $ 4,000 | | | $ 69,998 | $ 28,295 | $ 69,779 | $ 20,000 | $ 25,100 | $ 12,000 | | $ 155,174 | $ 225,170 |
| 4030 · Misc. income | | | | $ 1,760 | | | $ 1,760 | $ 8,041 | $ 5,850 | $ 48,000 | $ 540 | | | $ 61,731 | $ 63,491 |
| MVI Internal Consulting | | | | | | | | | | | | | | | |
| 4900 · Interest income | $ 687 | $ 321 | $ 197 | $ 53 | $ 12 | $ 4 | $ 1,274 | $ 4 | $ 4 | $ 4 | $ 4 | $ 4 | | $ 16 | $ 1,290 |
| Total Income | $ 37,780 | $ 19,764 | $ 9,657 | $ 5,833 | $ 12 | $ 4 | $ 73,050 | $ 36,340 | $ 74,833 | $ 68,004 | $ 25,744 | $ 12,000 | $ - | $ 216,921 | $ 289,971 |
| Cost of Goods Sold | | | | | | | $ - | | | | | | | $ - | $ - |
| 7250 · Salaries | $ 91,800 | $ 92,361 | $ 306,817 | $ 108,447 | $ 417,248 | $ 199,921 | $ 1,216,594 | $ 387,750 | $ 264,082 | $ 104,100 | $ - | | | $ 755,912 | $ 1,972,505 |
| 5200 · Sub Contractor | | | | | | | $ - | | | $ - | | | | $ - | $ - |
| Total COGS | $ 91,800 | $ 92,361 | $ 306,817 | $ 108,447 | $ 417,248 | $ 199,921 | $ 1,216,594 | $ 387,750 | | $ - | | | | $ 387,750 | $ 1,804,344 |
| Gross Profit | $ (54,020) | $ (72,597) | $ (297,160) | $ (102,614) | $ (417,235) | $ (199,917) | $ (1,143,544) | $ (351,410) | $ 74,833 | $ 68,004 | $ 25,744 | $ 12,000 | $ - | $ (170,829) | $ (1,314,373) |
| Expense | | | | | | | $ - | | | | | | | $ - | |
| Printing & Production | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 1,200 | $ - | $ 901 | | | $ 2,101 | $ 2,101 |
| Training | | | | | | | $ - | | $ 1,265 | | $ 1,385 | $ 962 | | $ 3,612 | $ 3,612 |
| 6100 · Advertising | $ (88) | $ 4,321 | $ 948 | $ 5,540 | | | $ 10,727 | $ 2,669 | $ - | $ 372 | | | | $ 3,041 | $ 13,768 |
| 6180 · Bank Charges | $ 90 | $ 45 | | | $ 16 | $ 24 | $ 175 | $ 58 | $ 14 | $ 7 | $ - | | | $ 77 | $ 252 |
| 6200 · Charitable Contributions | | | $ 820 | | $ 500 | $ 500 | $ 2,220 | $ 1,500 | $ - | $ - | $ 500 | | | $ 2,000 | $ 4,220 |
| 6250 · Consulting Fees | $ 3,600 | $ 84,377 | $ 12,000 | | | $ 7,500 | $ 87,377 | $ 2,100 | $ - | $ - | $ 29,000 | $ 14,300 | | $ 44,400 | $ 131,777 |
| 6251 · Commissions | | | | | | $ 5,344 | $ 5,344 | $ - | $ - | $ - | | | | $ - | $ 5,344 |
| 6300 · Education | | $ 4,025 | $ 7,564 | | | $ 2,310 | $ 13,898 | $ - | $ - | $ - | | $ 1,790 | | $ 1,790 | $ 15,698 |
| 6500 · Dues & Subscriptions | $ 1,305 | | | | $ 10 | $ 275 | $ 1,590 | $ 230 | $ - | $ - | $ - | | | $ 230 | $ 1,820 |
| 7000 · Lease Expense | | $ 4,019 | | | | | $ 4,019 | | $ - | $ - | $ - | | | $ - | $ 4,019 |
| 7150 · Legal & Accounting | $ 5,000 | | $ 4,296 | | $ 3,698 | $ 4,007 | $ 17,001 | | $ 4,820 | $ 23,357 | $ 42,273 | | | $ 70,151 | $ 87,152 |
| 7200 · Office Expense | $ 20,778 | $ 17,395 | $ 10,836 | $ 22,370 | $ 24,905 | $ 24,902 | $ 121,187 | $ 25,179 | $ 15,419 | $ 20,172 | $ (23,434) | $ 382 | | $ 38,717 | $ 159,904 |
| 7350 · Postage & Freight | $ 40 | $ 5,341 | $ 6,525 | $ 39 | $ 223 | $ 101 | $ 12,370 | $ 304 | $ - | $ 4,937 | $ - | | | $ 5,241 | $ 17,611 |
| 7380 · Recruiting | | | $ 648 | | | | $ 648 | | $ - | $ - | $ - | | | $ - | $ 648 |
| 7400 · Rent | $ 3,788 | $ 1,863 | $ 1,863 | $ 1,863 | | $ 97,767 | $ 107,112 | | $ - | $ - | $ - | | | $ - | $ 107,112 |
| 7750 · Telephone | $ 1,814 | $ 398 | | $ 561 | $ 1,061 | $ 1,980 | $ 5,814 | $ 1,630 | $ 169 | $ 292 | $ 455 | $ 718 | | $ 3,235 | $ 8,849 |
| 7760 · Travel | $ 48,223 | $ 14,636 | $ 14,663 | $ 39,451 | $ 2,329 | $ 6,377 | $ 125,679 | $ 10,328 | $ 21,757 | $ 20,183 | $ 2,366 | $ 465 | | $ 55,032 | $ 180,661 |
| 7770 · Meals & Entertainment | $ 3,500 | $ 699 | $ 3,455 | $ 552 | $ 1,608 | $ 1,207 | $ 11,060 | $ 1,199 | $ 1,169 | $ 450 | $ 736 | $ 192 | | $ 3,787 | $ 14,847 |
| 7960 · Penalties | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 4,239 | | | $ 4,239 | $ 4,239 |
| Total Expense | $ 87,738 | $ 117,016 | $ 63,714 | $ 70,416 | $ 34,614 | $ 152,419 | $ 525,917 | $ 47,296 | $ 44,284 | $ 69,760 | $ 57,405 | $ 18,808 | $ - | $ 237,513 | $ 763,430 |
| Net Income | $ (141,758) | $ (189,615) | $ (360,874) | $ (173,030) | $ (451,850) | $ (352,334) | $ (1,669,460) | $ (398,706) | $ 30,559 | $ (1,730) | $ (31,662) | $ (6,808) | | $ (408,342) | $ (2,077,802) |

**Queries / Review Points**

| | |
|---|---|
| 1 | Analysis of advertising spend by supplier |
| 2 | Consulting fees by vendor and date |
| 3 | Commissions by vendor |
| 4 | Education by vendor |
| 5 | Lease expense Feb 2006? For what and to whom? |
| 6 | Legal and accounting by vendor |
| 7 | Office expense by vendor and type |
| 8 | Salaries - Ref back to Common Paymaster invoices |
| 9 | Rent analysis - particularly Jan 2006 |
| 10 | Travel - Analysis of people and costs |
| 11 | Meals and Entertainment - Analysis of people and type by month |

**Notes:** Jan-Nov (Current Books) with large internal "Sales" removed for June ($18,540,567), Sept ($4,752,767)

## . ank Hailstones

| From: | Fernando Simo |
|---|---|
| Sent: | 20 June 2006 12:22 |
| To: | Frank Hailstones (M) |
| Cc: | Frank Amodeo; Shane Williams |
| Subject: | RE: Manufacturing Consulting |

Frank,
I totally agree with you, regarding Paul.  The lack of financials, in his opinion, is of
no concern to those operating the companies.  He provides what he wants and feels
appropriate--who is the customer?  In my old job as CFO, my operating team new about the
results on day one of the month by providing a "flash" report of the all elements of the
P&L.

It is NOT his decision as to what we find necessary to run our business.  He needs to
provide what WE feel is appropriate.  His behavior is totally unacceptable and insulting.

Best Regards,

Fernando
Work:       407-454-6660
FAX         407-426-9191
Cell        407-342-3347
Home      321-939-4264
Email:      fsimo@pinabiliaventures.com


-----Original Message-----
From: Frank Hailstones (M)
Sent: Monday, June 19, 2006 6:52 PM
To: Fernando Simo
Cc: Frank Amodeo; Shane Williams
Subject: RE: Manufacturing Consulting

Ok thanks
Interesting meetinf today
Also Kaurie in town tomorrow expecting financials for every company I think we should
arrange a meeting with him and Paul?
We need to sort this out
His outburst today was wholly inappropriate and his disrespectful comments unacceptable
especailly in such a forum They did not go  unnoticed Frank

  -----Original Message-----
From: Fernando Simo
Sent: Mon Jun 19 17:53:53 2006
To:    Frank Hailstones (M)
Cc:    Frank Amodeo; Shane Williams
Subject:    Manufacturing Consulting

Frank,


As per our conversation, I discussed with F1 the need to provide an intensive consulting
evaluation of our Manufacturing Domain; particularly, 2Wheel Tunes.  He agrees.  As a
minimum,

a.                     An evaluation of its current supply chain.  Looking at reducing piece part costs as well as improving manufacturing cycle time.

b.                     A Marketing Plan.  The plan, given the evaluation of piece parts, should allow for a tier pricing of 2Wheel Tunes products—to allow for Class B and C customers penetration of this product.  Additionally, the marketing plan should allow for OEM pricing.

c.                     Sales Plan.  An aggressive (world-wide) sales plan.  The sales plan should look at the major, existing, two wheel vehicles manufacturers—Yamaha, Vespa, etc.

d.                     Manufacturing Plan.

a.       Where can we manufacture high volume production?

b.       An evaluation of our current Systems - Bill of Materials, Labor and MRP—Can they handle high volume production.

c.       Cost Structure.

d.       Production Equipment.  Automation requires significant CAPEX investment.  What would it be?

e.                     People/Leadership required.


Let's discuss in more detail.  Thanks.


