IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

MIRABILIS VENTURES, INC. and                    Case No. 6:07-CV-1788-ORL-28-KRS
NEXIA STRATEGY CORPORATION,

      Plaintiffs,

v.

PALAXAR GROUP, LLC.;
PALAXAR HOLDINGS, LLC;
FRANK HAILSTONES; EDITH CURRY
a/k/a EDITH BROADHEAD; and
TERENCE CHU,

      Defendants.

v.

MIRABILIS VENTURES, INC. and
NEXIA STRATEGY CORPORATION,

And THIRD PARTY CORPORATION,
WELLINGTON CAPITAL GROUP, INC.,
YANIV AMAR, FRANK AMODEO,
AARON BATES, MATTHEW MOKWA,
ROBERT POLLACK, JAMES SADRIANNA.

**PLAINTIFFS' MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiffs' hereby file their Memorandum of Law in Opposition to Defendants' Motion

for Summary Judgment ("Memorandum") (DE 75).  Plaintiffs request that this Court enter an

order denying Defendants' Motion for Summary Judgment ("Motion") for the reasons that there

are genuine issues of material fact that exist and that applicable law does not support

Defendants' defenses.

# I.     INTRODUCTION

Plaintiffs filed a Second Amended Complaint (DE 56) asserting, *inter alia*, the following claims:  Breach of Contract (Count I); Breach of Fiduciary Duty (Count II); Misappropriation of Trade Secrets (Count III); Conversion (Count IV); Civil Conspiracy (Count V); Injunctive Relief (Count VI); Unjust Enrichment (Count VII).   The Defendants basis for their Motion for Summary Judgment is that Plaintiffs cannot prove or establish ownership of Nexia Certification, which is an anti-fraud certification program.

As will be shown herein, and in the supporting affidavit of R.W. Cuthill, Jr., which is attached hereto as Exhibit "1"[1] and the deposition transcripts of Edith Curry, attached hereto as Exhibit "2" and Frank Hailstones, attached hereto as Exhibit "3", which were filed contemporaneously herewith and are incorporated herein by reference, genuine issues of material fact exist which preclude summary judgment in favor of the Defendants.

# II.     STANDARD FOR SUMMARY JUDGMENT

As Defendants correctly recognize, Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is proper only where "there is no genuine issue as to a material fact and the moving party is entitled to judgment as a matter of law."  Summary judgment is a lethal weapon to be applied with caution "to ensure only those cases devoid of any need for factual determinations are disposed of by summary judgment."  <u>Tippens v. Celotex Corp.</u>, 805 F.2d 949, 952-953 (11th Cir. 1986); <u>See also</u>, <u>Useden v. Acker</u>, 947 F.2d 1563, 1573 (11th Cir. 1991) *cert. denied sub. nom.* <u>Useden v. Greenberg et al.</u>, 508 US 959 (1992); <u>Brunswick Corp. v. Vineberg</u>, 370 F.2d 605, 612 (5th Cir. 1967).  As the movant, Defendants bear the initial burden of demonstrating that the pleadings and discovery responses show that there is a complete

---

[1] See Exhibit "13" attached hereto, Affidavit of Nicolette Corso Vilmos, Esquire pursuant to Rule 56(f) of the Federal Rules of Civil Procedure as it relates to the filing of the notarized affidavit of Mr. Cuthill.

absence of evidence to support Plaintiffs' causes of action.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-25 (1986); Hairston v. Gainesville Sun Publishing Co., 9 F.3d 913, 918 (11th Cir. 1993). The Court is not to weigh the credibility of competing evidence if such evidence is competent, but instead must determine that there is no genuine issue of material fact remaining to be decided.  Genuine disputes are those in which the evidence is such that a reasonable jury could return a verdict for the non-movant.  Anderson v. Liberty Lobby, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986); See also, Mize v. Jefferson City Bd. of Education, 93 F.3d 739, 742 (11th Cir. 1996).

"Summary judgment is an extreme remedy which should not be granted, unless the moving party has established his right beyond controversy."  United States of America v. Feinstein et al., 717 F.Supp. 1552, 1555 (S.D. Fla. 1989).  In assessing whether the movant has met its burden, the district court must review the evidence and all factual interferences drawn therefrom in the light most favorable to the non-moving party.  Harrison, 9 F.3d at 918 (citing Welch v. Celotex Corp., 951 F.2d 1235, 1237 (11th Cir. 1992); Rollins v. TechSouth, Inc., 833 F.2d 1525, 1528 (11th Cir. 1987)).   If the moving party fails to meet its initial burden of identifying the basis of its motion and identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact, then the non-moving party has no obligation to present an evidentiary basis which demonstrates the existence of a genuine issue of material fact.  If, however, the moving party does meet its initial burden, the non-moving party must present an evidentiary basis such that a reasonable jury could return a verdict for the non-moving party.

