IN THE UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

ORLANDO DIVISION

CASE NO.: 6:07-CV-1788-ORL-28-KRS


MIRABILIS VENTURES, INC. and

NEXIA STRATEGY CORPORATION,

               Plaintiffs,

VS.

PALAXAR GROUP, LLC;

PALAXAR HOLDINGS, LLC;

FRANK HAILSTONES, EDITH CURRY

A/k/a EDITH BROADHEAD; and

TERENCE CHU,

               Defendants.

ORIGINAL

MIRABILIS VENTURES, INC., and

NEXIA STRATEGY CORPORATION,

And THIRD PARTY CORPORATION,

WELLINGTON CAPITAL GROUP, INC.

YANIV AMAR, FRANK AMODEO,

AARON BATES, MATTHEW MOKWA,

ROBERT POLLACK, JAMES SADRIANNA.

- - - - - - - - - - - - - x

1
2
3
4        **DEPOSITION OF:**
5        **FRANK HAILSTONES**
6
7
8
9        Examination of a witness beginning at **9:00 AM** and
10   concluding at **3:40 PM**, on **January 13, 2010**, taken at 390
11   North Orange Avenue, Suite 1400, Orlando, Florida before
12   **DAWN ROSCHER**, Notary Public, State of Florida at Large.
13
14
15
16
17
18
19
20
21
22
23
24
25

1    A P P E A R A N C E S:

2

3    TODD NORMAN, ESQ., OF:  Broad & Cassel, 390 North Orange

4    Avenue, Suite 1400, Orlando, Florida 32801, for the

5    Plaintiffs.

6

7

8    KATHLEEN HAVENER, ESQ., OF:  The Havener Law Firm, LLC,

9    15511 Russell Road, Chagrin Falls, Ohio 440022, on

10   behalf of Ms. Edie Curry.

11

12

13   ALSO PRESENT:  R.W. (Bill) Cuthill, Jr., James V.

14   Sadrianna and Edie Curry.

15

16

17              *     *     *     *     *     *

18

19

20

21

22

23

24

25

# I N D E X

**FRANK HAILSTONES**

  Direct Examination by Mr. Norman      5

* * * * * *

# E X H I B I T S

(Plaintiff's Exhibit Numbers 58-65 marked and retained by Counsel).

* * * * * *

<u>P R O C E E D I N G S</u>

THEREUPON:

### FRANK HAILSTONES

Having been first duly sworn to tell the truth, the whole truth and nothing but the truth, testified as follows:

### DIRECT EXAMINATION

BY MR. NORMAN:

   Q.  Good morning, sir.  My name is Todd Norman. I represent the Plaintiff in this matter, Mirabilis.  Would you, please, state your name for the record?

   A.  My name is Frank Hailstones.

   Q.  Mr. Hailstones, where do you reside, sir?

   A.  I reside in the U.K.

   Q.  Are you employed?

   A.  I am a self-employed independent consultant.

   Q.  Do you do that under the -- some people form a corporation to consult under and some people just do it by themselves.  Which situation do you fall within?

   A.  I have a private limited company that I operate.

   Q.  And what's the name of that?

   A.  BGS Solutions.

1     Q.   Do you know when, approximately, you formed

2   that company?

3     A.   The company was formed in March of 2008.

4     Q.   And since March of 2008, has been the only

5   place you've worked?

6     A.   Yes.

7     Q.   Okay.  What kind of consulting do you do

8   with BGS Solutions?

9     A.   It's property consulting.

10    Q.   Okay.  Real property consulting is what

11   we're describing here?

12    A.   Property compliance consulting.

13    Q.   Okay.  Here we have like the ADA and stuff

14   that you have to comply with and I know there are

15   consultants for that.  Is it similar?

16    A.   I'm not familiar with the ADA.

17    Q.   There are certain regulations, I assume,

18   that --

19    A.   Occupational building.

20    Q.   Are you doing any other type of consulting

21   work at this time?

22    A.   No.

23    Q.   I think I may have asked you this, but since

24   March of 2008,9 have you worked for anyone else

25   besides BGS Solutions?

1    A.   No.

2    Q.   Prior to March of 2008, were you employed?

3    A.   Sole trader.

4    Q.   Sole trader?

5    A.   Sole trader.

6    Q.   Explain to me what that means.

7    A.   There are different categories with which

8    one can conduct business in the U.K.

9    Q.   Okay.

10   A.   One can do it as an independent person, sole

11   trader, or one can do it as a company, which might

12   be a private company or a public company.

13   Q.   They often use the phrase sole

14   proprietorship here.  Are you familiar with that

15   phrase?

16   A.   I'm guessing it's pretty similar.

17   Q.   And as a sole trader, what do you do?

18   A.   The same thing.

19   Q.   Same type of consulting?

20   A.   Yes.

21   Q.   How long did you do that for?

22   A.   From January of 2008 to March of 2009 I was

23   a sole trader and March of 2009, BGS.

24   Q.   Because I had March 2008 for BGS, but it was

25   March of 2009?

1      A.   Yes.

2      Q.   So you were the sole trader from March of

3  2008 to March of 2009, basically; did get that

4  right?

5      A.   Correct.

6      Q.   And how about before that?

7      A.   I'm sorry.

8      Q.   Before that, before March of 2008?

9      A.   I wasn't employed.

10      Q.   And how long was your period of

11  unemployment?

12      A.   Since leaving the Mirabilis network at the

13  end of January of 2007.

14      Q.   And you did no independent consulting work

15  during that time?

16      A.   No.

17      Q.   Have you attempted to set up any other

18  ventures during this time from January of 2007 to

19  today's date?

20      A.   I have attempted to find some form of income

21  in employment, but it's proved to be very

22  difficult.

23      Q.   Sure.  Specifically, I'm talking about

24  setting up any companies, businesses, partnerships;

25  did any of that in that time?

1      A.   Set up a company in March of 2008, which was

2   Palaxar EMEA.

3      Q.   March of 2007, did you say?

4      A.   March of 2007, correct.

5      Q.   I think I have the documentation for that

6   one.

7

8           (Plaintiff's Exhibit No. 58 marked for

9   identification purposes).

10

11      Q.   Sir, I'm handing you now what has been

12   marked as Exhibit 58 to your deposition and tell me

13   if that is the corporation for which you are

14   referring to?

15      A.   Yep, it would be.

16      Q.   Okay.  I see the address 10 Abicorn Close;

17   is that a business address or what is that

18   specifically?

19      A.   That was my home address.

20      Q.   Okay.  So at that time, the company operated

21   or the company was planned to operate out of home

22   at that moment in time?

23      A.   The 10 Abicorn is a home address, because of

24   an old business and an old business premise.

25      Q.   There was no business --

1    A.   There was no business, no.

2    Q.   Okay.   It lists two directors; yourself and

3    Ms. Curry.   What percentage interest did you each

4    own of this company?

5    A.   As I recall one share each.

6    Q.   One share each?

7    A.   Yes.

8    Q.   You're in fact right.   It says at the end

9    one share each.   Did either of you pay any money

10   for your interest in this company?

11   A.   I'm sorry.

12   Q.   Did either of you pay for your interest in

13   this company?

14   A.   No money changed hands, no.

15   Q.   Okay.   What was your contribution for your

16   share in the business?

17   A.   I'm sorry.   I don't understand your

18   question.

19   Q.   Typically, when two people form a business,

20   they each bring something to the business to form

21   it.   Did you have a contribution to the business?

22   A.   Take a step back.   The company was set up

23   originally after I left Mirabilis network and went

24   back to the U.K. It was set up to try and take

25   advantage of any opportunities, which Ms. Curry

1    might have been able to develop in the U.S.

2         So there was no agreement, or otherwise, in

3    terms of -- it was just setting the company up,

4    because I needed to a vehicle in the U.K. to pursue

5    any opportunities.

6         Q.   Were there specific opportunities at that

7    time that it was looking to pursue?

8         A.   Nothing specific, no.

9         Q.   There was no targeted clients at that moment

10   in time?

11        A.   No.

12        Q.   What line of business did you intend this

13   company to be in?

14        A.   Any business that would generate some

15   income.

16        Q.   So you had no specific idea of a type of

17   business when you formed this?

18        A.   Well, clearly, the business would have to be

19   relevant to the experience and expertise which we

20   had.

21        Q.   Did you have any specific products you were

22   intending to market through the business?

23        A.   At that point in time, no.

24        Q.   You say at that point in time; did that

25   change at some point in time?

1      A.   There were some ideas that Ms. Curry and I

2  were talking about, but did not result in a defined

3  product.

4      Q.   Okay.  Can you share with me those ideas

5  that you were discussing?

6      A.   Again, based on our experience and expertise

7  and what we might be able to construct and take to

8  the market.

9      Q.   Okay.  You heard a lot of talk yesterday at

10  the deposition about Nexia certification, didn't

11  you?

12      A.   Yes, I did.

13      Q.   You heard what Ms. Curry described, when I

14  asked her to define that for me, so that we could

15  move with a common understanding.  Is your

16  understanding the same as hers was as to the

17  meaning of that phrase?

18      A.   Would you like to tell me what Ms. Curry

19  said?

20      Q.   What is your understanding of the meaning of

21  the word Nexia certification?

22      A.   My understanding is that Nexia certification

23  -- well, let me take a step back.  I think it's

24  important to understand the context that Nexia

25  certification, for me, I would explain it as the

1    process through which the financial integrity of an

2    individual would be verified.

3        Q.   I've seen certain patent applications

4    bearing your name as one of the inventors of a

5    process; is the process described in those patent

6    applications within the scope of what you define as

7    Nexia certification?

8        A.   I haven't read the patents for a long time,

9    so.

10       Q.   Okay.  Well, I will make sure we present

11   those to you today, so we can take a look at those.

12   So you're not aware of whether the patent

13   applications include the Nexia certification or

14   not?

15       A.   I think the patent -- I'm sure the patent

16   application includes a process.  Again, I make the

17   point, we need to be careful in using the

18   terminology Nexia certification in the context of

19   what it means.

20       Q.   And that's why I'm trying to get the

21   definition of it from you, so that we get a common

22   definition.

23       A.   My definition, again, was the process for

24   validating the financial integrity of an

25   individual.

1       Q.   And do I understand correctly that the

2    concept behind it, the concept of this process was

3    to put in certain indicators into this process and

4    use an algorithm to determine potential risk?

5       A.   I'm afraid that's something you'd have to

6    ask Ms. Curry to speak to.   I haven't seen the

7    algorithm.

8       Q.   But leaving aside the algorith; was that

9    your understanding of the process?

10      A.   Describe it to me again, please.

11      Q.   Sure.   As I understood it, maybe I

12   understood it wrong, is, that you were putting in

13   certain indicators of the person's financial

14   behaviors into a process and then using algorithms

15   and other methods to determine risk for those

16   individuals; was that your understanding as well?

17      A.   In broad terms.

18      Q.   And was that Nexia certification one of the

19   ideas you discussed marketing through Palaxar EMEA?

20      A.   No.

21      Q.   What ideas were you discussing then?

22      A.   Again, other ideas that might be relevant to

23   our experience, like, for example, insurance fraud.

24      Q.   And what did you discuss offering in terms

25   of insurance fraud?

1      A.   We discussed developing a product that might

2   help insurance companies identify fraudulent

3   insurance claims.

4      Q.   Any other ideas that you can recall that you

5   discussed with Ms. Curry for the company?

6      A.   In the same line; health insurance.

7      Q.   Specifically, fraud in the area of health

8   insurance or something different?

9      A.   Fraud.

10      Q.   Okay.  So detection of fraudulent health

11   insurance claims?

12      A.   Yeah.

13

14          (Plaintiff's Exhibit No. 59 marked for

15   identification purposes).

16

17      Q.   This will be Exhibit No. 59 to your

18   deposition.  Did you ever have the opportunity to

19   review the Palaxar website, sir.

20      A.   Yes, I saw it.

21      Q.   Did you note on the website these pages,

22   which indicate a U.K. address for Palaxar?

23      A.   Yes.

24      Q.   Okay.

25

1          MS. HAVENER:  Objection.  Vague as to time.

2

3     Q.   Do you know when this came online as being

4     listed on the website?

5     A.   The U.K. reference?

6     Q.   Yes.

7     A.   Well, it would have been after the company

8     was registered.  So it would have been after March

9     of 2007.

10     Q.   And do you know how long that reference was

11     on the website?

12     A.   No.

13     Q.   Do you know if it's still on it today?

14     A.   No.

15     Q.   Now, it uses the phrase Palaxar Limited.  It

16     doesn't use the EMEA designation.  Was it your

17     understanding that that is one of the same, that

18     that this was the intended designation of Palaxar

19     EMEA as we've described?

20     A.   Yes.  This is not correct.  It would have

21     been -- should have been Palaxar EMEA.

22     Q.   So the website was incorrect on that?

23     A.   Correct.

24

25          (Plaintiff's Exhibit No. 60 marked for

1      identification purposes).

2

3          Q.   Let me show you what we're now marking as

4      Exhibit No. 60.   You indicated that you reviewed

5      the Palaxar website.   Did you review this portion

6      of the Palaxar website indicating their anti-fraud

7      solutions?

8

9              MS. HAVENER:   Objection.   Vague as to time.

10

11         Q.   Let's start with have you ever reviewed them

12     and then we'll talk about timeframe?

13         A.   Yes.

14         Q.   And when did you see that on the website?

15         A.   I don't recall a particular time.

16         Q.   Do you know if it's still on there today?

17         A.   No.   I haven't looked at the website for a

18     long time.

19         Q.   Okay.   So were you aware that your company

20     in the U.K. was listed on the website as a contact

21     source for a website describing this occupational

22     fraud methodology service?

23

24              MS. HAVENER:   Objection.   Foundation.

25

1       A.   Let me answer it like this.

2       Q.   Sure.

3       A.   I was aware that Palaxar the U.K. Limited

4   EMEA was on the website.  Palaxar EMEA was set up

5   to try and take advantage of any developments and

6   apply it in the U.K., but it had no employees.  It

7   had no bank account.  It had not traded.  It's been

8   dormant from day one.  So in the context of

9   capability to deliver, my primary concern was any

10   opportunity that might come up in other areas, that

11   I might be able to service as a sole practitioner

12   in your terminology.

13       Q.   Sure.

14       A.   So the fact there is an occupational fraud

15   methodology is indicative of the fact I was looking

16   to deliver it.

17       Q.   So if someone contacted you in the U.K.

18   about providing that service, you would have told

19   them it was not possible?

20       A.   I would have referred them to Palaxar in the

21   U.S.

22       Q.   Okay.  I understand your testimony that

23   Palaxar in the U.K. EMEA has not done any business.

24   Did you have an agreement, though, on what would

25   happen with profits, if business was done by that

1    company?

2        A.   No.

3        Q.   And same for referrals, if you referred U.K.

4    clients to the U.S.; have you ever had any

5    agreement on what would happen?

6        A.   No.

7        Q.   So we can't say right now whether you would

8    receive any income from that or not?

9        A.   I'm sorry.

10       Q.   We couldn't say whether you would have

11   received any income or not; we don't know?

12       A.   No.   Well, it would have crystalized if a

13   client would have turned up, but none did.

14       Q.   Okay.   Was it your understanding that the

15   U.S. company had the ability to provide, for

16   instance, this occupational fraud methodology, even

17   though you didn't in the U.K?

18

19            MS. HAVENER:   Objection.

20

21       A.   I'm sorry.

22       Q.   Did you have an understanding whether the

23   U.S. company had the ability to provide this

24   occupational fraud methodology described in this

25   document that you've indicated that the U.K.

1    company didn't have the ability to?

2        A.    It would have depended on the particular

3    project that came up.  My understanding is at that

4    point in time that they, that the U.S. company had

5    only two people in it.

6        Q.    Who were those people?

7        A.    Ms. Curry and Terry Chu.

8        Q.    Wouldn't that have been true of the U.K. too

9    that would it have depended on the particular

10   client of what service you could provide?

11       A.    Well, I didn't have the expertise in this

12   particular area that Ms. Curry had?

13       Q.    Right, but you had a partner who had that

14   expertise?

15       A.    In this Palaxar EMEA?

16       Q.    Yes.

17       A.    Yes.

18       Q.    So you that the ability to provide the

19   service, just not the opportunity; is that a fair

20   statement?

21       A.    No, I don't think so.  It would have

22   required Ms. Curry coming over to the U.K. to

23   deliver.

24       Q.    She was your partner at that time?

25       A.    She was fifty percent owner of Palaxar EMEA.

1        Q.   And you never discussed that eventuality,

2   potential for that?

3        A.   No.   It was left that if something popped up

4   and we would do our best to resource it.

5        Q.   When did you first discuss with Ms. Curry

6   the possibility of creating a U.K. company?

7        A.   It was probably originally prior to it being

8   set up.

9        Q.   Well, we see it set up, as best as I can

10  tell, on March 16, 2007; do you think I have that

11  date right?

12       A.   I think so, yes.

13       Q.   So sometime immediately prior to that; would

14  it have been weeks or months or how long before

15  that?

16       A.   Days, probably.

17       Q.   And who contacted who regarding that

18  opportunity to set this company up?

19       A.   I don't recall where it came from, but it

20  would probably have been me, because I was looking

21  for some company, business.   I had to find

22  employment to generate income for my family.   This

23  was intended to be one of the two or three

24  different opportunities that I was about to explore

25  to see which one might come through.

1    Q.   Sure.   Were you in regular contact with Ms.

2    Curry at that time?

3

4         MS. HAVENER:   Objection.   Vague.

5

6    A.   Define regular.

7    Q.   Well, why don't you tell me what level of

8    contact you had with Ms. Curry?

9

10        MS. HAVENER:   Same objection.

11

12   A.   Pretty regular contact.

13   Q.   How do you define regular in that answer?

14   A.   We probably spoke several times a week.

15   Q.   Okay.   And would that have been from the

16   time she left Nexia or did it change overtime?

17   A.   Well, there are two timeframes here.   After

18   Ms. Curry left Nexia, I was in contact with her and

19   in guise of Nexia to try and honor Ms. Curry's

20   separation agreement from Mirabilis or Nexia, which

21   was that we were looking to co-develop

22   opportunities.   Indeed, there were, at least one,

23   if not two, two opportunities, which Ms. Curry and

24   I were working on for the benefit for both

25   organizations.

1      Q.   Can you give me a timeframe for that.   You

2   said there two timeframes here.   You just described

3   one of them; do you know when that timeframe

4   occurred?

5      A.   That was a timeframe particularly from Ms.

6   Curry leaving through until the end of December

7   2006 when the decision was taken to wind up Nexia

8   and let all the Nexia stuff go, in which case there

9   was no employees to deliver any services had we

10   been successful.

11      Q.   And that timeframe, if I understood

12   correctly, would start approximately once you left,

13   which was October of 2006; did I get that right?

14      A.   Correct.

15      Q.   Okay.   So we're talking for that first

16   timeframe October of 2006 to December of 2006?

17      A.   That would be right.

18      Q.   Okay.   How often would you say your contact

19   was during that time?

20      A.   I don't recall specifically, but it was

21   regular.

22      Q.   And you told me before you meant by regular

23   several times per weeks; is that still the running

24   definition of that?

25      A.   We were in regular contact.   I don't know if

1       it was four phone calls a day or whatever.  We were

2       in regular contact, because we were trying to

3       develop the opportunities which Ms. Curry's

4       separation agreement afforded Nexia.

5           Q.  You said there were one to two specific

6       opportunities that you looked at; is that correct?

7           A.  Correct.

8           Q.  Can you recall the names of those?  I assume

9       they were potential clients?

10          A.  The main opportunity, the main potential

11      client was Wachovia.

12          Q.  Wachovia?

13          A.  Yes.

14          Q.  Okay.

15          A.  Where Ms. Curry had created the opportunity

16      and I went with Ms. Curry to help to develop it.  I

17      help up to Richmond as Nexia to co-represent with

18      Ms. Curry to Wachovia.  All of which was to the

19      general knowledge of the senior management within

20      Mirabilis.  Indeed, I called in from Richmond,

21      because there was a shareholder meeting, a board

22      meeting that day explaining why -- they knew I

23      couldn't be there, because I was in Richmond

24      pursuing this opportunity for Nexia?

25          Q.  Who specifically knew that?

1    A.   The chairman, Mr. Amodeo and the people on

2    the phone call.  It was a loud speaker call.  I

3    explained I thought we had a good meeting at

4    Wachovia, hopefully there would be some

5    opportunities coming up for Nexia.  The travel

6    arrangements were made through Mirabilis, like they

7    always had to be.  So it was common knowledge of

8    that.

9        Q.   Who was the chairman at that time?

10       A.   That would be Laurie Holtz.

11       Q.   Do you know other than Mr. Holtz and Mr.

12   Amodeo, who specifically was on the speaker phone?

13       A.   Mr. Simo was there, as far as I recall, and

14   a number of senior executives, who were

15   participants to -- actually, the meeting in Orlando

16   was a critical meeting in context of the

17   development of Nexia.  I'll explain that.

18       Q.   Thank you.

19       A.   All of the course, the latter of course of

20   2006, I had an agreement with Mr. Amodeo that

21   rather than try and build up a consulting business

22   organically that we would identify consulting

23   businesses who already had credibility in a place

24   in the market.  It would be quicker and easier to

25   build up capacity to deliver consulting services in

1          that way.  There were two or three companies where

2          there was a letter of intent.  One was due to close

3          that day.

4               Now I couldn't be in Orlando at that

5          meeting, because it was the only day, from memory,

6          that Wacholvia could do.  I called in after the

7          presentation to Wachovia.  I was party to the

8          discussion and the decision was taken on whether to

9          continue with the potential investment or can it.

10         I recall it very well, because the decision at that

11         point in time was that the investments would be

12         canned.

13         Q.   Okay.  You said there was one due to close

14         that day; was it that all the investments would not

15         be pursued or simply that one on that day?

16         A.   All.  So the context here is that I couldn't

17         attend that meeting, but clearly it was an

18         important meeting, because I was pursuing an

19         opportunity on behalf of Nexia in Richmond.  So, of

20         course, the people on the phone were curious to

21         understand what had gone on.

22              So in that context it would have been Mr.

23         Amodeo was on the phone, I know, and Mr. Holtz and

24         Mr. Simo was there.  I don't recall if Mr.

25         Sadrianna was there or not, but probably.  Mr.

1    Sadrianna would have been at most of these meetings

2    given his role in Mirabilis.  So that was the main

3    opportunity.

4         Q.  Actually, I was going to ask you that.  You

5    said there were actually one or two; do you

6    remember any others or is that all you recall at

7    this time?

8         A.  That was the one that looked like the best

9    and biggest and closest opportunity.

10        Q.  Do you know a company by the name of

11   Forensic Pathways?

12        A.  Yes.

13        Q.  Describe that for me, please, what kind of

14   company that is.

15        A.  Forensic Pathways is a U.K. company.  In

16   2007, when I'm at Forensic Pathways, they were a

17   U.K. company formed by an ex-police officer, would

18   had been involved in, I guess, generally forensic

19   areas, which would include crime scene

20   investigation, materials and et ceteral and data

21   processing.

22        Q.  Okay.  And did you discuss with them any

23   business opportunities?

24

25             MS. HAVENER:  Objection.  Vague.

1

2     A.   Yes.

3     Q.   What business opportunities did you discuss

4  with them?

5     A.   I didn't discuss specific business

6  opportunities.   I discussed with them how in the

7  U.K. we might work together.

8     Q.   Okay.   Could you relay those conversations

9  to me, please?

10    A.   I'm sorry.

11    Q.   Describe the conversations.   You said you

12  had discussions; can you describe those

13  discussions?

14    A.   There were initial discussions on who they

15  were and what they are and what the client base

16  was.

17    Q.   Right.

18    A.   And what my background was and how it might

19  be helpful to both parties if we were able to

20  develop, you know.

21    Q.   What type of working relationship did you

22  discuss developing?

23

24    MS. HAVENER:   Objection.

25

1     A.   Again, I don't know that there was a
2     specific working relationship.   There was nothing
3     formal.
4         Q.   Did you discuss fraud detection as being one
5     of those areas which you could work with them on?
6         A.   Yes.
7         Q.   Specifically, what did you discuss about
8     fraud detection?
9         A.   Using their software in areas, which I
10    referred to earlier, like insurance fraud.   Again,
11    Todd, let me just make a point for clarification.
12        Q.   Yes.
13        A.   Several times yesterday the generic terms;
14    fraud detection, fraud deterrence came up.
15    Discussions I'm referring to here are in a
16    different functional area from what we're
17    describing in the Nexia certification.
18        Q.   If I understand the difference, and you tell
19    me if I've got it wrong, is what Ms. Curry was
20    talking about with Nexia certification would be
21    identifying the risk for future fraud, which you
22    related to be insurance fraud.   And what you've
23    described is identifying the existence or potential
24    existence of fraud that has already occurred; is
25    that a fair statement?

