In The United States Court Of Appeals
For The Eleventh Circuit

---

Court of Appeals No. 09-15255HH
District Court No. 08-00176-cr-Orl-28GJK

---

Frank L. Amodeo
Appellant

v

United States of America
Appellee

---

On Appeal from the United States District Court
For The Middle District of Florida
Orlando Division

---

INITIAL BRIEF OF THE APPELLANT

---

Frank L. Amodeo, pro se
Federal Correctional Complex-low
P.O. Box 1031
Coleman, FL. 33521-1031

Exhibits

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

### <u>Judiciary</u>

The Honorable John Antoon II, United States District Judge

The Honorable Presnell, United States District Judge

The Honorable Karen Jenneman, United States Bankruptcy Judge

The Honorable John Cook, United States Bankruptcy Judge

The Honorable Gregory J. Kelly, United States Magistrate Judge

The Honorable Karla R. Spaulding, United States Magistrate Judge

The Honorable Thomas B. Smith, Orange County, Circuit Court Judge

The Honorable Belvin Perry, Orange County, Circuit Court Judge

### <u>Attorneys and Representatives of the United States of America</u>

I. Randall Gold, Assistant United States Attorney

Peggy Morris Ronca, Assistant United States Attorney

Nicole Andrejko, Assistant United States Attorney

Carol Lee, United States Dept. Of Justice Trial Attorney Tax Division

Chief of Special Procedures for the Internal Revenue Service

Cierra M. Barker Financial Litigation Agent United States Attorney's
Office

Office of the United States Attorney General

### <u>Other Attorneys</u>

Harrison Slaughter

Kenton Sands

Robert Panoff

A. Brian Phillips

Thomas Dale

Michael Maher

C-1

J. Brent Smith

Jack Scorolla

Peter Hill

Kenneth Herron

Elizabeth Green

J. Russell Campbell

Jack Searcy

Jane Raskin

Kathleen Havener

John T. Gatlo

Joseph A. DeMaria

Thomas Tew

David Ketter

Joseph Varner III

Bart R. Valdes

Brent Wardrop

Charles Carlson

Karl Leo

### Bankruptcy Trustees and Attorneys

Richard P. Jahn, Chapter 7 Trustee

R.W. Cuthill, Mirabilis Ventures, Inc. Chapter 11 President

Richard Barrett, Esquire

R. Scott Shuker, Esquire

### Others

Gill R. Gedrich, Tennessee Attorney General's Office

C-2

## STATEMENT REGARDING ORAL ARGUMENT

The Appellant, Frank Amodeo, respectfully requests oral argument and believes oral argument would be extremely beneficial to the Court in light of the complex and nuanced nature of the case, the reference to multiple records and the significant public policy concerns and fundamental constitutional issues presented in the appeal.

## CERTIFICATE OF FORMATING

This appeal has certain nonstandard formatting aspects. This nonconformity is the result of Amodeo's lack of resources while incarcerated, lack of an attorney and lack of access to various transcripts.

Because Amodeo lacked access to complete and full transcripts of the proceedings, Amodeo cited to the various records and authorities utilizing a quasibibliography format.

Amodeo recognizes this is unusual but it does appear to make the argument easier to read.

i

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ....................................... C-1

STATEMENT REGARDING ORAL ARGUMENT ................................ i

CERTIFICATE OF FORMAT ................................................................. i

TABLE OF CONTENTS ......................................................................... ii

TABLE OF AUTHORITIES .................................................................. v

STATEMENT OF JURISDICTION ..................................................... xvii

STATEMENT OF THE ISSUES ............................................................ 1

STATEMENT OF THE CASE ............................................................... 2

    Introduction ...................................................................................... 2

    Amodeo's Illness During The Offense Conduct................................ 2

    Actions And Advice Of Attorneys And Accountants ...................... 4

    Acquiescence Of The Internal Revenue Service.............................. 7

    Harrison Slaughter Becomes A Witness And Advisor .................. 12

    Amodeo Agrees To Cooperate With The Government
    During The Investigation ................................................................ 15

    Amodeo's Attorneys are Threatened By U.S. Government
    And Pressure Amodeo To Sign A Plea Agreement The
    Attorneys know To Be Materially Inaccurate ................................ 17

    Amodeo Takes And Passes A Series Of
    Polygraph Examinations.................................................................. 19

    Amodeo Is Declared Incompetent.................................................... 20

    Slaughter Renews "Carrot And Stick" Plan To
    Get Amodeo To Enter A Guilty Plea Despite Amodeo's
    Insistence On Innocence.................................................................. 22

Slaughter And Gold Misinform Amodeo About The
Elements Of The Crimes And A Key Fact In The
Case (February Memo).................................................................... 24

Amodeo Takes Seroquel, Geodon, Depakote, etc.
To Ensure Amodeo Is Manageable ................................................ 28

Government Inducement And Pretense Continues ........................ 29

Amodeo Is Deprived Of Counsel At Sentencing ........................... 31

Amodeo Wants The Plea Withdrawn For Breach
Of Agreement ............................................................................... 32

Amodeo Again Deprived Of Counsel By Court
With Regard To The Motion To Cancel Plea Agreement.............. 35

Four Months Later Without Notice To Amodeo
The Motion To Cancel Plea Is Denied
And This Appeal Ensued................................................................ 36

SUMMARY OF THE ARGUMENT ......................................................... 37

    ARGUMENT.................................................................................... 38

Introduction

        (A) Amodeo's Actual Innocence Of The Alleged Crimes ... 38

        (B) Lack Of Factual Predicate For The Plea
            Agreement Does Not Support The Conviction..................... 43

Issue I. Effect of State Court Judgment of Incompetency on
        Validity Of Plea Agreement .......................................... 49

Issue II. Amodeo Was Actually Incompetent To Plea ........................... 51

Issue III. Invalidity Of Plea Agreement As A Contract ........................... 57

        (A) Fraudulent Inducement ................................................. 58

(B) Mutual Mistake ............................................................ 61

(C) Failure or Illusory Consideration .............................. 62

(D) Lack of Capacity ........................................................ 63

(E) Contract Analysis Summary....................................... 64

Issue IV. The Plea Was Not Knowing and Voluntary.............................. 65

(A) Amodeo's Attorneys Had Actual Conflicts Of Interest ........... 66

(B) Amodeo Is Misinformed About The Elements
Of The Crime Thus Does Not Understand The Charges
To Which Amodeo Is To Plea
        (i) tax counts ...................................................... 71
        (ii) other counts.................................................... 75

(C) Amodeo Is Misadvised Concerning The
Consequences Of The Plea Agreement And
Severity Of The Sentence.................................................. 77

(D) Government's Failure To Fulfill Promises To
Induce Cooperation And The Plea Agreement Renders The Plea
Invalid............................................................................... 79

(E) Cumulative Tactical Errors Of Amodeo's
Attorneys Constitute Ineffective Assistance Of
Counsel As Required By The Sixth Amendment........................... 83
        (i) Failure To Investigate ..................................... 83
        (ii) Character Witnesses ....................................... 84
        (iii) Failure To File Motion .................................. 87

Issue V. Amodeo Was Deprived Of Counsel During The
        Criminal Proceedings................................................. 88

