Page 2

```
1              PROCEEDINGS
2         MR. BERMAN: WOULD YOU SWEAR THE WITNESS,
3    PLEASE?
4         THE COURT REPORTER: SIR. WOULD YOU RAISE
5    YOUR RIGHT HAND AND BE SWORN? DO YOU SOLEMNLY
6    SWEAR THAT THE TESTIMONY YOU ARE ABOUT TO GIVE
7    WILL BE THE TRUTH SO HELP YOU GOD?
8         THE WITNESS: I DO.
9         THE COURT REPORTER: THANK YOU.
10             FRANK L. AMODEO
11   HAVING BEEN DULY SWORN, WAS EXAMINED AND TESTIFIED AS
12   FOLLOWS:
13             DIRECT EXAMINATION
14   BY MR. BERMAN:
15    Q  MORNING, SIR.
16    A  GOOD MORNING.
17    Q  WOULD YOU PLEASE STATE YOUR NAME AND BUSINESS
18   ADDRESS FOR THE RECORD?
19    A  FRANK L. AMODEO. 2875 SOUTH ORANGE AVENUE. SUITE
20   500. ORLANDO. FLORIDA 32806. AQMI STRATEGY CORPORATION.
21    Q  WHAT IS YOUR EDUCATIONAL BACKGROUND, SIR?
22    A  I HAVE AN UNDERGRADUATE DEGREE IN POLITICAL
23   SCIENCE FROM THE UNIVERSITY OF CENTRAL FLORIDA AND A LAW
24   DEGREE FROM EMORY UNIVERSITY.
25    Q  HAVE YOU ATTENDED ANY OTHER SCHOOLS?
```

Page 3

```
1    A  I ATTENDED GEORGIA STATE UNIVERSITY AND I WAS
2    ENROLLED IN A PH.D. PROGRAM. THE PROGRAM WAS NOT
3    COMPLETED.
4     Q  AND WHAT IS YOUR OCCUPATION OR PROFESSION. SIR?
5     A  I'M A CONSULTANT BY ANY OTHER NAME.
6     Q  DID THERE COME A TIME, SIR. WHEN YOU BECAME
7    AWARE OF AN ENTITY KNOWN AS PROFESSIONAL BENEFIT
8    SOLUTIONS?
9     A  YES.
10    Q  AND HOW DID THAT COME ABOUT?
11    A  PROFESSIONAL BENEFIT SOLUTIONS WAS A SMALL
12   P-E-O-A-S-O BUSINESS THAT WAS TRYING TO EITHER BE SOLD OR
13   RAISE NEW CAPITAL AND I BECAME INVOLVED IN. IN THAT
14   PROCESS. I GOT TO KNOW THEIR OWNER. LAURIE ANDREA AT THE
15   TIME.
16    Q  WHAT IS --
17    A  THIS WAS 19 -- I'M SORRY. THIS WAS 2004.
18    Q  WHAT IS A P-E-O-A-S-O BUSINESS?
19    A  A PEO IS A PROFESSIONAL EMPLOYER ORGANIZATION.
20   IT IS MORE COMMONLY REFERRED TO AS EMPLOYEE LEASING
21   COMPANY. AN ASO IS AN ADMINISTRATIVE SERVICE ORGANIZATION
22   AND IT IS MORE COMMONLY KNOWN AS A PAYROLL PROCESSING
23   COMPANY.
24    Q  AND WHO IS THE FIRST PERSON THAT YOU MET WITH?
25    A  OH. I DON'T EVEN REMEMBER. I MET WITH LAURIE
```

Page 4

```
1    ANDREA EVENTUALLY  THIS WAS ACTUALLY -- I WAS INTRODUCED
2    TO PROFESSIONAL BENEFIT SOLUTIONS AND THERE WERE FOUR OR
3    FIVE PEOPLE THAT DAY THAT I MET WITH AND I WENT TO LUNCH
4    WITH LAURIE ANDREA AND EXPLAINED A NEW WAY OF WHICH YOU
5    COORDINATE BENEFITS BETWEEN HEALTH INSURANCE AND WORKERS'
6    COMPENSATION INSURANCE.
7     Q  HOW DID THE MEETING COME ABOUT IN THE FIRST
8    PLACE?
9     A  I ACTUALLY DON'T EVEN REMEMBER. IT WENT -- WHAT
10   I DO KNOW IS THERE WAS AN ATTEMPT TO BUY IT BY TRAFALGAR
11   CAPITAL GROUP WHICH SUBSEQUENTLY WAS NULLIFIED.
12    Q  DO YOU HAVE ANY INVOLVEMENT WITH TRAFALGAR
13   CAPITAL GROUP?
14    A  I OWN TRAFALGAR CAPITAL GROUP. I DIDN'T OPERATE
15   IT. IT WAS AN INVESTMENT COMPANY THAT HAD FOUR OR FIVE
16   PROJECTS. RAN ITSELF FOR ABOUT A YEAR. CASHED OUT OF ITS
17   PROJECTS AND CLOSED DOWN.
18    Q  AFTER YOUR FIRST MEETING WITH LAURIE ANDREA. WAS
19   THERE ANY FOLLOW-UP WITH RESPECT TO YOUR PRIOR MEETING
20   WHERE YOU HAD A DISCUSSION WITH REGARD TO THIS PEO SLASH
21   ASO BUSINESS?
22    A  YEAH. AT SOME POINT -- AFTER TRAFALGAR WAS
23   GETTING OUT OF PBS. THE BUSINESS WAS BACK ON THE MARKET
24   FOR SALE.
25    Q  PBS IS PROFESSIONAL BENEFIT SOLUTIONS?
```

Pag[e]

```
1    A  PROFESSIONAL BENEFIT SOLUTIONS. AND DURING THAT
2    PERIOD OF TIME. THERE WAS ANOTHER BUYER FOR THE COMPANY
3    AND THAT WAS PRESIDION SOLUTIONS. INC. SO SOMEPLACE IN
4    THAT PROCESS. I. I TOLD PRESIDION SOLUTIONS. INC. THAT
5    PROFESSIONAL BENEFIT SOLUTIONS WAS UP FOR SALE. AND THEY
6    EVENTUALLY ORCHESTRATED A PURCHASE OF IT IN JANUARY OF
7    2005.
8     Q  WHAT IF ANY INVOLVEMENT DID YOU HAVE IN THAT
9    PURCHASE?
10    A  NONE.
11    Q  OKAY. WHAT IF ANY OWNERSHIP INTEREST DID YOU
12   HAVE IN THE PURCHASOR?
13    A  NONE.
14    Q  WHEN IS THE NEXT TIME THAT YOU HAD ANY OCCASION
15   TO BE INVOLVED WITH PROFESSIONAL BENEFIT SOLUTIONS OR ANY
16   OF THESE ENTITIES. SIR?
17    A  SOMEPLACE IN THE SPRING OF 2005. PROBABLY MARCH.
18   I GOT A CALL FROM PRESIDION SOLUTIONS SAYING THAT THE SUTR
19   RATE FOR PROFESSIONAL BENEFIT SOLUTIONS WAS NOT WHAT IT
20   WAS PURPORTED TO BE.
21    Q  WHAT IS A SUTR RATE?
22    A  IT'S A STATE UNEMPLOYMENT TAX.
23    Q  RIGHT. THAT'S ONE OF THOSE ACRONYMS THAT --
24    A  SORRY.
25    Q  -- A LOT OF PEOPLE DON'T UNDERSTAND INCLUDING
```

2  (Pages 2 to 5)

e4a0adfd-8f40-4935-bfe2-76eedb427bb5

Page 6

```
 1   MYSELF SO.
 2       A   THERE'S A STATE TAX -- THERE'S A STATE TAX ON
 3   WAGES.  AND IN THE -- IN THE INDUSTRY, THE PEO INDUSTRY,
 4   UP UNTIL LAST JULY, IT WAS VERY COMMON STANDARD PRACTICE
 5   FOR ONE -- FOR A PEO TO BUY ANOTHER PEO THAT HAD A LOWER
 6   SUTR RATE BECAUSE THEIR SUTR RATES GO UP EACH YEAR AS YOU
 7   GET UNEMPLOYMENT AND SWITCH THEIR BOOK OF BUSINESS INTO
 8   THE NEW COMPANY. PRETTY STANDARD PRACTICE.
 9       BUT I GUESS THERE WAS SOME ISSUE WITH PRESIDION
10   REGARDING WHAT THAT SUTR RATE WAS SUPPOSED TO HAVE BEEN
11   AND WHAT IT ACTUALLY WAS.  I DON'T EVEN KNOW WHAT THE
12   DIFFERENCE WAS.  I BASICALLY SAID YOU GUYS KNOW MORE ABOUT
13   THE INDUSTRY THAN I DO.  YOU SHOULD HAVE CONDUCTED DUE
14   DILIGENCE OR FIND A WAY TO WORK IT OUT.
15       Q   NOW, YOU USED THE WORD PRESIDION?
16       A   CORRECT.
17       Q   I UNDERSTAND THAT THERE IS MORE THAN ONE ENTITY
18   THAT BEARS AT LEAST THE NAME PRESIDION AS PART OF ITS
19   TITLE?
20       A   YES.
21       Q   AND WHAT PRESIDION ARE YOU TALKING ABOUT?
22       A   IN THIS CASE, I, I WAS SPEAKING WITH PRESIDION
23   CORPORATION BUT I AM PRETTY SURE THAT THE ENTITIES
24   INVOLVED WERE PRESIDION SOLUTIONS, INC., WHICH AT THE TIME
25   WAS A WHOLLY OWNED SUBSIDIARY OF PRESIDION CORPORATIONS.
```

Page 7

```
 1       Q   AND WHAT HAPPENED NEXT IN YOUR DISCUSSIONS?
 2       A   THE -- WITH PBS -- I MEAN WITH PROFESSIONAL
 3   BENEFIT SOLUTIONS?
 4       Q   YES. WITH PROFESSIONAL BENEFIT SOLUTIONS?
 5       A   AFTER THE MARCH MEETING. NOT MUCH.  SOMEPLACE IN
 6   MAY I RECEIVED AN E-MAIL THAT SAID EVERYTHING WAS OKAY.
 7   IT WASN'T SENT TO ME. I GOT COPIED ON IT AND I MADE A
 8   PHONE CALL TO PRESIDION CORPORATION'S OFFICERS AND SAID,
 9   LOOK, YOU GOT TO COME DOWN TO ORLANDO. YOU GOT TO VISIT
10   WITH ME.
11       BECAUSE MY CONTRACT WITH YOU HAS NOTHING TO DO
12   WITH THIS AND I KEEP GETTING CALLS FROM EVERY PERSON IN
13   YOUR ORGANIZATION ON A PRETTY CONTINUOUS BASIS.  SO I WANT
14   TO GIVE YOU MY FINAL INVOICE. I WANT TO BE DONE WITH THIS
15   SO WHY DON'T YOU GUYS COME DOWN AND VISIT ME AND THE
16   PRESIDENT AND GENERAL COUNSEL CAME DOWN TO VISIT WITH ME
17   AND HAD THIS DISCUSSION.
18       Q   OKAY. SO BEFORE ALL OF THIS HAPPENED, YOU HAD A
19   PREEXISTING CONTRACT WITH PRESIDION CORPORATION?
20       A   YES.
21       Q   AND WHAT WAS THE NATURE OF THAT CONTRACT?
22       A   I WAS HIRED AS A CONSULTANT TO SOLVE A THREAT TO
23   THE BUSINESS. THE PRESIDION CORPORATION'S BUSINESS.
24       Q   WHEN WERE YOU HIRED?
25       A   OCTOBER OF 1984.
```

Page 8

```
 1       Q   WHAT KIND OF THREAT?
 2       A   THEY WERE A SMALL PUBLICLY TRADED COMPANY. THEY
 3   HAD PURCHASED A SERIES OF SUBSIDIARIES WHICH ARE REFERRED
 4   TO IN THE AGGREGATE AS THE SUNSHINE COMPANIES OR
 5   ALTERNATIVELY AS PRESIDION ONE THROUGH FIVE.  PRESIDION
 6   DOES PROMULGATE THE. THE NAME A LOT HERE.  THEY -- THE
 7   SUNSHINE COMPANIES HAD A VARIETY OF PROBLEMS. NOT THE
 8   LEAST OF WHICH WAS A SIGNIFICANT OBLIGATION FOR NONPAYMENT
 9   OF FEDERAL EMPLOYMENT TAXES.
10       Q   WHEN YOU --
11       A   AND THEY -- AND I -- THEY NEEDED TO FIND SOME
12   WAY TO GET OUT OF THOSE OBLIGATIONS OR AT LEAST GET THEM
13   AWAY FROM THEIR PUBLICLY TRADED COMPANY.
14       Q   SO WHO CONTACTED YOU FOR PRESIDION CORPORATION?
15       A   ORIGINALLY IT WAS THEIR CHAIRMAN JOHN BERTRAM --
16   ACTUALLY, I WAS AT A MEETING WITH OTHER PEO AND STAFFING
17   COMPANIES.  ANOTHER VERSION OF THE PEO IS A STAFFING
18   COMPANY.
19       AND AT THAT MEETING, I MET A COUPLE OF GENTLEMEN
20   WHO SAID THEY HAD A FRIEND IN DETROIT WHO HAD A PEO THAT
21   HAD A PROBLEM AND MIGHT NEED MY SERVICES.  THEN JOHN
22   BERTRAM, THEIR CHAIRMAN OR THEN CHAIRMAN CAME DOWN TO
23   VISIT ME AND THIS IS PROBABLY AUGUST, EARLY SEPTEMBER OF
24   2004.
25       AFTER THE MEETING WITH MR. BERTRAM, THEN MR. VAN
```

Page 9

```
 1   DER BERG, WHO WAS THE PRESIDENT CEO AND TWO OR THREE OF
 2   HIS SENIOR MANAGEMENT CAME TO VISIT ME NEXT.
 3       Q   WAS THAT YOUR FIRST CONTRACT OF ANY KIND WITH
 4   PRESIDION CORPORATION?
 5       A   THAT WAS -- THAT WAS MY FIRST CONTACT WITH
 6   PRESIDION CORPORATION, YES.
 7       Q   AS A RESULT OF THAT CONTACT. WHAT HAPPENED?
 8       A   I WOULD EVENTUALLY GET A CONTRACT TO RESOLVE THE
 9   SUNSHINE COMPANY ISSUES.
10       Q   WHAT BUSINESS WAS PRESIDION CORPORATION ENGAGED
11   IN AS FAR AS YOU KNOW?
12       A   NONE. IT'S A HOLDING COMPANY. A PUBLICLY TRADED
13   HOLDING COMPANY.
14       Q   AND WHAT DID IT HOLD?
15       A   IT OWNED PEOS AND IT OWNED AN INSURANCE COMPANY.
16   IT OWNED AN ASO PROCESSING CENTER. IT OWNED A VARIETY OF
17   SMALL BUSINESSES WHICH EFFECTIVELY PROVIDED BACK OF THE
18   HOUSE AND SHARED RESOURCES TO THE. THE OPERATING
19   APPROXIMATE PEOS.
20       Q   BUT AFTER YOU HAD THE OPPORTUNITY TO MEET WITH
21   THEIR SENIOR PERSONNEL. THEIR CHAIRMAN, THEIR PRESIDENT
22   AND THEIR GENERAL COUNSEL. I BELIEVE YOU SAID, WHAT
23   HAPPENED NEXT?
24       A   THEY RAN MY NAME THROUGH THEIR INSURANCE COMPANY
25   IN ORDER TO DO A COMPREHENSIVE BACKGROUND CHECK ON ME.
```

3   (Pages 6 to 9)

e4a0adfd-8f40-4935-bfe2-76eedb427bb5

1  AND AFTER THAT, THEY CONTACTED ME FOR ANOTHER INTERVIEW
2  WITH THEM AND HAD OTHER PARTIES PRESENT TO SEE IF THEY
3  WOULD AGREE TO THE ENGAGEMENT.
4     Q   AND WHERE DID THAT -- DID THAT HAPPEN?
5     A   THAT DID HAPPEN.
6     Q   WHERE DID THAT HAPPEN?
7     A   JUPITER, FLORIDA.
8     Q   WHEN WAS THAT?
9     A   PROBABLY MIDDLE OF OCTOBER 2004.
10    Q   OKAY. AND WHO WAS PRESENT AT THAT MEETING?
11    A   THE MEMBERS OF THE BOARD OF DIRECTORS. BYERS.
12 JIM BYERS, CRAIG VAN DER BERG, JOHN BERTRAM. SEVERAL
13 MEMBERS OF THEIR SENIOR MANAGEMENT. CHRIS O'CONNOR. CHUCK
14 KIRKPATRICK. AND THEN I MET A VARIETY OF OTHER PEOPLE WHO
15 WEREN'T ACTUALLY PRESENT AT THE MEETING. CHRIS TRANSFER
16 WAS AN INSURANCE AGENT. THEY WERE PRESENT AT LEAST BY
17 PHONE AND THEY MAY HAVE HAD AN AGENT PRESENT AS WAS A
18 REPRESENTATIVE OF THE FIRST COMMERCIAL INSURANCE COMPANY,
19 THEIR PRIMARY INSURANCE CARRIER.
20    Q   AND WHAT WAS THE PURPOSE OF THAT MEETING?
21    A   TO ENSURE THAT THERE WAS AN UNDERSTANDING OF THE
22 SCOPE OF THE ENGAGEMENT AND TO EFFECTIVELY FINALIZE THE
23 CONTRACT.
24    Q   HAD YOU HAD ANY CONVERSATIONS OR COMMUNICATIONS
25 WITH ANY OF THESE PEOPLE WITH REGARD TO YOUR ROLE IN

1  WELLINGTON CAPITAL?
2     A   NO, NOT AT THAT TIME.
3     Q   SO WHAT DEAL WAS WELLINGTON CAPITAL CONSIDERING
4  THAT IT NEVER CONSUMMATED?
5     A   WELLINGTON DIDN'T HAVE ANY DEAL WITH PRESIDION
6  AT THE TIME, NOT IN OCTOBER OF 2004.
7     Q   AT ANY TIME?
8     A   NO. WASN'T MENTIONED. DIDN'T KNOW ABOUT IT.
9  WASN'T RELEVANT. THIS WAS A STRAIGHT OUT CONSULTING
10 ENGAGEMENT BETWEEN ME AND PRESIDION. ME INDIVIDUALLY AT
11 THE TIME.
12    Q   WHAT HAPPENED AS A RESULT OF THIS MEETING IF
13 ANYTHING?
14    A   THEY AGREED TO THE TERMS OF THE CONTRACT.
15 $900,000 EARNED UPON RECEIPT RETAINER AND 25 PERCENT OF
16 ANY OBLIGATIONS THAT WERE -- THE PUBLIC COMPANY WAS
17 INSULATED FROM. AND I FORMED AQMI STRATEGY CORPORATION TO
18 BE THE ACTUAL CONTRACTING PARTY.
19        AND WE ENTERED INTO THE CONTRACT. I BEGAN TO DO
20 AN INVESTIGATION OF THE COMPANY TO SEE IF -- THE BEST WAY
21 IT WOULD BE TO MINIMIZE THE LIABILITIES THAT SUBSIDIARIES
22 HAD ATTACHED TO THE PARENT.
23    Q   WHO OWNS OR WHO OWNED AT THE TIME AQMI?
24    A   I DO.
25    Q   HAS THE OWNERSHIP CHANGED FROM AND AFTER THAT

1  FORMATION OF THAT ENTITY?
2     A   NO.
3     Q   SO THE SCOPE OF YOUR ENGAGEMENT WAS TO DEAL WITH
4  SOME OF THESE ISSUES THAT YOU MENTIONED, SOME OF THESE
5  POTENTIAL TAX LIABILITIES?
6     A   IT REALLY INVOLVED A DIVESTITURE OF THE SUNSHINE
7  COMPANIES IN A FORM AND FASHION THAT THE PARENT COMPANY,
8  THE TWO STEP REMOVED PARENT COMPANY WOULD NOT BE LIABLE
9  FOR THE SUBSIDIARY OBLIGATIONS.
10    Q   SO THEY HAD A CONCERN ABOUT THAT?
11    A   THEY DID.
12    Q   WHAT DID YOU DO NEXT?
13    A   TOOK THREE OR FOUR WEEKS OF INVESTIGATING. I
14 ASKED A SMALL CONSULTING FIRM IN ORLANDO I KNEW TO GO DOWN
15 AND DO A PROFIT IMPROVEMENT SURVEY SO I COULD SEE WHERE
16 THE HOLES WERE IN THE BUSINESS. AND I BEGAN TO TALK TO
17 THE OFFICERS WHO HANDLED THE TRANSACTIONS SO -- BECAUSE
18 THERE WAS SO MANY PRESIDION NAMED COMPANIES. I WANTED TO
19 FIGURE OUT WHO ACTUALLY WAS RESPONSIBLE FOR WHAT AND WHO
20 WAS ACTUALLY MAKING THE PAYMENTS.
21    Q   DID YOU HAVE AT THAT POINT IN TIME ANY IDEA OF
22 THE POTENTIAL LIABILITIES THAT THESE WHOLLY OWNED
23 SUBSIDIARIES OF PRESIDION COULD POTENTIALLY BE RESPONSIBLE
24 FOR?
25    A   NO. MY IDEA AT THE TIME WAS ABOUT HALF OF WHAT

1  THE ACTUAL NUMBER WOULD TURN OUT TO BE IN THE SHORT RUN.
2  ABOUT 20 PERCENT OF WHAT IT WOULD TURN OUT TO BE IN THE
3  LONG RUN.
4     Q   AFTER THIS THREE WEEK OR SO INVESTIGATION, WHAT
5  IF ANYTHING DID YOU DO?
6     A   I DISCOVERED THAT I HAD THREE DIFFERENT
7  ALTERNATIVES WHICH WOULD ACCOMPLISH THE SAME GOAL.
8     Q   AND WHAT WERE THOSE?
9     A   ONE WOULD BE TO REFILE ALL THE TAX RETURNS THAT
10 HAD PREVIOUSLY EXISTED BECAUSE THE PAYMENTS HAD BEEN
11 MISAPPLIED. SECOND OF ALL WOULD BE TO PROCEED WITH A
12 NEGOTIATED INSTALLMENT ARRANGEMENT NOTING THAT THE PROCESS
13 BY WHICH THEY WERE PAYING THEIR TAX OBLIGATIONS WAS
14 CREATING ARTIFICIAL LIABILITY FOR THEM.
15        IN OTHER WORDS, IF YOU OWE $5 MILLION ON DAY ONE
16 AND YOU SUFFER THE UPFRONT PENALTIES IN MONTH TWO, YOU'RE
17 GOING TO PAY A HIGHER PERCENTAGE THAN IF EVERY TIME IN THE
18 SECOND MONTH. BUT FOR THE FIRST DEFAULT, THERE'S A MUCH
19 GREATER PENALTY THAN THE SECOND DEFAULT.
20        BECAUSE WHAT THEY WERE DOING IN ORDER TO MAKE
21 SURE THEIR PUBLIC FILINGS WERE APPROPRIATE, THEY PAID
22 THEIR PAYROLL TAXES ON THE LAST DAY IN WHICH THEY WERE IN
23 DEFAULT. WHAT THAT DID IS CREATE AN ONGOING FLOAT WHICH
24 KEPT GETTING HIGHER AND HIGHER. SO THE PENALTIES WERE
25 SUBSTANTIALLY HIGHER THAN WOULD HAVE BEEN IF THEY SIMPLY

REALTIME REPORTERS, INC.
407-884-4662

e4a0adfd-8f40-4935-bfe2-76eedb427bb5

1  WOULD HAVE SAID WE DIDN'T PAY IN MAY OF 2004, WE PAID
2  SINCE. THEN IT WOULD NOT HAVE BEEN NEARLY SUCH A BURDEN.
3       AND THE THIRD ANSWER AND THE ONE THAT SEEMED
4  BEST SUITED TO THE CIRCUMSTANCE BECAUSE IN ADDITION TO THE
5  TAXES, THE SUNSHINE COMPANIES WERE EMBROILED IN A VARIETY
6  OF LAWSUITS INCLUDING A FEW CLASS ACTION SUITS, THEY HAD
7  NO CREDIBILITY LEFT IN THE MARKET, WAS SIMPLY TO SELL THE
8  SUBSIDIARIES AT SOMETHING THAT WAS CLEARLY DEFINED ABOVE
9  THE FAIR MARKET VALUE OF THE COMPANIES AT THE TIME AND
10  REMOVE THEM FROM PRESIDION CORPORATIONS' OWNERSHIP.
11      Q  OKAY. LET'S GO BACK IF WE CAN FOR JUST A
12  MINUTE. THE FIRST THING YOU SAID WAS THAT THERE WERE --
13  YOU UNCOVERED -- THERE WERE CERTAIN LIABILITIES?
14      A  CORRECT.
15      Q  DID YOU HAVE AT THAT TIME AN IDEA AS TO WHAT
16  THOSE LIABILITIES WERE?
17      A  YEAH. I HAD SOME IDEA. I KNOW BETTER NOW THAN
18  THEN BUT I CAN GIVE YOU SOME SCOPE OF IT. THERE WERE --
19  THERE'S ABOUT $40 MILLION IN SECURED CLAIMS. THERE'S
20  ABOUT $40 MILLION IN UNFUNDED WORKERS' COMP AND HEALTH
21  CLAIMS. AND ACTUALLY, I GOT TO TELL YOU, I DIDN'T KNOW
22  ABOUT THAT UNTIL MUCH LATER BUT THEY EXISTED THEN.
23      THERE WAS A NEGATIVE FLOAT ON THE WORKERS' COMP
24  CLAIMS AND THERE'S REASONS, THERE'S A COUPLE REASONS FOR
25  THAT SO IT'S NOT AS ONEROUS AS IT SOUNDS IN TERMS OF NOT

1  BEING READILY VISIBLE BUT THEY EXISTED AT THE TIME.
2       THEY HAD A WHOLE SLEW OF CONTRACTS THAT WERE
3  VERY NEGATIVE CONTRACTS AND THE BEST I CAN TELL, THEY PUT
4  THEM IN PLACE BECAUSE THEY KIND OF WERE PATCH WORKING
5  SOLUTIONS TO PROBLEMS OVER THE PRIOR TWO YEARS.
6       Q  NOW, YOU SAID THAT AFTER YOU FIRST GOT INVOLVED,
7  YOU HIRED A CONSULTING COMPANY TO HELP YOU ANALYZE THE
8  FACTS AND CIRCUMSTANCES?
9       A  YES.
10      Q  WHAT CONSULTING COMPANY WAS THAT?
11      A  IT WAS MATRIX NETWORK ORLANDO.
12      Q  AND WERE YOU AFFILIATED OR ASSOCIATED WITH
13  MATRIX NETWORK ORLANDO IN ANY WAY?
14      A  NO. PREVIOUSLY THEY HAD WORKED FOR ME BEFORE ON
15  ANOTHER CASE AND I HAD REFERRED BUSINESS TO THEM SO I KNEW
16  THEM.
17      Q  AND HOW WERE THEY COMPENSATED FOR THAT
18  ENGAGEMENT?
19      A  THEIR, THEIR ENGAGEMENT WAS BY THE -- DIRECTLY
20  WITH PRESIDION. I DIDN'T PARTICIPATE IN THOSE
21  NEGOTIATIONS WHATSOEVER AND THEY WERE PAID BY PRESIDION
22  DIRECTLY.
23      Q  OKAY. NOW, YOU SAID THAT THERE WERE A NUMBER OF
24  THINGS THAT YOU UN -- UNCOVERED AT LEAST INITIALLY.
25      A  UH-HUH.

