1    Frank Amodeo income. I know what he said, he often said he
2    was able to charge $10,000 an hour and that he had large
3    fees, but I don't know that I knew exactly specifically who
4    got what or what the arrangements of the contracts were.
5    Q.    So I just want to make clear though, it was not your
6    understanding in December of 2004, when the Sunshine
7    companies plan was going through, that the $150,000 or a
8    hundred thousand dollars that was being paid by Mr. Amodeo to
9    your husband was coming out of the monies he was getting in
10   December from Presidion corporation pursuant to that plan?
11   A.    No, I don't believe I did, because there was several
12   companies that he was working with at the time. He had
13   Matrix and Trafalgar and AQMI and Wellington, so there were
14   several clients and companies he had going on.
15   Q.    Now, when Mr. Vanderburg in connection with the
16   Sunshine companies plan indicated to you that he thought you
17   could collect trust fund taxes and it wouldn't be criminal
18   not to pay them, you didn't believe him at that time, did
19   you?
20   A.    That was not my understanding, that you could use
21   payroll trust fund taxes for anything other than to pay the
22   IRS.
23   Q.    Did you write any memos, send any e-mails, prepare any
24   legal memoranda documenting your disagreement with that
25   position?

| | |
|---|---|
| 1 | A. I didn't have to because Richard Berman and Mr. Amodeo |
| 2 | were in the room at the time that comment was made and it, |
| 3 | you know, enough people heard that. |
| 4 | Q. Enough people heard him say it. |
| 5 | A. Uh-huh. |
| 6 | Q. What I'm asking you, ma'am, is if you wrote any legal |
| 7 | memoranda, sent out any e-mails. |
| 8 | A. I wasn't retained to do that. I didn't feel it was |
| 9 | appropriate at the time. I wasn't there as legal counsel. I |
| 10 | wasn't there to offer legal opinion. I was there as a |
| 11 | consultant. And when I could roll my head to the tax and |
| 12 | bankruptcy expert, Mr. Amodeo, who was in charge of dealing |
| 13 | with the tax controversy, or with Mr. Berman, who was |
| 14 | retained as counsel for Mr. Amodeo, I felt my duty was done. |
| 15 | Q. Now, you said to tax and bankruptcy expert, you're |
| 16 | talking about Mr. Amodeo, the gentleman who you knew at that |
| 17 | point in time was a disbarred ex-felon, correct? |
| 18 | A. I knew at that time was holding himself out as a tax |
| 19 | and bankruptcy expert. |
| 20 | Q. Well, I'm asking you, at that point in time you knew |
| 21 | that he was a disbarred ex-felon, isn't that true? |
| 22 | A. I certainly knew it was true he was an ex-felon. I |
| 23 | don't know if at that time I knew he was disbarred. |
| 24 | Q. Did you go out and consult with a criminal attorney to |
| 25 | find out if Mr. Vanderburg's theories were correct? |

1  A.     No. Because Mr. Berman and Mr. Amodeo believed his
2  theories were not correct.
3  Q.     Isn't it true that in the entire course of this case
4  with all of the e-mails that were sent back and forth and
5  memoranda that were written, you never wrote a single e-mail,
6  never sent out a single memorandum addressing the issue of
7  whether it is legal or illegal not to pay trust fund taxes
8  over to the government, did you?
9  A.     No, I did not do that.
10 Q.     Notwithstanding the fact that Craig Vanderburg, the
11 PEO king, had made this statement back in December 2004 when
12 you were coming up with this plan for the sale of the
13 Sunshine companies?
14 A.     When who was coming up with the plan for the Sunshine
15 companies?
16 Q.     Well, who was coming up with the plan?
17        THE COURT:  I'd ask you to move off that line of
18 questioning.  She's made it clear both on direct and on cross
19 several times that she did not believe it was her
20 responsibility to give tax advice and she's explained that
21 she was relying on others, including Mr. Amodeo, who was
22 charging $10,000 an hour for his expertise.
23        MR. SANDS:  I will, Your Honor.
24 Q.     Stepping forward now from December of 2004, when did
25 you actually become an employee or become a member of the