UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

vs. Case No. 6:08-CR-176-ORL-28

FRANK AMODEO,

Defendant.

---

**MAY 12, 2009**

**Transcript of Proceedings**
**HEARING ON SENTENCING**
**Day 1**

**Before The Honorable JOHN ANTOON II**
**United States District Judge**

APPEARANCES:

For the Plaintiff: Randy Gold
Anita Cream
Assistant U.S. Attorneys
501 W. Church Street, Suite 300
Orlando, FL 32805

For the Defendant: Harrison T. Slaughter
Orlando, FL 32801

Kenton V. Sands
Daytona Beach, FL 32114

Proceedings recorded by mechanical stenography, transcript produced with computer-aided transcription.

P R O C E E D I N G S

(CASE CALLED.)

THE DEPUTY CLERK: Counsel, please state your appearances for the record.

MR. GOLD: Good morning, Your Honor. On behalf of the United States, Randy Gold. Seated with me at counsel table is Richard Smith, special agent from the IRS, and Anita Cream, Assistant U.S. Attorney.

MS. CREAM: Good morning, Your Honor.

MR. SLAUGHTER: Good morning, Your Honor. Harrison Slaughter on behalf of Frank Amodeo who is seated to the right of me, and Kent Sands who is seated behind me.

THE COURT: The first order of business I suppose is the notice regarding possible conflict of interest by defense counsel which is document 101 in my file and 103 which is the response filed by Mr. Slaughter. When I say it's the first order of business, of course an issue in this case all along has been the competence of the defendant, so the government's suggestion is that I make inquiry of the defendant regarding a possible conflict and waiver of that conflict, and I think before I do that I need to hear again from counsel regarding the competence of the defendant, particularly his capacity to waive conflict if one did exist.

MR. SLAUGHTER: Your Honor, in response to their motion, I have two exhibits, one where we turned over the

sign-in sheet showing my name at that, quote, mock trial, both handwritten and typed.

THE COURT: Mr. Slaughter, let me interrupt you for one second. I saw that conflict in their motion and your response, and I don't think that the real issue is their notice. I'm going to take you at your word that there's not a notice issue.

MR. SLAUGHTER: Can I then say one or two other things?

THE COURT: Okay. If you want to make the record clear, go ahead, but my concern more is whether there actually is some sort of conflict, and the obvious reason for my interest in that is that I want this record to be clear and not have to deal with this issue four or five years down the road.

MR. SLAUGHTER: And so do I.

I was hired by Mr. Amodeo to help him get his license back in the summer of '06, his license in Georgia.

THE COURT: This is license to practice law?

MR. SLAUGHTER: Yes, sir. I didn't even know what companies he owned. I didn't know what Mirabilis was. I didn't even know what a PEO was. I was asked to come to this presentation. I sat in the presentation and I'm hearing words like PEO for the first time in my life. I still didn't know what they were. I don't know if I was there for the

whole time, but I left.

And then maybe two months later he asked me to help him find counsel to help negotiate with the IRS with an eye towards maybe getting a former IRS commissioner, and I think he and I went to Washington, D.C. and we went down south and we retained some lawyers down south and didn't retain some lawyers in Washington. However, before I left, in the back of my mind I'm thinking what was this videotaped under oath statement. So with some effort I got the transcript and I read it. And I read it again. And then I turned it over to Paul Hawkins, who was 31 years with the IRS as a criminal investigator, and he read it. And he says, he confirmed what I'm thinking, that there's a massive theft going on. So we started asking for documents. And then we literally confronted Mr. Amodeo, and, you know, he within I guess about five or six weeks we were in discussions with the U.S. Attorney to cooperate and enter a plea.

So that's what I knew about that meeting. I didn't participate in any of the conversations with any of the internal people. I just sat there and watched and there were probably 20 people in there that didn't know what they were even watching. And that's it.

But the fact that I was there, I certainly never hid it from the government. I'm on the video, and Mr. Amodeo's record is that he made no secret that I was there.

And I have the exhibits to show that these things were turned over to the government indicating that, in fact, I was there.

THE COURT: Bring me up to date regarding your client's psychiatric care and his present level of capacity to proceed.

MR. SLAUGHTER: Yesterday he talked to his primary therapist who is Dr. Peter Choras who is a psychoanalyst and he's been working with Mr. Amodeo, and Jeffrey Danziger is in the courtroom today. The therapist told Mr. Amodeo that before he makes a decision on any kind of waiver, he needs to take time and get a third lawyer to advise him whether or not there's a conflict, and in other words he said slow down and make the right decision. And we have Dr. Danziger in here and we can give you some testimony on that.

Do I think he's competent today? Yes, I do. But I am not going to give him advice on whether to waive it nor do I think Mr. Sands is because we participated in the plea bargain, I participated in the plea bargain and the change of plea, so I don't think I should be giving him advice on to whether or not he should waive it to have a clear record.

THE COURT: Well, does the government at this point believe that there is a conflict?

MR. GOLD: Not necessarily. But I felt it was the sort of thing that needed to be brought to the attention

of this court so that we don't four or five years down the road have to face this issue.

THE COURT: You just heard what Mr. Slaughter said, Mr. Gold, regarding the events leading up to the filing of this notice. Do you disagree with anything that he said?

MR. GOLD: Well, let me just supplement very briefly. First of all, as of July 17, 2006, Mr. Slaughter had also entered a notice of appearance in the bankruptcy court relating to one of Mr. Amodeo's corporations called Community Health Solutions of America where he represented Mr. Amodeo in that proceeding.

Now, in terms of the notice issue, we've reviewed maybe three million documents. We've got 20,000 hours of videotape. I'm not saying that they did not provide that. Okay. What I am saying is that when we received the sentencing memo and went through the final draft this time, that's when Mr. Smith, Steve McCabe, also an IRS special agent, and myself noticed it, and we immediately felt we had to bring it to the attention of the court.

There were enough other witnesses at that deposition that I can't imagine that I would have called Mr. Slaughter as a witness, and if there is no actual conflict I don't think we need a waiver and we can proceed. But I felt that it was important --

THE COURT: Well, there are two possible ways

there could be a conflict, I think. You can tell me your thoughts on this. One would be that you would call him as a witness, and the other -- which you're telling me is not an issue. You see no reason that you would be calling him as a witness. And the other possibility, of course, is that he would be a potential witness for Mr. Amodeo and would be giving testimony or would not be giving testimony, even though he had testimony to give. And I have to rely, I think, on what Mr. Slaughter tells me in that regard.

MR. GOLD: One thing I can tell you is we've had numerous discussions with Mr. Slaughter and Mr. Amodeo. We, in discussing this August 2006 mock deposition or whatever you want to call it, we specifically asked Mr. Amodeo, you know, who was there. He didn't say anything about Mr. Slaughter. Mr. Slaughter never piped up and said by the way, I was there too and I've already given you the stuff. That never happened.

Now, whether Mr. Amodeo would have called him as a witness with 20 or 30 other people there, I don't know that that would have ever happened as well. But I know, based on what I know now, I would not have called Mr. Slaughter as a witness.

THE COURT: Okay. Mr. Sands.

MR. SANDS: Could I be heard for just a moment, Your Honor?

THE COURT: Yes, sir.

MR. SLAUGHTER: I was just going to address one of the facts that -- I wouldn't have known to get the transcript had I not been there, and I certainly wouldn't have hidden the fact to them because I could care less whether they knew I was there because I was the one that was bringing him in to cooperate. But as it relates to being a witness for him, that's why Mr. Sands, when it became clear that he was indicted, I brought Mr. Sands and Brian Phillips in because of the potential that I would be a witness because Paul Hawkins and I were the first lawyers that told him that what they were doing was a crime. So the point I was thinking, I could very easily be a witness on his behalf and I told him, I think sometime on January 6 or 7, and it took us a while to convince him, but within a day or so he got the message. But that's the other issue here is that we were the ones that told him, hey, what you're doing wrong is, you know, a massive federal crime. And granted there was another witness with me, Paul Hawkins, but I just wanted to put that on the record. And I think Mr. Gold would agree that I'm the one that brought him in and told him that he was committing a crime. That specifically told him this is a crime.

MR. SANDS: I would just like to add to the record, Your Honor, that I also placed this information in the original draft of the sentencing memorandum which I

provided to the government back in March, basically exactly the same language as you see in the current draft of the sentencing memorandum, so I'm kind of flabbergasted that we're having this discussion now.

The problem I have, again, I've talked to Mr. Amodeo about it and given, I don't think that I can provide conflict counsel to him any more than Mr. Slaughter can given the fact that I was brought in by Mr. Slaughter. Although I did not appear at the change of plea hearing, I had been working with him before that. But my concern right now is that we just heard about this on Friday. Dr. Choras is telling Mr. Amodeo you cannot make snap decisions. Mr. Amodeo also is finding out, actually found out yesterday that apparently the government is not making a substantial assistance recommendation. We're in a situation where in the space of just the last few days the case has been completely turned upside down, and I have a client who a doctor from Harvard is telling us is, you know, not in a position, even medicated be in a position where he's competent to be able to make decisions like that on the fly, and I don't know why we should be in this position.

One of the reasons that I wrote that sentencing memorandum was to try to flesh out any potential issues and try to reach resolution on as many issues as we could possibly reach. And we actually have made strides in that

direction, or we had until Friday. And the apple cart has been completely upset by this. And I'm in a situation where Mr. Amodeo is telling me he wants to talk to conflict counsel, I think somebody who used to be with the Florida Bar, and I'm too close to be able to give him independent advice. Even though I just came into this in the latter stages, I didn't have any part back during the mock deposition or anything like that. I actually was just involved in this case within the last eight months. But I have real concerns right now that I'm being pushed into a situation which is problematic both now and maybe in the future in terms of looking back on this. Particularly given, I cannot provide, I don't think -- I'm concerned about being able to provide counsel to him on this issue given my historical involvement in the case.

THE COURT: What happened with Mr. Phillips? You say he was brought in early on?

MR. SANDS: He was actually -- Mr. Slaughter can address that, I think, better than I can. He was involved before I was, but Mr. Slaughter's absolutely correct that Mr. Phillips and I were in the fall, late summer, early fall of last year, brought in potentially to be able to actually take the case to trial if that ended up being necessary in contemplation of the fact that Mr. Slaughter might potentially be a witness. Now, that didn't end up coming to

pass.

THE COURT: Okay. You add an additional ingredient to this issue and that is that Mr. Amodeo is saying he wants to talk to an attorney regarding the issue of conflict that's been raised by the government?

MR. SANDS: That's what I wanted to convey to the court, yes. That is what Mr. Amodeo has conveyed to me.

MR. SLAUGHTER: Your Honor, obviously when Mr. Sands puts in the dates and says clearly that I was at the mock deposition, I never made any, hid it from anybody.

THE COURT: Let me tell you, Mr. Slaughter, once again. I am accepting your representations in that regard. The government's not challenging them. I don't know why the government didn't find out about it earlier. Mr. Gold attributes that to merely having such --

MR. SLAUGHTER: I'd say massive.

THE COURT: -- a huge number of documents that they were going through and says that it didn't, the light bulb didn't light up until he was reviewing the memo.

MR. SLAUGHTER: Theoretically we were going to start the sentencing on Monday. I didn't even learn of the motion, Randy called and told me, I said do what you have to do. I didn't see it until Monday morning because my computer for whatever reason was out this weekend. But to do it on the eve of the sentencing, I'm just looking at Frank and

saying I am not going to give you advice in this because that's just doubling --

THE COURT: I understand that.

If the issue were merely raised by the government and I accepted the facts as represented in the response to that memo, it would be possible for me to merely say there is no conflict and we go on from there. Now I've got an additional problem and that is that in response to the notice that was filed by the government, the defendant is saying that he wants to talk to somebody about a conflict. That's problematic, I believe.

Does the government wish to respond with regard to that issue, simply the fact that the government has raised a potential conflict and now, with counsel, with Mr. Slaughter. Mr. Sands, I agree, is colored by the same brush. And at this point it seems that I should give Mr. Amodeo the opportunity to talk to another lawyer. Does the government agree?

MR. GOLD: May I have a second, Your Honor?

THE COURT: Yes.

MR. GOLD: Your Honor, part of the problem I have agreeing with letting him talk to waiver counsel is obviously Mr. Slaughter and Mr. Amodeo have been aware of this from the very beginning. At no time was this raised in terms of the plea or any other proceeding where Mr. Amodeo or Mr.

Slaughter felt it was important to bring it to the attention of the court. We've gone all this way since the indictment, and if Mr. Slaughter and Mr. Amodeo thought it was an issue, you know, they've said that we should have raised it as late as March, but the point is even at the time of the plea, Mr. Amodeo, who is a former lawyer although disbarred, he was certainly aware of the issue. Mr. Slaughter was aware of the issue. And yet they obviously -- I think what they're trying to do now or what Mr. Amodeo, and I'm not imputing anything bad to either counsel, but I think what's happening here is now that Mr. Amodeo sees a way to maybe push back the sentencing a little bit, now he's raising it for the first time where he's never ever addressed this with any court or us before about a conflict with Mr. Slaughter.

MR. SANDS: May I respond, Your Honor?

The problem is that the government has suggested the conflict and what advice we have given him in the past with regard to whether there is or is not a conflict is irrelevant at this point. The government has suggested the conflict. And what Mr. Amodeo is telling me is he wants to talk to another attorney who would be conflict free about it. So the conversations that may or may not have occurred in the past between counsel and Mr. Amodeo are, unfortunately from our perspective, irrelevant at this point.

MR. SLAUGHTER: And again, I repeat, I must have

told Mr. Gold 20 times that I told Frank what he was doing was wrong, that he was committing a crime. He's known that from the first day that we came in to cooperate.

MR. GOLD: That's correct. But I was never told that he thought he was a possible witness.

MR. SLAUGHTER: I mean if you're getting down to whether there's going to be a trial, but there was a plea. I didn't see a reason to have to have a waiver at that plea when he enters into the plea.

THE COURT: It appears to this court that the facts surrounding this mock deposition years ago were known to Mr. Slaughter and Mr. Amodeo from the very beginning and I'm confident that Mr. Sands was made aware of them as soon as he was brought into the case as well. The concern the court would have regarding Mr. Slaughter's involvement in that deposition have largely been allayed by his representations to the court, which the court accepts. He's an officer of this court and I have no reason not to believe what he has said here today. And I don't think the government does either.

The concern that I would have would be a situation where Mr. Slaughter would feel compelled or Mr. Amodeo would feel compelled to have Mr. Slaughter testify during a trial before a jury vouching for the defendant's credibility. I don't know what is on Mr. Amodeo's mind that

he now wants to talk to somebody about a potential conflict, talk with a lawyer regarding the possible conflict, which apparently is merely in response to the government's notice, but I'm not going to delay these proceedings. We're going to start them. I have spent a lot of time reading filings made by Mr. Sands and Mr. Slaughter. The issues have been framed. An agreement has been entered into. I will, however, allow Mr. Amodeo to talk to whoever he wants. He's got that right. I'm not allowing him, he's got a right to talk to anybody else in the meantime.

If he talks with another lawyer, perhaps that could be Mr. Phillips, I don't know, but if he talks to somebody else, because we're not going to finish today obviously, and that person, that lawyer believes there is reason for me to have a hearing, I will conduct a hearing to determine whether there is a conflict.

Now, typically the way I handle, as counsel's aware, the way I handle sentencing, I think the way most district judge's handle sentencings is to merely start off with the presentence report and ask whether there are problems with it, but there are so many issues raised that I think that I'll proceed with allowing counsel just to be heard on those issues without now engaging in the formality of starting the standard colloquy. And those issues are raised primarily by defense counsel, so I will let you all

proceed.

MR. SANDS: May I have just a moment, Your Honor?

THE COURT: Yes, sir.

(DISCUSSION OFF THE RECORD.)

MR. SANDS: Your Honor, before we get to that, Mr. Amodeo has indicated to me that he wishes to bring some additional facts to the attention of the court with regard to this conflict issue. I think that it's better obviously for the court to hear that now than for the issue to have to be addressed at a later point in time. I believe it would require a direct representation to the court by Mr. Amodeo.

THE COURT: Do you understand, Mr. Amodeo, that I said that I would give you an opportunity to talk to someone and present any argument, and for that matter evidence that you might have regarding the existence of a conflict?

THE DEFENDANT: Yes, Your Honor, I do.

THE COURT: And you want to make things known to me now regarding that issue?

THE DEFENDANT: I do, sir. It's just time.

(DISCUSSION OFF THE RECORD.)

THE COURT: Is that what you want to do?

THE DEFENDANT: Yes, Your Honor. Mr. Slaughter was reminding me that the tendency of my disorder is to be impulsive and that may, that it may be better for me to wait a moment before I make the kind of snap decisions I tend to

make when I'm in this state of the mental condition. But I do want to let the court know that the conflict is not just the mock deposition, it extends back afterwards considerably through the investigation. There are other issues of conflict that I wish to discuss. That's why I needed to speak to counsel, not just because of this event, although I heard Mr. Slaughter tell --

THE COURT: Let me ask Mr. Slaughter a question. Mr. Slaughter, you have Dr. Danziger here, right?

MR. SLAUGHTER: Right there.

THE COURT: Was he going to be your first witness?

MR. SLAUGHTER: Yes.

THE COURT: Do you agree, Mr. Amodeo, that Mr. Danziger give testimony at least to get this hearing under way?

THE DEFENDANT: Yes, sir. I can see no problem with that. Yes, sir.

THE COURT: You may proceed, Mr. Slaughter.

MR. SLAUGHTER: Jeffrey Danziger.

Whereupon:

JEFFREY A. DANZIGER,

called as a witness, having been first duly sworn according to law, testified as follows:

DIRECT EXAMINATION

BY MR. SLAUGHTER:

Q. Dr. Danziger, give us your full name, please, and spell your last name, slowly?

A. Jeffrey A. Danziger. D A N Z I G E R.

Q. And what do you do for a living?

A. I am a psychiatrist.

Q. And how long have you been so employed?

A. I completed my residency in 1986, so that would make 23 years.

Q. And where did you go to undergraduate school?

A. My undergraduate was at Harvard College, Cambridge, Massachusetts.

Q. And what was your degree in?

A. A bachelor's degree, magna cum laude, in biology.

MR. GOLD: Your Honor, I'll stipulate to Dr. Danziger's expertise in forensic psychiatry.

MR. SLAUGHTER: I'd rather make a short presentation, Your Honor, than take the stipulation.

THE COURT: Okay. Well, you understand I've heard him many times before.

MR. SLAUGHTER: Then I'll stipulate.

THE COURT: And he is qualified based on his education and experience to give opinion testimony pursuant to 702, that is, within the field of forensic psychiatry.

BY MR. SLAUGHTER:

Q. Did there come a time when I called you about a client of mine?

A. Yes.

Q. And tell the court when that was.

A. That was on July 18, 2007.

Q. And what were you asked to do, if anything?

A. At that time you explained to me that you were representing Mr. Amodeo who was involved in a very complex tax matter, you had concerns about your ability to work with him and wondered if he was suffering from any psychiatric or psychological ailment. As such you asked me to evaluate him.

