**State of Florida**

**County of Orange**

### AFFIDAVIT

I, Steven McCabe, being duly sworn, depose and state the following:

1.      I am a Special Agent with the Criminal Investigation Division of Internal Revenue Service, Department of Treasury, and have been a Special Agent for fourteen years.  In my capacity as an Internal Revenue Service Special Agent, I have participated in numerous money laundering investigations, during the course of which I have conducted physical and electronic surveillance, executed search warrants, reviewed voluminous bank records, and analyzed complex financial transactions of individuals laundering money.  I have also had experience in debriefing defendants, participant witnesses, informants, and other persons who have personal experience and knowledge of the amassing, spending, converting, transporting, distributing, and concealing of proceeds of money laundering.

2.      This investigation is being conducted by the Internal Revenue Service (IRS).  The investigation thus far has consisted of physical surveillance, certain interviews and records requests, undercover operations, public record checks, and analysis and examination of bank records and other miscellaneous documents.  Any facts or circumstances which are mentioned in this affidavit are familiar to me either through my direct participation in the related investigation or from my discussions with witnesses and other Special Agents.  I have familiarized myself with all of the documents and records obtained thus far in this investigation, either directly or from a

1

review of reports and records.  This affidavit is being submitted for the limited purpose of establishing probable cause to support the civil forfeiture complaint against:

a.    2006 Black Harley Davidson Motorcycle, VIN # 1HD1BWB156Y077592;

b.    2006 Mercedes Benz CLS 500C Coupe, VIN # WDDDJ75X46A032858;

c.    2006 BMW 750Li, VIN # WBAHN83536DT30059

d.    2006 Mercedes Benz CLS 55AMG, VIN # WDDDJ76X66A055945

e.    Gates Learjet Model 25D, Aircraft Number 4488W;

f.    $253,487,45.00 in proceeds seized from the trust account of the law firm of Balch Bingham LLP located at 1710 Sixth Avenue North, Birmingham, Alabama 35203;

g.    $101,393.86 in proceeds seized from the trust account of the law firm of Shutts Bowen at 300 S. Orange Avenue, Ste 1000, Orlando, FL 32801;

h.    $42,419.72 in proceeds seized from the trust account of the law firm of Mateer and Harbert at 225 E Robinson St, Orlando, FL 32802;

i.    $100,000.00 in proceeds seized from the trust account of the law firm of Maher, Guily, Maher PA located at 631 W Morse Avenue, Suite 200, Winter Park, FL 32789;

j.    $105,922.96 in proceeds seized from the trust account of the law firm of Martin, Pringle, Oliver, Wallace, & Baur LLP located at 100 N. Broadway, Suite 500 Wichita, Kansas 67202;

k.    $50,000 in proceeds seized from the trust account of the law firm of Bieser, Greer & Landis LLP located at 400 National City Center, 6 North Main Street, Dayton, OH 45402;

l.    $8,518.30 in proceeds seized from the trust account of the law firm of Allen, Dyer, Doppelt, Milbrath & Gilchrist PA located at 255 S. Orange Avenue, Suite 1401, Orlando, FL 32802;

m.    $25,000 in proceeds seized from the trust account of the law firm of Valenti, Hanley & Robinson PLLC located at 401 West Main Street, Louisville, KY 40202;

n.  $10,000 in proceeds seized from the trust account of the law firm of Brown, Stone, & Nimeroff LLC located at 1818 Market St, Suite 2300, Philadelphia, PA 19103;

o.  $21,900 in proceeds seized from the trust account of the law firm of Hunt Rudd PA in Salt Lake City, Utah;

p.  $41,029.54 in proceeds seized from the trust account of the law firm of Ford & Harrison PA at 300 South Orange Avenue, Suite 1300, Orlando, FL 32801;

q.  $12,528.51 in proceeds seized from the trust account of the law firm of Broad & Cassel seized from Orlando, FL;

r.  $20,754.19 in proceeds seized from the trust account of the law firm of Latham, Shuker, Barker, Eden, & Beaudine LLC at 390 North Orange Avenue, Suite 600, Orlando, FL 32802;

s.  $13,100.99 in proceeds seized from Fifth Third Bank Account No. 7440599020 in the name of Soone Business Development;

t.  3801 Carolina Avenue, Richmond, VA 23222;

u.  614 Lake Avenue, Orlando, Florida 32806;

v.  709 Euclid Avenue, Orlando, Florida 32806;

w.  1159 DeLaney Avenue, Orlando, Florida 32806;

x.  4905 Research Drive, Huntsville, AL;

y.  Proceeds of the sale of 509 Riverfront Parkway, Chattanooga, Tennessee;

z.  102 West Whiting Street, Tampa, Florida;

aa.  A promissory note in the amount of $3,500,000 dated on or about May 7, 2007 between Wellington Capital and Worker's Temporary Staffing Inc. which includes payments of $63,000 per month; and

bb.  A promissory note in the amount of $5,500,000 dated on or about May 27, 2007 between Mirabilis Ventures Inc., and Conrad D. Eigenmann Jr. which includes semi-annual payments.

3

## BACKGROUND

3.     FRANK L. AMODEO is a disbarred attorney formerly licensed in the state of Georgia who had been convicted in federal court in Georgia of committing fraud. The conviction resulted in a two year prison sentence. AMODEO's conviction was a result of stealing funds from a client. AMODEO was sentenced to 2 years imprisonment. AMODEO spent 6 months at a federal boot camp. After being released from the boot camp, AMODEO spent approximately 5 months in a halfway house located in Maitland, Florida. While residing at the halfway house, AMODEO violated the conditions of the halfway house and was sent back to prison to serve the remainder of his sentence. AMODEO was released from prison in September 2000.

4.     Beginning in October 2004, AMODEO and other co-conspirators were involved in a massive tax fraud, wire fraud, and money laundering scheme. The entities used by AMODEO during the scheme included AEM, AQMI Strategy Corporation ("AQMI"), Mirabilis Ventures ("Mirabilis"), Presidion Corporation, Presidion Solutions, Quantum Delta Enterprises ("Quantum"), Wellington Capital Group ("Wellington"), and various other entities. Although AMODEO may not have been listed as a director, officer, or shareholder for the companies involved in the scheme, witnesses have stated that AMODEO and other co-conspirators directed and controlled the business activities of all the companies.

5.     AMODEO gained control of Presidion Solutions, a Michigan-based holding company for several professional employment organizations ("PEOs"). Presidion Solutions, through its PEO subsidiaries, provided comprehensive and integrated

4

resource management services (which included payroll services) to small to medium size businesses. Presidion Solutions was a wholly owned subsidiary of Presidion Corporation, a former publicly traded corporation.

6.     According to the contracts signed by the clients when Presidion Solutions (or its predecessors) started providing services to the clients, Presidion Solutions became the co-employer of its clients' employees and assumed the liabilities and responsibilities for reporting and paying to the IRS the payroll wages and the payroll taxes of the worksite employees. The benefit for the clients for hiring Presidion Solutions was a better workman's compensation insurance rate and reduced administrative costs to their businesses.

7.     Based upon the clients' payroll cycle, a client would e-mail, fax, or mail the number of hours worked by the worksite employee(s) to Presidion Solutions. After receiving the information, Presidion Solutions computed the amount of Federal Insurance Contributions Acts ("FICA") taxes, Medicare, withholding taxes, workman's compensation insurance, and 401K contributions to be added to the clients' bill, along with Presidion Solutions' administrative fee. Presidion Solutions would then e-mail, fax, or mail this information back to the clients, who would then either direct debit, mail, or wire the funds to Presidion Solutions.

8.     From 2001 through 2005, Presidion Solutions had acquired 7 PEOs, which made up Presidion Solutions' "book of business," i.e., the contracts Presidion Solutions had with its clients. In 2001, Presidion Solutions acquired Sunshine Staff Leasing, Sunshine Companies I, Sunshine Companies II, Sunshine Companies III, and

5

Sunshine Companies IV (herein after referred to as the "Sunshine Companies"). Subsequently, the Sunshine Companies did business as Presidion Solutions I, Presidion Solutions II, Presidion Solutions III, Presidion Solutions IV, and Presidion Solutions V, respectively. By 2005, Presidion Solutions had also acquired Paradyme, doing business Presidion Solutions VI, and Professional Benefit Solutions, doing business as Presidion Solutions VII ("PBS"). With the acquisitions of the Sunshine Companies, Paradyme, and PBS, Presidion Solutions had approximately 2,200 clients and approximately 29,700 worksite employees.

