FILED
2007 Jun-04  PM 06:30
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

|  |  |  |
|---|---|---|
| **DAVID CHAVIERS, NORMAN CHAVIERS, KELLIE LEDBETTER,** and **TOM HANCOCK**, | ) ) ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **CIVIL ACTION NO.** |
| **v.** | ) | **CV-07-0442-CLS** |
| | ) | |
| **MIRABILIS VENTURES, INC.,** and **FRANK AMODEO, et al.,** | ) ) | |
| | ) | |
| **Defendants.** | ) | |

## DEFENDANT AMODEO'S RESPONSE TO PLAINTIFFS' "MOTION TO STRIKE DECLARATION OF FRANK AMODEO AND IN OPPOSITION TO AMODEO MOTION TO DISMISS"

Defendant Frank Amodeo ("Amodeo") submits this Response to Plaintiffs' "Motion to Strike Declaration of Frank Amodeo and in Opposition to Amodeo Motion to Dismiss."

### INTRODUCTION

There are two core issues presented by Amodeo's motion to dismiss:

- Whether the Court can exercise specific personal jurisdiction over Amodeo based on his limited contact with Plaintiffs; and

- Whether the Court can exercise personal jurisdiction over Amodeo based on Plaintiffs' 10b-5 claim.

910591.1



# UCC DETAILS

**Office of the Secretary of State**
**State of Alabama**

```
----Filing Type----  --File Dt & Tm--  Pgs   --Exp Dt--   --Status--   --File #--
Business              12/19/2005 17:00  006   12/19/2010   Active       06-0072337
------------------------------------------------------------------------------------

 Finance Statement:  12/19/2005 17:00  006
    Debtor(s)..............................    .................................
      SYNEX CORPORATION LLC
      4717 UNIVERSITY DR STE 101             HUNTSVILLE, AL  35816
    Secured................................    .................................
      AMODEO, FRANK
      2875 SOUTH ORANGE AVENUE SUITE 500  ORLANDO, FL  32806
```



← PREVIOUS PAGE

© 2008, Office of the Secretary of State, State of Alabama

FILED
2007 May-04 PM 06:47
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT A

### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ALABAMA
### MIDDLE DIVISION

| | | |
|---|---|---|
| DAVID CHAVIERS, NORMAN CHAVIERS, KELLIE LEDBETTER, and TOM HANCOCK, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | CIVIL ACTION NO. CV-07-0442-CLS |
| MIRABILIS VENTURES, INC., and FRANK AMODEO, et al., | ) ) ) | |
| Defendants. | ) ) | |

## DECLARATION OF FRANK L. AMODEO

1. My name is Frank L. Amodeo. I am a resident of Orlando, Florida. I am over the age of twenty-one (21) years, am of sound mind, and am competent to make this declaration. This declaration is based upon my personal knowledge.

2. I am a resident of Orlando, Florida, and have been a resident of Orlando, Florida since 1995. Prior to that, I resided in Atlanta, Georgia for 10 years. I have never lived in Alabama.

3. I am currently President and CEO of AQMI Strategy Corporation ("AQMI"), and have held these positions since AQMI's inception in 2004. AQMI is based in Orlando, Florida.

4. I am not an employee or shareholder in Mirabilis Ventures, Inc. ("Mirabilis"). At one time, I owned a small amount of stock in Mirabilis -- less than 1.0% -- but I



have not been a stockholder since September of 2006. I have never been an employee of Mirabilis.

5.      AQMI is a Florida corporation and is not licensed to do business in Alabama. AQMI is a business consulting company but it does not have any offices in Alabama and does not maintain a registered agent for service in Alabama. AQMI does not advertise its services in Alabama (or anywhere for that matter), nor does it conduct any kind of other advertising in Alabama or targeted to reach Alabama.

6.      AQMI does not currently have any clients based in Alabama. Nor do I personally have any business interests based in Alabama.

7.      In the late summer of 2006, I was acting as a senior strategist for AQMI with regard to Mirabilis. Mirabilis had purchased a professional employer organization ("PEO") named The Hancock Group, LLC ("Hancock Group"), a sale which closed in February of 2006.

8.      The member interests of the Hancock Group were owned by David Chaviers, Tom Hancock, Norman Chaviers and Kellie Ledbetter – all of whom are plaintiffs in the above-captioned lawsuit.

9.      I did not participate in negotiations between Mirabilis and Hancock Group leading up to the purchase and sale agreement or the closing of the agreement between the members of Hancock Group and Mirabilis. I am not a signatory to any of the documents or agreements relating to the purchase and sale of Hancock



2

Group. I did not purchase or sell anything in that transaction, which was strictly between Mirabilis and the Plaintiffs and prior to any of my involvement.

10. My communications with former principals of Hancock Group all took place well after the closing of the purchase and sale agreement. Those communications, six or less in number, took place via telephone. All of the telephone calls were initiated by the Plaintiffs. I recall one visit by the former principals of Hancock Group to my offices in Orlando, Florida (there was possibly a second visit by one of the principals of Hancock Group to Orlando, Florida). I never traveled to Alabama in connection with this project.

