# BB

## BALCH & BINGHAM LU'

Attorneys and Coumelors 1710
Sixth Avenue North P.O. Box
306 (35201-0306) Birmingham,
AL 35203-2015 (205) 251-8100
(205) 226-8798 Fax
www.balch.com

(205) 488-5893 (direct fax)
medwards@balch.com

Alabama. Georgia. Mississipi- Washingron, DC

Michael L. Edwards
(205) 226-3401

December 27,2007

Ms. Edith Curry
11916 Brookmeade Court
Glen Allen, VA 231059

Re: **Notice of Claim**
    <u>AQMI Strategy Corporation, et aI. v. Berman, et aI.</u>
    Formal Demand and Claims for Relief Arising from Your Misconduct On Behalf of
    Mirabilis Ventures, Inc. and/or AEM, Inc.

Dear Ms. Curry:

On behalf of AQMI Strategy Corporation and Titanium Technologies, Inc., this letter is to make formal demand against you for the wrongful acts and omissions you committed while a director and/or officer of Mirabilis Ventures, Inc. and/or a director, officer or controlling person of AEM, Inc. These wrongful acts and omissions are more specifically described in the enclosed draft complaint for filing in the Circuit Court of the Ninth Judicial Circuit for Orange County, Florida. Please be advised that if these claims for monetary relief are not resolved to AQMI Strategy Corporation and Titanium Technologies, Inc.'s satisfaction within the next forty-five (45) days the attached lawsuit will be filed against you.

Mirabilis Ventures, Inc., and AEM, Inc. as a subsidiary of Mirabilis Ventures, Inc., maintain Directors and Officers Liability coverage with Arch Insurance Company (Policy No. PCDOO 19469-00), RSUI Group, Inc. (Policy No. N HS623868) and Zurich American Insurance Company (Policy No. DOC 5917968 01).          While we are sending notice of this claim to these insurance carriers, we encourage you to immediately contact these insurers concerning these

December 27,2007
Page 2

claims in writing and to demand formally that these insurers provide you with all insurance

coverage that you may be entitled to under these policies. You should be certain to identify your

policy number in your written correspondence to these insurers, and direct your written

correspondence to the following addresses:

Executi ve Assurance Claims
Arch Insurance Company One
Liberty Plaza, 53rd Floor New
York, New York 10006 Fax:
(646) 746-8111

RSUI Group, Inc.
945 East Paces Ferry Rd.
Suite 1800
Atlanta, Georgia 30326-1125
Fax: (404) 260-3997, Attn: Claims Department

Zurich American Insurance Company
One Liberty Plaza, 30th Floor
New York, New York 10006
Attention: Executive Assurance Department

In addition, there may be other liability insurance coverage available to you for these

claims. Therefore, we encourage you to notify any other insurers that may cover these claims

and to seek all liability coverage that may be available to you.

Thank you for your prompt attention to this matter.

Very truly yours,

Michael L. Edwards

MLE:as

Enclosure

948303 1

IN THE CIRCUIT COURT OF THE
NINTH JUDICIAL CIRCUIT, IN AND FOR
ORANGE COUNTY, FLORIDA

CASE NO.:

AQMI STRA TEGY CORPORATION and
TITANIUM TECHNOLOGIES, INC.,

                Plaintiffs,

vs.

RICHARD E. BERMAN, LAURIE S. HOLTZ,
EDITH CURRY, FRANK HAILSTONES,
JAMES SADRIANNA, ROBERT POLLACK,
JASON CARLSON, WILLIAM WALSH,
FERNANDO SIMO, JAMES V ANDEVERE,
HORTON S. JOHNSON, BRUCE WALKO,
THOMAS BROADHEAD, DANIEL MYERS,
PAUL GLOVER, HANS BEYER,
STEVEN BONCK, Y ANIV AMAR,
LAURIE ANDREA, DEBRA COLE,
MICHAEL STANLEY, LAWRENCE HABER,
CHUCK KIRKPATRICK, DANIEL McHENRY,
PHILIP KAPROW, JEFFREY REICHEL,
MICHAEL MAPES, KEVIN MUNROE, ALLEN
ARCHER, BRIAN FISCHER,
ROBERT KONICKI, TRACY TAYLOR,
and MICHAEL BARBEE,

                Defendants.

## **COMPLAINT**

      Plaintiffs AQMI Strategy Corporation and Titanium Technologies, Inc. (collectively

referred to as "Plaintiffs"), by and through their undersigned counsel, state as follows:

### **Introduction**

      1.      During the events giving rise to this lawsuit, Plaintiffs AQMI Strategy

Corporation ("AQMI") and Titanium Technologies, Inc. ("Titanium") were the primary secured

creditors of Mirabilis Ventures, Inc. ("Mirabilis"), and one of Mirabilis' s subsidiary

corporations, AEM, Inc. d/b/a Mirabilis HR, ("AEM"). Mirabilis and AEM were created to help reorganize and preserve the Professional Employer Organization ("PEO") assets of Presidion Solutions, Inc. ("PSI"), a subsidiary of Presidion Corporation (sometimes collectively referred to herein as "Presidion"). Mirabilis and AEM were tasked with this job by Frank Amodeo and AQMI, a consulting organization hired by Presidion to resolve Presidion's outstanding problems, including mounting payroll tax liabilities.

