# TAB 4

Case 6:07-cv-01788-JA-GJK   Document 251-8   Filed 05/24/10   Page 2 of 14
Case 6:07-cv-01788-JA-GJK   Document 199-1   Filed 02/16/10   Page 1 of 130

1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                   MIDDLE DISTRICT OF FLORIDA
 3                        ORLANDO DIVISION
 4
                CASE NO.: 6:07-CV-1788-ORL-28-KRS
 5
 6
    MIRABILIS VENTURES, INC. and
 7
    NEXIA STRATEGY CORPORATION,
 8
                  Plaintiffs,
 9
    VS.
10
    PALAXAR GROUP, LLC;
11
    PALAXAR HOLDINGS, LLC;
12
    FRANK HAILSTONES, EDITH CURRY
13
    A/k/a EDITH BROADHEAD; and
14
    TERENCE CHU,
15
                  Defendants.                   ORIGINAL
16
17  MIRABILIS VENTURES, INC., and
18  NEXIA STRATEGY CORPORATION,
19  And THIRD PARTY CORPORATION,
20  WELLINGTON CAPITAL GROUP, INC.
21  YANIV AMAR, FRANK AMODEO,
22  AARON BATES, MATTHEW MOKWA,
23  ROBERT POLLACK, JAMES SADRIANNA.
24  - - - - - - - - - - - - - - x
25
```

Case 6:07-cv-01788-JA-GJK   Document 251-8   Filed 05/24/10   Page 3 of 14
Case 6:07-cv-01788-JA-GJK   Document 199-1   Filed 02/16/10   Page 2 of 130

2

**DEPOSITION OF:**

EDIE CURRY

Examination of a witness beginning at **9:00 AM** and concluding at **5:40 PM**, on **January 12, 2010,** taken at 390 North Orange Avenue, Suite 1400, Orlando, Florida before **DAWN ROSCHER**, Notary Public, State of Florida at Large.

Case 6:07-cv-01788-JA-GJK   Document 251-8   Filed 05/24/10   Page 4 of 14
Case 6:07-cv-01788-JA-GJK   Document 199-1   Filed 02/16/10   Page 3 of 130

3

1  A P P E A R A N C E S:

3  TODD NORMAN, ESQ., OF:  Broad & Cassel, 390 North Orange
4  Avenue, Suite 1400, Orlando, Florida 32801, for the
5  Plaintiffs.

8  KATHLEEN HAVENER, ESQ., OF:  The Havener Law Firm, LLC,
9  15511 Russell Road, Chagrin Falls, Ohio 440022, on
10  behalf of Ms. Edie Curry.

13  ALSO PRESENT:  R.W. (Bill) Cuthill, Jr., James V.
14  Sadrianna and Frank Hailstones.

17           *    *    *    *    *    *

Case 6:07-cv-01788-JA-GJK   Document 251-8   Filed 05/24/10   Page 5 of 14
Case 6:07-cv-01788-JA-GJK   Document 199-1   Filed 02/16/10   Page 4 of 130

4

1

2

3     **INDEX**

4

5     EDIE CURRY

6

7     Direct Examination by Mr. Norman          5

8

9                 *   *   *   *   *   *

10

11

12

13    **EXHIBITS**

14

15    (Plaintiff's Exhibit Numbers 1-57 marked and retained by

16    Counsel).

17

18                *   *   *   *   *   *

Case 6:07-cv-01788-JA-GJK   Document 251-8   Filed 05/24/10   Page 6 of 14
Case 6:07-cv-01788-JA-GJK   Document 199-1   Filed 02/16/10   Page 5 of 130

5

P R O C E E D I N G S

THEREUPON:

EDIE CURRY

Having been first duly sworn to tell the truth, the whole truth and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. NORMAN:

Q. Good morning, ma'am. My name is Todd Norman. I represent the plaintiff in this matter. Can you state your name for the record?

