

0001
1                    UNITED STATES DISTRICT COURT
2                     MIDDLE DISTRICT OF FLORIDA
                         ORLANDO DIVISION
3
     In re:                    CASE NO. 6:09-cv-271-OC-31GAP-DAB
4
     MIRABILIS VENTURES, INC.,          VOLUME 1
5    Bankruptcy Case No. 6:08-bk-04327KSJ
     ------------------------------/
6
     MIRABILIS VENTURES, INC.,
7
          Plaintiff,
8    vs.
9
     RACHLIN COHEN HOLTZ, LLP, a Florida
10   limited liability partnership, n/k/a
     RACHLIN, LLP; LAURIE S. HOLTZ, an
11   individual; and JOSE I. MARRERO, an
     individual,
12
          Defendants.
13   ------------------------------/
14
15
16          DEPOSITION OF R.W. CUTHILL, JR.,
17             Taken by Counsel for Defendants
                     (Pages 1 - 200)
18               Wednesday, April 21, 2010
                  9:09 a.m. - 5:20 p.m.
19
20              Esquire Deposition Solutions
                 200 East Robinson Street
21                      Suite 725
                   Orlando, Florida 32801
22
     Reported By:
23   Richard Castillo
     Certified Shorthand Reporter
24   Notary Public, State of Florida
     Esquire Deposition Solutions
25   Orlando Office Job No. 158015
     Phone - (407)426-7676

0002
1                       APPEARANCES
2    ROBERT C. MIDEAN, ESQUIRE
     Morris & Widman, P.A.
3    245 N. Tamiami Trail
     Suite E
4    Venice, Florida 34285
     Phone:   (941)484-0946
5
6         On behalf of the Plaintiff
7    JOSEPH DeMARIA, ESQUIRE
     JESSICA B. FRANK, ESQUIRE
8    Tew Cardenas, LLP
     Four Seasons Tower
9    15th Floor
     1441 Brickell Avenue
     Miami, Florida 33131

0003
10   Phone:   (305)536-1112
11   JOSEPH H. VARNER, III, ESQUIRE
12   Holland & Knight, LLP
     100 North Tampa Street
13   Suite 1100
     Tampa, Florida 33602
14   Phone:   (813)227-6703
15   CHARLES J. HELTZ, ESQUIRE
16   Gronek, Ketcham, Rutherford, Bronson, Elde & Tolan, P.A.
17   901 N. Lake Destiny Road
     Suite 275
     Maitland, Florida 32751
18   Phone:   (407)425-9545
19   D. DAVID KELLER, ESQUIRE
     Keller, Landsberg, P.A.
20   One Financial Plaza
     100 SE 3rd Avenue
21   Suite 1050
     Fort Lauderdale, Florida 33394-0002
22   Phone:   (954)761-3550
23
24          PROCEEDINGS HELD ON APRIL 21, 2010
25                     I N D E X

0004
1    EXHIBITS                                          4
2
3
4    TESTIMONY OF R.W. CUTHILL, JR.,
5          Direct Examination by Mr. DeMaria           5
6
7    Stipulations                                    195
8    Certificate of Oath                             196
9    Court Reporter's Certificate                    197
10   Errata                                          198
11
12   NOTE:  Ellipses (...) used to reflect pauses between
              words.
13
14
15
16
17                   E X H I B I T S
18
19
20   Exhibit 51 (Debtor's monthly operating reports)   47
21   Exhibit 52 (Notice of Deposition)                  96
22   Exhibit 53 (Second Amended Complaint)              99

**EXHIBIT B**



Exhibit 54 (Consulting Agreement, President and ADM: ... 143
Exhibit 55 (Invoice, 4/05, ADM: and Presidion) ... 143
Exhibit 55 (Invoice, ADM: to President for $2,733,750) ... 143
Exhibit 56 (Consulting Agreement, ADM: and Mirabilis) ... 143
Exhibit 58 (Consulting Agreement, President and Nexia
            Strategy Corporation) ... 143
Exhibit 59 (Irrevocable proxy of Presidion Corp) ... 190
Exhibit 60 (Memo 12/8/04) ... 191
Exhibit 61 (Memo to Berman for Amodeo 12/04) ... 191

0005

Deposition taken before Richard Castillo,
Certified Livelohue Reporter and Notary Public,
in and for the State of Florida at Large, in the
above cause.

* * * * *

THE COURT REPORTER: Do you swear that the
testimony you are about to give will be the
truth, the whole truth, and nothing but the
truth, so help you God?
THE WITNESS: I do.

THEREUPON,

R.W. CUTHILL, JR.,

the witness herein, having been first duly sworn,
was examined and testified as follows:

DIRECT EXAMINATION

BY MR. DeMARIA:
Q. Good morning, sir.
A. Good morning.
Q. Could you state your name for the record.
A. Robert W. Cuthill, Junior.
Q. Do you go by your initials?
A. I do. You can call me Bill --
Q. What is that old one? You can call me --
A. -- or not take To Lunch.
Q. Or don't call me Ray Jay or whatever
that -- Jay Leno or that Carson skit was.
I'll call you Mr. Cuthill, of course, for
the record.
A. You can call me Bill, for the record.
Q. Are you presently employed, sir?

0006

A. I am.
Q. And how are you employed?
A. I'm the president of -- Mirabilis
Ventures, Inc. I'm the president of Evergreen
Security, Limited. I'm on the board of directors of
Impact Healthcare Services, Inc.
Q. Are you an officer of Impact --
A. I am.
Q. Or just a director?
A. I'm just a director.
Q. How much time -- how much of your working
time does your directorship at Impact Healthcare
take?
A. It varies, but it would be less than 100
hours a year.
Q. Okay. What are your general duties as a
director?
A. What -- would you repeat that?
Q. What are your general duties as a director
of Impact Health?
A. I don't have any specific duties.
Q. Are you on any committees?
A. I am not.
Q. How big is the directorship, how many
directors?
A. There are ... four directors of Impact

0007

Healthcare.
Q. Okay. How long have you been a director
of Impact Healthcare?
A. Maybe ten years.
MR. DeMARIA: Joe.
(Mr. Victor comes into the room.)
BY MR. DeMARIA:
Q. What's the business of Impact Healthcare?
A. They're a consulting company.
Q. What do they consult on?
A. Hospitals.
Q. For what? What do they do, billing
systems?
A. Revenue enhancement.
Q. We could probably use you at Jackson
Memorial down in Miami.
A. As a director, have you ever received any
training in what your obligations are, you know,
issues of importance to performing your function as
a director?
A. No.
Q. Or at all. Have you been a director of
other companies?
A. Yes.
Q. So, for any of the directorships you've
had, have you ever received any training on your
duties as a director and your rights as a director?
A. No, not that I recall.
Q. Okay. Does Impact Health have officers?
A. It does.
Q. Do you see your position as -- being a

director as being different from the position of the
officers?

A  I do.

Q  And how do you see the difference?

A  The directors of a company set the policy
of the company.  The officers of the company operate
the company.

Q  Okay.  So, you as a director, don't
operate the company?

A  I do not.

Q  And that would be beyond your duties to
operate the company, because you as a director

A  It would depend on which company you're
dealing with, because directors in different
companies have different duties.

**0009**

1  Q  Really?

2  A  I'm specifically talking about Impact

3  Healthcare Services.

4  Q  So, is Impact a different type of

5  directorship than what you're familiar with at other

6  companies?

7  A  It could be.

8  Q  In what way?

9  A  Well, certainly, public companies that

10  I've -- invested in and read about what their

11  directors do, have different duties that I do at

12  Impact Healthcare.

13  Q  Which is a private company?

14  A  Which is a private company, correct.

15  Q  Okay.  You mentioned a company named

16  Evergreen?

17  A  Yes.

18  Q  What is your position at Evergreen?

19  A  I'm the president of the company and the

20  only director of the company.

21  Q  And what's the business of Evergreen?

22  A  Evergreen was a ... as the media has

23  called it, the largest Ponzi scheme in Florida's

24  history.  And I did not operate the part -- Ponzi

25  scheme.  I was originally a Chapter 11 trustee.  We

**0010**

brought it out of bankruptcy.  And I changed
positions to becoming the president of the company
and the director of the company, as well as my
position in Mirabilis, is that I'm recovering zoney.

Q  So, is it basically involving litigation?

A  There were 157 pieces of litigation in the
litigation ... over a ... in four countries.
It started in 2001.  There is one piece of
litigation of the 157 left.  I've completed 156
pieces of it.

Q  When did you first become involved in
Evergreen?

A  I was appointed as Chapter 11 trustee in
2001.

Q  March 2001?

A  Did you have any involvement with
Evergreen before being appointed as Chapter 11
trustee?

A  I did not.

Q  How did you happen to get selected for
that position?

A  I guess I was lucky.

Q  I mean, was it a panel appointment or --

A  No, I'm not a panel trustee, no.

**0011**

1  Q  Okay.

2  A  I have been appointed several times in

3  large fraud cases by the office of the U.S. Trustee.

4  The office of the U.S. Trustee has appointed me in

5  these large fraud cases because of my background.

6  Q  Did the U.S. Trustee's office appoint you

7  in Evergreen, or did somebody else seek your

8  appointment?

9  A  No.  The U.S. Trustee's office appointed me in

10  Evergreen.

11  Q  And when it was filed, was it a

12  debtor-in-possession case?

13  A  It was.

14  Q  And then, at some point, they went to a

15  Chapter 11 trustee?

16  A  Within less than 30 days.

17  Q  Based on what?  Allegations of fraud based

18  on the management?

19  A  Nine of the management went to jail.

20  Q  So, at the time that the bankruptcy was

21  filed for Evergreen, the management was still in

22  control?

23  A  Yes.

24  Q  And, therefore, under the bankruptcy code,

25  a trustee was appointed?

**0012**

1  A  I think the U.S. Trustee's office asked

2  that a Chapter 11 trustee be appointed as opposed to

3  the creditors.  Any party in interest can ask --

4  Q  Okay.

5  A  -- for the appointment.  I think, it

6  Evergreen's case, the U.S. trustee's office asked

7  for that.

8  Q  Okay.  And was that Evergreen Company

9  reorganized ... or liquidated?

10  A  It actually filed a plan for

11  reorganization.  And from a technical standpoint, the

12  answer to the question is it was reorganized, in that

13  But there steps to be something more than

14  that a technical standpoint.

15  Q  Well, the plan of reorganization was a

16  liquidation plan, very similar to we recognized the

17  Mirabilis Company out of Chapter 11.  In the same

18  way, however, we filed a plan of liquidation as

19  opposed to a plan of reorganization, in that the two

20  cases are different that way.

21  Q  The Mirabilis case, we used a plan of

22  liquidation, and it is operating under a plan --

23  joint plan of liquidation?

24  Q  Whereas, in the Evergreen case, it was a

**0013**

0014
```
 1   plan of reorganization?
 2        A   Correct.
 3        Q   What was the business of Evergreen that
 4   ...led to the Ponzi scheme?
 5        A   You mean, what was the sizzle to the
 6   fraud?
 7        Q   Or the purported business. Same thing.
 8        A   Offshore mutual fund.
 9        Q   Okay. Who was the lead bad guy of
10   Evergreen?
11        A   There were several. The first three
12   were Thomas Spicer, Ray Spicer, and Thomas Coyler.
13        Q   And they were prosecuted in this district?
14        A   They -- two of the three were.
15        Q   What about the third?
16        A   An Italy was not prosecuted.
17        A   Spencer and Boyd both pled. Spencer died
18   before he went to jail. Boyd went to jail for 37
19   months.
20        Q   Federal?
21        A   So, in March of 2001, you received this
22   phone call that says, we want to appoint you as a
23   trustee for this case, which I'm sure you'd read
24   about in the paper since it was such a large Ponzi
25   scheme, right, in essence?
```

0015
```
 1        A   At that point it hadn't broken in the
 2   paper.
 3        Q   Okay.
 4        A   Right. Okay.
 5        Q   It wasn't -- they didn't sell; here in
 6   Hassan.
 7        A   They were purportedly operating out of
 8   Orlando.
 9        Q   Subhman?
10        A   Yes.
11        Q   Yes.
12        A   Orlando. So, what was the connection to
13   Hassli, it was a Florida-based company?
14        A   All the principals lived here, and it was
15   actually operated at 201 East Pine Street, which is
16   about two blocks south of here.
17        Q   All right. At what point in time was the
18   plan approved, if you got involved in March of '01?
19        A   I think the plan in Evergreen was approved
20   in '05.
21        Q   Okay. So from 2001 to 2005, you were a
22   trustee?
23        A   Correct.
24        Q   And from 2005 to the present date, you're
25   the president and sole director of this post-
0015 bankruptcy Evergreen?
```

0016
```
 1        Q   But filed in bankruptcy court, but as a
 2   non-court proceedings?
 3        A   Correct.
 4        Q   Okay. Who was the bankruptcy judge?
 5        A   Briskman. Judge Briskman.
 6        Q   Okay. Do you recall how many cases you
 7   had in general?
 8        A   It was four or five malpractice cases.
 9        Q   Do you recall the names of they you know,
10   the individuals who were the defendant.
11        A   I'd have to go back and look at my list.
12   It's been... six or seven years since we did the
13   malpractice cases.
14        Q   Okay. And did any of those cases go to
15   trial?
```

0017
```
 1        Q   Okay.
 2        A   There's an internet website that specifies
 3   all the cases.
 4        Q   What's the website name?
 5        A   Evergreencreditorscommittee.com.
 6        Q   Okay. And any of those 157 cases litigation
 7   against professionals, lawyers, or accountants --
 8        A   Yes.
 9        Q   -- of the company?
10        A   Also, if you go to my website --
11        Q   Okay.
12        A   You can get a link to it, and there's a
13   listing of every one of the 157 cases.
14        Q   And what's your website?
15        A   I think all the professional litigation
16   Trusteeadministeredittihill.com
17        Q   Okay. Where were they filed?
18        A   (Pause.)
19        A   I don't know.
20        Q   How many?
21        A   -- of the company.
22   was Middle District of Florida, federal court.
23   Bankruptcy court.
```

0018

15    A   Yes.
16    Q   Do you recall which one went to trial. Or
17  if it was more than one, which ones went for trial?
18    A   Only one went to trial.
19    Q   And which one was that?
20    A   I'm trying to recall the name of the firm.
21  It's a CPA firm here in Orlando.
22    Q   Brisham... who did it go to trial before?
23    A   Brisham.
24    Q   So it was tried in the bankruptcy court?
25    A   Correct.

0019

1    Q   Okay. Non-jury?
2    A   Non-jury?
3    Q   Okay. Did ... Judge Briskman issue a
4  ruling finding of fact, and conclusion of law?
5    A   He did.
6    Q   Was it in favor of Evergreen, or in favor
7  of the CPA firm?
8    A   Actually, it was in favor of the CPA firm.
9  He found that the CPA firm had ... had done
10  malpractice. However, he found that there were no
11  damages.
12    Q   Really? And when was that decision?
13    A   I ... I don't recall, but I think it would
14  have been before 2005.
15    Q   ...own though you don't remember the name of
16  the defendant, the plaintiff in the adversary would
17  be Evergreen?
18    A   Correct.
19    Q   Evergreen what? What would it be called
20  it —
21    A   Actually, it was S.W. Cuthill, Junior,
22  trustee for Evergreen Security, Limited.
23    Q   If you send me an e-mail, I'll send you
24  the style of the case.
25    A   Okay.

        MR. DeMARIA: Jessica, will you follow up
with that? I appreciate it.
        THE WITNESS: I just don't recall the
firm.
BY MR. DeMARIA:
    Q   No. Add, look, this is not a — this is
not a test-your-memory game.
    A   Well. —
    Q   You've been through this before.
    A   Well, basically, I remember the defendants
that I lose to, because ... I don't lose very often.
    Q   The other cases all settled, I assume?
    A   They all settled.
    Q   In these professional malpractice cases,
three — four — to — five — cases, were you deposed in
deposition? We'll get to trial separately. Were
you deposed?
    A   I don't recall.
    Q   Were you —
    A   However —
    Q   Yes.

0020

22    A   If you go to my website —
23    Q   Yes.
24    A   Yes.
25    Q   Every time I've been deposed is listed on
my website.

1    Q   Okay. Excellent.
2  Federal Rule 30(b)(6) is --
3  company, and even though you weren't there at the
4  time the material events occurred that you're being
5  asked about, you're asked to come in later in your
6  role as a corporate; successor, director,
7  president to testify?
8    A   I don't know.
9    Q   So you don't know if this is the first
10  time?
11    A   I don't know.
12    Q   Okay. When you were told you were being
13  asked to give testimony today in this case, in your
14  capacity with Mirabilis, had you ever done something
15  like that before?
16    A   Yes.
17    Q   All right. In which cases, or how many
18  times?
19    A   In the -- certainly in the Evergreen case,
20  I would have done that. I was deposed ... I'm not
21  sure how many times, but ... more than ten.
22    Q   In the Evergreen case, not just ten times
23  like that?
24    A   More than ten times in the Evergreen case.

0021

25    Q   I mean, the overall bankruptcy?

1    A   In one Evergreen.
2    Q   Got you. In those different malpractice
3  cases.
4    A   In the 157 cases.
5    Q   Got you.
6    A   Got you.
7    Q   In Evergreen, I was deposed at least more
8  than ten times. I don't recall.
9    Q   And I think it's a good argue into what
10  we'll be doing today is, you were not a person who
11  was at Evergreen at the time the events occurred
12  that were the material events of those lawsuits,
13  correct?
14    A   That's correct.
15    Q   But you were there, like you are today, as
16  a representative in the discovery process?
17    A   Correct.
18    Q   I won't assume you didn't show up at trial
19  as a witness unless maybe it was on issue of
20  damages, because you had no facts, historical facts,
21  correct?
22    A   Actually, I testified in some of the
23  criminal trials at Evergreen; trials. And what kind of
24  issues did you testify)?

0022

1    A   Most of them had to do with the facts of
2  the case.

```
 3        Q   What you found out after the fact?
 4        A   Correct.
 5        Q   Okay.
 6        Q   Do you know who were the prosecutors that
 7   called you to testify?
 8        A   The New York District Attorney's Office
 9   prosecuted three of the cases.  This was under
     Morgenthau.
10        Q   Okay.  I'm sure he didn't try the case.
11        A   No.
12        Q   So who was the trial attorney?
13        A   (Pause.)
14        Q   Do you recall the trial attorney?  Again,
15   if you --
16        A   I don't.
17        Q   Another e-mail from Jessica?
18        A   If Jessica sends me -- if you give me --
19   if you give me a little questions --
20        MR. WIDMAN:  You keep a master list of the
21   little e-mails.  At the end of the day would
22   you send me a copy?
23        MR. DeMARIA:  Of course.  We would never
24   communicate with Mr. Cuthill without
25   communicating with you.

0024

 1        THE WITNESS:  However, there's a shorter
 2   way to do it, then the e-mails because if you go
 3   on my website, I list every time I testify and
 4   who the -- who the prosecutor was.
 5        MR. DeMARIA:  Okay.
 6        THE WITNESS:  How do you do it?
 7        THE WITNESS:  He'd be listed on that.
 8   BY MR. DeMARIA:
 9        Q   I appreciate it, Mr. Cuthill, and that
10   makes things a lot easier.  And I guarantee you
11   we're not going to spend a lot of time on these
12   issues.  I'm just trying to get an understanding of
13   who you are.
14        A   The reason I put it on my website is, I
15   get asked the question all the time, and there's ...
16   maybe a couple of hundred entries on there, and my
17   memory is not that good.
18        Q   I agree.  I think a good expert does
19   exactly what you're doing.  Makes it easier for both
20   of us, and that way we don't have to waste time on
21   it.
22            You had mentioned -- I think you had
23   mentioned that, at the time you were appointed on
24   Evergreen, you had done work in the past in
25   bankruptcy-type matters, or fraud-type matters,
     something like that.

0023

 1        A   I had been both Chapter 7, Chapter 11
 2   trustees at prior bankruptcy cases, as well as
 3   examiner in bankruptcy cases.
 4        Q   For how long prior to Evergreen in March
 5   of 200.?
 6        A   I think my first appointment was in the
 7   middle '90s, 1990s in this district.  In this
 8   district.
 9        Q   So you've always been appointed in the
     Middle District?
```

```
10        A   In bankruptcy cases, I've only been
11   appointed in the Middle District.
12        Q   Okay.  Now, the way you answer makes it
13   sound as like you've been appointed in non-
14   bankruptcy cases somewhere else?
15        A   I have.
16        Q   Tell me about that.
17        A   I've been an examiner first, and a receiver
18   in state court cases in different areas, all within
19   the state of Florida.
20        Q   Okay.  Primarily Orange County?
21        A   There's -- most of them, but I
     don't know if I can say, primarily.
22        Q   Okay.
23        A   Central Florida.
24        Q   Now, when you were being selected, leading

0025

 1   up to Evergreen and these various cases, was it
 2   always the selection of, you know, R.W. Cuthill,
 3   Junior, as a CPA, or a company they would select,
 4   or how would that work?
 5        A   It was me.  I had a CPA firm up until
 6   2001, Cuthill & Eddy, LLC, which was started in
 7   1975.
 8        Q   So you had a CPA firm from '75 to 2001,
     Cuthill & Eddy?
 9        A   LLC.
10        Q   C-u-t-h-i-l-l?
11        A   E-D-D-Y, it is now the firm of Carr,
12   Riggs & Ingram.
13        Q   Did you sell out your interest in '01?
14        A   No, no.
15        Q   What happened?
16        A   I retired.
17        Q   As a CPA?
18        A   As a CPA.
19        Q   Obviously, you didn't retire from working
20   because you got pretty busy on Evergreen.
21        A   Well, the reason I retired was to spend
     full time on fraud cases.
22        Q   Wouldn't you think it would be useful in
23   being appointed or considered to continue to be a
24   CPA for a fraud case?
25        A   Well I was still a CPA.  I just wasn't --

0026

 1   I wasn't practicing as a CPA.
 2        Q   Got you.  You maintain your CPA license up
 3   to the present time?
 4        A   I have not.
 5        Q   Did there come a point in time when that
 6   ended, your CPA license?
 7        A   I resigned as a CPA in 2008.
 8        Q   Why?
 9        A   I had no need for the license.
10   December 2008.
11        Q   Really?  Not even just as a -- as a ... as
12   an experience to have for purposes of being
13   appointed in the work that you do?
14        A   Actually, the credentials had virtually
```

0027

17  nothing to do with my appointment.
18      Q   Okay.  Do you have any other licenses,
19  forensic accountant, licensed business evaluator, or
20  anything else that exists?
21      A   I was a certified fraud examiner until
22  2008.  I also resigned that.
23      Q   Well, now that one sounds like that would
24  be pretty useful for the work that you do,
25  continuing your certified fraud examiner license.

0028

1   Why did you give that one up?
2       A   ... I gave that up.
3       Q   You gave those two licenses up at the same
4   time?
5       A   Yeah.  The certified fraud examiner is not
6   a license.
7       Q   What is it?
8       A   It's a designation.
9       Q   By whom?
10      A   The Association of Certified Fraud
11  Examiners [the Texas ...]
12      Q   Why'd you give it up?
13      A   I answered that already.  The same reason
14  I gave up my CPA license.  I didn't need the
15  credential to be approached for the jobs that I get
16  appointed on.
17      Q   Was there any events or circumstances that
18  led you giving up these licenses and
19  certifications, the certified ... did you just
20  wake up one day and decide, you know, I think I'm
21  going to give these up?
22      A   Probably the largest motivating factor was
23  the appending that have to continuing education to
24  continue the licenses.
25      Q   Don't you think it's valuable to have

0029

24  ...
25  ...
1   gone through the process of getting those type of
2   licenses or certifications, just giving them up.
3   And so I'm just trying to find out why you'd do
4   that.
5       A   Well, the CPA -- you get a CPA license so
6   you can attest to things.  I haven't attested to
7   anything since my 2001.  And I had no need for the CPA
8   license at all.
9       Certified fraud examiner license is one of
10  the many credentials in my field that you can get to
11  kind of ... your knowledge and the fraud
12  examination field.  I don't consider myself a fraud
13  examiner purely.  What I do is much broader than a
14  fraud examiner.
15      So I might hire people that are certified
16  fraud examiners and actually have done that, and
17  continue to do that.
18      Q   You said there were other factors that
19  caused you to give up the license and the
20  certification, what were all the factors?
21      A   Oh, maybe the nuisance of getting
22  bombarded with advertisements from the two
23  organizations on ... basis, buy this, buy
24  that, you know ... the primary reason is, I
25  didn't need the credentials.

0030

1       Q   Now, you say that you have an experience
2   or you do work that's much broader than a fraud
3   examiner, that you sometimes will hire fraud
4   examiners.  So tell me what's the nature of your
5   work in that -- what you're doing right now is a limited
6   number of court-appointed cases.  Most of them are
7   related to the bankruptcy area, although all of them
8   are not.
9       And ... for instance, I do anything from
10  -- one of the cases I'm working on, I'm working
11  for an examiner.  The case is ... state of Florida
12  versus Menorah Gardens, et al.  And it is a ... I
13  guess the best way to explain the case, is
14  it's a graveyard case where the operator of the
15  graveyard, a New York Stock Exchange company, dug up
16  people and discarded the bodies and reused the --
17      Q   The space, the plot?
18      A   -- reused the space.
19      Q   Like they did in Georgia?
20      A   Yeah.  And they were fined a couple of
21  million dollars ... the corporation was criminally --
22  The corporation was convicted criminally.
23      Q   I'm getting to it.
24      Q   And what's your work with this graveyard?
25      Q   Okay.

0031

1       A   There was -- there was class action suit
2   that was -- there was $30 million judgment against
3   the corporation --
4       Q   Right.
5       A   -- corporate owner.  And there was an

examiner appointed by the state court who is -- his
name is Richard Baldwin. And he's of the Baldwin
Fairchild Funeral Home group. Actually sold the
Baldwin Fairchild Funeral Home group some years ago.
but his name's still on it. And he happens to be a
friend of mine, and he asked me if I'd hold the
money and -- because he was responsible for holding
the money, but he doesn't consider himself a
financial person.

Q. Got you.

A. So my role has been to assist his as
custodian.

Q. And you're currently doing that?

A. I have been doing that for a number of
years.

Q. How much of your percentage of your work
time is working on the Menorah Gardens matters?

A. Less than one percent.

Q. Okay. It sounds like you have an
interesting variety of work you're done, even -- you
know, mutual funds, REOs, as in Mirabilis,
cemeteries, as in Menorah Gardens.

A. ...

Q. ... your area of expertise when you choose
work, right? You'll do different subject matter
businesses?

A. What I've stated on -- in my website is
what I'm ... the type of work I'm looking for is
large fraud cases that are in court-appointed
positions. That's primarily what I'm looking for.

A. ... didn't consider myself retired. I don't really
want to work full time. And since 2001, I've tried
not to work full time.

Q. That doesn't sound like you've been too
successful in staying retired.

A. My wife thinks that's a joke, in our
family.

Q. Correct. Like how many hours a week are
you working now on all your matters? Put aside the
directorship.

A. It goes up and down. This year, I'll
probably work ... 1500 hours.

Q. For the year?

A. For the year?

Q. Which would be less than full time for me.

A. The majority.

Q. What's full time for you?

A. A couple of thousand hours a year.

Q. Okay. And of the 1500 you expect to work
this years, how many of those hours will be related
to Mirabilis work?

A. ...

Q. Okay. So somebody wore to ask, you know,
the U.S. Trustee's office, the bankruptcy judge,
bankruptcy practitioners, and mentioned your name
and said, Cuthill's the guy to hire when you
need -- what -- fill in the blank, "what" --

A. Well, would people say, based on your
experience or reputation?

A. If you need somebody to find the money.

Q. What does that mean, "find the money".

A. Well, it's something I've used in my
website, and it's ... I've used it and I started a
subsidiary of Cuthill & Eddy, back in the '90s, I
guess it was in the '90s, then we started Quantum
Consulting Group, LLC.

Q. It's still in existence.

A. It's still in existence.

Q. What is that?

A. It's a litigation subsidiary.

Q. In what litigation support?

A. Forensic accounting. It's a forensic
accounting firm.

Q. And what was your position with that firm?

A. I was the director -- well, actually, of
that firm, I was not a member of that firm prior to
2001. It was a subsidiary of the firm that I was a
partner in.

Q. But after 2001?

A. I spent two years as the director of
bankruptcy in solvency practices.

Q. For Quantum?

A. For Quantum?

Q. And then --

A. And then I left Quantum in 2003, I
believe.

Q. Why?

A. The ... officers of Quantum and I came to
the conclusion it would be better if I was separate
from the firm and didn't have the conflict of being
an employee of the firm.

Q. And after 2003, in matters that you
handled, did you continue to hire Quantum to provide
services for you?

A. I did. I've continued to use Quantum,
actually ... the last -- we finished the -- a case
in January of this year that was tried in ... I
think, January of this year, 2010.

Q. Do you use Quantum in any of the work that
you're doing for Mirabilis?

A. I do not.

Q. Have you?

A. I have not.

Q. Is there a reason why you haven't used
Quantum in Mirabilis?

Q. Okay. Do you need forensic accounting
skills?

A. They don't have the skills I needed.

Q. So you don't need forensic accounting
skills in the Mirabilis case?

A. I didn't say that.

Q. Okay.

A. Is there somebody that you're using, or
some entity you're using to provide those skills
that Quantum otherwise could provide?

A. No.

19  Q  Because Quantum can't provide it?
20  A  And what are the skills that you need that
21  Quantum can't provide?
22  A  Quantum -- the people in Quantum are
23  primarily in one basic area that has to do with
24  construction claims.
25

**0036**

1  Q  Okay.
2  A  And they only have two personnel left in
3  the firm.
4  Q  From a high of?
5  A  Ten.
6  Q  that happened?
7  A  Well --
8  Q  You'll have to ask the management of
9  Quantum.  I wasn't there.
10  Q  But you heard about it.  What do you think
11  happened?
12  A  I don't know.
13  Q  Okay.
14  A  I'd be guessing.
15  Q  So, basically, they're construction
16  specialists, few of the last and construction
17  testify.
18  A  Well, of the two people, one does not
19  testify.
20  Q  Got you.
21  A  So you only have one testifier left.
22  Q  Okay.
23  A  And ... that testifier has been with
24  Quantum since Quantum was -- soon after Quantum was
25  formed, anyway, in the middle, and he does the

**0037**

1  the skill set needed in Mirabilis.
2  Q  And what's the skill set you need for
3  Mirabilis?
4  A  Well, I needed -- in Mirabilis, I needed
5  somebody that was more oriented toward ... an
6  examination of each testimony, and could present, that
7  in front of either a jury or in a jury or non-jury
8  case.  And I felt like that the person that I'm
9  using is better than the managing partner of
10  Quantum.
11  Q  And who's the person you're using?
12  A  Steven Yoakum.
13  Q  Spell that?
14  A  Y-O-A-K-U-M.
15  Q  Is he -- and did you hire him as an
16  individual, or an entity that he works for?
17  A  He has a company called Yoakum Consulting
18  something.
19  Q  Okay.  What's his expertise?
20  A  He started as a CPA, as a auditor,
21  actually, with Cuthill & Eddy.
22  Q  Okay.
23  A  He worked for the predecessor to Quantum,
24  which was a division of Cuthill & Eddy, the
25  consulting -- litigation consulting division of
    Cuthill & Eddy.  And then left Cuthill & Eddy ...

**0038**

1  middle '90s, I would say.
2  Q  Okay.  What's the nature of his work that
3  he's doing for Mirabilis?  You talked about tracing
4  money, but if you could just explain that?
5  A  I've given him two primary assignments.
6  One is to prepare a report on the source and use of
7  funds for Mirabilis, and do some graphic
8  presentation related to that.
9  Q  And the second is to do the same type of
10  work on the Berman trust account.
11  A  Okay.  Has he completed reports on either
12  or both?
13  A  He has not completed a reports on either.
14  Q  Okay.  Do you have a expected arrival date
15  for those reports?
16  A  I know we have to get them done by a date
17  within the case management program, but I don't know
18  when those dates are.
19  Q  Okay.  Has his work in -- putting aside
20  the Berman trust, or maybe it's part of it, has his
21  work in either of those two projects involved
22  looking at any involvement of the Rachlin Cohen
23  firm?
24          (Pause.)
25  A  Well, since the Rachlin Cohen firm is all

**0039**

1  over the Mirabilis case, it's hard to look at the
2  money in the case without seeing the Rachlin Cohen
3  firm.
4  Q  So is that a long way of saying, yes?
5  A  That's a long way of saying, no, actually.
6  Q  Because?
7  A  Is because I didn't specifically tell him
8  to look for the Rachlin Cohen firm in the work he's
9  doing.
10  Q  Okay.
11  A  Okay.  So --
12  Q  -- I don't know if that answers your
13  question.
14  Q  Did you specifically ask him to identify
15  any individuals that had been, or are currently
16  associated with the Rachlin Cohen firm?
17  A  I did not.
18  Q  Okay.  Have you asked anybody else to do
19  that kind of analysis, other than Mr. Yoakum?
20  A  No.
21  Q  Okay.  Have you asked the question down a little
22  bit, because --
23  A  Well, let me ask it --
24  Q  You asked it very broadly.  You said,
25  "anything related to Rachlin Cohen."

**0040**

1  A  Right.
2  Q  Let me try it this way.  Let's start with
3  your description of work being done on the source
4  and use of funds for Mirabilis, right?
5  A  Right.
6  Q  So one step is -- all right, where did
    money that came into Mirabilis, where did it come

7
8   from; money that went out of Mirabilis, where did it
9   go?  So let's talk about where the money came from,
10  okay?
        A   All right.
11      Q   Have you asked anybody to look at not only
12  where the money came from, but who at Mirabilis,
13  either internally or professionals who was advising
14  Mirabilis, who knew where the money was coming from
15  and have you done that kind of analysis?
16      A   Yes.
17      Q   And, all right.  And is Mr. Yoakum doing
18  that analysis?
        A   Not primarily.
19      Q   Who primarily is doing that analysis?
20      A   I am.
21      Q   Personally?
22      A   Yes.
23      Q   Okay.  Good.  Experience-wise, your
24
25
0042
001
1   first appointment, I think, was in the ... court
2   said, right?
        A   I think the first ... yes, court appointment
3   would have been in the mid '90s, yes.
4       Q   And what did you do before that, before
5   your first court appointment?
        A   I was an audit partner with Cuthill &
6   Eddy.
7       Q   I got that.  I mean, is it ... is it the
8   case that you'd been doing, either expert work or
9   working on matters in the bankruptcy court, which
10  kind of evolved into you being appointed in that
11  position?
        A   That tends to be a typical route that
12  people in your position take.  They start as an
13  accountant, they start doing work for lawyers, or
14  professionals, or trustees or examiners, and then
15  they get a lot of experience, and at some point,
16  they become the trustee or examiner.  Is that the
17  path you took?
        A   No.
18      Q   Okay.  Tell be the path you took that led
19  you in your appointments in the mid '90s.
        A   ... in the mid '90s, or maybe in the
20  early part of the '90s, I had audited a lot of
21  companies in the construction area.
22      Q   Okay.
        A   And one of the ... litigators for Orange
23  County, Florida, asked me to be an expert witness
24  in ... what's known as the Orange County Convention
25  Center Phase 1 case.
        Q   Okay.
        A   I know.
        Q   I don't know if you're familiar with the
    case.
        A   I am.
        Q   It was all over the media for a long time.
        A   I'm familiar with it.
        Q   The ... familiar with the
        A   The roof caved in during construction.

14
15      Q   Uh-huh.
        A   And the ... plaintiff's attorney -- Orange
16  County was the plaintiff in the case.
        Q   Uh-huh.
17      A   The defendants were primarily construction
18  companies.  And I had never been an expert witness
19  before.
        Q   And this was in what, the '80s?
20      A   Early '90s, maybe late ''80s.
21      Q   Okay.  So you had never -- at that time,
22  you hadn't testified as an expert?
        A   I had not.
23
24      Q   Because you were doing mostly audit work?
25      A   I didn't know what an expert witness was.
0043
1       A   But he needed somebody that knew the
2   construction industry and knew numbers.  And he
3   thought that -- the reason the roof caved in was
4   they ended up bolting the structural beam for the
5   roof instead of welding them.  I'm sorry.  I just
6   said it backwards.
        A   Yeah.  They welded them instead.
7       Q   They welded them instead of bolting them.
8       A   The welding didn't hold.
9       Q   They saved ... one to $2 million in
10  material costs, and a lot in labor costs, but the
11  roof caved in.
        A   So how did that work, which I gather led
12  you to be an expert?  Was it something along the
13  lines of, "Hey, I like this better than being an
14  auditor"?
        A   Well, that parlayed itself into being the
15  financial expert for the state of Florida on the
16  Skyway Bridge job.
        Q   All right.  Passion [phonetic]
17  Construction Company was the primary contractor on
18  the rebuilding of the Skyway Bridge in Tampa.
19      Q   Okay.
        A   This is the one the freighter knocked
20  down.
        Q   Uh-huh.
        A   It was a $50 million contract, and there
21  was a $55 million claim for additional payment
22  against the state of Florida.
        Q   Uh-huh.
23      A   So the state of Florida needed a financial
24  expert.  They asked Orange County's attorney, who is
25  the best guy to hire, and he told them, I was, after
0044
1   one case.
        Q   Uh-huh.
2       A   And from there, how did that lead to you
3   being appointed in these bankruptcy proceedings?
4       A   Well, I ... we did more construction claim
5   cases.  The state of Florida liked our work, and we
6   set up a department or division of Cuthill & Eddy
7   that did nothing but construction-claim cases.  And
8   I headed up that department in the beginning.  But I

**0045**

had other duties.  Primarily, I had a lot of audit
clients.  And I didn't have time, and it was growing
rapidly.  So I trained somebody else to take it
over.

Q   To take the audit work over or the
construction work?

A   The construction-claim work.

Q   Got you.

A   The expert-witness work.

Q   Got you.

A   So I was trying to work my way back out of
being an expert witness about that time, I
got appointed -- I can't remember if it was
receivership or -- I also did a lot of hotels, and I
was a receiver.  I did two or three receiverships.
One was a strip center; one was a motel.  Maybe a
couple of hotels in there.

Q   Got you.

A   So that -- those, I think, were the first
appointments.  Those were state court appointments.

Q   Got you.

A   And -- since I was in the construction
industry, I was always used to the bankruptcy
process.

Q   Uh-huh.

A   Because my clients, over the years, had
visited the bankruptcy court from time to time.
During the boom-and-bust cycle, right?

Q   Yup.   During the cycles.   And -- and I
think the first bankruptcy appointment was an

**0046**

examiner position in Quality Medical Consulting
Services, Inc., in the middle '90s.

Q   Now, let me go back one more step, and
I'll be done with your background.

What was your highest level of education
achieved?

A   I have a bachelor's degree in business
administration.

Q   From where?

A   University of Florida, the only college in
the state.

Q   Oh, boy.

MR. KIMPAN:  Hear that, Gator?

MS. FRANK:  I hear that.

MR. DeMARIA:  She's a Gator.

BY MR. DeMARIA:

Q   What year?

A   1967.  The year Steve Spear graduated.
There you go.

Q   I got you.  When did you get your CPA license?

A   And when did you get your CPA license?

A   I think my license was '71.  You had a
two-year internship, or you had to have two years
experience back then, and I had two years with Uncle
Sam in the Army.

Q   Got you.

**0047**

In your work for Mirabilis, do you that
as an individual, or do you have a company that
performs the work?

A   I do that as an individual.

Q   Okay.  I mean, I know you're an individual
as the president, but in the services you performed,
you perform in your individual capacity?

A   I do that as an individual, and actually
that was a bone of contention.  The IRS -- in the
bankruptcy case, I was doing that as an independent
contractor, and the IRS took exception to that and
wanted me to be an employee.

MR. DeMARIA:  Can I take a one-minute
break to run across the hall?

(Recess.)

BY MR. DeMARIA:

Q   Mr. Cuthill, I'm going to show you a
composite exhibit of some documents I got from the
bankruptcy court, which the first part of it is the
debtor's monthly operating reports.  It was the last
one we filed from September 1st to September 30,
'09.  It was filed after that date, but I forgot the
date.

And then there were a debtors post
confirmation quarterly report, filed in February,
because I want to ask you some questions about
compensation you've received.  There's some gaps in
there.

(Exhibit 51 marked for identification.)

MR. DeMARIA:  So take a look at Exhibit 51
and here's a copy for your lawyer.

MR. PARERA:  Thank you.

MR. DeMARIA:  And what we're doing is,
we're following the numbering system, and since
Bob ended at 50 --

MR. WIKMAN:  So is this entire document
that you want?

MR. DeMARIA:  Yea, it'll be a composite.

BY MR. DeMARIA:

Q   Okay.  First of all, before I ask you
what's specifically, tell me -- and I think we can
quickly get through it -- are you compensated by a
salary or hourly basis for the work you do for
Mirabilis?

A   Yes, and you --

Q   Tell me the salary part, and tell me how
the hourly basis works.

A   For Mirabilis, that I'm compensated on a
hourly rate, which is paid so re in the form of W-2
compensation which I'm earning salary.  I use the
term, 'salary.'

Q   Because it is W-2.

A   Because it's W-2.

Q   And what is the hourly rate?

A   $100 an hour.

Q   Okay.

```
 9      A   Okay.  In the ADM and Houck [phonetic]
10   cases, I was compensated at the same hourly rate,
11   but not in W-2 compensation.  So, it was
12   non-salaried compensation.
13      Q   Okay.
14      A   Which leads to a question.  I'm
15   glad you answered that way.
16      Q   Now -- which leads to a question.  I'm
17          If you do work, do analysis, for example,
18   that might assist you in Mirabilis or might assist
19   you in Holtz, or might assist you in ADM, how would
20   you bill that?
21      A   I bill that in the same way I would bill
22   any client.  I keep a time record, the
23   time record to the accountants for Mirabilis.  The
24   accountants prepare the ... paycheck, if you will,
25   in the form of Mirabilis, there's withholding and

0050
 1   Social Security taxes.  In ADM and Houck, there were
 2   not.
 3      Q   And are your accounts internal or
 4   external?
 5      A   External.
 6      Q   Who are they?
 7      A   Baldwin's Company.
 8      Q   Okay.  Is there a particular person at
 9   Baldwin & Company that you work with?
10      A   Russel Baldwin is the partner in charge of
11   the accounts.  So, for example, if we look at
12   Exhibit 51, we saw in the bankruptcy proceeding;
13   Debtors monthly operating reports.  You filed these,
14   correct?
15      A   Actually, my attorney filed these on my
16   behalf.
17      Q   You signed off on them, like on the second
18   page, that's your signature on October 27, 2009,
19   correct?
20      A   I signed off at the debtor in possession.
21          Got you.  And then, in the second part of
22   the composites, this is the post confirmation, filed
23   February 10th.  On the second page you signed off on
24   January 26, 2010, as the president of Mirabilis,
25   correct?

0051
 1      A   That's correct.
 2      Q   Okay.  Now, a couple of questions, though,
 3   first.
 4          Under the arrangement that you have pre
 5   post-confirmation, did you have a debtor in
 6   possession, did you have to seek approval, for
 7   payments, or did you just simply have to give a copy
 8   to the Department of Justice, or IRS, or how would
 9   that work?  Because I didn't see applications in the
10   file.
11      A   For payment to whom?
12      Q   To yourself.
13      A   No.
14      Q   How did it work?
15      A   I was an employee of the company, and
```

```
16   employees don't -- aren't required to seek payments
17   through the professional payment you're talking
18   about.  For applications.
19      Q   I was not required to file -- an employee
20   is not required to file a fee application.
21      A   Was there any documentation, other than
22   these monthly operating reports, that the time
23   that there was a dip, that you would file in the
24   court, that would reflect work that you did?

0052
 1      A   No.
 2      Q   Has there any other documents that you had
 3   that you would provide, either to the U.S. Attorney,
 4   or the IRS, or somebody, if they wanted to see the
 5   work you were doing?  Were there any documents that
 6   were prepared?
 7      A   No.
 8      Q   Okay.  Do you have any documents that,
 9   reflect the work that you do, because you have these
10   general numbers in here of monies that were paid; do
11   you have any backup on it?
12      A   I do.
13      Q   What's the form of that backup?
14      A   It's a summary that's detailed by
15   time record, just as I may use in your law firm,
16   or any professional firm might have a time record
17   system.  I have a time record system that looks just
18   like --
19      Q   And when you fill out your time records,
20   do you put privileged information into it?  Are you
21   careful to just do a general description that
22   doesn't reveal, let's say, your work product of your
23   thought process?
24      A   It would have more information that would
25   be considered privileged.

0053
 1      Q   Now, have those records been maintained
 2   solely by you and Mirabilis, or have they been
 3   disclosed to anybody?
 4      A   They have been maintained by me, and
 5   they have been provided to Baldwin & Company that
 6   are Mirabilis's accountants, who keep --
 7      Q   I still consider that part of you, your
 8   accountants.
 9      A   Okay.
10      Q   What I mean is, anybody outside of you?
11      A   No.
12      Q   So it hasn't been given to Mr. Gold, for
13   example, or the IRS?
14      A   No.
15      Q   Hasn't been given to anybody else in the
16   process?
17      A   Let me -- let me make an exception to my
18   "yes" there.
19      Q   Okay.
20      A   I believe Carol Lam, who is with the U.S.
21   Attorneys' office in Washington, D.C. --
22      Q   Yes.
```

0054
```
23   of salary to me --
24   A    Yes.
25   Q    -- and represents the IRS in the case --
     A    Yes.
     Q    -- has objected at least once to payment
```

0055
```
 1   detail of my time record.
 2   A    -- and has asked me to provide her with a
 3        But it's just on that application?
 4   A    Just on one month.
 5   Q    Right.  So she hasn't asked you for
     details of all the work you've done?
 6   A    No.
 7   Q    And have you provided the detail to her?
 8   A    Whenever she asked for it, I did.
 9   Q    Okay.  Is it your position that those records --
10        If your position is that you haven't --
11   it your position that those records in general are
12   privileged, or that they may contain information
13   that's privileged in them?
14   A    -- in the record.
15   Q    Okay.
16   A    The only people that have asked me for my
17   time records to date have been Carol Lee.
18   Q    Okay.
19   A    And that was, I believe, a single month.
20   Q    Okay.
21   A    And, in producing those records for that
22   month, are you redacting information, or just
23   producing it entirely?
24   A    I did not redact anything for that month.
25   Q    Okay.
```

0056
```
 1   A    I produced to her.
 2        Let's take a look at the debtor's monthly
 3   operating report, which I thought was the easiest
 4   way.  This is the last one that I found, or that I
 5   more specifically, Miss Frank found, and I want to
 6   see how it works on a schedule.
 7        Tell me if I am right, that there is a
 8   current month and a cumulative position to date,
 9   right?
10   A    That's correct.
11   Q    And on there --
12   A    You're on what -- it shows at the bottom
13   as MOR-2,
14   Q    Correct.  The document you signed?
15   A    Right.  And the MOR stands for monthly
16   operating report.
17   Q    And just so I understand, is contract
```

0057
```
     waiver under disbursement 5C; is that you?
 4   A    Oh 5C, that would be me and other
     people --
 5   Q    Okay.
 6   A    Now much of the $353,431.31, as of
 7   September 30, '09 was you -- your work?
 8   Q    I don't know without looking, but I would
 9   say, the majority.
10   Q    Okay.  Who are the other people that would
11   be in that category?
12   A    I don't know without looking.
13   Q    What would you look at to find that out?
14   A    The accounting records.
15   Q    Okay.  Is this something on a computer you
16   could do a printout on?
17   A    A printout on?
18   Q    Okay.
19   A    We may follow up with a request, but I
20   don't really want to get into a lot of detail; your
21   time, that's not my purpose.  I just understand
22   what -- and maybe Steven at the end of this
23   series of questions, you'll see --

     BY MR. DeMARINIS:
24   Q    When I get to the end of this series of
25   questions, what I'm looking for is just to find out
```

```
     the amount of time which seems to be reflected by
 6   the money, because I divide, by the 400 hours
 7   of time you spent doing your work, there may be a
 8   easy follow-up way to do it, we can deal with that
 9   later.
10        As I correct, though, because we didn't
11   find that you had filed anything after
12   September 30th, until we found the debtor's
13   post-confirmation quarterly report; which means,
14   however, either from -- is a 1998 and -- Haven't see
15   anything for October that was on the file.  Do you
16   recall anything?
17   A    I think you're correct.  I asked my law
18        I represent me in bankruptcy matters.  The
19   firm that represents me in bankruptcy matters.  The
20   whether I needed to file the month of October,
21   confirmation was during the middle of the month of
22   October.
23        And they told me not to file an October
24   report.
25   Q    All right.
```

```
 1   Q    Do you have a general idea of how much
 2   time you put into Hiramblie's work in October?
 3   A    Not without looking.
 4   Q    Just rough, I mean, was it 40-hour weeks?
 5   A    No, I don't work, like 30, 40, or
 6   October.  What I'm trying to get is, we're missing
 7   talking, what's that; $4,000, right, at your rate,
 8   So it's just trying to get a general idea of how much
 9   time you put into work, so get a general idea of how much
10   you were paid for October.
```

A   I don't know. Without looking, I don't
    know.

Q   Okay. We may have to ask you to look for
    that.
    Now, it switched from a monthly operating
    report to a quarterly report. Is that because, in
    the post-confirmation posture of this case, you're
    not required to do monthly?

A   Correct.

Q   Okay. If we take a look at that part of
    Exhibit 51, it's a little bit harder to figure
    out ... if you're being paid, because I didn't see
    anything that reflected a check, and tell me if
    notes you're receiving as reflecting at ... in this
    post-confirmation quarterly operating report?

A   Any money that I would have been paid post-
    confirmation would be reflected here.

Q   So tell me where it is, because I couldn't
    find it.

A   It's not in here because I haven't been
    paid.

Q   Oh, all right.

A   So you've worked, but you haven't been
    paid?

A   Correct.

Q   No money?

A   There's no money in the company?

Q   Correct.

A   All right. There's no money.

Q   Correct.

A   Are money's gone?

Q   Pretty much.

Q   So, are you just doing this out of the
    goodness of your heart?

A   He's a charitable guy.

Q   All right. There's no ...
    professional?

A   Actually, there's just a large disagreement
    between the government and I about tax refunds,
    $26 million worth of tax refunds.

Q   Right.

A   There will be an evidentiary hearing
    tomorrow, if you like to attend.

Q   No, I don't think I will. I can read
    about it.

A   Yeah, it may be in the newspaper again.
    But if I understand that one right, that
    it was the last time I litigated this.

Q   But if I understand that one right, that
    would be a big chunk, of money Mirabilis would get If
    the IRS gives it up?

A   The argument has to do with tax refunds.
    There are three tax refunds.

Q   Right.

A   Income tax refunds that I filed last
    year --

Q   : I filed the income tax returns last year --

A   Right.

Q   -- that show refunds of ... $1.0 million.

A   Based on what?

A   Based on carrying net operating losses
    from 2006, 7 and 8, back to 2005. And this is money
    that Mirabilis paid the IRS already.
    KPMG prepared the income tax returns
    And ... they -- we asked -- I filed them
    September, requested a quick audit under the
    Bankruptcy Code, and the IRS has been dropping their
    feet ever since.

Q   When is the --

A   And they're asking for a continuance
    tomorrow.

Q   What is the IRS's position? Is it that
    they don't ... the amount or that even if they do,
    it's going to go from one pocket of the government
    to the other pocket because of the forfeiture?

A   No. If you want the IRS's positions, you
    need to ask them.

A   Well, as you understand it.

A   They haven't given me their position.

Q   Oh, they haven't written a document.

A   All right. So they haven't even responded
    explaining their position?

Q   No.

A   They've asked for a continuance.

Q   Got you.
    to what's scheduled for tomorrow?

A   Got you.
    If I got it right, then, as of September,
    the total funds available for operations on this
    page you signed as Exhibit 51, was $904,065.14,
    right? The second page of Exhibit 51, the total
    fund -- number four --

A   The total -- line item four, yes, that's
    correct.

Q   Is that the total money that was available
    to Mirabilis to pay on any disbursements, or were
    there other monies that were elsewhere?

A   That's the amount of money that had been
    recovered through September 30th, from the
    beginning of the bankruptcy to that point.

Q   And when you use the word, "recovered,"
    would that even include monies that were in the
    account the day you took over?

A   Actually, the money in the ... at the day
    I took over is on line one; $236.80.

Q   So when you started your work for
    Mirabilis, the money that was there, 295,807

Q   Correct.

A   And then you recovered additional monies
    to get up to a maximum of $904,065.14?

A   Correct.

Q   At this point, yes.

A   And where did those recoveries come from?

Q   Well, there's a detail of that on the next
    page.

A   Got you.
    At last, 903,000 is explained on the next
    page of the 904, and I think the rest of it is ....

Q   Okay. What's the --

0063

A    Was the beginning balance.

Q    What's the lawsuit settlement, for $75,000?

A    It was a lawsuit over ... well, actually, that one is with RMT Construction. I believe the style of the case was Mirabilis Ventures, Inc. versus RMT Construction, Inc. And ... what was a lawsuit that predated my involvement with Mirabilis that I settled.

Q    Where they paid $75,000?

A    No. They paid Mirabilis $75,000.

Q    Right. How many litigations does Mirabilis currently have pending?

A    I think the number is 17, but it might be 16 or 16.

Q    Where are they pending? All in the federal court?

A    No.

Q    Okay. Where, other than the federal court? I mean either district, based on the withdrawal of the reference, or bankruptcy. Cover both.

A    Yeah. Well, Federal bankruptcy Court is one location. Federal District Court, Middle District is another location.

Q    Um-hum.

0064

A    And there are some state court cases in Orange County. I think there's one remaining in Broward County. And possibly one in Volusia County. I really have a schedule of this, and I really need to refer to my schedule.

Q    And those are all with Mirabilis as the plaintiff?

A    Those are all as Mirabilis as a plaintiff. All of the Mirabilis as defendant were wiped out with bankruptcy.

Q    Got you. Are you aware that Frank Amodeo has litigation pending?

A    Yes.

Q    All right. Which ones are you aware of?

A    Well, I'm certainly aware of the one against your client.

Q    Okay.

A    And I'm aware of the one against Mr. Moller's client.

Q    Mr. Berman's firm, as the defendant?

A    Mr. Berman's firm and the Rachlin firm.

Q    Has any of the work that you've done for Mirabilis, that you've been involved in either for both of those litigation?

0065

A    No.

Q    Okay. Have you done any work, even if you haven't gotten paid for it, or charged for it, have you done any work on either or both of those litigations?

0066

A    No.

Q    And have you done any work coordinating with either or both those litigations, either with Mr. Amodeo individually, or with his attorneys?

A    I have not with both his attorney and ... Mr. Amodeo, to the extent that Mr. Amodeo's litigation, but I certainly wouldn't use the term ... cooperate or coordinate or support.

Q    Let's talk about meeting. Which attorneys have you met with?

A    I've met with Mike Maher, one of his partners, or two of his partners, that I don't really recall their names.

Q    How about Jack Skorol (phonetic)? Have you met with the ... he was not actually, the meeting to discuss the litigation, he was not in the meeting.

Q    How many times have you met with the attorneys?

A    Maher?

Q    Yeah. Or any of the attorneys for Frank Amodeo.

A    (Pause.)

Q    Let's start with certain attorneys, because that's -- Mr. Amodeo has several attorneys.

A    And so, let's start with the Maher firm. Of Mirabilis, I met with all of Mirabilis's attorneys. Which Maher firm -- the initial -- Mike Maher was representing -- co-representing Mirabilis and Frank Amodeo against your client and Mr. Moller's client.

0067

Q    You mean, in pre-suit?

A    This was pre-litigation.

Q    Pre-suit, in discussions.

A    There was a mediation in the Berman case.

Q    Okay.

A    Pre -- pre-suit, mediation, and Mirabilis was a party to that.

Q    This is back in that, 2000 and ....

A    Eight.

Q    Eight. Okay.

A    And you met with those attorneys?

Q    I met with Mr. Maher and told Mr. Maher I thought he had a conflict of interest, and he needed to pick sides.

Q    Amodeo or Mirabilis?

A    He picked Amodeo.

Q    Okay. So, after that point.)

A    He ceased to represent Mirabilis at that point.

Q    Okay. I met with Maher's firm ... once or twice after that to try to gain information that would help me in my case against your client, Mr. Berman's client, and in another ...

**0068**

```
13   litigation that I'm prosecuting.
14      Q  With respect to litigation against the
15   professional -- well, put aside other litigation.
16      A  All right.
17      Q  -- were you provided with any
18   documentation that you have used to educate yourself
19   to prosecute those actions?  Put aside verbal
20   discussions, documentation.
21      A  The answer to that is, yes.  And maybe an
22   explanation is required.
23      Q  When I met with the -- Maher initially,
24   since he represented Mirabilis, I asked Maher to
25   provide me all the documentation he had that was
```

**0069**

```
 1   Mirabilis's documentation so I could provide it to
 2   my attorneys.
 3      Q  Got you.
 4      A  And he did provide me documentation.
 5      Q  All right.  And did he provide
 6   you any additional documentation?
 7      A  (Pause.)
 8      Q  After that point, though, did he provide
 9   you any additional documentation?
10      A  Note that I recall, after that point.  He
11   was very reluctant to give me any documentation.
12      Q  Who, other than Mr. Maher's firm that
13   represented Mr. Amodeo, did you have any meetings or
14   discussions?
15      A  Slaughter.
16      Q  His current defense attorney?
17      A  Correct.
18      Q  Okay.  What was the general nature of
19   those discussions?  To educate yourself or something
20   else?
21      A  Part of my meetings with Mr. Slaughter
22   were at the beginning of the case.  And some of them
23   had to do with the custody of the -- what I'm going
24   to call the Mirabilis documents.  The -- when I got
25   into the case, I couldn't tell who was in charge of
```

**0069 (cont.)**

```
     the Mirabilis documents.  And since I was Mirabilis,
 1   or representing Mirabilis at that point in time, if
 2   the documents belonged to Mirabilis, I wanted to
 3   take possession of them.
 4      Q  Mr. Amodeo stated on the record, in
 5   court proceedings, that prior to the bankruptcy he
 6   had done a lot of work, you know, gathering
 7   information, work on CDs, work on documents --
 8      A  Uh-huh.
 9      Q  -- you know, you became involved in,
10   work that Mr. Amodeo says he produced?
11      A  I did seek access?
12      Q  Did you see it?  Did you get access to it?
13      A  I -- by using the term in the Mirabilis
14   documents --
15      Q  Yes.
16      A  That would be included in the Mirabilis
17   documents.
18      Q  So did you find that Mr. Amodeo had done
19   all this organization and compiling of information,
```

**0070**

```
 1      Q  Now, is that information, that
 2   documentation within the documents that you have
 3   responded to our document requests as being
 4   available to us, and in the warehouse and the
 5   colleague went to visit to look at, is that all
 6   within that universe?
 7      A  All that I know about.
 8      Q  Yeah.  What I'm getting at is, you didn't
 9   take any of Amodeo's work product or Mirabilis's
10   work product out of the documents.  Those 5,000
11   documents or whatever that list was you gave us,
12   includes all of that, right?
13      A  What I have in my possession is what the
14   government, and Amodeo's attorney provided to me.
15   There's still some question of whose possession
16   those documents are in.  The government takes the
17   position that they are in control of the documents
18   because they were ... obtained under grand-jury
19   subpoena.
20      Q  Uh-huh.
21      A  I know what Amodeo's position is.
22      Q  Tell me what you know.
23      A  I know the government has their
24   possession.  And I know that Amodeo's
25   attorneys are holding; anything like that?
```

**0071**

```
 1   you've made available.  But maybe the government's
 2   holding, that you know exist but haven't seen them
 3   or we don't have access to them, or that Amodeo's
 4   attorneys are holding; anything like that?
 5      A  Yes.
 6      Q  Tell me what you know.
 7      A  I know what Amodeo's position is, their
 8      Q  Yes.
 9      A  possession what, we have termed the Lawson.
10   L-A-W-S-O-N, computer.
11      A  And, frankly, I don't care about the
12   ownership.  I just want to know that we know the
13   universe that exists.  For example, to your knowledge,
14   are there any documents outside that universe that
```

**0072**

```
20   as he says he did?
21      A  I don't know if Amodeo did it.  I doubt he
22   personally did it.  But, he -- let's say his staff,
23   or staff of his attorneys, or various people did
24   certainly a lot of work trying to organize
25   documents.
```

**0072 (cont.)**

```
 9   possession what, we have termed the Lawson.
10      Q  The Lawson computer is the computer that
11   prepared all the payroll?
12      A  And HR one through four are Presidion Roman
13   numeral VI, Presidion Roman numeral VII, ABN, and
14   National Medstaff, in the new order.  Number HR
15   one, two, three, four ... through December 31,
16   2006.
17      Q  In other words, this was the -- this was
18   the computer that prepared the individual payroll
19   for the 25,000 or so 920 customers, where the
20   missing payroll tax money came from.
21      A  And who is Lawson?
22      Q  Lawson is the software program.
23      A  Oh, okay.
24      Q  And --
25      A  So what is Lawson, I guess, right?
```

1  A    Yeah.  And the reason we termed the
2  computer the Lawson computer, is 'cause it uses
3  Lawson payroll or tax software.
4       The IRS took position of that computer
5  in ... 2007, I believe the early part of 2007, I've
6  got a tracking of custody, because I may use the
7  computer data as evidence.  I do not have custody of
8  that.
9       Q    Do you have access to it?  Have they
10 copied the hard drive?
11      A    I do not have access to it, and I have
12 requested access to it, and I've been refused
13 access.
14      Q    Was that taken pursuant to grand-jury
15 subpoena?
16      A    According to the prosecutor, all of the
17 documents, including what I have in the warehouse
18 Jessica came to, are grand-jury-subpoena documents.
19      Q    I understand that, but what I'm getting
20 at, for example, was the computer taken by an IRS
21 agent pursuant to an IRS summons, or with a
22 grand-jury subpoena if you know?
23      A    I don't know for sure.  I've been told it
24 was part of a grand-jury subpoena.  But my
25 understanding of the documents, in general, is that

0073

1  Mr. Amodeo and his attorney, criminal attorneys,
2  turned these documents over, including computers as
3  well as hard copy documents, voluntarily.
4       Q    Whose computer was the Lawson computer?
5       A    The Lawson computer was actually owned by
6  Presidion Solutions, Inc., and was housed in
7  Orlando, Florida.  The box was housed in Orlando,
8  Florida, but it was being operated by personnel in
9  Miami, Florida.
10      Q    Say... was the personnel...
11      A    AEK HR personnel.
12      Q    Like a phone link or something?
13      A    Well, it was hard wired; it's a
14 hard-wired to computer.  But it's like a ... ??
15 link or whatever -- I'm not a computer guy.
16      Q    Is there any indication that a computer in
17 Miami would have had that information saved, as
18 well?
19      A    I know for sure that the computers in
20 Miami, which I have possession of, do not have that
21 information.
22      Q    You've checked?
23      A    Yes.
24      Q    Okay.  Why is it you want access to the
25 Lawson computer?  What information is on it that you

0074

1  think is important to your work?
2       A    Well, the IRS, who has possession of the
3  computer, has actually asked me for information on
4  the computer.  And so we're in a circular argument
5  over, I can't give them the information because they
6  have possession of the computer, but they're
7  demanding that I give them the information.

6  Q    Prior to this case, have you been involved
7  in cases where the IRS has been involved, as well?
8  A    Virtually every case I've been involved
9  when the IRS is involved.
10     Q    And you've been involved in cases where
11 there's a criminal component like Evergreen, where
12 there's a prosecution, right?
13 A    One of the jokes in .... my friends, is
14 that I'm never involved in a case where someone
15 doesn't go to jail.
16     Q    So, my question is, do you find that the
17 relationship or lack of a positive relationship with
18 the IRS and the Department of Justice, in this case,
19 is similar to the relationship you've had in other
20 cases, or is it different?
21 A    No, this case .... 180 degrees different
22 from all my prior dealings with both the IRS and the
23 Justice Department.
24     Q    What do you attribute that to?
25 A    I wish I knew.

0075

1       Q    Well, from what you understand, what's the
2  difference?
3       A    I have no idea.
4       Q    Well, you say it's 180 degrees different,
5  what is happening that make it different from other
6  cases?
7       A    I don't know.  I don't understand, and
8  I've told the Government this.  I've expressed this
9  to the Government.  I've also expressed this in open
10 court, is that I am the primary person that is ...
11 in this case, I've been the ... the 37-plus percent
12 beneficiary of that is the Government.  And its
13 Government -- the Government has forced me to spend
14 in excess of $400,000, fighting with them over
15 trivial issues such as should there be a bankruptcy,
16 the Government didn't, right?
17     Q    Well, I know you consider it trivial, but
18 A    Actually, they withdraw their objection.
19 A    The Government has done -- I shouldn't
20 belittle what the Government's done, because I don't
21 think they do anything without a reason.
22     Q    And you have no idea what the reason is as

0076

1  to why they're, for example, now objecting to the
2  payment of fees to you and your professionals?
3       A    No, I don't.  I know what's in their
4  motion.
5       Q    Yeah.  Well, how do you read that?  What's
6  the expressed view of the Government, as to why
7  they're objecting?
8       A    Well, this is the fourth go-around of
9  objecting to fees.
10      Q    Okay.
11      A    So, it's been litigated in front of Judge
12 Jennemann four times.
13      Q    But on this go-around, what are they
14 saying?

0077

1   A   Same reason.
2   Q   Which is?
3   A   Which is, all the professionals are being
4   paid too much money, and there hasn't been enough
5   recovery.
6   Q   Has Mr. Gold personally spoken to you
7   about the Government's view?
8   A   Personally spoken to me?
9   Q   Have you had a conversation with Mr. Gold?
10  A   Or -- and I forget the woman's name from Washington,
11  who represents the IRS.
12  Q   Carol Ido.
13  A   Carol Ido.  Either one, either or both,
14  have you spoken to them?
15  A   Steve.
16  Q   What do they tell you?
17  A   Same thing.
18  Q   What do they say?
19  A   They don't want the bankruptcy.
20  Q   But then you must be aware, in
21  light of the compromise in settlements, saying, hey,
22  I got these claims that I believe are valuable
23  against these professionals, and if I can collect
24  some money, that's better, not to your benefit, to the
25  Government;  Something like that, to them.

0078

1   A   Well, I've expressed that to them.
2   They've expressed to me that the Government has no
3   increase in money.
4   Q   Really?
5   A   That is a quote --
6   Q   Okay.
7   A   -- from Mr. Gold.
8   Q   Has Mr. Gold expressed to you his view of
9   whether you should be pursuing these litigations
10  against the professionals?
11  A   Actually, their -- one of the things that
12  will be litigated tomorrow is whether I should be
13  litigating against the defendant, because
14  litigating against one of the defendants, because
15  the Government prefers --
16  Q   Which defendant is that?
17  A   This is -- the case is Moxia Strategy, and
18  the individuals are Edith Curry and Frank
19  Hailstones.
20  Q   And the Government prefers that you not
21  litigate that case?  That's the case with your
22  counterclaims, right?
23  A   It's not a preference.  They filed a
24  motion.
25  Q   So, it's more than a preference?

0079

1   A   It's more than a preference.
2   Q   Okay.  Has Mr. Gold or his colleagues
3   commented in any way regarding your pursuing other
4   litigation, such as against by clients?
5   (Pause.)
6   A   Mr. Gold has commented on other
7   litigations, but not your client.
8   Q   All right.  Which litigators has he
9   commented on?
10  A   In the corporate agreement I entered into
11  with the Government.  I specifically agreed not to
12  litigate against certain parties.
13  Q   Which parties?
14  A   Busch Slaughter, Amedeo's -- generally,
15  Amedeo's attorneys.
16  Q   Meaning, not to pursue a professional
17  malpractice claim?
18  A   No, not to pursue a fraudulent transfer
19  suit, for the fees they were paid with Mirabilis's
20  money.
21  Q   Got you.  And that was because the
22  Government asked for that?
23  A   Yes.
24  Q   Do you know why the government asked for
25  that?  Did they explain to you why they wanted to

0080

1   protect Mr. Slaughter and other attorneys from that
2   kind of a claim?
3   A   They did not explain their reasoning to
4   me.
5   Q   Did you have an idea the amount of fees
6   that he had been paid to Mr. Slaughter?
7   A   Mr. Amedeo had told me that he paid
8   Mr. Slaughter and Mr. Slaughter's co-counsel
9   somewhere in the neighborhood of 1.4 million in
10  fees.
11  Q   And had Mr. Amedeo paid any other
12  attorneys fees, besides Mr. Slaughter and his
13  co-counsel, that the Government preferred you didn't
14  go after?
15  A   I actually have a detailed schedule of
16  fees paid to attorneys that totals about $6 million.
17  In the compromise agreement, there's a list of
18  parties that I cannot litigate against, or I entered
19  not to litigate against, and it's larger than just
20  Mr. Slaughter, but I don't recall other people,
21  other than Slaughter and his co- -- criminal and
22  co-counsel.
23  Q   Right.
24  A   Well, one other -- Mr. Maher's firm was
25  another firm that I was not allowed to litigate

0081

1   against.
2   Q   Do you know how many fees that Mr. Maher's
3   firm got?
4   A   Mr. Maher was working on a 45-percent
5   contingency basis.
6   Q   Okay.
7   A   And had not been paid any fees, although
8   he had been paid $100,000 worth of expenses that --
9   and that $100,000 payment was forfeited to the
10  United States.
11  Q   So that, they did take.
12  A   They did take that.
13  Q   Hmm.  To your knowledge, did they take
14  any money from Mr. Slaughter or his co-counsel?

3     A  Not to my knowledge.
4        Q  This list that you have -- as I guess
5     there's the corporate in settlement which,
6     identifies the parties you couldn't go after, but
7     the list was not attached to the compromise in this
8     settlement, right?  This list, that you have, this
9     schedule?
10    A  Correct.  They're totally separate
11    documents.
12       Q  But it is a schedule that you could
13    provide if we wanted to look at it?
14    A  Correct, to Mr. Witham.
15    BY MR. DeMARIA:
16       Q  Does Mr. Slaughter, to your knowledge,
17    have any other interest in these cases, these civil
18    cases, financial interest, other than the money has
19    already been paid, that the Government's not going
20    after?
21    A  He does.

0082
1        Q  What interest does he have as a criminal
2     defense attorney?
3     A  He's co-counsel.
4        Q  In which cases?
5     A  Both the Pupillon, Rochlin and Cohen,
6     as well as the case against Bareno.
7        Q  So he is co-counsel with you in this case?
8     A  No.
9        Q  Oh, he is co-counsel in the Amodeo cases?
10    A  With -- with Mr. Maher.
11       Q  In the Amodeo cases?
12    A  In the Amodeo cases.
13       Q  And does he have a percentage interest?
14    A  I ... have not seen a document to that
15    effect, but my ... attorneys have told me they
16    believe --
17       Q  Don't tell me what your attorney said.  I
18    don't want to know.  That's privileged.
19    A  All right.
20       Q  Other than your attorneys, you have no
21    understanding of his --
22    A  I don't have an understanding of his
23    financial interest; but I do have an understanding,
24    since he is co-counsel, he would have a financial
25    interest.

0083
1        Q  And do you know whether the Government has
2     approved or consented one way or the other on his
3     having an interest in that case?
4     A  They have approved the interest.
5        Q  Have you seen any documentation of that?
6     A  No.
7        Q  I've ... yes.
8     A  And what is the documentation?
9     A  I think the document is the engagement
10    agreement between Amodeo and his attorneys, which

10    was approved by the prosecutor.
11       Q  And what is the percentage interest in
12    that engagement agreement, if you know?
13    A  It's 15 percent to the attorneys'
14    contingency, which includes expenses; 55 percent
15    goes, not to the plaintiff, Amodeo, but it goes
16    directly to the Government.
17       Q  And so as nothing goes to Amodeo?
18    A  Correct.
19       Q  Okay.  You mentioned that, besides meeting
20    with Amodeo's attorneys, you had met with Amodeo.
21    Now, I'd like to talk about two periods, before he
22    went to jail, and after.  So let's start with the
23    first period.
24    A  Correct.
25       Q  Did you meet with Mr. Amodeo at any time

0084
1     before he went to jail?
2     A  No.
3        Q  Okay.  So you've only met with Mr. Amodeo
4     since he went to jail?
5     A  Correct.
6        Q  On how many occasions?
7     A  Three.
8        Q  And for how long on each occasion?
9     A  The first meeting was in 33rd Street Jail,
10    Orange County's 33rd Street Jail.
11       Q  Right.
12    A  And I met with him for ... two to three
13    hours.
14       Q  Were you alone?
15    A  No.
16       Q  Who were you with?
17    A  I was with one of my attorneys.
18       Q  Okay.  And was he alone?
19    A  Pardon?
20       Q  Besides the guards, was he alone?
21    A  There was no guard in the meeting.
22       Q  Who else was with Mr. Amodeo, if anybody?
23    Was he alone?
24    A  He was alone.
25       Q  So it was you, and your attorney, and

0085
1     Mr. Amodeo?
2     A  Correct.
3        Q  Did he provide you any documentation, or
4     was it just a discussion?
5     A  It was purely a discussion.
6        Q  Okay.  And how long was that?
7     A  Two to three hours.
8        Q  All right.  And now about the next time?
9     A  I met with him twice in Coleman prison.
10       Q  And now how about the next time?
11    A  I met with him twice in Coleman prison.  And
12    I would say, those meetings were ... approximately
13    an hour each.
14       Q  All right.  And, again, just discussion?
15    A  I -- actually, I'm not allowed to bring
16    documents in, and neither is Amodeo, into those --
17    in Coleman.  Coleman's very restrictive on visitors.
18       Q  Have you relied, in prosecuting your

0086

professional liability claim, on any information
that Mr. Renden's provided to your

    A.   No.

    Q.   All right.  When you get information from
Mr. Renden, do you try to find another source to
use, if you're going to use it?  Other may be
provide you a lead, or an ID or something you might
think has value, do you try to go to find other sources
to use?

    A.   I think "yes" would be a fair answer to
that.

    Q.   Okay.  Are there other people that were
associated with Mirabilis's pre-bankruptcy filling,
that you've met with and spoken to?

    A.   Yes.

    Q.   Who?

    A.   It's a fairly extensive list.  I'd
probably have to back and look at my notes.  I met
with ... some of the prior officers and -- of
Mirabilis, actually, I've deposed some of them.

    Q.   Who have you deposed?

    A.   Mr. Boyer.

    Q.   Okay.

    A.   Mr. Holtz.  Miss Curry.

    Q.   Marrero?

    A.   Yeah.  Well, but he wasn't an officer.  He
was --

    Q.   Okay.

    A.   I mean, he was a professional.

    Q.   Ooc you.

    A.   So, Holtz was an officer of Mirabilis.

    Q.   Okay.  Anybody else?

    A.   We have deposed Mr. Marrero, but he was a
professional working for a firm that represented
Mirabilis to your client.

          UM. DONATH:  Okay.  I have to take a
break.  I apologize --

          THE WITNESS:  Okay.

          (Break.)

BY MR. DONATH:

    Q.   Other than the people that your attorneys
have deposed, have you spoken to other persons that
either work for, or provided services to Mirabilis
as part of the work that you're doing for Mirabilis
now?

    A.   Yes.

    Q.   And who would that be?

          MR. KIDMAN:  Just one second.  On
deposition, did you mention Halistone?

          THE WITNESS:  Yes.

          MR. DONATH:  Oh, did you -- you deposed
Halistone, too?

          MR. KIDMAN:  I don't think he mentioned
them.

          MR. DONATH:  And he did mention them.

          THE WITNESS:  I mentioned both Halistones
and Curry.

0087

          MR. WIDMAN:  Okay.

BY MR. DONATH:

    Q.   Other ... think the depositions and talking to
Frank Renden, who asked?

    A.   The ones that I recall, I've talked to
Paul Glover.

    Q.   Okay.  And we'll get to him later.

    A.   Jody Jaisan?

    Q.   Jody Jaisan.

    A.   Jody Jaisan, J-A-I-W-S-N.

    Q.   What was her position?

    A.   President of Mirabilis, just prior to my
taking over.

    Q.   Okay.  Who else?

    A.   Sadjiann.

    Q.   Okay.

    A.   Also a prior president of Mirabilis.

    Q.   Okay.

    A.   Barry Lynch.

    Q.   Who's that?

    A.   He was an IT director.

    Q.   Okay.

    A.   He was ...

          (Pause.)

    A.   Maybe some more, but that's all I remember
of the top of my head.

    Q.   Now, in the different litigation that
you've commenced, have you commenced any litigation
against former officers and directors of Mirabilis?

    A.   I've included subsidiaries, yes.

    Q.   All right.  Which subsidiaries?

    A.   Well, there were seventy of them.  The
Halistones and Curry litigations --

    Q.   The Holtz?

    A.   -- they were officers of subsidiaries of
Mirabilis.

    Q.   What about officers of Mirabilis
themselves?  Have you sued any officers -- let's
start with officers.  Any officers of Mirabilis?

    A.   Yes.

    Q.   Who?

    A.   Well, Barzan was an officer of Mirabilis.

    Q.   Holtz was an officer of Mirabilis.

    A.   Are you sure he was an officer, or was he
a director?

    A.   I think he was an officer.  I think I've
got him listed as an officer.

    Q.   Okay.  Anybody else?

          (Pause.)

    A.   Not of Mirabilis.

    Q.   Okay.  Anybody else?

    A.   I think that's all.

0090

    Q.   How did you first get involved with
Mirabilis in 2008?

    A.   Mirabilis's bankruptcy counsel contacted
me and asked me if I would be ... a president of the

0091

```
 5   company.  And I had previously had discussions with
 6   the U.S. Trustee about being Chapter 11 trustee for
 7   Mirabilis?
 8        A    No.  The first time you heard about
 9   Mirabilis?  From the U.S. Trustee?
10        Q    So when was the first time you heard about
11   Mirabilis?
12        A    No.  The first time I heard about
13   Mirabilis was they were the named sponsor for the
14   Orlando Magic.
15        Q    Okay.
16        A    -- in 2006.  And I happened to be an avid
17   NBA fan.
18        Q    Okay.
19        A    So on their name was all over, plus they
20   were doing tons of PR in Orlando, so they were in
21   the newspapers a lot.
22        Q    Did you have any involvement with the PEO
23   business, any of your work or knowledge of the PEO
24   business before Mirabilis?
25        A    No substantive knowledge of the employee leasing
         business.  I had dealings with the employee leasing
         companies as a CPA before, but no substantive
```

0092

```
 1   knowledge.  And you ever run into, or met, or talked
 2   to Frank Amodeo before you were contacted for this
 3   work?
 4        A    I had never heard of his before.
 5        Q    Had you ever heard -- before I was contacted,
 6   because he was in the newspapers.
 7        Q    Because of the criminal investigation?
 8        A    No.  This was prior to the criminal
 9   investigation.
10        Q    Okay.  What was he in the newspapers for?
11        A    As president of Mirabilis.
12        Q    Just an article you saw?
13        A    I started researching Mirabilis about a
14   year before I was appointed.
15        Q    Why?
16        A    I research companies that I think
17   potentially could be Chapter 11 clients.
18        Q    Why did you think that Mirabilis might be
19   a Chapter 11 client?
20        A    Mirabilis is what I call a high flyer, a
21   Roman candle.  Go very fast and burn very
22   brightly, and then they delivery fast.
23        Q    What was it you saw that indicated to you
24   they were a high flyer or a Roman candle?
25        A    Perhaps.  They like to watch companies like that.
         Q    So you're watching them, you're
```

0093

```
12   investigating them, and then putting aside seeing
13   then in the paper or their name at the arena, when
14   is the next time you have contact about Mirabilis?
15        A    Actually, I had a meeting with the U.S.
16   Trustee about a year before my appointment.  And
17   discussed with the U.S. Trustee if Mirabilis went
18   into Chapter 11, the appointment of myself as
19   trustee -- by the U.S. Trustee as the Chapter 11
20   trustee.
21        Q    Is that strange for you to talk to the
22   U.S. Trustee about cases that are not in bankruptcy
23   court already, or --
24        A    That's a common occurrence.
25        Q    Okay.  So why did you take that unusual
```

0094

```
 1   step?
 2        A    I initiated the action.
 3        Q    So you really thought this Roman candle
 4   was ready to flame out?
 5        A    I did.
 6        Q    Okay.
 7        A    I thought it was ripe.
 8        Q    How did -- who was the U.S. Trustee you
 9   spoke to?
10        A    Ken Meeker.
11        Q    And how did Mr. Meeker respond to your
12   bringing up this unusual information?
13        A    Because there was nothing filed, right?
14        Q    It wasn't a case.
15        A    Okay.  So when is the next time you spoke
16   to either Mr. Meeker or anybody else about
17   Mirabilis?
18        A    The next time I spoke to -- I didn't speak
19   to Mr. Meeker again until after I had been appointed
20   president.
21        Q    Okay.  So, I guess your next event with
22   then was being contacted to be appointed president?
23        A    No.  This was after I was appointed.  I
24   didn't speak to him again.  He was not --
25        Q    My mistake.  I don't mean Meeker.  The
         next event chronologically would have been talking
         to somebody about being appointed president of
         Mirabilis?
         A    The debtors counsel ... Mirabilis hired
         bankruptcy counsel prior to filing bankruptcy.  And
         they called me a couple of weeks before my
         appointment in the bankruptcy filing concluded.
         They were both on the same day.
         Q    Right.  And who was it who contacted you?
         A    Did you have a prior working relationship
         with Mr. Shuker?
         A    I have used Mr. Shuker as my primary
         bankruptcy counsel since -- the late '90s.
         Q    Okay.  I'm trying to understand something,
         though.  You had no involvement with Mirabilis, and
```

19   if they're either going to file and be a debtor in
20   possession, or they're going to file and have a
21   trustee appointed.
22   Q.   So -- but if it was going to be a trustee,
23   that would have to be Mr. Hehner making a
24   recommendation, or the Court, or somebody.  So I
25   don't understand what your role was going to be,

0095

1   since you're not part of Mirabilis.  What was the
2   idea there?
3       A.   You'll have to ask the -- Shuker's firm.
4       His firm represented the debtor.
5       Q.   No, what was your understanding of the
6   idea when they reached out to you?
7       A.   They needed essentially a white knight to
8   come in and ... and they didn't want to
9   do it through a trustee mechanism.
10       Q.   Okay.  So, in essence --
11       A.   They wanted a debtor in possession.  They
12   wanted -- they needed a clean officer to do that.
13       Q.   Okay.
14       A.   -- they needed a clean officer to do that.
15       Q.   Okay.  And I was the clean officer, I guess you
16   would say.
17       Q.   Had you ever done anything like that
18   before?
19       A.   No.
20       Q.   Had you ever heard about anything like
21   that being done before?
22       A.   In which cases?
23       Q.   In -- It's been done several times in the Middle
24   District of Florida, where a outside party,
25   unrelated to the business would get appointed

0096

1   normally into the president's position to avoid the
2   appointment of a Chapter 11 trustee.
3       A.   Why would they avoid the Chapter 11 trustee?  What's
4   the thinking, as you understand it?
5       Q.   I ... there's some legal reasons, but I
6   don't know.
7       A.   You think that, any of its reasons have to
8   do with the attorneys for the debtor in possession
9   wanting to maintain control, and not be replaced by
10   new counsel for the Chapter 11 trustee?
11       Q.   That could be a reason, I don't know.  You
12   have to ask the attorneys.
13       A.   Have you ever heard it expressed?
14       Q.   Yes.
15       A.   By counsel.   That's one of the
16   reasons to do it, right?
17       Q.   That is a reason to do it.
18       A.   Okay.  Outside the Middle District, have a
19   you ever, this precedent used where, rather than
20   having a trustee appointed to replace the bad guys
21   that ran the company, you would bring in a clean guy
22   or get -- or get it right before the filing, to avoid the
23   trustee?
24       A.   Yes.
25       Q.   Where?

0097

1       A.   -- in public companies.  Normally, when you
2   have a turnaround specialist being brought in, where
3   you have a non-prepackaged bankruptcy.
4       Q.   Right.
5       A.   For instance, Chrysler Corporation back
6   20 -- 15, 20 years ago --
7       Q.   Whenever their first bankruptcy was --
8       A.   Yeah.
9       Q.   -- they had a change in their CEO just
10   prior to that, too.
11       A.   Other than public companies.
12       Q.   I ... don't have a lot of knowledge of
13   this.
14           (Exhibit 52 marked for identification.)
15   BY MR. DeMARIA:
16       Q.   Okay.  Let me show you Exhibit 57, which
17   is the notice of deposition.
18       A.   Okay.
19       Q.   We can leave that there in the pile
20   because we're going to have the original plus.
21       A.   Okay.
22       Q.   And this is the notice that we served.  Do
23   you understand -- and you have mentioned this for
24   you, and then for whoever would be the person with
25   the most knowledge of the matters identified in our

0098

1   exhibit under what's known as Federal Rule of Civil
2   Procedure 30(b)(6) and the bankruptcy rule is the
3   same, 70 -- 30(b)(6) which gives us the right to have
4   Mirabilis produce somebody with knowledge of the
5   various items.  So, understand that's the procedure,
6   right?
7       A.   I do understand --
8       Q.   Okay.
9       A.   -- that is the procedure, I just didn't
10   understand what 30(b)(6) was.
11       Q.   Okay.  Have you ever appeared for a
12   deposition using this procedure, or even offered you
13   understand a 30(b)(6) using procedures?
14       A.   I believe I have represented -- I have
15   been deposed in the Evergreen case under the same
16   format.
17       Q.   Okay.  And you understand, then, if we
18   look at Schedule A to Exhibit 52, that Mirabilis had
19   the obligation, you know, unless objected to, to
20   produce the person or persons with the best
21   knowledge of the 28 categories that we listed?
22       A.   Yes.
23       Q.   And are you that person?
24       A.   I am the only person at Mirabilis.  So,
25   with or without the knowledge, I am it.

0099

1       Q.   Do you understand that, under the rule,
2   that you have an obligation to the best of your
3   effort, to acquire the knowledge necessary to answer
4   the questions under these categories?

7   A   I do.
8       Q   And you've done that?
9   A   I have.
10      Q   So you're prepared for this deposition?
11      I have prepared as well as I can, yes.
12      Q   How many hours have you spent preparing?
13      A   Well, it wouldn't have put down...
        preparation for this specific deposition, because
        most of the categories -- I did read the list --
17      Q   Un-hum.
18      A   -- so so if I had a general knowledge of
        what was here.
20      Q   Um-hum.
21      A   And so, I would say I didn't spend
        specific time looking for theirs, because I was
        familiar with virtually all of your categories in
        again.
0100
1       A   Well, I think I'd have to go through them
        again.
3       Q   Take a look.
4       A   I mean, I haven't looked at them for --
        since I got this.
6       Q   Why don't we do this.  Let me go on to
        categories that I know you'll have knowledge, such
        as your complaint.
9       A   Okay.
10      Q   Keep that, and on lunch break, if you
        could look through it, if I went to depositions
        because I know your best effort, despite, I want to
        know is, if there's any categories that, despite
        your best efforts, you can't answer questions on,
        okay?
16      A   Okay.
17      Q   If you could take a look at that --
18      A   Okay.  Fair enough.
19      Q   Okay.  Fair enough.
20      A   -- on the break and show to it so.
21      Q   Let's move on.  Alrighty.
22          (Exhibit 53 marked for identification.)
24      Q   I guess this is Exhibit 53.  Let me show
25  BY MR. DeMARIA:

(Exhibit.)

BY MR. DeMARIA:
        Q   This is Exhibit 53 -- which is the second amended
        complaint, filed in Mirabilis Ventures, Inc., against
        Harrero; do you see that?
        A   I do.
        Q   You're familiar with the second amended
        complaint, correct?
        A   I am.
        Q   You authorized the filing of it, correct?
        A   I did.
        Q   Did you review it before it was filed?
        A   I did.
        Q   Okay.  And I believe you took the

14  depositions of Mr. Holtz and Mr. Harrero before you
15  filed the second amended complaint, correct?
16  A   I don't know.
17      MR. HANGER:  Joe, you got Harrero's
18  deposition.  What's the date of it?
19      MR. DeMARIA:  February 22, 2010.
20  BY MR. DeMARIA:
21  Q   This was filed on April 1, 2010.  So you
22  would agree with me that you were at Mr. Harrero's
23  deposition before this was filed?
24  A   Yes.
25  Q   And you sat in Mr. Harrero's
0102
1   deposition and listened to his testimony, right?
2   A   I did.
3   Q   And despite listening to his answers, you
4   still believe, based upon your knowledge and
5   investigation, that it was appropriate to keep him
6   in this case as an individual?
7   A   I did.
8   Q   Okay.  We'll get to some questions about
9   that.
10      (Pause.)
11  Q   Take a look at page -- I guess the best
12  way to do this is have you'll use the top page from the
13  filing system.  It will be four of 16, or five of
14  16.
15  Q   Take a look at four of 16, and that's
16  where we begin the formal allegations which start
17  with a section on the Sunshine Companies, right?
18  A   Okay.
19  Q   What is your understanding in
20  general, what the Sunshine Companies were?
21  A   The Sunshine Companies were a group of
22  subsidiaries of Presidion Corporation that operated
23  PEO businesses in the early 2000s.
24  Q   What do you understand PEO business to
25  be?
0103
1   A   A PEO is a professional employer
2   organization, and most people think of it as an
3   employee-leasing company.
4   Q   What is an employer-leasing company?
5   A   A co-employer relationship, or a legal
6   term but, in essence, the service company which the
7   organization, a PEO company, in which
8   the ... company provides a -- actually employs
9   someone else's employees, and then leases them to
10  the -- let me call it the customer, or the user
11  employer.
12  Q   So you have, in essence, it would be a
13  co-employer relationship.  In other states it is
14  a co-employer relationship-- it's kind of a legal
15  term but, in essence, the service company which the
16  company provides a service of employing the
17  company -- the employees, providing fringe benefits,
18  paying payroll taxes, and doing the administrative
19  part of the payroll for a fee, for the user company,
20  or the customer of the PEO.
        Q   And that's a legitimate business purpose?

0104
```
 1            A    Yes.
 2       companies, right?
 3            Q    Certainly; they're used all over the
 4       world.
 5            Q    If I understand it correctly then, that
 6       particular PEO is collecting money from the various
 7       co-employees for purposes such as taxes or ...
 8       employment compensation or insurance or things of
 9       that nature, right?
10            A    Correct.
11            Q    And then -- so they collect that money,
12       and then their job is to make those required
13       payments?
14            A    Yes.
15            A    Generally speaking, they collect the gross
16       payroll, plus payroll taxes, fringe benefits, and
17       their service fee, and they would be required to pay
18       out all the fringe benefits, payroll taxes, their
19       service fee, and then have a minimum whatever the PEO's
20       operating expenses would be.
21            Q    Is there a typical percentage or profit
22       margin that -- in the PEO industry seems to be an
23       acceptable profit margin for the service they're
24       providing?
25            A    Generally less than two percent.
```

0105
```
 1            Q    Less than two percent?
 2            A    Yes.
 3            Q    Would it be fair to say that if the PEO is
 4       large and has a number of employers, which a have
 5       a number of employees under it, that could be a lot
 6       of cash coming into that business?
 7            A    Well, there's certainly a lot of cash
 8       flow, yes.
 9            Q    And so, to run that PEO properly, there
10       has to be controls and systems in place to account
11       for that cash and make sure the payments are being
12       made to where they're obligated, correct?
13            A    Yes.
14            Q    Did you find, when you first got involved
15       in Mirabilis, that those controls were in place to
16       reflect the cash coming in, and make sure the
17       payments were being made that needed to be paid?
18            A    Well, none of Mirabilis -- Mirabilis was
19       not operating when I came in.
20            Q    Okay.
21            A    So, none -- there were no operational
22       controls in place when I came in to Mirabilis.
23       Mirabilis had ceased operations at that point.
24            Q    Okay.  Did you spend some time in the
25       front end of your work for Mirabilis to learn about
```

0106
```
 1       what Mirabilis's business was?
 2            A    Yes.
 3            Q    And Mirabilis wasn't a PEO, though, right?
 4            A    It was not.
 5            Q    Okay.  Within the structure of Amodeo's
```

corporations, what were the PEOs?
```
 5            A    Let's define what Amodeo companies were
 6       first.
 7            Q    Okay.  Define them.
 8            A    Well, you ask the question, so --
 9            Q    When you hear me use the term, "Frank
10       Amodeo's companies", what do you understand them to
11       be?
12            A    Companies that Frank Amodeo owned.
13            Q    How about companies that he had a control
14       over?
15            A    Through owner -- through stock ownership?
16            Q    Or through any other manner?
17            A    All right.  Well, you have to define that
18       for me.
19            Q    Did you find any companies that Frank
20       Amodeo owned?
21            A    Yes.
22            Q    Which companies were those?
23            A    Which companies were these?
24            Q    Yes.
25            A    They're -- it's pretty extensive.  I mean it may be
```

0107
```
 1       50 or 60 companies.
 2            Q    Was Mirabilis one of them?
 3            A    It was not.
 4            Q    Okay.  Did you have -- do you have a list
 5       of companies, or a knowledge of companies that
 6       Amodeo had an ownership interest, even if he
 7       didn't outright own it?
 8            A    Yes, I have a list of that.
 9            Q    Is Mirabilis part of that?
10            A    Okay.  What is your understanding of Frank
11       Amodeo's ownership interest in Mirabilis?
12            A    Frank Amodeo had an ownership interest
13       of ...
14            Q    I think it's in the 36 million world of
15       preferred stock, and I forget how many shares this
16       was.  It was a few thousand shares, but it was in
17       the five or 36 million range.  It's on the balance
18       sheet of Mirabilis.
19            Q    Was he the only preferred stockholder?
20            A    No.
21            Q    Who were the other preferred stockholders?
22            A    There were a number of other preferred
23       stockholders that owned a substantially larger number
24       of shares than Mirabilis.  They owned ... I forget
25       the exact number of shares.  It's again on the
```

0108
```
 1       balance sheet, the audited balance sheet of
 2       Mirabilis.
 3            Q    Okay.  To your understanding, did Frank
 4       Amodeo have any control over the operations of
 5       Mirabilis, putting aside his ownership interest?
 6            A    My position is that Frank Amodeo did not
 7       have operating control over Mirabilis.
 8            Q    Did he have any type of control over
 9       Mirabilis?
10            A    He had some economic control in that a lot
11       of the funds that provided the capital for Mirabilis
```

**0109**

```
 9          came from Frank-Amodeo-owned companies.
10     Q    So when you say, "a lot of," was it all the
11     funds that came to Mirabilis?
12     A    No.
13     Q    Was it a majority of the funds?
14     A    Yes.
15     Q    The percentage majority?
16     A    This is part of my forensic accountant's
17     report, but it's --
18     Q    We're talking, at this stage, what you
19     think.
20     A    Higher -- north of 80 percent, maybe north
21     of 90 percent.  I don't recall precisely.
22     Q    Okay.
23     A    Eighty-two -- approximately $82 million
24     came into Mirabilis from --
25     Q    And you're saying --
 1               -- from Amodeo-owned companies?
 2     A    And eighty-something percent of that was from
 3     Frank-Amodeo-owned companies?
 4     A    More than 70 million came from Amodeo, or
 5     Amodeo-owned companies.
 6     Q    Okay.  Would you -- do you believe he had
 7     operational control over Mirabilis.  Who do you
 8     believe had operational control over Mirabilis?
 9     A    I believe the officers of the company had
10     operating control of the company.
11     Q    Which ones?
12     A    Well, there's a lot of officers.  So they
13     had -- all had parts of the operating control.
14     Q    All right.  Let me change the word
15     "control" to "influence".  Do you believe that Frank
16     Amodeo had any influence on the operations of
17     Mirabilis?
18     A    I don't have any personal knowledge if he
19     did or didn't.
20     Q    From anything you've seen?  From anybody
21     you've talked to?
22     A    All right, I've relied to people that have
23     widely different opinions on whether Amodeo
24     completely controlled Mirabilis.
25     Q    Okay.
       all, other than the purse strings of Mirabilis.
       Q    To -- that he did not have much control at
       line.
       A    Okay.  So why don't we -- let's use that
       control, other than the very limited
       aside whether that means anything or not.  That's
       just a discussion for another day.  And the other
       end is people that believe he -- up to complete
       control.
       Q    Yeah, I call the complete control "The
       Puppet Theory".
       A    Okay.  So let's start with the Puppet
       Theory.
       Q    Okay.
       A    Which individuals, or which information do
```

```
16     you have -- it could be documents -- give you an
17     indication that some people may have viewed Frank
18     Amodeo under the Puppet Theory of control?
19     A    Well, let's start with the prosecutor.
20     Q    Okay.
21     A    I think the prosecutor's position is
22     pretty much that Frank Amodeo had complete control
23     of all of the officers and directors of Mirabilis,
24     and they simply operated as his puppets.
25     Q    Okay.  And when you say, the prosecutor,
```

**0111**

```
 1     that's Mr. Gold?
 2     A    That's Mr. Gold, that's --
 3     Q    When you say, Mr. Gold, that's federal
 4     Mr. Gold's position --
 5     A    Right.  And I'm not going to ask you
 6     questions about that.
 7     Q    You just did.
 8     A    Well, let me put it this way.
 9     Q    This area of questions --
10     A    Okay.
11     Q    -- has to do with part of the plea I'm
12     negotiating.
13     A    That's fine.  I don't need to get into
14     that.  It's either going to happen or not happen,
15     and I'll react accordingly.
16     Q    I understand.
17     A    But we know, for example, with Amodeo,
18     the U.S. Government took a position
19     through an indictment; through a forfeiture
20     proceeding through a conviction at sentencing, and
21     we know, with respect to Mirabilis, that they have
22     at least taken a formal position with respect to an
23     indictment.  We'll put aside the last step of
24     negotiations.  Let's go to these pre --
25     A    Well, let me back up and see if I can
```

**0112**

```
 1     answer your question a different way than you asked
 2     it.
 3     Q    Okay.
 4     A    Because I think I can.
 5     Q    Okay.
 6     A    All right.  Mr. Amodeo was indicted.
 7     Q    Yes.
 8     A    Mr. Amodeo pled, and the plea was
 9     accepted, and he was sentenced.
10     Q    Yes.
11     A    And so they were basically a plea document
12     and a sentencing document.  And there was a
13     sentencing hearing.
14     Q    Yes.
15     A    I have read the plea document, some of the
16     sentencing documents, and the transcript of the
```

23   sentencing hearing.
24   A   Yes. And the plea transcript, too. There
25   was a colloquy at the plea.

0113
1    Q   Correct. And the position that the
2    Government took, and Mr. Amodeo took, in all of
3    -- that document, was that Mr. Amodeo had --
4    was the puppeteer.
5    A   Okay.
6    Q   -- was the controller of ... Mirabilis and
     its subsidiaries.
7    A   Okay.
8    Q   Which would include all its officers and
     directors.
9    A   Okay. Now -- so that's a great answer
10   because you gave a non-answer.
11   Q   But I haven't finished my answer.
12   A   Okay.
13   Q   I don't agree with that position.
14   Q   I'm going to get there.
15   A   Okay.
16   Q   And the reason I disagree with that
17   position is because of some of the video of the
18   officers and directors that shows their discussions
19   doing the day-to-day things, these officers
20   and directors were present. And some of the action
21   they took as officers and directors. That didn't
22   necessarily follow what Mr. Amodeo thought they
23   were doing. The fact is, there were some
24   specific discussions on video of not telling Frank

0114
1    about certain things they were doing, because he
2    would to approve.
3    A   Now --
4    Q   So which tended to indicate to me, and
5    Frank wasn't the total puppeteer, and these officers
6    and directors were simply just -- that just danced
7    on the strings to whatever the master wanted them to
8    do.
9    Q   All right. You've said a lot. So let's
10   go through it.
11   A   Okay.
12   Q   So the first thing is, your understanding
13   is that both the United States Government and Frank
14   Amodeo are in agreement, in his position,
15   that their position is that he was the controller,
16   the puppeteer, to use your words, right?
17   A   They were at its plea part.
18   Q   But putting that aside --
19   A   I'm sorry. His appeal --
20   Q   Well, that's an important element, I
21   mean, you can't put that aside, because Frank
22   very important, because that Amodeo basically has
23   taken the position that he relied solely on his
24   outside advisors, and not just your client, but
25   Mr. Maler's client, but subsequently relied on his

0115
1    criminal counsel -- and this is in his appeal
2    documents, which I'm sure you've looked at.

4    Q   I agree.
5    A   He's changed his position.
6    Q   Are you now relying on his changed
7    position in your -- in his ...
8    A   I'm not relying on Mr. Amodeo for any of
9    my position.
10   Q   Okay. We'll leave aside whether his
11   changed position has any legal effect. It will
12   probably come as no surprise to you that the
13   Government and I agree that it has no effect; not
14   only does it violate his plea agreement, our
15   position is that until his plea agreement is
16   overturned or withdrawn, that plea stands. So I
17   want to talk about the plea.
18   A   Okay.
19   Q   The plea and the sentencing, your
20   understanding was that the Government and Mr.
21   Amodeo, at that time, were in agreement on this
22   control puppeteer theory, that he was the puppet
23   master, from what his plea agreement said, that
24   that's the reading. My understanding of the plea
25   just talked really, right of the, what I call the

0116
1    agreement and some of the ... the ... transcript of
2    the sentencing would have followed that pattern.
3    A   Now, to your understanding, Mr. Gold, the
4    government agent had access to the same video you
5    just talked about, right?
6    Q   Mirabilis documents were provided to me by Mr. Gold.
7    A   So the answer is, yes?
8    Q   Yes.
9    A   Because the documents included videos,
     right?
10   Q   Yes.
11   A   By the way, did you see the videos in the
12   warehouse? Were they in the gigabyte somewhere?
13   Q   I gave you an electronic media index.
14   A   And it's in there?
15   Q   Yes.
16   A   So all the videos are in that disk?
17   Q   It's not a disk.
18   A   Okay, it's in the gigabyte somewhere?
19   Q   There's not a gigabyte.
20   A   Okay, we're talking about 70 or 80 file servers.
21   Q   We're talking about 70 or 80 file servers.
22   A   Okay.
23   Q   Some of which are running and some of
24   A   which are not.
25   Q   Okay.

0117
1    A   We're telling about Terabytes of
2    information, not gigabytes.
3    Q   Okay.
4    A   And I've given you a complete index of
5    that.
6    Q   I have indexed all the electronic media,
7    which would include things like audio and
8    well as things like video and video records. And so
9    I've given you an index of that to look at. I mean,
10

11  it's very extensive.  My understanding of the video
12  is 20,000 hours of video.
13      Q   Okay.  Let me, in an initial point from
14  what I know, but case law, what I'm aware of you
15  pleadings, what I listened to your attorney ask
16  questions about; I think you have in mind certain
17  videos you've seen or you're aware of that you think
18  are important.  So I'm going to ask you about those.
19          I know there was a reference in an
20  April 18, 2006 meeting, for example.  That's a video
21  that I think you think is important.  But I'll ask
22  you about those later.  But right now at least I
23  at least want to start in my discovery process at
24  understanding the videos that you think are
25  important, and maybe in conflict with this notion of

0118

1   the puppet master theory so that we can easily go
2   back and say, can I make sure I have those videos.
3       A   I've only seen snippets of it at times,
4   either in the pre-litigation, of Mr. Maher provided
5   it to me.
6       Q   You had this -- when did you come
7   jointly taken by the Department of Justice and
8   Mr. Amodeo, as to his puppet master control?  When
9   did you come to disagree with that?
10      A   That's fine.
11      Q   That's my question, though, is -- but Mr. Gold
12  had access to those videos ... and his agents?
13      A   Yes.
14      Q   You had this -- when did you come
15  of a video that you went with.
16      A   Right.
17      Q   Right.
18      A   Although, certainly, he was a target.
19      Q   Right.
20      A   And he were other parties.
21          points in time, I mean, it was -- as I learned about
22  the case -- Amodeo had not been indicted when I
23  started in, this point.
24      Q   Right.
25      A   And I was aware of that and, you know, I

0119

1   tried -- when I could, to these ends, I try to
2   identify who the Government's targets are, because
3   they cannot tell me who their targets are.
4       Q   Right.
5       A   Right.  It's very helpful, for me to know,
6   because, usually, their targets won't talk to me.
7   Usually, I can identify who the targets are, whether
8   they'll talk to me or not.
9       Q   Right.
10      A   So, as I came into the case, I did not
11  understand the puppet master theory at all.  Because I had
12  been told by various parties all kinds of things
13  about Mirabilis that were conflicting, which is kind
14  of normal, in these types of cases, for me.  I come
15  in, I talk to ten people, I get 12 stories, it's

18  Uh-huh.
19      Q   And kind of my job is to figure out
20  really from -- if I talk to ten people I get, also
21  ten agendas, particularly if some of those ten
22  people are targets of the prosecutor.
23          So, when I came into this case, the same
24  thing happened.  I initially asked to talk to Jodi
25  Jalsam, Jay Stollswork and Shane Williams who were

0120

1   the current officers and directors of the company,
2   at the time, and I recommended she have a criminal
3   counsel.  I recommend -- she did not have criminal counsel
4   at the time, and I recommended she have a criminal
5   counsel before she talks to me.
6       A   So, I focused on that aspect.
7       Q   And did she obtain a criminal
8   counsel.
9       A   I do not know if she obtained a criminal
10      Q   Did you ever talk to her?  Subsequently?
11      A   Okay.  Was one of my goals, at the time,
12  to talk to me on advice of their criminal counsel.
13      A   Jay Stollswork and Shane Williams refused
14          Okay.
15      Q   What was her view of information that she
16  any information from those three people that would
17  have helped you in your analysis?
18      A   Well, actually, I did from Jalsam.
19      Q   Okay.  What one of the --
20      A   The first one.
21      Q   Before you advised her to get criminal
22  counsel?
23      A   I advised her, and she kept talking.
24          Okay.
25      A   I mean, she met with me and one of my

18  kind of standard.
19      Q   Uh-huh.
20      A   And kind of my job is to figure out
21  bankruptcy attorneys.  And, you know, I told her
22  that, you know, what I've got is open to the
23  Government.  I share information with the
24  Government.  And I'm open with people about that.
25          What was her view of information that she

0121

1   gave you as it affects this control theory we're
2   talking about?  You know, where was she on that
3   scale between puppeteer and nothing other than
4   money?
5       A   I didn't specifically ask for the
6   question.
7       Q   But did you get any information from her
8   that helped in that understanding?
9       A   Yeah.  Because she basically explained
10  to me the way Mirabilis had operated during the --
11  let me call it the liquidation phase, which would
12  have started in the early part of '07.
13      Q   She was the president of the company.
14      A   She was the current president of the company
15  resigned in -- December of '06, I think was the last
16  president before Jalsam resigned, then Jalsam [sic]
17  took over as president.
18      Q   Was she associated with Mirabilis before

0122
25 she became president?
1      A   Yes.  She was an employee of Mirabilis
2 you about how Mirabilis operated was in this
3 January '07 forwards period, where she was
4 president?
5      A   Well, that's what I was asking her
6 primarily about.
7      Q   Okay.
8      A   I have time quickly trying to come up to
9 speed on what was going on.  We're talking -- the
10 meeting took place within five or six days of my
11 appointment.
12      ... from what you know from your
13 investigation as of early '07, Bachlin was not
14 performing specific services for Mirabilis, correct?
15      A   I don't have a specific date when they
16 stopped providing services.  I don't know that off
17 the top of my head.
18      Q   And in early '07, Mr. Holtz had resigned
19 as chairman, correct?
20      A   I have that on a document that I keep of
21 when his resignation.  And the most of the
22 resignations were in late '06.
23      Q   Okay.
24      A   But some of them were as late -- or after
25

0123
1 that, through February '07, and I don't recall
2 Mr. Holtz exactly.
3      Q   And if I got it, Miss -- is her name
4 Jaimen?
5      A   Jaimen.
6      Q   Miss Jaimison?
7      A   Jaimen.
8      Q   Miss Jaimen's discussion with you
9 about, right?
10      A   Most of it had to do with the -- how she
11 was operating the company and the litigation that
12 was taking place, the liquidation of specific assets
13 that was being done just prior to my taking over.
14      Q   And by early '07, Mr. Asodeo had been
15 retained by the Government and was -- by his own
16 words, I guess, trying to cooperate with the
17 Government, correct?
18      A   That -- I don't have any personal
19 knowledge of that, but I've been told that.
20      Q   That's his windup period, right, '07 into
21 '08?
22      A   It's what I call the liquidation phase of
23 Mirabilis of the -- the subpoenas came out in
24 November of '06 to the FDO customers.

0124
1      Q   Uh-huh.
2      A   And the FDO customers reacted very badly
3 to those subpoenas coming out, where they got tons
4 of FDO customers.  Also, the morale at Mirabilis I
5 had been told, declined substantially because of the

6 subpoenas, once that became common knowledge within
7 the company.
8      Q   And as to the officers resigned -- most of
9 the officers resigned, or board members resigned in
10 December of '06.  And a skeleton crew took over,
11 which consisted of Jaimen, Stalworth, Williams, two
12 attorneys and Yoakey, Asodeo, who was not an
13 officer or director of Mirabilis, but was in the
14 liquidation phase and ... couple of secretaries.
15      Q   From your understanding from Miss Jaimen
16 in that liquidation phase, these are -- were we
17 closer to the puppeteer end of the theory, or the
18 not-involved end at that time, for Mr. Asodeo?
19 theory?
20      A   He would be closer to the puppeteer
21      Q   So he was controlling it?
22      A   He was -- I would -- from what I've been
23 told, he was essentially running the liquidation
24 phase.  Jaiman was reporting directly to him.
25      Q   So you agree with the position of

0125
1 puppeteer in that phase?
2      A   [Pause]  I'd be closer to it during the
3 liquidation phase.  Once we go down to the skeleton
4 crew, but I can't answer for those six people.
5 These six people would have never known... whatever
6 had this phase I have talked -- talked the -- whatever
7 the -- I've talked to Nutter, Moeckey, and Jaiman ...
8 and Asodeo.  So I've talked to four of those six
9 people.
10      Q   And I would think, based on my
11 conversations with four of those six people, that
12 Asodeo was running the liquidation.  I'm not sure if
13 I can say Asodeo was running it, or Asodeo and the
14 Slaughter, his criminal counsel, and Randy Gold, the
15 prosecution, were running it.
16      A   Okay.
17      Q   They were doing it.  They were getting
18 Government's perspective on certain things.
19      A   Okay.
20      Q   So let's go back a little bit before
21 January of '07.  Have you seen information or spoken
22 to people that discussed who was in control of
23 Mirabilis during the fourth quarter of 2006 -- none of
24      Not specifically the fourth quarter.
25      Q   Is that a period you focused on?  I'll say

0126
1 the second half of 2006, or the third and fourth
2 quarter.
3      A   I didn't focus on a period.  I would say
4 the pre -- I would separate the liquidation phase
5 from the pre-liquidation phase, and say it was
6 substantially different, pre-liquidation phase as
7 the -- to the liquidation phase.
8      Q   Have you seen information that, in the
9 late 2006 time period, the directors of Mirabilis
10 were trying to convince Mr. Asodeo to take charge
11 in the management of Mirabilis, and to take control
12 away from him?  Have you seen that?

0127

```
13        A    In -- what's the time period?
14        Q    Late '06.  Late third quarter, fourth
15   quarter, '06.  Have you heard?, or seen it, that
16   that was a position that the directors were trying
17   to assert to take control away from Randeo and his
18   people?
19        A    I don't know if I can put it in that time
20   period.  Various officers and directors are on video
21   making statements that they knew where the money was
22   coming from.  And that -- and the money was a
23   control issue.  And so they spent a lot of time and
24   effort wherever, concerning the money having control.
25             Randeo, as I stated before, having control

0128
 1   of where the money was coming from; i.e., Presidion
 2   Corporation.  That was -- in my mind,
 3   that was common knowledge from the beginning of,
 4   2005, when Mirabilis first started up.
 5        Q    Okay.  Tell me what you've seen or heard
 6   or been told about that leads to that conclusion
 7   that you -- that leads to that conclusion
 8   that you -- just stated.  That's where my
 9   knowledge from early 2005 -- I'll tell you exactly
10   where I'm going -- I don't want it to come as any
11   surprise to you.
12        A    It's okay.
13        Q    I'd like to know what your position is,
14   what the knowledge was that people had, who the
15   people were that had that knowledge, you know.  So
16   that's the -- the basis and the reason why you want, but that's where
17   I'm going to go.
18        A    Okay.  I think my basis is that the whole
19   operation started with the acquisition of Presidion
20   Corporation, actually the representation of
21   Presidion Corporation, the public company.
22             Presidion Corporation had subsidiaries,
23   the Sunshine Companies, that had payroll tax, unpaid
24   payroll tax issues, and they hired ACME, which I'm
25   going to call ACME, only because other people use
     that nomenclature, and I don't know why, because

0129
 1        A    -- HE.  But --
 2        Q    -- ME.
 3        A    I always thought it was a road runner.
 4        Q    Yeah.  Okay.
 5        A    But at that point, they had an unpaid
 6   payroll tax issue.
 7        Q    Could we stop right there for a second? :
 8        A    Sure.
 9        Q    You're not asserting that the Mirabilis
10   directors, officers of professionals in '05 forward,
11   had responsibility for the unpaid payroll taxes of
12   Sunshine Companies that had preceded the
13   acquisition, are you?
14        A    Actually, I'm talking about a timeframe
15   when Mirabilis didn't exist, that -- that forward,
16        Q    Okay.  So then, you would agree with me
17   that that historical lack of payment of payroll
```

0130

```
20   taxes is something different than what you're
21   talking about with monies coming in to Mirabilis?
22        A    Correct.
23        Q    So, at that point, the Sunshine Companies
24   Plan was formulated and that was formulated in the
25
```

0129 (right column)

```
 1   latter part of 2004, and started being executed in
 2   the first week of 2005.  And now we are into a
 3   timeframe where Mirabilis existed.  Mirabilis came
 4   into existence November of 2004.
 5        Q    The name change occurred at that time?
 6        A    Yes, there was a predecessor company that was a
 7   shell corporation.
 8        Q    Right.
 9        A    And it certainly was not Mirabilis.
10        Q    Right.
11        A    It was Stellar Industries.
12        Q    Right.
13        A    Which was a ... it was a off-the-shelf
14   shell corporation.
15        Q    And who ran that company?
16        A    Originally, or the predecessor?
17        Q    The Stellar Industries in the time that it
18   was watching to Mirabilis?
19        A    To my knowledge, it had no business
20   operations and was not an operational company.
21        Q    Okay.
22        A    And I will go back and go through some of
23   these points you're mentioning, but I do want to
24   focus -- that's why your narrative's important -- on
25
```

0131

```
 5        A    So that's what I'm asking.  I'm going to
 6   go back piece by piece, but I want to tear the whole
 7   right now.
 8        Q    Okay.  So we go back into that.  So, at
 9   that point, the -- Mirabilis existed but Presidion
10   Corporation and its subsidiaries, the Sunshine
11   Companies, began being represented by your client to
12   deal with the Sunshine Companies' payroll tax issue.
13   And, actually, does Marrero, you asked me previously,
14   why we kept him in the case.
15        Q    No, I just said, I asked the question
16   that way.  I just said, I think I asked you, you
17   don't, think I asked you why yet, because I think
18   kept him in the case after taking his deposition.  I
19        A    That's, you know, frankly, a privileged decision by
20   you and your counsel.
21        Q    All right.
22        A           (Pause.)
23        A    He was the person at Rachlin Cohen who was
24   the primary spokesperson for the Sunshine Companies
25
```

0132

```
 1   with the IRS.
 2       Q   In early '05?
 3       A   In early '05.
 4       Q   Beginning in early '05?
 5       A   Isn't it true that, although Mr. Marreo
 6   was prepared to fulfill that role in transferring
 7   the IRS case from Detroit down to Miami, that by the
 8   spring of '05, he wasn't really being used at all,
 9   that the interest of the -- the prosecution just took over
10   themselves; isn't that true?
11       A   That's not what he said in his deposition.
12       Q   What do you understand him to have said?
13       A   He said in his deposition that, prior to
14   '05, but his time records indicated that he was
15   still involved well into the June
16   '05.  But his time records indicated that he was
17   still involved well into the June
18   His Berkowitz from the IRS was sending his
19   information and said, can you get me this
20   information, and he passed it along to Mr. Myers,
21   would you say that is that if I had his
22   deposition here, I'll point out to you what his
23   answers were, rather than me trying to recall his
24   deposition off the top of any head.
25       Q   I'm not asking you that.  What I'm getting
```

0133

```
 1   at --
 2       A   Well, you're asking me about specific
 3   dates and what he said in his deposition, and I
 4   would call you -- I would call that you asking me
 5   specifically about his deposition.
 6       Q   But you put --
 7       A   Before I filed a second amended
 8   complaint, which was after Mr. Marreo's deposition.
 9   you filed a first amended complaint, correct?
10       A   I think -- yeah, we're on --
11       Q   Same one; right?
12       A   Number three.
13       Q   And you sued Mr. Marreo in that
14   deposition -- in that complaint?
15       A   Yes.
16       Q   And that was before you took his
17   deposition?
18       A   Yes.
19       Q   So, there was a basis you had in your mind
20   to why you believed you, in good faith, would sue
21   Jose Marreo; right?  Because I know there's no
22   personal animosity you have towards the man?
23       A   Right.  You're doing your job.
24       A   I don't have any personal animosity of
25   anybody in this case, including the good guys or the
```

0134

```
 6       A   Yes.
 7       Q   And I'm assuming part of that basis is
 8   tied to this 2005 time period when, based on
 9   information you saw, he was involved in those
10   discussions with the IRS on behalf of this Sunshine
11   Company plan, correct?
12       A   That's part of the reason.
13       Q   What are the other parts of the
14   reason for Jose Marreo, specifically?
15       A   Well, Jose Marreo, prior to his
16   deposition --
17       Q   Yes.  Don't talk about his deposition.
18   Talk about your thinking on information you had
19   before he was deposed.
20       A   That's what I'm trying to do.
21       Q   Okay.
22       A   My understanding of what he did was
23   he was the interface for the Sunshine Companies with
24   the IRS.
25       Q   Okay.
```

0135

```
 1       Q   At the prior -- prior to his deposition, I
 2   didn't know how long that went.
 3       A   Okay.
 4       Q   In his deposition I found out -- he
 5   answered the question.  We asked his questions about
 6   how long he went, and he actually produced time
 7   records that indicated what his involvement was.
 8       Q   Okay.
 9       A   And he was very good at answering the
10   questions in his deposition.  So, I got a much
11   clearer picture of his involvement in the case
12   was.  The information I had prior to that was more
13   from documentary evi... -- information, particularly
14   e-mails, some memorandum back and forth about his
15   involvement, because he wrote -- he would report to
16   others within Bacillin Cohen as well as others within
17   the, either Mirabilis group of companies, or the
18   Amodeo group of companies, and he was reporting to
19   let me call it, a group of people that were
20   working on the Sunshine Corporate Plan.
21       Q   What did you -- and I'm going to ask the
22   question this way.  I'm going to ask you what you
23   understood the Sunshine Corporate Plan to be.  But
24   circa early '05, in connection with your answer that
25   it was common knowledge of where the money was
 1   coming from, because what I'm getting at was it
 2   Jose did.  His time records -- the documents are
 3   there.  But the question to me is, what does it
 4   mean?  And the question to me is, you must think it
 5   means something sufficient to bring a lawsuit
```

0136

15 against him, based on the rubric of te being among
16 those who knew where the money was coming from,
17 coming in to Mirabilis.
18    A    And so since we're talking about early
19 '05, that's the view I want to know at that time
20 period.  What is it in early '05, through
21 Mr. Marrero's work, as it gets to that point would
22 have told you this or money coming into his and said,
23 wait a minute, there's money coming into Mirabilis
24 here that are from an improper source?
25    A    I don't think that I said that.

0137

1    Q    Okay.  So you're not saying that about
2    A    I don't think I'm saying that about
3 Mr. Marrero.  I'm not aware that Mr. Marrero knew or
4 did not know the money coming
5 into Mirabilis.  I think that was your question.
6    Q    Yes.  We'll call it the payroll tax money.
7    A    I don't know if he knew or did not know
8 that.
9    Q    Okay.  Do you believe that, based upon the
10 work that he was doing and the information he had
11 available, he should have known?
12         (Pause.)
13    A    I believe his ... partners in his firm had
14 knowledge of that and would represent money
15         Which partners?
16    A    Holtz, Druckmann.
17    Q    Druckman?
18    A    Yeah.
19         And now I'm trying to understand --
20    Q    I'm not sure if Druckman was a partner.
21    A    All right.  We'll say, an individual at
22 Rachlin.
23    Q    Okay.
24         But now I'm a little bit confused.  So you
25 say it may be possible that others within Rachlin

0138

1 had information they didn't give to Jose Marrero,
2 right?
3    A    Yes.
4    Q    And Mr. Druckmann may be one of those?
5    A    Maybe.
6    Q    Mr. Holtz may be one of these?
7    A    Yes.
8    Q    Yes; I'm looking at a lawsuit that
9 sues Mr. Marrero, in your theory, the person who may
10 not have received information from others at.
11 Rachlin, Holtz, under the entire Rachlin.
12    A    I don't see Mr. Druckmann's lawsuit.  I'm trying to
13 understand your thinking.
14    A    I mean, the logical thing to me would seem
15 to be, if I have somebody that has information that
16 didn't give it, I would treat that person
17 differently than somebody that didn't receive
18 information, but yet you've chosen to sue the guy
19 who you think may not have received information.  I
20 don't get it.
21    A    Well, he may not have received the

22 information, but he was an integral part of the
23 Sunshine Companies Plan.  The Sunshine Companies
24 Plan was an integral part -- the PBS
25 plan was the use of the payroll tax money within the

0138

1 Mirabilis organization.
2    Q    And we'll get --
3    A    -- there, but you would agree
4 with me that the Sunshine Companies Plan, as you've
5 termed it, was not on a going-forward basis, using
6 currently occurring obligations for business
7 operations.  You would agree with me, right,
8 sunshine was historical?
9    A    Correct.
10    Q    So there was no -- there was no money
11 coming into Mirabilis from the Sunshine Company
12 Plans, correct?
13    A    No, that's correct.
14    Q    I mean, the monies that came into
15 Mirabilis, based on your investigation came in from
16 the PBS plan, is that correct?
17    A    That's not correct.
18    Q    No monies came in from the PBS plan?
19    A    No, it did, but not solely.  You used the
20 term, "solely," so --
21    Q    I didn't mean to say that.  There was no
22 money that came into Mirabilis from the Sunshine
23 Companies Plan, to your knowledge?
24    A    Correct.
25    Q    All right.  But the time period we're

0139

1 talking about in early '05, that Mr. Marrero was
2 involved in, was involved with the Sunshine
3 Companies Plan, correct?
4    A    Yes.
5    Q    All right.  So is there something in that
6 time period that Mr. Marrero learned about the
7 Sunshine Companies Plan that you're saying should
8 have been an indication to him that something
9 improper would be occurring later on with the PBS
10 plan?
11    A    Well, let me correct my answer --
12    Q    Okay.
13    A    -- to your previous question.
14    Q    Okay.
15 '05.  You've used the term, "spring of '05".  And
16 you keep continually using the term, "early '05".
17    Q    Okay.
18    A    Mr. Marrero was involved with the Sunshine
19 Companies Plan and representing the Sunshine
20 Companies through, best I can tell, the fall of '05.
21    Q    All right.  Not early '05.
22    A    Okay.
23    Q    Okay.
24    A    He was ... best I can tell, he was not
25 involved with the PBS plan.

0140

1    Q    Okay.
2    A    Except from the standpoint that he was

3  involved somehow with the writing of various
4  memorandums, tax memorandums. He didn't appear to
5  be an author, but he appeared to have seen some of
6  those. They were respecting the PSP plan, or part of
7  justifying the PSP plan.
8         So from Marrero's involvement, I don't
9  believe Marrero had any personal interest, based on
10 his deposition of any use of payroll taxes for
11 other than ... paying the Government, except for
12 the Sunshine Companies Plan.
13   Q   And that was ...
14   A   ... before Nirabilis existed.
15   Q   Okay. What did you understand the
16 Sunshine Companies Plan to be; what were they trying
17 to achieve?
18   A   The primary achievement was to separate
19 the assets of the Sunshine Companies, in other
20 words, the PEO operating assets from the liability
21 of the unpaid payroll taxes to the Government.
22   Q   So you were trying to separate ...
23   A   ... that they were being separate ...
24   Q   ... from ... you are separating the
25 assets from the liabilities that way?
0141

1   A   No. Actually, I thought it was a fairly
2  ingenuous plan.
3   Q   Okay. Whose plan was it?
4   A   Best I can tell in -- in trying to figure
5  this out, it was ... Frank Amodeo's plan, but he
6  needed to have had ... help from outside
7  professionals in developing the plan.
8   Q   Who were the professionals that you
9  believe assisted him in that plan?
10  A   There was ... I think ... Looks like Berman
11 and Boyer and Hans Beyer, who were around prior to
12 that, were two of the parties as well as ... Larry
13 Haber. There was a ... law firm representing ...
14 Presidion Corporation, Koselowcci -- I'm going
15 to --
16  Q   Koselowecci & Fink?
17  A   Yeah. I'm going to butcher their name
18 because ...
19  Q   Always do.
20  A   Okay.
21        That were involved in the process. But --
22 and I haven't specifically asked Mr. Amodeo, who
23 assisted with coming with the idea, or whether
24 it's -- it was solely his own idea. That's an
25 interesting question. I don't know.
0142

1   Q   Now, as you understand the facts, let's
2  say, in mid 2004, Mr. Amodeo first had contact with
3  people associated with Presidion when he was -- trying
4  to market, I guess, his own PEO idea, correct?
5   A   That's how the contract all started?
6   Q   I don't know that.
7   A   You've seen -- you've seen him express
8  that that's how it started?
9   Q   I ...
10  A   You haven't read that in his statement?
11  Q   I may have read it. I don't recall

reading.
   Q    What's your understanding of how
Mr. Amodeo first became involved with Presidion?
   A    I don't know. I don't recall.
   Q    You do know, though, that there came a
point in time when Mr. Amodeo and Presidion entered
into a consulting agreement through his company --
that we like to refer to as AQMI but it's A-Q-M-I,
not A-C-M-E, right?
   A    Yes.
   Q    Are you refer to that on page four of 16
of the second amended complaint, which is Exhibit
51 -- no, I'm sorry. Exhibit 53. You refer to that
as -- in paragraph 11, in 2004 -- and you refer to
that ... consulting agreement, correct?
   A    Yeah. It doesn't mention the name.
0143

Amodeo, in that paragraph?
   Q    No, I know that.
   A    Well, you highlighted it in your
question.
   Q    Okay. Let me show you as Exhibit 54 ...
   MR. DeMARIA: Yeah. Whenever you need it.
   MR. DeMARIA: Are we going to take another
break any time soon?
   THE WITNESS: Yeah.
   MR. DeMARIA: What's your plan? I mean, I
can go for a while, but what time are you --
   MR. DeMARIA: I guess we have to be out of
this room at 12, so --
   THE WITNESS: Oh, is that the deal?
   MR. DeMARIA: Yeah, because I've got some
schedule calls at the lunch break. I'm just
trying to figure out when I can do them.
   MR. DeMARIA: You want to take a break now
to schedule them?
   THE WITNESS: No, I have already told them
I'm going to call ...
   MR. DeMARIA: When do you want to break?
   THE WITNESS: If we got to be out of here
at noon, that's fine.
   MR. DeMARIA: Okay. Yeah, I think we have
to be -- before noon.
   THE WITNESS: Can we take a, like a five
minute one right now?
   MR. DeMARIA: Yeah, sure.
   (Recess.)

BY MR. DeMARIA:
   Q    Back on the record. What was the last
question.
   A    "Can we take a break?"
   Q    You think it's not substantive question.
   A    No, the last substantive question.
   COURT REPORTER: Well, you were about to
show him Exhibit 54.
   MR. DeMARIA: Okay. Good.
0144

```
17
18
19              (Exhibits 54-58 marked for
20         identification.)
21   BY MR. DeMARIA:
22        Q   I'm going to show you Exhibits 54
23   through ... 58, which all have to do with this
24   consulting relationship.
25              MR. DeMARIA:  Here's a set.
0145           for you, kind sir.
 1             And I'll identify them on the record which
 2   is which.
 3             Fifty-four is a consulting agreement of
 4   October 18, 2004 between Presidion Solutions,
 5   Inc., and AQMI, A-Q-M-I, Strategy, and it
 6   attaches an addendum.
 7             Fifty-five is ... Invoice from April of '05
 8   from AQMI to Presidion for $11,533,429.
 9             Fifty-six is an invoice from AQMI to
10   Presidion for $2,733,750.
11             Fifty-seven is a consulting agreement
12   between AQMI and Mirabilis.
13             And 58 is a consulting agreement between
14   Presidion and Nexia Strategy Corporation.
15             That's the order.
16        Q   Are you familiar with Exhibits 54 through
17   58?
18        A   Yes.
19        Q   Okay.  And when you refer to ... it paragraph
20   !! of your second amended complaint, Presidion
21   entering into a consulting agreement with AQMI,
22   that's the consulting agreement we're
23   talking about, right?  The very first one.
24        A   (Pause.)
25        Q   Maybe?
0146  BY MR. DeMARIA:

 1        Q   Why, are you aware of any other consulting
 2   agreement between Presidion and AQMI, other than
 3   this one?
 4        A   Uh-huh.
 5        Q   Okay.  -- Is not signed.
 6        A   Take a look at page ten.  Page ten is the
 7   agreement signed by Mr. Amodeo for AQMI; and
 8   Mr. Vandenberg for Presidion Solutions; do you see
 9   that?
10        A   Right.
11        Q   Okay.
12        A   And without comparing this one to the one
13   I have, I can't say that it's necessarily the same
14   one.
15        Q   This one on page 12 --
16        A   Um-hum.
```

```
24        A   They didn't sign the addendum.
25        Q   Right.
0147
 1        A   And then page ....
 2        Q   Oh, although, I guess there is --
 3        A   There's a second addendum.
 4        Q   Yeah.  Sort-of filled-out addendum, I guess.
 5        A   Which is signed.
 6        Q   Yeah.  I guess they filled it out.
 7        A   And so it appears that this document may
 8   have come from different sources.
 9        Q   I -- without comparing it to mine, I don't
10   know it it's the same document.
11        A   But, in general, is this the consulting
12   relationship you're talking about?
13        A   Yes.
14        Q   And what is your understanding of the
15   what that consulting relationship was? What was Mr.
16   Amodeo's company going to do in return for the fee
17   reflected on the addendum, which looks to be a
18   pretty substantial fee?
19        A   Well, I think the consulting agreement
20   speaks for itself.
21        Q   I know ...
22        A   I don't think you want me to interpret it.
23        Q   What did you understand it to be?
24        A   I think we can read it.  I can read it to
25   you, and it says what it says.
0148      Q   Do you understand that this agreement
 1   reflected this -- this was going to be -- talked about,
 2   that -- this was going to be the agreement
 3   to cover the work done for that Plan?
 4        A   It does cover the work done under the
 5   Sunshine Plan.  I can't say that this does not cover
 6   other work.
 7        Q   Okay.
 8        A   But it was the genesis of the work to be
 9   done on the Sunshine Plan, yes.
10        Q   Now Exhibits 55 and 56, is it your
11   understanding, from your review of this case,
12   that -- have you learned that AQMI was paid ... over
13   $13 million under this consulting agreement?
14        A   Yes.
15        Q   Okay.  And in your tracing of funds, have
16   you found where any of that money went?
17        A   Yes.
18        Q   Where, either from what you've seen, or
19   what you've seen the Government's traced, where did
20   that $13 million go?
21        A   Well, some of it went into Mirabilis.
22        Q   Okay.  And that's not money you're
23   claiming to be improper money to go into Mirabilis,
24   correct?
25        A   Actually, it is.
0149      Q   What's improper about it?
 1        A   Well, where the money came from --
```

---

**[0150]**

```
5        Q    Yes.
6        Q    Where Presidion got the money from --
7        A    -- is unpaid payroll taxes.
8        Q    How do you know that?
9        A    Okay.
10       Q    Because Presidion was ... spewing red ink
         operationally in early '05?
11       A    Yes.
12       Q    Losing money.
13       A    Yes.
14       Q    Okay.
15       Q    And it only had one source of funds, which
16       were unpaid payroll taxes.
17       A    Yes.
18       Q    Which was PEOs?
19       Q    Now is it just payroll taxes, or any of
         the other obligations of the PEOs?
20       A    You know, I haven't gone through Presidion
21       to know that completely.
22       Q    Was Presidion making their workers'
23       compensation payment obligations?
24       A    I do not know.
25  0150
```

**[0151]**

```
1        Q    Was Presidion making their unemployment
2        tax obligations?
3        A    I do not know.
4        Q    So, then, how do you know that they
5        weren't making their federal payroll tax
6        obligations?  Actually, I do not know it they weren't
7        making any of their obligations, but I have been
8        told that they were spewing negative cash flow and
9        could not finance from outside parties, which
10       funding was from their PEO customers.
11       Q    Who told you that?  You said, "I've been
12       told."
13       A    I'm going to have to go look and see who
14       my source is, and I think it comes from multiple
15       people.
16       Q    Okay.
17       A    I didn't do an investigation of Presidion.
18       Q    Okay.
19       A    Or the stolen payroll tax money.  That's
20       Mr. Gold's job, not my job.
21       Q    Okay.
22       A    My job's to recover money.
23       Q    Okay.  But is recovering money, if I
24       understand the theory of your strategy, there's
25  0151  $13 million of money that comes into AQMI in this
```

**[0152]**

```
1        April-May '05 time period.
2             MR. VARNER:  This is the video conference
3        call.  They told us we have to leave for --
4        don't know what we're supposed to do about
5        that.
6 
7             MR. DeMARIA:  We're supposed to go down
8        the --
9             THE WITNESS:  Yeah.
10            MR. VARNER:  I mean, I don't know what
```

---

**[0152]**

```
12       we're supposed to do about answering the TV.
13            THE WITNESS:  I'm not answering.
14            MR. DeMARIA:  When she comes in, she'll
15       tell us.  Let me just finish a question of two,
16       and then we'll move.
17            MR. VARNER:  Turn the volume down, if
18       that's you.
19            MR. DeMARIA:  If that's me, I got a real
20       problem.
21            MR. VARNER:  No, that's not you.
22            THE WITNESS:  No, that's your new
23       after-lunch -- lunch deposit.
24            MR. DeMARIA:  We better exit.
25            (Lunch recess.)
```

**[0153]**

```
1    BY MR. DeMARIA:
2        Q    Mr. Cuchill, I was showing you the
3        consultant agreement, Exhibit 54 --
4        A    Can you give me one minute, and I'll
5        answer your question without the question.
6        Q    All right, let's strike the question.
7             We're going to go back to a pending question, which
8        we had which was, are there any areas of 30b(6)
9        notice, Exhibit 52, that he does not have knowledge
10       of ... and we'll dispense of that question.
11            (Discussion held off the record.)
12   BY MR. DeMARIA:
13       Q    Mr. Cuchill, are there any others on
14       Exhibit 52 that you do not have knowledge of?
15       A    No.
16       Q    Okay.  You can put that in the pile.
17            Let's go back to Exhibit -- 54, 55, and
18       56, where it showed the $13 million that AQMI
19       received in April and May of '05, and I think I had
20       asked you whether you believed any of those monies
21       made their way into Mirabilis, yes, yes.
22            And then I asked you whether you believed
23       that there was any impropriety in those monies.  And
24       I think your answer was along the lines that, yes,
25  0153 this came from Presidion that was bleeding red and
```

```
1        that had to be payroll tax money -- something along
2        that lines, right?
3        A    Yeah.  Lot so probably correct that.
4 
5             MR. DeMARIA:  Okay.
6        Q    Because Presidion got money from its PEO
7        customers, which included payroll tax money, but it
8        also includes other, for instance, fringe benefits,
9        its service fee.
10       A    Right.
11       Q    And because it was losing money from
12       operations, so its service fee would not be covering
13       its operating expenses.  Then there -- the only
14       source -- and it couldn't borrow money -- the only
15       source it had for money, at that point, were the
16       payroll taxes and the fringe benefits.
17       A    So it may have used one of the two of
```

0154

those. And I'm going to make the assumption that it was paying the net pay to its PEO customer employees.

Q. Right.

A. Okay.

Q. Otherwise, they'd be raising hell?

A. Yeah.

So the only thing --

0155

A. Yeah. So the only thing left is fringe benefits and payroll taxes. And is the source of the funds, is it going to be the fringe benefits, payroll taxes. So the payroll taxes might have been not the only source. Fringe benefits could have been your position, it would be that if I'm somebody sitting down at Mirabilis, either as an officer, director, or professional assisting Mirabilis, and if I have information that my funding source that's a company that's having financial difficulties, and is dipping into monies that are supposed to be designated for other purposes, whether that's fringe benefits or payroll taxes that would raise a red flag in my mind. Wouldn't that be, in essence, what you would think?

A. Well, I wouldn't do business with them unless I checked that out. Yes, it's more than a red --

Q. But that's what I want to get to. You've made the statement, for example, that Presidion did not have other sources of financing, okay? What's your basis for that statement?

A. The financial statement of Presidion and some of the e-mails back and forth between Presidion and Anodyne and Anodyne's professionals indicated that Presidion could not borrow money at that point in time.

Q. Number one, the financial statements. Were these financial statements available in early '05, which I guess would make them '04 financial statements?

A. Yes, Presidion Corporation was a public company.

Q. So you're saying, for example, that if my client who becomes engaged to do some accounting work or consulting work in late '04, did a little bit of due diligence and went on EDGAR and read about Presidion Corporation, the negative information to be found in reading that 10-Q; is that what you're saying?

A. Yes. They would have seen a financially distressed corporation.

Q. from the fourth quarter, 10-Q for Presidion Corporation?

A. Earlier than that.

Q. Okay. Third quarter?

A. I didn't go back --

0156

Q. Okay. When you're doing the snapshot there, you're saying, hey, this was available to me if I'm a professional or somebody being hired to work at that company, to go online, look, and that's something you've looked at? Or as a source of information, or negative information about Presidion Corporation, you think those 10-Q's are something to look at, or should have looked at?

A. By whom?

Q. By those people that were working for Mirabilis early on?

A. Well, Mirabilis didn't exist at that point.

Q. Well, in early '05, it did.

A. Right. But in '04, it didn't.

Q. All right, let me ask you this question. Is it your understanding that the -- that the people associated with -- that the funding for Mirabilis was coming from Presidion Corporation?

A. Some did.

Q. All right.

A. I would think, at that point in time, the CFO of the company did.

Q. And that was who?

0157

A. At that point in time ... I'm not going to guess. I'm going to have to go back and look and see who the CFO is. They have three board members.

Q. They are Carlson, Pollack, and -- I'm drawing a blank on the third board member.

A. Okay. Who else should have known, or do you believe?

Q. Actually, later on, I believe the auditors should have known, because 60 percent of the money comes in from this source, consulting fees. Sixty percent of the 20th --

A. We'll get to that.

Q. You're talking about Jares Moore & Company, right?

A. Yeah.

Q. We'll get to that, because they don't do an audit until, actually, their field work would have been late '05, correct?

A. No. Actually, they did it in '06.

Q. Early '06?

A. Early '06, right.

Q. So clearly, Jares Moore -- not that I'm defending their interests, but clearly, James Moore's field work would not have been in this early '05 time period?

A. Oh, no.

Q. All right.

A. Because we're still in early '05. That's what we're talking about, because you made that comment that, in this '05 time period, that somebody would have known there was monies coming in that were from an improper source?

7    A   Yeah.  Actually, I believe the entire
8    board of directors knew.  And I believe your
9    client's -- some of your client's personnel,
10   specifically Mr. Holtz, knew.
11        Q   In early '05?
12        A   Actually, maybe as late as,
13   or early as late '04, but certainly into early '05.
14   And I believe Mr. Berman knew at that point.
15        Q   Okay.  So tell me now what is your
16   your recollection, what is the evidence you have to
17   support that's when -- when you're saying this
18   combination of both?  What raised you feel the way
19   you do?
20
21        A   It's a combination of circumstances in the
22   fact that you had looked at the upside-down situation,
23   which included your client, and Mr. Berman's firm,
24   being two, representing President Corporation in
25   this consulting agreement.  President Corporation
0159 had an upside-down situation with payroll taxes.

1    which they got -- they hired AGM to resolve.
2         Q   Right.
3         A   All of AGM's operating money comes from
4    this consulting agreement.  AGM's not what
5    you call a high-flying consulting company at that
6    point.  And both the Berman firm, who has
7    represented Amodeo prior to this point in time,
8    prior to the initiation of the consulting
9    agreement, and the Rachlin Cohen firm, has a
10   relationship with Amodeo prior to the initiation of
11   this consulting agreement, have knowledge of that.
12   situation, and they understand the Sunshine
13   Companies because both the Berman firm and the
14   Rachlin Cohen firm are -- primarily professionals
15   representing Amodeo and AGM in executing the
16   Sunshine Companies Plan.
17        If all the money coming in to Mirabilis,
18   of, which Mr. Berman becomes the chief counsel, and
19   the Rachlin Cohen firm is a ... doing the primary
20   due-diligence work, the financial due-diligence work
21   on the acquisition Mirabilis is doing, then they've
22   got to wonder where the money's coming from.  Well,
23   the bulk of the money comes initially from this
24   consulting agreement you showed, which is Exhibit
25

Number --

Q   Fifty-five and 56 -- 54, 55, and 56.
A   Fifty-four, 55 and 56.
Q   You have it.  It's 54.
A   It's 57.
Q   No, that's the Mirabilis consulting
agreement.

A   That's what I'm talking about.
Q   Oh, okay.  I hadn't gotten to that.
A   That's what I'm talking about, how
Mirabilis got the money, were taking money from
the Mirabilis professionals and the Mirabilis
officers and directors know that it was payroll tax

---

14   money, or fringe-benefit money.
15        Q   Let's take about that for a second.
16        A   Well, you aren't letting me finish?
17        Q   You got --
18        A   Yeah.  Stop there because I have a
19   follow-up.
20        Q   Okay.
21        A   -- I don't think -- if I understood your
22   thinking, I don't think it was much of a dispute that
23   in late '04 and early '05, these people understood
24   that this company called President, had a payroll
0161

1    tax problem, they hadn't paid their payroll taxes,
2    and that AGM and Frank Amodeo had a proposal, on how
3    to solve that problem, right?  I think --
4         A   I agree.
5         Q   Okay.  I understand that.  I have no
6    problem with that.
7
8         A   And you seem to be saying, well, if they
9    knew that President had a payroll tax problem, and
10   if they knew that President was paying AGM this
11   $15 million, and if they knew that funding for
12   Mirabilis was coming from AGM, then in some general
13   sense, they're getting money from a source that had
14   a payroll tax problem.  I mean, is that what you're
15   saying?
16        Q   Yes.
17        A   Okay.  But here's my point, my question, I
18   guess.  None of the damages in this case that you're
19   seeking have anything to do with -- "cause
20   historical payroll tax problem, correct?
21        Q   Define "historical payroll tax problem"
22   for me.
23        A   None of the damage in this case -- 'cause
24   I know President's sure floats around here a lot,
25   but none of the damages in this case have to do with
0162 the payroll taxes that President had not paid prior

1    to late '04, and they were trying to solve the
2    problem with the Sunshine Plans.  None of the
3    damages in this case come from that money at the
4    President level that had not been paid prior
5         Q   Correct.
6         A   Okay.  Are you saying, then, that
7    because -- we're going to assure, for purpose of the
8    question -- they know that the money that was coming
9    in to Mirabilis through the AGM vehicle, was money
10   that came from President, a company you could read
11   on EPOGH, has financial problems, and therefore, you
12   would have a good reason to suspect they were using
13   monies that had been going to their payroll
14   taxes and fringe benefits.
15        Are you saying that because they knew that
16   with respect to President and the Sunshine Plan,
17   that should have believed that Frank Amodeo, on
18   a going-forward basis with the FBS plan, would do
19   the same thing?
20        A   Not exactly saying that.  What I'm saying

is they either know .....

    THE WITNESS:    Let me finish showing.

    MR. DeMARIA:    This is the reason I was
excuse me.

    MR. DeMARIA:    This is the reason I was
contrary to your exiting policy.

    THE WITNESS:    I apologize.   This is my
fault.

0163

BY MR. DeMARIA:

    Q    It's okay.

    A    At the point, we started the Sunshine
Companies Plan.   Now -- the PBS would operate Sunshine
firm and the Berman firm representing Amodeo and
AGMI, and Mirabilis being formed, you had the
Sunshine Companies Plan and the genesis -- the
beginning of the PBS plan.   So the two plans aren't
separated.   They're hooked together from the hip.
And the PBS plan doesn't work without the Sunshine
Companies.

    A    So -- at that point in time, there had to be
a funding source for the Plan.   And the funding --
and I will tell you, and the Government, I think,
and Amodeo have agreed that the PBS payroll tax
money was the funding source.

    Q    My position is, and I can prove this with
my forensics report when he finishes it, that the
funding source for Mirabilis was the -- primarily,
the Mirabilis payroll tax money.   I'm sorry --

    Q    PBS?

    A    Presidion payroll tax money.

0164

    Q    When you say Presidion now, you mean the
PBS?

    A    When I'm talking about Presidion, the
money came from not only Presidion Seven, which is
PBS, but also prior companies.   So, the Rachlin --

    Q    Which would be Sunshine?

    A    Which would have been Sunshine.

    Q    Okay.   But we're in an important area that
: want to understand.

    A    Yeah.

    Q    And I want you to understand my concern
about this.   I mean, I think I know where your line of
question is going.   I'm trying to get there, but --

    A    Yeah.   In this discussion, for purposes of
this discussion, I'm saying I'm not going to dispute
that somebody providing services to Mirabilis in
late '04 to early '05, who's aware of the Sunshine
plan, and who can understand what was going on at
the Presidion level, would realize that the
historically, the Presidion had not paid payroll taxes
that it was obligated to pay, and therefore,
wouldn't be a big leap to figure out that if
$11 million went into AGMI, and from that, money was
coming into Mirabilis, that some of that money is
coming from a company that didn't pay payroll tax

obligation.   I got that.   Okay?

    A    Yup.

    Q    But you seem to be making the jump, and
this is what I want to understand, that because they
would have known that with respect to historical
payroll taxes that had not been paid by Presidion
with regard to the Sunshine Companies, that the
money that they were getting, or would have known --
and I want to talk about both, because of the legal
standards -- that they would have either knew or
should have known that on a going-forward basis,
from the Sunshine Companies, that the cash money
payroll tax obligations that would be incurred under
the PBS situation.   That's my question to you.   Is
that what you're saying?

    A    That what -- because of what they know
historically about what the Presidion boys were
doing, meant that Frank Amodeo was going to do the
same thing going forward, the companies he took
control over.   That's what you think?

    A    Well, I'm saying they watched it happen,
and they participated in it.

    A    But tell me -- tell me why you believe

0166

that knowing -- we'll get to other things that may
have been red flags to them -- but why, knowing what
had happened for five years, but the prior money,
meant that Frank Amodeo was going to do the same
thing with the PBS companies on a going-forward
basis?

    A    Because I think that that is one of
crucial issues in this case.   They know what Frank was
going to do at that point in time.

    Q    Okay.

    A    However, if they had looked at Presidion,
which I think they did, because they at least billed
for due diligence work on it, and Mr. Berman became
the chief counsel for Presidion Corporation.

    A    So during -- a little later during this reference.   So
he was chief counsel for both Mirabilis and
Presidion Corporation simultaneously.

    Q    Okay.   And you could understand that as
much as -- and I agree with your attorney's comment
off the record before I think a lot of this is
deposition for all of us to get a flavor of what
your case is about.   But you can understand that I'm
most concerned about what Rachlin and Mr. Holtz and
Mr. Berman -- as counsel -- I mean your ultimate your
vision, because they seem to be intertwined.

    A    I'm going to try --

    Q    Try to be as specific as you can.

    A    I'm going to try to tie them together for
you.

    Q    I know you want to, but try to also be
specific as I can untie them.

    A    Okay.   At this point in time, Berman's
firm and Rachlin's firm represent AGMI.

0167

0168

9   Q   Correct.
10      A   But Mirabilis is formed --
11      Q   Well, you say AQMI, but we'll say Frank
12  Amodeo.
13      A   We'll get to that. You think it was
14  actually a representation of AQMI?
15      Q   Okay. Stop you there.
16      A   Well, let's say, in the Rachlin firm, I
17  went through the time records that you produced and
18  the invoice you produced and often it was very
19  unclear who your client was.
20      Q   Did you read the retainer letter?
21      A   I read the retainer letter, and I also
22  looked at the bills -- at the bills, and the
23  description of the services being performed, and I
24  couldn't tell the difference --
25      Q   Okay.

0169

1       A   I did that: I had the same problem with
2   the Berman firm. A bill might
3   say, Frank Amodeo, but they may be working on
4   Mirabilis's work. A bill might say, Mirabilis, but
5   they might be working on Frank Amodeo's work.
6       Q   Okay.
7       A   And so, in going through, say -- well, let
8   me get back to the money.
9       Q   Okay.
10      A   Because that's your basic question. How
11  did the two firms more specifically the Rachlin
12  firm, know that this was payroll tax money way back
13  when?
14      Q   And let's even be even more clear. If
15  your position is, they know, please tell me and tell
16  me how. Or if your position is they knew --
17      A   It is --
18      Q   It is they knew --
19      A   It should have known, please tell me.
20      I'll explain to you --
21      Told me --
22          THE WITNESS:  I'm sorry.
23          MR. WIDMAN:  You're burying this poor guy
24  out.
25          THE COURT REPORTER:  Carry on. Please

0170

1   carry on.
2           MR. DeMARIA:  We're talking over each
3   other.
4           MR. DeMARIA:  We're talking over each
5   other -- I know he can't do that.
6       Q   At the point of Mirabilis's first
7   formation, it needs funding. The Rachlin firm and
8   the Berman firm are primary occasions.
9   professionals representing Amodeo. In the case of
10  simultaneously represents Mirabilis. They
11  Berman, he also represents Presidion. In the case of
12  2005, through late 2005, $26 million flows through
13  the Berman trust accounts, of which north of
14  15 million comes directly from Presidion. And that
15  shows in Berman's trust records, and that is, by and
16  large, the initial funding of the Mirabilis
17  operation.
18      Q   Okay. So you there.
19      A   I like the way you do your narrative, but
20  if I can stop at certain points, it helps me.
21      My clients knew what was running through the Berman
22      trust account? 'Cause you talk about the due
23      Q   Did you say that my clients knew the due
24  diligence, but my understanding was that the due
25  diligence was looking at the acquisition down, not

0171

1   looking up at Presidion.
2       A   Okay. You asked me a question, then you
3   made a statement. The answer to the question is,
4   yes, they had knowledge.
5       Q   Based on what do you say that, why do you
6   say that?
7       A   Because the Rachlin Cohen firm was asking,
8   how are you going to fund the acquisitions, and
9   there were e-mails going back and forth, talking
10  about funding. Okay.
11      Now, the founding source was with money in
12  the Berman trust account. Because, in the money in
13  in the 2005 timeframe, the -- I won't say,
14  100 percent of the acquisition money, but the
15  majority of the acquisition money flowed through the
16  Berman trust account. Once we get into 2006, the
17  it gets less than that.
18      Q   Let's talk about the Berman trust account.
19  Are you saying Rachlin the Berman trust account, and
20  the Rachlin firm audited the Berman trust account, and
21  would know that that's Mirabilis's money. But are
22  you saying that Rachlin asked questions and gathered
23  information a step beyond that to ask where the
24      Q   source of that money was from?
25      A   I believe Holtz knew, from the beginning,
1   where the source was from.
2       Q   But based on what? Based on -- why do you
3   say that?
4       A   Based on e-mails and conversations that
5   I've had with people, which people say Laurie
6   Holtz knew, from early on, the source of the funds?
7       [Pause.]
8       A   I don't know -- I don't think I've had a
9   person tell me directly, but, you know, I think a
10  Richard Berman knew. But they told me how they
11  operated, and they told me about how the funding was
12  operating, and there were -- one of the e-mails that
13  I thought was very interesting was between Frank
14  Amodeo, Richard Berman and Laurie Holtz. And they
15  gave themselves a title in that e-mail. They called
16  themselves the shadow executive committee.
17      A   Now, I had to re-read that to see what a
18  shadow executive committee was, because there was an
19  actual executive committee, and actually, Richard

Berman was on that executive committee. So -- and
first, Rachlin was not an officer on any of
Mirabilis's committees. So I had to look at that
and try to figure out, what does a shadow executive
committee actually do, unless it shadows the
executive committee. But the e-mails had to do
about decision making. So they were -- there were
lots of e-mails, not a few, between Holtz, Berman,
and Amodeo. And they became, in my mind, the three
key players orchestrating the FSS plan.

      If I had to pick three people, other than
a couple of financial people that made the wire
transfers, those were the three people.

   Q     Now, this Sunshine Plan -- you're aware
that there has been this discussion and legal advice
given, that this obligation that President had or
that its auditors thought would have to be reflected
on its books for the unpaid payroll taxes would not
be carried over once the Sunshine Plan was
accomplished, and you had the transfer to Wellington
on the one hand, and then the Sunshine Companies,
you know, separating the assets and liabilities,
those payroll tax obligations would not be the
obligations of a successor company; you understand
that, right?

   Q     And you agree with that, that that was a
strategy that you thought was a good strategy?

   A     I don't agree with the strategy. I agree
with -- it was their strategy. And, subsequently,
the Government didn't prosecute anybody for that
strategy.

   Q     Right.

   A     And they also didn't, civilly or criminally
prosecute anybody. So I came to the conclusion that
the Government agreed that the strategy actually
worked.

      And just to cover the landscape, the
Government didn't assert forfeiture claims with
regard to assets in that strategy. It was only the
later-on period that the Government asserted
forfeiture claims; correct?

   A     Okay.

         (Pause.)

   Q     The Government didn't take the position
that those --

   A     Are you answer the question --

   Q     -- could be traced?

   A     -- before you ask the next question.

      As long as you got it, then you could
answer it.

   A     I'm trying to think of how I want to
answer the question.

   Q     Okay.

   A     So let me answer the first question before
you give me another one.

   Q     Okay.

   A     I know you like to go long.

         (Pause.)

   A     I don't think I can say that the
forfeiture didn't, -- excluded the Sunshine
Companies, because the forfeiture wasn't about the
Sunshine Companies. It was about specific acts that
Frank Amodeo did.

   Q     Okay.

      Now, Frank Amodeo was an integral part of
the Sunshine Companies Plan. But the forfeiture
agreement, and then the forfeiture -- the forfeiture
forfeiture agreements, just as we're clear here.
There's the civil and a criminal.

   A     Right.

   Q     And so there are two different ...

   A     Okay. And so there are two different,
wrong terminology.

   A     Right.

   Q     So there were two separate forfeitures,
one based on Frank Amodeo's criminal indictment, and
one based on a civil complaint filed against Frank
Amodeo. And the Government executed on both of
these agreements.

      So, that's a long way to say, I don't -- I
can't exclude the Sunshine Companies Plan from those
forfeiture agreements, without rejecting at them,
but they weren't -- I will say that they weren't,
the basis, the primary basis for the forfeiture.

   Q     Let me ask you this question. If you put
yourself in the position of these professionals who
were providing legal services to Mirabilis and Frank
Amodeo in early 2005, and who are aware of the
advice and information being given by other
professionals regarding this Sunshine Plan, about
how, through the Sunshine Plan, they were going to
through -- there would be no liability with the new
companies for the old obligation, then why is it
that you see their knowledge of monies coming into
Mirabilis as a consequence of that plan, being
improper in any way?

   A     They're looking at a plan that says, as a
result of this plan, the entities going forward are
not going to have this payroll tax obligation, had
now they're going to put into their company to do
these acquisitions that come from that plan, why is
that something that should tell them there's
something wrong going on here?

   Q     Go ahead.

   A     -- into only the Sunshine Companies Plan.
There was a lot going on, other than the Sunshine
Companies Plan. And both your client and
Mr. Berman's firm were involved in a whole bunch --
virtually everything that was going on, on a
day-to-day basis.

      I mean ... if I go back and look at the
documentary evidence in this case, it doesn't say,
on every Rachlin and Cohen document, "Sunshine"

**0177**

Computer Plan." They were involved in a whole bunch of other stuff, other than the Sunshine Companies Plan.

The Sunshine Companies Plan wasn't the only element that we outlined in our lawsuit. It was one of the elements. Okay? So I'm trying to take -- you know, to say the Sunshine Companies Plan was the problem, yeah, it was part of the problem, but it wasn't the whole problem. And I think -- I think our lawsuit doesn't plan the problem on just the Sunshine Companies Plan.

Q   Well, I will agree with you, it's to your advantage to, use your words, tie these issues together. I would do the same if I were in your shoes, but I think you'll understand my desire to try to focus on separate parts of the chain, and examine them.

That's what I'm trying to find out, why you're saying there was something that should have been a red flag, or should have -- or that indeed told my clients or others that there was something wrong with funding for Mirabilis, coming from ADP, as part of the Sunshine Companies Plans when the Sunshine Companies Plans included a tax strategy that Experts thought was lawful, that the Government never challenged.

**0178**

That's what I'm trying to focus on the Sunshine Companies Plan, part, and I'm just trying to find out why that part of your chain is a negative part, -- I could understand the backlighting for what started everything like the backlighting for what started everything, but you go no further than that. You say that's a competent of the chain that you say should impose liability on my clients, and I'm trying to understand why.

Q   The Sunshine Companies Plan is a foundation for the FBO plan.

But is it an illegal foundation, in your mind?

A   I'm not into legal or illegal. That's the prosecutor.

Let's say, improper. Is it an improper, is the foundation itself improper?

A   The Sunshine Companies Plan?

Q   Yeah.

A   I don't know. The Government didn't challenge it. I know that.

Q   Are you taking the position in your lawsuit that the Sunshine Companies Plan, as a foundation, was improper? Are you taking that position?

A   I don't think that's what my lawsuit says. All right. So I'm asking you now. So you're not asserting here, on behalf of Mirabilis, that that was improper?

(Pause.)

A   That the --

**0179**

Q   The Sunshine --

A   Let me make sure I understand what you're trying to get me to say.

Q   Let me ask it. Are you asserting that the knowledge of my clients that funding that Mirabilis was getting in their, ultimately came from a source that got to Mirabilis because of the Sunshine Companies Plan, that that money was somehow improper or tainted and shouldn't have been used for acquisition?

A   I'm not asserting that as a solo basis.

Q   Are you asserting that as a basis in any way?

A   Yes.

Q   Why? How?

A   Because -- well, I've answered the question already, but I'll reanswer it.

Q   Okay.

A   Because the Sunshine Companies Plan was a basis, I mean a foundation basis, a building block, if you will, for the FBO plan. Without the Sunshine Companies Plan, the FBO plan doesn't exist. The same theory was used in the FBO plan, is to segregate the liabilities from the creditors, and keep them away from the creditors. That worked in the Sunshine Companies Plan.

**0180**

In the FBO plan, the same elements were there with one other little nuance: the other little nuance being that we were going to temporarily not pay payroll taxes, so to raise money, originally in the form of rehabilitating the FBO, but actual history showed that there was more than rehabilitation of the FBOs. Sell the fruits of the investments, or -- either to the public or sell it to someone else, and pay back the Government, which was the FBO plan.

The element of segregating those liabilities out of the Sunshine Companies is a building block for the FBO plan, so that when I said they're kind of joined at the hip, you can't separate them, you're trying to say I can separate them, but I can't in my mind, and my lawsuit can't separate them, either.

Q   I'm not trying to get you to do anything, because -- I'm just trying to understand your position.

A   No.

Q   I don't think I could succeed in getting you to say anything you don't want to say, so I'm not going to try to waste my time.

A   No, I can --

MR. WIGWAM:   Just answer his questions.

THE WITNESS:   Okay.

BY MR. DeMARIA:

Q   You don't have to go there, I'm just trying to understand.

You say that the PBS plan is the same,

putting aside the temporarily not paying payroll
taxes, but isn't there a difference, a significant
difference between the Sunshine Companies Plan,
which is looking at separating assets from
liabilities on historical basis in the PBS
not paid, versus a going-forward basis in the PBS
plan, where those in control of the PBS companies
would have obligations to pay payroll taxes.

Q   Okay.

A   But it had more to it. The more to it was
with a historical problem that preceded the Sunshine
Companies Plan, versus an ongoing obligation to the
PBS with the PBS plan? Isn't there a difference?

A   Yeah.  And I think that's what I just
said, that the plan under the ... Sunshine
Companies Plan as its foundation.

Q   Okay.

the nonpayment payroll taxes.  The Sunshine
Companies Plan did not have the nonpayment of future
payroll taxes as part of it.

Q   But as you understand what happened in
this case, wasn't it that the significant difference
that caused the Government to take the position that
the PBS plan was improper, it violated the Internal
Revenue Code, and even had criminal liabilities,

whereas the Sunshine Companies Plan did not; that
that difference was the key difference in the case,
wasn't it?

A   No, I think you're going to have to ask
the Government; they didn't prosecute the
Sunshine Companies Plan.

Q   I'm not asking why they didn't.  I'm
asking you, is your observation of it, that was the
difference, as the Government expressed; was it not?

A   No.

Q   Really?

A   I'm telling you that I don't know why they
didn't prosecute the Sunshine Companies Plan. .
read some of the PBS agents that were investigating
the Sunshine Companies Plan and the Sunshine -- excuse
me -- prior to the Sunshine Companies Plan.  They
were investigating the Sunshine Companies, the
nonpayment of payroll taxes by the Sunshine
Companies Plan and so on and so forth; agreements,
and there was -- and it was clearly -- now, this
isn't the Sunshine Companies Plan.  It was clearly
they didn't pay -- they willfully didn't pay payroll
taxes.  They did not prosecute, and I don't know
why.

Q   All right.  But you're going down a third
road.

Q   If we put a time period, there's the
President's failure to pay payroll taxes that was
under the investigation in Michigan for their
failure to pay taxes at those taxes were owed.
Then we have the middle piece of this

Sunshine Companies Plan to come in and go through a
corporate structure that would not leave the new
companies liable for this historical repayment of
payroll taxes.

And then we have the third piece, which is
this going-forward PBS structure, where they didn't
pay.

So, I think the first and third pieces are
kind of the same, with the middle being different;
wouldn't, you agree?

A   No.

Q   Really?

A   No.

Q   No?

A   No.

Q   Don't you see -- the Sunshine Companies
Plan was talking about dealing with historical
failure to pay?

A   Well, correct?  If you deal with your three
pieces, as you just defined them --

Q   Uh-huh.

A   -- the first piece was the nonpayment of

the Sunshine Companies payroll taxes.

Q   By President?

A   By the Sunshine Companies.

Q   Right.  Under the President umbrella.

A   By the Sunshine Companies.  That was the
whole basis of the Sunshine Companies Plan.  That's
how the plan supposedly worked, is the parent
company using silo theory, wasn't really responsible
for its subsidiaries.  Now, you're dealing with a
fairly sophisticated tax legal issue.  I'm neither a
lawyer or a tax person.  I just read about this.

Q   Let me ask you a different question.

A   You said the PBS plan included this
additional component of temporarily not paying
payroll taxes.  What do you know, from your
investigation of this case, to say that Laurie Holtz
or anybody else associated at Rachlin knew that part
of the PBS plan, and if so, when?

A   Laurie Holtz was involved with the
financing of the acquisitions, at least ... he
looked at budgeting and how much money was needed
for the acquisition.  He was very knowledgeable.
And he was involved with trying to determine how
much money would be needed, at which periods of
time.

That process would have led him to try to
determine where they got the money from.  At that
point, on the books, all the money was coming from
either Frank's companies or Frank directly, in
taking early 2005.  There were tens of millions of
dollars that came in in early 2005.  And it either
came in directly from Frank Amodeo, or Frank's
companies, some of which flowed through the Bezman
trust account.

Actually, more than 10 million would have
flowed through the Bezman trust account in that
timeframe.  Both Holtz and Bezman were aware of

0186

```
13   these consulting agreements that are Exhibits 54
14   through 58; I believe.
15        A    Right.
16        Q    And all the money originates with
17   Presidion.
18        A    You used the word "would."   Are you saying
19   that Laurie Holtz did, in fact, know that payroll
20   taxes were temporarily not being paid under the PBS
21   plan, or are you saying that he should have known?
22        A    I believe he did.
23        Q    Based on what?
24        A    Based on the e-mails back and forth, and
25   the work that he was doing in the budgeting, the
```

0187

```
1    due-diligence area, and the knowledge of these
2    consulting agreements, knowing that all of the money
3    is essentially coming through -- from Presidion
4    Corporation, having knowledge that Presidion
5    Corporation was in financial distress at that point,
6    and has historically not paid its payroll taxes and
7    misused money.   That should have been known.
8         Q    Now, I'm taking that, and I'm going --
9    I'm going one step further.   I give Laurie Holtz a
10   lot of credit.   He's a very smart man.   I've been --
11   he's another guy -- Norm Rachlin, his partner and I
12   have been -- have known each other since prior to my
13   starting my CPA firm.   Actually performed by CPA
14   firm after Norm Rachlin.
15        So I've had a lot of respect for Mr. Holtz
16   over the years.   And I don't see him as someone that
17   could take a look at this type of information and
18   not know where the money is going.   In Exhibit
19   57 is the Mirabilis ADMI consulting agreement.
20        A    Yes.
21        Q    Let me ask you this question.   In Exhibit
22   that consulting agreement was, as to be
23   distinguished from the Presidion Solutions, ADMI
24   Consulting agreement?
```

0188

```
1         A    Well, that's actually a fairly interesting
2    consulting agreement, because what the document
3    says, and what actually was done to earn the fee,
4    was somewhat unusual.   I could find no real basis
5    for the services being performed.
6         Q    Well, what were the services to be
7    performed, as you understand it?
8         A    As we get to the document.
9         Q    If you look at Exhibit 57, the addendum
10   says:   The consulting agreement provides that an
11   addendum shall be executed to provide for specific
12   services level and reimbursable expenses for each
13   individual project for the engagement, right?
14        A    And then it has a provision, I guess,
15   where you could fill in what the project was?
16        A    Yes.
17        Q    Um, on the next -- on the page you're on?
18        A    Yes.
19        Q    Well, no, that's like four pages from the
20   back.   It says Exhibit A addendum.
```

0188 (right column)

```
20        A    Not --
21        Q    Exhibit A addendum.
22        A    Okay, I'm with you.
23        Q    It seems to me that this was like an
24   overriding agreement that says:   As we identify
25   projects, we'll identify them, and we'll say what
```

0189

```
1    you're going to get paid.
2         A    Yeah.   My understanding was, this
3    was like, what I would call, an open agreement.
4         Q    Right.
5         A    And we'll figure out the services later,
6    and we'll figure out the payment later.
7         Q    So, having said that now, were there
8    services provided under this agreement, and were
9    there payments made?
10        A    There were certainly payments made.
11        Q    How much?
12        A    Well, I think you showed us --
13        Q    No.
14        A    Didn't you show me an invoice from
15   Mirabilis?
16        Q    Those were the Presidion.
17        A    Okay.
18        Q    Those were -- the 13 million were
19   Presidion.
20        A    It's about 60 percent of the 2005 revenue
21   of somewhere around ten to $15 million.
22        Q    Was paid to ADMI?
23        A    No, was paid from ADMI to Mirabilis.
24        Q    Pursuant to this consulting agreement?
25        A    Um-hum.
```

0190

```
1         Q    You're right.
2         A    I thought I understood.   Maybe I'm confused.
3    It's ADMI that's going to get paid, not the other
4    way around.   If you look at page two, it's the
5    consultant's compensation.   I mean, Mirabilis paying
6    ADMI.
7         Q    So, was any money paid under this
8    agreement?
9         A    It's confusing this one with another
10   consulting agreement.
11        Q    Okay.
12        A    That was the opposite way, where ADMI paid
13   Mirabilis.
14        Q    And what services was Mirabilis providing
15   to ADMI?
16        A    You got me.
17        Q    So there's a consulting agreement you've
18   seen that does that?
19        A    Yes.
20        Q    Okay.   Exhibit 58 is the next Hexia
21   Strategy corporation Presidion agreement.   Okay?
22   You've seen that one before?
23        A    Yes.
24        Q    Hexia Strategy was Mr. Amodeo's company
25
```

```
 1  too, right?
 2     A   It was.
 3     Q   All right.  Do you understand what that
 4  agreement was intended to cover, and whether any
 5  money was paid under that agreement?
 6     A   I haven't looked at this for a while, but
 7  my general recollection was, yeah, I understood that
 8  Noxia was going to provide services to Presidion.
 9            (Pause.)
10            (Exhibit 59 marked for identification.)
11  BY MR. DeMARIA:
12     Q   Let me show you Exhibit 59, which is a --
13  an irrevocable proxy of Presidion Corporation to
14  Frank Amedeo in May of 2005.  Have you seen this
15  document before?
16     A   I have.
17     Q   What do you understand the purpose of this
18  proxy to have been?
19     A   Well, it gives the voting rights of
20  Mr. ... Beyer -- I'm not sure if that's the correct
21  pronunciation -- shares in Presidion Corporation to
22  Frank Amedeo.
23     Q   And why?  What was happening at that time
24  in the spring of '05, that led to this proxy, as you
25  understand it?
        A   I don't know.
0191
```

```
 1     Q   Do you know why it is needed to be done,
 2  or --
 3     A   No.
 4     Q   -- or what the purpose was?
 5     A   No.
 6     Q   Have you asked anybody about that?
 7     A   I don't believe I asked anybody directly
 8  about this.
 9     Q   Was this connected with the PSS plan?
10     A   I don't recall.
11     Q   Do you know whether this gave Mr. Amedeo
12  control of Presidion, or was -- it gave Amedeo, plus
13  the shares that Mirabilis initially bought, and
14  later went over to one of Amedeo's companies, it
15  gave his effective voting control of the public
16  company.
17     Q   Do you know whether -- is it your position
18  that my client: knew of this control issue going on
19  in early '05, with Mr. Amedeo having control of
20  Presidion?
21     A   I don't know if your client did or not.
22     Q   Okay.  Will you have your client, too.
23            (Exhibits 60 and 61 marked for
24  identification.)
25
0192
  BY MR. DeMARIA:
     Q   Let me show you 60 and 61.
     MR. DeMARIA:  I'm sorry.  And here's one
  for you.
     MR. WIDMAN:  Which is 60, the same?
     MR. DeMARIA:  Yes.  And 61 is --
     MR. WIDMAN:  Thanks.
```

```
 9
     MR. DeMARIA:  Okay.  Sixty is a
  December 28, '04 memo.
     Sixty-one is to Mr. Berman from Frank
  Amedeo, copied to a bunch of other people.  And
  61 is a securities purchase agreement from
  December '04, having to do with Presidion and
  Wellington.
  BY MR. DeMARIA:
     Q   Do you see 60, the memo?
     A   I do.
     Q   Have you seen that before?
     A   I have.
     Q   And it's -- it talks about a Sunshine
  matter timetable.
     Q   Would you agree that this is kind of a
  summary of what work was to be done in connection
  with the Sunshine Plan?
     A   It is.
0193
     Q   All right.  Is there anything you see in
  this memo that you believe is the type of
  information that a reader of this memo would look at
  and be troubled by, and think that there's something
  improper or illegal going on in the Sunshine Plan?
     A   Well, I would certainly think that a
  reader of this memo, if they looked in Roman numeral
  III.
     Q   Um-hum.
     A   And we were dealing with, in item number
  one, bankruptcy matters, and filing emergency
  petitions.  Item number two, we were dealing with
  contacting the U.S. Attorney's Office.
     Item number three, contacting the CID
  Division.  And item number four, contacting the
  Florida Department of Insurance, that I would be --
  have a very heightened knowledge of we got -- we got
  a -- something that could be a major problem we're
  dealing with.
     Now, I think everybody that got this memo
  understood that.  That's why they were tasked for
  those four items:
0194
     Q   Well, you understand that, in December of
```

```
  '04, the strategy that was being discussed was to
  try to go through this corporate structuring process
  that would lead to the successor companies not
  having liability for the prior unpaid payroll taxes,
  but the alternative they talked about, was actually
  putting the Sunshine Corpsies into bankruptcy,
  correct?
     A   I understand that, although some of our
  other deponents do not understand it that way.
     Q   Well, I don't care about they -- I care
  about, what you understand.
     A   Okay.
     Q   So, is there something wrong in a
  bankruptcy attorney like Mr. Beyer and his firm
```

Expiration: February 25, 2011

preparing bankruptcy schedules, if the contingency
to file bankruptcy were to occur; is there something
wrong with that?

A.   Actually, Mr. Beyer denied preparing these
schedules.

(Continued in Volume 2.)

* * * * *

STIPULATIONS:   IT IS HEREBY AGREED and so
stipulated by and between the parties hereto
through their respective counsel, that the
reading and signing of the deposition is hereby
reserved.

STATE OF FLORIDA
COUNTY OF ORANGE

                    )
                    )
                    )

CERTIFICATE OF OATH

I, Richard Castillo, Certified Livehloe
Reporter, Notary Public, State of Florida, certify
that R.M. CUTHILL, JR., personally appeared
before me on April 21, 2010, and was duly sworn.

Signed this 28th day of April, 2010.

_____
RICHARD CASTILLO
Certified Livehloe Reporter
Notary Public, State of Florida
at Large
Commission No. DD609499

Expiration: February 25, 2011

STATE OF FLORIDA
COUNTY OF ORANGE

I, RICHARD CASTILLO, Certified Livehloe
Reporter and Notary Public, do hereby certify that I
was authorized to and did stenographically report the
deposition of R.M. CUTHILL, JR.; that a review of
the transcript was requested; and that the foregoing
transcript, pages 5 through 194, is a true record of
my stenographic notes.

I FURTHER CERTIFY that I am not a relative,
employee, or attorney, or counsel of any of the
parties, nor am I a relative or employee of any of the
parties' attorneys or counsel connected with the action,
nor am I financially interested in the action.

DATED this 29th day of April, 2010, at Orlando, Orange
County, Florida.

_____
RICHARD CASTILLO
Certified Livehloe Reporter
Notary Public, State of Florida at Large
Commission No. DD609499
Expiration: February 25, 2011

CERTIFICATE OF REPORTER

DEPOSITION ERRATA SHEET

Our Assignment No. 158015
Case Caption: Mirabilis Ventures, Inc.
vs.
Rachlin Cohen Holtz, LLP, et al

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury
that I have read the entire transcript of
my Deposition taken in the captioned matter
or the same has been read to me, and the
same is true and accurate, save and
except for changes and/or corrections, if
any, as indicated by me on the DEPOSITION
ERRATA SHEET hereof, with the understanding
that I offer these changes as if still under
oath.

Signed on the _____ day of _____,
20___.

R.W. CUTHILL, JR.,

DEPOSITION ERRATA SHEET

0199
1
2   Page No. _____ Line No. _____ Change to: _____
3   Reason for change: _____
4   Page No. _____ Line No. _____ Change to: _____
5   Reason for change: _____
6
7   Page No. _____ Line No. _____ Change to: _____
8   Reason for change: _____
9   Page No. _____ Line No. _____ Change to: _____
10  Reason for change: _____
11  Page No. _____ Line No. _____ Change to: _____
12  Reason for change: _____
13  Page No. _____ Line No. _____ Change to: _____
14  Reason for change: _____
15  Page No. _____ Line No. _____ Change to: _____
16  Reason for change: _____
17  Page No. _____ Line No. _____ Change to: _____
18  Reason for change: _____
19  Page No. _____ Line No. _____ Change to: _____
20  Reason for change: _____
21  Page No. _____ Line No. _____ Change to: _____
22  Reason for change: _____
23
24
25  SIGNATURE: _____ DATE: _____

R.W. CUTHILL, JR.,

0200
1
2   Page No. _____ Line No. _____ Change to: _____
3   Reason for change: _____
4   Page No. _____ Line No. _____ Change to: _____
5   Reason for change: _____
6
7   Page No. _____ Line No. _____ Change to: _____
8   Reason for change: _____
9   Page No. _____ Line No. _____ Change to: _____
10  Reason for change: _____
11  Page No. _____ Line No. _____ Change to: _____
12  Reason for change: _____
13  Page No. _____ Line No. _____ Change to: _____
14  Reason for change: _____
15  Page No. _____ Line No. _____ Change to: _____
16  Reason for change: _____
17  Page No. _____ Line No. _____ Change to: _____
18  Reason for change: _____
19  Page No. _____ Line No. _____ Change to: _____
20  Reason for change: _____
21  Page No. _____ Line No. _____ Change to: _____
22  Reason for change: _____
23
24
25  SIGNATURE: _____ DATE: _____

R.W. CUTHILL, JR.,

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CASE NO. 6:09-cv-271-Orl-31GJK-DAB

VOLUME 2

In re:

MIRABILIS VENTURES, INC.,
Bankruptcy Case No. 6:08-bk-04327KSJ
_____/

MIRABILIS VENTURES, INC.,

Plaintiff,

vs.

RACHLIN COHEN HOLTZ, LLP, a Florida
limited liability partnership, n/k/a
RACHLIN LLP; LAURIE S. HOLTZ, an
Individual; and JOSE I. MARRERO, an
Individual,

Defendants.
_____/

DEPOSITION OF R.W. CUTHILL, JR.,
Taken by Counsel for Defendants
(Pages 201 - 390)
Wednesday, April 21, 2010
9:09 a.m. - 5:20 p.m.

Esquire Deposition Solutions
200 East Robinson Street
Suite 725
Orlando, Florida 32801

Reported By:
Richard Castillo
Certified Livenote Reporter
Notary Public, State of Florida
Esquire Deposition Solutions
Orlando Office Job No. 158015
Phone - (407)426-7676

APPEARANCES

On behalf of the Plaintiff

ROBERT C. WIDMAN, ESQUIRE
Morris & Widman, P.A.
245 N. Tamiami Trail
Suite E
Venice, Florida 34285
Phone: (941)484-0646

JOSEPH DeMARIA, ESQUIRE
JESSICA R. FRANK, ESQUIRE
Fox Rothschild, LLP
Four Seasons Tower
15th Floor
1441 Brickell Avenue
Miami, Florida 33131

Phone: (305)536-1112

On behalf of the Defendants

JOSEPH M. VANSER, III, ESQUIRE
Holland & Knight, LLP
100 North Tampa Street
Suite 1100
Tampa, Florida 33602
Phone: (813)227-6701

CHARLES J. HELTZ, ESQUIRE
Gronek, Ketcham, Rutherford, Bronson, Eide & Telan, P.A.
901 N. Lake Destiny Road
Maitland, Florida 32751
Phone: (407)423-5545

D. DAVID KELLER, ESQUIRE
Keller, Landsberg, P.A.
One Financial Plaza
100 SE 3rd Avenue
Suite 1050
Fort Lauderdale, Florida 33394-0002
Phone: (954)761-3550

PROCEEDINGS HELD ON APRIL 21, 2010
I N D E X

TESTIMONY OF R.W. CUTHILL, JR.

Direct Examination (Cont'd) by Mr. DeMaria     204

EXHIBITS

Stipulations                          205
Certificate of Oath                   385
Court Reporter's Certificate          386
Errata                                387
                                      388

NOTE:  Ellipses (...) used to reflect pauses between words.

E X H I B I T S

Exhibit 62 (Notes from witness)                                   217
Exhibit 63 (Minutes of Wellington Capital Group 12/15)            219
Exhibit 64 (Form 8-K)                                             222

Exhibit 65   (More 1:2/13/04, Amadeo to Vandenberg)                223
Exhibit 66   (String of e-mails from Jean Marrero)                 227
Exhibit 67   (Minutes of Mirabilis Ventures special meeting)       231
Exhibit 68   (E-mail 2/11/05 Johnson to Beyer, et al)              236
Exhibit 69   (PowerPoint Myers to Buckman, et al)                  242
Exhibit 70   (PowerPoint for President, Solutions Benefit
             Services Strategic Plan)                              245
Exhibit 71   (E-mail from Curry to Holtz, 12/08)                   246
Exhibit 72   (E-mail 4/4/05, Marrero to Forte)                     255
Exhibit 73   (E-mail to Mike Stanley to Vandenberg)               256
Exhibit 74   (E-mail re Mike Stanley)                              260
Exhibit 75   (08/06 e-mail from President to Stanley)              262
Exhibit 76   (E-mail from Marrero, 4/21)                           264
Exhibit 77   (Undated letter to Mirabilis)                         269
Exhibit 78   (RSM Financial Statements)                            283
Exhibit 79   (Mirabilis Ventures & subsidiaries)                   283
Exhibit 80   (Document re summary of dates and events at
             President, 1/06)                                      294
Exhibit 81   (11/7/05 e-mail from Vandenberg to Amadeo)            294
Exhibits 82 - 104 (Marked, not individually identified)            335
Exhibit 105  (E-mail from Paul Glover, 6/28/06)                    354
Exhibit 106  (Advocacy Complaint)                                  356
Exhibit 107  (Joint stipulation)                                   358
Exhibit 108  (Order settling objections re $400,000 claim)         358

0205

P R O C E E D I N G S
(Continued from Volume 1)

* * * * *

BY MR. DeMARIA:

Q   All right.  Is there something wrong with
being tasked -- we'll just up with the memo -- is
there something wrong with being tasked to prepare
bankruptcy schedules if, in the event, a decision was
made by the client to file for bankruptcy; is there
anything wrong with that?

A   No.

Q   Is there anything wrong with
Mr. Marrero contacting the IRS to determine whether
they could change where the case was being handled,
from Detroit to Miami, anything wrong about that?

A   There's nothing wrong with it, the right tasks
here.  You asked me, initially, if this would have
heightened anybody's awareness, and it certainly
should have.  It should have heightened their
awareness of what they were doing.

Q   Why?

A   Well, we're dealing with .... the
nonpayment of payroll taxes.

---

75
0206

Q   And a plan to deal with it.

work.

A   And a plan to deal with it;

A   And an alternative plan, if that didn't
to file for bankruptcy.

Q   Right.

A   And so, you tell me what's wrong with a
professional being aware of a problem that a client
had, based on historical problems, a plan to solve
that problem, and a contingent plan to deal with it,
if Plan A didn't work.  Tell me what's wrong with
that.

Q   Well, actually, there's nothing wrong with
Plan A, but we won't dwell on this.  That same
professionals are dealing with Plan B, which is
setting up Mirabilis and funding Mirabilis at the
same time with the same source of money, payroll tax
money, from President.

A   From the historical payroll tax money?

Q   No.  New payroll tax money.

A   What evidence do you have that they were
told, in early '05, that Mr. Amadeo now was going to
be able -- you had been overstating historically and
not pay currently recurring payroll tax obligations?
What do you have to say that they knew, going
forward, that Frank Amadeo was going to do that?

A   Well, they had to find out where the money

---

0207

was going to come from.

Q   We've talked about that.

A   I know.

Q   And we've talked about part of that money
was historical money, and you're saying part of that
money was ongoing money.

A   Well, we defined the historical money as
the $52 million Sunshine Companies money that all
preceded the Sunshine Companies Plan.

Q   Okay.

A   The genesis of the plan.

Q   Okay.

A   So, the money subsequently that funded the
consulting agreement, and the subsequent Mirabilis
operations and purchases of subsidiaries, had to
come from somewhere.  It didn't come from thin air.

Q   Now, you say that the people that were
working on the Sunshine Plan, as reflected in this
December 28, '04 memo, at that same time, were working
also on these -- Mirabilis going forward
acquisitions and business, right?

A   Yeah.  Some of the people listed in these
tasks in Roman Numeral Three, one through eight.

Q   For instance, one of them used to be by ex
boss.

A   Who's that?

Q   Morey Hollander --

A   But --

Q   -- I reported to.

A   Yes.

**0209**

Q   Okay.  Here's my question, though.

A   But specifically, Kati -- you said you wanted me to be specific about your corporate -- Nati Bruckmann and Sharnia Khmorkar were inceptal parts of the due-diligence operation for the Mirabilis purchases.

A   But he was.

Q   Even so much so that Khmorkar had an office in Mirabilis's offices in Orlando.

Mr. Cottli, and there, we don't dispute that there's an office that she used at Mirabilis's offices in Orlando at a later time.

My question is, on December 28, '04, there is no indication in these matters -- we'd dispute timetable, of acquisition for Mirabilis you'd agree with me on that when you look at Exhibit 60, correct?

A   Let me look at it again.

Q   Take a look.

(Pause.)

A   Yeah.  My recollection is, that's correct, but ....

A   Correct.

Q   All right.  And, in fact, what Mr. Bruckmann and Miss Khmorkar, Rechlin, Cohen review of all Sunshine transactions and corporate governance documents to comply with bankruptcy disclosure issues.  So that, basically, if they went forward with bankruptcy, you'd have the backup for it, correct?

A   That's what the document says, yes.

Q   And that was the plan at that time?

A   That's what this document says, that plan was more than the overall plan.  Because there were more things happening than just what's on this piece of paper.

Q   That documentation have you seen that you rely on in this late '04 to January '05 time period that is more than what's reflected in this Sunshine timetable?

A   Well, there were e-mails that transmitted this, and there were also, for instance, notes of meetings prior to this.  There was a meeting prior to the consulting agreement between AQMI and Presidion, to whatever extent Presidion had to do with -- it was kind of a pre-setup for the engagement between the AQMI and Presidion Corporation.

Q   Now -- oh, I'm going to get the wrong name -- one of the two principals of Presidion Corporation took fairly extensive handwritten notes at that meeting, which we produced, and we may have attached them, but not sure.

Q   To the complaint?

A   I'm not sure if we attached them, though.

---

**0210**

or they were produced.

Q   Okay.

A   They were kind of a genesis of this idea.

But, at this point in ... and this is December '04, December 28, '04, and then you had a couple of meetings within the next eight or nine days of January.  This month of '05 at Mr. Bryson's office, one or two at Cardenas' -- at your firm's office, and one with Judy Berkowitz at the IRS office, and one with Judy Berkowitz at the three that I remember.

Q   I think these are the three that I remember.

Q   Well, let's talk about them in reverse order.

With Miss Berkowitz, the meeting was to discuss the historical tax obligations from Sunshine Companies, correct?

A   That was one of the topics of the agenda.

Depending on who I've spoken to, different recollections of spoken to, the system different recollections of what was discussed in that meeting, I'd like to -- that.

I haven't talked to Miss Berkowitz or deposed Miss Berkowitz yet, but I think she may have the clearest recollection.

Q   You're not saying that Frank Amodeo or his people went in to Miss Berkowitz and the IRS and revealed, in any way, their intention to temporarily not pay payroll taxes.

A   Actually, Mr. Amodeo has stated he did had -- he stated, in writing and verbally, that he did that.

Q   He did that.

A   Yeah.  I believe that?

Q   Do I believe that?

A   Yeah.

Q   I think I made the statement before that ... that Mr. Amodeo told me.

Q   Which, by the way, I think is good practice, but do you believe that anybody, on behalf

---

**0212**

of these companies, went to the IRS agent and said: Well, you know what, going forward, we plan to temporarily not pay our payroll tax obligation.  So you believe that?

A   Actually, I -- if I understand what Mr. Harreo said in his deposition, and what I've been told, that exactly took place.

Q   They told me that he be told Miss Berkowitz that they were not -- that they were not going to pay their payroll taxes that were -- that were going to be recurring, going forward?

A   No, that's not what I said.  What -- what I'm trying to say is that, they filed payroll tax returns and showed Miss Berkowitz the amount of growing unpaid payroll taxes.  And they gave her schedules of that.  I have some of the schedules, due and owing in the '05 time period, not historical?

0213

```
 1        A   Not what we've defined as its 52 million
 2   of the historical Sunshine Corporate payroll taxes.
 3        Q   Now, explain that one to me.  If my client
 4   was involved in going to the IRS and telling the IRS
 5   openly, as this business moves forward, we're going
 6   to have payroll taxes that we're going to report; but
 7   not pay, on a temporary basis, you think that was
 8   appropriate they're telling the IRS?
 9        A   I don't think your client did that.  Why
10   don't you are the question rather than making a
11   statement.  So --
12        Q   Do you think my client did that?
13        A   They went to the IRS and informed the IRS
14   that there was going to be payroll tax obligations
15   that were going to be reported, not paid on an
16   ongoing basis, did my client do that?
17        Q   And do you think my client had any
18   knowledge that was being done?
19        A   Actually, I don't think that was done by
20   anybody.
21        Q   All right.  So, then, they didn't go to
22   Miss Berkowitz and tell Miss Berkowitz, hey, we're
23   going to report the taxes but not pay them?
24        A   No.  On the contrary, what they did was,
25   they told Miss Berkowitz what they reported, and
```

0214

```
 1   they showed her what they hadn't paid.  And that
 2   amount was growing.  So, retroactively, they were
 3   telling her they didn't pay the taxes, not
 4   prospectively.  And that's the difference between
 5   what you're asking me and what I'm answering.
 6        Q   Okay.
 7        A   All right, it was it was becoming
 8   retroactive, every time they went in, because they
 9   would update the numbers with a period that had just
10   ended?
11        A   Yes.
12        Q   Okay.  But doesn't, that tell the IRS, if
13   somebody's keeps in -- regularly -- every time they
14   come, telling you the number's growing, that they're
15   just, on an ongoing basis, not paying their taxes;
16   doesn't, that tell the IRS that?
17        A   Yes.
18        Q   What was your understanding of what
19   Miss Berkowitz's position was to that?
20        A   I haven't spoken to Miss Berkowitz.  :
21   don't know what her position is.
22        Q   Your understanding from the record in this
23   case, I would think, is that that was the discussion
24   they were having with the IRS, that idea being to
25   solve this problem, this temporary nonpayment, and
```

0215

```
 1   they were going to sell the companies, or go public,
 2   or find some way of funding it and solve the problem
 3   later on.  Isn't that, that, in essence, what they were
 4   telling her?
 5        A   This was -- that was the gist of the PSA
```

0216

```
 1   plan, was non-paying payroll taxes and trying to
 2   take the assets of these companies that owed the tax
 3   liabilities, increase the assets, in order to sell
 4   them to pay back the IRS.  That was the PSA plan.
 5        And what I have been told was, they told
 6   that to Miss Berkowitz, but I have not spoken to
 7   Miss Berkowitz, so I don't know if that's factual or
 8   not.
 9        Q   And who was it that told Miss Berkowitz
10   that?
11        A   Who would have told Miss Berkowitz?
12        Q   Yeah.  To your knowledge, who told her?
13        A   Well, I know about the meetings with
14   Miss Berkowitz.  For instance, Mr. Bayer and people
15   in the meetings.  And they were in, some of
16   the meetings; but not all of the meetings.  Dan
17   Myers was in some of the meetings, depending on who
18   being deposed, and I get a different set of answers.
19        Q   You would agree with me, from the
20   documents you've seen, that by the spring of '05,
21   although Mr. Marrero was prepared to become more
22   involved with Miss Berkowitz, Mr. Myers really took
23   that over?
24        A   I answered that previously with,
25   Mr. Myers didn't take it over in the spring of
 1   '05 --
 2        Q   Summer of '05?
 3        A   -- that Mr. Marrero was involved until
 4   the fall of '05.
 5        Q   But Mr. Myers, I mean, Mr. Marrero was
 6   involved.  I could show you credible Mr. Marrero was
 7   providing information that he's ready to do
 8   something; but they didn't give him anything to do;
 9   isn't that true?  He was basically a conduit of
10   information?
11        A   You want to show me an e-mail that says
12   that?
13        Q   We'll get there.
14        A   Okay.
15        Q   Take a look at Exhibit 61.
16        A   Okay.
17        Q   The Securities Purchase Agreement.  This
18   is the December 3, 2004 agreement between Presidion
19   and Wellington that was part of the Sunshine Plan,
20   right?
21        A   I don't recall seeing this document.
22        Q   You've never seen it?
23        A   No.
24        Q   You have heard about it?
25        A   I've heard about it, but I don't recall
 1   ever seeing this specific document.
 2        Q   All right.  And in your lawsuit, do you
 3   believe there's anything improper in this Securities
 4   Purchase Agreement, the action they went through to
 5   make this sale to Wellington?
```

```
 8          A   My lawsuit speaks for itself.
 9          Q   I know, but as part of your lawsuit, is
10     this something that you rely on to say that there
11     was something improper in this corporate
12     transaction?
13          A   I don't even know if my lawsuit mentions
14     this document.
15               (Exhibit 62 marked for identification.)
16          BY MR. DeMARIA:
17          Q   Okay.  I's told by Miss Frank that Exhibit
18     62 are notes that we found from your documents that
19     you control.
20          Q   Do you recognize the handwriting on
21     handwriting on
22     Exhibit 62?  Does that look like Mr. Amodeo's
23          A   (Pause.)
24          Q   I don't recognize the handwriting.
25          Q   Have you ever seen this before?  It's from
0219   your documents.
 1          A   (Pause.)
 2          Q   When you say it's free my document, which
 3     document are you talking about?
 4               MS. FRANK:  From the boxes in the
 5     warehouse.
 6          BY MR. DeMARIA:
 7          Q   The warehouse, from your warehouse
 8     documents that you made available to us last week.
 9          A   Okay.
10          Q   You've not seen this before?
11          A   No, I have 1500 square feet of documents.
12          Q   Okay.
13          A   I don't recall seeing this specific
14     document before.
15          Q   Here's my next question.  Take a moment and
16     read it, it's only two pages, and my question to
17     you, as you read it, is: Is the items in this
18     description of what they call the Chapter 11
19     Equivalent Plan, consistent with your understanding
20     of what the plan was at that time?  Just take a look
21     at it and read it.
22          A   Okay.
23               (Witness complies.)
24               (Pause.)
25          A   Okay.  I read the document, so would you
0220   ask me the question again.
 1          Q   Sure.  The information in the document I's
 2     familiar to you in any way as -- it looks like it's
 3     something that would have been prepared in early
 4     '06, from the dates in it.
 5               Is it information that's familiar to you
 6     as concepts that were being discussed for, in part,
 7     repayment of these obligations?
 8          A   No.
 9          Q   Okay.
10               (Pause.)
11               (Exhibit 63 marked for identification.)
12          BY MR. DeMARIA:
```

```
13          Q   Let me show you Exhibit 63 from the
14     minutes.  This is the minutes of Wellington Capital
15     Group, special joint meeting of board of directors
16     and shareholders, December 15th.  Have you seen
17     this document before?
18          A   No.
19          Q   Okay.  This is a document apparently
20     signed by Frank Amodeo, as the sole director and
21     shareholder of Wellington.
22               Was the sole director and shareholder of Wellington?
23          A   Yes.
24          Q   Okay.  And you see it here, in the
25     Resolved, that Wellington Capital Group commits to
0221   utilizing its best efforts to submit and offer
 1     compromise with the Internal Revenue Service to
 2     provide for utilization of tax credits in the
 3     Staff Leasing and Sunshine Companies into Chapter 11
 4     bankruptcy; you see that?
 5               And that's consistent with what the
 6     Sunshine Plan was, correct?
 7          A   And that's consistent with what the
 8          Q   No.
 9          A   Plan A and Plan B.
10          Q   This is consistent with the Sunshine
11     Companies Plan.
12          Q   And then you see the second Resolved says
13     that Wellington acknowledges that should this be
14     unsuccessful, that Wellington would place Sunshine
15          A   Is there anything improper in those two plans?
16          Q   That reflects anything improper in those two plans?
17          A   That's a legal question.
18          Q   I mean, is there anything that troubles
19     you in reading it?
20          A   Only one of my defendants shows up down on
21     the bottom here.  Mr. Beyer.
22          Q   Meaning what?
23          A   Well, you'd have to read his deposition to
24     see.
25          Q   Well, I'm not asking that.  I'm asking
 1     about reading the document, where the only thing it
 2     says about Mr. Beyer is that he was hired on behalf
 3     of the Sunshine Companies.
 4          A   Uh-huh.
 5          Q   Is that troubling, that a lawyer got
 6     hired?
 7          A   Well, based on the answers in --
 8          Q   I'm not asking --
 9          A   -- his deposition.
10          Q   Remember the reason.  I'm asking it this
11     way, not have been available to people like my
12     client or Mr. Berman or anybody else who was a
```

0222
```
22   professional since '04.
23       Q   Okay.
24       A   Not what you may have learned in a
25   deposition in 2010.
 1       Q   Okay.
 2           All I'm asking is, something that may have
 3   been available to them in 2004, does it raise any
 4   kind of a red flag to you?
 5       A   No.
 6       Q   Okay.  You talked about public filings of
 7   Presidion -- and I want to show you an 8-K from
 8   Presidion in...
 9       A   No.
10           (Exhibit 64 marked for identification.)
11   BY MR. DeMARIA:
12       Q   This is Exhibit 64.  This is a Form 8-K
13   filed with the Securities and Exchange Commission
14   for the period ending 12/13/06, for Presidion
15   Corporation.  Have you seen this before?
16       A   No.
17       Q   All right.  And, in this document ...
18   there is a reflection of a... entry into a
19   Definitive Agreement, in which Presidion Solutions
20   entered into the agreement with Wellington Capital,
21   that it showed you.  And they discuss a December 8th
```

0223
```
 1       Q   ... have there anything in this 8-K that would
 2   have been publicly... And they described
 3   all these transactions.
 4       A   No.
 5       Q   All right.  ... Integration ...
 6   problems at Presidion?
 7       A   No.
 8       Q   Okay.
 9           (Pause.)
10           Okay.
11       A   Itself.
12       Q   (Pause.)
13           (Exhibit 65 marked for identification.)
14   BY MR. DeMARIA:
15       Q   Exhibit 65 is a December 13, 2004
16   memorandum from Frank Amodeo to Craig Vandenberg,
17   copied to a bunch of people on the second page.
18   Subject:  AQMI view of Presidion upon which MVP
19   Insurance are based... lists six items.
20           Have you seen this before?
21           (Pause.)
22       Q   Look in the second paragraph -- third --
23   fourth paragraph, I guess.  In this regard, I would
24   like to set out AQMI -- this is Frank Amodeo
25   speaking -- AQMI view of Presidion upon which MVP
```

```
Mr. Amodeo is describing in the manner in which
Presidion would be operated to provide the funds
```

0225
```
 3   upon which MVP Insurance are based?  Do you see
 4   anything improper in those six items?
 5       A   No, it would actually really be cool if
 6   some of this stuff was -- these were even true,
 7   but it wasn't.  And Mr. Holtz and Mr. Berman knew,
 8   at the point of this that, for instance, the bank
 9   he's talking about and the insurance company, are
10   not true...
11       Q   So, you're telling me that my -- that
12   Mr. Holtz, my client, and others who received this
13   memorandum in December of 2004, read it and knew
14   that Frank Amodeo was lying to them; is that what
15   you're saying?
16       A   I'd use the word, "puffing".  They were
17   discussing doing -- buying a bank, buying an
18   insurance company with MVP's insurance companies --
19   pipeline.  This -- this is talking about ... let me
20   come back to the one little point.
21           (Pause.)
22       A   Integration of Presidion into an
23   affiliated network with MVP's insurance companies --
24   they did not have any insurance companies at that
25   point -- and commercial bank acquisition and
```

0226
```
 1   preliminary due diligence -- they never ever came
 2   close to acquiring a bank.  They bought less than
 3   one percent stock in a bank.
 4           But if you have the advantage, you have
 5   the fact... of looking back on this, as we all
 6   do as historical litigators, but what I want to know
 7   is what do you got to back up the statement that
 8   Mr. Holtz knew this wasn't true, or was putting
 9   this on... that Holtz commenced.
10           So, I got to... Do you have any e-mails, do
11   you have anybody saying that Holtz commenced,
12   anything like that in this time period?
13       A   Well, both Holtz and Berman were both
14   involved with the formation of Mirabilis and the
15   Holtz firm, Rachlin's firm, was doing the due
16   diligence for the initial acquisitions.  They
17   certainly would have had first-hand knowledge, the
18   firm, whether Mr. Holtz did or not, I would have
19   believed -- Holtz was the lead at this point, so I
20   would have believed he would have, but I don't know
21   that factually, that these certain firms -- or did
22   not exist, and then they certainly were discussing
23   discussing the formation of Mirabilis and the
24   funding of Mirabilis.
25           So this one document, is this a damning
```

```
a whole story.
    Q   I mean, forget damning document.  Let's
use a different word, an exculpatory document.
Isn't this a document that shows any fair-minded
judge or jury that what Mr. Holtz, Mr. Berman and
others were being told by Frank Amodeo in December
of 2004, was that AQMI had a legitimate business
plan upon which MVP Insurance would be based?
    A   Certainly, that's the way frauds are
```

10  always perpetrated, is, you have to have a
11  reasonable, identifiable, believable plan. That's
12  the whole bizzle of a fraud.
13     Q  Okay. So, my question is ... this
14  memorandum by Frank Amodeo presents a reasonable,
15  identifiable -- I forget the third word; whatever
16  the third word you used, till ... take
17  readers of that same in late 2004, plan to the
18  readers of that memo?
19     A  Believable was the third.
20     Q  Believable.
21     A  Yeah.
22     Q  Yeah. It presents that, doesn't it?
23     A  Actually, it looks good, and when I talked
24  to Frank Amodeo, he's a good salesman, he's a
25  believable guy.
0227
1     Q  But, again, without the benefit of
2  hindsight, when you have, this is what they were
3  being told in 2004, when they were beginning their
4  work with this man, isn't it?
5     A  Yeah.
6     (Pause.)

0228
     (Exhibit 66 marked for identification.)
BY MR. DeMARIA:
     Q  Sixty-six. Exhibit 66 is a string of
e-mails from Jose Marrero. The second one, I guess,
is the one that I want to focus on.
     A  And that -- before the
December 21st meeting, and because Mr. Marrero was
not going to be available for that meeting, he's
providing this e-mail.
     Q  Are you familiar with it? Have you seen
it before?
     A  Let me look at it.
     (Pause.)
     Q  Okay.
     A  All right. You know what, I'm going to do,
sir? Jessica tells me that I have one that has all
the documents attached. I'll make that exhibit --
I'm going to substitute it, okay?
     MR. DeMARIA: Yeah.
     A  Yeah. What I'm going to
do -- let me see if I can do an old sticker
replacement.
66.    Yup. Thanks, Jess, this way it's complete
     THE WITNESS: Okay.
     Thank you, kind madam.
     (Pause.)
     Have you seen it?
     A  I don't recall seeing it.
     Q  You're aware that Mr. Marrero was not at
the December 21st meeting, correct?
     A  Yes.
     Q  And I think you're aware he testified that
he had provided information prior to that meeting?
     A  Yes.

0229
17     Q  After his deposition, and before you filed
18  the second amended complaint, did you go and make
19  any effort to review the documentation that
20  Mr. Marrero provided as part of your continuing
21  evaluation of whether or not he should be a
22  defendant in this case?
23     A  The information he provided in his
24  deposition?
25     Q  After his deposition, when he testified
0229
1  that he had provided information before the
2  December 21st meeting.
3     A  Okay.
4     Q  Did you take any time, before filing the
5  second amended complaint, to say: Well, let me take
6  a look at what Jose provided, and I'll decide if
7  it's something that I would believe is inculpatory
8  or exculpatory or neither, for that matter. But did
9  you make any effort to look at this information?
10     A  I did not personally.
11     Q  Okay. Do you know if any effort was made?
12     A  I do not know.
13     Q  Okay. I assume that one of the reasons
14  you took Mr. Marrero's deposition -- you named his
15  involvement in these activities, right?
16     A  My attorney did.
17     Q  All right. And did you do any evaluation,
18  after taking Mr. Marrero's deposition, about whether
19  he should continue to be a party in this case?
20     A  I did discuss that with my attorney.
21     Q  And obviously cares to the conclusion
22  that you wanted to have him remain as a party in
23  this case?
24     A  Correct.

0230
1     Q  Okay. What is it you saw that you knew of
2  before his deposition, or that you saw in his
3  deposition, that gave you the basis to want -- that
4  he needs to continue to be a defendant in this case?
5  What connection of Jose Marrero are you relying on?
6     A  Without going over my discussion with my
7  attorney --
8     Q  Which I don't want to hear.
9     A  -- which I --
10     Q  I just want to know the basis of your
11  lawsuit.
12     Okay. The basis of my lawsuit,
13  originally, prior to the deposition, would include
14  Mr. Marrero, had to do with his involvement with the
15  Sunshine Companies Plan, which is an integral part
16  of the PBS plan. His deposition didn't change that
17  position.
18     And so, I didn't come up with anything
19  within his deposition or subsequent to his
20  deposition, that would have changed my basis for
21  including him in the lawsuit?
22     Q  So, there was nothing that added to the
23  basis that you had before. Whatever basis you had

0231

1  before stayed the same; it didn't change?
2      A   You mean, after taking his deposition?
3      Q   Yeah.  I mean, you had a basis, before you
4  sued him, and there was nothing in that deposition
5  that added to the basis, or subtracted from it.  It
6  stayed the same.
7      A   I'd say there were things that both added
8  and subtracted because we gained more knowledge
9  from this deposition.
10     Q   What added?
11     A   Okay.
12     Q   But without having the deposition here --
13     A   Okay.
14     Q   You know, you're dealing with ... a
15 six-hour deposition.
16     A   Okay.
17     Q   And you're asking me to state from memory?
18     A   I will ask, not give me the time to
19 read this lengthy document.  Have you had the
20 proprietary of having him in the case to look at
21 Exhibit 66, among other documents.
22     A   Okay.
23        (Exhibit 67 marked for identification.)
24 BY MR. DeMARIA:
25     Q   Let me go to the next exhibit.

0232

1      Mirabilis Ventures special meeting of directors and
2  shareholders, February 10, 2005; have you seen this?
3      A   This document says:  Frank Amodeo acted as
4  chairman at the meeting, and that a waiver and
5  consent that says that Frank Amodeo was the sole
6  shareholder and director of Mirabilis Ventures, Inc.
7  Do you believe that to have been true as of
8  February 2, 2005?
9      A   It was not true.
10     Q   That was a lie?
11     A   Yes.
12     Q   Okay.  And how do you know that?
13     A   Well, I have two or three pieces of
14 information, because one of the great questions in
15 this case is who were the shareholders of Mirabilis,
16 and who were the officers and directors of
17 Mirabilis.  And there are different documents within
18 the corporate minutes that show different things,
19 this being one of them.
20        I went back and traced the entire history
21 of every officer and every director that show up in
22 the minute book, and every share of stock that was
23 issued to try to determine the officers and
24 directors.
25        And I also looked at other documents that

0233

1  weren't in the corporate books, the corporate minute
2  books, to try to identify who were the officers and
3  directors, for instance, looking at the agendas and
4  video and watching the meetings and who were at the

5  board of directors meetings to see if they
6  corresponded with the board minutes, because I had
7  been told that the board minutes may have been
8  doctored.
9         And -- in other words, maybe there were
10 subsequent board minutes written and substituted for
11 previous board minutes.  Surprise, surprise.  So, I
12 have been looking for that all the way through.
13     Mr. Amodeo -- and actually there's more than this
14 one -- that show Mr. Amodeo as the solo shareholder.
15        Now, it generally is not -- it doesn't
16 compare with a whole list of other board minutes and
17 actions, as well as Florida, on this corporation,
18 Nevada, as well as Florida, on this corporation,
19 which showed Mr. Amar (phonetic) as the --
20 originally, the sole stockholder before preferred
21 stock became issued, and still being the sole ...
22 common stockholder.  But --
23        The Moore firm did a lot of work on the
24 ownership and this question right here you're asking
25 me about.  And their document production really

0234

1  helped me solidify the corporate minutes, and who
2  the owners were, and who the officers were, at least
3  up through their subsequent events period, which
4  was -- I think this subsequent events period ended
5  like June or July of '06.
6      Q   You have to agree with me that it looks
7  like, in February '05, Frank Amodeo thought he was
8  the sole shareholder and director of that company,
9  right?
10     A   No.
11     Q   He didn't?
12     A   No.
13     Q   Then what reason, based on your knowledge
14 of the case, would he have to assert himself as the
15 sole shareholder and director, if he didn't believe
16 it to be true?
17     A   Frank Amodeo asserted himself to do a lot
18 of things, for whatever his purposes were, that
19 weren't necessarily true.
20     Q   Wouldn't it be consistent with what we're
21 seeing here in this document, that Mr. Amodeo was
22 asserting to others that he was the controller of
23 this company, that he controlled it through his
24 shareholder and director instrument?

0235

1      A   I don't know what he was asserting with
2  this document.  I know what the document says.
3      Q   But you're asking me, what was his purpose
4  in doing it, and you'd have to ask Frank Amodeo
5  that.  I wouldn't know.
6      Q   No.  My question is more along the lines
7  of when we talked before about those who may have
8  thought that he was the puppet master on one end to
9  those who thought his control right he limited to
10 the financial control since he was funding
11     Mirabilis.  Wouldn't this be a document that would

**0236**

```
12   be pushed more towards the puppet master end of that
13   line?
14       A   Not necessarily at all.
15       Q   Because this document could have been used
16   to defraud somebody for a single sole purpose.
17           Was it?
18       A   I don't know.
19       Q   Okay.
20       A   I don't know how this document was used.
21       Q   Do you know what view my clients had of
22   Frank Amodeo's control of Mirabilis, what you've
23   seen in the case?
24       A   Ask that again.
25       Q   Would it surprise you that my client was
     of the view that Frank Amodeo was controlling
1    Mirabilis?
2           (Pause.)
3        A   I believe I asked Mr. Holtz that in his
4    deposition, and considering that he was on the board
5    of directors and knew who the shareholders were, and
6    the -- if he said that Frank Amodeo was the sole
7    shareholder of the company, it would not be
8    consistent with his board directorship.
9        Q   I didn't use that word.  I used the word,
10   "control."  It was Mr. Holtz's view that Frank
11   Amodeo controlled Mirabilis, right.
12       A   And he further, in I think he stated that.
13   And do you believe that that was an
14   honestly held view that he had back in '05 and '06?
15       A   I believe he stated that from the standpoint
16   of economic control.
17       Q   So you think he was only talking about
18   economic control?
19       A   I believe that, yeah.
20       Q   Okay.
21       A   It certainly wasn't voting control.
22           (Pause.)
23           (Exhibit 66 marked for identification.)
24       MR. DeMARIA:   Exhibit Six -- pardon me?
25   guess, Exhibit 68 is something both from your
     files and Web; this 68.
1        MR. DeMARIA:   We're fighting over the
2    witness.
3        THE WITNESS:   Is that all I get?  I'm
4    doing the heavy lifting here.
5    BY MR. DeMARIA:
6        Q   Sixty-eight, sir.
7        A   Okay.  I'm sorry.
8        THE WITNESS:   We're fighting over the
9    chocolate chips.
10       MR. DeMARIA:   It's not in our document.
11   It's not Bates stamped, but may have been
12   Laurie Holtz, but it's printed out.
13       MR. WIEMAN:   This is 68.  It may have been
14   something that we have from Laurie Holtz or
15   yours, I don't know.
```

**0238**

```
19       Q   But it's a February 11, '05 e-mail from a
20   Moody Johnson to Mr. Meyer, Mr. Mersch, Mr. Myers,
21   Mr. Buckman, so forth.  And it makes reference to an
22   attached letter from Frank Amodeo.  Have you seen
23   this February 11th letter from Frank Amodeo?
24       A   I don't know.  Let me take a look.
25           (Pause.)
1        Q   Okay.
2        A   I don't specifically recall seeing this
3    letter, but much of what's in this letter is very
4    familiar to me.
5        Q   Let me -- let's talk about this letter for
6    a minute, and we're going to assume that these
7    people received this letter, and that you yourself
8    in the position of Mr. Holtz, for example, who
9    receives this letter on February 11th, which says,
10   Dear Sirs:  I was preparing for next week's meeting
11   with my board and staff and identified a discrepancy
12   I thought I had addressed but had not.  Therefore I would
13   like to clear it up.
14       All companies in the Mirabilis Venture,
15   Inc. network and all of these have been out of
16   compliance, nor are any outstanding obligations due
17   other than in the ordinary course of business.
18           In the past, certain companies I have
19   substantially overpaid the IRS, and the IRS is the
20   debtor, not our companies.
21           In the past, certain companies I have
22   owned, in part or in whole, were in arrears, this
23   resulted from failure to collect, not failure to
24   remit.  Subsequently, I have paid these obligations
25   generally before assessment.
1        These experiences have resulted in our new
2    policies which are consistent with maintaining the
3    moral imperative, as well as meeting the legal safe
4    harbor articulated by the Supreme Court in the
5    Slodov, S-l-o-d-o-v, case.
6           In the cases of Kingdom Vision Networks,
7    Sunshine Companies Three, Inc., and Sunshine Staff
8    Leasing, Inc., the events resulting in the tax
9    obligation occurred before our ownership.  In the
10   control, in fact, all arrearage of Kingdom Vision,
11   and the vast majority of Sunshine took place before
12   any of us even knew these businesses existed.
13           Although in some cases the tax
14   returns, this was done only for informational; slash
15   reporting purposes, and only after liability.
16           My question to you, sir, is receiving
17   this letter, would you tell you, as the reader,
18   that the payroll tax failure-to-remit problem was
```

**0239**

```
6        Q   But it's a February 11, '05 e-mail from a
7    Moody Johnson to Mr. Meyer, Mr. Mersch, Mr. Myers,
```

0240
1       historical, and that Frank Amodeo did not intend to
2       continue to fail to remit; would I; that tell you
3       that?
4           A       Why?
5           A       Actually, it wouldn't.
6           Q       It's very cleverly written, and it's write
7       by a PR guy.  If you look at who sent the e-mail,
8       Woody Johnson is the month, the PR mouthpiece for
9       Mirabilis at that point in time.  He runs a PR
10      corporation.  This character -- and there were several
11      e-mails like this one I've already cited,
12      and if you look at -- if you look at who it was sent
13      to, it was sent to the group of people that were
14      dealing with the IRS.  Hans Beyer, Dan Myers,
15      Bruchon, who was -- and that was sent --
16          A       Hans Beyer, Dan Myers --
17          A       You slipped him.
18          Q       And Mr. Berman.  You slipped him.
19          A       Pardon?
20          Q       Did I slip Berman?
21          A       Gee, that was a Freudian slip.  Sorry.  My
22      apologies to Mr. Moller.
23          A       At that -- they were the primary people
24      dealing with this tax issue with Judy Berkowitz.
25          Q       Okay.
0241
1           A       They were trying to -- this was within
2       three weeks or four weeks after the meeting, the
3       initial meeting with Judy Berkowitz, and they're
4       trying to reassure her that they don't have a, going
5       forward, tax issue.  But listen how clever they
6       craft:
7                   Back to the second paragraph: All
8       companies in the Mirabilis network -- that doesn't
9       include President, because President's not in the
10      Mirabilis network -- are in compliance with all tax
11      laws.

12                   (Pause.)
13          Q       Are you saying that -- let's say Laurie
14      Holtz site there, reads this short letter ... that
15      puts this PR discussion explanation out there, and
16      sits there and says: Ah, I know Frank Amodeo's
17      being outc, because the taxes aren't being paid at
18      the president level, so therefore, although this
19      maybe a true statement, it's not really an
20      accurate statement.  Are you saying something like
21      that went through Mr. Holtz's mind?
22          A       I don't even know if Mr. Holtz would have
23      read this, I don't know about anybody.
24          Q       Well, he stated in his deposition that to got a
25      lot of this stuff and didn't necessarily spend the
0242   time to read it.

1           Q       Well, Mr. Marreso as well.  And you could
2       have asked Mr. Marreso.  You didn't; but are you
3       saying that if they reviewed this, they would have
4       been, sitting there knowing that it's just a big lie
5       to the IRS, because of careful wordsmanship? Is
6       that what you're saying was going on?

---

7           Q       I don't know.
8           Q       Do you think Jose Marreso, in light of his
9       position for all the years he worked with the IRS,
10      would knowingly have been part of; of lying to the IRS?
11          A       I don't believe Jose Marreso knew that
12      there were payroll taxes not being paid
13      purposefully, other than the reporting to, to Judy
14      Berkowitz, because there was a spooling payroll tax
15      issue, and he got some of those reports.
16          Q       Okay.
17          A       I do know that there were unpaid payroll
18      taxes.  I think he necessarily knew they came
19      from Mirabilis.
20          Q       Okay.  I got that.  I mean, you've
21      explained that.  I appreciate that.
22          Q       Okay.
23
24                   (Exhibit 69 marked for identification.)
25
0243
1       BY MR. DeMARIA:
2           Q       This is 69.  It was already 47, I try not.

3       to do that too often, but every once in a while I
4       may do.
5           A       Sir, this an exhibit that your attorney
6       actually used, I believe, in the questioning of my
7       clients.  And it's a memo of February 25th from
8       Dan Myers to Mr. Druckmann, Mr. Berman, Mr. Holtz,
9       Miss Broadhead -- or Dr. Pollock, Mr. Carlson.
10          A       Mirabilis Ventures projected investment
11      needs.  Attached are the projected uses of cash and
12      the related months they are due.
13          A       Yes.
14          Q       And ... do you believe there's anything in
15      this document, in February of 2005, that revealed to
16      the reader that the payroll taxes were not being paid at
17      the President level?
18          A       No.  It simply is pointing out that they
19      need a whole bunch of money.
20          Q       Okay.  And how much money is it that they
21      needed?
22          A       $23 million rounded off.
23          Q       Okay.  Does that have any significance in
24      your claims against the profession?
25          A       Certainly does.
0244
1           Q       What is that significance?
2           A       Well, the professionals either should have
3       known, I mean, $23 million is not a small
4       coming from.  They're not borrowing the money.
5       lump of money.  They're not borrowing the money.
6       They're getting the money from Frank Amodeo, who
7       must be a really wealthy guy to be paying all this
8       money over.
9           A       Actually, Berman knows that it's not all
10      coming from Frank Amodeo, because he's getting wire
11      transfers directly from President through his trust
12      account.  And so, I believe that both Mr. Holtz and
13      Mr. Berman and Mr. Amodeo know precisely where the

14 money was coming from to pay this money. So I think
15 it's an important issue that there was this much
16 money needed, and this shadow executive committee
17 had knowledge of where it was coming from.
18 Q When was this shadow executive committee
19 created, based on what your testimony was?
20 A Actually, I think it was created in 2004,
21 but that actually preceded Mirabilis. The three
22 gentlemen were together when they used the term,
23 "shadow executive committee" -- I got to pull this
24 e-mail out and see when that e-mail is dated. It's
25 later.

0245
1 (Exhibit 70 marked for identification.)
2 BY MR. DeMARIA:
3 Q Exhibit 70 -- 71, I guess.
4 A No, 70.
5 Q I don't know what's going on with my 70.
6 This is ... This looks like a Power Point for
7 President Sunshine Services Strategic Plan.
8 Have you seen this before?
9 A Let me look at it.
10 (Pause.)
11 Okay.
12 A I may have. I don't recall this one,
13 though.
14 (Pause.)
15 Q Are you aware that in 2005, there were
16 discussions about the business plan was of
17 President for the PHS plan?
18 A This is for a segment. This isn't a
19 business plan for President. This is a benefit
20 services ...
21 A Well, there's also a .... the second half
22 of it. I guess they're together.
23 Q Yeah.
24 A Is it a departmental vision, a risk
25 management vision?

0246
1 A Right.
2 Q What was this, as you understood it?
3 A Again, I don't recall seeing the document
4 before, so ....
5 Q Okay.
6 (Pause.)
7 (Exhibit 71 marked for identification.)
8 BY MR. DeMARIA:
9 Q Show you Exhibit 71. It's an e-mail --
10 forget the e-mail; I'd give Curry to Laurie Holtz on
11 the top. The e-mail is passing along this
12 e-mail to Mr. Holtz in December of '08. The bottom
13 e-mail, the operative e-mail, is Matt Porter from
14 AQMI Strategy to ... a bunch of people on April 1,
15 2005. Reviewed this memo, prepared by Please
16 review to conclusion and let him know if this is
17 satisfactory for the auditors.
18 Have you reviewed this memo?
19 A (Pause.)
20 I don't specifically remember this
21 particular memo. Again ... there were a whole bunch

0247
21 of memos talking about the -- a whole bunch of
22 e-mails circulating ideas on the tax memorandum
23 between a group of people, including Mr. Berman and
24 Mr. Holtz.
25 Q Right.

0247
1 A Harrero, Druckmann ... Hans Beyer, and I
2 don't particularly recall this one. This is maybe
3 one of a whole bunch of them that were being
4 circulated.
5 Q And as a shorthand version, this would be
6 dealing with the Sunshine Plan, the tag treatment
7 for the Sunshine Plan, correct?
8 A Well, I don't recall this one, so I'd have
9 to read it to tell you what it's about.
10 Q Okay. If you don't recall, I'll move on.
11 (Pause.)
12 Q Do you know a Kevin Flynn from the
13 Kostelanetz & Fink did one of these tax memos?
14 A I ... I think the draft, my understanding,
15 don't think it got issued, or I don't think I've
16 seen an issued memorandum, but I have seen a draft
17 that he prepared.
18 Q I'm going to try not to mark things I
19 don't need to. I'm going to learn my lesson.
20 Exhibit 36 was one of your exhibits.
21 MR. DeMARIA: So -- not marking this?
22 MR. WISDOM: (Shakes head.)
23 MR. DeMARIA: 'Cause I've done it before, so
24 marked. I shouldn't have done it before, so
25 I'm not going to do it again.

0248
1 BY MR. DeMARIA:
2 Q This one is ... April 14th is actually
3 this employment tax opinion is the first e-mail at
4 the bottom, which is the source of ... from
5 Mr. Floyd, who I guess works with Mr. Flynn at
6 Kostelanetz & Fink, this draft tax opinion; do you
7 see that?
8 A Yes.
9 Q Have you reviewed that?
10 A Yes.
11 Q And is this a draft opinion that deals
12 with the Sunshine Companies Plan?
13 (Pause.)
14 A Kostelanetz & Fink were President's
15 lawyers.
16 Q Right.
17 A And they were trying to craft a tax memo
18 that would give them -- come to a similar conclusion
19 of the later, or actually previous to this. He
20 Haber memo and the Wildermuth memo, I believe, the
21 basically the same idea. Actually, Mr. Porter, I
22 believe, who was a paralegal working for Larry
23 Haber, was the original author of all the memos,
24 including this one.
25 Q Mr. Flynn works for one of the most

0249
1 preeminent tax law firms in the country, correct;

the Fink firm?
   A   I didn't know.  I'm not familiar with the
firm.
   Q   Really?  Okay.
   A   And now, Mr. Beyer says:  Here is the
opinion from our New York tax counsel on the issue
of whether Presidion will shelter the Sunshine
taxes.  It is very -- it was -- strong in our
favor, but I think we have to tone down the
discussion of how much control Presidion had over
Sunshine's operations.  Nonetheless, I think it
may be another important part getting HNY --
that's the accounting firm, right?
   Q   The auditing firm.
   A   -- comfortable -- because it's the
auditors that is needed to get comfortable with this
treatment, correct?
   Q   Yeah.  They didn't want, on the public
corporation, Presidion Corporation, they did not
want to show the Sunshine Companies payroll tax
liabilities.
   A   And they did get comfortable, right?  The
auditors were satisfied?
   A   They did.

0250

   Q   "This is a real high-powered tax firm, and
their conclusion is very strong.  Let's revise it
tomorrow.
   A   That's what it says.
   Q   So now, if you're part of this group of
people that worked with retail, in April of
2005, and you're aware that this prominent
corporate structure that the Sunshine Companies
high-powered tax firm is giving an opinion approving
Plan, in the development into, wouldn't that give you
a positive feeling about what you're doing and
therefore comes that are coming into Mirabilis?
   A   Well, actually the firm, I don't believe
ever gave the opinion.  They never signed the opinion
because they couldn't get the wording crafted
correctly.  That's why they went to the Berman firm
to get the opinion.
   Q   I understand that, but my question is, if
you're somebody's client -- lawyers that are
understands there's different -- lawyers that are
opining all the same way on the legitimacy of a
Sunshine Companies Plan, wouldn't that give you a
positive view everybody receiving it
into Mirabilis to fund acquisitions that may have
come from the Sunshine Companies?
   A   This firm didn't take a position.  It
never signed this opinion.
   Q   I'm saying --
   A   It was simply a draft.
   Q   I'm saying a draft.
   A   It's saying, if you read this draft, if you
read Mr. Porter's draft.  If you read the Berman firm
draft, if you're the person reading this from

0251

different lawyers, saying this is a legitimate tax
structure plan, wouldn't that give you comfort in
using the money for acquisitions that you were aware
was coming from the Sunshine Companies?
   A   Would it -- if I was on the board of
directors
   Q   Yeah.
   A   -- of Mirabilis?
   Q   Yeah.
   A   I think it did give the board of directors
comfort.
   Q   Okay.  And it would give other outside
professionals who saw these, the same comfort,
wouldn't it?
   A   Actually, the outside professionals were
the ones providing the opinion.
   Q   Not Rachlin Cohen, they weren't.

0252

   Q   Not this one.
   A   Not this one.
   Q   All right.  So when Rachlin Cohen reviewed
this one --
   A   That's being circulated to -- the Rachlin
firm, Mr. Marrero, and Mr. Holtz.
   Q   Except the prior one you just showed me?
   A   Yeah.
   Q   Yeah.  As a recipient.  Not as a giver of
the advice, as a recipient of the information.
   A   They're being asked to comment on it?
   Q   Yeah.
   Q   And you're telling me they're not involved
with the --
   A   Yeah.
   Q   I'm not asking you that.  I'm asking if
they have legal advice being told to them that this
is a corporate structure that could work to deal
with this tax problem, isn't it fair to say that
would give Mr. Holtz and my client comfort?
   A   They were trying to provide their client
   Q   Their client was trying to justify not
putting this on the -- balance sheet of Presidion
Corporation at this point in time.
   Q   This one was on for months.  I'm not sure
how many lawyers actually were involved with the

0253

process.  Certainly, your firm and Mr. Berman's firm
were involved, and Mr. Beyer's firm was involved
with the process of reviewing, editing and
commenting on the tax memorandum.
   A   My firm is accountants doing specific due-diligence
work on acquisitions as you've specified to -- if you believe my
firm didn't have the right to rely on what they were
seeing from the lawyers, just tell me so, and tell

me why.
    A    Actually, Mr. Marrero is an ex CID IRS
agent, very familiar with the tax laws, and he --
actually, it the exhibit you showed me, that I
hadn't seen before, a couple of exhibits ago, he was
actually sending information regarding to the IRS
code and tax law about this memorandum, or about
the... the... information in the memorandum.
    Q    You got it.  You just passed --
    A    I think I just got it, Number 66.

    Q    Uh-huh.
    A    And he was asked several times to comment
on what went into this memorandum, and collaborated
with Miss Wildsmith, Mr. Boyer, Mr. Berman,
Mr. Holtz, on the heads-up memorandum.
    Q    You're familiar with the failures of
Horizon and Enron in 2002?
    A    Yes.
    Q    And you're familiar with the fact
it's become pretty good public news, that after that
time period, the Department of Justice put a
heightened scrutiny on corporations for potential
criminal prosecution of corporations, and actually
put guidelines out that they were to investigate
corporations; you've heard of that?
    A    Okay.
    Q    Are you aware that Mr. Marrero, in
2005, provided to the people that were advising
Mirabilis, with information regarding this
heightened scrutiny that the Department of Justice
was putting on corporations at that --
    A    Not aware of that way you just said it,
but I am aware that Mr. Marrero gave information
to... this group that was dealing with the ... the
tax memorandum, about the criminal aspects of that.

    Q    I think he -- he answered that in his deposition.
    A    Yeah.
    Q    I want to go even broader than
that, though.
    A    Okay.
         (Exhibit 72 marked for identification.)
BY MR. DeMARIA:
    Q    Let me show you Exhibit 72.
    A    All right.
    Q    This is an April 4, 2005 e-mail from
Mr. Marrero.  It's a back-and-forth.  It starts with
Marrero, and then it goes back and forth from
Marrero, and then back and forth. And then he
says, two additional papers concerning DOJ position
on corporate prosecutions.  Things have changed,
based on my personal experience.
         And he attaches to that the -- what we
call in the criminal law practice, called the
Thompson memorandum from the Deputy Attorney General.
from January '03, on principles of federal
prosecution of business organizations. And then he
attaches to that a speech given in 2000 by James
Robinson, the then Assistant Attorney General of the

Criminal Division, which we're talking about these
type of issues, investigating and prosecuting
companies; do you see that?

    A    Yes.
    Q    Were you aware that Mr. Marrero provided
that information?
    A    My question to you, sir, is, do you think
before...
    Q    Well...
    A    ...that Jose Marrero not only based upon his
that Jose Marrero not only based upon his
background, but based upon the information, he was
providing to the group of people that either worked
for, or provided services to Mirabilis, was, on the
one hand, providing them all this heads-up
information that Jose -- that he could be prosecuted,
of Justice, that he could be prosecuted for this,
but on the other hand, was turning a blind eye and
allowing the tax fraud to continue? Do you think
that was being done?
    A    Well, he certainly have that payroll taxes
were not being paid, and they were continuing to
mount. He got them -- he got reports to that
effect.
    Q    I stated before, I don't believe he knew
utilized, although I would think Mr. Holtz did.
    A    So, whether Marrero was providing this and
turning a blind eye, I would not put it that way,

but he was certainly not doing anything about the
knowledge that payroll taxes weren't being paid,
and, other than giving them information like this, saying
that -- what he was trying to say here, I'm not
sure.
    Q    Don't you think he was saying, heads up,
guy, you could be prosecuted if you don't follow the
law?
    A    Right.  But he continued to represent that
client at the same point in time.
    Q    Tell me, from all your investigation, have
you found a motivation for Jose Marrero to do this?
Have you seen some kickbacks, or bribes, or
extraordinary payments from anyone, anything that
would motivate a man who had spent his career
working for the Criminal Investigation Division of
the IRS, and was providing this kind of information
to his client, anything that would have motivated
him to look the other way?
    A    No.
    Q    Can you explain then, with a lack of
motivation, why he did it?
    A    No.
    Q    You took his deposition.  Did you ask him
why he did it?

    A    I don't know if we asked him why or not.
I don't recall.
         (Pause.)

0259

1   (Exhibit 73 marked for identification.)
2   BY MR. DeMARIA:
3       Q   Remember, I asked you before about
4   Mr. Myers becoming more involved in dealing with
5   Judy Berkowitz. Let me show you as the next
6   Exhibit, 73.
7       Have you seen this July 14th e-mail from
8   Mr. Myers to Mr. Vandenberg, copied in Scorpword and
9   Williams --
10      MR. DeMARIA: Did I get this from their
11  files?
12  BY MR. DeMARIA:
13      Q   -- which we got from your files, which
14  Miss Frank got from your files, which also has some
15  other e-mails discussed in this exhibit is discussing
16  information that Judy Berkowitz requested.
17      A   Tell me which e-mail you're talking about,
18  because there's a whole string here.
19      Q   ... Take a look at it then. It has to do
20  with information dealing with -- dealing with Judy
21  Berkowitz.
22      A   Okay. Hang on.
23
24      Q   And my question to you is, it seems to me
25  that ... Mr. Marrero is not involved in this at all.
    it's all being done by Mr. Myers and his people.

0261
1       MR. WITMAN: Is this supposed to have a
2   blank second page?
3       MR. DeMARIA: I don't think so. It's
4   called bad copying. You can pull it out.
5       MR. DeMARIA: Okay.
6   BY MR. DeMARIA:
7       Q   Well, you know what, yeah, because it's
8   missing pages. I don't know, we got it -- we got it
9   from your box.
10      Q   You're missing pages.
11      Q   Yeah, I know that. What are we going to
12  do?
13      A   Cure from your box, I think, that way.
14      A   Yeah.
15      (Pause.)
16      A   Please don't call it my box.
17      Q   I'm not going to send poor Jessica back to
18  that warehouse just to find the missing papers.
19      A   She said it was a nice place. Let me
20  see --
21
22      MS. FRANK: Don't even expect it.
23      THE WITNESS: Can I throw away the blank
24  page?
25      MS. DeMARIA: Yes, of course.
    (Pause.)
    THE WITNESS: Okay. I -- these appear ...
    BY MR. DeMARIA:
    Q   Okay. You're right. Because one
    of these is "6." I apologize. Two different dates,
    of them is "6." I apologize. Two different dates,
    A   One of them is ... they're different dates,
    and they're different people, and you got page one

0260
11  of two, and two of two, which appear to be one
    string.
12      And then you have page one of three, which
13  is the first page, which appears to be a separate
14  o-mail.
15      Q   You are correct.
16      A   And it's missing page two and three.
17      Q   Why don't we do this?
18      A   And you want to make 73 just the first
19  page?
20      A   Yes. And then let's make 74 --
21      A   And make these 74?
22      Q   Correct.
23      (Exhibit 74 marked for identification.)
24      MR. DeMARIA: Do the same thing, Bob.
25  0261
1       THE WITNESS: And it's easier to talk
2   about, and I don't see Marrero on any of these.
3   BY MR. DeMARIA:
4       Q   Okay. Who is Mike Stanley?
5       A   Mike Stanley at the time ... was ... let
6   me see. We're in July '06, I believe he's the CFO of
7   Microhills at that point in time.
8       Q   Chief financial officer?
9       A   Yes.
10      Q   Preceded Glover, or succeeded Glover?
11      A   Succeeded Glover.
12      Q   So he --
13      A   He was the successor. Glover is there
14  from January, '06 to -- we never could figure out if
15  it's June of '06 or September of '06, because
16  Stanley doesn't get appointed as the CFO until, I
17  believe it's maybe October '06, officially in the
18  minute book.
19      Q   Okay. So, by July of '06, Stanley is
20  there as the CFO?
21      A   Stanley is the man on the street. He's
22  the financial guy for Microhills.
23      Q   He's also -- it looks like he's involved
24  in Nexia Strategy, right, from the e-mail?
25  0262
1       A   Oh, yes.
2       Q   Yes?
3       A   Yes.
4       Q   So he's an Acodeo run?
5       A   No.
6       Q   No?
7       A   Och.
8       Q   Och.
9       A   Well, he's not one or the other.
10      Q   Okay. Now, let me take a look at the next
11  exhibit, with Stanley, and I'll ask you a question.
12      (Pause.)
13      (Exhibit 75 marked for identification.)
14  BY MR. DeMARIA:
15      Q   Seventy-five is an August '06 e-mail from
16  Stanley to some people. Management of President
17  Solutions Seven and Paradyne, which is ... in
18  response from a e-mail from Sue Schumacher of

18 Presidion, I guess, to Stanley, which talks about
19 management of Presidion Solutions VII, and Paradope.
20 And this is a1 part of -- the PBS plan, correct?
21 A    Right.
22 Q    These are the companies under the PBS plan, right?
23 A    Some of them.
24 Q    Okay.
25 A    Now, actually Presidion, just to kind
0263
1 clarify, 'cause I used Presidion VI, and Presidion
2 VII before.
3 Q    Right.
4 A    And up at the top, this says, management
5 of Presidion Solutions VII and Paradope.
6 Q    Right.
7 A    Paradope is -- Presidion Solutions VII,
8 its real name is Presisional Benefits Solutions
9 inc. PBS.
10 Q    Right.
11 A    And Paradope, Inc, is Presidion Solutions
12 VI, inc. I mean numeral VI. So when I say six and
13 seven, we're talking about PBS is VII and Paradope
14 is VI.
15 Q    Or, in this case, we're covering both?
16 A    We're covering both here.
17 Q    Okay. And my question is, if you take a
18 look at the bottom e-mail from Sue Schumacher, she's
19 providing information about the way these businesses
20 are being run. And my question is to you, when you
21 read this, do you see anything in that description
22 from Miss Schumacher that raises a red flag in your
23 mind that something improper is being done at the
24 PBS companies as read this one, because I haven't
25 seen this one before.
0264
1 Q    Okay.
2 A    All right. Let me say, I don't recall
3 seeing this one before.
4 Q    (Pause.)
5 A    Read it, then
6 Q    Okay.
7 A    (Pause.) Yes.
8 Q    Reading that, do you see anything in the
9 description of the way Presidion is managing VI and
10 VII, PBS, that you believe to be improper, or be a
11 flag in a way that there's something wrong going
12 on?
13 A    Not in this e-mail.
14 Q    Okay. And that's what Presidion was
15 corporation?
16 A    No, actually, this e-mail has to do with
17 ADM HR taking over its management. And Sue
18 Schumacher worked in Detroit.
19 Q    Right.
20 A    She was head of accounts payable, among
21 other things, and she was one of the key people that
22 reported on the unpaid payroll taxes, on a daily
23 basis.
24 Q    Even better, 'cause ADM is a subsidiary to

25 Mirabilis, right?
0265
1 A    Yes. I think we can all agree that if
2 somebody's providing services to, or has worked for
3 Mirabilis, then something below Mirabilis would be
4 relevant to their consideration, somebody that is
5 subsidiary to Mirabilis, right.
6 Q    Well, what she's talking about is ADM HR
7 is going to take -- has already taken over the
8 management of VI and VII.
9 A    Right.
10 Q    They took it over on January 1, 2006, but
11 the bank account still remained under Schumacher's
12 control until this point. And what this e-mail is
13 about is transferring that cash accounting
14 and the cash accounts down to ADM HR. And they
15 were done sometime in and around this point.
16 A    There was a -- there was a acquisition in
17 the spring of '06, I believe the ADM was supposed to buy
18 Presidion VI and VII. And the ADM board of
19 directors and the Mirabilis board of directors
20 retroactively canceled that acquisition within 30
21 days of the acquisition date. They didn't resell
22 it. They rescinded the acquisition. The
23 acquisition papers were signed. But they rescinded
24
25
0266
1 the acquisition.
2 A    And, at that point, -- and this was
3 sometime in the spring of '06, maybe April, ADM HR
4 was managing VI and VII, both businesses, but
5 Schumacher was still doing the cash accounts up in
6 Detroit. And so, at this point -- and we're at
7 August '06, they're going to transfer the cash
8 accounts from accounts they went into Bank of
9 America bank account, right.
10 A    Right.
11 Q    for our court reporter: We've been going long,
12    MR. DeMARIA: Okay. Let's take a break
13    (Recess.)
14    (Exhibit 76 marked for identification.)
15 BY MR. DeMARIA:
16 Q    Seventy-six trombones.
17 A    Mr. Cuthill, I'm showing you an e-mail
18 from Jose Marrero, April 21st, to a group of people.
19 Q    It's a list of questions, Actions from R.O. Berkowitz: I
20 want -- and I maybe he should have said, "Let" --
21 with R.O. Judy Berkowitz mostly just to get
22 her anything see did not already have.
23    She provided the information shown and
24 made a request for the following -- and then he
25 lists what he wanted -- what she wanted. And he
0267
1 says: She appears to be very cooperative and
2 flexible at this time. I believe that we could even
3 get more time to respond if that is all you want to
4 do, should we need you to.
5    I also feel that, as long as we get her

**0268**

```
 6  information to continue moving forward processing
 7  this case, that one will work with us.  Let me know
 8  what you need/want me to do from this point.
 9       Q    Yeah.
10       A    Were you aware of this e-mail?
11       Q    Yeah.
12       A    Yes.
13       Q    Okay.   Is there anything in this -- I
14  mean, first of all, isn't this e-mail consistent
15  with the work that Mr. Marrero was doing there in
16  the spring of '05, which was a conduit between,
17  basically, Mr. Anodeo's companies, President or
18  whoever was over the IRS on the one side and the
19  IRS on the -- he was providing information back and
20  forth?  He was providing information back and forth.
21       A    No.
22       Q    No?
23       A    Mr. Marrero represented the Sunshine
24  Companies in the investigation Judy Berkowitz was
25  doing.  He was not simply a conduit.
```

**0269**

```
 1       Q    Well, yes.  He formally filed a Power of
 2  Attorney as he had to do with the IRS agents, but
 3  when you say, "represented," what did he do beyond
 4  passing information back and forth, to your
 5  knowledge?
 6       A    He was the spokesperson for the Sunshine
 7  Companies with Judy Berkowitz.
 8       Q    And do you have any basis to believe that
 9  anything he said as the spokesperson, that he knew
10  to be not true?
11       A    Actually, other than what he told me about
12  in his deposition, I don't know what he said.  And
13  no, I don't know anything he said that would have
14  been untrue.
15       Q    Okay.  Is there anything in the list of
16  items in the e-mail that reflected that Mr. Marrero
17  had any knowledge that President was continuing an
18  ongoing failure to pay payroll taxes?
19       A    He wants to know -- this is down about two
20  thirds of the way down.  I guess he wants to know:
21  What are the plans to pay the liability because the
22  dollars are due and high?  The informed me that the
23  manager, their manager, and the regional manager
24  will be interested in getting this resolved quickly,
25  and continually be inquiring about the status.
```

**0270**

```
13       A    Yes.
14       Q    So taxes that were owed in December of
15  '04, when the Sunshine Companies were with
16  President, prior to its sale to Wellington, would
17  fall under the same category as payroll taxes for
18  November of '04, or October of '04, or September,
19  correct?
20       A    No.
21       Q    It's not qualitatively different?
22       A    Actually, no.
23       Q    Why not?
24       A    Well, the 941 for December '04 is after
25  what we have defined as the -- as the older or the
```

**0271**

```
 1  historical payroll tax period.
 2       A    Well, maybe what you're saying now, but I
 3  didn't say that.
 4       Q    Actually, I tried to define it so I could
 5  use the term.
 6       A    But the "after" would be after the
 7  acquisition by Wellington, wouldn't it?
 8       Q    No.
 9       A    Why not?
10       Q    It would be after the representation by
11  Rachlin Cohen & Company.
12       A    No, but it's still historical until --
13  until ... Wellington takes over and has the
14  obligation?
15       Q    Why not?
16       A    You're just picking a later date.
17       Q    I'm not picking a corporate event.
18       A    Because your client started working on the
19  Sunshine Companies Plan prior to the acquisition by
20  Wellington, and so did Mr. Berran's firm.
21       Q    Okay.  I get it.  I'm just trying to
22  understand your position.
23       A    No, I -- MR. DeMAHY:  This one's already marked,
24  so I won't re-mark it.  I'm going to learn my
25  lesson to not waste numbers.
```

BY MR. DeMAHY:
```
 1       Q    Exhibit 31 is Elona Wildermuth's e-mail to
 2  Mr. Anodeo, of February 2, 2006.  Relationship
 3  between current and ... obligation after
 4  acquired ...
 5       Q    Is this one of the legal memos that you
 6  had referred to in your testimony before --
 7       A    Yeah.
 8       Q    -- they had provided?
 9       A    Yes.
10       Q    Okay.  And is there anything in these
11  legal memos that show you, as the reader, any
12  indication that the law is being violated on an
13  ongoing forward basis?
14       (Pause.)
15       A    No, it's rare what the memo doesn't say.
16       Q    Well, but doesn't the memo also say --
17       A    It doesn't talk about the criminal part of
```

```
      the law.
 2         Q    Okay.  But --
 3         A    At least, this one you're using here?
 4         Q    Yeah.
 5         A    My conclusion is, this does not have the
 6    criminal paragraph in it.  Some or the other
 7    conditions of this memo do.
 8         Q    But it is civil about what the violations
 9    of the Internal Revenue Code would be?
10         A    Civil.
11         Q    Right.
12         A    Civil.
13         Q    Well, forget whether you pay money or go
14    to jail.  They both come from the same source,
15    violations of the Internal Revenue Code, correct?
16         A    Okay.  And this memo tells the reader what
17    conduct violates the Internal Revenue Code, and what
18    conduct doesn't violate the Internal Revenue Code?
19         A    I understand that, but my question to you
20    is, as a reader, the reader is being told what type
21    of conduct in the context of the payment of payroll
22    taxes is violative of the Internal Revenue Code, and
23    what type of conduct is not violative, correct?
24         A    No.
25         Q    Huh?
0273
 1         A    I simply talk about Internal Revenue
 2    Code, 6672.  It's listed to that one particular
 3    section.
 4         Q    Are you telling me that a reader had to be
 5    told, you will go to jail for up to three years, or
 6    you will go to jail for up to five years, or you
 7    will go to jail over a period of time, to have a
 8    qualitative view of what's going on in this company,
 9    rather than just being told it's a violation of the
10    Internal Revenue Code?
11         A    No.
12         Q    Then what's the significance of the lack
13    of a discussion of criminal penalties?  Why is that
14    significant?
15         A    Well, it's significant because if the --
16    if your client was told about it.
17         Q    So, you're basically saying that there is
18    something qualitatively different about a criminal
19    penalty versus a civil penalty?
20         A    You're saying that if my client was told
21    and read about criminal penalties, they should have
22    acted differently than simply civil penalties.  I
23    don't get that.  I don't get that somebody who's a
24    CPA, somebody who is a professional accountant,
25    somebody who's a lawyer, somebody who's a former IRS
      agent, is going to say, well, that's okay, if it's
      only a civil violation, but if it's a criminal
0274
```

```
 1    violation, that's a different story; is that what
 2    you're saying?
 3         A    Yeah, I don't think that's what I'm saying at
 4    all.
 5         Q    Well, then, therefore, the lack of a
 6    criminal penalty section should be insignificant to
 7    this memo as long as the memo addresses the
 8    obligation of the Internal Revenue Code, correct?
 9         A    No.
10         Q    Why not?
11         A    I'm not saying that.
12         Q    Why not?
13         A    What I'm saying is, in this particular memo
14    is limited to Internal Revenue Code Section 6672.
15         Q    I understand that.
16         A    Prior iterations of this memo had other
17    parts of the Internal Revenue Code section in it,
18    including some of the criminal sections, which I
19    think are in the 7000 series.
20         Q    All right.  Those were taken out of here.
21         A    By whom?
22         Q    Obviously, the author.
23         A    From Mr. Berman's firm?
24         Q    Miss Wildemuth was the -- stated -- she's
25    from Mr. Berman's firm?
0275
 1         A    Miss Wildemuth was the author.
 2    the person that ultimately signed this opinion on
 3    this one.
 4         Q    From Mr. Berman's firm, right?
 5         A    She works for Mr. Berman's firm.  Or I
 6    think she still does.
 7         Q    Okay.  Do you have any evidence that
 8    Wolz was part of this Wildemuth's removal
 9    of references to criminal penalties?
10         A    No.
11         Q    All right.  Do you have any evidence that
12    Mr. Marcero was part of Miss Wildemuth's removal of
13    criminal penalties?
14         A    No.
15         Q    Do you have any evidence that anybody at
16    Rachlin was part of Miss Wildemuth's removal of
17    reference to criminal penalties?
18         A    No.
19         Q    Okay.  Do you think that Frank Amodeo,
20    convicted felon, disbarred lawyer, needed to see
21    criminal penalties versus civil penalties,
22    than simply being told what the Internal Revenue
23    Code requires and prohibits?
24         A    I -- I don't know what -- you're asking
25    me for an impression that Frank Amodeo might have
0276
 1    had.
 2         Q    Well, you seem to think that there's a
 3    significant difference in the lack of the reference
 4    to the criminal penalties.  Are you saying that
 5    that the lack of the reference to criminal penalties
 6    is significant?
 7         A    I've seen this memo with them in, and I've seen this
```

**Page 0277**

```
 1   memo with me then out.
 2        A    Okay.  Why --
 3        Q    And I saw a group of people that this was
 4   circulated to by Marreno.
 5        A    Uh-huh.
 6        Q    And I saw people, mainly Presidion
 7   Corporation people, asking that that language be
 8   removed.  I don't know if the language only people
 9   asking for the removal of the language, or people
10        A    My question, though, is, is it significant
11   to you that it was removed?
12        Q    Why?
13        A    Well, I think the significance is that
14   this memo, which originally I think I stated
15   Mr. Porter, I believe, was the original author of
16   least ten revisions before Wildemuth started
17   writing her own part of it.  And so we had adopted
18   a version that he had started that -- under working
19   for Haber, Larry Haber.
20        Q    And so this memo had gone through, I don't
21   know how many iterations.  Haber -- I have one copy
22   of Haber saying, it's revision number ten.  So at
23   least that point, this memo had been in this firm
24   and it was involved with.  But, only -- I think the
25   only -- I only saw one variation with it in there,
     and it was a draft.
```

```
 1        A    And I did see some emails asking for that
 2   limited number of them.  I never saw them in the
 3   Haber memo.  And the only criminal section I've ever
 4   seen is the one that the Bakerman firm
 5   Beyer, the Presidion Corporation two executives.
 6   One of those two guys asked for the removal of them.
 7        Q    But was Mr. Ramoeko aware of the drafts
 8   that had the original penalties in it?
 9        A    He was part of the edit group.
10        Q    So then he had to be aware of it,
11   right?
12        A    Not necessarily.  I think his testimony --
13   his testimony in his sentencing hearing, and in his
14   plea agreement was, he didn't read the draft that
15   had the criminal, aspect in it.
16        Q    Do you think Mr. Beyer and Mr. Vandenberg
17   were keeping that information from Mr. Amodeo?
18        A    I don't know.
19        Q    And so why do you think it's
20   significant that the end result which ended up in
21   this February 2, 2005 memorandum, doesn't have the
22   criminal penalties references why is that
23   significant?
24        A    To me?
25        Q    Yeah.
     A    It's only significant to me from the
     standpoint of whether Pasillo and Cohen pointed out
     to their client the criminal nature of the activity
```

**Page 0279**

```
15   that was taking place.
16        Whether it was in this memo, or it was
17   pointed out in another form, such as Marreno sending
18   documents when we previously looked at it, we mean,
19   there's some indication that Marreno is trying to
20   point out potential criminal activity here, which
21   also becomes a basis that Marreno had knowledge that
22   there were unpaid payroll taxes, or at least had a
23   suspicion that --
24        A    -- there were unpaid payroll taxes.
25        Q    So you think because --
```

**Page 0280**

```
 1        A    -- there were unpaid payroll taxes.
 2        Q    You think, because he didn't go further
 3   than he already did in giving warnings, that that
 4   meant what, that he knew something that he was
 5   turning a blind eye to?
 6        A    No, not at all.  His point was, he continued
 7   representing his clients, knowing full well what's
 8   going on, and so did the rest of the firm, actually
 9   for the next two years.
10        Q    Okay.  Do you know who Kevin Monroe was?
11        A    Un-hum.
12        Q    Who is he?
13        A    I'm sorry, yes.
14        A    Kevin Monroe was an accountant for
15   Mirabilis.
16        Q    Here's Exhibit 77, which we got from your
     file.
          (Exhibit 77 marked for identification.)
          (Discussion held off the record.)
17   BY MR.  DeMARIA:
18        Q    Sir, take a look at Exhibit 77.  This is a
19   unsigned letter from Mr. Kevin Monroe to Mirabilis
20   HR.
21        Q    To whom it may concern: I've been asked
22   by Presidion Solutions, Inc., to review their
23   payroll tax account summary provided by the Internal
24   Revenue Service, as of January 24, 2006.  Upon
25   review, I have determined per these documents, that
     Presidion Solutions, Inc., has no 940 or 941
     outstanding tax liability.  According to those
     documents, Presidion Solutions, Inc., has overpaid
     these taxes by more than $500,000.  For additional
     information you may contact me.
          Were you aware of Mr. Monroe taking this
     position on February of 2006?
 8        A    I have seen this letter before.
 9        Q    All right.  And do you believe that that's
10   an accurate reflection of what Mr. Monroe believed
11   to be the books and records of Presidion Solutions,
12   Inc., as of that time?
13        A    I don't know if he believed it or did not
14   believe it, but it is totally untrue.
15        Q    And you base that on seeing what?
16        A    I have an accounting of the Presidion tax
17   liability from the acquisition of the Presidion tax
18   Corporation by Mirabilis over the Amodeo companies,
```

```
                                                              0281
    to the end.
 1       Q   To the extent that Mr. Monroe, CPA, had
 2   expressed this view as of early 2006, do you believe
 3   it would be unreasonable for somebody who heard this
 4   to rely on it?
 5       A   He was an employee of the company, as were
 6   many people that were making false statements, so, I
 7   don't know if they believed it or not believed it.
 8       Q   Wouldn't you agree --
 9       A   I don't know who this was addressed to.
10   It was addressed to Mirabilis HR, and Mirabilis
11   HR is AEM -- 100-percent-owned subsidiary.
12       Q   Of?
13       A   Mirabilis.
14       Q   Exactly.  So, if this goes into the
15   Mirabilis organization -- where someone is saying
16   that President is current and actually overpaid on
17   its payroll taxes, is that not something that people
18   at Mirabilis can rely on?
19       A   I could respond, actually, I think that
20   there was a lot of information disseminated within
21   the Mirabilis organization to do precisely that.  To
22   reassure people that everything was fine.
23       Q   Really?  Who are the ones that designed
24   this dissemination of information?
25
```

```
                                                              0282
 1       A   The designers, I don't -- I don't know if
 2   I can tell you, but certainly, you had Woody
 3   Johnson, that was the PR guy.  And he did a lot of
 4   internal promotion for instance, the Hesla was one
 5   of the pieces they used.  It was a internal
 6   newsletter that was issued -- it was internally,
 7   but primarily internally that was -- had a lot of
 8   misinformation in it.
 9       A   It was kind of a rah-rah monthly
10   newsletter that was -- of internal press
11   releases, mainly authored by Woody Johnson, that had
12   to do with the expansion -- well, let me give you
13   one example.
14           There was one press release that was
15   issued that said that Mirabilis was going to do one
16   billion dollars in sales volume in the year 2006.
17   And that was released, not just internally, but also
18   to the media.
19           And it was going to have, I think the
20   number was 5,000 employees -- but well over a
21   thousand employees.  That wasn't even in the realm
22   of believability; right?  (laugh toward.  But,
23   there was -- actually, let's call it smoke, but
24       Q   You called it "puffing" before.
25       A   Yeah.  Well, "puffing" is fine.  A lot of
     puffing going on about that grand design puffing to is
     the listener or the reader that they're not paying
     their payroll taxes?
```

```
                                                              0283
 1       A   Well, you know, one of the reasons that I
 2   became interested in Mirabilis -- and this was in
```

```
                                                              0284
 3   2006, when I started researching Mirabilis well
 4   before the Government subpoena even came out on the
 5   street -- was because there was so much puffing in the
 6   media, about -- that they had already suspected there
 7   that -- Award was going to be awarded to them, and
 8   my -- my estimate of them wasn't -- unfounded.  They
 9   turned out to be just a large fraud.  It was -- when
10   you see such grandiose plans -- let me give you
11   another example.
12           I think the public statement was made
13   after the Congo event, and Mr. Amodeo went up to see
14   the President, Clinton, and they were -- Mirabilis
15   would have an office within 100 miles of every
16   populated area in the -- in the world, by the
17   year -- and I think it was like 2012.
18           And this was a public statement that was
19   put out through Woody Johnson to the local
20   media, and it was grandiose at the least, and
21   unbelievable at the most.
22       Q   Okay.
23       A   I happened to be on the unbelievable side.
24       (Exhibits 78 and 79 marked for
25       identification.)
```

```
                                                              0285
 1   BY MR. DeHATH:
 2       Q   Let me show you ... 78 and 79.
 3   Seventy-eight is AEM financial statements,
 4   December 31, '79 is Mirabilis Ventures and
 5   subsidiaries consolidated financial statements and
 6   independent auditors report for the years '05 and
 7   '04.
 8           Have you seen these documents before?
 9       (pause.)
10       A   I have.
11       Q   James Moore & Company issued the financial
12   statements for AEM on April 24, 2006.  And James
13   Moore & Company issued the consolidated financial
14   statements on July 17, 2006.
15           Do you believe it was reasonable for
16   people such as Mr. Holtz, or others who had access
17   to these financial reports, to rely on these
18   reports, to continue to believe they were working
19   for a legitimate company?
20       A   Well, I do believe that they relied on
21   them, both Mr. Holtz and Mr. Beyer, in their
22   depositions, stated that they relied on those
23   audited reports.  We didn't ask them about the AEM
24   audit reports.
25       Q   All right.  Do you have any basis to
     challenge, that they relied on it?
 1       A   No.  Actually, I believe they relied on
 2   them.
 3       Q   And do you believe they relied on it in
 4   good faith?
 5       A   Yes.
 6       Q   Okay.  Now, as part of Exhibit 79, on page
 7   11, there is a discussion of basis of presentation
```

and summary of significant accounting policies going
concerns; do you see that?
    I do.
    And you reviewed that before, right?
    I have.
    And it talks about the losses, the
substantial losses that the company had incurred,
and that has created financial
support to the company to allow it to continue
activities for at least the following year, as
needed. Do you see that?
    I do.
    There could be no guarantee that the
company will be able to generate cash flow in the
future, or that the company will be able to obtain
financing. The consolidated financial statements do

0286

not include any adjustments relating to the
recoverability of asset amounts, or the amounts of
liability should the company be unable to continue
as a going concern; do you see that?
    I do.
    Do you call that a going concern
reservation?
    No?
    What do you call it?
    Well, you're talking about a going concern
of qualification, which would be in the auditor's
report on that.
    Right, which it's not.
    No.
    So it's something less than that, right?
    Yes, it is.
    No.
    This indicates that the company has a going concern
issue. However, it's been mitigated, and by
mitigated," it's being mitigated by somebody said
they'd pony up all the cash that's needed. The
stockholder that they're talking about is Frank
Amadeo.
    Or AQM.
    Pardon?
    Through AQM, right?

0287

going concern qualification on this audited
financial statement; correct?
    No.
    Well, there is no going concern
qualification; is there?
    No, because there's no litigation.
    What's the mitigation?
    The ability to put money up.
    And James Moore accepted that as mitigation,

0288

correct?
    They did.
    All right.  And so -- A reader of this
audited financial statement from a reputable
accounting firm, who reads this going-concern issue
that's raised in the footnotes, but sees there's no
qualification, wouldn't to that person have the right
to rely on that?
    They might.   But I read it, and that's
part of the reason I sued James Moore & Company for
malpractice.
    I understand, but first of all, you're
reading this after the fact. You're not reading
this in July of 2006, you're reading this after the
fact has been -- after a position has been
indeed, after Frank Amadeo pled guilty and
admitted he was a fraud. Don't you think it's a
little bit different than what was going on July of
'06?
    Certainly. It's different.
    Okay.
    I agree.
    It's a bit easier, right? Okay.
    It's always easier in hindsight.
    All right.

0289

(Pause.)
    Let me understand that.
    So -- on the one hand, you sued James Moore,
the entity, that gave this opinion that did not
include the qualification that you think should have
been there, but on the other hand, you sue people
that say they relied on James Moore's audited
financial statement.
    My question to you is, how do you in your
mind, believe those two lawsuits are consistent?
    Well, to start with, your statement of
what I said is not correct.
    Okay.
    I don't sue James Moore because they
didn't put a going concern of qualification in.
    Okay.
    And I didn't state I sued them because of
that.
    All right.
    My problem with the going concern
qualification of James Moore & Company is, they
didn't test Amadeo's ability to fund Mirabilis.
    Now, during the calendar year, 2006 or

which their -- not their issue date, as you
previously stated is the date on here, that's not
the issue date of the report.  That's the end of
their field work.
Q  Where'd they issue it?
A  Sometime subsequent to this.
Q  Do you know when?
A  I do know, not off the top of my head, but
I do have the date.  It's ... you know, this would
be the -- an accountant takes responsibility because
they do subsequent reviews up to the date of
sign-off of an auditor's report is to the end of
their field work date.  And so they wouldn't issue
the report that day.
Q  That's fair to take a wild guess that
it had to be before the grand jury subpoenas became
known, right?
A  Yeah.
Q  So somewhere between July and November?
A  Yeah.  It might have been August.
Q  Okay.  And my point, though, is, early in
your deposition, you talked about people who knew
where the money was coming from, and were performing
you is that if you establish that my client knew
where the money was coming from, and were performing
services that created duties at that time at ...

Micablila, they also were being told by Micablila's
auditors that they had good opinions coming out?
Q  Well, actually, James Moore & Company also
knew where the money was coming from.
A  I understand, but that's my question with
this.  If it's the person relying on James Moore,
maybe I can understand you being critical of James
Moore, but how can you both be critical of James
Moore for not divulging something they should have
divulged, and then be critical of the person who
relied on what James Moore said about the company;
how are those two consistent?
A  Well, if we take that position, we could
just claim James Moore and let everybody, all the
other professionals off the hook.  But the
professionals were relying on one another's legal
opinion that -- there were no illegal acts going on to
James Moore & Company, as part of their audit work.
That was an untrue statement, and I believe
Mr. Berman knew the truth.  These taxes being
utilized from the beginning of 2005, till late in
2006, and he knew it -- it was illegal.
A  His own -- I don't think Wildermuth was a
partner, so I'm not sure.  She's of counsel now, but
She brought up the possible criminal issue
in her memorandum, which was later taken out.  And I
I'm not sure if she was of counsel then.
think there was knowledge of this.  So you had --

you had professionals relying upon one another.  So
to pick one professional and say, it's their fault,
and in this case you just told me to pick James
Moore & Company, and say it's their fault, and let's
let Berman and Rachlin off the hook.  It doesn't
work that way.  They're all culpable.
Q  Do you have any indication of conversation with
Miss Wildermuth had any kind of conversation with
Mr. Berman, in sum and substance, that said, hey,
you know, this is illegal, and Mr. Berman saying,
Yeah, I know it's illegal, but we're going to
change it anyway, and that they were going to ask his
that question in their deposition.
Q  Do you have any evidence to support such a
good-faith basis to believe that happened?
A  That my point is that's the question about
Yeah, something like that.
A  Well, I want to know who took -- who
caused the criminal section to be taken out of the
memorandum.  I've seen some e-mails of people asking
for that to be taken out, but Miss Wildermuth
reported to Mr. Berman, and Mr. Berman was involved
heavily in the memorandum.
As we spoke to the Rachlin personnel.
A  Have you ever spoken to Mr. Gold about
that issue, the removal of the criminal penalty
section from that memo?
(Pause.)
A  Yes.
Q  What was the nature of that discussion?
A  I'm not going to reveal my discussions
with Mr. Gold, because they related to me being --
Micablila was indicted, and I was representing
Micablila in those discussions with my counsel, and
they would have been privileged.
Q  Under what ground?  How were they
privileged?  It's not attorney-client privilege, you
and Mr. Gold.  What's the privilege here?
A  If we're negotiating a plea, they're not
privileged?
Q  So you're telling, me this comes up only
in the context of negotiating in the negotiation of a
plea for -- since -- almost since the ...
A  Well, my point is, you never had
conversations with Mr. Gold, outside of negotiating
a plea; is that what you're saying?
A  No, not related to what you just asked me
about.
Q  Okay.  If that's your position, I'll
accept it.
(Exhibit 80 marked for identification.)
BY MR. DeMahy:
Q  Let me show you Number 80.

```
                MR. DeMARIA:  It came from their
        documents, right?
                MS. FRANK:  Yes.
        BY MR. DeMARIA:
             Q    When Jessica found this and showed it to
        me, I thought, this might be an easy way to go down
        the summary of events.  It came from your documents,
        so I'm asking you whether you've seen it before, and
        do you believe this to be a reasonably accurate
        summary of dates and events that occurred in this
        Presidion Solutions transactions ... which was
        updated as January of '06.
             A    (Pause.)
             A    I may have seen this document before.  I
        don't -- I don't recall it right of the top of my
        head.
             Q    Mr. Beyer did some chronology about this
        timeframe.
             A    Okay.
             Q    Around early part of '06.
             A    Yes.
             Q    Do you know if it's accurate or not?
             A    No, I don't recall seeing this document.
        We've been looking for some of Mr. Beyer's work that
        relates to a chronology of things that went on, as
        well a kind of a summary that was going to be used
        in the -- Anodoc's criminal defense, and haven't
        found it.
        BY MR. DeMARIA:
                  (Exhibit 81 marked for identification.)
             Q    Let me show you Exhibit 81, again from
        your documents.
                  We've talked about, I guess, this ongoing
        failure to pay taxes in connection with what
        Mr. Marroco may have known or not known, but this is
        a November 7, '05 memorandum from Craig Vandenberg
        to Frank Amodeo, copied to Tessa Ivy and, I guess,
        himself.
                  Tax due Monday, 11/7/05.  It says, 2005
        tax deposits revised, which seems to reflect that
        there was a continuing failure to pay taxes to the
        IRS.
             Q    Do you see that?
             A    I do.
             Q    Is that -- is that consistent with your
        understanding -- was happening at Presidion, that
        that they were not paying their taxes to the IRS?
             A    This is consistent that Presidion VII was
        not paying its taxes.  The non-paying is true up to
        this, and they also continued to report on a daily
        basis.
             Q    And my question, though, is, do you have
        any indication that Mr. Marroco knew of this? He's
        not copied on any of this.  I haven't found any
        indication that he got this.
             A    I ... don't think Marroco got any of the
        daily reports that I saw.  He only got some summary
        reports of the unpaid payroll taxes, because they
```

```
        needed the summary reports to give to the IRS.
                  Now, Mr. Holtz, on the other hand, got
        some of the daily reports of unpaid payroll taxes.
             Q    You've seen them before?
             A    Yes.  They were e-mails.
             Q    Okay.
             A    I think we produced them.
             Q    Okay.  Let me ask you this.  It's your
        position that Frank Amodeo knew that payroll taxes
        were being collected from the PEO clients in '05 and
        '06, correct?
             A    That he knew payroll taxes were being
        collected?
             Q    From the PEO clients.  The money was being
        collected from the clients that would have to be
        paid as payroll taxes?
             A    Yes.
             Q    And he also knew that those taxes were not
        being paid to the Government, right?
             A    Yes.
             Q    And he also knew that at least some of
        those payroll taxes were being used to fund MVI and
        its subsidiaries?
             A    Yes.
             Q    And he directed individuals at MVI
        regarding deposits and his direction, over this
        think he talked about his direction in over this
        2006.
             A    Actually, no.
             Q    Prior to that, there were Presidion personnel
        that were making the payroll tax deposits.
             Q    But is it your position that Amodeo knew
        that Presidion personnel were doing that?
             A    Yes.
             Q    Okay.  And he knew that the payroll taxes
        were being used for the benefit of MVI, correct?
             A    Yeah.
             Q    He also was aware of the transfer of these
        monies, right?
             A    Yeah.  He got a daily report on them.
                  (Pause.)
             Q    And I think the number you used was --
        there was over 80 million, I think you used
        $82 million?  $82 million was transferred pursuant
        to those steps that I've just asked you about;
        right?  That Frank Amodeo was involved in payroll tax
        liability was about 121 million of unpaid payroll
        taxes.  The best I can tell, all came from Presidion
        VII.
             Q    Okay.
             A    Of that, about 81 or 82 million found its
        way to Mirabilis.
             Q    And that document --
             A    Right.  And the balance found its way to Amodeo,
        Amodeo's companies, or personal expenditures for
```



0299
1   Q   And what documentation do you have that
2   shows, in these reports, the $82 million making its
3   way to Mirabilis?
4   A   My forensic accountant, compared a source
5   of funds for Mirabilis ABM, the source of funds
6   shows where the money came from.
7   Q   Okay.
8   A   Predominantly came from Presidion.
9   Q   Okay.
10  Q   Is that report now completed, that part of
11  the report?
12  A   It is not.
13  Q   Okay.  Does that $82 million of funds that
14  made it to Mirabilis, have any relationship with the
15  damages you're seeking from my client in this case?
16  A   Yes.
17  Q   What is your relationship?
18  A   Explain the relationship.
19  Q   The damage that I'm seeking is $200
20  million.
21  A   Okay.
22  A   Mirabilis, ABM and Nexus gave a joint and
23  several unsecured forfeiture claim to the U.S.
24  Government, the IRS, in all three of the bankruptcy
25  cases, for $200 million.

0300
1   A   The $200 million is made up -- was the
2   government's number.  And it's made up of sixty ...
3   $19 million of rounding, upset repeating, sixty ...
4   I'm sorry 71 million -- no -- 62 million of
5   penalties and interest; and $120 million worth of
6   unpaid payroll taxes.
7   Q   Okay.
8   A   So the $200 million claim was put into
9   the case through a composite Mirabilis ABM and
10  Nexus reached with U.S. Bankruptcy Court, and became a ...
11  right; in the unsecured forfeiture claim
12  by the U.S. Bankruptcy Court, and became a ...
13  forfeiture claim, in the unsecured forfeiture claim
14  in all three cases.
15  A   The cases have been consolidated, so it's
16  not three $200 million claims, it's one $200 million
17  claim.  And that's the damages we're seeking in this
18  case.
19  Q   Is the $2 million that made its way to
20  Mirabilis, part of the 120 million of the unpaid
21  payroll taxes that are part of the 200 million?
22  A   Okay.
23  A   Actually, not one penny has been paid on
24  right?
25  Q   Okay.  And this is an unsecured claim,

0301
1   right?
2   A   It is.
3   Q   And not one penny has been paid to the
4   U.S. Government on that claim to date, correct?
5   A   Actually, not one penny has been paid on
6   Q   Okay.
7   A   Right.
8   Q   And not the damages in this case, except
9   any claims in the case, except administrative
10  claims.
11  Q   Right.  But I'm just talking about this
12  claim, because your damages are related to
13  forfeiture, right?
14  A   Right.

0302
1   Q   And right now, I think you testified this
2   morning there's no money left in Mirabilis, right?
3   A   There's about 25, $30,000 in the account.
4   Q   And the administrative claims that come
5   before the administrative unsecured claim,
6   would come first.  The administrative claims would
7   come first, right?
8   A   That's correct.
9   Q   And you and your professionals have more
10  than $25,000 of time in it?
11  A   That's correct.
12  Q   And you and your professionals have more
13  Q   And so, assuming that the pattern is
14  followed, that administrative claims are paid first,
15  it's your expectation that, at this stage, there's
16  no money to pay that forfeiture claim, right?
17  A   Not today.
18  Q   What is your understanding of what
19  happens, if "not today" never changes.  If there is
20  never any money to pay that claim, what happens to
21  that claim?
22  A   The claims don't get paid.
23  Q   Okay.  So if the claim doesn't get paid,
24  Mirabilis is not damaged, correct?
25  A   If the claim doesn't get paid ... no,

0303
1   Mirabilis still has the liability paid ... no,
2   Q   And so what effect does it have on
3   Mirabilis?
4   A   It may put Mirabilis into bankruptcy
5   again.
6   Q   Well, Mirabilis is in liquidation mode; is
7   it not?
8   A   It is.
9   Q   That's the intent of Mirabilis, is to
10  liquidate now, right?
11  A   It's operating under a plan of
12  liquidation, right?
13  Q   That was -- the plan was that you said it
14  was approved by the bankruptcy court, right?
15  A   That's right.
16  Q   There's no plan to operate, right?
17  A   No.
18  Q   There's no plan to reorganize, right?
19  A   No.
20  Q   And so there is no future for Mirabilis
21  either way, is there?
22  A   No.
23  Q   So, aren't these lawsuits just a manner of
24  trying to raise money to pass through to the
25  Government?
1   A   Absolutely.
2   Q   That's all this is, right?
3   A   I wouldn't say that's all it is, because
4   there are other creditors, other than the
5   Government.
6   Q   Uh-huh.  Okay.  But the forfeiture comes
7   first, right?
8   A   No.

14    Q   I thought the forfeiture relates back.
15    A   For forfeiture is an unsecured claim.
16        There's about $20 million worth of other unsecured
17    claims.
18    Q   And what's your understanding of the
19    relationship between the secured and unsecured claim
20    as the Government's agreed to?
21    A   They're in the pool of unsecured claim.  There
22    are no secured claims in the case.
23    Q   Now, on these unsecured claims, what are
24    they secured by?
25
0304

1     A   There are not any secured claims in the
2     case.
3     Q   Oh, so you have pool of $20 million of
4     other unsecured claims?
5     A   Yes.
6     Q   There's no secured claims?
7     A   I got you.  There's no secured claims in the
8     case.
9     Q   So, the other unsecured claims, like the
10    same fate of the Government, if there's no money in
11    Mirabilis?
12    A   They share in the pot.  If the pot's zero,
13    they get nothing.  If it's $100 million, they share pro
14    rata.  If it's $100 million, they share pro rata.
15    Q   So, let's say you continue this litigation
16    fight against the entities you've sued, at the end
17    of the day, you have enough to pay yourself and
18    the professionals through victories or settlements,
19    just enough to pay yourself and professionals, and
20    not leave one penny in Mirabilis after that, there'd
21    be nothing to go to the unsecured creditors, would
22    there?
23    A   That would be correct.
24    Q   Including the Government?
25    A   They're an unsecured creditor.  That would
0305

be correct.

1     Q   Do you have any damages theory in this
2     case, other than what you've just described before.  Any
3     damages claim.  I don't want to say "theory,"
4     because that would be disrespectful to what you're
5     doing.
6     A   It's a claim.
7     Q   Do you have any damages claim, other than
8     what you just described?
9     A   The other damage claim that we outlined
10    was the indictment.  And I think that's specified in
11    the case.  I think... specified that.
12    Q   And the... theory or production, I'll go
13    to it if I have to, but what is it you're saying?
14    How did the indictment damage Mirabilis?
15    A   From the standpoint of - the biggest
16    damage is, I guess the inability to prosecute the
17    directors and officers' liability litigation which
18    was $25 million worth of litigation.
19    Q   How is that?
20    A   Because the exclusion clauses within the
21    D&O insurance policies, had a more strict

21    insurance -- I'm sorry, a ... a criminal exclusion
22    than the malpractice policies did.
23    Q   And this was a damage based on claims that
24    you thought you would have pursued against the
25    other than the professionals that you've sued,
0306

1     right?
2     A   Actually, this wasn't one of my theories.
3     That was one of the theories of my -- the
4     predecessors that were at Mirabilis.
5     Q   Right.
6     A   They actually notified the D&O carriers
7     and started the process of filing suit against them,
8     I ... looked at that and determined whether or not
9     to do that, but once the corporation was indicted --
10    I'm back to conversations I had with my counsel, so
11    let me stop there.
12    Q   Isn't it a fact that Mr. Meyer and his
13    colleagues made this demand long before Mirabilis
14    was ever indicted, made this demand on the D&O
15    insurance?
16    Q   Who made the demand?
17    A   Joel Jalali, I think, signed the letter,
18    as president, in the two years since that, they,
19    Q   But the demand that was made by whoever
20    made it, was made long before there was ever any
21    indictment, correct?
22    A   And the response of the insurance company
23    had nothing to do with indictment.  The response of
24    the insurance company was, we're rescinding the
25    policy because you people lied to us when you signed
0307

1     up for this D&O insurance, isn't that right?
2     A   That's the response of one of the
3     carriers.
4     Q   All right.  So it has nothing to do with
5     the indictment, does it?
6     A   Actually, the -- even though they made
7     that response, in the two years since they,
8     have not returned premiums, and our position is they
9     have not rescinded the policy.
10    Q   Okay.  Now, do you blame any of, do
11    you blame them in any way for the failure of the D&O
12    insurance to provide any coverage in this case?
13    A   Well, I blame the professionals.
14    Q   Yeah.  Are they a cause in any way?
15    A   [Pause.]
16    Q   Of the loss of the D&O coverage?
17    A   Yeah.  'Cause I asked you what your
18    damages were and you said that that's part of your
19    damages.  I'm trying to understand how my guys are
20    responsible for that.
21    A   If your guys hadn't advised the Mirabilis
22    group to continue in these activities, Mirabilis

never would have been indicted, and never would have

2     had the ability, or never would have indicted --
3     been indicted, and the D&O coverage would have still
4     been there.
5     Q  What would the D&O coverage have been for?
6     There wouldn't have been a claim.  You wouldn't have
7     been hired.  There wouldn't have been a bankruptcy.
8     So where are we going with this?
9     A  Because the claim is only because of you creating
10    it.  So how can that be a damage?  Explain that one
11    to me.  You've been around a while, you're a pretty
12    sophisticated guy.
13    Q  What's the actual damage?
14    A  All right.  Thank you.
15    Q  Any other damage besides the two that
16    you've described?
17    A  I don't.  They're the two we listed.
18    Q  Okay.  There's no others you have in your
19    mind at this point?
20    A  Not that I recall.  I mean, the suits
21    speak for themselves, but those are the two I
22    recall.
23    Q  Okay.
24    (Pause.)
25

0310

2     aware, in March of 2006, that there was a
3    $70 million tax liability owed to the government?
4    And to be specific, March 23, 2006.
5    Q  I'll tell you why I asked it.  I'm not
6    just pulling questions out of thin air.
7    Give me some more information rather than
8    setting me up.
9    A  No, it is not a setup.  Your attorney
10    asked Mr. Holtz about that.  And I don't have these
11    videos, but the questions which I got from the
12    transcript was, he said Mr. Holtz, was there a
13    March 23, 2006 meeting where Amodeo said there was
14    a $70 million tax liability and your attorney
15    referred to a video.
16    Q  Yes.
17    A  So my question, my first question is, is
18    it your position that there was such a meeting, and
19    that Mr. Amodeo told my client that there was a $70
20    million tax liability?
21    Q  Well, I watched the video of the meeting,
22    And Mr. Amodeo didn't specifically tell Mr. Holtz,
23    who was in -- sitting in the meeting, that there was
24    a $70 million tax liability.  What he did was, he
25    walked into the room, and the meeting was in

2     process.
3    Q  Uh-huh.
4    A  Mr. Bersam was in the room.  Mr. Boyer was
5    in the room.
6    Q  Uh-huh.
7    A  And Mr. Amodeo made the statement that,
8    you think your day was bad -- I'm going to
9    paraphrase this, because this is --

---

9     Q  We'll get the video at some point.
10    A  I mean, everybody's going to see the
      video.
11    Q  And -- then he made the statement:  You
12    think your day was bad, you should be me.  I had
13    a -- I got a 70 -- and I think it's a $71 million
14    tax liability problem with the IRS.
15    A  Yeah.
16    Q  I think it's very significant that half the room
17    starts laughing, because if I heard that statement,
18    and I didn't have any prior knowledge, I wouldn't
19    have started laughing.
20    A  Because of the common knowledge of the
21    amount of the tax liability that the Sunshine
22    Companies owed, as of that time?
23    Q  Less than 52 million.
24    A  Less than 52 million.
25    Q  So then, in your view of this case then,

0311

1     if somebody heard 70 million, they had to be
2    thinking, this is something more than the Sunshine
3    Companies' liability?
4    A  That wasn't Sunshine Companies' liability.
5    Q  How do you know?
6    A  The Sunshine Companies' liability had been
      resolved at that point.
7    Q  By Butch of '06?
8    A  Yes.
9    Q  Did anybody ask any questions in
      this video?
10    A  Nope.  Meeting kept going.
11    Q  So, is this a -- is this a piece of
12    evidence that you used that you rely upon to say
13    that there -- that these people were -- reason to know
14    that payroll taxes weren't being paid?
15    A  It's one of them.
16    Q  Okay.  Do you have any documentation to
17    support what happened at that meeting, other than
      this video?
18    A  The minutes don't reflect that comment.
19    Q  Okay.
20    A  The only knowledge I have is the video
21    itself and ... let's see, we've deposed ... a couple
22    of people that have been in the meeting so far.
23    Q  Okay.
24    A  And ... let's see ... I think one says he wasn't in
25    the meeting, Mr. Holtz said he was in the meeting,

0312

1     but ... didn't recall the comment.
2    (Pause.)
3    A  And Mr., who was -- I believe who was in
4    the meeting, but doesn't recall the comment.  And I
5    think we got the same response out of Halletcross and
6    Curry.
7    Q  Let me ask you this question.  This is a
8    board meeting, right?
9    A  This is a board of directors.
10    Q  It was at a time when Mr. Holtz had become
11    chairman of the board, right?  In March of '06.
12    A  It's March of '06, and ... let's see.
13    He's president from, I think January '06 to around

December '06.  So I think he's president and also a
board member.
Q   Number one, you would agree Mr. Marrero
wasn't at that meeting, right?
A   No, Mr. Marrero was not at the meeting.
Q   No other Rachlin Cohen employee was at
that meeting, correct?  Is what you saw in the
videotape?
A   I can't identify Sharmila Khanorkar, and
her office was in Mirabilis at that point in time.
And I -- there were a lot of people in that meeting,
I can't answer you one way or the other.
Q   But, as you sit here today, you have no
evidence that she was there?
A   Correct.
Q   Okay.
A   I have a -- I believe, on that meeting, I
have a detail, by person, of who is sitting at the
table.
Q   Let me ask you this question.
Hirabilis.  And Miss -- how do you say her last name?
A   At the time, Mr. Holtz was chairman of
A   Let's call her Sharmila K.
Okay.  At the time that Sharmila K. was
working at Mirabilis and providing accounting services for
that they were providing accounting services for
Rachlin Cohen, that Rachlin Cohen was separately
billing Mirabilis for, at the time it, March of '06?

A   Okay.  Let me restate that, 'cause the way
you asked the question --
I'll make it simple and --
A   No, no, no.  I understand the question.
Q   You know where I'm going with this.
You just flipped to the client was to
Rachlin.
A   I'm sorry.
A   The client is Mirabilis.
Q   Let me try it again.  Mirabilis, we all
know, at a certain point in time, provided services
to Mirabilis right.
A   Rachlin provided services.
Q   No, Mirabilis -- I'm sorry.
And we know that, at a certain point in
time, Mr. Holtz was on the board of Mirabilis?
A   Correct.
Q   All right.  And we know, at a certain
point in time, Sharmila K. was working for
Mirabilis being paid by Mirabilis?
A   Correct.
Q   My question is very simple.  Based upon
your review of this case, including our bills, is it
your position that, in this early 2006 time period,
Mr. Holtz and Sharmila K. were working, doing any
work for Rachlin or Mirabilis at the same time that

they were working for Mirabilis, or was it separate
at that time?
(Pause.)
A   Let me make sure I understand the
question.
Q   Okay.
A   You're asking me if they were employee --
during the time when they were employee --
of Mirabilis.
Q   Correct.
A   was working for Mirabilis -- in other words, Holtz
-- and Sharmila was working in whatever
her position was --
Q   Correct.
A   -- whether they were billing under the
Rachlin timeframe at that point in time?
Q   Correct.  Do you have any indication that
was happening?
A   I haven't -- gone back to try to take the
e-mails and integrate them with the time sheets.
Q   Okay.
A   But actually, I do believe that was
happening, because there were time billing records
during the time period that they were in Mirabilis's
offices, but I haven't gone through to, you know, do
an hour-by-hour-type review.  There was stuff going
back and forth.  Sharmila seemed to be one of those

people on the street for Mr. Brueckmann and
Mr. Holtz.
Q   What does that mean, "people on the
street"?
A   She was in the offices a lot, of Mirabilis
a lot, so she sent a lot of information back to the
Rachlin Cohen office in Orlando -- I'm sorry, in
Miami.  For instance, some of the cash reporting.
Sharmila was getting some of the daily cash
reporting and sending that to Mr. Holtz or
Mr. Brueckmann.  And that's why I -- remember
looking at how much capital some of those
acquisitions were going to take.
Q   No, I think I remember that this morning,
firm stop performing services for Mirabilis?
A   And I don't know the exact date.  We have the time
records --
Q   -- which would tell us, but I don't
recall.
A   Yeah.
Q   I could show it to you.  The time records
are prior to March of 2006.  They stopped billing
before then.  Is it your position that even though
they weren't billing, they were continuing to
provide services?
A   I ... I haven't looked at the time records

to answer the question.

Q   I mean, do you have any basis -- if we were to show-you the records, or you were to analyze them yourself, do you have any basis to believe that the Backius firm was providing services without billing for it?

A   I can't tell. That would be a little bit remarkable, wouldn't it, for a professional services firm.

Q   Well, actually, Natero testified that he did precisely that; that he only billed what he thought was reasonable, even though he might have spent time on this project.

A   Yeah. I think there's a little bit of difference between not billing all of your hours on a project, and not billing anything if you're working on a project. You see the difference?

Q   Okay.

A   And it would surprise me. I mean, to be candid with my answer, it would surprise me if they did any work and didn't bill for it.

Q   Okay. In your deposition of Mr. Holtz, you refer to an -- your attorney referred to a first controus meeting on April 20, 2005. Is it -- are you taking a position in this case, there was a meeting in April of 2005, that might have been referred to as a first meeting, that has any significance with regard to the legal cases you've taken against the professionals?

A   Yes.

Q   What is it?

A   The meeting is a video -- it was a videotaped meeting again. And I watched the videotape of the meeting. It's a long meeting, a couple of hours. And it was actually an explanation -- it was an introduction, about an hour of introduction of all the players, and there might have been 50 people there, including Mr. Holtz and Mr. Norman.

And the first hour of the meeting was an introduction of everybody and what they planned to do in Mirabilis. And the second hour, the meeting basically was Frank Amodeo out to the Mirabilis plan.

Q   Was there anything in that video that you saw that reflected to a listener at that meeting that Frank Amodeo didn't intend to pay payroll taxes on an ongoing basis, at least temporarily?

A   No. The biggest question in the meeting was: How you're going to pay for it?

Q   Okay. Let me ask you about: these videos was this guy what, was he Richard Nixon, taping all these people?

A   Yes. Actually, he was.

for a moment.

Q   And you understand that tapes could be doctored or could be modified, right?

A   I do.

Q   Have you hired any type of an expert who could authenticate these tapes to determine if they've been doctored or not?

A   I have not yet.

Q   All right. And we're talking about Frank Amodeo, a now-convicted felon that was in charge of these tapes, right?

A   For Mirabilis, yes.

Q   People that worked for him, or actually worked for Mirabilis -- actually, people that worked for Mirabilis were directly for Amodeo, not people that worked directly for Amodeo.

Q   But my understanding is that, by early '07, after the Government investigation surfaced, Mr. Amodeo, by his own statements, was trying to work, cooperate and gather information for the prosecutor and the IRS, correct?

A   Yes.

Q   Do you have any confidence that Frank Amodeo wouldn't have doctored tapes to serve his purposes?

A   Do I have any confidence ...

Q   Do you have any confidence any confidence that Frank Amodeo, the twice-convicted felon, that he wouldn't -- I have no confidence in Frank Amodeo, whatever he said no confidence in Frank Amodeo.

Q   So, if Frank Amodeo had access to these tapes that you've now reviewed, and you believe reflect evidence of conduct that supports your case, would that in any way cause you concern that maybe you shouldn't be relying on it?

A   Not really, because one of the people that is working for me -- is a IT person that was ... involved with the tapes. He's still working for me. He was a Mirabilis IT person.

Q   Who's that?

A   Barry Lynch.

Q   Okay.

Q   And there are about 20,000 hours of tapes.

A   I-- hmm --

Q   They were primarily shot in three locations. The SunTrust main conference room, the Machovia conference room, Frank Amodeo's office, were the three major locations. There was also some covert videotapes that have access to and they're not in my possession, and I've never seen then.

Q   Then how do you know they exist?

A   I have been told about them.

Q   Okay.

A   And again, the person that told me about them, who supposedly had possession of them, is Mr. Amodeo.

Q   Okay.

A   So, as I stated before, I don't

18 necessarily have confidence that they exist.
19　A　Wait, wait. He has possession of nothing
20 right now, other than his toothbrush. I mean, so it
21 would be Mr. Slaughter, I guess, has possession --
22　A　Actually, he has a laptop and he has ...
23 removable hard drive, and he has a lot of things.
24　Q　The position of Mr. Slaughter, you're saying, is in
25 possession of these?

0322
1　A　No.
2　Q　Let me ask you this question.
3　A　Actually, Mr. Slaughter is not in
4 possession of these.
5　Q　Okay. Let me ask you this question.
6 According to Mr. Amodeo.
7　Q　When you're involved as a debtor in
8 possession, you had the right, in this bankruptcy,
9 under Section 2004, to take examinations of people,
10 right?
11　A　I did.
12　Q　And as I understand the law, you could go
13 fishing with those examinations, unlike
14 depositions -- unlike depositions in lawsuits that
15 have a limitation. The purpose of a 2004
16 examination is to go fishing, in essence, right?
17　A　Correct.
18　Q　You didn't do that, though, did you?
19　A　Actually ... I didn't need to.
20　Q　Really?
21　A　Yeah. I have -- I had a ... when I
22 started the case, I created what I call a target
23 list -- of people I wanted to do 2004 examinations.
24 And I so that in every case, not just Mirabilis.
25 And I created such a list. And I started working

0323
1 down the list. And I had essentially two results.
2 One is people voluntarily came and talked
3 to me.
4 And number two, people told me -- or,
5 actually, their reporter told me their ... criminal
6 attorney told me that they would not allow their
7 criminal attorney to talk to me, and if I subpoenaed
8 them for a 2004 depo, they'd just take the fifth
9 Amendment.
10　Q　So I didn't -- I haven't had any 2004
11 examinations in the case.
12　Q　Now, let me ask you this. My client
13 didn't take the fifth Amendment, did he?
14　A　Okay. Now, let me ask you this.
15 Actually, your client didn't have a
16 criminal attorney, that I know of --
17　Q　Let me ask you this. The only time I know
18 of, other than when you're the federal prosecutor,
19 and you have a grand jury subpoena power, and you
20 get to go searching and fishing and taking
21 discovery, is this 2004 examination, that you had
22 the power to use.
23　A　Correct.

0324
1　Q　And I'm trying to understand, were you
2 just so confident on what you saw at the beginning
3 of this bankruptcy proceeding, and so sure of what
4 you saw, that you didn't need to take this discovery
5 vehicle that was available to you, and put people in
6 the position of answering these questions or taking
7 the fifth and being able to draw adverse inferences
8 against them; is that what was going on?
9　A　Actually, that's a legal determination on
10 whether I want to do that, whether I want to take a
11 voluntary statement, and the reasons to do that, or
12 not to do that, and I chose not to take 2004
13 examinations.
14 ...
15 and told me that they wasn't going to answer
16 questions, I took that as I didn't want to waste
17 the time and the money to have a bunch of fifth
18 Amendment answers on a tape, or on a transcript.
19 And the people that I did want to talk to
20 to -- actually, everybody that I've asked to talk to
21 me, that their criminal counsel hasn't advised them
22 not to, have voluntarily talked to me.
23　Q　And you used the word "statements." So
24 did you take formal statements of these people?
25　A　Because I understand your position, which is, I got

0325
1 somebody who's willing to talk to me, I don't need
2 to do the 2004; I'll just -- I just take a
3 statement. So, did you take formal statements?
4　A　By formal statements, you mean a
5 recorded statement with a reporter there?
6　Q　You tell me.
7　A　A statement can be any
8 number of things. You tell me what you did.
9　Q　All right.
10　A　Whether it was a reporter or a video or
11 you took notes, tell me what you did.
12　A　All right. I took no unsworn statements
13 with a reporter; I take no -- I just take a
14　Q　So you didn't take any statements where
15 the reporter would sit there and take it down, but
16 not under oath?
17　A　But not under oath.
18　Q　Did you take any sworn statements with a
19 court reporter?
20　A　Depositions, yes.
21　Q　Depositions where there were -- where
22 somebody -- done litigation, yes.
23　A　Yeah. All the depositions I've done,
24 there was a litigant on the other side.
25　Q　I don't mean the depositions in this

0326
1 litigation which we've talked about. I'm talking
2 about back in the stage of in the -- the pre-litigation
3 stage, did you take any sworn statements?
4　A　No.
5　Q　Okay. Did you take any written
statements, affidavits, or written statements?

6    A   I did receive some affidavits.
7        (Pause.)
8    Q   From whom?
9    A   I have to go back and look. I mean, we're
10       talking two years ago now.
11   Q   Anybody that you're relying on in this
12       case as having your basis to proceed?
13       Just in the Rachlin case ... let me think about
14       this for a minute.
15       (Pause.)
16   A   Yes;
17   Q   Whom?
18   A   I think there are three affidavits that
19       I'm relying on that were from the board of directors
20       in the early '05 timeframe.
21   Q   And what from those affidavits -- I mean,
22       I'll ask you about them in a minute. And Bob
23       and I will talk a little bit, but I don't think
24       they're privileged. I'm just trying to get an idea
25       what you're relying on against my clients --

0227

1        the court file that case from Mike Moyer, and
2        you're welcome to a copy. Chuck has copies, I
3        think.
4    BY MR. DeMAIO:
5    Q   Okay.
6    A   So other than those affidavits --
7    A   They're used in all cases, and they were
8        affidavits that were done prior to me coming into
9        the case.
10   Q   Okay. Anything that -- anything other
11       than those affidavits that you've taken, any sworn
12       statements?
13   A   They're the only sworn statements.
14   Q   Okay. And for the unsworn interviews, is
15       it basically somebody taking notes of what you're
16       being told --
17   A   Yes and no.
18   Q   Okay.
19   A   So --
20       Tel: me the yes part. Who takes the
21       notes?
22   A   I -- generally, when I do an interview, I
23       take notes. And this wouldn't be true in all cases,
24       because, for instance, the three times I met with
25       Frank Amodeo, I was not allowed to take any paper,
0228
1        pencil into the jail, and so I couldn't take notes.
2    Q   Could have typed it up on his computer and
3        just taken -- right?
4    A   Actually, the computer is in the law
5        library, I think.
6    Q   So I don't think a visitor is allowed in
7        the law library. You have to be a prisoner to have
8        that privilege.
9    A   Yeah.
10   Q   Exactly.
11   A   No; I don't want that privilege.
12       You have to be in prison to get it.

13   Q   And no recorded statements, right?
14   A   The only recorded statements would be the
15       warehouse, that was in existence when I look over,
16       had audio and video recording in it. That was put
17       there at the request of the Government, because of
18       the grand-jury documents.
19   Q   Just to keep an eye on things?
20   A   It records audio and video. It's voice or
21       motion activated.
22       Jessica -- and I told her this right when she walked
23       in -- has audio and video recording.
24   Q   Right. But what I'm getting at, though --
25   A   And they do it for the warehouse. For

0229

1        instance, Jessica -- and I've talked to other people
2        in that, but it was recorded.
3    Q   Got you.
4    A   But I mean, it's not recorded like I'd
5        have a videographer here recording it. Generally, I
6        take notes when I meet with people, when I cannot
7        take notes, for instance, when I met with Amodeo, I
8        would write my notes later from my memory.
9    Q   Let me ask you this, just to close off
10       this issue of the warehouses.
11   A   Was there ever a time where you happened
12       to have seen this conversation on the warehouse that
13       afterward you thought, hey, that's a pretty good
14       conversation, and you went back to, you know, run
15       the proverbial videotape to try to save it, anything
16       like that?
17   A   Well, the videotapes aren't destroyed;
18       they are saved.
19   Q   All I'm asking is, as of this date, as we
20       sit here, did you have any random conversations or
21       interviews in the presence of these cameras or
22       videos, that you went back to and said, hey, that's
23       really good, I want to preserve it.
24   A   I have never gone back to one yet.
25   Q   Okay. Now, in your deposition of

0230

1    Mr. Holtz, your attorney also referred to a
2    January 16, 2005 confidential memo. There was at
3    least a question that was asked of Mr. Holtz. Does
4    that ring a bell asking that you've seen or
5    rely on in these cases. There was no exhibit shown
6    to us. It was just mentioned.
7    A   I'd have to look at it.
8    Q   Well, here's a January 16th memo. I've
9        looked at thousands of reams in this case.
10   A   It's that something that you've seen and
11       you're relying on as evidence in this case?
12   Q   I'm just asking if you know something
13       there was also a reference made to an IRS
14       tax lien notice to PBS in June of 2006, that was
15       referred to in the question.
16   A   You know, when you say a January 16th memo, I've
17       seen something that you've seen and
18       you're relying on as evidence in this case?
19   A   I have seen the tax lien. And that was
20       circulated about with the Rachlin Cohn firm.

Q   And how much was that lien for?
A   I do not recall the amount.
Q   And do you have position is Ruchlin was aware
of that lien in June of '06?
A   I don't recall if they were aware of it at
that point. I think the June '06 may be the date on
the lien.
Q   When do you think they were aware of it?
A   I don't know.
Q   What have you seen that indicates that
they were aware of it at any time?
A   Well, Marrero was dealing with Judy
Berkowitz, and the whole question of payroll tax
liabilities and liens for President. That was
the whole question of what Marrero was dealing with.
Judy Berkowitz about.
Q   Okay. We will leave it at that.
Sunshine Companies?
A   They were owned by President Corporation.
Q   I thought he was dealing with all of the
Sunshine Companies?
A   But I thought these were liens that had to
do with PBS.
Q   Actually, she was -- Marrero was dealing
with the tax liability. Berkowitz later evolved
into dealing with the PBS liabilities. Again, the
timeframe whether -- Marrero's statement in his
deposition was, he wasn't involved with that.
A   However his time records didn't indicate
that.
Q   Forget what they didn't indicate. What
positive evidence do you have that Mr. Marrero was
involved in Miss Berkowitz's case on the PBS tax
liabilities in mid 2006, to be distinguished from
the Sunshine Companies tax liabilities? Do you have
anything?
A   Marrero's time records, going into the
fall.
Q   Yes.
Q   And so you believe that reflects him
working on the PBS tax liabilities?
A   Working on it --
Q   Or maybe --
A   Working on it, being aware of it, you
know, it's a little sketchy. I -- you know, his
time records were that after spending lots of time.
His account was that after June or July,
when Dan Myers took over the passing of documents to
Judy Berkowitz, that all he did was handle IRS
notices that would come to him, pass them on to Dan
Myers, and then Myers would give the documents. I
think that's the statement he made in his
deposition.
His time records indicated that he did
more than that, but without going back and looking at the

0332

detail --
Q   And I got a question. What does it take
for you to show you what the time records were, other than
the man who filled out the time records who said,
this is what I did? Do you believe Mr. Marrero was
lying to you in his deposition?
A   No. I think the time records speak for
his best recollection of what happened. What
stated, and his time records didn't quite gel.
Q   Do you have any witness or anybody that
interprets Mr. Marrero's time records differently
than he interprets his own time records?
(Pause.)
A   No. I think the time records speak for
themselves.
Q   Okay. We'll leave it at that.
Mr. Holtz's deposition to the Piper Project -- do
you know what that is?
A   No, we were fishing.
Q   Okay. But where did it come from? I
mean, it was chum, but I didn't understand what it
was.
A   I don't, either.
Q   I never heard about that.
A   That's why I asked him about it.
Q   Well, why didn't you ask him about the Joe
Jones project? I mean, you used the word, "Piper"
for a reason.
A   I came up -- the Piper Project was in some
of the documents and about a half hour, obviously, I
he and Bream and Azcomo were the shadow executive
committee, I figured if anybody know, one of those
three would.
Q   So you have no understanding of what that
was?
A   No, I don't.
Q   Okay.
      MR. WIDMAN:  Let me ask you a question.
      MR. DeMARIA:  Yes, sir.
      MR. WIDMAN:  I don't know where you are in
   your deposition. The Rule gives you seven
   hours. We had about a half hour for lunch, I
   don't want to cut you off if you're obviously, I
   don't want to cut you off if you're --
      (Discussion held off the record.)
      MR. DeMARIA:  Here's where I am. We
   should be --
      MR. WIDMAN:  Okay.
      MR. DeMARIA:  I want to go through, which
      THE WITNESS:  Okay, because the
   engagements. And then I have some questions by
   Ruchlin. I want to just show him those
   Mr. Glover, and I'm pretty much getting through.
      MR. DeMARIA:  Let's do this quickly.
Give me the section three stuff.

0335

0336
1      THE WITNESS:  If -- can we go off the
2  record?
3          MR. DeMARIA:  Sure.
4          (Recess.)
5          (Exhibits 82 through 104 marked for
6          identification.)
7  BY MR. DeMARIA:
8      Q  Mr. Cuhaji, I put before you Exhibits 82
9  through ... 104.  Okay.  And I will tell you what
10 they are, and I tried to put them in chronological
11 order, which is, a set of documents that would
12 consist of either any correspondence
13 letters with due diligence reports, and then with
14 billing records at the end, so that I could try to
15 have a scope of the universe of documented
16 information that was within the file and doing for
17 Mr. Amodeo and for Mirabilis, the work they were
18 performing, other than what we've talked about with
19 Mr. Harrero and the dealings with the IRS.
20     A  Understand where I'm going at?
21     Q  Yes.
22     A  All right.  And I understand that, in this
23 case here, you're not effectively challenging any
24 of the work that was done in the due diligence.  For
25 example, you're not saying, on behalf of Mirabilis,

0337
1  they committed malpractice because they did a bad
2  due diligence regarding a particular acquisition;
3  you're not saying that, right?
4      Q  No, I didn't say that.
5      A  Well, have you sued, for example --
6      Q  I did not sue anybody for bad work on due
7  diligence.
8      A  Correct.
9      Q  Okay.  And those acquisitions, there were
10 specific acquisitions done on a number of entities
11 that were being purchased by Mirabilis; Presidion,
12 Kadac, H&R Security Systems, DVD Marketing,
13 RMC, Cedar Park, a variety of entities that
14 Mirabilis was purchasing, right?
15     A  Correct.
16     Q  Let me ask you this question.  What was
17 the business plan for Mirabilis to purchase these
18 entities?  I've read enough information I've read
19 Frank Amodeo statement: of this integration between
20 businesses that would need FBO services.  What was
21 your understanding of what that plan was, when you
22 look back after the fact?  Or was he just buying
23 toys?
24     A  You're asking me to give you my opinion of
25 what somebody else had in their mind.

0338
1      Q  No.  Your view of what was going on.
2      A  I was also a financial person.
3      Q  What was written down.
4      A  Let's start with that.  --
5      Q  -- as the business plan, was to create a
6  venture capital company that was based on the
7  capital genesis model.  The capital genesis model
8  was defined within the paperwork of the organization
15 as what I would call synergy by companies using each
16 other's services and creating efficiencies in doing
17 so.
18     The ... business plan of Mirabilis had
19 Mirabilis expanding into a worldwide company doing
20 over a billion dollars a year, within five years,
21 and having in excess of ... 5,000 employees, and a
22 office location within 100 miles of every populated
23 area in the world within a five-year period.  That
24 was what was written down.
25     Now, whether that was ... I think you

0338
1  asked what was Amodeo's plan or --
2      Q  Yeah.  Well, based on the evidence you've
3  reviewed, what was his plan.
4      A  My -- my personal opinion of what
5  what I think Amodeo was doing, other than
6  self-aggrandizing.
7      Q  Okay.
8      A  My -- my personal opinion of what being a
9  big guy, big shot.  And he had a lot of money to do
10 it.
11     Q  To you, did that self-aggrandizement come
12 across to somebody who would see his back in that
13 time period?
14     A  Absolutely.
15     Q  We see his now.
16     A  He see his now.
17     Q  But we ... that's ... your clients.
18     A  That's what I'm getting at.  But we see
19 him now, after he's been indicted and convicted and
20 statements he said about himself, but you're saying
21 that you believe his self-aggrandizement was visible
22 in '05 and '06?
23     A  Certainly.  For instance, when we deposed
24 Mr. Holtz and Mr. Harrero, we asked them about the
25 Empire cash reports.  Mr. Amodeo was a Star Wars
26 aficionado, and he called the -- his organization

0339
1  "The Empire".
2      Q  Okay.
3      A  And "The Empire" became widely used within
4  the organization, from some of the written documents
5  that I've seen.
6      Q  Okay.
7      A  Now; I might have seen -- actually, I've
8  done -- I've done document searches using the word,
9  "Empire" or -- and I've had, I mean ... maybe over a
10 thousand hits in the documents in the warehouse.
11     Q  The warehouse?
12     A  The gist of what I'm trying to say is:
13     Q  The use of what I'm trying to say is:
14 companies.  Amodeo, in his mind, considered
15 everything one thing.  The people working for him
16 didn't necessarily, but one of the things they did,
17 specifically, was create something called an Empire
18 Daily Cash Report.  And it has a cash report of
19 Presidion -- the President, all the Amodeo
20 companies, and all the Mirabilis companies, and it
21 consolidated it into one combined total, the Empire

total.

Mr. Holt:  This was one of the cash reports we asked
Mr. Boreman, as well as Mr. Haenower, and
        these were being circulated to your firm, including

Mr. Druckmann, Sharmila K.  -- Rhenooker, and
cash report go to Mr. Marrero.
        Q    Okay.  Don't you think, though, it's a
little bit strange to be getting cash reports to look
that Mr. Remdeo's been convicted, is in jail, to look
back and pick up, on the use of the word, "the Empire,"
and say that, as you seem to be suggesting, that "The
Empire" is a reflection of this business as "The
Empire," that should be a reflection you're doing
with somebody who's not on the up-and-up, somebody
who is a crook; don't you think it's a little
bit?
        A    I didn't say, because he was using the
term, "Empire," that made him a crook.  But anybody
that calls themselves an Emperor, in my book would
be self-aggrandizing, because I haven't known very
many reports, due diligence and bills.

        Q    All right.  In the -- what I -- what we
did off the record, so I can move this quickly, as I
asked -- I know you're busy, when you got
some time after this deposition, look at that with
the information you have, and if you have any other
engagement letters, due-diligence reports, written
work product, other than these discussions with the
IRS, which we already deal with, or bills that you
say would show the scope of the work that Rechlin
was doing, if you could then have Bob give that to
me, and we can do --

        MR. WIDMAN:  Yeah.  The only problem is,
written work product is kind of a broad term.
I have --
        MR. DeMAIO:  That he's relying on.
        MR. WIDMAN:  Okay.  Bezze -- I mean,
there's a lot of e-mails, there's a lot
of e-mails, you know, there's a lot of e-mails, --
of e-mails, there are a lot of financials, --
have no problem with engagement letters and due
diligence, and -- but when you say "written
work product" --

BY MR. DeMAIO:
        Q    I'll make it easier.  I'm not asking you
to go and look in the 5,000 documents or boxes,
whatever they are, of documents or the data, to try
to find information that may be responsive.

---

I'm saying as you sit here today, you
you believe you have a good-faith basis to proceed
in a claim against my clients.
        All I'm saying is, in that galaxy of
information within the universe that's out there, of
stuff that you're aware of, if you were
aware of, if you were already relying on in this category that I may have
missed, that's what I'm looking for.  I'm not asking
you to go and look for more and find more bases for
your lawsuit, but if there's something up front you
think is important to your client, and you have
work Rechlin performed for Mirabilis or Remdeo, and
if it, because that's something you're relying on.
        A    Well, let me see if I can answer the
question this way.  To start with, I don't have the
time or the inclination to do searches for you in my
warehouse.
        Q    I'm not asking you to.
        A    You are.  Okay?  The due-diligence work is
not a part of the substance of what I'm litigating
about.
        Q    Okay.
        A    And whether -- and I will tell you that I
believe there -- and I believe there right here is not all the
due-diligence documentation.
        Q    Okay.
        A    It's not even close to it.
        Q    Because I've seen more than this?
        A    Because I've seen more than this, I mean,
instance, there's tons of correspondence back and
forth on these -- acquisitions between your firms and
the Mirabilis folks, about those acquisitions and
the due-diligence work that's going on, including
members of your firm, two members of your firm that
I have copies of e-mails, because your members --
        Q    I'm using your firm, incorrectly.
        A    I got it.
        Q    The Rechlin firm were using Mirabilis's
e-mails, okay?  Well, I have e-mail archives for the
entire system.  So I know there was more than this.  But,
for me to go look for it when it's not even part of
my litigation --
        Q    Let me ask you a different question.
        A    -- seems like a waste.  However, I will
say that most of what my litigation revolves around,
there were no engagement letters or at best, they
were sketchy.  And I will look at the bills, because
I think that you bring up a very valid point.  The
last date on these bills is April -- the end of
April '06.  I think you said it was like March of
'06.
        Q    It's a little bit in April.  Yeah.

April '06.
   A  The last one I see is like the end of

0315
10   A  Right.
11   A  Yeah.  And I'll compare that back to the
12  payments out of the Mirabilis accounting system, and
13  see if I can tie that together.  I also have
14  Andreo's accounting system, too.
15   Q  Okay.  That's fair, because, you know,
16  while I'm going to stick with Mirabilis, because I
17  do believe, to the extent that my client had duties
18  to Mr. Andreo as well as with Mr. Amodeo, that he's
19  in talking about here to the issue of the Mirabilis
20  billings, that's fine.  So there's something on the
21  billings, if you can compare it and you have something on the
22  billings, that's fine.
23   A  I'll go one more step.  You say you have
24  access to these e-mails to do searches.
25  done?

   A  Yeah.  I gave Jessica the index to that.
   Q  Right, but how would those searches be
conduct a search, is that something that can be
done?
   A  Yes.
   Q  Okay.  All right.  We'll save it for
another day.
   A  Yeah.  I mean, let me answer this question
'cause it may help everybody sitting here.  And I've
been asked this question before.  I think Mr. Holtz
asked me how do I get some of the electronic
media, how do I get copies of some of the hard
drive?
    For instance, if you want the hard drive
that has the e-mail archives on it -- and I think I
answered that on the hard drive -- we
can -- we can't give it to you, and we can't let you
operate it in the warehouse, because it's grand-jury
evidence, and if you touch it, you've contaminated
it.
    So, what we need to do is, we can have my
IT guy copy it, so you have to pay him a fee.  And
you have to pay him the cost of -- he'll copy it
onto a thumb drive or something and give it to you.
   Q  Okay.  That's fair enough.
   A  Yeah.  And I think we give you a price on
doing some of that electronic -- I think it was your
firm.
   Q  Well, let's take a look --
   A  Well, let's --
   Q  Let's take a look at Exhibit 83, just one
question.  This is the very first due-diligence
report.
   MR. MIDANI:  By the way, when you say,
"due diligence," the due diligence that you say
have produced is massive.  Every time they
purchased a company, there's a file --
   A  It's -- I'm not
talking about a scope of engagements, okay, a
particular report for -- again, look at 83;

0316

   MR. MIDANI:  Okay.
BY MR. DeMARIA:
   Q  One question I have for you.
    Because I have one question for you.
    Our engagement -- this is the very first
one we could find.
    On April 29, 2005, Rachlin Cohen and Holtz
was engaged to perform due diligence procedures on
behalf of Mirabilis Ventures, pursuant to a
February 15, 2005 letter, submitted to Provise,
expressing its interest to invest in the company.

0317
   A  Um-hum.
   Q  Now, take a look at page 15 of this
due-diligence report, Exhibit 83, which is RCH
1946.
   A  What's the page number?
   Q  Fifteen.
   A  This report isn't on anybody's letterhead,
and it isn't signed.
   Q  I agree with you.  This is what I got, but
I will tell you, that's all the reports that we
have.
   A  Okay.  I mean, is this what was issued, or
is this just something of the computer?
   Q  This is something that was produced to the
grand jury.
   A  Let me direct your attention to right
before and use tax; do you see that?
   A  Yes.
   A  And in the block, it says:  The company
should request from its taxpayer account.  The
determine the status of its taxpayer account.  The
company should not use trust funds for operations,
and it should obtain alternative sources of working
capital.  The company should also follow the
prescribed rules and regulations regarding --
   Q  Can I stop you?
   A  Yes.
   Q  I'm not following where you are.
   A  On page 15.
   Q  Oh, in the block.
   A  In the block.
   Q  All right.  And the company is Provise.
   A  Yes.
   Q  The acquisition target.
   A  Acquisition -- this report telling -- telling
The short site for the company is Provise, okay?
   A  Yes.
   Q  Here's what Provise should not use
Mirabilis in this report that Provise should not use
trust funds for operations.  And it should obtain
alternative sources of working capital.
   A  The company, meaning Provise, should also
follow the prescribed rules and regulations
regarding timely filing of tax returns and payment
of tax depositories.  The company should obtain
state unemployment taxes timely, and it should also
follow the prescribed rules and regulations
Now, my question to you is, sir, if this
was what Rachlin was telling his client, Mirabilis,

24    with regard to the way its acquisition targets
25    should be managed with regard to the payment of

0349

1     these IRS obligations, is it your position that it
2     was telling Mirabilis it's important to have your
3     acquired target act that way, but is it's okay for you
4     to act a different way?
5         A     Well, let me answer the question this way.
6     This report has to do specific with this acquisition
7     target, and if you look at two paragraphs above
8     this, it's apparent that this company is not paying
9     its payroll taxes on a timely basis.
10        Q     Uh-hum.
11        A     And they're pointing that out.     And I
12    think it's very important that they're pointing that
13    out here, because the acquirer, Rachlin and Cohen knows
14    that it's incorrect to do this.
15            Now, they're pointing out to the acquirer
16    that the target is not paying their payroll taxes on
17    a timely basis.     That's a standard operating
18    procedure for many of the companies Mirabilis
19    acquired, because they -- their business plan was to
20    acquire distressed corporations do not have
21    payroll taxes paid, such as the Presidion companies.
22    I think these were the same scenario.     They know there weren't
23    payroll taxes being paid.
24        Q     But my point is --

0350

1         A     The reason they're pointing it out here,
2     is because if I'm writing a due-diligence report and
3     I'm telling the client the knowledge where the
4     acquisition money is coming from to buy this
5     company, but I'm certainly going to point that out.
6            But here's my point.     There's a hypocrisy
7     here.     It's your position is to be accepted, then by
8     client, under your understanding, not only knew the
9     obligations of the Internal Revenue Code as
10    expressed to Mirabilis, but you saying, knew that
11    Mirabilis was not fulfilling its obligations and
12    turned a blind eye to that; is that what you're
13    saying happened?
14        Q     Actually, it wasn't Mirabilis, it was
15    Presidion, but that's what I'm saying.
16        A     Well, the funding source, that's what
17    you're saying.
18        Q     That's what I'm saying.
19        A     Why'd they do it?
20        Q     You're -- I have to ask you them.
21        A     Well, what's your position?     Maybe you
22    don't have to prove active, but you knew that any
23    judge or jury is going to be saying, "Why'd they do
24    it?
25        Q     You know, I asked Holtz -- we asked Holtz

0351

the question.     He denied knowledge of it.     And I
asked Mendez the question, and he says his
agreement said one thing, his appeal has said
something else.     So he's made conflicting statements

on why he did it.
6         A     No, no, why he did it, why did Rachlin go
7     along with that, as an outside professional, in your
8     view, for the amount of money that you say they were
9     paid, they did this?
10        Q     I don't know why they did it.     It amazes
11    me --
12        A     But doesn't that cause you to think that
13    maybe your historical view of this case may just be
14    wrong?     That maybe the inference that you've been
15    drawing may not be correct, with the benefit of the
16    last -- now, with the answer is, they did do it
17    it?     That maybe Frank Amodeo didn't provide them
18    with all the information you think they had, to know
19    what was going on, did you ever consider that?
20        Q     Well, Rachlin -- Rachlin didn't provide his
21    professionals all the information.
22        A     Well, didn't -- doesn't the lack of a
23    motive cause you a concern in your ultimate
24    conclusion?
25        Q     You sound like your prosecutor again.

0352

1         You're looking for the motive.
2         A     Well, I think the motive is your as valuable
3     in a civil case as in a criminal case.     You're
4     telling me that this otherwise reputable accounting
5     company turned a blind eye to a passive tax fraud,
6     and I'm saying, I'd like to know why Jose Marrero,
7     with his record, and who is he, would have turned a
8     blind eye, for that?     His salary he did this?     Is
9     that what you're saying?
10        Q     No.
11        A     Then why'd he do it?
12        Q     Marrero?
13        A     Yeah.
14        Q     Well, I think Marrero was only part of the
15    pin, part of what Rachlin Cohn did.     Marrero only
16    did part of it, predominantly worked in the Sunshine
17    Companies Plan, I'm involved with the PMG plan to
18    some extent, but didn't have all the knowledge.     By
19    position is Mr. Holtz had a lot or most of the
20    knowledge, knew where the payroll tax money was
21    coming from, and did turn a blind eye to it.
22        A     Why?
23        Q     You have to ask Mr. Holtz.
24        A     Why?
25        Q     What's your position?

0353

1         A     I can't guess why he did it.
2         Q     So you have no position.     Forget guess.
3     You have no position on Holtz?     You don't intend to
4     articulate any position to a judge or jury, as to
5     why Holtz did it to try to convince them that he
6     actually did do it?
7         MR. MIDHAH:     Well, you know, Holtz denies
8     it, so your whole precise is that he knew it.
9     Holtz denies that he knew about this money.
10        THE WITNESS:     We asked him the question in
11    these depositions.

**Page 0354**

```
13  BY MR. DeMARIA:
14      Q  Your counsel, speak up for the first time
15  today, and won't put my -- that's my
16  point.  He'd be going on, you're saying through
17  your circumstantial evidence, that that reveals that
18  they did it, and I'm saying, motive is a very
19  important part of the circumstantial evidence, and
20  if they don't have it, circumstantial evidence, and
21  for them, how do you explain it?
22      A  All right.  I have a motive
23      Q  So you have no explanation for it?
24      A  No.
25      Q  Okay.  That's a fair answer.
0354
 1      A  I wish I did.
 2      Q  That's a fair answer.  I can only ask you,
 3  and you tell me.
 4      A  All right.  Let me ask you about ...
 5  Mr. Glover.  Mr. Glover was the CFO, correct?
```

**Page 0355**

```
 6      A  I'm a pretend to January '06
 7  through either June or July '06, or maybe as late as
 8  October '06.  And I'm not clear on the ending date.
 9      Q  All right.
10         (Pause.)
11         (Exhibit 105 marked for identification.)
12         MR. DeMARIA:  Let me show you, while she's
13  looking for a copy, Exhibit 105.  Take a look
14  is 105?
15         THE WITNESS:  You got one for my attorney?
16         THE WITNESS:  He's looking for one.  This
17  is 105?
18         MR. DeMARIA:  Correct.
19         (Discussion held off the record.)
20         MR. WIDMAN:  You gave me something else.
21         MR. DeMARIA:  I'm sorry.  I may have given
22  you the wrong one.
23         MR. WIDMAN:  This is September 20, 2006?
24         THE WITNESS:  You want to see this again?
25         MR. DeMARIA:  He's got June.
0355
 1  Mr. Glover was doing.
 2         MR. WIDMAN:  Just make a note and send it
 3  to me if you don't have it.
 4         MR. DeMARIA:  Well, a minute.  Here it is.
 5         MR. WIDMAN:  Okay.
 6         MR. DeMARIA:  Now you keep yours because
 7  that's mine.
 8         THE WITNESS:  This is the wrong one.  You
 9  gave --
10         MR. VARNER:  That's your secret memo.
11         THE WITNESS:  That's the settlement
```

**Page 0356**

```
19  amount.
20         MR. DeMARIA:  Everything was good until
21  450.
22         MR. WIDMAN:  What number are we up to?
23         THE WITNESS:  105.
24         MR. WIDMAN:  Okay, I've got 105.
25
0356
 1  BY MR. DeMARIA:
 2      Q  All right.  Is this a reflection of some
 3  of the work Mr. Glover was doing in June of '06?
 4      A  This was ... an e-mail between the --
 5  actually, there are two e-mails between the --
 6  The latter e-mail is from Glover to Daniel Shurman,
 7  Dan Meyers and Kevin Leonard.
 8      Q  All right.  Let me just try to get this done an
 9  easier way, because I know we're running short on
10  time.
11         It appears to be the open items left to
12  complete the audit; correct?
13      A  Okay.  You sued Mr. Glover in an adversary
14  complaint, correct?
15      Q  I did.  I have settled that suit.
16      A  I know.  We're going to get to that.
17  Because I found that interesting.
18      Q  I found that interesting.
19         (Exhibit 106 marked for identification.)
20  BY MR. DeMARIA:
21      Q  106 is your adversary complaint against
22  Paul Glover, correct?
23      A  Are we done with 105?
24      Q  Yes.
25      A  Correct?
```

**Page 0357**

```
 1      Q  And on page of, right, you sued him in
0357
 2  count three for breach of fiduciary duty.  You said,
 3  between January '06 and March of '07, he served as a
 4  corporate officer in a fiduciary relationship.  He
 5  breached his fiduciary duty by failing to properly
 6  supervise Frank Amodeo.  He allowed Amodeo to take
 7  action on behalf of Mirabilis, which led to the
 8  federal grand jury investigation as a direct and
 9  approximate result of Glover's breach of fiduciary
10  duties.  Mirabilis has been damaged in its business
11  and property, and accordingly seeks compensatory
12  damages; right?
13      A  Yes.
14      Q  Sounds a little bit familiar to the breach
15  of fiduciary duty claims you've made against my
16  clients.  Similar, no?
17      A  We made a breach of fiduciary duty.
18  Actually two different law firms wrote the -- or two
19  different lawyer wrote the -- this complaint and
20  the other complaint, the one against your firm.
21      Q  Right.  But I mean -- I'm saying
22  similar -- similar claims, right?  You're saying --
23      A  Breach of fiduciary duty.
24      Q  You're saying this internal chief
25  financial officer caused this damage.  Then you're
```

0358
1  saying this outside accounting firm, my client,
2  caused this damage, right?
3      A  Yes.
4      Q  And you dismissed the case against
5  Mr. Glover, right?
6      A  Uh-huh.
7      Q  And you entered into an agreed order
8  setting the objections and allowing Mr. Glover to
9  have a claim against your company, right?
10     A  Yes.
11         (Exhibits 107 and 108 marked for
12         identification.)
13  BY MR. DeMARIA:
14     Q  108 is the agreed order allowing --
15  setting the objections and allowing Mr. Glover to
16  have a $400,000 claim against your company, right?
17     A  Yes.
18     Q  Okay.
19     A  Yes.
20     Q  And so, under this settlement --

0359
1  right?
2      A  It's not my company.
3      Q  The company that you're the president of,
4  right?
5      A  Yes.
6      Q  Under the settlement, that, you're
7  receiving nothing from Mr. Glover; financially?
8      A  Actually, I'm receiving a reduction in
9  almost $4 million worth of claims
10     Q  And was the claim that you had against
11  Mr. Glover for breach of fiduciary duty, the same
12  $200 million claim that you have against my clients?
13     A  I don't recall.
14     Q  You didn't; set forth damages, you just
15  said conspiracy damages? What was the thinking?
16     A  I don't recall.
17     Q  Had to be the same damages, right?
18     A  I seem, you said --
19     Q  I don't recall.
20     A  "I don't recall" --
21     Q  You said --
22     A  -- is my Answer.
23     Q  -- in count three, Glover allowed
24  Amodeo to make with led to the internal jury
25  investigation. The investigation was led to the
0360
1  press, resulting in negative articles, ultimately
2  destroyed the reputation and operations of
3  Mirabilis. It's been damaged in its business and
4  property. Isn't it the same thing we're talking
5  about here?
6      A  I don't recall what the damage in the
7  Glover case were.
8      Q  Would you say that what Mr. Glover was a

7  joint tortfeasor with these other internal and
8  external professionals that didn't; serve Mirabilis
9  well, according to your position?
10         MR. MIDONY:  Object to the form.
11         THE WITNESS:  I haven't said that.
12  BY MR. DeMARIA:
13     Q  Does he fall into a different category
14  from other professionals?
15     A  He wasn't a professional.  He was an
16  employee.
17     Q  He was a chief financial officer, wasn't
he?
18     A  An employee.
19     Q  Okay.  But he was a professional employee,
20  right?
21     A  No.  He was an employee -- he was an
22  officer of the company, but he was not an outside
23  professional.
24     Q  Did Mr. Glover provide you with any
0361
1  cooperation in this case in return for this
2  settlement?
3      A  I can't disclose the settlement
4  discussions.
5      Q  Has Mr. Glover agreed -- as part of the
6  settlement that's now been achieved, has Mr. Glover
7  agreed to cooperate in your investigation against my
8  clients and others?
9      A  What's in the settlement agreement that
10  was filed by the court is all I can disclose about
11  the settlement agreement.
12     Q  Has Mr. Glover provided you any testimony,
13  or any statements against my clients?
14     A  Mr. Glover has provided me with statements
15  that relate to ... all of the malpractice
16  litigation.
17     Q  All right.  I'll ask about the one that I
18  care about, which is my clients.  What's he said
19  about my clients?
20     A  He hasn't said specific things about your
21  client.
22     Q  Has he said anything upon which you
23  believe that supports a claim against my clients?
24     A  What's he said?
0362
1      A  He generally gave me background related to
2  the cash activities and the internal reporting
3  during the period of '05, and that was
4  a short period of time.  I believe that period of
5  time to be January '06 to July '06, although the
6  corporate records indicate it could be as late as
7  October of '06.  He basically changed activities in
8  Mike Stanley took over the activities in July
9      So, most of the information I obtained
10  from Mr. Glover, related to documents, the audit by
11  Moore & Company, and the operations of specifically
12  cash activities of Mirabilis, where it was getting
13  its money from during the January through July

period, when he was the CFO.

Q   Have you identified particular documents that Mr. Glover either gave you or showed you, that you believe are supportive of your case against, my client?

A   No, but the documents Mr. Glover gave me are in the warehouse and are indexed and identified as Mr. Glover's documents.

Q   All right.  Mr. Stanley have you filed a claim against him?

A   I did not.

Q   Have you had any conversations with Mr. Stanley about this case?

A   I have not.

Q   Is anybody, on your behalf, had any conversations?

A   Not that I'm aware of.

Q   All right.  You said you couldn't, tell us the settlement discussions with Mr. Glover.  Is that based on some privilege you're asserting?

A   My counsel has told me that settlement discussions are privileged, and I can't disclose them.

Q   Are you asserting a privilege on that question?

MR. WIKMAN:  I have no idea.  It isn't me, I don't know.

MR. DeMARIA:  But are you asserting a privilege today?

MR. WIKMAN:  Well, I guess we'll have to break, and I will find out what this is all about.

MR. DeMARIA:  May I don't think, we'll break, and then if it's something that you decide is not privileged, we can probably follow it with some kind of written interrogatory answer.  ! don't want to waste more time on it.  It's a one-question-type thing.

MR. WIKMAN:  It wasn't me, and I have no involvement.  It's Shuker's firm, so.

MR. DeMARIA:  Which firm?

MR. WIKMAN:  I think Shuker, Lathar's firm.

THE WITNESS:  And Glover, yes, sir.

MR. DeMARIA:  I don't believe, even if there's a settlement privilege involved, that's a evidentiary privilege that prevents -- there may be something a judge decides a jury shouldn't hear, but I don't think it's like an attorney-client privilege.

MR. WIKMAN:  I'm not raising it today, and if you want to take a break, I'll go find out what it is.

MR. DeMARIA:  No, I don't think we'll get very far with that; we're near the end.

MR. WIKMAN:  I don't, either.

BY MR. DeMARIA:

Q   Let me ask you this question.  We talked about the April 18, 2006 meeting before, earlier today,

A   The Omnibus meeting?

Q   Well, it's this April 18th meeting, If you review --

A   Well, I don't remember the date, but I do remember the Omnibus meeting, but I don't remember the date of it, so you have to tell me which meeting.

Q   Did you review Frank Amodeo's statement of facts and comments on the disclosure statement when he responded to your disclosure statement in support of the plan, something that Slaughter filed.  It was a very lengthy statement.

A   All right.  You're going way too fast for me, much less the court reporter.  Let's break that up.

Q   Which plan?

A   Did you review statements of facts and comments on disclosure statement that Frank Amodeo filed on August 5, 2009?

A   In which case?

Q   In the bankruptcy case.  Mirabilis.

A   Yes.

Q   Okay.  Do you recall him making statements about this April 18th meeting?

A   I don't recall which is the April 18th meeting, sir.

Q   Okay.

A   And I don't recall -- that document is -- I forget how many pages long.  Pretty long winded, more than 70, I believe.

Q   Have you relied on any information from against my client?

A   Again, I made the statement that all of Mr. Amodeo's statements without corroborating some way I haven't relied on.

A   Okay.  And that was --

Q   And that includes written and oral statements.

Q   How, Mr. Amodeo made a statement I'll represent to you in here, that he had believed Mr. Glover had made a disclosure to Messrs. Holtz, Bertain, and Mike Curry, regarding the use of payroll taxes to fund operations.  Have you ever heard that said?

A   I have.

Q   All right.  And did Mr. Glover support Mr. Amodeo in any way in saying that?

A   I'd have to review my notes with talking to Mr. Glover.  I don't recall specifically that being in there, but it could be.

Q   Okay.  So this could be one where Mr. Amodeo said it, but has not been supported by Mr. Glover?

0368

What I'm getting is, I understand Frank
Amodeo and your reluctance to use him as a witness,
I would agree.

Q   But you have met, you're going to know whether Mr. Glover
back up Mr. Amodeo?

A   No, no. No... but I have met with
Mr. Glover on multiple occasions, and have taken
notes and that -- an item like that would be in my
notes.

Q   But you think it would be something you'd
remember?

It would be pretty significant, don't you
think?

A   If you had dealt with as many facts as I
had and as many cases as I'm dealing with, you
remembering then all off the top of your head, you
may -- it's significant for your client, but I have
a whole bunch I'm dealing with. You're only dealing
with...

Q   Okay. Did you review the sentencing
transcript of Frank Amodeo?

A   I read it.

Q   Okay. Do you know that, as part of the
sentencing proceeding, Richard Smith, the IRS agent
was called to the stand?

A   Yes, I'm aware of that.

0369

Q   Do you know that part of Mr. Amodeo's
argument for reduced sentence was that he had
provided substantial cooperation to the Government?

A   Yes.

Q   And you understand that the Government
opposed that, and said that Mr. Amodeo had not
provided all that substantial cooperation?

A   Actually, that's part of
Mr. Amodeo's appeal.

Q   Okay. And do you recall Mr. Sands,
Mr. Amodeo's attorney, asking the IRS agent, you
know, whether Mr. Amodeo ... whether they had said
to Mr. Amodeo information they were specifically
looking for to assist them in their investigation?

A   I don't recall that specific item in
there, but ...

Q   Okay. Do you recall the IRS agent saying
that they did ask Mr. Amodeo on several occasions
for supporting information, and he never came
forward and provided it?

A   I don't recall.

Q   Well, would that surprise you to find that
Mr. Amodeo was asked for information to support his
allegations and just didn't back it up?

A   It wouldn't surprise me in the least.

Q   Any ...

A   I believe Mr. Amodeo is very clever with
providing information when it's useful to him or not
useful to him. That's why I'm somewhat skeptical of
using information he provides me.

(Pause)

A   All right.

Q   Let's go back to where we started. The

0370

second amended complaint, Exhibit 53. I just have a
few questions, and I'm done.

A   Okay.

Q   If you take a look at page five, paragraph
it says: In early 2005, AQMI and its various
professionals, including Harreto, met with
representatives ... Is it your position that AQMI
hired Rachlin in contrast to Frank Amodeo,
individually?

A   No.

Q   So AQMI never hired Rachlin?

A   No. No, I think if we assume that Amodeo that hired
Rachlin originally. The statement here has to do
with AQMI represented Presidion Corporation in the
Sunshine Companies Plan. In this early meeting with
the professionals, Rachlin was also part of
the AQMI representation and carrying out the
Sunshine Companies Plan, tell you what I'm getting
at. If you go to page six, for example, paragraph
three, maybe just use the words, says: In 2004,
Rachlin was retained by Frank Amodeo of AQMI, to
give consulting and accounting services,
and just want to understand, it's your
position it was Amodeo that hired Rachlin, right?

A   Rachlin ... second amended complaint in
the AQMI that hired Rachlin? -- Frank Amodeo was one
of the people that hired Rachlin.

Q   But AQMI was not one of the entities that
hired Rachlin. There's no bills to AQMI;

A   I don't ... there's never a client of
Rachlin, that I recall. Mirabilis and ... Amodeo was.

Q   Got you.

A   And I think those were the two primaries.

Q   Right, in this second amended complaint in
paragraph -- I mean, count on.

A   What page are you on?

Q   I guess page 14, it's collot: Breach of
fiduciary duty by aiding and abetting.

A   Okay.

Q   When you say that ... that my clients
aided and abetted -- look at paragraph 73 -- Amodeo

0371

in formulating and carrying out the Sunshine
Companies Plan and PBS plan by, among other actions,
consulting and advising Amodeo about these actions,
taking steps to assist Amodeo in carrying out these
two plans and juices, attending meetings, reviewing
preparing documents, attending meetings, reviewing
documents and consulting with our individuals.

We've talked a lot today about these
plans. And my -- just my general question to you,
is there any other facts that you're relying on to
support this claim, other than what we've talked
about today? Because I have a pretty good
understanding of your position, but just want to
know if there is anything out there that supports
the aiding and abetting count that you're thinking

16  about; in your mind, that you haven't told us about?
17       MR. WISMAN: Form.
18       THE WITNESS: I'm sure that there are
19  more ... you know, facts.
20       Q  Well, let me ask you this question
21  without getting into universes and empires and
22  galaxies.
23       Let's talk about, as you sit here today,
24  do you have any specific facts, statements by
25  somebody, documents that you've seen, anything
0372

 1  evidentiary that you would rely on to support this
 2  aiding and abetting claim, other than what we've
 3  talked about?
 4       WISMAN: Object to the form.
 5       THE WITNESS: What we've provided you in
 6  the interrogatories and document requests, I
 7  think would include the answers or the
 8  documents that we're relying on, that I know
 9  about right now.
10  BY MR. DeMAHY:
11       Q  Well, I think your document request was,
12  go to your warehouse, don't know about that
13  one. And your interrogatories said, go look at the
14  list of all of the people that are on your
15  international disclosure.  If you don't have
16  anything else to add, but want to leave the door
17  open, you might find it.  I have no problem with
18  that.  I just want to know what you have today.
19  BY MR. DeMAHY:
20       Q  All.  I'm asking you for it, there's
21  something today that I haven't asked, some piece of
22  evidence that you think is important that supports
23  these claims, tell me about it.
24       A  And I'll just stick with the answer I've
25  previously given.
0373

 1       Q  All right.  Now ... in your earlier
 2  version of this aiding and abetting claim,
 3  basically -- and I want to make sure I've got you
 4  pied that there were others at Mirabilis, that if
 5  they had been informed by my clients, what Frank
 6  Amodeo was up to, that, they would have acted to
 7  protect the company.  Is not that what you've pled
 8  in this earlier version of it that your
 9  that again in this version but is that your
10  position, that there were other persons associated
11  with Mirabilis -- I'm just asking you this as a
12  question -- is it your position there were other
13  persons associated with Mirabilis, that if they had
14  been informed what Frank Amodeo was up to, would

23  have taken action to stop him?
24       A  Yes.
25       Q  Who?
0374
 1       A  The board of directors.
 2       Q  Who?
 3       A  I haven't talked to all of the board of
 4  directors, because some of the board members
 5  attorneys won't allow me to talk to them.
 6       Q  Okay.
 7       A  But I suspect I'm looking at the board of
 8  directors, and some of the officers at that time
 9  would have changed the course of Mirabilis.
10       Q  Who -- obviously, we can't rely on the
11  ones that you talked to you, so in the ones that
12  have talked to you about this question,
13  didn't -- know and they would have acted differently
14       A  I haven't talked to those who I believe
15  would have acted differently.
16       Q  Okay.  But if you had, you basis to believe that
17  they didn't know and would have acted differently?
18       A  (Pause.)
19       Q  Anybody?
20       A  I haven't talked to anybody that has told
21  me they would act differently at this point.  I have
22  some specific officers and board members who I
23  believe would have.
24       Q  So you don't have any contemporaneous
25  evidence?
0375
 1       A  Let me take that book.
 2       Q  Okay.
 3       A  One of the officers I talked to has told
 4  me he would have acted differently.
 5       Q  Who's that?
 6       A  Mr. Glover.
 7       Q  Mr. Glover?  Well, I'm surprised.  Was
 8  this before or after you dropped your breach of
 9  fiduciary duty claim and allowed him a $100,000
10  claim against your company?
11       A  It's before I filed the suit against him.
12       Q  So, at the time that he told you he would
13  have acted differently, that didn't convince you not
14  to sue him, right?
15       A  No.
16       Q  So what was it after he told you, and
17  after you sued him, that convinced him not to
18  continue to sue; what changed?
19       A  Where'd you get that?
20       Q  With regard to your claim against
21  Mr. Glover, why'd you give it up?
22       A  To settle his claim against Mirabilis.
23       Q  Why?  You get nothing for it.
24       A  He would.
25       Q  Pardon me?
0376
 1       A  He would get something for it.
 2       Q  But you got nothing for it.  Mirabilis got
 3  nothing for it.

0377

          MR. WIDMAN:  Well, you're being
argumentative.  He had a substantial claim that
he depended on.
          MR. DeMARIA:  Okay.
          MR. WIDMAN:  I don't know if you're
listening.
          MR. DeMARIA:  Substantial, unsecured
claim.
          MR. WIDMAN:  You said he got nothing.

BY MR. DeMARIA:
    Q   Well, isn't it a fact that what you got
was to try to get him to testify in your behalf;
isn't that it?
    A   No.
    Q   Aren't you kind of like a little Randy
Gold right here?
    A   No.
    Q   Making deals with witnesses and trying to
create evidence?
    A   No.  Actually, Mr. Glover agreed to
cooperate with me two years ago -- well, before I
sued him.  The reason I filed suit against him had
much more to do with the claims he filed against

Hirabills.
    Q   That's fair enough.
    A   ... but as ask you this.  Is there anybody
else who have acted differently -- that you would
have acted differently -- that you believe?
    A   You put that qualifier on that.  You mean,
other than --
    Q   Because my client -- my client -- my
clients, I believe have told you that "I didn't
know", but you don't believe them.  So I want to
know the ones you believe, besides the cooperating
Glover.
    A   Other than Frank Amadeo?
    Q   Other than Amadeo and Glover.
    A   Who has said that in court filings and his
appeal, and ...
    Q   Do is there anybody else -- I'm just about
done -- is there anybody else that you've spoken to
that has told you, in sum and substance, I didn't
know, and I would have acted differently, and you
believed them?
          MR. WIDMAN:  Well, those are two different
questions.  You wanted somebody that said both
or had one or the other.

    Q   Yeah.  Let's start with the both.
Anybody?
    A   No.
    Q   Okay.  And these directors you haven't
spoken to, who is it that you'd like to talk to?
    A   Well, I'd certainly like to talk to all
the board of directors before and that, as was
number of people.  Since Mr. Holz was on the board,
I've had the ability to talk to him under oath.
    Q   Um-hum.  You don't believe him, right?
    A   Actually ... most of what he said, I do
believe.
    Q   What are parts you don't believe?
    A   That he didn't have knowledge about the
payroll taxes.

0379

    Q   Okay.
    A   And that he didn't -- and he only got
courtesy copies of e-mails, and didn't read his
e-mails.
    Q   Okay.
    A   Those were the, probably, the primary
areas that he said, in his deposition, and the
third area would be that he didn't know what was
going on
    Q   Do you really think it's plausible for any
of these former directors of Hirabills, now knowing
that the Frank Amadeo has gone to jail, Mr. Gold is
going to investigate criminally, and Hirabills
is going to plead guilty next week; do you really
think it's plausible?
          MR. WIDMAN:  Wait, wait a second.  Not
pleading guilty next week.
          MR. DeMARIA:  Whenever.  Two weeks.
          MR. WIDMAN:  Not pleading guilty.
          MR. DeMARIA:  No contest, resolving the
current case.
          MR. WIDMAN:  Okay, whatever.
          MR. DeMARIA:  I understand the point,
doesn't mean anything.
          THE WITNESS:  Number one, I'm not stating

how Hirabills is pleading.
BY MR. DeMARIA:
    Q   I got you.  I'll take that out of the
question.
          do you believe that any former director,
knowing what happened and what the
publicity and the potential criminal
case, is going to stand up and say to you anything
other than, "I didn't know, and I would have acted
differently," They're all going to say it if you
ask them now, right?
          MR. WIDMAN:  Object to the form.
BY MR. DeMARIA:
    A   Wouldn't you expect that?
    A   I don't know what they're going to say
until I ask them.
    Q   My question, in your thinking processes,

0381

18  how do you choose to believe the ones who say, "I
19  didn't know," I wouldn't have acted -- I would have
20  acted differently," from the ones you don't believe.
21  What's your process in figuring that out?
22     A   Well, based on prior cases, my case just
23  before this, the Evergreen case --
24     Q   Yeah.
25     A   -- had a virtual identical fact pattern in

0382

1   one of my suits against a law firm ... as this one,
2   almost straight up identical fact pattern, including
3   the case accounting firm.  And everything -- it very
4   much into the -- as the way they turned out.  I mean,
5   the case is out there, it's available, it was -- it
6   was not litigated, it was settled.  It was the most
7   substantial case in the Evergreen cases.  And, you
8   know -- I would secure a copy of it, but the
9      Q   What's there to read if it was settled?
10     A   Well, you can read the settlement
11  agreement.
12     A   It's open -- it's filed with the court.
13  make admissions in that settlement agreement.
14  haven't seen it for a long time ago.
15     Q   Been a long time ago since -- I mean, I
16  haven't seen it for a long time ago.
17     Q   If I remember correctly, the one
18  that way.
19     A   Their partner went to jail, let me put it
20     Q   Okay.
21     A   And I also stated that the reason I lost,
22  trial; you didn't have an accounting firm,
23  and that one you lost, right?
24     A   Yeah.  I testified to that earlier this
25  morning.

0383

1      Q   Is there anyone that you believe would
2   have acted differently?
3      A   (Pause.)
4      Q   I don't know, because I haven't been able
5   to talk to most of the people that I believe pay
6   have done something different.
7      A   I would have to say that --
8      Q   And the officers and directors' liability
9   policies would have covered them, had the
10  corporation not been indicted.
11     A   Okay.  And ... if I got it right, you sued
12  officers -- you'd be fair to say that the
13  availability of insurance company is an important
14  factor for you in deciding who to sue and not sue?
15     A   That's fair to say.  Certainly, I would
16  look at the economics of who to sue and not to sue.
17  There's no sense in getting a judgment I can't
18  collect on it.
19     Q   Okay.  And -- if I got it right, you sued
20  disney in retaliation for his filing claims in the
21  bankruptcy against Hillsville, right?
22     A   That was not my primary reason, but,

0384

certainly, it was one of my reasons.

25
1      Q   Got it.
2          MR. DeMARIA:  Let me take a moment to
3      consult with colleagues and see if they want to
4      ask anything else before I close the record,
5      and then we'll be done, so that Bob can return
6      to --
7          THE WITNESS:  We'll step out.
8          MR. DeMARIA:  Mr. Cuthill, I appreciate
9      your time.  I have no further questions.
10         MR. MIDDAK:  You're going to read and sign, right?
11         MR. DeMARIA:  Yes.
12         MR. MIDDAK:  Okay.  Then for exhibits,
13         MR. DeMARIA:  Okay.  Then for exhibits,
14     we're going to give them to the court reporter
15     which are numbered 51 through ... 108, and then
16     if you would, sir, make copies for us and I'll
17     take a transcript in due course and
18     disseminated the exhibits when you send them.
19         MR. MIDDAK:  And my copy, I want it
20     reduced, and I do not need exhibits, because
21     I've got the exhibits.
22         MR. DeMARIA:  I'll take a reduced as well
23     as an ASCII.  You know, the whole menu of stuff
24     you guys --
25         MR. MIDDAK:  So I guess he needs a disk,

0385

too.

        (The reading and signing of this
    deposition is reserved, and the deposition
    was concluded at 5:20 p.m.)

              - - - - -

STIPULATIONS:  IT IS HEREBY AGREED and so stipulated by and between the parties hereto through their respective counsel, that the reading and signing of the deposition is hereby reserved.

CERTIFICATE OF OATH

STATE OF FLORIDA     )
COUNTY OF ORANGE     )

I, Richard Castillo, Notary Public, State of Florida, certify that R.W. CUTHILL, JR., personally appeared before me on April 21, 2010, and was duly sworn.

Signed this 29th day of April, 2010.

RICHARD CASTILLO
Certified Livenote Reporter
Notary Public, State of Florida
at Large
Commission No. DD609499
Expiration: February 25, 2011

CERTIFICATE OF REPORTER

STATE OF FLORIDA     )
COUNTY OF ORANGE     )

I, RICHARD CASTILLO, Certified Livenote Reporter and Notary Public, do hereby certify that I was authorized to and did stenographically report the deposition of R.W. CUTHILL, JR.; that a review of the transcript was requested; and that the foregoing transcript, pages 205 through 384, is a true record of my stenographic notes.

I FURTHER CERTIFY that I am not a relative, employee, or attorney, or counsel of any of the parties, nor am I a relative or employee of any of parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

DATED this 29th day of April, 2010, at Orlando, Orange County, Florida.

RICHARD CASTILLO
Certified Livenote Reporter
Notary Public, State of Florida at Large
Commission No. DD609499
Expiration: February 25, 2011

DEPOSITION ERRATA SHEET

Our Assignment No. 158015
Case Caption:  Mirabilis Ventures, Inc.
vs.
Rachlin Cohen Holtz, LLP, et al

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the _____ day of _____, 20___.

_____
R.W. CUTHILL, JR.

DEPOSITION ERRATA SHEET

Page No.____ Line No.____ Change to:_____
Reason for change:_____

Page No.____ Line No.____ Change to:_____
Reason for change:_____

Page No.____ Line No.____ Change to:_____
Reason for change:_____

Page No.____ Line No.____ Change to:_____
Reason for change:_____

Page No.____ Line No.____ Change to:_____
Reason for change:_____

DEPOSITION ERRATA SHEET

0390

1    Page No. ____ Line No. ____ Change to: ____
2    Reason for change: ____
3    Page No. ____ Line No. ____ Change to: ____
4    Reason for change: ____
5    Page No. ____ Line No. ____ Change to: ____
6    Reason for change: ____
7    Page No. ____ Line No. ____ Change to: ____
8    Reason for change: ____
9    Page No. ____ Line No. ____ Change to: ____
10   Reason for change: ____
11   Page No. ____ Line No. ____ Change to: ____
12   Reason for change: ____
13   Page No. ____ Line No. ____ Change to: ____
14   Reason for change: ____
15   Page No. ____ Line No. ____ Change to: ____
16   Reason for change: ____
17   Page No. ____ Line No. ____ Change to: ____
18   Reason for change: ____
19   Page No. ____ Line No. ____ Change to: ____
20   Reason for change: ____
21   Page No. ____ Line No. ____ Change to: ____
22   Reason for change: ____
23
24   SIGNATURE: _____ DATE: _____
25
         R.W. CUTHILL, JR.

SIGNATURE: _____ DATE: _____
         R.W. CUTHILL, JR.