Best Regards,


Fernando

Work:       407-454-6660

FAX         407-426-9191

Cell          407-342-3347

Home       321-939-4264

Email:      [illegible]

# Frank Hailstones

| | |
|---|---|
| **From:** | Kevin Leonard |
| **Sent:** | 26 September 2006 19:06 |
| **To:** | Frank Hailstones (M); Jodi Jaiman |
| **Cc:** | Nikitra Martin; Fernando Simo |
| **Subject:** | RE: Nexia Invoices |

Jodi would be in the best position to explain the Nexia invoices and I will forward the original invoices with your notations to her. Fernando and I had a similar conversation with Jodi this morning.

On a broader note, I don't know what source information Jodi uses or for that matter what source information I would use to charge out these costs 'accurately'.

For instance, is it based on where the employee's payroll is charged or what organization they may be providing service for on a project. If it is based upon payroll, is it where their payroll was charged at the time the charge was incurred or the date of the invoice? If it is based upon Common Paymaster's Payroll or the Headcount report, which list should be used? What if the Domain President doesn't agree with the payroll list? This is not uncommon.

If certain charges or charges for particular individuals are not chargeable to Nexia then it needs to be determined what entity should be responsible for them. I struggle with understanding to which entity certain charges belong at a particular point in time as the organizational structure, people's assignments have been and are very fluid.

I would suggest some basic rules that we'd all need to live by but given the natural tendencies of the organization, I don't think we could cover every permutation. Therefore if we are to ever get companies to inter-company charge and gain agreement I believe we will need to have some basic ground rules and allowance for the moving target. For instance if it is a charge specific to a particular individual then agree a common Payroll Headcount report and let that be the referee.

I'd suggest some overhead application for certain central charges but that doesn't work particularly well for companies owned by different parent companies.

We can't agree UA charges, Tenshi charges, I-3 charges etc.

It is leading to a growing number of orphan charges and invoices. As well as I am sure instances where no 2 people might agree who is responsible. Further we will be putting more and more resources into no value added, swatting of charges back and forth.

I think a more fundamental approach is needed.

Kevin Leonard
Phone: 407 517 7779
Fax: 407 426 9191

**From:** Frank Hailstones (M)
**Sent:** Tuesday, September 26, 2006 12:03 PM
**To:** Kevin Leonard
**Cc:** Nikitra Martin; Fernando Simo
**Subject:** RE: Nexia Invoices

Kevin

These invoices are incorrect in several ways – some of the people charged are not/were not Nexia and, in addition contain insufficient explanation as to the charges (timing / period / nature of spend item).

I have done an analysis and highlighted the queries

Please confirm they will NOT be processed until the queries are resolved

**From:** Kevin Leonard
**Sent:** Tuesday, September 26, 2006 8:53 AM
**To:** Frank Hailstones (M)
**Cc:** Nikitra Martin
**Subject:** FW: Nexia Invoices
**Importance:** High


Kevin Leonard
Phone: 407 517 7779
Fax: 407 426 9191

**From:** Jodi Jaiman
**Sent:** Monday, September 25, 2006 2:30 PM
**To:** Kevin Leonard
**Cc:** Claudia Amell
**Subject:** Nexia Invoices
**Importance:** High

Kevin,

Attached are the Nexia invoices from TenShi Enterprises, Inc., as well as a lease schedule used to calculate the furniture and equipment costs.
You will receive the actual lease agreement electronically shortly and a full set of hard copies will be delivered to you within the next business day.

The invoices have been used credited towards the monies owed to Nexia Strategy.

If you have any questions, please do not hesitate to contact me.


Kind Regards,


*Jodi Jaiman*
*President*
*TenShi Enterprises, Inc.*
*407-454-6600*
*407-517-7879 (fax)*
*jjaiman@tenshienterprises.com*

## Frank Hailstones

| | |
|---|---|
| From: | Frank Hailstones (M) |
| Sent: | 30 August 2006 20:37 |
| To: | Fernando Simo |
| Subject: | RE: Desert Valley Travel |

Fernando,

Fully agree; also, I  suggest that you get access to the accounts (QB) of all of the companies.

I have been going through Nexia and there is lots of cleaning up required:

1 Lots of miscodings which I will reallocating out to other companies
2 A number of high value charges from F1 Axex Card ($150k first 6 months of 2006) which I need to analyse and validate
3 Almost $90k from Desert Avaiation - again I am seeking follow up data to analyse
4 Expenses charged which I have no idea who authorized

This is messy/sloppy coding; cost dumping; lack of monitoring.

I discussed with F1 and told him I was going to clean Nexia up for the year to date and discuss with you how we might clean up the rest of the companies so we all have a good starting point going forward.

I think we need to institute a few key controls immediately and link it to the current initiative on business and financial management

My thoughts on key actions (which I would like to get out this week):

1 We instruct that ALL expenses need to be approved by domain leaders then you/ me. All expenses get put in for payment processing Noon Friday and that we keep copies of them / register of whats been submitted
2 We get out a Policy note ASAP on T & E explaining the 'rules' - actual, business related and reasonable spend supported by receipts if greater than $20 per item. We need to explain policy re travel (air coach unless international / overnight) ; insurance (travel and car) ; define 'reasonable' in the context of meals, drinks etc
3 We instruct again, on the process for committing expenditure and require each business to keep a register of orders. We might also require a standard order form (seq numbered and controlled) with guidance on authority limits. Just now its all too late and after the fact
4 We design a simple Invoice Approval Form to be attached to every invoice. They should all be approved on the official form by domain leaders and they should keep a register
5 Above applies to internal companie as well as external vendors
6 All companies be required to submit a standard form note every month of goods/services sold, to whom and billing data so we can ensure we are billing regularly
7 We get a monthly report detailing every journal entry for every company
8 We get a monthly report from each company showing transactions for that month to confirm the above. This is very easy from QB

Fernando, your call from Friday. I will help you in any way I can

Let me have your thoughts

Frank Hailstones
CFO
111 N Orange Ave

## Frank Hailstones

| | |
|---|---|
| **From:** | Fernando Simo |
| **Sent:** | 26 September 2006 15:15 |
| **To:** | Frank Hailstones (M) |
| **Subject:** | FW: Audit |

Best Regards.

Fernando
Work:     407-454-6660
FAX       407-426-9191
Cell      407-342-3347
Home      321-939-4264
Email:    fsimo@mirabilisventures.com

**From:** Kevin Leonard
**Sent:** Tuesday, September 26, 2006 9:19 AM
**To:** Fernando Simo
**Cc:** Dan Myers; Paul Glover
**Subject:** Audit

You asked yesterday why the problem with the audit.  I will address at a higher level:

1. Legal transactions are devised, revised or reversed and therefore their ultimate financial accounting treatment will as well. Lack of clarity of ownership of various entities.
2. Flow of legal documents for sale agreement, note payments, transfers and other commitments are not freely shared, circulated or assessable.
3. Excessive use of un-agreed Intercompany transactions and lack of synchronization of both parties recording the same or at all.
4. Charges billed to one entity but for the benefit of another
5. Employees working across entities but invoiced to one
6. Responsibility centers do not mirror or follow legal corporate structure.
7. Decentralization of accounting records, major transactions from Trust fund accounts
8. No standard chart of accounts or common financial platform.
9. Distressed entities with lack of full history and records
10. Cash crossing unrelated entities for a third company's purposes

In my view many of these issues have accelerated in 2006.
Each area obviously can be addressed but it will require radical change to current behaviors that can not be driven without total executive commitment.

Kevin Leonard
Phone: 407 517 7779
Fax: 407 426 9191

41

09:21AM 1 very few assets, if any.

09:21AM 2     Q.   Does it have liabilities?

09:21AM 3     A.   Very few. I believe I can think

09:21AM 4 of -- of one liability is all I can recall at

09:21AM 5 this point.

09:21AM 6     Q.   Have you seen a financial statement

09:21AM 7 of Mirabilis Ventures, Inc.?

09:21AM 8     A.   I had. I had seen one in -- I had

09:21AM 9 seen one certainly in June of '07.

09:22AM 10     Q.   What occasioned that?

09:22AM 11     A.   The reason being in June of '07, I

09:22AM 12 was involved with the wind down of Mirabilis, the

09:22AM 13 settling with creditors and winding down

09:22AM 14 Mirabilis, and for that reason, we secured the

09:22AM 15 Mirabilis financials which were being kept in

09:22AM 16 Quickbooks in which I ran reports, and quite

09:22AM 17 frankly, there was so much information in there

09:22AM 18 that -- that did not provide a clear picture in

09:22AM 19 my opinion. There was so much history in there

09:22AM 20 and so many people had been involved in the

09:22AM 21 bookkeeping of Mirabilis that we left that

09:22AM 22 version of the books untouched from that time

09:23AM 23 period -- or close to that time period. We have

09:23AM 24 not been actively using those financials.

09:23AM 25     Q.   So it's fair to say that at least

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska (402) 331-2500

42

09:23AM 1 from your observation, the Quickbooks database

09:23AM 2 was probably not reliable?

09:23AM 3     A.   Yes.

09:23AM 4     Q.   And that observation was made by you

09:23AM 5 in June of '07?

09:23AM 6     A.   Yes, that's my opinion in looking at

09:23AM 7 it.

09:23AM 8     Q.   Did you ever see a financial

09:23AM 9 statement of Mirabilis Ventures, Inc., prior to

09:24AM 10 today that you would consider reliable?

09:24AM 11     A.   I have a copy of the 2005 audited

09:24AM 12 financial statements either on my computer or --

09:24AM 13 or in a hard copy file in my office.

09:24AM 14     Q.   Is that a calendar?

09:24AM 15     A.   Yes, it would have been a calendar.

09:24AM 16 The fiscal year was a calendar year.

09:24AM 17     Q.   So the last reliable financial

09:24AM 18 statement for Mirabilis Ventures, Inc., that you

09:24AM 19 have reviewed is the one for the period ended

09:24AM 20 December 31, 2005?

09:24AM 21     A.   Yes.

09:24AM 22     Q.   And you have not seen what you would

09:24AM 23 consider to be a reliable financial statement of

09:24AM 24 Mirabilis Ventures, Inc., from and after that

09:24AM 25 date?

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska (402) 331-2500

43

09:24AM 1     A.   That's right.

09:24AM 2     Q.   And did you understand prior to the

09:24AM 3 closing of the Alliance transaction that the

09:24AM 4 parties had contemplated that Mirabilis Ventures,

09:24AM 5 Inc., would acquire the capital stock of

09:24AM 6 Alliance?

09:24AM 7     A.   I'm sorry, will you repeat that?

09:24AM 8     MR. PASSARELLI: Can you repeat

09:24AM 9 that, Jessica?

09:24AM 10     (The requested portion of the testimony

09:24AM 11 was read back.)