Defendants have failed to carry their initial burden in connection with their Motion for Summary Judgment.  Where a case involves complex issues of fact and difficult questions of

law, summary judgment should be sparingly, cautiously and slowly employed.  <u>S.J. Groves &</u>

<u>Sons Co. v. Ohio Turnpike Commission</u>, 315 F.2d 235, 237 (6th Cir. 1963); <u>Tee-Pak, Inc. v. St.</u>

<u>Regis Paper Co.</u>, 491 F.2d 1193, 1195-1196 (6th Cir. 1974); <u>Giordano v. McKeone</u>, 434 F.2d

1227, 1230 (8th Cir. 1970); <u>Miller v. General Outdoor Advertising</u>, 337 F.2d 944, 948 (2nd Cir.

1964).

## III.    DISPUTED ISSUES OF MATERIAL FACT

The following issues of material fact relied on by Defendants in their Motion for

Summary Judgment are disputed in the record as set forth below.

### a. Curry and Hailstones Were Bound by Employment Contracts Which Provided Ownership of Nexia Certification To Plaintiff

1.      Both Mr. Hailstones and Ms. Curry were bound by employment contracts with Mirabilis

and Nexia, which expressly provided that their employer retain ownership of their mental efforts

during   their   employment.     The   agreements   also   contain   provisions   prohibiting   the

misappropriation of trade secrets and providing for the protection of confidential information

obtained while performing their duties as employees of Plaintiffs.

2.      Curry admitted to signing the employment agreement and employee handbook. (Curry

Deposition, P. 69 -77).   However, Curry disputes her employment obligations.   A copy of

Curry's employment contract is attached hereto as Exhibit "4." (also Curry Deposition Exhibit

"5").

3.      Pursuant to her employment agreement, Ms. Curry was bound to devote all of her time to

the Plaintiffs.   Moreover, when Ms. Curry signed the employment agreement, she agreed that

anything developed during the time of her employment was owned by the Plaintiffs:

### 8.    Devotion By Employee of Full-Time To Business
(a)     Except as otherwise agreed to by Employer in writing, Employee
shall  devote  all  of  her  time,  attention,  knowledge  and  skills  solely  and

4

exclusively to he business and interests of Employer during normal working hours.  Employer shall retain all the benefits, emoluments, profits or other returns from or incidental to ay and all work, services, advice and mental efforts of Employee that arise during the term of this Agreement, or such other amount as agreed to in writing by Employer's Board of Directors or set out in the Employee Handbook.

4.      The employment contract for Ms. Curry also provides:

Unless done within the normal course and scope of the duties of Employee, and in a good faith effort to serve the best interests of Employer, Employee shall not, at an time or in any manner, directly or indirectly communicate to any person, business, or corporate entity, any confidential information of any kind concerning any matters affecting or relating to the business of Employer.  Such matters include … the manner of any aspect of Employer's operations, Employer's plans or processes, and other information of any kind, nature or description that relates to Employer's operations, customers, suppliers, products, or financial condition … Employee hereby agrees to refrain from disseminating, in any manner, information related to the affairs of Employer, its parent, subsidiary, or affiliate corporations or the customers of any of them without the receipt of written consent of the legal counsel of Employer in advance of such dissemination.

5.      Despite attesting that he did not have a written employment agreement with either Mirabilis or Nexia, (Motion at ¶3) Mr. Hailstones was presented with a signed Employment Agreement at his deposition and acknowledged the signature looked like his.  (Hailstones Deposition, P. 33-34).  A copy of Mr. Hailstones Employment Agreement is attached hereto as Exhibit "5," Hailstone Deposition Exhibit 62.  Construing any dispute in favor of Plaintiffs, Mr. Hailstones signed the employment agreement and agreed that anything developed during the time of his employment was owned by the Plaintiffs:

**9.      Devotion By Employee of Full-Time To Business**

(a)      Except as otherwise agreed to by Employer in writing, Employee shall devote all of her time, attention, knowledge and skills solely and exclusively to he business and interests of Employer during normal working hours.  Employer shall retain all

the benefits, emoluments, profits or other returns from or incidental to ay and all work, services, advice and mental efforts of Employee that arise during the term of this Agreement, or such other amount as agreed to in writing by Employer's Board of Directors or set out in the Employee Handbook.