1      A.   No.

2      Q.   Okay.   Then tell me how I've got that wrong.

3      A.   The difference in summary would be that the

4  terminology Nexia certification was a personal

5  relationship related to a person, the financial

6  integrity of an individual.   The insurance fraud

7  related to the area of fraudulent insurance claims,

8  not the integrity of the individual.

9      Q.   Right.   When Ms. Curry described detecting

10  fraud in an individual or the potential for fraud

11  in an individual, she discussed, if I recall

12  correctly, that there would be certain indicators

13  that you would consider; is that same process used

14  in what you're describing?

15      A.   No.

16      Q.   What type of information, then, do you

17  review or data do you review to determine the

18  insurance type fraud that you're describing?

19      A.   I'll give you an example.   Insurance fraud,

20  there would be five or six pieces of data which you

21  would need to identify potential insurance fraud,

22  like the names and addresses of the policy holder

23  and the names and addresses of claims, people

24  making claims, bank account numbers, those kinds of

25  things.

1          The idea would be to match where a number of

2    aliases lived at the same address.  That's where

3    technology would come up into help process data,

4    which is what Forensic Pathways is.  That's an

5    entirely different process and methodology from

6    personal financial integrity, which looks at

7    behaviors of an individual in the context of their

8    pattern of spending, their frequency of spending,

9    the nature of spending.  They are entirely

10   different and separate from both a methodology and

11   process point.

12        Q.  We ran a timeframe back through when you

13   left the Mirabilis entities.  I don't know if you

14   used that term Mirabilis.  What company did you

15   view you as leaving in January of 2007; was it

16   Mirabilis.  I just don't want to put words in your

17   mouth.

18        A.  Axena.

19        Q.  You felt you were leaving Axena in January

20   of 2007?

21        A.  Yes.

22        Q.  And how long did you feel you had been

23   employed by Axena?

24        A.  Since I came to the U.S.

25        Q.  And when was that?

1     A.   2002, I think it was.

2     Q.   Okay.  And did you work for anyone else

3  between 2002 and January of 2007, to your

4  knowledge?

5     A.   No, I couldn't; I worked for Axena.  I was

6  employed by Axena.

7     Q.   Do you know if you held any roles with

8  Mirabilis?

9     A.   Part of the deal, when Mirabilis made an

10  investment in Axena, was that Axena senior

11  executives staff, like myself, would be available

12  to Mirabilis to help to develop opportunities

13  within Mirabilis, Nexia as one may arise.  My

14  employment was with Axena and the titles, which I

15  held and the projects which I got involved in, were

16  for the benefit of both organizations.

17     Q.   When you say both; do you mean Mirabilis and

18  Axena?

19     A.   Axena and the Mirabilis entities, generally.

20     Q.   Okay.  Who did you receive paychecks from

21  during that timeframe after the Mirabilis

22  investment through until January of 2007, do you

23  know?

24     A.   Common Pay Master.

25     Q.   What was your understanding of Common Pay

1    Master's role?

2       A.   Common Pay Master was the internal PEO for

3    the Mirabilis network.

4

5       (Plaintiff's Exhibit No. 61 marked for

6    identification purposes).

7

8       Q.   Sir, you've just been handed a document

9    which has been marked as 61; do you recognize that

10   document, sir?

11      A.   I recall the discussion about it, but I

12   don't recall the document.

13      Q.   Let me ask it a different way.  Do you

14   believe that to be your signature on the last page

15   of that?

16      A.   It looks like it.

17      Q.   Okay.  Would you take a moment to review the

18   terms of this agreement and see if you recollect

19   those being the terms which you agreed with

20   Mirabilis on behalf of Axena?

21      A.   It's similar of the context of the.

22      Q.   Do we have reason to believe that it's one

23   of the agreements between you and Axena, between

24   Axena and you?

25      A.   I am commenting on the basis of page 2.

1           Q.   Okay.

2           A.   Discussions.  At this point we would pilot

3     the use of the Axena product to try and develop

4     other compliance regiments.  That's consistent with

5     section 2 here.

6           Q.   Okay.

7           A.   Also, I guess section 1 in the context that

8     Mirabilis would provide company access.  This was

9     premised on the basis that we'll take a rain check

10    to see how this goes and whether or not we'd take

11    it further.

12          Q.   We'll take a rain check?

13          A.   Its an American expression.

14          Q.   It is, but I've never heard it used that way

15    before.

16          A.   It was like a pilot project.

17          Q.   Okay.

18          A.   Axena had developed software products which

19    were in the market, but the Sarbanes-Oxley market,

20    which was our main product, was becoming saturated

21    with a lot of supplies and consulting business.  My

22    vision for Axena at that time was to expand the

23    base away from just Sarbanes-Oxley into other areas

24    where there might be a similar need.

25               Dr. Pollack had identified that to the

1     sector where there are lots of requirements and

2     looked on the face of it to him and for Mr. Amodeo

3     whom we had presented to at this point in time,

4     that the Axena product might provide good platform

5     with which to develop a PEO product.  It was

6     successful, it would enable both Axena and

7     Mirabilis to take a product to market together.  So

8     this was the initial discussion around what the

9     pilot project would look like.

10         Q.   When you use the term PEO, I understand that

11    to be a payroll entity within a large organization;

12    is that your intention also with that?

13         A.   No.

14         Q.   Describe for me what you mean by that.

15         A.   Professional employment organization

16    provides you with most job services beyond just

17    payroll processing, for example, benefits,

18    administration, HR and et cetera.

19         Q.   Sure.

20         A.   One stop shop for HR.

21         Q.   I understand.  I spoke too narrowly when I

22    said payroll.  It usually provides those functions

23    as a subsidiary of a larger entity; is that your

24    understanding or is your understanding different

25    than that?

1      A.   My understanding of the PEO is a market, at

2    least then, that has an attraction to smaller

3    organizations.   When you have a small number of

4    employees, it's difficult to get good rates on

5    benefits, claim benefits, for example, if you join

6    a PEO, which has a number of small ones under one

7    umbrella, then you can negotiate better rates,

8    because these have more employees.   It's an

9    advantage to smaller size organizations, in

10   particular.

11      Q.   Okay.   I see there a phrase Axena-ware.

12      A.   Correct.

13      Q.   What was your understanding of that phrase

14   at this time in 2005?

15      A.   Axena-ware was a software program which was

16   owned by Axena.

17      Q.   Was it limited to Sarbanes-Oxley or was

18   there other functions?

19      A.   No.   Axena-ware was the risk liberated of

20   risk management software.   There was a separate

21   product called -- which was a Sarbanes-Oxley

22   software.   The use of Axena-ware, again, was web

23   based library to which would enable a group, such

24   as this, or dealings over the internet to

25   contribute on a particular issue to rank them as a

1    group, to score them as a range to identify key

2    issues, whether it be risks or controls or

3    opportunities, whatever.  That was the purpose of

4    the Axena software.

5        Q.  You use a phrase of risk management and then

6    the rest of it didn't seem to fit with that.  Was

7    there a separate risk management function to it?

8        A.  It was principally used as a risk management

9    vehicle, but it could also be used, for example, to

10   help an organization to identify risks or controls

11   or opportunities.  The function of the software was

12   such that people contributed real time.  The only

13   difference, the language, the objective of the

14   project or the objective of the meeting.  Today we

15   could run a risk management session and I would ask

16   the group to tell me the key risks to achieving

17   Broad & Cassel's business objectives and

18   alternatively run the same session the same way ask

19   Broad & Cassel to identify the best opportunities

20   for growing the business in that context, but at

21   that point in time, because of my background,

22   because of the people who were in Axena, it was

23   being promoted principally as a risk management

24   term.  It had broader base functions.

25       Q.  You described earlier that they were looking

1    to move into the PEO segments; how did this

2    software relate to PEO's?

3        A.   The answer is at that point it didn't,

4    because it didn't have a PEO context.   The design

5    was to work -- the intention was to work with the

6    managers at one of the Mirabilis PEO's and for each

7    of the areas of payroll, benefits, administration,

8    to get them to identify what areas they had to

9    adhere to, what the risks of non-adherence were and

10   what controls had to be in place in order to adhere

11   to it.

12       Now, the end product of that would have been

13   a PEO risk and control library, which would have

14   been, not that different, conceptually, to a legal

15   risk and control library or an IT risk and controls

16   library.   The only difference would have been the

17   contents, which would have been particular and

18   specific to a PEO.

19       Q.   Okay.

20       A.   So within Axena, we didn't have a PEO

21   expertise.   So we were looking at this stage to

22   develop and to create a product that would be based

23   on the Axena-ware platform, but market, again, in

24   this area, a smaller PEO, it would have been, we

25   thought, a good marketing opportunity.   It was for

1    Axena and it was for Mirabilis.

2        Q.   Is this approximately the time you -- we

3    discussed a time when you started to be paid by the

4    Common Pay Masters entity; is this the same

5    timeframe, February of 2005, approximately?

6        A.   No.

7        Q.   When did you start becoming paid by the

8    Mirabilis entity?

9        A.   When Axena joined the Mirabilis network,

10   which was October of 2005.

11       Q.   Okay.

12

13           (Plaintiff's Exhibit No. 62 marked for

14   identification purposes).

15

16       Q.   Have you seen that document before, sir?

17       A.   Give me a moment to read it over.  It looks

18   familiar as the standard employment letter, which

19   has my name on it.

20       Q.   Were you asked to sign one of these?

21       A.   No.

22       Q.   Why was one created, then, do you know?

23       A.   Because of the terms under which I would be

24   paid by Common Pay Master.

25       Q.   Okay.  Explain that to me a little bit more

1      in detail?

2          A.   My employment was with Axena.  This was part

3      of the deal in the Mirabilis investment.  My

4      employment had to remain with Axena.

5          Q.   Is that in writing anywhere?

6          A.   Yes.

7          Q.   Where is that in writing?  It wasn't in that

8      agreement?

9          A.   No.

10         Q.   Where is it in writing?  Are there e-mails?

11         A.   I have a letter from Common Pay Master to

12     that effect.

13         Q.   Who at Common Pay Master wrote you that

14     letter, do you know?

15         A.   Marty Flynn, who I was think was the

16     president at the time.

17         Q.   What was the substance of the letter, do you

18     recall?

19         A.   The substance of the letter was to recognize

20     that my employment status started in the U.S. and

21     would depend on me remaining as an employee of

22     Axena, but recognizing the Mirabilis investment.

23     Part of the terms was that I work to support

24     Mirabilis entities for the mutual benefit of both

25     Axena and Mirabilis and that Mirabilis, Axena would

1      be a no cost organization.

2          Q.  From this date forward, October 3, 2005, did

3      you ever receive any more paychecks from Axena?

4          A.  No.  They came through Common Pay Master.

5          Q.  When you use the term came through, did

6      Axena provide portions of that salary to Common Pay

7      Master?

8          A.  No.  The deal was that Common Pay Master

9      would pay my salary and that there would be a truce

10     up at the year end, which essentially would be a

11     two-way transaction having neutral effects.

12         Q.  What parties would there be to that

13     transaction?

14         A.  That Nexia would issue an invoice to Axena

15     for the sums paid to me and Axena would issue an

16     invoice for the same amount to Nexia for services

17     provided to Nexia by Axena.

18         Q.  Okay.  So no money changed hands, just a

19     bookkeeping function?

20         A.  A transaction, otherwise writing one check

21     and writing another.  It was processes in an

22     accounting transaction.  Again, that's the terms of

23     the deal that Mirabilis struck with Axena.

24         Q.  Do you know if there was a contract between

25     Axena and Mirabilis or Axena to that effect?

1      A.   I think it's in the agreement.

2      Q.   You think it's in the agreement that we just

3    saw a moment ago?

4      A.   No. 61.

5      Q.   Okay.

6      A.   That's not the agreement.

7      Q.   A separate agreement?

8      A.   Well, Mirabilis made an investment in Axena

9    and took a twenty-five percent ownership position.

10   This is a letter of understanding between Dr.

11   Pollack and Axena some eight months prior in order

12   to develop what the common opportunity was at that

13   point in time.  No money changed hands on this

14   basis of this.  Axena didn't receive --

15     Q.   On the basis of Exhibit No. 61, you're

16   referring to?

17     A.   Correct.

18     Q.   So money changed hands later at the time of

19   the transaction, you just described?

20     A.   Yes.

21     Q.   Mirabilis paid for the -- well, describe for

22   me the terms as you understood it?

23     A.   The Mirabilis transaction to Axena, which

24   was effective in early October of 2005 was for a

25   twenty-five percent share of the equity.  Mirabilis

1    would pay six hundred sixty-seven thousand dollars

2    in cash.   The cash was a hundred and sixty-seven

3    thousand dollars up front on signing and five

4    hundred thousand dollars available to be spent with

5    the Mirabilis IT companies in developing the Axena

6    software.

7          In addition, Mirabilis picked up all the

8    costs of Axena, because it wanted access to the

9    Axena individuals, like myself, and senior

10   individuals to help grow Mirabilis, Nexia, whatever

11   business, for the mutual benefits of both Axena and

12   the Mirabilis network.

13   Q.   Okay.   Those costs would include the

14   salaries of the people as we've described?

15   A.   Correct.

16

17         (Plaintiff's Exhibit No. 65 marked for

18   identification purposes).

19

20   Q.   Let me give you now what's been marked as

21   Exhibit No. 65 to your deposition.   Are those your

22   initials where it says employee on that page, on

23   that first page?

24   A.   I do not recall signing the employee

25   handbook.

1    Q.   I understand, but are those your initials?

2    A.   I'm not sure how to respond.

3    Q.   Do you know if those are your initials?

4    A.   No.

5    Q.   Those are not?

6    A.   FH is my initials.  I am questioning if I

7    actually wrote these initials on this document.

8    Q.   Okay.

9    A.   So that's my response; I don't recall

10   signing my initials or my signature on this

11   document.

12   Q.   Can you say for certain -- well, does that

13   look like your handwriting?

14   A.   No.

15   Q.   So you believe someone has written that and

16   that's not your handwriting?

17   A.   I'm answering your question, which is does

18   it look like my handwriting and I'm responding to

19   you no.

20   Q.   And the words in here:  Name, location,

21   start date; does that appear to you to be your

22   handwriting?

23   A.   It's similar.

24   Q.   Do you have any reason to believe that this

25   is not your handwriting?

1     A.   The reason I just mentioned, I wasn't an

2     employee of Common Pay Master, therefore, why would

3     I have signed an employee handbook.

4     Q.   It's dated the same date as your start date.

5

6          MS. HAVENER:   Objection.

7

8     A.   Again, I don't recall signing this document.

9     Q.   Okay.

10    A.   My position, here, again, is number one, I

11    don't recall signing and number 2, I don't

12    understand why I would have thought I should have

13    signed it and number 3, the signatures look

14    different on the document, if I did sign them then,

15    but I don't recall it.

16    Q.   Okay.  Turning to the second page, the

17    signature; does that appear to be your signature?

18    A.   There are two.

19    Q.   Whereby it says the words your signature.

20    A.   It's similar, but, again, it's different, if

21    you look at those two here.

22    Q.   Now I'm asking to compare how your signature

23    looks, as you understand it.  Do you believe it to

24    be your signature where it says the words your

25    signature?

1      A.   Well, again, I don't mean to be difficult,

2  but the point I'm making is that it's similar to my

3  signature, but I'm not sure if I signed it.

4      Q.   You don't have a recollection of signing it?

5      A.   Correct.

6      Q.   It was four years ago, I presume you don't

7  recall everything you signed four years ago?

8      A.   No.

9      Q.   Do you have any reason to dispute that

10 that's your signature?

11     A.   Again, referring to my prior answer, I don't

12 recall the circumstances of which I would have

13 signed this, if I didn't sign the employment

14 agreement.

15     Q.   The handwriting on your signature; does that

16 appear to be your handwriting?  Under the line of

17 your signature; does that appear to be your

18 handwriting to you?

19     A.   Again, it looks similar.

20     Q.   The date under that, does that appear to be

21 your handwriting?

22     A.   Again, it looks similar.

23     Q.   Do you have a social security number?

24     A.   I had a social security number.  I don't

25 recall the exact numbers.

1     Q.   Who did you give your social security

2    number, do you recall?

3     A.   Well, it would have been Common Pay Master

4    in order to process my paycheck.

5     Q.   The handwriting for that social security

6    number, does that look like your handwriting?

7     A.   You mean the social security number itself?

8     Q.   Yes.

9     A.   Again, similar.

10     Q.   And lastly, the witness line, I assume

11    that's not your signature; is that a fair

12    statement?

13     A.   Well, it's not my name.

14     Q.   That's why I assumed that.

15     A.   You assumed correctly, sir.

16     Q.   Do you know whose signature that is?

17     A.   No.

18     Q.   You don't know?

19     A.   No, I don't.

20     Q.   Okay.  Was there anyone named Lea, or

21    something, with Common Pay Master that you ever

22    dealt with?

23     A.   I'm sorry, but this is three or four years

24    ago.  I don't recall.

25

1

2                        (Luncheon recess taken).

3

4        BY MR. NORMAN:

5            Q.   Okay.   Do you ever remember seeing an

6        employee handbook for Common Pay Master?

7            A.   Yeah, I do.

8            Q.   You were provided one?

9            A.   I think I had access to one, yeah.

10           Q.   Do you know if you were handed one at the

11       time in approximately October of 2005?

12           A.   No, I don't recall.

13           Q.   You don't recall either way?

14           A.   I do recall one.

15           Q.   Sure.   You just don't recall if it was in

16       October of 2005?

17           A.   I don't recall the specific days, no.

18           Q.   Do you recall ever being asked to sign an

19       employee handbook?

20           A.   Specifically, no.   There might have been a

21       general e-mail, but I don't recall.

22           Q.   Did you ever understand yourself to be bound

23       by the terms of an employee handbook?

24           A.   Well, I wasn't an employee of Common Pay

25       Master.   I would have expected to comply with

1    things like dress codes, for example, and things

2    like that in it, yeah.

3        Q.   So you looked at it, understood you were to

4    comply with some terms of it?

5        A.   Sure.

6        Q.   Like use of confidential information?

7

8            MS. HAVENER:   Objection.

9

10       A.   Is that in there?

11       Q.   You would, generally, understand you would

12   be bound by those?

13       A.   Well, my professional background, there are

14   protocols of that that clearly, client

15   confidentiality is one of them.

16       Q.   Sure.  Explain to me how you would describe

17   it, because you did it a couple different ways?

18

19            MS. HAVENER:   Objection.   Vague.

20

21       Q.   I'm trying to figure out did you believe you

22   were employed or working on behalf of any entities,

23   other than Axena after 2002?

24

25            MS. HAVENER:   Objection.

1

2      A.   When I left the Mirabilis network, my

3    understanding of my status was that I was employed

4    by Axena.  This was part of the discussions that

5    lead up to the Mirabilis investment in Axena that

6    that situation had to continue.  But because of the

7    terms of the deal that I would make myself

8    available to Mirabilis and the network in order to

9    enable to use my prior experience and in addition

10   to create business for both Axena and for Mirabilis

11   and its network.

12     Q.   Okay.  Did you understand yourself to work

13   for the benefit of the Mirabilis entities at

14   different points in time?

15     A.   I understood I worked for the benefit of

16   Axena, which was also for the benefit of Mirabilis

17   and the Mirabilis entities.

18     Q.   Were there any particular Mirabilis entities

19   that you described earlier that Nexia actually cut

20   the check or cut the invoice?

21     A.   Correct, I didn't, but they did.

22     Q.   Okay.  Nexia; was that a Mirabilis entity

23   that you believed to be working for the benefit of?

24     A.   Initially, the check which was cut to me by

25   Common Pay Master, but it came through Nexia.

1    Q.   Describe what you mean by came through?

2    A.   Was charged to Nexia.

3    Q.   Okay.  On the books of Nexia somehow?

4

5         MS. HAVENER:  Objection.

6

7    A.   I don't know.

8    Q.   My understanding was that Common Pay

9    Master's payroll processes on behalf of Nexia

10   Strategy, so consequently I would conclude from

11   that that the charge would have been to Nexia; what

12   you're describing as a bookkeeping function, you

13   would have expected between Common Pay Master

14   Nexia, was it not?

15   A.   Correct.

16   Q.   Okay.  What was the services that you were

17   providing in this employment, as you understood?

18

19        MS. HAVENER:  Objection.

20

21   A.   In this employment?

22   Q.   Right.  You described your employment as

23   being by Axena for the benefit of Mirabilis

24   entities, as I understand, but maybe I

25   misunderstood?  In that employment; what did you

1       understand your job duties to be?

2           A.   Let me make sure I understand your question.

3           Q.   Sure.

4           A.   Is your question what was I doing within the

5       Mirabilis network?

6           Q.   Yes.  I like your question better, but I

7       thought I would get an objection if I asked it.

8           A.   After about one month of joining the

9       Mirabilis network, I was advised by Mr. Amodeo that

10      he wanted me to take the lead in the Nexia

11      consulting business.  For the next two or three

12      months I spent time developing a Nexia consulting

13      plan, business plan identifying products that Nexia

14      might take to market, which premised upon the

15      staff, which Nexia had or was within the Mirabilis

16      organization, the experience and expertise that

17      Axena already had.  That's it.

18          Q.   Okay.  You said within one month of joining;

19      did you understand your job duties to include those

20      same things or did it change during that month?

21          A.   No, it changed.

22          Q.   What was your understanding of when you

23      joined the company, what your job duties would be?

24

25               MS. HAVENER:  Objection.

1          MR. NORMAN:  He used the phrase.  I'm trying

2     to make sure I use the right phrase.

3

4          Q.  At that time, when that happened, what was

5     your understanding of your job duties?

6          A.  Well, part of the deal was that there were a

7     number of companies already within the Mirabilis

8     network who were ready to take on board the Axena

9     software and the Axena products.  So my expectation

10    in joining Axena, joining the network was that

11    there was already an internal client base for

12    Axena.

13         Q.  Okay.

14         A.  My initial task, as I expected, was to help

15    to imbed the Axena solution within the existing

16    Mirabilis network of companies, which was one of

17    the big issues, which Mirabilis had in why they

18    were interested in the investment in Axena, because

19    they had grown and were intending to grow rapidly.

20    They wanted to standardize and formalize the

21    control procedures.  They saw the Axena software

22    being so.  I already had an internal client base,

23    which I would be able to service.

24         Q.  In Exhibit No. 61 in 2a I note under the

25    title company obligations, I believe it's similar

1    to what you just described.  Would there be another

2    way in what you just indicated?

3        A.   This agreement was supercede by --

4        Q.   Is that a fair way of describing the word

5    used there what you just described?  Forget about

6    the agreement.

7        A.   Let me rephrase it slightly.

8        Q.   Okay.

9        A.   Because there are a couple things, at least

10   one thins that's missing in this, which is that an

11   internal network of Mirabilis companies were going

12   to pay for the Axena product and the Axena

13   solution.

14       Q.   Sure.

15       A.   It doesn't reference the fact it would be a

16   job for doing so at this point, because it's a

17   pilot project to see if there were some common

18   grounds.

19       Q.   Okay.

20       A.   So in joining, my expectation was I had been

21   advised that there were a number of companies in

22   the network who were ready to take on more of the

23   Axena solution and secondly, that every company

24   that came on board subsequently would be required

25   as part of the Mirabilis investment in them to take

1   on board the Axena solution.

2         So my expectation in joining was that from

3   day one there was an internal client base.  That's

4   what I expected to be doing for the benefit of both

5   organizations.

6         Q.   It goes onto identify other things in 2b.  Do

7   you see that?

8         A.   Yes.

9         Q.   Did you understand when Axena joined, that

10  that was part of what would be your job duties?

11        A.   By this time, which was eight months

12  subsequent to that, initially the intention was to

13  improve the financial controls and the physical

14  control frame work within Mirabilis, yeah.  The

15  intention in taking Axena forward was to broaden

16  its base into other areas and that at some point.

17        Q.   So the idea was that additional software

18  would be developed after Axena joined the Mirabilis

19  network?

20        A.   Well, of the six hundred sixty-seven

21  thousand investment only one sixty-six in cash and

22  the other fiver hundred was to be spent for

23  Mirabilis, the company to develop the software.

24        Q.   Sure.  Again, that was the intent while you

25  were at -- when you joined Mirabilis, it was to

1    develop software among other things?

2        A.   The intent, when Axena joined Mirabilis, was

3    to invest in the existing software in terms of its

4    functionality and to create new markets for the

5    software by learn the experience of the individual

6    industry sectors, like the PEO sector by creating

7    libraries to the Axena product, software product

8    could be packaged as a PEO offering, rather than

9    just a financial offering.

10       Q.   Did you also understand a duty to create

11   additional new processes of software?