Issue VI. Forced Medication Violated Amodeo's Due Process Rights .... 93

CONCLUSION................................................................................ 96

CERTIFICATE OF COMPLIANCE.......................................... 97

CERTIFICATE OF SERVICE ................................................... 98

CITATION TO THE RECORDS (ENDNOTES) ..................................... 99

APPENDIX, SEPERATELY BOUND AND FILED

    Appendix 1 - Citations to the Record

    Appendix 2 - Sworn Statements of May 9, 2009

    Appendix 3 - Witness List

    Appendix 4 – Structural Flaws in the Plea System

    Appendix 5 – Governmental Misconduct

    Appendix 6 – Motivation of Defense Attorneys to Obtain Guilty Plea

    Appendix 7 – Examples of Events Augmenting Mental Diseases

    Appendix 8 – Mock Deposition Transcript

    Appendix 9 – Berman's February 2006 Tax Memorandum

    Appendix 10 – Declaration Statement of Facts with Addenda

    Appendix 11 – Memorandum of Law Regarding Appointment of
              Counsel

    Appendix 12 – Stipulated Statement of Facts

    Appendix 13 – The Medicine: SEROQUEL

    Appendix 14 – Berman's April 2005 Tax Memorandum

# TABLE OF AUTHORITIES

## Cases

Page

*AMERICAN SURETY CO. v BALDWIN*
   287 US 156 (1932) ....................................................... 51

*AVILA v GUARTEMAN*
   2009 APP LEXIS 3250 (17 FEB 2009) ...................... 74

*BAKER v THOMAS*
   45 F3D 1501 (11TH CIR 1995) ................................... 87

*BELL v CONE*
   535 US 685 (2002) .................................................... 70

*BEMIS v UNITED STATES*
   30 F3D 220 (1ST CIR 1994) ...................................... 58

*BLACKLEDGE v ALLISON*
   431 US 63 (1977) ............................................. 65,82,83

*BLACKLEDGE v PERRY*
   417 US 21 (1974) ...................................................... 63

*BLADE v KEMP*
   758 F2D 523 (11TH CIR 1985) ................................... 87

*BOUSLEY v UNITED STATES*
   523 US 614 (1998) .................................................... 66

*BOYKIN v ALABAMA*
   395 US 238 (1969) .................................................... 65

*BREWER v WILLIAMS*
   403 US 387 (1977) .................................................... 92

*BROWN v BUTLER*
   811 F2D 938 (5TH CIR 1987) ..................................... 74

*BRYAN v UNITED STATES*
   524 US 184 (1998) .................................................... 38

*BURDEN v ZANT*
   871 F2D 956 (11TH CIR 1989) ................................................. 70

*CHANDLER v UNITED STATES*
   218 F3D 1205 (11TH CIR 2000) .............................................. 70

*CHEEK v UNITED STATES*
   492 US 192 (1991) ................................................................ 38,39

*CHESSMAN v TEETS*
   354 US 156 (1957) ................................................................ 92

*CHRISTMAS v RUSSEL*
   72 US 290 (1866) ................................................................. 51

*CODE v MONTGOMERY*
   799 F2D 1481 (11TH CIR 1986) .............................................. 84

*CONKLIN v SHEFFIELD*
   366 F3D 1191 (11TH CIR 2004) .............................................. 70

*COOPER v NEWELL*
   173 US 555 (1899) ................................................................ 51

*COX v LOUISIANA*
   379 US 559 (1965) ................................................................ 43

*COLLIER v TURPIN*
   177 F3D 1184 (11TH CIR 1999) .............................................. 87

*CRANDELL v BUNNELL*
   144 F3D 1213 (9TH CIR 1998) ................................................ 84

*CUYLER v SULLIVAN*
   446 US 335 (1980) ................................................................ 70

*D'ARCY v KETCHUM*
   52 US 165 (1851) ................................................................. 51

*DECK v MISSOURI*
   544 US 622 (2005) ................................................................ 95

*DEMOSTHENES v BAAL*
   485 US 731 (1990) ................................................................ 51

*DEVLIN v INGRUM*
  928 F2D 1084 (11TH CIR 1991) .................................................. 61

*DOUGLAS v CALIFORNIA*
  372 US 353 (1963) .................................................. 92

*DURFLE v DUKE*
  375 US 106 (1963) .................................................. 51

*DUSKY v UNITED STATES*
  362 US 402 (1960) .................................................. 96

*EVITTS v UNITED STATES*
  469 US 387 (1985) .................................................. 92

*FALLADA v DUGGER*
  819 F2D 1564 (11TH CIR 1987) .................................................. 51,57

*FLORIDA v NIXON*
  543 US 175 (2004) .................................................. 70

*GIDEON v WAINWRIGHT*
  372 US 355 (1963) .................................................. 92

*GRIFFEN v WARDEN*
  970 F2D 1355 (4TH CIR 1992) .................................................. 87

*HALBERT v MICHIGAN*
  545 US 605 (2009) .................................................. 92

*HENDERSON v MORGAN*
  426 us 637 (1976) .................................................. 73

*HOLBROOK v FLYNN*
  475 US 560 (1986) .................................................. 95

*HORTON v ZANT*
  941 F2D 1449 (11TH CIR 1990) .................................................. 74,87

*ILLINOIS v ALLEN*
  397 US 337 (1970) .................................................. 95

*INNES v DALSHIEM*
  864 F2D 974 (2ND CIR 1988) ................................................... 58

*JACKSON v GOBERT*
  117 F3D 262 (5TH CIR 1997) ................................................... 48

*JOHNSON v UNITED STATES*
  352 US 565 (1957) ............................................................ 92

*JOHNSON v ZEBRST*
  304 US 458 (1938) ............................................................ 92

*KERCHEVAL v UNITED STATES*
  274 US 220 (1927) ........................................................ 65,83

*KIRBY v UNITED STATES*
  406 US 682 (1972) ............................................................ 92

*KRAMER v CHEMICAL CONSTRUCTION CORP.*
  456 US 461 (1982) ............................................................ 51

*LANE v BROWN*
  372 US 477 (1963) ............................................................ 93

*LIGHTBOURNE v DUGGER*
  829 F2D 1012 (11TH CIR 1987) ................................................ 69

*LoCONTE v DUGGER*
  847 F2D 1139 (5TH CIR 1988) ................................................. 74

*MABRY v VAUGHN*
  67 F3D 909 (11TH CIR 1995) .................................................. 64

*MAINE v MOULTON*
  474 US 159 (1995) ............................................................ 92

*MARCHIBRODA v UNITED STATES*
  368 US 487 (1962) ............................................................ 82

*MARSHALL v CITY OF ATLANTA*
  195 BR 156 (ND GA 1996) ..................................................... 75

*MARTIN v KEMP*
  760 F2D 1244 (11TH CIR 1985) .............................................. 65,83

*McCARTHY v UNITED STATES*
   394 US 459 (1969) ................................................................. 44

*MEMBA v RHAY*
   389 US 487 (1967) ................................................................ 82

*MILLS v DURYEE*
   11 US 481 (1813) ................................................................. 51

*MONGE v CALIFORNIA*
   524 US 721 (1998) ................................................................ 95

*MOORE v ILLINOIS*
   434 US 220 (1977) ................................................................ 92

*MORISETTE v UNITED STATES*
   342 US 246 (1952) ................................................................ 41

*NEDER v UNITED STATES*
   527 US 1 (1999) .................................................................. 75

*NELSON v HARGETT*
   989 F2D 847 (5TH CIR 1993) ................................................. 74,84

*NIX v WHITESIDE*
   475 US 157 (1986) ................................................................ 87

*PATE v ROBINSON*
   383 US 375 (1966) ............................................................. 51,57

*PENSON v OHIO*
   488 US 75 (1988) ................................................................ 92

*PIERCE v UNITED STATES*
   705 A 2D 1086 (DC CIR 1997) .............................................. 51,57

*RECTOR v JOHNSON*
   120 F3D 551 (5TH CIR 1997) .................................................. 74

*RIGGINS v NEVADA*
   504 US 127 (1992) ................................................................ 94

*RIOS v ROCHA*
   299 F3D 796 (9TH CIR 2002) ............................................................ 84

*ROWE v GRIFFIN*
   676 F2D 524 (11TH CIR 1982) .......................................................... 49

*SAN PEDRO v UNITED STATES*
   79 F3D 1065 (11TH CIR 1996) ........................................................ 64,82

*SANTABELLO v NEW YORK*
   404 US 257 (1971) ........................................................................ 82

*SMITH v BLACKBURN*
   785 F2D 545 (5TH CIR 1986) ........................................................... 82

*STAN v DUGGER*
   921 F2D 1125 (5TH CIR 1991) ......................................................... 65

*STINSON v WAINWRIGHT*
   710 F2D 743 (11TH CIR 1983) ....................................................... 51,57

*STINYARD v DUGGER*
   1989 US LEXIS 16526 (11TH CIR 1989) ............................................. 74

*STOKES v SINGLETARY*
   952 F2D 1567 (11TH CIR 1992) ....................................................... 92

*STRICKLAND v WASHINGTON*
   466 US 688 (1984) ........................................................................ 74

*THOMAS v KEMP*
   796 F2D 1322 (11TH CIR 1986) ....................................................... 87

*UNITED STATES v ALARCON*
   261 F3D 416 (5TH CIR 2001) ........................................................... 49

*UNITED STATES v ALEMAN*
   286 F3D 86 (2ND CIR 2002) .......................................................... 49,82

*UNITED STATES v ANDRADES*
   169 F3D 131 (2ND CIR 1999) ........................................................... 49

*UNITED STATES v ANDREWS*
   953 F2D 1312 (11TH CIR 1992) ...................................................... 41,47

*UNITED STATES v ANSALDI*
  372 F2D 118 (2ND CIR 2004) ...................................................... 42

*UNITED STATES v BOATNER*
  966 F2D 1575 (11TH CIR 1992) .................................................. 82

*UNITED STATES v BROWN N.*
  117 F3D 471 (11TH CIR 1997) .................................................... 73

*UNITED STATES v CARR*
  740 F2D 339 (5TH CIR 1984) ..................................................... 48

*UNITED STATES v CONDON*
  132 F3D 653 (11TH CIR 1998) ................................................... 42

*UNITED STATES v CRONIC*
  466 US 648 (1984) ................................................................... 70

*UNITED STATES v DAVIS*
  583 F2D 190 (5TH CIR 1978) ................................................. 42,48

*UNITED STATES v DAY*
  949 F2D 973 (8TH CIR 1991) ................................................ 51,57

*UNITED STATES v DeLUNA*
  815 F2D 301 (5TH CIR 1987) .................................................... 71

*UNITED STATES v DEAN*
  59 F3D 1479 (5TH CIR 1995) .................................................... 49

*UNITED STATES v DENEDO*
  173 L2D 1235, 566 US (2009) ................................................... 93

*UNITED STATES v DUDDEN*
  65 F3D 1461 (9TH CIR 1995) ................................................ 49,82

*UNITED STATES v DUKES*
  139 F3D 469 (5TH CIR 1998) .................................................... 48

*UNITED STATES v EISENTIEN*
  731 F2D 1540 (11TH CIR 1984) ................................................. 42

*UNITED STATES v ETHRIDGE*
    948 F2D 1215 (11TH CIR 1991) ................................................................. 75

*UNITED STATES v ETTINGER*
    344 F3D 1149 (11TH CIR 2003) ............................................................. 42,47

*UNITED STATES v FATON*
    179 F3D 1328 (11TH CIR 1999) ................................................................. 43

*UNITED STATES v FULLER*
    162 F3D 256 (3RD CIR 1998) ..................................................................... 42

*UNITED STATES v FUNCHES*
    135 F3D 1405 (11TH CIR 1998) ................................................................. 43

*UNITED STATES v GOBERT*
    139 F3D 436 (5TH CIR 1998) ................................................................. 44,48

*UNITED STATES v GONZALEZ*
    921 F2D 1530 (11TH CIR 1991) ................................................................. 47

*UNITED STATES v GORDON*
    156 F3D 376 (2ND CIR 1998) ..................................................................... 79

*UNITED STATES v GOSS*
    650 F2D 1336 (5TH CIR 1981) ................................................................... 42

*UNITED STATES v GRAMMAS*
    376 F3D 433 (5TH CIR 2004) ..................................................................... 79

*UNITED STATES v GREEN*
    296 FED APPX 820 (11TH CIR NOV 25 2008) ............................................. 42

*UNITED STATES v GUESS*
    203 F3D 1143 (9TH CIR 2000) ................................................................... 49

*UNITED STATES v GUICHARD*
    779 F2D 1139 (5TH CIR 1986) ............................................................... 44,74

*UNITED STATES v HARVEY J.*
    869 F2D 1439 (11TH CIR 1989) ............................................................. 61,82

*UNITED STATES v HARVEY M*.
    791 F2D 294 (4TH CIR 1986) ................................................................ 61