1       Q  AND THE FIRST THING YOU MENTIONED WAS THAT
2  PAYMENTS WERE MISAPPLIED. WHAT DID YOU MEAN BY THAT?
3       A  THE TAXPAYERS' PAYMENT OF THE TAXES FOR THE
4  SUNSHINE SUBSIDIARIES DID NOT COME FROM THE SUNSHINE
5  COMPANIES. THEY CAME FROM NON TAXPAYERS AND SO THEY WERE
6  APPLIED IN AN AUTOMATIC FASHION BY THE SERVICE AS OPPOSED
7  TO BEING APPLIED TO -- IN A VOLUNTARY FASHION BY THE
8  PAYOR.
9       A VERY TECHNICAL ISSUE AND I'M SURE THE
10  PRESIDION PEOPLE DIDN'T EVEN UNDERSTAND IT. BUT WHAT IT
11  REALLY AMOUNTED TO IS THE OBLIGATION SHOULDN'T HAVE
12  TRAILED ANYPLACE BUT THE SUBSIDIARY IF THEY SIMPLY WOULD
13  HAVE APPLIED IT IN THE RIGHT PLACE --
14      Q  SO THEY WEREN'T --
15      A  AND THE PENALTIES WOULD HAVE BEEN SUBSTANTIALLY
16  REDUCED.
17      Q  THEY WERE NOT APPLIED TO THE SUNSHINE COMPANIES'
18  TAX LIABILITIES?
19      A  NO. THEY WERE BUT THEY WERE APPLIED TO THE WRONG
20  PERIODS. A NON TAXPAYER MADE PAYMENTS AND THE IRS
21  APPLIED -- THE IRS COMPUTERS APPLIED THEM IN THE FASHION
22  MOST FAVORABLE TO THE SERVICE AND LEAST FAVORABLE TO THE
23  TAXPAYER.
24      Q  NOW, AS A RESULT OF YOUR INITIAL INVESTIGATION,
25  DID YOU DISCOVER WHETHER OR NOT THERE WERE ANY TAX LIENS

1  THAT HAD BEEN FILED BY THE INTERNAL REVENUE SERVICE?
2       A  YEAH. THERE WERE NO TAX LIENS AND NO
3  ASSESSMENTS.
4       Q  NONE?
5       A  NONE.
6       Q  YOU MENTIONED THERE WAS SEVERAL ALTERNATIVES
7  PRESENTED AND YOU RECOMMENDED ONE OF THE ALTERNATIVES. IS
8  THAT CORRECT?
9       A  THAT'S CORRECT.
10      Q  AND WHAT ALTERNATIVE DID YOU RECOMMEND?
11      A  THAT THEY SIMPLY SELL THE SUNSHINE COMPANIES AND
12  LET SOMEBODY ELSE LIQUIDATE THEM AND SATISFY THE
13  OBLIGATIONS.
14      Q  AND HOW DID THAT -- DID THAT OCCUR?
15      A  IT DID.
16      Q  AND HOW DID THAT COME ABOUT?
17      A  I OWNED WELLINGTON CAPITAL GROUP, INC., WHICH IS
18  A COMPANY IN THE BUSINESS OF LIQUIDATING OTHER
19  ENTERPRISES. SO I BOUGHT IT AND LIQUIDATED IT.
20      Q  AND WHEN YOU SAY I, YOU MEAN WELLINGTON OR YOU?
21      A  WELLINGTON CAPITAL, WHICH I OWNED, BOUGHT THE
22  FIVE SUNSHINE COMPANIES AND SHUT THEM DOWN.
23      Q  WHAT WAS THE PURCHASE PRICE?
24      A  $500,000.
25      Q  HOW WAS IT PAID?

e4a0adfd-8f40-4935-bfe2-76eedb427bb5

1  LITIGATION THAT WAS OUT THERE?
2      A  UNTIL JUNE OF 2006.
3      Q  WHAT KIND OF LITIGATION WAS THERE THAT WAS
4  RESOLVED?
5      A  A GREAT DEAL OF IT HAS TO DO WITH THE SUNSHINE
6  COMPANIES HAVING BEEN DEFRAUDED BY A VARIETY OF INSURANCE
7  COMPANIES AND THIRD PARTY ADMINISTRATORS PRIOR TO THE
8  PRESIDION ACQUISITION. IN THE PUBLIC RECORD, THERE'S A
9  CASE CALLED VICTORIA FRIEND VERSE -- THE SUNSHINE
10  COMPANIES, ET AL. NAMES A SLEW OF PARTIES. THAT IS ONE OF
11  THE EXAMPLES.
12      ANOTHER IS THE SUNSHINE COMPANIES VERSUS EPIC.
13  THIRD PARTY ADMINISTRATORS, WHICH IS A BLUE CROSS/BLUE
14  SHIELD SUBSIDIARY. THOSE ARE TWO BIG ONES. AND THEN
15  THERE WERE A VARIETY OF SMALLER ONES WHICH, ONCE THE
16  SUNSHINE COMPANIES WERE SHUT DOWN, WERE REASONABLY EASY TO
17  RESOLVE.
18      Q  AND WHO WAS INVOLVED IN A RESOLUTION OF THOSE
19  CASES?
20      A  MEANING?
21      Q  WERE YOU PERSONALLY INVOLVED IN THE RESOLUTION
22  OF THOSE --
23      A  I WAS AND WELLINGTON CAPITAL WAS APPOINTED BY
24  THE COURT TO BE THE ADMINISTRATOR OF THE CLAIM PAYMENTS.
25      Q  SO AT THE END OF THE RESOLUTION OF THOSE CASES.

1  YOU WERE STILL LEFT WITH THE SUNSHINE COMPANIES AND
2  CERTAIN TAX OBLIGATIONS. IS THAT CORRECT?
3      A  CORRECT.
4      Q  NOW, YOU PAID $500,000. GOT A FEW HUNDRED
5  THOUSAND DOLLARS BACK FROM THE INTERNAL REVENUE SERVICE.
6  WAS IT A PROFITABLE TRANSACTION AT THAT POINT IN
7  TIME?
8      A  YEAH. LIKE I SAID. THE PROFIT IN THE CASE IS
9  STILL A LITTLE UNDETERMINED BECAUSE I DON'T HAVE THE FINAL
10  ACCOUNT FROM THIS BIG SETTLEMENT. BUT SOMEPLACE BETWEEN
11  100 AND $200,000 IN ADDITIONAL PROFIT -- PROFIT TO
12  WELLINGTON CAPITAL GROUP FROM THE LIQUIDATION OF THE
13  SUNSHINE COMPANIES.
14      Q  WHERE DID THAT PROFIT GO?
15      A  TO WELLINGTON CAPITAL GROUP'S OPERATIONS.
16      Q  NOW, YOU MENTIONED THAT THERE WAS A, QUOTE, I
17  THINK, BIG SETTLEMENT. UNQUOTE. IN FAVOR OF I'M ASSUMING
18  THE SUNSHINE COMPANIES?
19      A  THAT IS CORRECT.
20      Q  WHICH SUNSHINE COMPANIES?
21      A  SUNSHINE COMPANIES ITSELF. WHICH IS THE NAME OF
22  THE FIRST ONE AND SUNSHINE COMPANIES THREE.
23      Q  AND WHAT WAS THAT CASE ABOUT?
24      A  THEY HAD -- THEY HAD BEEN SOLD AN INSURANCE
25  POLICY BY A COMPANY CALLED TRG FIDELITY. THEY MAY HAVE

1  BEEN SUCCESSOR COMPANIES IN ORDER. AND A PROGRAM BY SIERRA
2  ADMINISTRATION IN THE 2000. IN 1999, I THINK OR 1998. WAY
3  BEFORE MY TIME IN -- PICKING UP YEARS AFTER THE PROGRAM IS
4  CLOSED AND THEY'RE IN LITIGATION.
5      SINCE THAT TIME. I GUESS THERE HAVE BEEN. I'M
6  AWARE OF THREE CONVICTIONS ARISING FROM IT WITH TOTAL
7  AWARDS TO THE SUNSHINE COMPANIES OF -- THERE MAY BE SOME
8  DOUBLE COUNTING BUT SOMETHING AROUND $10 MILLION. THE
9  STATE EMBEZZLED FROM THEM AND IT'S JUST GONE.
10      Q  WAS THAT MONEY PAID TO THE SUNSHINE COMPANIES?
11      A  NO.
12      Q  THE SUNSHINE COMPANIES OBTAINED JUDGMENT FOR
13  $10 MILLION?
14      A  JUDGMENT OR RESTITUTION ORDERS. SOME OF IT IS
15  IN JUDGMENTS. SOME OF IT IS IN RESTITUTION ORDERS.
16      Q  AND HOW MUCH OF THAT MONEY IF ANY HAS BEEN PAID?
17      A  NONE.
18      Q  AND WHO ARE THE JUDGMENTS AGAINST?
19      A  STEVE EDWARDS. I DON'T KNOW THE TWO NAMES OF
20  THE PEOPLE HERE IN FLORIDA. TRG PRODUCTS, SIERRA
21  ADMINISTRATORS AND FIDELITY INSURANCE COMPANY.
22      Q  WHEN YOU SAY THAT THERE WERE ARRESTS.
23  INDICTMENTS. BY WHOM WERE THE PEOPLE WHO WERE ARRESTED OR
24  INDICTED EMPLOYED BY?
25      A  I DON'T KNOW. NOTHING TO DO WITH THIS. ANY OF

1  THE COMPANIES THAT I WAS ASSOCIATED WITH OR THE SUNSHINE
2  COMPANIES THEMSELVES.
3      Q  OKAY. SO THIS WAS THE OTHER SIDE OF THE LAWSUIT
4  THAT HAD CRIMINAL PROBLEMS?
5      A  THAT IS CORRECT.
6      Q  WHAT ARE THE PROSPECTS OF COLLECTION OF EITHER
7  THE RESTITUTION ORDERS OR THE JUDGMENTS?
8      A  THERE HAVE BEEN SOME DISCUSSIONS WITH THE
9  PARTIES HERE IN FLORIDA ABOUT TAKING A DISCOUNT IN A LUMP
10  SUM PAYMENT IN LIEU OF THE RESTITUTION. THERE ARE A
11  COUPLE OF CASES THAT ARE STILL PENDING THAT ONE OF THE
12  INDIVIDUALS IS KNOWN TO BE A HIGH ROLLER. GOES UP. GOES
13  DOWN.
14      HE WAS IN A COMA AND APPARENTLY HAS COME OUT OF
15  IT AND IS TOOLING AROUND RIGHT NOW SO WE ARE TRACKING HIM.
16  I WOULD SAY THERE IS A CHANCE THAT THERE WILL BE A SMALL
17  PERCENTAGE RECOVERY.
18      Q  TO WHOM WOULD THAT RECOVERY GO?
19      A  THE INTERNAL REVENUE SERVICE.
20      Q  TO WHOM IS THAT RECOVERY OWED?
21      A  THE SUNSHINE COMPANIES. THEY'RE HELD IN
22  AGGREGATE AT THE MOMENT. THE WAY THE JUDGMENT AND
23  RESTITUTION CAME DOWN. I GUESS NOBODY THOUGHT TO. TO MAKE
24  THEM DISTINCT AND SPECIFIC. BUT I'M TOLD THAT THE SERVICE
25  IN MY MEETING ALREADY THAT SHOULD WE GET COLLECTIONS FROM

EALTIME REPORTERS, INC.
407-884-4662

e4a0adfd-8f40-4935-bfe2-76eedb427bb5

1    A  CASH.
2    Q  TO WHOM?
3    A  PRESIDION SOLUTIONS.
4    Q  TO PRESIDION SOLUTIONS?
5    A  INC.
6    Q  WERE THEY SUBSIDIARIES OF PRESIDION SOLUTIONS,
7  INC.?
8    A  THEY WERE.
9    Q  AND PRESIDION SOLUTIONS, INC. IN TURN WAS A
10  SUBSIDIARY OF PRESIDION CORPORATION?
11    A  CORRECT.
12    Q  SO AT THE END OF THE SALE, WE ARE LEFT WITH
13  PRESIDION CORPORATION?
14    A  CORRECT.
15    Q  WHICH IS A PUBLICLY TRADED COMPANY?
16    A  YES.
17    Q  TO YOUR KNOWLEDGE, DOES PRESIDION CORPORATION
18  HAVE ANY TAX LIABILITY TO THE INTERNAL REVENUE SERVICE?
19    A  NO. NOT NOW OR EVER.
20    Q  AND PRESIDION SOLUTIONS, INC. THAT WAS STILL AT
21  THE END OF THIS TRANSACTION OWNED BY PRESIDION
22  CORPORATION?
23    A  YES.
24    Q  DID THAT HAVE ANY TAX LIABILITIES TO THE
25  INTERNAL REVENUE SERVICE?

1    A  NO.
2    Q  TO YOUR KNOWLEDGE, IS IT CURRENT IN ITS TAX
3  OBLIGATIONS?
4    A  YES.
5    Q  WHY WOULD WELLINGTON CAPITAL PAY $500,000 FOR
6  COMPANIES THAT OWED A LOT OF MONEY TO THE INTERNAL REVENUE
7  SERVICE?
8    A  BECAUSE IT WAS ABLE TO LIQUIDATE ASSETS AND PAY
9  OFF CLAIMS IN EXCESS OF THE $500,000, WHICH IT DID. THE
10  IRS REFUNDED ABOUT $700,000 TO A COUPLE OF THE SUNSHINE
11  COMPANIES. AND THE -- THERE WERE SEVERAL LAWSUITS WHICH
12  WERE SETTLED DURING THE PROCESS. AND ON BALANCE, THERE'S
13  A COUPLE HUNDRED THOUSAND IN PROFIT. A LITTLE LESS THAN
14  THAT, FROM THE TRANSACTION.
15    Q  NOW, WHAT BUSINESS IS PRESIDION CORPORATION IN
16  TODAY TO YOUR KNOWLEDGE, SIR?
17    A  NONE.
18    Q  STILL PUBLIC COMPANY?
19    A  STILL A PUBLIC COMPANY.
20    Q  IS IT LISTED, DELISTED, TRADED, NOT TRADED?
21    A  IT IS DELISTED BUT TRADED. IT'S TRADED AND
22  EVERYTHING. IT'S CALLED OVER-THE-COUNTER. AND WHEN IT'S
23  TRADED, YOU CAN BUY THE SHARES. IT IS REGISTERED BUT IT'S
24  NOT ON ANY EXCHANGE.
25    Q  AND WHAT IS THE STATUS TO YOUR KNOWLEDGE OF

1  PRESIDION SOLUTIONS, INC.?
2    A  PRESIDION SOLUTIONS, INC. IS NOW OWNED BY
3  WELLINGTON CAPITAL GROUP, INC. IN A SUBSEQUENT TRANSACTION
4  AND IT'S DOING FINE.
5    Q  WHAT DOES IT DO?
6    A  IT'S AN INVESTMENT COMPANY.
7    Q  WHAT DOES IT INVEST IN?
8    A  VARIOUS TYPES OF REAL ESTATE PROJECTS. HOLDS
9  INTEREST IN DEVELOPMENTS.
10    Q  DOES IT HAVE ANY TAX LIABILITIES OF ANY KIND?
11    A  NO.
12    Q  OKAY. NOW, YOU PAID $500,000 FOR THE VARIOUS
13  SUNSHINE COMPANIES?
14    A  CORRECT.
15    Q  HOW MANY COMPANIES WAS THAT?
16    A  FIVE.
17    Q  FLORIDA COMPANIES?
18    A  ALL FLORIDA.
19    Q  ALL C CORPS?
20    A  YES.
21    Q  AND YOU WERE ABLE TO RESOLVE THE LITIGATION --
22    A  YES.
23    Q  -- THAT WAS OUT THERE? AND YOU SAID YOU WERE
24  ABLE TO GET SOME REFUNDS FROM THE INTERNAL REVENUE
25  SERVICE?

1    A  THAT IS CORRECT.
2    Q  AND WHY -- HOW DID THAT COME ABOUT?
3    A  THE IRS IS CONSISTENT WITH THE LEGAL OPINIONS I
4  HAD ON ANALYZING THE CIRCUMSTANCES. THEY HAD SILOED THE
5  OBLIGATIONS OF EACH ENTITY. SO WHERE ONE ENTITY -- ONE OF
6  THE SUNSHINE COMPANIES DID NOT HAVE A TAX LIABILITY, THEY
7  DID NOT ATTACH IT TO THE SISTER. EVEN THOUGH THEIR SISTER
8  WAS OUT THERE AND UNDER LIEN AND DURING THIS TIME I'M
9  TALKING TO THEM ON A WEEKLY BASIS.
10    THEY REFUNDED THOSE COMPANIES WHICH HAD OVER
11  PAID AND LEFT THE LIABILITY OWING FROM THE COMPANIES THAT
12  DID NOT.
13    Q  SO WHEN YOU SAY SILOED, YOU MEAN THE IRS TREATED
14  EACH COMPANY, EACH SUNSHINE COMPANY AS A SEPARATE AND
15  INDEPENDENT ENTITY?
16    A  CORRECT.
17    Q  AND TAXES HAD BEEN PAID OR CREDITED TO THE WRONG
18  ENTITY THAT DIDN'T OWE ANY TAXES AND YOU WERE ABLE TO GET
19  THAT MONEY BACK?
20    A  YES. SOME OF IT WAS JUST OVER PAYMENTS IN THE
21  NATURAL COURSE OF BUSINESS AND ADJUSTING OUT 941S IN THE
22  INDUSTRY. SO, BUT IN THOSE COMPANIES THAT DID NOT OWE THE
23  OBLIGATION, THEY REFUNDED EVEN THOUGH THE SIBLING HAD
24  SUBSTANTIAL TAX OBLIGATIONS DUE.
25    Q  HOW LONG DID IT TAKE YOU TO RESOLVE THE PENDING

EALTIME REPORTERS, INC.
407-884-4662

e4a0adfd-8f40-4935-bfe2-76eedb427bb5

1  THEM. WE HAVE ENOUGH MONEY TO PURSUE COLLECTIONS ALREADY
2  IN THE KITTY. WE WILL USE THAT FOR COST AND WHATEVER
3  RECOVERIES THERE ARE WE'LL THROW INTO THE PAYMENT PLAN.
4    Q  SO THE MONEY -- STRIKE THAT. WHEN YOU SAY WE
5  HAVE ENOUGH MONEY IN THE KITTY. WHO IS WE?
6    A  WELLINGTON CAPITAL GROUP HAS ENOUGH MONEY IN THE
7  KITTY TO PURSUE SEVERAL COLLECTION ACTIONS THAT ARE
8  OUTSTANDING ON BEHALF OF THE SUNSHINE COMPANIES AND
9  PRESIDION SOLUTIONS.
10   Q  HOW WOULD WELLINGTON CAPITAL BE COMPENSATED FOR
11 THAT?
12   A  TIME. TIME AND EXPENSE.
13   Q  NOW. YOU HAVE BEEN TALKING ABOUT TAX
14 OBLIGATIONS --
15   A  CORRECT.
16   Q  -- FOR THE SUNSHINE COMPANIES. HAVE YOU BEEN
17 ABLE TO MAKE A DETERMINATION AS TO THE TYPE OF TAX
18 OBLIGATIONS THAT ARE OUT THERE AND ARE PURPORTEDLY OWED TO
19 THE INTERNAL REVENUE SERVICE?
20   A  I HAVE A FINAL ASSESSMENT FROM THE INTERNAL
21 REVENUE SERVICE BASED UPON DOCUMENTS WHICH WE AGREE
22 REFLECT THE FINDINGS OF THEIR LONGSTANDING INVESTIGATION
23 AND ARE CONSISTENT WITH THE INFORMATION AVAILABLE TO US.
24 SO SUBJECT TO REAPPLYING THOSE PAYMENTS WITHIN THE
25 STATUTORY AMENDMENT PERIOD, WE HAVE -- WE UNDERSTAND THAT

1  THE BREAKDOWN OF THE NUMBER.
2    AS TO THE SUNSHINE COMPANIES. IT'S SOMEWHERE
3  AROUND BETWEEN 52 AND $56 MILLION INCLUDING PENALTIES AND
4  INTEREST FOR THE NONPAYMENT OF 941 TAXES. BOTH THE.
5  EMPLOYER EXCISE TAX AND THE WITHHOLDING PORTION FROM THE
6  EMPLOYEES.
7    Q  OKAY. WHAT ARE 941 TAXES?
8    A  EMPLOYMENT TAXES.
9    Q  ARE THERE ANY OTHER TAXES OWED TO ANYONE OTHER
10 THAN THE INTERNAL REVENUE SERVICE?
11   A  WE HAVE BEGUN TO GET SOME VERY SMALL RUMINATIONS
12 FROM SOME STATE AND COUNTIES ABOUT UNPAID TAXES RELATING
13 TO THEM. THEIR NUMBER IS, IS INSIGNIFICANT COMPARED TO
14 THIS. I WOULD SAY LESS THAN A MILLION DOLLARS -- A MILLION
15 DOLLARS WOULD BE VASTLY MORE THAN IS OWED AND MOST OF THEM
16 WERE JUST AFTER SUCH A LONG PERIOD OF TIME ARE JUST
17 WRITING IT OFF AND WE ARE NOT EVEN BOTHERING TO GO BACK
18 AND REPROCESS IT.
19   BUT THERE ARE HAVE BEEN ONE OR TWO CASES IN
20 WHICH THERE'S BEEN A 1,200 OBLIGATION OWED OR 1,800
21 OBLIGATION OWED AND GENERALLY FROM THE NON LIENED
22 COMPANIES, I HAVE PAID THOSE WHEN THEY HAVE ARISEN.
23   Q  OKAY. SO ARE THERE ANY TAX LIENS OF ANY KIND
24 FROM ANY TAXING AUTHORITY THAT ARE OUT THERE RELATIVE TO
25 THE SUNSHINE COMPANIES OR ANY OF THEM?