Q. And when did that evaluation take place?

A. The initial evaluation actually took place over three dates; those were August 26, August 29 and September 10 of 2007.

Q. Did I supplement sending Mr. Danziger up with any videos of any behavior that I thought was potentially bizarre or would be helpful to you?

A. Yes. There were a number of videos that you sent to me. These included April 20, 2005, speech he gave at the

University Club. A March 23, 2006 board meeting. A videotape entitled nine days in the Congo. And then a conference call from February 28, 2006. Those were the key documents that I reviewed.

Q. And based upon those three sessions and looking at those videos, were you able at that time to formulate an opinion?

A. Yes.

Q. What was that opinion?

A. It was my opinion that Mr. Amodeo suffered from bipolar disorder, type one, that he was in a manic episode and had psychotic features.

Q. And would you tell the court what bipolarism is?

A. Bipolar disorder is primarily a diagnosis of mood. The cardinal feature is the presence of manic episodes. During manic episodes individuals have a mood that is predominantly euphoric or elated, although there may be periods of irritability. There is markedly increased energy despite a decreased need for sleep. There is an inflated self esteem to the point of grandiosity. Individuals may have racing thoughts, pressured speech or increased motor behavior. Because of the grandiosity there is often unwarranted optimism and individuals with bipolar disorder may engage in foolish and risky behavior, they simply see no obstacles, no barriers, there is unwarranted optimism and, as

such, their reckless and impulsive behavior frequently gets them into significant trouble.

While the hallmark of bipolar disorder is manic episodes, individuals with bipolar disorder also suffer from depressive episodes. During these depressive episodes, the mood is low, there is feelings of hopelessness, worthlessness, even suicidal thinking and there is a disturbance of sleep, appetite, energy and concentration.

In speaking with Mr. Amodeo, he related first a history to me of both manic and depressive episodes. When I met with him in the fall of 2007 he presented with pressured speech, tangential thinking, markedly increased energy, despite getting by on very little sleep and described to me a rather messianic vision, essentially that he is, his economic methods would eventually make governments an anachronism, that he would set up regional areas of 30,000 square miles with three and a half million people, and because of his restructuring of the world's economy, eventually world governments would wither away. He essentially would establish his Terran empire. My opinion was that this was all extraordinarily delusional and consistent with someone suffering from mania.

In addition, reviewing the videotapes that Mr. Slaughter supplied to me showed that this was not anything new. In other videotapes he had spoken about similarly his

plans to dominate the world's economy to, for example, become bigger than Citibank by the end of 2006, become the largest company ever. In one of the videotapes he spoke about becoming an advisor to the Congo, eliminating their debt, making them a first world nation in less than a year.

And not only were there grandiose themes in many of these audio and videotapes, but there was a disturbance in the flow of his thought. He often rambled illogically, made very little sense.

These are very difficult things to fake and malinger. It is easy for someone to say I hear voices or I think I'm Jesus or the emperor of the world, that's relatively easy for anyone to say. What's hard to do is to ramble on for an hour in a rapid pressure and disorganized manner. That's extraordinarily difficult to do and suggests to me genuine psychiatric illness.

Q. Can I interrupt you for a second? Did the videos that I sent up to you, were they in front of groups of people?

A. Oh, yes.

Q. They were in front of his business associates in formal settings?

A. One was an interview, the nine days in the Congo was with some sort of a reporter or videographer, but the others seemed to be a conference call to three or 400 employees of Mirabilis. The meeting at the University Club in April of

2005, that was before a variety of investors and corporate officials. So these were not merely his own ramblings but given to employees and educated people.

Q. Before I cut you off you were starting to say something?

A. Simply that at the end of those three meetings I spoke with you by telephone. You had, of course, expressed to me your concerns, speaking as an attorney, as a lay person in medical matters, something is not right with my client. And I said to you your client is seriously mentally ill. He presents with classical features of bipolar disorder. He's currently in a manic episode with psychotic features. I explained this was likely why you were having difficulties in defending him and why his mood would change from day to day. Some days he was rational, some days he was not. And I stated, first, that I wanted to get more information, likely speak to his wife of 19 years which later was arranged, and I also suggested that he was in need of treatment with psychotropic medications to control his condition.

Q. And at the time that you saw him the first time, was he taking any psychotropic medicine?

A. None at all.

Q. And could you tell the court what type of medicines you thought he should be taking?

A. It was my opinion he needed to be on both mood

stabilizing and anti psychotic medications. This is a typical medication strategy used in individuals with bipolar disorder. Not everyone with bipolar disorder has the psychotic or delusional features. Mr. Amodeo when I saw him, and to the present day, did. My recommendation was, first, a mood stabilizing agent, something to try to level out the mood, and secondly, the addition of a anti psychotic medication to try to control and eliminate his grandiose and delusional beliefs.

Q. And did I ask you if you could provide those medications to him and treat him?

A. At the time I requested that he see another doctor so as not to have any confusion between forensic roles and a treatment role.

Q. And who was that doctor?

A. I referred him to a colleague of mine, Dr. Jeffrey Krotenberg, a psychiatrist in Lake Mary, Florida.

Q. Did there come another time that I called and asked you to see Mr. Amodeo?

A. Yes. That was on May 12, 2008.

Q. And was he with his wife?

A. At that time he was. However, I had met with his wife previously on October 1, 2007 and obtained information then, so when I met with Mr. Amodeo on May 12, 2008, that was again at your request and his wife was present at that time.

Q. And had I told you whether or not I thought he was getting better or worse?

A. You were concerned that he was getting worse and were quite concerned about your ability to work with him in a reasonable and rational way.

Q. And how long did you see him on that occasion?

A. Perhaps an hour and a quarter at that time.

Q. And can you tell the court what your opinion was?

A. At that time my major focus per your request was was he competent to stand trial, and looking at things factually, and of course Mr. Amodeo has a law degree, there was no question that he knew what the charges were theoretically, he knew what the penalties, he knew what a lawyer did, what a United States Attorney and what a judge did. There was no question as to his factual understanding of the legal process.

My concern, however, was his rational understanding. He believed, because of his ability to foretell the future, that all charges would be dropped, that Mr. Gold, the United States Attorney, would simply fold his hand, and that his path to world domination would continue apace. He was disregarding the advice of his attorneys believing that he could tell the future because he had the power of old testament prophets and, as such, he did not need to listen to his lawyers. He was not in any jeopardy. He

was 100 percent convinced of this.

When I asked him what would happen if he was in any way wrong, he stated that he would not kill himself, but a holy fire from above would consume him and take him to heaven.

My concern at this point was even though he factually understood the legal process, he did not, in my opinion, have a rational understanding of the legal process insisting that Mr. Gold would simply fold his hand. Secondly, it was my opinion he could not consult with his attorneys with any reasonable degree of rational understanding. And I authored a report shortly thereafter expressing to Mr. Slaughter my concerns that because of his bipolar disorder, type one mania with psychotic features, he was not competent to proceed. Moreover, he expressed concern about his ability to handle financial and contractual matters and suggested that probate court, guardianship proceedings would likely be appropriate.

Q. Now, do you recall whether or not Mr. Gold and the special agents from the IRS came to your office and you explained this situation to them?

A. Yes. There was a meeting one afternoon shortly thereafter, you were present, Mr. Gold was present as well as the agent, and I expressed my opinions and findings to them.

Q. Now, would you tell the court what about this where we

went to court in the probate to have him declared incompetent?

A. The first proceeding was on June 10, 2008 before the Honorable Circuit Court Judge Belvin Perry, Jr. here in Orange County, and that was an emergency guardianship hearing where I offered testimony relating to Mr. Amodeo's mental illness, his delusional beliefs, and at that point Judge Perry did grant the emergency guardianship and also, pursuant to the Florida statutes, appointed a committee of disinterested professionals with no involvement in this matter to evaluate him for guardianship.

Q. And would you tell the court who was appointed and what their findings were of Mr. Amodeo?

A. The psychologist appointed was Dr. Darlene Antonio, a licensed clinical psychologist, and she met with Mr. Amodeo on June 26, 2008. Dr. Antonio opined that Mr. Amodeo had a long-standing history of ingrained delusions, he expressed a belief that he could transmute molecules, was having out of body experiences and having prophetic visions. What was important was that Dr. Amodeo performed --

Q. Dr. Amodeo?

A. I'm sorry. Dr. Antonio. Dr. Antonio performed the MMPI-2, the Minnesota Multiphasic Personality Inventory, second edition. This is a broad band psychological test, but what's key about it is that it has internal validity scales.

It helps you distinguish between someone who is genuinely psychiatric versus someone who is attempting to exaggerate or malinger psychiatric. Dr. Antonio evaluated the test and opined it was consistent with a genuine psychosis and that he generated a valid profile.

Q. Meaning he wasn't faking?

A. Correct. That was Dr. Antonio's opinion based upon the objective MMPI-2 test. As such, Dr. Antonio opined that limited guardianship was appropriate.

The second examiner was Dr. --

Q. Wait a minute. Did she give a psychological opinion as to his mental condition?

A. Oh, yes, similar to mine, that he suffered from a bipolar disorder with psychotic features. Essentially our diagnoses were congruent.

Q. And who was the second physician that saw Mr. Amodeo?

A. That was Dr. Edward Ballantine. Dr. Ballantine is a psychiatrist in Seminole County who does forensic work and interestingly also acquired a law degree in middle life. Dr. Ballantine on June 28, 2009 opined that Mr. Amodeo suffered from bipolar disorder, type one mania, that he had racing thoughts and grandiose delusions, and opined that plenary guardianship was appropriate. So both of the, both the psychiatric and psychological examiner including psychological testing done in June 2008 reached conclusions

essentially identical to mine.

MR. SLAUGHTER: Just one second, Your Honor.

Your Honor, I thought it might be helpful to the court for the court to watch the video or snippets of the video from the speech at the University Club and then afterwards have Mr. or Dr. Danziger advise you what's going on mentally. This will give us a snapshot into what Mr. Amodeo was doing with his business associates at the time. And the date was?

THE DEFENDANT: April 20, 2005. But I need some help connecting to the monitors.

(DISCUSSION OFF THE RECORD.)

THE COURT: Hold on one second. Is there any way you can make that available to the people in the audience as well?

MR. GOLD: Your Honor, it's also not coming up on our screen.

THE COURT: Okay. We'll get it fixed.

(DISCUSSION OFF THE RECORD.)

THE COURT: We'll take a five minute break while Miss Darley gets that set up.

(BRIEF RECESS.)

MR. SLAUGHTER: What is the date of this meeting?

THE DEFENDANT: This is the February 28 system wide conference call. Is that the first one, Doctor, or do

you want the Omni conference?

THE WITNESS: However you wish to.

MR. SLAUGHTER: The Omni conference. Do you have it broken down into snippets so the judge doesn't have to watch the whole thing?

THE DEFENDANT: Yep.

MR. GOLD: Your Honor, I don't oppose Dr. Danziger testifying about what he saw, but to just have snippets of this.

THE COURT: Have you seen it before, Mr. Gold?

MR. GOLD: We have. Well, we've seen the April 23. I believe this conference is a telephone call, but I don't think it's a video, am I correct?

MR. SLAUGHTER: We're doing the University Club one.

MR. GOLD: Okay. Yes. But I think what's necessary is that counsel put the entire thing into evidence rather than just snippets.

MR. SLAUGHTER: That's fine. It's 40 some minutes.

MR. GOLD: I'm not suggesting that we have to watch the entire thing, but I think for the record to have just snippets --

MR. SLAUGHTER: That's fine.

THE COURT: I don't think it's been offered yet,

but when it is offered I will receive the entire exhibit. And, Mr. Gold, to the extent that you believe it's incomplete or there's something else on it that I should see, I'll give you the opportunity to show me that before we move on to the next witness.

MR. GOLD: Okay.

(VIDEO PLAYING.)

BY MR. SLAUGHTER:

Q. Dr. Danziger, have you viewed that video before?

A. Yes, I have.

Q. And there is more to that video that we'll talk about later, but would you tell the court what if anything that you saw that corroborated your opinion of bipolarism?

A. First off, this was more than two years before I first saw Mr. Amodeo, so to me this was an important historical document. Secondly, if you listened to that, first, he is all over the place. He is talking, his speech often goes from one topic to another. More importantly, there are grandiose themes in there. Listening early on, he's talking about his ability to change human behavior, to predict human behavior through mathematical models, and as such, this is the underpinning of what he called his master plan.

He also speaks in there of the ability to make 500 times the money invested, and even when mentioning the Roadhouse Grill, which is a restaurant chain, he said we can

buy it for five million dollars and make our money back in the first hour. So while I don't have a MBA and I'm not an expert in business, as I listen to this, I hear someone who says I can predict future behavior of humans, I have that ability, I can make you investors 500 times your money, and if I buy a company, I'll make you your money back in an hour. And then he cites in some bizarre reference in how the Jews have been doing it for 5,000 years and that's how it can be done.

I listen to this snippet and, Your Honor, there's more stuff in this 40 odd minute videotape, but I listen to this and I think this is grandiosity. There are certainly talented businessmen in the world, but with what I know about Mr. Amodeo, I see speech that rambles all over the place and I see various grandiose and delusional beliefs which are consistent with someone who feels I have an economic master plan that will ultimately dominate the world. That's on page 56 of the transcript of this.

Q. What's the next minute on the tape that you found significant?

A. I have it -- I'm not sure what minute it's located. The transcript is page 29 and at that point he talks about by the end of 2006 Mirabilis becoming 50 percent larger than Citicorp's 110 billion in shareholder equity. That was in a year and a half.

MR. SLAUGHTER: Do you know where that is?

(VIDEO PLAYING.)

BY MR. SLAUGHTER:

Q. Would you tell the judge, you reviewed this I think on Sunday?

A. Yes; and previously.

Q. Tell the judge what the significant things that Mr. Amodeo said during this time that either bolster your opinion or took away from it?

A. There are other things on this tape. For example, early on after he starts talking about his ability to predict the future, he then starts talking about how his global changing policies will eliminate the medical malpractice crisis. I'm not sure where that came from, except that's a bizarre tangent that's on page 19 of the transcript.

On page 29 of the transcript he states that Mirabilis will be 50 percent more than Citibank's 150 billion in 2006.

On page 43 he talks about having thousands of employees and his plan that at the end of the first year they get jewelry, then they get a car, then a house, then a franchise, and then they become something about guild across employee lines, which I don't know what that means. And then he says, and this is in May of '05, by January 1 of 2006 we'll have officers in 125 cities around the globe, and by

2010 no human being will be more than one hour away from one of our offices in the entire globe. Now, this ties into what he said in the beginning with his master plan.

So, as I view this, a full two years before I saw him, we have someone here who essentially is talking about growing from scratch a company that will dominate the world's economy, that they'll be larger than Citicorp in a year and a half, and his speech here is rambling and all over the place, full of various grandiose and delusional themes. Why was this relevant to me? What he's saying here is the same thing he was saying to me in 2007 and 2008 and, as I view this videotape, I see one who is manic, delusional and grandiose.

Q. Do you know to whom he was speaking at that conference?

A. Corporate board members of his company and I believe other investors and interested parties.

Q. Now, you mentioned that there can be times of euphoria and also times when he has angst and is angry?

A. Yes.

Q. Is there a tape that we can play to show the judge that angle?

A. Yes. That was a 14 minute tape from February 28, 2006 which was a conference call to the three or four hundred employees at Mirabilis, runs about 14 minutes, and that demonstrates someone who is in a very irritable manic phase,

but also demonstrates a thought disorder and various grandiose and paranoid themes.

Q. What was the date again?

A. February 28, 2006. This is an audiotape, not a video, because it was a conference call.

MR. SLAUGHTER: Can you play that?

(AUDIO PLAYING.)

MR. GOLD: Your Honor, if I can pause just very briefly, it seems like we are jumping from spot to spot and we're losing the import of what's there, and I don't know if that's the way the tape's designed or Mr. Amodeo was just jumping to spots that he think is important.

MR. SLAUGHTER: No. I think what happened was the first run we thought would take the whole 14 minutes and he apparently had set it up to be two takes, correct?

THE DEFENDANT: The first one was a snippet and then the snippet ended. I just tried to find the right spot to start this one at. The easiest thing would be to just play this in full, but then you're going to hear over again what was already said. And this is a complete version of the 14 minutes.

MR. GOLD: Your Honor, at this point we've heard various things. We think, at this point I hate to take up the time, but we've got to play the 14 minutes. I mean we're just jumping all over the place.

MR. SLAUGHTER: Your Honor, it's your call. There's some very good stuff on the tape that Dr. Danziger is going to talk about and you'll hear some pretty weird things that's going to come out.

THE COURT: Well, we're well into a total of 14 minutes, so go ahead and finish it.

MR. GOLD: Well, part of the problem is we've skipped sections through the 14 minutes.

(DISCUSSION OFF THE RECORD.)

THE COURT: What are you going to do, Mr. Slaughter?

MR. SLAUGHTER: He wants to start at the beginning because he can't find where it was split before. He didn't have it written down and he started playing the wrong tape to begin with.

(DISCUSSION OFF THE RECORD.)

MR. GOLD: Your Honor, it now sounds like Mr. Amodeo is trying to testify about who is there, so I think we need to stop any editorial comments from Mr. Amodeo.

(VIDEO PLAYING.)

THE COURT: Stop this for a second, please.

Mr. Slaughter, does the 14 minutes include this introductory?

MR. SLAUGHTER: No. That's the problem. Mr. Amodeo is afraid to move it forward to where he starts

talking and so he should be starting any second, and then it's 14 minutes.

I don't know how to work his computer.

THE COURT: Well, you say any second. Is it literally any second or does this go on for some time? Do you know?

(DISCUSSION OFF THE RECORD.)

(VIDEO PLAYING.)

MR. SLAUGHTER: Sorry we had to play that twice for you, Judge.

BY MR. SLAUGHTER:

Q. Dr. Danziger, please tell us what jumped out at you as a forensic psychiatrist as it relates to your diagnosis of Mr. Danziger. Or Mr. Amodeo. Sorry.

A. In bipolar disorder the mood is not always elated or euphoric. It can also be profoundly irritable which is also demonstrated here. There is a marked irritability. He is telling employees they can march in the streets, they can go to the department of labor, he'll take their profits if they do anything wrong or he'll sue them. So there is a marked irritability and anger.

However, the grandiosity persists. He speaks about building nations, protecting democracy and making sure that 5100 employees don't get killed in the process, which seems rather bizarre to me. He speaks about changing the

world. He also states that they are the fastest company to profitability ever, no one is even close, all of which seems to me grandiose and quite illogical.

Q. And untrue?

A. Likely untrue. Speaking at the beginning he says that in the next 72 hours later this week we're going to double our employees, double the volume of our business. The rest of the talk seems to be an angry diatribe with rather illogical and grandiose statements.

To me, looking at this as a psychiatrist, I'm seeing someone with a manic episode with grandiosity and profound irritability. What's also striking to me is there's a room full of people here, presumably employees and executives of the company, nobody seems to be questioning comments about changing the globe and imperiling democracy. So to me, again, this was well over a year before I saw Mr. Amodeo. This is consistent with someone who is mentally ill with irritability, grandiosity and disturbed thought patterns.