9.     Presidion Solutions engaged in "SUTA dumping," which involves "transferring" the book of business from one PEO to another, depending on the State Unemployment Tax Act ("SUTA") rates for the PEOs. The SUTA rates changed on a yearly basis, so depending on which PEO had the best SUTA rate for the year, the PEO with the lowest SUTA rate would report the payroll wages and the payroll taxes. The bulk of the Presidion Solutions' book of business was reported by PBS during 2005 and 2006.

10.     During 2005, the funds sent to Presidion Solutions from the clients were deposited into Bank of America account #5481578981 in the name of Paradyme ("Paradyme's BOA Account"). Funds used to pay the worksite employees would be paid out through various Presidion Solutions' controlled accounts depending on whether the employee(s) received their wages via a check or a direct deposit. Even though the funds paid to Presidion Solutions were deposited into Paradyme's account during the year, the wages and payroll tax liabilities were reported by PBS. Once the funds were

6

released to pay the worksite employee(s), Paradyme's BOA Account would automatically transferred the funds into a different Bank of America Account, #548151578978 in the name of Presidion Solutions, titled as the Ultimate Master Account ("Ultimate Master Account").  The funds used to pay the federal payroll taxes, insurance payments, state taxes, and 401K contributions for the PEO subsidiaries were maintained in the Ultimate Master Account.

### SCHEME

11.     Beginning in October 2004 and continuing through March 2008, AMODEO and co-conspirators knowingly and willfully defrauded the clients of Presidion Solutions by offering payroll services to the clients, collecting the funds from the clients via wire transfers, and willfully failing to pay the payroll taxes to the IRS for PBS and the Sunshine Companies.  AMODEO and co-conspirators knowingly failed to remit to the IRS payroll taxes paid to them by the clients totaling approximately $181,000,000.00, including approximately $129,000,000.00 in FICA and withholding taxes (also referred to as trust fund taxes) collected by PBS and the Sunshine Companies.

12.     At the direction of AMODEO and co-conspirators, Presidion Solutions notified each client by invoice of the amount owed, including amounts owed for payroll taxes.  Presidion Solutions subsequently collected funds, via wire transfers, from the clients and deposited these funds into a Presidion Solutions Account and then into the Ultimate Master Account.  At no time during the scheme were the clients informed that the funds they were paying for the payroll taxes were not being used this way.

13.     The bulk of the funds that were diverted from Presidion Solutions' clients

were laundered through three main accounts during the scheme. Although the names of the corporations changed and AMODEO and other co-conspirators switched accounts throughout the scheme, the scheme remained the same: divert funds intended to pay the payroll taxes. Although the three main accounts used by AMODEO and the other co-conspirators to launder the proceeds of the wire fraud are detailed below, this affidavit only reflects a small portion of the total fraud committed by AMODEO and his co-conspirators.

14.     In the early part of the scheme (October 2004), AMODEO used AQMI, a corporation that he controlled, to steal the payroll tax funds. AMODEO signed a consulting agreement with Presidion Solutions to allegedly assist the company by reducing the payroll tax liabilities previously accrued by the Sunshine Companies. At the time when AMODEO began assisting Presidion Solutions with the reduction of the payroll tax debt, Presidion Corporation (the publicly traded parent corporation) was preparing for an annual audit. In an attempt to have Presidion Corporation appear more profitable as a publicly traded company, Presidion Solutions wanted the Sunshine Companies' payroll tax liabilities removed from Presidion Corporation's financial statements. Instead of helping Presidion Solutions with the payroll tax problem, AMODEO, with the knowledge of co-conspirators, directed the transfer of the payroll tax funds to accounts controlled by AMODEO.   After stealing the funds from Presidion Solutions, AMODEO and co-conspirators then laundered the profits of the scheme through various corporations he controlled to disguise the source of the funds and to promote the scheme. AMODEO and co-conspirators used fictitious consulting

8

agreements, service agreements and other fraudulent business transactions as a means to conceal the theft of payroll tax funds.

15.    During 2004, the clients received an invoice from Presidion Solutions and paid their invoice by wiring their funds to accounts controlled by Presidion Solutions. AMODEO then directed funds to be transferred to AmSouth Bank account #55292976 in the name of AQMI ("AQMI AmSouth Account").  In December 2004, the AQMI AmSouth Account received the following deposits from the Presidion Solutions Ultimate Master Account:

- on December 10, 2004, a deposit in the amount of $772,471.84

- on December 13, 2004, a deposit in the amount of $1,410,375.52

- on December 15, 2004, a deposit in the amount of $162,937.87

- on December 16, 2004, a deposit in the amount of $477,200.64

- on December 17, 2004, a deposit in the amount of $423,407.87

- on December 20, 2004, a deposit in the amount of $1,284,986.58

- on December 21,2004, a deposit in the amount of $88,054.24

- on December 22, 2004, a deposit in the amount of $75,307.09

- on December 23, 2004, a deposit in the amount of $1,082,588.09

- on December 24, 2004, a deposit in the amount of $1,056,917.79

- on December 28, 2004, a deposit in the amount of $894,645.38

- on December 29, 2004, a deposit in the amount of $102,144.26

- on December 30, 2004, a deposit in the amount of $353,329.54

- on December 31, 2004, a deposit in the amount of $720,834.55

16. The total amount of deposits into the AQMI AmSouth Account received from the Ultimate Master account during the month of December was approximately $8,905,201.26. All the funds received in the AQMI bank account were profit to AMODEO as a result of his wire fraud scheme. Once AMODEO had laundered the funds from Presidion Solutions through AQMI, AMODEO then transferred the money to his personal accounts and used the funds to purchase his residence, his cars, and other personal items. AMODEO also began to launder the funds to other accounts that he controlled to finance the purchase of other businesses, further concealing the source of the stolen funds.

17. After funds that were intended to pay the payroll taxes had been paid to Presidion Solutions by the clients, they were transferred to the AQMI AmSouth Bank Account. AMODEO then transferred a portion of those funds to Wellington's SunTrust Bank Account #100002640116 ("Wellington Sun Trust Account"), a company controlled by AMODEO. AMODEO controlled the Wellington Sun Trust Account and transferred funds from this account to his personal accounts or to other corporate accounts that he controlled.

18. In late December 2004, AMODEO, through Wellington, purchased the Sunshine Companies, including their existing payroll tax liabilities, but not Presidion Solutions' book of business, which had been transferred to Paradyme. AMODEO financed the purchase of the Sunshine Companies with funds he diverted through the AQMI AmSouth Account and the Wellington Sun Trust Account. On December 17, 2004, AMODEO caused to be transferred approximately $1,284,986.58 from the

10

Ultimate Master Account to the AQMI AmSouth Account, then AQMI transferred approximately $1,000,000.00 to the Wellington Sun Trust Account on December 20, 2004. AMODEO then used the funds from the Wellington Sun Trust Account to purchase multiple cashier's checks on December 20, 2004 and December 29, 2004, to make the purchase of the Sunshine Companies for approximately $500,000.00 from Presidion Solutions.