11. My limited communications with the Plaintiffs were for the purpose of integrating Hancock Group's book of business into Mirabilis' book of business. These services were provided to Mirabilis as an outside consultant as part of its PEO consolidation strategy.

12. Mirabilis had acquired other PEOs, and was working to integrate all of its PEO business for the purposes of achieving uniformity and economies of scale. This was the nature of my engagement as an outside consultant for Mirabilis.

13. My communications with the former principals of Hancock Group were pursuant to the above-described engagement, and not for the purpose of negotiating the purchase and sale agreement or other documents between Mirabilis and the former principals of Hancock Group. In fact, my communications with the plaintiffs in this case were in their capacity as employees of a Mirabilis affiliate – not in their capacity as the former principals of Hancock Group.

3

14. By the time I first spoke with any of the former principals of Hancock Group, the purchase and sale agreement already had been executed and the sale had closed seven months earlier. Thus, nothing I said or did could have influenced plaintiffs' decision to sell Hancock Group.

15. AQMI was retained by Mirabilis to aid in the implementation of a strategic business plan and to advise on the utilization of the Capital Genesis Investment Model. This business model allows small businesses to consolidate their needs and benefit from increased bargaining power as a result of that consolidation.

16. My only correspondence related to the Hancock Group acquisition occurred well after the execution and closing of the purchase and sale agreement. That correspondence, attached as Exhibit H to the complaint in this case, speaks for itself. I did not directly exchange e-mails with the former principals of Hancock Group.

17. I do not now and have never owned or leased property in Alabama. Until this lawsuit, I have never been a plaintiff or a defendant in a lawsuit in the courts of Alabama (state or federal).

18. I do not have any current business dealings with Alabama. I have had no business dealings involving Alabama, other than the limited communications discussed above.

19. I have not visited Alabama since 2006. The purpose of that visit was for the wedding of the daughter of a friend of the family. Prior to that, I have been to

4

Alabama a few times, usually stopping to see friends of mine or my wife's while passing through the state.

20. Based on my limited contacts with the former principals of Hancock Group and my limited contacts with the state of Alabama otherwise, I would not have expected to be brought to court in Alabama.

21. It would be extraordinarily difficult for me to defend against a lawsuit in Alabama. Due to my responsibilities with regard to AQMI and the distance between Alabama and Orlando, Florida, defense of such a lawsuit in Alabama would work an extreme hardship on me.

22. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the facts set forth in this declaration are true and correct to the best of my knowledge.

Executed on this **4th** day of May, 2007.

Frank L. Amodeo

STATE OF FLORIDA )
)
COUNTY OF ORANGE )

The foregoing instrument was subscribed and sworn to before me this ___4th___ day of May, 2007, by Frank L. Amodeo, who is <u>personally known to me</u> or who has produced _____ _____ as identification.

[SEAL]

SCOTT M. GOLDBERG
MY COMMISSION # DD511730
EXPIRES: February 10, 2010
1-800-3-NOTARY    FL Notary Discount Assoc. Co.

Notary Public
Printed Name: _Scott M. Goldberg_

5

Plaintiffs' response to Amodeo's motion (styled as a "Motion to Strike") never addresses the heart of the key issues. Instead, Plaintiffs' response take shots at Amodeo's credibility (mostly on irrelevant matters) and simply states without analysis that personal jurisdiction exists.

As set forth below, the alleged "falsehoods" in Amodeo's declaration have been manufactured by manipulated context or are premised on inaccurate assumptions (rather than personal knowledge) in the declaration of David Chaviers. But buried within the mud slung by Plaintiffs is a critical admission: Plaintiffs now concede Amodeo had nothing to do with their decision to sell Hancock Group to Mirabilis. (Pl. Br., p. 20 and Chaviers Dec. ¶¶ 12-13 and 15). This is critical to the Court's analysis because the basis of the cause of action frames the specific personal jurisdiction analysis. Recognizing the consequences of this admission, Plaintiffs now attempt to shift their focus to Amodeo's alleged role in their "acceptance" of the Promissory Notes and Security Agreement. In essence, Plaintiffs now contend that the Court should exercise personal jurisdiction over Amodeo because he somehow misled them into "accepting" instruments which were unilateral in nature, and which were incidental to the Purchase and Sale Agreement closed between Plaintiffs and Mirabilis in February 2006 (long before Amodeo's first interaction with Plaintiffs).

Plaintiffs' contentions strain credulity and belie common sense. Their motion to strike should be denied, and this case should be reduced to what it is—a dispute between Mirabilis and Plaintiffs over the sale of Hancock Group.

## I. PLAINTIFFS HAVE MANUFACTURED "FALSEHOODS" IN AMODEO'S DECLARATION BY MANIPULATING CONTEXT AND RELYING ON INACCURATE, SUBJECTIVE ASSUMPTIONS BY DAVID CHAVIERS.

Plaintiffs' argument that Amodeo's declaration should be stricken relies on several "specific subjects of falsehoods." (Pl. Br., pp. 11-22). None of these so-called "falsehoods" withstand scrutiny, however.