2.      Amodeo and AQMI developed a plan for Presidion, which was primarily designed to preserve, restore, and maximize the inherent value of the Presidion PEO assets, which had become depressed because of a myriad of problems created by mismanagement of Presidion and its subsidiaries, including the acquisition of large payroll tax liability. The plan involved creating successor companies, Mirabilis and AEM, to acquire the Presidion PEO assets, including two subsidiaries of PSI known as Professional Benefits Solutions, Inc. ("PBS") and Paradyme, Inc. ("Paradyme"), resell them, and use the proceeds to pay unsecured priority state and federal tax creditors. Mirabilis and AEM were capitalized by Plaintiffs Titanium and AQMI, resulting in Plaintiffs being the primary secured creditors of Mirabilis.

3.      In preparations for the purchase of the PEO assets, AEM entered into a Management Agreement with PSI to oversee the processing of Presidion's PEO assets. AEM also utilized AEM's bank accounts to process the payroll of Presidion's PEO assets. While PBS and Paradyme collected payroll taxes under the PBS federal employer identification number ("FEIN"), however, Mirabilis and AEM began to apply these payroll tax payments to the *AEM FEIN*. These actions dramatically increased the large tax liability already owed by the Presidion PEO assets, while lowering the tax liability owed on AEM's own PEO assets. Mirabilis and AEM continued fraudulently to apply such tax payments to AEM's own FEIN and transfer the

payroll tax money to Mirabilis, or its affiliates, as loans or payments for services. During this time, AEM also represented to state regulatory authorities that it had acquired the Presidion PEO assets, when in fact it had not, and Mirabilis and AEM periodically represented to PSI that current taxes owed on behalf of the Presidion PEO assets had been paid. The continued remittance of tax payments under the AEM FEIN, and diversion of tax monies to Mirabilis and others, resulted in an erroneous tax credit for AEM of approximately $11,000,000, additional tax arrearages owed by Paradyme, and precipitated the investigation of Amodeo, Presidion, PSI, Mirabilis, AEM and others by the IRS and U.S. Attorney's Office for alleged evasion of payment of taxes.

4.     This lawsuit is brought against the directors and officers of Mirabilis and AEM for breach of fiduciary duty, recklessness and negligence in failing to discharge their duties in good faith, and for acting in a way that injured Mirabilis's and AEM's shareholders and creditors, including Titanium and AQMI.

## Parties

5.     Plaintiff Titanium Technologies, Inc. is a Florida corporation with its principal place of business in Orange County and, at all material times, was one of the primary secured creditors of Mirabilis Ventures, Inc.

6.     Plaintiff AQMI Strategy Corporation is a Florida corporation with its principal place of business in Orange County and, at all material times, was one of the primary secured creditors of Mirabilis Ventures, Inc.

7.     Presidion Corporation ("Presidion") is a Florida corporation.

8.     Presidion Solutions, Inc. ("PSI") is a Florida corporation.

'1~R2(J1 2

9.      Professional Benefits Solutions, Inc., also known as Presidion Solutions VII, Inc. ("PBS") is a Florida corporation. At all material times, PBS was a professional employer organization ("PEO") operating subsidiary of Pre sid ion Solutions, Inc. and/or Wellington.

1 0.      Paradyme, Inc. ("Paradyme") is a Florida corporation. At all material times, Paradyme was a PEO operating subsidiary of PSI and/or Wellington.

11.      Wellington Capital Group, Inc. ("Wellington") is a Nevada corporation.

12.      Mirabilis Ventures, Inc. ("Mirabilis") is a Nevada corporation. At all material times, Mirabilis transacted business in Orange County, Florida.

13.      AEM, Inc. d/b/a Mirabilis HR ("AEM") is a Florida corporation.

14.      Defendant Richard Berman ("Berman") was a member of the Board of Directors of Mirabilis from March 23, 2006 until February 1, 2007, and was Secretary and General Counsel for Mirabilis from January 25, 2006 until December 28, 2006. Berman is a resident of Broward County, Florida. With respect to the allegations contained in this Complaint, Berman was acting in his capacity as a director and officer of Mirabilis.

15.      Defendant Laurie Holtz ("Holtz") was a member of the Board of Directors of Mirabilis from March 23, 2006 until February 26, 2007. Beginning in or about June of 2005, and prior to being a member of the Mirabilis Board of Directors, Holtz was hired as an outside, independent member of the Mirabilis Audit Committee. Holtz is a resident of Dade County, Florida. With respect to the allegations contained in this Complaint, Holtz was acting in his capacity as a director of Mirabilis.

16.      Defendant Edith Curry ("Curry") was a member of the Board of Directors of Mirabilis from January 3, 2005 until October 31, 2006, and was Secretary and Treasurer for Mirabilis from January 3, 2005 until October 1, 2005. Curry is a resident of Henrico County,

Virginia. With respect to the allegations contained in this Complaint, Curry was acting in her capacity as a director and officer of Mirabilis.

17.     Defendant Frank Hailstones ("Hailstones") was a member of the Board of Directors of Mirabilis from January 25, 2006 until January 31, 2007, was Vice-President of Mirabilis from September 1, 2005 until December 31, 2005, and was President of Mirabilis from January 1, 2006 until December 15, 2006. Additionally, beginning on March 15, 2006, Hailstones became a statutory controlling person of AEM. Hailstones is a resident and citizen of the United Kingdom. With respect to the allegations contained in this Complaint, Hailstones was acting in his capacity as a director and officer of Mirabilis, and as a statutory controlling person of AEM.