A. Edith Curry.

Q. And are you employed, ma'am?

A. I am a partner in a business, yes.

Q. What is the name of the business?

A. Palaxar.

Q. Okay. And where do you reside?

A. Richmond, Virginia.

Q. Okay. Have you had your deposition taken before, ma'am?

A. Yes, sir.

Q. Okay. In what matter?

A. Several matters for various companies that I worked for.

Q. Okay. When was the last time you had your

Case 6:07-cv-01788-JA-GJK   Document 251-8   Filed 05/24/10   Page 7 of 14
Case 6:07-cv-01788-JA-GJK   Document 199-1   Filed 02/16/10   Page 57 of 130

57

1    Q.   But is that one of the things that feeds
2    into your algorithm?  I don't want to disclose
3    secrets, but is that the type of information that
4    then feeds into the algorithm you're talking about?
5    A.   It's data.  It's not information.  It's
6    data.  So what feeds into the algorithm is do you
7    have a house, what is your mortgage and what's the
8    demographic; is your house, for example, a four
9    million dollar house in a demographic where there's
10   two hundred thousand dollar homes.  So it's the
11   data.
12   Q.   Sure.  Did you take any information from
13   your time at Capital One that you viewed as trade
14   secret to use towards the algorithm?
15   A.   Of course not.
16   Q.   Has the algorithm ever been patented?
17   A.   It has been applied for -- no, not the
18   algorithm.  The algorithm will never be patented.
19   The process has been patented, but the algorithm
20   has been trade secreted and has not been disclosed
21   to anyone.
22   Q.   What do you mean by disclosed?
23   A.   It means I have not disclosed it to anyone.
24   Q.   Okay.  Were there any algorithms that Nexia
25   attempted to obtain while you were at Nexia?

Case 6:07-cv-01788-JA-GJK Document 251-8 Filed 05/24/10 Page 8 of 14
Case 6:07-cv-01788-JA-GJK Document 199-1 Filed 02/16/10 Page 59 of 130

59

1  A. That he would fund the development. If he
2  would fund the development, that he would get a
3  license to use it and some of the revenue from that
4  process.
5  Q. Did you discuss it any further than that?
6  You just used fairly general terms; a license to
7  use it. Is it a free license to use it globally
8  without any royalties; is that what you discussed?
9  A. I'm trying to think, Todd. I don't recall
10  at that time in November how it was discussed,
11  because at the time we had talked about it, it was
12  in addition to what was available from Axena. I
13  didn't know what arrangements Frank Amodeo had with
14  that front-end piece as well as that made this
15  whole process run. So I don't know.
16  Q. Okay. Do you know if it was discussed to be
17  used as an exclusive license of that algorithm?
18  A. No, I don't think I would ever agree to
19  that.
20  Q. But do you recall if that was even requested
21  of you?
22  A. Requested of me?
23  Q. Yes.
24  A. No, I don't recall that?
25

Case 6:07-cv-01788-JA-GJK   Document 251-8   Filed 05/24/10   Page 9 of 14
Case 6:07-cv-01788-JA-GJK   Document 199-2   Filed 02/16/10   Page 55 of 130

185

1    Nexia certification?

2    A.  No.  They were hired specifically to do the
3    call center, but until he followed through on his
4    commitment, because he said okay, go get the
5    building.  He signed the check.  That's when stuff
6    was supposed to be moving up there.  Then next
7    Tuesday that was going to happen and next Tuesday
8    that was supposed to happen.

9         So in order to fill the time and space of
10   these four highly educated folks -- five -- sitting
11   in a room; I said okay, I tell you what, why don't
12   we flowchart this and work on this, just to fill
13   the days, so these men weren't sitting getting paid
14   doing nothing.

15   Q.  And they were flowcharting the Nexia
16   certification?

17   A.  That was part of the processes.  They were
18   flowcharting for the patent application, because
19   there was nothing else to fill their day.

20   Q.  It says until the Nexia certification is up
21   and running, they had to be out harking dialing for
22   dollars; the indication from that is they had to be
23   out soliciting work until the Nexia certification
24   is up and running?

25   A.  No.  This mandate came from Alan Archer that

Case 6:07-cv-01788-JA-GJK   Document 251-8   Filed 05/24/10   Page 10 of 14
Case 6:07-cv-01788-JA-GJK   Document 199-2   Filed 02/16/10   Page 56 of 130

186

1  we were supposed to be cold calling. AQMI was
2  expecting us to be cold calling folks in the
3  Commonwealth of Virginia for PEO services, when it
4  wasn't licensed. So I'm snitting at Frank and
5  Fernando saying you gave us no phones, no desks, no
6  computers, no call center. We're not doing what we
7  were hired to do. We're sitting up here white
8  boarding this, because there's nothing else, quite
9  frankly, to do. And now you want us to sell
10 unlicensed services. I would go to Amodeo and say
11 why isn't the call center moving; well, you can
12 work on this in the meantime. So that's what we
13 were doing.