09:25AM 12     MR. MOONEY: And I'll interpose a

09:25AM 13 foundation objection. You can go ahead and

09:25AM 14 answer to the extent you understood it and know

09:25AM 15 what it's asking.

09:25AM 16     THE WITNESS: My understanding prior

09:25AM 17 to the closing was that the Alliance companies

09:25AM 18 were being acquired to be part of the Mirabilis

09:25AM 19 PEO network that was being assembled.

09:25AM 20 BY MR. PASSARELLI:

09:25AM 21     Q.   And did you understand that on the

09:25AM 22 eve of closing that -- at Mr. Amodeo's election,

09:25AM 23 the documentation was modified to reflect that

09:25AM 24 the buyer would be Wellington Capital?

09:26AM 25     A.   I don't recall when I became familiar

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska (402) 331-2500

44

09:26AM 1 with -- I believe I became familiar with that

09:26AM 2 change on the day of the closing when I was asked

09:26AM 3 to coordinate the initial payments of closing to

09:26AM 4 be made on behalf of Wellington Capital.

09:26AM 5     Q.   What do you recall about that fact?

09:26AM 6     A.   I recall Jim Sadrianna contacting me

09:26AM 7 about the initial payments being out of

09:26AM 8 Wellington, and the payments were made -- I

09:26AM 9 believe Mr. Mapes and Mr. Petersen were made the

09:26AM 10 following day out of Wellington's trust funds,

09:26AM 11 out of Berman, Keane law firm trust fund, and

09:27AM 12 Wellington had cut the other three checks on that

09:27AM 13 date. And as I recall, I was -- my role in that

09:27AM 14 was -- I believe I contacted Marty Flynn who was

09:27AM 15 a check signer for Wellington to cut those three

09:27AM 16 checks, and I had sent an e-mail to Richard

09:27AM 17 Berman at the law firm holding the trust to send

09:27AM 18 out the two wires for Mr. Petersen and Mr. Mapes,

09:27AM 19 and I believe it was very late in the day. I

09:27AM 20 want to say after 4 o'clock. And I don't -- I

09:27AM 21 don't recall if it was too late to send the wire

09:27AM 22 or what, but we had agreed that it would go out

09:27AM 23 the next day, and I think Mr. Mapes and I spoke

09:27AM 24 either the day of closing or the next day so I

09:27AM 25 could give him a confirmation number -- must have

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska (402) 331-2500

**Edie Curry**

| | |
|---|---|
| **From:** | Edie Curry |
| **Sent:** | Wednesday, April 19, 2006 3:19 PM |
| **To:** | Jodi Jaiman |
| **Subject:** | RE: |

I get it!

-----Original Message-----
From:      Jodi Jaiman
Sent: Wed Apr 19 15:17:14 2006
To:   Edie Curry
Subject:     RE:

Edie,


While I understand you received approval from Frank A already, as part of my process I
then take the costs associated with his approval for him to sign off on.  If I don't, it
will come back to haunt me later!

It's for my protection, purely!


Thank you!

Jodi



From: Edie Curry
Sent: Wednesday, April 19, 2006 2:46 PM
To: Jodi Jaiman
Subject: RE:


Jodi:

Scott, Wylie, Mark and Tony will need the Treo set up given their position and what they
will be working on.  The laptops are because of their travel requirements during the first
12 months of their employment.  I have had this conversation with Frank A and Laurie Holtz
as well as Frank Hailstones and this has been approved.  The rest of the staff can get the
standard equipment setup for regional offices.


Thanks,

Edie



From: Jodi Jaiman
Sent: Wed 4/19/2006 1:19 PM
To: Tom Broadhead
Cc: Allen Archer; Frank Hailstones (M); Edie Curry; Scott and Georgia Hannah

94

Subject: RE:

Tom,

I received your voice mail and wanted to follow up with you.  I was in a meeting where we were actually discussing Richmond (as well as other sites).  I have a couple of questions that I need answered and then I can map out the plan for getting your office functional.

What do you have in your budget regarding equipment?  Please understand that I have a process that I have to follow and I cannot just order equipment for ANYONE (aside for Frank Amodeo himself) without an approval (cost approval).  You are asking for laptops for people as well as cell phones.  Can you please identify how many laptops you are requesting as well as cell phones?

While I don't believe it will be necessary to supply cell phones, we need to associate a cost with the request.


Thank you!

Jodi


---

From: Tom Broadhead
Sent: Friday, April 14, 2006 12:23 PM
To: Jodi Jaiman
Cc: Allen Archer; Frank Hailstones (M); Edie Curry; Scott and Georgia Hannah
Subject:


Jodi,


As we discussed, here is the list of people who will be at the new site ( Westmoreland building) in the short term


Edie Broadhead

Tom Broadhead

Mike Dement

Terry Carney

Lori Eberhardt

Jacquelyn Poliquin

Scott Hannah

Mark Westmoreland

Wylie Schwieder

Tony Santillo (April 24)

(Probably 2-3 more people in the next 2-3 weeks not listed above who will be brought on board or that I missed in the list)

95

We are trying to get very basic service established for the building.  This would include internet access and phone service of some kind.  We know that there is a strong preference for bringing the building up n a plan and making the right decisions regarding phone lines, switches, internet access, computer specs, and phone access (cell and other).  However, the people we have just brought on board are without basic tools to get things done in an efficient manner - especially computers and some sort of phone access.  We would like to be able to set up a basic set of computers with basic internet access (even wireless internet through a residential type internet router would be good) and a printer. We would also like to get people cell phones to work with prior to the phone solution for the building being determined and installed. (For that matter, we may be able to set up some amount of telephone connectivity with the internet using Vonage, Skype or a similar service)

I understand that Florida has minimal resources over the next week or two to set up or support any of this for us.  I believe we can support a basic network on our own for the next few weeks and this would get us started.  We are coming through you because we want to be team players and not work against efforts and procedures that are being established while also jumping in and being productive over the next few weeks.  I believe the cost of getting this up and running would be fairly nominal - 3-5 thousand dollars - and most of this equipment can be recycled to either the day-care center we are planning or other uses.

Another aspect of moving forward on this is that the lease for the 2 small offices for Brookmeade expires at the end of this month.  We will therefore lose whatever connectivity we already have in Richmond (other than Edie and my personal computers and internet access at home).  We will be able to reuse some of the equipment from those offices (3 or 4 computers and the internet equipment, a printer or two, and some desks, tables and files) to bring this new site up and running in the short term until final plans are made and implemented.  This type of a solution, while not ideal, will also take off some of the pressure to meet a very aggressive date for getting the building up.

Let me know if you think we can go forward with this type of a plan.


Tom Broadhead

Mirabilis Ventures, Inc.

407.517.7712 (Orlando office)

804.364.8450 (Richmond office)

407.256.0747 (cell)

tbroadhead@nexiastrategy.com


The information contained in this transmission may contain privileged and confidential information.  It is intended only for the use of the person(s) named above. If you are not the intended recipient,  you are hereby notified that any review, dissemination, distribution or duplication of this communication is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

## Edie Curry

| | |
|---|---|
| **From:** | Edie Curry |
| **Sent:** | Tuesday, May 30, 2006 3:27 PM |
| **To:** | Jodi Jaiman |
| **Cc:** | Jay Stollenwerk |
| **Subject:** | Life for eight sr execs |

We have two phone lines but no phones for the past eight weeks.

We don't have the internet except at home for the past eight weeks.

We have been served an eviction notice for the third time in two different locations.

We can't issue a press release because we don't have a local phone to take the calls.

The landlord keeps driving by the building and telling anyone who will listen that we've misrepresented our interest in moving to VA.

Tom's phone number was changed and the old number...which everyone in state and federal government has, just rings buzy with no forwarding info.  This does wonders for the landlord's storyline of misrepresentation.


Sent by GoodLink (www.good.com)
Edie Curry

# Edie Curry

| | |
|---|---|
| **From:** | Jodi Jaiman |
| **Sent:** | Tuesday, May 30, 2006 7:13 PM |
| **To:** | Tom Broadhead; Scott Hannah |
| **Cc:** | Edie Curry; Allen Archer |
| **Subject:** | Richmond Update |
| **Importance:** | High |

Tom,

I am following up with you regarding our conversation this morning. At this time I have been unable to speak to Dean Armitage regarding his team and their travel arrangements. He is out of town and I have been unsuccessful in trying to reach him. Once I do, I will provide you with the timeline I had committed to. I can however update you on the items I have control over:

- Additional phone lines were ordered and will be installed on 6/2/2006 between the hours of 8AM – 5PM
- A static IP was ordered for the DSL line and should be complete by 6/2/2006
- The copier and furniture quotes will be submitted to Frank A. in the AM for purchase approval
- The fax machine was ordered
- Jacquelyn's workstation was returned (as the laptops had been) and will ship out again tomorrow for delivery on Friday (UA will set it up once it is received)
- I spoke to Frank Amodeo regarding the security person for the site. TenShi will provide a security person as well as a receptionist for 24/7 coverage of your space. This will be a billable item that TenShi will bill back.
- Cell phones: It is my understanding that after the original request was made to convert Tom & Edie's phones to Richmond (per Tom's request on 5/18/2006) someone from UA (Larry McNeill) called to confirm the change was made and it was requested at that time (Thursday or Friday of last week) that the numbers have some sort of forwarding or reference, as you are both receiving calls from prominent individuals. That request was submitted to me today, as I have to approve the use of another phone or voice mail box, since our service provider does not offer the service you were requesting. That request was approved, but I wanted to point out that the request was made 1 week after the original was put in place and they were unable to stop the change as it had already been submitted and provisioned. I was on vacation last week and therefore did not receive the request for the forwarding/reference until today.
- I spoke with Frank Amodeo regarding the space in Richmond, and here is how he would like that space to lay out:
    - Set aside 4,000-5,000 square feet of space (cubicles) for a PEO processing center
    - Insurance (Continuum)
    - Call Center
    - Internal Factor (Continuum)
    - Day Care (If someone else pays for it Only)
    - Training
    - Mirabilis Regional Office
    - Nexia Regional Office
- Based upon what the final space will be, we need to put everyone in the offices in the front of the building (temporarily) so we can do the build out in phases. You know your team the best, so I would ask that you take a look at the floor plan and assign the offices to the individuals on your team. Feel free to double up if necessary. Please have that to me by Thursday (it is my understanding that UA will be onsite beginning Friday and through the weekend) so we can make sure that the phones and workstations are set up properly.