6.     Mr. Hailstones' employment agreement additionally states:

[T]he Confidential Information and all physical, tangible and intangible embodiments or other repositories of the Confidential Information shall be and at all times remain the sole and exclusive property of Employer…Employee acknowledges that during the Employment Term, from time to time, Employee may have access to (directly or indirectly), or receive information from or regarding the Employer or its affiliates in the nature of trade secrets, the release of which may be damaging to Employer or its affiliates.

Employee agrees to hold in strict confidence any information it receives regarding the Employer or its affiliates that is considered a trade secret and shall not disclose such information to any other person or entity, and will take all necessary steps to prevent any other person or entity from discovering the trade secrets.  (Section 6(b)(d) of Mr. Hailstone's Employment Agreement).

7.     The employment contracts for Mr. Hailstones and Ms. Curry also provide that upon the employees' termination, they are prohibited from disclosing or making available any confidential information to any person or entity within a specific period of time after their termination without Plaintiffs' consent.

Specifically, the employment contract for Hailstones provides:

For the period of the Employment Term through the date which is three (3) years after termination of employment, Employee agrees that Employee will not, without the prior written consent of Employer, which consent may be withheld in the Employer's sole and absolute discretion, disclose or make available any Confidential Information to any person or entity (verbally or in writing), nor shall Employee make or cause to be made, or permit or allow, either on Employee's own behalf or on the behalf of others, any use of the Confidential Information then in Employee's knowledge, custody, control or possession.  Employee further agrees that immediately upon termination of Employee's

6

employment with Employer for any reason … Employee shall promptly deliver to Employer and/or its affiliates any and all property belonging to Employer and/or its affiliates, including without limitation, all Confidential Information (including all physical, electronic, or other repositories thereof) in Employee's custody, control or possession.

The employment contract for Curry provides:

Upon termination, Employee shall immediately provide to Employer all documents and items of any nature or description, including computer files, that pertain to actual potential customers or leads that Employee developed or obtained during employment, any phase or aspect of Employer's operations, any phase or aspect of Employer's future operations or plans, and any other items, lists, documents, or the like, that in any way may pertain to employer's business … [F]or a period of two (2) years following Employee's termination under this Agreement, Employee agrees that Employee shall not (a) contact or solicit any customer or employee of Employer for any matter; (b) divulge or use any information regarding Employer to any business in the same industry as Employer; or (c) advise any competitor of Employer regarding any aspect of the business operations of Employer.

8. Common Paymaster was the internal PEO for Mirabilis and Mirabilis' affiliated companies. See Affidavit of Bill Cuthill attached hereto as Exhibit "1" and (Hailstones Deposition, P. 32, L. 25, P. 33, L. 1-3). Ms. Curry agreed in writing that she was a joint employee of Nexia and its payroll company, Presdion. (Curry Deposition, P. 70-71, L. 23-1, and Exhibit "6" to Curry Deposition). Ms. Curry also acknowledged that Common Paymaster became the payroll entity for Nexia (Curry Deposition, P. 12, L. 13-15). Ms. Curry admits that she was told she was employed by Common Paymaster (P. 12, L. 8-12).

### b. Frank Amodeo Did Not Have Decision Making Authority

9. Defendants attempt to claim ratification of their misappropriation of the Nexia Certification by asserting that "Frank Amodeo held complete and exclusive control over the affairs and operations of both MVI and Nexia." See Motion at ¶2. However, Frank Amodeo

7

was not a Class 'A' shareholder of Mirabilis and did not hold voting control of the company. Frank Amodeo did not own one hundred (100%) of the shares in Nexia.  In fact he held less than 1%.  See affidavit of Bill Cuthill attached hereto as Exhibit "1" as well as Composite Exhibits to his affidavit.

      **c.**      **Nexia Was in The Business of Fraud Deterrence Prior to the Employment of Curry and Hailstones**

10.     Defendants also seek to assert that Nexia was not in the fraud deterrence business at the time of their employment.  Ms. Curry's employment with Nexia was related to the creation of the Nexia Certification.   Prior to her employment, Nexia was already in the business of fraud deterrence:

> Q.   When you joined, then, in June of 2005, Nexia was considering, at least, providing third parties fraud deterrence systems?
>
> A.  I don't know about systems, but fraud deterrence consulting, absolutely.
>
> Q.  I just want to be clear, then, you understood when you joined Nexia that part of their business might include fraud deterrence consulting?
>
> A.  At that time it was a part of everybody's -- yes.  Was it specific just to Nexia, no.   (Curry Deposition P.124, L: 3-13)
>
>
> Q.  Okay. So when you came aboard at Nexia, you understood the potential for there to be an insurance risk product?   (Curry Deposition, P. 176, L. 6-8)
>
> A.   Yes, that it could be used, absolutely.  (Curry Deposition, P. 176, L. 9).