12       A.   I don't understand.

13       Q.   You already had the Axena software?

14       A.   Correct.

15       Q.   I'm asking in addition to that, did you

16   understand your duties to include creating a new or

17   different software or processes?

18       A.   If the opportunity arose through the

19   investment, then we would have looked at some.

20       Q.   So was it your understanding that was part

21   of what was contemplated at the time?

22       A.   From an Axena perspective, again, in any

23   software company you cannot stand still.  You're

24   always looking at two or three different things;

25   number 1, software against competitor products,

1    number 2, you're looking at how you might launch

2    the existing software in other areas and number 3,

3    you're looking at how you might take your existing

4    into new markets or geographies.

5         It's all a constant development and

6    resolution.  Again, from Axena point of view, it

7    needed funding, which we were in the business of,

8    looking for investors, which we have been doing for

9    the best part of, at least several months by this

10   point.

11        Q.   When you joined Mirabilis, it was your

12   understanding these three functions would be part

13   of what you would be doing?

14        A.   Which ones?

15        Q.   The three you just described.

16        A.   Well, it's business development.  It's

17   nothing more than that.

18        Q.   Okay.

19        A.   Ongoing business development, no difference

20   from Broad & Cassel.

21        Q.   Obviously, our intent is not to create

22   software.  Different businesses have different

23   functions.  As understand yours, is that part of

24   it, was to develop new software or processes?  T

25   maybe I don't understand that correctly.

1        A.   The intention was to develop the software.

2   In doing so, it was premised on the fact that the

3   software was already there.   It might through

4   investment, work better, faster, quicker, new

5   functionality.   Every business is in the business

6   of growing, developing, making profits.

7        Q.   It's not that some companies are in the

8   business of developing and creating things that

9   don't exist; others using what already exists?

10       A.   Well, Axena was in the business of both,

11   what can you do to optimize the tools that you have

12   and maximize your profits.

13       Q.   Sure.   Did you have an understanding when

14   Axena joined the Mirabilis network, what would

15   occur or what would happen to newly developed

16   products and who would, market them and who would

17   sell them and receive the benefits from?

18       A.   As part of the deal agreement, there were

19   some provisions which related to how future

20   revenues from either consulting or software would,

21   first of all, be shared between the parties.

22       Q.   When did you meet Ms. Curry?

23       A.   I met Ms. Curry for the first time in, I

24   think it would have been September, August or

25   October of 2005.

1       Q.   So this is before Axena joins the Mirabilis

2   network?

3       A.   Correct.

4       Q.   In what context did you meet her?

5       A.   A meeting that I had with Mr. Amodeo and

6   Scott Goldberg with my Axena associate, Mr.

7   Ramtage, in order to discuss and clarify several

8   deal points in connection with a Mirabilis

9   investment in Axena.

10       Q.   Mr. Goldberg; do you know what his

11   profession was?

12       A.   An attorney, a Mirabilis attorney.

13       Q.   Okay.  Do you know if he has a specialty,

14   like intellectual property?

15       A.   No.

16       Q.   Okay.  What was discussed in this meeting

17   that you can recall?

18       A.   There was a power point presentation, which

19   I had prepared.  It discussed the points which were

20   outstanding at that point in time in finalizing the

21   contractual terms of the deal.  Mr. Amodeo had

22   invited Ms. Curry along, because he wanted the two

23   of us to meet that she had been a recent addition

24   to the Mirabilis network.

25       I think it was really to show me that

1    Mirabilis had other good senior people, that it was

2    a good place to work, et cetera.

3         Q.  Okay.  Do you still have that power point

4    presentation, do you know?

5         A.  I think so.

6

7              (Discussion off the record).

8

9    BY MR. NORMAN:

10        Q.  So in that timeframe, you met Ms. Curry at

11   the meeting, in which you presented a power point

12   presentation, as I understand understood, it

13   basically was what Axena could provide to

14   Mirabilis; is that a fair statement?

15        A.  No.

16        Q.  Could you correct me on that then?

17        A.  Sure.

18        Q.  What do you think it presented?

19        A.  The presentation at that point was on our

20   understanding of the Mirabilis deal and the

21   comments of the deal.

22        Q.  Okay.

23        A.  And in order to expedite the contract of it.

24        Q.  At that time, did you discuss with Ms. Curry

25   her background?  Did you get a sense of what she

1    could bring to this endeavor?

2        A.   She was introduced more likely by herself at

3    the meeting, because the purpose of the meeting

4    wasn't to introduce me to Ms. Curry.  She was

5    actually in the office.  Mr. Amodeo, I think, took

6    the opportunity while she was there.

7        Q.   I don't mean for you to confirm this, but I

8    saw a start date on this document of October 3rd.

9    Do you believe that to be the date Axena joined the

10   Mirabilis network?

11       A.   Yes.

12       Q.   I don't want to put words in your mouth, but

13   earlier you said your job duties changed?

14       A.   Why it changed was that it was not in

15   healthy position, generally, from an organizational

16   perspective.  Secondly, early in November, Mr.

17   Amodeo asked me to take on developing the Nexia

18   consulting business.

19       Q.   Mr. Amodeo asked you to take on the Nexia

20   consulting business; did I catch that correctly?

21       A.   Developing the Nexia business.

22       Q.   Developing?

23       A.   Correct.

24       Q.   Was it your understanding that someone was

25   already doing that at Nexia?

1          A.   Yes, Ms. Curry.

2          Q.   Okay.  So it was your understanding, your

3    role to supplement Ms. Curry or what was your

4    understanding of what Mr. Amodeo was asking you to

5    do?

6          A.   Asking me to lead it, to lead the

7    development of Nexia consulting at that point in

8    time.  I would make a point that there was no

9    written brief.  It was a broad discussion about

10   developing the potential for consulting business

11   within Nexia.

12         Q.   What type of consulting business were you

13   discussing with Mr. Amodeo at this point?

14         A.   Based on my experience, it would have been

15   in the area of risk management similar to the types

16   of services that we had expected to provide within

17   the Mirabilis network.

18         Q.   Are you saying provide the Axena-ware or

19   something through Nexia or something different than

20   that?

21         A.   I'm talking about providing consulting

22   software services.

23         Q.   Okay.  Were they defined as software

24   services you would be providing or just whatever

25   ones were useful to the clients?

1       A.   I had expected the other companies in the

2   network to have some form of a business plan, which

3   identified which products and which markets for

4   which clients to take to market as Nexia.

5       Q.   Sure.

6

7            (Plaintiff's Exhibit No. 64 for

8   identification purposes).

9

10      Q.   This will be Exhibit 64 to your deposition;

11  if you could take a look at that and tell me if

12  you've ever seen that document before?

13      A.   It looks similar, yeah.

14      Q.   Okay.   When do you believe you first saw

15  that document?

16      A.   It would have been late 2005 following

17  discussions that I had with Ms. Curry.

18      Q.   Did you play a role in the development of

19  this document?

20      A.   I don't think so.   Again, let me give you

21  the context of time here, again, because it's

22  important.   The context of time is that Mr. Amodeo

23  asked me to take a lead in the development of the

24  Nexia consulting business.   My understanding of

25  that, from that discussion, was that I would have a

1       look at what Nexia had and the other people that

2       Nexia had.  I would have to look at the products

3       which were available in the network from a

4       consulting perspective and put something together

5       to help generate consulting revenues for the

6       network.

7              I contacted Ms. Curry, because she was at

8       Nexia Strategy, I was aware of that.  My

9       expectation was that she would have been aware that

10      I was asked to lead Nexia Strategy and the

11      consulting business.  She was not.  She heard it

12      from me first.

13             Subsequent to that, over the next few weeks,

14      I met with Ms. Curry.  I spoke with her on the

15      telephone and together with other Nexia senior

16      Nexia people, one being Ellen, who had joined as

17      well, in trying to develop an outline of a business

18      plan that we could present to Mr. Amodeo on how

19      Nexia consulting might be taken to market.

20      Q.   When you use the term taken to market, I

21      understand that to mean that it's going to be

22      provided as a public offer?

23      A.   No, I'm sorry.  It's a marketing term.

24      Q.   Is that your phrase for beginning to market

25      the organization?

1        A.   Yes.

2        Q.   That would be a different type of business

3   plan than we what we see here?

4        A.   Correct.   Let me be clear.   It would be a

5   business plan focused on different products and

6   solutions that would be taken to market.

7        Q.   Okay.

8        A.   This document, again, talks about how to --

9   where the organization wants to be, whatever the

10   period is, three years or five years, how it

11   intends to get there and some market analysis on

12   the competitive environment and how it will be

13   marketed and acquisitions and how it will be

14   resourced.

15        Again, from scanning it, it looks like a

16   business plan that would be pitched, if you like,

17   in terms of where this is going and how we're

18   getting there and this is how we're going to do it.

19   The business plan would have been similar

20   conceptually, but covering different areas.

21        Q.   In those meetings with Mr. Curry, did at

22   that time discuss the Nexia certification?

23        A.   No.

24        Q.   Were there processes that were discussed in

25   those meetings without using that term that would

1   later become or later used in the Nexia

2   certification process?

3       A.   The first time Ms. Curry and I discussed

4   Nexia certification, in order to be consistent in

5   your terminology, would have been late November of

6   2005.

7       Q.   Okay.  Do you recall the meeting?

8       A.   Yes, I do.

9       Q.   Could you describe it for me, please?

10      A.   I met with Ms. Curry and Mike Dement at the

11  hotel, close to the airport in Washington.  I had

12  visited Richmond to meet with Ms. Curry and Mike

13  Dement.  I was in route back to the U.K., as I

14  recall, and to discuss with them my thoughts on

15  Nexia consulting in the context of the particular

16  products, solutions that we might take to market

17  and the capabilities and the competencies, which

18  were available within the network.

19          Now during the course of that meeting, and

20  prior to it, as I had been developing my thoughts,

21  one of the areas based on the Axena products and

22  solutions and my background, and secondly, the fact

23  that Mirabilis at this point in time had hired a

24  number of staff from the security services, like

25  the FBI, who were doing white color fraud, et

1     cetera,.

2          One of the potential offers, which I

3     discussed with Ms. Curry and Mike Dement was taking

4     products and market them around the area of

5     anti-fraud.

6          During the course of that conversation, when

7     we started talking about the different products and

8     the anti-fraud products, Ms. Curry and Mike Dement

9     started telling me, in particular, Ms. Curry's

10    background and how they thought there might be

11    certain similarities between what I was trying to

12    do and her experience in espionage and anti fraud.

13         So it was a very fruitful meeting in

14    discovering we had some common grounds that we

15    might be able to create something in the common

16    market.

17    Q.   Were you aware of a Richmond, Virginia

18    governmental presentation that Nexia had done in, I

19    believe the date we talked about yesterday was

20    October 20, 2005?

21    A.   I was aware there were presentations being

22    made in Richmond to the state of Virginia, which I

23    believe Mr. Amodeo attended.  Again, my

24    recollection was that that was to create a Nexia

25    business call center, payroll processing, et

1        cetera, for the Mirabilis network in Richmond.

2            Q.   My recollection, and some documents included

3        a reference to fraud deterrence or a word like

4        that, were you aware that that was being discussed

5        at that time?

6            A.   I have no recollection of that.

7            Q.   Okay.   Your meeting with Ms. Curry an Mr.

8        Dement was that before or after that presentation,

9        if you know?

10            A.   The end of November, because it was around

11        my birthday.

12            Q.   Okay.   I know you said you had seen this

13        document, Exhibit 64, in late 2004.   Do you know if

14        you had seen this before or after this meeting when

15        you saw this document, Exhibit 64?

16            A.   I recognize a document like this as being a

17        business plan that was believe authored by Ms.

18        Curry with regard to the Richmond business.   I

19        don't know which version I've seen, but this looks

20        familiar.   When did I see it; I think my

21        recollection is that as I started to develop a

22        business plan for Nexia consulting, my

23        conversations with Ms. Curry were there was already

24        one in existence or at least in draft, which she

25        had shared with me at that point in time.   That

1    would have been sometime in November.  Does that

2    help?

3        Q.  It does, I think.  You say sometime in

4    November.  Can I assume you left for the U.K on the

5    22nd of November?

6        A.  End of November, right about then.

7        Q.  After the meeting with Mr. Dement and Ms.

8    Curry; you left for the U.K.?

9        A.  Yes.

10       Q.  And you saw this document sometime in

11   November?

12       A.  I think then, yes.  Generally speaking, this

13   looks familiar.

14       Q.  Sure.  So you had this meeting around the

15   end of November in a hotel with Ms. Curry and Mr.

16   Dement in which you discussed -- just to be clear,

17   did you get like a conference room at the hotel or

18   just at the hotel bar or a room?

19       A.  We sat in the lobby of the hotel.

20       Q.  Okay.  At that time, did you document

21   anything that would describe your ideas or --

22       A.  My recollection was no.

23       Q.  You didn't document it in any way?

24       A.  Not at that stage.  It was just the sharing

25   of information and experiences to try and get to a

1    point where there might be something that's worth

2    investing some time here.  Then we talked about

3    areas, one of the documents produced that had, what

4    circles on it.  There were a number of other

5    products that were already in existence at Axena.

6    There were a number of other products and solutions

7    where I had experience.  Again, for the sake of

8    clarity, it was not a meeting to discuss Nexia

9    certification, but the concept came up in the

10   meeting as we started to explore the other ways we

11   could develop products to take to market.

12       Q.  Meaning, that first meeting is when you

13   discussed for the first time something that would

14   become Nexia certification?

15       A.  Yes.

16       Q.  Do you know what time of day the meeting

17   was?

18       A.  I flew in that morning and flew out that

19   evening.  So it was probably like over lunch.  I

20   remember having lunch.

21       Q.  Do you remember if it was a weekend or a

22   week day?

23       A.  I thought a week day.  I'm pretty sure it

24   was.

25       Q.  Okay.  Ms. Curry and Mr. Dement; were they

1    both stationed in the D.C. area at this time?

2        A.   Richmond, I believe.

3        Q.   Forgive me, but do you know how far Richmond

4    is from D.C.?

5        A.   I'm guessing a hundred miles or something

6    like that.

7        Q.   Okay.  Funny, I'm asking somebody from the

8    U.K.

9        A.   Yes.

10       Q.   When is the next time you remember

11   discussing with anyone this concept that would

12   become the Nexia certification?

13       A.   I think probably after the turn of the year

14   in 2006.  The reason being is that Ms. Curry had to

15   go back to her prior employers and discuss with

16   them her ability to take it further and

17   commercialize it.

18       Q.   Who did you understand she was having those

19   discussions with?

20       A.   The governmental agency in California that

21   Ms. Curry had worked for.

22       Q.   Right.  Anyone else that you know she was

23   discussing it with?

24       A.   At that point that was my understanding of

25   the main organization.

1    Q.   Do you know if she had met with other people

2    from the Mirabilis family or companies before going

3    to this meeting with PERSEREC out in California

4    about the Nexia certification?

5    A.   I think she and I had a follow-up

6    conversation.  Again, remember this is a new kind

7    of development and Ms. Curry and I had only known

8    each other for a short period of time.  We were

9    still understanding each other's background, still

10   making the connection who worked what.

11   Q.   Were you having regular phone calls doing

12   that?

13   A.   I don't know if I would classify that as

14   regular.  At that point, Ms. Curry had to get

15   clearance from her prior employer before she was

16   able to take it forward.  So there wasn't much

17   sense in investing in a lot of effort and time into

18   it until she had that clearance.

19   Q.   Is there some documentation to that?  If so,

20   do you know when that first was created, the

21   documentation, any documentation relate Todd this?

22

23        MS. HAVENER:   Objection.  Vague.

24

25   Q.   You described the Nexia certification

1    process in general terms; my question is, do you

2    know the first time someone put a pen to paper and

3    documented in any manner the process that you were

4    talking about?

5         A.   I'm trying to distinct in my mind here.

6         Q.   Sure.

7         A.   Developing of an idea, a thought, to the

8    point where there is something that you might

9    describe as methodology or process.   There were,

10   I'm sure, because I write things down and I

11   re-write things to help my thought processes, to

12   frame what something might look like.   So I know

13   that I had developed some ideas, just based on

14   conversations to make sure that when I had

15   discussions with Ms. Curry and Mike Dement and

16   Laurie Holtz, to make sure that I was getting it

17   right.

18        Now, this is all, again, part of the normal

19   process in developing a product.   So that's your

20   thought processes, before you get to the point that

21   you are able to articulate how the process would

22   work, at least in general terms.   Now, from early

23   on, the concept of personal financial integrity was

24   what we were trying to go to, how we were going to

25   get there, what it might look like.

1      Q.   My question is specifically about

2   documentation.  I appreciate you giving me

3   background.  I suspect that you probably noted that

4   days and events when you met with Ms. Curry; am I

5   correct about that?

6      A.   I would have made some form of a note about

7   the conversation, because I was developing a

8   business plan.  At that point in time, while I was

9   excited about the opportunity of developing

10   something like this, I didn't know -- as I

11   mentioned earlier in my response, there didn't seem

12   much value in investing a lot of time and effort

13   until we knew there was clearance.  We understood

14   it was something we could take to market, but --

15      Q.   Was that the first time you discussed with

16   anyone in the Mirabilis Nexia family or entities

17   that meeting with Ms. Curry and Mike Dement about

18   the integrity of personal financial?

19      A.   The genesis of the idea came from that

20   meeting at the end of November.

21      Q.   Okay.  Were you part of that group that flew

22   to PERSEREC to meet with them, do you know?

23      A.   Which group and when?

24      Q.   Okay.  Were there multiple -- did you ever

25   go and meet with the people at PERSEREC?

1    A.   Yes.

2    Q.   When did you go and meet with the people at

3    PERSEREC?

4    A.   From memory early of 2006, maybe February.

5    Q.   Okay.  We saw yesterday a January 19th

6    flight manifest for there; I take it you were not

7    in that group?

8    A.   I don't know if I was or not.  I went once.

9    Q.   Okay.  Can you recount that meeting for me,

10   please?

11   A.   The meeting was with Dr. Tim.  The meeting

12   was to -- from Ms. Curry's perspective.  She had

13   left PERSEREC like twenty years earlier.  She left

14   some considerable period before that.  So the

15   initial discussions with Dr. Tim were what had

16   happened since and how the same methodologies,

17   concepts might have value in the commercial sector,

18   rather than just in the government sector, because

19   of the limitations of government data, the

20   government bodies.  It was a further exploration of

21   the concept, update on what had happened at

22   PERSEREC and contributed to the decisions on

23   whether this is something that was worth pursuing.

24   Q.   If I recall correctly yesterday, we

25   discussed a discussion between Ms. Curry and Dr.

1    Tim related to leading indicators.  Do you recall a

2    discussion like that in your presence at this

3    PERSEREC meeting in 2006?

4        A.  Well, the whole thing was premised on the

5    fact that there indicators.

6        Q.  Right.  And do you remember a discussion of

7    specific indicators?

8        A.  No.  This is a very general meeting.

9        Q.  Okay.

10       A.  My recollection of that meeting was sharing

11   of ideas and concepts on what happened at PERSEREC

12   and the potential for taking such a product

13   further.  I don't recall -- I don't recall there

14   being specific decisions and Ms. Curry leaving with

15   a paper signed saying go ahead.  Again, it was

16   about developing this process.

17       Q.  Sure.  After that meeting, what was the next

18   activity that you recall doing in developing the

19   Nexia certification?

20       A.  I don't know if it was the next one, but

21   certainly a white board session, which was Ms.

22   Curry, myself and Laurie Holtz, which was

23   essentially bringing together discussions with

24   PERSEREC and her thoughts, her ideas on how this

25   might be good.

1      Q.   And where was this white board session?

2      A.   I think in the Orlando office, Mirabilis.

3      Q.   Was it literally a white board session?

4      A.   It was again -- general, yeah.

5      Q.   There was a discussion how to progress this

6    Nexia certification?

7      A.   Again, it was all part of the development of

8    the idea, the thought, the concept and

9    methodologies, yeah.

10      Q.   Sure.  Approximately, the timeframe this

11    was?

12      A.   Early 2006.

13      Q.   Can you be anymore specific or is that the

14    best you can do at this point?

15      A.   First few months of 2006.

16      Q.   Okay.  After this white board session in

17    Orlando, what's the next thing you can really

18    occurring as it relates to the Nexia certification?

19      A.   Just, generally again, making the point

20    about the development of it from a thought, an

21    idea, a concept, a methodology, a product, a

22    solution, marketing and et cetera.  This is early

23    2006, still the continuation of what this might

24    look like.

25      Q.   Is this discussion occurring through phone

1    calls, e-mails, things like that?

2        A.   It's occurring both, face to face meetings,

3    if Ms. Curry was in Orlando and if I had the

4    occasion to get up to Richmond.

5        Q.   What percentage of your time would you say

6    this was taking up by the middle of 2006?

7        A.   I don't know.  I've had a long career in

8    doing this kind of thing.

9        Q.   Was it ten percent of your time?

10       A.   It was not a lot of time.  I think in total

11   for 2006 that I might have spent, you know, less

12   than a month, I'm sure.

13       Q.   Okay.

14       A.   It's all about experience.  I had a lot of

15   experience in it, most recently through

16   Sarbanes-Oxley.

17       Q.   During this time, was your time spent, let's

18   say 2006, entirely on Nexia related business?

19       A.   No.

20       Q.   Okay.  Can you give me a percentage of time,

21   maybe you spent on Nexia related business or by

22   months?

23       A.   On Nexia?

24       Q.   Yes.

25       A.   No, sir.

1       Q.   Did you ever try to make a determination of

2    a value of the product?

3       A.   I made determination of the cost and the

4    value.   The cost, first of all, I think, again, you

5    filed an exhibit yesterday by Jodi Jaiman that came

6    to 1.2 million, which is inaccurate.   She was not

7    involved in the process at the time.   I was.   So my

8    calculation was based on the fact that I had spent

9    no more than a month on it.   Secondly, my

10   observation on how much time Ms. Curry had spent it

11   was probably two months.

12          That's premised on the fact that we are

13   pretty experienced people.   It's not that we're

14   creating something, like we have to build a house.

15   We know what a house looks like.   Ms. Curry had

16   done a separate calculation of something like three

17   hundred and forty thousand dollars.   In

18   conversations with Mr. Amodeo and Mr. Holtz and Mr.

19   Berman, I suggested a number of fifty-seven hundred

20   thousand that might be appropriate on the grounds

21   that it couldn't cost anymore than six hundred

22   thousand.   Ms. Curry was entitled to a severance

23   agreement, which was a hundred thousand.

24      Q.   How did you determine the severance package?

25      A.   From general discussions.

1      Q.   Did you ever see a document that said she

2   was entitled to that?

3      A.   I don't recall that I saw a specific

4   document, but it certainly came out in certain

5   conversations and it's referenced in the e-mails.

6      Q.   Your role in this was to negotiate on behalf

7   of Mirabilis entities the best amount they could

8   receive for this, correct?

9      A.   My role was to try and, as referenced in

10   this e-mail, get an agreement in the interest of

11   Mirabilis, if they were not able to reach one with

12   Ms. Curry, that anytime that had been invested, the

13   opportunity of taking it forward would be lost,

14   because the whole product was Ms. Curry and what

15   she owned, the network and et cetera.  This wasn't

16   going to happen without her.  That e-mail I'm

17   referencing, was my attempt to try and negotiate

18   between the parties, which was acceptable to both

19   sides.

20      Q.   Did you feel it was in the best interest of

21   Mirabilis?

22      A.   Yes.

23      Q.   Were you trying to maximize their return?

24      A.   Of course.

25      Q.   Why wouldn't you first determine was there

1      any basis for the severance package?

2          A.   The whole thing was not an exact science.

3      As I mentioned in my response in calculating the

4      five hundred thousand as a starting point, that was

5      on the premise everybody was hired in Richmond,

6      spent all their time on this, which they didn't.

7      They were doing other things.  There was some big

8      ballpark, how much could it have cost; five hundred

9      thousand, which was a negotiating figure with Mr.

10     Amodeo.

11         Ms. Curry was prepared to walk away from

12     that, which I didn't want that.  It wasn't in the

13     best interest of Mirabilis or Nexia.

14         Q.   When you say walk away --

15         A.   She had the algorithm.  Without the

16     algorithm, there was no product.

17         Q.   So you felt she just giving up on developing

18     the Nexia certification altogether, if there wasn't

19     an agreement reached?

20         A.   Yes.

21         Q.   Did she express that to you?

22         A.   Yes, it's in the e-mails, too.

23         Q.   When Mr. Amodeo demanded two and a half

24     million dollars; did you ever ask him for any

25     breakdown or how he calculated it?

1      A.   His response was he wanted to destroy Ms.

2   Curry.

3      Q.   Those were his words to you?

4      A.   Yes.

5      Q.   You spoke to him about this face to face?

6      A.   Yes.

7      Q.   Do you know why he had such an extreme

8   dislike for her.