*UNITED STATES v HEDGES*
    912 F2D 1397 (11TH CIR 1990) ............................................................ 43

*UNITED STATES v HORSFALL*
    552 F3D 1275 (11TH CIR 2008) ............................................................ 61,82

*UNITED STATES v HOWLE*
    166 F3D 1166 (11TH CIR 1999) ............................................................ 57

*UNITED STATES v JACOBY*
    955 FED 2D 1527 (11TH CIR 1998) ....................................................... 42

*UNITED STATES v JAMES*
    827 F2D 1469 (11TH CIR 1987) ............................................................ 74

*UNITED STATES v JENKINS*
    779 F2D 606 (11TH CIR 1986) .............................................................. 42,48

*UNITED STATES v JOHNSON E.*
    139 F3D 1359 (11TH CIR 1998) ............................................................ 43

*UNITED STATES v JOHNSON R.*
    194 F3D 657 (5TH CIR 1999) ................................................................ 44

*UNITED STATES v JONES*
    58 F3D 688 (DC CIR 1995) ................................................................... 64,82

*UNITED STATES v KAHN*
    920 F2D 1100 (2ND CIR 1990) ............................................................. 58

*UNITED STATES v KERDACHI*
    756 F2D 349 (5TH CIR 1985) ................................................................ 58,82

*UNITED STATES v KURKCULER*
    918 F2D 295 (1ST CIR 1990) ................................................................ 64,82

*UNITED STATES v LARA-VELASQUEZ*
    919 F2D 946 (5TH CIR 1990) ................................................................ 71

*UNITED STATES v LAWLOR*
    168 F3D 633 (2ND CIR 1999) ............................................................ 64

*UNITED STATES v LOCASCIO*
    6 F3D 924 (2ND CIR 1993) .............................................................. 68

*UNITED STATES v MASHER*
    538 F2D 721 9DC CIR 1976) ........................................................... 51,57

*UNITED STATES v METZ*
    608 F 2D 147 (5TH CIR 1979) ......................................................... 42

*UNITED STATES v NOVATION*
    271 F3D 968 911TH CIR 2001) ........................................................ 70

*UNITED STATES v PADILLA*
    186 F3D 136 (2ND CIR 1999) .......................................................... 57

*UNITED STATES v PALMER*
    456 F3D 484 (5TH CIR 2006) .......................................................... 44

*UNITED STATES v PARKER*
    839 F2D 1473 (11TH CIR 1988) ....................................................... 75

*UNITED STATES v RESTREPO-GRANADA*
    575 F2D 524 (5TH CIR 1978) .......................................................... 71

*UNITED STATES v RINGLING*
    988 F2D 504 (4TH CIR 1983) .......................................................... 57

*UNITED STATES v ROSS*
    131 F3D 970 (11TH CIR 1997) ......................................................... 75

*UNITED STATES v RUIZ*
    536 US 622 (2002) ....................................................................... 65

*UNITED STATES v SALGADO-OCAMP*
    159 F3D 469 (5TH CIR 1998) .......................................................... 48

*UNITED STATES v SIMON*
    839 F2D 1461 (11TH CIR 1988) ....................................................... 75

*UNITED STATES v SKILLING*
    554 F3D 529 (5TH CIR 2009) ......................................................... 72

*UNITED STATES v TAYLOR*
    77 F3D 368 (11TH CIR 1996) ......................................................... 58,61,82

*UNITED STATES v TO*
    144 F3D 737 (11TH CIR 1998) ......................................................... 47

*UNITED STATES v WEISS*
    599 F2D 730 (5TH CIR 1979) ......................................................... 61,82

*UNITED STATES v WILLIAMS*
    728 F2D 1402 (11TH CIR 1984) ......................................................... 42

*UNITED STATES v YEMITON*
    70 F3D 746 (2ND CIR 1995) ......................................................... 57

*WASHINGTON v SMITH*
    219 F3D 620 (7TH CIR 2000) ......................................................... 84

*WHEAT v UNITED STATES*
    486 US 153 (1988) ......................................................... 51,57,96

*WOOD v GEORGIA*
    450 US 261 (1981) ......................................................... 70

*YOUNG v ZANT*
    677 F2D 792 (11TH CIR 1982) ......................................................... 74

STATUES AND PROCEDURES
18 USC SECTION 1505 ......................................................... 75

18 USC SECTION 3553 ......................................................... 87

26 USC SECTION 7202 ......................................................... 25,27,38,46,48

28 USC SECTION 1738 ......................................................... 51

FLORIDA GUARDIANSHIP LAW FLORIDA
STATUTE SECTON 95.051(1)(2) ......................................................... 50,63

"ACT OF 1790"
    FEDERAL RULES OF CRIMINAL PROCEDURE RULE 44 ............................ 51


OTHER
1) ABA STANDARDS FOR CRIMINAL JUSTICE 4-4.1
(2D ED 1982 SUPP) ..................................................................... 84

2) American Psychiatric Association: Diagnostic and
Statistical Manual of Mental Disorders, Fourth Edition
Text Revision.  Washington, D.C., American Psychiatric
Association, 2000.  (Latest Version) ......................................... 2

## **<u>STATEMENT OF JURISDICTION</u>**

Jurisdiction for this appeal is conferred upon the Court of Appeals by 28 U.S.C. §1291 and the appeal is assigned to the Court fro review under 28 U.S.C. §1294.

## STATEMENT OF THE ISSUES

Issue I.   Whether Amodeo was legally competent to enter a plea as a result of a state court determination of incompetency?

Issue II.   Whether Amodeo was actually incompetent to enter a plea as a result of mental illness and use of antipsychotic and mood-altering medication?

Issue III.   Whether Amodeo's plea is invalid because of essential infirmities which render a contract void: such as fraudulent inducement, lack of capacity, failure of consideration or mutual mistake?

Issue IV.   Whether Amodeo's guilty plea was not knowingly and voluntarily entered as a result of Amodeo's attorneys' actual conflicts of interest, Amodeo's attorneys' actual conflicts of interest, Amodeo's attorneys' inaccurate and ineffective advice or the Government's unfulfilled promises.

Issue V.   Whether the district court's failure to provide Amodeo an unconflicted counsel at sentencing or any counsel at all with regards to motion to cancel plea is an unconstitutional deprivation of counsel?

Issue VI.   Whether the magistrate's order forcing Amodeo to be medicated violated Amodeo's rights to due process and a fair trial?

## STATEMENT OF THE CASE
### Introduction; Statement of Case

The underlying conduct and the plea agreement are the result of a convergence of factors which led to a cascade of events. The result was to make a conglomeration of mistakes and negligent judgment appear criminal. The converging factors include: Amodeo's illness, attorneys' conflicts of interest and a media conscience government (how to explain that 181 million dollars in taxes were reported but not collected and the IRS although aware of the obligations took no action).

### Amodeo's Illness

Amodeo's illness is undisputed. The government admitted the existence of the disease and the disease's impact on Amodeo's competency during a bankruptcy proceeding on June 12, 2006. The Assistant United States Attorney, I. Randall Gold, Esq. (Deputy Chief of Orlando Division) acknowledged personally having witnessed the disease manifest itself during the change of pleas hearing in September 2009 and finally the government stipulated to the existence of the disease at sentencing. Additionally, the government stipulated to the validity of the McLean Hospital Report (Harvard Evaluation) and utilized the incompetency to the government's advantage in the collateral bankruptcy proceedings.

Amodeo has axis 1 bipolar disorder with psychotic episodes and permanent delusions. An excellent synopsis of the disorder is available from the American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (DSM-IV Revised Edition). An understanding of the symptoms of the disease is necessary to fully understand how the disease impacted the case.

The disease, except at the extremes, does not affect Amodeo's (or anyone suffering from it) intelligence or memory. In Amodeo's case Amodeo's intelligence is heightened during the hypomanic phase and declines during the manic or depressive cycle. As many of the doctors and therapists have noted, since Amodeo is so high-functioning and is a rapid cycler, Amodeo is often able to mask the full onset of the disease from the casual or limited observer.

Amodeo manifests many of the other common characteristics of the bipolar; Amodeo is very charismatic during the manic phases of the disorder while easily irritated and highly irritable during the depressive phases. Amodeo, when cycling or in manic phases, will display rapid speech, racing thoughts and an inability to concentrate or focus, especially on emotionally sensitive matters. Amodeo, like all manics, will not recognize Amodeo is ill while in the manic phases, mixed states, or while cycling and probably will not recognize during the depressive phase.

A bipolar individual does not believe he or she is sick. Often the bipolar is addicted to the manic experience, because of the perceived ability to think so much better and faster than normal. A bipolar person cannot cure himself. Bipolars usually, cannot even recognize the disease is manifest. To treat a bipolar, intervention is required.

A prominent symptom of the bipolar disease is a tendency to engage in spending and purchasing sprees. In Amodeo's case this tendency manifests itself in the spending of professional fees.

Amodeo and the related companies spent over 12 million dollars in fees; not including the internal professional staff, during the two-year period of the alleged offense.

### Actions and Advice of Accountant's and Attorney's

The consequence of this spending spree was to provide the professionals with a strong incentive to ensure the proverbial "goose laying the golden eggs" did not get cooked. In other words, if the professional had "discovered" the crime or warned Amodeo and certain other key personnel of a possible duty with regards to the payment of the taxes; then the lucrative engagements, employment contracts, bonuses, etc ... would have ended. It was common knowledge that without the liquidity provided by the PEOs (either Professional Benefits Solutions, Inc. or AEM, Inc.); [which entity owes the tax is still undecided], it would have been impossible to pay for the professional contracts or maintain the substantial level of compensation for the internal professional staff.

The result was that the professionals, through both advice and behavior confirmed and condoned the legitimacy of deferring the payroll taxes. Deferring the tax payments in order to reorganize the corporate taxpayer. Especially, paying the professionals.

This approach was particularly effective because of Amodeo's disease. Amodeo's disease may not have a chronic effect on Amodeo's intelligence but it does effect Amodeo's perception of reality and risk.

Amodeo's belief in the legitimacy of the tax-deferment strategy was not new; Amodeo had utilized similar strategy before and the IRS had not only accepted the strategy but provided accolades to Amodeo.