1    A  THE IRS HAS TAX LIENS NOW IN PLACE FOR THE
2  AGREED UPON ASSESSMENT.
3    Q  AND IF YOU WERE ASKED OR APPROACHED BY ONE OF
4  THESE OTHER TAXING AUTHORITIES TO PAY TAXES THAT THEY
5  WOULD PROPERLY ASSESS. WHAT POSITION WOULD YOU TAKE?
6    A  IT WOULD DEPEND ON THE ENTITY OF WHICH THEY
7  AROSE FROM. IF IT'S THE THREE THAT ARE ENCUMBERED BY THE
8  IRS LIEN. I WOULD SAY YOU'RE SUBORDINATE AND THERE'S NO
9  HOPE OF SELECTION.
10   IF IT'S FROM THE OTHER TWO, IT WILL DEPEND ON
11 THE SIZE OF THE TAX AND ME BEING ABLE TO VERIFY THE
12 ASSESSMENT.
13   Q  IF YOU --
14   A  BUT IF I GET IN THE MONIES THERE I'D JUST PAY
15 IT. I MEAN THERE IS LIKE 9,000, 27,000, THERE'S LITTLE
16 BITS OF MONIES IN THOSE ACCOUNTS RIGHT NOW.
17   Q  ARE ANY OF THE SUNSHINE COMPANIES OPERATIONAL?
18   A  NO.
19   Q  ARE THEY IN EXISTENCE?
20   A  NO. THEY HAVE BEEN DISSOLVED. SO THEY'RE IN
21 WINDUP PHASE UNDER FLORIDA LAW.
22   Q  NOW, YOU MENTIONED ON A COUPLE OF OCCASIONS
23 MEETINGS WITH THE INTERNAL REVENUE SERVICE?
24   A  YES.
25   Q  HAVE YOU HAD MORE THAN ONE MEETING WITH THE

1  INTERNAL REVENUE SERVICE RELATIVE TO THIS SUNSHINE COMPANY
2  TAX LIABILITY?
3    A  YES.
4    Q  AND WHEN WAS THE FIRST SUCH MEETING THAT YOU
5  HAD?
6    A  JANUARY OF TWO -- LATE JANUARY OR EARLY FEBRUARY
7  OF 2005.
8    Q  AND WHAT WAS THE SUBJECT MATTER AT THAT MEETING?
9    A  WE INFORMED THEM OF THE COMING LIABILITY FROM
10 THE SUNSHINE COMPANY AND OTHER PRESIDION SUBSIDIARIES.
11   Q  DID YOU ASK FOR THE MEETING OR DID THE INTERNAL
12 REVENUE SERVICE ASK FOR THE MEETING?
13   A  WE DID.
14   Q  AND WHAT TRANSPIRED AT THE MEETING?
15   A  WE DISCUSSED OTHER CASES THAT I HAVE WITH THE
16 IRS AND WE PRESTAGED THIS CASE. THE IRS ASKED US IF. AS A
17 MATTER OF CONVENIENCE. THAT WE WOULD SWITCH THE
18 HEADQUARTERS OF THE COMPANY TO A MAILBOX WITHIN THE ZIP
19 CODE. THIS WAY THE CASE WOULD AUTOMATICALLY BE ROUTED TO
20 THEIR OFFICE IN SOUTH FLORIDA.
21   Q  NOW, YOU SAID OTHER TAX CASES?
22   A  I HAVE OTHER CLIENTS.
23   Q  HAVE YOU BEEN INVOLVED IN OTHER ISSUES WITH THE
24 INTERNAL REVENUE SERVICE BEFORE?
25   A  I HAVE OTHER CLIENTS.

EALTIME REPORTERS, INC.
407-884-4662

e4a0adfd-8f40-4935-bfe2-76eedb427bb5

Page 32

1  Q  AS A RESULT OF THOSE OTHER CLIENT ISSUES WITH
2  THE INTERNAL REVENUE SERVICE, HAVE YOU CAUSED THOSE OTHER
3  COMPANIES OR FACILITATED THE PAYMENT OF TAXES BY THOSE
4  OTHER COMPANIES TO THE INTERNAL REVENUE SERVICE?
5      A  YES. IN THE THREE OTHER CASES, I WAS ABLE TO
6  GET THE IRS PAID THE OBLIGATIONS THAT THEY WERE OWED
7  WITHIN 14 MONTHS OF CLOSURE.
8      Q  NOW. WHAT IS THE MAGNITUDE OF THE OBLIGATIONS WE
9  ARE TALKING ABOUT IN THOSE OTHER CASES?
10     A  HIGH MID AND HIGH SIX FIGURES. YOU KNOW, UNDER A
11 MILLION DOLLARS.
12     Q  AND WHAT --
13     A  STILL SIGNIFICANT NUMBERS BUT NOTHING LIKE THIS.
14 THIS WAS A BIG CASE.
15     Q  WHAT PERCENTAGE OF THE TAX LIABILITY WAS PAID IN
16 THOSE OTHER CASES?
17     A  BETWEEN 66 AND A HUNDRED PERCENT.
18     Q  AND WAS THE INTERNAL REVENUE SERVICE. TO YOUR
19 KNOWLEDGE, PLEASED WITH THE RESULTS OF THOSE OTHER CASES?
20     A  YES. IN FACT. THE ONE CASE THEY AGREED THEY
21 WOULD PLACE THE LIENS ANYWAY. IF THEY COLLECTED. THEY
22 WOULD SUBROGATE THEIR COLLECTIONS TO ME. THAT REMAINS IN
23 PLACE TODAY.
24     MR. BERMAN: WE WOULD LIKE TO TAKE A BREAK.
25     THE WITNESS: OKAY.

Page 31

1      MR. BERMAN: WE ARE OFF THE RECORD.
2      (WHEREUPON, A BRIEF RECESS WAS TAKEN FROM
3  11:45 TO 11:57.)
4      Q  GO BACK ON THE RECORD. MR. AMODEO. YOU HAVE
5  INDICATED IN YOUR TESTIMONY THAT WELLINGTON CAPITAL
6  PURCHASED THE SUNSHINE COMPANIES. IS THAT CORRECT?
7      A  CORRECT.
8      Q  AND I BELIEVE YOU SAID THE PURCHASE PRICE WAS
9  SOME $500,000?
10     A  YES.
11     Q  AND DID YOU BUY ASSETS OR DID YOU BUY -- AND
12 WHEN I SAY YOU. I MEAN WELLINGTON -- OR BUY STOCK?
13     A  STOCK.
14     Q  WELL, WHY WOULD YOU BUY STOCK OF A COMPANY WITH
15 A TAX LIABILITY OF APPROXIMATELY $50 MILLION? HOW CAN
16 THAT EVER BE A PROFITABLE TRANSACTION?
17     A  BECAUSE THE IRS BEHAVED CONSISTENT WITH THE
18 STATUTE. SOME OF THE COMPANIES OWE TAX AND SOME DIDN'T.
19 THE ONES THAT OWED THE TAX, THERE WASN'T ANY PROFIT IN.
20 THE ONES THAT DIDN'T. THERE WAS IF IT WAS A PACKAGE DEAL.
21     Q  WELL. I UNDERSTAND THAT. BUT $50 MILLION IS A
22 LOT OF MONEY?
23     A  THE SUNSHINE COMPANIES DIDN'T HAVE ANY ASSETS.
24 IT'S THE NATURE OF THIS BUSINESS. THE ASSETS ARE FEMORAL.
25 FEMORAL. THEY'RE CONTRACTS. THEY ARE NO MORE THAN ONE

Page 33

1  YEAR IN LENGTH AND THEY CAN BE TERMINATED ON 30 DAYS
2  NOTICE.
3      SO THERE REALLY WASN'T -- AT LEAST INITIALLY, IT
4  DIDN'T APPEAR THERE WERE ANY ASSETS IN THE SUNSHINE
5  COMPANIES. THEN WE DISCOVERED THERE WAS AN ASSET AFTER I
6  HAD ACQUIRED IT AND SHUT IT DOWN. THERE WERE $12 MILLION
7  OF DEPOSITS WITH AN INSURANCE COMPANY THAT WERE SUPPORTING
8  WORKERS' COMP CLAIMS. SO YOU COULDN'T TOUCH THEM. THEY'RE
9  RESTRICTED BUT THEY EXISTED.
10     AND SO THAT WAS THE REAL ASSETS OF IT. THAT WAS
11 KIND OF A PLUS. I DIDN'T KNOW IT WAS THERE. BUT IT WAS
12 IN THE COMPANIES THAT WERE ENCUMBERED BY THE THEN EXISTING
13 TAX LEVY. I TOLD THE IRS ABOUT DEBTS IN PLACE OR LEVIES
14 IN PLACE. AND SO I CONVERTED INTO A NOTE AND SENT IT TO
15 THE IRS AS A -- AS BELONGING TO THEM UNDERNEATH THE LIENS.
16     Q  HOW MUCH OF A NOTE DID YOU CONVERT IT INTO?
17     A  TWELVE MILLION, 245 DOLLARS AND CHANGE.
18     Q  FROM WHOM TO WHOM?
19     A  IT WAS FROM PARADIGM. WHICH WAS ONE OF THE
20 PRESIDION SOLUTION SUBSIDIARIES. A SISTER TO THE SUNSHINE
21 COMPANIES. TO THE SUNSHINE COMPANIES. THE REASON FOR THAT
22 IS THE INSURANCE COMPANY HAD CROSS COLLATERALIZED ALL THE
23 DEPOSITS SO THEY WOULDN'T HAVE TO REPAY THIS DEPOSIT FOR
24 AS MUCH AS FIVE YEARS OR UNTIL PARADIGM PAID OFF ALL OF
25 ITS CLAIMS AND CLOSED DOWN FOR A CERTAIN PERIOD OF TIME.

Page 33

1      SO THE INSURANCE COMPANY WAS NOW GOING TO KEEP
2  THE SUNSHINE ASSETS AND PROTECT ITS POSITION IN PARADIGM
3  EVEN THOUGH THEY WERE SEPARATE. THEY WERE CROSS
4  COLLATERALIZED BY THEIR CONTRACTS. SO I HAD TO CONVERT IT
5  TO A NOTE THAT WOULD PROPERLY REFLECT THE DAY IN WHICH THE
6  INSURANCE COMPANY WOULD RELEASE THE COLLATERAL.
7      Q  WHAT DID PARADIGM HAVE TO DO WITH THE SUNSHINE
8  COMPANIES?
9      A  IT WAS A SISTER. DIFFERENT PEO.
10     Q  NOW WHO CONTROLLED PARADIGM?
11     A  PRESIDION SOLUTIONS. INC.
12     Q  WHO CONTROLLED PRE SOLUTION INC.?
13     A  CRAIG VAN DER BERG.
14     Q  AND THAT ENTITY SIGNED A NOTE?
15     A  YES.
16     Q  TO THE SUNSHINE COMPANIES?
17     A  YES.
18     Q  DID THAT ENTITY HAVE ANY ASSETS?
19     A  IT HAD BUSINESS SO ITS CONTRACTS WERE ITS ASSETS
20 SO YES.
21     Q  HOW WAS THE AMOUNT OF THAT NOTE DETERMINED?
22     A  THEY HAD AN AUDIT CONDUCTED BY A FIRM CALLED
23 UHY. IT'S APPARENTLY A BIG FIRM IN THE MIDWEST AND
24 THEY'RE THE ONES THAT DETERMINED THE ACTUAL AMOUNT.
25     Q  AND HOW WAS PARADIGM INDEBTED TO THE SUNSHINE

REALTIME REPORTERS, INC.
407-884-4662

e4a0adfd-8f40-4935-bfe2-75eedb427bb5

1  COMPANIES?
2  A  BECAUSE IT WAS USING THEIR DEPOSIT FOR FUTURE
3  INSURANCE OR HISTORICAL INSURANCE OBLIGATIONS.
4  Q  IS THAT PURSUANT TO ANY WRITTEN AGREEMENT?
5  A  YES.
6  Q  AND THIS PROMISSORY NOTE WAS EXECUTED?
7  A  CORRECT.
8  Q  DELIVERED?
9  A  YES.
10  Q  AND WHAT DID THE SUNSHINE COMPANIES DO WITH THAT
11  PROMISSORY NOTE?
12  A  IT TOLD THE INTERNAL REVENUE SERVICE THAT AN
13  ASSET HAD BEEN DISCOVERED OF SUBSTANTIAL SIZE AND SENT A
14  COPY OF THE NOTE TO THE, THE SERVICE.
15  Q  WAS THE INTERNAL REVENUE SERVICE OFFERED THAT
16  PROMISSORY NOTE IN PARTIAL PAYMENT FOR OBLIGATIONS?
17  A  GIVEN IT, YES.
18  Q  AND WHAT DID THE IRS SAY IN RESPONSE TO THE
19  NOTE --
20  A  THAT THE, THE COLLECTION --
21  Q  -- BEING PRESENTED TO IT?
22  A  THAT THEY WOULD PREFER US TO LIQUIDATE IT IF WE
23  COULD, EVEN AT A DISCOUNT, AND GET SOME CASH; PAY THEM IN
24  CASH. COLLECTING THE NOTE WOULD BE TOO HARD AND INVOLVED
25  REALLY AN ONGOING OPERATION AND SO WE WOULD THEN -- IF WE

Page 35

1  COULD FIND SOMEBODY WHO WOULD BE WILLING TO BUY IT, THEY
2  WOULD RATHER HAVE THE CASH THAN THE NOTE.
3  Q  WAS THIS NOTE FORWARDED TO THE IRS?
4  A  YES.
5  Q  DO YOU KNOW TO WHICH OFFICE OF THE IRS IT WAS
6  FORWARDED?
7  A  NO. I'M SURE I HAVE IT IN THE FILES BUT, YOU
8  KNOW, IT WAS BEING HANDLED BY THE ACCOUNTANT AT THE TIME
9  WHO WAS ON THE CASE SO I DON'T KNOW DIRECTLY WHERE HE SENT
10  IT.
11  Q  LET ME PUT IT THIS WAY. WAS IT HANDLED BY THE
12  COLLECTION --
13  A  YES.
14  Q  -- TEAM FOR THE SUNSHINE COMPANIES ESTABLISHED
15  AT THE IRS?
16  A  YES.
17  Q  AND THEY SAID WE DON'T WANT IT?
18  A  CORRECT.
19  Q  SO WHAT HAPPENED TO THE NOTE?
20  A  I HAVE -- HAD STARTED A RELATED COMPANY. I HAD
21  STARTED A COMPANY CALLED MIRABILIS VENTURES, INC., WHICH
22  ORIGINALLY WAS HOLDING WHAT WE HOPED WOULD BE A PROFITABLE
23  STOCK OPTION ON PRESIDION STOCK OPERATION AND SUBSEQUENTLY
24  IT'S NOT BEEN EXECUTED BECAUSE THERE'S NO VALUE TO IT.
25  AND SOLD IT TO THEM FOR TEN CENTS ON THE DOLLAR

1  AND ASKED THEM TO PAY THE IRS DIRECTLY AND THEY DID.
2  Q  SO HOW MUCH WAS THE NOTE PURCHASED FOR BY
3  MIRABILIS VENTURES, INC.?
4  A  A MILLION 200 AND SOME THOUSAND DOLLARS.
5  Q  AND WAS THAT PAID IN CASH?
6  A  IT WAS PAID IN THREE INSTALLMENTS.
7  Q  AND --
8  A  THERE WASN'T ENOUGH CASH TO PAY IT RIGHT THEN SO
9  THEY PAID IT IN THREE INSTALLMENTS.
10  Q  AND TO WHOM DID THAT MONEY GET PAID?
11  A  TO THE IRS COLLECTION UNIT IN HALLENDALE,
12  FLORIDA.
13  Q  AND TO WHAT ACCOUNT WAS IT APPLIED TO YOUR
14  KNOWLEDGE BY THE INTERNAL REVENUE SERVICE?
15  A  TO THE SUNSHINE COMPANIES.
16  Q  THE IRS DIDN'T WANT THE $12 MILLION NOTE?
17  A  NO.
18  Q  NOW, YOU BOUGHT A COMPANY OR I SHOULD SAY
19  TRAFALGAR --
20  A  WELLINGTON.
21  Q  I'M SORRY. WELLINGTON CAPITAL PURCHASED A
22  COMPANY THAT HAD SUBSTANTIAL TAX LIABILITIES?
23  A  YES.
24  Q  WERE YOU CONCERNED AS TO HOW A COMPANY OR A
25  COMPANIES GOT THEMSELVES IN THAT POSITION?

Page 37

1  A  NO. IT WAS IRRELEVANT. THEY WERE NO LONGER
2  OPERATING IN BUSINESS. EACH COMPANY WAS A SEPARATE
3  TAXPAYER THAT FILED ITS RETURNS AND HAD ITS LIABILITIES
4  AND ITS ASSETS ATTACHED TO ITSELF.
5  Q  WELL, DID YOU EVER MAKE AN INVESTIGATION TO
6  DETERMINE WHO THE RESPONSIBLE PARTIES WERE THAT WERE IN
7  CHARGE OF THESE COMPANIES WHEN THESE LIABILITIES ACCRUED?
8  A  YES. IN FACT, I IDENTIFIED FOR THE INTERNAL
9  REVENUE SERVICE IN A WRITTEN MEMO WHO THE OFFICERS WERE
10  AFTER EACH QUARTER IN WHICH THE TAX LIABILITIES ACCRUED,
11  WHO THE DIRECTORS WERE, WHO THE SHAREHOLDERS WERE, BUT
12  THE ISSUE THEY WANTED MOST WAS WHO WAS SIGNING ON THE
13  CHECKING ACCOUNTS SO WE GAVE THAT INFORMATION TO THEM.
14  Q  DID YOU DETERMINE WHO WAS SIGNING ON THE
15  CHECKING ACCOUNT FOR THE SUNSHINE COMPANIES?
16  A  YES.
17  Q  AND WHO WAS THAT?
18  A  MR. VAN DER BERG.
19  Q  NOW, ARE YOU FAMILIAR WITH THE TERM RESPONSIBLE
20  PARTY OR RESPONSIBLE PERSON?
21  A  YES.
22  Q  WHAT IS YOUR UNDERSTANDING IN TERMS OF THE IRS'
23  INTERPRETATION OF WHAT A RESPONSIBLE PERSON OR RESPONSIBLE
24  PARTY IS RELATIVE TO A TAX OBLIGATION?
25  A  A PERSON WHO HAS -- WHO COLLECTS THE MONEY AND

10  (Pages 34 to 37)

e4a0adfd-8f40-4935-bfe2-76eedb427bb5

Page 38

1 HAS THE DUTY TO PAY IT OVER AND THE ABILITY TO PAY IT
2 OVER.
3   Q   DO YOU KNOW WHERE THE MONEY CAME FROM THAT
4 RESULTED IN THIS LARGE INDEBTEDNESS TO THE INTERNAL
5 REVENUE SERVICE?
6   A   CUSTOMERS, I GUESS.
7   Q   SUNSHINE COMPANIES WAS A PEO?
8   A   IT -- YES -- IT WAS FROM CALCULATION OF TAXES
9 OWED ON THE EMPLOYEE WAGES.
10   Q   SO THE SUNSHINE COMPANIES COLLECTED MONEY FROM
11 ITS CUSTOMERS?
12   A   CORRECT.
13   Q   AND IN THE COLLECTIONS, THEY WERE SUPPOSED TO
14 COLLECT AND THEN REMIT MONEY TO THE INTERNAL REVENUE
15 SERVICE FOR PAYMENT OF TAXES?
16   A   YES.
17   Q   DID THEY COLLECT MONEY FROM THEIR CUSTOMERS?
18   A   YES.
19   Q   DID THEY REMIT THE PORTION OF THE MONEY THAT
20 THEY WERE SUPPOSED TO REMIT TO THE INTERNAL REVENUE
21 SERVICE FOR TAXES?
22   A   NO. IT'S AN OBLIGATION BUT YES, THEY REMITTED
23 MONEY TO THE IRS. THE IRS WAS THE NUMBER ONE VENDOR. IT'S
24 THE NUMBER ONE PAYEE FROM SUNSHINE COMPANIES AND THEY PAID
25 HUNDREDS OF MILLIONS OF DOLLARS IN TAXES. THEY JUST

Page 39

1 DIDN'T COLLECT ENOUGH MONEY.
2     I UNDERSTAND NOW PART OF WHAT CAUSED THE
3 PROBLEM. BUT I DIDN'T CARE ABOUT IT THEN. I ONLY CARE
4 ABOUT IT NOW LOOKING BACK THAT THE -- THE SUNSHINE
5 COMPANIES THEMSELVES HAD ADOPTED A POLICY OF BUNDLE
6 PRICING. THEY SIMPLY UNDERCHARGING. IT'S A SIMPLE
7 CALCULATION. DOESN'T TAKE A LOT OF INVESTIGATION EVEN TO
8 GO BACK.
9     YOU LOOK AT THE 941, YOU LOOK AT THE TAX RETURNS
10 THAT ARE FILED. YOU COMPARE THEM WITH ALL THE WITH W2'S.
11 BY THE WAY, THE U.S. ATTORNEY'S OFFICE IN MICHIGAN
12 CONDUCTED A CRIMINAL INVESTIGATION OF THE SUNSHINE
13 COMPANIES AND PRESIDIONS FOR TWO YEARS PRIOR TO MY
14 INVOLVEMENT RIGHT UP THROUGH THE BEGINNING OF MY CONTRACT.
15 BEFORE THEY ISSUED A LETTER DELIVERED TO ME AS PART OF
16 THIS SAYING THEY FOUND NO CRIMINAL CONDUCT ON THE PART OF
17 ANY OF THESE INDIVIDUALS.
18     ONE OF THE INDIVIDUALS IS UNDER INVESTIGATION
19 FOR SOMETHING DIFFERENT AND I HAD TO BUY HIM OUT SO THEY
20 WOULD CLOSE THIS CRIMINAL INVESTIGATION. THAT WAS JOHN
21 BERTRAM. BUT --
22   Q   JUST A MOMENT?
23   A   BUT MORE IMPORTANTLY, HERE'S WHAT YOU DO. YOU
24 TAKE. YOU TAKE THE 941'S. YOU COMPARE THEM TO THE W2'S.
25 WHICH THE U.S. ATTORNEY'S OFFICE DID. YOU MAKE SURE THEY

Page 40

1 MATCH UP. THEN YOU GO LOOK AT THE AMOUNT OF MONEY THAT
2 WAS SELECTED. AND WHAT YOU DISCOVER, THEY WEREN'T
3 COLLECTING ENOUGH MONEY TO PAY THEIR BILLS. SO THEY
4 DON'T -- YOU DON'T PAY SOMETHING. A LOT OF TIMES IT'S
5 INSURANCE. SOMETIMES IT'S PAYABLES. SOMETIMES IT'S TAXES.
6   Q   LET'S GO BACK TO WHAT YOU JUST SAID JUST A
7 MINUTE AGO. THERE WAS A CRIMINAL INVESTIGATION OF THE
8 SUNSHINE COMPANIES?
9   A   AND PRESIDION. YES.
10   Q   AND PRESIDION CORPORATION?
11   A   SOLUTIONS.
12   Q   WAS PRESIDION CORPORATION AS THE OWNER OF THESE
13 SUBSIDIARIES RESPONSIBLE FOR THE PAYMENT OF THESE 941
14 TAXES?
15   A   NO. THEY'RE NOT.
16   Q   DID YOU MAKE AN INVESTIGATION TO DETERMINE
17 WHETHER OR NOT THAT'S THE LAW?
18   A   THERE HAVE BEEN THREE SETS OF LAWYERS WHO HAVE
19 RENDERED OPINIONS ON THAT MATTER. TWO FIRMS HIRED BY
20 PRESIDION DIRECTLY AND ONE HIRED BY ME. AND IT SEEMS TO
21 BE COMPLETELY CONSISTENT WITH THE IRS' PRACTICE OF SILOING
22 THE REFUNDS.
23   Q   WAS THERE ANY CONCERN THAT THERE WOULD BE ANY
24 ADDITIONAL LIABILITY BY THE PURCHASE -- PURCHASOR OF THE
25 SUNSHINE COMPANIES FOR THESE OUTSTANDING TAX OBLIGATIONS?