Q. Now, did you watch a video called nine days in the Congo?

A. I did.

Q. And I'm going to ask you a couple of questions and then ask the judge if you want to hear this video.

What is the significance of that video to you?

A. This video had to do with some of Mr. Amodeo's employees who were advising a presidential candidate.
Q. Presidential candidate where?
A. For the Democratic Republic of the Congo. So he was involved in Congolese politics and had a person they were supporting and giving advice to.
Q. You're talking about Mr. Amodeo?
A. Mr. Amodeo. Apparently this was part of his strategy to extend the global influence of Mirabilis. And two of these employees I believe were actually imprisoned for nine days and obviously there was great concern about their well-being, would they be released, would they be harmed.

So the first issue was to me, perhaps naively, what the heck was an Orlando company doing involved in a Congolese presidential race. The second factor is that as the interview goes on, Mr. Amodeo states that his role is to be an economic advisor to this nation and his belief was that within a year he could double their gross national product, eliminate their debt and make them a first world nation if only they would follow his economic plans.

So not only did he have a desire to essentially have his candidate become the president of the Congo through his political assistance and machinations, but in addition, that would allow him to be an economic advisor to that nation and essentially turn it into a first world country if only

they would follow his economic advice.

Well, I'm certainly not an expert on international politics or economics, my comments that I wrote after viewing this tape were audacious and grandiose. And, again, putting in the context of everything else, this was consistent with someone who was manic, euphoric and grandiose, and consistent with someone who had a master plan to dominate the world's economy.

Q. When you watched the video, can you tell to whom he is speaking?

A. I believe he's speaking to some sort of interviewer, someone with the media, so this was not a meeting to a large group of people, but I believe it was to someone for a documentary.

MR. SLAUGHTER: Your Honor, this tape is 51 minutes. I'm not suggesting we play the 51 minutes, but could we play a couple parts of it, say 15 minutes of it so you get the flavor of --

THE COURT: I'll tell you what we'll do. We'll take a 15 minute break, which I need to do anyway, and we'll go to noon, but during the break you can cue the parts that you want to play. If there's anything the government wants to play, you can do the same thing.

You may step down for the time being, Doctor. You're still under oath.

We are in recess for 15 minutes.

(BRIEF RECESS.)

MR. SLAUGHTER: Your Honor, I think we've cued it up to right where he's going to be interviewed, it should take about four or five minutes.

THE COURT: Thank you.

(VIDEO PLAYING.)

BY MR. SLAUGHTER:

Q. Did that snippet corroborate your opinion?

A. Yes. Certainly he states all you have to do is listen to me, within a year I'll double your gross national product, eliminate your debt and make you a first world nation within three years. This is something that obviously has defied world leaders and the World Bank and economic advisers throughout the world, but Mr. Amodeo says with conviction, looking into the camera, with my theories I can perform these economic miracles. I view this as grandiosity of delusional proportions.

Q. Now, did there come a time when you and I had a discussion as to whether or not he should seek inpatient evaluation? If so, where and under whose auspices?

A. This was after the events of May of 2008 and then after the guardianship evaluation in June of 2008, my opinion was that Mr. Amodeo was not competent to stand trial. Further, his treating psychiatrist, Dr. Krotenberg, had fired

him because Mr. Amodeo was non-compliant to his medications. So Mr. Amodeo was unmedicated, in my opinion not competent to stand trial and quite delusional to where it was interfering with your ability to defend him.

I recommended to you at that time that we try to send him to an academic institution and suggested perhaps we send him to what's arguably the best psychiatric hospital in the country, which would be McLean Hospital, Belmont, Massachusetts, that is Harvard University's flagship psychiatric hospital. There were several purposes for this. The first was essentially to get a second opinion or perhaps a fourth or fifth opinion. While I was of the opinion that Mr. Amodeo suffered from serious mental illness, my understanding was that the agents from the Internal Revenue Service and United States Attorney's Office were understandably skeptical of my opinion and diagnosis. My thinking was let's send him to the best psychiatric hospital we can, have an inpatient evaluation, psychological testing, a period of observation, and let's see if they agree with me.

Secondly, it was to get him treatment and to get him stabilized because he was unmedicated and uncompliant as an out patient. And, thirdly, the idea was if he could get stabilized, this might solve the issue with his being incompetent to proceed. So for all of those reasons, I recommended that we make arrangements to try to get him to an

academic medical center and suggested the McLean Hospital in Massachusetts.

Q. I'm showing you what is marked as defense exhibit 47 for identification and ask you, have you seen that?

A. Yes, I have. I was sent a packet of this. These are various records, consults and documents from the physicians, psychiatrists, psychologists who worked with Mr. Amodeo during his 15 day stay at the McLean Hospital.

Q. Either during or after, did you have discussions with those physicians and psychologists?

A. I did. The treatment team met to discuss Mr. Amodeo and I was able to participate via telephone and they related to me verbally their findings and recommendations which they later followed up with these written documents.

MR. SLAUGHTER: Your Honor, could we move 47 into evidence?

MR. GOLD: No objection, Your Honor.

THE COURT: 47 is received from the defendant.

BY MR. SLAUGHTER:

Q. Would you tell the court what significance, if any, 47 had to your evaluation of Mr. Amodeo's condition?

A. The bottom line, Your Honor, is that after 15 days at McLean Hospital, psychological testing, multiple psychiatrists, behavioral neurologists, they reached the same conclusion that I did, that Mr. Amodeo suffers from bipolar

type one mania with psychotic features, and they started him on a mood stabilizing agent, Depakote, and an anti psychotic medication, Geodone. Essentially their conclusions were consistent with mine.

Q. And would you tell the court exactly what they did? Did they do psychiatric testing or psychological testing and blood testing?

A. He was seen by multiple individuals. The two psychiatrists on his case were Dr. Choras and Dr. Vuckovic, both of whom have appointments as Harvard faculty. He was also seen by a psychologist, Dr. Jennifer Taylor who did a chemical dependency evaluation; Dr. Susan Parks, a neuropsychologist; Dr. Evan Murray, a physician and behavioral neurologist; as well as Dr. Marian Klepser, an internist. They did a battery of tests, blood testing, EEGs, MRIs of the brain. They did a sleep study on him. They performed all sorts of tests of his blood chemistries and metabolic functioning.

Essentially the opinion was that this was someone who indeed was suffering from bipolar disorder with a demonstrated history of both manic and depressive episodes. They noted a variety of bizarre delusional beliefs, including the belief that he had the power to move molecules, to tell the future, and that his economic plans would dominate the world and he would essentially become the emperor of the

earth.

The psychological testing as with Dr. Barrett was consistent with genuine illness. Again, there are very subtle and clever tests designed that can distinguish those malingering mental illness from those who are genuinely psychotic and the testing performed up there was consistent with someone who was genuinely mentally ill.

In addition, they also noted problems with stimulant dependency, a past history of the use of caffeine and Sudafed, which may have exacerbated the mania. Nevertheless, even during periods of time when he was not using those over the counter substances, he nevertheless continued with manic and psychotic features.

Essentially they discharged him on Depakote and Geodone. They also diagnosed a number of medical conditions and sent him home in a partially improved state. Their opinion was that while he was still ill and continued to harbor the delusional beliefs, his mood was more stable and he was appropriate for outpatient treatment.

Q. Now, the doctors at McLean, they are not forensic psychiatrists and psychologists, are they?

A. No, they are not.

Q. And what is the difference?

A. In forensic psychiatry one is not involved in patient care. In forensic psychiatry one takes medical and

scientific data about people's mental state and applies it to legal situations and legal contexts, and the doctors there at McLean Hospital were doing first a diagnostic evaluation, and then, secondly, initiating treatment.

Q. And did you suggest that we also have a forensic psychiatrist visit him while he was at Harvard?

A. Yes, I did.

Q. And his name was Bernard Katz?

A. That was Dr. Bernard Katz.

Q. And could you tell the court what findings, if any, he had?

A. Dr. Katz met with Mr. Amodeo on August 18, 2008. Dr. Katz agreed with my diagnosis, again, that this was someone with bipolar disorder with psychotic features. Dr. Katz again opined that while Mr. Amodeo still had residual symptoms of mental illness, he wrote that he was, quote, likely competent to stand trial as of now, unquote.

Q. All right. Now, at the time that Mr. Amodeo entered his plea, did you opine to the court of his mental state at the time that he entered that plea?

A. I did. After coming out of McLean I met with Mr. Amodeo on both September 3 and September 18 of 2008. The competency hearing was held in this building before United States Magistrate Judge Kelly, and at that hearing I opined that while Mr. Amodeo had bipolar disorder with psychotic

features, that while there were still symptoms of mental illness, he was nevertheless partially improved to where he could comprehend the legal process, work with his attorneys in a rational way and assist in his defense.

Q. Now, during the time that the indictment covers, do you know whether or not there was a licensed psychiatrist on the staff of Mirabilis?

A. Yes, there was a licensed physician with training in psychiatry.

Q. What is his name?

A. Dr. Robert Pollack.

Q. And could you briefly tell the court what his background is?

A. He is a psychiatrist, undergraduate at Yale, trained at the University of Florida, and a board certified psychiatrist.

Q. And do you know whether or not he established a patient-doctor relationship with Mr. Amodeo?

A. I don't have actual documents or medical records. Mr. Amodeo has stated to me that prescriptions were prescribed for asthma medications and that there was some understanding between them that the doctor was looking out for him and keeping an eye on him. That is the information I have from Mr. Amodeo. If that is accurate, if a prescription was written and there was that understanding, then that would

suggest a doctor-patient relationship was in evidence.

Q. Now, you mentioned to the court that you saw these videos where he was talking to board of directors and other personnel from Mirabilis. What significance does that have in your opinion of his bipolarism?

A. Certainly as I viewed this, I saw someone with unstable moods, grandiose delusions, plans for world domination. This is something that should have come to someone's attention, particularly if they're trained in psychiatry or psychology. Similarly, I would imagine that other trained professionals in the business or legal arena might have had some question as to the scope of these plans.

Q. In all of the videos that you saw where he was speaking to groups of people -- do you want some water? Did you ever observe anybody question him, call him on the carpet, tell him he was nuts, or in any way try to dissuade him from the course of action that he was talking about taking or envisioning for the company?

A. Well, I certainly don't know what back channel communications there may have been or discussions off the record. In what I viewed, there were no such discussions, questions, can we really do that, despite the extreme grandiose nature, megalomania, there did not seem to be anyone standing up and questioning can we really do this.

Q. Now, if somebody were a manic depressive and they

utilized the services of forensic accountants, lawyers, people of stature in the business community and the legal profession and the accounting profession, would Mr. Amodeo listen to them or would he overrule any decisions that they had made?

A. Difficult to say. When someone is in a manic state they see only success, boundless optimism, grandiosity, a belief in their destiny. They cannot see any obstacles, pitfalls, nothing can go wrong. Normal caution, normal reticence is simply abandoned. If someone had said to him you can't do this, it's impossible, it won't work, it's wrong, maybe he would have listened to them, maybe he wouldn't have. I don't know. But at least from what I viewed, I didn't see anybody standing up and saying can we really do this, is this right? Can we really make the Congo a first world nation? Can we dominate the world? On one point he said at the 4-20-05 meeting, by 2010 we'll have a Mirabilis office within an hour of every human being on the earth. Did anyone ever question this or say that seems a little extreme? Not that I ever heard or saw.

Q. Would these individuals of academic professionalism, lawyers, accountants, etcetera, would their support have encouraged Mr. Amodeo in his manic state?

A. Well, if someone is already manic and if people of various backgrounds were telling him you're okay, your plans

make sense, well, that would be like pouring gasoline on the fire. That would only likely inflame or cause him to increase his efforts believing that everything is justified.

Q. Is there anything that you would like to tell the judge that I have failed to ask you, based upon your notes?

A. Simply that, Your Honor, it's my opinion that Mr. Amodeo suffers from a severe psychiatric illness. The information that I obtained from Mr. Amodeo, from his wife, from other sources is consistent with someone who has suffered from this illness from at least the 1980s. Previous psychiatrists and psychologists have diagnosed psychothymia which is a variant of bipolar illness, in 1985 a Dr. Urashami described him for Social Security evaluation as the most manic person she has ever seen. This is a mentally ill individual.

It is my opinion that the mental illness, which was uncontrolled during the period of time he was at Mirabilis, the positive aspects of it was that he had vision, charisma, he could provide enthusiasm for individuals, but without a break on it, his behavior became reckless.

It is my opinion that his actions, he believed, were foreordained, his destiny to become the emperor of the world, his divine mission, so to speak. Because of his mental illness it is my opinion that he could not appreciate that his conduct was wrong. He saw no obstacles, no pitfalls

in his manic and delusional --

MR. GOLD: Objection. He's now getting into way beyond what we would call diminished capacity. It almost sounds, when he says he was not able to appreciate his conduct, that we're now getting into an insanity test, and I don't think that has ever been raised.

MR. SLAUGHTER: Your Honor, I think what we were getting at is 5(k)2.13, diminished capacity.

THE COURT: Well, what Mr. Gold says though is correct, it sounded like we were going right down the McNaughton standard and we were going to hear that the delusions were reasonable in his mind and all of that.

There's an objection. I sustain the objection. You can ask another question.

BY MR. SLAUGHTER:

Q. Do you have something that you would like to say with reference to the objection?

A. I would clarify, Your Honor. I'm certainly not here to testify as to insanity. Mr. Amodeo took a plea, I know that insanity is not on the table here, it is not an issue. I'm not asked to opine on that. I'll clarify. My opinion is that the offense was committed while he was mentally ill and suffering from a significantly reduced mental capacity. While he may at some point have understood that he was skirting the law, pushing the rules, doing things that were

not proper, it's nevertheless my opinion that his significantly reduced mental capacity contributed to that offense. He believed that he would ultimately be justified, that the end results of dominating the world's economy, creating a better world for everybody, would prove him right in the end. So it's my opinion that his mental illness contributed significantly to the offense, affected his judgment and reasoning, and played a major role in what happened.

Q. I'm going to anticipate a cross examination question. When a patient like Mr. Amodeo comes in and starts talking to you and saying I want to run the world, I want to be the emperor of the world, how can you tell whether or not they're faking or trying to exacerbate a condition to gain your testimony?

A. There are several things that we can do. The first is we try to obtain collateral information, and in this case I had information as to past history, previous evaluations done in the 1990s, and I also spoke with his wife who provided a very good history for prior episodes.

Secondly, I reviewed the videotapes which were a year and two years before I ever met Mr. Amodeo, and these documents, in my opinion, show grandiosity and a disturbed flow of thought before any criminal charges or any such issues were raised.

Next, psychological testing was done. Dr. Barrett in the guardianship evaluation did psychological testing which was consistent with genuine mental illness. And then I recommended to you, let's send him to McLean hospital, let's have them observe him over an extended period of time. It's hard to fake continuously for 15 days. They observed him for 15 days, performed psychological testing, had multiple people evaluate him. Everyone's conclusion here, mine, Dr. Barrett, Dr. Ballantine, Dr. Choras, Dr. Vuckovic, Dr. Parks, everyone who saw him reached the same conclusion I did, bipolar disorder type one mania with psychotic features. And in this case efforts were made to get multiple opinions, do testing, obtain history. In my opinion, this is not faking, this is real.

Q. No further questions.

One final. Did Dr. Vuckovic lead the team at Harvard?

A. Yes, he did.

Q. Is that exhibit 47 for the defense?

A. Yes.

Q. Would that give a good background of the findings of the Harvard team, separate and apart from yourself?

A. Yes. It is a discharge summary which summarizes the work of every member of the team.

MR. SLAUGHTER: Thank you. No further questions.

MR. GOLD: Your Honor, do you want me to proceed now or take the lunch break because I'm going to be a while?

THE COURT: Well, by that question I take it you're not going to finish before lunch, right?

MR. GOLD: Absolutely not.

THE COURT: Well, would you use the ten minutes or so you have and then we'll come back after lunch?

MR. GOLD: Sure. Be happy to.

May I speak with counsel one second?

THE COURT: Certainly.

(DISCUSSION OFF THE RECORD.)

THE COURT: Mr. Gold, if you need time to get organized, I'll go ahead and break now.

MR. GOLD: So much has been said this morning on so many things, it would certainly help, but I'm prepared to proceed if the court wants.

THE COURT: We'll go ahead and break. Please be back at five minutes after one.

(LUNCH RECESS.)

AFTERNOON SESSION

MR. GOLD: May I proceed, Your Honor?

THE COURT: Yes.

CROSS EXAMINATION

BY MR. GOLD:

Q. Good afternoon, Dr. Danziger.

A. Good afternoon, Mr. Gold.

Q. As I understand it, you did not meet Mr. Amodeo until approximately August of 2007?

A. Correct.

Q. And you didn't discuss any of this with his wife until after October of '07 or somewhere in that timeframe?

A. I met with her October 1, 2007.

Q. And these meetings occurred after the conduct which has been alleged in the indictment to which Mr. Amodeo pled?

A. Yes.

Q. Now, when you went to the probate court to deal with the competence to handle his own affairs, that was also after the timeframe, was it not?

A. Yes, that was in June and then again in, is it September? Yes, June. I'm sorry, August of 2008.

Q. You spoke on direct examination about the psychiatric reports of Dr. Ballantine and Dr. Antonio, I believe?

A. Correct.

Q. Now, those reports were basically a snapshot at that

time about his mental status, is that correct?

A. Yes. As well as giving a diagnosis because bipolar disorder is not a diagnosis you have for a day or two, it implies a longer standing condition.

Q. All right. But you can agree that it was a snapshot of how he presented himself at that time?

A. That was the mental status part. They also obtained a history looking back in time, but, yes, they only saw him on the one occasion.

Q. Now, there was nothing in either Dr. Antonio's report or Dr. Ballantine's report that opined whether he had used poor judgment during the times set out in the indictment?

A. That's correct. Those were a focus on his present ability to handle his affairs, which was appropriate to a guardianship evaluation.

Q. Okay. Now, when you first examined Mr. Amodeo, he knew that you were examining him in relation to either criminal charges or potential criminal charges?

A. Yes.

Q. And he knew that you might be called upon to testify in his behalf?

A. Well, that was not discussed at that time. Sure, that was a possibility.

Q. Now, you mentioned in your report a Dr. Philip Tell.

A. Yes.

Q. Did you ever see any reports from Dr. Tell?
A. No, I did not.
Q. He's a psychiatrist?
A. Actually he's a Ph.D. psychologist.
Q. Okay. And you obviously didn't get a chance to talk to Dr. Tell?
A. Correct.
Q. You would agree that either talking to Dr. Tell or seeing his medical records would have also been good historical information for you to have in terms of rendering your diagnosis?
A. Yes, if those records were available it would have been helpful.
Q. And you mentioned Dr. Pollack, Robert Pollack, is that correct?
A. Yes.
Q. And you said that he was a psychiatrist?
A. Yes.
Q. And as I understand it, he was Mr. Amodeo's psychiatrist at one time?
A. Well, I don't know. I don't believe that he actually ever saw him in an office. I'm not aware of any, if that.
Q. You don't know whether he treated him in any way for bipolar disorder?
A. All I know from Mr. Amodeo is that he, according to

Mr. Amodeo, he received some prescriptions for asthma medications from Dr. Pollack and that Dr. Pollack, according to Mr. Amodeo, was there to keep an eye on him. I'm not aware that he ever actually saw him in an office type setting, treated him as a regular patient. Again, this is what I learned from Mr. Amodeo, no other sources.