19.    In June 2005, AMODEO was authorized by co-conspirators to open First Southern Bank account #2058256506 in the name of Presidion Solutions, titled as the Reserve Account ("Reserve Account"). Since AMODEO was not on the Board of Directors of Presidion, the other members of the board of directors resolved that AMODEO would become Vice-President and AMODEO was authorized to open the Reserve Account. This account was opened to receive funds transferred from the Ultimate Master Account, which held the funds that should have been used to pay the payroll taxes, and so that it would appear to the employees, regulators, IRS, and other creditors that it was a regular business account when, in fact, it was used for AMODEO's personal benefit. AMODEO had sole signature authority on the Reserve Account. However, Daniel Myers, an accountant for AMODEO, was authorized to order outgoing wires from the Reserve Account, at the direction of AMODEO. Witnesses have stated that AMODEO controlled the banking activity for the Reserve Account. Documents and e-mails secured during the investigation reveal that AMODEO gave the instructions on when to move the funds into this account from the Ultimate Master Account and when to transfer funds out of this account. The funds in this account were

11

dispersed at AMODEO's direction, for his benefit and the benefit of other co-conspirators. During the latter half of 2005, AMODEO diverted approximately $64,600,000.00 of funds paid to Presidion Solutions by clients, which should have been used to pay payroll taxes, through the Reserve Account. This sum represents the proceeds of the wire fraud, and was profit to AMODEO as a result of the scheme. These profits were ultimately transferred to other companies and used to purchase assets and other companies as part of the overall scheme. The following transactions are a sample of the transactions involving the clients' funds that were diverted by AMODEO and laundered through the Reserve Account to his personal bank accounts:

- On August 15, 2005, $500,000.00 was transferred from the Ultimate Master Account to the Reserve Account. On the same date, $525,000.00 was transferred from the Reserve Account to Wellington's Mercantile Bank Account #7600303414 ("Wellington's Mercantile Bank Account"). On August 16, 2005, $500,000.00 was withdrawn from Wellington's Mercantile Bank Account via check 10031 and the funds were deposited in AMODEO'S Janney Montgomery Scott Account #84493091.

- On September 29, 2005; September 30, 2005; and October 3, 2005, $600,000.00; $700,000.00; and $600,000.00, respectively, were transferred from the Ultimate Master Account to the Reserve Account. On October 4, 2005, $2,000,000.00 was transferred from the Reserve Account to First Southern Bank Account #3055441306, in the name of

Berman Kean & Riguera IOTA ("Berman's First Southern Bank Account I"). On October 6, 2005, $2,000,000.00 was transferred from Berman's First Southern Bank to First Southern Bank Account #3058127506, in the name of Berman Kean & Riguera, Escrow for AMODEO ("Berman's First Southern Bank Account 2").

- On November 28, 2005; November 28, 2005; November 29, 2005; and December 1, 2005, $300,000.00, $1,500,000.00, $700,000.00 and $250,000.00, respectively, were transferred from the Ultimate Master Account to the Reserve Account. On December 1, 2005, $1,000,000.00 was transferred from the Reserve Account to Wellington's Mercantile Bank Account. On December 8, 2005, $1,050,000.00 was withdrawn from Wellington's Mercantile Bank Account via check 10034 and the funds were deposited in AMODEO'S Janney Montgomery Scott Account.

20.     In July 2005, AMODEO and co-conspirators intended to transfer Presidion Solutions' book of business to AEM because i) AEM had a better State Unemployment Tax ("SUTA") rate than Paradyme and PBS and ii) because the Presidion Solutions name was tainted in the PEO industry due to previous tax and insurance problems and they needed to get workman's compensation insurance for their clients. AEM was a PEO shell purchased by AMODEO in 2005 and was a subsidiary of Mirabilis. At the beginning of 2006, Bank of America account 556191732 in the name of AEM, titled as the Depository Account ("Depository Account"), was opened to collect funds from

13

Presidion Solutions' clients. The funds from the Depository Account were automatically transferred to Bank of America Account #5561911523 in the name of AEM, titled as the Master Account ("Master Account"). During 2006, the funds from the client's payroll taxes for PBS were deposited into the Master Account, but were not used for that purpose. Instead, AMODEO directed funds transferred from the Master Account to SunTrust Bank Account #100041146787 in the name of Presidion Solutions, titled as the Capital Account ("Capital Account"). AMODEO diverted approximately $23,750,000.00 from the Master Account to the Capital Account, which were the proceeds of the wire fraud, and were profit to AMODEO as a result of the scheme. AMODEO controlled and directed all the banking activity of the Capital Account. After the funds were transferred to the Capital Account, these profits were spent by AMODEO to purchase, fund, and grow additional businesses, such as AQMI, Mirabilis, and Quantum and profits from this account were also used to purchase the property at 509 Riverfront Parkway and Worker's Temporary Staff Inc.

21. Beginning in January 2006, AMODEO had begun billing and collecting the money from the 2,200 clients (29,700 employees) under the name AEM d/b/a Mirabilis HR. The majority of the AEM clients were the former clients of Presidion and/or Sunshine's book of business. Again (as discussed above) each client received an itemized invoice showing how much money was to be paid for taxes, workman's compensation insurance, 401k, and other similar expenses. AMODEO and the other co-conspirators directed the payment of only some of the items on the invoice, including workman's compensation insurance, diverting the remainder of the funds collected from

14

clients to other ventures or for AMODEO'S personal benefit.

22.     In May 2007, AMODEO sold the Presidion Solutions/AEM book of business (along with the other PEOs' books of business including Paradyme) to another company for approximately $11,000,000.00.  The purchase agreement required the purchaser to pay monthly payments on a five year promissory note.  After the sale was completed, AMODEO became aware that he had prepaid collateral and premiums to Sunz Insurance (Sunz) the workman's compensation insurance for his companies for the year 2007 (the policy expired in August 2007).  The sales contract with the new owner called for the seller to retain the workman's compensation deposits.  Because of the liability exposure for such a large policy, Douglas Lilak, President of Sunz, required AMODEO to put up collateral at the inception of the policy before they would write the policy.  On a monthly basis, Sunz would bill and then collect a monthly premium from AEM.  The monthly premium would include realized losses and any additional collateral needed.  AEM would bill each client for the workman's compensation insurance on a weekly basis.  AMODEO was fully aware the funds that were paid to Sunz had been paid for by the clients of AEM (which collected the funds for PBS and other PEO's).  AMODEO and co-conspirators had set up accounts for AEM at Fifth Third Bank to handle any funds that could be collected on behalf of AEM.  Any monies returned to AEM by Sunz belonged to former clients or the IRS, not AMODEO.

23.     Beginning in November 2007, AMODEO collected over $5,000,000.00 in workman's compensation insurance refunds from Sunz.  AMODEO was the person who negotiated the refund from Sunz on behalf of AEM.   AMODEO deposited the checks

and wire transfers into a Fifth Third Bank account #7440599210 in the name of AEM and further laundered a portion of these funds by transferring some of these funds to Fifth Third Bank account #7440634728 in the name of AQMI.  AMODEO neither paid back his clients nor paid more than $180,000,000.00 in back payroll taxes owed to the IRS (although AMODEO did make payments to the IRS on other PEO entities he controlled); instead, AMODEO used the funds to retain attorneys to assist with various lawsuits around the country, pay his living expenses, pay employees and transfer funds to other corporations he controlled.

24.  At first glance, it would appear that AEM's payment of the workman's compensation to Sunz Insurance is a legitimate expenditure of AEM, since it was the client's money.  However, it is important to understand that in order for the fraud to continue, it was necessary to make these payments or the policy would have been cancelled and scheme would have collapsed.  The payment of workman's compensation was an essential element of the fraud because if the insurance is not paid then the coverage is terminated and the scheme fails.  The payment of the workman's compensation money by AMODEO to Sunz Insurance were acts of promotion of the money laundering scheme.  The subsequent refund of proceeds of the Sunz money to Amodeo were profits of the fraud scheme being returned to AMODEO— and further acts of money laundering.  In order to further conceal his profits gained from the fraud, AMODEO took the profits ($5,000,000) he had received from Sunz Insurance, and through AQMI, AEM, and MIRABILIS, hired numerous attorneys to initiate lawsuits against his various businesses and former partners.

16

25.  In June 2007, three former employees working for AMODEO set up a new corporation, Soone Business Development ("Soone").  Soone was set up to assist AMODEO in the liquidation of Mirabilis, AEM, AQMI, and other AMODEO companies.  AMODEO has been funding Soone with the funds received during the liquidation of Mirabilis, AEM, AQMI, and other AMODEO companies.  Since August 2007, AMODEO has diverted over $300,000.00 to these three employees as monthly fees from the AEM and AQMI accounts, which was discussed above.  A portion of the money paid to Soone was from the Sunz workman's compensation refund.  AMODEO is continuing to use Soone to conceal the funds stolen from the clients and owed to the IRS.