### A. The surreptitiously recorded telephone conversations do not show that Amodeo "negotiated" the terms and conditions of the Promissory Notes and Security Agreement on behalf of Mirabilis.

Plaintiffs rely on a secretly recorded December 13, 2006 telephone conversation between Amodeo and Chaviers to support their contention that Amodeo "negotiated" the terms of the Promissory Notes and Security Agreement.[1] However, Plaintiffs entirely omit the context of the December 13, 2006 conversation. As Amodeo clarifies in his Supplemental Declaration:

---

[1] Tellingly, Plaintiffs never articulate what parts of the documents they contend were being "negotiated" in this conversation. In fact, Plaintiffs concede that the *amount* of the Promissory Notes had been determined prior to Amodeo's involvement. (Pl. Br., pp. 8, 13 and 20). Further, the payment terms already had been agreed-upon in the Purchase and Sale Agreement which closed in February 2006. (Purchase and Sale Agreement, attached at Amended Complaint Exhibit A, pp. 10-11).

At the time of my limited dealings with Plaintiffs, I was the previous owner of client contracts belonging to two professional employer organizations ("PEOs"), Paradyme, Inc., a Florida corporation ("Paradyme"), and Professional Benefit Solutions, Inc., a Florida corporation ("PBS"), which had been sold to Mirabilis. In that regard, I was similarly situated to Plaintiffs vis-à-vis Mirabilis . . . .

\* \* \* \*

When Mirabilis was approached by Paysource, Inc. ("Paysource"), who was interested in purchasing all of Mirabilis' PEO businesses, I set out to negotiate and ensure my continued security in the books of business belonging to Paradyme and PBS until I was paid in full.

\* \* \* \*

My conversation with Chaviers was solely for the purpose of informing him of the terms of my agreement with Mirabilis to guarantee payment and protect my collateral. Holding such security interests were in the best interests of all of the original PEO owners (such as Plaintiffs and me) who sold their businesses to Mirabilis.

\* \* \* \*

I was explaining that Chaviers and the original owners of the Hancock Group needed to, and could, obtain and continue their secured right to the book of business of the Hancock Group through notes and security agreements, as I had personally done on the PBS and Paradyme contracts.

\* \* \* \*

Taken in context, the "we" that I referred to in the recorded conversation was not Mirabilis and me, but rather the original owners of the Hancock Group and me,

> as similarly-situated original owners of PEOs being sold
> to a third-party.

(Amodeo Supp. Dec. attached hereto as Exhibit A, ¶¶ 3-4, 6 and 7-8). David
Chaviers' "understanding" of Amodeo's role or the December 13, 2006
conversation (even assuming the veracity of Chaviers' declaration) is of no
consequence. What matters here are *facts* based on personal knowledge—not ex
poste facto assumptions generated to support a litigation strategy [2].

### B. Plaintiffs' unilateral interpretation of the term "initiated" amounts to much ado about nothing.

Plaintiffs argue that, contrary to his declaration testimony, Amodeo did
"initiate" calls with Plaintiffs because Amodeo actually dialed Chaviers' telephone
number on two occasions. (Pl. Br., pp. 18-19). Amodeo does not dispute that he
actually made calls to Chaviers. The issue—as it relates to the jurisdictional
analysis—is whether Amodeo unilaterally initiated contact with Plaintiffs. He did
not. Amodeo unequivocally testified in his supplemental declaration: "every
communication I had with the Plaintiffs was in response to a request they made to
speak with me." (Amodeo Supp. Dec., ¶ 10). Plaintiffs do nothing to address the
substantive issue and instead, cling to the hyper-technical meaning of "initiated."
But even assuming Amodeo had unilaterally contacted Plaintiffs on two occasions,

---

[2] As explained in more detail in part I.E. *infra*, Chaviers' declaration is riddled with
impermissible conclusory statements and his and other Plaintiffs' "understanding" of certain
events.

this is of little consequence to the jurisdictional analysis. Surely Plaintiffs do not contend that two telephone calls placed to an Alabama phone number subject an out-of-state resident to personal jurisdiction in Alabama. <u>Fiedler v. First City Nat. Bank of Houston</u>, 807 F.2d 315 (2d Cir. 1986) (wherein Second Circuit held that bank's two telephone calls and one mailing into State of New York did not confer personal jurisdiction over the bank); <u>FC Investment Group LC v. IFX Markets, Ltd.</u>, 479 F. Supp. 2d 30 (D.D.C. 2007) (telephone calls placed by agent of defendant corporation into District of Columbia from elsewhere did not constitute "transacting business" in District of Columbia under long-arm statute governing personal jurisdiction).

> **C.    The documents and information provided to the Plaintiffs by Mirabilis at the closing of the purchase/sale of Hancock Group do not indicate that Amodeo was or is an employee of Mirabilis.**

At pages 5-10 of their brief, Plaintiffs attempt to "reconnect" Amodeo and Mirabilis through a series of vague assertions. For example, Plaintiffs assert (without explaining the relevance) that Amodeo at one point had been identified as part of the "team" or "roster of talent" for Nexia Strategy Corp. and Mirabilis. (Pl. Br., p. 5, and Chaviers Dec., ¶ 6). As Amodeo explains in his supplemental declaration, he was one of the independent consultants available for potential engagement by Mirabilis or Nexia (a wholly-owned subsidiary of Mirabilis).