18.             Defendant James Sadrianna ("Sadrianna") was a member of the Board of Directors of Mirabilis from October 1, 2005 until December 31, 2006, and was President of Mirabilis from October 1, 2005 until January 25, 2006. Sadrianna is a resident of Orange County, Florida. With respect to the allegations contained in this Complaint, Sadrianna was acting in his capacity as a director and officer of Mirabilis.

19.             Defendant Robert Pollack ("Pollack") was a member of the Board of Directors of Mirabilis from January 3, 2005 until December 31, 2006, and was Vice-President of Mirabilis from October 1, 2004 until January 25, 2006. Additionally, Pollack was a director of Presidion from January 5, 2005 until December 31, 2006. Pollack is a resident and citizen of Orange County, Florida. With respect to the allegations contained in this Complaint, Pollock was acting in his capacity as a director and officer of Mirabilis.

20.     Defendant Jason Carlson ("Carlson") was a member of the Board of Directors of Mirabilis beginning January 3, 2005 and ending February 28, 2007, and was Vice-President and

President of Mirabilis from January 3, 2005 until February 28, 2007. Additionally, Carlson was a director of Presidion from January 5, 2005 until December 31, 2006. Carlson is a resident of Washington County, Minnesota. With respect to the allegations contained in this Complaint, Carlson was acting in his capacity as a director and officer of Mirabilis.

21.     Defendant William W alsh ("Walsh") was a member of the Board of Directors of Mirabilis from October 2, 2006 until February 28, 2007, and was Chief Financial Officer and President of Mirabilis from October 2, 2006 until February 28, 2007. Walsh is a resident of Chester County, Pennsylvania. With respect to the allegations contained in this Complaint, Walsh was acting in his capacity as a director and officer of Mirabilis.

22.     Defendant Fernando Simo ("Simo") was a member of the Board of Directors of Mirabilis from November 1,2006 until February 28,2007, and was Chief Operating Officer and Chief Executive Officer of Mirabilis from January 25, 2006 until February 28, 2007. Simo is a resident of Orange County, Florida. With respect to the allegations contained in this Complaint, Simo was acting in his capacity as a director and officer of Mirabilis.

23.     Defendant James Vandevere ("Vandevere") was Vice-President of Mirabilis from October 1, 2005 until January 25, 2006. Vandevere is a resident of Orange County, Florida. With respect to the allegations contained in this Complaint, Vandevere was acting in his capacity as an officer of Mirabilis.

24.     Defendant Horton S. Johnson ("Johnson") was Vice-President of Mirabilis from October 1, 2005 until January 31, 2007. Johnson is a resident of Orange County, Florida. With respect to the allegations contained in this Complaint, Johnson was acting in his capacity as an officer of Mirabilis.

()-1lQ632

25.     Defendant Bruce Walko ("Walko") was a member of the Board of Directors of Mirabilis from October 1, 2005 until December 31, 2006. Walko is a resident of Broward County, Florida. With respect to the allegations contained in this Complaint, Walko was acting in his capacity as a director of Mirabilis.

26.     Defendant Torn Broadhead ("Broadhead") was a member of the Board of Directors of Mirabilis from March 23, 2006 until May 31, 2006, and was Vice-President, Secretary and General Counsel for Mirabilis from August 1, 2005 until January 31, 2007. Broadhead is a resident of Henrico County, Virginia. With respect to the allegations contained in this Complaint, Broadhead was acting in his capacity as a director and officer of Mirabilis.

27.     Defendant Daniel Myers ("Myers") was Chief Financial Officer and Vice-President of Mirabilis from January 1, 2005 until January 31, 2007. Myers is a resident of Orange County, Florida. With respect to the allegations contained in this Complaint, Myers was acting in his capacity as an officer of Mirabilis.

28.     Defendant Paul Glover ("Glover") was Chief Financial Officer and Vice-President of Mirabilis from January 25, 2006 until August 31, 2006. Additionally Glover was a statutory controlling person of AEM from April 21, 2006 until June 1,2006. Glover is a resident of Seminole County, Florida. With respect to the allegations contained in this Complaint, Glover was acting in his capacity as an officer of Mirabilis, and as a statutory controlling person of AEM.

29.     Defendant Hans Beyer ("Beyer") was Vice-President and Regional Director for Mirabilis from March 1, 2005 until December 31, 2006. Beyer is a resident of Hillsborough County, Florida. With respect to the allegations contained in this Complaint, Beyer was acting in his capacity as an officer of Mirabilis.

30.     Defendant Steven Bonck ("Bonck") was Chief Corporate Tax Manager and Vice-President of Mirabilis from April 1, 2006 until March 31, 2007. Bonck is a resident of Seminole County, Florida. With respect to the allegations contained in this Complaint, Bonck was acting in his capacity as an officer of Mirabilis.

31.     Defendant Yaniv Amar ("Amar") was President of AEM from August 1,2005 until June 21, 2006. Additionally, Amar was a statutory controlling person of AEM from August 1, 2005 until June 21, 2006. Amar is a resident of Dade County, Florida. With respect to the allegations contained in this Complaint, Amar was acting in his capacity as an officer and statutory controlling person of AEM.