14     Q.  Okay. So you were white boarding the Nexia
15 certification?
16     A.  Yes, white boarding payroll processes, and
17 the eventual, in the hope that it would happen. In
18 addition to, we were white boarding Nexia
19 certification, absolutely.
20     Q.  And how long did that last?
21     A.  They were hired in April, late April, April
22 18th, around there. We sat even without garbage
23 pick-up. We sat in a building without phones,
24 computers, desks, heat, garbage pick-up until
25 August. Wiley, I think resigned a month later. He

Case 6:07-cv-01788-JA-GJK   Document 251-8   Filed 05/24/10   Page 11 of 14
Case 6:07-cv-01788-JA-GJK   Document 199-2   Filed 02/16/10   Page 116 of 130

247

1   time noting, as we discussed earlier, that this is
2   for purposes of summary judgment only and that we
3   reserve the right to ask questions on the merits at
4   a later date.
5       MS. HAVENER:  Yes.  We're not closing the
6   record on this witness, because there is going to
7   be a second opportunity to depose.  It will be just
8   a continuation of the deposition.

> A.  . . . . The algorithm will never be patented. The process has been patented, but the algorithm has been trade secreted and has not been disclosed to anyone. (Curry Deposition, P. 57, L. 18-21).
> .. . .
> Q.  How would you be able to do the Nexia Certification as a functioning product without an algorithm; could you?
> A.  No.
> Q.  So then was the use of the algorithm, you've described, a necessary part to make the Nexia Certification an active useable product?
> A.  Yes   (Curry Deposition, P. 59, L. 6-13)

**g.   The Defendants did not pay Nexia for an Assignment of any Alleged Rights From Nexia to Curry and Hailstones**

20.   The Defendants never reached a final agreement regarding a proposed assignment of rights to Curry. The required promissory note terms were never finalized, executed or agreed to by Mirabilis or Nexia.

> Q. Was a note ever executed?
>
> A. No, because Mirabilis or Nexia never set up the company. At that time, October, November, I believe is when the sale of the PEO's to Jevity failed and subpoenas started hitting employees, various employees. So I think they got – they never honored the terms of the agreement. They never set up NewCo. I was never -- a couple drafts had been sent back and forth, but nothing ever materialized, because the company was shut down. (Curry Deposition, P. 235, L. 4-14)

21.   To the extent a valid assignment took place; Ms. Curry is obligated to pay Plaintiffs. While Plaintiffs dispute the amount owed to Plaintiffs, Ms. Curry admits that she agreed to pay <u>at least</u> $500,000 to Plaintiffs:

> Q.  You offered them five hundred thousand dollars for the assignment?
>
> A.  I offered to repay them five hundred thousand dollars, yes. (Curry Deposition, P. 234, L. 4-7).

22.   The Defendants claim that "[b]ecause MVI [Mirabilis] set up no entity to which a note could be paid, Ms. Curry cannot honor that provision." (Motion at ¶ 22). However, Mirabilis,

12

248

C E R T I F I C A T E  O F  O A T H

**STATE OF FLORIDA** )
**COUNTY OF ORANGE** )

I, Dawn Roscher, being a Notary Public, State of Florida at Large, do hereby certify that **EDIE CURRY**, personally appeared before me and was duly sworn.

Witness my hand and official seal this 8TH day of February, 2010.

_____
Court Reporter
Notary Public, State of FL
Notary Comm. No. DD0702693
Comm. Expires: 08-06-2011

Case 6:07-cv-01788-JA-GJK Document 251-8 Filed 05/24/10 Page 14 of 14
Case 6:07-cv-01788-JA-GJK Document 199-2 Filed 02/16/10 Page 118 of 130

249

# C E R T I F I C A T E

STATE OF FLORIDA )

COUNTY OF ORANGE )

I, Dawn Roscher, certify that I was authorized to and did stenographically report the deposition of **EDIE CURRY**; that a review of transcript WAS requested; and that the transcript is a true and complete record of my stenographic notes.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action

DATED this 8TH day of February, 2010.

_____
Dawn Roscher

Dawn Roscher, Court Reporter
P. O. Box 533406, Orlando Florida 32853