If you have any questions, please do not hesitate to contact me.
I will provide a more detailed timeline in the morning.

Thanks,

*Jodi Jaiman*
*President*
*TenShi Enterprises. Inc.*
*407-454-6600*
*407-517-7879 (fax)*
*jjaiman@tenshienterprises.com*

STATE OF FLORIDA                    CASE NOS. 6:08-bk-4327-KSJ
COUNTY OF ORANGE                              6:08-bk-4328-KSJ
                                             6:08-bk-4681-KSJ

## AFFIDAVIT

I, Jay Stollenwerk, being duly sworn state the following:

1.    I was a member of the board of directors of the following companies for

the following time periods:

| Company | Time Period |
|---|---|
| Mirabilis Ventures, Inc. | March 14, 2007 to May 23, 2008 |
| AEM, Inc. | April 27, 2008 to May 1, 2008 |
| Nexia Strategy Corporation | October 11, 2007 to May 23, 2008 |
| Tenshi Leasing, Inc. | May 4, 2007 to March 26, 2008 |
| Titanium Technologies, Inc. | February 26, 2007 to April 13, 2007 |

2.    I know the information contained in the following paragraphs through

conversations with Frank L. Amodeo (Amodeo); Shane Williams (Williams); Jodi Jaiman

(Jaiman); Scott Shuker, Esq. (Shuker) and Elizabeth Green, Esq. (Green),

who are partners with the law firm of Lantham, Shuker, et al.; and/or Aaron Bates,

Esq. (Bates) and Matthew Mokwa, Esq. (Mokwa).  Bates and Mokwa were previously

1

GOVERNMENT EXHIBIT
B

in-house counsel at Mirabilis Ventures, Inc. (Mirabilis) and are partners in the firm of

Bates and Mokwa.  Once they formed their firm, almost all of Bates and Mokwa's work

consisted of representing Mirabilis at the behest of Amodeo.

3.      Amodeo was the person who controlled the above-referenced companies,

as well as Hoth Holdings, Inc. and others.


4.      One of my responsibilities was to gather documents so that Amodeo and

his defense attorneys could provide documents to the United States pursuant to grand

jury subpoenas which were executed in late 2006.

5.      Another one of my responsibilities as an officer of the above-referenced

companies was to liquidate assets of the companies so that the funds could be paid to

the Internal Revenue Service (IRS) to pay back the IRS for payroll tax monies (trust

fund taxes) for which a combination of Amodeo, other individuals, AEM, and

Professional Benefits Solutions were responsible but which were not remitted to the

IRS.  Amodeo knew that he was the target of a federal grand jury and was attempting to

cooperate with the United States in order to receive a reduced sentence.  Amodeo told

me that the reason he wanted to pay back the IRS was that it would illustrate that there

was never an intent to defraud the IRS.  I surmised from this that Amodeo would use

these payments to seek leniency from a sentencing judge.

2

6.      I was further responsible for paying as many creditors as possible.  It was my understanding that almost all of the creditors had been paid prior to the institution of the bankruptcy proceedings.  Other than creditors who had claims which were disputed by Amodeo, I know of only one or two creditors who were not paid as of the time the bankruptcies were filed because they would not accept a settlement offer (LexisNexis and American Express).

7.      At the time that the bankruptcy petitions were filed, lawsuits which Mirabilis had instituted against other companies and individuals comprised almost all of the assets of the companies.

8.      When seizure warrants were served on law firms which handled legal matters for the above-referenced companies, there was a concern about how to save the litigation cases to make sure the IRS received the funds referenced above for Amodeo's benefit in the potential criminal case.

9.      It is my understanding that Green proposed the bankruptcy proceedings. Green believed that filing bankruptcy was the best way to save the litigation.  Amodeo then directed Mirabilis to file for bankruptcy protection.

10.      I was present at a meeting with Bates, Mokwa, Jaiman, Williams, Green and Shuker at Green and Shuker's office in which Shuker and Green discussed how to handle the bankruptcy.  They talked about their experience in what they referred to as

3

the "Church Street case." Jaiman, Williams, and I would resign as officers and directors. We were to appoint Michael E. Moecker (Moecker) as a member of the board of directors. Moecker would then appoint R. W. (Bill) Cuthill, Jr. (Cuthill) as president of Mirabilis. They wanted to talk with the office of the United States Trustee, as they believed that they had found a loophole which would allow them to proceed without a trustee. Green was concerned that the United States would seize attorney fees, but they decided that they could use the money received from the settlement of two cases with RKT Constructors, Inc. to fund the bankruptcies.

11.     Although I have not spoken with Green directly about paying back the trust funds to the IRS for Amodeo's benefit in the criminal matter, it was clear that any funds recovered were to go to the IRS, no matter the source of the funds, for Amodeo's benefit in the possible criminal case.

12.     At the time the bankruptcies were filed, there were no remaining employees of Mirabilis, AEM, or Hoth Holdings. Hoth Holding contained only one asset, i.e., a piece of property in Virginia.

Further your Affiant sayeth not.

_____
Jay Stollenwerk

Sworn to and subscribed
before me this 22nd day
of September, 2008

4

Notary Public State of Florida
Stacey A Frye
My Commission DD480338
Expires 10/11/2009

STATE OF FLORIDA                           CASE NOS. 6:08-bk-4327-KSJ
COUNTY OF ORANGE                                      6:08-bk-4328-KSJ
                                                     6:08-bk-4681-KSJ

## AFFIDAVIT

I, Steven McCabe, being duly sworn state the following:

1.      I am a special agent with the Internal Revenue Service (IRS) and have

been so employed for approximately 14 years.

2.      I am one of two IRS special agents assigned to the investigation and

prosecution of Frank L. Amodeo, and the investigation of several corporations and

other individuals.

3.      On May 14, 2008, prior to the institution of the instant case, was present

at a meeting at the Office of the United States Trustee which included, among others,

debtors counsel, Scott Shuker and Elizabeth Green; Assistant United States Attorneys

I. Randall Gold and Nicole Andrejko; and Ken Meeker.  Debtor's counsel explained that

they had been hired by Frank L. Amodeo, the controlling person of debtor Mirabilis and

the related debtors, and were considering whether to file a Chapter 11 bankruptcy for

Mirabilis.  They advised that the board of directors at that time, Jodi Jaiman, Shane

Williams, and Jay Stollenwerk, would appoint another individual as the sole member of

the board of directors and then resign.  The new member of the board of directors

would then appoint William Cuthill as president of Mirabilis.  At that time, debtor's

counsel stated that the sole reason for the filing of the bankruptcy in the instant case

and related cases was to use the bankruptcy to continue civil litigation which, if settled

or won, would provide funds for Frank Amodeo to pay the Internal Revenue Service

1



Steven McCabe Affidavit

CASE NOS. 6:08-bk-4327-KSJ
6:08-bk-4328-KSJ
6:08-bk-4681-KSJ

some of the payroll taxes he owed the IRS.  It was represented that the logic behind

paying the IRS with the bankruptcy assets was to allow Amodeo to present this

information to the sentencing judge in a potential criminal case against Amodeo,

hopefully so that he could receive a more lenient sentence.

Further your Affiant sayeth not.

_____
Steven McCabe

Sworn to and subscribed
before me this 22nd day
of September, 2008.

_____

Robin N. Shue
Commission # DD384831
Expires January 9, 2009
Bonded Troy Fain - Insurance, Inc. 800-385-7019

2

# *TRANSCRIPT OF PROCEEDINGS*

COPY

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

RECEIVED
U.S. ATTORNEY'S OFFICE
SEP 0 4 2008
MIDDLE DISTRICT OF FLORIDA
ORLANDO

CASE NO: 2008-4327, CHAPTER 11

IN RE: MIRABILIS VENTURES, INC.,

CASE NUMBER 2008-4328, CHAPTER 11

IN RE: HOTH HOLDINGS

---

HEARING

BEFORE:          KAREN JENNEMANN,
                 U.S. BANKRUPTCY JUDGE

DATE:            JUNE 4, 2008

APPEARANCES:

ON BEHALF OF DEBTORS:    ELIZABETH GREEN, ESQUIRE
                            JIMMY PARRISH, ESQUIRE

ON BEHALF OF UNITED STATES:   RANDY GOLD, ESQUIRE

ON BEHALF OF U.S. TRUSTEE:   KEN MEEKER, ESQUIRE



# Realtime Reporters, Inc.

Registered Professional Reporters
Certified Video Technicians

---

1188 Fox Forrest Circle • Apopka, Florida 32712 • (407) 884-4662 • FAX (407) 884-4664
*Sandra A. Dawkins, President • Professional Reporting Since 1977*