**d.      The Nexia Certification Was Finalized During the Term of Curry and Hailstones Employment**

11.      While serving as President of Nexia and a Director of Mirabilis, Curry was tasked with creating an anti-fraud certification program for the benefit of Plaintiffs referred to as the Nexia Certification Program.  Plaintiffs' purpose in creating Nexia Certification was to market and sell Nexia Certification as a suite of anti-fraud services to businesses.  See Exhibit "6" hereto, (Exhibit "28" to Curry's Deposition).      Curry admitted in her deposition that she and other employees worked on the development of the Nexia Certification during work hours:

> Q.  And they were flowcharting the Nexia certification?
>
> A.  That was part of the processes.  They were flowcharting for the patent application, because there was nothing else to fill their day. (Curry Deposition, P. 185, L. 15-19)
>
> Q.  Okay.  So you were white boarding the Nexia certification?
>
> A.  Yes, white boarding payroll processes, and the eventual, in the hope that it would happen.  In addition to, we were white boarding Nexia certification, absolutely. (Curry Deposition, P. 186, L. 14-19)

12.      Defendants admit that Mirabilis, as Nexia's parent corporation, paid all fees associated with the research and development of Nexia Certification and the accompanying patent application.  (Motion at ¶ 11).  Additionally, Ms. Curry continued to utilize the law firm hired by Nexia to file the patent:

> Q.      And you applied for the patent, did you not, while you were at Mirabilis or Nexia; is that correct?
>
> A.      I believe Scott Goldberg assisted in that, too, but yes. (Curry Deposition, P. 243, L. 10-14)

13.      Through their employment with Plaintiffs and/or throughout the process of developing Nexia Certification, Hailstones and Curry had access to, and did in fact gather, confidential and

proprietary information for the purpose of developing Nexia Certification including, but not limited to, confidential information regarding Plaintiffs' development of products to be offered and/or marketed to other companies.

**e.     Frank Amodeo Did Not Have Authority to Assign The Rights of Nexia or Mirabilis**

14.     Defendants rely on an unauthenticated handwritten note allegedly written and signed by Frank Amodeo, which purports to give Curry exclusive ownership of Nexia Certification. (Motion at ¶14).    However, Defendants have failed to obtain the affidavit of Mr. Amodeo to authenticate the document.   Additionally, Defendants affidavits and arguments do not reflect the entire substance of the alleged document agreed to by Mr. Amodeo, which made any assignment contingent on payment by Ms. Curry and non-disclosure.   The entire document states:

> July 28, 2006, Because Edie Curry is the Earth Goddess; Mirabilis and Nexia Strategy Corporation, its successors and assigns surrender all rights, ownership interest in Nexia Certification effective this date.   Subject to subsequent economic negotiation of reasonableness reflecting actual investment and non-disclosure until public Mirabilis venture shareholders on 1/1/07. Frank Amodeo.
>
> A copy of the handwritten note is attached hereto as Exhibit "7" hereto, Exhibit "43" to Curry's Deposition.

Ms. Curry admits in her deposition that she wrote the beginning part of the note and Mr. Amodeo added "subject to subsequent economic negotiation of reasonableness reflecting actual investment and non-disclosure."   (Curry Deposition, P. 212, L. 11-25, P. 213, L. 1-9).   This demonstrates that the parties knew the Nexia Certification was Plaintiff's property and Curry would have to reach an agreement to buy the rights from the Plaintiffs.    The only such agreement thereafter which Ms. Curry relies upon is signed by her alleged co-conspirator, Mr. Hailstones this does not avoid the claim.