9      A.   That's something you may have to ask Mr.

10   Amodeo.

11      Q.   But he never expressed to you why?

12      A.   No.

13      Q.   It's my understanding that there was

14   negotiations after the settlement had been reached

15   on the particulars of it; did I understand

16   correctly no one could ever come to an agreement,

17   so that a note could be executed; is that true?

18      A.   I'm not sure of the discussions between

19   legal -- I never saw a final note.  Indeed, as I

20   recall, the note was supposed to be a new company.

21   It was being set up by Nexia.  That never happened.

22   So there wasn't a company on the Mirabilis site for

23   the note to be attached to it.

24      Q.   Right.  There was also no agreement on the

25   terms of the note, correct?

1    A.   Again, my understanding is that there was

2    some discussions on the terms of the note, but I

3    never saw a final note.

4    Q.   Okay.  Did anyone ever tell you what the

5    discussions were on the terms of the note, what the

6    disagreements were?

7    A.   I don't know if there were any

8    disagreements.

9    Q.   Okay.

10   A.   It was being handled by legal.

11   Q.   I think you described to me earlier this

12   morning that some of your focus was on product

13   development?

14   A.   That's with regard to Nexia.

15   Q.   Was that solely with Nexia or with the other

16   Mirabilis entities, too?

17   A.   It also included --  there's some overlap.

18   Early October to November, my expectation was that

19   there was already an internal market at which there

20   was not.  That became clear after two or three

21   weeks that none of these companies were ready.

22   Then I was asked to help or lead the development of

23   Nexia consulting business, which was early in

24   November, which I walked through into November,

25   December.  I met with Ms. Curry to put together

1    some form of a business plan, which again that was

2    memorialized in a power point presentation.  I came

3    back from my holiday.  I called into Mr. Amodeo's

4    office and advised I was the CEO.

5        Q.  Was there an issue with accounting; is that

6    why you were brought in?

7        A.  Not just that.  There was no strategy for

8    the business, other than it was principally in

9    PEO's, yet the business kept acquiring stressed

10   companies.  What I was trying to do in that period

11   of time was to imbed better systems and procedures,

12   which included everything from understanding the

13   businesses that we had and which ones we should be

14   mentoring and which ones to be looking to exit

15   from.

16           Again, the strategy at that point in time

17   was that they didn't have much due diligence.

18   There were a number of distressed companies.  They

19   were distressed for a reason.  My concern was it

20   wasn't going to get ahead unless Mirabilis ventures

21   had good systems and procedures and had a strategy

22   and planning systems in place.

23           There were a number of positions filled by

24   junior, very junior people.  So there was a lot to

25   be done in the early part of 2006 to fix and to

1    build and to imbed indeed.

2        Q.   Okay.

3        A.   And there was a lot of resistance to it.

4    Mr. Amodeo indicated that he wanted to change and

5    he needed to change and why he brought me in, but

6    very little changed at the end of the day.

7        Q.   Was your compensation on an hourly basis or

8    a salary?

9        A.   A salary.

10       Q.   Okay.  Did it change at the time you became

11   CEO?

12       A.   Nope.  I had no job description to change

13   and it didn't change the terms of my employment.

14   The amount didn't change.  The bonus that was

15   promised, didn't appear either.

16       Q.   Did you keep time sheets?

17       A.   We tried to and produced one of the

18   initiatives regarding such a recording system,

19   which lasted, from memory, four or five weeks.

20   They all blew up, because of the number of senior

21   people didn't want to record time sheets.  I

22   suspect it was showing that there were a number of

23   people who were not contributing a running value of

24   the organization and whom Mr. Amodeo didn't want to

25   get rid of for his own reasons, which I'm not

1     questioning.

2         Q.   Did you personally keep time sheets?

3         A.   I was recording time at that point.

4         Q.   Do you still have copies of those time

5     sheets?

6         A.   I don't think so.

7         Q.   Who did you turn them into at the company?

8         A.   One of the administrative assistants.

9         Q.   Do you know if Ms. Curry provided time

10    sheets?

11        A.   Everybody did as far as I can recall or they

12    should have been, but not everybody submitted them.

13        Q.   How about the period of time up until Ms.

14    Curry's departure in October of 2006, how

15    significant to Nexia was the Nexia certification

16    process during that time?

17        A.   It was a big part.  With the Nexia

18    certification, it was seen as being a really good

19    combined offering.

20

21             (Plaintiff's Exhibit No. 65 marked for

22    identification purposes).

23

24        Q.   I'm handing you now what's been marked as

25    Exhibit No. 65.  Do you recognize that document?

1    A.   I recognize that I submitted an affidavit

2    with a number of exhibits.

3    Q.   Turning to the last page of page 21; is that

4    your signature?

5    A.   I believe so.

6    Q.   Did you initially draft this document,

7    Exhibit 65?

8    A.   I think in discussion with attorneys, I

9    drafted it.

10   Q.   Okay.   Paragraph 4 states that I have never

11   been a member, employer or otherwise had an

12   interest in Palaxar Holdings.   Do you see that?

13   A.   Yes, I do.

14   Q.   Now, you were aware at the time you were a

15   member of -- is the correct term for Palaxar EMEA?

16   A.   I was a shareholder of Palaxar EMEA, but

17   it's not listed here.

18   Q.   Right.   I understand.

19   A.   I had no interest in Palaxar Group or

20   Holdings.

21   Q.   Does EMEA stand for something?

22   A.   Yes.

23   Q.   What?

24   A.   Europe Middle Eastern Africa.

25   Q.   So this was intended to serve people in

1    those areas?

2        A.   The name was trying to leverage any business

3    opportunities that might come in the states that we

4    might be able to take into the U.K. market.

5        Q.   And the fact that it was listed on the

6    website?

7        A.   As a reference, yes.

8        Q.   Well, when you give a notation like that,

9    one presumes that you're intending to market that

10   area?

11       A.   Yes.

12       Q.   Okay.  So was it your intention?

13       A.   If the opportunity might arise in those

14   areas.  The reason being, I had experience and

15   clients in those areas.

16       Q.   Sure.  And did you have any discussions with

17   Ms. Curry about whether or not any of these smaller

18   entities you've identified in paragraph 4 had any

19   businesses in Europe, Middle East or --

20       A.   The assumption was that Ms. Curry's business

21   was here in the U.S.

22       Q.   Right.

23       A.   I think the reason was, if given the

24   opportunity, to take some into market and take

25   advantage of anything that was able to develop and

1    in this case I was able to help develop.

2         Q.   So whatever the Palaxar Group could develop,

3    you were trying to market in Europe?

4         A.   If relevant.

5         Q.   That would include the Nexia certification?

6         A.   Yes.

7         Q.   Did you attempt to market it, Palaxar EMEA?

8         A.   Well, I was trying to earn a living.

9         Q.   Sure.  The intention was there might be two

10   or three opportunities through which I could do

11   that, Palaxar EMEA being one of them, but proved

12   rather difficult after a number of blogs maligning

13   my reputation and Ms. Curry's.

14        Q.   Are you referring to the Mirabilis blog on

15   the Orlando Sentinel website?

16        A.   One of them, yes.

17        Q.   And you were a contributor to that, were you

18   not?

19        A.   No.

20        Q.   You never posted anything on that?

21        A.   No.

22        Q.   You only reviewed it?

23        A.   Yes.

24        Q.   Do you know who posted on it?

25        A.   It clearly had to come through people who

1       were well connected with Mirabilis.

2              Q.   Could you tell me any names?

3              A.   They didn't have the guts to put their names

4       on it, so I could only guess.

5              Q.   Did you ask the Sentinel to take that blog

6       down?

7              A.   No.   It's a freedom of speech, isn't it.

8              Q.   There is, but not for defamation.

9              A.   I don't know.   I'm not an attorney.

10             Q.   You gave speaking engagements, I assume

11      during this time?

12             A.   During which time?

13             Q.   During the time marketing Palaxar?

14             A.   Yes.

15             Q.   Did you use those speaking engagements to

16      attempt to market Palaxar EMEA?

17             A.   I'm not allowed to.

18             Q.   I'd presume often times in those speaking

19      engagements, the company is mentioned there to whom

20      you work for in the hopes to produce revenue?

21             A.   Your presumption is incorrect.   It comes

22      from the fact that you are good, knowledge in what

23      you do and how you present it.

24             Q.   Of course, but that's why you'd put that

25      information in there, so if they think you're good

1       and knowledgeable, when they see you speaking; they

2       can contact your company?

3            A.   No.   The company that sponsored the

4       conference puts it on there to attract people by

5       reference to the fact you are an experienced

6       individual who has something to say.

7            Q.   Okay.   Do you know if Palaxar EMEA was

8       listed on your resume or biography for certain

9       speaking engagements?

10           A.   EMEA wasn't?

11           Q.   Okay.

12           A.   As far as I'm aware.   I know there was some

13      erroneous information that I was co-founder of

14      Palaxar, LLC, which is incorrect, if that's what

15      you are referring to?

16           Q.   The correct statement would be co-founder of

17      Palaxar EMEA?

18           A.   That would be a correct statement.

19           Q.   Why didn't you put in here when you say I'm

20      a member of these two entities; however, I am the

21      member of the other Palaxar entity?

22           A.   I think it's referenced somewhere else in

23      this document, is it not?

24

25           MS. HAVENER:   Just to clarify, it was not a

1    part of the lawsuit.

2

3        Q.   Now I noted you were indicated on the patent

4    applications as being one of the inventors of those

5    four patent applications that were filed?

6        A.   Yes.

7        Q.   What did you believe your contributions were

8    to those inventions?

9        A.   Helped build it together, the concept.

10       Q.   That would have been the genesis of that

11   November meeting that we talked about?

12       A.   That was the first time that we had

13   discussed the concepts, yes.

14       Q.   Then you developed it from that time to the

15   time the patent application was filed, at least?

16       A.   I had some input during that period.

17       Q.   During that entire period, the people that

18   you were working with, were employed, to your

19   knowledge, by Nexia, correct?

20       A.   Laurie Holtz was employed by -- I'm not

21   quite sure.  It certainly wasn't Nexia.

22       Q.   Other than Mr. Holtz, the people you worked

23   with on that project, were Nexia employees?

24

25            MS. HAVENER:   Objection.   Foundation.

1

2     A.   The white board discussions we had were

3     really about framing, how the product would be

4     taken to the market, because the personal financial

5     integrity and the algorithm was already there.  So

6     this was all about how we would develop the product

7     operationally.  So during that period, the people

8     who were working on it, were reporting to Ms.

9     Curry, the people in Richmond.  My input was

10    periodic.

11    Q.   It says paragraph 10 on or about October 3,

12    2005 I began working with Mirabilis in addition to

13    continuing my Axena duties.  What were your Axena

14    duties?

15    A.   Axena was still a business that was out

16    there in the market.  So the attraction for Axena

17    and for me of the deal again was that initially we

18    expected an internal market within Mirabilis for

19    Axena products.  Secondly, that as Mirabilis grew,

20    it recreated another market for the Axena products

21    so to help together develop Mirabilis, the

22    Mirabilis network and companies provided Axena for

23    a better vantage point of growing its own revenues.

24    Q.   So you continued to do work for Axena

25    separate from Mirabilis after 2005?

1      A.   It was all part and parcel of the same

2    objective, which was to create value for them all

3    around.

4      Q.  Was that consulting with third party

5    companies, i.e, not Mirabilis related companies?

6      A.  Yes.

7      Q.  So let's say you're consulting with Axena,

8    how did you bill your services for that time; to

9    Axena or to Mirabilis, Nexia, not Mirabilis?

10      A.  Number 1, it would be whatever I was

11    consulting on, so first was it an Axena product

12    that was pitched to a Axena client, it would have

13    been Axena.  If it was something that was not an

14    existing Axena product, that was using Nexia, it

15    would have been Nexia.

16        The major consulting assignment in this

17    period was a defense contractor for a major

18    government defense contract.  Clearly that wasn't

19    something that was a Axena product or used Axena

20    software.

21      Q.  Did you still have time to do Axena work at

22    this point?

23      A.  Axena was, you know, my company.  Anything I

24    did for Axena was for the benefit of the Mirabilis

25    network.  The only thing I did for Mirabilis was

1    hopefully to be a benefit for Axena that was the

2    thing that attracted me on this deal on both sides

3    was to hopefully generate business for the other

4    side.

5        Q.   Okay.

6        A.   The deal again included that Mirabilis would

7    get a share of software income and that Axena would

8    get a share of consulting income.

9        Q.   Paragraph 22, Mr. Amodeo often claimed

10   merely to be a consultant for Mirabilis.  Had you

11   heard him say those words?

12       A.   Yes.

13       Q.   Did you understand that to be his statement

14   on his position with the company?

15       A.   That is what he had claimed was his

16   position, yes.

17       Q.   It says in paragraph 27 on or about July

18   28th Edie Curry informed she had a discussion with

19   Frank Amodeo which referred to the Nexia

20   certification belonged to her.  Were you aware of

21   any issues on that point.

22       A.   No.  I think it was just the confirmation of

23   moving forward after there had been some

24   frustrations about moving this whole thing forward.

25       Q.   Exhibit B to your affidavit, which was

1    attached, is actually dated July 28, 2006.  I think

2    you heard Ms. Curry's testimony, correct, all the

3    words after the word date were inserted and some

4    before then by Mr. Amodeo.  Did you hear that

5    testimony yesterday?

6       A.   I herd the discussion.  I can't confirm to

7    the particulars, but I did hear the discussion

8    around it.

9       Q.   My question for you is, do you recall,

10   because your affidavit indicates a recollection of

11   a discussion with Ms. Curry at the time; do you

12   recall discussing this with her, the insertion of

13   that additional language?

14      A.   No.

15      Q.   Your affidavit indicates you reviewed the

16   document that he signed, the handwritten document?

17      A.   I saw it.

18      Q.   Right.  Did you note the difference in the

19   color of ink?  Did you see the original?

20      A.   I can't remember.  I saw it.  It must have

21   been the original.  I can't remember what color ink

22   it was.

23      Q.   Did you ever discuss with her what was meant

24   by that, it was assigned to her subject to

25   subsequent economic negotiations?

1      A.   Vaguely I remember -- I'm trying to

2   remember.

3      Q.   Go ahead and read it for yourself?

4      A.   I see that.

5      Q.   Did you ever discuss with Ms. Curry that?

6      A.   No.

7      Q.   Were you in the negotiations with her at the

8   time of her departure on behalf of Mirabilis?

9      A.   Correct.  I was one of three senior

10  executives, who were involved in discussions with

11  Ms. Curry regarding that.

12     Q.   I noted I didn't see many e-mails with her,

13  but you.  Was that your understanding of the line

14  of communication?

15     A.   I'm guessing you don't have all the e-mails,

16  because there are a number of them between Mr.

17  Holtz and Mr. Berman.  I think they're attached,

18  the e-mails to the affidavit.

19     Q.   Sure.  Let me look through my notes.

20

21

22                  (Recess taken).

23

24  BY MR. NORMAN:

25     Q.   A few more questions here.  Looking at this

1    document, this exhibit; where did you gain that

2    understanding?

3        A.   From discussions with Ms. Curry and I have

4    also seen an e-mail from Mr. Goldberg to Ms. Curry

5    with a draft assignment agreement, which confirmed

6    my understanding from our discussion.

7        Q.   Okay.  It says Frank Amodeo within a matter

8    of days; do you know how many days it was?  Do you

9    have any idea?

10       A.   No.  This is four years ago.  I can't recall

11   exactly, but pretty soon after.

12       Q.   Frank Amodeo personally instructed me to

13   sign.  Do you recall that?

14       A.   Yes, I do.

15       Q.   Who was present for that?

16       A.   It took place outside Mr. Amodeo's office.

17   He had a table outside of his office in the Sun

18   Trust building.  I was there.  Ms. Curry was there.

19   I think from memory Mr. Amodeo and Mr. Goldberg was

20   there.  From memory, I was speaking with Ms. Curry

21   and I think Mr. Amodeo went past and she grabbed

22   him and said here this is ready to sign.  He looked

23   through it and said he couldn't sign it.  He threw

24   it across the table and had me sign it.

25       Q.   Do you know if he had the authority as

1    director to sign --

2       A.   Mr. Amodeo was Mirabilis.

3       Q.   From your perspective?

4       A.   From everybody's perspective and from him;

5    it was his company, his money.

6       Q.   You never saw, for instance, a stock

7    certificate of the company?

8       A.   Which?

9       Q.   Any?

10      A.   Yes, I did.

11      Q.   Okay.   Which one did you see?

12

13           MS. HAVENER:   Objection.   Vague as to time.

14

15      Q.   When did you see a stock certificate?

16      A.   Sometime -- I'm guessing July or August.

17      Q.   July, August of 2006?

18      A.   Yes, believe so.

19      Q.   What did you see at that time?

20      A.   I saw -- indeed, I signed a number of them.

21   I was instructed to do so at one point in time.

22      Q.   Who instructed you to sign them?

23      A.   Came from Mr. Amodeo through Phil Kaprow,

24   who was one of the attorneys.

25      Q.   Who did they assign stock to?

1      A.   They were assigned on the basis -- I saw an

2    e-mail from, I think Mr. Amodeo and Mr. Sadrianna

3    deciding who the shareholder should be.   That was

4    the basis.

5      Q.   Do you understand the distinction between

6    voting shares and non-voting shares?

7      A.   I think so.

8      Q.   Do you know if these were voting shares or

9    non-voting share that you were signing?

10     A.   My understanding is that Mr. Amodeo had the

11    black shares, whatever it is, but he had the

12    overall authority over all the shares.

13     Q.   Where did you get that information from?

14     A.   A number of sources; one being Mr. Amodeo

15    telling everybody and the February 28th, I think,

16    telephone call meeting and the personal auditors

17    and the audit records.

18     Q.   Okay.   And based on that, you took his

19    authority to sign the document?

20     A.   Correct.

21     Q.   There was no other person there telling you

22    to do it at that time, the assignment?

23     A.   Mr. Kaprow was there.

24     Q.   Mr. Kaprow was there for the stock

25    certificates or the assignment?

1      A.   The assignment agreement.   I'm sorry.

2      Q.   Was Mr. Amodeo the only person there who

3   authorized you to sign the assignment agreement?

4      A.   Yes.

5      Q.   Page 10, paragraph 28; you indicate you

6   signed a written assignment transferring all your

7   rights, Nexia certification to Ms. Curry alone; is

8   that correct?

9      A.   That's what it says, yes.

10      Q.   Okay.   What consideration did you receive

11   for that?

12      A.   None.

13      Q.   Why did you not receive consideration for

14   it, do you know?

15      A.   Because of the interest of Mirabilis

16   network.   It was Axena -- another step forward in

17   creating the business, which I wanted to build.

18      Q.   Okay.

19      A.   And it become clear by this time that if

20   Nexia certification was going to, it had to be

21   outside of the Mirabilis network, because of Mr.

22   Amodeo's previous felony record, and in particular

23   by this stage, the targets being companies in the

24   finance sector, and no one would be associated with

25   an organization, which had someone in a senior

1       position with a criminal record.

2              It would have killed its thunder.  It

3       wouldn't have been a marketable product.  You also

4       have to understand, Todd, the assignment agreement

5       for the assignment, Mirabilis got the non-exclusive

6       license to Nexia certification.

7          Q.  Let's talk about that.  Let me see if you

8       understand it the way I understand it, which is

9       that a subset of what was given to her in that

10      assignment, you gave her the whole rights; she

11      gives back part of the rights?

12         A.  No.  She had it with the start of it.  She

13      earned it.

14         Q.  Why would she then have it assigned?

15         A.  She wanted to make it clear.

16         Q.  Who told you she owned it?

17         A.  She owned the algorithm.

18         Q.  Who told you she owned any or part of the

19      process that's being patented?  Who told you she

20      owned it?

21         A.  There was nothing without the algorithm.

22         Q.  But that is not --

23         A.  It's like a patent for wheels for a car,

24      when there's no car -- without the algorithm, there

25      was nothing much of any great value.  The whole

1    thing is premised on the fact that the algorithm

2    was the whole thing.

3        Q.   I understand that.  My question is, why

4    would they assign to her anything at that point?

5        A.   It was an important step in creating the

6    business environment to take Nexia certification

7    and the other products forward.

8        Q.   What was your understanding, other than the

9    license, that they give back to her consideration

10   for receiving the assignment?

11       A.   The question again.

12       Q.   Did she give any consideration for this

13   assignment, to your knowledge, other than giving

14   the license back?

15       A.   I don't recall.

16       Q.   You're not aware of any?

17       A.   Is the question am I clear of anything else

18   Ms. Curry gave up in order to get the assignment?

19       Q.   Yes.

20       A.   Off the top of my head, I can't recall at

21   this stage.

22       Q.   Sure.  You recognize, don't you, that the

23   license is part of the assignment that was given in

24   this, that license is a part of the assignment she

25   was given in this document?

1      A.   I'm not clear on what you're asking.  Sorry.

2      Q.   It's like me giving you a hundred dollars

3  and you giving me a dollar back.  That is a subset

4  of --

5

6           MS. HAVENER:   Objection.  That's a

7  mischaracterization of the witness's testimony as

8  well as the process and the license.

9

10     A.   I think there's bit of a misunderstanding

11 here, Todd.  She had the money to start with.

12     Q.   Well, that begs the question of why would

13 you do that?  It makes no sense.

14     A.   The circumstances.

15     Q.   How did it make any sense to assign her

16 something she already owned?

17     A.   My understanding is she felt the need to

18 memorialize the fact of the ownership of it.

19     Q.   So this wasn't a transaction, but

20 memorializing something she understood?

21

22           MS. HAVENER:   Objection.

23 Mischaracterization of testimony.

24

25     Q.   You can answer the question still.

1        A.   Repeat it, please.

2        Q.   Was this simply memorializing of what she

3   already understood, to your knowledge?

4

5        MS. HAVENER:   Same objection.

6

7        A.   The assignment agreement assigns the rights

8   to and in return Mirabilis got the notes, because

9   of the use of the license, et cetera, yeah.   At

10  least, that's my understanding of the deal.

11       Q.   Did you ever discuss with anyone whether

12  there was fair compensation for this agreement?

13

14       MS. HAVENER:   Objection.   Mr. Hailstones is

15  not an attorney.

16       MS. NORMAN:   I just asked him if he

17  discussed it with anyone.

18

19       A.   Mr. Amodeo was happy with it.

20       Q.   Right, but you didn't -- you had no

21  discussion with him, like are you getting anything

22  for this; he just told you to sign it?

23       A.   Right.

24       Q.   That's all the conversation you can recall?

25       A.   Just for me to sign it.   That's the essence

1    of it.

2         Q.  You can't recall anything else from that?

3         A.  From that conversation?

4         Q.  Yes.

5         A.  Like I said, that's the essence of it.  I

6    can't recall it word for word.

7         Q.  You can't recall it better than that?  I

8    just don't want to hear a different version of it

9    at a different time, is all.

10        A.  Okay.  Again, my recollection of it, at that

11   point in time, is -- and I'm paraphrasing -- that

12   he was happy with it and I had to sign it, because

13   he couldn't.

14        Q.  That's all you can recall from that

15   conversation?

16        A.  At this point in time, that's all I can

17   recall now, Todd.

18        Q.  You said you have assisted Palaxar since

19   leaving Mirabilis; how have you assisted Palaxar

20   since leaving Mirabilis?

21

22             MS. HAVENER:  Objection.

23

24        A.  Paragraph 31 there references a discussion

25   of my response this morning following my departure

1    from the Mirabilis network subsequent discussions

2    with Ms. Curry about how we might work together in

3    some shape or form benefit both to generate income.

4         Q.  My question is, how have you helped Palaxar?

5         A.  Again, reference my response this morning,

6    in starting to develop new products, like I think I

7    mentioned this morning, insurance fraud.

8         Q.  You've brainstormed or white boarded that

9    concept with her; is that what you're describing?

10

11         MS. HAVENER:  Objection.

12

13         A.  We communicated, yes.

14         Q.  Turning to paragraph 33 it says I have

15    assisted Ms. Curry from time to time in helping

16    Palaxar Holdings get off the ground.  What are you

17    trying to describe in that answer?  How did you

18    help them get off the ground?

19         A.  We discussed the terms of trying to put work

20    -- what the product might look like in insurance

21    fraud.  Again, so it's clear, the Palaxar business

22    wasn't just going to be relying on Nexia

23    certification.  It was a website where you had a

24    number of other products on there that were

25    developed after both Ms. Curry and I left.

1    Q.   So there's other products you developed with

2    Ms. Curry?

3    A.   I had some input into it, yes.

4    Q.   You discussed attempting to market the Nexia

5    certification -- your intention to market the Nexia

6    certification in Europe; do you recall that

7    discussion?