The primary difference in this case, causing Amodeo to seek out professional advice, was that Presidion Corporation was publicly traded and Amodeo had no experience with public companies or the securities laws.

The secondary factor (in Amodeo seeking assistance) was Amodeo's initial consulting partners: Eddie Curry, Esq., Robert Curry, CPA, Dan

Myers, CPA, Jason Carlson, MBA, etc ... imposed certain requirements on assisting Amodeo with the "Presidion case." The restrictions involved when fees were collected, disbursement of funds and due diligence, including utilizing outside attorneys.

Carlson and Curry were especially concerned about the involvement and hidden agenda of the Presidion Corporation principals including but not limited to: Craig Vanderburg, James Baier, Esq., John Burcham, Chris O'Connor, CPA, David Firestone and the Millennia Group and the representatives of Ken Hendricks (Forbes 400).

As a result of these two concerns, Amodeo elected to retain three prominent firms to advise Amodeo and Amodeo's consulting company, AQMI Strategy Corporation: the law firm of Berman, Keane and Riguera; the accounting firm of Rachlin, Cohen and Holtz; and the law firm of Buchanan and Ingersoll.

The principals of these firms, Richard Berman, Esq., Laurie Holtz, Esq., and Hans Beyer, Esq., joined with Edie Curry, Esq. in persuading Amodeo to stop performing accounting and legal activities for the various consulting companies; since they [Berman, Beyer, et. al.] were the licensed professionals and Amodeo was not. Furthermore, these advisors emphasized Amodeo was the "visionary" and Amodeo needed to focus on sales, motivation and expanding the vision, not the operations.

Nothing could have been better "music to Amodeo's (or any bipolar-manic) ears". Amodeo was perceived and treated as the great leader; able to identify a strategy or project, then turn over development or implementation of the project to others. In this case, the others were exceptionally well credentialed professionals of considerable experience and renown. (An

extensive list of these professionals is included in the addenda attached to the Statement of Facts).

Each and every time these professionals took actions which validated the "brilliance" and legitimacy of the plan; Amodeo's belief in the legality of the actions, and inevitable positive results was reinforced.

This type of belief reinforcement is typical of manics but even more pronounced in individuals like Amodeo who experience the disease in mixed states.

The Harvard doctors have identified a chronic underlying depression in Amodeo. Amodeo's delusions and warped perception of reality seem to serve the function of boosting Amodeo's self-esteem in order to minimize the duration and effect of the depressive cycles.

Every time one of these professionals advised or executed part of the plan, Amodeo's belief in the value of the plan increased. (Significantly, every transfer of funds and use of tax dollars was conducted by someone other than Amodeo and with few or no exceptions, these actions were taken by licensed accountants or attorneys).[i] Amodeo, any bipolar, and for that matter even normal people, could not help but believe these individuals would not have conducted these thousands of transactions for over two years, if anyone had been concerned about the legality of the transactions.

Adding to the belief of Amodeo, and undoubtedly others, in the validity of the tax deferment plan was the acquiescence of the IRS and the support of the extremely well credentialed advisors for the "client" – Presidion Corporation.

Presidion Corporation had two separate advisory groups. The internal group consisted of James Baiers, Esq., Chris O'Connor, CPA, Sue Schumacher, CPA and PEO experts such as Presidion COO Chuck

Kilpatrick. Each of these individuals had extensive support staff all who were experienced PEO operators and many of whom were licensed accountants and attorneys.

The external group consisted of the national accounting firm UHY, LLP, the prominent securities law firm of Kilpatrick and Lockhart and the prestigious tax law firm of Kostelanetz and Fink.

This does not even include the professional advisors to the other principals: the billionaire Ken Hendricks, and the exclusive Californian hedge fund and the investment bank of the Millennium Group. It is inconceivable that these professionals would have allowed their clients to participate, indeed facilitate a massive tax crime; exposing their substantial clients and their own firms to civil and criminal penalties.

Since Amodeo insisted Presidion Corporation and its principals obtain and maintain separate counsel, Amodeo became increasingly convinced of the greatness of the strategy; never entertaining any notion the plan was wrong. If any of the prominent firms or Presidion professionals had believed the plan would not work, let alone be against the law, surely these professionals would have intervened or at least terminated their representation.[ii]

Since no one raised any concerns nor terminated their contracts of employment, Amodeo's belief system was reaffirmed. Again it is significant that every transaction involving the unpaid taxes was directed or executed by Schumacher or O'Connor, up to May, 2006 (More than 120 million dollars in tax, exclusive of interest and penalty).

### Internal Revenue Service

The second enhancing factor was the Internal Revenue Service. The IRS had conducted a two year investigation of Presidion Corporation

between 2004 and 2006. This investigation was done in conjunction with the Organized Crime Task Force out of Detroit.

At the time this investigation ended, Presidion Corporation, or more accurately Presidion Corporation's consolidated subsidiaries, owed $52 million in taxes, penalties and interest.

The AUSA for the Task Force – Keith Corbett, Esq. – and IRS Special Agent Patterson; issued a letter for public dissemination confirming Presidion Corporation and affiliates were not going to be charged with any crimes and had been cleared of any wrong doing. Further, Criminal Investigation Division Special Agent Patterson told James Baiers, Esq. that "the unpaid taxes were not his (Patterson's) concern as delinquent taxes were a civil and not a criminal matter".

This position of the IRS was reinforced when officer Pace McNealy told Amodeo's power-of-attorney, Dan Myers, CPA, that he (McNealy) and the IRS were surprised when Amodeo paid back the payroll taxes on two companies previously owned by Amodeo. The surprise was because Amodeo would not have been liable for the tax since Amodeo did not receive a direct personal benefit.

In addition, IRS collection officer Judy Berkowitz, who handled another Amodeo case involving a bankruptcy, not only was satisfied with the handling of that case (which included the use of payroll taxes for other purposes), Berkowitz affirmatively asked for the Sunshine cases (names of Presidion Corporation subsidiaries).

Berkowitz even went so far as to tell Amodeo in January of 2005 to change the corporate address of the Sunshine companies to the same private mailbox used by Amodeo's company in the prior case. This change of

address would result in the Sunshine cases being automatically assigned to Berkowitz.

It is important to note, at this point, that the IRS had failed to identify a 52 million dollar tax liability in the prior criminal investigation. Amodeo affirmatively and voluntarily went to the IRS and disclosed the debt and mistake. (This meeting and the professionals in attendance are more thoroughly discussed in the Statement of Facts entered and stipulated to by the government at the sentencing hearing, the revised somewhat more comprehensive version of the Statement of Facts was filed separately in this case and the district court case).

After this meeting, and for the next 18 months, the IRS met on many occasions with the accountants and attorneys employed by Amodeo or the corporations. The principal IRS agent, Berkowitz, and Amodeo's representative, Myers, communicated so often by telephone and fax that they took to referring to each other as Dan and Judy. More than 150 contacts and communications took place. Jose Marrero, of Rachlin, Cohen and Holtz, Sharmilla Kharokar, CPA, of the same firm, Myers and Hans Beyer, Esq. assured Amodeo and others that everything was going well with the IRS.

In February of 2006, Amodeo informed Berkowitz that the successor entity to the Sunshine companies (PBS) had accrued a 71 million dollar payroll tax liability in 2005 as part of the reorganization plan.

Berkowitz, in the hundreds of communications after the letter nor in Berkowitz's meeting with Beyer, Khanokar and Myers ever expressed concern over the unpaid tax; even though PBS's situation was part of her inquiries and discussions.

At or about the same time, Craig Vanderburg, President of Presidion Corporation, was contacted by the FBI, first as a person-of-interest, then as a

witness in a different matter.  The USAO in Fort Lauderdale and the FBI were investigating a letter-of-credit scam.

During this investigation and interview of Vanderburg the FBI brought up a possible issue concerning unpaid Presidion payroll taxes. Vanderburg brought this to the attention of Berman, but before the matter was discussed with Amodeo, the FBI told Vanderburg "not to worry about it, the matter was a collection issue and since the taxes were being repaid it was not a concern."

[The government has conceded; that the "grand plan" was to reorganize the business, sell the business and repay the taxes.  (Language was inserted in the factual statement included in the plea agreement at the government's request).]

Next, Amodeo personally met with the IRS on or about July 20, 2006. This meeting was arranged by Amodeo and Amodeo insisted on going himself.  Amodeo believed Amodeo could best negotiate a resolution; especially since an issue had been raised by the IRS as to whether the IRS could be beneficiary of a trust.[iii]

At this meeting, attended by four IRS representatives, Amodeo, Khanokar and Myers, Amodeo explained the plan disclosed the fees paid to Amodeo and the consultants, discussed legal issues and the amount of the debt.  The meeting went well and both sides agreed on an agenda which should lead to a mutually satisfactory resolution by the time the business was to be marketed for sale in January 2007.  (See document package with charts submitted to the IRS July 20, 2006).

At the beginning of this meeting when John Lordi, the district counsel for the IRS, tells Amodeo this is a civil investigation, not a criminal investigation.

- 10 -

One of the main issues discussed at this meeting was how a note and security-interest had been created by certain of the entities. This resulted in an income stream which could be levied upon by the IRS. The IRS followed Amodeo's recommendation and began receiving weekly payments of $150,000 as well as being able to "piggy-back" on the preexisting security interest. As a result, the IRS now had a secured position where previously the IRS claim was unsecured.

The IRS received these payments for the rest of the year until the allocation of payments was altered because of an agreement between Amodeo, the USAO and CI Division of the IRS.

Even while these payments progressed, the professionals continued to work with the IRS producing thousands of pages of documents and answering all questions.

These communications ended after the grand jury investigation commenced.

At this point, the original pattern of convergence has been identified: Amodeo's belief in the legality of the tax deferment plan is increasingly solidified by the actions of the corporate executives, the advice of the professionals and the acquiescence as well as apparent affirmance from the IRS and other government agencies. This merges with the personal incentives and enthusiasm of the hundred or so executives and professionals.