Page 41

1   A   NO. OPERATIONS CEASED PRIOR TO THE PURCHASE.
2 AND I ACTUALLY GOT TO READ A SUPREME COURT CASE ON THAT
3 ISSUE THAT MADE IT VERY CLEAR THAT THERE WAS NO SUCCESSOR
4 LIABILITY WHERE THERE IS NO NEW REVENUES.
5   Q   NOW, YOU SAID AS A RESULT OF THIS INVESTIGATION,
6 THERE WAS NO CRIMINAL ACTION AND NO CRIMINAL ACTIVITY
7 DETERMINED BUT THAT ONE OF THE PEOPLE BEING INVESTIGATED
8 WAS BEING PURSUED FOR SOME OTHER REASON.
9   A   WHICH I DON'T KNOW WHAT THAT'S ABOUT. THEY
10 WERE -- THEY WEREN'T GOING TO TELL ME. WHAT THEY WERE
11 WILLING TO DO IS SAY THAT IF MR. BERTRAM WAS NO LONGER
12 INVOLVED WITH PRESIDION, THEN WE WILL SEND YOU A FORMAL
13 LETTER CLOSING THE INVESTIGATION WITH A FINDING THAT THERE
14 WAS NO INAPPROPRIATE CONDUCT. AND I HAVE THAT LETTER AND
15 THAT WAS PART OF MY CONTINUING ON LATER WITH THE CASE AS
16 RECEIVING THAT DOCUMENTATION.
17   Q   YOU MADE SOME COMMENT ABOUT BUYING HIM OUT OF A
18 CRIMINAL PROSECUTION. WHAT DID YOU MEAN BY THAT?
19   A   BUYING JOHN BERTRAM OUT OF PRESIDION ALLOWED THE
20 U.S. ATTORNEY'S OFFICE IN DETROIT TO CLOSE THE
21 INVESTIGATION AGAINST PRESIDION.
22   Q   SO YOU BOUGHT THE STOCK OF MR. BERTRAM?
23   A   MIRABILIS VENTURES DID.
24   Q   AS A RESULT OF THE PURCHASE BY MIRABILIS
25 VENTURES OF MR. BERTRAM'S STOCK. WHAT IMPACT IF ANY DID

REALTIME REPORTERS, INC.
407-884-4662

e4a0adfd-8f40-4935-bfe2-76eedb427bb5

1 THAT HAVE ON THE CRIMINAL INVESTIGATION THAT WAS
2 ONGOING --
3    A  IT WAS FORMALLY CLOSED IN WRITING, WHICH WAS
4 ABSOLUTELY ESSENTIAL TO MAINTAINING ANY CHANCE OF GOING
5 CONCERN VALUE. AS LONG AS THOSE RUMORS WERE OUT THERE,
6 THE CUSTOMERS WERE BEGINNING TO GET CONCERNED THAT AND
7 THEY WERE FLEEING.
8    Q  WHAT RUMORS?
9    A  RUMORS THAT PRESIDION WAS GOING TO BE CLOSED
10 DOWN BECAUSE OF SOME EVENT OR ANOTHER.
11    Q  PRESIDION CORPORATION?
12    A  PRESIDION SOLUTIONS.
13    Q  LET'S TRY TO BE PRECISE IN OUR NAMES.
14    A  OKAY.
15    Q  NOW, WHAT DID MIRABILIS VENTURES, INC. BUY, THE
16 STOCK OF MR. BERTRAM IN WHAT?
17    A  IN PRESIDION CORPORATION, THE PUBLICLY TRADED
18 ENTITY.
19    Q  HOW DID THAT HELP WITH PRESIDION SOLUTIONS?
20    A  BECAUSE REGARDLESS OF THE LEGAL DISTINCTIONS
21 THAT WE ARE SEEING TODAY IN THE MARKET, PEOPLE WERE, WERE
22 BUNCHING THESE ALL TOGETHER, PUTTING ALL THESE THINGS WITH
23 THE SAME NAME WAS JUST A HORRENDOUS IDEA.
24    I MEAN, THESE GUYS THOUGHT THEY WERE MARKETING
25 WHIZZES AND THIS WAS A BRANDING THING. IT WAS JUST

1 STUPID. ALL -- EVERYTHING GOT MIXED UP AND IT SHOULDN'T
2 HAVE BEEN. BUT IN THE COMMON WORLD. IN THE CUSTOMERS AND
3 INDUSTRY, THEY'RE ALL MIXED TOGETHER.
4    Q  WHO NEGOTIATED THE PURCHASE FOR MIRABILIS
5 VENTURES, INC. OF THE STOCK OF MR. BERTRAM IN PRESIDION
6 CORPORATION?
7    A  I DID.
8    Q  OKAY. AND WHAT INTEREST IF ANY DO YOU HAVE IN
9 MIRABILIS VENTURES, INC.?
10    A  I HOLD ABOUT A LITTLE UNDER 1 PERCENT.
11    Q  WERE YOU AN OFFICER OR DIRECTOR OF MIRABILIS
12 VENTURES, INC.?
13    A  NO.
14    Q  WHY DID MIRABILIS VENTURES, INC. TO YOUR
15 KNOWLEDGE PURCHASE MR. BERTRAM'S STOCK?
16    A  BECAUSE PRESIDION SOLUTIONS, INC. GUARANTEED
17 THAT -- TO HELD THEM HARMLESS AGAINST ANY LOSSES IN THE
18 INVESTMENT.
19    Q  WHAT ASSETS DID PRESIDION SOLUTIONS, INC. HAVE?
20    A  AT THE TIME, THEY HAD ABOUT A 770 MILLION
21 DOLLARS IN ANNUAL REVENUE WHICH ACCORDING TO THEIR
22 OFFICERS AND THEIR PROFORMAS WOULD HAVE BEEN PROFITABLE TO
23 ABOUT $20 MILLION A YEAR.
24    Q  AND HOW MUCH WAS MR. BERTRAM PAID?
25    A  2 MILLION -- IT WAS LIKE 60,000 BUCKS A MONTH

1 AND THEN THERE WAS A DOWN STROKE. I DON'T REMEMBER ALL
2 THE NUMBERS ALTHOUGH I WAS PART OF IT. I WAS TRYING TO
3 KEEP A LITTLE BIT OF DISTANCE AND THEN THERE WAS A PROBLEM
4 BECAUSE I GUESS MR. BERTRAM DIDN'T QUITE TELL THE TRUTH
5 ABOUT SOMETHING ELSE AND IT HAD TO BE REWORKED INTO A
6 SLIGHTLY DIFFERENT NOTE. I WOULD SAY 2.7, 2.8 MILLION
7 DOLLARS.
8    Q  HAS HE BEEN PAID?
9    A  HE HAS BEEN PAID WHAT IS DUE TO DATE AS FAR AS I
10 KNOW.
11    Q  SO HE IS STILL RECEIVING MONTHLY --
12    A  ONGOING MONTHLY INSTALLMENTS. THAT'S CORRECT.
13    Q  THEY'RE CURRENT?
14    A  THEY'RE CURRENT.
15    Q  IN EXCHANGE FOR THE NOTE AND THE DOWN PAYMENT
16 AND THE MONTHLY PAYMENTS, MR. BERTRAM TRANSFERRED ALL OF
17 HIS RIGHT, TITLE AND INTEREST IN IT INTO THE STOCK OF
18 PRESIDION CORPORATION TO MIRABILIS VENTURES, INC.?
19    A  CORRECT.
20    Q  OKAY. WHAT IS THE SOURCE OF THE FUNDS THAT
21 MIRABILIS VENTURES, INC. UTILIZED TO PURCHASE
22 MR. BERTRAM'S INTEREST IN PRESIDION CORPORATION?
23    A  THE ORIGINAL DOWN STROKE MONEY I CONTRIBUTED TO
24 MIRABILIS VENTURES, INC. FOR THEM TO MAKE THIS TRANSACTION
25 WORK. THE REST JUST CAME FROM THEIR GENERAL OPERATING

1 EXPENSES.
2    SO THINGS LIKE FOUR OR $500,000 UP FRONT. I
3 THINK. AND THERE'S SOME -- THE REASON I DON'T HAVE AN
4 IMPACT NUMBER IS BECAUSE PRESIDION SOLUTIONS
5 INCORPORATIONS HAD TO NEGOTIATE THIS BIG MASS GLOBAL
6 SETTLEMENT WITH JOHN BERTRAM AND SOME OF THAT MONEY CAME
7 FROM THEM AND THAT SETTLEMENT. GET OUT OF AN EMPLOYMENT
8 CONTRACT AND HE HAD BORROWED SOME MONEY. I WASN'T PARTY
9 TO ANY OF IT. I REALLY DON'T KNOW WHAT TOOK PLACE. I DO
10 KNOW THAT EVENTUALLY THEY GOT HIM TO AGREE WITH SETTLEMENT
11 AND HE TOOK THE MONEY FROM MIRABILIS.
12    Q  NOW, WHY DID -- NOW, YOU SAY YOU CONTRIBUTED.
13 DOES THAT MEAN THAT YOU INVESTED, THAT YOU LOANED?
14    A  I JUST INVESTED THE MONEY INTO MIRABILIS AND
15 BASICALLY LOANED IT TO THEM AT THE TIME. MIRABILIS
16 VENTURES IS SOMETHING I CREATED TO TEST A THEORY I WROTE.
17 I CAN GO TO A WHOLE DIFFERENT DISCUSSION OF THAT AND THE
18 WAY IT WORKED IS I PUT UP SOME CAPITAL. A LOT OF WHICH I
19 GOT OUT OF THESE FEES. AND I GOT A BUNCH OF VERY SKILLED
20 PROFESSIONALS TO COME IN WHO COULD HANDLE OPERATIONS.
21    THAT WAS THE MIRABILIS VISION BY THIS TIME. AND
22 THE OTHER THING MIRABILIS WAS HOLDING WAS A STOCK OPTION
23 ON 25 PERCENT OF PRESIDION BUT IT WAS DISCOVERED THAT
24 THERE WASN'T ANY VALUE THERE. THE MARKET SAYS IT'S WORTH
25 12 CENTS, 14 CENTS A SHARE BUT IT'S REALLY NOT BECAUSE

EALTIME REPORTERS, INC.
407-884-4662

e4a0adfd-8f40-4935-bfe2-76eedb427bb5

Page 46

1  NOBODY WILL BUY IT. IT JUST EVAPORATED.
2  Q  IF IT HAD NO VALUE, WHY DID MIRABILIS PAY A
3  COUPLE MILLION DOLLARS FOR IT?
4  A  BECAUSE PRESIDION SOLUTIONS GUARANTEED TO HOLD
5  THEM HARMLESS. THAT'S THE ONLY REASON I WAS EVEN IN THOSE
6  NEGOTIATIONS ACTUALLY. I WAS ON THE PHONE WITH MR. VAN
7  DER BERG AND HE SAID IF YOU DON'T GET JOHN BERTRAM OUT OF
8  THIS COMPANY. FIRST COMMERCIAL INSURANCE IS GOING THE
9  CANCEL OUR INSURANCE POLICY ON DECEMBER 31ST. I KNOW
10 THAT'S TRUE. I SPOKE WITH LOUISE. THE PRESIDENT OF FIRST
11 COMMERCIAL MYSELF AND HE SAID. WE DON'T WANT JOHN BERTRAM
12 IN THIS COMPANY ANYMORE. WE ARE NOT GOING TO INSURE IT.
13 Q  WHAT IS IT THAT MIRABILIS WAS BEING HELD
14 HARMLESS FROM?
15 A  WHATEVER MONEY IT HAD TO PAY IN PURCHASING THE
16 STOCK. THE $2.7 MILLION.
17 Q  HOLD HARMLESS FROM. FROM CLAIMS. FROM. FROM
18 WHAT?
19 A  FROM LOSS. IF IT LOST MONEY ON THE PURCHASE OF
20 THE SHARES.
21 Q  AT WHAT POINT IN TIME? WAS THERE A MEASURING
22 STICK. WAS THERE A TIME FRAME?
23 A  NO. THERE WASN'T -- THIS. THE FIRST PART OF
24 THIS WAS A VERBAL DISCUSSION ON THE PHONE WHEN MIRABILIS
25 WANTED TO WALK AWAY FROM THE TABLE WITH JOHN BERTRAM IN

Page 47

1  FORT LAUDERDALE BECAUSE THEY WERE JUST FED UP WITH HIM AND
2  CRAIG CALLED ME. I WENT ON THE PHONE. I TALKED TO HIM. HE
3  SAID GO BACK AND TELL THEM WE WILL HOLD THEM HARMLESS.
4  AND MIRABILIS HAD A SECURITY INTEREST. IT HAD A
5  SECURITY INTEREST IN PRESIDION CORPORATION AND SOLUTIONS
6  AND IT DOWNSTREAMED ALL THE SUBSIDIARIES SO IT WOULD
7  ATTACH THE NOTE AND THE SECURITY INTEREST REGARDLESS. I
8  MEAN. MIRABILIS COULDN'T ENFORCE IT BUT THAT'S PROBABLY
9  WHY THERE WASN'T A SPECIFIC DATE.
10 Q  LET ME SEE IF I CAN UNDERSTAND THIS. MIRABILIS
11 WAS GUARANTEED THAT ITS PURCHASE PRICE THAT IT PAID FOR
12 STOCK IT BOUGHT FROM MR. BERTRAM WOULD ULTIMATELY BE
13 VALUED AT AT LEAST WHAT MIRABILIS PAID FOR THE STOCK?
14 A  YEAH. I GUESS MORE CORRECTLY. PRESIDION
15 SOLUTION AGREED TO BUY THE STOCK FROM MIRABILIS IF
16 MIRABILIS WANTED TO SELL IT TO IT. AT LEAST ITS ORIGINAL
17 BASIS.
18 Q  IS THIS A WRITING THAT DOCUMENTS THAT?
19 A  I'M SURE THERE IS BECAUSE MIRABILIS IS PRETTY
20 CONSCIENTIOUS ABOUT THE STUFF. BUT IT WOULD HAVE BEEN
21 BETWEEN. IT WOULD HAVE BEEN A FOLLOW-UP FROM MY PHONE
22 CALL TO CRAIG SINCE I INTERMEDIATED IT. THERE'S
23 UNDOUBTEDLY A LETTER SOMEPLACE. I WOULD HAVE TO ASK
24 MIRABILIS ABOUT THAT. WHICH I CAN DO AND GET A COPY OF IT.
25 Q  NOW. YOU HAD MENTIONED THAT THERE WAS A CRIMINAL

Page 48

1  INVESTIGATION.
2  A  YES.
3  Q  ARE YOU FAMILIAR WITH WHAT A CID INVESTIGATION
4  IS?
5  A  YES.
6  Q  WHAT IS CID?
7  A  A CRIMINAL INVESTIGATION DIVISION OF THE INTERNAL
8  REVENUE SERVICE.
9  Q  WERE THERE ANY ONGOING CID INVESTIGATIONS TO
10 YOUR KNOWLEDGE OF ANY OF THE TAXPAYERS RELATIVE TO THIS
11 LARGE OUTSTANDING UNPAID TAX OBLIGATION?
12 A  NO. THEY HAD ALL BEEN STOPPED AT THE TIME OF
13 WELLINGTON'S ACQUISITION.
14 Q  NOW. FROM AND AFTER THE TIME THAT YOU PURCHASED
15 THIS -- STRIKE THAT. FROM AND AFTER THE TIME THAT THE
16 SUNSHINE COMPANIES WERE SOLD AND ACQUIRED BY AN ENTITY IN
17 WHICH YOU HAVE AN INTEREST. DID THE SUNSHINE COMPANIES
18 CONDUCT ANY FURTHER BUSINESS?
19 A  NO. OTHER THAN THE LIQUIDATION OF ITS ASSETS.
20 MARSHALLING -- I MEAN MARSHALLING OF ITS ASSETS AND THE
21 PAYMENT OF DEBTS.
22 Q  WAS WERE THERE ANY FURTHER TAX OBLIGATIONS THAT
23 WERE INCURRED BY THE SUNSHINE COMPANIES FROM AND AFTER THE
24 TIME OF THE SALE AND PURCHASE?
25 A  NO.

Page 49

1  Q  DO YOU NOW KNOW THE AMOUNT. THE TOTAL AMOUNT
2  CLAIMED TO BE OUTSTANDING BY THE INTERNAL REVENUE SERVICE
3  RELATIVE TO ALL OF THE SUNSHINE COMPANIES?
4  A  56 MILLION.
5  Q  DOES THAT INCLUDE INTEREST AND PENALTIES?
6  A  IT DOES.
7  Q  AND WHERE DID YOU GET THE 56 MILLION DOLLAR
8  NUMBER FROM?
9  A  THE IRS SENIOR COLLECTION OFFICER FAXED IT TO
10 ME WHEN THEY COMPLETED THE ASSESSMENT.
11 Q  AND WHEN WAS THAT?
12 A  JANUARY OR FEBRUARY OF 2006. JANUARY 22ND. 2006.
13 I BELIEVE.
14 Q  TO YOUR KNOWLEDGE. WHO IS RESPONSIBLE FOR THE
15 PAYMENT OF THAT $56 MILLION?
16 A  THE TAXPAYERS. OUR SUNSHINE COMPANIES ONE AND
17 THREE AND FOUR ACTUALLY HAS SOME SMALL PORTION OF THE
18 LIABILITY.
19 Q  ARE THERE ANY INDIVIDUALS. RESPONSIBLE PARTIES
20 WHO WOULD ALSO BE LIABLE FOR THAT $56 MILLION?
21 A  THAT'S A QUESTION FOR THE IRS. TO DATE THEY
22 HAVE ASSESSED MR. BERTRAM AND MR. VAN DER BERG FOR
23 APPROXIMATELY $2.3 MILLION IN WHICH APPLICATION OF THE
24 PAYMENTS THEY HAVE RECEIVED IN THE ORDINARY COURSE. I
25 BELIEVE. HAS EXTINGUISHED THAT LIABILITY. THERE'S NO

13  (Pages 46 to 49)

e4a0adfd-8f40-4935-bfe2-76eedb427bb5

1  INDIVIDUAL ASSESSMENTS.
2      Q   THE ONLY INDIVIDUAL ASSESSMENTS YOU'RE AWARE OF
3  ARE AGAINST MR. BERTRAM AND MR. VAN DER BERG?
4      A   THAT IS CORRECT.
:       Q   AND IS THAT $2.3 MILLION EACH OR THE SAME
6  $2.3 MILLION?
7      A   I THINK IT'S THE SAME $2.3 MILLION.
8      Q   DID THEY PAY ANY MONEY?
9      A   NO.  BUT AS I LIQUIDATED THE OBLIGATIONS, THE
10  IRS HAS APPLIED THEM PRETTY MUCH TO THOSE TAXES DUE.  THE
11  NOTE PAYMENT FROM PARADIGM WENT TO THE IRS AND THEY KIND
12  OF APPLIED IT TO THOSE PAYMENTS.
13      Q   THE PAYMENTS THAT WERE MADE THAT WERE OCCASIONED
14  BY YOUR ACTIONS WERE YOUR COMPANIES EXTINGUISHED TO YOUR
15  KNOWLEDGE THE ASSESSMENT MADE BY THE IRS AGAINST
16  MR. BERTRAM AND MR. VAN DER BERG?
17      A   I CAN'T -- I BELIEVE SO BUT I DON'T KNOW EXACTLY
18  HOW THEY APPLIED THEM OR HOW MUCH.  AND BUT THERE HAVE
19  BEEN NO ADDITIONAL ASSESSMENT AND NO ADDITIONAL ACTION
20  TAKEN THAT I'M AWARE OF.
21      Q   WELL, WHO ALLOWED THIS LARGE TAX LIABILITY TO
22  OCCUR?
23      A   VAN DER BERG.
24      Q   WHAT DOES HE DO NOW?
25      A   HE IS STILL PRESIDENT OF THE PUBLICLY TRADED

1  COMPANY.  HE IS STILL AN OFFICER OF TWO OF THE OPERATING
2  SUBSIDIARIES AND THEY'RE NO LONGER OPERATING BUT HE IS
3  STILL THERE.  HIS MAIN FUNCTION FROM --
4      Q   WELL, LET'S IDENTIFY THE SPECIFIC COMPANIES WITH
5  WHICH HE IS AFFILIATED OR ASSOCIATED.
6      A   PRESIDION CORPORATION.
7      Q   WHAT OFFICE DOES HE HOLD THERE?
8      A   PRESIDENT, CEO.
9      Q   WHAT OTHER OFFICES DOES HE HOLD?  STRIKE THAT.
10  IS HE A DIRECTOR AS WELL?
11      A   YES.
12      Q   WHAT ELSE?
13      A   PRESIDION SOLUTIONS, INC.  .
14      Q   AND IS HE -- WHAT DOES HE HOLD THERE.  WHAT
15  OFFICES?
16      A   THE SAME I BELIEVE.
17      Q   HE IS A PRESIDENT.  HE IS THE CEO AND HE IS A
18  DIRECTOR?
19      A   CORRECT.
20      Q   ANY OTHER ENTITIES?
21      A   PARADIGM, INC. AND PROFESSIONAL BENEFIT
22  SOLUTIONS.
23      Q   SAME OFFICES AND DIRECTORSHIPS?
24      A   YES.
25      Q   ARE THE ENTITIES, PRESIDION SOLUTIONS, INC.

1  PARADIGM INC. AND PROFESSIONAL BENEFITS, INC. SUBSIDIARIES
2  OF PRESIDION CORPORATION?
3      A   NO.
4      Q   ARE ANY OF THEM SUBSIDIARIES OF PRESIDION
5  CORPORATION?
6      A   NO.
7      Q   HOW IF AT ALL ARE THEY RELATED?
8      A   SOLUTIONS, PARADIGM -- SOLUTIONS IS THE PARENT
9  OF PARADIGM AND PBS AND THEY'RE UNRELATED TO PRESIDION
10  CORPORATIONS.
11      Q   SO PARADIGM, INC. AND PROFESSIONAL BENEFITS,
12  INC. ARE WHOLLY OWNED SUBSIDIARIES OF --
13      A   SOLUTIONS.
14      Q   PRESIDION SOLUTIONS, INC.?
15      A   CORRECT.
16      Q   DO YOU DIRECTLY OR INDIRECTLY HAVE ANY OWNERSHIP
17  INTEREST IN PRESIDION SOLUTIONS, INC., PARADIGM, INC. OR
18  PROFESSIONAL BENEFITS?
19      A   AS OF JULY 28, 2005 SUBJECT TO A CERTAIN
20  CONTINGENCIES, WELLINGTON CAPITAL GROUP, INC. OWNS
21  PRESIDION SOLUTIONS.
22      Q   WHAT CONTINGENCIES?
23      A   IT HAD TO DO WITH OBTAINING NEW INSURANCE.  IT
24  HAD TO DO WITH -- THERE'S A MATERIALITY PROVISION IN THE
25  AGREEMENT THAT DEALS WITH FULL AND COMPLETE DISCLOSURE

1  WHICH WOULD ALLOW THE AGREEMENT TO BE UNWOUND SHOULD THERE
2  BE A MATERIAL MISREPRESENTATION OR OMISSION.
3      Q   WHAT DID WELLINGTON PAY FOR THESE ENTITIES?
4      A   A HUNDRED THOUSAND DOLLARS.
5      Q   EACH?
6      A   ONE, NO, JUST TOTAL.
7      Q   AND WHAT DID IT PURCHASE.  DID IT PURCHASE ASSETS
8  OR DID IT PURCHASE STOCK?
9      A   STOCK.
10      Q   DID THOSE, ANY OF THOSE THREE ENTITIES HAVE ANY
11  TAX LIABILITIES TO THE INTERNAL REVENUE SERVICE?
12      A   WHEN THEY WERE PURCHASED OR CURRENTLY?
13      Q   WELL, LET'S START WITH WHEN THEY WERE PURCHASED?
14      A   PROFESSIONAL BENEFIT SOLUTIONS DID.
15      Q   WHAT DID IT OWE?
16      A   AT THE TIME, IT WAS UNKNOWN BUT I KNOW AM AWARE
17  THERE WAS PROBABLY 16 TO $24 MILLION AGAIN IT, DEPENDS ON
18  HOW THE PENALTIES ARE APPLIED TO THE DIFFERENCE IN THAT
19  RANGE.
20      Q   AND ON WHOSE WATCH SO THE SPEAK DID THAT
21  LIABILITY ACCRUE?
22      A   MR. VAN DER BERG'S.
23      Q   HAS THERE BEEN AN ASSESSMENT BY THE INTERNAL
24  REVENUE SERVICE RELATIVE TO PROFESSIONAL BENEFITS?
25      A   TOTAL ASSESSMENT OF $94 MILLION ON PROFESSIONAL

14  (Pages 50 to 53)

e4a0adfd-8f40-4935-bfe2-76eedb427bb5

1    BENEFIT SOLUTIONS.
2        Q   WHEN WAS THAT ASSESSMENT MADE?
3        A   WE DELIVERED THE TAX RETURNS TO THEM. I BELIEVE.
4    THE FIRST WEEK OF JULY AND THEY ASSESSED THEM A COUPLE
5    WEEKS AFTER THAT. WE BEING AQMI STRATEGY CORPORATION.
6        Q   SO THERE'S $94 MILLION OWED TO THE INTERNAL
7    REVENUE SERVICE BY PROFESSIONAL BENEFITS. IS THAT RIGHT?
8        A   THAT'S THE ASSESSMENT. THAT'S CORRECT.
9        Q   AND THERE IS
10       A   THERE'S DISPUTES AS TO THE NUMBERS UPWARDS AND
11   DOWNWARDS DEPENDING ON A WHOLE BUNCH OF ISSUES BUT IT'S IN
12   THAT RANGE.
13       Q   AND THERE'S $56 MILLION OWED BY THE SUNSHINE
14   COMPANIES?
15       A   CORRECT.
16       Q   AS THAT'S A TOTAL OF 150 MILLION DOLLARS IN
17   INDEBTEDNESS?
18       A   YES.
19       Q   THAT'S BEEN ASSESSED BY THE INTERNAL REVENUE
20   SERVICE?
21       A   CORRECT.
22       Q   AND WHO OWNS THOSE COMPANIES NOW?
23       A   WELLINGTON CAPITAL GROUP OWNS PRESIDION
24   SOLUTIONS WHICH OWNS THE TAX. THE TAXPAYERS.
25       Q   WHY WOULD WELLINGTON CAPITAL GROUP BUY A COMPANY

1    WITH $94 MILLION IN TAX LIABILITIES?
2        A   IT'S A DIFFERENT ISSUE THAN THAT. WELLINGTON
3    CAPITAL GROUP BOUGHT PRESIDION SOLUTIONS THAT HAD
4    $300 MILLION IN OBLIGATIONS OUTSTANDING AGAINST IT.
5        Q   OKAY. WHY WOULD WELLINGTON CAPITAL BUY A
6    COMPANY WITH $300 MILLION IN OBLIGATIONS?
7        A   THERE WERE TWO REALLY GOOD REASONS. NUMBER ONE
8    IS THAT WELLINGTON CAPITAL GROUP, AS ME IF YOU WILL.
9    THOUGHT WE COULD REORGANIZE THIS BUSINESS AND MAKE IT
10   PROFITABLE ENOUGH TO PAY OFF ALL THE DEBT AND MAKE A BIG
11   PROFIT.
12       Q   TO PAY OFF $300 MILLION AND STILL MAKE MONEY?
13       A   YES.
14       Q   AND OPERATE?
15       A   AND OPERATE. AND THE SECOND REASON, WHICH WAS
16   THE. MAYBE THE MORE IMMINENT REASON AT THE TIME. IS THIS
17   OCCURRED ON A VERY SHORT WINDOW. FIRST COMMERCIAL
18   INSURANCE CORPORATION ESSENTIALLY DECIDED TO NON RENEW THE
19   INSURANCE POLICY FOR PRESIDION SOLUTIONS, INC.
20       Q   HOW MANY EMPLOYEES -- PRESIDION SOLUTIONS, INC.
21   WAS THE PEO?
22       A   WAS THE PARENT OF THE PEOS.
23       Q   OKAY.
24       A   IT HAD THE INSURANCE PROGRAM. THAT'S WHY IT
25   WAS -- THAT'S WHY IT'S SIGNIFICANT IN THESE TRANSACTIONS.