Q. And as a follow-up to that then, you did not reach out to Dr. Pollack to talk to him?

A. Correct.

Q. And you didn't ask to see whether he had any records of treatment?

A. Correct.

Q. And, again, these would have been helpful if they existed looking historically where Mr. Amodeo had been psychiatrically?

A. If any such existed, yes.

Q. Now, in speaking with Mr. Amodeo and others, you knew that Dr. Pollack was actually in business with Mr. Amodeo, did you not?

A. Yes.

Q. And he worked with him side by side?

A. That was my understanding.

Q. Was it also your understanding that he met with Mr. Amodeo almost daily?

A. That was what Mr. Amodeo related to me that through

their business, yes.

Q. And there was no indication that he thought Mr. Amodeo --

MR. SLAUGHTER: Your Honor, I'm going to object if Mr. Gold is testifying with this question.

MR. GOLD: It's cross examination.

THE COURT: Objection's overruled.

MR. SLAUGHTER: But it has to be based on fact.

THE COURT: All I heard was there's no indication that he thought.

MR. GOLD: Let me rephrase the question, Your Honor.

THE COURT: Who is he?

MR. GOLD: Dr. Pollack.

THE COURT: Okay.

BY MR. GOLD:

Q. Do you have any indication from anything that you have reviewed that Dr. Pollack thought that he was mentally ill?

A. The only information that I have came from my discussions with Frank Amodeo and also conversations with his wife, Claire Holland. This is what they related to me. I don't have any documents. I can certainly tell you what they told me, if that would be helpful.

Q. Well, you opined earlier about other people working with Mr. Amodeo and whether they would have continued to work

with him, is that correct? Did you discuss that on direct examination?

A. Yes.

Q. And based upon that, you have no indication that Dr. Pollack disbelieved any of Mr. Amodeo's theories?

A. I certainly don't know what he did or did not believe.

Q. All right. Now, you referred Mr. Amodeo to Dr. Krotenberg I believe you said.

A. Correct.

Q. And to the best of your knowledge, Mr. Amodeo knew that Dr. Krotenberg was also examining him in relation to criminal charges?

A. No. Dr. Krotenberg's role was as a treater, not as a forensic psychiatrist.

Q. Well, you are relying at least in part on Dr. Krotenberg's opinion of Mr. Amodeo and his treatment, are you not?

A. Well, to some extent. If he had reached a radically different diagnosis, I perhaps might have rethought my own reasoning, but the reasoning for the referral to Dr. Krotenberg was Frank Amodeo, in my opinion, needed treatment.

Q. Now, in coming to an opinion about a patient's mental state, you would agree that it's important that a patient be honest with a doctor?

A. Yes, it's certainly helpful. People are not always

honest, that is why we look at collateral sources as best we can.

Q. All right. But it's important in your mind for a patient to be truthful with you?

A. It certainly helps.

Q. And you know from your review of the records that Mr. Amodeo was not truthful with Dr. Krotenberg?

A. To some extent he was not fully compliant with medications and he minimized some of the grandiose delusions about taking over the world.

Q. Well, specifically he did not discuss with Dr. Krotenberg his views about becoming emperor of the world?

A. That's correct.

Q. And when you discussed this with Mr. Amodeo, I believe you said he said that although he knows this to be true, he keeps it to himself usually?

A. In some situations he does, even though he believes it to be true, he's seen the reaction other people will have, so he does not always reveal it.

Q. So he picks and chooses with whom he wants to be truthful?

A. Truthful about his delusional beliefs?

Q. Yes.

A. Okay. Yes. Yes.

Q. All the reports from McLean then are after the facts

alleged in the indictment?

A. Well, yes, they are from August of 2008.

Q. And you would agree that persons who are charged with a crime or about to be charged with a crime can become depressed?

A. Well, yes.

Q. I mean you've seen this in your practice, have you not?

A. Sure. If someone is facing serious charges, well, that is a stressful thing, of course.

Q. All right. And I believe your testimony was that either you or Mr. Slaughter thought that Mr. Amodeo was getting worse from what you originally saw, is that correct?

A. Well, this was in May of 2008 and Mr. Slaughter called me stating that Frank seemed to be doing poorly, he was having trouble working with him, was concerned he was getting worse and concerned about his ability to work with him on this case.

Q. Now, but you would agree though that the fact that criminal charges were pending could have caused Mr. Amodeo to feel worse at that time?

A. Well, certainly facing criminal charges is a stressful thing. If you have a preexisting mental illness, a stressor of that magnitude could exacerbate or worsen it.

Q. Now, you said one of the reasons for your opinion that

he was bipolar with delusional aspects was he spoke of becoming the emperor of some empire, is that correct?

A. Yes. He spoke of achieving world domination, establishing the Terran empire. Speaking as a psychiatrist, well, that sounds delusional to me.

Q. The Terran empire, did he ever explain to you what the Terran empire was?

A. Yes. Essentially he would become the de facto ruler of the earth, that governments would wither away, that there would be Mirabilis everywhere on the planet. He would support Supreme Court justices, presidents would take direction from him, that he would essentially become the emperor of the earth.

Q. Did he explain to you that the Terran empire came from Star Trek?

A. Well, he spoke about some science fiction references.

Q. Was one of the references to Star Trek?

A. He did not mention Star Trek specifically to me.

Q. So he did not describe to you that the Terran empire then was from Star Trek?

A. Well, he did not say that to me, and having watched Star Trek, I know about the Federation of Planets, but not the Terran empire.

Q. And you didn't think it was important to look up and see what the Terran empire was?

A. No. Counselor, I thought somebody saying I'm going to take control of the world and become the emperor and governments will wither away to my authority, well, as a psychiatrist, I thought that reflected grandiose delusions. I did not think it required researching Star Trek mythology.

Q. All right. Let me back up. He didn't tell you that the basis of the Terran empire was to basically take over the world and kill anybody who disagreed with him?

A. He did not say anything about killing anyone who disagreed with him. He did not reference that to me.

Q. Now, you talked about these delusions of his. You're aware that there are conventions that deal with things like Star Trek?

A. Well, yes. I don't attend, but I am aware there are such conventions.

Q. Thousands of Star Trek devotees, correct?

A. Yes.

Q. They dress up as Star Trek characters?

A. I understand that they do.

Q. And they speak in languages like Klingon?

A. Well, they speak in made-up languages, yes. I understand that for some people they have quite a bit of fun with that.

Q. And in your mind though, somebody walking around in Star Trek costumes speaking some bizarre language, in your

mind, would be delusional?

A. No, they would not. And the reason is if they are going to a convention to have fun, if they're with their friends, if they enjoy dressing up as a Romulan or as a future space soldier, well, it's the same thing as people who go to Renaissance fairs or civil war enactors, it's a way of recreation and fun in a social setting. Now, that's not delusional. That's a hobby. Maybe a little bit eccentric for some folks, but it's a hobby, it's shared by a group of people and accepted within that group.

Now, if I see someone who comes in and tells me he's the captain of a starship, he came from the future, or if I see someone who really believes they're a Klingon, that's delusional. That's not reality. So there's quite a difference between a civil war reenactor or someone who enjoys Star Trek conventions and dressing up versus someone who actually believes this to be true.

Q. Mr. Amodeo effectively wanted to grow his business empire to enormous proportions, is that accurate?

A. Yes. He believed that it was his destiny.

Q. He wanted to expand internationally?

A. Well, yes.

Q. That's not unusual in the business world, is it?

A. No. Certainly entrepreneurs do wish to grow their business and become very successful, that is not unusual.

Q. Including heads of corporations that want to expand globally?

A. Sure, yes.

Q. Some bizarre ideas often bear fruit, don't they, in the corporate context?

A. I'm not sure about bizarre ideas bearing fruit. Certainly sometimes visionaries may have ideas that become successful. Whether those ideas are bizarre or not, I don't know.

Q. Mr. Amodeo thought he was a visionary, right?

A. Well, yes. He also thought that he could tell the future and was going to rule the world, but, yes, he thought he was a visionary.

Q. Now, do you think that when Bill Gates was in his garage and wanted to expand his computer idea and take over the world, would you have called him delusional?

A. No. He didn't want to take over the world, he just wanted to set the standard for computing, so I'm not aware that he ever claimed to have the power to transmute molecules, foretell the future, that a fire from heaven would consume him. I certainly don't know Mr. Gates, but I'm not aware that any of those things would apply to him.

Q. As a result of looking into Mr. Amodeo's background, you knew that he owned at least 15 companies?

A. Yes.

Q. You knew that he ran them?
A. That was my understanding that there was -- well, I don't know the details. I understand there were a series of interlocking companies that he controlled or owned or had some interest in.
Q. And that there were approximately 70 others in a very short period of time that he purchased?
A. That's my understanding, though I don't know the exact number.
Q. All right. Now, you said that regarding the discussions on the tape regarding building this empire quickly, because he was talking about this global concept happening very quickly, that that was a sign of his bipolar disorder?
A. Yes.
Q. Yet in a two or three year period he did come to own or control 85 companies, did he not?
A. Yes.
Q. He also had a number of well respected professionals go to work for him?
A. Apparently so.
Q. Lawyers, are you aware that there were lawyers that went to work for him?
A. Yes. I understand that sitting in the board room were people with law degrees.

Q. Accountants and CPAs?
A. I understand that there were.
Q. Former special agents of the FBI?
A. I believe so.
Q. Former special agents of the Secret Service? I think we saw one on tape, Mr. Billings?
A. I didn't know that he was with the Secret Service, but I'll accept your representation.
Q. So, effectively, he was able to fool all of these people into believing his theories?
A. Is fooled the right word? I don't know. Were they -- why were they there? How much money did they receive and what benefit came to them? I don't know if fool is the right word.
Q. He was able to convince them to keep working with him on a day to day basis?
A. That, yes.
Q. Now, were you aware that he was able to sit two seats down from the president of the United States, George W. Bush?
A. Yes, I saw a photo of that.
Q. And that he was invited by former President Clinton apparently to sit on the board of directors of one of his foundations?
A. Yes.
Q. You have no indications that in meeting with President

Bush that he had any impaired judgment?

A. Well, I don't know the circumstances of the meeting. I saw a photograph of it. I don't know how much money you have to throw around to sit down with the president, but, yes, he sat down at a table with the president and I saw a signed, autographed picture.

Q. And you have no indication that he exhibited any poor judgment as it related to President Clinton?

A. Since I don't know the circumstances of that meeting, what he promised, what he said, I don't know.

Q. Looking back historically, you would agree that there was no indication that he was incapable of making informed decisions about some of the following things. His right to marry or divorce.

A. Well, yes. He married Claire, so I don't think there's any question that 20 odd years ago he had the right to do that.

Q. Or that he was incapable of making informed decisions about his right to vote?

A. Voting? I'm not aware of any problem with voting.

Q. Or incapable of understanding his right to have a driver's license?

A. I don't see a particular problem with the driver's license.

Q. Or operate a motor vehicle?

A. I'm not aware of his driving skill, but I'm not aware he had difficulty in driving a vehicle.
Q. He can't have any problems, he didn't seem incapable of understanding his right to travel?
A. No. Certainly had the right to travel if he wished to do so.
Q. Or to seek or retain employment?
A. I guess I should clarify at what time point. At any time point, now?
Q. No. My question is let's limit it to just June of '04 through February of '06.
A. All right.
Q. Do you have any indication -- would your answer be any different now that we've limited the timeframe?
A. I, of course, did not see him during that time, but as far as issues regarding could he vote, could he get married, could he drive a car, I'm not aware that those abilities were impaired.
Q. The same thing with determining his residence?
A. Yes. He could pick a home.
Q. Or his right to consent to medical treatment?
A. I'm not aware that he had any delusional beliefs affecting his medical health at the time or his understanding of medical conditions or procedures.
Q. Now, all these questions that I've just asked you,

they go back to the report of Dr. Antonio, do they not? Those were some of the things that she was looking at that time, is that correct?

A. That's correct. And if you recall, she referenced that in her opinion Mr. Amodeo should receive limited guardianship. Some of the things you listed she thought were okay, but issues relating to the need for mental health treatment relating to his ability to conduct business, well, she had concerns about those things.

Q. She did not opine concerning the time period of the indictment though, did she?

A. No. Because for the probate court, the focus was on the present.

Q. Now, people who are bipolar are capable of leading normal lives, are they not?

A. Under two conditions. First, the illness for many people is a remitting and relapsing illness, meaning there may be long periods of time or even without medication they're not ill and during that time they may function without symptoms. The other time is when the illness is properly controlled with medications.

Q. But even without medication what you're suggesting is they may be capable of leading perfectly capable lives?

A. Some may, some may not. Usually during periods of time where the illness is in its full flower, by definition

the illness produces either significant distress or impairment in social, occupational or other important areas of functioning. So if they are having an acute manic or an acute depressive episode, by definition their ability to function will be impaired.

Some individuals will have long periods of remission where the illness is quiet. Other individuals have a more malignant course and the illness tends to be more chronic and persistent. Those folks have a much more difficult time of it.

Q. People who are bipolar though can have successful careers?

A. They can if they're either lucky with a benign, relatively mild bearing of the illness or if their illness is properly controlled.

Q. They can raise families?

A. Yes. Although the divorce rate is extraordinarily high in bipolar disorder because of the nature of the illness.

Q. Mr. Amodeo was married to his wife I believe 18 years at that point?

A. At what point?

Q. When you examined him?

A. I believe it was 19, but that's pretty close.

Q. Now, other than the videotapes that you reviewed, you

didn't get an opportunity to observe Mr. Amodeo during the time period of the indictment?

A. No. I did not know who he was and had no contact with him.

Q. The videos you saw were the videos that were handpicked by his attorneys to have you review?

A. Well, yes, his attorneys supplied them to me. Whether they were handpicked or not, I don't know, but, yes, they were supplied to me.

Q. And you did not see the thousands of hours of other videotape that existed, did you?

A. No.

Q. And you never saw Mr. Amodeo, other than on the videotapes, in his day to day business dealings?

A. No. I certainly had nothing to do with Mirabilis, was not there when day to day business was conducted and had no dealings with him of any kind.

Q. And during the timeframe of the indictment you didn't see him interact with his family? Well, I don't even think there was anything on the video, but you didn't see him interact with his family, did you?

A. No. I did not know him.

Q. Or his friends?

A. No.

Q. Let's talk about the tapes that we saw earlier. The

meeting at the University Club.

A. Yes.

Q. All right. You said it was your opinion that he was rambling on that videotape.

A. Yes.

Q. In fact, didn't he seem to be very much in control of that meeting and what he was saying?

A. Well, he seemed to be in control of the meeting, there's no question about that, but if you read through the transcript, there are times when he says things that make very little sense. For example, I'm referring to the transcript now, he's talking about on the one hand being able to predict and change human behavior, and then on page 12 of the transcript starts talking about solving the medical malpractice crisis, and I'm not sure what the connection is, how that links up.

Later on he again, on page 56, talks about how by 2010 no human being will be more than an hour away from one of their offices. In another eight months we'll have 125 offices. These are things to me that suggest a problem.

Q. They suggest a problem or they suggest that he was rambling?

A. The rambling part is that he shifts topics at times and goes off on tangents. That is what I mean by that. There are also delusional factors in there as well.

Q. You would agree though that he appeared to be very confident in what he was saying?
A. Oh, yes, he was confident.
Q. He appeared to be a very good speaker?
A. He seems to be a good orator and he seemed to portray himself as excessively self confident, yes, which would be consistent with a manic state.
Q. He sounded intelligent?
A. Certainly his vocabulary is good, he's an educated man, he sounds intelligent.
Q. His speech was controlled, he wasn't screaming?
A. No, of course he was not screaming.
Q. If anything, he seemed to have a gift of gab?
A. Well, and certainly speaking well, speaking fluently, speaking excessively, having a gift of gab, again, would be consistent with a manic state.
Q. Now, you said that on that particular occasion that he was exaggerating things, or what you felt were exaggerations, is that correct?
A. Yes.
Q. A lot of what he said though, wasn't it, in a way, as much as you say it's a potential symptom of the bipolar disorder, wasn't it also equally consistent with puffery of a salesman trying to sell a product?
A. In my opinion it went beyond puffery. It's one thing

to tout your expertise, how investors can make money with you. It's another thing to claim that you're going to solve the medical malpractice crisis, be 50 percent larger than Citicorp in a year and a half. Those things sound beyond hyperbole to me.

Q. On the videotape you didn't see anybody get up and walk out, did you?

A. No.

Q. Nobody stood up and said this guy's crazy, I'm out of here?

A. Nobody said that.

Q. Nobody got up and walked out on it?

A. Not that I could see.

Q. Now, you've had an opportunity in your practice to examine white collar defendants, haven't you?

A. Yes.

Q. And many of them have the same traits that Mr. Amodeo does? For example, many of them have grandiose thoughts.

A. I've not seen too many to this degree with the element of grandiosity. I have testified on some individuals with bipolar disorder on diminished capacity issues. I've not had any white collar defendant whose plans were to become emperor of the earth though. So that was the most extreme grandiose delusion that I heard.

Q. Other white collar defendants you also have seen

exhibit narcissism just like Mr. Amodeo, correct?

A. Yes. Narcissism certainly does not excuse conduct. That is an inflated something of self esteem, conceit to exaggerated proportions, yes. That is a character flaw and would not qualify to mitigate or excuse criminal conduct.

Q. They all have large egos?

A. That would be one way to say narcissism.

Q. All these other individuals not were necessarily bipolar, were they?

A. No. And certainly I've testified at times for the United States Attorney's Office saying somebody is not mentally ill.

Q. Doctor, if we could just answer my questions, please, without all the editorial comments.

A. Sure.

Q. His performance on that tape was also consistent with a slick con man, was it not?

A. That could be one interpretation.

Q. All right. Now, I don't know if it was on that tape, I think it was, but there was some discussion about law and economics, is that correct?

A. Yes.

Q. And you were saying that in relation to the law and economics, when Mr. Amodeo was talking about predicting human behavior based upon mathematical formulas or some sort of

mathematics, you said that that was a symptom of his bipolar disorder?

A. In my opinion that reflected grandiosity to believe that he could actually predict future events with certainty.

Q. All right. Doctor, are you familiar with a Dr. -- not a doctor, a Judge Richard Posner?

A. No.

Q. All right. Are you familiar with the rational choice theory?

A. No.

Q. Are you familiar with the Freakonomics?

A. I've read the book, yes.

Q. And you know that at least in that sense in Freakonomics that the thought is that you can predict human behavior based upon economics?

A. I certainly don't want to speak for the author of Freakonomics. The issue is can you predict individual behavior, large scale society trends. That I don't know.

Q. You would agree that some of this is an academic debate, there's people on both sides of that fence?

A. I'm not familiar with that academic debate.

Q. Now, let's talk about the February 28, 2006 conference call. Did you talk to him about the background of that call, what caused that call to take place?