## MONEY LAUNDERING

26.  Below are the financial transactions conducted by AMODEO, in violation of Title 18, United States Code, Sections 1343, 1956, and 1957 that were used to purchase the assets that are subject to the civil forfeiture complaint.  AMODEO used the various corporations and the various accounts detailed above to transfer the proceeds of his wire fraud scheme and to purchase the assets detailed below.  After a thorough analysis of the accounts and corporations controlled by AMODEO, the only source of funds available to AMODEO for the purchase of the assets detailed below is the proceeds of his wire fraud scheme.  AMODEO diverted the proceeds of the fraud to bank accounts he controlled and used these profits to promote his other companies and to purchase additional assets.  Research conducted by your affiant reveals that after AMODEO was released from prison in 2001 he had various jobs, but did not earn a substantial income until the scheme began in 2004.  Also, AMODEO owed trust fund

17

taxes (over $400,000) from a previous business and did not have the ability to pay these taxes until 2004, when the scheme described in this affidavit began. A review of AMODEO's tax returns reveals that in 2004, AMODEO reported income over $700,000; in 2003 AMODEO reported income over $240,000; and in 2002 AMODEO reported income over $43,000.

**2006 Mercedes Benz CLS 500C Coupe, V.I.N. WDDDJ75X46A032858 ("2006 Mercedes Benz")**

27.     On August 1, 2005, AMODEO wrote check 1026 in the amount $85,709.44 from the Janney Montgomery Scott Account to Domani Motors for the purchase of a **2006 Mercedes Benz**. An analysis of the original source of these funds revealed that the funds came from the Ultimate Master Account, which is the account that maintained the funds that should have been used to pay the payroll taxes. The funds in the Ultimate Master Account were transferred to the Reserve Account. The Reserve Account was set up by AMODEO and other co-conspirators, and witnesses have stated that the funds from this account were used to fund all of AMODEO's acquisitions and special projects. AMODEO was the sole signature authority on the Reserve Account. AMODEO deposited over $64,600,000.00 in diverted clients' funds into this account. The $64,600,000.00 represents the proceeds of the wire fraud, and was profit to AMODEO as a result of the scheme.

28.     Specifically, investigation into these transactions to trace the original source of funds that were used to purchase the **2006 Mercedes Benz** revealed that on June 13, 2005, AMODEO caused to be transferred $700,000.00 from the Reserve

18

Account to Bank of America Account #5502778055 in the name of Nexia ("Nexia BOA Account"), a company that AMODEO controlled. On that same day, AMODEO caused to be transferred $40,000.00 from the Nexia BOA Account to his Janney Montgomery Scott Account.

29.     Then, on June 30, 2005, AMODEO wrote check #95 in the amount of $423,961.29 from the AQMI AMSouth Account to himself (it was noted as "loan repayment") and deposited this check into his Janney Montgomery Scott Account. On July 1, 2005, AMODEO directed a transfer in the amount of $76,433.25 from the AQMI AmSouth Account to the Wellington Mercantile Bank Account. On July 1, 2005, AMODEO transferred $55,435.94 from the Wellington Mercantile Bank Account to his Janney Montgomery Scott Account.

30.     In order to effectuate his scheme, AMODEO diverted funds paid by clients that should have been used to pay the payroll taxes for the Sunshine Companies and PBS from the Ultimate Master Account to the Reserve Account, making these profits to AMODEO, which were then laundered through accounts that he controlled in the name of AQMI (a deposit in the amount of $2,00,000.00) and Wellington (a deposit in the amount of $76,433.25), then to his personal account at Janney Montgomery Scott (deposits in the amounts of $423,961.29 and $55,435.94). The funds received by AMODEO were the profits from the fraud. These funds ($85,709.44) were then used to purchase the **2006 Mercedes Benz**.

### 2006 BMW 750Li, V.I.N. WBAHN83536DT30059 ("2006 BMW")

31.     During the investigation, it was uncovered that AMODEO drove the above-

described **2006 BMW**. Based upon what the investigation had revealed regarding the source of the purchases of the other property described in this affidavit, IRS agents believed that the **2006 BMW** was purchased with proceeds from his wire fraud scheme. IRS agents advised AMODEO's representatives that they were seizing all items that had been purchased with the proceeds from AMODEO's wire fraud scheme. As a result, the **2006 BMW** was voluntarily surrendered to the IRS by an AMODEO employee on behalf of AMODEO.

**2006 Mercedes Benz CLS 55AMG, V.I.N. WDDDJ76X66A055945 ("2006 Mercedes II")**

32.     On December 19, 2005, AMODEO authorized the wire transfer in the amount $116,691.11 from the Berman Trust Account to Domani Motors for the purchase of a **2006 Mercedes II**. AMODEO had the vehicle titled in the name "Satrax Motors," another company that AMODEO controlled. An analysis of the original source of these funds revealed that the funds came from the Ultimate Master Account, which is the account that maintained the funds that should have been used to pay the payroll taxes, as discussed previously in this affidavit. The funds in the Ultimate Master Account were transferred to the Reserve Account, as discussed previously in this affidavit. The Reserve Account was set up by AMODEO and other co-conspirators, and witnesses have stated that the funds from this account were used to fund all of AMODEO's acquisitions and special projects. AMODEO was the sole signature authority on this account. AMODEO deposited over $64,600,000.00 in diverted clients' funds into this account. The $64,600,000.00 was the proceeds of his wire fraud scheme, and was profit to AMODEO as a result of the scheme.

20

33.     Specifically, investigation into this transaction to trace the original source of funds that were used to purchase the **2006 Mercedes II** reveal that on November 2, 2005, AMODEO caused to be transferred $1,000,000 from the Reserve Account to the Berman Trust Account, and on November 4, 2005, AMODEO transferred another $2,000,000 to the Berman Trust Account.  AMODEO diverted funds paid by clients that should have been used to pay the payroll taxes for the Sunshine Companies and PBS from the Ultimate Master Account to the Reserve Account, making these profits to AMODEO, which were then laundered through Berman's Trust Account.  The funds received by AMODEO were the profits from the fraud.  These funds were then used to purchase the **2006 Mercedes II**.

### Gates Learjet Model 25D, Aircraft Number 4488W ("Learjet")

34.     An investigation into the source of the funds used to purchase the **Learjet** revealed that on November 21, 2005, AMODEO caused to be transferred $850,300.00 from the Reserve Account to Insured Title Aircraft for the purchase the **Learjet.**  The purchase price of the Learjet was $850,000, including $300 for the title. Research into the source of the funds in the Reserve Account revealed that on November 18, 2005, AMODEO caused the transfer of $1,000,000 from the Ultimate Master Account, which is the account that maintained the funds that should have been used to pay the payroll taxes, as discussed previously in this affidavit, to the Reserve Account (which AMODEO was the sole signature on the account).  Records received during the investigation, including the sales/lease contract signed by AMODEO, revealed that the **Learjet** is currently titled in the name of Ompir Avir, an AMODEO controlled corporation and a

21

corporation for which AMODEO was an officer. Ompir Avir's sole business purpose was to hold ownership of the **Learjet**.

### 2006 Black Harley Davidson Motorcycle, V.I.N. 1HD1BWB156Y077592 ("Motorcycle")

35.     AMODEO was the highest bidder for the **Motorcycle** at a charity auction in mid-2006. Witness statements indicate that AMODEO paid approximately $40,000.00 for the **Motorcycle** at the auction. The Department of Motor Vehicle and Safety records indicate that through July 31, 2006 AMODEO was the owner of record of the Motorcycle. Thereafter, on October 19, 2007, title was transferred to Frederick Crafferty, Jr. The **Motorcycle** was voluntarily turned over by AMODEO after seizure warrants were issued for the **Motorcycle**. At this time, it is unclear whether any consideration was paid for the **Motorcycle**.

36.     After a thorough analysis of accounts and corporations controlled by AMODEO, the only source of funds available to AMODEO for the purchase of the **Motorcycle** is the proceeds he obtained from the wire fraud, i.e., the funds paid by clients that should have been used to pay the payroll taxes for the Sunshine Companies and PBS.