(Amodeo Supp. Dec., ¶ 13). More to the point, Plaintiffs never explain how—as they apparently contend—the alleged connection between Amodeo and Mirabilis factors into the jurisdictional analysis. Even assuming Amodeo *was* an employee, officer or director of Mirabilis, this does not mean the Court has personal jurisdiction over him. See, e.g., Rhodes v. Unisys Corp., 170 Fed. Appx. 681 (11th Cir. 2006) (finding no jurisdiction over CEO even though jurisdiction was proper against company).

### D. The e-mails Plaintiffs sent to Amodeo and the e-mails from others at AQMI do not support personal jurisdiction over Amodeo.

Plaintiffs claim that they negotiated with Amodeo, as a representative of Mirabilis, with regard to the terms and conditions of the Promissory Notes and the Security Agreement. Notably, however, none of the e-mails on which Plaintiffs hinge their personal jurisdiction argument (1) discuss any particular terms and conditions of those documents, or (2) were sent or authored by Amodeo. (Ex. G to Pl. Br.). Moreover, of the eighteen e-mails attached to Chaviers' declaration as Exhibit G, only five were sent prior to Plaintiffs' "acceptance" of the Promissory Notes and Security Agreement. Of these five e-mails, four are from Plaintiffs themselves. (Chaviers Dec., Ex. G). The lone e-mail originating from someone other than Plaintiffs was sent by Jay Stollenwerk of AQMI Strategy, and says, in response to an earlier e-mail from David Chaviers:

> Good Morning David,
>
> Thank you for the information.  I shared the good news with Frank and he agrees that is a Great job and a terrific GM.
>
> Jay

(Chaviers Dec., Ex. G, p. 2 of 9).  This is not the stuff of "negotiation" and certainly is not a legitimate basis for personal jurisdiction (especially over a non-party to the e-mail).

### E. The Chaviers' declaration is not based on personal knowledge but instead, on impermissible conclusory statements.

It is ironic, to say the least, that Plaintiffs would take aim at Amodeo's declaration when their own supporting declaration suffers from fatal factual and legal infirmities. "[A]n affidavit may only be considered to the extent that it is based on personal knowledge."  The Homebingo Network, Inc. v. Chayevsky, 428 F. Supp. 2d 1232, 1238 (S.D. Ala. 2006). "Another black-letter requirement of affidavits is that they must be rooted in facts, rather than conclusory remarks." Id. at 1239. [3]

---

[3] See, e.g., Burger King Corp. v. Lumbermens Mut. Cas. Co., 410 F. Supp. 2d 1249, 1255 (S.D. Fla. 2005) ("An affidavit has no probative value and must be stricken when it contains conclusions rather than statements of fact."); Pashoian v. GTE Directories, 208 F. Supp. 2d 1293, 1297 (M.D. Fla. 2002) ("an affidavit must be stricken when it is a conclusory argument, rather than a statement of fact").

Chaviers' declaration is replete with statements that are not based on personal knowledge, but rather are conclusory statements of the Plaintiffs' "understandings." The list of statements includes:

> "That is certainly what **we understood** it to be from the labels and from the speakers' remarks." (Chaviers Declaration, ¶ 4).

> "… **we understood** Mr. Amodeo to have significant authority within Mirabilis and to have authority to speak on behalf of the company." <u>Id.</u> at ¶ 6.

> "… **I understood** Mr. Amodeo to suggest that I should not take his sale of stock to constitute the termination of his investment in Mirabilis." <u>Id.</u> at ¶ 8.

> "**We understood** Mr. Stollenwerk to be an employee of Mr. Amodeo at AQMI and/or Nexia, who worked closely with Mr. Amodeo." <u>Id.</u> at ¶ 9.

> "**We understood** that Mr. Stollenwerk was, in fact, consulting with Mr. Amodeo, as he indicated, and Mr. Amodeo never repudiated any communications of Mr. Stollenwerk, and never denied having spoke with Mr. Stollenwerk about matters as to which Mr. Stollenwerk claimed to have consulted Mr. Amodeo." <u>Id.</u>

> "**We understood** that these emails went to a Toni Higgins, who was Mr. Amodeo's assistant." <u>Id.</u> at ¶ 10.

> "**We understood** that Ms. Higgins was, in fact, consulting with Mr. Amodeo, as he indicated, and Mr. Amodeo never repudiated any communications of Ms. Higgins, and never denied having spoken with Ms. Higgins about matters as to which Ms. Higgins claimed to have consulted Mr. Amodeo." <u>Id.</u>

> "From this, **I concluded** that Mr. Amodeo had been involved in the process of purchasing the Hancock Group, although plaintiffs did not have direct contact

with him until later in 2006, as set forth herein." <u>Id.</u> at ¶ 12.