32.     Defendant Laurie Andrea ("Andrea") was Vice-President of Mirabilis from January 1, 2005 until March 31, 2007. Additionally, Andrea has been a statutory controlling person of AEM since June 30, 2005. Andrea is a resident of Collier County, Florida. With respect to the allegations contained in this Complaint, Andrea was acting in her capacity as an officer of Mirabilis and a statutory controlling person of AEM from August 1, 2006 until present.

33.     Defendant Debra Cole ("Cole") was Vice-President of Mirabilis from April 1, 2006 until May 1, 2007. Additionally, Cole was the Chief Financial Officer of AEM from May 1, 2006, until May 1, 2007. Cole is a resident of V olusia County, Florida. With respect to the allegations contained in this Complaint, Cole was acting in her capacity as an officer of Mirabilis andAEM.

34.     Defendant Michael Stanley ("Stanley") was Vice-President of Mirabilis from March 31, 2006 until March 31, 2007, and was President of AEM from March 31, 2006 until March 31, 2007. Additionally, Stanley has been a statutory controlling person of AEM since March 31, 2006. Stanley is a resident of Orange County, Florida. With respect to the allegations

9482632

contained in this Complaint, Stanley was acting in his capacity as an officer of Mirabilis and AEM, and a statutory controlling person of AEM.

35.     Defendant Lawrence Haber ("Haber") was Vice-President of Mirabilis from October 31, 2004 until December 31, 2006. Haber is a resident of Orange County, Florida. With respect to the allegations contained in this Complaint, Haber was acting in his capacity as an officer of Mirabilis.

36.     Defendant Chuck Kirkpatrick ("Kirkpatrick") was Vice-President of Mirabilis from July 1, 2005 until September 1, 2006. Kirkpatrick is a resident of Palm Beach County, Florida. With respect to the allegations contained in this Complaint, Kirkpatrick was acting in his capacity as an officer of Mirabilis.

37.     Defendant Daniel McHenry ("McHenry") was Vice-President of Mirabilis from May of 2005 until March of 2006. McHenry is a resident of Orange County, Florida. With respect to the allegations contained in this Complaint, McHenry was acting in his capacity as an officer of Mirabilis.

38.     Defendant Philip Kaprow ("Kaprow") was Vice-President of Mirabilis from July 1, 2005 until May 1, 2007. Kaprow is a resident and citizen of Seminole County, Florida. With respect to the allegations contained in this Complaint, Kaprow was acting in his capacity as an officer of Mirabilis.

39.     Defendant Jeffrey Reichel was Vice-President of Mirabilis from January 1, 2006 until May 1, 2007. Reichel is a resident of Gwinnett County, Georgia. With respect to the allegations contained in this Complaint, Reichel was acting in his capacity as an officer of Mirabilis.

40.     Defendant Michael Mapes ("Mapes") was Vice-President of Mirabilis from June 1, 2006 until March 31, 2007. Mapes is a resident of Douglas County, Nebraska. With respect to the allegations contained in this Complaint, Mapes was acting in his capacity as an officer of Mirabilis.

41.     Defendant Kevin Mumoe ("Mumoe") was Vice-President of Mirabilis from October 1, 2005 until December 31, 2006. Mumoe is a resident of Orange County, Florida. With respect to the allegations contained in this Complaint, Mumoe was acting in his capacity as an officer of Mirabilis.

42.     Defendant Allen Archer ("Archer") was Vice-President of Mirabilis from October 1, 2005 until December 31, 2006. Archer is a resident of Seminole County, Florida. With respect to the allegations contained in this Complaint, Archer was acting in his capacity as an officer of Mirabilis.

43.     Defendant Brian Fischer ("Fischer") was Vice-President of Mirabilis from June 1 2005 until October 31, 2006. Fischer is a resident of Palm Beach County, Florida. With respect to the allegations contained in this Complaint, Fischer was acting in his capacity as an officer of Mirabilis.

44.     Defendant Robert Konicki ("Konicki") was Vice-President of Mirabilis from June 1, 2005 until December 31, 2006. Konicki is a resident of Palm Beach County, Florida. With respect to the allegations contained in this Complaint, Konicki was acting in his capacity as an officer of Mirabilis.

45.     Defendant Tracy Taylor ("Taylor") was Vice-President of Mirabilis from April 1, 2006 until January 31, 2007. Taylor is a resident of Osceola County, Florida. With respect to the

allegations contained in this Complaint, Taylor was acting in her capacity as an officer of Mirabilis.

46.     Defendant Michael Barbee ("Barbee") was Vice-President of Mirabilis from June 1, 2005 until December 31, 2006. Barbee is a resident of Hillsborough County, Florida. With respect to the allegations contained in this Complaint, Barbee was acting in his capacity as an officer of Mirabilis.

47.     This is an action for damages in excess of $15,000, exclusive of interest, costs, attorneys' fees, and/or punitive damages.

48.     This Court has subject matter jurisdiction of this action pursuant to Florida Statutes § 26.012(2)(a).

49.     The events giving rise to the claims alleged in this Complaint arose in Orange County, Florida. Venue in this Court is therefore proper pursuant to Florida Statutes Ch. 47.

## **Facts**

A.     Pre-Mirabilis: Presidion 2000-2005

50.     From 2000 until the middle of 2005, PSI maintained a number of professional employer organization ("PEO") operating subsidiaries collectively named "Presidion."