GOVERNMENT EXHIBIT

1               P R O C E E D I N G S

2

3          THE CLERK:  CASE NUMBER 2008-4327, CHAPTER 11,

4     MIRABILIS VENTURES, INC., ALSO CASE NUMBER 2008-4328,

5     CHAPTER 11, HOTH HOLDINGS.  ALL INTERESTED PARTIES,

6     PLEASE COME FORWARD AND ENTER YOUR APPEARANCES.

7          MS. GREEN:  YOUR HONOR, ELIZABETH GREEN AND

8     JIMMY PARRISH ON BEHALF OF MIRABILIS VENTURES.  I

9     HAVE MR. BILL CUTHILL AT COUNSEL TABLE PRESENT IN

10    MIRABILIS.

11         MR. MEEKER:  MAY IT PLEASE THE COURT.  KEN

12    MEEKER FOR THE U.S. TRUSTEE.

13         MR. GOLD:  YOUR HONOR, MAY IT PLEASE THE COURT.

14    ALTHOUGH THE UNITED STATES IS NOT PARTY, RANDY GOLD

15    ON BEHALF OF THE UNITED STATES.  WE'RE HERE STRICTLY

16    THAT WE MAY HAVE INFORMATION THAT THE COURT WOULD

17    FIND RELEVANT.  IF YOU DON'T, THAT'S FINE TOO.

18         THE COURT:  VERY GOOD.

19         MR. GOLD:  WE'LL HEAR THE CASE IF YOU HAVE ANY

20    QUESTIONS.

21         THE COURT:  VERY GOOD.  DOES ANYONE ELSE CARE

22    TO MAKE AN APPEARANCE?

23             THEN THESE TWO RELATED CHAPTER 11 CASES

24    WERE FILED ON MAY THE 27TH AND MY NORMAL PRACTICE IS

25    SIMPLY TO HAVE A STATUS CONFERENCE EARLY IN THE CASE;

1    PARTICULARLY IF THERE'S CREDITOR INTEREST, TO JUST SEE

2    WHERE WE'RE GOING AND UNDERSTAND THE DEBTOR SO I CAN

3    PLAN HEARINGS AND SUCH.

4            THAT IS THE PURPOSE AND ONLY PURPOSE OF

5    TODAY.  THERE'S NO PENDING MOTIONS OR MATTERS AND THE

6    DEBTOR DID RECENTLY FILE SUMMARIES OF THE CASE WHICH

7    MAY BE USEFUL OR HELPFUL FOR PEOPLE THAT WANT TO

8    MONITOR THE CASE.  BUT MISS GREEN IF YOU COULD GIVE

9    ME SOME ADDITIONAL BACKGROUND AND TELL ME WHY WE'RE

10   HERE AND WHERE WE'RE GOING.

11           MS. GREEN:  YES, YOUR HONOR.  AS YOU'RE

12   PROBABLY WELL AWARE FROM JUST THE MERE FACT THAT

13   MIRABILIS VENTURES HAS BEEN IN THE NEWSPAPER FOR

14   QUITE SOME PERIOD OF TIME, MIRABILIS VENTURES WAS A

15   NEVADA CORPORATION THAT WAS ESTABLISHED IN OCTOBER OF

16   2004 AS A PRIVATE EQUITY COMPANY.  IT WAS ESTABLISHED

17   ESSENTIALLY TO ACQUIRE OTHER COMPANIES, AND AT ONE

18   POINT IT HAD 100 SUBSIDIARIES.

19           WE BELIEVE THAT AT THIS POINT IN TIME

20   MIRABILIS VENTURES HAS APPROXIMATELY 40 WHOLLY OWNED

21   SUBSIDIARIES.  AND ONE OF THE THINGS THAT'S HAPPENING

22   RIGHT NOW IS WE'RE ANALYZING THOSE SUBSIDIARIES TO

23   DETERMINE WHETHER OR NOT ANY OF THOSE SUBSIDIARIES

24   SHOULD BE BROUGHT INTO THE BANKRUPTCY CASE TO ADD

25   VALUE TO THE MIRABILIS VENTURES CASE.

1    THE COURT:   ARE ANY OF THEM OPERATING SUBSIDIARIES

2    THAT YOU KNOW OF?

3        MS. GREEN:   NOT TO MY KNOWLEDGE.   THERE'S A

4    COUPLE OF THEM ACTUALLY IN BANKRUPTCY COURTS ACROSS

5    THE COUNTRY, AND THEN THERE'S SOME THAT ARE JUST SORT

6    OF OUT THERE AS SUBSIDIARIES THAT HAVE PROBABLY MOST

7    VALUE IN FRAUDULENT TRANSFER ACTIONS AND IN

8    LITIGATION.

9        ON MAY 27, THE DIRECTORS OF MIRABILIS

10   VENTURES, WHO AT THAT TIME WERE JAY STOLLENWERK AND

11   SHANE WILLIAMS, WAS APPOINTED MICHAEL MOECKER AS A

12   DIRECTOR.   THEY THEN RESIGNED, AS DID THE PRESIDENT

13   OF MIRABILIS WHOSE NAME WAS JODI JAIMAN.

14       MR. MOECKER HAS APPOINTED MR. CUTHILL TO

15   SERVE AS PRESIDENT UNTIL SUCH TIME AS HE'S EITHER

16   REMOVED BY THE COURT UNTIL THE CASE IS CONVERTED OR

17   DISMISSED, OR A TRUSTEE IS APPOINTED.   SO THAT THERE

18   CAN BE NO ABILITY FOR ANY OTHER THIRD PARTY TO

19   ATTEMPT TO REMOVE THE PRESIDENT OF THIS ENTITY.

20       AS THE COURT IS WELL AWARE BOTH MR.

21   MOECKER AND MR. CUTHILL ARE WELL VERSED IN THE

22   BANKRUPTCY FIELD AND NEITHER HAVE HAD ANY PREVIOUS

23   RELATIONSHIP WITH MIRABILIS VENTURES OR ITS OFFICERS

24   OR DIRECTORS OR EMPLOYEES.

25       THE COURT:   DID THEY RECEIVE ANY COMPENSATION

1    OTHER THAN THEIR ANTICIPATED HOURLY COMPENSATION?

2         MS. GREEN:  JUST THEIR ANTICIPATED HOURLY

3    COMPENSATION.  THEY DID NOT RECEIVE ANY PREPETITION

4    COMPENSATION AT ALL.

5              THIS CASE WAS FILED REALLY IN RESPONSE TO

6    A NUMBER OF THINGS.  ONE OF WHICH WAS AN INREM

7    FORFEITURE ACTION THAT WAS FILED BY THE UNITED

8    STATES, MR. GOLD IS HERE TODAY.  THAT INREM

9    FORFEITURE ACTION SOUGHT FORFEITURE OF ESSENTIALLY

10   ATTORNEYS FEES, FUNDS THAT WERE HELD ON ACCOUNT IN

11   TRUST ACCOUNTS WITH VARIOUS ATTORNEYS THAT WERE

12   LITIGATING LITIGATION THAT BELONGED TO MIRABILIS

13   VENTURES.

14             AS A RESULT, MIRABILIS VENTURES IS UNABLE

15   TO PARTICIPATE IN THESE LITIGATIONS, OBVIOUSLY

16   ATTORNEYS WERE WITHDRAWING.  WE BELIEVE THAT THERE

17   WERE SIGNIFICANT ASSETS THAT COULD BE OBTAINED IF

18   MIRABILIS PURSUED THIS LITIGATION, INCLUDING

19   LITIGATION AGAINST FORMER PROFESSIONALS, LITIGATION

20   FOR FRAUDULENT TRANSFERS, AND LITIGATION AGAINST

21   PEOPLE WHO TOOK ASSETS OF MIRABILIS AFTER MID-2007.

22   AND IN AN EFFORT TO DO THAT, THIS BANKRUPTCY CASE WAS

23   FILED.

24             THERE IS NO PENDING LITIGATION AGAINST

25   MIRABILIS VENTURES BY THE UNITED STATES IN, AS FAR AS

1    I KNOW, IN THE DISTRICT COURT IN THE MIDDLE DISTRICT OF

2    FLORIDA, OR ANY OTHER COURT.  THE IRS, WHICH IS

3    REALLY WHERE A LOT OF THE UNITED STATES INTEREST

4    COMES FROM REGARDING 941 TAX LIABILITY, HAS NOT

5    ASSESSED MIRABILIS NOR HAS IT FILED A TAX LIEN.

6    THERE WAS SOME TAX LITIGATION FILED IN THE DISTRICT

7    COURT WHICH WAS DISMISSED WITHOUT PREJUDICE ABOUT A

8    YEAR AGO.

9              THE IDEA BEHIND THE CASE IS TO ANALYZE THE

10   ASSETS, DETERMINE THE ACTUAL CREDITORS OF MIRABILIS.

11   THERE ARE, AS FAR AS WE KNOW SO FAR, WE HAVE ABOUT 25

12   MILLION IN GENERAL UNSECURED CLAIMS THAT ARE NOT

13   INSIDER CLAIMS AND THERE MAY BE MORE.  MR. CUTHILL,

14   YESTERDAY, WAS AT THE DOCUMENT DEPOSITORY WHICH IS

15   BEING HELD AT A WAREHOUSE IN THE CUSTODY OF, I

16   BELIEVE, MR. BUTCH SLAUGHTER'S FIRM, IN RESPONSE TO

17   AN IRS SUBPOENA.  HE'S STARTED THE REVIEW OF THOSE

18   DOCUMENTS IN ORDER TO DETERMINE THE OTHER CREDITORS.

19        THE COURT:  WHAT NON-IRS LITIGATION IS PENDING?

20   JUST GENERALLY, IS THERE TEN CASES, FIFTY CASES,

21   WHERE ARE THEY?

22        MS. GREEN:  THERE ARE -- THERE'S A NUMBER OF

23   CASES REGARDING PROFESSIONALS, PROBABLY FIVE OR SIX,

24   MR. MIKE MAYNARD IS HERE IN THE COURTROOM TODAY.  HIS

25   FIRM HAD BEEN RETAINED TO PURSUE SOME OF THAT

1    LITIGATION.

2         THERE IS ALSO LITIGATION INVOLVED IN

3    BANKRUPTCY CASE IN CHATTANOOGA REGARDING A PIECE OF

4    PROPERTY AND THE PROCEEDS OF THAT PROPERTY.   THERE IS

5    LITIGATION IN ORLANDO RELATED TO A ATLANTIC, AND

6    THERE'S LITIGATION RELATED TO SUBSIDIARIES.

7         I WOULD SAY THERE'S PROBABLY TEN MAJOR

8    PIECES OF LITIGATION IN ADDITION TO THE PROFESSIONAL

9    LITIGATION.   AND THERE'S LITIGATION WHICH BELONGS TO

10   SOME OF THE SUBSIDIARIES.