15.     Even if Defendants had obtained proper authentication of the note, Frank Amodeo did not

have authority to assign any rights of Nexia to Ms. Curry or Mr. Hailstones.   See Affidavit of

Mr. Cuthill attached hereto as Exhibit "1" and the composite exhibits thereto.   Ms. Curry bases

her belief in Mr. Amodeo's authority on Mr. Amodeo's alleged orally representations:

> A.     Well he said he had authority to do it.   He suspended all board
> meetings.   So I would assume.   And he had control of all the cash.
>
> Q.     But that's what you're relying upon to say he had the authority to
> allow—
>
> A.      His statements.        (Curry deposition, P. 226, L. 21-25)

16.     Hailstones and Curry drafted and signed documents purporting to transfer rights to Nexia

Certification to them.   Defendants drafted and signed such documents without the authorization,

approval or ratification of the Board of Directors for Plaintiffs.   See Affidavit of Bill Cuthill and

Composite Exhibits attached thereto.

> **f.     Nexia Owned The Intellectual Property Rights As It Related To The Nexia Certification.**

17.     In a March 2, 2006 e-mail from Edith Curry to Tessah Ivery, Marty Flynn and Frank

Hailstones, Curry admits that Nexia is the owner of the patent for Nexia Certification:

> Incidentally, you do realize that Nexia Strategy owns the patent for Nexia
> Certification and the three inventors are Edie Curry, Frank Hailstones and Mike
> Dement.  (Exhibit "8" hereto, Exhibit "30" to Ms. Curry's Deposition).

18.     Ms. Curry now attempts to retract her admission and claims that she "misspoke in my

email dated March 2, 2006 when I stated that Nexia Strategy Corporation owned the patent and

trademark rights for the "Nexia Certification."  (1-15-08 Curry Affidavit ¶ 20).

19.     In addition to the patent for the Nexia Certification, the algorithm is a trade secret owned

by Nexia:

A.      . . . . The algorithm will never be patented.  The process has
been patented, but the algorithm has been trade secreted and has
not been disclosed to anyone.  (Curry Deposition, P. 57, L. 18-21).
.. . .

Q.      How would you be able to do the Nexia Certification as a
functioning product without an algorithm; could you?

A.      No.

Q.      So then was the use of the algorithm, you've described, a
necessary part to make the Nexia Certification an active useable
product?

A.      Yes      (Curry Deposition, P. 59, L. 6-13)

**g.      The Defendants did not pay Nexia for an Assignment of any Alleged Rights From
Nexia to Curry and Hailstones**

20.      The Defendants never reached a final agreement regarding a proposed assignment of

rights to Curry.  The required promissory note terms were never finalized, executed or agreed to

by Mirabilis or Nexia.

Q.  Was a note ever executed?

A.  No, because Mirabilis or Nexia never set up the company.  At
that time, October, November, I believe is when the sale of the
PEO's to Jevity failed and subpoenas started hitting employees,
various employees.  So I think they got – they never honored the
terms of the agreement.  They never set up NewCo.  I was never --
a couple drafts had been sent back and forth, but nothing ever
materialized, because the company was shut down.  (Curry
Deposition, P. 235, L. 4-14)

21.      To the extent a valid assignment took place; Ms. Curry is obligated to pay Plaintiffs.

While Plaintiffs dispute the amount owed to Plaintiffs, Ms. Curry admits that she agreed to pay

at least $500,000 to Plaintiffs:

Q.      You offered them five hundred thousand dollars for the assignment?

A.      I offered to repay them five hundred thousand dollars, yes. (Curry
Deposition, P. 234, L. 4-7).

22.      The Defendants claim that "[b]ecause MVI [Mirabilis] set up no entity to which a note

could be paid, Ms. Curry cannot honor that provision."  (Motion at ¶ 22).  However, Mirabilis,

12

the 100% stockholder of Nexia, continues to be an active corporation and payment could have been made at any time.  See Florida Incorporation Record attached hereto as Exhibit "9" and Exhibit "1" the affidavit of Bill Cuthill.

**h.      Hailstones and Curry Opened Up Palaxar In Violation of Their Employment Agreements**

23.      While Mr. Hailstones and Ms. Curry were still employed by Plaintiffs, they organized a competing entity, Palaxar Group LLC and/or Palaxar Holdings LLC, which would in turn implement and market Nexia Certification. (Motion at ¶19)

24.      On September 11, 2006, while Mr. Hailstones and Ms. Curry were still employed by Plaintiffs, Palaxar Group, LLC was incorporated as a Virginia limited liability company.  See Incorporation Document Exhibit "10" hereto.

25.      Mr. Hailstone contends that he "is not and has never been a member or employee of Palaxar Group or Palaxar.  (Motion at ¶21).  However, Mr. Hailstones admits he is a member of Palaxar EMEA.  This is the Palaxar entity created to market the Nexia Certification in Europe, the Middle East and Asia.    (Hailstone Deposition, P. 8-21).    Additionally, Curry is a fifty percent owner of Palaxar EMEA.  (Hailstones, P. 20, L. 24-25).