8    A.   Yes.

9    Q.   Have you paid Ms. Curry anything for the

10   right to attempt to market there?

11   A.   No.

12   Q.   She gave you that ability without payment?

13   A.   It's in everybody's interest, for Ms. Curry,

14   my interest, Mr. Chu's interest, if we were able to

15   generate any client opportunities that generated

16   revenue.   The assignment agreement; let me say how

17   important it was for Mirabilis, the consulting

18   business, and Nexia, for Nexia certification be

19   available.

20        There were a number of different links of

21   the business development and the business model

22   that were premised upon, like bringing in the

23   consulting business, I mentioned, Axena, Fox, et

24   cetera.

25   Q.   It says end of paragraph 38 talking about

1    the separation agreement, the terms were approved

2    by Frank Amodeo; is that actually correct?

3        A.   Yes.

4        Q.   So Mr. Amodeo was the one that gave final

5    approval of the separation agreement?

6        A.   Yes.

7

8        MS. HAVENER:   For clarification purposes;

9    are you suggesting that Mr. Amodeo didn't have any

10   input into the terms before it was finished?

11       MR. NORMAN:   No, I'm not.

12

13       A.   Just on that point, I think this was touched

14   on yesterday, Todd, but there are two e-mails from

15   Mr. Berman and, I believe general counsel, saying

16   that he thought this was a fair agreement.

17       Q.   Do you know if he was relying upon anything?

18   Did he make any independent determination of the

19   situation, to your knowledge?

20

21       MS. HAVENER:   Objection.

22

23       A.   That's something you would have to ask Mr.

24   Berman.

25       Q.   He may have been relying on your

1    information, knowledge of the economic situation,

2    correct, you provided yours to him?

3

4          MS. HAVENER: Objection. Speculation.

5

6      Q. Did you provide -- I've seen your e-mail

7    that says here's how I calculate the amount.

8      A. Yeah.

9      Q. Okay.

10      A. Also, see in the first two or three

11    paragraphs that say we have got to fix this and

12    reach an agreement, because without this, without

13    Ms. Curry's participation, the investment today

14    will have been lost and wasted.

15      Q. None of those were ever realized by Nexia or

16    Mirabilis, correct?

17      A. Well, Mirabilis pulled the plug on Nexia,

18    fired them, closed down the business. So it was

19    rather difficult to realize any benefits under

20    those circumstances.

21      Q. Other than your calculation of the economic

22    situation; are you aware of anyone at Mirabilis or

23    Nexia who did a calculation of that?

24      A. You produced a document schedule from Jodi

25    Jaiman. It was, again, after the event that

1    included costs that were never incurred.

2        Q.   Other than that, are you aware of any?

3        A.   As part of the dialogue back and forth, Ms.

4    Curry had constructed a calculation.  I think, from

5    memory, her figure was something like three forty.

6        Q.   Okay.

7        A.   I listed my views on how much it could have

8    cost at the top, which I thought was six hundred

9    thousand and suggested five hundred thousand was a

10   reasonable figure in terms of cost.

11       Now, we had covered the part in terms of

12   value.  Value was to be the back end through of

13   this; development of the relationship with Ms.

14   Curry and the consulting opportunities that it

15   would generate for Mirabilis network.

16       Q.   With the understanding that Jodi, sometime

17   later; there are no calculations of the value,

18   other than yours and Ms. Curry, that you're aware

19   of; is that correct?

20

21       MS. HAVENER:   Objection.

22

23       A.   There's no -- I'm not aware of any, no.

24       Q.   You're not aware of any cost, other than

25   yours and Ms. Curry's at the time this was done?

1    A.   This is not a sophisticated product where

2    there are -- it was people based essentially with

3    some legal fees.

4    Q.   My question is, are you aware of any other

5    calculations of cost?

6    A.   Everybody knew the people who were working

7    on it.   We took all the --

8    Q.   When you say we, you mean you?

9    A.   Let me finish here, please.   You'll see that

10   e-mail was addressed to Mr. Holtz and Mr. Berman.

11   So they had the opportunity, if they wished to

12   contribute or to challenge, which they didn't.

13   Q.   Do you know of anyone who actually did?

14   A.   Not to my knowledge.

15   Q.   As to value, are you aware of anyone who

16   made an analysis of that, other than you?

17   A.   Well, again, there was other people; Mr.

18   Holtz and Mr. Berman, for example, in a value

19   proposition, overall, Nexia to bring in the new

20   consulting business, the opportunities it would

21   generate.   So part of that calculation is premised

22   on the fact that Nexia certification was an

23   important part of it.

24   Q.   Did they share with you a value different

25   than yours?

1    A.    Not as I recall.

2    Q.    Turning to your Exhibit E; to be clear,

3    you've never seen a copy, separation agreement

4    except for that?

5    A.    No.

6    Q.    You refer to, which I assume to be the

7    draft, a document marked draft separtion agreement?

8    A.    I would presume that.

9    Q.    I understand it was an agreed position, but

10   was not formalized further.  So in that e-mail it

11   recognizes that it was initially in draft; is that

12   correct?

13   A.    Mr. Berman in the e-mail above is indicating

14   that it didn't make any difference, that it didn't

15   change the fact that it was a bona fide agreement.

16   Q.    I understand that's your position.  You had

17   some belief it would be formalized further?

18

19        MS. HAVENER:   Objection.

20

21   A.    My recollection of making that statement was

22   that that was the draft that was signed with the

23   last document.

24   Q.    Did you believe it would be formalized

25   further?

1      A.   I would have expected it to have been.   I

2   think I would have expected a document, but Mr.

3   Berman's advice was that it wasn't required and I'm

4   not an attorney, so.

5      Q.   Okay.   I think I'm done. Thank you.   I told

6   you that you wouldn't be as long as Ms. Curry.

7      A.   Close, though.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E   O F   O A T H

2

3    **STATE OF FLORIDA )**

4    **COUNTY OF ORANGE )**

5

6       I, Dawn Roscher, being a Notary Public, State of

7    Florida at Large, do hereby certify that **FRANK**

8    **HAILSTONES**, personally appeared before me and was duly

9    sworn.

10

11       Witness my hand and official seal this 11th day

12    of February, 2010.

13

14

15

16       _____

17       Court Reporter

18       Notary Public, State of FL

19       Notary Comm. No. DD0702693

20       Comm. Expires: 08-06-2011

21

22

23

24

25

1          **C E R T I F I C A T E**

2

3     STATE OF FLORIDA   )

4     COUNTY OF ORANGE   )

5

6          I, Dawn Roscher, certify that I was

7     authorized to and did stenographically report the

8     deposition of **FRANK HAILSTONES**; that a review of

9     transcript WAS NOT requested; and that the

10    transcript is a true and complete record of my

11    stenographic notes.

12          I further certify that I am not a relative,

13    employee, attorney, or counsel of any of the

14    parties, nor am I a relative or employee of any of

15    the parties' attorney or counsel connected with the

16    action, nor am I financially interested in the

17    action

18          DATED this 11th day of February, 2010.

19

20

21     _____

22          Dawn Roscher

23

24

25

**0**

08-06-2011 - 115:20

**1**

1 - 34:7, 56:25, 94:10
1.2 - 79:6
10 - 9:16, 9:23, 93:11, 101:5
11th - 115:11, 116:18
13 - 2:10
1400 - 2:11, 3:4
15511 - 3:9
16 - 21:10
19th - 75:5

**2**

2 - 33:25, 34:5, 45:11, 57:1
20 - 67:20
2002 - 32:1, 32:3, 49:23
2004 - 68:13
2005 - 36:14, 39:5, 39:10, 41:2, 42:24, 48:11, 48:16, 58:25, 63:16, 68:6, 67:20, 93:12, 93:25
2006 - 23:7, 23:13, 23:16, 25:20, 71:14, 75:4, 76:3, 77:12, 77:15, 77:23, 78:6, 78:11, 78:18, 84:25, 86:14, 98:1, 99:17
2007 - 8:13, 8:18, 9:3, 9:4, 16:9, 21:10, 27:16, 31:15, 31:20, 32:3, 32:22
2008 - 6:3, 6:4, 7:2, 7:22, 7:24, 8:3, 8:8, 9:1
2008,9 - 6:24
2009 - 7:22, 7:23, 7:25, 8:3
2010 - 2:10, 115:12, 116:18
21 - 87:3
22 - 95:9
22nd - 69:5
27 - 95:17
28 - 96:1, 101:5
28th - 95:18, 100:15
2a - 53:24
2b - 55:6

**3**

3 - 41:2, 45:13, 57:2, 93:11
31 - 106:24
32801 - 3:4
33 - 107:14
38 - 108:25
390 - 2:10, 3:3
3:40 - 2:10
3rd - 61:8

**4**

4 - 87:10, 88:18
440022 - 3:9

**5**

5 - 4:5

**58** - 9:8, 9:12
**58-65** - 4:14
**59** - 15:14, 15:17

**6**

60 - 16:25, 17:4
61 - 33:5, 33:9, 42:4, 42:15, 53:24
62 - 39:13
64 - 63:7, 63:10, 68:13, 68:15
65 - 43:17, 43:21, 86:21, 86:25, 87:7
6:07-cv-1788-orl-28 -krs - 1:4

**9**

9:00 - 2:9

**A**

A/k/a - 1:13
Aaron - 1:22
Abicorn - 9:16, 9:23
ability - 19:15, 19:23, 20:1, 20:18, 71:16, 108:12
able - 11:1, 12:7, 18:11, 28:19, 53:23, 67:15, 72:16, 73:21, 80:11, 88:4, 88:25, 89:1, 108:14
acceptable - 80:18
access - 34:8, 43:8, 48:9
account - 18:7, 30:24
accounting - 41:22, 84:5
achieving - 37:16
acquiring - 84:9
acquisitions - 65:13
action - 116:16, 116:17
activity - 76:18
Ada- 6:13, 6:16
addition - 43:7, 50:9, 56:15, 59:23, 93:12
additional - 55:17, 56:11, 96:13
address - 9:16, 9:17, 9:19, 9:23, 15:22, 31:2
addressed - 112:10
addresses - 30:22, 30:23
adhere - 38:9, 38:10
adherence - 38:9
administration - 35:18, 38:7
administrative - 88:8
advantage - 10:25, 18:5, 36:9, 88:25
advice - 114:3
advised - 52:9, 54:21, 84:4
affidavit - 87:1, 95:25, 96:10, 96:15, 97:18
afforded - 24:4
afraid - 14:5
Africa- 87:24
agency - 71:20
ago - 42:3, 46:6, 46:7, 47:24, 98:10

agreed - 33:19, 113:9
agreement - 11:2, 18:24, 19:5, 22:20, 24:4, 25:20, 33:18, 40:8, 42:1, 42:2, 42:6, 42:7, 46:14, 54:3, 54:6, 58:18, 79:23, 80:10, 81:19, 82:16, 82:24, 98:5, 101:1, 101:3, 102:4, 105:7, 105:12, 108:16, 109:1, 109:5, 109:16, 110:12, 113:3, 113:7, 113:15
agreements - 33:23
ahead - 76:15, 84:20, 97:3
airport - 66:11
algorithm - 14:8
algorithm - 14:4, 14:7, 81:15, 81:16, 93:5, 102:17, 102:21, 102:24, 103:1
algorithms - 14:14
aliases - 31:2
allowed - 90:17
alone - 101:7
alternatively - 37:18
altogether - 81:18
Amar - 1:21
American - 34:13
Amodeo - 1:21, 25:1, 25:12, 25:20, 26:23, 35:2, 52:9, 59:5, 59:21, 61:5, 61:17, 61:19, 62:4, 62:13, 63:22, 64:18, 67:23, 79:18, 81:10, 85:24, 95:9, 95:19, 96:4, 98:7, 98:12, 98:19, 98:21, 99:2, 99:23, 100:2, 100:10, 100:14, 101:2, 105:19, 109:2, 109:4, 109:9
Amodeo's- 84:3, 98:16, 101:22
amount - 41:16, 80:7, 85:14, 110:7
analysis - 65:11, 112:16
answer - 18:1, 22:13, 38:3, 46:11, 104:25, 107:17
answering - 44:17
anti - 17:16, 67:5, 67:8, 67:12
anti-fraud - 17:6, 67:5, 67:8
anytime - 80:12
appear - 44:21, 45:17, 46:16, 46:17, 46:20, 85:15
appeared - 115:8
application - 13:16, 92:15
applications - 13:3, 13:6, 13:13, 92:4, 92:5
apply - 18:6
appreciate - 74:2
appropriate - 79:20
approval - 109:5
approved - 109:1
area - 15:7, 20:12, 29:16, 30:7, 38:24, 62:15, 67:4, 71:1, 88:10

areas - 18:10, 27:19, 29:5, 29:9, 34:23, 38:7, 38:8, 55:16, 57:2, 65:20, 66:21, 70:3, 88:1, 88:14, 88:15
arise - 32:13, 88:13
arose - 56:18
arrangements - 25:6
articulate - 73:21
aside - 14:8
assign - 99:25, 103:4, 104:15
assigned - 96:24, 100:1, 102:14
assignment - 94:16, 98:5, 100:22, 100:25, 101:1, 101:3, 101:6, 102:4, 102:25, 102:10, 103:10, 103:13, 103:18, 103:23, 103:24, 105:7, 108:16
assigns - 105:7
assistants - 86:8
assisted - 106:18, 106:19, 107:15
associate - 59:6
associated - 101:24
assume - 6:17, 24:8, 47:10, 69:4, 90:10, 113:6
assumed - 47:14, 47:15
assumption - 88:20
attached - 82:23, 96:1, 97:17
attempt - 80:17, 89:7, 90:16, 108:10
attempted - 8:17, 8:20
attempting - 108:4
attempts - 26:17
attended - 67:23
attorney - 59:12, 90:9, 105:15, 114:4, 116:13, 116:15
attorneys - 87:8, 99:24
attract - 91:4
attracted - 95:2
attraction - 36:2, 93:16
audit - 100:17
auditors - 100:16
August - 58:24, 99:16, 99:17
authored - 68:17
authority - 98:25, 100:12, 100:19
authorized - 101:3, 116:7
available - 32:11, 43:4, 50:8, 64:3, 66:18, 108:19
Avenue - 2:11, 3:4
aware - 13:12, 17:19, 18:3, 64:8, 64:9, 67:17, 67:21, 68:4, 87:14, 91:12, 95:20, 103:16, 110:22, 111:2, 111:18, 111:23, 111:24, 112:4, 112:15
Axena- 31:16, 31:19, 31:23, 32:5, 32:6, 32:10, 32:14, 32:18, 32:19, 33:20, 33:23, 33:24, 34:3, 34:18, 34:22, 35:4,

35:6, 36:11, 36:15, 36:16, 36:19, 36:22, 37:4, 37:22, 38:20, 38:23, 39:1, 39:9, 40:2, 40:4, 40:22, 40:25, 41:3, 41:6, 41:14, 41:15, 41:17, 41:23, 41:25, 42:8, 42:11, 42:14, 42:23, 43:5, 43:8, 43:9, 43:11, 49:23, 50:4, 50:5, 50:10, 50:16, 51:23, 52:17, 53:8, 53:9, 53:10, 53:12, 53:15, 53:18, 53:21, 54:12, 54:23, 55:1, 55:9, 55:15, 55:18, 56:2, 56:7, 56:13, 56:22, 57:6, 58:10, 58:14, 59:1, 59:6, 59:9, 60:13, 61:9, 62:18, 66:21, 70:5, 93:13, 93:15, 93:16, 93:19, 93:20, 93:22, 93:24, 94:7, 94:9, 94:11, 94:12, 94:13, 94:14, 94:19, 94:21, 94:23, 94:24, 95:1, 95:7, 101:16, 108:23
Axena-ware- 36:11, 36:15, 36:19, 36:22, 38:23, 62:18

**B**

background - 28:18, 37:21, 49:13, 60:25, 66:22, 67:10, 72:9, 74:3
ballpark - 81:8
bank - 18:7, 30:24
bar - 69:18
base - 28:15, 34:23, 37:24, 53:11, 53:22, 55:3, 55:16
Based - 62:14
based - 12:6, 36:23, 38:22, 66:21, 73:13, 79:8, 100:18, 112:2
basis - 33:25, 34:9, 42:14, 42:15, 81:1, 85:7, 100:1, 100:4
Bates - 1:22
bearing - 13:4
became - 83:20, 85:10
become - 66:1, 70:14, 71:12, 101:19
becoming - 34:20, 39:7
began - 93:12
beginning - 2:9, 64:24
begs - 104:12
behalf - 3:10, 26:19, 33:20, 49:22, 51:9, 80:6, 97:8
behaviors - 14:14, 31:7
behind - 14:2
belief - 113:17
belonged - 95:20
benefit - 22:24, 32:16, 40:24, 50:13, 50:15, 50:16, 50:23, 51:23, 55:4, 94:24, 95:1, 107:3
benefits - 35:17, 36:5, 38:7, 43:11, 58:17, 110:19

Berman - 79:19,
97:17, 109:15,
109:24, 112:10,
112:18, 113:13
Berman's - 114:3
best - 21:4, 21:9,
27:8, 37:19, 57:9,
77:14, 80:7, 80:20,
81:13
better - 36:7, 52:6,
58:4, 84:11, 93:23,
106:7
between - 32:3,
33:23, 41:24, 42:10,
51:13, 58:21, 67:11,
75:25, 80:18, 82:18,
97:16, 100:5
beyond - 35:16
Bgs - 5:25, 6:8,
6:25, 7:23, 7:24
big - 53:17, 81:7,
86:17
biggest - 27:9
Bill - 3:13
bill - 94:8
biography - 91:8
birthday - 68:11
bit - 39:25, 104:10
black - 100:11
blew - 85:20
blog - 89:14, 90:5
blogs - 89:12
board - 24:21, 53:8,
54:24, 55:1, 76:21,
77:1, 77:3, 77:16,
93:2
boarded - 107:8
bodies - 75:20
bona - 113:15
bonus - 85:14
bookkeeping -
41:19, 51:12
books - 51:3
bound - 48:22,
49:12
brainstormed -
107:8
breakdown - 81:25
brief - 62:9
bring - 10:20, 61:1,
112:19
bringing - 76:23,
108:22
Broad - 3:3, 37:17,
37:19, 57:20
broad - 14:17, 62:9
broaden - 55:15
broader - 37:24
Broadhead - 1:13
brought - 84:6, 85:5
build - 25:21, 25:25,
79:14, 85:1, 92:9,
101:17
building - 6:19,
98:18
business - 7:8,
9:17, 9:24, 9:25, 10:1,
10:16, 10:19, 10:20,
10:21, 11:12, 11:14,
11:17, 11:18, 11:22,
18:23, 18:25, 21:21,
25:21, 27:23, 28:3,
28:5, 34:21, 37:17,
37:20, 43:11, 50:10,
52:11, 52:13, 57:7,
57:16, 57:19, 58:5,
58:8, 58:10, 61:18,
61:20, 61:21, 62:10,
62:12, 63:2, 63:24,
64:11, 64:17, 65:2,

65:5, 65:16, 65:19,
67:25, 68:17, 68:18,
68:22, 74:8, 78:18,
78:21, 83:23, 84:1,
84:8, 84:9, 88:2,
88:20, 93:15, 95:3,
101:17, 103:6,
107:21, 108:18,
108:21, 108:23,
110:18, 112:20
businesses - 8:24,
25:23, 57:22, 84:13,
88:19

## C

calculate - 110:7
calculated - 81:25
calculating - 81:3
calculation - 79:8,
79:16, 110:21,
110:23, 111:4, 112:21
calculations -
111:17, 112:5
California - 71:20,
72:3
canned - 26:12
cannot - 56:23
capabilities - 66:17
capability - 18:9
capacity - 25:25
Capital - 1:20
car - 102:23, 102:24
career - 78:7
careful - 13:17
Case - 1:4
case - 23:8, 89:1
cash - 43:2, 55:21
Cassel - 3:3, 37:19,
57:20
Cassel's - 37:17
catch - 61:20
categories - 7:7
center - 67:25
Ceo - 84:4, 85:11
certain - 6:17, 13:3,
14:3, 14:13, 30:12,
44:12, 67:11, 80:4,
91:8
certainly - 76:21,
80:4, 92:21
certificate - 99:7,
99:15
certificates - 100:25
certification -
12:10, 12:21, 12:22,
12:25, 13:7, 13:13,
13:18, 14:18, 29:17,
29:20, 30:4, 65:22,
66:2, 66:4, 70:9,
70:14, 71:12, 72:4,
72:25, 76:19, 77:6,
77:18, 81:18, 86:15,
86:18, 89:5, 95:20,
101:7, 101:20, 102:6,
103:6, 107:23, 108:5,
108:6, 108:18, 112:22
certify - 115:7,
116:6, 116:12
cetera - 35:18, 60:2,
67:1, 68:1, 77:22,
80:15, 105:9, 108:24
ceteral - 27:20
Chagrin - 3:9
chairman - 25:1,
25:9
challenge - 112:12
change - 11:25,
22:16, 52:20, 85:4,
85:5, 85:10, 85:12,

85:13, 85:14, 113:15
changed - 10:14,
41:18, 42:13, 42:18,
52:21, 61:13, 61:14,
85:6
charge - 51:11
charged - 51:2
check - 34:9, 34:12,
41:20, 50:20, 50:24
Chu - 1:14, 20:7
Chu's - 108:14
circles - 70:4
circumstances -
46:12, 104:14, 110:20
claim - 36:5
claimed - 95:9,
95:15
claims - 15:3,
15:11, 30:7, 30:23,
30:24
clarification -
29:11, 109:8
clarify - 59:7, 91:25
clarity - 70:8
classify - 72:13
clear - 65:4, 69:16,
83:20, 101:19,
102:15, 103:17,
104:1, 107:21, 113:2
clearance - 72:15,
72:18, 74:13
Clearly - 94:18
clearly - 11:18,
26:17, 49:14, 98:20
client - 19:13,
20:10, 24:11, 28:15,
49:14, 53:11, 53:22,
55:3, 94:12, 108:15
clients - 11:9, 19:4,
24:9, 62:25, 63:4,
88:15
close - 26:2, 26:13,
66:11
Close - 9:16, 114:7
closed - 110:18
closest - 27:9
co - 22:21, 24:17,
91:13, 91:16
co-develop - 22:21
co-founder - 91:13,
91:16
co-represent -
24:17
codes - 49:1
color - 66:25, 96:19,
96:21
combined - 86:19
coming - 20:22,
25:5
Comm - 115:19,
115:20
commenting -
33:25
comments - 60:21
commercial - 75:17
commercialize -
71:17
Common - 32:24,
32:25, 33:2, 39:4,
39:24, 40:11, 40:13,
41:4, 41:6, 41:8, 45:2,
47:3, 47:21, 48:6,
48:24, 50:25, 51:8,
51:13
common - 12:15,
13:21, 25:7, 42:12,
54:17, 67:14, 67:15
communicated -
107:13
communication -

97:14
companies - 8:24,
15:2, 26:1, 43:5, 53:7,
53:16, 54:11, 54:21,
58:7, 63:1, 72:2,
83:21, 84:10, 84:18,
93:22, 94:5, 101:23
company - 5:22,
6:2, 6:3, 7:11, 7:12,
9:1, 9:20, 9:21, 10:4,
10:10, 10:13, 10:22,
11:3, 11:13, 15:5,
16:7, 17:19, 19:1,
19:15, 19:23, 20:1,
20:4, 21:6, 21:18,
21:21, 27:10, 27:14,
27:15, 27:17, 31:14,
34:8, 52:23, 53:25,
54:23, 55:23, 82:3,
82:20, 82:22, 86:7,
90:19, 91:2, 91:3,
94:23, 95:14, 99:5,
99:7
compare - 45:22
compensation -
85:7, 105:12
competencies -
66:17
competitive - 65:12
competitor - 56:25
complete - 116:10
compliance - 6:12,
34:4
comply - 6:14,
48:25, 49:4
concept - 14:2,
70:9, 71:11, 73:23,
75:21, 77:8, 77:21,
92:9, 107:9
concepts - 75:17,
76:11, 92:13
conceptually -
38:14, 65:20
concern - 18:9,
84:19
conclude - 51:10
concluding - 2:10
conduct - 7:8
conference - 69:17,
91:4
confidential - 49:6
confidentiality -
49:15
confirm - 61:7, 96:6
confirmation -
95:22
confirmed - 98:5
connected - 90:1,
116:15
connection - 59:8,
72:10
consequently -
51:10
consider - 30:13
considerable -
75:14
consideration -
101:10, 101:13,
103:9, 103:12
consistent - 34:4,
66:4
constant - 57:5
construct - 12:7
constructed - 111:4
consult - 5:19
consultant - 5:17,
95:10
consultants - 6:15
consulting - 6:7,
6:9, 6:10, 6:12, 6:20,