The explanation for the actions and advice of many (possibly most) of the executives was provided by Special Assistant United Stated Attorney, Theresa Boatner.

Boatner told Amodeo she realized that what was happening was a vicious spiral. Beyer told Amodeo this was OK, Amodeo told Myers, Myers told Stanley, Stanley told Glover, (the names were different, but the point is

the same).  Glover then tells Myers and Myers then tells Beyer.  In effect
everyone began to reinforce the beliefs of each other.

All the while the senior advisors like Berman (who became general
counsel) and Holtz (who became chairman) blithely ignored the conduct and
misperceptions: quite possibly because of the large fees being made by
Berman's firm (estimated at over 60% of their annual billings) and the
anticipated gigantic wealth expected by Holtz (See April 19, 2006 video of
discussion between Laurie Holtz and his son Stephen – partially transcribed
in the Statement of Facts).

Amodeo's disease made Amodeo particularly susceptible to these
influences.

### Harrison Slaughter Becomes Involved

Into this environment enters Harrison "Butch" Slaughter.  Slaughter
introduced to Amodeo as the most prominent defense attorneys in Orlando
and one of the most politically connected.  Slaughter represented both
Mayor Buddy Dyer and Mayor Richard Crotty in various criminal
investigations.

Amodeo originally retained Slaughter to represent Amodeo in being
readmitted to the Georgia Bar Association.

In the midst of this representation, the United States Trustee's Office
believed Amodeo was engaged in some sort of misconduct in the
Community Health Service bankruptcy case.  Slaughter quickly began to
defend Amodeo in this proceeding.

Slaughter, after reviewing this case and the prior three bankruptcy
cases where Amodeo utilized a similar tax deferment strategy, determined
Amodeo had not done anything wrong.  In fact it appeared the various
debtor's prior owners had actually taken advantage of Amodeo in these

cases and (had taken advantage) of Mirabilis Ventures, Inc. in the Community Health bankruptcy.

At the conclusion of the Community Health case, the bankruptcy judge, on her own motion, told the trustee's office they owed Amodeo an apology for the false accusations.

Slaughter continued to represent Amodeo; examining Amodeo's past and current activities and reviewing the very detailed white paper prepared by George Duke a senior investigator for the state wide prosecutor of the State of Florida.

On August 29, 2006, Slaughter attended a town-hall styled meeting now referred to as the "Mock Deposition." It is referred to as the "Mock Deposition" because Amodeo was sworn, a court reporter transcribed the meeting, the "depo" was professionally videotaped and the format involved Berman asking questions and Amodeo answering.

Slaughter's name was prominently displayed on the sign-in sheet and Slaughter was visible on the videotape.[iv]

During this "Mock Deposition," Amodeo clearly discussed the history and reasons for the unpaid taxes. On pages 86 and 87 of the transcript (and on video), Amodeo discussed how, by not paying the taxes, funds were made available for buying other businesses.

Even after this explicit and simple statement by Amodeo, Slaughter did not warn Amodeo to stop the tax deferment strategy; nor tell Amodeo to disassociate Amodeo's self from any company (AEM, Inc.), then collecting and not paying the taxes.

Not only did Slaughter not say anything, nor did Berman, Holtz, Beyer, Curry, Stanley, Khanokar, Paul Glover, CPA, Brian Nugent, Esq.,

Kelly Tomeo, Esq., Thomas Sadaka, Esq., or any of the nearly 50 professionals or experts in attendance.

Again if this duty to pay tax was so clear, how is it so many professionals failed to identify the duty? Always remembering it was these professionals who handled the money, prepared corporate governance, prepared the various contracts and actually executed the transactions.

Roughly two weeks after the grand jury subpoenas were received, Slaughter finally approached Amodeo about the legality of deferring the payment of payroll taxes.

Slaughter now recounts, including at the sentencing hearing, how Amodeo was shocked (in December of 2006) that the tax deferment was illegal. Slaughter tells how Amodeo did not believe Slaughter until Amodeo independently confirmed the law over the weekend. Amodeo asked Slaughter how Slaughter could have a view so different from all the accountants and attorneys already involved with the tax strategy.

Ironically, if Slaughter, as now purported, was actually a prosecutor of tax cases for the U.S. Attorney in the past, why did Slaughter not raise this issue earlier?

Slaughter had Amodeo's confidence, now, because Slaughter had proved his reputation. After the initial grand jury subpoenas were issued, and once it became apparent that neither Mirabilis nor AEM, Inc. were going to act quickly. Amodeo told Slaughter what was going on. Slaughter told Amodeo not to worry. He (Slaughter) knew Gold and had an excellent relationship with the United States Attorney's Office. Slaughter contacted Gold and instead of serving the subpoenas on the companies and witnesses, Gold sent them to Slaughter to give to Amodeo.

Amodeo was made responsible for distributing the subpoenas.

- 14 -

Amodeo promptly paid a couple hundred thousand additional dollars to Slaughter and ninety thousand to Robert Panoff, Esq. (tax expert; member of the IRS advisory board).

## Cooperation

During the first six months of 2007 Amodeo provided hundreds of thousands of documents, compiled and organized financial data, assured an orderly shut down and liquidation of the Mirabilis companies, and conducts seven undercover operations for the government.

Amodeo was told by Gold that in exchange for these efforts, Amodeo would get a "Tampa letter", should Amodeo ever be convicted. A Tampa letter meant at least a five level sentencing reduction and possibly as much as a ten level reduction.

By May of 2007, the government made a deal with Amodeo to allow Amodeo to close certain businesses and sell the assets. Further, the government said Amodeo had already "earned his credit" and would only need to be available to provide documents in the future.

As it turns out Amodeo provides considerably more assistance to the government; including locating, reviewing and explaining 27,000 hours of audio/video recordings of the corporate facilities.

Amongst these meetings were many hours of very explicit discussions about the unpaid taxes, the tax controversy and the corporate decision makers.

Based on all of this assistance, plus the preservation of tens of millions of dollars of assets, Herb Hoelter the sentencing expert hired by Amodeo, believed Amodeo should receive 10 to 15 levels reduction on any sentence. The sentencing expert was recommended by Slaughter.

Amodeo also hired many other Slaughter recommendations during this time: forensic psychiatrist, another attorney, Brian Phillips, etc, spending at least another $250,000. All told – Slaughter and Slaughter's associates received over 1.25 million dollars from Amodeo.

During this entire period Amodeo continued to assert Amodeo's innocence. Amodeo made it clear, Amodeo never intended to defraud the IRS or anyone else.

Amodeo was told by Slaughter, Panoff and Phillips that conspiracy only required an agreement and an act; it did not matter whether Amodeo intended to assist in a fraud or knew Amodeo was participating in unlawful conduct.

Even with considerable pressure mounting from Amodeo's attorneys to enter a plea, Amodeo flatly refused to admit any wrong doing. Instead Amodeo insisted upon taking a polygraph examination to prove Amodeo was telling the truth and had no intent to mislead the IRS or anyone else.

While the polygraph was being arranged, Amodeo was presented with a plea agreement that contained a set of facts which was blatantly false. Amodeo refused to sign the agreement.

Amodeo was so distressed by the surprise plea agreement (Amodeo was unaware Slaughter and Panoff had been negotiating a plea) (Panoff asserted Slaughter was supposed to have told Amodeo over a month before), Amodeo could not even make comments about the proposed agreement.

Amodeo asked two former staff attorneys to review the facts in the proposed plea agreement and send back a correct version to Phillips. (Phillips was doing the writing for Panoff and Slaughter).

The staff attorneys drawing upon their personal knowledge from experiencing some of the events and two years of researching the documents

and recordings for the plethora of civil actions pending (See litigation list in the Statement of Facts), had so many "red lines" in the version of the purposed plea they were trying to edit. That the staff attorneys believed it was impossible to correct simply rewrote the proposed plea facts.

Amodeo requested the staff attorneys not only send the red lined version, but also send the rewritten and accurate factual statement to Panoff, Phillips and Slaughter.

Discussions between Amodeo and the staff attorneys made it clear the criminal defense attorneys would be committing a serious ethics violation if they permitted Amodeo to sign the original factual statement; because Slaughter et. al. should be aware that the proposed factual statement is materially untrue.

Shortly thereafter, Amodeo was summoned to Slaughter's office. The purported reason was to meet the polygrapher and schedule the polygraph examinations. When Amodeo arrived at Slaughter's office, Slaughter told Amodeo about a conference call with Panoff [v] (Panoff's office is located in Miami, Florida; Amodeo's office and Slaughter's offices are located in Orlando, Florida). Brian Phillips was present at Slaughter's office.

As soon as Panoff came on the telephone, Amodeo was presented with a new plea agreement. This plea agreement contained a factual statement essentially the same as the one the staff attorneys had told Slaughter was untrue and that no attorney could ethically permit Amodeo to sign.

## Prosecutorial Threats

Amodeo protested even reviewing the agreement. Panoff then told Slaughter to show Amodeo the email from Gold.

The email from Gold said: Amodeo had to sign the plea agreement without any changes or else the deal was off. The only deal point specified in the email was the promise by Gold to protect the attorneys' fees from seizure and forfeiture. The email also gave the attorneys until Monday (the meeting was on a Thursday) to get Amodeo to sign the plea agreement without any changes.

Amodeo said no. Amodeo had never lied under oath. Amodeo was not going to start lying under oath now.

Phillips, a comparatively recent departure from the Middle District's US Attorneys Office, then told Amodeo, "If you do not sign the plea agreement, the government will immediately arrest you, seize your assets, take away the money set aside for your handicap stepson's survival, embarrass and humiliate your family and deprive you of counsel by taking our (attorney) fees."

Further, Phillips said the government will get a conviction because the government will not hesitate to get perjured testimony from all of the bad guys. The bad guys who will escape justice by helping the government get you: the "low-hanging fruit."

Phillips then went on to explain to Amodeo, Amodeo would not really be lying by agreeing to the factual statement since all Amodeo was really admitting to was, "what the government could prove at trial even if only by perjured testimony."