1        Q   HOW MANY EMPLOYEES DID IT THROUGH ITS
2    SUBSIDIARIES HAVE?
3        A   AT THE TIME ABOUT 28,000.
4        Q   WHEN YOU SAY AT THE TIME. AT WHAT TIME --
5        A   JULY OF 2005.
6        Q   -- ARE WE TALKING ABOUT? AND WHAT EVENTS IF ANY
7    HAPPENED IN JULY OF 2005?
8        A   I HAD MENTIONED BEFORE THAT I HAD ASKED THE
9    OWNERS TO COME DOWN AND SEE ME OR THE OFFICERS BECAUSE I
10   WAS TIRED OF GETTING DRAGGED INTO ALL KINDS OF LITTLE
11   DISPUTES THAT REALLY WERE OUTSIDE THE SCOPE OF AQMI'S
12   ORIGINAL CONTRACT.
13       Q   THE SAME OFFICERS WE DISCUSSED BEFORE?
14       A   JIM BYERS. WHO'S WITH MR. VAN DER BERG. JIM
15   BYERS WAS GENERAL COUNSEL. MR. BERTRAM WAS NO LONGER IN
16   THE COMPANY.
17       Q   WE ARE TALKING ABOUT YOU --
18       A   THIS IS MAY OF 2005.
19       Q   OKAY. SO YOU WERE NOW DOING BUSINESS WITH, ON A
20   REGULAR BASIS, TWO INDIVIDUALS WHO RAN UP $350 MILLION
21   WORTH OF LIABILITY?
22       A   NO. ACTUALLY WHAT I JUST SAID IS I JUST CALLED
23   THEM DOWN TO TELL THEM THAT MY CONTRACT WAS DONE AND TO
24   PLEASE STOP BOTHERING ME. SO I WAS FINISHED. HERE'S MY
25   FINAL INVOICE. YOU OWE ME $14,247,000. YOU HAVE PAID ME

1    TEN. PAY ME THE DIFFERENCE. AND I'M HAPPY. PLEASE TELL
2    THE PEOPLE TO STOP CALLING ME.
3        Q   LET'S STOP RIGHT THERE. WHO IS THEY AND WHO
4    OWED YOU $14 MILLION?
5        A   PRESIDION CORPORATION AND PRESIDION SOLUTIONS.
6    INC. OWED ME $14 MILLION FOR DIVESTING THEM OF THE
7    SUNSHINE COMPANIES.
8        Q   WAS THERE AN AGREEMENT IN PLACE PURSUANT TO
9    WHICH YOU WOULD BE PAID $14 MILLION?
10       A   YES.
11       Q   AND HOW WAS THAT DETERMINED?
12       A   IN OCTOBER OF 2004. THAT'S WHEN -- REMEMBER I
13   HAD THE BOARD OF DIRECTORS GET TOGETHER BECAUSE I WANTED
14   TO MAKE SURE THAT ONCE I PROVED -- IT WAS BASED UPON THE
15   AMOUNT OF LIABILITIES THAT WE WOULD NO LONGER ATTACH TO
16   PRESIDION CORPORATION.
17       Q   YOU ALREADY TOLD US THOUGH THAT THE LIABILITIES
18   DON'T FLOW UP FROM THE SUBSIDIARIES TO THE CORPORATION?
19       A   CORRECT.
20       Q   THEY DIDN'T KNOW THAT?
21       A   NOPE. NOR DID THERE -- I HAD A MEETING WITH
22   THEIR LAWYERS AND THE INDIVIDUAL OFFICERS HIRED LAWYERS.
23   THEY HIRED A GROUP OUT OF NEW YORK. ONE OF THE AV RATED
24   WALL STREET GROUP. THEY CAME IN. THEY HAD THIS PHONE
25   CONFERENCE WITH ME BEFORE WE EXECUTED ON THE STRATEGY.

e4a0adfd-8f40-4935-bfe2-76eedb427bb5

Page 58

```
1      THEY SAID THAT WE HAD TO PAY THIS RETAINER LIKE
2   $5,000 TO GET THIS LEGAL OPINION FROM THIS FIRM. AND THEN
3   THEY WERE GOING TO -- THEY GOT A COUPLE OF HOURS OF PHONE
4   INTERVIEW WITH ME. AFTER ABOUT TEN OR 15 MINUTES. THE
5   LAWYER ON THE OTHER SIDE SAID YOU SHOULD DO WHAT HE SAYS
6   BUT WE NEED TO TALK FOR ANOTHER HOUR SO WE CAN BURN UP THE
7   RETAINER. HE JUST ADMITS IT. I MEAN. PRESIDION DIDN'T
8   KNOW WHAT TO DO. THEIR AUDITORS DIDN'T KNOW WHAT TO DO.
9   THEIR DIRECTORS AND THEY DIDN'T KNOW THE SOLUTION.
10     Q  TO YOUR KNOWLEDGE. AT THE TIME THAT YOU GOT
11  INVOLVED AS A CONSULTANT. PRESIDION CORPORATION HAD BEEN
12  ADVISED THAT IT WAS RESPONSIBLE FOR THE TAX LIABILITIES
13  INCURRED AT THE SUBSIDIARY LEVEL?
14     A  THAT'S WHAT THEY TOLD ME.
15     Q  WHO IS THEY?
16     A  THE OFFICERS OF PRESIDION CORPORATION.
17     Q  WEREN'T YOU CONCERNED ABOUT THAT?
18     A  WHAT ABOUT THEM? I MADE THEM A PROMISE. I TOLD
19  THEM I WOULD DO MY -- I WOULD CERTAINLY FIND A WAY TO
20  MITIGATE THE DAMAGE TO THE BUSINESS. I DIDN'T KNOW HOW
21  MUCH. I GOT A CONTINGENCY AND I WOULD DO MY BEST TO
22  RESOLVE THE SITUATION FAVORABLY TO EVERYONE.
23     Q  MR. AMODEO. THESE ARE GUYS WHO RAN A BUSINESS
24  RESULTING IN LIABILITY OF HUNDREDS OF MILLIONS OF DOLLARS.
25     A  WELL. I REALLY WASN'T AWARE OF THAT AT THE TIME
```

Page 59

```
1   BUT IT WAS A LESSER LIABILITY WITH A CLEARLY DEFINED
2   EXPLANATION.
3      Q  HOW BIG A LIABILITY DID YOU THINK IT WAS?
4      A  WHEN I GOT STARTED. I THOUGHT IT WAS BETWEEN 15
5   AND $20 MILLION.
6      Q  THAT'S STILL A BIG NUMBER.
7      A  RIGHT. BUT I KNEW -- I KNEW OF THE EMBEZZLEMENT
8   AND THE CLAIMS THEY PAID OUT IN THE HEALTH CARE CASE. I
9   ALSO KNOW THEY OVERPAID FOR THE PURCHASE OF THE BUSINESS.
10  THEY PAID ON TOO SHORT A NOTE.
11     Q  WELL. OKAY. SO YOU DIDN'T HAVE ANY CONCERNS
12  ABOUT THEIR ABILITY TO RUN A BUSINESS?
13     A  I CERTAINLY HAD SOME CONCERNS ABOUT THEIR
14  ABILITY TO RUN A BUSINESS. NOT AT THE BEGINNING. AT THE
15  BEGINNING. I KIND OF TOOK IT AT FACE VALUABLE AND WAS VERY
16  FOCUSED ON IT. BY THE TIME I GOT TO MAY WHEN I REALIZED
17  THAT THEY HAD WHOLE SLEW OF OTHER PROBLEMS THAT WERE NOW
18  BUBBLING UP AFTER THE TAXES DISAPPEAR. I HAD PRETTY GRAVE
19  CONCERNS ABOUT THEM RUNNING A BUSINESS.
20     Q  NOW. YOU SAID THAT YOU HAD A FEE OF $14 MILLION?
21     A  CORRECT.
22     Q  WHEN WAS THAT NEGOTIATED?
23     A  OCTOBER 2004.
24     Q  HOW WAS THAT FEE DETERMINED?
25     A  BASED UPON THE TOTAL LIABILITIES OF THE SUNSHINE
```

Page 60

```
1   COMPANIES.
2      Q  BASED ON IT HOW?
3      A  I GOT 25 PERCENT OF WHATEVER LIABILITIES
4   PRESIDION CORPORATION DID NOT HAVE TO PAY.
5      Q  SO MERELY BY SEPARATING THE SUNSHINE COMPANIES
6   FROM PRESIDION AND PRESIDION THEREFORE AVOIDING WHAT THEY
7   THOUGHT WAS LIABILITY FOR THE PAYMENT OF THOSE TAXES. YOU
8   WERE TO BE COMPENSATED FOR 25 PERCENT OF THE POTENTIAL
9   LIABILITY THAT THEY WOULD HAVE HAD HAD THEIR LAWYERS'
10  ADVICE BEEN CORRECT. IS THAT WHAT YOU'RE SAYING?
11     A  YES. THAT'S WHAT I SAID. BUT I ALSO DEAL WITH A
12  MULTITUDE OF PROBLEMS IN CLOSING THESE BUSINESSES DOWN.
13  REMEMBER. THE LAST LAWSUIT ONLY GETS FINISHED IN 2006. WE
14  HAVE HAD TO ADMINISTER HUNDREDS AND HUNDREDS OF HEALTH
15  CLAIMS. A DOZEN LAWSUITS. AND GO THROUGH -- SO THE
16  SOLUTION IS THAT THE FEE WAS BASED UPON THE SUCCESS BUT
17  THE AMOUNT OF EFFORT AND TIME THAT WENT INTO IT WAS
18  CONSIDERABLE OVER TWO YEARS PERIOD OF TIME.
19     Q  WHO IS WE. YOU SAID WE HAD TO --
20     A  AQMI STRATEGY CORPORATION AND THE CONSULTANTS
21  AND ADVISORS THAT AQMI PERIODICALLY HIRED TO PROCESS. WE
22  SPENT HUNDREDS OF THOUSANDS OF DOLLARS IN LEGAL FEES
23  OURSELVES DEALING WITH ALL THIS LITIGATION THAT'S OUT
24  THERE.
25     SO ALTHOUGH IT SOUNDS LIKE IT WAS A MAGIC TRIP
```

Page 61

```
1   FROM ONE EVENT. THERE WAS MUCH MORE TO THAT ENGAGEMENT.
2   IT WAS THE WINDING DOWN OF FIVE COMPANIES THAT IT HAD DID
3   OVER $3 BILLION OF SALES IN THE TWO YEARS PRIOR TO OUR
4   INVOLVEMENT OR THREE YEARS PRIOR TO OUR INVOLVEMENT.
5   SO THERE WAS A LOT OF WORK TO DO TO CLOSE THOSE
6   BUSINESSES. IT WAS NOT JUST THE TAX SAVING. THAT WAS
7   JUST A MEASURE BY WHICH THE FEE WAS DETERMINED.
8      Q  NOW. PRESIDION CORPORATION WAS NO LONGER ACTIVE
9   AT THIS TIME?
10     A  PRESIDION CORPORATION OWNED PRESIDION SOLUTIONS
11  AT THAT TIME BUT THAT'S ALL IT DID. IT DIDN'T HAVE ANY
12  BUSINESS GOING ON.
13     Q  WHY WOULD MIRABILIS HAVE ANY INTEREST IN BUYING
14  STOCK IN THAT COMPANY THAT WASN'T REALLY DOING ANYTHING
15  AND WASN'T MAKING ANY MONEY?
16     A  THEY DIDN'T.
17     Q  WHY DID THEY BUY MR. BERTRAM'S STOCK?
18     A  BECAUSE THEY WERE GOING TO GUARANTEE TO GET
19  REPAID. IF IT WENT UP. GREAT. IF IT DIDN'T. THEY AT
20  LEAST BROKE EVEN.
21     Q  WHY DO IT TO BEGIN WITH?
22     A  I ASKED THEM TO. THEY DID IT AS CONSIDERATION
23  BECAUSE I KNEW THAT IF MR. BERTRAM REMAINED INSIDE THESE
24  COMPANY AS AN OWNER. THEN THEY PROBABLY -- THEY MIGHT NOT
25  HAVE BEEN AROUND LONG ENOUGH TO EVEN PAY ME MY FEES. HE
```

16 (Pages 58 to 61)

e4a0adfd-8f40-4935-bfe2-76eedb427bb5

**Page 62**

1  HAD A VERY NEGATIVE IMPACT ON THE INDUSTRY.
2  Q   WHAT IMPACT ON THE INDUSTRY HAS MR. VAN DER BERG
3  HAD?
4  A   I'LL TELL YOU. IT WAS REAL NEGATIVE. THERE ARE
5  A LOT OF PEOPLE THAT WOULDN'T WANT TO DEAL WITH HIM. I
6  HAVE EXPERIENCED SOME OF THOSE. I WENT THROUGH THE
7  REORGANIZATION OF PBS.
8       BUT THERE ARE SOME CIRCLES WHICH SEEM TO LIKE
9  HIM. I MEAN. HE'S -- HE HAS WORKED HARD IN THE LAST YEAR
10 TO KIND OF REHABILITATE HIMSELF AND HELP MAKE SURE THAT
11 TAX DEBT GETS PAID. AND I'M SURE HE HAS SOME DEFINITE
12 PERSONAL INTEREST IN MAKING SURE IT GETS PAID SO HE
13 DOESN'T GET RESPONSIBLE FOR IT. BUT HE HAS BEEN -- HE HAS
14 BEEN ON THAT PATH FOR ABOUT 12 MONTHS.
15 Q   COULD HE STILL BE ASSESSED BY THE INTERNAL
16 REVENUE SERVICE FOR ADDITIONAL TAXES?
17 A   YES. IN FACT. HE SIGNED AN AFFIDAVIT ADMITTING
18 HE WAS THE SOLE RESPONSIBLE PARTY AND IT HAS BEEN GIVEN TO
19 THE IRS.
20 Q   WHEN WAS THAT?
21 A   JULY.
22 Q   NOW. WE HAVE TWO DIFFERENT SETS OF TAX
23 LIABILITIES THAT WE ARE TALKING ABOUT?
24 A   CORRECT.
25 Q   ONE IS THE SUNSHINE COMPANIES AND ONE IS

**Page 64**

1  A   WELLINGTON CAPITAL GROUP ACQUIRED THEM. THEN I
2  HAD THE ABILITY -- COULD HAVE MADE MYSELF A SIGNER IF I
3  NEEDED TO. I DIDN'T BUT I COULD HAVE.
4  Q   DID YOU EVER HOLD A POWER OF ATTORNEY OVER THOSE
5  ACCOUNTS?
6  A   NOT THAT I'M AWARE OF. THERE WAS A GENERAL
7  POWER OF ATTORNEY ISSUED BY PRESIDION CORPORATION AT ONE
8  POINT IN TIME AND RECENTLY I HAVE BEEN INFORMED THAT THAT
9  COVERED A LOT MORE BANK ACCOUNTS IN THE EXHIBIT THAN I
10 KNEW.
11      BUT I HAVEN'T -- I DON'T RECALL ABOUT
12 INITIALLING EVERY PAGE OF WHAT I SIGNED SO I CAN BELIEVE
13 THEY WERE LISTED ON THERE. BUT BY THEN. THEY WERE MY --
14 THEY WERE WELLINGTON CAPITAL COMPANIES ANYWAY SO IF I WANT
15 TO SIGN ON THEM. I COULD HAVE.
16 Q   DID YOU EVER USE THE POWER OF ATTORNEY THAT YOU
17 HAD WITH PRESIDION?
18 A   NO.
19 Q   YOU NEVER EXERCISED IT AT ANY TIME IN ANY WAY?
20 A   NOPE. NO.
21 Q   DO YOU OWN ANY PORTION OF PRESIDION CORPORATION?
22 A   MIRABILIS DISTRIBUTED THE SHARES IT GOT FROM
23 JOHN BERTRAM WHEN IT WROTE THEM OFF. REALIZING THEY WERE
24 WORTHLESS TO THE GUYS THAT WORKED ON THE PROJECT. AS A
25 RESULT OF WHICH I HAVE 3 MILLION SHARES OF PRESIDION

**Page 63**

1  PROFESSIONAL BENEFIT SOLUTIONS. IS THAT CORRECT?
2  A   THAT IS CORRECT.
3  Q   ARE THEY BEING ADMINISTERED SEPARATELY BY THE
4  INTERNAL REVENUE SERVICE OR ARE THEY BEING ADMINISTERED
5  TOGETHER?
6  A   THEY'RE BEING -- THEY'RE BEING HANDLED
7  SEPARATELY AND ADMINISTERED TOGETHER. BUT THEY'RE BEING
8  ADMINISTERED TOGETHER REALLY BECAUSE WE. WE BROUGHT THIS
9  TO THEIR ATTENTION AND THEY HAVE IT ALL AT THE SAME UNIT.
10 Q   NOW. DO YOU PERSONALLY HAVE ANY OWNERSHIP
11 INTEREST IN THE SUNSHINE COMPANIES?
12 A   WELLINGTON CAPITAL GROUP OWNS THE SUNSHINE --
13 Q   DOES FRANK AMODEO HAVE ANY PERSONAL INTEREST?
14 A   NO.
15 Q   DID FRANK AMODEO EVER HAVE. YOU. SIR. HAVE A
16 POWER OF ATTORNEY RELATIVE TO BANK ACCOUNTS OF THE
17 SUNSHINE COMPANIES?
18 A   AFTER I OWNED THEM. I PROBABLY HAD THE AUTHORITY
19 TO DO WHATEVER I NEEDED TO WITH THE SUNSHINE COMPANIES.
20 AFTER JANUARY OF 2005. THE SUNSHINE COMPANIES BANK
21 ACCOUNTS WERE EFFECTIVELY MY BANK ACCOUNTS. PRIOR TO
22 THAT. NO. I HAD NO INTEREST OR NO ABILITY TO MANAGE OR
23 CONTROL.
24 Q   WELL. WHEN YOU SAY YOU ACQUIRED THEM. DID YOU
25 PERSONALLY --

**Page 65**

1  CORPORATION STOCK.
2  Q   BUT THEY'RE NOT WORTHLESS. DIDN'T YOU TELL US
3  THAT YOU HAD INDEMNIFICATION THAT MADE THEM VALUABLE?
4  A   THE INDEMNIFICATION RAN TO MIRABILIS. NOT TO THE
5  INDIVIDUAL SHARES OF STOCK. REMEMBER IT WAS -- THE
6  INDEMNIFICATION WASN'T TO THE SHAREHOLDERS THEMSELVES.
7  Q   SO MIRABILIS HOLDS AN INDEMNIFICATION?
8  A   CORRECT.
9  Q   HAS IT EXERCISED ITS RIGHTS UNDER THAT
10 INDEMNIFICATION AGREEMENT?
11 A   YES.
12 Q   HOW? WHAT DID IT DO?
13 A   IT ASKED -- IT ASKED FOR PAYMENT ONCE THE
14 LAWSUIT WITH JOHN BERTRAM WAS DISCOVERED TO BE FRAUDULENT.
15 THERE WAS SOME MISREPRESENTATION ON MR. BERTRAM'S PART.
16 MIRABILIS SUES MR. BERTRAM AND GOES TO PRESIDION AND SAYS.
17 LOOK. THIS IS YOUR FAULT. YOU KNEW THIS GUY. WE DIDN'T.
18 WE DID THIS BECAUSE YOU SAID YOU WOULD PAY US. PLEASE PAY
19 US AND PRESIDION DID. THEY HAD TO. IT WAS A SECURED DEBT.
20 Q   WHICH PRESIDION?
21 A   PRESIDION SOLUTIONS. INC.
22 Q   PAID MIRABILIS?
23 A   RIGHT.
24 Q   WHAT DID IT PAY MIRABILIS?
25 A   2.700.000 OR SOME DOLLARS. WHATEVER -- IT WAS

17 (Pages 62 to 65)

e4a0adfd-8f40-4935-bfe2-76eedb427bb5

Page 66

1  JUST THE PURCHASE PRICE.
2     Q   SO MIRABILIS WAS REIMBURSED THE PURCHASE PRICE
3  THAT IT WAS OBLIGATED TO PAY TO MR. BERTRAM?
4     A   CORRECT.
5     Q   FOR HIS SHARES?
6     A   THAT IS CORRECT.
7     Q   WHICH IT IS STILL PAYING?
8     A   WHICH IT IS STILL PAYING FOR THE SHARES.
9     Q   THEN IN TURN MIRABILIS WITH THE SHARES WHICH ARE
10  WORTH LITTLE OR NOTHING, ACCORDING TO YOUR TESTIMONY?
11     A   ACCORDING TO THE MARKET VALUE, YES. DISTRIBUTED
12  THOSE TO A VARIETY OF INDIVIDUALS, WHICH I GOT 3 MILLION.
13     Q   HAVE YOU EVER BEEN AN OFFICER, DIRECTOR OR
14  SHAREHOLDER OF PRESIDION CORPORATION?
15     A   NO, OTHER THAN THE 3 MILLION SHARES I WAS GIVEN.
16     Q   OTHER THAN THAT?
17     A   NO.
18     Q   NOW, YOU SAID THAT OF THESE $150 MILLION IN TAX
19  LIABILITY THAT THEY'RE BEING ADMINISTERED TOGETHER BY THE
20  INTERNAL REVENUE SERVICE BUT TREATED SEPARATELY?
21     A   YES.
22     Q   DOES THAT MEAN THE SAME TEAM AT THE IRS IS
23  DEALING WITH BOTH OBLIGATIONS?
24     A   CORRECT.
25     Q   WHERE IS THAT TEAM LOCATED?