A. No.

Q. All right. So he didn't talk to you about the fact that there was somebody who had countermanded his orders from Richmond and that that's why he had called that particular conference call?
A. No, I did not know that.
Q. In your experience, you have seen businessmen whose subordinates don't follow instructions and they become upset with them, don't they?
A. That can happen.
Q. And you said that at least in part his being irritable was corroborative of his bipolar disorder?
A. It would be consistent.
Q. Now, people who are not bipolar can become irritable?
A. Of course they are. But the issue was the context it was in and the statements made, not merely the irritability.
Q. And there's people who are not bipolar who are capable of being euphoric?
A. Generally if something good happens to them, they can have feelings of elation or euphoria, the birth of a child, for example. The issue is it doesn't last a week and it is not associated with the other symptoms of bipolar disorder. That's the distinction.
Q. Watching the tape it left no doubt that he was running the company?
A. Well, he certainly appeared to be the man in charge.

Q. On that tape he certainly chose his words carefully, did he not?
A. I'm not sure if the words chosen and careful -- he threatened to sue people, told them to go to the department of labor, told them that he was familiar with people marching in front of the company. I'm not sure those words were carefully chosen. Somebody may disagree with that that they were threatening and across the line, but I'll leave that to others to decide.
Q. He wasn't out of control?
A. No, he certainly didn't holler at anybody or threaten physical harm in that sense, no.
Q. Now, you also said that his thoughts about the Congo were another symptom or manifestation of his bipolar disorder?
A. Yes.
Q. Yet he did send people to the Congo, did he not?
A. Yes, he did.
Q. And on the tape you saw one of the individuals on there say that he would go back, didn't you?
A. Yes, I believe he said that.
Q. And he also said that he believed in Mr. Amodeo's theories.
A. All right. He said that.
Q. He didn't say that Mr. Amodeo was crazy?

A. No, he did not.

Q. Now, did I understand you to say that, in fact, his caffeine dependence exacerbated his bipolar disorder?

A. Yes.

Q. And that was based upon the reports that you saw from McLean?

A. Yes. They were of that opinion that the overuse of caffeine and Sudafed could have played a role in worsening his condition.

Q. Can you point me to any of the reports that say that?

A. In McLean?

Q. Uh-huh.

A. Sure.

Q. That say that it possibly exacerbated his condition.

A. I'm having trouble finding that, although I know it's in here.

Q. I'll give you time to find that, Doctor.

A. All right.

MR. SLAUGHTER: Substance use history is on page one.

THE WITNESS: All right. I have a report here from Jennifer Taylor, Ph.D. at McLean hospital, and in her conclusion she notes the co-occurrence of chemical dependency and psychiatric illness suggests that a comprehensive -- must address both disorders simultaneously. I believe that Mr.

Amodeo would benefit from -- regarding stimulant beverage use and his psychiatric instability.

Q. That does not say that his caffeine dependency exacerbated his bipolar condition, does it?

A. She does reference the link between them.

Q. Where?

A. Simply in what was stated there, how they impact on one another. She also noted that earlier in her report Mr. Amodeo said that he was almost continuously manic during this 11 year period with the exception of a six month hiatus during which did he not take any Sudafed and his consumption of stimulant beverages was reduced, which would imply some correlation or exacerbation.

Q. It does not say in that report that the use of caffeine exacerbated his symptoms, does it?

A. Does she actually use that phrase?

Q. Yes, sir.

A. No.

Q. Which is what I believe you said that, you know, she had said. I believe on direct examination you said specifically that the doctors there said that his bipolar disorder was exacerbated by the caffeine.

A. That was the impression that I had from my conversations with them. I simply have what Dr. Taylor wrote in her report.

Q. All right. Now, when you first met with Mr. Slaughter back or the first report I believe you wrote him was in May of 2008, was it not?

A. That's correct.

Q. And by that time you had seen Mr. Amodeo several times?

A. Correct.

Q. And he had discussed with you at that time his caffeine dependence?

A. Yes. He had told me he was drinking quite a bit of caffeine and had taken Sudafed.

Q. Your report to Mr. Slaughter mentions nothing about any dependence exacerbating his bipolar disorder?

A. That's right.

Q. And you would agree that Dr. Antonio's report says nothing about that?

A. Correct.

Q. And Dr. Ballantine's report says nothing about that?

A. Correct.

Q. As a matter of fact, Dr. Vuckovic, is that how you pronounce his last name?

A. Yes, I believe so.

Q. His report upon discharge says absolutely nothing about the caffeine exacerbating his bipolar disorder, although he does reference that he was still dependent on the

caffeinated beverages?

A. Correct.

Q. And your report of August 28 of '08 mentions nothing about the fact that Mr. Amodeo's caffeine consumption exacerbated his bipolar condition?

A. Yes.

Q. Yes, it is correct?

A. That's correct.

Q. Now, you've testified that the bipolar disorder led Mr. Amodeo to exhibit poor judgment.

A. Correct.

Q. And with that poor judgment you're aware that it's alleged that he stole almost 200 million dollars?

A. Yes.

Q. In your opinion, how much more would he have stolen if his judgment wasn't impaired?

A. I don't know how to answer that question. If he did not have a mental illness, would any of this have happened or would there have been some criminal conduct? That I don't know.

MR. GOLD: I have no further questions, Your Honor.

REDIRECT EXAMINATION

BY MR. SLAUGHTER:

Q. Do you have Dr. Antonio's report up there?

A. Yes, I believe I do. I have it here.

Q. And as Mr. Gold said, this, quote, snapshot that she took, did she not say that he lacks the ability to consent to refusal of medical or other professional treatment or care, counseling services or treatment?

A. Yes.

Q. Did she also say that he lacks the ability for access to consent to or release confidential records or papers?

MR. GOLD: Objection, Your Honor. I have no objection as long as it's clear that that was at that moment and no other moment in time.

THE COURT: That's my understanding. You may proceed.

BY MR. SLAUGHTER:

Q. Did she say he lacked that ability?

A. She did indeed.

Q. Why don't you tell the court what Dr. Antonio said as Mr. Gold said in his, quote, snapshot, what abilities he lacked because of his bipolar condition?

A. She opined that he lacked the ability to, that he lacked the ability to control or manage real or personal property or income from any source, lacked the ability to

manage a business, act as a member of a partnership, make contracts, pay or collect debts, make gifts, initiate, defend or settle lawsuits, execute a will or be admitted to the Florida state hospital or any other public treatment facility on a voluntary basis. She said he did have the ability to make decisions about travel, where to live and education.

Q. And on page two did she say he was not able to make informed decisions regarding his or her right to contract?

A. Yes.

Q. And he lacked the ability to make informed decisions regarding his or her right to sue or assist in the defense of suits of any nature against him or her?

A. Correct.

Q. And he lacked the ability to make an informed decision regarding his or her right to manage property, make any gift or disposition of property?

A. Correct.

Q. Now, there was another doctor that was seen, you said this was an MD and the person had also obtained a law license?

A. Yes. That's Dr. Edward Ballantine.

Q. Would you tell the court on page two what he said Mr. Amodeo lacked on that snapshot day?

A. Dr. Ballantine opined that Mr. Amodeo lacked the ability to do everything, which was right to marry, vote,

apply for government benefits, drive, travel, seek employment, contract, manage property, make decisions involving his residence, consenting to medical treatment or any other decisions about his social environment.

Q. And on page four what did he say he lacked?

A. Essentially Dr. Ballantine stated, quote, this man's racing thoughts and grandiosity significantly impair his ability to make informed decisions in all areas of his life, and he went down the page and said that he lacked the ability to do everything including running businesses, making legal decisions and so forth.

Q. Now, Mr. Gold asked you a question about caffeine dependence that you put into your report or you talked about on direct examination. Did you not say that you had talked to the team on at least one or two occasions?

A. On at least one occasion, yes.

Q. And where did you get the information that there was a codependence on caffeine that exacerbated the bipolar?

A. I believe that was from verbal discussions. They wanted him to not take Sudafed and reduce the amount of caffeinated beverages because of the concern that could worsen his condition.

Q. Now, if a person has bipolarism, are you able to say like say from one to ten what you believe the severeness of that condition is?

A. Well, certainly at any point in time I can offer an opinion whether the symptoms are mild, moderate, severe or extreme. I can look back in time at a point and say at this point the patient was seriously ill with extreme manic symptoms, they're extremely depressed and in a hospital, so at any given point I can make an assessment how ill they are at that point. I can also look back over the course and offer general opinions as to how malignant or benign over the course of treatment has been and all.

Q. Now, in this particular case based upon all you've seen in Mr. Amodeo, the tapes and from our sources including Claire and everybody else that may have talked to you, from a scale of one to ten, where would he be?

A. It's hard to quantify it. I'll simply say he's had a rather malignant course of illness, rather chronic and unstable depressive symptoms, chronic and unstable manic symptoms, and persisting delusions in spite of treatment. This would be a rather severe variant of the bipolar illness.

Q. Would Mr. Amodeo be able to conduct the affairs normal in life today or from '04 to '07 without medication?

A. Well, if you're talking about basic activities of daily living, can you drive a car, can he shave himself, can he make himself macaroni and cheese at his house, yes, he can do those things. Because of his delusional beliefs, is that going to affect his ability to make rational judgments in the

business world and dealing with others? Well, that's why we're here today.

Q. Now, Mr. Gold asked you about whether or not he was a con man and he asked you about all these smart people that were in the room and didn't say anything. Has anybody shared with you what these people were being paid?

A. I don't know the exact amount. I know they were well compensated.

Q. Has anybody shared with you the fact of how many people knew that this money was stolen?

A. I don't know how many people knew that or suspected that.

Q. With reference to bipolarism, is it consistent with bipolarism for a person to start a number of business activities simultaneously?

A. Yes. They may start many projects, have trouble completing them, handling them all, and they may easily over extend themselves.

Q. And have you heard of anyone single building or project or subpoena that Mr. Amodeo associated himself with that ever was successful or turned a profit?

A. I don't know of any.

Q. Is that consistent with bipolarism?

A. Yes, it's consist with someone who clearly is not functioning well and somebody who would clearly be ill,

either that or a poor businessman, but the former is likely given the history here.

Q. Was Mr. Amodeo expansive?

A. Oh, yes. How can you be any more expansive than believing it's your duty to rule the planet.

Q. Was there unwarranted optimism?

A. Yes, absolutely.

Q. And grandiosity and poor judgment?

A. Certainly the grandiosity, the belief of his preternatural powers, super natural abilities, messianic destiny. Oh, yes, there was quite a bit of grandiosity here.

Q. And would those symptoms lead to imprudent involvement in poor business investments?

A. Well, certainly one could argue that's exactly what happened here.

Q. With reference to bipolarism and ethics, is there any correlation?

A. Sure. Ethical constraints are often disregarded. Even though someone may have an inkling that this is wrong, they'll create a way to justify it in the end. And it states in our Diagnostic and Statistical Manual, individuals in a manic state may disregard conventions, engage in behavior that is inappropriate or even criminal, and through the prism of their illness be able to justify and rationalize their behavior.

Q. What did Claire Holland, Frank Amodeo's wife, tell you about Mr. or Dr. Pollack?
A. She -- I'm going off what she told me October 1, 2007. She stated that she had e-mailed him saying that Frank was talking about being emperor of the universe. Her recollection his reply was that he needed rest and to play more and that he was keeping an eye on him. That is what Claire Holland related to me.
Q. And based upon your discussions with Mr. Amodeo and with Claire Holland, did he ever diagnose or did he ever prescribe any bipolarism medications such as --
A. I'm not aware that that was done.
Q. Mr. Gold also asked you about isn't it possible he was just a slick con man?
A. He did ask me that.
Q. And based upon your experience and expertise and with a reasonable degree of psychiatric certainty, can you tell, is he a slick con man or does he suffer from bipolarism?
A. He suffers from bipolar disorder in my opinion, based not only on my opinion but multiple other psychologists, psychiatrists and psychological tests. This is not merely a scoundrel, this is someone who has a serious mental illness that, in my opinion, greatly affected and influenced his behavior.
Q. One final question. When a person is manic or

euphoric, is there any criteria of how long that lasts in bipolarism?

A. And the answer is the minimum duration for a manic episode is one week. However, the episode can last months or in some cases even years. It can be chronic and persistent in some unfortunate individuals.

Q. And do you have an opinion based upon a reasonable degree of psychiatric certainty of whether Mr. Amodeo's bipolarism and his manic episodes were chronic over the last few years?

A. Well, if you look at his history, he certainly had periods of depression interspersed. He has relatively few what we call euthymic or relatively normal days. Either he's in a manic state, a depressed state, or what we call a mixed state where he's irritable but unhappy but also accelerated. So his illness seems to cycle between these different cycles. He will stay manic for a period of time, he's manic for a while, has a spurt of depression, may be manic again. He tends to have multiple episodes occurring through his cycling.

Q. If there were a punch list of symptoms for bipolarism with reference to your diagnosis, would Mr. Amodeo hit each and every one of them?

A. Yes, he would. He has the elevated, irritable mood, grandiosity, racing thoughts, reckless behavior, markedly

increased energy, a depressed need for sleep, the inflated self esteem, the reckless spending, so, yes, he hits the DSM-4 criteria very well.

Q. And what impact, if any, would that have on Mr. Amodeo participating the theft of 180 million dollars --

MR. GOLD: Object, Your Honor, asked and answered. We've been all over this.

MR. SLAUGHTER: I have not asked that question before.

THE COURT: Overruled.

Q. Did you hear the question?

A. Yes. It is my opinion that because of his manic and grandiose state, his belief that it was his destiny to rule the planet, that any ethical concerns were pushed aside as a pursuit of his vision and he found a way to justify it in his mind because his mind was affected by a mental illness.

Q. And did the professionals around him have a positive impact on that feeling that he had?

A. I'm certainly not aware that anyone put a brake on it.

MR. SLAUGHTER: Thank you. No further questions.

MR. GOLD: If I can have just have one second, Your Honor.

Your Honor, just two questions. May I?

RECROSS EXAMINATION

BY MR. GOLD:

Q. Having a bipolar disorder is not necessarily inconsistent with being a slick con man, is it?

A. Someone could be both.

Q. And when you talk about someone being manic for periods or depressed for periods, much of that is based upon a patient's self reporting, isn't that correct?

A. As well as the observations of others. Often times individuals who are ill don't recognize their behavior or actions are inappropriate.

MR. GOLD: I have no further questions, Your Honor.

THE COURT: You may step down, sir.

THE WITNESS: Thank you, Your Honor.

MR. SLAUGHTER: May Dr. Danziger be excused?

THE COURT: Yes.

Oh, I wanted to ask a question, Doctor. I wanted to ask a question about the term psychothymia. Tell me about that.

THE WITNESS: Psychothymia can be considered a variant of bipolar disorder. It refers to individuals who have an unstable mood state with mild manic and mild depressive symptoms that persist over time. So one could think of it as a minor varianted bipolar disorder, although

someone recognizes there are symptoms of both mania and depression.

For some individuals psychothymia may be how the bipolar actually presents. For example, in their early 20s, they may have minor mood permutations, but as they get older the illness increases. Other individuals, it may be a mild or variant disorder persisting throughout life where they have the mild episodes of mania and depression, but never progressing to the full blown illness.

THE COURT: Okay. Thank you, sir.

THE WITNESS: Thank you, Your Honor.

MR. SANDS: Your Honor, our next witness is Mr. Amodeo.

THE COURT: Okay.

MR. GOLD: Your Honor, I think, based upon this morning's conversations though, I think the court at least needs to make an inquiry because he was talking about the conflict. I don't mind him going forward obviously, but I want the court to at least place on the record he's doing this voluntarily, after consulting with his attorneys. I don't want him to come back and say that his lawyers forced him to testify or anything like that.

THE COURT: Okay. Mr. Amodeo, raise your right hand, sir, and be sworn.

Whereupon:

FRANK LOUIS AMODEO,

called as a witness, having been first duly sworn according to law, testified as follows:

THE COURT: Sir, what is your full name?

THE DEFENDANT: Frank Louis Amodeo.

THE COURT: Mr. Sands, what is it you're going to question him about?

MR. SANDS: Mr. Amodeo would like to testify about his, the manifestations of his illness in his earlier life, about his long course of involvement with Mirabilis, about his subsequent cooperation with the government. He basically wants to testify as to the, basically the narrative of the case as set forth in the sentencing memorandum.

THE COURT: Okay.

MR. GOLD: Your Honor, we already have the stipulated facts in the plea agreement that are contained in the PSR. If this is a supplement, it's one thing, but if he's now contesting the facts in there, I have some concerns.

MR. SANDS: Your Honor, one thing I can tell you is that Mr. Amodeo has gone through this process with the understanding and expectation that he would have the opportunity to make a thorough statement to the court explaining his behavior, explaining what happened, and he wants to have the opportunity to do --

THE COURT: Well, he will have that opportunity. The question is whether he's going to do it now based on his earlier representation that he thought there was some sort of conflict he had, some sort of conflict that counsel had with regard to his referring to Mr. Slaughter's representation. You thought that if he did, you might also, Mr. Sands.

MR. SANDS: Right. And I have no problem with your conducting any kind of examination that you deem fit, Your Honor.

THE COURT: Mr. Amodeo, it's my understanding that you have received treatment and that you are competent to proceed with this hearing and that you were competent to enter a plea when you entered your plea. Is that your understanding?

THE DEFENDANT: Yes, sir, that's my understanding.

THE COURT: Are you thinking clearly this morning, or this afternoon?

THE DEFENDANT: Honestly, Your Honor, not up to speed. Dr. Danziger had to change my medication last week because it reached near toxic levels.

THE COURT: But you've understood everything that's happened here, right?

THE DEFENDANT: Yes, sir, I have.

THE COURT: And you're able to express yourself

clearly here today, aren't you?

THE DEFENDANT: I believe so, sir, yes, sir.

THE COURT: What you're saying is that your medication was changed and have you reacted positively to that?

THE DEFENDANT: It's actually a negative reaction to it. I spoke with Dr. Danziger during the break. He's going to have me get a blood test done.

THE COURT: And what is the negative reaction?

THE DEFENDANT: They had to reduce the amount of medication so the mood swings are greater. I've noticed myself cycling while I've been in here, a little more depressed, a little more manic, and take a blood test and then he's going to re-prescribe medication for me in a different combination, but he told me I had to have the blood test first.

THE COURT: Did you hear everything that your attorney said this morning?

THE DEFENDANT: I did.

THE COURT: Did you understand it?

THE DEFENDANT: Yes.

THE COURT: Did you hear everything that Mr. Gold said?

THE DEFENDANT: I did.

THE COURT: Did you understand that?

THE DEFENDANT: I do.

THE COURT: I watched you at times during the hearing and you seemed to indicate by body language and gesture and conversation with your attorneys that you were aware of what was going on. Was my impression correct?

THE DEFENDANT: Yes, sir.

THE COURT: Mr. Sands just indicated that he wanted you to have an opportunity to address the court regarding several things, including your history of mental illness, your involvement with Mirabilis, and the kinds of things that are included in the presentence report with regard to background. Did you hear that?