37.     Therefore, the above-referenced vehicles, motorcycle and airplane are subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(C) and (a)(1)(A). The vehicles, motorcycle and airplane were purchased with proceeds from AMODEO'S wire fraud scheme; thus, are subject to forfeiture under 18 U.S.C. § 981(a)(1)(C). Additionally, the vehicles, motorcycle and airplane were involved in the money laundering scheme in

violation of 18 U.S.C. § 1956, and subject to forfeiture under 18 U.S.C. § 981(a)(1)(A), because AMODEO knowingly used proceeds, which were profits to AMODEO once he diverted the proceeds from his wire fraud scheme, to conceal the source and ownership of the funds used to purchase the vehicles, motorcycle and airplane, all in violation of 18 U.S.C. § 1956. Finally, the transactions made to purchase the vehicles, motorcycle and airplane were made in violation of Section 1957(a) because they involved monetary transactions conducted with more than $10,000 in fraud proceeds and, as such, are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

**e.** **Retainers held by Law Firms**

38.     Your affiant has included a chart which details the receipt of the worker's compensation refund monies from Sunz to AEM. Since AMODEO had previously sold AEM and the other PEO's, including PBS which held the bulk of the book of business, he negotiated a settlement with Sunz and received a windfall of profit. AMODEO had laundered his profits of the wire fraud through Sunz and subsequently received these funds back. He then used these funds to retain attorneys to file lawsuits around the country against his former business associates. The manner in which he obtained the money he used to pay the attorneys effectively concealed the nature and the source of the funds (as discussed above, the payment of workman's compensation was an essential element of the fraud because if the insurance is not paid then the employer's coverage is terminated and the scheme fails. The payment of the workman's compensation money by AMODEO to Sunz Insurance was an act of promotion of the money laundering scheme. The subsequent refund of proceeds of the Sunz money to

23

Amodeo were profits of the fraud scheme being returned to AMODEO—and further acts of money laundering).

39.    The chart below shows the initial deposits into the AEM Account from Sunz and the subsequent retainer payments made to the law firms.  The analysis below is not meant to show the entire activity from the AEM Account, but merely to highlight payments made from the AEM Account to various law firms.  The Sunz funds in the AEM Account were also being used to pay other creditors and to transfer money to other accounts controlled by AMODEO.  Those transactions are not included in the chart below.

40.    In the first transaction detailed in the chart, on November 14, 2007, Sunz Insurance issued a refund check to AEM and AMODEO caused the check to be deposited into a new AEM Account at Fifth Third Bank ("AEM Fifth Third Bank Account").  On the following day, November 15, 2007, AMODEO caused a wire transfer of $274,736.24 from the AEM Fifth Third Bank Account to the law firm of Balch & Bingham for legal services.  The rest of the chart details the additional receipt of the Sunz Insurance refund money into the AEM Fifth Third Account and AMODEO's subsequent payments to various law firms around the country with the funds received from Sunz.

| Sender | Receiving Account | Date | Amount | Date of Next transfer | Amount | Receiving Account | |
|---|---|---|---|---|---|---|---|
| Sunz Insurance | AEM Fifth Third Bank Acct 7440599210 | 11/14/2007 | $1,000,000.00 | 11/15/2007 | $274,736.24 | Wire transfer to Balch & Bingham LLP | |
| Sunz Insurance | AEM Fifth Third Bank, Acct 7440599210 | 12/19/2007 | $300,000.00 | | | | |
| Sunz Insurance | AEM Fifth Third Bank Acct 7440599210 | 12/20/2007 | $1,300,128.00 | | | | |
| Sender | Receiving Account | Date | Amount | Date of Next transfer | Amount | Receiving Account | |
| Sunz Insurance | AEM Fifth Third Bank Acct 7440599210 | 12/28/2007 | $3,200,000.00 | 12/28/2007 | $135,000.00 | Cashier's Check payable to The Bales Law Group | |
| | | | | 12/28/2007 | $150,000.00 | Cashier's Check payable to Balch & Bingham LLP | |
| | | | | 12/28/2007 | $15,000.00 | Cashier's Check payable to Martin, Pringle, Oliver, Wallace & Bauer LLP | |
| | | | | 12/28/2007 | $150,000.00 | Cashier's Check payable to Shutts Bowen LLP | |
| | | | | 01/08/2008 | $10,000.00 | Check 1081 payable to Allen, Dyer, Doppelt, Milbrath & Gilchrist PA | |
| | | | | 01/08/2008 | $50,000.00 | Check 1082 payable to Bieser, Greer & Landis LLP | |
| | | | | 01/08/2008 | $10,000.00 | Check 1088 payable to Thompson McMullen | |
| | | | | 01/08/2008 | $25,000.00 | Check 1089 payable to Valenti, Hanley & Robinson PLLC | |
| | | | | 01/11/2008 | $25,000.00 | Check 1085 payable to Hunt Rudd PA | |
| | | | | 01/11/2008 | $100,000.00 | Wire transfer to Martin, Pringle, Oliver, Wallace & Bauer LLP | |
| | | | | | | | |

| | | | | 01/14/2008 | $10,000.00 | Check 1083 payable to Brwon, Stone, & Nimeroff LLC | |
| | | | | 01/18/2008 | $25,000.00 | Check 1084 payable to Ford & Harrison LLP | |
| | | | | 01/30/2008 | $25,000.00 | Cashier's Check payable to Broad & Cassel | |
| | | | | | | | |

41.    Your affiant has included another chart which shows how AMODEO used clients' funds from AEM to make investments on behalf of AQMI.  This was done by taking clients; funds from AEM and transferring those funds to AQMI so that AQMI could invest the clients' funds.  The investments were subsequently returned and the $290,000 from DLA Piper and $500,000 from Mirabilis in the chart below represent the returned investments funds.  These transactions show how AMODEO disguised and/or concealed the nature and the source of the clients' funds.  After the funds were transferred to the Fifth Third Bank accounts #7440634728 and #7740599210 both in the name of AQMI, AMODEO and other co-conspirators again used these funds to retain various attorneys around the country to assist with AMODEO's lawsuits.  This chart only details the transactions that are relevant to the money laundering.  The AEM and the AQMI bank accounts had other transactions in and out of the accounts that are not detailed in these charts.  The first transaction reveals that on July 31, 2007, AMODEO received funds ($290,000) from a law firm in Tampa (DLA Piper).  Those funds were then deposited into AQMI's account at Fifth Third Bank.  The next day, AMODEO moved $135,000 from the AQMI Fifth Third Account to pay a retainer to the law firm of Goldberg Bates, PA. Then, four days later, AMODEO moved $100,000 from the AQMI

26

Fifth Third Account to pay a retainer to Akerman Senterfitt. The rest of the transactions below are detailed in the same manner in the charts.

| Sender | Date | Amount | Receiving Account | Date of Next transfer | Amount | Receiving Account | Date of Next transfer | Amount | Receiving Account |
|--------|------|--------|-------------------|-----------------------|--------|-------------------|-----------------------|--------|-------------------|
| DLA Piper US LLP | 07/31/2007 | $290,000.00 | AQMI, Fifth Third Bank, Acct 7440634728 | 08/1/2007 | $135,000.00 | Wire transfer to Goldberg Bates PA | | | |
| Mirabilis Account 7324 at Fifth Third Bank | 07/31/2007 | $500,000.00 | AQMI, Fifth Third Bank, Acct 7440634728 | 08/3/2007 | $100,000.00 | Wire transfer to Akerman Senterfitt | | | |
| | | | | 08/3/2007 | $25,000.00 | Check 1061 payable to Mateer Harbert PA | | | |
| | | | | 08/2/2007 | $50,000.00 | Check 1064 payable to Latham, Shuker, Barker, Eden, & Beaudine LLC | | | |

| Sender | Receiving Account | Date | Amount | Date of Next transfer | Amount | Receiving Account | Sender | Receiving Account | Date |
|--------|-------------------|------|--------|-----------------------|--------|-------------------|--------|-------------------|------|
| | | | | 8/3/2007 | $25,000.00 | Check 1067 payable to Maher, Guily, Maher P.A | | | |
| AEM, Bank of America, Acct 05566379607 | 08/17/2007 | $560,644.31 | AEM, Fifth Third Bank, Acct 7440599210 | 08/23/2007 | $341,000.00 | AQMI, Fifth Third Bank, Acct 7440634728 | 08/24/2007 | $45,000.00 | Check 1093 payable to Goldberg Bates PA |
| | | | | | | | 08/29/2007 | $25,000.00 | Check 1104 payable to Mateer Harbert PA |
| | | | | | | | 08/30/2007 | $25,000.00 | Cashier's Check payable to Shutts Bowen LLP |
| | | | | | | | 09/4/2007 | $90,000.00 | Check 1097 payable to Goldberg Bates PA |
| Sunz Insurance | 11/14/2007 | $1,000,000.00 | AEM, Fifth Third Bank, Acct 7440599210 | 11/15/2007 | $50,000.00 $143,000.00 | AQMI, Fifth Third Bank, Acct 7440634728 | 11/15/2007 | $37,246.39 | Cashier's Check payable to Shutts & Bowen LLP |
| | | | | | | | 11/15/2007 | $58,649.62 | Cashier's Check payable |