Preceded with the words "we understood" or "we concluded," Chaviers' declaration statements are nothing more than conclusory remarks on facts of which Chaviers himself has no personal knowledge. Even more troubling is that Chaviers' declaration purports to represent what the *other* plaintiffs "understood," not just himself.

## II.   PLAINTIFFS' "SPECIFIC" JURISDICTION ARGUMENT FAILS AS A MATTER OF FACT AND LAW.

### A.   Plaintiffs are attempting to re-cast their fraud claims in an effort to bootstrap "specific" personal jurisdiction.

Plaintiffs admit they had no contact with Amodeo until November or December of 2006—nine to ten months *after* Plaintiffs sold Hancock Group to Mirabilis. (Chaviers Dec., ¶ 12). Plaintiffs further admit that "Mr. Amodeo was not involved in the negotiations regarding the Purchase Agreement," and that "Amodeo made no representations on which Plaintiffs relied in entering in to the Purchase Agreement." (Chaviers Dec., ¶ 15, and Pl. Br., p. 20). For this reason, Plaintiffs shift their focus away from the alleged fraud leading to the sale of Hancock Group and instead, loosely allege problems with the Promissory Notes and Security Agreement (instruments to which Frank Amodeo was *not* a party). This is important in the context of "specific" personal jurisdiction because, for

specific jurisdiction to exist, the cause of action must "arise out of or relate to" a defendant's contact with the forum state.  Thus, Plaintiffs are attempting to re-cast their fraud claims against Amodeo in an effort to satisfy the specific personal jurisdiction standard.

On an even more fundamental level, Plaintiffs' claim of fraud in the "negotiation" of the Promissory Notes and Security Agreement (to the extent there were any "negotiations") does not make sense.  In the hundreds of pages of motions, briefs, exhibits and declarations, not once do Plaintiffs explain, much less show, how they were defrauded in connection with the Promissory Notes and Security Agreement. What were the material misrepresentations of fact upon which they relied to their detriment?  It is undisputed that Plaintiffs already had sold Hancock Group, already had established the price of the sale, and already had established the amount to be paid through Promissory Notes (and the essential terms, such as the repayment period).  Are Plaintiffs really asserting that something Amodeo said or did misled them into "accepting" the Promissory Notes or Security Agreement?  What if they had *not* accepted them?  They would be *worse* off as a matter of law (since they already had sold Hancock Group, but had no notes or security).  Plaintiffs' allegations in this regard are almost too preposterous to rebut.

**B.** **Amodeo's limited interaction with the Plaintiffs during November and December of 2006 does not confer personal jurisdiction over him in Alabama.**

Even if the Court looks past Plaintiffs' cause-of-action shell game, the alleged contacts upon which Plaintiffs rest their jurisdictional argument are still insufficient as a matter of law. Importantly, Amodeo never once came to Alabama in connection with this project. (Original Amodeo Declaration, ¶ 10). His contacts with Plaintiffs in the time period Plaintiffs now contend is critical (November and December 2006, immediately prior to their "acceptance" of the Promissory Notes and Security Agreement) were exclusively over the telephone, or in-person in Orlando, Florida. Id. In fact, Amodeo's contacts with Alabama, as alleged by Plaintiffs, are limited to the following:

a) A single, surreptitiously recorded telephone conversation between Amodeo and David Chaviers;

b) A single recorded telephone message from Amodeo to Chaviers made in response to an inquiry from Plaintiffs;

c) One e-mail sent by someone from Amodeo's e-mail address to Plaintiffs to set up a conference call (sent well after the Promissory Notes and Security Agreement were "accepted" by Plaintiffs);

d) A single letter in November 2006 to Plaintiffs' counsel sent in response to a letter from Plaintiffs'

counsel that did not address the Promissory Notes
or the Security Agreement; and

e)  The fact that *Plaintiffs sent/placed* limited e-mails
and telephone calls to Amodeo at his office in
Florida.

These few events are insufficient to establish personal jurisdiction over Amodeo in

the courts of Alabama.

### III. THE COURT CANNOT EXERCISE PERSONAL JURISDICTION OVER AMODEO BASED ON THE ALLEGED 10B-5 CLAIM BECAUSE THE PROMISSORY NOTES AND SECURITY AGREEMENT ARE NOT "SECURITIES."

Plaintiffs offer no rebuttal to Amodeo's argument that the purchase and sale

of Hancock Group, LLC was not the "purchase and sale of a security" required to

support a 10b-5 claim. Instead, they argue that their "acceptance" of the

Promissory Notes and Security Agreement were separate transactions and that the

transfer of the Promissory Notes and Security Agreement was a "transfer of

securities subject to 10b-5." (Pl. Br., p. 30). [4]  Even if the Court accepts this

strained argument, the 10b-5 claim still lacks sufficient merit to saddle Amodeo

with personal jurisdiction.

---

[4] This is an odd argument to say the least.  Plaintiffs are conceding (apparently) that the "thing"
sold (membership interests in Hancock Group, LLC) is not a "security," but that somehow the
promise to pay for that "thing" *is* a "security."  This oddity is part in parcel of Plaintiffs'
overarching theme for personal jurisdiction—that their "acceptance" of the Promissory Notes
and Security Agreement is severable from the February 2006 transaction from which they flow.