51.     During this time PSI was a subsidiary of a company known as Presidion Corporation. Presidion was the consolidation of:

(a)     the Sunshine Companies[1];

(b)     companies known as PBS and Paradyme; and

---

[1] The Sunshine Companies were comprised of: Sunshine Staff Leasing, Inc. a/kla Presidion Solutions, I, Inc. ("Sunshine Staffing"); Sunshine Companies, II, Inc. ("Sunshine II"); Sunshine Companies, III, Inc. a/kla Presidion Solutions, IV, Inc. ("Sunshine III"); and Sunshine Companies, IV, Inc. alkJa Presidion Solutions, V, Inc. ("Sunshine IV").

(c)     an asset purchase of PEO client contracts belonging to the Fidelity United Group (collectively referred to herein as the "Presidion Acquired PEOs").

52.     The Presidion Acquired PEOs had a myriad of financial problems, which existed pnor to their acquisition by Presidion, including (i) improperly constituted workers' compensation insurance programs; (ii) mispricing of PEO client contracts to reflect inflated revenues; and (iii) specifically with regard to the Sunshine Companies, an illegal healthcare plan.

53.     These problems did not end when the PEOs were acquired by Presidion. In fact, such mismanagement and illegal activity continued, and included:

(a)     Presidion's purchase of the PEOs as part of a securities "pump and dump" scheme to roll up the Presidion Acquired PEOs, and their misrepresented and inaccurate audited financial statements, into Presidion, thereby falsely inflating the financials of Presidion for purposes of a reverse merger (collectively the "Revenue Manipulation Scheme");

(b)     Presidion's fraudulent reversal of a net loss of $700,000 for the 2002 fiscal year to a profit of $2,300,000 through a fraudulent workers' compensation reinsurance plan for PSI, known as the Aldrostar policies (the "Aldrostar Plan").

(c)     Presidion' s improper payments, including perks, to individuals involved in the revenue manipulation schemes, funded in various ways, including: (i) non-payment of payroll taxes; and (ii) issuance of fraudulent and invalid letters of credit (the "Fraudulent LOCs").

54.     By the end of 2004, Presidion issued $56,000,000 in Fraudulent LOCs, while accruing $51,000,000 in unpaid payroll taxes, leading to an investigation by the U.S. Attorneys Office into possible tax evasion by Presidion, PSI, and the Presidion Acquired PEOs.

B.     <u>Sunshine Companies Divestiture</u>: (August 2004-May 2005)

55.     By August 2004, the Presidion management realized there was no feasible way of reorganizing the business so as to solve the numerous problems caused by their mismanagement and commission of illegal acts, and therefore called upon Frank Amodeo, and his AQMI Strategy Corporation consulting team, to reorganize and resolve Presidion's outstanding problems, including tax liabilities.

56.     At this time, Presidion management misrepresented to Amodeo that the Presidion Acquired PEOs had accrued over $5,000,000 in outstanding payroll tax liabilities, with the majority of this amount composed of a liability belonging to the Sunshine Companies. [2]

57.     Amodeo's proposed strategy of reorganization involved deconsolidating, divesting, and liquidating the Sunshine Companies, the funds of which would then be used to pay creditors, including the IRS for unpaid payroll tax liability. This strategy would also allow Presidion to deconsolidate its financials and separate itself from the excessive tax and other liabilities associated with the Sunshine Companies, and continue to conduct business as a going concern (collectively the "Sunshine Companies Plan").

58.     Contemporaneous with this plan, a company called Stellar Industries, Inc., was purchased, and subsequently renamed Mirabilis Ventures, Inc. At that time, Mirabilis was to act as a vehicle by which to hold an option to purchase 25% of the issued and outstanding common stock of Presidion for $100,000 (the "Presidion Stock Option").

59.     On or about December 21, 2004, Amodeo, Berman, Holtz, Curry, Baiers, and various other professionals, met to develop a detailed assignment of tasks with respect to the Sunshine Companies Plan, including determining from the U.S. Attorneys' Office [3] and the

[2] Presidion management failed to disclose several of the aforementioned illegal and improper acts committed relevant to Presidion, including the Revenue Manipulation Scheme, the Aldrostar Plan, and the Fraudulent LOCs.

[3] Berman was tasked with contacting the USAO.

QJJX2I.1 2

Internal Revenue Service [4] whether non-payment of the Sunshine Companies' payroll "trust fund" taxes to meet other obligations complied with all local, state, and federal tax laws.

60.     On December 31, 2004, Wellington, a company owned by Frank Amodeo, purchased the Sunshine Companies from Presidion, immediately dissolved the Sunshine Companies, and liquidated their remaining assets, all of which was paid over to the IRS. [5]

61.     After Wellington's acquisition of the Sunshine Companies, Amodeo and Wellington discovered that the actual payroll tax liability of the Presidion Acquired PEas was approximately $53,000,000, with several million dollars more in local and state taxes outstanding (the "Pre-Wellington Presidion PEO Tax Liability").

62.     On January 8, 2005, Mirabilis purchased all shares of commo¥! stock issued to Burcham, the then chairman of Presidion (the "Burcham Shares"). [6] Mirabilis subsequently placed two individuals on the Presidion Board of Directors, Carlson and Pollack, both of whom were officers and/or directors of Mirabilis.