11        THE ONE MOTION THAT I DO INTEND TO FILE

12   SOONER RATHER THAN LATER, IS A MOTION TO STAY ALL

13   PENDING LITIGATION IN WHICH MIRABILIS IS A PLAINTIFF,

14   BECAUSE THAT IS NOT STAYED UNDER 362.   AND ALL

15   PENDING LITIGATION IN WHICH THE SUBSIDIARIES ARE A

16   PLAINTIFF OR A DEFENDANT FOR A PERIOD OF 60 DAYS.

17        THERE ARE SOME LAWSUITS OUT THERE THAT ARE

18   BEING BROUGHT BY SUBSIDIARIES WHERE FIRMS ARE

19   ATTEMPTING TO WITHDRAW AND WE'D LIKE TO GET A HANDLE

20   ON THAT TO ANALYZE THAT LITIGATION TO DETERMINE IF

21   THAT'S AN ASSET THAT MAKES SENSE FOR THE ESTATE TO

22   PURSUE, OR NOT.   AND SO THAT'S THE PLAN WITH REGARD

23   TO LITIGATION.

24        WE ALSO PLAN TO FILE MOTIONS TO EMPLOY

25   ACCOUNTANTS, THEY'RE BEING PREPARED RIGHT NOW.   AND

1   WE WILL MOST LIKELY BE FILING MOTIONS TO EMPLOY SPECIAL

2   COUNSEL WITH REGARD TO THE LITIGATION.

3        THE COURT:  THE SUMMARIES REFLECT ANTICIPATED

4   LIABILITIES OF SUBSTANTIAL AMOUNTS TO THE SERVICE.

5   IS THAT -- WHERE DID YOU GET THAT NUMBER FROM?

6        MS. GREEN:  I ACTUALLY GOT THAT NUMBER FROM, I

7   BELIEVE, A MEETING WITH MR. GOLD AND ALSO FROM THE

8   NEWSPAPER.

9        THE COURT:  VERY GOOD.  BUT THERE'S BEEN -- SO

10  IT'S NOT BASED ON RETURNS AND IT'S NOT BASED ON

11  ASSESSMENTS.  IT'S JUST BASED ON --

12       MS. GREEN:  NO, IT IS A 941 TAX LIABILITY.  I

13  BELIEVE APPROXIMATELY 120 MILLION DOLLARS OF THAT IS

14  A TRUST FUND AMOUNT, AND THE OTHER IS THE 189

15  MILLION.  I'M SURE MR. GOLD WILL CORRECT ME IF I --

16       THE COURT:  NO PROBLEM, I'LL ASK HIM.  YOU ALSO

17  LISTED A SUBSTANTIAL SECURED CREDITOR, LET ME SEE IF

18  I CAN FIND THE NAME.

19       MS. GREEN:  ACME STRATEGY CORPORATION HAS FILED

20  A UCC.  THAT I LISTED AS AN AFFILIATED ENTITY THAT

21  MAY ASSERT A SECURITY INTEREST BECAUSE THAT SECURITY

22  INTEREST MAY OR MAY NOT BE VALID.  SO AT THIS POINT

23  IT'S JUST OUT THERE.

24         IT'S A COMPANY OWNED BY MR. FRANK AMODEO

25  WHO WAS NOT AN OFFICER OR DIRECTOR OF MIRABILIS.

1     HOWEVER, THE GOVERNMENT HAS ALLEGATIONS IN THE FORFEITURE

2     COMPLAINT RELATING TO CERTAIN ACTIVITIES OF MR.

3     AMODEO THAT WOULD BE CONSIDERED TO BE CRIMINAL.

4          THE COURT:  WHAT KIND OF SECURITY -- HAVE YOU

5     EVEN LOOKED AT THOSE DOCUMENTS OR --

6          MS. GREEN:  I DON'T HAVE ALL OF THE DOCUMENTS

7     RELATED TO THE SECURITY INTEREST.  I JUST WANTED TO

8     DISCLOSE TO THE COURT THAT THAT WAS OUT THERE.

9          THE COURT:  AND AT THIS JUNCTURE, AS FAR AS

10    WITH MR. CUTHILL AND MR. MOECKER'S INVOLVEMENT, MR.

11    AMODEO AND THE FORMER OFFICERS AND DIRECTORS ARE NOT

12    IN ANYWAY IN CONTROL OF ANY ASSETS OR BOOKS OR

13    RECORDS OF THE DEBTOR?  IS THAT CORRECT?

14         MS. GREEN:  THE BOOKS AND RECORDS ARE LOCATED

15    IN THE WAREHOUSE.

16         THE COURT:  YOU SAID OF THE LAWYER.

17         MS. GREEN:  WHICH I BELIEVE ARE SUPPOSED TO BE

18    IN THE CUSTODY OF MR. SLAUGHTER.  I'M SURE THAT MR.

19    GOLD CAN CONFIRM THAT.  AT THIS POINT I THINK THE

20    RENT MAY BE BEING PAID BY MR. AMODEO AND THAT'S

21    SOMETHING THAT WE'RE LOOKING AT WITH A WAY TO REMEDY

22    THAT.

23              WHAT I'D LIKE TO DO IS BECAUSE SOME OF THE

24    DOCUMENTS, THEY WERE COMPILED UNDER THE SUBPOENAS, I

25    WOULD AT LEAST LIKE TO BE ABLE TO FIGURE OUT A WAY TO

1    HOLD THOSE DOCUMENTS AND MAKE EVERYBODY HAPPY AND STILL

2    ALLOW US TO HAVE THE CONTROL OVER THEM.

3             NO, MR. AMODEO IS NOT INVOLVED IN THE

4    OPERATIONS OF THE BUSINESS OR THE OPERATIONS OF THE

5    BANKRUPTCY.  I HAVE HAD SOME PHONE CALLS WITH

6    MIRABILIS COUNSEL WHO ALSO REPRESENTS SOME COMPANIES

7    OF MR. AMODEO FOR FACT FINDING MISSIONS, ESSENTIALLY,

8    TO DETERMINE THE EXTENT AND THE STATUS OF SOME OF

9    THIS LITIGATION.

10        THE COURT:  HOW DID YOU GET PAID?

11        MS. GREEN:  WE WERE PAID BY A DEPARTMENT OF

12   TRANSPORTATION CHECK IN THE SETTLEMENT OF A LAWSUIT

13   THAT RFK, ONE OF THE MIRABILIS SUBSIDIARIES, HAD

14   AGAINST THE DOT FOR BREACH OF CONTRACT.

15        THE COURT:  AND THERE'S ESSENTIALLY NO CASH

16   ASSETS, BANK ACCOUNTS? THERE MAY BE BANK ACCOUNTS BUT

17   THERE'S NO CASH --

18        MS. GREEN:  THERE MAY BE BANK ACCOUNTS BUT AS

19   FAR AS WE KNOW, NO.

20        THE COURT:  VERY GOOD.  VERY GOOD.

21        MS. GREEN:  DO YOU WANT ME TO ADDRESS HOTH OR

22   DO YOU WANT TO DO IT?

23        THE COURT:  YEA, LET'S DEFINITELY ADDRESS HOTH

24   BUT BEFORE WE MOVE ON I DID HAVE ONE MORE QUESTION.

25   YOU'RE GOING TO FILE THE MOTION FOR THE STAY AND

1    WE'LL SET THAT.  ANY OTHER EMERGENCY MOTIONS OR ANY OTHER

2    QUICK MATTERS THAT I NEED TO PARTICIPATE --

3            MS. GREEN:  I THINK THE ONLY OTHER QUICK

4    MATTERS WILL RELATE TO THE RETENTION OF PROFESSIONALS

5    IN THE FORM OF ACCOUNTANTS.

6            THE COURT:  VERY GOOD.  YEA, GO AHEAD AND

7    PROCEED TO HOTH.

8            MS. GREEN:  YES, YOUR HONOR.  HOTH HOLDINGS,

9    LLC IS AN ENTITY WHICH OWNS A PIECE OF PROPERTY IN

10   HENRICO COUNTY VIRGINIA.  WE BELIEVE THE VALUE OF THE

11   PROPERTY IS 1.25 MILLION DOLLARS.  THAT PROPERTY WAS

12   THE SUBJECT OF LITIGATION WHICH WAS PENDING IN

13   HENRICO COUNTY WHEREIN THE PARTIES WERE SEEKING

14   SPECIFIC PERFORMANCE.  IN OTHER WORDS, REQUIRING HOTH

15   TO TRANSFER THE DEED TO THE REAL ESTATE.

16            THIS PROPERTY WAS THE SUBJECT OF ONE OF

17   THE CIVIL FORFEITURE ACTIONS HOWEVER THE JUDGE IN THE

18   VIRGINIA COURT REFUSED TO STAY THAT LITIGATION BASED

19   UPON THE CIVIL FORFEITURE ACTION AND WAS GOING

20   FORWARD WITH THE TRIAL.

21            UNFORTUNATELY, THERE WAS NOBODY TO

22   REPRESENT HOTH HOLDINGS AT THAT TRIAL AND IN AN

23   EFFORT TO RETAIN THE VALUE OF THAT PROPERTY FOR

24   WHOMEVER THE APPROPRIATE CREDITOR MAY BE, WE FILED

25   THE BANKRUPTCY FOR HOTH.

1      THE COURT:  AND THIS IS ONE OF THE SUBSIDIARIES,

2   SIMILAR TO OTHER SUBSIDIARIES?

3      MS. GREEN:  IT'S ACTUALLY NOT WHOLLY OWNED.

4   IT'S AN LLC, 90 PERCENT MEMBERSHIP INTEREST IS WITH

5   MIRABILIS VENTURES WHO IS ALSO THE MANAGING MEMBER.

6      THE COURT:  AND WHO IS THE OTHER TEN PERCENT IF

7   YOU KNOW?

8      MS. GREEN:  IT'S EXIA, LLC WHICH IS A COMPANY

9   CONTROLLED BY MR. AMODEO, I BELIEVE.

10      THE COURT:  ANY EMERGENCY MATTERS IN THAT?

11   IT'LL BE, YOU'LL FILE A SIMILAR -- WELL, YOU'RE A

12   DEFENDANT IN THAT PROCEEDING.

13      MS. GREEN:  WE'RE A DEFENDANT IN THAT

14   PROCEEDING SO I THINK WE WON'T HAVE ANY EMERGENCY

15   MATTERS UNLESS THOSE MATTERS ARE BROUGHT BY OTHER

16   PARTIES.

17      THE COURT:  VERY GOOD.  THANK YOU.  I GUESS,

18   MR. GOLD IF YOU COULD BRING ME, YOU CERTAINLY HAVE

19   PROBABLY AT LEAST AS MUCH, IF A DIFFERENT TYPE OF

20   KNOWLEDGE THAN MISS GREEN.  BUT PROBABLY FAIRLY

21   SUBSTANTIAL.

22      MR. GOLD:  MS. GREEN IS CORRECT.  THERE ARE A

23   NUMBER OF ACTIONS SPINNING AT THE SAME TIME.  THERE