**i.      The Defendants Are Offering to Sell and Use the Nexia Certification**

26.      Palaxar Group LLC and/or Palaxar Holdings LLC is now offering for sale to others the patent-pending fraud solution program, Nexia Certification, developed by Hailstones and Curry at Mirabilis' expense while employed by Plaintiffs. (Motion at ¶ 19).

27.      Upon information and belief, Defendants continue to market the Nexia Certification as their own.  Specifically, Defendants participated in a conference located in Scottsdale, Arizona from October 14, 2007, through October 18, 2007, entitled the "58th Audit Directors &

Managers Symposium," at which Defendants discussed and/or offered for sale the anti-fraud solutions program referred to above as Nexia Certification.   See Exhibits attached hereto as Composite Exhibit "11," (Deposition Exhibits "59" & "60")

## IV.    Legal Argument

The Defendants base their Motion for Summary Judgment on their argument that Plaintiffs cannot prove or establish ownership of Nexia Certification, and as a result, Defendants are entitled to summary judgment as a matter of law on Plaintiffs' claims for Breach of Contract (Count I); Breach of Fiduciary Duty (Count II); Misappropriation of Trade Secrets (Count III); Conversion (Count IV); Civil Conspiracy (Count V); Injunctive Relief (Count VI); Unjust Enrichment (Count VII).   However, the evidence and the deposition testimony of Ms. Curry and Mr. Hailstones clearly demonstrate that, at the very least, substantial issues of material fact exist as it relates to ownership of Nexia Certification, the underlying algorithm, and the Defendants' obligations under their employment contracts.

### a.   The Nexia Certification and its Algorithm are Owned by the Plaintiffs

As demonstrated above, significant material factual issues are in dispute as it relates to the ownership of Nexia Certification, the algorithm and related trade secrets.   The law recognizes that employers may have an interest in the creative products of their employees.   *Solomons v. United States, 137 U.S. 342, 346, (1890)*. For example, an employer may obtain a shop right in employee inventions where it has contributed to the development of the invention. *McElmurry v. Arkansas Power & Light Co., 995 F.2d 1576, 1581-82 (Fed. Cir. 1993)*. A shop right permits the employer to use the employee's invention without liability for infringement.   *Id. at 1580*.

In addition, contract law allows individuals to freely structure their transactions and employee relationships. *United States v. Dubilier Condenser Corp., 289 U.S. 178, 187, 77*

14

*(1933)*; *Standard Parts Co. v. Peck, 264 U.S. 52, 59-60, (1924).*  Even without such an express

assignment, employers may still claim an employee's inventive work where the employer

specifically hires or directs the employee to exercise inventive faculties.  *See id.*

By signing employment agreements with Mirabilis and Nexia, Defendants contractually

agreed that Nexia would maintain ownership of the Nexia Certification and any trade secrets

related thereto.   Additionally, the sworn testimony demonstrates that Ms. Curry and Mr.

Hailstones were specifically tasked with completing a fraud deterrent system for Nexia.   The

Defendants i) worked on Nexia Certification while employed by Nexia and Mirabilis, (ii) worked

on Nexia Certification during work hours; and (iii) the Plaintiffs paid for the development of

Nexia Certification:

> Q.  Okay.  So you were white boarding the Nexia certification?
>
> A.  Yes, white boarding payroll processes, and the eventual, in the
> hope that it would happen.  In addition to, we were white boarding
> Nexia certification, absolutely.
>
> (Curry Deposition, P. 186, L. 14-19)

Furthermore, Curry admitted, at least once, that the intellectual property rights to the Nexia

Certification were owned by Nexia.   *See* Exhibit "8" hereto.

As a result of the foregoing, a genuine issue of material fact exists which precludes the entry

of a summary final judgment in favor of the Defendants.