7:19, 8:14, 25:21,
25:22, 25:25, 34:21,
52:11, 52:12, 58:20,
61:18, 61:20, 62:7,
62:10, 62:12, 62:21,
63:24, 64:4, 64:5,
64:11, 64:19, 66:15,
68:22, 83:23, 94:4,
94:7, 94:11, 94:16,
95:8, 108:17, 108:23,
111:14, 112:20
contact - 17:20,
22:1, 22:8, 22:12,
22:18, 23:18, 23:25,
24:2, 91:2
contacted - 18:17,
21:17, 64:7
contemplated -
58:21
contents - 38:17
context - 12:24,
13:18, 18:8, 25:16,
26:16, 26:22, 31:7,
33:21, 34:7, 37:20,
38:4, 59:4, 63:21,
63:22, 66:15
continuation -
77:23
continue - 26:9,
50:6
continued - 93:24
continuing - 93:13
contract - 41:24,
60:23, 94:18
contractor - 94:17
contractual - 59:21
contribute - 36:25,
112:12
contributed - 37:12,
75:22
contributing -
85:23
contribution -
10:15, 10:21
contributions -
92:7
contributor - 89:17
control - 38:13,
38:15, 53:21, 55:14
controls - 37:2,
37:10, 38:10, 38:15,
55:13
conversation -
67:6, 72:6, 74:7,
105:24, 106:3, 106:15
conversations -
28:8, 28:11, 68:23,
73:14, 79:18, 80:5
copies - 86:4
copy - 113:3
corporation - 5:19,
9:13
Corporation - 1:7,
1:18, 1:19
correct - 9:4, 16:20,
24:6, 60:16, 74:5,
80:8, 82:25, 87:15,
91:16, 91:18, 92:19,
96:2, 101:8, 109:2,
110:2, 110:16,
111:19, 113:12
Correct - 8:5, 16:23,
23:14, 24:7, 36:12,
42:17, 43:15, 46:5,
50:21, 51:15, 56:14,
59:3, 61:23, 65:4,
97:9, 100:20
correctly - 14:1,
23:12, 30:12, 47:15,
57:25, 61:20, 75:24,

82:16
  cost - 41:1, 79:3,
  79:4, 79:21, 81:8,
  111:8, 111:10,
  111:24, 112:5
  costs - 43:8, 43:13,
  111:1
  counsel - 109:15,
  116:13, 116:15
  Counsel- 4:15
  County- 115:4,
  116:4
  couple - 49:17, 54:9
  course - 25:19,
  26:20, 66:19, 67:6,
  80:24, 90:24
  Court- 1:1, 115:17
  covered - 111:11
  covering - 65:20
  create - 38:22,
  50:10, 56:4, 56:10,
  57:21, 67:15, 67:24,
  94:2
  created - 24:15,
  39:22, 72:20
  creating - 21:6,
  56:6, 56:16, 58:8,
  79:14, 101:17, 103:5
  credibility - 25:23
  crime - 27:19
  criminal - 102:1
  critical - 25:16
  crystalized - 19:12
  curious - 26:20
  Curry- 1:12, 3:10,
  3:14, 10:3, 10:25,
  12:1, 12:13, 12:18,
  14:6, 15:5, 20:7,
  20:12, 20:22, 21:5,
  22:2, 22:8, 22:18,
  22:23, 23:6, 24:15,
  24:16, 24:18, 29:19,
  30:9, 58:22, 58:23,
  59:22, 60:10, 60:24,
  61:4, 62:1, 62:3,
  63:17, 64:7, 64:14,
  65:21, 66:3, 66:10,
  66:12, 67:3, 67:8,
  68:7, 68:18, 68:23,
  69:8, 69:15, 70:25,
  71:14, 71:21, 72:7,
  72:14, 73:15, 74:4,
  74:17, 75:25, 76:14,
  76:22, 78:3, 79:10,
  79:15, 79:22, 80:12,
  80:14, 81:11, 82:2,
  83:25, 86:9, 88:17,
  93:9, 95:18, 96:11,
  97:5, 97:11, 98:3,
  98:4, 98:18, 98:20,
  101:7, 103:18, 107:2,
  107:15, 107:25,
  108:2, 108:9, 108:13,
  111:4, 111:14,
  111:18, 114:6
  Curry's- 22:19,
  24:3, 67:9, 75:12,
  86:14, 88:20, 89:13,
  96:2, 110:13, 111:25
  cut - 50:19, 50:20,
  50:24
  Cuthill- 3:13

**D**

  data - 27:20, 30:17,
  30:20, 31:3, 75:19
  date - 8:19, 21:11,
  41:2, 44:21, 45:4,
  46:20, 61:8, 61:9,

67:19, 96:3
  dated - 45:4, 96:1
  Dated - 116:18
  Dawn - 2:12, 115:6,
  116:6, 116:21
  days - 48:17, 74:4,
  98:8
  Days - 21:16
  Dc - 71:1, 71:4
  Dd0702693 - 115:19
  deal - 32:9, 40:3,
  41:8, 41:23, 50:7,
  53:6, 58:18, 59:8,
  59:21, 60:20, 60:21,
  93:17, 95:2, 95:6,
  105:10
  dealings - 36:24
  dealt - 47:22
  December - 23:6,
  23:16, 83:25
  deciding - 100:3
  decision - 23:7,
  26:8, 26:10
  decisions - 75:22,
  76:14
  defamation - 90:8
  Defendants - 1:15
  defense - 94:17,
  94:18
  define - 12:14, 13:6,
  22:13
  Define- 22:6
  defined - 12:2,
  62:23
  definition - 13:21,
  13:22, 13:23, 23:24
  deliver - 18:9,
  18:16, 20:23, 23:9,
  25:25
  demanded - 81:23
  Dement - 66:10,
  66:13, 67:3, 67:8,
  68:8, 69:7, 69:16,
  70:25, 73:15, 74:17
  departure - 86:14,
  97:8, 106:25
  depended - 20:2,
  20:9
  Deposition - 2:4
  deposition - 9:12,
  12:10, 15:18, 43:21,
  63:10, 116:8
  Describe- 14:10,
  27:13, 28:11, 35:14,
  51:1
  describe - 28:12,
  42:21, 49:16, 66:9,
  69:21, 73:9, 107:17
  described - 12:13,
  13:5, 16:19, 19:24,
  23:2, 26:23, 30:9,
  37:25, 42:19, 43:14,
  50:19, 51:22, 54:1,
  54:5, 57:15, 72:25,
  83:11
  describing - 6:11,
  17:21, 29:17, 30:14,
  30:18, 51:12, 54:4,
  107:9
  description - 85:12
  design - 38:4
  designation -
  18:16, 16:18
  destroy - 82:1
  detail - 40:1
  detecting - 30:9
  detection - 15:10,
  29:4, 29:8, 29:14
  determination -
  79:1, 79:3, 109:18

determine - 14:4,
  14:15, 30:17, 79:24,
  80:25
  deterrence - 29:14,
  68:3
  develop - 11:1,
  22:21, 24:3, 24:16,
  28:20, 32:12, 34:3,
  35:5, 38:22, 42:12,
  55:23, 56:1, 57:24,
  58:1, 64:17, 68:21,
  70:11, 88:25, 89:1,
  89:2, 93:6, 93:21,
  107:6
  developed - 34:18,
  55:18, 58:15, 73:13,
  92:14, 107:25, 108:1
  Developing- 61:21,
  61:22, 73:7
  developing - 15:1,
  28:22, 43:5, 52:12,
  58:6, 58:8, 61:17,
  62:10, 66:20, 73:19,
  74:7, 74:9, 76:16,
  76:18, 81:17
  development -
  25:17, 57:5, 57:16,
  57:19, 62:7, 63:18,
  63:23, 72:7, 77:7,
  77:20, 83:13, 83:22,
  108:21, 111:13
  developments -
  18:5
  dialogue - 111:3
  difference - 29:18,
  30:3, 37:13, 38:16,
  57:19, 96:18, 113:14
  different - 57:22
  different - 7:7, 15:8,
  21:24, 29:16, 31:5,
  31:10, 33:13, 35:24,
  38:14, 45:14, 45:20,
  49:17, 50:14, 56:17,
  56:24, 57:22, 62:19,
  65:2, 65:5, 65:20,
  67:7, 106:8, 106:9,
  108:20, 112:24
  difficult - 8:22,
  36:4, 46:1, 89:12,
  116:19
  diligence - 84:17
  Direct - 4:5, 5:7
  director - 99:1
  directors - 10:2
  disagreements -
  83:6, 83:8
  discovering - 67:14
  discuss - 14:24,
  21:5, 27:22, 28:3,
  28:5, 29:22, 29:4,
  29:7, 59:7, 60:24,
  65:22, 68:14, 70:8,
  71:15, 96:23, 97:5,
  105:11
  discussed - 14:19,
  15:1, 15:5, 21:1, 28:6,
  30:11, 39:3, 59:16,
  59:19, 65:24, 66:3,
  67:3, 68:4, 69:16,
  70:13, 74:15, 75:25,
  92:13, 105:17,
  107:19, 108:4
  discussing - 12:5,
  14:21, 62:13, 71:11,
  71:23, 96:12
  Discussion - 60:7
  discussion - 26:8,
  33:11, 35:6, 63:9,
  63:25, 75:25, 76:2,
  76:6, 77:5, 77:25,

87:8, 95:18, 96:6,
  96:7, 96:11, 98:6,
  105:21, 106:24, 108:7
  discussions -
  28:12, 28:13, 28:14,
  50:4, 63:17, 71:19,
  73:15, 75:15, 76:23,
  79:25, 82:18, 83:2,
  83:5, 88:16, 93:2,
  97:10, 98:3, 107:1
  Discussions-
  29:15, 34:2
  dislike - 82:8
  dispute - 46:9
  distinct - 73:5
  distinction - 100:5
  distressed - 84:18,
  84:19
  District - 1:1, 1:2
  Division - 1:3
  document - 19:25,
  33:8, 33:10, 33:12,
  39:16, 44:7, 44:11,
  45:8, 45:14, 61:8,
  63:12, 63:15, 63:19,
  65:8, 68:13, 68:15,
  68:16, 69:10, 69:20,
  69:23, 80:1, 80:4,
  86:25, 87:6, 91:23,
  96:16, 98:1, 100:19,
  103:25, 110:24,
  113:7, 113:23, 114:2
  documentation -
  9:5, 72:19, 72:21,
  74:2
  documented - 73:3
  documents - 68:2,
  70:3
  dollar - 104:3
  dollars - 43:1, 43:3,
  43:4, 79:17, 81:24,
  104:2
  done - 18:23, 18:25,
  67:18, 79:16, 84:25,
  111:25, 114:5
  dormant - 18:8
  down - 73:10, 90:6,
  110:18
  Dr - 34:25, 42:10,
  75:11, 75:15, 75:25
  draft - 68:24, 87:6,
  98:5, 113:7, 113:11,
  113:22
  drafted - 87:9
  dress - 49:1
  due - 26:2, 26:13,
  84:17
  duly - 5:4, 115:8
  during - 8:15, 8:18,
  23:19, 32:21, 52:20,
  68:19, 86:16, 90:11,
  92:16, 93:7
  During- 67:6,
  78:17, 90:12, 90:13,
  92:17
  duties - 52:1, 52:19,
  52:23, 53:5, 55:10,
  56:16, 61:13, 93:13,
  93:14
  duty - 56:10

**E**

  e-mail - 48:21,
  80:10, 80:16, 98:4,
  100:2, 110:6, 112:10,
  113:10, 113:13
  e-mails - 40:10,
  78:1, 80:5, 81:22,
  97:12, 97:15, 97:18,

109:14
  early - 42:24, 61:16,
  73:22, 75:4, 77:22,
  83:23, 84:25
  Early- 77:12, 83:18
  earn - 89:8
  earned - 102:13
  easier - 25:24
  East- 88:19
  Eastern - 87:24
  economic - 96:25,
  110:1, 110:21
  Edie - 3:10, 3:14,
  95:18
  Edith - 1:12, 1:13
  effect - 40:12, 41:25
  effective - 42:24
  effects - 41:11
  effort - 72:17, 74:12
  eight - 42:11, 55:11
  either - 10:9, 10:12,
  48:13, 58:20, 85:15
  Ellen - 64:16
  Emea - 9:2, 14:19,
  16:16, 16:19, 16:21,
  18:4, 18:23, 20:15,
  20:25, 87:15, 87:16,
  87:21, 89:7, 89:11,
  90:16, 91:7, 91:10,
  91:17
  employed - 5:16,
  5:17, 7:2, 8:9, 31:23,
  32:6, 49:22, 50:3,
  92:18, 92:20
  employee - 40:21,
  43:22, 43:24, 45:2,
  45:3, 48:6, 48:19,
  48:23, 48:24, 116:13,
  118:14
  employees - 18:6,
  23:9, 36:4, 36:8,
  92:23
  employer - 72:15,
  87:11
  employers - 71:15
  employment - 8:21,
  21:22, 32:14, 35:15,
  39:18, 40:2, 40:4,
  40:20, 46:13, 51:17,
  51:21, 51:22, 51:25,
  85:13
  enable - 35:6,
  36:23, 50:9
  end - 8:13, 10:8,
  23:6, 38:12, 41:10,
  68:10, 69:15, 74:20,
  85:6, 108:25, 111:12
  End- 69:6
  endeavor - 61:1
  engagements -
  90:10, 90:15, 90:19,
  91:9
  entire - 92:17
  entirely - 31:5, 31:9,
  78:18
  entities - 31:13,
  32:19, 40:24, 49:22,
  50:13, 50:17, 50:18,
  51:24, 74:16, 80:7,
  83:16, 88:18, 91:20
  entitled - 79:22,
  80:2
  entity - 35:11,
  35:23, 39:4, 39:8,
  50:22, 91:21
  environment -
  65:12, 103:6
  equity - 42:25
  erroneous - 91:13
  espionage - 67:12

Esq - 3:3, 3:8
essence - 105:25, 106:5
essentially - 41:10, 76:23, 112:2
et - 27:20, 35:18, 60:2, 66:25, 67:25, 77:22, 80:15, 105:9, 108:23
Europe - 87:24, 88:19, 89:3, 108:6
evening - 70:19
event - 110:25
events - 74:4
eventuality - 21:1
ex - 27:17
ex-police - 27:17
exact - 46:25, 81:2
exactly - 98:11
Examination - 2:9, 4:5, 5:7
example - 14:23, 30:19, 35:17, 36:5, 37:9, 49:1, 112:18
except - 113:4
excited - 74:9
exclusive - 102:5
executed - 82:17
executives - 25:14, 32:11, 97:10
exhibit - 79:5, 98:1
Exhibit - 4:14, 9:8, 9:12, 15:14, 15:17, 16:25, 17:4, 33:5, 39:13, 42:15, 43:17, 43:21, 53:24, 63:7, 63:10, 68:13, 68:15, 86:21, 86:25, 87:7, 95:25, 113:2
exhibits - 87:2
exist - 58:9
existence - 29:23, 29:24, 68:24, 70:5
existing - 53:15, 56:3, 57:2, 57:3, 94:14
exists - 58:9
exit - 84:14
expand - 34:22
expectation - 53:9, 54:20, 55:2, 64:9, 83:18
expected - 48:25, 51:13, 53:14, 55:4, 62:16, 63:1, 93:18, 114:1, 114:2
expedite - 60:23
experience - 11:19, 12:6, 14:23, 50:9, 52:16, 56:5, 62:14, 67:12, 70:7, 78:14, 78:15, 88:14
experienced - 79:13, 91:5
experiences - 69:25
expertise - 11:19, 12:6, 20:11, 20:14, 38:21, 52:16
Expires - 115:20
explain - 12:25, 25:17
Explain - 7:6, 39:25, 49:16
explained - 25:3
explaining - 24:22
exploration - 75:20
explore - 21:24, 70:10
express - 81:21
expressed - 82:11

expression - 34:13
extreme - 82:7

F

face - 35:2, 78:2, 82:5
fact - 10:8, 18:14, 18:15, 54:15, 58:2, 66:22, 76:5, 79:8, 79:12, 88:5, 90:22, 91:5, 103:1, 104:18, 112:22, 113:15
fair - 20:19, 29:25, 47:11, 54:4, 60:14, 105:12, 109:16
fall - 5:20
Falle- 3:9
familiar - 6:16, 7:14, 39:18, 68:20, 69:13
family - 21:22, 72:2, 74:16
far - 25:13, 71:3, 86:11, 91:12
faster - 58:4
Fbi- 66:25
February- 39:5, 75:4, 100:15, 115:12, 116:18
fees - 112:3
felony - 101:22
felt - 31:19, 81:17, 104:17
few - 64:13, 77:15, 97:25
Fh- 44:6
fide - 113:15
fifty - 20:25, 79:19
fifty-seven - 79:19
figure - 49:21, 81:9, 111:5, 111:10
filed - 79:5, 92:5, 92:15
filled - 84:23
final - 82:19, 83:3, 109:4
finalizing - 59:20
finance - 101:24
financial - 13:1, 13:24, 14:13, 30:5, 31:6, 55:13, 56:9, 73:23, 74:18, 93:4
financially - 116:16
finish - 112:9
finished - 109:10
fired - 110:18
Firm- 3:8
First- 77:15
first - 5:4, 21:5, 23:15, 43:23, 58:21, 58:23, 63:14, 64:12, 66:3, 70:12, 70:13, 72:20, 73:2, 74:15, 79:4, 80:25, 92:12, 94:11, 110:10
fit - 37:6
five - 30:20, 42:9, 42:25, 43:3, 65:10, 81:4, 81:8, 85:19, 111:9
fiver - 55:22
fix - 84:25, 110:11
Fl- 115:18
flew - 70:18, 74:21
flight - 75:6
Florida- 1:2, 2:11, 2:12, 3:4, 115:3, 115:7, 116:3
Flynn- 40:15
focus - 83:12

focused - 65:5
follow - 72:5
follow-up - 72:5
following - 63:16, 108:25
follows - 5:6
Forensic- 27:11, 27:15, 27:18, 31:4
forensic - 27:18
Forget- 54:5
Forgive- 71:3
form - 5:18, 8:20, 10:19, 10:20, 63:2, 74:6, 84:1, 107:3
formal - 29:3
formalize - 53:20
formalized - 113:10, 113:17, 113:24
formed - 6:1, 6:3, 11:17, 27:17
forth - 111:3
forty - 79:17, 111:5
forward - 41:2, 55:15, 72:16, 80:13, 95:23, 95:24, 101:16, 103:7
Foundation- 17:24, 92:25
founder - 91:13, 91:16
four - 24:1, 46:6, 46:7, 47:23, 85:19, 92:5, 98:10
Fox- 108:23
frame - 55:14, 73:12
framing - 93:3
Frank- 1:12, 1:21, 2:5, 4:3, 5:3, 5:13, 95:19, 98:7, 98:12, 108:2, 115:7, 116:8
fraud - 14:23, 14:25, 15:7, 17:6, 17:22, 18:14, 19:16, 19:24, 29:4, 29:8, 29:10, 29:14, 29:21, 29:22, 29:24, 30:6, 30:10, 30:18, 30:19, 30:21, 66:25, 67:5, 67:8, 67:12, 68:3, 107:7, 107:21
Fraud- 15:9
fraudulent - 15:2, 15:10, 30:7
freedom - 90:7
frequency - 31:8
front - 43:3
fruitful - 67:13
frustrations - 95:24
function - 37:7, 37:11, 41:19, 51:12
functional - 29:16
functionality - 56:4, 56:5
functions - 35:22, 36:18, 37:24, 57:12, 57:23
funding - 57:7
Funny- 71:7
future - 29:21, 58:19

G

gain - 98:1
general - 24:19, 48:21, 73:1, 73:22, 76:8, 77:4, 79:25, 109:15
Generally- 69:12
generally - 27:18,

32:19, 49:11, 61:15, 77:19
generate - 11:14, 21:22, 64:5, 95:3, 107:3, 108:15, 111:15, 112:21
generated - 108:15
generic - 29:13
genesis - 74:19, 92:10
geographies - 57:4
given - 27:2, 88:23, 102:9, 103:23, 103:25
Goldberg- 59:6, 59:10, 98:4, 98:19
government - 75:18, 75:19, 75:20, 94:18
governmental - 67:18, 71:20
grabbed - 98:21
great - 102:25
grew - 93:19
ground - 107:16, 107:18
grounds - 54:18, 67:14, 79:20
group - 36:23, 37:1, 37:16, 74:21, 74:23, 75:7
Group- 1:10, 1:20, 87:19, 89:2
grow - 43:10, 53:19
growing - 37:20, 58:6, 93:23
grown - 53:19
guess - 27:18, 34:7, 90:4
guessing - 7:16, 71:5, 97:15, 99:16
guise - 22:19
guts - 90:3

H

Hailstones - 1:12, 2:5, 4:3, 5:3, 5:13, 5:14, 105:14, 115:8, 116:8
half - 81:23
hand - 115:11
handbook - 43:25, 45:3, 48:6, 48:19, 48:23
handed - 33:8, 48:10
handing - 9:11, 86:24
handled - 83:10
hands - 10:14, 41:18, 42:13, 42:18
handwriting - 44:13, 44:16, 44:18, 44:22, 44:25, 46:15, 46:16, 46:18, 46:21, 47:5, 47:6
handwritten - 96:16
happy - 105:19, 106:12
Havener - 3:8, 16:1, 17:9, 17:24, 19:19, 22:4, 22:10, 27:25, 28:24, 45:6, 49:8, 49:19, 49:25, 51:5, 51:19, 52:25, 72:23, 91:25, 92:25, 99:13, 104:6, 104:22, 105:5, 105:14, 106:22, 107:11, 109:8, 109:21, 110:4,

111:21, 113:19
head - 103:20
health - 15:6, 15:7, 15:10
healthy - 61:15
hear - 96:4, 96:7, 106:8
heard - 12:9, 12:13, 34:14, 64:11, 95:11, 96:2
held - 32:7, 32:15
help - 15:2, 24:16, 24:17, 31:3, 32:12, 37:10, 43:10, 53:14, 64:5, 69:2, 73:11, 83:22, 89:1, 93:21, 107:18
helped - 107:4
Helped - 92:9
helpful - 28:19
helping - 107:15
herd - 96:6
hereby - 115:7
herself - 61:2
hired - 66:23, 81:5
holder - 30:22
Holdings - 1:11, 87:12, 87:20, 107:16
holiday - 84:3
Holtz - 25:10, 25:11, 26:23, 73:16, 76:22, 79:18, 92:20, 92:22, 97:17, 112:10, 112:18
home - 9:19, 9:21, 9:23
honor - 22:19
hopefully - 25:4, 95:1, 95:3
hopes - 90:20
hotel - 66:11, 69:15, 69:17, 69:18, 69:19
hourly - 85:7
house - 79:14, 79:15
Hr- 35:18, 35:20
hundred - 43:1, 43:2, 43:4, 55:20, 55:22, 71:5, 79:17, 79:19, 79:21, 79:23, 81:4, 81:8, 104:2, 111:8, 111:9