Amodeo said, "Fine, the United States has just declared war on the Empire. I hereby renounce my citizenship. I will not be part of a country which forces its citizens to lie to protect their families and how could anyone try and harm my sick parents (father a cancer victim; mother recovering from a stroke) or damage Gentry (stepson, raised by Amodeo, with Down

- 18 -

syndrome amongst a variety of other chronic diseases). Ok, I will sign it. I do not need to read it (plea agreement). It is completely false but obviously this does not matter. God, this is not an oath before you." Amodeo then signed the plea agreement and went to meet with the polygrapher.

After finishing with the polygraph, Amodeo went to the offices of Matt Mokwa and asked Mr. Mokwa to arrange for a court reporter to take a video statement from Amodeo so Amodeo could memorialize the events and have a recording of Amodeo's demeanor contemporaneously completed. (Appendix 2).

Slaughter and Phillips visited Amodeo and told Amodeo not to worry; this plea agreement would not actually be used. They said Gold needed the plea agreement to circumvent the dual approval process in Washington, DC. This process was what gave Gold authority to prosecute.

Amodeo said this was good because as soon as Amodeo gets in court, Amodeo intends to tell the judge and the media everything about this process, including the agents not wanting exculpatory evidence on the other targets.

Slaughter said to "settle down" that it would "work out" like Slaughter had predicted. Slaughter reminded Amodeo, Slaughter's other predictions had been right. Slaughter reaffirmed two years was worst case and that was less time than a trial would take.

Also, Amodeo would not have to lie to the court, the facts would be reworked. Finally, Slaughter asked Amodeo to remember the polygraph was scheduled for next week and to be ready.

### Amodeo Passes the Polygraphs

Amodeo took the first polygraph examination. Slaughter went to meet with the polygrapher alone and then came back in to see Amodeo.

Slaughter had an awful look on his face. Slaughter told Amodeo, "You passed. Nobody ever passes."

Slaughter then told the polygrapher there were more questions to be asked. The polygrapher [vi] told Slaughter, "only four questions a day and preferably one test per day."

A plan was designed for a series of tests. Amodeo took the test and much to the surprise of Slaughter, Amodeo passed all four examinations.

Slaughter wanted more tests but the polygrapher, former FBI, said no, we have done enough. "I think we should go tell Randy (Gold) this man did not commit any crimes. Maybe they should set up their own (government) polygraph tests."

### Amodeo Declared Incompetent

Slaughter had a different idea. Slaughter told Amodeo, based on an email from Amodeo's wife, Amodeo should go see Jeffery Danzinger, MD again. Also, Slaughter told Amodeo he should definitely take Amodeo's new medication (Seroquel) before going. Slaughter had recently seen Amodeo on a full dose of the Seroquel. Slaughter and Panoff were amazed at how quiet and compliant Amodeo became while on the medication (only a third of a dose that day).

At the meeting with Danzinger, Amodeo reiterated Amodeo's long standing belief that Amodeo would ultimately conquer the world and become Emperor of the Earth. This was not the first time Danzinger had heard about the "Emperor" belief; actually Amodeo had spoken of it on every occasion Amodeo had met with Danzinger (Amodeo actually was never shy about this belief, Amodeo regularly told everyone and all the executives and staff at Mirabilis, Amodeo's goal was to control the world and make obsolete all existing governments).

- 20 -

Danzinger, however, had a different response this time. Danzinger after speaking with Slaughter, decided Amodeo was too insane to take care of himself. Slaughter suggested it would be appropriate to commence a competency hearing and get a guardian appointed.

Slaughter initially tried to get Amodeo's wife, and then Amodeo's father to petition the court. Both refused.

Slaughter then arranged for a guardian, a petitioner and a judge to have the hearing. Next, Slaughter called Jim Luesner from the local newspaper and invited Luesner to attend. Slaughter had his staff member [and client] Andy Dinda drive Amodeo to court and make sure Amodeo took a full dose of Seroquel (Slaughter had seen that Amodeo was not only compliant with a full dose as opposed to a partial dose of Seroquel, but actually began to slobber, stagger and actually fall asleep).

Slaughter's old friend, Judge Perry, held the hearing in a conference room as opposed to open court. Amodeo sat, slobbering, without talking. Judge Perry ruled Amodeo incompetent and appointed Harvey Morre, Ph.D. as the temporary plenary guardian and told Slaughter that Amodeo would need to be evaluated by a panel of psychologists to confirm the incompetency.

Slaughter and Danzinger facilitated the evaluations. Slaughter had Dinda drive Amodeo and ensure Amodeo took a full dose of Seroquel before the first appointment. Dinda also confirmed Amodeo took the Seroquel before the second evaluation which took place at Amodeo's townhouse. Both psychologists (one was also a psychiatrist) determined Amodeo was completely incompetent and should not be allowed to make decisions. Even decisions such as where to live, what type of medical treatment to receive and who to visit.

As soon as Slaughter heard the news, Slaughter told Amodeo, "That's it for the plea agreement. I think Randy will have to tear it up."

Amodeo, on the non Seroquel days, continued winding up Amodeo's business affairs. Expecting a long fight with both the bipolar disease and the government (trial estimated at eight months with ten months preparation).

Next, Slaughter told Amodeo to go and get a full in-patient treatment at a mental health hospital. Danzinger recommended Amodeo go to McLean in Boston, Massachusetts. McLean is affiliated with Harvard University and Massachusetts General Hospital. McLean is recognized as the leading mental health facility in the world.

Danzinger and Jeffery Krotenberg, DDO - Amodeo's treating psychiatrist – pulled some strings and Amodeo was admitted in early August.

While at McLean, the United States indicted Amodeo; the United States agreed to allow Amodeo to continue the in-patient evaluation and then return to Orlando and submit to arrest upon completion of the program.

### The Carrot & Stick Plan To Get Amodeo's Plea Bargain

During the stay at McLean, Slaughter introduced Amodeo to Kenton Sands, Esq. Slaughter said that because he (Slaughter) could not take any more fees, because of the SUNZ [vii] Insurance issue, and because Amodeo did not seem to get along very well with Phillips. Slaughter felt it appropriate to bring in another attorney.

Slaughter, Sands and Phillips flew to Boston to visit Amodeo and told Amodeo it would cost another 1.2 to 1.5 million dollars to try the case. The money must not come from Amodeo because the government would seize the money as soon as Amodeo paid the fees to the attorneys.

If Amodeo did not have someone else who could put up the fees, then maybe Amodeo would like to revisit the plea agreement. Amodeo had provided so much substantial assistance, Amodeo would not be looking at an insurmountable sentence.

On a telephone call, Sands was asked by Slaughter to compute the sentence assuming Amodeo only received the four level reduction Gold had the authority to grant. Sands calculated the worst case sentence at 144 months with a 4-level reduction.

Slaughter pointed out this did not include: any credit for the money collected, any additional downward departure the judge might give or could result if the Tampa letter came through, did not include three levels for acceptance of responsibility; and did not factor in any mitigation because of the role played by the professionals or the diminished capacity. With all of these factors Slaughter foresaw two years possibly probation.

Amodeo said ok, but Amodeo still could not agree to admit to the false factual statement. Also, Amodeo would insist upon a full hearing at sentencing where Amodeo could tell Amodeo's story, showing that Amodeo lacked any unlawful intent or evil motive.

Slaughter said this should not be a problem; that Amodeo could plea guilty without mentioning intent and further sentencing would take several weeks of court time and the court dates would be spread out over months, so Amodeo could get a full hearing and create a comprehensive record.

Amodeo returned to Orlando and made an initial appearance and entered a not guilty plea.

Slaughter told Gold a plea agreement was in the making but Slaughter would only enter a limited appearance because if Amodeo did not plea – Slaughter did not want to be stuck in the case.

Throughout the month of September a battle waged between the government and the defense over the plea language.

Although Amodeo was wilting under the pressure from Amodeo's own counsel to enter a plea, Amodeo flatly refused to admit intentional wrongdoing or knowing participation in a conspiracy.

### Slaughter And Gold Misinform Amodeo About The Facts

Ultimately, Amodeo agreed to plea to being reckless because Amodeo should have read the memorandum prepared by the Berman law firm in February of 2006.  According to Amodeo's attorney if Amodeo had read the memorandum, Amodeo would have been made aware of the law against deferring payroll taxes and of Amodeo's duty to ensure payment of the taxes.  Even though Amodeo was not a shareholder, director, officer, bank account signer, check signer, manager, employee or consultant of the company collecting the tax.

Amodeo agreed it was reckless to not read the memorandum even if Amodeo's disease made such a task physically impossible.[viii]

Again, according to Amodeo's attorney recklessness was the equivalent of willful blindness, and willful blindness was the same as specific intent.

Therefore if Amodeo would plead guilty to being reckless in not reading the memorandum, he (Slaughter) and Gold could slip the plea by the magistrate and Amodeo would get the benefit of all the time and money spent on the substantial assistance to date.

In addition, Amodeo would stay out of prison for many months and get a chance to provide even more assistance.  In this way Amodeo would get closer to Herb Hoelter's estimate of a fifteen level reduction.

Amodeo acquiesced. The next hurdle was Amodeo's insistence that no fraud had been committed.

Slaughter told Amodeo the problem with not being able to plea to some kind of fraud was because of what Phillips had pointed out earlier: no forfeiture exists for violation of §7202.

Therefore something had to be concocted to permit a plea of guilty which permits forfeiture.

Amodeo said no, I never – never had any intent to defraud, I cannot plea; then Slaughter came up with an idea. Slaughter pointed out that Amodeo had known it was illegal from sometime in early December, 2006.

After that date, Amodeo did not approve a transfer of funds to cover net paychecks and healthcare claims of the employees – Amodeo said yes. Slaughter said that should be enough for the wire fraud charge.

Slaughter told Amodeo all that was needed was the wire transfer, it was irrelevant that the transfer occurred in 2007 or that the company which made the transfer paid the related taxes soon after the wire was completed or that Amodeo had no legal authority to authorize or stop the transfer. It still counted as wire fraud (as wire fraud only required the actus reas not mens rea).

Amodeo now realizes neither the factual statement in the plea nor the charges alleged in the indictment cover the time period of the admitted wire transfer.