Page 67

1     A   MIAMI, HALLENDALE ACTUALLY. MAYBE IT'S
2  PLANTATION. THE MIAMI AREA.
3     Q   OKAY. YOU'RE NOT A SOUTH FLORIDA GUY?
4     A   I'M NOT A SOUTH FLORIDA GUY.
5     Q   I BELIEVE IT'S IN PLANTATION, FLORIDA.
6     A   PLANTATION, FLORIDA. SOUNDS CLOSE.
7     Q   OKAY. AND HAVE YOU HAD ANY CONVERSATIONS OR
8  DISCUSSIONS WITH THE INTERNAL REVENUE SERVICE ABOUT THIS
9  $150 MILLION OF INDEBTEDNESS EITHER WITH RESPECT TO ONE
10  COMPANY OR THE OTHER SEPARATELY OR TOGETHER?
11     A   YES.
12     Q   HAVE THESE BEEN JOINT DISCUSSIONS THEN AS TO HOW
13  TO LIQUIDATE THE ENTIRE INDEBTEDNESS OR SEPARATE
14  DISCUSSIONS RELATIVE TO EACH COMPANY?
15     A   THEY HAVE BEEN JOINT DISCUSSIONS.
16     Q   AND WHO PARTICIPATED -- WELL, STRIKE THAT.
17  FACE-TO-FACE OR ON THE PHONE?
18     A   BOTH. SEVERAL FACE-TO-FACE MEETING WITH AGENTS.
19  THEN I MET WITH THE CO-TEAM DOWN THERE AND IN THIS PART.
20  I'LL DEFER FOR A SECOND ON THE COURTESY OF THEM. WHAT TOOK
21  PLACE AT THAT MEETING. THEY HAD A COUNSEL PRESENT AND I
22  DIDN'T.
23     BUT MY IMPRESSION OF IT WAS THEY EXPECTED THAT
24  WAS PROBABLY CONFIDENTIAL STILL. AND THAT WAS IN AUGUST.
25  SO SOME PARTS OF IT I DON'T MIND, BUT I DON'T WANT -- THEY

Page 68

1  TOLD ME THINGS THAT, YOU KNOW, NO OVERWHELMING
2  IMPLICATIONS BUT POSITIONING STUFF THAT PROBABLY AREN'T
3  RELEVANT. RELEVANT TODAY BECAUSE I WANT TO RESPECT MY
4  PROMISE TO THEM THAT I WOULD KEEP IT CONFIDENTIAL.
5     Q   WE DON'T WANT YOU TO BREACH ANY CONFIDENTIALITY
6  AGREEMENTS EXPRESS OR IMPLIED --
7     A   IMPLIED.
8     Q   -- WITH THE INTERNAL REVENUE SERVICE.
9     A   THEY WERE FACE-TO-FACE MEETINGS. THE LAST TIME
10  WAS WITH THEIR FULL TEAM AND THEIR COUNSEL BECAUSE WE WERE
11  LOOKING AT SPECIFIC -- ONE OF THE ISSUES THEY HAVE IS
12  THERE'S AN OBLIGATION FROM ONE OF THE SUNSHINE COMPANIES
13  THAT WAS CLOSED DOWN AND WRITTEN OFF BY THEM.
14     AND SO ONE OF THE THINGS WE TALKED ABOUT WITH
15  WHICH I DON'T THINK THERE'S ANY ISSUE WITH. THEY SHOULD
16  REACTIVATE IT BECAUSE IF THE GLOBAL RESOLUTION COMES IN.
17  IT'S LIKE A $1,400,000 THAT THEY NOW BELIEVE WAS OWED. IF
18  THAT IS OWED, IT CAN BE ADDED IN TO THE GLOBAL RESOLUTION.
19     Q   HAVE THERE BEEN ANY AGREEMENTS MADE WITH THE
20  INTERNAL REVENUE SERVICE WITH REGARD TO THIS $115 MILLION
21  DOLLARS OF INDEBTEDNESS?
22     A   NO. THERE IS A PROCESS IN PLACE CURRENTLY WHICH
23  HAS BEEN IN PLACE FOR ABOUT 11 WEEKS. AND I -- THIS IS --
24  THIS IS A CERTAINTY ISSUE. THIS IS A GOOD FAITH ISSUE I
25  THINK. SO WE PROVIDED ALL THE DOCUMENTS. THEY HAVE BEEN

Page 69

1  PROVIDING US ALL THE REPORTS THAT WE HAVE BEEN ASKING FOR
2  AND WE HAVE BEEN WATCHING THE STEADY STREAM OF PAYMENTS
3  THAT THEY HAVE BEEN GETTING WHICH HAS BEEN, WHICH ARE
4  SIGNIFICANT NUMBERS COMING OFF THE REHABILITATED ASSETS.
5     AND SOMETIME IN SEPTEMBER, WE ARE GOING TO HAVE
6  ANOTHER MEETING TO TALK ABOUT HOW TO MAKE THIS A FORMAL
7  RESOLUTION AND HOW -- HOW TO AGGREGATE THE LIABILITY OF
8  ALL FIVE OF THE ENTITIES AND PBS. BECAUSE THERE'S SOME --
9  THERE'S SOME -- THERE ARE SILOS CREATED THE OPPORTUNITY
10  FOR WELLINGTON TO MAKE SOME MONEY BUT MAKE A GLOBAL
11  RESOLUTION A LITTLE BIT.
12     Q   LET'S SORT OF STOP AND PUT THAT IN ENGLISH.
13  OKAY?
14     A   OKAY.
15     Q   BECAUSE YOU SAID A LOT OF THINGS AND THEY'RE.
16  THEY'RE A LITTLE DIFFICULT FOR ME THE FOLLOW. YOU TALKED
17  ABOUT A REHABILITATED COMPANY?
18     A   REHABILITATED ASSETS.
19     Q   WHAT DID YOU MEAN BY THAT TERM?
20     A   THAT THE CONTRACTS WHICH PBS HELD, SIGNIFICANT
21  PORTION WITH HAD PREVIOUSLY BEEN HELD BY THE SUNSHINE
22  COMPANIES. HAVE BEEN MADE MORE VALUABLE BY THE WORK OF
23  AQMI STRATEGY CORPORATION AND SEVERAL MIRABILIS AFFILIATES
24  SO THAT THESE ASSETS WHICH PREVIOUSLY HAVE NOT BEEN
25  PROFITABLE. THEY DIDN'T GENERATE ENOUGH MONEY TO PAY THEIR

18  (Pages 66 to 69)

e4a0adfd-8f40-4935-bfe2-76eedb427bb5

Page 70

1   OBLIGATIONS. ARE NOW PROFITABLE AND BECOMING INCREASINGLY
2   MORE PROFITABLE AND ACCORDINGLY MORE VALUED...
3        MR. BERMAN: WHY DON'T WE TAKE A BREAK AND
4   WE WILL GO INTO THAT AFTER THE BREAK.
5        THE WITNESS: OKAY.
6        (WHEREUPON, A BRIEF RECESS WAS TAKEN FROM
7   12:40 P.M. TO 1:25 P.M.)
8   BY MR. BERMAN:
9        Q   MR. AMODEO, WHAT'S BECOME CLEAR TO ME IS THAT IN
10  THE AMOUNT OF TIME THAT WE HAVE ALLOTTED, THERE IS NO WAY
11  WE CAN. WITH DOCUMENTS PROPERLY EXPLAINED AND GO THROUGH
12  ALL OF THESE TRANSACTIONS. SO WITH YOUR PERMISSION, WHAT I
13  WOULD LIKE TO DO IS GET TO THE SOLUTIONS TO SOME OF THE
14  ISSUES AND PERHAPS WE WILL REVISIT THIS IN THE -- IN THE
15  FUTURE.
16       A   THAT'S FINE. IN FACT, THAT PART OF THE ANALYSIS
17  IS SIMILAR TO MINE, JUDGING THE REACTIONS, FIRST OF ALL,
18  TRYING TO WATCH PEOPLE THROUGH THE AUDIENCE AND TALKING TO
19  SOME PEOPLE ON THE BREAK. THOSE PEOPLE WHO KNOW THE
20  INDUSTRY HAVE A MUCH BETTER GRASP ON WHAT HAPPENED THAN
21  THOSE PEOPLE WHO DO NOT.
22       SO WE NEED TO DO THIS AGAIN IN A COUPLE WEEKS.
23  I'LL DO IT ON A FRIDAY SO I CAN GO INTO SATURDAY. I THINK
24  EVERYBODY NEEDS TO SEE THE EXHIBITS AND THE DOCUMENTS UP
25  FRONT AND THE CHARTS IN ADVANCE. EVERYBODY HAS SPOKEN OF

Page 71

1   A TIMETABLE, A TIME LINE REALLY NEEDS TO BE CREATED, SO
2   AT THIS POINT. MAYBE IT'S BETTER IF I TELL THE STORY.
3        Q   WELL, I THINK WHAT I WOULD LIKE TO DO IS ASK YOU
4   SOME, SOME QUESTIONS TO FIND OUT WHERE WE ARE, WHERE YOU
5   ARE AND WHERE THE ENTITIES SPECIFICALLY INVOLVED IN THIS
6   TRANSACTION ARE TODAY.
7        A   OKAY.
8        Q   NOW, JULY 28TH IS AN IMPORTANT DATE IN THE
9   EVENTS THAT WE HAVE BEEN DISCUSSING, IS IT NOT, SIR?
10       A   YES.
11       Q   WHAT IS IT THAT HAPPENED ON THAT DAY?
12       A   ON JULY 28, 2005, I WAS IN MIAMI AND GOT A PHONE
13  CALL FROM MR. VAN DER BERG AND MR. BYERS TELLING ME THAT
14  THEY HAD FINALLY RECEIVED THE FOURTH REJECTION OF
15  INSURANCE COVERAGE AND THEY HAD NO MORE INSURANCE. AND
16  THAT THE EXISTING CARRIER WAS GOING TO PUT THEM IN
17  INVOLUNTARY BANKRUPTCY.
18       SO THEY WERE SIMPLY OUT OF BUSINESS.
19       Q   WHO WAS OUT OF BUSINESS?
20       A   PROFESSIONAL BENEFIT SOLUTIONS AND PARADIGM,
21  INC. BECAUSE BOTH OF THEM WERE RELYING UPON PRESIDION
22  SOLUTIONS FOR THEIR INSURANCE COVERAGE.
23       Q   HOW MANY EMPLOYEES WOULD BE IMPACTED BY THAT?
24       A   28,000.
25       Q   NO INSURANCE MEANS NO WHAT KIND OF INSURANCE?

Page 72

1        A   NO WORKERS' COMPENSATION INSURANCE.
2        Q   IF YOU DON'T HAVE WORKERS' COMPENSATION
3   INSURANCE, CAN YOU FUNCTION IN THE PEO BUSINESS?
4        A   NO.
5        Q   SO WHAT DID YOU DO?
6        A   I TOLD THEM THAT -- I TOLD MR. VAN DER BERG AND
7   PRESIDION SOLUTIONS, INC. THAT UNDER SOME VERY SPECIFIC
8   GUIDELINES, I WOULD BE WILLING TO REORGANIZE THE COMPANY.
9   BUT THAT SINCE THEY COULDN'T GET INSURANCE WHICH THEY HAD
10  BEEN TRYING TO DO, I WAS GOING TO HAVE TO PUT SOME
11  CONDITIONS ON THE INSURANCE BECAUSE MY PERSONAL WORD WOULD
12  BE ON THE LINE WITH THIS NEW INSURANCE CARRIER THAT THEY
13  WOULD NEVER BE HARMED.
14       AND I HAD TO STRUCTURE THE DEAL IN SUCH A WAY
15  BECAUSE THE INSURANCE CARRIER DID NOT WANT TO BE
16  ASSOCIATED WITH PRESIDION SOLUTIONS, INC. OR ITS
17  SUBSIDIARIES. SO WE ENGAGED IN A TRANSACTION.
18       Q   WHO IS WE?
19       A   PRESIDION SOLUTIONS, INC. AND WELLINGTON CAPITAL
20  GROUP. ON JULY 28TH OF 2005 TO PROVIDE INSURANCE FOR THE
21  1,800 CUSTOMERS THAT WERE ABOUT TO LOSE THEIR WORKERS'
22  COMP AND ITS EMPLOYEES. AND WHAT THAT INVOLVED IS A
23  PLANNED AUSTERITY PROGRAM FOR THE COMPANY, THE COMPANY
24  BEING PBS OR THIS TIME TO REDUCE ITS COSTS AND BRING THEM
25  MORE CONSISTENT WITH THE INDUSTRY AVERAGES, TO ENTER INTO

Page 73

1   A NEW INSURANCE PROGRAM WHERE IT WOULD BE STRICTLY
2   MONITORED TO MAKE SURE THAT THEY DIDN'T CREATE ANOTHER BIG
3   ARREARAGE -- THE INDUSTRY CALLS IT A TAIL -- LIKE THEY DID
4   IN THE PAST YEAR. THEY A BIG GIGANTIC INSURANCE TAIL ON
5   JULY 28, 2005.
6        Q   WHEN YOU SAY INSURANCE TAIL, WHAT DO YOU MEAN BY
7   THAT?
8        A   THAT MEANS CLAIMS WHICH -- OBLIGATIONS WHICH HAD
9   ALREADY BEEN INCURRED BUT HAD NOT BEEN FUNDED. THAT WAS
10  JULY 28, 2005 HERE'S THE SITUATION:
11       PROFESSIONAL BENEFIT SOLUTIONS HAD -- WAS IN A
12  6 MILLION-DOLLAR NEGATIVE FLOAT. I WAS TOLD IT WAS A 6
13  MILLION DOLLARS NEGATIVE FLOAT.
14       Q   WHAT DOES THAT MEAN?
15       A   THEY DIDN'T HAVE ENOUGH MONEY TO CLEAR THE
16  CHECKS THAT WERE GOING THROUGH THEIR BANK ACCOUNTS.
17       Q   SO THEY WERE $6 MILLION SHORT IN THE BANK?
18       A   THAT IS CORRECT.
19       Q   FOR CHECKS THEY HAD WRITTEN?
20       A   CORRECT.
21       Q   OR HAD TO WRITE?
22       A   I DON'T KNOW. I'M RESPONDING TO THEIR FINANCIAL
23  OFFICERS' INFORMATION TO ME ON JULY 28, THAT IF THE
24  BUSINESS CLOSED, WHICH SEEMED TO BE IMMINENT, BECAUSE THEY
25  COULDN'T PROVIDE ANY INSURANCE, THEY WERE GOING TO BOUNCE

19 (Pages 70 to 73)

e4a0adfd-8f40-4935-bfe2-76eedb427bb5

1  AS MANY AS 22,000 PAYCHECKS IN THE NEXT WEEK.
2      THAT WAS --
3    Q  ALL THE LEASED EMPLOYEES, THE 28,000 FAMILIES,
4  WERE GOING TO HAVE NO PAYCHECKS, NO INSURANCE, NO
5  BENEFITS, IS THAT CORRECT?
6    A  THAT'S CORRECT.
7    Q  AND THEY WERE $6 MILLION SHORT OF BEING ABLE TO
8  MEET THAT OBLIGATION AND HAD NO INSURANCE AVAILABLE IN ANY
9  EVENT?
10    A  CORRECT. AND ALL OF THE ASSETS WERE ENCUMBERED
11  BY A VARIETY OF SECURED CREDITORS, ALL OF WHO WERE IN
12  DEFAULT AT THE TIME, WHO HAD BEEN THREATENING TO SEIZE THE
13  PROCEEDS FROM THESE CONTRACTS PURSUANT TO THEIR SECURITY
14  AGREEMENTS.
15    Q  SO IN ADDITION TO THE LACK OF SIX MILLION
16  DOLLARS AND THE LACK OF INSURANCE, THEY HAD SECURED
17  CREDITORS KNOCKING AT THE DOOR SAYING PAY ME OR I'M GOING
18  TO EXECUTE ON MY SECURITY ON ALL OF YOUR ASSETS, IS THAT
19  RIGHT?
20    A  THAT IS CORRECT.
21    Q  SO WHAT DID YOU DO AND WHAT DID WELLINGTON DO?
22    A  ACTUALLY, THIS IS REALLY WHAT -- WELLINGTON DID
23  NOTHING BUT BUY AND HOLD THE STOCK OF PRESIDION SOLUTIONS,
24  INC.
25    Q  WHO TOOK ACTION, WHAT ENTITY?

1    A  AQMI STRATEGY CORPORATION TOOK ACTION --
2    Q  WHAT DID IT DO?
3    A  INITIALLY, IT NEGOTIATED A NEW INSURANCE POLICY
4  WITH THE NEW INSURANCE CARRIER, IT DID IT -- IN ORDER TO
5  GET THAT INSURANCE WRITTEN, IT HAD TO ENGAGE IN AN -- A
6  PURCHASE AND SALE OF THE ASSETS, AN AGREEMENT FOR THE
7  PURCHASE AND SALE OF THE ASSETS TO BE CLOSED AT A FUTURE
8  DATE TO AN ENTITY WHICH WAS NOT A PRESIDION ENTITY, BUT
9  WITH A SUFFICIENT AMOUNT OF INTEREST SO THAT THE CONTRACTS
10  WERE INSURABLE AS AN ACQUIRING ENTITY HAVING AN INSURABLE
11  INTEREST IN THOSE CONTRACTS.
12    Q  LET'S TRY THAT AGAIN.
13    A  OKAY.
14    Q  SO THE COMPANY COULD NOT OPERATE ANY LONGER?
15    A  IT WAS CLOSED, IT WAS DONE.
16    Q  AND THERE WERE SOME CONDITIONS THAT THE NEW
17  INSURER PUT ON IT BEING ABLE TO CONTINUE OPERATIONS, IS
18  THAT RIGHT?
19    A  NOT ON PRESIDION. THERE WERE SOME CONDITIONS
20  THAT THE NEW INSURER PUT IN PLACE IN ORDER TO CONTINUE TO
21  INSURE THE EMPLOYEES AND THE EMPLOYEES EMPLOYERS.
22    Q  WHO IS THE INSURANCE CARRIER?
23    A  SUNZ INSURANCE COMPANY.
24    Q  WHAT DID SUNZ SAY HAD TO BE DONE IN ORDER FOR IT
25  TO PLACE INSURANCE?

1    A  THEY REQUIRED THAT -- THAT THE NEW COMPANY
2  UNRELATED TO PRESIDION OWNERS --
3    Q  IS THIS A NEW COMPANY TO BE FORMED OR AN
4  EXISTING COMPANY?
5    A  IN THIS CASE, IT WAS -- I DON'T KNOW IF IT
6  MATTERED TO THEM AND I DIDN'T ASK -- IN THIS CASE, IT WAS
7  AN EXISTING COMPANY THAT WAS IDENTIFIED THAT WAS OWNED BY
8  MIRABILIS VENTURES --
9    Q  WHAT COMPANY --
10    A  -- THAT WAS A LICENSED PEO IN THE STATE OF
11  FLORIDA.
12    Q  WHAT COMPANY?
13    A  AEM, INC.
14    Q  AND WHAT WAS AEM, INC. DOING AT THAT POINT IN
15  TIME?
16    A  NOTHING, IT WAS AN EXISTING SHELL PEO --
17  MIRABILIS WAS PLANNING TO BE IN THE PEO BUSINESS. A LOT
18  OF IT HAD BEEN LEARNED DURING THE FIRST ENGAGEMENT WITH
19  PRESIDION CORPORATION. THEY BOUGHT THE SHELL AND WERE
20  HOLDING IT IN ANTICIPATION OF BEING IN THE BUSINESS.
21    Q  SO HOW WAS THE PROBLEM OF THE $6 MILLION
22  SHORTFALL AND THE LACK OF INSURANCE SOLVED WITH SUNZ AND
23  BY THE USE OF THE AEM EXISTING PEO?
24    A  AEM AGREED, SUBJECT TO DUE DILIGENCE, TO ACQUIRE
25  THE BOOK OF BUSINESS, THAT GAVE IT AN INSURABLE INTEREST.

1    Q  TO ACQUIRE WHAT BOOK OF BUSINESS?
2    A  THE PROFESSIONAL BENEFIT SOLUTIONS BOOK OF
3  BUSINESS.
4    Q  OKAY. ALL OF THESE 22, 28,000 EMPLOYEES?
5    A  MOST OF THE 28,000 EMPLOYEES. SOME WEREN'T
6  COVERED. SOME WERE COVERED BY SEPARATE PROGRAMS. BUT THE
7  VAST MAJORITY WERE ENCOMPASSED HERE.
8    Q  OKAY. AND HOW WERE THEY GOING TO ACQUIRE THEM?
9    A  PURCHASE THEM IN A -- FOR AN EARN OUT, STANDARD
10  INDUSTRY PRACTICE.
11    Q  WHAT DOES THAT MEAN, AN EARN OUT?
12    A  THAT AS THE BUSINESS CONTINUES ON, A CERTAIN
13  PERCENTAGE OF EVERY SALE GETS PAID BACK TO THE SELLER.
14    Q  IS THIS A WRITTEN AGREEMENT THAT WAS ENTERED
15  INTO?
16    A  IT IS.
17    Q  AND WHAT DID THE WRITTEN AGREEMENT PROVIDE?
18    A  IT PROVIDED THAT BY -- THAT IT PROVIDED THE
19  FORMULA FOR THE PRICING. IT PROVIDED THAT DUE DILIGENCE
20  COULD OCCUR WITHIN A CERTAIN PERIOD OF TIME OR SUBSEQUENT
21  EXTENSION FOR THE BOOK OF BUSINESS. BUT THAT NOBODY ELSE
22  WOULD BE ALLOWED THE BUY IT. THERE'S A LOCKUP AGREEMENT,
23  SO PROFESSIONAL BENEFIT SOLUTIONS COULD NOT SELL
24  THAT BOOK OF BUSINESS TO ANYONE ELSE WITHOUT THIS
25  AGREEMENT FIRST HAVING BEEN TERMINATED. BUT AEM DID NOT

REALTIME REPORTERS, INC.
407-884-4662

e4a0adfd-8f40-4935-bfe2-76eedb427bb5

Page 78

1  NEED TO CLOSE ON THE AGREE -- ON THE CONTRACTS IN THE
2  CURRENT TIME PERIOD BECAUSE THEY STILL HAD TO DO DUE
3  DILIGENCE AND THEY COULD BE SELECTIVE. THEY DID NOT HAVE
4  TO TAKE THE ENTIRE BOOK OF BUSINESS.
5      Q  ALL RIGHT. WE STILL HAVE A $6 MILLION PROBLEM.
6  WE HAVE AN INSURANCE PROBLEM. HOW DO THEY GET RESOLVED?
7      A  THE INSURANCE PROBLEM IS RESOLVED BECAUSE FIRST
8  COMMERCIAL INSURANCE DOESN'T GET THEIR EXTRAORDINARY
9  REPAYMENT IN JULY SO THAT THE MONEY IS AVAILABLE TO
10  PROVIDE FOR THE FUTURE INSURANCE.
11      AND THE $6 MILLION PAYROLL PROBLEM DIDN'T GET
12  TAKEN CARE OF BECAUSE THEY DIDN'T PAY THE PAYROLL TAXES.
13  WHAT THEY LET HAPPEN IS THE PAYROLL TAX OBLIGATION RUN UP
14  TO MAKE SURE THE NET CHECKS GOT CLEAR.
15      Q  WHO MADE THE DECISION NOT TO PAY THE PAYROLL
16  TAXES?
17      A  CRAIG VAN DER BERG.
18      Q  AND WHAT WAS THIS EXTRAORDINARY REINSURANCE
19  PAYMENT YOU'RE TALKING ABOUT THAT WASN'T MADE?
20      A  FIRST COMMERCIAL DEMANDED THAT THE $19,000,800
21  IN HISTORIC CLAIMS BE PAID IN FULL AND IN CASH. AND THAT
22  AN ADDITIONAL 18 OR 24 MILLION DEPENDING ON WHO CALCULATED
23  IT AMOUNT OF CASH BE PAID AS COLLATERAL UP FRONT.
24      Q  AND WERE THEY OWED THAT MONEY?
25      A  YES. I MEAN. THERE ARE SOME ARGUMENTS AS TO HOW

Page 79

1  MUCH WHAT AND WHEN. BUT YES. THEY WERE OWED THAT MONEY.
2      Q  WHO MADE THE DECISION NOT TO PAY THEM?
3      A  MR. VAN DER BERG.
4      Q  INSTEAD WHAT DID HE DO WITH THAT MONEY?
5      A  HE PROVIDED THE MONEY TO COLLATERALIZE THE
6  ONGOING -- THE NEW INSURANCE COMPANY WITH -- THE NEW
7  COVERAGE WITH AEM. AND THE REST WERE IN OPERATING EXPENSES
8  AT THE TIME.
9      Q  SO THE NEW COVERAGE THROUGH AEM WITH SUNZ?
10      A  SUNZ. AND HE LET THE -- AND HE MADE SURE -- NOT
11  JUST -- HE DIDN'T MAKE SURE BECAUSE I WATCHED THIS EVENT.
12  THIS WAS A KEY FACTOR IN STAYING IN THIS. REMEMBER AT THE
13  TAME. I HAD MADE $14 MILLION AND SIMPLY COULD HAVE WALKED
14  AWAY. MY CONTRACT WAS DONE.
15      BUT I MADE SURE THAT THEY COVERED THOSE NET
16  CHECKS BECAUSE I HAVE BEEN ON THE OTHER SIDE TOO MANY
17  TIMES. AND I WASN'T GOING TO LET THAT HAPPEN TO EITHER
18  THE SMALL BUSINESS OWNERS OR THE EMPLOYEES.
19      Q  BUT AEM DIDN'T OWN THE BOOK YET?
20      A  DIDN'T HAVE TO. THEY HAD AN INSURABLE INTEREST.
21      Q  SO --
22      A  IF YOU LOOK IN THE INDUSTRY. MANY TIMES THE
23  COVERAGE COMES FROM A THIRD PARTY UNDER SOME KIND OF
24  MASTER AGREEMENT. IT'S A COMMON PRACTICE. IT'S A TRADE.
25  YOU GET A PARENT COMPANY THAT HAS AN INSURABLE INTEREST IN

Page 80

1  THE SUBSIDIARIES AND IT COVERS THEM. IT'S THE WAY THE
2  INDUSTRY HAS BEEN DESIGNED.
3      Q  SO THEY SOLVE THE PROBLEM?
4      A  WE SOLVED THE IMMEDIATE PROBLEM.
5      Q  ON A GOING FORWARD BASIS, YOU HAD PEOPLE WHO HAD
6  CREATED THE PROBLEM FOR VARIOUS REASONS WHO WERE STILL
7  THERE AND HOW WAS THAT GOING TO CHANGE?
8      A  TWO WAYS. FIRST OF ALL. THERE'S NOBODY ELSE
9  THAT COULD STILL BE THERE BECAUSE I CERTAINLY WASN'T AND I
10  CAN'T IMAGINE ANYBODY ELSE GOING TO SIGN THE TAX RETURNS
11  OR SIGN ON TO THE BANK ACCOUNTS WHEN THESE GUYS WERE NOT
12  ABLE. UNDERSTAND ABLE TO PAY THE TAXES AND THE REST OF
13  THEIR EXPENSES. THERE WERE TWO SETS OF COSTS.
14      WHAT I DIDN'T KNOW AT THE TIME, WHAT I DO KNOW
15  NOW IS THAT A GOOD PART OF IT. THE EARLIER DESCRIPTION I
16  GAVE YOU. THEY SO UNDER PRICED THEIR BOOK OF BUSINESS AS
17  TO MAKE THIS IMPOSSIBLE. BUT WE DIDN'T KNOW THAT. WE
18  DIDN'T KNOW THAT UNTIL MAY OF 2006. THE REASONS WE DIDN'T
19  KNOW THAT -- I THINK SOME OF THEM WERE INTENTIONAL BUT --
20      Q  INTENTIONAL FROM WHOSE PROSPECTIVE?
21      A  I CAN'T -- I BELIEVE THAT THE MIDDLE LEVEL
22  MANAGEMENT'S COMPENSATION WAS BASED ON THEIR TOP LINE AND
23  SO THEY KIND OF JURY RIGGED THE NUMBERS TO MAKE SURE THERE
24  WERE LOTS OF SALES EVEN IF THE SALES WERE NOT PROFITABLE.
25      YOU SEE. IT DIDN'T MATTER IF IT WAS A PROFITABLE