THE DEFENDANT: I did.

THE COURT: Now, as I recall, you're an attorney?

THE DEFENDANT: Yes, sir.

THE COURT: You're educated as an attorney but right now you don't have a license, is that correct?

THE DEFENDANT: Yes, sir.

THE COURT: You're a graduate of Emory University School of Law?

THE DEFENDANT: Yes, sir.

THE COURT: And you have actually engaged in the practice of law, most of which was commercial in nature, is that right?

THE DEFENDANT: Yes, sir.

THE COURT: You did a good bit of bankruptcy work at one time?

THE DEFENDANT: I did.

THE COURT: And that involves transactions and relationships between creditors and debtors, is that right?

THE DEFENDANT: Correct.

THE COURT: And during the time that you were not practicing law, you've been engaged in the business world, is that right?

THE DEFENDANT: Yes, sir.

THE COURT: In fact, you have made a living as consultant from time to time consulting other executives or representatives of other entities regarding how they should go about their business, is that right?

THE DEFENDANT: I have.

THE COURT: You were paid for that?

THE DEFENDANT: Yes, sir.

THE COURT: In some instances it seems like you were paid a lot of money for that.

THE DEFENDANT: Yes, sir.

THE COURT: Now, you indicated this morning that you had a concern as to whether your attorneys, I think you were talking about Mr. Slaughter specifically, had a conflict of interest, is that right?

THE DEFENDANT: Correct.

THE COURT: Have you thought about that since you brought it to my attention?

THE DEFENDANT: I have.

THE COURT: Do you now think that there's such a conflict?

THE DEFENDANT: I have discussed it briefly in the intervening time. The conflict runs to Mr. Slaughter, Mr. Phillips and Mr. Pannoff, and now the conflict runs even deeper after Mr. Gold's last comment. There is a very specific understanding about the statement of facts in the plea agreement, and if Mr. Gold is trying to change that understanding today, then I have a problem with it. Those facts were created so that --

THE COURT: Wait a minute, I don't think Mr. Gold is trying to change it. He's saying that he wants to make sure that it's not changed.

THE DEFENDANT: The meaning of those facts are not what has been projected in other proceedings.

THE COURT: Well, let me just back up. I've got the presentence report here and you're telling me that you believe that it has -- the facts set forth in that presentence report are accurate, right?

THE DEFENDANT: No.

THE COURT: Oh, you don't.

THE DEFENDANT: Not at all. Nor in the statement

-- in the statement of facts of the plea agreement were done with very specific meanings and not what has been portrayed in the presentence report, at all. And the only reason I agreed to it after weeks of excruciating negotiation was because I was -- it was represented to me that, number one, existing substantial assistance had remained in place, and then, more importantly, far more importantly to me, is that this proceeding would take weeks and I'd be able to present all kinds of witnesses in order that the whole story would be told, that these hundreds of hours of videos would be entered into the record so that the complete layout of all of the evidence would be --

THE COURT: Hundreds of hours?

THE DEFENDANT: Hundreds of hours.

THE COURT: Of videos.

THE DEFENDANT: Of videos. I have 267,000. I've been able to reduce them to a few hundreds hours.

THE COURT: So you contemplated that I would listen to hundreds of hours of video?

THE DEFENDANT: No. I contemplated that they would be entered into the record kind of in block.

THE COURT: Well, maybe they will be. It's not inconsistent -- let me stop you one second because I want to make sure you understand how I go about things. I don't think there's a defendant or defense attorney around here

that will say, I hope there's not, that I haven't given them an adequate opportunity to present evidence in mitigation. I hope I'm not known as a judge that doesn't give both sides a fair opportunity to be heard, in this kind of case or any other kind of case. So it's not my intention to cut anybody off.

I don't like to deal with information that's not relevant. I don't like to deal with information that is redundant. And you understand that because you're a lawyer. I mean the system will break down if we do that. If you have information that you think I should hear in helping me make a decision as to what a fair and just sentence would be, I'll listen to it. It's hard to imagine a great deal that's not contemplated under 3553.

THE DEFENDANT: That's what my expectation was, Your Honor.

THE COURT: Well, knowing that, are you still maintaining that what is in the presentence report is inaccurate? Or is it that you're concerned that you're not going to get an opportunity to present evidence that you think is mitigating?

THE DEFENDANT: I haven't seen the presentence report.

THE COURT: Oh, you haven't seen the report.

THE DEFENDANT: My version I gave to Mr. Sands

and I've never seen a copy of the presentence report since then. But I have heard some of the claims that were in it because I talked to Mr. Sands on the phone.

THE COURT: So let me back up. You're telling me that you've never read the presentence report?

THE DEFENDANT: That's correct, Your Honor.

THE COURT: Can you tell me what you believe the conflict of interest that Mr. Slaughter has is?

THE DEFENDANT: My recollection of a memo when the government needed me to sign a plea agreement so that they could get authority to prosecute the case without going through their regular channels was they threatened to deprive me of counsel and attack my counsel's fees if I didn't sign the plea agreement within a couple of days, with no changes made, even though they knew I didn't agree with it. Shortly after that is when I went real manic and that's when Mr. Slaughter did the guardianship proceedings.

MR. SLAUGHTER: Different plea agreement, Your Honor. That was a different plea agreement.

THE COURT: I was just going to go back and look at the date. That was some time ago.

THE DEFENDANT: Correct.

THE COURT: Well, that plea agreement isn't relevant. The plea agreement you did sign is relevant. Now, let me go back to the presentence report. A second ago you

told me that what was in the presentence report was not correct.

THE DEFENDANT: What I've heard of it in being brought up in other proceedings, yes, sir. There are civil actions which are pending and people have been citing portions of things which I just disagree with. And Mr. Sands read to me before he filed a set of objections early in the process, he called me and he read to me some paragraphs and some responses. And that's what I've seen of the presentence report.

THE COURT: So you've never had possession of it?

THE DEFENDANT: I had it because I gave it to Mr. Sands. Apparently they gave one to Mr. Slaughter and one to me, not one to Mr. Sands, so I sent it to him.

THE COURT: Without reading it?

THE DEFENDANT: He was at my condominium interviewing me, so I think he took it with him that day. Just circumstances.

THE COURT: But you didn't read it before he came to your condominium?

THE DEFENDANT: No, sir.

THE COURT: So go back to the conflict. What is the conflict?

THE DEFENDANT: I guess the conflict -- that's what I don't know. Honestly, I'm facing a severe sentence

and I'm not even sure what the conflict is. There is a, I've been told that there is a Mr. Atkinson who helped us out in another case from Tallahassee who is an expert and I want to find out what the conflict is and what my waiver does to any of the rights that I might have. That's what I'm looking to get an answer to.

THE COURT: Well, I tell you what, if you can't articulate a conflict, I'm not going to delay the proceedings, but I will delay the proceedings for you to read the presentence report and I'll delay them until three o'clock. During that time I want you to read the presentence report.

THE DEFENDANT: Yes, sir.

THE COURT: And I want you to discuss the presentence report with your attorneys.

(RECESS.)

THE COURT: Mr. Amodeo, did you have an opportunity to read and review the presentence report?

THE DEFENDANT: I did, Your Honor. And just so I can make it clear to the court, I had read Mr. Salce's version of this before, the one that I assume was a draft. I had gone over that with Mr. Sands. The only thing I had not seen was the final version where the probation office put in Mr. Sands' objections and concerns.

THE COURT: Okay. Well, that's really not part

of the report, that's an addendum where the objections and the responses from the parties, from probation and in this case the government appear. But you did read the body of the report?

THE DEFENDANT: Yes, sir. And I read it all again this afternoon just to be on the safe side.

THE COURT: Okay. And do you have any objections as to the factual accuracy of that report?

THE DEFENDANT: Are you going to try to save me on this one, Kent?

MR. SANDS: Could I interject for just a moment, Your Honor? I think I can explain what Mr. Amodeo's position is and then he can affirm it if he so chooses.

The statement of facts in the presentence report is largely based on the statement of facts from the plea agreement. The statement of facts in the plea agreement was drafted very carefully with a certain amount of vagueness to leave the parties with the ability to argue their respective positions at sentencing on specific issues. For example, with regard to what Mr. Amodeo's intent was in December of 2004, with regard to the monies that were paid over at that point in time, the 8.9 million. Mr. Amodeo thinks that the statement of facts itself is, unless you know the fuller facts of the case, which he wants to bring to the court's attention now, is incomplete and potentially misleading. But

Mr. Amodeo agreed that the statement of facts was not incorrect.

THE COURT: That's all I'm asking. Is there anything in the report that you would object to as being factually inaccurate? As I understood what your attorney just said, the answer is no, but that there were certain areas where the facts in the plea agreement were vague and that that was intentional and that I would -- that your attorneys anticipated that was something that you and perhaps they would speak to during this sentencing hearing.

THE DEFENDANT: That's correct, Your Honor.

THE COURT: But Mr. Sands also says that those facts are pretty much the same as the facts in the presentence report and therefore they wouldn't be inaccurate. Is that correct?

THE DEFENDANT: That's correct, Your Honor.

THE COURT: And you had an opportunity to discuss the report with your attorneys, right?

THE DEFENDANT: Yes, I did.

THE COURT: Now, there also are objections that your attorneys have raised as to the probation officer's application of the guidelines.

THE DEFENDANT: Yes, sir. I've seen those.

THE COURT: And you're in agreement with their objections, is that correct?

THE DEFENDANT: I am.

THE COURT: And do you have any other objections as to the application of the guidelines that have not been raised?

THE DEFENDANT: No, sir.

THE COURT: Are you satisfied with that inquiry, Mr. Sands?

MR. SANDS: Yes, Your Honor.

THE COURT: Mr. Slaughter.

MR. SLAUGHTER: Yes, sir.

THE COURT: Mr. Gold.

MR. GOLD: I am, but still we have to get to the issue of whether he's going to testify voluntarily, but I also may be able to short circuit this a little bit and save the court a great deal of time.

THE COURT: I'm not to that point. That's where I was going until I was confronted with the possibility that he had not read the report yet. That's where I started earlier.

MR. GOLD: Okay. If I could just tell the court, I mean once we get through this, the United States is willing to stipulate pages one through 90 of the sentencing memo, not that we agree with everything in there, but that's what his testimony would be. The court can consider it for whatever reason the court wants without the necessity for further

testimony so that we don't, in effect, rehash everything. I'm not saying that everything is factually accurate, but that's what his testimony would be.

THE COURT: Okay. Going back, let's go back to the other question and that's whether you testify or not. You probably remember from your criminal law or criminal procedure course that a defendant has a right to testify during a trial and also during a sentencing, and you also have a right not to testify. It's up to you to decide whether you want to testify or not. And you indicated a minute ago that you did want to testify.

THE DEFENDANT: Yes, sir.

THE COURT: And I just want to make sure that you're doing that freely and voluntarily.

THE DEFENDANT: Yes, sir.

THE COURT: Has anyone threatened you or coerced you or intimidated you in any way to persuade you to testify?

THE DEFENDANT: No, sir.

THE COURT: Has anyone done anything that you think is wrong or unfair or unethical in order to persuade you to testify?

THE DEFENDANT: No, sir.

THE COURT: Are you ready to testify because you want to testify?

THE DEFENDANT: Yes, sir.

THE COURT: And you're making this decision freely and voluntarily?

THE DEFENDANT: I am.

THE COURT: And you've had an opportunity to discuss with Mr. Slaughter or Mr. Sands or both of them about this decision?

THE DEFENDANT: I have.

THE COURT: Okay. Anything else?

MR. GOLD: Nothing, Your Honor.

MR. SANDS: Defense would call Mr. Amodeo.

MR. GOLD: I guess we're not accepting the stipulation.

MR. SANDS: No, certainly not as phrased. That's not really the stipulation we were talking about before anyway.

MR. GOLD: Well, I can, if you want me to say that those are the facts that he believes at the present time, that's fine.

MR. SANDS: What Mr. Gold is referring to, Your Honor, is we were in the process last week of talking about a potential stipulation in the case by which the government would stipulate that the pages one through 90 of the sentencing memorandum are Mr. Amodeo's actual recollection of the events that occurred during that time period reflected in pages one through 90. We were discussing that at that point

in time. There's been a lot of water under the bridge since then. Mr. Amodeo has not indicated to me that he wants to forfeit his right to actually testify and have you assess his credibility and his account simply by reference to my sentencing memorandum. Is that correct?

THE DEFENDANT: Yes, that's correct.

THE COURT: Okay.

DIRECT EXAMINATION

BY MR. SANDS:

Q. Please state your name for the record.

A. Frank Louis Amodeo.

Q. Mr. Amodeo, how old are you?

A. 48.

Q. Just as a preparatory matter, what medications are you taking today?

A. So far today I have had 2,000 milligrams of Depakote and 40 milligrams of Geodone which is about two-thirds of my Depakote dose and about half of the Geodone dose.

Q. And that hasn't prevented you from understanding what is going on in the proceeding today?

A. No, it hasn't.

Q. I'd like to take you back and talk with you first a little bit about your background before this case. Where were you born?

A. Detroit, Michigan.

Q. And when did you actually move to Orlando?

A. 1965.

Q. How old were you at that time?

A. I was five. It would be the end of '65, beginning of '66. I don't remember exactly.

Q. How many children other than yourself in your family?

A. Four. Other than myself, three.

Q. What was your father doing for a living when you moved down to Orlando?

A. He was, he did bowling lane promotions. He was kind of a promotions manager, you know, held events to attract new customers to the venue.

Q. How would you describe your childhood?

A. My childhood was pretty good. You know, my father got really involved with little league, we played little league a great deal. Both my parents worked, financially it was a bit of a struggle, they were lower middle class. And eventually my dad got a business, but all through the struggles financially they were actively involved in our school and sports and other stuff.

Q. How did you do in school? And, again, I'm focusing now on secondary school, high school.

A. I did really well in school, particularly from junior high on I started straight A type grades.

Q. What kinds of activities were you involved in when you

were in school?

A. Early on in the middle school I was playing little league baseball, little league football. When I got to Memorial Junior High School I started things like the chess club and the math club and those type of activities, more academic pursuits. And then by the time I got to high school it was, I no longer had the hand to eye coordination of the size for the sport so I kind of dropped from the sports all together and stayed with things like building a radio station for the school and really speech and debate which became my principal activity until student government in the last year.

Q. Okay. Did you have an opportunity to actually participate in radio shows or TV shows?

A. I did. I had a -- Oak Ridge High School, we actually built a radio station and got it licensed and so I did a political commentary, how America is going to the dogs on a daily basis for probably a semester, and then I was a panelist on the Pro and Con television show which ran on channel 9 in '78.

Q. What kind of grades were you receiving?

A. I was 3.89 kind of average, just under a 4.0.

Q. You mentioned student council. Did you at some point become a part of the student council at your school?

A. Yeah, I ran for student council my senior year and was elected.

Q. What did you do, if anything, with regard to your coronation as senior council president?

A. You know, it may be my first recount of some of these events. While I was student council president, the Orlando Sentinel ran a little article that I was running the school like it was a country. I had created different layers of student government. I gave people appointments. I got authority to write, you know, passes to excuse students from classes. I had the ROTC which was acting as my personal, they were the Army, they got to actually do drills and stuff. I ran the pep rallies for the football teams and Oak Ridge had a really good football team having just integrated at the time. And so I ran some real cool pep rallies including I came in a limo and had security guards and put on displays.

I was also, I believe, the first or second student advisor to the Orange County School Board, I took that on as a formal position. And that was kind of, you know, so the senior year was kind of me creating a country. And I did it all through to the end.

Q. Had you received any kind of mental health counseling in your adolescence?

A. No, I had not.

Q. What was your habit with regard to the intake of the caffeinated beverages?

A. It stemmed from the little league and stuff and really

the family, it would be 12 to 24 Cokes a day when I was a kid. As I got to my senior year in high school I began to change that a little bit more towards iced tea, but that really wouldn't become a conversion until I got to Emory.

Q. How would you describe your interaction with other students? I mean did you have positive interaction with other students in your school?

A. Yeah, positive and limited in some sense. One of the reasons why the election really went so well is because I was the sports guy as the jocks liked me and then amongst selections they voted for me. I also received predominantly all of the black vote. I just seemed to get along with everybody. I've always been charismatic. But I didn't really develop close friendships. I mean I had maybe one close buddy in high school and a couple that were one step removed.

Q. Where did you go after high school?

A. I went to the University of Central Florida.

Q. What was your major?

A. Political science.

Q. And how long did it take you to obtain that degree?

A. Five years, I believe, or a little over their norm. I had some extra hours, but it took me a little longer than normal to get the degree.

Q. Why was that?

A. While going, I had set up a couple of businesses that were related to the cypress clock industry. My dad had moved into the cypress clock business which is those old clocks, they're shaped like that and I had discovered that -- well, actually I didn't discover, I was kind of facilitated as becoming an intermediary between the importers of the products and all the little cypress clock companies and really what that amounted to is I, as a kid, didn't mind loading it up in a van and driving around. But over time I built it into a business where I was able to get imports from Japan directly and started dealing with the import brokers. At the same time I started building the retail store, so I'd supply these guys their components and then I'd buy some of their product and I'd sell them at Belz Outlet Mall, the international shopping center, that type of thing.

Q. Now, this was while you were a full-time student at UCF?

A. That is correct.

Q. Did there come a time during your student days at UCF that you experienced an episode that you now equate with your condition, your bipolar condition?

A. Yeah. There was the first time I remember what is, what I now believe is depression was when I thought I got what I thought was sick. My parents were living in a duplex so I and my buddy from high school were renting the other

side and for two weeks, maybe a little longer, I was in bed and never got out. They brought me the stuff home from school, I studied there and I just kept saying I'm sick, I'm sick, I'm sick, and I can't get out.

Q. Did you go to the doctor?

A. You know, I didn't go to the doctor. In fact, it's still probably a bad trait of being a little too Italian ethic macho to go to the doctor. I should just stick with it through, stay there and get healthy.

Q. Why is it you associate that episode with your current condition?

A. I've now been able to read about the current condition, I've been able to study about the depressive periods of time and what really happened is I was locked into a depressive state of time.

Q. What happened?

A. I went blank. I came out of it. Literally I came out of it and that morning I told him I'd sell him the supply base because he needed it for his wholesale company, went and found my two partners which was a buddy that was staying with me and a professor in the university and told them look, I'm selling out, I'm going to law school. And the girl I had met along the way called up and said, you know, we need to see more of each other and pretty quickly decided to get married.

Q. How long, this is your -- this is not Claire Holland,

correct, your current wife, this is your first wife?

A. That's correct.

Q. How long after you met your first wife did you actually end up getting married?

A. Three months probably.

Q. And where did you end up going to law school?

A. Emory University.

Q. At that point in time where were you living?

A. When I first got to Atlanta I was living at the, in an apartment in a downtown tower at the corner of Peachtree and North, and that was right up next to Georgia Tech University which is where she was a student at, so I had picked it so that she was in walking distance to Georgia Tech.

Q. Were you a full-time student at this point?

A. I would be in eight or ten weeks. In other words, I had been accepted to Emory, so the first couple of months there I wasn't a student yet.