27

| Sender | Date | Amount | Receiving Account | Date of Next transfer | Amount | Receiving Account | Date of Next transfer | Amount | Receiving Account |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | to Mateer Harbert PA |
| Sunz Insurance | 12/19/2007 | $300,000.00 | AEM, Fifth Third Bank, Acct 7440599210 | 12/20/2007 | $150,000.00 | AQMI, Fifth Third Bank, Acct 7440634728 | 12/24/2007 | $32,786.50 | Check 1225 payable to Balch & Bingham LLP |
| Sunz Insurance | 12/20/2007 | $1,300,128.00 | AEM, Fifth Third Bank, Acct 7440599210 | | | | 12/17/2007 | $18,263.42 | Cashier's Check payable to Shutts & Bowen LLP |
| | | | | | | | 12/17/2007 | $50,000.00 | Cashier's Check payable to Charles McBurney |
| | | | | | | | 12/17/2007 | $50,000.00 | Cashier's Check payable to Shutts & Bowen LLP |
| | | | | | | | 12/17/2007 | $50,000.00 | Cashier's Check payable to Mateer Harbert PA |
| Sender | Receiving Account | Date | Amount | Date of Next transfer | Amount | Receiving Account | Sender | Receiving Account | Date |
| | | | | | | | 12/20/2007 | $90,000.00 | Cahier's Check payable to Goldberg Bates PA |
| Sunz Insurance | 12/28/2007 | $3,200,000.00 | AEM, Fifth Third Bank, Acct 7440599210 | 12/28/2007 | $150,000.00 | AQMI, Fifth Third Bank, Acct 7440634728 | | | |
| | | | | 12/31/2007 | $150,000.00 | AQMI, Fifth Third Bank, Acct 7440634728 | 12/31/2007 | $25,000.00 | Cashier's Check payable to Charles McBurney |
| | | | | | | | 12/31/2007 | $50,000.00 | Check 1237 payable to Maher, Guily, Maher P.A. |
| | | | | | | | 12/31/2007 | $50,000.00 | Check 1238 payable to Maher, Guily, Maher P.A. |
| | | | | | | | 01/15/2008 | $25,000.00 | Cashier's Check payable to Ford & Harrison LLP |
| | | | | | | | 01/08/2008 | $50,000.00 | Cashier's Check payable to Mateer Harbert PA |

42.     Your affiant has detailed in the charts above all the retainers and fees paid to various lawyers around the country with funds stolen from clients.  These funds were laundered through new bank accounts at the direction of AMODEO to conceal the true ownership and source of the funds and then given to various attorneys to be used as retainers for legal services for AMODEO, to further conceal the true ownership and source of the funds.  Your affiant is not suggesting that any of these law firms had knowledge of AMODEO's money laundering activities.

43.     The funds provided to these attorneys are retainers for assisting AMODEO with lawsuits he is involved with around the country.  Since AMODEO'S only source of income is from the proceeds of the scheme described above, the retainers held in these trust accounts are the proceeds of a specified unlawful activity, i.e., wire fraud.  Title to the funds seized from the law firm's trust accounts remained with AMODEO directly, or with one of his corporations.  However, pursuant to 18 U.S.C. §§ 981(d) and 983, third parties will have the opportunity to file a claim of ownership to the seized funds.

44.     Therefore, the retainer funds are subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(C) and (a)(1)(A).  The retainer funds are proceeds from AMODEO'S wire fraud scheme; thus, are subject to forfeiture under 18 U.S.C. § 981(a)(1)(C).  Additionally, the retainer funds were involved in the money laundering scheme in violation of 18 U.S.C. § 1956, and subject to forfeiture under 18 U.S.C. § 981(a)(1)(A), because AMODEO knowingly used proceeds, which were profits to AMODEO once he diverted the proceeds from the Presidion Ultimate Master Account

into the Reserve Account, from his wire fraud scheme and moved those funds through

various corporations' accounts prior to giving those funds to various attorneys as

retainer fees to conceal the source of the funds that were given to the attorneys to be

used as retainers, in violation of 18 U.S.C. § 1956.  Finally, these transactions were

made in violation of Section 1957(a) because they involved monetary transactions

conducted with more than $10,000 in fraud proceeds and, as such, are subject to

forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

### 709 Euclid Drive, Orlando, Florida ("705 Euclid Drive property")

45.     AMODEO purchased the **709 Euclid Drive property** on or about April 14,

2005 for $1,500,000.  The purchase of AMODEO's personal residence at **709 Euclid

Drive** was made through a series of transactions where profits were moved through

various corporations and eventually ended up in one of two of AMODEO's personal

accounts: Janney Montgomery Scott Account or Morgan Stanley Account

#660022989157 ("Morgan Stanley Account").  A portion of the funds from the

transactions relating to the purchase of the **709 Euclid Drive property** were then

transferred through the trust account for AMODEO's attorney, Richard E. Berman

(herein referred to as the "Berman Trust Account").  Documents received during the

investigation reveal that when AMODEO purchased the residence, he titled the

residence in the name of "Condor and Eagle," a Florida general partnership.  The

investigation has revealed that AMODEO has set up numerous corporations and

partnerships in order to hide his assets.  A detailed description of the scheme is as

follows:

30

i.  <u>Janney Montgomery Scott Account transactions</u> - On December 29, 2004,
AMODEO withdrew funds from the AQMI AmSouth Bank Account (profits
to AMODEO described earlier in paragraph 15 of the affidavit) and
purchased a cashier's check in the amount of $500,000.00.  On February
16, 2005, AMODEO deposited the cashier's check into the Janney
Montgomery Scott Account, his own personal account.  AMODEO
maintained the funds in the Janney Montgomery Scott Account until March
22, 2005, at which time, AMODEO wrote check #102 in the amount of
$500,000.00, which was deposited into the Berman Trust Account.

ii.  <u>Morgan Stanley Account transactions</u>

1.      On or about December 23, 2004, AMODEO caused to be
transferred $150,000.00 and $750,000.00 from the AQMI AmSouth Bank
Account to the Berman Trust Account (profits to AMODEO described
earlier in paragraph 15 of the affidavit).  Thereafter, on December 27,
2004, AMODEO caused to be transferred $600,000.00 from the AQMI
AmSouth Bank Account to the Berman Trust Account.  On January 26,
2005, $500,000.00 of the total amount of the funds transferred to the
Berman Trust Account was transferred to the Morgan Stanley Account,
AMODEO's brokerage account.

2.      Additionally in December 2004 and January 2005, AMODEO
received funds totaling over approximately $900,000 from the AQMI
according to the accounting ledgers of AQMI.

31

3.      Subsequently, on February 10, 2005, AMODEO wrote check 1003 in the amount of $100,000.00 from the Morgan Stanley Account payable to the Berman Trust Account with a notation of "$25,000.00 and $75,000.00 earnest money Condor and Eagle."  Then, on March 13, 2005, AMODEO wrote check 113 in the amount of $900,000.00 from the Morgan Stanley Account to the Berman Trust Account with a notation of "EC709."

iii.    <u>Berman Trust Account transactions</u>

1.      AMODEO used the checks drawn against the Morgan Stanley Account and the wire transfers from the Janney Montgomery Scott Account (discussed above) and deposited them into the Berman Trust Account and on April 14, 2005, AMODEO caused to be wire transferred from Berman's Trust Account $1,309,891.76 and $150,539.38 to Independent Banker's Bank of Florida to complete the purchase of his residence at **709 Euclid Avenue**.

**1159 Delaney Drive, Orlando, Florida ("Delaney Condominium")**

46.     On or about December 15, 2005, AMODEO purchased the **Delaney condominium** for $510,000.  During an analysis of the funds used to purchase the **Delaney condominium**, it was revealed that funds originated from the Ultimate Master Account, which is the account that maintained the funds that should have been used to pay the payroll taxes. Funds from the Ultimate Master Account were then wired/transferred to the Reserve Account.