## A. The Promissory Notes and the Security Agreement are not "securities."

Plaintiffs offer no substantive argument as to how the Promissory Notes or Security Agreement can be deemed a "security" for purposes of 10b-5. Their entire argument is a single sentence of text quoting (without discussion) Reves v. Ernst & Young, 494 U.S. 56, 110 S. Ct. 945 (1990). (Pl. Br., p. 30). In Reves, a farmers' cooperative issued demand promissory notes to thousands of its members and third parties. Id. at 58-59. The notes were marketed as "an investment program," contained variable rates of interest, and were issued to finance general business operations. Id. at 59. After the cooperative went bankrupt, noteholders sued the accounting firm alleging intentional failure to follow accepted accounting principles with respect to major assets of the cooperative. Id.

In addressing the issue of whether and when "notes" were securities, the Reves Court held that a note may be an investment covered by the 1934 Act in some contexts, and in others may well be simply an ordinary commercial obligation. The Court adopted a four-prong "family resemblance" test to determine whether various notes are indeed securities. Id. at 66. The Court enumerated the four factors as follows:

> 1) The transaction must be examined to "assess the motivations [prompting] a reasonable seller and buyer to enter into it. If the seller's purpose is to raise money…or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to

generate, the instrument is likely to be a 'security.'"  If the purpose of issuance is to finance a particular debt obligation or has a commercial or consumer purpose, it is less akin to an investment.

2) The instrument's "plan of distribution" must be examined to determine if there exists "common trading for speculation or investment."

3) The reasonable expectations of the investing public must be examined.  The Court will consider instruments "securities" "on the basis of such public expectations."

4) Factors such as the existence of a regulatory scheme that reduces the risk, such as federal deposit insurance, "thereby rendering application of the Securities Acts unnecessary" must be reviewed.

Id. at 66-67.

In formulating this test, the Court reviewed a list that the Second Circuit had created of instruments commonly denominated as notes "that nonetheless fall without the 'security' category."  Id. at 65.  Types of notes that are not "securities" include:

the note delivered in consumer financing, the note secured by a mortgage on a home, **the short-term note secured by a lien on a small business or some of its assets,** the note evidencing a 'character' loan to a bank customer, the short term notes secured by an assignment of accounts receivable, or a note which simply formalizes an open-account debt incurred in the ordinary course of business…[and] notes evidencing loans by commercial banks for current operations.

Id. (citing Exchange National Bank v. Touch Ross & Co., 544 F.2d 1126, 1138 (2d

Cir. 1976) and Chemical Bank v. Arthur Anderson & Co., 726 F.2d 930, 939 (2d

Cir. 1984)) (emphasis added).   After applying the "family resemblance" test to the

farmers' cooperative notes and comparing them to the list enumerated by the

Second Circuit, the Supreme Court determined that they were securities because

they were sold in an effort "to raise capital for its general business operations, and

purchasers bought them in order to earn a profit in the form of interest...slightly

above the rate paid by local banks and savings and loans."   494 U.S. at 67-68.

Unlike in Reves, however, the Promissory Notes in this case are most naturally

akin to a note created to finance a debt obligation on the part of Mirabilis.   There

was no speculation, investment or consumer expectation involved anywhere in the

creation of the Promissory Notes.   As such, the Promissory Notes are not

"securities" for purposes of a 10b-5 claim. [5]

### B.     Neither the Promissory Note nor the Security Agreement was purchased or sold.

Even if the Promissory Notes and Security Agreement are somehow

construed to be securities, a 10b-5 claim cannot stand unless Plaintiff can show

that the alleged unlawful conduct was *in connection with a purchase or sale of*

---

[5] Plaintiffs offer no argument—not even a sentence—to support their conclusory assertion that the "transfer" of the Security Agreement was a "transfer of securities subject to 10b-5." (Pl. Br., p. 30).  Nowhere in the language of Section 3(a)(10) of the 1934 Act (defining "security") is anything remotely akin to the Security Agreement mentioned.

*those securities*.  It defies logic to say that the Promissory Notes or Security Agreement were purchased or sold in the December 2006 timeframe.  Here, the Promissory Notes and Security Agreement were executed by Mirabilis in or around December 2006 to memorialize a debt obligation borne solely by Mirabilis. Mirabilis promised to pay the former principals of Hancock Group, and Mirabilis provided a security interest in collateral to the former principals of Hancock Group.  The former principals of Hancock Group incurred no obligations whatsoever through the formation of the Promissory Notes and Security Agreement.

## CONCLUSION

Plaintiffs have gone to great lengths to keep Amodeo in this case.  Through manipulated context, erroneous assumptions, and completely irrelevant allegations, they have attempted to characterize Amodeo as a liar.  Through claim-recharacterization, Plaintiffs leave behind the original focus of their Complaint (seller's remorse) and attempt to breathe independent life into ancillary instruments.  Through these efforts, Plaintiffs have unnecessarily complicated an otherwise basic in personam jurisdiction analysis.  Looking past the red-herrings in Plaintiffs' response, the fundamental assertions in Amodeo's Motion to Dismiss still hold true:

- Amodeo does not have sufficient contacts with Alabama for the Court to exercise personal jurisdiction consistent with Due Process; and

- Plaintiffs' 10b-5 claim is a legally flawed attempt to manufacture personal jurisdiction where it otherwise does not exist.