63.     Amodeo and AQMI successfully completed the Sunshine Companies Plan in or about April 2005.

64.     In April 2005, Mirabilis chose to distribute to the AQMI consultants the Burcham Shares, as opposed to acquiring stock pursuant to the Presidion Stock Option and distributing

---

[4] Holtz was tasked with contacting the IRS.

[5] Berman and Holtz, as well as the numerous other professionals retained by Amodeo, including a number of the other Defendants in this matter, advised Amodeo that the Sunshine Companies Plan, and all actions taken in connection therewith, complied with all local, state, and federal tax laws.

[6] The reason for this opportunity, according to Presidion, was the result of pressure from two sources: (i) the investigation instituted by the Michigan Organized Crime Strike Force relevant to Presidion, in which Presidion was informed by the USAO that if Burcham was no longer employed by Presidion, the investigation would be dropped as to Presidion; and (ii) FCIC's refusal to renew the workers compensation insurance coverage for the Presidion PEO assets unless and until Burcham was removed as an employee of Pre sid ion.

those shares to the AQMI consultants engaged relevant to the Sunshine Companies Plan. Based upon the advice provided by various professionals retained by Amodeo and Mirabilis, it was determined that distributing the Burcham Shares, as opposed to exercising the Presidion Stock Option, would allow Mirabilis to operate as a creditor of Presidion, instead of as a major shareholder, which was particularly important since Carlson and Pollack were directors of both Presidion and Mirabilis.

C.      Presidion Reorganization: May 2005-December 2005

65.     On May 18, 2005, Amodeo was approached again by Presidion regarding further problems, including a shortfall of working capital for the remaining Presidion PEO operations, particularly Paradyme and PBS, and a tax liability which had increased approximately $21,000,000 between December 2004 and May 2005 (the "2005 Presidion PEO Tax Liability").

66.     Amodeo agreed to continue to assist Presidion in reorganizing their remaining PEO business and seeking a global resolution to the myriad of problems faced by Presidion.

67.     Amodeo's plan involved having Mirabilis acquire the remaining Presidion PEO assets, after the primary secured creditors were bought out and/or restructured, leaving only the unsecured priority state and federal tax creditors of Presidion, which would be paid via installments, and upon resale of the PEO assets, or at the time of a public offering of the aggregated PEO assets of Presidion and Mirabilis.

68.     Mirabilis would be initially capitalized by Titanium and AQMI, compames owned solely by Amodeo, resulting in Plaintiffs being the primary secured creditors of Mirabilis. Mirabilis would be further capitalized through: (i) Mirabilis' provision of risk arbitrage services; and (ii) interim nonpayment of payroll taxes owed by PSI's PEO operating subsidiaries.

69.     In preparation for an eventual acquisition of the remaining Presidion PEO assets, in June 2005 Mirabilis decided to acquire a PEO shell company called AEM.

70.     Based on tax and legal advice provided by professionals, Amodeo proposed a strategy whereby Presidion would be provided working capital through:

       I.     PSI, truthfully and accurately accounting and reporting the taxes collected by PBS and/or Paradyme, relevant to their respective federal employer identification numbers ("FEIN"); and

       II.     Using the collected payroll tax funds to: (1) pay for services to be rendered by PSI to Paradyme in the ordinary course of business; (2) pay all of unsecured creditors of Presidion; and (3) refinance the secured creditors of Presidion (collectively the "PBS Plan").

71.

       The PBS Plan would allow for accrued tax liabilities to remain with the FEIN of

PBS and/or Paradyme, while providing additional funds to enable the PEO operations to continue until the business could pay all of its outstanding liabilities.

72.     Furthermore, as part of the PBS Plan, on July 28, 2005 Wellington subsequently purchased PSI, and in effect the remaining Presidion PEO assets, so as to preserve the value of the assets, and to maintain Presidion's PEO operations as a viable business in the interim, so that the business would be financially rehabilitated for purposes of a sale to AEM at a later date.

73.     Additionally, AEM and PSI entered into an agreement and subsequent amendment whereby AEM would purchase the PEO assets from PSI in December 2005.

74.     In or about August 2005, prior to AEM's planned acquisition of the Presidion PEO assets, AEM entered into a management agreement with PSI wherein it would oversee the

processing of the Presidion PEO assets while performing its due diligence (the "Management Agreement").

75.     Pursuant to Section 9(a) of the Management Agreement, AEM warranted and represented to PSI that AEM would comply with all applicable federal, state, and local laws, rules, and regulations, codes, statutes, ordinances and orders of any governmental or regulatory authority relevant to PBS, Paradyme, and/or the Presidion PEO assets.

76.     During the initial term of the Management Agreement, AEM and Wellington determined that the Presidion PEO assets had a significant amount of previously undisclosed problems and that the Management Agreement would need to be extended until January 2006 to allow AEM an appropriate amount of time to resolve the various problems related to the Presidion PEO assets, which included the inability of AEM to effectively transfer the data and licenses of the Presidion IT system. AEM was required to retain an interest in the Presidion PEO assets because, absent AEM's involvement, Presidion or its management was unable to obtain worker's compensation insurance coverage for its own customer accounts.