24   IS A CRIMINAL INVESTIGATION THAT HAS BEEN ONGOING FOR

25   A LITTLE LESS THAN TWO YEARS.  IT IS VERY EXTENSIVE.

1       WE DID FILE A CIVIL FORFEITURE ACTION AGAINST

2   CERTAIN HOMES AS WELL AS [INAUDIBLE] AND A PLANE.

3   AND THEN THERE WERE SEIZURE WARRANTS ISSUED TO

4   SEVERAL LAW FIRMS WHO HAD FUNDS WE BELIEVE CAME FROM

5   TAINTED MONEY AND IT WAS IN THEIR TRUST ACCOUNTS.

6       THE COURT:  AND I DON'T WANT TO IMPEDE UPON THE

7   CRIMINAL INVESTIGATION BUT JUST GENERALLY, WERE THE

8   FORFEITURE ACTIONS RELATED TO THE DEBTORS' PROPERTY,

9   THESE TWO DEBTORS' PROPERTIES, OR WERE THEY RELATED

10  TO EITHER THE OTHER SUBSIDIARIES OR MR. AMODEO'S

11  PERSONAL PROPERTIES?

12      MR. GOLD:  IT IS PROBABLY RELATED TO

13  EVERYTHING.

14      THE COURT:  ALL OF THEM, OKAY.

15      MR. GOLD:  AND, AS A MATTER OF FACT, WHAT ONE

16  OF THE THINGS THAT I WAS GOING TO RELATE TO THE COURT

17  IS WE ARE CONSIDERING, PROBABLY WILL FILE, A MOTION

18  TO WITHDRAW THE REFERENCE AND BRING IT OVER TO JUDGE

19  ANTONE, SO THAT HE CAN HEAR THE BANKRUPTCY OR PARCEL

20  ITEMS THAT YOUR HONOR, CERTAIN ASPECTS SO THAT IT'S

21  ALL OVER THE DISTRICT COURT.

22      THE COURT:  AND HE'S HANDLING ALL THE CIVIL

23  FORFEITURE?

24      MR. GOLD:  CIVIL FORFEITURE PROCEEDINGS, THAT'S

25  CORRECT.

1    THERE ARE SEVERAL OTHER ISSUES WE JUST WANT

2    TO BRING TO THE COURT'S ATTENTION.  IF THE COURT

3    WANTS DETAILS I CAN GO INTO THEM.

4         BUT, THERE ARE ISSUES, PROBABLY

5    UNBEKNOWNST TO MS. GREEN, ABOUT THE WAY THIS

6    BANKRUPTCY CAME ABOUT.  AND THERE MAY BE AN ISSUE AS

7    TO MR. AMODEO'S COMPETENCE WHICH MAY FIGURE INTO HOW

8    THIS CASE WAS FILED.

9         THE ONE ITEM THEY WERE TALKING ABOUT BEING

10   PAID, THE MONEY FOR THE RFK, WE BELIEVE [INAUDIBLE]

11   WILL BE SUBJECT TO FORFEITURE.  THERE ARE NO OTHER

12   ASSETS AS WE UNDERSTAND IT.

13        WE DID HAVE A DISCUSSION WITH MR. MEEKER,

14   MS, GREEN WITH MR. SCHUKER AND SOME FOLKS FROM MY

15   OFFICE AS WELL AS THE IRS ABOUT HOW THEY WERE GOING

16   TO FUND THIS.  ORIGINALLY THEY THOUGHT THEY HAD FOUR

17   THOUSAND DOLLARS IN CASH, WHICH WE GOT.  MR. AMODEO

18   AND MIRABILIS DOES NOT.

19        AS TO THE 1.2 MILLION, WE MAY BE ABLE TO

20   TRACE THAT TO THE TAINTED FUNDS.  SO IT MAY BE THAT

21   THE 1.2 MILLION DOLLARS IS GOING TO BE SUBJECT TO

22   FORFEITURE.  AS MS. GREEN KNOWS, WE'VE ALREADY WITH A

23   SEIZURE WARRANT TAKEN SOME MONEY FROM HER FIRM.

24        AS TO THE RECORDS, THE RECORDS WE RECEIVED

25   PURSUANT TO A GRAND JURY SUBPOENA.  AND WHILE THERE

1    IS A WAREHOUSE THAT'S UNDER THE CONTROL OF THE CRIMINAL

2    DEFENSE ATTORNEY AND/OR POTENTIALLY SOME OTHER

3    ATTORNEYS, I THINK WE WILL WIND UP RETAINING CONTROL

4    OF THE DOCUMENTS.

5          THAT'S NOT TO SAY THAT THEY MAY NOT BE

6    ABLE TO LOOK AT THEM, BUT I DON'T THINK THAT WE'RE

7    GOING TO BE IN A POSITION WHERE WE'RE GOING TO BE

8    WILLING TO GIVE UP THE CONTROL OF THOSE DOCUMENTS.

9          THE COURT:  DO YOU HAVE CONTROL OF THEM AT THIS

10   POINT?

11         MR. GOLD:  BASICALLY THE ANSWER IS YES.

12   THROUGH MR. SLAUGHTER'S OFFICE, AND THEY SPENT A

13   GREAT DEAL OF TIME COMPUTERIZING THINGS.  BUT

14   BASICALLY THEY BELONG TO THE GRAND JURY.

15         AS I UNDERSTAND IT FROM MS. GREEN NOW,

16   APPARENTLY THERE ARE NO ASSETS OTHER THAN THESE

17   LAWSUITS.  I'M NOT QUITE SURE WHY WE ARE IN AN ELEVEN

18   RATHER THAN A SEVEN, BECAUSE AS I UNDERSTAND IT

19   MIRABILIS IS NOT GOING TO GO FORWARD AS AN ENTITY NOR

20   ARE ANY OF THE SUBSIDIARIES.  FOR THE MOST PART

21   THEY'RE ALREADY OUT OF BUSINESS.

22         WE'RE ALSO A LITTLE BIT TROUBLED IN SEEING

23   THE PETITION ITSELF, IN TERMS OF THE LIST OF THE

24   CREDITORS AND SHAREHOLDERS.  WE BELIEVE THERE ARE

25   SOME INSIDERS ON THE LIST OF CREDITORS INCLUDING

1    TITANIUM TECHNOLOGIES, TENSHEE, JOHN BIRCHAM --

2         THE COURT:  THESE ARE THE LIST OF THE 20

3    LARGEST CREDITORS?

4         MR. GOLD:  YES, YOUR HONOR.

5         THE COURT:  AND WHEN YOU SPEAK OF INSIDERS,

6    THEY WERE --

7         MR. GOLD:  WELL, TITANIUM AND TENSHEE ARE

8    BASICALLY MR. AMODEO'S COMPANIES.  AND AS FOR THE

9    SHAREHOLDERS, I DON'T BELIEVE THERE ARE ANY

10   SHAREHOLDERS OTHER THAN MR. AMODEO.  AND WE'RE IN THE

11   PROCESS OF GETTING AFFIDAVITS TO THAT EFFECT.  THEY

12   MAY HAVE BEEN ELIGIBLE TO BE SHAREHOLDERS BUT NOBODY

13   EVER GOT STOCK CERTIFICATES, NOBODY EVER DEEMED

14   THEMSELVES TO BE A CREDITOR -- OR A SHAREHOLDER.

15        AND LAST, BUT NOT LEAST, WE ARE CONCERNED

16   ABOUT MOTIVE FOR THE FILING OF THIS BANKRUPTCY.  WHEN

17   WE HAD A MEETING IN MR. MEEKER'S OFFICE, ONE OF THE

18   THINGS THAT WAS REPRESENTED TO US BY MR. SCHUKER WAS

19   THAT THE MAIN REASON FOR FILING THE BANKRUPTCY, THIS

20   WAS BEFORE THEY FILED IT, WAS THAT THEY WERE TRYING

21   TO GET ENOUGH MONEY BACK TO PAY THE IRS SO THAT IT

22   WOULD LOOK BETTER FOR AMODEO AT SENTENCING.

23        I DON'T THINK THAT'S A PROPER MOTIVE FOR

24   BANKRUPTCY.  AND WE'RE CONCERNED THAT THAT IS THE

25   UNDERLYING ISSUE.  AS THE MATTER OF FACT, IF YOU

1    LOOK, MIRABILIS IS NOT LISTED -- OR THE IRS IS NOT LISTED

2    AS A CREDITOR.  THERE IS ABOUT 182 MILLION DOLLARS

3    THAT WE HAVE ALLEGED WAS STOLEN, IN FACT, FROM THE

4    IRS.  SOME PORTION OF THAT IS TRUST FUND MONEY AS

5    WELL.

6        THE COURT:  AND ABOUT TWO THIRDS OF IT IS TRUST

7    FUND MONEY, IS THAT APPROXIMATELY?

8        MR. GOLD:  I GUESS, APPROXIMATELY.  BUT, SO

9    WE'VE GOT A NUMBER OF CONCERNS ABOUT THE BANKRUPTCY.

10   BUT WE'RE NOT HERE TO LITIGATE IT, WE JUST WANTED TO

11   BRING THOSE TO THE COURT'S ATTENTION.

12       THE COURT:  VERY GOOD.  THANK YOU VERY MUCH.

13           AND MR. MEEKER, DOES THE U.S. TRUSTEE'S

14   OFFICE CARE TO MAKE A STATEMENT OR GIVE ME ANY

15   FURTHER INFORMATION THIS MORNING?

16       MR. MEEKER:  AS MR. GOLD ALLUDED TO, WE HAD

17   SOME INVOLVEMENT, KIND OF A GO BETWEEN ROLE I GUESS

18   YOU WOULD CALL IT, FOR A COUPLE OF WEEKS, AND HAVEN'T

19   REALLY STAKED OUT ANY POSITION.

20           ONE OF THE THINGS WE WILL PROBABLY TAKE A

21   LOOK AT, I'M NOT SURE HOW WE WILL RESOLVE IT, IS THIS

22   WHOLE 1104 ISSUE OF WHO REALLY CONTROLLED THE WHOLE

23   THING AND CAN YOU SANITIZE IT.  WE'VE BEEN HERE

24   BEFORE WITH A SIMILAR ISSUE.  WE THINK MAYBE THE

25   FACTS ARE ENOUGH DIFFERENT HERE THAT WE ARE AT LEAST

1    TAKING ANOTHER LOOK AT IT.

2            I THINK THE FIRST MEETING IS LATER THIS

3    MONTH.  I DOUBT THAT WE'LL DO ANYTHING PRIOR TO THAT

4    FIRST MEETING.

5            THE COURT:  RIGHT.

6            MR. MEEKER:  AND SEE WHAT'S THERE.  THE ONLY

7    OTHER THING I WOULD JUST COMMENTARY, YOU KNOW, IT'S

8    KIND OF A STRANGE CASE WHERE THE CREDITOR, THE

9    LARGEST CREDITOR WHO OWNS ABOUT 90 TO 95 PERCENT OF

10   THE CLAIMS DOESN'T WANT TO BE HERE.  I GUESS WE'VE