### b.        No Meeting of the Minds

To the extent the Defendants are attempting to argue that they purchased the rights to

Nexia Certification, the algorithm and underlying trade secrets, the record evidence demonstrates

that there was not a meeting of the minds between the parties.   "It is well-established that a

meeting of the minds of the parties on all essential elements is a prerequisite to the existence of

an enforceable contract."  *DiMase v. Aquamar 176, Inc.*, 835 So. 2d 1150, 1155 (Fla. 3rd DCA

4816-5949-2869.2

2002) (internal quotation and citation omitted).  For a valid contract to exist not only must there be an offer, acceptance, and consideration, there must also be a "meeting of the minds of the parties upon definite terms and conditions which include the essential elements of a valid contract." *Leopold v. Kimball Hill Homes Florida, Inc.*, 842 So. 2d 133, 136 (Fla. 2d DCA 2003) (*citing Mehler v. Huston,* 57 So. 2d 836, 837 (Fla. 1952)).  To be enforceable, an agreement must be sufficiently specific and <u>reflect assent by the parties</u> to all essential terms. *Williams v. Ingram*, 605 So. 2d 890 (Fla. 1st DCA 1992).   Where essential terms of an agreement remain open, and subject to future negotiation, there can be no enforceable contract. *Suggs v. Defranco's, Inc.,* 626 So. 2d 1100, 1101 (Fla. 1st DCA 1993).

As indicated by the deposition of Ms. Curry the essential terms of the promissory note and alleged assignment were never finalized.  See Curry deposition (P. 214- 220, P. 235, L. 5-14).  Consequently, there is a dispute as to whether there was a meeting of the minds as it relates to these alleged agreements, which precludes the entry of Defendants' summary judgment.

**c.     Mr. Amodeo and Mr. Hailstones Did Not Have Proper Authority or Approval to Negotiate or Enter Into Agreements With Insiders**

A significant dispute exists as to the authority held by Mr. Amodeo and Mr. Hailstones and their ability to execute assignment agreements or separation agreements.  Florida Statute §607.0832 deals with the validity of actions taken by the board when an interested director is involved.  *See id.*  In order for an insider transaction to be approved, Florida Statute §607.0832 requires the following:

> (2) For purposes of paragraph (1)(a) only, a conflict of interest transaction is authorized, approved, or ratified if it receives the affirmative vote of a majority of the directors on the board of directors, or on the committee, who have no relationship or interest in the transaction described in subsection (1), but a transaction may not be authorized, approved, or ratified under this section by a

16

single director. If a majority of the directors who have no such relationship or interest in the transaction vote to authorize, approve, or ratify the transaction, a quorum is present for the purpose of taking action under this section. The presence of, or a vote cast by, a director with such relationship or interest in the transaction does not affect the validity of any action taken under paragraph (1)(a) if the transaction is otherwise authorized, approved, or ratified as provided in that subsection, but such presence or vote of those directors may be counted for purposes of determining whether the transaction is approved under other sections of this act.

(3) For purposes of paragraph (1)(b), a conflict of interest transaction is authorized, approved, or ratified if it receives the vote of a majority of the shares entitled to be counted under this subsection. Shares owned by or voted under the control of a director who has a relationship or interest in the transaction described in subsection (1) may not be counted in a vote of shareholders to determine whether to authorize, approve, or ratify a conflict of interest transaction under paragraph (1)(b). The vote of those shares, however, is counted in determining whether the transaction is approved under other sections of this act. A majority of the shares, whether or not present, that are entitled to be counted in a vote on the transaction under this subsection constitutes a quorum for the purpose of taking action under this section.

Other than their self-serving affidavits, the Defendants have been unable to produce any evidence that supports authority or approval of the separation agreement negotiated by Mr. Hailstones and Ms. Curry. In fact, the board minutes attached as to Mr. Cuthill's affidavit show that these alleged assignment agreements were not discussed at the board meetings and they certainly were not approved by the board or other shareholders.

Furthermore, under Florida Statute §607.1202, *Sale of assets other than in regular course of business*, requires that a company may only dispose of a substantial asset if the board recommends it to the shareholders and then a majority of all shareholders approve the proposed sale. *See id.* The Defendants have failed to provide any evidence which would demonstrate

approval by the board or shareholders of either Mirabilis or Nexia.   To the extent Defendants are relying on these alleged agreements as proof of ownership, they are invalid under Florida law.

In addition to the alleged agreements being invalid under Florida law, they are also invalid under Section 3.16 of Nexia's bylaws which prohibit self dealing in the same manner provided under Florida law.  See Nexia Bylaws attached hereto as Exhibit "12."  Furthermore, to the extent Defendants attempt to rely on Mr. Amodeo's alleged approval of these transactions, Frank Amodeo was not a Class 'A' shareholder of Mirabilis and did not hold voting control of the company.   Frank Amodeo did not own one hundred (100%) of the shares in Nexia.  In fact he held less than 1%.  See affidavit of Bill Cuthill attached hereto as Exhibit "1" as well as Composite Exhibits to his affidavit.