I

Idea - 11:16, 31:1, 55:17, 73:7, 74:19, 77:8, 77:21, 98:9
ideas - 12:1, 12:4, 14:19, 14:21, 14:22, 15:4, 69:21, 73:13, 76:11, 76:24
identification - 9:9, 15:15, 17:1, 33:6, 39:14, 43:18, 63:8, 86:22
identified - 34:25, 63:3, 88:18
identify - 15:2, 25:22, 30:21, 37:1, 37:10, 37:19, 38:8, 55:6
identifying - 29:21, 29:23, 52:13
imbed - 53:15, 84:11, 85:1
immediately - 21:13
important - 12:24, 26:18, 83:22, 103:5, 108:17, 112:23
improve - 55:13

inaccurate - 79:6
inc - 1:6, 1:17, 1:20
include - 13:13, 27:19, 43:13, 52:19, 56:16, 89:5
included - 68:2, 83:17, 84:12, 95:6, 111:1
includes - 13:16
income - 8:20, 11:15, 19:8, 19:11, 21:22, 95:7, 95:8, 107:3
incorrect - 16:22, 90:21, 91:14
incurred - 111:1
indeed - 22:22, 24:20, 82:19
indeed - 85:1, 99:20
independent - 5:17, 7:10, 8:14, 109:18
indicate - 15:22, 101:5
indicated - 17:4, 19:25, 54:2, 85:4, 92:3
indicates - 96:10, 96:15
indicating - 17:6, 113:13
indicative - 18:15
indicators - 14:3, 14:13, 30:12, 76:1, 76:5, 76:7
individual - 13:2, 13:25, 30:6, 30:8, 30:10, 30:11, 31:7, 56:5, 91:6
individuals - 14:16, 43:9, 43:10
industry - 56:6
information - 30:16, 49:6, 69:25, 90:25, 91:13, 100:13, 110:1
informed - 95:18
initial - 28:14, 35:8, 53:14, 75:15
initials - 43:22, 44:1, 44:3, 44:6, 44:7, 44:10
initiatives - 85:18
ink - 96:19, 96:21
input - 92:16, 93:9, 108:3, 109:10
inserted - 96:3
insertion - 96:12
instance - 19:16, 99:6
instructed - 98:12, 99:21, 99:22
insurance - 14:23, 14:25, 15:2, 15:3, 15:6, 15:8, 15:11, 29:10, 29:22, 30:6, 30:7, 30:18, 30:21, 107:7, 107:20
insurance - 30:19
integrity - 13:1, 13:24, 30:6, 30:8, 31:6, 73:23, 74:18, 93:5
intellectual - 59:14
intend - 11:12
intended - 16:18, 21:23, 87:25
intending - 11:22, 53:19, 88:9
intends - 65:11
intent - 26:2, 55:24, 56:2, 57:21

intention - 35:12, 38:5, 55:12, 55:15, 58:1, 88:12, 89:9, 108:5
interest - 10:3, 10:10, 10:12, 80:10, 80:20, 81:13, 87:12, 87:19, 101:15, 108:13, 108:14
interested - 53:18, 116:16
internal - 33:2, 53:11, 53:22, 54:11, 55:3, 83:19, 93:18
internet - 36:24
introduce - 61:4
introduced - 61:2
inventions - 92:8
inventors - 13:4, 92:4
invest - 56:3
invested - 80:12
investigation - 27:20
investing - 70:2, 72:17, 74:12
investment - 26:9, 32:10, 32:22, 40:3, 40:22, 42:8, 50:5, 53:18, 54:25, 55:21, 56:19, 58:4, 59:9, 110:13
investments - 26:11, 26:14
investors - 57:8
invited - 59:22
invoice - 41:14, 41:16, 50:20
involved - 27:18, 32:15, 79:7, 97:10
issue - 36:25, 41:14, 41:15, 84:5
issues - 37:2, 53:17, 95:21
itself - 47:7

**J**

Jalman - 79:5, 110:25
James - 1:23, 3:13
January - 2:10, 7:22, 8:13, 8:18, 31:15, 31:19, 32:3, 32:22, 75:5
job - 35:16, 52:1, 52:19, 52:23, 53:5, 54:16, 55:10, 61:13, 85:12
Jodi - 79:5, 110:24, 111:16
join - 36:5
joined - 39:9, 52:23, 55:9, 55:18, 55:25, 56:2, 57:11, 58:14, 61:9, 64:16
joining - 52:8, 52:18, 53:10, 54:20, 55:2
joins - 59:1
Jr - 3:13
July- 95:17, 96:1, 96:16, 99:17
junior - 84:24

**K**

Kaprow - 99:23, 100:23, 100:24
Kathleen - 3:8

keep - 85:16, 86:2
kept - 84:9
key - 37:1, 37:16
killed - 102:2
kind - 8:7, 27:13, 72:6, 78:8
kinds - 30:24
knowledge - 24:19, 25:7, 32:4, 90:22, 92:19, 103:13, 105:3, 109:19, 110:1, 112:14
knowledgeable - 91:1
known - 72:7

**L**

language - 37:13, 96:13
Large- 2:12, 115:7
large - 35:11
larger - 35:23
last - 33:14, 87:3, 113:23
lasted - 85:19
lastly - 47:10
late - 63:16, 66:5, 68:13
latter - 25:19
launch - 57:1
Laurie- 25:10, 73:16, 76:22, 92:20
Law- 3:8
lawsuit - 92:1
Lea- 47:20
lead - 50:5, 52:10, 62:6, 83:23, 64:10, 83:22
leading - 76:1
learn - 58:5
least - 22:22, 36:2, 54:9, 57:9, 68:24, 73:22, 92:15, 105:10
leaving - 8:12, 14:8, 23:6, 31:15, 31:19, 76:14, 106:19, 106:20
left - 10:23, 21:3, 22:16, 22:18, 23:12, 31:13, 50:2, 69:4, 69:8, 75:13, 107:25
legal - 38:14, 82:19, 83:10, 112:3
less - 78:11
letter - 26:2, 39:18, 40:11, 40:14, 40:17, 40:19, 42:10
level - 22:7
leverage - 88:2
liberated - 36:19
libraries - 56:7
library - 35:23, 38:13, 38:15, 38:16
license - 102:6, 103:9, 103:14, 103:23, 103:24, 104:8, 105:9
likely - 61:2
limitations - 75:19
Limited- 16:15, 18:13
limited - 5:22, 36:17
line - 11:12, 15:6, 46:16, 47:10, 97:13
links - 108:20
listed - 16:4, 17:20, 87:17, 88:5, 91:8, 111:7
lists - 10:2
literally - 77:3
lived - 31:2
living - 89:8

Llc- 1:10, 1:11, 3:8, 91:14
lobby - 69:19
location - 44:20
look - 13:11, 35:9, 44:13, 44:18, 45:13, 45:21, 47:6, 63:11, 64:1, 64:2, 73:12, 73:25, 77:24, 97:19, 107:20
looked - 17:17, 27:8, 35:2, 49:3, 56:19, 98:22
Looking- 97:25
looking - 11:7, 18:15, 21:20, 22:21, 37:25, 38:21, 56:24, 57:1, 57:3, 57:8, 84:14
looks - 31:6, 33:16, 39:17, 45:23, 46:19, 46:22, 63:13, 65:15, 68:19, 69:13, 79:15
lost - 80:13, 110:14
loud - 25:2
lunch - 70:19, 70:20
Luncheon- 48:2

**M**

mail - 48:21, 80:10, 80:16, 98:4, 100:2, 110:6, 112:10, 113:10, 113:13
mails - 40:10, 78:1, 80:5, 81:22, 97:12, 97:15, 97:18, 109:14
main - 24:10, 27:2, 34:20, 71:25
major - 94:16, 94:17
maligning - 89:12
management - 24:19, 36:20, 37:5, 37:7, 37:8, 37:15, 37:23, 62:15
managers - 38:6
manifest - 75:8
manner - 73:3
March - 6:3, 6:4, 6:24, 7:2, 7:22, 7:23, 7:24, 7:25, 8:2, 8:3, 8:8, 9:1, 9:3, 9:4, 16:8, 21:10
marked - 4:14, 9:8, 9:12, 15:14, 16:25, 33:5, 33:9, 39:13, 43:17, 43:20, 86:21, 86:24, 113:7
market - 11:22, 12:8, 25:24, 34:19, 35:7, 36:1, 38:23, 52:14, 58:16, 63:4, 64:19, 64:20, 64:24, 65:6, 65:11, 66:16, 67:4, 67:16, 70:11, 74:14, 83:19, 88:4, 88:9, 88:24, 89:3, 89:7, 90:16, 93:4, 93:16, 93:18, 93:20, 108:4, 108:5, 106:19
marketable - 72:3
marketed - 65:13
marketing - 14:19, 38:25, 64:23, 77:22, 90:13
markets - 56:4, 57:4, 63:3
marking - 17:3
Marty - 40:15
Master - 32:24,

33:2, 39:24, 40:11, 40:13, 41:4, 41:7, 41:8, 45:2, 47:3, 47:21, 48:6, 48:25, 50:25, 51:13
Master's - 33:1, 51:9
Masters - 39:4
match - 31:1
materials - 27:20
matter - 5:10, 98:7
Matthew - 1:22
maximize - 58:12, 80:23
mean - 32:17, 35:14, 46:1, 47:7, 51:1, 61:7, 64:21, 112:8
Meaning - 70:12
meaning - 12:17, 12:20
means - 7:6, 13:19
meant - 23:22, 96:23
meet - 58:22, 59:4, 59:23, 66:12, 74:22, 74:25, 75:2
meeting - 24:21, 24:22, 25:3, 25:15, 25:16, 26:5, 26:17, 26:18, 37:14, 59:5, 59:16, 60:11, 61:3, 66:7, 66:19, 67:13, 68:7, 68:14, 69:7, 69:14, 70:8, 70:10, 70:12, 70:16, 72:3, 74:17, 74:20, 75:9, 75:11, 76:3, 76:8, 76:10, 76:17, 92:11, 100:16
meetings - 27:1, 65:21, 65:25, 78:2
member - 87:11, 87:15, 91:20, 91:21
memorialize - 104:18
memorialized - 84:2
memorializing - 104:20, 105:2
memory - 26:5, 75:4, 85:19, 98:19, 98:20, 111:5
mentioned - 45:1, 74:11, 81:3, 90:19, 107:7, 108:23
mentoring - 84:14
merely - 95:10
met - 58:23, 60:10, 64:14, 66:10, 72:1, 74:4, 83:25
methodologies - 75:18, 77:9
methodology - 17:22, 18:15, 19:16, 19:24, 31:5, 31:10, 73:9, 77:21
methods - 14:15
middle - 78:6
Middle - 1:2, 87:24, 88:19
might - 7:11, 11:1, 12:7, 14:22, 15:1, 18:10, 18:11, 21:25, 28:7, 28:18, 34:24, 35:4, 48:20, 52:14, 57:1, 57:3, 58:3, 64:19, 66:16, 67:10, 67:15, 70:1, 73:8, 73:12, 73:25, 75:17, 76:25, 77:23, 78:11,

79:20, 88:3, 88:4, 88:13, 89:9, 107:2, 107:20
**Mike** - 66:10, 66:12, 67:3, 67:8, 73:15, 74:17
  **miles** - 71:5
  **million** - 79:6, 81:24
  **mind** - 73:5
  **Mirabilis** - 1:6, 1:17, 5:11, 8:12, 10:23, 22:20, 24:20, 25:6, 27:2, 31:13, 31:14, 31:16, 32:8, 32:9, 32:12, 32:13, 32:17, 32:19, 32:21, 33:3, 33:20, 34:8, 35:7, 38:6, 39:1, 39:8, 39:9, 40:3, 40:22, 40:24, 40:25, 41:23, 41:25, 42:8, 42:21, 42:23, 42:25, 43:5, 43:7, 43:10, 43:12, 50:2, 50:5, 50:8, 50:10, 50:13, 50:16, 50:17, 50:18, 50:22, 51:23, 52:5, 52:9, 52:15, 53:7, 53:16, 53:17, 54:11, 54:25, 55:14, 55:18, 55:23, 55:25, 56:2, 57:11, 58:14, 59:1, 59:8, 59:12, 59:24, 60:1, 60:14, 60:20, 61:10, 62:17, 66:23, 68:1, 72:2, 74:16, 77:2, 80:7, 80:11, 80:21, 81:13, 82:22, 83:16, 84:20, 89:14, 90:1, 93:12, 93:18, 93:19, 93:21, 93:22, 93:25, 94:5, 94:9, 94:24, 94:25, 95:6, 95:10, 97:8, 99:2, 101:15, 101:21, 102:5, 105:8, 106:19, 106:20, 107:1, 108:17, 110:16, 110:17, 110:22, 111:15
  **mischaracterizatio n** - 104:7
  **Mischaracterizatio n** - 104:23
  **missing** - 54:10
  **misunderstanding** - 104:10
  **misunderstood** - 51:25
  **model** - 108:21
  **Mokwa** - 1:22
  **moment** - 9:22, 11:9, 33:17, 39:17, 42:3
  **money** - 10:9, 10:14, 41:18, 42:13, 42:18, 99:5, 104:11
  **month** - 52:8, 52:18, 52:20, 78:12, 79:9
  **months** - 21:14, 42:11, 52:12, 55:11, 57:9, 77:15, 78:22, 79:11
  **morning** - 5:9, 70:18, 83:12, 106:25, 107:5, 107:7
  **most** - 27:1, 35:16, 78:15
  **mouth** - 31:17, 61:12

  **move** - 12:15, 38:1
  **moving** - 95:23, 95:24
  **multiple** - 74:24
  **must** - 96:20
  **mutual** - 40:24, 43:11

## N

  **Name** - 44:20
  **name** - 5:9, 5:11, 5:13, 5:24, 13:4, 27:10, 39:19, 47:13, 88:2
  **named** - 47:20
  **names** - 24:8, 30:22, 30:23, 90:2, 90:3
  **narrowly** - 35:21
  **nature** - 31:9
  **need** - 13:17, 30:21, 34:24, 104:17
  **needed** - 11:4, 57:7, 85:5
  **negotiate** - 36:7, 80:6, 80:17
  **negotiating** - 81:9
  **negotiations** - 82:14, 96:25, 97:7
  **network** - 8:12, 10:23, 33:3, 39:9, 43:12, 50:2, 50:8, 50:11, 52:5, 52:9, 53:8, 53:10, 53:16, 54:11, 54:22, 55:19, 58:14, 59:2, 59:24, 61:10, 62:17, 63:2, 64:3, 64:6, 66:18, 68:1, 80:15, 93:22, 94:25, 101:16, 101:21, 107:1, 111:15
  **neutral** - 41:11
  **never** - 21:1, 34:14, 82:11, 82:19, 82:21, 83:3, 87:10, 89:20, 99:6, 111:1, 113:3
  **new** - 56:4, 58:11, 56:16, 57:4, 57:24, 58:4, 72:6, 82:20, 107:6, 112:19
  **newly** - 58:15
  **Nexia** - 1:7, 1:18, 12:10, 12:21, 12:22, 12:24, 13:7, 13:13, 13:18, 14:18, 22:16, 22:18, 22:19, 22:20, 23:7, 23:8, 24:4, 24:17, 24:24, 25:5, 25:17, 26:19, 29:17, 29:20, 30:4, 32:13, 41:14, 41:16, 41:17, 43:10, 50:19, 50:22, 50:25, 51:2, 51:3, 51:9, 51:11, 51:14, 52:10, 52:12, 52:13, 52:15, 61:17, 61:19, 61:21, 61:25, 62:7, 62:11, 62:19, 63:4, 63:24, 64:1, 64:2, 64:8, 64:10, 64:15, 64:16, 64:19, 65:22, 66:1, 66:4, 66:15, 67:18, 67:24, 68:22, 70:8, 70:14, 71:12, 72:4, 72:25, 74:16, 76:19, 77:6, 77:18, 78:18, 78:21, 78:23, 81:13, 81:18, 82:21, 83:14, 83:15, 83:23,

  86:15, 86:17, 89:5, 92:19, 92:21, 92:23, 94:9, 94:14, 94:15, 95:19, 101:7, 101:20, 102:6, 103:6, 107:22, 108:4, 108:5, 108:18, 110:15, 110:17, 110:23, 112:19, 112:22
  **next** - 52:11, 64:13, 71:10, 76:17, 76:20, 77:17
  **non** - 38:9, 100:6, 100:9, 102:5
  **non-adherence** - 38:9
  **non-exclusive** - 102:5
  **non-voting** - 100:6, 100:9
  **none** - 19:13, 83:21
  **None** - 101:12, 110:15
  **normal** - 73:18
  **Norman** - 3:3, 4:5, 5:8, 5:9, 48:4, 53:1, 60:9, 97:24, 105:16, 108:11
  **North** - 2:11, 3:3
  **Notary** - 2:12, 115:6, 115:18, 115:19
  **notation** - 88:8
  **note** - 15:21, 53:24, 74:6, 82:17, 82:19, 82:20, 82:23, 82:25, 83:2, 83:3, 83:5, 96:18
  **noted** - 74:3, 92:3, 97:12
  **notes** - 97:19, 105:8, 116:11
  **Nothing** - 11:8
  **nothing** - 5:5, 29:2, 57:17, 102:21, 102:25
  **November** - 61:16, 66:5, 68:10, 69:1, 69:4, 69:5, 69:6, 69:11, 69:15, 74:20, 83:18, 83:24, 92:11
  **number** - 25:14, 31:1, 36:3, 38:6, 45:10, 45:11, 45:13, 46:23, 46:24, 47:2, 47:6, 47:7, 53:7, 54:21, 58:25, 57:1, 57:2, 66:24, 70:4, 70:6, 79:19, 84:18, 84:23, 85:20, 85:22, 87:2, 89:12, 97:16, 99:20, 100:14, 107:24, 108:20
  **Number** - 94:10
  **numbers** - 30:24, 46:25
  **Numbers** - 4:14

## O

  **objection** - 22:10, 52:7, 105:5
  **Objection** - 16:1, 17:9, 17:24, 19:19, 22:4, 27:25, 28:24, 45:6, 49:8, 49:19, 49:25, 51:5, 51:19, 52:25, 72:22, 92:25, 99:13, 104:6, 104:22, 105:14, 106:22, 107:11, 109:21, 110:4, 111:21, 113:19

  **objective** - 37:13, 37:14, 94:2
  **objectives** - 37:17
  **obligations** - 53:25
  **observation** - 79:10
  **Obviously** - 57:21
  **occasion** - 78:4
  **Occupational** - 6:19
  **occupational** - 17:21, 18:14, 19:16, 19:24
  **occur** - 58:15
  **occurred** - 23:4, 29:24
  **occurring** - 77:18, 77:25, 78:2
  **October** - 23:13, 23:16, 39:10, 41:2, 42:24, 48:11, 48:16, 58:25, 61:8, 67:20, 83:18, 86:14, 93:11
  **offer** - 64:22
  **offering** - 14:24, 56:8, 56:9, 86:19
  **offers** - 67:2
  **office** - 61:5, 77:2, 84:4, 98:16, 98:17
  **officer** - 27:17
  **official** - 115:11
  **often** - 7:13, 23:18, 90:18, 95:9
  **Ohio** - 3:9
  **old** - 9:24
  **once** - 23:12, 75:8
  **one** - 7:8, 7:11, 9:6, 10:5, 10:9, 13:4, 14:18, 16:17, 18:8, 21:23, 21:25, 22:22, 23:3, 24:3, 26:13, 28:15, 27:5, 27:8, 29:4, 32:13, 33:22, 36:6, 38:6, 39:20, 39:22, 41:20, 45:10, 48:8, 48:9, 48:10, 48:14, 49:15, 52:8, 52:18, 53:16, 54:10, 55:3, 55:21, 64:16, 66:21, 68:24, 70:3, 76:20, 80:11, 82:16, 85:17, 88:9, 89:11, 92:4, 97:9, 99:11, 99:21, 99:24, 100:14, 101:24, 109:4
  **One** - 7:10, 10:6, 26:2, 35:20, 67:2, 86:8, 89:16
  **ones** - 36:6, 57:14, 62:25, 84:13, 84:14
  **Ongoing** - 57:19
  **online** - 16:3
  **operate** - 5:23, 9:21
  **operated** - 9:20
  **operationally** - 93:7
  **opportunities** - 10:25, 11:5, 11:6, 21:24, 22:22, 22:23, 27:23, 28:3, 28:6, 32:12, 37:3, 37:11, 37:19, 88:3, 89:10, 108:15, 111:14, 112:20
  **opportunity** - 15:18, 18:10, 20:19, 21:18, 24:10, 24:15, 24:24, 26:19, 27:3, 27:9, 38:25, 42:12, 56:18, 61:6, 74:9, 80:13, 88:13, 88:24, 112:11
  **optimize** - 58:11

  **Orange** - 2:11, 3:3, 115:4, 116:4
  **order** - 38:10, 42:11, 47:4, 50:8, 59:7, 60:23, 66:4, 103:18
  **organically** - 25:22
  **organization** - 35:11, 35:15, 37:10, 41:1, 52:16, 64:25, 65:9, 71:25, 85:24, 101:25
  **organizational** - 61:15
  **organizations** - 22:25, 32:16, 36:3, 36:9, 55:5
  **original** - 96:19, 98:21
  **originally** - 10:23, 21:7
  **Orlando** - 1:3, 2:11, 3:4, 25:15, 26:4, 77:2, 77:17, 78:3, 89:15
  **otherwise** - 11:2, 41:20, 87:11
  **outline** - 64:17
  **outside** - 98:16, 98:17, 101:21
  **outstanding** - 59:20
  **overall** - 100:12, 112:19
  **overlap** - 83:17
  **overtime** - 22:16
  **own** - 10:4, 85:25, 93:23
  **owned** - 36:16, 80:15, 102:16, 102:17, 102:18, 102:20, 104:16
  **owner** - 20:25
  **ownership** - 42:9, 104:18
  **oxley** - 34:19, 34:23, 36:17, 36:21, 78:16

## P

  **package** - 79:24, 81:1
  **packaged** - 56:8
  **page** - 33:14, 33:25, 43:22, 43:23, 45:16, 87:3
  **Page** - 101:5
  **pages** - 15:21
  **paid** - 39:3, 39:7, 39:24, 41:15, 42:21, 108:9
  **Palxxar** - 1:10, 1:11, 9:2, 14:19, 15:19, 15:22, 16:15, 16:18, 16:21, 17:5, 17:6, 18:3, 18:4, 18:20, 18:23, 20:15, 20:25, 87:12, 87:15, 87:16, 87:19, 89:2, 89:7, 89:11, 90:13, 90:16, 91:7, 91:14, 91:17, 91:21, 106:18, 106:19, 107:4, 107:16, 107:21
  **paper** - 73:2, 76:15
  **Paragraph** - 87:10, 95:9, 106:24
  **paragraph** - 88:18, 93:11, 95:17, 101:5, 107:14, 108:25
  **paragraphs** -

110:11
**paraphrasing** - 106:11
**parcel** - 94:1
**part** - 40:2, 50:4, 53:6, 54:25, 55:10, 58:20, 57:9, 57:12, 57:23, 58:18, 73:18, 74:21, 77:7, 84:25, 86:17, 92:1, 94:1, 102:11, 102:18, 103:23, 103:24, 111:3, 111:11, 112:21, 112:23
**Part** - 32:9, 40:23
**participants** - 25:15
**participation** - 110:13
**particular** - 17:15, 20:2, 20:9, 20:12, 36:10, 36:25, 38:17, 50:18, 66:15, 67:9, 101:22
**particularly** - 23:5
**particulars** - 82:15, 98:7
**parties** - 28:19, 41:12, 58:21, 80:18, 116:14
**parties'** - 116:15
**partner** - 20:13, 20:24
**partnerships** - 8:24
**Party** - 1:19
**party** - 26:7, 94:4
**past** - 98:21
**patent** - 13:3, 13:5, 13:12, 13:15, 92:3, 92:5, 92:15, 102:23
**patented** - 102:19
**patents** - 13:8
**Pathways** - 27:11, 27:15, 27:16, 31:4
**pattern** - 31:8
**Pay** - 32:24, 32:25, 33:2, 39:4, 39:24, 40:11, 40:13, 41:4, 41:6, 41:8, 45:2, 47:3, 47:21, 48:6, 48:24, 50:25, 51:8, 51:13
**pay** - 10:9, 10:12, 41:9, 43:1, 54:12
**paycheck** - 47:4
**paychecks** - 32:20, 41:3
**payment** - 108:12
**payroll** - 35:11, 35:17, 35:22, 38:7, 51:9, 67:25
**pen** - 73:2
**Peo** - 33:2, 35:5, 35:10, 36:1, 36:6, 38:1, 38:4, 38:13, 38:18, 38:20, 38:24, 56:6, 56:8
**Peo's** - 38:2, 38:6, 84:9
**people** - 5:18, 5:19, 10:19, 20:5, 20:6, 25:1, 26:20, 30:23, 37:12, 37:22, 43:14, 60:1, 64:1, 64:16, 72:1, 74:25, 75:2, 79:13, 84:24, 85:21, 85:23, 87:25, 89:25, 91:4, 92:17, 92:22, 93:7, 93:9, 112:2, 112:6, 112:17
**per** - 23:23
**percent** - 20:25,

42:9, 42:25, 78:9
**percentage** - 10:3, 78:5, 78:20
**period** - 8:10, 85:10, 72:8, 75:14, 84:10, 86:13, 92:16, 92:17, 93:7, 94:17
**periodic** - 24:3
**Perserec** - 72:3, 74:22, 74:25, 75:3, 75:13, 75:22, 76:3, 76:11, 76:24
**person** - 7:10, 30:5, 100:21, 101:2
**person's** - 14:13
**personal** - 30:4, 31:6, 73:23, 74:18, 93:4, 100:16
**personally** - 86:2, 98:12, 115:8
**perspective** - 56:22, 61:16, 64:4, 75:12, 99:3, 99:4
**Phil** - 99:23
**phone** - 24:1, 25:2, 25:12, 26:20, 26:23, 72:11, 77:25
**phrase** - 7:13, 7:15, 12:17, 16:15, 36:11, 36:13, 37:5, 53:1, 53:2, 64:24
**physical** - 55:13
**picked** - 43:7
**pieces** - 10:20
**pilot** - 34:2, 34:16, 35:9, 54:17
**pitched** - 65:16, 94:12
**place** - 6:5, 25:23, 38:10, 60:2, 84:22, 98:16
**Plaintiff** - 5:10
**Plaintiff's** - 4:14, 9:8, 15:14, 16:25, 33:5, 39:13, 43:17, 63:7, 86:21
**Plaintiffs** - 1:8, 3:5
**plan** - 52:13, 63:2, 64:18, 65:3, 65:5, 65:16, 65:19, 68:17, 68:22, 74:8, 84:1
**planned** - 9:21
**planning** - 84:22
**platform** - 35:4, 38:23
**play** - 63:18
**plug** - 110:17
**Pm** - 2:10
**point** - 11:23, 11:24, 11:25, 13:17, 20:4, 26:11, 29:11, 31:11, 34:2, 35:3, 37:21, 38:3, 42:13, 46:2, 54:16, 55:16, 57:8, 57:10, 59:18, 59:20, 60:3, 60:11, 60:19, 62:7, 62:8, 62:13, 66:23, 68:25, 70:1, 71:24, 72:14, 73:8, 73:20, 74:8, 77:14, 77:19, 81:4, 84:2, 84:16, 86:3, 93:23, 94:22, 95:21, 99:21, 103:4, 106:11, 106:16, 109:13
**points** - 50:14, 59:8, 59:19
**police** - 27:17
**policy** - 30:22
**Pollack** - 1:23,