Finally, the government told Amodeo's counsel the plea had to provide some cover for the IRS's ineptitude.

Amodeo said the only activity which remotely "smacked" of misleading the IRS would have been the advice rendered by Eddie Curry,

Esq. and Hans Beyer, Esq. at the break in between the two sessions of the "Mock Deposition".

Curry and Beyer told Amodeo, the story has to be presented chronologically otherwise the IRS may interpret the events as if "we planned them". As opposed to the reality where each event was an "ad hoc" response to the "crisis de jure".

Amodeo agreed to change the presentation during the second session of the "Mock Deposition". Amodeo told Myers and Khanokar to use the chronological presentation with the IRS in the future.

This was the factual basis in the plea for the interference with agency charge.

Interestingly enough the government has confirmed, neither Myers or Khanokar ever had an opportunity to present the story to the IRS.

Further, Amodeo is now convinced having thoroughly reviewed the audio/video recordings after the plea agreement that Curry and Beyer's were correct. Presenting the story chronologically provides a more accurate understanding of the events.

Amodeo agreed to plea guilty, the facts as described above, because Amodeo's attorney told Amodeo intent was not required to commit obstruction of an agency and it did not matter whether the accountants had actually told the IRS the chronological story.

Amodeo is now aware from Amodeo's post-incarceration research; this was not an accurate recital of the elements of the crime necessary for a conviction. If Amodeo had known the real elements then no plea would have been entered.[ix]

Even more ironic is the willful blindness plea to the three §7202 charges. Remember, Amodeo pled guilty because Amodeo was reckless in not reading the memorandum.

It appears that neither Slaughter, Gold, any of the agents or Amodeo's defense team bothered to read the memorandum either.

Because when Kenton Sands, eight months after the plea was entered, read the memorandum; Sands discovered the memorandum did not reference any duty which would apply to anyone in Amodeo's status; nor did the memorandum state the tax deferment strategy was illegal.

Further, a careful reading of the memorandum revealed the memorandum implied the conduct was completely legal.

The memorandum stated that it was only illegal to defer payroll taxes <u>if the IRS had provided notice pursuant to section §7515</u> requiring the collected funds to be segregated.

Obviously, it was not reckless for Amodeo to have not read the memorandum. If Amodeo had read the memorandum, the memo would have simply confirmed the conduct was legitimate.

In some sense this is not surprising since Berman's firm wrote the memorandum. Berman's firm represented Presidion, AQMI Strategy Corporation, ~~AEM, Inc, PBS, Amodeo individually, and many of the other~~ persons involved in these transactions.

Berman became a director, officer and general counsel of the principal investment company. This company, Mirabilis, was the sole owner of the company which actually collected and failed to remit the taxes.

Berman's trust account was used to manage tens of millions of dollars of the unpaid taxes.

- 27 -

Berman nor the attorneys in Berman's firm would have taken these actions – risks – if Berman's memo had identified the activity as criminal.

It was not reckless for Amodeo to not read the memo. The memo did not state what Slaughter and Gold claimed the memo stated.

Amodeo admitted to facts in the plea agreement which were not a crime.

### Amodeo Is Medicated

The plea agreement was signed the day of the change of plea hearing. Amodeo's disease was raging; Amodeo could not read the agreement.

Slaughter was worried Amodeo might "spout off" and cause the magistrate to reject the plea.

Slaughter told Amodeo to take, and made sure Amodeo took, a partial dose of Seroquel in order to insure Amodeo was controlled at the hearing; explicitly so Amodeo would not deviate from the script.

Slaughter emphasized if Amodeo messed up the plea by talking about intent, Amodeo would be stuck with a third-rate appointed attorney, would lose the tremendous benefits of acceptance of responsibility and substantial assistance and the trial would take several years; i.e. the trial would be longer than the sentence on the plea.

Amodeo having taken a full dose of Depakote (3000 mg/150% maximum recommended dosage), a full dose of Geodon, and a half dose of Seroquel and a full dose of Labetol was able to maintain the charade during the plea colloquy; never explaining to the judge what the admitted facts meant.

Slaughter told Amodeo it was a great performance and not to worry at sentencing the whole story would be revealed. The district court judge might even dismiss the counts once the polygraphs and recordings were

disclosed, but under any circumstances the substantial assistance benefits were preserved.

Further, Slaughter said the government would start aggressively pursuing the real culprits. Since Amodeo had pled, the culprits would no longer be able to use their willingness to testify against Amodeo to shield themselves from the government.

## Pretense Continues

Over the next seven months, Amodeo continued to assist the government. Amodeo reviewed the recordings and provided both snippets and an index of the recordings to the government.

Amodeo disposed of assets and paid the funds over to the IRS. When the government did not have the budget to transcribe the undercover tapes, Amodeo paid for the transcription. Amodeo met on several occasions with the agents about this case as well as other cases involving the PEO industry.

On one of those occasions, Sands told the agents not to "blame me (Sands)" about some delay. Sands was mostly acting pro-bono, others (Slaughter, Panoff, and Phillips) had gotten their fees and it seemed only he (Sands) was working the cases. The agents acknowledged this as fact. The agents further said they were upset with the amount and source of the fees the other defense attorneys had been paid.

A dispute occurred at this meeting because the agents said Amodeo was back-sliding on Amodeo's admissions. Sands corrected the agents, telling the agents, the agreement was Amodeo would be allowed to present Amodeo's view of the case at sentencing in its entirety.

The agents contacted Gold who confirmed this condition to the plea agreement and reminded the agents of a prior conversation. In the conversation the agents were told to take it easy, the plea was on both shaky

ground and a slippery-slope.  If Amodeo was pushed too hard, Amodeo would go over the edge and this case could go on for a decade.

During this time, because of the abandonment of the case by Slaughter, Panoff and Phillips, Sands went about preparing a "position paper" i.e. Statement of Facts, (referred to as Stipulated Statement of Facts in the endnotes).

In the process of preparing the "position paper", Sands took time to read the memorandum and discovered Amodeo had been misinformed about the contents of the memorandum.

Sands also began to get nervous when Sands discovered that Slaughter told Amodeo to get twenty or thirty subpoenas to be served on prospective witnesses for the sentencing hearing.

Sands nervousness first arose because Amodeo was being asked to serve Amodeo's own subpoenas and second because Amodeo believed that thirty witnesses would present testimony at sentencing.

In addition, Sands was concerned because the government had not yet filed a substantial assistance motion and the probation office was claiming the acceptance of responsibility was to be taken off the hypothetical guideline sentence not the statutory cap.

Amodeo pointed out to Sands the deal was Amodeo would plea to the "make believe charges" supported by the "multi meaning" facts based on some very specific promises:

1)   Reduction in time for all money recovered,

2)   Minimum 4 level substantial assistance reduction and open-ended opportunity to argue for more,

3)   3 level acceptance of responsibility downward departure; and

4)    The opportunity to present the entire case at sentencing.

If any of these were missing then there was no deal, Amodeo would simply go tell the truth regardless of the consequences.

Sands said Sands understood this but Sands was not counsel at the time of the agreement.

Sands did confirm all the defense counsels agreed the case was such a close call that except for the substantial assistance and acceptance of responsibility it would not make any sense to plea.

On the eve of the sentencing the government informed Sands that no motion regarding substantial assistance would be filed, the acceptance of responsibility would be opposed and Slaughter had an actual conflict of interest. The government did not wish to proceed unless Amodeo agreed to waive the conflict of interest.

### Amodeo Was Deprived of Unconflicted Counsel

Amodeo never agreed to waive the conflict. Amodeo requested the Court permit Amodeo time to get an attorney to advise Amodeo on the conflict. The Court said no.

The Court asked Sands if Sands could advise Amodeo on the conflict or represent Amodeo at sentencing. Sands said he was not properly prepared to represent Amodeo at sentencing. Sands told the Court he (Sands) would have a conflict advising Amodeo about Slaughter's conflict and the implications of the conflict or Amodeo waiving the conflict.

The Court ordered the proceeding to commence without Amodeo waiving the conflict.

Contrary to the promises made to Amodeo regarding presenting Amodeo's case at trial or the time available to properly prepare during the sentencing hearing dates. Sentencing did not take weeks, spaced out over

- 31 -

months, (if it had the videos would have been converted to the court's
technology format), [sentencing actually took three and one half days spread
out over 10 days] nor did Amodeo get an opportunity to present Amodeo's
entire case.

### Plea Agreement Is Breached, Amodeo Wants Plea Withdrawn

Amodeo told Amodeo's attorneys to announce the breach of the plea
agreement and withdraw the plea.

Sands and Slaughter told Amodeo to at least wait until the sentencing
hearing was over before doing this: "we might as well see what happens."

Several issues arose at sentencing, the judge commented on how he
was observing Amodeo's behavior.  Particularly, Amodeo's control of the
defense attorneys.

After this Slaughter told Sands and Amodeo again how the
magistrate's order requiring Amodeo to be medicated was hurting the case.

This because Judge Antoon was seeing Amodeo substantially
controlled by the medication; therefore could not properly appreciate how
the disease unchecked impacted the offense conduct; i.e., the judge would
dramatically underestimate Amodeo's diminished capacity during the
offense conduct time period.

The Court also "warned" Amodeo and Amodeo's attorneys about how
much control Amodeo was asserting over the proceedings.  This fueled the
defense attorneys' concern about withdrawing the plea.

Sands however did object that the governments' failure to grant a true
three level reduction was a breach of the plea agreement.  Sands pointed out
the consideration was illusory since the downward departure was not
received in full and what was received had no impact on the sentence.

The government turned over Jencks material and it turns out the witnesses all confirmed that when issues concerning the taxes were being discussed, at least one and usually more than one attorney or certified accountant, was present.

None of these professionals advised the conduct was illegal; none refused payment or terminated their employment, because the client was involved in continuing criminal activity and most became officers and directors of the various businesses, benefiting from the conduct or performing the purportedly illegal conduct.

Other witnesses having subsequently told Amodeo and others that everyone told the government the same thing, but did not reveal this to Amodeo or others because they were threatened with criminal prosecution.