Page 81

1  SALE. IT ONLY MATTERED THAT IT WAS A SALE. THAT'S KIND
2  OF HOW THEY GOT THEIR COMPENSATION BASED ON.
3      Q  THE SALES PEOPLE?
4      A  AND I THINK THE REST OF THE STAFF. I MEAN. IF
5  YOU GET INTO THE CULTURE BEHIND IT. IT WAS VERY IMPORTANT
6  THAT THERE WAS 700 -- WE ARE A BILLION DOLLAR COMPANY.
7  WELL. THEY WEREN'T A BILLION DOLLAR COMPANY. THEY WERE A
8  700 MILLION-DOLLAR COMPANY AND THEY WERE A 700
9  MILLION-DOLLAR COMPANY WITH 3 PERCENT GROSS MARGINS. BUT
10  THEY WERE A BILLION DOLLAR COMPANY AND IT WASN'T -- IT
11  PERMEATES THEIR OPERATION. AND SO --
12      Q  HOW DO YOU TAKE A 300 MILLION-DOLLAR DEFICIT
13  WITH A COMPANY THAT WORKS ON A 3 PERCENT MARGIN AND MAKE
14  IT PROFITABLE?
15      A  BECAUSE ALTHOUGH IT APPEARS TO BE A LOW MARGIN
16  BUSINESS. IT'S A HIGH MULTIPLE BUSINESS.
17      Q  EXPLAIN THAT.
18      A  IF YOU EXAMINE THE COMPANIES THAT ARE PUBLICLY
19  TRADED AND THE LARGE PLATFORM COMPANIES. 500 MILLION OR
20  MORE BUSINESS THAT IS SOLD. THEY GET A LARGE MULTIPLE OF
21  REVENUES. THE PUBLIC ENTITIES ARE RANGING FROM 21 TO 47.
22      Q  WHAT DOES THAT MEAN. A MULTIPLE?
23      A  IT'S THE VALUE OF THE COMPANY VERSUS ITS
24  OPERATING INCOME. SO IF YOUR BUSINESS MAKES A THOUSAND
25  DOLLARS. IT'S WORTH 21,000. THAT'S WHAT YOU CAN SELL IT

EALTIME REPORTERS, INC.
407-884-4662

e4a0adfd-8f40-4935-bfe2-76eedb427bb5

Page 82

1 FOR.
2 AND IN THE INDUSTRY. IF YOU GO -- I MEAN, THE
3 AVERAGE RIGHT NOW I BELIEVE IS A 33 MULTIPLE FOR A COMPANY
4 THIS SIZE. THAT'S A BIT MORE OF A GLOBAL INDUSTRY.
5 THAT'S ALL THE HUMAN RESOURCE COMPANIES.
6 Q ALL RIGHT. BUT IF YOUR COMPANY IS WORTH MINUS
7 $300 MILLION, MINUS 300 MILLION TIMES 21 NOT A GOOD
8 NUMBER.
9 A BUT IT'S NOT MINUS $300 MILLION. THAT'S THE
10 IMPORTANT PART.
11 Q TELL ME WHY.
12 A WHAT HAPPENS IS, WHEN I WAS GIVEN A CHANCE TO
13 LOOK AT IT, I NOTICE THAT, FIRST OF ALL, THEIR COSTS WERE
14 WAY TOO HIGH AND SOME OF THOSE COSTS WOULD BE EASY TO
15 CHANGE. THE NEW INSURANCE PROGRAM ITSELF WAS A
16 12 MILLION-DOLLAR SAVINGS RIGHT OFF THE TOP. LITERALLY IN
17 ONE DAY WE SAVED A MILLION DOLLARS A MONTH.
18 THE DEBT HAD ALREADY BEEN ACCRUED. THERE'S THIS
19 BIG GIGANTIC DEBT THAT HAD BUILT UP OVER A LONG PERIOD OF
20 TIME. IN FACT BECAUSE SOME OF IT WAS ROLLING FORWARD IN
21 DISGUISE. IT WAS A CONTINGENT LIABILITY THAT DIDN'T
22 MATERIALIZE THE TAILS, YOU DON'T EVEN SEE IT UNTIL YOU HIT
23 THE WALL. THAT'S REALLY WHAT FIRST COMMERCIAL INSURANCE
24 CORPORATION SAID TO US.
25 SO ON JULY 28. I ONLY KNOW WHAT THE DEBT IS

Page 83

1 BECAUSE IT FROZE IN TIME AND I STARTED LOOKING AT ALL THE
2 CLAIM. ALL THE LEASES THAT WERE UNEXPIRED. THAT WERE
3 GOING TO ACCELERATE. ALL THE UNSECURED CREDITORS. LITTLE
4 GUYS. 800 BUCKS. A THOUSAND BUCKS. 10,000 BUCKS. THAT IF
5 THE BUSINESS RAN FOR 90 DAYS AND TIGHTENED ITS BELT WOULD
6 BE PAID. SO BUT THE CHANGES HAD TO BE MADE IMMEDIATELY.
7 SO THAT BECAME MY REAL ARRANGEMENT WITH CRAIG
8 VAN DER BERG. I'LL STAND FOR THE INSURANCE BECAUSE YOU
9 CAN'T GET IT. SUNZ IS NOT GIVING YOU A COVERAGE PERIOD.
10 THEY WILL COVER IT UNDER THIS ARRANGEMENT AND THEY WILL
11 COVER IT UNDER VERY SPECIFIC CONDITION THAT I'M PRESENT
12 AND WATCHING TO MAKE SURE THAT YOU DON'T DO TO THEM WHAT
13 HAPPENED TO FIRST COMMERCIAL INSURANCE COMPANY.
14 AND WE ARE GOING TO INSTALL AN AUSTERITY PROGRAM
15 THAT YOU'RE GOING TO HAVE TO LIVE WITH. AND THE DAY YOU
16 DON'T MAKE THOSE CHANGES. I QUIT. THAT'S EASY. I JUST
17 STOP. SO IF YOUR BOOK IS PRICED RIGHT, YOU HAVE THIS MUCH
18 MONEY AND THIS MUCH IS GOING TO BE SENT EVERY DAY OR EVERY
19 COUPLE DAYS TO AN ACCOUNT WHICH I CONTROL, I WILL PROTECT
20 THE INSURANCE CARRIERS.
21 Q WHO IS IT?
22 A I IS FRANK AMODEO. I WILL PROTECT THE INSURANCE
23 CARRIER. I WILL PROTECT THE SECURED CREDITORS BECAUSE I
24 HAVE TO TALK ALL THE SECURED CREDITORS AND GET THEM AGREE
25 TO DO THIS. IF THEY DON'T AGREE TO DO THIS. THEY OWN THE

Page 84

1 ASSETS. WE MIGHT AS WELL JUST GO HOME BECAUSE YOU HAVE TO
2 ENTER INTO FORBEARANCE AGREEMENTS WITH THEM BUT NOT THE
3 KIND YOU HAVE BEEN ENTERING INTO FOR THE LAST THREE YEARS.
4 PAYING $80,000 IN ADDITIONAL INTEREST FOR TWO WEEKS TIME.
5 THAT'S WHERE YOUR MONEY IS GONE.
6 WE WILL ENTER INTO LONG-TERM AGREEMENTS AND
7 THESE SECURED CREDITORS ARE GOING TO COOPERATE WITH US
8 BECAUSE IF NOT. THEY'RE NOT GOING TO GET PAID EITHER.
9 AND WE WILL TAKE THIS BUSINESS OVER A YEAR AND
10 WE WILL TURN IT AROUND SO THAT THERE'S ENOUGH MONEY FOR US
11 TO GET EVERYBODY PAID. BECAUSE FRANKLY, IF YOU LOOKED AT
12 HIS TOP LINE AND I DIDN'T KNOW ABOUT THE PRICING PROBLEM
13 AT THE TIME. IF YOU LOOKED AT THE TOP LINE AND YOU BELIEVE
14 THE PRICING. THIS BUSINESS SHOULD BE WORTH FOUR OR
15 $500 MILLION.
16 THERE'S NO REASON THIS BUSINESS WAS WORTH
17 $12 MILLION. WE HAD THE BUSINESS APPRAISED SO WE KNEW IT
18 WHAT WAS WORTH GOING IN AND CAME OUT WITH AN APPRAISAL OF
19 $12,275,000 BECAUSE IT WAS SO DRAGGED DOWN BY ALL THE
20 STUFF.
21 SO BEGINNING IN JULY AND CARRYING THROUGH TO
22 NEXT JULY --
23 Q FROM JULY '05 TO JULY '06. WHAT HAPPENED?
24 A THE OVERALL LIABILITIES OF THE COMPANY WERE
25 REDUCED TO --

Page 85

1 Q WHICH COMPANY?
2 A PBS. PARADIGM TOGETHER. BECAUSE THE PARADIGM
3 LIABILITY HAD TO BE REDUCED BECAUSE OF THE SECURITY
4 INTEREST IN THE PBS ASSETS.
5 Q PARADIGM HAD A SECURITY INTEREST IN THE PBS'
6 ASSETS?
7 A THE CREDITORS OF PARADIGM HAD A SECURITY
8 INTEREST IN THE PBS ASSETS. THE TOTAL LIABILITIES WERE
9 REDUCED FROM THREE HUNDRED MILLION TO $200 MILLION.
10 PAYROLL FLOAT WAS CURED IN THE ACCOUNT.
11 Q WHAT DOES THAT MEAN?
12 A NOBODY'S CHECK BOUNCED AND THE BANK ACCOUNTS
13 WERE FULLY FUNDED. THEY WEREN'T --
14 Q PEOPLE WERE WRITING CHECKS WHEN THE MONEY WAS IN
15 THE BANK?
16 A ONLY WHEN THERE WAS ENOUGH MONEY. THAT IS
17 CORRECT. NONE OF THE WORKERS' COMP GOT CANCELED AND OVER
18 THIS YEAR. WE HAVE THREE WORKERS' COMP CARRIERS NOW
19 ENSURING THE BOOK OF BUSINESS. THE OLD WORKERS' COMP
20 TAILS HAVE BEEN PAID OFF FOR MANY OF THE COMPANIES OR ARE
21 BEING SATISFIED BY THIRD PARTIES. ALL THE SECURED
22 CREDITORS HAVE BEEN PAID EXCEPT FOR TWO.
23 ONE IS MIRABILIS BLUES VENTURES. WHICH IS STILL
24 OWED ABOUT $12 MILLION AND IS THE SENIOR CREDITOR BECAUSE
25 IT PURCHASED AND CONSOLIDATED ALL THE TROUBLESOME SECURED

22 (Pages 82 to 85)

e4a0adfd-8f40-4935-bfe2-76eedb427bb5

Page 86

1  CREDITORS. THE SECOND IS A CONSULTANT FIRM WHICH ONCE IT
2  REALIZED THE TAXES WERE. EVEN THOUGH THEIR OBLIGATION WAS
3  FROM PRESIDION SOLUTION ONCE IT REALIZED THERE WERE SOME
4  PROBLEMS DOWNSTREAM, JUST ELECTED TO DEFER THEIR PAYMENTS.
5      Q   WHO IS THE CONSULTANT FIRM?
6      A   BROOKMEAD GROUP DECIDED THAT. YOU KNOW, THEY
7  WOULD WAIT UNLIKE, UNLIKE THE OTHER CREDITORS WHO WANTED
8  TO BE PAID NOW OR TODAY OR AT LEAST HAVE SOME ADDITIONAL
9  STREAM FROM A THIRD PARTY. BROOKMEAD JUST SAID, LOOK, I'LL
10 WAIT. LET'S SEE IF WE CAN TURN THE THING AROUND AND THEN
11 EVERYBODY WILL GET PAID AT THE END.
12      SO WE BEGIN A PROSTHESIS OF THE TURN AROUND.
13 THE NUMBER -- THE AMOUNT OF LIABILITIES HAS BEEN REDUCED
14 BY TWO HUNDRED MILLION DOLLARS IN ONE YEAR'S TIME. THE
15 IRS OBLIGATION IS HIGHER.
16      Q   BY 200 MILLION OR 100 HUNDRED MILLION?
17      A   BY $100 MILLION. I'M SORRY. BY A HUNDRED
18 MILLION DOLLARS TO $200 MILLION. THE IRS OBLIGATION HAS
19 INCREASED DURING THAT TIME PERIOD.
20      Q   WHY DID THE IRS OBLIGATION INCREASE?
21      A   JUST LIKE I TOLD THE IRS. MR. VAN DER BERG HAD A
22 CHOICE. HE COULD PAY THE INSURANCE, I.E., ME. HE COULD
23 PAY THE SECURED CREDITORS. I.E., A LOT OF PEOPLE. HE COULD
24 PAY HIS UTILITIES. HE COULD PAY HIS RENT. IF HE DIDN'T
25 PAY THEM. IMMEDIATE DEATH. THEIR BUSINESS WAS OVER. IF

Page 87

1  HE DIDN'T PAY THE INSURANCE AND I WALKED. SUNZ WOULD
2  CANCEL. HE IS OVER IN 30 DAYS.
3      Q   HOW WERE YOU THE INSURANCE?
4      A   IT WAS MY COMMITMENT TO THE INSURANCE COMPANY
5  WHICH KEPT THAT COVERAGE IN PLACE.
6      Q   WHAT KIND OF COMMITMENT?
7      A   I PROMISED THEM AND THERE ARE LETTERS BACK AND
8  FORTH THAT I WOULD WATCH AND CONTROL THESE ASSETS DURING
9  THIS TIME PERIOD. BUT I WOULD MAKE SURE THAT THE PAYMENTS
10 WERE MADE TO COVER THE INSURANCE COST AND ENOUGH MONEY WAS
11 AVAILABLE TO PAY THE NECESSARY EXPENSES TO ENOUGH THE ASSETS
12 GOING TO A CERTAIN VALUE OF THE BUSINESS IN PLACE.
13      Q   BUT THERE WAS NOT ENOUGH MONEY TO PAY THE IRS
14 TAX?
15      A   NO.
16      Q   SO WHAT HAPPENED TO THE IRS DEBT IN THAT ONE
17 YEAR TIME FRAME?
18      A   IT WENT -- THE IRS DEBT WENT HIGHER BUT BECAME
19 FULLY SECURED OR NEARLY FULLY SECURED. SO THEY WENT FROM
20 BEING IN AN UNCOVERED POSITION WHERE THEY WERE GOING TO
21 LOSE $78 MILLION TO BEING IN THE COVERED POSITION WHERE
22 THEY'RE GOING TO GET PAID A 132 CURRENTLY AND IN ALL
23 LIKELIHOOD BE PAID IN FULL, INCLUDING COST OF COLLECTIONS.
24 INTEREST AND PENALTIES. IN FACT, THAT'S BEEN ONGOING NOW
25 FOR MANY WEEKS.

Page 88

1      Q   HOW -- STRIKE THAT. DURING THE COURSE OF THE
2  YEAR, WERE ANY PAYMENTS MADE TO THE IRS?
3      A   YES. 69,900,000 FROM ORDINARY OPERATIONS AND
4  ABOUT 11 MILLION, I BELIEVE, FROM EXTRAORDINARY
5  OPERATIONS.
6      Q   AND WHO PAID THEM?
7      A   THE 69 MILLION WAS PAID BY PROFESSIONAL BENEFIT
8  SOLUTIONS. THE 11 MILLION WAS EFFECTIVELY PAID BY ME AS I
9  PROCESSED ASSETS AND ADDED ADDITIONAL FUNDS.
10      Q   WHY?
11      A   WHY?
12      Q   YEAH.
13      A   BECAUSE SOME OF THOSE ASSETS I THOUGHT WERE
14 ATTRIBUTABLE TO THE SUNSHINE COMPANIES. WHEN THEY WERE
15 SOLD, THE MONEY BELONGED TO THE IRS.
16      Q   SO THE MONEY FROM THE LIQUIDATION OF SUNSHINE
17 WENT TO THE IRS?
18      A   SOME OF THAT WAS THROUGH SOME OF THE ACCOUNTS.
19 I MEAN, THERE WERE SOME TRANSFERS OF CUSTOMERS UP TO PBS
20 AND THERE SHOULD BE A PAYMENT FOR THEM AT FAIR MARKET
21 VALUE BUT THAT'S WHY THE PAYMENTS WENT TO THE IRS.
22      Q   DID THE BOOK OF BUSINESS THAT PBS HAD STAY
23 INTACT?
24      A   YES. IT LOST -- DURING THE TIME PERIOD, THE
25 CONSULTING FIRM AND THE INDIVIDUAL CONSULTANTS DID AN

Page 89

1  AMAZING JOB. THE OPERATING EXPENSES. NORMAL SG&A EXPENSES
2  IN THE YEAR PRIOR TO JULY --
3      Q   WHAT ARE SG&A EXPENSES?
4      A   SALES AND GENERAL ADMINISTRATION COSTS.
5  OVERHEAD. WAS $25 MILLION. ON A BOOK OF BUSINESS THAT
6  AVERAGED OVER 600 MILLION DOLLARS. IN THE YEAR FOLLOWING.
7  THE BOOK OF BUSINESS WAS REDUCED TO 550 MILLION.
8      BY THE WAY, THAT WAS A GOOD THING BECAUSE SOME
9  OF THE CUSTOMERS. IT WAS COSTING TO WRITE THE CHECK. IT
10 GOT LESS MONEY FROM THE EMPLOYER THAN THEY PAID THE
11 EMPLOYEE.
12      Q   WHO WAS RESPONSIBLE FOR THAT?
13      A   CRAIG VAN DER BERG. JIM BYERS. JOHN BERTRAM AND
14 A HOST OF MIDDLE MANAGEMENT PEOPLE. UNBELIEVABLE
15 INEPTITUDE IN OPERATING THE BUSINESS.
16      Q   NOW, WAS THE IRS MADE AWARE OF THE CHANGE IN THE
17 DEBT OF THE COMPANY AND THE CHANGE OF THEIR RELATIVE
18 POSITION FROM BEING COMPLETELY UNSECURED TO A NEW POSITION
19 OF HAVING MORE SECURITY?
20      A   YES. AND AS A PRECAUTION. I WOULD FILE THE TAX
21 RETURNS DIRECTLY WITH THE COLLECTION OFFICE IN MIAMI.
22 SEPARATELY. MR. VAN DER BERG FILED THE REGULAR RETURNS
23 WHEREVER HE WAS SUPPOSED TO. JUST AS A PRECAUTION. I
24 WOULD SEND THEM DOWN TO THE COLLECTION OFFICE SO THEY HAD
25 A COPY IN THEIR FILES.

23  (Pages 86 to 89)

e4a0adfd-8f40-4935-bfe2-76eedb427bb5

1   Q   WAS THE IRS BEEN MADE AWARE OF WHAT WAS GOING
2   ON?
3   A   YES.
4   Q   WHAT WERE THEY TOLD?
5   A   THAT WE WERE GOING TO TRY TO REORGANIZE THE
6   ASSETS, FORMALLY OF SUNSHINE, THEN OF PBS, IN ORDER TO
7   COME UP WITH THE ABILITY TO PAY THEM OFF.
8   Q   SO MONEY WAS TAKEN FROM THE LIQUIDATION OF THE
9   ASSETS USED TO REDUCE THE IRS DEBT, IS THAT RIGHT?
10   A   YES.
11   Q   AND MONEY WAS TAKEN FROM THE DAILY BUSINESS
12   OPERATIONS TO PAY THE OPERATING EXPENSES ON AN ONGOING
13   BASIS?
14   A   CORRECT.
15   Q   AND ALL OF THE SECURED CREDITORS WERE PAID OFF?
16   A   YES, EXCEPT THE AFOREMENTIONED BROOKMEAD AND
17   MIRABILIS.
18   Q   HOW LARGE ARE THE BROOKMEAD AND MIRABILIS CLAIMS
19   TOGETHER?
20   A   I DON'T KNOW WHAT THE BROOKMEAD NUMBER IS OFF
21   THE TOP OF MY HEAD BUT PROBABLY STILL $800,000. AND IN
22   THE MIRABILIS IS ABOUT 11 MILLION.
23   Q   IF THE COMPANY HAD BEEN SHUT DOWN ON JULY 28,
24   2005, HOW MUCH WOULD THE IRS HAVE REALIZED?
25   A   NOTHING. LOST $78 MILLION OR MORE.

1   Q   AND HOW HAS THE IRS' POSITION BEEN IMPROVED OVER
2   THE LAST 12 MONTHS?
3   A   BECAUSE THE BOOK OF BUSINESS, THE ASSETS WHICH
4   ARE COLLATERALIZING, IS NOW WORTH $132 MILLION. AND WITH
5   THE REST OF THE REORGANIZATION TO BE COMPLETED IN FOUR
6   MONTHS. AS I HAVE TOLD THE IRS, THE BOOK OF BUSINESS IS
7   WORTH $360 MILLION.
8   Q   WHAT IS THE REST OF THE REORGANIZATION?
9   A   THERE ARE FOUR OTHER PROFESSIONAL EMPLOYEE
10   ORGANIZATIONS WHICH ARE BEING CONSOLIDATED WITH THESE
11   ASSETS INTO A FIFTH COMPANY WHICH HAS A SUPERIOR --
12   Q   LET ME STOP YOU A SECOND. YOU SAID ONE OF THE
13   PROBLEMS IS THAT THE BOOK OF BUSINESS WAS PROPERLY
14   IMPROPERLY PRICED?
15   A   CORRECT.
16   Q   AND THAT MEANS THAT PEOPLE, CUSTOMERS WERE
17   PAYING LESS MONEY THAN IT COST TO SERVICE THOSE CUSTOMERS?
18   A   YES.
19   Q   HAS THAT BEEN FIXED?
20   A   NOT COMPLETELY. LET ME TELL YOU -- LET ME
21   ANSWER THAT IN TWO PARTS. SOME OF IT HAS BEEN FIXED. A
22   LOT OF THE BAD CLIENTS HAVE BEEN DROPPED. THE LOWER COST
23   OF INSURANCE, THE VARIABLE COST HAS HELPED CONSIDERABLY.
24   CONTRACTS THAT WERE NEGATIVE BEFORE NOW AT LEAST BREAK
25   EVEN.

1   AND THE CUSTOMERS ARE BEING PREPARED FOR A YEAR
2   END SWITCH, WHERE THE PRICES WILL BE RAISED BACK TO
3   MARKET. BUT YOU CAN'T JUST CHANGE THEM IMMEDIATELY. SO
4   IT'S NOT -- IT'S A WORK IN PROGRESS. WE ARE PROFITABLE
5   NOW. IT MAKES MONEY EVERY MONTH BUT ITS NOT FIXED YET.
6   Q   DOES IT MAKE MONEY EVERY MONTH AND PAY THE IRS
7   INDEBTEDNESS AS IT IS CURRENTLY ACCRUING?
8   A   YES.
9   Q   SO HAS THE IRS DEBT, FORGET ABOUT INTEREST AND
10   PENALTIES FOR THE MOMENT, IS THE IRS BEING PAID CURRENTLY
11   ON AN ONGOING BASIS FROM OPERATIONS AND THE FUNDING OF
12   PAYROLL?
13   A   YES, THEY'RE BEING PAID $150,000 A WEEK AGAINST
14   THE OLD DEBT AND THEY'RE BEING KEPT CURRENT.
15   Q   HOW LONG HAVE THEY BEEN PAID $150,000 A WEEK?
16   A   TWO MONTHS.
17   Q   SO THEY HAVE RECEIVED TOWARDS THE OLD DEBT, OVER
18   A MILLION DOLLARS WHILE THEIR NEW DEBT HAS STAYED CURRENT,
19   IS THAT CORRECT?
20   A   CORRECT.
21   Q   NOW, YOU SAID THAT MIRABILIS, FOR EXAMPLE, A
22   SECURED CREDITOR, OWED $12 MILLION DECIDED NOT TO REALIZE
23   ON ITS SECURITY.
24   A   DECIDED NOT TO DEFAULT AND CEASE THE ASSETS. I
25   DON'T THINK THEY'RE GOING TO FOREGO THEIR CLAIM.