Q. What were you doing if you weren't in school?

A. I had started by trying to open a business called the outlet nuthouse in one of their outlet malls on Buford Highway and I had obtained a job in the evenings as a deli manager.

Q. Did you continue with any of those jobs after you started school in the fall?

A. The outlet mall was the old Buford Highway and simply

wasn't viable, so that one disappeared, but I did continue with the deli manager position once I started school.

Q. What kind of hours were you working while you were in school?

A. This was usually, you know, like 5:00 to 2:00 since I was the closer, I was the new guy, so I was working the late hour shifts at the deli.

Q. How, if at all, did that job affect your school performance?

A. In the beginning I was missing my morning property class which had been scheduled at 8:00 a.m. with Professor Alexander, and so I probably missed the, you know, six of the first seven classes, in which case I got reported -- he reported me to the dean.

Q. How was your marriage?

A. The marriage had gotten real shaky by this time and she was talking about and would shortly thereafter, I don't have the exact date, just move back on campus, move back into the dorms.

Q. So how long did you all actually stay together after your marriage?

A. Four months.

Q. Now, after the marriage had collapsed, you're still working, correct?

A. Correct.

Q. Were you doing anything else other than the working, other than going to Emory?

A. Well, at Emory, once I got before the dean, Professor Alexander said that I was really a pretty good student and they told me I wasn't permitted to work full-time and go to Emory law school, that was against policy. So by then some of the Georgia Tech guys told me how much money they were making delivering pizzas for Domino's, so I quit the deli job, I took the Domino's pizza job and I asked the dean if I could take some more classes, and she said yes. And so I went over to Georgia State University and registered in the graduate business program.

Q. So at this point in time you were at Emory law school, you were in a graduate business program and you were working at night?

A. That is correct.

Q. Did there come a time during this period that you considered a career in the CIA as well?

A. During my, after my first year of law school the CIA came recruiting on campus and I went ahead and applied to the CIA.

Q. Why did you do that?

A. Well, I was fascinated with the excitement and adventure that would come with it was the principal leading factor and I was trying to find some kind of career that was,

that the law degree would be useful for which was not law. I think I had an intuitive grasp at the time that there was a deficiency in my work at the law school which had to deal with detailed study, reading of subjects. I was really good about listening in class and memorizing things and not so good about sitting down and reading textbooks.

Q. Was that being reflected in your grades?

A. Yeah, it was. You know, interesting enough somebody observed that I tended to have better grades in classes in which I would be less likely to, in other words, some of my business classes would be lower than my others, and what that really amounted to is I made sure I attended the classes that I wasn't, didn't have a natural instinct for.

Q. Now, at this point in time how old were you?

A. 25.

Q. Had you, we've already talked about your adolescence. Had you sought out any kind of mental health counseling at this point? You've already gone through a failed marriage. You had the issues at school. Had you sought out any kind of mental health counseling?

A. No.

Q. What happened with your CIA application?

A. They passed me through the first evaluations and I never followed up on the second. I turned them down, but they had a second set of tests they wanted me to submit to.

Q. Why did you turn them down?
A. I don't know. Bad mistake.
Q. Did you continue to be fascinated by the CIA and their activities thereafter?
A. Yeah, I mean, you know, at least the television portrayal of it is exciting and interesting and that's kind of what I like to do.
Q. Did you ultimately complete your law degree?
A. I did.
Q. And what year was that?
A. 1987.
Q. And what were your plans at that point in time?
A. By then I had enrolled in the doctoral and financial economics program at Georgia State and I planned to complete the doctoral work and teach finance or economics. I liked teaching.
Q. And is that what you ended up doing?
A. No. My father had contracted the throat cancer and it was pretty severe such that he would not ever fully recover from it, even to this day, and so I knew that I probably had to go help at least a little bit about, you know, covering the family's expenses because they hadn't had insurance, so they had already lost everything by the time I would get my license.
Q. How many times did you have to take the bar exam to

get your license?

A. Just once.

Q. And that was the Georgia bar?

A. That is correct.

Q. Who ultimately hired you for your first job out of law school?

A. It was a firm called Hyatt Legal Services.

Q. Explain a little bit about what Hyatt Legal Services did at that time.

A. They are a storefront legal operation which is kind of like H&R Block, they're from the same family and so it's a related concept. And what they did is they had simple, generally speaking, what they proceeded with is simple cases, standard DUIs, trust and wills, all which could be done on forms, and kind of the one exception to that rule was bankruptcy cases. And that, you know, Chapter 7s are really easy and formalistic, especially under the rules in place at the time, and it didn't have all the convolution that exists today. But the Chapter 13 cases are, were a monster. And nobody did a good job for the debtors and Hyatt's lawyers weren't well trained in them, so that was the only kind of complicated case they did. Although some individual attorney every once in a while would take something more interesting.

Q. What role did you take on at Hyatt?

A. When I ended up, I was the guy that sat there and did

intakes, you know, partially it was because I liked doing it, I could talk to people, they seemed to like me, and partially it was because I was the unmarried single guy, so that if I was there on Saturday it was okay, you know, not family and kids. And then I became their bankruptcy attorney and that was a completely different turn of events.

Q. How did that come about?

A. Over this first summer I was doing the bankruptcy cases and the Chapter 13s and very, very simplistic financial equations are helpful to debtors in Chapter 13, but none of the attorneys were using them from what were the mills, just turning out case after case after case after case. So I would walk into court and say, you know, we need to revalue this asset. People were like what are you doing? It's a car. And I'm, like, the guy can't pay the payment now, why do you think if you put the 400 dollar payment in the Chapter 13 plan he's going to be able to pay it next month? This car isn't worth it, let's rewrite the installment. And I did that a dozen times during that first summer I was there, so that I kind of become the bankruptcy guy and they were calling me for it. And then Hyatt got in trouble and what happened is they got, there were six judges, each of them sent out a contempt citation to the firm on the same day, 36 contempt violations pending for failure to represent your client. Now, what that really was is Hyatt's system is you

got paid based on how much revenue you generated in any particular month. It was a current period month that you got the money. And so attorneys would take all the fees from Chapter 13, credit them to their account, work for a month or two, and then leave to go to a different firm. It was kind of a, you know, it was a wheelhouse. People came in and left it, so the 13 cases would get kind of abandoned. And Hyatt's solution to that problem was to give me all the bankruptcy cases.

Q. And how many bankruptcy cases did you take on just as a standard caseload?

A. There was about 454 new filings a year, 254 to 454 new filings and about 2,000 cases. I think the first day I got 400 from Hyatt.

Q. At that point in time how did you rank so far as you knew among bankruptcy filing attorneys in the Atlanta area?

A. Top three in Atlanta and certainly the top hundred in the country.

Q. And how long out of law school were you at this point?

A. Four months.

Q. What was going on in your personal life at this same time? And again, we're focusing on those first years at Hyatt.

A. Claire Holland had come to Hyatt via a class action background where she was a litigator, but couldn't litigate

and take care of her son any longer, so she had come up to Atlanta and kind of taken the first thing that was available which was a Hyatt, you know, assistant manager type position. So I had met her when she came in to be interviewed by my manager at my office, and I eventually would date her and get married a couple of months later.

Q. Okay. So how long in this instance, we're talking about the second marriage now, after you first met Miss Holland did you actually get married?

A. I met her in the summer of '88. I first dated her at the New Orleans and Atlanta football game, so between September and December of '88 I had my first date and got married.

Q. You mentioned her child. Did the child have any special needs?

A. Gentry is ADHD Downs syndrome and has some other medical conditions.

Q. Do you recall a foundation by the name of the Euralius (ph) foundation?

A. Yes.

Q. What is the Euralius foundation?

A. It was actually me and a couple of my buddies from Georgia Tech, we were putting on this great and glorious think tank that we were going to be.

Q. And what was the focus of the foundation?

A. Develop new thoughts and concepts that would revolutionize the world and, you know, it was, you know, it was kind of a group of guys that this is what, the label we needed to hang out together and talk about things that didn't seem to have any practical significance.

Q. Did that go anywhere?

A. No, it did not. My wife got upset with it when she found out it was kind of what she viewed as a facade and I just quit and then it kind of faded away.

Q. Did you ever tell people around the Hyatt offices that your family was extremely wealthy and lived in a compound?

A. Yes.

Q. Do you know why you did that?

A. No, I don't.

Q. Did Miss Holland ever ask you to seek out during this period of time any psychological counseling? And, again, I'm focusing on this early period of time.

A. Depends on how much you mean by early. '88, no. '89, no. But somewhere in the beginning of the early Nineties there was a couple of occasions where she wanted me to go see a psychiatrist.

Q. Did she have any particular or articulate to you any particular concerns about caffeine or the use of prescription medication?

A. She became -- she used to be a pharmacological

salesperson so she became very concerned about my using the asthma medicine called Isochlor, and when her own research on it and I guess the FDA eventually agreed because they banned it was because it was a psychotropic and when you take it, you could like, you know, taking LSD.

Q. Did she tell you with respect to particular behavior you had why it was that she was concerned?

A. Only because I was, you know, hearing helicopters come by. She gave me recounts of stuff that I don't remember, some of which that I was saying and doing and she pretty much insisted that I stop taking the Isochlor.

Q. Did you do that?

A. I did stop.

Q. Did you, however, substitute anything in its place?

A. I did.

Q. And what was that?

A. Sudafed. She had told me that the over the counter dose is about half of the prescription dose, and so I started taking four Sudafed four times a day for my asthma condition, in my mind, and what I was taking it for I believe was for the asthma condition. And I would take that all the way till I was sent to Williamsburg boot camp.

Q. How much were you taking?

A. 16 Sudafed a day.

Q. Did you tell her that you had done that?

A. No, I didn't.
Q. Why didn't you tell her?
A. Probably because she yelled at me. Taking too much.
Q. You have another child, Mia, correct?
A. I do.
Q. When was Mia born?
A. 1990.
Q. Is she your only child together?
A. She is.
Q. After Mia was born in 1990, did that change the dynamics at your house in terms of the employment situation?
A. Yes. Claire chose or we chose together for Claire to not work, to really give up her law career and take care of the children, especially Gentry. Gentry's father was a real problem and, you know, it continued to be until he's passed away now. And Claire had also become, you know, disappointed in the adversarial process. She thought the litigation, and started looking at mediation, knowing that she could maybe do some mediation stuff, which was very new at the time, really from the house on very great occasions, but most of her effort would be spent towards raising the two kids.
Q. Now, did you, in connection with her leaving her job, did you change your professional career at all?
A. Yeah. Hyatt ended up with -- Hyatt ended up giving me an opportunity and then they said that if I did it, if I

would practice separately, they would send me all of their bankruptcy work. They gave me an office, they just turned over the office to me without any cost and said that they would refer the cases down to me, and they keep the first $200 bucks and that's what their attorneys got and we got all the rest of the money on the case, that is me and my office would collect the balance, and so I set up the law firm of Amodeo, Durden and Thompson. Originally Amodeo and Durden, and Thompson who is a pretty experienced bankruptcy attorney joined a few months later.

Q. And at that point were you primarily doing bankruptcy work?

A. No. It was really, it was -- I was primarily doing bankruptcy work. The rest of the firm had taken on some other kind of litigation.

Q. How long did that firm survive?

A. Eighteen months to two years.

Q. What was the cause of its demise?

A. Claire came in one day and saw how badly we had managed the bank accounts and the trust accounts of the thing and basically told me this is not how a law firm is run, go shut it down.

Q. Was Claire, Miss Holland, the only one that was complaining?

A. Yeah, and she wasn't even part of the firm. She just

had come in one day and was looking around and happened to talk to Scott Walker, who was like the manager, and Doug Erickson, who was my executive assistant, and then that evening she told me. Lawyers don't behave like this, you need to stop.

Q. Wasn't it also true that there were bar complaints mounting at that time about lack of activity in bankruptcy cases, etcetera?

A. That was before the Hyatt time. I don't believe it was when Claire actually had closed it down. I don't think any bar complaints had been filed against me or maybe one had. She wouldn't have known that. She just saw how sloppy it was.

Q. Did you ultimately shut the business down?

A. Yes.

Q. And when was that?

A. Right within the next month or so I -- we had a receiver appointed who was to wind up the affairs of the business and start dividing up the cases amongst the attorneys.

Q. Did you ultimately have to deal with bar complaints as well?

A. I did.

Q. And why was that?

A. Most of it dealt with the money issues. There were a

couple that were kind of strange that actually ended up being fought out like I lent money to a client -- Mr. Durden had a criminal case, a bad check case, didn't show up, client's going to go to jail. The only way out of it was for the client to pay off the check. I lent the client the money to solve the problem and then I got hit with a bar complaint because I wasn't supposed to lend clients money.

Q. Isn't it a fact though that there was a lack of internal controls in your firm and that clients weren't being serviced in an expedient manner?

A. That's correct.

Q. How did that affect your bar license?

A. That became, the lack of attention to the clients became a big problem, especially until I started taking the cases. As I closed the firm, I started working the cases myself and wasn't bringing in any new cases. What that caused to happen was the money ran out because the money came on the new cases, not the old cases. And so if anything caused the lack of internal controls and the mismanagement of the funds, it was because there was no more revenue generation, so the firm cycled into collapse. So much that the receiver couldn't pay the storage unit and they threw all the documents out.

Q. How did you end up dealing with the bar complaints?

A. I eventually just surrendered my license.

Q. And what year was that?

A. '93, '94 I believe was when the suspension occurred and '97 is when the disbarment took place.

Q. Now, at this point in time when the old, when the law firm business has collapsed and closed, did you make a move from where you had been living?

A. Yes. In between I had built up clients who were in business, and so I stayed, I moved into those businesses in Atlanta. One group of businesses was actually in Puerto Rico and so I started working with all of those companies, both in Atlanta and other places, but primarily from Atlanta. And then in '94, the end of '94, the beginning of '95, the partners in Atlanta had problems with the Puerto Rican situation, and because it was, you know, I was the youngest person in it and I needed the money the worst, off to live in Puerto Rico I went. I would commute back and forth for a while.

That had a lot of problems. One, Claire and the family was getting all kinds of aggravation because of my conduct, so people were knocking on the door, that type of thing. And number two, taking care of the kids without any support structure whatsoever was burdensome on Claire. So they moved to Orlando and we came down here in '95.

Q. Did you buy a home or did you rent?

A. We rented.

Q. What was your financial condition in 1995?
A. It was pretty much, you know, paycheck to paycheck in '95.
Q. Now, did you have a steady paycheck?
A. When I was in Puerto Rico at the beginning of it, I got a good contract right after the businesses that I went down to be involved with were closed and that lasted for about six months. After that, no.
Q. What did you do to try to support yourself once you had come down to Florida?
A. I ran into a friend of mine who was an accountant and he had some cases which were just difficult to handle, and he wanted to -- and I gave him solutions, and suddenly it developed into a pretty decent working relationship where he would get clients with hard problems, I would figure out how to solve those problems, tell him about it, and he would go do it.
Q. Were these typically tax debt workout type problems?
A. Tax controversy work, Department of Labor prohibited transaction issues.
Q. Now, did there come a point in time after you first moved to Orlando that your wife again brought up the subject of your mental condition?
A. She couldn't figure out why I couldn't hold anything that looked like a steady job, and frankly she couldn't

figure out why with all the credentials I had that I hadn't gone ahead and got a real position at a real place. And so one day she said you're not coming back in the house if we don't go get you evaluated, and she drove me over to the Princeton Center Life to have an evaluation.

Q. Now, how if at all was that connected to Social Security disability?

A. It was a precursor to that. They wanted to admit me when she took me there, but we didn't have insurance, so --

Q. Did you ultimately have an evaluation to determine whether or not you might qualify as disabled under Social Security in order to receive the kind of mental healthcare treatment that she thought you needed?

A. Yeah, that was actually the next event. Once Princeton said we couldn't come without the funds, Claire --

Q. May I approach, Your Honor?

Let me recapitulate. You went to Princeton Behavioral Center in Orlando and they recommended a course of treatment, but you could not afford it at that time, is that correct?

A. That's correct.

Q. And as a result you sought a Social Security disability determination?

A. Yeah. Claire made me go to Social Security, see if I could get a disability determination, not so much for the

disability funds, but to get the Medicare treatment and get treatment for the condition.

Q. What happened?

A. I went to an interview and they turned me down actually.

Q. Do you recall who you were examined by?

A. Sidney Urashami.

Q. And do you recall anything about the tests or examination that was administered to you by Dr. Urashami?

A. Yeah. It went on for a while and she talked to me about all the up and coming business activities I was going to have and what I understand now is part of the evaluation was financial qualifications. And then the rest was the stuff that I've been experiencing for the last couple of years.

Q. Well, what if anything did you tell her about your financial circumstances?

A. Without knowing the events, I probably bragged about a whole bunch of prospects.

Q. Were you ultimately able to receive Medicaid based on disability?

A. No.

Q. What if anything did you tell your wife about this evaluation?

A. Really just that they had turned me down.

Q. Did you obtain any form of alternative mental health treatment at that time?

A. No.

Q. When was the first time that you actually started getting any kind of treatment?

A. First time I got any treatment was with Dr. Louis at Pensacola.

Q. What about Dr. Tell?

A. I had a written test evaluation with Dr. Tell and I think I may have had a couple of sessions with him before I went to Pensacola, but he was -- that wasn't so much sessions with him, he was trying to lay out a plan of action. I think at the time he really thought I just needed to talk to somebody to start with and we never got to a conclusive treatment plan, in great part because I didn't have the money. I mean it's the same thing over again.

Q. Based on your few treatments with Dr. Tell, what was your understanding, if any, about what you were suffering from?

A. I think with Dr. Tell I had no understanding. I mean there was no description of either the bipolar condition or anything else, it was just that, you know, I kind of was like not adjusted socially and I needed somebody to talk to.

Q. At this point in time had you begun working with building contractors?

A. I had.
Q. And tell the court about that.
A. One of the ways in which I had discovered that I was helpful is as a salesman and the contractors would often need somebody to assist. Bidding is part of the process, but the other part of the process is selling the services and what we can do better and what we need to do better, and so I began to work with different contractors on helping them get jobs, and sometimes helping them get capital. Mico Construction didn't have enough money to get a bond. Alcabuto had money. I put them together and got a little bit of the profits for brokering the transaction.
Q. This would have been in the late Nineties?
A. This was in the late Nineties.
Q. Now, you mentioned a moment ago in your testimony that you subsequently got some treatment in Pensacola. How is it that you ended up in Pensacola, Florida?
A. In the, in 1998 I was contacted by the postal inspector who said that there was a grand jury investigation going on in Atlanta and they needed me to testify, and I went and asked them if they would do it here and they took the interview at Tradeport. I had no clue it was about me at the time, and eventually got indicted for a mail fraud charge after that interview. And the sentence was to go to the shock incarceration program, the federal boot camp.