47.     On November 7, 2005, AMODEO caused to be transferred $2,000,000.00

32

from the Reserve Account to the Berman Trust Account. As previously discussed in this affidavit, AMODEO controlled the Reserve Account and had sole signature authority on this account, which contained the profits to AMODEO from his fraud.

48.     Thereafter, on or about December 15, 2005, AMODEO caused to be transferred $462,428.29 from the Berman Trust Account to The Closing Agent, the title company for the **Delaney condominium**, to complete the purchase of this property. This amount was used to partially satisfy the $510,000.00 purchase price for the **Delaney condominium**, in addition to funds already deposited in the Berman Trust Account.   AMODEO had the **Delaney condominium** titled in the name of "Condor and Eagle," the same name that AMODEO used to title his personal residence located at 709 Euclid Ave, Orlando, Florida.

### 4905 Research Drive, Huntsville, Alabama ("4905 Research Drive property")

49.     On or about January 18, 2006, AMODEO purchased the **4905 Research Drive property** for approximately $1,850,000. An investigation into the original source of the funds used to make the purchase of the **4905 Research Drive property** reveals that the funds originated from the Ultimate Master Account.  On November 2, 2005 and November 4, 2005, AMODEO directed employees to transfer $1,500,000.00 and $1,000,000.00, from the Ultimate Master Account into the Reserve Account.  Then, on November 7, 2005, AMODEO caused to be transferred $2,000,000.00 from the Reserve Account to the Berman Trust Account.

50.     On January 18, 2006, AMODEO transferred $1,754,685.57 from the Berman Trust Account to Balch and Bingham, LLC, the closing agent for the property,

33

for the purchase of the **4905 Research Drive property**.  From the records obtained during the investigation and from witness statements, it has been determined that AMODEO titled the **4905 Research Drive property** under the name of "Degaboh, LLC", an Alabama corporation.  Witnesses have indicated that AMODEO controlled Degaboh, LLC, even though he is not listed as a director or officer of the corporation and that Degaboh, LLC's, only business purpose was to hold the title to the property.

### Proceeds from the Sale of 509 Riverfront Parkway, Chattanooga, Tennessee ("509 Riverfront Parkway property")

51.     On or about March 31, 2006, the **509 Riverfront Parkway property** was purchased for  approximately $3,031,287.06.  An investigation to determine the source of the funds used to purchase the **509 Riverfront Parkway property** reveals that on March 17, 2006, AMODEO directed the transfer of $1,300,000.00, from the Master Account to the Capital Account.  Then, on March 21, 2006, AMODEO directed the transfer of an additional $600,000.00 from the Master Account to the Capital Account. On March 31, 2006, AMODEO again directed the transfer of $1,300,000.00 from the Master Account to the Capital Account.

52.     Further investigation revealed that the source of the funds in the Master Account originated from the Depository Account, which was opened to collect funds from clients.  In March 2006, AMODEO caused to be transferred more than $8,000,000.00 in clients' funds from Depository Account to the Master Account; these monies were profit to AMODEO that he used at his discretion.

53.     After depositing $3,200,000.00 from the Master Account to the Capital Account, AMODEO signed a wire authorization on March 31, 2006, to wire

34

$3,031,287.06 from the Capital Account to Pioneer Title Company to purchase the real property located at **509 Riverfront Parkway property**.

**614 Lake Avenue, Orlando, Florida ("614 Lake Avenue property")**

54.      AMODEO purchased the **614 Lake Avenue property** for $979,000.00 on or about November 6, 2006.  The purchase by AMODEO of the **614 Lake Avenue property** was made through a series of transactions in which clients' funds were moved through various corporations and eventually ended up in one of two of AMODEO's personal accounts: Morgan Stanley or Janney Montgomery Scott.

55.      An investigation into the source of the funds used to purchase AMODEO's **614 Lake Avenue property** reveals that on December 1, 2005, AMODEO caused to be transferred $1,000,000.00 from the Reserve Account to the Wellington Mercantile Bank Account.  As discussed previously in this affidavit, all funds that were transferred into the Reserve Account (were profits to AMODEO) were traced back to the funds paid by Presidion Solutions clients and deposited into the Ultimate Master Account.  Then, on December 8, 2005, AMODEO wrote check 10034 in the amount of $1,050,000.00 from the Wellington Mercantile Bank Account and deposited check 10034 into the Janney Montgomery Scott Account.

56.      On November 03, 2006, AMODEO wrote check 1065 from the Janney Montgomery Scott Account in the amount of $408,062.26.00 to Jean Stiles, the seller of the **614 Lake Avenue property**.  On November 6, 2006, AMODEO wrote check 1043 in the amount of $200,000.00 from the Morgan Stanley Account payable to Investment Title Services and on the same date, AMODEO again wrote a check (check #1067)

35

from the Janney Montgomery Scott Account, this time in the amount of $300,000.00, to Investment Title Services, to complete the purchase of the **614 Lake Avenue property**. AMODEO titled the property in the name of the 614 Lake Avenue Revocable Trust and AMODEO signed the closing documents as trustee for the trust.  It should be noted that AMODEO initially put down a $97,900 down payment on the home and your affiant has been unable to trace the source of this payment at this time.

### 3801 Carolina Avenue, Richmond, Virginia ("3801 Carolina Avenue property")

57.    AMODEO purchased the **3801 Carolina Avenue property** under the name of "Hoth Holding," a corporation set up specifically by AMODEO to hold the **3801 Carolina Avenue property**.  Public records reveal that on May 17, 2006, AMODEO paid $1,400,000.00 for the property.  A witness stated that AMODEO purchased this property because he intended to move some of the administrative operations of Mirabilis to Virginia.  On December 1, 2005, AMODEO authorized a $25,000 deposit to be paid on the property.  The $25,000 check originated from the Mirabilis Ventures Capital account at Suntrust, Account #1000037724100.   On March 16, 2006, a contract was signed and a deposit of $140,000 was wired from the Mirabilis Suntrust Account #1000037724100 to the seller of the property.  The contract called for the closing to take place in sixty days from the date of the contract.  On May 16, 2006, AMODEO caused a wire transfer of $500,000 from the Mirabilis Ventures Capital account at Suntrust, Account #1000037724100 to the LeClair Ryan Trust and on May 17, 2006, AMODEO caused another wire of $900,000 to the LeClair Ryan Trust for the purchase

of the property at **3801 Carolina Avenue property.**

58.     Further investigation to determine the source of the funds used to make the purchase at **3801 Carolina Avenue property** reveals that clients' funds held in the AEM Depository Account were transferred by AMODEO to the AEM Master Account. From there, AMODEO caused to be transferred over $1,500,000.00 to the Mirabilis Capital Account in May 2006.  These transactions illustrate how AMODEO concealed the source and ownership of the funds used to purchase the **3801Carolina Ave. property**.

### 102 West Whiting Street, Tampa, FL

59.     In November 2005, AMODEO and other co-conspirators formed a California corporation, Pacific Atlantic Capital Corporation (Pacific).  Although AMODEO was not listed as a board member or officer of Pacific, he controlled Pacific.  Pacific and Moreco (Moreco Partners n/k/a Forge Capital Partners ("Moreco") was owned by Peter Collins and Robert Moreyra) agreed to form a company, Coastal Equity (Moreco and Pacific would each be 50% owners of Coastal), under an operating agreement.  Coastal intended to be an investment arm of Mirabilis.  Coastal was also a 100% owner of another partnership, CEP CapTrust LLC.

60.     On August 16, 2006, CEP CapTrust LLC, purchased an office building in Tampa, Florida for $6,000,000.  An analysis was conducted to determine the source of the funds used to purchase the building.  From the analysis, it was determined that the funding for the down payment on the building came from profits diverted by AMODEO from AEM.  Specifically, on August 18, 2006, AMODEO caused to be wired $1,000,000

37

from the AEM Master Account to the law firm of Sach, Sax, and Klein for the down

payment on the building.  Also on that day, AMODEO caused another wire transfer of

$100,000 to the law firm of Sach, Sax, and Klein from the AEM Master Account.  The

original source of the funds that were transferred into the Master Account revealed that

AMODEO had transferred AEM's clients' funds from the AEM Depository Account to the

AEM Master Account and then diverted these funds for the purchase of the property.