For all of the foregoing reasons, Defendant Frank Amodeo respectfully requests that the Court deny Plaintiffs' Motion to Strike the Declaration of Frank Amodeo and dismiss the claims against him for lack of personal jurisdiction.

Respectfully submitted,

Dated: June 4, 2007.

/s Eric B. Langley
Charles A. Burkhart
Eric B. Langley
David Burkholder
Attorneys for Defendants
**BALCH & BINGHAM LLP**
Post Office Box 306
Birmingham, AL 35201-0306
Telephone: (205) 251-8100
Facsimile: (205) 488-5689
E-mail: cburkhart@balch.com
    elangley@balch.com
    dburkholder@balch.com

**Counsel for Defendants**

**Of Counsel for Defendants:**
Mark J. Bernet, Esq.
200 South Orange Avenue, Suite 2800
Orlando, FL  32801
Telephone: (407) 517-7779
Facsimile: (407) 454-5102
mbernet@mirabilisventures.com
Florida Bar No. 606359

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

|  |  |  |
|---|---|---|
| **DAVID CHAVIERS, NORMAN CHAVIERS, KELLIE LEDBETTER, and TOM HANCOCK**, | ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **CIVIL ACTION NO.** **CV-07-0442-CLS** |
| **MIRABILIS VENTURES, INC., and FRANK AMODEO, et al.,** | ) ) ) | |
| **Defendants.** | ) ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on June 4, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Phillip W. Williams, Jr. / phwill@sbswlegal.com

and I hereby certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participants:

John M. Gross
TAYLOR, BUSCH, SLIPAKOFF, DUMA, LLP
1600 Parkwood Circle, Suite 200
Atlanta, Georgia 30339
Telephone: (770) 434-6868
Facsimile: (770) 434-7376

Counsel for Plaintiffs

Mark J. Bernet, Esq.
200 South Orange Avenue, Suite 2800
Orlando, FL 32801
Telephone: (407) 517-7779
Facsimile: (407) 454-5102
mbernet@mirabilisventures.com

Counsel for Defendants

/s Eric B. Langley
    Charles A. Burkhart
    Eric B. Langley
    David Burkholder
    Attorneys for Defendants
    BALCH & BINGHAM LLP
    Post Office Box 306
    Birmingham, AL 35201-0306
    Telephone: (205) 251-8100
    Facsimile: (205) 488-5689
    E-mail: cburkhart@balch.com
            elangley@balch.com
            dburkholder@balch.com

**Counsel for Defendants**

FILED

2007 Jun-04  PM 06:30
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

| | | |
|---|---|---|
| DAVID CHAVIERS, NORMAN CHAVIERS, KELLIE LEDBETTER, and TOM HANCOCK, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | CV-07-0442-CLS |
| | ) | |
| MIRABILIS VENTURES, INC., and FRANK AMODEO, et al., | ) ) | |
| | ) | |
| Defendants. | ) | |

## SUPPLEMENTAL DECLARATION OF FRANK L. AMODEO

1.      My name is Frank L. Amodeo. I am a resident of Orlando, Florida. I am over the

age of twenty-one (21) years, am of sound mind, and am competent to make this

declaration. This declaration is based upon my personal knowledge.

2.      I have read the Plaintiffs' motion to strike my declaration and their response to

my motion to dismiss for lack of personal jurisdiction, as well as the declaration

of David G. Chaviers in support of their motion (collectively the "Motion to

Strike"). I submit this supplemental declaration to clarify the facts in my original

declaration and to rebut certain mischaracterizations in the declaration of David

Chaviers.

3.      At the time of my limited dealings with Plaintiffs, I was the previous owner of

client contracts belonging to two professional employer organizations ("PEOs"),

Paradyme, Inc., a Florida corporation ("Paradyme"), and Professional Benefit



911291.1

Solutions, Inc., a Florida corporation ("PBS"), which had been sold to Mirabilis. In that regard, I was similarly situated to Plaintiffs vis-à-vis Mirabilis. As a condition to my sale, my consent was required if the aforementioned contracts were sold prior to payment of outstanding amounts owed to me for the purchase of the same. I also obtained a secured right in the books of business belonging to Paradyme and PBS for so long as there were outstanding amounts owed for the purchase of the contracts.

4.    When Mirabilis was approached by Paysource, Inc. ("Paysource"), who was interested in purchasing all of Mirabilis' PEO businesses, I set out to negotiate and ensure my continued security in the books of business belonging to Paradyme and PBS until I was paid in full.

5.    In their Motion to Strike, Plaintiffs reference a call between David Chaviers ("Chaviers") and me on December 13, 2006 and provide a transcript of that recording which they allege directly contradicts certain testimony in my original declaration. I was never informed the call was being recorded and I never consented to such recording. I reserve all rights against Chaviers under federal and state law in connection with this surreptitious recording.