77.     Additionally, pursuant to the PBS Plan, Mirabilis bought out all of PSI's secured creditors for a significant discount, allowing Mirabilis to realize an immediate profit of approximately $10,800,000. [7]

78.     Furthermore, Mirabilis realized a gain of approximately $10,000,000 as a result of its risk arbitrage services provided to Presidion and its secured creditors.

D.     <u>Mirabilis and AEM Transition</u>: (January 2006 - June 2007)

---

[7] For example, Mirabilis acquired and assumed debt owed to the Sunshine Companies by Paradyme, which was guaranteed by Presidion. The Promissory Note evidencing the debt belonged to the Sunshine Companies. Mirabilis acquired the asset and the consideration for the asset was paid directly to the IRS at a discount.

79.     In January 2006, AEM discovered that the Presidion PEO assets would not be ready for acquisition until approximately April 2006 as a result of the aforementioned inability of AEM to transfer Presidion's customer data into AEM's IT system.

80.     As a result thereof, during the period beginning January 2006 and ending on or about April 2006, AEM agreed to allow PSI to use AEM's bank accounts to process the payroll of the Presidion PEO assets, so that, while AEM was in control of operations it appeared as if AEM was in control of the Presidion PEO expenditures, when in actuality it was not.

81.     While all payroll tax collections and reporting continued to take place through PBS and/or Paradyme and under the PBS FEIN, the payroll tax payments began to be made under the AEM FEIN, *not the PES FEIN* Beginning in March 2006, all tax payments owed by PBS and/or Paradyme, via collection of taxes on the Presidion PEO assets, had ceased.

82.     On or about April 1, 2006, AEM officially acquired the Presidion PEO assets; however, Mirabilis and AEM management subsequently decided to rescind the acquisition of the Presidion PEO assets and to continue under the Management Agreement under the guise that it would allow them additional time to re-evaluate the Presidion PEO assets and terminate unprofitable clients.

83.     AEM continued to operate and control the Presidion PEO assets as if no rescission or change in control had taken place.

84.     Furthermore, Mirabilis and AEM elected not to properly reapply tax payments made under AEM's FEIN to PBS and/or Paradyme's FEIN, but rather to apply said tax payments to future tax obligations incurred by AEM's own PEO assets.

85.     Additionally, from on or around July 1, 2006 until October 1, 2006, AEM informed various state regulatory authorities that it had acquired the Presidion PEO assets, when in actuality it had not.

86.     On July 1, 2006, AEM and PSI entered into a new Management Agreement whereby AEM would continue to manage the Presidion PEO assets and be responsible for the management of all of the PSI PEO tax accounts.

87.     In July 2006, AEM failed to make tax payments on behalf of the Presidion PEO assets, and, instead, utilized its fraudulently obtained tax credit to reduce the tax liability owed on behalf of its own PEO assets.

88.     In August 2006, Mirabilis and AEM represented to PSI that all taxes owed on behalf of the Presidion PEO assets were current for the third quarter of 2006.

89.     On September 30, 2006, Mirabilis and AEM again represented to PSI that all taxes owed on behalf of the Presidion PEO assets remained current and had been paid.

90.     In November 2006, PSI and Amodeo discovered that the previously represented PBS and/or Paradyme daily tax payments had ceased, and PBS discovered that AEM had not complied with remitting daily tax payments on behalf of the Presidion PEO assets in the amount of $238,000 per day, which had been repeatedly requested by Amodeo and PSI and was to be strictly enforced beginning on or about October 1, 2006. Instead, only payments for approximately $714,000.00 had been made.

91.     The continued remittance of tax payments under the AEM FEIN resulted in an additional erroneous tax credit for AEM of approximately $11,000,000.

92.     Moreover, AEM refused to file Form 941 or Form W-2 filings with the Internal Revenue Service, on behalf of the Presidion PEO asset employees, because the officers of AEM

did not want to incur personal liability for collecting, but not remitting, the taxes owed by the Presidion

PEO assets and believed that by not signing the aforementioned tax returns they would be insulated from

such liability

93.      In September 2006, the IRS and U.S. Attorney's Office for the Middle District of

Florida begin investigating Amodeo, Presidion, PSI, Mirabilis, AEM and others for potential civil and

criminal liability arising from the alleged evasion of payment of taxes in connection with the Sunshine

Companies Plan and PBS Plan.

## SPECIFIC ALLEGATIONS COUNT I:.

## BREACH OF FIDUCIARY DUTY

94.      Plaintiffs reallege and adopt all preceding paragraphs.

95.      As a result of their positions as directors of Mirabilis, Defendants Berman, Holtz

Curry, Hailstones, Sadrianna, Pollack, Carlson, Walsh, Simo, Walko, and Broadhead had the authori ty to

exercise significant control over the business and financial affairs of Mirabilis and

AEM.

96.      As a result of their positions as officers of Mirabilis, Defendants Berman, Curry,

Hailstones, Sadrianna, Pollack, Carlson, Walsh, Simo, Vandevere, Johnson, Broadhead, Myers, Glover,

Beyer, Bonck, Andrea, Cole, Stanley, Haber, Kirkpatrick, McHenry, Kaprow, Reichel, Mapes, Munroe,

Archer, Fischer, Konicki, Taylor, and Barbee had the authority to exerCIse significant control over the

business and financial affairs of Mirabilis and AEM.