11   HAD THOSE CASES BEFORE, BUT CERTAINLY NOT AT THIS

12   LEVEL AND THIS SCOPE.

13           THE COURT:  NO, IT CERTAINLY IS A UNIQUE CASE.

14   AND MS. GREEN?

15           MS. GREEN:  FIRST, THE REASON THE IRS ISN'T

16   LISTED AS A CREDITOR IS BECAUSE IN THE BARE BONES

17   PETITION THE IRS WOULD BE A PRIORITY CREDITOR.

18           THE COURT:  A PRIORITY CREDITOR, YES THEY'RE

19   JUST UNSECURED.

20           MS. GREEN:  IT'S NOT THAT THEY'RE BEING

21   IGNORED.  I THINK I DISCLOSED IN THE CASE SUMMARY

22   THAT WE CONSIDER THAT THE IRS MAY BE A CREDITOR.

23   EVEN THOUGH, LIKE I SAID, THERE'S BEEN NO ASSESSMENT

24   OR NO LITIGATION OR NO LIEN FILED.

25           WITH REGARD TO THE MEETING THAT WE HAD AND

1     THE STATEMENT ALLEGEDLY MADE BY MR. SCHUKER, I'D LIKE TO

2     ELABORATE ON THE FACT THAT THE GOAL OF THIS

3     BANKRUPTCY WAS TO MARSHALL THE ASSETS, ANALYZE THEM,

4     DETERMINE WHAT THOSE ASSETS WERE AND DISTRIBUTE THEM

5     TO CREDITORS WHOEVER THOSE CREDITORS MAY BE.

6          I BELIEVE THE RESPONSE THAT MR. SCHUKER

7     MADE WAS IN RESPONSE TO WELL WHAT WILL MR. AMODEO

8     GET.  AND THE ANSWER IS NOTHING.  MR. AMODEO ISN'T

9     RELATED TO THIS BANKRUPTCY.  IT WAS ALLEGEDLY

10    POSSIBLE THAT IF MONEY WENT BACK TO THE SERVICE THAT

11    MIGHT BENEFIT HIM, BUT THAT WASN'T THE REASON FOR THE

12    FILING.

13          THE REASON FOR THE FILING IS THAT IN

14    ADDITION TO THE IRS THERE ARE OTHER CREDITORS AND THE

15    IRS MAY OR MAY NOT BE A CREDITOR.  WE BELIEVE THAT

16    THEY ARE, BUT I THINK THE IRS IS ACTUALLY THEMSELVES

17    TAKEN A DIFFERING POSITION AS TO WHETHER THEY'RE A

18    CREDITOR OF MIRABILIS OR SOME OTHER COMPANY.  SO THE

19    IDEA IS TO ANALYZE THE ASSETS, MARSHALL THEM AND

20    DISTRIBUTE THEM TO THE CREDITORS THE WAY THAT THEY

21    SHOULD BE DISTRIBUTED.

22          THE COURT:  VERY GOOD.  THANK YOU.

23          I WILL SET A FURTHER STATUS CONFERENCE IN

24    THIS CASE TO CONSIDER THE MOTIONS TO BE FILED -- WHEN

25    DO YOU ANTICIPATE FILING THOSE MS. GREEN?

1      MS. GREEN:  I WOULD LIKE TO GET THEM FILED IN A

2  DAY OR TWO.  I'M TRYING TO GET A REAL GOOD LOOK AT

3  THE SUBSIDIARIES SO WE DON'T ACCIDENTALLY STAY

4  SOMEBODY ELSE'S LITIGATION.

5      THE COURT:  AND WHAT IS THE EXPEDIENCY THAT YOU

6  THINK THAT IT -- I DON'T KNOW MUCH ABOUT THE

7  UNDERLYING LITIGATION.  I DON'T KNOW IF THERE'S

8  SOMETHING IMMINENT THAT I NEED --

9      MS. GREEN:  I THINK THAT ABOUT TEN DAYS WOULD

10  BE GOOD.

11      THE COURT:  WE WILL SET A FURTHER STATUS

12  CONFERENCE FOR JUNE 18TH AT 2:00.  THAT WILL GIVE TIME

13  FOR THE -- YES MA'AM.

14      MS. GREEN:  YOUR HONOR, I'M NOT GOING TO BE

15  AVAILABLE THAT DAY.  AND ACTUALLY MR. SCHUKER ISN'T

16  EITHER.

17      THE COURT:  OKAY.  IS IT THE WHOLE WEEK OR JUST

18  THAT DAY OR?

19      MS. GREEN:  I'M UNAVAILABLE THE 16TH UNTIL THE

20  18TH, BUT I'M AVAILABLE THE 19TH AND 20TH.  [INAUDIBLE]

21      THE COURT:  JUNE THE 23RD AT 2:00 P.M. WILL BE

22  THE NEXT STATUS CONFERENCE.  AT THAT TIME IF THE

23  MOTIONS REQUESTING THE STAY ARE TIMELY FILED AND CAN

24  BE NOTICED SO THAT AT LEAST TEN DAYS NOTICE IS GIVEN

25  THEY'LL BE HEARD AT THAT TIME, ON JUNE THE 23RD AT 2.

1    AS WELL AS ANY OTHER TIMELY FILED MOTIONS WE CAN ADD.

2            MR. MEEKER, YOU HAD A QUESTION?  WHEN IS

3    THE 341 MEETING?

4            MR. MEEKER:  I THINK --

5            THE COURT:  THAT DAY.  WHAT TIME?  WHAT TIME

6    THAT DAY?

7            MR. MEEKER:  NINE O'CLOCK.

8            THE COURT:  OKAY, SO THAT SHOULD BE OKAY.

9            MR. MEEKER:  ONE THING I PROBABLY SHOULD BRING

10   TO THE COURT'S ATTENTION AND I DON'T KNOW WHETHER THE

11   COURT'S AWARE OF THIS OR NOT.  BUT THERE WAS TALK OF

12   OTHER LITIGATION IN PLACES.

13           AND WHAT WE'RE ALMOST RUNNING UP AGAINST

14   IS THE GURLY SITUATION.  THERE IS A CASE IN

15   CHATTANOOGA AT WINFAR MANAGEMENT THAT THE FORFEITURE

16   ACTION IS BEING ASSERTED THERE.  THE CHAPTER SEVEN

17   TRUSTEE IS TESTING VARIOUS THINGS, AND NOW MS. GREEN

18   HAS FILED A SUGGESTION OF BANKRUPTCY AND THE

19   APPLICATION OF 362.  SO, THERE IS A HEARING IN THAT

20   CASE THIS AFTERNOON.  I DON'T KNOW HOW IT'S GOING TO

21   PLAY OUT, VIS-À-VIS THIS MATTER, BUT IT'S VERY

22   INVOLVED AT THIS POINT.

23           THE COURT:  I HAVE A FEELING A LOT OF THE

24   LITIGATION IS GOING TO BE VERY INVOLVED AND WHERE IT

25   ALL ENDS UP AND HOW IT ALL WORKS OUT, WILL PROBABLY

1  BE SOME TIME IN THE FUTURE BEFORE WE'LL KNOW.  BUT WE'LL

2  DO OUR BEST AND AS LONG AS THE PROCEEDING IS HERE.

3            AND ON THAT LINE, THE CONNECTION WITH THE

4  MOTION TO WITHDRAW REFERENCES OBVIOUSLY THEY'RE

5  UNUSUAL.  I UNDERSTAND THE JUSTIFICATION.  I ALSO

6  JUST WANT TO MAKE SURE THE PARTIES ALL KNOW THAT THEY

7  WILL BE TREATED -- ANY MOTION TO WITHDRAW IS TREATED

8  AS AN APPEAL.  SO IT WILL BE DECIDED BY THE DISTRICT

9  COURT NOT BY ME.

10           AND IT WILL NEED TO BE BRIEF ON AN

11 EXPEDITIOUS BASIS -- THERE IS, I HAVEN'T LOOKED AT

12 THE RULE IN QUITE AWHILE BUT I WOULD ASK YOU ALL TO

13 DO THAT.  WE WILL BE GLAD TO TRANSMIT IT QUICKLY, BUT

14 IT WILL ONLY GO OVER AFTER THE BRIEFS ARE DONE AND

15 SUCH.  SO, YOU MAY WANT TO TALK ABOUT THAT BETWEEN

16 YOURSELVES.

17      MR. GOLD:  YOUR HONOR, WE ANTICIPATE FILING A

18 MOTION [INAUDIBLE].

19      THE COURT:  YEA, BUT IN TERMS OF BRIEFING AND

20 SUCH, THE QUICKER YOU GET IT OVER THE QUICKER IT'LL

21 GET RESOLVED.  JUST SO EVERYBODY DOESN'T ANTICIPATE.

22 YOU ALL KNOW THE RULES BUT FOR EVERYBODY ELSE IN THE

23 COURTROOM, JUST SO THAT THEY UNDERSTAND THAT THE

24 DISTRICT COURT WILL DETERMINE WHETHER THE BANKRUPTCY

25 CASE STAYS HERE OR WHETHER ALL OR A PART OF IT GOES

1    BACK TO THE DISTRICT COURT.   IT MAY OR MAY NOT.

2              AND, ANYTHING ELSE THAT WE NEED TO DO

3    TODAY OR SHOULD?   NO?   THANK YOU ALL VERY MUCH FOR

4    YOUR PROMPT ATTENTION AND I WILL SEE YOU JUNE 23RD.

5    I'M GOING TO FINISH MY NOTES BUT COURT'S IN RECESS.

6              [COURT RECESSED AT 11:32 A.M.]

```
1                        CERTIFICATE OF OATH

2

3       STATE OF FLORIDA:

4       COUNTY OF SEMINOLE:

5

6           I, SANDRA A. MOSER, NOTARY PUBLIC, CERTIFY THAT

7       I WAS AUTHORIZED TO AND DID TRANSCRIBE, FROM CD, THE

8       FOREGOING PROCEEDINGS AND THAT THE TRANSCRIPT IS A

9       TRUE RECORD.

10

11          I FURTHER CERTIFY THAT I AM NOT A RELATIVE,

12      EMPLOYEE, ATTORNEY OF RECORD FOR ANY OF THE PARTIES,

13      NOR AM I FINANCIALLY INTERESTED IN THE OUTCOME OF THIS

14      MATTER.

15

16          DATED THIS 12TH DAY OF JUNE, 2008.

17

18      _____

19          SANDRA A. MOSER, RPR, FPR, PRESIDENT

20      -   STATE OF FLORIDA

21          REALTIME REPORTERS, INC.

22          407-884-4662

23          Fax: 407-884-4664

24

25      MY COMMISSION NO:  DD115338

26      MY COMMISSION EXPIRES:  MAY 6, 2010
```