Accordingly, there are disputed issues of material fact as it relates to authority and approval, which prohibits the entry of Defendants' summary judgment.

### d.    Lack of Consideration

Summary judgment is also improper where there are issues of fact that there was a lack of consideration and failure of consideration.  *See Scherer v. Kamelhair, et al.,* 665 So.2d 1147 (Fla. 1st DCA 1996); *see Vichaickul v. S.C.A.C. Enterprises, Inc.,* 616 So.2d 100 (Fla. 2d DCA 1993).  It has been demonstrated by the testimony and exhibits, that the negotiations between the parties as they related to the alleged assignment and promissory note were never finalized or fully agreed upon.  Even if valid agreements did exist, the Defendants admit that they have not paid Plaintiffs for Nexia Certification.  See Curry deposition (P. 235, L. 5-14) and (Motion at ¶ 22).

As a result of the foregoing dispute regarding the lack of consideration, a genuine issue of material fact exists, which precludes the entry of a summary final judgment in favor of the Defendants.

## V.   <u>CONCLUSION</u>

The foundation of Plaintiffs' causes of action for Breach of Contract (Count I); Breach of Fiduciary Duty (Count II); Misappropriation of Trade Secrets (Count III); Conversion (Count IV); Civil Conspiracy (Count V); Injunctive Relief (Count VI); Unjust Enrichment (Count VII) depend on factual determinations regarding 1) Defendants obligations under the employment agreements; 2) ownership of the Nexia Certification, algorithm and trade secrets; 3) the validity of any alleged assignments; 4) whether Mr. Amodeo and Mr. Hailstones had the legal authority to enter into any agreements with Ms. Curry; 5) whether Defendants paid consideration to Plaintiffs for the Nexia Certification rights, and 6) whether Defendants involvement with Palaxar violates the terms of their employment agreements.   Limited discovery has been taken in this case; however, the depositions of Ms. Curry and Mr. Hailstones alone have created significant issues of material fact.   Based on the foregoing, Defendants' Motion for Summary Judgment should be denied.

/s/  Nicolette Corso Vilmos
Todd K. Norman
Florida Bar No.:  62154
tnorman@broadandcassel.com
Nicolette Corso Vilmos, Esq.
Florida Bar No.: 0469051
nvilmos@broadandcassel.com
**BROAD AND CASSEL**
390 N. Orange Ave., Suite 1400
Orlando, FL  32801
Phone: 407-839-4200
Fax: 407-425-8377

4816-5949-2869.2

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 15, 2010 I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send notice of electronic filing to all parties named on the attached Service List or in some other authorized manner for those counsel or parties who are not authorized to receive notices electronically.

/s/ Nicolette Corso Vilmos

John Russell Campbell
Balch & Bingham, LLP
Suite 1500
1901 Sixth Avenue N.
Birmingham, AL  35203

Jane S. Raskin/Martin Robert Raskin
Raskin & Raskin, PA
Suite 725
2601 S. Bayshore Dr.
Miami, FL  33133

Kathleen B. Havener
15511 Russell Rd.
Chagrin Falls, OH  44022

Chrstine M. Ho/Donald E. Christopher
Litchford & Christopher, PA
390 N. Orange Avenue, Suite 2200
PO Box 1549
Orlando, FL  32802-1549

James Sadrianna
10025 Chatham Oaks Court
Orlando, FL  32836

Terence Chu
5637 Country Hills Lane
Glen Allen, VA  23059

Cory L. Taylor/ Jack C. McElroy
Shutts & Bowe, LLP
300 S. Orange Avenue, Suite 1000
PO Box 4956

4816-5949-2869.2

Orlando, FL  32802-4956

James Robert Lussier
Mateer & Harbert, PA
225 E. Robinson Street, Suite 600
PO Box 2854
Orlando, FL  32802-2854

James Everett Shpherd
Pohl & Short, PA
280 W. Canton Avenue, Ste 410
Winter Park, FL  32790

John Edwin Fisher
Fisher, Rushmer, Werrenrath, Dickson, Talley & Dunlap, PA
20 N. Orange Avenue, Suite 1500
PO Box 712
Orlando, FL  32802-0712

Frank Amodeo
614 Lake Avenue
Orlando, FL  32801

Craig S. Warkol
Bracewell & Giuliani LLP
1177 Avenue of the Americas
New York, NY  10036

Yaniv Amar
3475 Mystic Point Drive

Robert Pollack
8767 The Esplanade #36
Orlando, FL  32836

4816-5949-2869.2