34:25, 42:11
**popped** - 21:3
**portion** - 17:5
**portions** - 41:6
**position** - 42:9, 45:10, 61:15, 95:14, 95:16, 102:1, 113:9, 113:16
**positions** - 84:23
**possibility** - 21:6
**possible** - 18:19
**posted** - 89:20, 89:24
**potential** - 14:4, 21:2, 24:9, 24:10, 26:9, 29:23, 30:10, 30:21, 62:10, 67:2, 76:12
**power** - 59:18, 60:3, 60:11, 84:2
**practitioner** - 18:11
**premise** - 9:24, 81:5
**premised** - 34:9, 52:14, 58:2, 76:4, 79:12, 103:1, 108:22, 112:21
**prepared** - 59:19, 81:11
**presence** - 76:2
**present** - 13:10, 64:18, 90:23, 98:15
**Present** - 3:13
**presentation** - 26:7, 59:18, 60:4, 60:12, 60:19, 67:18, 68:8, 84:2
**presentations** - 67:21
**presented** - 35:3, 60:11, 60:18
**president** - 40:16
**presume** - 46:6, 90:18, 113:8
**presumes** - 89:9
**presumption** - 90:21
**pretty** - 7:16, 70:23, 79:13, 98:11
**Pretty** - 22:12
**previous** - 101:22
**primary** - 18:9
**principally** - 37:8, 37:23, 84:8
**private** - 52:2, 7:12
**procedures** - 53:21, 84:11, 84:21
**process** - 13:1, 13:5, 13:16, 13:23, 14:2, 14:3, 14:9, 14:14, 30:13, 31:3, 31:5, 31:11, 47:4, 66:2, 73:1, 73:3, 73:9, 73:19, 73:21, 76:16, 79:7, 86:16, 102:19, 104:8
**processes** - 41:21, 51:9, 56:11, 56:17, 57:24, 65:24, 73:11, 73:20
**processing** - 27:21, 35:17, 67:25
**produce** - 90:20
**produced** - 70:3, 85:17, 110:24
**product** - 12:3, 15:1, 34:3, 34:20, 35:4, 35:5, 35:7, 36:21, 38:12, 38:22, 54:12, 56:7, 73:19, 76:12, 77:21, 79:2,

80:14, 81:16, 83:12, 93:3, 93:6, 94:11, 94:14, 94:19, 102:3, 107:20, 112:1
**products** - 11:21, 34:18, 52:13, 53:9, 58:25, 58:16, 63:3, 64:2, 65:5, 66:16, 66:21, 67:4, 67:7, 67:8, 70:5, 70:6, 70:11, 93:19, 93:20, 103:7, 107:6, 107:24, 108:1
**profession** - 59:11
**Professional** - 35:15
**professional** - 49:13
**profits** - 18:25, 58:6, 58:12
**program** - 36:15
**progress** - 77:5
**project** - 20:3, 34:16, 35:9, 37:14, 54:17, 92:23
**projects** - 32:15
**promised** - 85:15
**promoted** - 37:23
**property** - 6:9, 6:10, 59:14
**Property** - 6:12
**proposition** - 112:19
**proprietorship** - 7:14
**protocols** - 49:14
**proved** - 8:21, 89:11
**provide** - 19:15, 19:23, 20:10, 20:18, 34:8, 35:4, 41:6, 60:13, 62:16, 62:18, 110:6
**provided** - 41:17, 46:8, 64:22, 86:9, 93:22, 110:2
**provides** - 35:16, 35:22
**providing** - 18:18, 51:17, 62:21, 62:24
**provisions** - 58:19
**Public** - 2:12, 115:6, 115:18
**public** - 7:12, 64:22
**pulled** - 110:17
**purpose** - 37:3, 61:3
**purposes** - 9:9, 15:15, 17:1, 33:6, 39:14, 43:18, 63:8, 86:22, 108:8
**pursue** - 14:1, 11:7
**pursued** - 26:15
**pursuing** - 24:24, 26:18, 75:23
**put** - 14:3, 31:16, 61:12, 64:4, 73:2, 83:25, 90:3, 90:24, 91:19, 107:19
**puts** - 91:4
**putting** - 14:12

**Q**

**questioning** - 44:6, 86:1
**questions** - 97:25
**quicker** - 25:24, 58:4
**quite** - 92:21

**R**

**rain** - 34:9, 34:12
**Ramtage** - 59:7
**ran** - 31:12
**range** - 9:7:1
**rank** - 38:25
**rapidly** - 93:10
**rates** - 36:4, 36:7
**rather** - 25:21, 56:8, 75:18, 89:12, 110:19
**re** - 73:11
**re-write** - 73:11
**reach** - 80:11, 110:12
**reached** - 81:19, 82:14
**read** - 13:8, 39:17, 97:3
**ready** - 53:8, 54:22, 83:21, 98:22
**Real** - 6:10
**real** - 37:12
**realize** - 110:19
**realized** - 110:15
**really** - 59:25, 77:17, 86:18, 93:3
**reason** - 33:22, 44:24, 45:1, 46:9, 71:14, 84:19, 88:14, 88:23
**reasonable** - 111:10
**reasons** - 85:25
**receive** - 19:8, 32:20, 41:3, 42:14, 58:17, 80:8, 101:10, 101:13
**received** - 19:11
**receiving** - 103:10
**recent** - 59:23
**recently** - 78:15
**recess** - 48:2
**Recess** - 97:22
**recognize** - 33:9, 40:19, 68:16, 86:25, 87:1, 103:22
**recognizes** - 113:11
**recognizing** - 40:22
**recollect** - 33:18
**recollection** - 46:4, 67:24, 68:2, 68:6, 68:21, 69:22, 76:10, 96:10, 106:10, 113:21
**record** - 5:12, 60:7, 85:21, 101:22, 102:1, 116:10
**recording** - 85:18, 86:3
**records** - 100:17
**recount** - 75:9
**recreated** - 93:20
**refer** - 113:6
**reference** - 16:5, 16:10, 54:15, 68:3, 88:7, 91:5, 107:5
**referenced** - 80:5, 80:9, 91:22
**references** - 106:24
**referencing** - 80:17
**referrals** - 19:3
**referred** - 18:20, 19:3, 29:10, 95:19
**referring** - 9:14, 29:15, 42:16, 46:11, 89:14, 91:15
**regard** - 68:18, 83:14
**regarding** - 21:17, 85:18, 97:11
**regiments** - 34:4

registered - 16:8
regular - 22:1, 22:6, 22:12, 22:13, 23:21, 23:22, 23:25, 24:2, 72:11, 72:14
regulations - 6:17
relate - 38:2, 72:21
related - 29:22, 30:5, 30:7, 58:19, 76:1, 78:18, 78:21, 94:5
relates - 77:18
relationship - 28:21, 29:2, 30:5, 111:13
relative - 116:12, 116:14
relay - 28:8
relevant - 11:19, 14:22, 89:4
relying - 107:22, 109:17, 109:25
remain - 40:4
remaining - 40:21
remember - 27:6, 48:5, 70:20, 70:21, 71:10, 72:6, 76:6, 96:20, 96:21, 97:1, 97:2
Repeat- 105:1
rephrase - 54:7
report - 116:7
Reporter- 115:17
reporting - 93:8
represent - 5:10, 24:17
reputation - 89:13
requested - 116:9
required - 20:22, 54:24, 114:3
requirements - 35:1
reside - 5:14, 5:15
resistance - 85:3
resolution - 57:6
resource - 21:4
resourced - 65:14
respond - 44:2
responding - 44:18
response - 44:9, 74:11, 81:3, 82:1, 106:25, 107:5
rest - 37:6
result - 12:2
resume - 91:8
retained - 4:14
return - 80:23, 105:8
revenue - 90:20, 108:16
revenues - 58:20, 64:5, 93:23
review - 15:19, 17:5, 30:17, 33:17, 116:8
reviewed - 17:4, 17:11, 89:22, 96:15
Richmond- 24:17, 24:20, 24:23, 26:19, 66:12, 67:17, 67:22, 68:1, 68:18, 71:2, 71:3, 78:4, 81:5, 93:9
rid - 85:25
rights - 101:7, 102:10, 102:11, 105:7
risk - 14:4, 14:15, 29:21, 36:19, 36:20, 37:5, 37:7, 37:8, 37:15, 37:23, 38:13, 38:15, 62:15
risks - 37:2, 37:10,

37:16, 38:9
Road- 3:9
Robert- 1:23
role - 27:2, 33:1, 62:3, 63:18, 80:6, 80:9
roles - 32:7
room - 69:17, 69:18
Roschen- 2:12, 115:6, 116:6, 116:21
route - 66:13
run - 37:15, 37:18
running - 23:23, 85:23
Russell- 3:9
Rw- 3:13

**S**

Sadrianna - 1:23, 3:14, 26:25, 27:1, 100:2
sake - 70:7
salaries - 43:14
salary - 41:6, 41:9, 85:8, 85:9
Sarbanes - 34:19, 34:23, 36:17, 36:21, 78:16
Sarbanes-oxley- 34:19, 34:23, 36:17, 36:21, 78:16
sat - 69:19
saturated - 34:20
saw - 15:20, 42:3, 53:21, 61:8, 63:14, 68:15, 69:10, 75:5, 80:3, 82:19, 83:3, 96:17, 96:20, 99:6, 99:20, 100:1
scanning - 65:15
scene - 27:19
schedule - 110:24
science - 81:2
scope - 13:6
score - 37:1
Scott- 59:6
seal - 115:11
second - 45:16
Secondly- 61:16, 79:9, 93:19
secondly - 54:23, 66:22
section - 34:5, 34:7
sector - 35:1, 56:6, 75:17, 75:18, 101:24
sectors - 56:8
security - 46:23, 46:24, 47:1, 47:5, 47:7, 66:24
see - 9:16, 17:14, 21:9, 21:25, 33:18, 34:10, 36:11, 54:17, 55:7, 65:3, 68:20, 80:1, 87:12, 91:1, 96:19, 97:4, 97:12, 99:11, 99:15, 99:19, 102:7, 110:10, 112:9
seeing - 48:5
seem - 37:6, 74:11
segments - 38:1
self - 5:17
self-employed - 5:17
sell - 58:17
senior - 24:19, 25:14, 32:10, 43:9, 60:1, 64:15, 85:20, 97:9, 101:25
sense - 60:25,

72:17, 104:13, 104:15
Sentinel - 89:15, 90:5
separate - 31:10, 36:20, 37:7, 42:7, 79:16, 93:25
separation - 22:20, 24:4, 109:1, 109:5, 113:3
separtion - 113:7
September - 58:24
serve - 87:25
service - 17:22, 18:11, 18:18, 20:10, 20:19, 53:23
services - 23:9, 25:25, 35:16, 41:16, 51:16, 62:16, 62:22, 62:24, 66:24, 94:8
session - 37:15, 37:18, 78:21, 77:1, 77:3, 77:16
set - 8:17, 10:22, 10:24, 18:4, 21:8, 21:9, 21:18, 82:21
Set- 9:1
settling - 8:24, 11:3
settlement - 82:14
seven - 43:1, 43:2, 55:20, 79:19
Several - 29:13
several - 22:14, 23:23, 57:9, 59:7
severance - 79:22, 79:24, 81:1
shape - 107:3
share - 10:5, 10:6, 10:9, 10:16, 12:4, 42:25, 95:7, 95:8, 100:9, 112:24
shared - 58:21, 68:25
shareholder - 24:21, 87:16, 100:3
shares - 100:6, 100:8, 100:11, 100:12
sharing - 69:24, 76:10
sheets - 85:16, 85:21, 86:2, 86:5, 86:10
shop - 35:20
short - 72:8
show - 17:3, 59:25
showing - 85:22
side - 95:4
sides - 80:19, 95:2
sign - 39:20, 45:14, 46:13, 48:16, 98:13, 98:22, 98:23, 98:24, 99:1, 99:22, 100:19, 101:3, 105:22, 105:25, 106:12
signature - 33:14, 44:10, 45:17, 45:19, 45:22, 45:24, 45:25, 46:3, 46:10, 46:15, 46:17, 47:11, 47:16, 87:4
signatures - 45:13
signed - 45:3, 45:13, 46:3, 46:7, 46:13, 78:15, 96:16, 99:20, 101:6, 113:22
significant - 86:15
signing - 43:3, 43:24, 44:10, 45:8, 45:11, 46:4, 100:9
similar - 6:15, 7:16, 33:21, 34:24, 44:23,

45:20, 46:2, 46:19, 46:22, 47:9, 53:25, 62:15, 63:13, 65:19
similarities - 67:11
Simo- 25:13, 26:24
simply - 26:15, 105:2
site - 82:22
situation - 5:20, 50:6, 109:19, 110:1, 110:22
six - 30:20, 43:1, 55:20, 55:21, 79:21, 111:8
sixty - 43:1, 43:2, 55:20, 55:21
sixty-seven - 43:1, 43:2, 55:20
sixty-six - 55:21
size - 36:9
slightly - 54:7
small - 36:3, 36:6
smaller - 36:2, 36:9, 38:24, 88:17
social - 46:23, 46:24, 47:1, 47:5, 47:7
software - 29:9, 34:18, 36:15, 36:20, 36:22, 37:4, 37:11, 38:2, 43:6, 53:9, 53:21, 55:17, 55:23, 58:1, 58:3, 58:5, 58:7, 58:11, 56:13, 56:17, 56:23, 56:25, 57:2, 57:22, 57:24, 58:1, 58:3, 58:20, 62:22, 62:23, 94:20, 95:7
Sole - 7:3, 7:4, 7:5
sole - 7:10, 7:13, 7:17, 7:23, 8:2, 18:11
solely - 83:15
solution - 53:15, 54:13, 54:23, 55:1, 77:22
solutions - 17:7, 65:6, 68:16, 66:22, 70:6
Solutions - 5:25, 6:8, 6:25
someone - 18:17, 44:15, 61:24, 73:2, 101:25
Sometime - 99:16
sometime - 21:13, 69:1, 69:3, 69:10, 111:16
somewhere - 91:22
soon - 98:11
sophisticated - 112:1
sorry - 8:7, 10:11, 10:17, 19:9, 19:21, 28:10, 47:23, 64:23, 101:1
Sorry - 104:1
source - 17:21
sources - 100:14
speaker - 25:2, 25:12
speaking - 69:12, 90:10, 90:15, 90:18, 91:1, 91:9, 98:20
specialty - 59:13
specific - 11:6, 11:8, 11:16, 11:21, 24:5, 28:5, 29:2, 38:18, 48:17, 76:7, 76:14, 77:13, 80:3
Specifically - 8:23,

15:7, 29:7, 48:20
specifically - 9:18, 23:20, 24:25, 25:12, 74:1
Speculation - 110:4
speech - 90:7
spending - 31:8, 31:9
spent - 43:4, 52:12, 55:22, 78:11, 78:17, 78:21, 79:8, 79:10, 81:6
sponsored - 91:3
staff - 32:11, 52:15, 66:24
stage - 38:21, 69:24, 101:23, 103:21
stand - 56:23, 87:21
standard - 39:18
standardize - 53:20
start - 17:11, 23:12, 39:7, 44:21, 45:4, 61:8, 102:12, 104:11
started - 39:3, 40:20, 67:7, 67:9, 68:21, 70:10
starting - 81:4, 107:6
State - 2:12, 115:3, 115:6, 115:18, 116:3
state - 5:11, 67:22
statement - 20:20, 29:25, 47:12, 60:14, 91:16, 91:18, 95:13, 113:21
States - 1:1
states - 87:10, 88:3
stationed - 71:1
status - 40:20, 50:3
stenographic - 116:11
stenographically - 116:7
step - 10:22, 12:23, 101:16, 103:5
still - 16:13, 17:16, 23:23, 56:23, 60:3, 72:9, 77:23, 88:4, 93:15, 94:21, 104:25
stock - 99:6, 99:15, 99:25, 100:24
stop - 35:20
strategy - 84:7, 84:16, 84:21
Strategy - 1:7, 1:18, 51:10, 64:8, 64:10
stressed - 84:9
struck - 41:23
stuff - 6:13, 23:8
subject - 96:24
submitted - 86:12, 87:1
Subsequent - 64:13
subsequent - 55:12, 98:25, 107:1
subsequently - 54:24
subset - 102:9, 104:3
subsidiary - 35:23
substance - 40:17, 40:19
successful - 23:10, 35:6
suggested - 79:19, 111:9
suggesting - 109:9
Suite - 2:11, 3:4
summary - 30:3
sums - 41:15

Sun - 98:17
supercede - 54:3
supplement - 62:3
supplies - 34:21
support - 40:23
supposed - 82:20
suspect - 74:3,
85:22
sworn - 5:4, 115:9
system - 85:18
systems - 84:11,
84:21, 84:22

**T**

table - 98:17, 98:24
talks - 65:8
targeted - 11:9
targets - 101:23
task - 53:14
technology - 31:3
telephone - 64:15,
100:16
ten - 78:9
Terence- 1:14
term - 31:14, 35:10,
37:24, 41:5, 64:20,
64:23, 65:25, 87:15
terminology -
13:18, 18:12, 30:4,
66:5
terms - 11:3, 14:17,
14:24, 29:13, 33:18,
33:19, 39:23, 40:23,
41:22, 42:22, 48:23,
49:4, 50:7, 56:3,
59:21, 65:17, 73:1,
73:22, 82:25, 83:2,
83:5, 85:13, 107:19,
109:1, 109:10,
111:10, 111:11
Terry- 20:7
testified - 5:5
testimony - 18:22,
96:2, 96:5, 104:7,
104:23
themselves - 5:20
therefore - 45:2
Thereupon- 5:2
thins - 54:10
third - 94:4
Third- 1:19
thoughts - 66:14,
66:20, 76:24
thousand - 43:1,
43:3, 43:4, 55:21,
79:17, 79:20, 79:22,
79:23, 81:4, 81:9,
111:9
three - 21:23, 26:1,
47:23, 52:11, 56:24,
57:12, 57:15, 65:10,
79:16, 83:20, 89:10,
97:9, 110:10, 111:5
threw - 98:23
thunder - 102:2
Tim- 75:11, 75:15,
76:1
timeframe - 17:12,
23:1, 23:3, 23:5,
23:11, 23:16, 31:12,
32:21, 39:5, 60:10,
77:10
timeframes - 22:17,
23:2
title - 53:25
titles - 32:14
today - 13:11,
16:13, 17:16, 110:13
Today- 37:14

today's - 8:19
Todd- 3:3, 5:9,
29:11, 72:21, 102:4,
104:11, 106:17,
109:14
together - 28:7,
35:7, 64:4, 64:15,
76:23, 83:25, 92:9,
93:21, 107:2
took - 42:9, 61:5,
98:16, 100:18, 112:7
tools - 58:11
top - 103:20, 111:8
total - 78:10
touched - 109:13
traded - 18:7
trader - 7:3, 7:4,
7:5, 7:11, 7:17, 7:23,
8:2
transaction - 41:11,
41:13, 41:20, 41:22,
42:19, 42:23, 104:19
transcript - 116:9,
116:10
transferring - 101:6
travel - 25:5
tried - 85:17
truce - 41:9
true - 20:8, 82:17,
116:10
Trust- 98:18
truth - 5:4, 5:5
try - 10:24, 18:5,
22:19, 25:21, 34:3,
69:25, 79:1, 80:9,
80:17
trying - 13:20, 24:2,
49:21, 53:1, 64:17,
87:11, 73:5, 73:24,
80:23, 84:10, 88:2,
89:3, 89:8, 97:1,
107:17, 107:19
turn - 71:13, 86:7
turned - 19:13
Turning- 45:16,
87:3, 107:14, 113:2
twenty - 42:9,
42:25, 75:13
twenty-five - 42:9,
42:25
two - 10:2, 10:19,
20:5, 21:23, 22:17,
22:23, 23:2, 24:5,
26:1, 27:5, 41:11,
45:18, 45:21, 52:11,
56:24, 59:22, 79:11,
81:23, 83:20, 89:9,
91:20, 109:14, 110:10
two-way - 41:11
type - 6:20, 7:19,
11:16, 28:21, 30:16,
30:18, 62:12, 65:2
types - 62:15
Typically- 10:19

**U**

Uk- 5:15, 7:8,
10:24, 11:4, 15:22,
16:5, 17:20, 18:3,
18:6, 18:17, 18:23,
19:3, 19:17, 19:25,
20:8, 20:22, 21:6,
27:15, 27:17, 28:7,
66:13, 69:4, 69:8,
71:8, 88:4
umbrella - 36:7
Under- 46:16
under - 5:18, 5:19,
36:6, 39:23, 46:20,

53:24, 110:19
understood - 14:11,
14:12, 23:11, 42:22,
49:3, 50:15, 51:17,
60:12, 74:13, 104:20,
105:3
unemployment -
8:11
United - 1:1
unless - 84:20
up - 8:17, 8:24, 9:1,
10:22, 10:24, 11:3,
18:4, 18:10, 19:13,
20:3, 21:3, 21:8, 21:9,
21:18, 23:7, 24:17,
25:5, 25:21, 25:25,
29:14, 31:3, 41:10,
43:3, 43:7, 50:5, 70:9,
72:5, 78:4, 78:6,
81:17, 82:21, 85:20,
86:13, 103:18
update - 75:21
useful - 62:25
uses - 16:15

**V**

Vague - 16:1, 17:9,
22:4, 27:25, 49:19,
72:23, 99:13
Vaguely- 97:1
validating - 13:24
Value - 111:12
value - 74:12,
75:17, 79:2, 79:4,
85:23, 94:2, 102:25,
111:12, 111:17,
112:15, 112:18,
112:24
vantage - 93:23
vehicle - 11:4, 37:9
ventures - 8:18,
84:20
Ventures - 1:6, 1:17
verified - 13:2
version - 68:19,
108:8
view - 31:15, 57:6
views - 111:7
Virginia- 67:17,
67:22
vision - 34:22
visited - 66:12
voting - 100:6,
100:8, 100:9
Vs- 1:9

**W**

Wacholvia - 26:6
Wachovia - 24:11,
24:12, 24:18, 25:4,
26:7
walk - 81:11, 81:14
walked - 83:24
wants - 65:9
ware - 36:11, 36:15,
36:19, 36:22, 38:23,
62:18
Washington- 66:11
wasted - 110:14
ways - 49:17, 70:10
web - 36:22
website - 15:19,
15:21, 16:4, 16:11,
16:22, 17:5, 17:6,
17:14, 17:17, 17:20,
17:21, 18:4, 88:6,
89:15, 107:23
week - 22:14, 70:22,

70:23
weekend - 70:21
weeks - 21:14,
23:23, 64:13, 83:21,
85:19
Wellington - 1:20
wheels - 102:23
Whereby- 45:19
white - 66:25,
78:21, 77:1, 77:3,
77:16, 93:2, 107:8
whole - 5:5, 76:4,
80:14, 81:2, 95:24,
102:10, 102:25, 103:2
wind - 23:7
wished - 112:11
witness - 2:9, 47:10
Witness - 115:11
witness's - 104:7
word - 12:21, 54:4,
68:3, 96:3, 106:6
words - 31:16,
44:20, 45:19, 45:24,
61:12, 82:3, 95:11,
96:3
worth - 70:1, 75:23
write - 73:10, 73:11
writing - 40:5, 40:7,
40:10, 41:20, 41:21
written - 44:15,
62:9, 101:6
wrote - 40:13, 44:7

**Y**

Yaniv - 1:21
year - 41:10, 71:13
years - 46:6, 46:7,
47:23, 65:10, 75:13,
98:10
yesterday - 12:9,
28:13, 67:19, 75:5,
75:24, 79:5, 98:5,
109:14
yourself - 10:2,
48:22, 50:12, 97:3