Amodeo attempted to introduce a considerable amount of audio/video recording evidence at sentencing. Between Amodeo's counsels fear of antagonizing the Court, the Court's own comments and the incompatible audio/visual equipment at the court house, these presentations were minimized to only a couple of hours viewed and about twelve entered into the record.

If the Court would have reviewed a significant portion of the tapes, the impact of Amodeo's disorder and the role the professionals played would have become apparent.

Most significantly, the Court did not permit the playing of an undercover tape where Dr. Robert Pollack recounts being present on two different occasions, once in the summer of 2005 when tax determent strategy was beginning and once in December of 2005 when phase one was ending and phase two was being planned.

- 33 -

Pollack states that on both these occasions Amodeo described the plan. Pollack confirms the attorneys stated the plan was "perfectly" legal. Pollack then proceeds to identify some of the accountants and attorneys present.

Because of faulty courthouse equipment and Amodeo's attorneys dread of having the plea vacated thus being required to go to trial without further remuneration[x], this evidence was not introduced.

Evidence which bears initially on Amodeo's intent then on Amodeo's good faith reliance on professional advice[xi] and finally upon the level of mitigation based on the roles of the professionals.

Amodeo's counsel advised Amodeo not to file the motion to cancel the plea because the clear indication was the judge understood Amodeo was ill. Amodeo's attorneys' said wait until sentencing is concluded; then you can file, it does not hurt to see what the judge has on his mind.

Amodeo prepared a motion to cancel the plea and filed it anyway.

The government responded to the motion, but Sands had filed a notice of appeal based upon the original judgment and government's breach of the plea agreement.

Amodeo in the meantime was sent to the Orange County Jail.

Orange County Jail determined Amodeo needed to be in the Acute Mental Health Unit, solely based upon the quantity of medication Amodeo was taking. An amount which was less than two thirds of what Amodeo was taking at the time of the plea hearings. (HMHU made this decision and did not even factor in the Seroquel).

Acute Mental Health is a special facility where the inmate is not permitted to leave the cell, is forbidden from using the telephone even to call his attorney and is watched twenty-four hours per day because of his mental

condition. No reading materials, no writing materials, no cups, etc …
complete isolation.

After being in Acute Mental Health for three days, Sands and
Slaughter arrived telling Amodeo they needed to withdraw because they
were going to be witnesses.

Amodeo did not realize at the time the irony of this in Slaughter's
case. Slaughter was going to be a witness from day one. Only by making
Amodeo enter a plea could Slaughter hope to avoid the conflict, of Slaughter
being a witness to the purported crime, becoming and issue.

If the conflict had became an issue, Slaughter and Slaughter's
colleagues multimillion dollar civil and criminal fees would be at risk.[xii]

Amodeo said Amodeo could not be without counsel especially being
incarcerated. Sands and Slaughter said no problem, the Court would appoint
an attorney.

And it did not matter about Amodeo's pending motion because as
soon as Sand's filed the notice of appeal the District Court lost jurisdiction
of the case.

### Amodeo Totally Deprived Of Counsel

The Court permitted Sands and Slaughter to withdraw. Appointed the
well-intentioned but resourceless Thomas Dale to represent Amodeo on the
appeal.

Dale visited Amodeo at Orange County Jail and told Amodeo that he
(Dale) was appointed solely for the purpose of the direct appeal.

Amodeo was moved to the Federal pod at Orange County Jail, then to
the Coleman Federal Correction Complex.

Dale's budget authorization did not even permit Dale to come and discuss the case with Amodeo at Coleman prison located 40 miles from Dale's office.

It was impossible for Dale to have done anything near an adequate review of one of the most complex cases ever on Dale's restricted budget.

Dale did appear at a status conference in the case of the United States v AEM, Inc. et al on or about August 29, 2009; case number <u>6:08-cr-231-Orl-28KRS</u>.

Dale wanted again to bring to the Court's attention that Amodeo was declared incompetent by the State of Florida and that in Dale's opinion Amodeo's continuing behavior raised serious issues about Amodeo's grasp on reality.

## <u>Motion To Cancel Plea Is Denied</u>

Amodeo was eventually returned to Coleman Federal Correction Complex – Low on or about October 7, 2009. Amodeo was shocked by the sudden denial of the motion to cancel plea by the District Court which had supposedly been divested of jurisdiction.

The order was signed September 27, 2009. In order to not miss the ten day time limit, Amodeo that day filed both a motion for reconsideration which remains pending at the District Court (Court has now denied the motion based exclusively on lack of jurisdiction) and the notice of appeal which commenced this proceeding.

Amodeo remains without counsel at both the District Court level and in this appeal.

## SUMMARY OF ARGUMENT

Amodeo argues Amodeo is actually innocent of the crimes of which Amodeo has been charged and to those which Amodeo pled guilty.

The meaning Amodeo ascribed to the factual statement in the plea was different than the meaning conveyed to the Court and as such no factual predicate exists for the plea.

The cause of this conduct is a convergence of factors including Amodeo's mental illness, the conflicts of interest of Amodeo's attorneys and imperatives of the Internal Revenue Service.

This combination of factors resulted in Amodeo entering a plea; even though: (1) Amodeo was actually and legally incompetent; (2) the plea agreement was not a valid contract having been induced by unfulfilled promises of the government; and because the plea agreement lacked the essential elements necessary for an enforceable contract; (3) Amodeo lacked effective assistance of counsel; (4) Amodeo did not understand the charges against Amodeo or the consequences of the guilty plea, and (5) the Court deprived Amodeo of counsel at critical stages in the criminal proceeding as well as (6) forcibly medicating Amodeo to the disadvantage of Amodeo's defense.

## ARGUMENT

### Introduction (A); Actual Innocence

Amodeo asserts Amodeo's actual innocence from all the charges in the indictment. Each and every charge of the indictment includes an element of, at least, specific intent and the tax counts include subjective intent.

In order to commit a tax crime, you must subjectively be aware of the law and know you are breaking it. *Cheek v. United States,* 492 U.S. 192 (1991); *Bryan v. United States,* 524 U.S. 184, 118 S. Ct. 1939, 141 L. Ed. 2d 197 (1988).

This case is simply about unpaid taxes. The Government became aware that the evidence, (including statements from dozens of people and hundreds of hours of recordings) indicated at least Amodeo, and possibly everyone[xiii] was, operating under a mistake of law, mistake of fact or in reliance upon the Internal Revenue Service's actions. The Government had to try to convert the case into a wire fraud case.

This because the Government had no authority to forfeit assets for a violation of 26 U.S.C. §7202[xiv]; therefore to ensure the United States Attorney's Office instead of the Internal Revenue Service got credit for recovering and thus control over the millions of dollars, the USAO had to concoct an extra crime which permitted forfeiture.

As a salve to the Internal Revenue Service, the USAO promised to get some conviction which would provide a plausible excuse for the Internal Revenue Service's embarrassing conduct of allowing the tax liability to reach such astronomical levels over two years.[xv] This also helped cover up the statements credited to Special Agent Patterson, an IRS agent, assigned to the Michigan Organized Crime Strike Force.

Mr. Patterson told the general counsel of the taxpayers, Presidion Solutions, Inc. I through VII, not to worry; that the nonpayment of taxes was a civil matter not a criminal matter.[xvi]

The case is replete with such representations from the IRS. Agent Pace McNealy of the IRS told Amodeo's CPA and Power of Attorney that he and the IRS were surprised when Amodeo chose to pay hundreds of thousands of dollars on behalf of certain corporate taxpayers. The reason for the surprise was since Amodeo did not get a direct personal benefit from the taxes, the IRS had determined Amodeo was not personally responsible.[xvii]

Hundreds of communications between the IRS and Amodeo's or the taxpayer's accountants or attorneys were consistent with foregoing expressions of the IRS.[xviii]

In order to placate the IRS, the USAO needed to give the IRS something - thus the manufactured charge of interference with an agency. Gold complained on several occasions Gold was refereeing a feud about who got credit for the money.

Ultimately, the USAO realized this was at best a tax case, if not just a cascade of mistakes, and that the USAO would need both a plea and some contrived charges to seize assets and placate the badly embarrassed IRS.

A tax crime requires specific intent and subjective knowledge of the law being violated. *Cheek v. United States,* 492 U.S. 192 (1991).

The fraud and interference crimes set forth in the indictment require knowledge of the fraud or schemes, the intentional and voluntary participation in the facilitation the schemes. In particular, the fraud requires obtaining money or property of another through a scheme or artifice involving false promises, premises or representations.

Amodeo never attempted or admitted to any such conduct. Amodeo was told Amodeo was liable for the acts of others and the conspiracy charge required no intent.[xix]

Amodeo willingly submitted to four separate polygraph examinations. Each examination was designed to determine if Amodeo had any fraudulent intent or engaged in any fraudulent conduct. Amodeo passed all four examinations. The examinations were conducted by Richard Kiefer, the former Senior Polygrapher for the FBI.[xx] (See polygraph results and Kiefer's qualification in Addendum F to Amodeo's affidavit of October 14, 2009.)

The undercover tapes produced evidence of the lawyers being informed of the unpaid taxes[xxi] and the use of the funds. As well as affirmatively telling Amodeo the conduct was legal[xxii] (Pollack undercover tape at or near minute 7 regarding August 2005 advice and then again at what Amodeo remembers as minute 17 regarding the extensive discussion with outside and inside counsel in December 2005.).

The February 6, 2006 legal memorandum from Berman, Keane and Riguere indicated the conduct was legal absent prior notice from the IRS to cease the activity and segregate the funds.[xxiii]

Copy of the interview notes of the Presidion general counsel, where Edith Curry, the initial attorney involved in the matter, reiterated in October 2005, it is not illegal to not pay the taxes, it just creates civil liability.[xxiv]

The April 18, 2006 Chairman's (Laurie Holtz, CPA, one of the world's leading forensic accountants) meeting where the senior executives of Mirabilis Ventures openly discussed the $144,000,000 in payroll tax liability including certain penalties and interest (see video recording entered in part into, the record and available in total upon request).[xxv]