1   Q   I UNDERSTAND THAT. DID THEY SUBORDINATE THEIR
2   POSITION TO THAT, THE IRS?
3   A   THE IRS. I TALKED WITH THEM ABOUT THIS. THIS IS
4   PART OF THIS RESOLUTIONS FROM THEIR PROSPECTIVE THAT I
5   DON'T WANT TO GET INTO. BUT I DID TELL THEM THAT THE GOAL
6   IS TO CONSOLIDATE OTHER MIRABILIS ENTITIES WITH THIS BOOK
7   OF BUSINESS BY JANUARY 1ST. CREATE A 900 MILLION-DOLLAR A
8   YEAR BUSINESS THAT HAS EASILY CERTAINABLE MARKET VALUE OF
9   $360 MILLION. HAVE ONE YEAR AND THEN SELL IT.
10   MIRABILIS HAS TENTATIVELY AGREED TO DEFER ANY
11   COLLECTION ON THE SECURITY INTEREST UNTIL 2008 IN
12   ANTICIPATION THAT THE DEBT -- THE WHOLE COMPANY WILL BE
13   SOLD. SO BUT I DON'T HAVE A FORMAL AGREEMENT WITH THEM
14   YET BECAUSE WE DON'T HAVE A FORMAL AGREEMENT WITH ALL THE
15   PARTIES. IT IS IN THE WORKS.
16   Q   WOULD IT BE FAIR TO SAY THAT THE IRS HAS WAITED
17   TO PURSUE ITS COLLECTION EFFORTS AGAINST PBS IN ORDER NOT
18   TO LOSE THE POTENTIAL 70 OR 80 MILLION DOLLARS THAT IT
19   COULD COLLECT SHOULD THIS REORGANIZATION BE SUCCESSFUL?
20   A   YES. I HAD A VERY -- I MEAN A VERY FORTHRIGHT
21   DISCUSSION WITH THEM ABOUT THAT ISSUE. IF THE IRS WOULD
22   MOVE TO COLLECT THESE OBLIGATIONS, THE BUSINESS WOULD HAVE
23   GONE AWAY AND THEY KNEW IT. THERE ARE A WHOLE SLEW OF
24   PRIOR CASES THAT THEY HAD WHERE YOU JUST MAKE THE
25   COLLATERAL VALUE EVAPORATE.

e4a0adfd-8f40-4935-bfe2-76eedb427bb5

Page 94

1  Q  SO THE BUSINESS WOULD SHUT DOWN?
2  A  THE MINUTE THEY MOVED. IT WOULD HAVE SHUT DOWN.
3  Q  THESE CONTRACTS THAT THE BUSINESS HAS ARE
4  TERMINABLE IN 30 DAYS?
5  A  THAT'S CORRECT.
6  Q  AND THEY COULD HAVE JUST GONE TO SOME OTHER PEO?
7  A  BASICALLY UP AT LEAST UNTIL OUR NEW MODEL
8  ADJUSTS TO COMMODITY.
9  Q  AND WHAT WOULD THE REMAINING ASSETS THEN BE
10  WORTH FOR THE IRS TO COLLECT ON?
11  A  NOTHING.  THERE ARE THE CAUSES OF ACTION THAT I
12  MENTIONED BEFORE AGAINST THE PEOPLE WHO STOLE THE MONEY
13  FROM PRESIDION OR FROM THE SUNSHINE COMPANY. BUT GOT TO
14  CHASE THEM.
15  THERE IS A CLAIM AGAINST AN URUGUAY COMPANY FOR
16  $27 MILLION AND THE IRS SAID THEY WOULD HELP US TRY TO
17  TRACK THEM DOWN. BUT YOU KNOW, TRYING TO COLLECT AGAINST
18  SOUTH AMERICAN COMPANY. LONG TIME. LOTS OF MONEY BEFORE
19  YOU SEE ANY RETURN.
20  Q  HAS THE IRS MADE ANY COLLECTION EFFORTS AGAINST
21  PBS IN THE PAST YEAR?
22  A  NO.  THEY DID GIVE THEM A REFUND WHEN THEY
23  SILOED. SO THEY REFUNDED $67,000 TO THEM.
24  Q  OKAY.  AND HOW HAS THE IRS' POSITION BEEN
25  ENHANCED IN THE LAST 12 MONTHS?

Page 95

1  A  THEY WERE UNCOLLATERALIZED COMPLETELY AS OF JULY
2  2005.
3  Q  TO WHAT EXTENT?
4  A  NO COLLATERAL AND $78 MILLION IN LOSSES ON
5  JULY 28 OF 2005.
6  Q  HOW MUCH HAVE THEY COLLECTED ON AN ONGOING BASIS
7  IN THE LAST YEAR AND HOW MUCH HAVE THEY COLLECTED TOWARDS
8  THE OLD DEBT IN THE PAST YEAR?
9  A  I DON'T KNOW ABOUT THE ONGOING BASIS BECAUSE I
10  SPECIFICALLY DID NOT HANDLE THE OPERATING ACCOUNTS. I DO
11  KNOW THE AGGREGATED SUM OF $69 MILLION BUT I DON'T KNOW
12  HOW TO BREAK IT DOWN. I ONLY KNOW THAT BECAUSE THEY TOLD
13  ME. I KNOW WHAT THEIR NUMBERS ARE.
14  MY RESPONSIBILITY WAS TO THE PARENT AND TO
15  PROTECT THE INSURANCE COMPANY. I WASN'T GOING TO BE -- I
16  WASN'T GOING TO BE A CONTROLLING PERSON. I WASN'T GOING
17  TO BE AN OPERATOR SO I CAN'T GIVE YOU AN EXACT ANSWER AS
18  TO THAT.
19  Q  DID YOU SIGN ANY CHECKS?
20  A  NO.
21  Q  HAS FRANK AMODEO EVER SIGNED ANY PAYROLL CHECKS
22  FOR PBS?
23  A  NO. I HAVE ONE BANK ACCOUNT WITH TWO DIFFERENT
24  BACKS AT DIFFERENT TIMES ONLY AND THAT ACCOUNT WAS FOR
25  PAYING EXTRAORDINARY EXPENSES ASSOCIATED WITH THE ASSETS

Page 96

1  AND THE INSURANCE COSTS.  THAT'S QUITE IT.
2  Q  WHO HAD THE BANK ACCOUNT?
3  A  CRAIG VAN DER BERG.
4  Q  YOU SAID YOU HAD ONE BANK ACCOUNT.  WHO ARE YOU
5  REFERRING TO?
6  A  OH. PRESIDION SOLUTIONS HAD A BANK ACCOUNT WHICH
7  WAS DESIGNED TO RESERVE MONEY BASED UPON HOW MANY SALES
8  THEY MADE FOR INSURANCE AND EXTRAORDINARY COST. I. FRANK
9  AMODEO. SIGNED ON THAT ACCOUNT IN MY ROLE AS AQMI STRATEGY
10  CORPORATION'S CONSULTANT ON THE PROJECT.
11  Q  WHAT WERE THOSE FUNDS USED FOR?
12  A  A VARIETY OF EVENTS. I PAID -- THERE WAS ABOUT
13  $40 MILLION IN INSURANCE COLLATERAL AND HISTORIC COSTS
14  THAT HAD TO BE PAID.  THERE WERE THE AGREEMENTS WITH THE
15  SECURED SELLERS' NOTES.
16  I WONDERFULLY HAVE A LIST. WHICH IS -- THERE'S
17  BEEN A REFINANCING ARRANGEMENT BETWEEN MIRABILIS AND ITS
18  ENTITIES AND PRESIDION -- I BELIEVE THESE DOCUMENTS ARE
19  GOING TO BE FILED IN THE PUBLIC RECORD ANY DAY NOW. SO
20  ANYBODY WHO WANTS TO SEE IT CAN SIMPLY GO TO SUNBIZ AND
21  PULL IT DOWN.
22  Q  LET ME ASK YOU. ON THE PBS PAYROLL ACCOUNT?
23  A  CORRECT.
24  Q  DID FRANK AMODEO. DID YOU. SIR. EVER SIGN A
25  CHECK?

Page 97

1  A  NO.
2  Q  WHO SIGNED THEM?
3  A  CRAIG VAN DER BERG DID.
4  Q  ON ANY OF THE ACCOUNTS RELATING TO ANY OF
5  TRANSACTIONS WE DISCUSSED TODAY. DID YOU EVER SIGN A
6  CHECK?
7  A  NO.
8  Q  WHO SIGNED THE CHECKS?
9  A  VAGUE VAN DER BERG DID.
10  Q  NOW, IS PBS AS WE SIT HERE TODAY ON AN ONGOING
11  BASIS. GOING FORWARD BASIS. PROFITABLE?
12  A  PBS HAS BEEN DISSOLVED.  THE ASSETS --
13  Q  DID AEM. DID AEM CLOSE ON ITS DEAL?
14  A  NO.
15  Q  WHO CONTROLS THESE ASSETS NOW?
16  A  THERE'S A PHILADELPHIA CORPORATION THAT HAS
17  BOUGHT THE ASSETS SUBJECT TO APPROPRIATE STATE APPROVAL.
18  Q  WHEN DID -- FROM AEM?
19  A  FROM PBS. ACTUALLY FROM PARADIGM. INC.
20  Q  LET'S BE PRECISE.
21  A  FROM PARADIGM, INC. BECAUSE PARADIGM, INC.
22  ACTUALLY HELD THE CONTRACTS.
23  Q  DID YOU EVER DIRECT CRAIG VAN DER BERG TO SIGN
24  ON ANY PAYROLL CHECKS?
25  A  NO.

25 (Pages 94 to 97)

e4a0adfd-8f46-4935-bfe2-76eedb427bb5

1    Q   DID YOU EVER DIRECT CRAIG VAN DER BERG ON WHAT
2   CHECKS TO SIGN AND WHAT CHECKS NOT TO SIGN ON ANY ACCOUNT?
3    A   YES. I DID. AT THE PRESIDION SOLUTIONS ACCOUNT
4   LEVEL, I GUESS DIRECTLY MAY BE THE WRONG TERM. I TOLD
5   HIM -- I HAD TOLD HIM WHAT HE HAD TO PAY IN ORDER TO MEET
6   HIS INSURANCE AND EXTRAORDINARY RESERVE COSTS.
7    Q   YOU GAVE HIM NUMBERS THAT HE HAD TO MEET?
8    A   I DIDN'T ACTUALLY GIVE HIM THE NUMBERS. I -- HE
9   WOULD CALL ME UP AND SAY HE HAD ALL THESE OBLIGATION AND I
10  WOULD SAY, OKAY, THIS MUCH IS OWED TO ME. THERE WAS --
11   Q   FOR INSURANCE?
12   A   FOR INSURANCE AND EXTRAORDINARY EXPENSES. THERE
13  WAS A TIME I TOLD CRAIG TO PAY HIS UTILITY BILLS BEFORE
14  THE POWER GOT TURNED OFF. LITERALLY, THAT'S A REAL LIFE
15  EXAMPLE. UTILITIES WERE NOT BEING PAID IN THOSE
16  PARTICULAR CIRCUMSTANCES FOR REASONS I STILL DON'T KNOW.
17   Q   WHAT ARE EXTRAORDINARY EXPENSES?
18   A   THE SECURED CREDITORS. EXPENSES NOT RELATED
19  DIRECTLY TO OPERATIONS.
20   Q   CREDITORS HOLDING SECURITY -- WHICH CREDITORS?
21   A   HENDRICKS GAIN, SANDLIN, MIRABILIS COMMERIC
22  BANK, FIRST COMMERCIAL INSURANCE CORPORATION, LUMBERMAN'S
23  UNDERWRITERS ASSOCIATION, NATIONAL HEALTH PARTNERS --
24  NEIGHBORLY HEALTH PARTNERS IN MIAMI, PROVIDENCE INSURANCE,
25  THOSE KIND OF EXPENSES.

1    A LOT OF THEM WERE CREDITORS BECAUSE THEY HAD
2   PRE-EXISTING DEBT. WHETHER THEY WERE SECURED OR NOT WAS A
3   MATTER OF ARGUMENT BUT IT REALLY WAS IRRELEVANT. IF THEY
4   WEREN'T PAID WHEN THEY WENT TO MARKET, THEY WERE GOING TO
5   DESTROY THE BOOK OF BUSINESS SO THEY HAD TO BE PAID.
6    Q   SO THE ONLY EXPENSES PAID WERE TO PRESERVE THE
7   BOOK OF BUSINESS?
8    A   YES.
9    Q   OKAY. NOW, WHO CURRENTLY OWNS THIS BOOK OF
10  BUSINESS?
11   A   BCA CORPORATION OUT OF PHILADELPHIA.
12   Q   AND WHEN DID BCA ACTUALLY CLOSE ON THE
13  TRANSACTION?
14   A   A SUBJECT TO APPROVAL FROM THE STATE AUTHORITY BUT
15  THEY'RE OPERATING THE BOOK OF BUSINESS NOW.
16   Q   AND WHO IS BCA?
17   A   I CAN TELL YOU I HAVE MET THE BCA PRESIDENT ON
18  ONE OCCASION FOR A FEW MINUTES. I'M AWARE OF ONE OF THE
19  BCA SHAREHOLDERS AND I DON'T -- I HAVEN'T MET THE OTHERS
20  AND I DON'T ACTUALLY KNOW THEIR NAMES.
21   Q   AND DO YOU HAVE ANY IDEA WHY THEY WERE
22  INTERESTED IN THE BOOK OF BUSINESS AND WHY PBS WOULD BE
23  INTERESTED IN THEM?
24   A   WELL, PBS HAD TO GET OUT OF THE BUSINESS AT THIS
25  STAGE. THAT'S WHY THEY WOULD BE INTERESTED IN THEM.

1    Q   WHY DID THEY HAVE TO GET OUT OF THE BUSINESS?
2    A   BECAUSE. YOU KNOW, THEY AREN'T VERY GOOD AT IT.
3   I MEAN, THEY'RE AWFUL. THEY WERE JUST HORRIBLE AT RUNNING
4   THIS BUSINESS. THEY NEEDED A FLORIDA PARTNER TO
5   MANAGEMENT. AEM REMAINS THE MANAGER OF THE BOOK OF
6   BUSINESS TODAY. AEM REFUSED TO DEAL WITH PRESIDION ANY
7   MORE. THEY LIED TO THEM. THEY HAD A WHOLE SECOND
8   ACCOUNTING SYSTEM WHICH WAS DISTORTING THE PRICE OF THE
9   BOOK AND FRANKLY THE AEM PEOPLE SIMPLY DREW THE LINE AND
10  SAID WE ARE DONE.
11   Q   WHO HAD A SEPARATE ACCOUNTING SYSTEM?
12   A   PBS.
13   Q   YOU'RE SUGGESTING THAT -- YOU'RE SUGGESTING THAT
14  THOSE PEOPLE IN CONTROL OF PBS DISTORTED THE INFORMATION
15  THAT WAS COMING OUT OF PBS?
16   A   YES. NOT SUGGESTING, WE KNOW THEY DID. GUESS
17  WHAT -- PART OF THAT IS INTERESTING -- AND I HAVE DONE
18  THIS ANALYSIS PARTICULARLY AFTER MY MEETING WITH THE IRS.
19  WE NOW BELIEVE THAT THE TAX RETURNS OVERSTATE THE PAYROLL
20  BY AN AVERAGE $13,000 A DAY. WE HAVE DONE VARIANCE
21  ANALYSIS TO SHOW THAT THEY'RE REPORTING -- THE WAY THE TWO
22  SYSTEMS WORKED TOGETHER, YOU OVER REPORT THE WAGES.
23   Q   ARE YOU SUGGESTING TWO SETS OF BOOKS OR TWO
24  DIFFERENT SYSTEMS?
25   A   I'M TALKING ABOUT TWO DIFFERENT SYSTEMS. THEY

1   SPENT $7 MILLION A YEAR ON I.T. FOR TWO YEARS. THEY HAVE
2   TWO DIFFERENT SYSTEMS WHERE WHEN WE RAN REPORTS. SAME
3   QUERY THREE TIMES IN A DAY CAME UP WITH THREE DIFFERENT
4   ANSWERS. THE AEM PEOPLE SAID WE ARE GONE, OUT OF HERE.
5   BECAUSE THERE'S NO WAY WE CAN MANAGE THIS BUSINESS WITH
6   THIS KIND OF SYSTEM IN PLACE.
7    I MEAN, IT IS PAST BEING CORRUPT. IT'S STUPID.
8   IT'S NOT POSSIBLE TO RUN IT. I DON'T KNOW ABOUT ENOUGH
9   ABOUT I.T. BUT I WILL TELL YOU THE GUYS THAT DO CAN'T
10  STAND IT. PBS HAD TO BE OUT OF THE BUSINESS. THIS BOOK
11  OF BUSINESS WAS GOING TO BE PRESERVED AND MANAGED, HAD TO
12  BE SOLD TO SOMEBODY WHO HAD A SOFTWARE SYSTEM THAT COULD
13  HANDLE THIS SIZE COMPANY.
14   Q   WELL, HOW WAS IT IF YOU DIDN'T HAVE VIABLE
15  FINANCIAL DATA AVAILABLE, HOW DID BCA DETERMINE THE PRICE
16  TO PAY FOR THE BUSINESS?
17   A   THE PRICE IS SUBJECT TO END OF THE YEAR TRUE-UP
18  BASED UPON THE ACTUAL CASH TRANSACTIONS THAT OCCURRED
19  BETWEEN NOW AND THEN.
20   Q   IS BCA LICENSED TO DO BUSINESS IN THE STATE OF
21  FLORIDA?
22   A   NO. AEM IS HAVING TO MANAGE IT AND BCA HAS
23  FILED ITS APPLICATION.
24   Q   SO BCA IS LICENSED -- I'M SORRY -- BCA IS
25  LICENSED WHERE?

REALTIME REPORTERS, INC.
407-884-4662

e4a0adfd-8f40-4935-bfe2-76eedb427bb5

Page 102

1  A   PENNSYLVANIA AND A FEW OTHER STATES. I DON'T
2  KNOW WHAT THE OTHER ONE IS.
3  Q   IT'S AN OPERATING PEO IN THOSE STATES?
4  A   CORRECT.
5  Q   IT'S APPLIED FOR A FLORIDA LICENSE?
6  A   IT HAS.
7  Q   IT HAS A FLORIDA MANAGER IN AEM WHO IS LICENSED
8  IN FLORIDA?
9  A   CORRECT.
10  Q   NOW BCA OPERATES FROM WHERE?
11  A   PHILADELPHIA.
12  Q   AND THEY HAVE A MANAGER OPERATING IN FLORIDA?
13  A   YES.
14  Q   THE MANAGER IN FLORIDA IS MANAGING THE
15  FLORIDA --
16  A   CORRECT.
17  Q   -- PEO BUSINESS?
18  A   THAT'S RIGHT. IT'S A LICENSED FLORIDA PEO.
19  IT'S PROCESSED UNDER ITS EIN NUMBER SO THAT IT IS IN
20  COMPLIANCE HERE IN THE STATE OF FLORIDA.
21  Q   SO BCA RIGHT NOW, IS NOT DOING BUSINESS IN
22  FLORIDA?
23  A   NO, IT IS NOT.
24  Q   THIS EARN OUT WILL BE DETERMINED WHEN?
25  A   THERE IS TWO TRUE IT BASE. THE FIRST ONE IS

Page 103

1  DECEMBER OF THIS YEAR AND DECEMBER OF NEXT YEAR.
2  Q   WHAT DID BCA HAVE TO OFFER THAT WAS ATTRACTIVE?
3  A   THEY HAD A SOFTWARE SYSTEM WHICH CUT THE COST OF
4  PROCESSING A CHECK BY 70 PERCENT OF THE CHECK. AND IT WAS
5  ALREADY IN PLACE. TO REPRODUCE THE SOFTWARE SYSTEM FROM
6  SCRATCH WOULD COST MILLIONS OF DOLLARS AND MORE
7  IMPORTANTLY. THE PBS BOOK HAS ALREADY GONE THROUGH THESE
8  CHANGES FOR TWO OR THREE YEARS.
9     I MEAN, BECAUSE WE DON'T HAVE TIME. I CAN'T GO
10  INTO THE SOFTWARE STORY. IT IS A HORRENDOUS STORY OF
11  WASTE AND MISMANAGEMENT. $14 MILLION THROWN DOWN A BLACK
12  HOLE IN SOFTWARE EXPENDITURES OVER A TWO YEAR PERIOD OF
13  TIME.
14  Q   IF BCA BECAME LICENSED IN FLORIDA. WOULD IT HAVE
15  THE CAPACITY TO PROCESS THE FLORIDA BUSINESS?
16  A   YES. IN FACT. THE PROGRAM THAT'S IN PLACE RIGHT
17  NOW. THE MEMORANDUM OF UNDERSTANDING IS TO BE FINALIZED
18  NEXT WEEK. IS THAT BCA WILL CONSOLIDATE WITH FIVE OR SIX
19  MIRABILIS PEOS. AEM WILL KEEP THE FLORIDA PORTION BOOK OF
20  BUSINESS AND THEY WILL OPERATE AS ONE ENTITY.
21     AND THIS WAS THE PARTICULARLY INTERESTING PART
22  TO THE IRS. INSTEAD OF TRYING TO SEGREGATE THE
23  OPERATIONS. WHICH COULD HAVE BEEN DONE LEGALLY. YOU CAN
24  DRAW BOXES AROUND IT.
25  Q   THE PBS OPERATION?

Page 104

1  A   YES. MIRABILIS AGREED THAT IT WOULD CONSOLIDATE
2  ALL OF THE ASSETS INTO ONE PLACE AND THEY WOULD ALL BE
3  SUBJECT TO THE SECURITY INTEREST OF THE IRS. SO THAT
4  THEIR COLLATERAL POSITION WOULD GO FROM ITS CURRENT
5  POSITION TO BEING FULLY SECURED.
6     AND THE DISCUSSIONS HAVE EVEN OCCURRED TO, TO
7  BORROWING A SMALLER SOME OF MONEY TO PAY OFF A CASH
8  PAYMENT OF A LESSER NUMBER ONCE THE CONSOLIDATION HAS
9  OCCURRED. BUT UNDER ALL CIRCUMSTANCES, ALL $900 MILLION
10  OF PROFITABLE BUSINESS HAS NOW SECURED REPAYMENT OF THE
11  DEBT. AND THE DEBT IS BEING REDUCED AT ABOUT $150,000 A
12  WEEK. PLUS EXTRAORDINARY PAYMENTS.
13  Q   AND IS ANY MONEY BEEN PAID TO THE IRS AFTER
14  THIS --
15  A   $150,000 A WEEK.
16  Q   -- TRANSACTION? WHO IS PAYING THEM THE
17  $150,000?
18  A   BCA IS PAYING THEM DIRECTLY, PART OF THAT GOOD
19  FAITH THING. BCA IS SENDING IT DOWN, THE IRS IS APPLYING
20  TO TRUST FUND TAXES ONLY CURRENTLY AND THEY GET -- THEY
21  COLLECT IT DIRECTLY.
22  Q   WHAT IS THE UPSIDE OF THIS TRANSACTION FOR BCA?
23  A   BCA IS A 70 MILLION DOLLAR PEO AS MARGINALLY
24  PROFITABLE. OWNERS MAKE A GOOD LIVING. TAKE 70 MILLION
25  DOLLARS AND DROP IT ON TOP OF $550 MILLION, AND YOU CAN

Page 105

1  START MAKING A SIGNIFICANT PORTION.
2     THE INCREMENTAL -- THE INCREMENTAL PROFIT FROM
3  EACH DOLLAR OF BUSINESS BEGINS TO APPROACH FIVE PERCENT OF
4  REVENUES. AND WITH THE MULTIPLES WE WERE TALKING ABOUT,
5  THAT MEANS FOR EVERY DOLLAR OF BUSINESS YOU GET A DOLLAR
6  OF VALUE. THAT'S WHERE YOU ARE WHEN YOU HIT A BILLION
7  DOLLARS IN BUSINESS.
8     MR. BERMAN: CAN WE TAKE A BREAK?
9     THE WITNESS: I THINK WE CAN PROBABLY WIND
10  IT UP AT THAT STAGE AND WE'LL DO IT AGAIN IN TWO
11  WEEKS WITH CHARTS AND EVERYTHING ELSE. BUT IF
12  SOMEBODY HAS A SPECIFIC QUESTION --
13     MR. BARKS: OFF THE RECORD. PLEASE.
14     (WHEREUPON. A DISCUSSION WAS HELD OFF THE
15  RECORD.)
16     (WHEREUPON. THE DEPOSITION WAS ADJOURNED AT
17  2:00 P.M.)

27  (Pages 102 to 105)

e4a0adfd-8f40-4935-bfe2-76eedb427bb5

1
2              CERTIFICATE OF OATH
3    STATE OF FLORIDA)
4    COUNTY OF ORANGE)
5          I, THE UNDERSIGNED AUTHORITY, CERTIFY THAT
6    FRANK L. AMODEO PERSONALLY APPEARED BEFORE ME AND
7    WAS DULY SWORN.
8          WITNESS MY HAND AND OFFICIAL SEAL THIS 31ST
9    DAY OF AUGUST, 2006.
10          I, SANDRA A. MOSER, REGISTERED PROFESSIONAL
11    REPORTER, CERTIFY THAT I WAS AUTHORIZED TO AND DID
12    STENOGRAPHICALLY REPORT THE FOREGOING PROCEEDINGS
13    AND THAT THE TRANSCRIPT IS A TRUE RECORD.
14          I FURTHER CERTIFY THAT I AM NOT A RELATIVE,
15    EMPLOYEE, ATTORNEY OR COUNSEL OF ANY OF THE
16    PARTIES, NOR AM I FINANCIALLY INTERESTED IN THE
17    ACTION.
18          DATED THIS 31ST DAY OF AUGUST, 2006.
19
20                          .
21          _____
22          SANDRA A. MOSER, RPR,FPR
            NOTARY PUBLIC - STATE OF FLORIDA
23          MY COMMISSION NO. DD0525811
            MY COMMISSION EXPIRES:  5/6/10
24
25

REALTIME REPORTERS, INC.
407-884-4662

e4a0adfd-8f40-4935-bfe2-76eedb427bb5