Q. Let me step back for a second. What if any connection did that mail charge have to your previous practice?
A. It was the last client, I mean literally it's the last client in the door. The mother-in-law -- Lance Santiago was the client. He came to me and threatened to sue for malpractice because his case had been taken over by Rich Thompson. I agreed to take the case back, but only if $50,000 would be put in escrow and we would use that for the case. I told the mother-in-law it would only be used for the case. And then I discovered the case was an impossibility and we're going to burn the 50,000 up in fees immediately if they weren't already earned, so instead of wasting the money in the estate, I let Lance who was in Puerto Rico and join the Puerto Rican project and take his money with him or most of it and I didn't tell the mother-in-law.
Q. So you ultimately pled guilty to using her money for this real estate project, is that correct?
A. Correct.
Q. What was the sentence that you received from the court in that case?
A. Two years and the boot camp program.
Q. And you mentioned Pensacola.
A. The boot camp program is at Williamsburg, Pennsylvania, and that's the strange part about this. It's a tough program and I had the best time I had had in years.

Q. Well, let's step back for a second. What was your original sentence from Judge Tidwell?
A. Twenty-four months and then three years probation.
Q. All right. And you served that in a boot camp program?
A. I served six months and eleven days in the boot camp program and then I was supposed to do six months at a halfway house and some home confinement.
Q. In connection with that original case, did you receive any mental health evaluation?
A. No.
Q. While you were --
A. While I was being -- during the presentencing report stage of the first case, the presentencing office, the probation officer asked my attorney if I had had a mental evaluation, and to that point in time I had not, and she said I don't understand it, you need to go have him have an evaluation. I had an evaluation done by a gentleman I know now to be Dr. O'Hagen and I have never seen that report. But that was the only mental evaluation I did and it was done at kind of the poking of the probation office.
Q. What if any changes in your lifestyle -- strike that.
Did you change your Sudafed, caffeine practices while you were in prison?
A. Yeah. While I was at the boot camp I had become

captain of the team and so the PA said he couldn't give me any more Sudafed because either the inmates would get me to switch with them and then I'd get, Mr. Perfect would get gigged, or I would trade it and the guards would come and see me. So basically they said you have to stop taking it. And what you do is you take your inhaler and you run. And I got to be a pretty good runner at the time and I stopped taking all the Sudafed. They only let you drink Coke once a week at the boot camp. You drink water. So --

Q. Looking back on it, did that result in any changes to your behavior?

A. While I was at the boot camp it was a completely different world, but as soon as I got to the halfway house, I was, I said it was the Florida allergies and I was back on the caffeine and the Sudafed.

Q. Where were you at the halfway house and when did that start?

A. The halfway house was, had to be the end of August just timewise and it's the one that used to be in Maitland. And I was there from August, really didn't have anyplace to go, Claire had moved out of the area, so I just stayed as opposed to moving towards home confinement.

Q. What had Miss Holland done with the children at this point in time? You said she moved out of the area?

A. She moved out of the area and had the kids with her.

Q. Once you got to the halfway house, what did you do for employment?
A. Went back to work for the accounting firm and --
Q. This is the accountant that you had met?
A. Beforehand.
Q. Previously?
A. Yes. And started working on the same kind of construction brokering arrangements that I had just begun to develop when the postal inspector had first come about.
Q. Now, as a practical matter, explain what those brokering events entailed.
A. Contractor needed to have staffing. I'd go find the staffing company, I'd find the contractor, and I'd get paid a commission for putting the two together.
Q. How many hours a day were you allowed to be working while you were out of the halfway house?
A. Probably nine or ten.
Q. How many hours a day were you actually working?
A. Nine or ten.
Q. Were you working while you were at the halfway house?
A. Oh, yes. When I got back I would be on the cellphone calling up trying to put the deals together.
Q. And what if anything happened with regard to your supervised release as a result of your business activities?
A. Halfway house or the supervised release?

Q. Were you able to complete that supervised release period successfully?

A. Yes, I was.

Q. Okay.

THE COURT: How about the halfway house, did you complete that?

THE WITNESS: No, sir, that's where I was going. During January, the last month of the halfway, I was signed out to a client's office as opposed to the main office. They called and I got violated for being at the wrong place. I was at the client's office, but I wasn't at the accountant's office, and then I was sent back to Saufley Field. That's where I first got real medical treatment was they happened to have a psychiatrist there and she said she was only one of two that remained, and Claire talked to her on the phone and she actually took me in and gave me an evaluation and started paying attention.

Q. Do you recall that psychiatrist's name?

A. Dr. Louis. I believe I've seen it as Janet Louis since then, but she was always Dr. Louis to me.

Q. Do you recall what her diagnosis was?

A. The psychothymia was what her diagnosis was. Here's what she told me. And I have the materials on this. She said she couldn't do a complete diagnosis because the BOP didn't have the resources. She said it was at least mild

bipolar disorder and she said it was caffeine and Sudafed psychosis. And she gave me a whole slew of materials which I just dredged up on caffeine psychosis which she said was the effect of the quantity that I was drinking while in jail and that I had to start cutting back immediately and stop all cold medicine. And I've not taken any cold medicine since then, although the caffeine has gone up and down since that time.

THE COURT: Before we get too far down the road I wanted to ask you a question about surrendering your license in Georgia. Did the Georgia bar pursue your license? Were they in a position of engaging in proceedings to have your license revoked?

THE DEFENDANT: Yes. They had filed a couple of actions where I got reprimanded and then they had like 12 more pending, and I agreed to a voluntary suspension, but I was still contesting some of the actions.

THE COURT: Were there disbarment proceedings under way?

THE DEFENDANT: They were under way, yes.

BY MR. SANDS:

Q. You were talking about Dr. Louis's recommendation with regard to the Sudafed and caffeine. You did change your practices with regard to those drugs?

A. The Sudafed completely. The caffeine was, I reduced

it immediately, though I said I have back slid on occasion.

Q. When were you actually released from the prison camp on the violation of the supervised release?

A. It was September of 2000.

Q. Okay. And at this point in time where were you living?

A. I didn't really have a place. When I got done that time I was picked up, my accountant friend had came and picked me up and I came back here, Claire had gotten a job with an overseas project with USAID and I came back and kind of stayed with my family, either my dad or my brother for a couple of weeks while I found a place to rent.

Q. I think you mentioned before, Claire is an attorney, correct?

A. That's correct.

Q. And at this point in time she was working as a mediator?

A. She was working as a mediator.

Q. And what exactly was she doing for USAID as a mediator?

A. In this particular case it wasn't as a mediator. She was establishing a rule of law program in Kurdistan. And so she was one of a team of U.S. lawyers that went over there to help them institute different rule of law procedures including alternative dispute resolutions which was her

specialty.

Q. Now, while she was over there, what was being done with the children?

A. I took care of the children.

Q. Did you actually, after finishing your stint in prison and your period of treatment with Dr. Louis, did there come a point in time when you saw another therapist?

A. Yes. When I came back I pretty quickly went to Dr. Joseph Trim.

Q. Where is Dr. Joseph Trim's practice located?

A. It was on Lee Road originally and now it's moved downtown.

Q. And how long did you actually treat with Dr. Trim?

A. It was quite a while because I was actually in his office during 9-11. We were both in his office when 9-11 happened, and that was still on Lee Road, so maybe a month or two after that I began to run, you know, just short on money again when he moved downtown. So a year, over a year.

Q. So did you stop seeing him because you had run short on money?

A. Yes.

Q. Did you seek out any other kind of mental health treatment at that point in time?

A. I didn't, but I developed -- the probation officer who was handling supervised release for me is Scott Fanelli and

he, you know, had noticed the difference when I was in counseling and not, and so he came to me and said that the Bureau of Prisons would be willing to help me modify my supervised release order requiring me to have regimental health counseling, and then they'd be able to pay for it and the money wouldn't matter any more.

Q. And did you do that?

A. I did that.

Q. And who did you see?

A. A therapist named Diane Shuker.

Q. Do you know if her appraisal of your mental condition was any different than what you received previously from Dr. Louis?

A. Not that I know of, no.

Q. How often did you see her?

A. I'm pretty sure it was a weekly visit.

Q. At this point in time had anyone suggested that you take any kind of medication for bipolar condition?

A. Dr. Trim had suggested that I go to Dr., I want to call him Chekov, but that's Star Trek. He's pretty well-known in the area as a psychiatrist and he was the one to go there for an evaluation because he thought it may be biological and that medicine might be required.

Q. Speaking of Star Trek, is the Terran empire, does that have anything to do with Star Trek?

A. No. The only time it came up in Star Trek at all was when Kirk went into an alternative universe. It has nothing to do with Star Trek otherwise.

Q. You heard reference to a Terran empire. Do you derive that term from Star Trek?

A. No. It probably was derived from, you know, years and years and years of science fiction. I have no doubt that that's where the concept originally came from, but the underpinning thoughts still exist and in this case it was a much more narrow version.

So this doctor here in Orlando, I went to see him one time for the evaluation and it cost like $200 for 15 minutes, and I just couldn't afford it. I mean there was just no money for it and I couldn't go back to him, and that's when Dr. Trim said you got to pay me too and you're $400 behind.

Q. This was after the termination of your supervised release?

A. No. This was during supervised release.

Q. When did your supervised release actually terminate then?

A. September of '03.

Q. Well, so after you've gone to this doctor, did you seek out and obtain any additional mental health counseling?

A. After I went -- well, that was Diane Shuker. Trim and

this other doctor were at the same time.

Q. Right. And did you continue to see Trim?

A. Then I was out of money at the same time. Then within a couple of weeks or a month, I was done with Trim and I was with Miss Shuker.

Q. Okay. And when did you stop treating with Miss Shuker?

A. When the day, when supervised release ended, then I was done with Miss Shuker because I was there under the government's contract.

Q. Would it do violence to your recollection if I said September of 2003?

A. No. September 2003.

Q. Now, at that point in time I take it that you're without any ongoing mental health counseling?

A. That's correct.

Q. At that point in time what was your stance with regard to any Sudafed type drugs?

A. I was taking none. I thought I was cured.

Q. Were you completely abstaining from caffeine?

A. No, I was not.

Q. What was your practice with regard to the intake of caffeine at this point in time? Again, this is late 2003.

A. A gallon of iced tea a day.

Q. Did you understand that that could cause problems?

A. No, because that was so much less than before, I thought I was okay.

Q. What had you been drinking then?

A. Probably two and a half times that amount.

Q. At this point in time, and again, I'm talking about end of 2003 into 2004, did you become acquainted with a gentleman by the name of Dr. Robert Pollack?

A. I did.

Q. How did you meet Dr. Pollack?

A. Brenda Detreville and Woody Johnson brought Dr. Pollack around one day and said this is a guy you have to meet, he thinks like you do.

Q. Okay. You mentioned two other people. Explain who they are and how you knew them.

A. Woody Johnson was one of the, was a marketing consultant and was with Matrix Network, Inc. And I met him when he was trying to sell advertising services to one of the distressed print companies that I was working with. Brenda Detreville is a local media, I don't know exactly what she does, but she kind of flits around among all the different media here and does some promotions and other stuff. She was a good friend of Woody's from a firm they worked at together. They both knew Dr. Pollack.

Q. Now, at this point in time, this is after your supervised release, what were you actually doing for a

living?

A. I was doing the distressed consulting work. One of the things that happened by this time is people in the telemarketing business had found that I was a convenient choice to help close their businesses down and that, you know, I had gotten, my understanding now looking on it partially because I was willing to take inordinate risk, but at the time I just thought I was great at it. They'd pay me a reasonably large sum of money and I'd go and shut down their troubled businesses.

Q. Now, getting back to Dr. Pollack for a moment, did you establish any sort of doctor patient relationship with him after you met him?

A. Dr. Pollack told me -- the only thing he ever did with me in terms of a doctor-patient relationship, on a couple of occasions and maybe it was even one occasion with like three refills, he gave me an albuterol prescription to take as a inhaler for my asthma, and he referred me to an EMT and to a dermatologist.

Q. Did you ever discuss your mental health issues with Dr. Pollack, including letting him know what your prior history had been in terms of seeing other doctors and therapists?

A. Yes. I generally told the story to all the people that were involved and the bipolar condition was one of the

elements with Dr. Pollack that was literally asked to watch out for me, and he, at one time I was publishing the bipolar condition on my website and Dr. Pollack came in and scratched it out and said we want to say medical condition. Bipolar conveys the wrong message when it's on your website. But part of Bob's function was to tell me if I had gone over the edge because I was, I had done it in the past and, you know, the easy way for me to recover is I'd go home and I would sleep and I would tend to be better.

Q. Now, when you say part of his function, would you step ahead a little bit to his future role?

A. Not in 2003 but in 2004. 2004 is when it happens.

Q. Now, did you -- you mentioned Matrix. Explain to the court briefly what exactly it is that Matrix did back in 2003, 2004.

A. Kind of a loose knit group of consultants. Typically they were middle aged executives who had been, you know, displaced from large companies and they kind of got together and they would look for different kind of work to do, whether it would be a profit improvement, whether it would be a marketing plan, or in many cases, what attracted them to me was I could get clients and they would work on them.

Q. What if any connection did Dr. Pollack have to Matrix?

A. He became one of Matrix's principal officers, principal consultants. I mean they didn't call themselves

officers, they were members or shareholders or something like that.

Q. When did you first begin doing some work with Matrix?

A. 2003. It got started because the Matrix guys, there was a case from my accounting friend that the Matrix people did all the work on. That was how it got started. And then I was using the Matrix people to do litigation support in a civil action that was taking place in South Florida, Smith International case. So it would be 2003.

Q. What was your understanding as of say late summer of 2003 of the financial condition of Matrix?

A. It was in pretty bad shape. They were, they struggled all the time. It was always how do I get money to pay the next set of bills and can we pay the rent. And Woody did a pretty good job of making sure that the essentials were paid, but they weren't making any money.

Q. At this point in time, before any kind of restructuring, who were the main principals at Matrix?

A. Bob Flynn. Woody Johnson. Bob Pollack had been added. John Murphy. Dan Jittu. And then it would be Bob Curry, Dan Myers, Jason Carlson, Tom Broadhead.

Q. Obviously there's mention in the sentencing memorandum of the woman by the name of Edie Curry. What if any relationship is there between Bob and Edie Curry?

A. Edie and Bob are sister and brother and Tom is Edie's

husband.

Q. Now, did the company actually go through a reorganization as part of this adding personnel?

A. Yeah. They became Matrix Network Orlando because Tom brought in input of $125,000 in capital so they became Matrix Network Orlando when that event occurred.

Q. Where were they located?

A. It was in the Wachovia Bank building on the 14th floor. Matrix originally was in the beer can building sharing space with (INAUDIBLE), and then when Tom put in the money and Hughes moved out of the Wachovia building, that floor was able to be rented really cheap. In fact, Jim said Rihanna and Tom Broadhead bought all the furniture on the floor for a dollar. They went over to Hughes and got them to sell 50 offices for a buck and then they rented the floor. November of '03, I believe.

Q. I'm sorry. In connection with this restructuring, did Edie Curry ultimately become involved with the company?

A. To start with, Edie Curry came down -- Bob Curry got Edie to come down and have lunch with me and spend an afternoon because Edie Curry was the skeptic and she went through and listened to my war story and went back to Bob and said this will be probably a pretty good deal for you guys, but not so much for me, I'm going to keep my own company up here in Virginia, which was Brookmeade Group. And so Matrix

Network Orlando forms, it associates with me, and Edie is kind of out of the loop for the, I mean not, she was in on phone calls, you know, and was hearing what was going on, but wasn't really involved in the first few months.

Q. What did you understand about her background back then?

A. She was an attorney, I thought she was a CPA, I know that's not the case now. She had been the highest ranking woman at Nestle and she had handled the insider trading investigation of Capital One's executives.

THE COURT: Before you go too much further, tell me again about the website and Dr. Pollack.

THE DEFENDANT: I have on my website, I published that I was a convicted felon, that I had been bankrupt and that I had been disbarred.

THE COURT: And he just said change it to a medical condition?

THE DEFENDANT: Well, and I also put on that I was bipolar. And he said scratch the bipolar and make it a medical condition. I left the others on. Mr. Holtz didn't want me to, but I told him, you know, I've gotten through these three years by being straightforward with everybody about what my background is, but I did change the bipolar condition to medical condition at Dr. Pollack's request.

AMODEO - DIRECT - SANDS


BY MR. SANDS:

Q. Can you let the court know when that was?

A. That was '06, maybe late '05, early '06. I mean I have an example of it in the notes.

Q. And what company is this with respect to, the website?

A. AQMI Strategy Corporation.

Q. Now, did the reorganization, so far as you know, solve Matrix's financial problems?

A. No. They took on a company called Sports Magic something which was a Bob Curry client, and it ate up all of Tom's money in like 60 or 90 days.

THE COURT: Mr. Sands, we're going to go ahead and wrap it up for today. Let me ask you to consider what Mr. Gold said earlier about the 123 page memorandum. I know the exact number of pages.

MR. SANDS: Did you read them all?

THE COURT: Oh, yes. That's why I knew about the halfway house. But that's not to say that you can't continue to do what you're doing. I'll let you do that. But it may be better, you may want to consider leaving that in place and accepting the stipulation that that's what's contained in there is what Mr. Amodeo considers to be the relevant facts leading up to the, all the way up to the sentencing, I guess.

The other thing is it would free you up to ask questions about those areas that are vague, rather than

merely repeat what is already there.

MR. SANDS: I understand, Your Honor, and I'll talk with Mr. Amodeo.

THE COURT: I understand about Edie and her brother and all that because I read it here.

MR. SANDS: And I appreciate that. And I will talk with him about it and see what he will agree to.

MR. SLAUGHTER: Your Honor, could we have that room left open? It's raining and that way we can talk without running out in the rain.

THE COURT: Yes, I'll make arrangements somehow for you, Mr. Slaughter. It's a thought. I'm happy to listen to it. And hearing something is different from reading it, but I want you to make good use of your time and I want to assure you that I have read it and --

MR. SANDS: I appreciate that. One thought I'm throwing out and Mr. Amodeo can hear it too, we're certainly interested in actually based on the fact, obviously this is a pretty comprehensive sentencing memorandum in terms of the facts at least, and we're interested in hearing back from the court obviously in terms of what questions you have after having read it and what you think is important. And we certainly want to be responsive to that.

Also, in terms of being able, if the court so wishes, to play video that I only referred to, you know, in

various parts of the sentencing memorandum, if you want to hear particular parts, maybe you want to hear an entire meeting or a bigger section --

THE COURT: I'll tell you what I'm primarily interested in right now is those areas that you and Mr. Gold deliberately left vague in the sentencing agreement because I don't know what that is. I mean I don't know what you're referring to there.

The conduct that is described in the sentencing memorandum is very complex. I mean it warrants drawing pictures perhaps at points to keep everybody straight, but stuff we're doing now, I've got that down pat already.

MR. SANDS: Right. And, of course, we're just really getting into the time period of the actual indictment. But your comments are certainly heard, Your Honor, and we'll talk about it.

THE COURT: Miss Darley, would you see if you can give them a room.

MR. SLAUGHTER: The room was open, I just wanted to make sure we could use it while we wait for the rain to stop and modify our presentation.

THE COURT: We'll be back tomorrow at nine o'clock.

(HEARING RECESSED.)

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*s/ Anthony Rolland*

ANTHONY ROLLAND