AMODEO further concealed the source of the funds by setting up additional entities,

Pacific, and using the money as the down payment on a building.

      61.    Therefore, the above-referenced properties are subject to forfeiture

pursuant to 18 U.S.C. §§ 981(a)(1)(C) and (a)(1)(A).  The properties were purchased

with proceeds from AMODEO'S wire fraud scheme; thus, are subject to forfeiture under

18 U.S.C. § 981(a)(1)(C).  Additionally, the properties were involved in a money

laundering scheme in violation of 18 U.S.C. § 1956, and subject to forfeiture under 18

U.S.C. § 981(a)(1)(A), because AMODEO knowingly used proceeds, which were profits

to AMODEO once he diverted the proceeds from his wire fraud scheme, to conceal the

source and ownership of the funds used to purchase the properties, all in violation of 18

U.S.C. § 1956(a)(1)(B)(i).  Moreover, AMODEO knowingly used proceeds, which were

profits to AMODEO once he diverted the proceeds from his wire fraud scheme,  from his

scheme to defraud clients to promote violations of 18 U.S.C. § 1343 when he purchased

the **3801 Carolina Avenue property**, in violation of 18 U.S.C. § 1956(a)(1)(A)(i).

Finally, the transactions made to purchase the real properties were made in violation of

Section 1957(a) because they involved monetary transactions conducted with more

38

than $10,000 in fraud proceeds and, as such, are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

### Promissory Note from the Agreement for Purchase and Sale of Common Stock of Worker's Temporary Staffing

62.     On or about March 10, 2006, AMODEO, through Wellington Capital, authorized the purchase of a business called Worker's Temporary Staffing Inc., (WTS) for $5,000,000.  WTS was a temporary labor business located in the Orlando area owned by Mark Lang.  An investigation into the source of the funds used to make the WTS purchase reveal that the $5,000,000 came from the Presidion Capital Account (discussed earlier in the affidavit in paragraph 23).  Between February 1, 2006 and March 10, 2006, AMODEO diverted over $9,000,000 from the AEM Master Account and deposited these funds into the Presidion Capital Account.  AMODEO then used the profits diverted from the AEM Master Account to purchase WTS.  The original source of the funds that were transferred into the AEM Master Account to purchase WTS was clients' funds.  AMODEO transferred clients' funds from the AEM Depository Account to the AEM Master Account.  From there, AMODEO transferred the funds to the Presidion Capital Account and ultimately used the funds in that account to purchase WTS. AMODEO diverted approximately $23,750,000.00 from the AEM Master Account to the Presidion Capital Account.  The approximately $23,750,000.00 was the proceeds of the wire fraud, and was profit to AMODEO as a result of the scheme.

63.     In 2007, AMODEO wanted to sell WTS because of financial problems with Mirabilis and the related entities.  In early 2007, Thomas Bean approached AMODEO about purchasing the business since he had previously purchased other businesses

from AMODEO.  On or about May 9, 2007, Bean purchased WTS from Wellington

Capital for $3,500,000.  Wellington Capital did not receive the full purchase price in

cash and instead accepted a $500,000 down payment and a $3,000,000 promissory

note to be paid over three years with payments of $63,000 per month.

### Promissory Note from the Agreement for Purchase and Sale of Common Stock of Florida Industrial Electric

64.    On or about September 5, 2005, AMODEO, through Mirabilis Ventures,

authorized the purchase of 75% of the stock of a business called The New Florida

Industrial Electric Inc., for $5,000,000.  The 75% interest would represent 75 shares of a

newly formed company from a merger of Florida Industrial Electric, Inc. and The New

Florida Industrial Electric, Inc.  The $5,000,000 would be used to pay Integrated

Industrial Electric, the former parent company of Florida Industrial Electric.

65.    An investigation into the source of the funds used to make the purchase

reveal that the funds originated from the Presidion Ultimate Master Account (which is

the account that maintained the funds that should have been used to pay the payroll

taxes) which were then transferred by AMODEO to the Reserve Account, which

AMODEO had sole signature authority on.   As discussed previously in this affidavit, all

funds that were transferred into the Reserve Account were profits to AMODEO obtained

from his wire fraud scheme.  In August and September 2005, AMODEO caused to be

transferred over $8,000,000 from the Reserve account to the MIRABILIS Surplus

Account at First Southern Bank, Account #2057071006.  AMODEO then further

concealed the source and ownership of the funds by transferring over $4,000,000 in

August 2005 and over $3,500,000 in September 2005 to a Mirabilis Capital Account at

40

Suntrust, Account #1000037724100 (the Mirabilis Capital Account was used to fund purchases for Mirabilis). Finally, in September 2005, AMODEO authorized the wire transfer of $5,750,000 from the Mirabilis Capital Account to the trust account of the law firm of Akerman Senterfitt to be paid to Integrated Industrial Electric to complete the stock purchase of Florida Industrial Electric.

66. On or about May 27, 2007, Mirabilis Ventures, Inc., entered into an agreement to sell the stock of The New Florida Industrial Electric Inc., to Conrad Eigenmann (the original owner) for $6,250,000. Eigenmann wanted to buy back Florida Industrial Electric because they were not able to get bonding for new jobs because of Mirabilis' failure to provide adequate financial statements to the bonding companies. Without the bonding they would be forced out of business. Mirabilis did not receive the full purchase price in cash, instead it accepted a $5,500,000 promissory note from Eigenmann with payments to be paid semi-annually to Mirabilis.

67. Therefore, the above-referenced promissory notes and all corresponding right of payment are subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(C) and (a)(1)(A). The properties subject to the promissory notes were originally purchased with proceeds from AMODEO'S wire fraud scheme; thus, are subject to forfeiture under 18 U.S.C. § 981(a)(1)(C). Additionally, the properties were involved in a money laundering scheme in violation of 18 U.S.C. § 1956, and subject to forfeiture under 18 U.S.C. § 981(a)(1)(A), because AMODEO knowingly used proceeds, which were profits to AMODEO once he diverted the proceeds from his wire fraud scheme, to conceal the source and ownership of the funds used to purchase the properties, all in violation of 18

41

U.S.C. § 1956.  Finally, the transactions made to purchase the real properties were made in violation of Section 1957(a) because they involved monetary transactions conducted with more than $10,000 in fraud proceeds and, as such, are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

## CONCLUSION

68.     Based on my training and experience I am familiar with the methods and practices used by individuals and organizations involved in illicit activities that generate large amounts of income and try to conceal and disguise the source of the funds and conduct financial transactions with the intent to promote the carrying on of specified unlawful activity.  AMODEO and co-conspirators conducted numerous financial transactions, described more fully above, to move the funds between various corporations to conceal and disguise the source of such funds.  AMODEO and co-conspirators also conducted numerous financial transactions by setting up the corporations and paying the employees and paying rent and other expenses through the various corporations to promote the carrying on the specified unlawful activity

69.     AMODEO and co-conspirators set-up corporations and conducted numerous financial transactions with proceeds from their wire fraud scheme and then used those proceeds to purchase the assets described in this affidavit, in violation of 18 U.S.C. § 1343.  Therefore, these assets are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).  These financial transactions were made between various corporations' bank accounts to conceal and disguise the source and ownership of such funds, in violation of 18 U.S.C. § 1956(a)(1)(B)(i).  Further, the purchase of the 3801 Carolina Avenue property promoted violations of 18 U.S.C. § 1343, therefore, the purchase was made in violation of 18 U.S.C. § 1956(a)(1)(A)(i). Finally, the transactions made to purchase and/or fund these assets were made in violation of Section 1957(a) because they involved monetary transactions conducted with more than $10,000 in fraud proceeds.  As such, these assets are also subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

Steven McCabe, Special Agent

State of Florida

County of Orange

Before me, the undersigned authority personally appeared, Special Agent Steve McCabe, who having produced his Internal Revenue Service credentials as identification and having being duly sworn, deposes and says that the foregoing Affidavit is true to the best of his knowledge, information and belief. Witness my hand and official seal in the State of Florida, County of Orange this 27th day of August, 2008.

Tyline R. Medina
Commission # DD590194
Expires December 29, 2010
Bonded Troy Fain - Insurance, Inc. 800-385-7019

Notary Public

Commission Expires: 12/29/2010

44