6.    My conversation with Chaviers was for the purpose of informing him of the terms of my agreement with Mirabilis to guarantee payment and protect my collateral. Holding such security interests were in the best interests of all of the original PEO owners (such as Plaintiffs and me) who sold their businesses to Mirabilis. In pertinent part, their transcription of the conversation states:

MR. AMODEO: Okay. First of all, they have -- here's what I was proposing, and I proposed for everybody just like for me so I'm getting the same thing, a -- a note with a security interest in the actual contracts so that the contracts, and a general guaranty from Mirabilis.

MR. AMODEO: Now, I said the deal has to look as the following: A note with a security interest to the specific contracts.

MR. CHAVIERS: Now, when you say -

MR. AMODEO: -- by December 31st including any personal guaranties. . . .

MR. AMODEO: And so my -- the essence of this is that there's a director's meeting on Friday, which I anticipate this will be approved because I have talked to most of them. **And I'll tell them that will leave -- you know, I will be out of their hair, as long as this is done, and I see that on Monday they pay off all the personal guaranties. Which, truthfully speaking, I don't really have any but the insurance, but I was speaking for -- I was advocating for everybody in this deal.**

MR. CHAVIERS: Uh-huh

**MR. CHAVIERS: Okay. When you're saying a security interest, explain that. What exactly do you mean?**

**MR. AMODEO: You see that says that if the notes are in default, that we can take back the particular contracts. In other words, the contracts are collateral for the debt until the debt is paid. So you have -- we have the right to either sue Mirabilis or take the contracts back.**

. . . . . .

MR. AMODEO: Here's what I'm doing right now so I can tell you. I made this phone call to kind of, you know, get a feel for the notions first. I'm going to chat with everybody else because I told them that I would call personally. I want to live up to what I said.

MR. CHAVIERS: Right.

**MR. AMODEO: As soon as I do that, I will write up a memo, I will give it to them. And my goal would be to have it done by Friday of next week at the latest. I'll set an absolute one-week deadline to have it all in place.**

MR. CHAVIERS: Okay. And they're going to meet this Friday?

MR. AMODEO: They're meeting this Friday at 1:00. Like I said, I don't expect any trouble out of that meeting, from my conversations. I talked to five or six of them already, and this works out -- this works out really well for everybody because this -- this was going to become a mon-- they needed a real management team to run this.

Exhibit E to Chaviers Decl., at 2-7; see also recording in file ORLANDO FL Recording 407-913-8873 Duration 13-02 12-13-2006 10-38-00-AM.wav, included in Exhibit D to Chaviers Decl. (emphasis added).

7.    Chaviers' declaration grossly misconstrues the substance and underlying purpose of the above-referenced conversation. I was explaining that Chaviers and the original owners of Hancock Group needed to, and could, obtain and continue their secured right to the book of business of the Hancock Group through notes and security agreements, as I had personally done on the PBS and Paradyme contracts.

8.    Taken in context, the "we" that I referred to in the recorded conversation was not Mirabilis and me, but rather the original owners of the Hancock Group and me, as similarly-situated original owners of PEOs being sold to a third-party.

9.    A global resolution and agreement as to the transfer of the aggregate PEO business was in the best interests of all involved, and I set forth to facilitate that process among all of the interested parties.

10.   Plaintiffs provide proof of two calls that I made as purported proof that I "initiated" calls to them. However, every communication I had with the Plaintiffs was in response to a request they made to speak with me. Specifically, Plaintiffs called my offices several times to discuss problems or seek my assistance in

911291.1                                    4

resolution of their problems. As is evident from the call transcripts, I called Plaintiffs in response to their previous inquiries or questions with regard to integration of the PEO business of Mirabilis. This is what I meant in my original declaration when I said the telephone calls were "initiated by the Plaintiffs."

11. With regard to Plaintiffs' allegation that "[S]ubordinates of Mr. Amodeo at Nexia, including Mr. Stollenwerk and Ms. Higgins, frequently responded to those emails, purporting to offer Mr. Amodeo's responses to Plaintiffs' inquiries," e-mails sent from my staff were only in response to requests for meetings and/or inquiries from Plaintiffs.

12. Plaintiffs also reference marketing documentation provided to them by Mirabilis "at the time of closing of the Purchase Agreement." Specifically, they reference a brochure in which I am listed on a Nexia Strategy Corporation ("Nexia") roster of talent and a video in which I am featured speaking.

13. Nexia was a wholly-owned subsidiary of Mirabilis that conducted business consulting services for non-affiliates and affiliates of Mirabilis during 2006. As part of its business plan, Nexia engaged independent consultants with subject-matter experience relevant to any given project. Therefore, the referenced "roster of talent," simply meant the professionals which Nexia could access to render services on consulting projects. I was one of the professionals that Nexia could potentially engage to work on its projects.

14. To my knowledge, Nexia was not retained or utilized in the acquisition or operation of the Hancock Group.

5

15.    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the facts set

forth in this declaration are true and correct to the best of my knowledge.

Executed on this 4th day of June, 2007.

Frank L. Amodeo