97.      As a result of their positions as statutory controlling persons of AEM pursuant to

Florida Statutes §§ 468.520 - 468.535, Hailstones, Glover, Amar, Andrea, and Stanley had the authority to

exercise significant control over the business and financial affairs of AEM.

98.     As a result of their positions as officers of AEM, Amar, Cole and Stanley had the authority to exercise significant control over the business and financial affairs of AEM.

99.     At all material times, Plaintiffs were the primary secured creditors of Mirabilis and AEM, and a fiduciary relationship existed between Plaintiffs and Defendants.

100.    Defendants owed a duty to Plaintiffs:

(a)     to discharge their duties as directors, officers andJor controlling persons of Mirabilis and/or AEM in good faith and with the care that an ordinarily prudent person in a like position would exercise under similar circumstances; and

(b)     to act on behalf of Mirabilis and/or AEM, and their shareholders and creditors, and refrain from any acts that would injure the constituencies of Mirabilis and AEM.

1 01 . Defendants breached their aforementioned fiduciary duties to Plaintiffs, by failing:

( a)    to exercise due care in the management and oversight of the Mirabilis and/or AEM PEO portfolio, including, but not limited to, the transfer of the Presidion PEO assets to AEM and the proper collection, withholding, truthful accounting for, and paying over of "trust fund" taxes relevant to the Presidion PEO assets and the Mirabilis and/or AEM PEO companies;

(b)     to exercise due care in the investments and acquisitions made by Mirabilis and/or AEM;

(c)     to fulfill and properly implement plans to develop and implement internal corporate governance and financial/accounting controls for Mirabilis and/or AEM;

(d)     to investigate and/or disclose the source of Mirabilis and/or AEM's capital to shareholders and creditors, particularly the more than $102 million received, directly or

indirectly, from PSI through investments and loans, derived primarily from the nonpayment of payroll "trust fund" tax relevant to the Presidion PEO assets;

    (e)  to exercise due care in the management of the assets of Mirabilis and/or AEM, including but not limited to, exercising judgment in an informed and good faith effort so as to maximize Mirabilis and/or AEM's long-term wealth-creating capacity, instead allowing Mirabilis and/or AEM's assets to be squandered and wasted; and

    (f)  to exercise due care in the process of obtaining and/or maintaining ESAC Certification of Mirabilis and/or AEM's PEO portfolio.

  102. As a direct and proximate result of Defendants' breach of their fiduciary duties, Plaintiffs have been damaged in their business and property.

  103. Defendants' actions were done wrongfully, negligently, willfully, intentionally, maliciously, recklessly and without regard for the rights of Plaintiffs.

  WHEREFORE, Plaintiffs respectfully request that this Court enter judgment against Defendants in an amount to be determined at trial, including but not limited to compensatory damages, punitive damages, all costs and attorneys fees associated with this action, and such other relief as the Court deems proper.

## COUNT II - RECKLESSNESS AND NEGLIGENCE

  104. Plaintiffs reallege and adopt all preceding paragraphs.

  10S. Defendants owed a duty to Plaintiffs to:

    (a)  discharge their duties as directors, officers and/or controlling persons of Mirabilis and/or AEM in good faith and with the care that an ordinarily prudent person in a like position would exercise under similar circumstances; and

(b)      to act on behalf of Mirabilis and/or AEM, and their shareholders and creditors, namely the Plaintiffs, and refrain from any acts that would permit them to receive an improper personal benefit or injure the constituencies of Mirabilis and AEM.

106.    Defendants were reckless and negligent in failing:

(a)      to exercise due care in the management and oversight of the Mirabilis and/or AEM PEO portfolio, including, but not limited to, the transfer of the Presidion PEO assets to AEM and the proper collection, withholding, truthful accounting for, and paying over of "trust fund" taxes relevant to the Presidion PEO assets and the Mirabilis and/or AEM PEO compames;

(b)      to exercise due care in the investments and acquisitions made by Mirabilis and/or AEM;

(c)      to fulfill and properly implement plans to develop and implement internal corporate governance and financial/accounting controls for Mirabilis and/or AEM;

(d)      to investigate and/or disclose the source of Mirabilis and/or AEM's capital to shareholders and creditors, particularly the $125,000,000 from PSI through direct investments and loans, derived primarily from the nonpayment of payroll "trust fund" tax relevant to the Presidion PEO assets;

(e)      to exercise due care in the management of the assets of Mirabilis and/or AEM, including but not limited to, exercising judgment in an informed and good faith effort so as to maximize Mirabilis and/or AEM's long-term wealth-creating capacity, instead allowing Mirabilis and/or AEM's assets to be squandered and wasted; and

(f)      to exercise due care in the process of obtaining and/or maintaining ESAC Certification of Mirabilis and/or AEM's PEO portfolio.

107. As a direct and proximate result of Defendants' recklessness and negligence, Plaintiffs have been damaged in their business and property.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment against Defendants in an amount to be determined at trial, including but not limited to compensatory and punitive damages and all costs and attorneys fees associated with this action, and such other relief as the Court deems proper.

<u>JURY DEMAND</u>

Plaintiff demands a trial by struck jury.

Dated: This __ day of _____ .,
2007.


One of the Attorneys for Plaintiffs

<u>**OF COUNSEL:**</u>
Michael L. Edwards
Spencer M. Taylor
Amelia K. Steindorff
Batch & Bingham LLP
P.O. Box 306
Birmingham, AL 35201