# Exhibit A

```
-------------------------- Original Message --------------------------
```
Subject: Re: MVI Motion to substitute counsel
From:   terence.chu@palaxar.com
Date:   Wed, March 10, 2010 10:23 am
To:     nvilmos@broadandcassel.com
        tnorman@broadandcassel.com
Cc:     rcampbell@balch.com
        aestes@balch.com
```
-----------------------------------------------------------------------
```

Nicolette and Todd,

I have not received the courtesy of a reply to my request regarding your withdrawal of your motion to substitute counsel - as it was filed in violation of local rules. Please advise.

Sincerely,
Terence Chu

```
-------------------------- Original Message --------------------------
```
From: terence.chu@palaxar.com [mailto:terence.chu@palaxar.com]
Sent: Tuesday, March 09, 2010 5:39 PM
To: tnorman@broadandcassel.com; nvilmos@broadandcassel.com
Cc: kbhavener@havenerlaw.com; ediecurry@verizon.net; mraskin@raskinlaw.com
Subject: Motion to substitute counsel
```
-----------------------------------------------------------------------
```

Todd and Nicolette,

I was surprised to hear of your motion to substitute counsel because no one has conferred with me regarding this motion pursuant to local rule 3.01(g) and Rule 2.03 (b). Please advise whether you are going to withdraw your motion or whether I will have to move to strike it.

I was also surprised on March 3, 2010 to receive a packet of filings dating back to November, 2009 when I had not been contacted prior.

Please advise.
Thank you,
Terence Chu
terencchu@yahoo.com
804-363-2666 (cell)

# EXHIBIT A
## Page 1 of 23

---------------------------- Original Message ----------------------------
Subject:
From:   terence.chu@palaxar.com
Date:   Tue, March 30, 2010 12:37 pm
To:     kbhavener@havenerlaw.com
        nvilmos@broadandcassel.com
        tnorman@broadandcassel.com
Cc:     mraskin@raskinlaw.com
        jraskin@raskinlaw.com
------------------------------------------------------------------------

Counsel:

If you'll notice, Ms. Vilmos' Response (Doc 222 - filed 3/25/10) which, of course, was filed in disregard of local rules as well as the courts' Case Management Order had the style of the case listed inappropriately as did the withdrawal (Doc 226).

I also believe the position of the US is that both the Bankruptcy Court and the District Court have, in fact, ruled. The documents/orders cited by Mr. Park (as well as those submitted by Broad and Cassel) clearly say, "the following assets...shall be forfeited to the USA [Nexia Strategy Corporation]."

If Nexia had been "administratively dissolved - and the rights assigned" as has been inaccurately contended, there would have been no "assets" to transfer to the USA and that concession to the government would have been extraneous and nonsensical.

Regardless, I have asked Ms. Vilmos if there is an order that I haven't been sent that gives MVI permission to file their "interpretation of the style of the case" with the court, and not what is in fact, currently court record; nor can I find any rule or case law that permits a unilateral amendment. So far, I have not received a response.

Thank you,
Terence Chu

From: Kathleen Havener [mailto:kbhavener@havenerlaw.com]
Sent: Tuesday, March 30, 2010 11:24 AM
To: 'Nicolette Vilmos'
Cc: 'Martin Raskin'; 'Jane Raskin';
Subject: Withdrawal of Reply

Dear Nicolette:

Mirabilis' withdrawal of its reply to Defendants Opposition to Mirabilis' Motion to for Extension, for Leave to Amend, and to Amend the Style of the Case is disingenuous at best. Until the court so rules, Mirabilis is not the assignee of the litigation rights of Nexia.

# EXHIBIT A
## Page 2 of 23

Nexia's status (and therefore Mirabilis' as well) remains an issue before the Court, as was pointed out by the government yesterday in its filing, and not a decided issue, as your filing implies.

Best regards,

Kathleen


-------------------------- Original Message --------------------------
Subject: Re: Error in Bates Affidavit -Jaiman Deposition
From:   terence.chu@palaxar.com
Date:   Thu, May 27, 2010 12:39 pm
To:     acbates@maherlawfirm.com
Cc:     kbhavener@havenerlaw.com
        mraskin@raskinlaw.com
----------------------------------------------------------------------

Mr. Bates,

Are you asserting in your response below that "thousands of documents and hours of video" have been already been produced to the defendants in this case?

Please advise,
Sincerely,
Terence Chu

From: "Aaron C. Bates, Esq." <abates@batesmokwa.com>
Date: May 25, 2010 5:07:39 PM EDT
To: "Aaron C. Bates" <acbates@maherlawfirm.com>
Cc: "Allen M. Estes" <aestes@balch.com>, "J. Russell Campbell" rcampbell@balch.com, "Kathleen Havener, Esq." kbhavener@havenerlaw.com, "randy.gold@usdoj.gov" <randy.gold@usdoj.gov>, "scott.park@usdoj.gov" <scott.park@usdoj.gov>, "Martin R. Raskin Esquire"<mraskin@raskinlaw.com>, "tnorman@broadandcassel.com" <tnorman@broadandcassel.com>, Nicolette Vilmos <nvilmos@broadandcassel.com>
Subject: Re: Error in Bates Affidavit -Jaiman Deposition

Mr. Chu:

The declarations I submitted in response to your motion are accurate.  The deposition excerpts you are referring to relate to a different case involving discovery requests which did not overlap with the documents provided by Plaintiffs in this case.

Regards,
Aaron C. Bates

EXHIBIT A
Page 3 of 23

Sent from my iPhone

-----Original Message-----
From: terence.chu@palaxar.com [mailto:terence.chu@palaxar.com]
Sent: Tuesday, May 25, 2010 1:11 PM
To: acbates@maherlawfirm.com
Cc: aestes@balch.com; rcampbell@balch.com; kbhavener@havenerlaw.com;
randy.gold@usdoj.gov; scott.park@usdoj.gov; mraskin@raskinlaw.com;
kbhavener@havenerlaw.com
Subject: Error in Bates Affidavit -Jaiman Deposition

Mr. Bates,

I've read your latest filings and affidavits in the case styled MVI v. Palaxar et al. Among other things, you attest from June 2007 through filing of the original complaint October 12, 2007 you [together with your client - Jodi Jaiman, president of MVI, and co-counsel] "reviewed thousands of pages of documents, all of the corporate governance of Mirabilis and Nexia, hours of audio and video, financial records of Mirabilis and Nexia, etc."

However, twelve days after the filing of the above referenced case, you and Mr. Estes participated in a deposition of Jodi Jaiman held on October 23, 2007 in which Ms. Jaiman replies to the question regarding why those plaintiffs have been unable to get responses to their document production requests from several months prior.

Ms. Jaiman states,
A. We have a very vague inventory of assets or documents of Mirabilis. But as far as an index, we are in the process of doing that.

Q. Does that inventory identify particular documents or a category of documents or something else?

A. We are not that far into the process. It's simply a matter of identifying which storage units were from which buildings and then trying to identify the offices that were in those buildings to determine what boxes of documents belonged to each individual.

Q. where are the Mirabilis documents currently being stored?

A. There are two warehouses in Orlando.

Q. Do you have the addresses?

A. Not on me. Sorry.

Q. Can you give me some kind of identifying characteristic of those locations, like the name of the warehouse or the street that they're on, although you may not know the street address?

**EXHIBIT A**
Page 4 of 23

A. There's no real name of the warehouses...

Mr. Bates, Ms. Jaiman's testimony and certainly her knowledge of Mirabilis documents and corporate structure on October 23, 2007 does not appear as though all the information was as readily or easily accessible as you, your co-counsel and Ms. Jaiman attested in the instant case.

Was the statement in your affidavit filed in error or is it still your contention that a sufficient review of all MVI/Nexia records was done prior to filing the complaint but then 12 days later, Ms. Jaiman was unable to easily access those very same records as there was only a "very vague inventory - and in the process of developing an index"?  Or, are you attesting that during 2007 Ms. Jaiman was focused only on finding documents relevant to 'future litigation' and not currently filed complaints such as the Hendricks case, in which you had a duty to respond?

Please advise.

Thank you,
Terence Chu

<Jaiman_HendricksDepo.pdf>
<PalaxarDoc251-1.pdf>

--------------------------- Original Message ---------------------------
Subject: Document Disclosures
From:    terence.chu@palaxar.com
Date:    Wed, June 2, 2010 12:35 pm
To:     acbates@maherlawfirm.com
        mmokwa@batesmokwa.com
        aestes@balch.com
        rcampbell@balch.com
        nvilmos@broadandcassel
        tnorman@broadandcassel
        kdavies@davieslawfirm.com
Cc:     mraskin@raskinlaw.com
        kbhavener@havenerlaw.com
        jsadrianna@cfl.rr.com
        shephard@pohlshort.com
        scott.park@usdoj.gov
        randy.gold@usdoj.gov
-------------------------------------------------------------------------

Counsel,

Your responses to my motion for sanctions repeatedly references "thousands of documents and hours of video." To date, nothing has been produced to me. Only 200 documents were produced by plaintiffs to Palaxar in January, 2008, but since then nothing else has been produced, certainly nothing has ever been produced to me as a pro se defendant, as required pursuant to Rule 26(a).

Further, you assert in your affidavits and motions that I had notice of Balch's desire to withdraw in November, 2009. That statement is false, I was neither notified nor conferred with as evidenced by various emails and communications to Ms. Vilmos, Mr. Norman, Mr. Estes and Mr. Campbell during that time.

Please advise when the documents and videos will be forthcoming.

Sincerely,
Terence Chu

--------------------------- Original Message ---------------------------
Subject: Inconsistent Statements in Doc 251
From:   terence.chu@palaxar.com
Date:   Thu, June 3, 2010 7:30 pm
To:     acbates@maherlawfirm.com
        mmokwa@batesmokwa.com
        aestes@balch.com
        rcampbell@balch.com
        nvilmos@broadandcassel.com
        tnorman@broadandcassel.com
        kdavies@thedavieslawfirm.com
Cc:     kbhavener@havenerlaw.com
        mraskin@raskinlaw.com
        randy.gold@usdoj.gov
        scott.park@usdoj.gov
-----------------------------------------------------------------------

Mr. Bates:

In your response (Doc 251) to my motion for sanctions, you state:

"...counsel went through great detail to investigate the claims of Plaintiffs prior to filing the aforementioned lawsuit. The analysis above and the documents attached as Exhibit A demonstrate that counsel acted reasonably and in good faith when filing the lawsuit." The operative words here are "in good faith WHEN FILING THE LAWSUIT"

Then, in Exhibit A, (Doc 251-2) you list the 75 paragraphs of the original complaint filed in October, 2007 - but in no less than 29 paragraphs, you certify that prior to filing the lawsuit, you examined "documents, affidavits and depositions" that WERE NOT IN EXISTENCE at the time you filed. For example, how could you have examined Mr. Hailstone's and Ms. Curry's depositions in 2007 when they weren't deposed until January, 2010?

Please explain how that was possible?

## EXHIBIT A
### Page 6 of 23

Notably, your doc 251-12 is from Mr. Cuthill's filing in February 2010 and includes documents not disclosed prior to February. Interestingly, the shareholder agreement is signed by Frank Amodeo as Shareholder with the word "proxy" written in. This contradicts the documents you filed with Ms. Jaiman's affidavit in January, 2008. Your doc 251-14 is particularly illuminating, in light of Mr. Amodeo's proxy for Mr. Amar's Class A shares. Again, this document was never produced prior to your response on 5/24/10. You did not produce a single document to defendants or to the court in 2007 or 2008 that in anyway referenced Yaniv Amar's ownership interest or board position. Mr Cuthill did in February, 2010 and again I refer you to his April, 2010 deposition for an explanation as to what he discovered in June, 2008 by interviewing Jodi Jaiman, Jay Stollenwerk, Matt Mokwa, Mr. Amodeo and you.

Also, from the date stamp on the documents (doc 251-5) the Palaxar website you enclose in your documents was printed by Plaintiffs on June 25, 2007, a full 4 months prior to your filing the law suit. Yet, not a inquiry was made of Palaxar prior to the lawsuit being filed, the press releases and news articles and you, Mr. Mokwa, and Mr. Amar flying from Florida to Scottsdale to serve the suit. Not a single cease and desist letter, not a phone call, not an inquiry to anyone at Palaxar in four months.

I look forward to your responses.

Sincerely,
Terence Chu

---------------------------- Original Message ----------------------------
Subject: Documents  217 & 258 - Motion to Amend
From:    terence.chu@palaxar.com
Date:    Wed, June 9, 2010 6:44 am
To:      "Nicolette Vilmos" <nvilmos@broadandcassel.com>
         tnorman@broadandcassel.com
Cc:      aestes@balch.com
         jcampbell@balch.com
         kbhavener@havenerlaw.com
         randy.gold@usdoj.gov
         kdavies@thedavieslawfirm.com
         mraskin@raskinlaw.com
-------------------------------------------------------------------------

Ms. Vilmos and Mr. Norman:

Your March 12, 2010 Motion to Amend stated the following as justification in asking the Court for leave:

"While preparing for the depositions of Ms. Curry and Mr. Hailstones [conducted 2/13/10], Mirabilis learned that Michael A. Dement and Laurie S. Holtz, former employees of the Mirabilis related entities, are named inventors on four fraud deterrence and monitoring patent applications filed with the United States Patent and Trademark Office.

EXHIBIT A
Page 7 of 23

Additionally, Mirabilis learned that Laurie S. Holtz is associated with Palaxar and listed on Palaxar's website as being part of Palaxar's "advisory counsel." Mirabilis is requesting the Court to allow it to bring the pending causes of action for 1) Breach of Contract; 2) Breach of Fiduciary Duty; 3) Misappropriation of Trade Secrets and Confidential Information; 4) Conversion; 5) Civil Conspiracy; 6) Injunction; and 7) Unjust Enrichment against Michael A. Dement and Laurie S. Holtz."

Interestingly, Laurie Holtz and Michael Dement were on MVI's initial disclosures prepared by Aaron Bates and J. Russell Campbell on January 14, 2008.

Prior to making this assertion to the Court, MVI deposed Ms. Curry and Mr. Hailstones on February 12 - 13 respectively and Mr. Holtz was deposed on February 23, 2010 - attended by Mr. Cuthill. In Mr. Holtz's deposition, when asked if he has "derived any economic benefit from Nexia Certification" he responded, "No."

Further, now that Mr. Bates, Mr. Estes and Mr. Campbell have attested that PRIOR to filing the complaint in October, 2007 they "reviewed thousands of documents and hours of video as well as interviewed current and former officers and directors of MVI and Nexia" how is it possible that this was "new information?" In light of the hundreds of hours Mr. Cuthill and his attorneys; both the litigation consultants and bankruptcy attorneys spent between May, 2008 and March, 2010 SUBSEQUENT to the filing of the complaint - and since their only job at MVI was litigation; how is your assertion possible? Especially since you and your client had deposition testimony for a month prior to your motion which directly contradicts your March 12, 2010 statements to the court.

Please advise.

Sincerely,
Terence Chu

--------------------------- Original Message ---------------------------
Subject: RE: MVI indexes - document review
From:   "Nicolette Vilmos" <nvilmos@broadandcassel.com>
Date:   Fri, July 9, 2010 8:18 am
To:     "'terence.chu@palaxar.com'" <terence.chu@palaxar.com>
------------------------------------------------------------------------

Mr. Chu,

Please provide me dates that work with your schedule and I will confirm which ones work for us.

Thank you,
Nicolette

-----Original Message-----

From: terence.chu@palaxar.com [mailto:terence.chu@palaxar.com]
Sent: Thursday, July 08, 2010 8:31 AM
To: Nicolette Vilmos; Todd K. Norman; Roy Kobert
Cc: kbhavener@havenerlaw.com; mraskin@raskinlaw.com; randy.gold@usdoj.gov;
scott.park@usdoj.gov
Subject: MVI indexes - document review

---

Counsel;

I was provided a list of MVI indexes on Tuesday, June 29, 2010 at 9:00 p.m.  I responded
Thursday, July 1, at 3:00 p.m. asking for a time when these might be made available. I am in
Richmond, Virginia and the documents are in Orlando, Florida which requires flight
arrangements.  It has been a week and I have not yet been given available dates to the
document warehouse.

Please advise when the documents would be made available for review.

---

Thank you,
Terence Chu

--------------------------- Original Message ---------------------------
Subject: RE: [Fwd: MVI indexes]
From:    terence.chu@palaxar.com
Date:    Thu, July 1, 2010 1:31 pm
To:      "Nicolette Vilmos" <nvilmos@broadandcassel.com>
Cc:      "Todd K. Norman" <tnorman@broadandcassel.com>
         "Kathleen Havener" <kbhavener@havenerlaw.com>
         "raskinlaw@aol.com" <raskinlaw@aol.com>
-----------------------------------------------------------------------

---

Ms. Vilmos:

Thank you for your response.  I apologize for the short notice, but I did turn around my request
to you within 36 hours of receipt of the information.

Please tell me what is the earliest date the information will be made available. July 9 - 11?

Thank you,
Terence Chu

---

--------------------------- Original Message ---------------------------
Subject: RE: [Fwd: MVI indexes]
From:    "Nicolette Vilmos" <nvilmos@broadandcassel.com>
Date:    Thu, July 1, 2010 1:08 pm
To:      "'terence.chu@palaxar.com'" <terence.chu@palaxar.com>
         "Todd K. Norman" <tnorman@broadandcassel.com>

EXHIBIT A
Page 9 of 23

Cc:    "Kathleen Havener" <kbhavener@havenerlaw.com>
       "raskinlaw@aol.com" <raskinlaw@aol.com>
------------------------------------------------------------------------

We are not available for anyone to review the documents this weekend.  It is a holiday weekend and short notice.  Please provide me a list of other dates that work for you and I will work on accommodating your request for a different time.


-----Original Message-----
From: terence.chu@palaxar.com [mailto:terence.chu@palaxar.com]
Sent: Thursday, July 01, 2010 3:07 PM
To: Nicolette Vilmos; Todd K. Norman
Cc: Kathleen Havener; raskinlaw@aol.com
Subject: [Fwd: MVI indexes]
Importance: High

Ms. Vilmos:

Due to family constraints, I can only have someone review records on Saturday and Sunday. Given the time delay in getting this information to me, I would like to have this available for review this Saturday and Sunday.

Let me know the procedures for accessing the building where these boxes of documents are located.  Also, I ask that you provide a list of documents that are not located at the warehouse, e.g. with friends and/or relatives of Frank Amodeo.

As for the electronic data, I'll send you that request under separate cover.

Sincerely,
Terence Chu

| Box Barcode | Box Location |
| --- | --- |
| > Number | 35th |
| > 26 | 35th |
| > 95 | 35th |
| > 96 | 35th |
| > 97 | 35th |
| > 119 | 35th |
| > 120 | 35th |
| > 121 | 35th |
| > 122 | 35th |
| > 123 | 35th |
| > 124 | 35th |
| > 167 | 35th |
| > 168 | 35th |
| > 169 | 35th |

> 170   35th
> 171   35th
> 172   35th
> 173   35th
> 228   35th
> 229   35th
> 230   35th
> 232   35th
> 239   35th
> 240   35th
> 244   35th
> 245   35th
> 247   35th
> 248   35th
> 251   35th
> 252   35th
> 253   35th
> 254   35th
> 255   35th
> 256   35th
> 258   35th
> 259   35th
> 260   35th
> 261   35th
> 265   35th
> 266   35th
> 267   35th
> 270   35th
> 271   35th
> 273   35th
> 274   35th
> 277   35th
> 280   35th
> 282   35th
> 283   35th
> 284   35th
> 285   35th
> 286   35th
> 289   35th
> 290   35th
> 292   35th
> 293   35th
> 295   35th
> 296   35th
> 297   35th
> 298   35th

EXHIBIT A
Page 11 of 23

> 305    35th
> 328    35th
> 332    35th
> 333    35th
> 335    35th
> 336    35th
> 338    35th
> 344    35th
> 352    35th
> 353    35th
> 355    35th
> 356    35th
> 358    35th
> 362    35th
> 367    35th
> 368    35th
> 369    35th
> 370    35th
> 371    35th
> 372    35th
> 373    35th
> 377    35th
> 378    35th
> 383    35th
> 384    35th
> 385    35th
> 386    35th
> 387    35th
> 389    35th
> 390    35th
> 391    35th
> 392    35th
> 394    35th
> 399    35th
> 400    35th
> 402    35th
> 403    35th
> 404    35th
> 411    35th
> 412    35th
> 417    35th
> 420    35th
> 428    35th
> 432    35th
> 433    35th
> 434    35th

EXHIBIT A
Page 12 of 23

```
> 435    35th
> 436    35th
> 437    35th
> 448    35th
> 454    35th
> 455    35th
> 456    35th
> 476    35th
> 477    35th
> 478    35th
> 557    35th
> 558    35th
> 560    35th
> 560    35th
> 561    35th
> 564    35th
> 643    35th
> 653    35th
> 668    35th
> 820    35th
> 1151   35th
> 1152   35th
> 1158   35th
> 1159   35th
```

-------------------------- Original Message---------------------------

Subject: MVI indexes
From:    "Nicolette Vilmos" <nvilmos@broadandcassel.com>
Date:    Tue, June 29, 2010 9:02 pm
To:      "'terence.chu@palaxar.com'" <terence.chu@palaxar.com>
Cc:      "Nicolette Vilmos" <nvilmos@broadandcassel.com>

--------------------------------------------------------------------

Mr. Chu,
Attached is an index of the Mirabilis paper and electronic documents. Please advise when you
would like to inspect the paper documents.  If you identify which electronic documents you
would like copied, we can advise you of the cost in advance and will copy them for you on a
form of electronic media once we receive payment.
Thank You,
Nicolette

EXHIBIT A
Page 13 of 23

---------------------------- Original Message ----------------------------
Subject: Confer - Motion to compel - Dean Amodeo possession of Mirabilis   Documents
From:   terence.chu@palaxar.com
Date:   Fri, July 23, 2010 9:56 am
To:     "Nicolette Vilmos" <nvilmos@broadandcassel.com>
        tnorman@broadandcassel.com
        rkobert@broadandcassel.com
        aestes@balch.com
        rcampbell@balch.com
Cc:     kbhavener@havenerlaw.com
        mraskin@raskinlaw.com
        randy.gold@usdoj.gov
        scott.park@usdoj.gov
-----------------------------------------------------------------------

Ms. Vilmos,

The "other people" you referred to are your co-counsel and legal representatives of your client.
The documents I cited in my most recent response to you were official, certified filings made on
behalf of your client in federal court. They refer to, and were based, upon documents belonging
to your client. Regardless of where they are currently located, your client is obligated to make
them available to me for my inspection. You, as your client's counsel, have previously attested to
the Court that you will make them available for discovery. Accordingly, please confirm whether
or not all Mirabilis documents, including those in the care, custody, and control of others,
including, but not limited to Dean and/or Anthony Amodeo, will be available for my inspection
at the Mirabilis warehouse on August 5th and 6th?

In the event that you will not certify by close of business Monday July 26th that I will have
access to all responsive documents belonging to Mirabilis, please consider our email discussions
as my conferral with you regarding my intention to file a motion to compel.

Sincerely,

Terence Chu

---------------------------- Original Message ----------------------------
Subject: RE: Dean Amodeo possession of Mirabilis Documents
From:   "Nicolette Vilmos" <nvilmos@broadandcassel.com>
Date:   Wed, July 21, 2010 10:31 am
To:     "'terence.chu@palaxar.com'" <terence.chu@palaxar.com>
Cc:     "Nicolette Vilmos" <nvilmos@broadandcassel.com>
-----------------------------------------------------------------------

Mr. Chu,

I cannot speak to documents allegedly referred to by other people. The only documents we can attest to are the ones on the index which I provided to you.

Nicolette

-----Original Message-----
From: terence.chu@palaxar.com [mailto:terence.chu@palaxar.com]
Sent: Tuesday, July 20, 2010 3:51 PM
To: Nicolette Vilmos; Todd K. Norman; Roy Kobert; aestes@balch.com;
rcampbell@balch.com
Cc: kbhavener@havenerlaw.com; mraskin@raskinlaw.com; randy.gold@usdoj.gov;
scott.park@usdoj.gov
Subject: Dean Amodeo possession of Mirabilis Documents

Ms. Vilmos:

I refer you to Doc 127 filed in the Case styled 6:08-bk-04681-KSJ certified by attorneys Ms. Green on 28 July 2009 and by Layne Smith on 23 July 2009. I also refer you to Doc 134 (e.g. page 9 of 14) in the same case filed 18 August 2009 and certified by the same two attorneys. I'll also refer you to my Supplemental Motion for Sanctions in the instant case with the same exhibits.

There are also at least two previous emails to you and your firm discussing Smith, Brooks & Masterson's invoices to the MVI bankruptcy court reverencing Dean Amodeo's possession of documents, etc.

Sincerely,

Terence Chu

--------------------------- Original Message ---------------------------
Subject: RE: [Fwd: RE: Conferral - Motion to Compel - MVI indexes - document review]
From:    "Nicolette Vilmos" <nvilmos@broadandcassel.com>
Date:    Tue, July 20, 2010 1:08 pm
To:      "'terence.chu@palaxar.com'" <terence.chu@palaxar.com>
--------------------------------------------------------------------------

Mr. Chu,

Please advise me the name or names of the people on behalf of Mirabilis who have "submitted to various courts evidence that relevant information is in the care, custody and control of Dean Amodeo and Anthony Amodeo."

Nicolette

Nicolette Vilmos, Esq.
390 North Orange Avenue
Suite 1400
Orlando, FL 32801-4961
Telephone: 407.839.4200
Facsimile: 407.425.8377
BIO
Direct Line: (407) 839-4233
Direct Facsimile: (407) 650-0955
E-mail: nvilmos@broadandcassel.com

www.broadandcassel.com

-----Original Message-----
From: terence.chu@palaxar.com [mailto:terence.chu@palaxar.com]
Sent: Tuesday, July 20, 2010 1:40 PM
To: Nicolette Vilmos; Todd K. Norman; Roy Kobert; aestes@balch.com;
rcampbell@balch.com
Cc: kbhavener@havenerlaw.com; mraskin@raskinlaw.com; randy.gold@usdoj.gov;
scott.park@usdoj.gov
Subject: [Fwd: RE: Conferral - Motion to Compel - MVI indexes - document
review]

Ms. Vilmos:

Please provide an itemized cost to copy all data that is currently in electronic form.

Ms. Vilmos, once again, you have not answered my question. I understand that all documents
listed in the index you provided are supposed to be available at the warehouse. Mirabilis has
however, submitted to various courts evidence that relevant information is in the care, custody
and control of Dean Amodeo and Anthony Amodeo. I am asking, once again, that you certify,
pursuant to both Federal and local rules, that, including but not limited to, information that was/is
in their possession (as was certified in the MVI bankruptcy case) will be available at the
warehouse on August 5 through 6.

Sincerely,

Terence Chu

-------------------------- Original Message --------------------------

EXHIBIT A
Page 16 of 23

Subject: RE: Conferral - Motion to Compel - MVI indexes - document review
From:    "Nicolette Vilmos" <nvilmos@broadandcassel.com>
Date:    Tue, July 20, 2010 11:16 am
To:      "'terence.chu@palaxar.com'" <terence.chu@palaxar.com>
Cc:      "Nicolette Vilmos" <nvilmos@broadandcassel.com>
-------------------------------------------------------------------------

Mr. Chu,

I will provide you with the location shortly.  As to the electronic documents, you will need to
follow the protocol as I outlined.  You cannot download the information in the storage location.
Identify the electronic information you want copied and we will give you an estimate for the cost
of the storage device(s).  Once you approve the estimate and pay the charges we will copy the
electronic documents for you.  As to the documents available at the warehouse, all of the
documents listed in the index provided to you are available.  The boxes you have requested
ahead of time will be pulled and available for your review when you get there.

Nicolette

Nicolette  Vilmos, Esq.
390 North Orange Avenue
Suite 1400
Orlando, FL  32801-4961
Telephone: 407.839.4200
Facsimile: 407.425.8377
BIO
Direct Line: (407) 839-4233
Direct Facsimile: (407) 650-0955
E-mail: nvilmos@broadandcassel.com


www.broadandcassel.com


-----Original Message-----
From: terence.chu@palaxar.com [mailto:terence.chu@palaxar.com]
Sent: Tuesday, July 20, 2010 10:49 AM
To: Nicolette Vilmos; Todd K. Norman; Roy Kobert; aestes@balch.com;
rcampbell@balch.com
Cc: kbhavener@havenerlaw.com; mraskin@raskinlaw.com; randy.gold@usdoj.gov;
scott.park@usdoj.gov
Subject: Conferral - Motion to Compel - MVI indexes - document review

Dear Ms. Vilmos,

**EXHIBIT A**
Page 17 of 23

Please see below for the list you seek.

Please provide the address of the warehouse location, point of contact (the individual's name and contact information who will provide access to the warehouse upon arrival) and confirm that its normal business hours are 9am- 5pm?

As for the electronic documents, since I will take a copy of all electronic data, I will be bringing a hard drive with sufficient capacity for all electronic data to be uploaded. Please ensure someone is available August 5 - 6 to assist me in uploading all data to the hard drive.

By the close of business today, please confirm you have received this email, that you located the list of boxes below. Please also confirm that all documents, including, but not limited to, those held by Dean Amodeo or Anthony Amodeo, are available for review at the warehouse August 5 and 6.

Sincerely,

Terence Chu

---

Mr. Chu,
      You can review the documents during the week during normal business hours, but they will not be made available on the weekend. If you would like to review them August 5 and 6, that is acceptable. If you need more time, you will have to provide additional dates during the week.
      We need a list of all of the boxes you would like to review one week prior to your review, which will give us time to pull the requested boxes. We will have a person on site with you the entire time who will copy the documents you would like at $.10 per page. If you want electronic documents, those need to be requested from the inventory and we will give her a budget to copy the electronic documents onto an electronic media for you, payment will be required in advance for the electronic copying.
      Please confirm that you will be reviewing the documents August 5 and 6 and provide me with the list of boxes you would like to review no later than July 29, 2010.

Nicolette

-----Original Message-----
From: terence.chu@palaxar.com [mailto:terence.chu@palaxar.com]
Sent: Friday, July 16, 2010 3:23 PM
To: Nicolette Vilmos; Todd K. Norman; Roy Kobert; aestes@balch.com; rcampbell@balch.com
Cc: kbhavener@havenerlaw.com; mraskin@raskinlaw.com; randy.gold@usdoj.gov;
scott.park@usdoj.gov
Subject: Conferral - Motion to Compel - MVI indexes - document review

## EXHIBIT A
### Page 18 of 23

Ms. Vilmos:

I have not received any substantive response from you with respect to scheduling a time to review the documents referred to in this email chain, despite my four previous requests. If you would rather that I communicate with one of your colleagues on this matter, please let me know and I will be happy to do so. Otherwise, please be advised that this is my last request to you to provide me with suitable dates and times for said review. In the event we are unable to amicably resolve this simple matter by the close of business Monday, please advised of my intent to seek the assistance of the Court and consider this communication my conferral with you with respect to that intention. To refresh your recollection, I had originally requested the earliest available Thursday - Sunday times for me and/or my representatives to review the documents. To assist you those dates are:

> - July 29 - Aug. 1
> - Aug. 5 - 8
> - Aug. 12 - 15
> - Aug. 19 - 22
> - Aug. 26 - 29

As part of my request, I am again asking you to inform me of the process for accessing the boxes of documents located at the Orlando warehouse, points of contact, the precise hours of operation, whether or not copying/scanning service is available there, will there be someone there to pull additional boxes if needed, etc. Again, the box numbers I wish to review were provided to you on July 1, over two weeks ago.

Also, were you aware that Broad and Cassel was retained by Mirabilis Ventures for various insurance and worker's comp issues and in 2006 - I keep seeing Ken Levine's name with an email address at Broad and Cassel on several emails providing insurance advice to AEM, MVI et. al.

Thanking you I am,

Terence Chu

----- Forwarded message from terence.chu@palaxar.com -----
     Date: Fri, 09 Jul 2010 14:18:07 -0600
     From: terence.chu@palaxar.com
   Reply-To: terence.chu@palaxar.com
    Subject: RE: MVI indexes - document review
       To: Nicolette Vilmos <nvilmos@broadandcassel.com>

Ms. Vilmos:

Thank you for your reply. I would like access to the documents as soon as possible. You haven't provided the procedures to accessing the documents in the warehouse. Is the process to have all the boxes pulled and stacked and I am to go through them on site at the warehouse or is there an attendant that pulls them one at a time as I need them? Is there a photocopier and/or scanner there? Or do I mark the ones I need copies of and you provide that later?

**EXHIBIT A**
**Page 19 of 23**

I would like to have them the on a Thursday - Sunday timeframe, so tell the earliest they would be available on a Thursday - Sunday so I can make the appropriate arrangements.

Thank you,
Terence Chu

Quoting Nicolette Vilmos <nvilmos@broadandcassel.com>:

Mr. Chu,
Please provide me dates that work with your schedule and I will confirm which ones work for us.

Thank you,
Nicolette

-----Original Message-----
From: terence.chu@palaxar.com [mailto:terence.chu@palaxar.com]
Sent: Thursday, July 08, 2010 8:31 AM
To: Nicolette Vilmos; Todd K. Norman; Roy Kobert
Cc: kbhavener@havenerlaw.com; mraskin@raskinlaw.com;
randy.gold@usdoj.gov; scott.park@usdoj.gov
Subject: MVI indexes - document review

Counsel; I was provided a list of MVI indexes on Tuesday, June 29, 2010 at 9:00 p.m.  I responded Thursday, July 1, at 3:00 p.m. asking for a time when these might be made available. I am in Richmond, Virginia and the documents are in Orlando, Florida which requires flight arrangements. It has been a week and I have not yet been given available dates to the document warehouse.

Please advise when the documents would be made available for review.
Thank you,
Terence Chu

-------------------------- Original Message --------------------------
Subject: RE: [Fwd: MVI indexes]
From:   terence.chu@palaxar.com
Date:   Thu, July 1, 2010 1:31 pm
To:     "Nicolette Vilmos" <nvilmos@broadandcassel.com>
Cc:     "Todd K. Norman" <tnorman@broadandcassel.com>
        "Kathleen Havener" <kbhavener@havenerlaw.com>
        "raskinlaw.com@aol.com" <raskinlaw@aol.com>
-------------------------------------------------------------------

Ms. Vilmos:

Thank you for your response.  I apologize for the short notice, but I did turn around my request to you within 36 hours of receipt of the information.

EXHIBIT A
Page 20 of 23

Please tell me what is the earliest date the information will be made available. July 9 - 11?

Thank you,
Terence Chu

-------------------------- Original Message ----------------------------
Subject: RE: [Fwd: MVI indexes]
From:   "Nicolette Vilmos" <nvilmos@broadandcassel.com>
Date:   Thu, July 1, 2010 1:08 pm
To:     "'terence.chu@palaxar.com'" <terence.chu@palaxar.com>
        "Todd K. Norman" <tnorman@broadandcassel.com>
Cc:     "Kathleen Havener" <kbhavener@havenerlaw.com>
        "raskinlaw@aol.com" <raskinlaw@aol.com>
------------------------------------------------------------------------

We are not available for anyone to review the documents this weekend. It is a holiday weekend and short notice.  Please provide me a list of other dates that work for you and I will work on accommodating your request for a different time.

-----Original Message-----
From: terence.chu@palaxar.com [mailto:terence.chu@palaxar.com] Sent:
Thursday, July 01, 2010 3:07 PM
To: Nicolette Vilmos; Todd K. Norman
Cc: Kathleen Havener; raskinlaw@aol.com
Subject: [Fwd: MVI indexes]
Importance: High

Ms. Vilmos:

Due to family constraints, I can only have someone review records on Saturday and Sunday. Given the time delay in getting this information to  me, I would like to have this available for review this Saturday and Sunday.

Let me know the procedures for accessing the building where these boxes of documents are located.  Also, I ask that you provide a list of documents that are not located at the warehouse, e.g. with friends and/or relatives of Frank Amodeo.

As for the electronic data, I'll send you that request under separate cover.

Sincerely,
Terence Chu

 Box Barcode    Box Location
>>> Number  35th
[list of boxes requested]

>>> -------------------------- Original Message ----------------------------
>>> Subject: MVI indexes

EXHIBIT A
Page 21 of 23

>>> From:   "Nicolette Vilmos" <nvilmos@broadandcassel.com>
>>> Date:   Tue, June 29, 2010 9:02 pm
>>> To:     "'terence.chu@palaxar.com'" <terence.chu@palaxar.com> Cc:
 "Nicolette Vilmos" <nvilmos@broadandcassel.com>
-----------------------------------------------------------------------
Mr. Chu,

Attached is an index of the Mirabilis paper and electronic documents. Please advise when you
would like to inspect  the paper documents.  If you identify which electronic documents you
would like copied, we can advise you of the cost in advance and will copy them for you on a
form of electronic media once we receive payment.

Thank You,
Nicolette

_____


---------------------------- Original Message ----------------------------
Subject: Meet and Confer - Document Production
From:   terence.chu@palaxar.com
Date:   Mon, July 26, 2010 8:51 am
To:     "Nicolette Vilmos" <nvilmos@broadandcassel.com>
        tnorman@broadandcassel.com
        aestes@balch.com
        rcampbell@balch.com
        rkobert@broadandcassel.com
Cc:     kdavies@thedavieslawfirm.com
        kbhavener@havenerlaw.com
        mraskin@raskinlaw.com
        randy.gold@usdoj.gov
        scott.park@usdoj.gov
-----------------------------------------------------------------------
Ms. Vilmos:

I presume that you have reviewed Elizabeth Green's and Latham Shuker's recent affidavits and
motions. What caught my attention is her testimony that Bates and Mokwa were "preparing
documents in preparation of Frank Amodeo's criminal defense."  Those filings assert that
documents belonging to AEM and held by Dean and/or Anthony Amodeo were used to prepare
the amended complaint filed against me and my co-defendants but also the Joint Answer and
Affirmative Defenses (Doc 72) signed by Allen Estes and filed March 13, 2008.

Accordingly, I encourage you to re-think your previous assertions to me regarding document
production.  I am entitled to review and you are obligated to make these documents available to
me for my inspection. I ask you again to confirm that such documents are housed in the
warehouse and will be available for my inspection.

EXHIBIT A
Page 22 of 23

In addition, I have not yet heard back from you regarding the cost to obtain copies the electronic data. Please respond immediately so that I may continue to prepare for document review on August 6th and 7th.

As you consider my numerous requests, please note that the relevant Florida Rules of Professional Conduct to keep in mind are Sections 4-3.2, 4-3.3, 4-3.4(a), 4-4.1, 4-4.3, and 4-4.4. Also, please be advised that this is my conferral with you regarding my intent to file a Motion to Compel in light of Ms. Green's recent testimony and because I have yet to receive initial disclosures.

Sincerely,
Terence Chu

**EXHIBIT A**
**Page 23 of 23**

Exhibit B

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

IN RE: MIRABILIS VENTURES, INC.
Bankruptcy Case No.: 6:08-Bk-4327-KSJ

MIRABILIS VENTURES, INC.

     Plaintiff,

v.                                                    Case No. 6:09-cv-1974-Orl-31DAB

BUCHANAN, INGERSOLL, & ROONEY, P.L.,
SAXON, GILMORE, CARRAWAY, GIBBONS,
LASH & WILCOX, P.A., and HANS
CHRISTIAN BEYER,

     Defendants.

_____/

## AFFIDAVIT OF ELIZABETH A. GREEN

STATE OF FLORIDA

COUNTY OF ORANGE

     **ELIZABETH A. GREEN,** being duly sworn, hereby deposes and says:

     1.    My name is Elizabeth A. Green. I am over 21 years of age and fully competent to make this declaration. Unless otherwise stated, I have personal knowledge of the facts set forth in this affidavit.

     2.    I was bankruptcy counsel for Mirabilis Ventures, Inc. ("MVI") from May 27, 2008 through September 19, 2009. I was a partner at the law firm of Latham, Shuker, Eden and Beaudine, LLP ("LSEB") until September 19, 2009.



EXHIBIT
1

EXHIBIT B
1 OF 27

3.     On May 14, 2008, I met with Assistant United States Attorney Randall Gold, Assistant United States Trustee Kenneth Meeker, and R. Scott Shuker, to discuss the filing of a Chapter 11 bankruptcy case for MVI.

4.     At the meeting, Mr. Gold, Mr. Meeker, Mr. Shuker and I discussed the payroll ("941") tax issues related to MVI.  At the time, Mr. Frank Amodeo ("Amodeo") had been indicted and charged in connection with the MVI tax scheme, and Mr. Gold was the lead prosecutor for this case.  Mr. Gold told Mr. Shuker and me that MVI had essentially stolen or had conspired to steal approximately $200,000,000.00 in payroll tax payments.

5.     During this meeting, Mr. Gold stated that Mr. Hans Beyer ("Beyer") was significantly involved in MVI and was on his list of potential targets involved in the MVI tax conspiracy.

6.     On May 27, 2008 ("Petition Date"), the existing directors of MVI, Shane Williams and Jay Stollenwork appointed Michael Moecker as a director of MVI by unanimous consent.  Mr. Moecker is an insolvency professional with thirty years of experience. Mr. Williams and Mr. Stollenwork immediately resigned from the MVI board of directors.

7.     On May 27, 2008, Mr. Moecker appointed Mr. R. W. Cuthill, Jr. as President of MVI. Mr. Cuthill is a former certified fraud examiner and an insolvency and fraud expert with extensive experience in fraud and bankruptcy cases.

8.     Neither Mr. Moecker nor Mr Cuthill had any previous affiliation with or knowledge regarding MVI.

9.     On May 27, 2008, Mr. Cuthill signed as President and I filed as MVI's attorney, a petition for Protection under Chapter 11 of Title 11 of the United States Code for MVI ("Petition").  The purpose of the Chapter 11 case was to liquidate the assets of MVI and

2

**EXHIBIT B**
2 OF 27

distribute the proceeds thereof to the victims/creditors in accordance with the priorities set forth in the Bankruptcy Code.  Upon filing the bankruptcy case, Mr. Cuthill had a fiduciary duty to the creditors and parties in interest of MVI's bankruptcy estate ("Estate").

10.     At the time of the Petition, all of the corporate books and records of MVI, including electronic records, were held by the United States of America ("USA") pursuant to a grand jury subpoena.  The records were located in two warehouses ("Document Warehouse") and were comprised of  millions of pages of documents, tens of thousands of hours of video and multiple terabytes of electronic data. There were between five and six thousand boxes of documents between the two warehouses.  Due to concerns about  the effects on its criminal investigation, the USA would not give Mr. Moecker and Mr. Cuthill access to the Document Warehouse until early November 2009.  Mr. Cuthill did have some very  limited access to MVI documents on one of the MVI servers.

11.     The assets of MVI included, among other assets, numerous law suits in which MVI was a Plaintiff or Defendant/Cross-Plaintiff and potential claims against various parties, including former professionals employed by MVI.

12.     Prior to the Petition Date, the pre-petition lawsuits were being prosecuted by a number of law firms and were being overseen by Mr. Aaron Bates and Mr. Mathew Mowka of the firm of Bates & Mowka.

13.     Mr. Bates had been the MVI in-house counsel from March of 2006 for a period of approximately one year, and at the time of the filing of the petition, he was outside counsel for MVI.

3

14.     Within weeks of the Petition Date, I met with Mr. Cuthill, Mr. Bates and Mr. Mowka to discuss the status of the pre-petition lawsuits and to commence an initial evaluation of the validity and value of the potential claims of MVI's bankruptcy estate.

15.     At that meeting, Mr. Bates stated that he spent the previous year analyzing and gathering information related to claims of MVI and assisting with an orderly wind down of MVI.

16.     At that meeting, Mr. Bates and Mr. Mowka stated that they believed—based upon the facts known to Mr. Bates at the time as former in house counsel and outside counsel—MVI held a valid claim against Mr. Beyer, his current law firm Saxon, Gilmore ("Saxon") and his former law firm, Buchanan, Ingersoll ("Buchanan"), for malpractice related to his representation of MVI and his advice and involvement with the 941 tax scheme. During the course of the case I had multiple conversations with Mr. Bates regarding the facts related to Mr. Beyer and Saxon's representation of MVI and its affiliates and their involvement or knowledge of the tax scheme.

17.     On June 16, 2008, I filed a Motion to Stay all Pending Litigation ("Motion to Stay") (Bk. Doc. 27) for a period of sixty days so that the Debtor could analyze the status of the pre petition lawsuits and retain professionals to pursue the litigation.  The Motion to Stay was granted as to certain cases on July 9, 2008.

18.     MVI did retain a number of professionals to pursue litigation and determined that the professional liability litigation—including the potential litigation against Mr. Beyer—would be prosecuted by LSEB's litigation department.

19.     Citing concerns over its effect on the USA's ongoing criminal case, on August 14, 2008, the USA filed a motion to intervene and to stay MVI and its affiliates Bankruptcy Cases ("Intervenor Motion") (Bk Doc. 48).

4

20.     On September 23, 2008, Mr. Amodeo pled guilty to five counts of the indictment. In the plea, Mr. Amodeo agreed to forfeit all proceeds of his conspiracy, including all of the assets of MVI and related debtors.

21.     In addition, on September 23, 2008 the USA filed a motion to dismiss the bankruptcy cases (Bk. Doc 71).

22.     On September 29, 2008, the Intervenor Motion was scheduled to be heard before the Bankruptcy Court. The parties stipulated to an adjournment of the hearing. As a condition of the adjournment, the USA required that MVI not spend any funds related to litigation or claims unless necessary to preserve an asset of the estate. This was because the USA contended that all assets of MVI were to be forfeited to the USA pursuant to the terms of Mr. Amodeo's plea agreement.

23.     On September 29, 2008, the USA filed an uncontested Motion of Preliminary Forfeiture in the United States District Court for the Middle District of Florida and a Preliminary Order of Forfeiture was entered on October 2, 2008 (District Court Doc. 40, 46). The Order forfeited all assets of MVI to the USA.

24.     On October 30, 2008, the USA indicted MVI. The indictment included criminal forfeiture counts.

25.     From mid-October 2008 through mid-November 2008, Mr. Cuthill, on behalf of the Estate, entered into discussions related to the co existence of criminal forfeiture proceedings against insiders and others involved in the MVI conspiracy and the administration of certain assets, including the professional liability causes of action for the Estate. In connection with this meeting, Mr. Cuthill, Mr. Gold and I discussed which assets should be subject to forfeiture and which assets would be better administered through the Bankruptcy Court. On November 25,

5

2008, the USA and MVI noticed a compromise on twenty days negative notice, which resolved the competing ownership claims to the MVI assets (Bk. Doc. 101). Given the uncertainty of how the MVI assets were to be administered and the agreement between the Estate and the USA not to spend any Estate funds except as necessary to preserve asset value, action could not be taken with regard to any of the Estate's lawsuits or claims until after the compromise was reached. The compromise retained for the MVI estate any cause of action for malpractice against professionals. Mr. Gold and I discussed the basis for the malpractice actions, including the claim against Mr. Beyer. The compromise also provided that the USA and the Debtors shall cooperate in maintaining the documents which were being held pursuant to the grand jury subpoena.

26.    On December 15, 2008, Forge Capital Partners ("Forge") objected to the compromise. A hearing on the objection was held before the Bankruptcy Court on February 18, 2009 (Bk. Doc 137), and an Order was entered approving the compromise on March 4, 2009 (Bk Doc. 145).

27.    Customers and affiliates of MVI received grand jury subpoenas in early December 2006. MVI was aware of the issuance of these subpoenas and, therefore, MVI knew or should have known that the tax scheme was arguably illegal at that time. The two-year statute of limitations for malpractice against professionals of MVI, including Mr. Beyer would, therefore, run in early December 2008. It was uncertain whether the statute would be extended under the Bankruptcy Code, and Mr. Cuthill directed that the Complaint be filed before the expiration of the two-year statute of limitations. Mr. Cuthill was not permitted to access the Document Warehouse, and had limited access to documents until early November 2009. Due to the USA's requirement that no work be done on lawsuits until the Motion to Dismiss filed by the USA was resolved, work did not begin on the Beyer complaint until mid-November 2008.

6

28.     Despite Mr. Cuthill's limited access to documents, he had obtained a copy of a complaint ("Complaint") against Mr. Beyer, Buchanan, and Saxon, which was found in the limited documents available to him. Mr. Bates stated that the Complaint was drafted by outside litigation counsel and himself. Mr. Cuthill also obtained a copy of a timeline indicating that Mr. Beyer had knowledge of the tax scheme. The timeline was kept in the Document Warehouse. Mr. Cuthill gave the Complaint to LSEB litigation counsel and gave the timeline to me and LSEB litigation counsel. A copy of the Complaint is attached hereto as Exhibit A.

29.     The Complaint, my conversations with Mr. Bates as MVI's former in-house and outside  counsel, and the statements of Mr. Gold formed the basis for the Original Complaint against Mr. Beyer, Buchanan, and Saxon.  The Original Complaint was revised by LSEB litigation counsel and filed on December 8, 2008 (Adversary Proceeding Doc. 1).

30.     On February 1, 2009, Mr. Beyer and Saxon filed a motion to Dismiss the Original Complaint.

31.     On February 15, 2009   Justin Luna, an associate with LSEB, contacted Mr. Varner at my direction and told Mr. Varner that the Original Complaint would be dismissed and requested fourteen days to file an Amended Complaint. Mr. Varner agreed to the dismissal of the Original Complaint and the time to amend on February 16, 2009.

32.     On February 18, 2009, Mr. Varner served his first Rule 9011 letter.

33.     On February 19, 2009, the Bankruptcy Court dismissed the Original Complaint against all defendants with leave to amend (Adv. Doc. 22).

34.     The Agreed Order Granting Motion to Dismiss was entered by the Bankruptcy Court on March 4, 2009 (Adv. Doc. 23).

7

**EXHIBIT B**
7 OF 27

35.     After the Original Complaint was dismissed—but prior to the time the Amended Complaint was filed—Mr. Bates called me and invited me to lunch. At the lunch, he gave me a two-page memorandum prepared by MVI and related to Mr. Beyer's and Saxon's involvement with MVI, "including his (Mr. Beyer's) knowledge of the increasing payroll liabilities of Presidion and the use of the funds to benefit MVI". A copy of that memorandum is attached hereto as Exhibit B. He also gave me a binder comprised of a number of documents which supported the assertion that Mr. Beyer represented MVI and that he had knowledge of the payroll liabilities. The documents and memorandum were business records of MVI which Mr. Bates obtained from the Document Warehouse prior to the petition date.

36.     In addition, Mr. Cuthill provided a binder related to Mr. Beyer's knowledge of the tax liabilities, and a video of a meeting with Mr. Amodeo and others in which tax liabilities were discussed. Mr. Cuthill personally knew Mr. Beyer and had seen Mr. Beyer on numerous occasions prior to March of 2009. Mr. Cuthill told me that he had viewed the video and that Mr. Beyer was in attendance at the meeting. The binder and video were kept in the Document Warehouse.

37.     I also met with Mr. Cuthill to discuss the factual allegations set forth in the Amended Complaint, including the basis for the allegations and the documents supporting the allegations.

38.     On March 18, 2009, the Amended Complaint was filed (Adv. Doc. 26). Buchanan was not joined as a defendant in the Amended Complaint because Buchanan's counsel provided evidence—including time records—that Buchanan had not provided services to MVI.

39.     On April 15, 2009, the Defendants filed a Motion to Dismiss the Amended Complaint. (Adv. Doc. 15).

8

**EXHIBIT B**

40.     Although the Motion to Dismiss the Bankruptcy Case—filed by the USA—was resolved, there was a pending Motion to Dismiss the entire Bankruptcy Case, which was filed by Forge. That motion was joined by Mr. Beyer and Saxon on May 12, 2009 (Bk. Doc. 185).

41.     On May 20, 2009, Mr. Varner—on behalf of Mr. Beyer and Saxon—served a second sanctions letter.

42.     On June 9, 2009, Justin Luna and I drove to Tampa, Florida to meet with Mr. Varner.  We brought with us a binder of documents which supported the allegations that Mr. Beyer and Saxon represented MVI and that Mr. Beyer and Saxon participated in the payroll scheme, including meeting with the IRS.

43.     Mr. Varner stated only that everyone knows that taking 941 money is illegal and, therefore, that Mr. Beyer would not have provided any advice regarding the tax scheme.

44.     He also stated that Mr. Beyer and Saxon did not represent MVI in tax matters.

45.     Mr. Luna and I requested that Mr. Varner provide us with an engagement letter and billing records.

46.     Mr. Varner did not provide the engagement letter, billing records or any other evidence that Saxton and Mr. Beyer did not provide tax advice to MVI.

47.     On June 30, 2009, the Bankruptcy Court entered an order denying the Motion to Dismiss the adversary proceeding (Adv. Doc. 30, 31).  The court specifically found that the Amended Complaint was not a "shot gun" pleading and that it stated a cause of action for malpractice against Saxon and Mr. Beyer.

48.     On August 26, 2009, the Bankruptcy Court held a pretrial conference and expressly ruled that discovery in the adversary proceeding could commence on October 1, 2009 (Adv. Doc. 34, 35).

9

**EXHIBIT B**
9 OF 27

49.     On August 26, 2009, the Bankruptcy Court denied the Forge and Beyer motions to dismiss the entire bankruptcy case (Bankr. Doc. 265).  In its ruling, the Bankruptcy Court stated that the movants (including Mr. Beyer and Saxon) argued that the filing was in bad faith and was a diversionary tactic to recover damages from professionals to reduce the sentence of Mr. Amodeo.  (Bankr. Doc. 284, at 10-12).  The court specifically found that MVI had not acted in bad faith and that there were millions of dollars in claims owed to real creditors of MVI (Bankr. Doc. 284, at 13).

50.     On September 1, 2009, Mr. Beyer and Saxon filed an Answer to the Amended Complaint (Adv. Doc. 36).

51.     On September 19, 2009, I resigned as a partner at the LSEB firm.  MVI chose to have its matters remain at the LSEB firm.

52.     On September 22, 2009, Mr. Shuker was substituted as counsel for MVI in both the main case and the adversary case (Bk. Doc. 301; Adv. Doc. 37).

53.     I did not and was not able to conduct any discovery in this matter because I withdrew as MVI's counsel prior to the start of discovery in this case.

Further affiant sayeth not.

ELIZABETH A. GREEN

10

**EXHIBIT B**
10 OF 27

STATE OF FLORIDA )
)
COUNTY OF *ORANGE* )

    Sworn to and subscribed before me this 22nd day of July, 2010 by **ELIZABETH A.**

**GREEN** [X] personally known to me or [ ] who has produced <u>a valid Florida driver's license</u> as

identification.



Print Name: _JANICE M. DRIGGERS_

Notary Public

My commission expires: _9|6|2011_

BARRISTERS, 009962, 000187, 502957896.2, Affidavit of Elizabeth Green
DRAFT 7/23/10

11

**EXHIBIT B**
11 OF 27

IN THE CIRCUIT COURT OF THE
NINTH JUDICIAL CIRCUIT, IN AND FOR
ORANGE COUNTY, FLORIDA

CASE NO.: _____

FRANK L. AMODEO,

        Plaintiff,

vs.

BUCHANAN, INGERSOLL, & ROONEY, P.C.,
SAXON, GILMORE, CARRAWAY, GIBBONS,
LASH & WILCOX, P.A., and HANS C. BEYER,

        Defendants.

_____

### COMPLAINT

    COMES NOW the plaintiff, Frank L. Amodeo ("Amodeo"), by and through his undersigned counsel, and for his Complaint against the defendants, Buchanan, Ingersoll, & Rooney, P.C. ("Buchanan Ingersoll"), Saxon, Gilmore, Carraway, Gibbons, Lash, & Wilcox, P.A. ("Saxon Gilmore"), and Hans C. Beyer ("Beyer") (Buchanan Ingersoll, Saxon Gilmore, and Beyer shall sometimes be collectively referred to herein as the "Defendants"), states and alleges as follows:

    1.    This is an action for damages substantially in excess of $15,000.00, exclusive of interest, costs, attorneys' fees, and/or punitive damages.

    2.    Amodeo is a resident and citizen of Orange County, Florida, and sui juris.

    3.    Buchanan Ingersoll is a Pennsylvania professional corporation authorized to transact business in the State of Florida and which maintains a substantial business presence in Dade County, Florida.

<div align="center">1</div>



EXHIBIT
EXHIBIT B
12 OF 27

4.      Saxon Gilmore is a Florida professional association with its principal place of business in Hillsborough County, Florida.

5.      Upon information and belief, Beyer is a citizen and resident of Hillsborough County, Florida, and sui juris, who was at all times relevant to the events described herein an employee and/or agent of Buchanan Ingersoll and Saxon Gilmore and was acting within the scope of his employment and/or that agency.

6.      This Court has subject matter jurisdiction of this action pursuant to Florida Statutes § 26.012(2)(a).

7.      The events giving rise to the claims alleged in this Complaint arose in Orange County, Florida. Venue in this Court is therefore proper pursuant to Florida Statutes Ch. 47.

8.      All conditions precedent to the bringing of this action by Amodeo has occurred, or their performance has been waived by Defendants.

## GENERAL ALLEGATIONS

9.      At all times material hereto, Beyer was licensed to practice law in the State of Florida and was actively engaged in the same.

10.     In or about August 2004, Amodeo was approached by principals of Presidion Corporation, a publicly-traded company, and its affiliates and subsidiaries (collectively "Presidion"), regarding developing and implementing a plan of reorganization for Presidion.

11.     At the time, Presidion owed over $55,000,000.00 in outstanding liabilities, with the majority of said liabilities being payroll taxes owed by certain professional employee organization ("PEO") operating subsidiaries of Presidion, including Sunshine Staff Leasing, Inc.

2

**EXHIBIT B**
13 OF 27

a/k/a Presidion Solutions, I, Inc. ("Sunshine Staffing"); Sunshine Companies, II, Inc. ("Sunshine II"); Sunshine Companies, III, Inc. a/k/a Presidion Solutions, IV, Inc. ("Sunshine III"); and Sunshine Companies, IV, Inc. a/k/a Presidion Solutions, V, Inc. ("Sunshine IV") (collectively the "Sunshine Companies").

12.     Amodeo's proposed strategy involved deconsolidating, divesting, and liquidating the Sunshine Companies.

13.     The divestiture and liquidation of the Sunshine Companies would then be used to pay creditors, including the Internal Revenue Service.

14.     Additionally, Amodeo's proposed strategy allowed Presidion to deconsolidate its financials and separate itself from the excessive liabilities associated with its subsidiaries, allowing it to continue to conduct business as a going concern (collectively the "Sunshine Companies Plan").

15.     Amodeo was retained by Presidion in October 2004.

16.     Because of the complexities involved in the Sunshine Companies Plan, particularly with regard to legal and tax implications of the proposed strategy, Amodeo sought advice and opinions from multiple professionals, including attorneys and accountants qualified to provide such advice.

17.     In or about November 2004, Amodeo requested Beyer and Buchanan Ingersoll, who had already been retained by Amodeo for representation and advice with respect to various bankruptcy matters, to represent and advise Amodeo as to the implications and potential consequences resulting from the Sunshine Companies Plan.

3

**EXHIBIT B**

18.     Beyer attended numerous meetings and worked extensively in providing advice and counsel relevant to the Sunshine Companies Plan.

19.     In particular, on December 21, 2004, Amodeo, Beyer, Richard E. Berman ("Berman"), a director of the law firm of Berman, Kean, & Riguera, P.A. ("BKR"), Laurie Holtz ("Holtz") and José I. Marrero ("Marrero"), principals of Rachlin, Cohen, & Holtz, LLP ("Rachlin"), the General Counsel of Presidion, and various other professionals met to develop a detailed assignment of tasks with respect to the Sunshine Companies Plan.

20.     In or about December 2004, Amodeo began to implement the Sunshine Companies Plan as Wellington Capital Group, Inc. ("Wellington"), a company owned by Amodeo, purchased the Sunshine Companies from Presidion, immediately ceased operations of the Sunshine Companies, subsequently dissolved them, and liquidated their remaining assets for a total liquidated value of approximately $3,000,000.00, all of which was paid over to the Internal Revenue Service.

21.     On January 6, 2005, Beyer, Berman, Marrero, Daniel Myers, and Amodeo attended a meeting at the Plantation, Florida Internal Revenue Service collections office (the "Plantation Office") in which the details of the Sunshine Companies Plan were specifically discussed, including the non-payment of taxes by the Sunshine Companies, of which the Internal Revenue Service was unaware.

22.     Beyer and Buchanan Ingersoll advised that the Sunshine Companies Plan, and the actions taken in connection therewith, complied with all local, state, and federal laws.

23.     In or about March 2005, Beyer left Buchanan Ingersoll to join Saxon Gilmore.

4

**EXHIBIT B**

24. Beyer informed Amodeo that the reason for his departure from Buchanan Ingersoll was a result of Buchanan Ingersoll's decision to move away from bankruptcy practice.

25. Upon information and belief, Beyer and Buchanan Ingersoll failed to inform Amodeo that the actual reason for Beyer's departure from Buchanan Ingersoll was that Beyer had breached his fiduciary duties to clients by participating in self-dealing and entering into transactions with clients in which Beyer received a direct economic benefit above, beyond, and disproportionate to the compensation he received as their attorney.

26. Immediately thereafter, Amodeo retained Beyer and Saxon Gilmore to provide the same services for which Beyer and Buchanan Ingersoll were previously retained to provide. *See* **Exhibit A** attached hereto and incorporated herein by reference.

27. During the Sunshine Companies Plan, Amodeo sought and received legal and tax advice from various professionals, including Defendants, which provided, in pertinent part, that any tax liabilities incurred by a subsidiary would remain with that subsidiary and such liability would not attach to the detriment of the parent company or affiliated subsidiaries pursuant to a strict silo theory of tax liability.

28. Extensive research and written opinions were provided by the professionals retained by Amodeo, including Defendants, to validate the opinion of the requirements of the Internal Revenue Code, including a memorandum of law prepared in April 2005 by BKR which specifically addressed the question of what, if any, liability may arise or inure to the detriment of Amodeo or his staff by engaging in the Sunshine Companies Plan (the "April 2005 Memo"). *See* **Exhibit B** attached hereto and incorporated herein by reference.

<center>5</center>

<center>**EXHIBIT B**
16 OF 27</center>

29.     Beyer and Saxon Gilmore were consulted and actively involved in the preparation of the April 2005 Memo.

30.     The April 2005 Memo failed to inform Amodeo that persons with the authority to exercise significant control over the financial affairs of a company have a statutory duty to collect, withhold, truthfully account for, and pay over payroll "trust fund" taxes and a failure to intervene to stop and/or mitigate the nonpayment of collected payroll "trust fund" taxes collected could result in significant liability, particularly criminal liability, despite multiple requests from Amodeo as to the potential consequences of the Sunshine Companies Plan.

31.     Amodeo paid over $100,000.00 in professional fees related to the preparation of the April 2005 Memo.

32.     In or about May 2005, Amodeo was approached again by Presidion regarding problems they were encountering with certain other PEO subsidiaries, particularly problems relating to worker's compensation insurance coverage, shortfall of working capital for the PEO operating subsidiaries, and a tax liability which had increased to over $80,000,000.00 since August 2004.

33.     The affected Presidion subsidiaries were Presidion Solutions, Inc. ("PSI"), and its wholly-owned PEO operating subsidiaries, Professional Benefits Solutions, Inc. a/k/a Presidion Solutions, VII, Inc. ("PBS") and Paradyme, Inc. ("Paradyme").

34.     The lack of worker's compensation insurance was particularly catastrophic, as it caused the value of PSI, PBS, and Paradyme assets to drop drastically as well as trigger additional defaults under a variety of loan and security agreements resulting in PSI, PBS, and Paradyme assets becoming subject to immediate expropriation by secured creditors.

6

**EXHIBIT B**

35.   Based on the previous legal opinions provided by professionals retained by Amodeo, including Beyer and Buchanan Ingersoll, Amodeo proposed a strategy to resolve the new problems encountered by Presidion, PSI, PBS, and Paradyme, whereby:

    a.   The lack of worker's compensation insurance was resolved through Amodeo obtaining insurance coverage by virtue of his agreement to act as a personal indemnitor with regard to the obligations owed to the insurer; and

    b.   The lack of working capital would be provided through:

        i.   PSI truthfully and accurately accounting and reporting the taxes collected by PBS and/or Paradyme, relevant to their respective federal employer identification numbers ("FEIN"); and

        ii.   Using the collected payroll tax funds to pay for services to be rendered by PSI to PBS and/or Paradyme in the ordinary course of business (i.e. worker's compensation premium payments, administrative services, information technology, critical vendor payments, etc...) (collectively the PBS Plan).

36.   Defendants were actively engaged in, and a part of, the development of the PBS Plan.

37.   The PBS Plan would allow for accrued tax liabilities to remain with the FEIN of PBS and/or Paradyme, while providing additional funds to enable PEO operations to continue until the business was restored to a position wherein it could pay all of its outstanding liabilities.

7

**EXHIBIT B**

38.     As part of the PBS Plan, Wellington subsequently purchased PSI on or about July 28, 2005, in order to preserve the value of the assets for creditors of PSI, and to preserve PSI as a viable entity so it could pursue the recovery of certain substantial claims.

39.     Prior to, during, and after the implementation of the PBS Plan, Amodeo sought professional advice and counsel from Beyer and Saxon Gilmore as to what, if any, personal civil or criminal liability may arise or inure to the detriment of Amodeo or his staff by engaging in the PBS Plan.

40.     Furthermore, Beyer and Saxon Gilmore advised that the PBS Plan and actions taken in connection therewith, complied with all local, state, and federal laws.

41.     At all times material hereto, Beyer was actively involved in providing counsel relevant to, and directly participating in, the development and implementation of the Sunshine Companies Plan and PBS Plan, in particular:

    a.  Beyer completed drafts of bankruptcy petition schedules in or about June 2005, which acknowledged the tax liability of PBS and Paradyme in advance of a potential decision to file bankruptcy on behalf of PSI as part of the PBS Plan;

    b.  Beyer compiled and reviewed an index of all of the documents related to the PBS Plan;

    c.  Beyer attended numerous meetings with the Internal Revenue Service to discuss the tax liability of PBS and Paradyme, which included discussions of the non-payment of taxes by the Sunshine Companies, PBS, and Paradyme;

8

**EXHIBIT B**
19 OF 27

d. Beyer assisted in answering questions asked to Amodeo, PSI, the Sunshine Companies, PBS, and Paradyme by the District Counsel for the Plantation Office;

e. Beyer drafted correspondence to the Plantation Office addressing the non-payment of taxes by the Sunshine Companies, PSI, PBS, and Paradyme;

f. Beyer participated in the revision of a narrative describing the Sunshine Companies Plan and PBS Plan;

g. Beyer reviewed and commented on multiple memorandums of law prepared by professionals retained by Amodeo which analyzed and provided advice related to the potential consequences of the Sunshine Companies Plan and PBS Plan, including: (i) the April 2005 Memo; (ii) a memo discussing the respective priority of perfected liens and taxes pursuant to the Federal Tax Lien Act; and (iii) a memo discussing the ramifications of the Debt Refinancing Agreement between PSI and Mirabilis;

h. In or about July 2006, Beyer attended a mock deposition of Amodeo in preparation of potential depositions in connection with civil proceedings arising out of the Sunshine Companies Plan and PBS Plan, specifically with regard to the tax strategy employed (the "Mock Deposition").

See **Composite Exhibit C** attached hereto and incorporated herein by reference.

42.     During and after the Mock Deposition, concerns were raised by various professionals not a party to the development of the Sunshine Companies Plan and PBS Plan, regarding the legality of the same.

9

**EXHIBIT B**
20 OF 27

43.     Particularly, Edith Curry ("Curry") – another attorney retained by Amodeo to represent and advise Amodeo as to the implications and potential consequences resulting from the Sunshine Companies Plan and PBS Plan – informed Beyer that the answers provided by Amodeo during the Mock Deposition implied that illegal acts relevant to racketeering had taken place in connection with the Sunshine Companies Plan and PBS Plan.

44.     Subsequent to the Mock Deposition, Berman, Holtz, Beyer and Curry coached Amodeo on how to answer questions related to the Sunshine Companies Plan and PBS Plan so that it would not appear as if illegal acts relevant to racketeering had taken place in connection therewith.

45.     At all times material hereto, Beyer failed to advise Amodeo that persons with the authority to exercise significant control over the financial affairs of a company have a statutory duty to collect, withhold, truthfully account for and pay over payroll "trust fund" taxes and that failure to intervene to stop and/or mitigate the nonpayment of collected payroll "trust fund" taxes collected could result in significant liability, particularly criminal liability, despite multiple requests from Amodeo as to the potential consequences of the Sunshine Companies Plan and PBS Plan.

46.     At all times material hereto, Amodeo was never advised that criminal liability may result from the actions taken in connection with the Sunshine Companies Plan or PBS Plan.

47.     As opposed to advising Amodeo of the aforementioned liability potentially resulting from the Sunshine Companies Plan and PBS Plan, and resigning/terminating his representation if Amodeo did not cease the potentially illegal conduct, Defendants chose to instead obtain a direct pecuniary interest from his representation of Amodeo.

10

**EXHIBIT B**

48.     Particularly, Defendants were the direct beneficiaries of significant amounts of compensation and consideration flowing from the Sunshine Companies Plan and PBS Plan and the resulting unpaid payroll "trust fund" taxes of PSI, PBS, and Paradyme, including:

a.   Beyer became an officer and employee of Mirabilis Ventures, Inc. ("Mirabilis"), a company which received approximately $72,726,446 from PSI and Amodeo through direct investments and loans;

b.   Beyer's employment with Mirabilis resulted in direct compensation of approximately $328,000.00 for the year he was employed by Mirabilis;

c.   Beyer negotiated to receive approximately $20,000,000.00 in further compensation from Mirabilis upon occurrence of certain events;

d.   Beyer received approximately $8,999,262.98 from PSI and Amodeo through investments in Beyer-sponsored projects in which Beyer had a potential direct economic benefit;

e.   Buchanan Ingersoll received approximately $70,000.00 in professional fees for services rendered to Amodeo and the Sunshine Companies; and

f.   Saxon Gilmore received $406,411.21 in professional fees for services rendered to Amodeo, the Sunshine Companies, PSI, PBS, Paradyme, and/or Mirabilis.

See **Composite Exhibit D** attached hereto and incorporated herein by reference.

49.     In or about September 2006, the Internal Revenue Service and United States Attorney's Office for the Middle District of Florida began investigating Amodeo, Presidion, PSI, and others for potential civil and criminal liability arising from the alleged evasion of payment of taxes in connection with the Sunshine Companies Plan and PBS Plan.

11

**EXHIBIT B**

50.     Pursuant to the doctrine of respondeat superior, Buchanan Ingersoll and Saxon Gilmore are vicariously liable to Amodeo for the actions of its employee and/or agent Beyer.

## COUNT I – NEGLIGENCE

51.     Amodeo hereby reasserts by reference in this Count I the allegations of Paragraphs 1 through 50 of this Complaint as if fully set forth herein.

52.     At all times material hereto, an attorney-client relationship existed between Amodeo and Defendants.

53.     By accepting employment to render legal advice to Amodeo, Defendants had a duty to use such skill, prudence, and diligence as other attorneys of ordinary skill and capacity commonly possess and exercise in the performance of the tasks they undertake.

54.     Defendants breached their aforementioned duties and deviated from the applicable standards of professional care in that they failed to advise Amodeo that the Sunshine Companies Plan and PBS Plan could result in criminal liability for individuals acting in connection therewith, including Amodeo, and they failed to inform Amodeo that the actual reason for Beyer's departure from Buchanan Ingersoll was that Beyer had breached his fiduciary duties to clients by participating in self-dealing and entering into transactions with clients in which Beyer received a direct economic benefit.

55.     As a direct and proximate result of Defendants' negligence, Amodeo has suffered damage to his business, property, as well as emotional and mental injury, and accordingly seeks compensatory damages in the amount of $153,054,642.00.

12

**EXHIBIT B**
23 OF 27

56.   Moreover, Defendants' actions and conduct aforesaid were done willfully, intentionally, maliciously and with indifference to the rights of Amodeo, and Amodeo, therefore, seeks punitive damages in the amount of $100,000,000.00.

## COUNT II – BREACH OF FIDUCIARY DUTY AND SELF-DEALING

57.   Amodeo hereby reasserts by reference in this Count II the allegations of Paragraphs 1 through 56 of this Complaint as if fully set forth herein.

58.   At all times material hereto, a fiduciary relationship existed between Amodeo and Defendants, particularly, an attorney client relationship existed between Amodeo and Defendants.

59.   Defendants each breached their fiduciary duties to Amodeo, by virtue of their conduct described hereinabove, particularly, Defendants each failed to advise Amodeo that persons with the authority to exercise significant control over the financial affairs of a company have a statutory duty to collect, withhold, truthfully account for, and pay over payroll "trust fund" taxes and that failure to intervene to stop and/or mitigate the nonpayment of collected payroll "trust fund" taxes collected could result in significant liability, particularly criminal liability, despite multiple requests from Amodeo as to the potential consequences of the Sunshine Companies Plan and BBS Plan, and Defendants failed to inform Amodeo that the actual reason for Beyer's departure from Buchanan Ingersoll was that Beyer had breached his fiduciary duties to clients by participating in self-dealing and entering into transactions with clients in which Beyer received a direct economic benefit.

13

60.     Additionally, Defendants' breach of their fiduciary duties allowed Beyer to confer a benefit upon himself in a private capacity.

61.     As a direct and proximate result of Defendants' breach of fiduciary duties and self-dealing, Amodeo has been damaged in his business and property and accordingly seeks compensatory damages in the amount of $153,054,642.00.

62.     Moreover, Defendants' actions and conduct aforesaid were done willfully, intentionally, maliciously and with indifference to the rights of Amodeo, and Amodeo, therefore, seeks punitive damages in the amount of $100,000,000.00.

WHEREFORE, the plaintiff, Frank L. Amodeo, demands the following relief:

1.     That Amodeo have and recover from the Defendants the sum of $153,054,642.00 in compensatory damages resulting from Defendants' negligence, breach of fiduciary duties, and self-dealing together with $100,000,000.00 in punitive damages for the foregoing actions;

2.     That a jury be empaneled to hear this cause; and

3.     For such other and further relief to which Amodeo may be entitled.



14

and Open Issues" lays out all relevant legal and factual issues regarding the Presidion Reorganization Plan. *See* **Exhibit D**: (i) Beyer Personal Notes regarding Presidion reorganization; and (ii) Beyer Presidion Reorganization "Analysis of Certain Transactions" (collectively, No. 011606 Master Timeline); (iii) 01/16/06 Entities and People Relevant to Certain Details Memorandum; and (iv) 01/16/06 Tasks and Open Issues Memorandum.

7.     On or about April 20, 2006, Beyer attended a meeting with the IRS in which the unpaid taxes of the Presidion's PEOs (which were then over $140 million) were discussed. *See* **Exhibit E**: (i) Beyer 05/18/06 Expense Report detailing the meeting with the IRS and the topics discussed; i.e. Presidion taxes.

8.     On or about June 27, 2006, Beyer participated in the preparation and revision of AQMI's formal offer to the IRS for resolution of the outstanding payroll tax liabilities of 2the Presidion PEOs. See **Exhibit F**: (i) Beyer's 06/27/06 email to Amodeo with attached draft letter to Berkowitz of the IRS prepared and edited by Beyer (No. 062706.1 Master Timeline).

9.     On or about August 29, 2006, Beyer attended the Mock Deposition where Frank Amodeo ("Frank Amodeo") explained the Presidion reorganization plan in great detail; including the nonpayment of PBS payroll taxes. By this time, the unpaid payroll taxes were over $170 million. *See* **Exhibit G**: (i) Attendees of the Mock Deposition; (ii) Transcript of the Mock Deposition; (iii) Video of the Mock Depotion (*collectively*, 082906.1 Master Timeline).

10.     On or about November 30, 2006, Beyer met with Amodeo, Peter Collins, Robert Moreyra, and Jim Sadrianna to discuss a global resolution of the outstanding PEO payroll tax liabilities. *See* **Exhibit H**: (i) Video of 11/30/06 Meeting (No. 113006.1 Master Timeline).

11.     Beyer and the law firms he worked for were the direct recipients of over $900,000. Beyer also developed several business interests which were funded by the payroll taxes of PBS, including Pacific Atlantic Capital Corporation, Hudson Nursery, and the Lake Ellen project. *See* **Exhibit I**: (i) Draft Compensation Report regarding Beyer; (ii) Deposition Testimony of Peter Collins stating that Beyer received an undisclosed $120,000 for organizing an ill-advised Mirabilis Acquisition in 2006.

### HANS C. BEYER
### MEMORANDUM

The purpose of this memorandum is to explain Hans Beyer's ("Beyer") involvement with the professional employer organization ("PEO") subsidiaries of Presidion Corporation ("Presidion") and Mirabilis Ventures, Inc. ("Mirabilis"), including his knowledge of the increasing payroll tax liabilities of the Presidion PEOs and the use of those funds for the benefit of Mirabilis.

1.      Beyer is a licensed attorney and an expert in corporate insolvency and bankruptcy law. *See* **Exhibit A**: (i) Beyer Personal Resume; (ii) Beyer Buchanan Ingersoll Resume; (iii) Beyer Saxon Gilmore Resume; and (iv) Beyer Mirabilis/Nexia Resume.

2.      Beyer was the President and Founder of Professional Payroll Services, Inc., a payroll administration company. *See* **Exhibit A**: (i) Beyer Personal Resume.

3.      Beyer was an Officer of Mirabilis, specifically Executive Vice-President of Mirabilis. *See generally* Mirabilis Ventures Corporate Governance.

4.      Beyer was one of the principal members of the AQMI Strategy Corporation ("AQMI") team of consultants tasked with the first piece of the Presidion reorganization (i.e. the Sunshine Companies Plan). In this capacity, he attended the December 21, 2004 meeting at the offices of Rachlin Cohen & Holtz, LLP where the initial Presidion reorganization strategy was developed, he attended the January 6, 2005 meeting with the IRS where the unpaid payroll taxes of the Sunshine Companies were specifically discussed, and he participated in the revision of the April 2005 memorandum from Berman, Kean, & Riguera, P.A. which stated that AQMI would not be responsible for the Sunshine Companies' unpaid payroll taxes. ·As a result, he was aware of the amount of taxes owed by Presidion's PEO subsidiaries beginning in December of 2004. *See* **Exhibit B**: (i) Beyer Personal Notes from the 12/21/04 meeting (No.122104.2 Master Timeline); (2) 1/04/05 Memorandum summarizing Sunshine Companies Plan and individual tasks.

5.      Additionally, when the second piece of the Presidion reorganization began in July of 2005 (i.e. the PBS Plan), Beyer completed drafts of bankruptcy petition schedules in or about June 2005, which expressly acknowledged the tax liability of PBS as it existed at the time. *See* **Exhibit C**: (i) Email to Amodeo discussing potential bankruptcy of Presidion; (ii) Draft Presidion Bankruptcy Schedules prepared by Beyer and Saxon Gilmore (collectively, No.122104.2 Master Timeline).

6.      Beginning in or about January of 2006, Beyer compiled all documents related to the Presidion reorganization plan in preparation for meetings with the IRS. His "Analysis of Certain Transactions" details all relevant debts, agreements, memorandum, etc. existing at this time. His handwritten notes related to the reorganization evidence express knowledge of the unpaid payroll taxes of the Presidion PEOs and the strategy moving forward. His memorandum titled "Entities and People Relevant to Certain Details" lays out all relevant legal and factual issues regarding the Reorganization Plan. His memorandum titled "Tasks



EXHIBIT
"B"
EXHIBIT B
27 OF 27

Exhibit C

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

In re:                                                    Case No.: 6:09-cv-01974-GAP-DAB

MIRABILIS VENTURES, INC.,                                 Bkry. Case No. 6:08-bk-04327-KSJ

            Debtor.
_____/

MIRABILIS VENTURES, INC.,                                 Case No.: 6:09-cv-01974-GAP-DAB

            Plaintiff,

v.

SAXON, GILMORE, CARRAWAY,
GIBBONS, LASH & WILCOX, P.A.,
and HANS CHRISTIAN BEYER,

            Defendants,
_____/

## LATHAM SHUKER EDEN & BEAUDINE, LLP AND JENNIFER S. EDEN, ESQ.'S RESPONSE TO THE DEFENDANTS' MOTIONS FOR SANCTIONS PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 9011, 11 U.S.C. §105(A), AND THE COURT'S INHERENT AUTHORITY

     Respondents, Latham, Shuker, Eden & Beaudine, LLP and Jennifer S. Eden, Esq.

(hereinafter collectively referred to as "LSEB"), by and through undersigned counsel, hereby files

their response to Defendants Saxon, Gilmore, Carraway & Gibbons, P.A. and Hans C. Beyer's

Motions for Sanctions and Incorporated Memorandum of Law (Doc. Nos. 41, 42) and in support

thereof state as follows:

**EXHIBIT C**
1 OF 40

## PROCEDURAL AND FACTUAL BACKGROUND

1.      On May 27, 2008, ("Petition Date") Mirabilis Ventures Inc. ("MVI") filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Bkrty. Doc. No. 1.

2.      On December 8, 2008, MVI initiated an adversary proceeding ("Adversary Proceeding") against Saxon, Gilmore, Carraway & Gibbons, P.A. and Hans C. Beyer (the "Defendants") alleging causes of action for negligence, negligent misrepresentation, professional negligence and negligent supervision (the "First Complaint")[1]. Adv. Pro. Doc. No. 1. The First Complaint was filed on or about the date the statute of limitations pursuant to Florida Statutes §95.11 (4)(a) was about to expire. Due to an agreement with the United States Attorney ("US Attorney"), as discussed *infra*, LSEB had only thirteen (13) days to review voluminous documents of MVI and draft the First Complaint.[2]

3.      On January 30, 2009, the Defendants filed a motion to dismiss the First Complaint asserting numerous boilerplate affirmative defenses and the failure to state a cause of action (the "First Dismissal Motion"). Adv. Pro. Doc. No. 15. Simultaneously with the filing of the First Dismissal Motion, counsel for the Defendants, Mr. Joseph H. Varner, III ("Varner"), served LSEB with a letter, purportedly written pursuant to Federal Rule of Bankruptcy Procedure 9011, demanding that LSEB withdraw or dismiss the First Complaint because: (i) the First Complaint

---

[1] In the First Complaint, Buchanan, Ingersoll & Rooney P.C. ("BIR") were also named as defendants; however, they were subsequently voluntarily dismissed as defendants in the adversary proceeding.

[2] In or around early December 2006, the PEO (Professional Employer Organizations) customers of MVI received subpoenas regarding the alleged criminal conspiracy to misuse payroll tax funds. At this time, MVI knew or should have known that the "tax scheme" opined upon by the professionals was illegal, and, as such, any action for professional malpractice would have begun to accrue.

2

**EXHIBIT C**
2 OF 40

lacked evidentiary support; and (ii) the use of the Bankruptcy Court to acquire funds for the benefit of Frank Amodeo was improper. At this time, Varner did not serve LSEB with a separate motion pursuant to F.R.B.P. 9011(c)(1)(A) describing the specific conduct alleged to violate F.R.B.P. 9011(b).

4.      On February 15, 2009, counsel for MVI sent counsel for the Defendants an email expressing its intent to amend the First Complaint to appropriately correct several allegations and contentions. On February 16, 2009, counsel for the Defendants agreed and stipulated that the First Complaint would be voluntarily dismissed without prejudice, and the Defendants would permit MVI fourteen (14) days from entry of the order to amend the First Complaint. However, in contravention to the agreement between the parties, on February 18, 2009, Varner served LSEB with the Defendants's first proposed Motion for Sanctions and Incorporated Memorandum of Law with respect to the First Complaint (the "First Sanctions Motion"). On March 4, 2009, the Bankruptcy Court entered the agreed order on the First Dismissal Motion ("First Dismissal Order"). Adv. Pro. Doc. No. 25. Although the Defendants had almost three (3) months prior to the dismissal of the First Complaint, the Defendants did not file the First Sanctions Motion with the Bankruptcy Court prior to the entry of the First Dismissal Order.

5.      On March 18, 2009, MVI filed its amended complaint against the Defendants alleging causes of action for negligence, breach of fiduciary duty, negligent misrepresentation, professional negligence and negligent supervision (the "Second Complaint"). Adv. Pro. Doc. No. 26. In the Second Complaint, MVI provided additional historical background on the parties and

3

**EXHIBIT C**
3 OF 40

their respective involvement with MVI, and deleted twenty-one of the paragraphs cited by the Defendants in the First Sanctions Motion which allegedly contained allegations and other factual contentions that lacked evidentiary support. Although the Defendants objected to eighteen (18) additional paragraphs, MVI chose to retain the paragraphs because the averments contained within were either supported by reasonable inferences based on the existing evidentiary support, or by the existing legal standards. In addition, counsel for MVI reasonably believed that additional evidentiary support would be discovered supporting the retained allegations, after a reasonable opportunity for further investigation or discovery. (See comparison of the First Complaint to the Second Complaint, attached hereto as **Exhibit A**).

6.    On April 15, 2009, the Defendants filed a motion to dismiss the Second Complaint asserting the same boilerplate affirmative defenses and the failure to state a cause of action as set forth in the First Dismissal Motion (the "Second Dismissal Motion"). Adv. Pro. Doc. No. 27. In addition, on May 20, 2009, Varner served LSEB with the Defendants's another proposed Motion for Sanctions and Incorporated Memorandum of Law with respect to the Second Complaint (the "Second Sanctions Motion").

7.    On or about May 20, 2009, the Bankruptcy Court scheduled a final hearing on the Second Dismissal Motion for June 30, 2009. However, prior to the final hearing counsel for MVI and counsel for the Defendants agreed to meet to discuss a potential resolution of the Second Complaint and engage in informal discovery. It was MVI's understanding that the Defendants were going to voluntarily produce documents, including attorney time sheets and billing statements to demonstrate the exact nature of the legal services provide by the Defendants. During this time

4

**EXHIBIT C**
4 OF 40

and up to and including October 1, 2009, formal discovery had been stayed by agreement of the parties and the Bankruptcy Court pending a resolution of the Second Dismissal Motion.

8.    The parties met in early June 2009 at the offices of counsel for the Defendants. At the meeting, counsel for MVI showed the Defendants some of the documents it believed supported the claims alleged in the Second Complaint. MVI expressly stated that the documents did not comprise the entire case against the Defendants, as only a portion of MVI's business records had been reviewed at that time, but counsel for MVI reasonably believed that additional evidentiary support would be discovered supporting the Second Complaint. However, despite the aforementioned promises to the contrary, the Defendants produced *no documents* (i.e., time sheets, billing statements, engagement letters, emails, etc.) substantiating their claims that they never provided legal services to MVI relating to tax matters. As such, counsel for MVI left the meeting with the belief that the Defendants were not being completely forthcoming as agreed and required under the Federal Rule of Bankruptcy Procedure 7026.

9.    On June 30, 2009, the Bankruptcy Court conducted the final hearing on the Second Dismissal Motion. After hearing the arguments of counsel, the Bankruptcy Court took the matter under advisement and scheduled a continued hearing for August 26, 2009. Pro Memo Adv. Pro. Doc. No. 29. On August 12, 2009, the Bankruptcy Court entered a Memorandum Opinion Denying the Second Dismissal Motion ("Memorandum") and an Order Denying the Second Dismissal Motion. Adv. Pro. Doc. Nos. 30, 31. In the Memorandum, the Bankruptcy Court explained that despite the Defendants' contention regarding Mirabilis' lack of evidence, an attorney-client relationship is based on the client's subjective reasonable belief and the attachments

5

EXHIBIT C
5 OF 40

to the Second Complaint were sufficient to evidence valid causes of action and allege an attorney-client relationship. Memorandum, p. 5. On August 26, 2009, the Bankruptcy Court conducted the continued hearing and continued the stay of discovery until October 1, 2009, and scheduled a pretrial conference for January 21, 2010. Pro Memo. Adv. Pro. Doc. No. 34.

10.     On September 1, 2009, the Defendants filed their answer and affirmative defenses to the Second Complaint. The Defendants did not file the Second Sanctions Motion.

11.     On September 22, 2009, R. Scott Shuker, Esq., an attorney with LSEB, substituted as counsel for Elizabeth A. Green, Esq. in the Adversary Proceeding, as well as the MVI bankruptcy case. Adv. Pro. Doc. No. 37.

12.     On October 22, 2009, counsel for the Defendants filed a Stipulated Motion for Withdrawal of the Reference ("Reference Motion"). Adv. Pro. Doc. No. 38. On October 30, 2009, LSEB filed an Unopposed Motion for Substitution of Counsel ("Substitution Motion"). Adv. Pro. Doc. No. 39. In the motion, LSEB requested, with the consent of the Defendants, to "be relieved of any further responsibility for representation of the Plaintiff" in the adversary proceeding. Substitution Motion, p. 2. As of the Substitution Motion, the Defendants still had not filed either the First Sanctions Motion or the Second Sanctions Motion. At this time, LSEB believed that all issues regarding the First Sanctions Motion and the Second Sanctions Motion had been resolved, and that the Defendants were no longer seeking sanctions against LSEB.

13.     Prior to the Bankruptcy Court granting the Substitution Motion, the adversary proceeding was transmitted to the District Court on November 4, 2009. On November 10, 2009, LSEB re-filed the Substitution Motion. Doc. No. 5. On November 19, 2009, the Court granted

6

**EXHIBIT C**
6 OF 40

the Reference Motion and the Substitution Motion. Doc. Nos. 6, 7. As of November 19, 2009,

the Defendants still had not filed either the First Sanctions Motion or the Second Sanctions Motion.

14.     On January 29, 2010, MVI moved to amend the Second Complaint. Doc. No. 18. The Defendants did not oppose the Motion to Amend the Second Complaint. Doc. No. 19. On February 25, 2010, the Court granted the Motion to Amend *nunc pro tunc* to February 2, 2010. Doc. No. 21.

15.     MVI filed its second amended complaint against the Defendants alleging causes of action for negligence, breach of fiduciary duty, negligent misrepresentation, and negligent supervision (the "Third Complaint")[3]. Exhibit 1. Doc. No. 18. (See comparison of the Second Complaint to the Third Complaint, attached hereto as **Exhibit B**).

16.     LSEB was unable to conduct: (i) any pre-suit discovery due to the consensual stay of the bankruptcy case, which was not lifted until November 25, 2008; and (ii) any post-suit discovery due to the stay of discovery, which was not lifted until October 1, 2009[4]. LSEB had effectively ceased all involvement in the Adversary Proceeding upon confirmation of the Plan, discussed *infra*, and the engagement of replacement counsel.

---

[3] On March 9, 2010, the Defendants served on replacement counsel, Robert C. Widman, Esq. and Roy S. Kobert, Esq., a third motion for sanctions and incorporated memorandum of law with respect to the Third Complaint. ("Third Sanctions Motion"). The Defendants did not serve LSEB with the Third Sanctions Motion, and LSEB was unaware that the Defendants were still seeking sanctions until June 22, 2010.

[4] Counsel for the Defendants admitted that the required discovery in the Adversary Proceeding would be lengthy, and suggested that the parties agree to a one year to discovery timetable, and that they proceed according to the rules, but that the parties waive the ten deposition limit because from the record, it is obviously more than a ten deposition case. August 26, 2009 Transcript, p.33.

7

**EXHIBIT C**
7 OF 40

17.    In the First Sanctions Motion and the Second Sanctions Motion, the Defendants request, pursuant to Federal Rules of Bankruptcy Procedure 9011(c)(2), 11 U.S.C. §105(A), and the Court's inherent authority, that the Court enter an order of monetary sanctions against Elizabeth Green, Esq., Jennifer S. Eden, Esq. (collectively, the "Attorneys"), and Latham, Shuker, Eden & Beaudine, LLP for presenting to the Court a pleading which contains allegations and other factual contentions that have no evidentiary support and which was presented for an improper purpose, such as to acquire funds that Frank Amodeo can use for restitution to attempt to improve his standing in the criminal proceeding and obtain a more lenient sentence.

18.    LSEB asserts that at the time of the filing of the First Complaint and the Second Complaint, MVI and its Attorneys had a good faith belief after a reasonable inquiry that the First Complaint and Second Complaint were well grounded in fact. There was nothing known to the Plaintiff or counsel at the time counsel signed the First Complaint or the Second Complaint to lead counsel to believe that the factual allegations were frivolous.

### REASONABLENESS OF PRE-FILING INQUIRY

#### CIRCUMSTANCES SURROUNDING COMMENCEMENT OF BANKRUPTCY CASE

19.    On May 14, 2008, R. Scott Shuker, Esq. and Elizabeth A. Green, Esq. met with Randy Gold, an attorney with the US Attorney, and a representative of the United States Trustee's Office to discuss the filing of the MVI bankruptcy case. At this initial meeting Mr. Gold expressed his concerns regarding the potential bankruptcy filing, the alleged overall criminal "tax scheme" of Mr. Amodeo and the use of tax and legal professionals to perpetuate the criminal conspiracy to misuse payroll tax funds. Mr. Gold specifically identified Mr. Beyer as a participant in the criminal

8

**EXHIBIT C**
8 OF 40

conspiracy and implied that he was a "target" of the criminal investigation related to Mr. Amodeo

and MVI. Although the US Attorney did not originally approve of the filing of the Chapter 11

bankruptcy petitions and the use of the Bankruptcy Code to liquidate the assets of the Debtors for

the benefit of all creditors, the United States did ultimately agree that it was in the best interests of

all parties to have some of the assets administered in the bankruptcy proceedings

   20.    On May 27, 2008, upon the resignation of Shane Williams and Jay Stollenwerk,

Mr. Moecker, as the sole remaining director, elected Mr. Cuthill as President and authorized Mr.

Cuthill, on behalf of MVI, to file Chapter 11 bankruptcy petitions. Bkrty. Doc. No. 237, ¶ 11,

Exhibit E. Subsequently, MVI and Hoth Holdings, LLC ("Hoth") filed voluntary petitions for relief

under Chapter 11 of the Bankruptcy Code. On June 5, 2008, AEM, Inc. ("AEM") also filed a

Chapter 11 bankruptcy petition (collectively, MVI, Hoth, and AEM shall be referred to as

"Debtors").

   21.    The Chapter 11 filings came primarily as a result of an *in rem* civil forfeiture action

commenced by the United States Attorney ("US Attorney") on behalf of the United States of

America ("United States") against certain assets of MVI, which effectively caused MVI to be

unable to collect assets and pursue claims and litigation against various third parties[5]. Bkrty. Doc.

No. 185, ¶ 2. The *in rem* civil forfeiture action was filed based upon the criminal investigation of

---

[5] On April 25, 2008, the US Attorney instituted *in rem* civil forfeiture proceedings ("Civil Complaint"), in the United States District Court for the Middle District of Florida, case no. 6:08-cv-00670-ACC-KRS, against certain property owned by MVI. On September 4, 2008, the US Attorney amended the Civil Complaint to add additional property, some of which was owned by MVI. On October 30, 2008, the US Attorney indicted AEM and MVI for conspiracy, wire fraud, and forfeiture; case no. 6:08-cr-00231-JA-KRS.

9

**EXHIBIT C**
9 OF 40

Mr. Amodeo[6]. In an effort to preserve equity for all creditors, the Debtors deemed a Chapter 11 liquidation plan as in the best interest of all creditors. See id.

22.    On August 14, 2008, the US Attorney filed a motion to intervene and stay the bankruptcy case of MVI ("Stay Motion"). Bkrty. Doc. No. 48. In the Stay Motion, the US Attorney sought to stay the MVI bankruptcy case in order to pursue a forfeiture and seizure action against property of the Debtors' estates which would "become property of the United States and [would] not remain in the related bankruptcy estates." Bkrty. Doc. No. 48, ¶ 6. If granted, the United States would have seized substantially all of MVI's assets. On September 3, 2008, MVI and the US Attorney agreed to voluntary stay the MVI bankruptcy case until a hearing could be held on the Stay Motion. During this period, MVI agreed to perform only the necessary administrative work on the main bankruptcy case and respond to the Stay Motion.

23.    On September 24 and 25, 2008, the US Attorney filed motions to dismiss the Debtors' bankruptcy cases based upon allegations of bad faith (the "USA Dismissal Motions"). Bkrty. Doc. No. 41. On November 25, 2008, the Debtors and the US Attorney reached a settlement agreement with respect to the Stay Motion and the USA Dismissal Motion, and filed a motion for approval of compromise of controversy by and between Debtors and the United States (the "Settlement"). Bkrty. Doc. No. 101.

24.    Pursuant to the terms of the Settlement, the Debtors and the US Attorney agreed that it would be in the best interests of all parties to agree to the administration of the Debtors'

---

[6] On August 6, 2008, the US Attorney indicted Frank L. Amodeo for conspiracy, failure to remit payroll taxes, wire fraud, and obstruction of an agency investigation ("Amodeo Indictment"); case no. 6:08-cr-176-Orl-28-GJK.

**EXHIBIT C**
10 OF 40

assets, and have part of the administration occur in the bankruptcy cases. Bkrty. Doc. No. 101, ¶ 24-31. The Settlement provides, in part, for the division of assets between the bankruptcy estates and the United States and the allowance of a $200,000,000 unsecured forfeiture claim. Id. The Settlement was ultimately approved by the Bankruptcy Court's order approving the Settlement entered on March 4, 2009. Bkrty. Doc. No. 145. The division of assets specifically provided that MVI would retain all causes of action against insurance carriers or for malpractice against professionals, including the instant Adversary Proceeding. Bkrty. Doc. No. 101, ¶ 26(b).

25.     Shortly prior to the confirmation hearing on the Plan, MVI and counsel met with the US Attorney and discussed the pending and contemplated litigation which would fund payments to the unsecured creditors under the Plan, of which the United States is the holder of ninety percent (90%) of the general unsecured claims. At this time the instant Adversary Proceeding was specifically identified and discussed amongst the parties. The US Attorney requested that replacement counsel for LSEB be compensated on an hourly basis rather than a contingency fee agreement because the US Attorney viewed the recovery to be significant and wanted to prevent a windfall to replacement counsel. At no time did the US Attorney advise MVI or counsel that the instant Adversary Proceeding lacked merit.

### CONDITION AND CONTENT OF MVI BUSINESS RECORDS

26.     Upon his appointment as President of MVI, Mr. Cuthill began the task of securing the corporate records of MVI. Prior to the Petition Date, MVI had two separate warehouses containing over 5,000 boxes of documents. The boxes were not organized, indexed or accurately

11

**EXHIBIT C**
11 OF 40

labeled, and some of the boxes were broken and falling apart. It was clear from inspection the boxes had been rummaged through and documents were strewn about the warehouses.

27.    As soon as Mr. Cuthill was able to obtain possession of the boxes and the warehouses, in or around November 2008, he began the task of moving, re-boxing, organizing and indexing over 5,000 boxes. Although it was cost prohibitive to review each and every piece of paper in all 5,000 boxes, Mr. Cuthill and his staff were able to index the general categories of documents contained within the boxes and consolidate the warehouses into a single storage facility.

28.    Once Mr. Cuthill was able to properly review the business records of MVI and its related companies and subsidiaries, Mr. Cuthill located several documents which enabled him to piece together the events surrounding the development and implementation of the alleged criminal conspiracy to misuse payroll tax funds and the role played by the Defendants. Specifically, Mr. Cuthill identified and reviewed the following documents (collectively, the "Beyer Documents"):

i.    *December 21, 2004 Notes*: contemporaneous handwritten notes of James E. Baiers dated December 21, 2004 denoting that Hans Beyer and BIR are associated with the "Fall back plan-Fail Safe" to file two separate bankruptcies one in Orlando and one in Miami. The only entities identified as filing Chapter 11 bankruptcy are the Sunshine Companies, and the only specific creditors discussed are the IRS and "Hendricks." The Hendricks were two individuals suing Presidion Corporation and Presidion Solutions, Inc.  Presidion Corporation was the owner of the Sunshine Companies;

12

EXHIBIT C
12 OF 40

ii.     *Employee Bio*: The biographies of various professionals were prepared by Aaron C. Bates, Esq., Matthew S. Mokwa, Esq., Shane Williams, Jay Stollenwerk and Jodi Jaiman, employees of MVI and entities owned by Frank Amodeo, in preparation of Frank Amodeo's criminal defense of the alleged criminal conspiracy to misuse payroll tax funds. The biography of Hans Beyer identifies him as an attorney, "involved in Presidion related matters since January 2005, prepared Presidion document files and index." The biography also states that he was the primary editor of the IRS narrative, an officer of Mirabilis and managing director of Tampa area and foreign projects;

iii.     *Sunshine Memorandum*: Memorandum dated January 4, 2005, on the Sunshine Matter Timetable from Richard Berman, Esq. to Frank Amodeo and copied on Hans Beyer Esq. The Sunshine Memorandum specifically references a meeting with Hans Beyer and other individuals on January 6, 2005 in Miami Gardens to prepare bankruptcy schedules and petition, as well as first day motions and brief in support of "stay-expansion." The Sunshine Memorandum also discusses contacting both the criminal and civil departments of the Internal Revenue Service ("IRS") to discuss receiving an expeditious final assessment and the advantages of a confidential compromise offer or "an imposed resolution in bankruptcy court." The only known tax assessment which would involve both the criminal and civil divisions of the IRS was alleged the criminal conspiracy to misuse payroll tax funds;

iv.     *Unsigned Frank Amodeo Affidavit*: The affidavit was prepared by Aaron C. Bates, Esq., Matthew S. Mokwa, Esq., Shane Williams, Jay Stollenwerk and Jodi Jaiman, employees of MVI and entities owned by Frank Amodeo, in preparation of Frank

13

**EXHIBIT C**

Amodeo's criminal defense of the alleged criminal conspiracy to misuse payroll tax funds. The affidavit specifically states that Hans Beyer attended a meeting with the IRS in Plantation, Florida, in which the details of the Sunshine Companies Plan were specifically discussed, including the non-payment of taxes by the Sunshine Companies;   TAB - 5

          v.     *February Beyer Email*: email dated February 14, 2005 from Hans Beyer, Esq., of Saxon Gilmore, *et al.* P.A., to Tessah Ivey and copied on Frank Amodeo regarding a retainer check for $15,000.00 issued for the Sunshine Companies to Saxon Gilmore, and an additional retainer check to deal with the plan and motion to dismiss/convert in the Kingdom Vision Case. The Beyer Email confirms that Hans Beyer and his new law firm were being employed with respect to the workout and/or potential bankruptcy filing of the Sunshine Companies;

          vi.     *December Beyer Email*: email dated December 20, 2005 from Hans Beyer, Esq., of Saxon Gilmore, *et al.* P.A. and as employee of Nexia Strategies/Mirabilis Ventures, to Tessah Ivey attaching revised schedules and statement of financial affairs for Presidion Solutions;

          vii.     *Beyer Bankruptcy Notes*: handwritten notes of Hans C. Beyer dated 06-01-16 (presumably January 16, 2006) regarding: (i) tax liability of Presidion Solutions; (ii) note from Paradyme, Inc. which was offered to IRS, then sold to MVI; (iii) settlement offers to IRS; and (iv) voidable transfers and solvency issues of Presidion Solutions;

14

**EXHIBIT C**
14 OF 40

viii.    *Beyer Memorandum*: Draft Confidential Memorandum on MVI letterhead, dated January 16, 2006, from Hans Beyer to "File" regarding the assets and liabilities, including the unpaid payroll tax liabilities, of the Presidion and Sunshine Companies;

ix.    *IRS Binder Index*: Draft index to Volume I of the binder of all transactional documents in connection with Presidion Solutions and Sunshine Companies for the meeting with the IRS, dated January 16, 2006, and compiled by Hans Beyer. Index identifies bankruptcy documents of Presidion Solutions Inc. and lists MVI as a category of documents. The binder has not been located;

x.    *June Beyer Email*: email dated June 27, 2006 from Hans Beyer, Esq., as employee of Nexia Strategies/Mirabilis Ventures, to Shane Williams and Jay Stollenwerk attaching a revised letter on behalf of the Presidion and Sunshine Companies to Revenue Officer Judy Berkowitz regarding unpaid payroll tax liabilities, and the edits made by Beyer to the letter;

xi.    *Transparency Timeline Index*: The Transparency Timeline Index was prepared by Aaron C. Bates, Esq., Matthew S. Mokwa, Esq., Shane Williams, Jay Stollenwerk and Jodi Jaiman, employees of MVI and entities owned by Frank Amodeo, in preparation of Frank Amodeo's criminal defense of the alleged criminal conspiracy to misuse payroll tax funds. The timeline identifies key events related to the bankruptcy and tax issues of the Presidion/Sunshine Companies: (a) January 23, 2006: In preparation for meeting with IRS, Hans Beyer compiled all transactional documents in connection with Presidion Solutions and Sunshine Companies, and spoke with dozens of people in order to accumulate and

15

**EXHIBIT C**
15 OF 40

assemble documents for the binder; (b) June 20, 2006: Responses to IRS Revenue Officer, Judy Berkowitz's questions (purportedly drafted by Hans Beyer and others) concerning the tax liabilities and providing more information on the Presidion/Sunshine Companies, associated transactions and the reorganization plan; (c) August 29, 2006: over thirty (30) professionals attended a mock deposition of Amodeo in preparation for potential interview in connection with civil proceedings arising out of the Presidion reorganization plan, specifically with regard to the nonpayment of taxes during the plan; and (d) November 30, 2006: meeting including Hans Beyer and Frank Amodeo where they have a nonchalant discussion of resolving the tax issue;

xii.    *Tax Timeline*: The Tax Timeline was prepared by Aaron C. Bates, Esq., Matthew S. Mokwa, Esq., Shane Williams, Jay Stollenwerk and Jodi Jaiman, employees of MVI and entities owned by Frank Amodeo, in preparation of Frank Amodeo's criminal defense of the alleged criminal conspiracy to misuse payroll tax funds. The timeline identifies and further substantiates the key events related to the bankruptcy and tax issues of the Presidion/Sunshine Companies set forth in the Transparency Timeline Index;

xiii.    *Beyer Expense Report*: Expense Report of Hans Beyer dated May 18, 2006, for the period of April 18, 2006 through April 23, 2006, for the reimbursement by MVI for expenses incurred for his attendance of meeting with the IRS to discuss the Presidion tax issues; and

xiv.    *Payments to Defendants*: Professional fee reports extracted from the books and records of MVI evidencing payments in the amount of $271,374.60 to or for the

16

**EXHIBIT C**
16 OF 40

benefit of the Defendants for legal and professional service rendered from February 2005

through December 2006.

<u>INVESTIGATION PRIOR TO FILING ADVERSARY PROCEEDING</u>

29.     In addition to the Beyer Documents, Mr. Cuthill also located several draft complaints

against Hans Beyer, BIR and Saxon, Gilmore, Carraway, Gibbons, Lash & Wilcox, P.A.

(collectively, the "Draft Complaints"). The Draft complaints alleged causes of action for negligence,

breach of fiduciary duty and self-dealing.

30.     The Draft Complaints were prepared by or at the direction of Aaron C. Bates, Esq.

Mr. Bates was a former employee and in-house counsel to MVI until June 2007. Mr. Bates was

then subsequently engaged by MVI to commence legal action against former officers, directors and

professionals of MVI. Due to the nature, length and scope of Mr. Bates' employment with MVI,

Mr. Bates had first hand knowledge of the events in the Draft Complaint.

31.     LSEB reviewed the Draft Complaints and the Beyer Documents, as well as the Civil

Complaint and Amodeo Indictment. During this time LSEB attempted to contact several former

officers and directors for information on the Defendants' involvement; however, due to the pending

criminal investigation none of those contacted would voluntarily comment.

**MEMORANDUM OF LAW**

32.     Sanctions pursuant to Federal Rule of Bankruptcy Procedure 9011, like Federal Rule

of Civil Procedure 11, are properly assessed: (1) when a party files a pleading that has no

reasonable factual basis; (2) when a party files a pleading that is based on a legal theory that has

no reasonable chance of success and that cannot be advanced as a reasonable argument to change

17

**EXHIBIT C**
17 OF 40

existing law; or (3) when the party files a pleading in bad faith for an improper purpose. <u>See</u> <u>Massengale v. Ray</u>, 267 F. 3d 1298, 1301 (11th Cir. 2001) (quoting <u>Worldwide Primates, Inc.</u> <u>v. McGreal</u>, 87 F. 3d 1252, 1254 (11th Cir. 1996)).

33.     The Eleventh Circuit has also held that under section 105(a), the bankruptcy court may take any action "necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process." <u>11 U.S.C. §105(a)</u>. Sanctions may also be imposed under the bankruptcy court's inherent power, if the court finds bad faith. <u>In re Walker</u>, 532 F.3d 1304, 1309 (11th Cir. 2008). "A finding of bad faith is warranted where an attorney knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent. A party also demonstrates bad faith by delaying or disrupting the litigation or hampering enforcement of a court order." <u>Id</u>. (internal citations omitted). "If particularly egregious, the pursuit of a claim without reasonable inquiry into the underlying facts can be the basis for a finding of bad faith." <u>Barnes v. Dalton</u>, 158 F. 3d 1212, 1214 (11th Cir. 1998).

34.     A court ruling on a motion for Rule 11 sanctions must make a "two-step inquiry as to (1) whether the party's claims are objectively frivolous; and (2) whether the person who signed the pleadings should have been aware that they were frivolous." <u>See</u> <u>Baker v. Alderman</u>, 158 F. 3d 516, 524 (11th Cir. 1998).

35.     Rule 11 stresses the need for some pre-filing inquiry. <u>See</u> <u>Mike Ousley Productions,</u> <u>Inc. v. WJBF-TV</u>, F. 2d 380, 382 (11th Cir. 1992). The reasonableness of the inquiry may depend on such factors as how much time for investigation was available to the signer; whether he had to rely on a client for information as to the underlying facts; or whether he depended on

18

**EXHIBIT C**
18 OF 40

forwarding counsel or another member of the bar. See id. (quoting Advisory Committee Note to Rule 11, as amended in 1983).

36.     The court's inquiry should only focus on the merits of the pleading gleaned from the facts and law known or available to the attorney *at the time of filing*. See Jones v. International Riding Helmets, Ltd., 49 F. 3d 692, 694-95 (11th Cir. 1995) (original emphasis).

37.     A court is expected to avoid using the wisdom of hindsight and should test the signer's conduct by inquiring what was reasonable to believe at the time the pleading, motion, or other paper was submitted. See Souran v. Travelers Ins. Co., 982 F.2d 1497, 1506 (11th Cir. 1993) (quoting Fed.R.Civ.P. 11 Advisory Committee Note).

I.     **THE FIRST COMPLAINT AND THE SECOND COMPLAINT CONTAIN ALLEGATIONS AND OTHER FACTUAL CONTENTIONS WHICH HAVE EVIDENTIARY SUPPORT. ACCORDINGLY, LSEB SHOULD NOT BE SANCTIONED FOR PRESENTING THE COMPLAINTS TO THE COURT.**

38.     The purpose of Rule 9011 is to deter baseless filings of documents: (i) not well grounded in fact, warranted by existing law or containing a good faith argument for a change of the existing law; or (ii) filed for an improper purpose. See In re Pea, 154 B.R. 749 (Bankr. D. Conn. 1992). Accordingly, an attorney has a duty to conduct a "reasonable inquiry" into the facts of the case before signing a pleading. As such, the pleader may be subject to sanctions for the inclusion of baseless allegations or, on the other hand, for the omission of relevant facts. See In re Kouterick, 167 B.R. 353 (Bankr. D. N.J. 1994) (citing In re Ronco, Inc., 838 F. 2d 212, 218 (7th Cir. 1988)).

39.     Violations of Rule 9011 are determined by applying an objective standard of reasonableness under the circumstances. In re KTMA Acquisition Corp., 153 B.R. 238, 248

19

**EXHIBIT C**
19 OF 40

(Bankr. D. Minn. 1993) (citing Business Guides, Inc. v. Chromatic Communications Enters., Inc., 498 U.S. 533, 554 (1941)). Reasonableness is defined as "an objective knowledge or belief at the time of the filing of a challenged paper" that the claim was well grounded in law and fact. Ford Motor Co. v. Summit Motor Products Inc., 930 F. 2d 277, 289 (3d Cir. 1991). The inquiry focuses on "what should have been done by the filer before filing rather than how things turned out; conduct rather than result." In re KTMA Acquisition Corp., 153 B.R. at 248.

40.     A court must look at all of the circumstances that existed at the time the paper was signed and filed. As set forth in the Committee Notes to the 1983 amendment of Civil Rule 11, the four factors to be considered in determining reasonableness are: (i) how much time for investigation was available to the signer; (ii) whether the signer had to rely on a client for information as to the facts underlying the pleading, motion or other paper; (iii) the plausibility of the legal position advocated; and (iv) whether the case was referred to the signer by another member of the bar.

41.     In the instant case, upon review of the Draft Complaints and the Beyer Documents, it was not unreasonable for LSEB to infer that the Defendants: (i) were engaged to render legal services to or for the benefit of several entities, including the Presidion/Sunshine Companies; (ii) MVI paid for those legal services; (iii) the scope of those legal services included, but may not have been limited to, workout negotiations with the IRS for the unpaid payroll tax liability of the Presidion/Sunshine Companies, filing for Chapter 11 on behalf of the Presidion/Sunshine Companies, and assisting those entities and persons affected by the unpaid payroll tax liability with

20

**EXHIBIT C**
20 OF 40

46.     The rule is aimed at deterring abuse caused not only by bad faith, but also by negligence and, to some extent, by incompetence. See Gaiardo v. Ethyl Corp., 835 F. 2d 479 (3d Cir. 1987). A paper interposed for an improper purpose is sanctionable even if it warranted by existing law and supported by the facts. Likewise, a paper interposed without a reasonable inquiry is sanctionable even if it is filed with the purest of intention. See In re International Oriental Rug Center, 165 B.R. 436, 441 (Bankr. N.D. Ill. 1994).

47.     The sole basis for the Defendants' assertion that the Adversary Proceeding was commenced for an improper purpose is that "the MVI Attorneys filed the MVI bankruptcy proceeding and the adversary proceedings for the purpose of acquiring funds that Amodeo can use for restitution to attempt to improve his standing in the criminal proceeding and obtain a more lenient sentence." However, this Court has already ruled that the MVI bankruptcy case was not filed in bad faith or for an improper purpose.[7]

48.     Furthermore, MVI and LSEB have not demonstrated a pattern in the Adversary Proceeding of engaging in vexatious and dilatory litigation tactics, which has needlessly increased the cost of litigation. Accordingly, the First Complaint and the Second Complaint are not violative of Federal Rule of Bankruptcy Procedure 9011(b)(1).

---

[7] "[T]he decision to file was not made by Amodeo, and there was no evidence presented that Cuthill (or Moecker, for that matter) intended to aid Amodeo by doing so. In addition, the possibility that the filings might benefit Amodeo should not obscure the fact that such benefit would result from creditors recovering as mush as possible from the debtors." Order, p. 11. (Case No. 6:03-cv-1650-Orl-31, Doc. No. 30).

22

an exit strategy; and (iv) knew or should have known that the legal services provide deviated from the standard of care.

42.     Furthermore, based upon discussions with the US Attorney regarding Hans Beyer and his involvement and association with the criminal conspiracy to misuse payroll tax funds it was reasonable for LSEB to infer that the cause of action had merit.

43.     Based on these facts, the looming statute of limitations, the inability to conduct discovery, and the unavailability of witnesses due to the assertion of Fifth Amendment rights, LSEB had sufficient reason to believe that the Defendants may have committed professional negligence in connection with their rendition of legal services to or for the benefit of MVI.

44.     MVI and LSEB did make a reasonable inquiry into the factual allegations set forth in the First Complaint and the Second Complaint. Accordingly, neither the First Complaint nor the Second Complaint and the factual contentions contained therein are violative of Federal Rule of Bankruptcy 9011(b)(3).

II.     **THE FIRST COMPLAINT AND THE SECOND COMPLAINT WERE NOT BEING PRESENTED FOR AN IMPROPER PURPOSE. ACCORDINGLY, LSEB SHOULD NOT BE SANCTIONED FOR PRESENTING THE FIRST COMPLAINT AND THE SECOND COMPLAINT TO THE COURT.**

45.     Under Rule 9011, a bankruptcy court must impose sanctions if the pleading or paper is frivolous or filed for an improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation. See Cooper v. Litton Loan Servicing, 253 B.R. 295 (Bankr. N.D. Fla. 2000) (sanctions were imposed upon debtors' attorneys for their bad faith "scorched earth" policy of suing anyone remotely connected to the case).

21

**EXHIBIT C**
22 OF 40

III.   THE FIRST SANCTIONS MOTION AND THE SECOND SANCTIONS MOTION ARE
       UNTIMELY AND THEREFORE SHOULD BE DENIED.

49.     The Eleventh Circuit has held that a party who moves for sanctions under F.R.B.P.

9011 must follow a two-step process. In re Walker, 532 F.3d at 1307. "The party first must

serve the motion on the opposing party and then, at least twenty-one days later, file the motion with

the court." Id. The Eleventh Circuit has also held that the filing and service of a sanctions motion

must occur prior to final judgment or judicial rejection of the offending motion. See id. at 1309.

"Any argument to the contrary renders the safe harbor provision a mere formality." Id.

50.     In the case McMahan v. Barker, 2007 WL 4403261, *1(M.D. Fla. 2007), the

plaintiffs filed an amended complaint while a motion for sanctions under Rule 11 was pending.

Subsequently, thereafter the defendants withdrew the Rule 11 motion, and the litigation between

the parties continued until summary judgment was entered in favor of the defendants. See id. After

the order granting summary judgment was entered, the defendants sought to renew the previously

withdrawn Rule 11 motion. See id. The court held that counsel for plaintiff was necessarily

prejudiced by the course of conduct of the defendants and the Rule 11 motion was untimely. See

id. at *2. The court reasoned that based on the procedural safe guards embedded in the rule,

motions seeking sanctions filed after a point in the litigation when the lawyer sought to be

sanctioned lacks an opportunity to correct or withdraw the challenged submission, will be

disallowed as untimely. See id.

51.     In the instant case, the Defendants did not file the First Sanctions Motion or the Second

Sanctions Motion, until June 22, 2010, over seven (7) months after LSEB had been relieved of any

further responsibility for the representation of the Plaintiff in the Adversary Proceeding, over four

23

**EXHIBIT C**
23 OF 40

**WHEREFORE**, Latham, Shuker, Eden & Beaudine, LLP and Jennifer S. Eden, Esq.

respectfully requests this Court enter an order: (i) denying the First Sanctions Motion; (ii) denying

the Second Sanctions Motion; (iii) awarding LSEB some or all of the reasonable attorneys' fees

and other expenses its has incurred in opposing the motions; and (iv) granting such other and further

relief as the Court deems reasonable and necessary under the circumstances.

   **DATED** this 23<u>rd</u> day of July 2010.

<div style="margin-left:40%">

/s/ R. Scott Shuker, Esq._____
R. Scott Shuker, Esquire
Florida Bar No. 984469
Mariane L. Dorris, Esquire
Florida Bar No. 0173665
**LATHAM, SHUKER,**
**EDEN & BEAUDINE, LLP**
390 N. Orange Avenue, Suite 600
Orlando, Florida 32801
rshuker@lseblaw.com
mdorris@lseblaw.com
Tel: 407-481-5800
Fax: 407-481-5801
Attorneys for Latham, Shuker, Eden &
Beaudine, LLP and Jennifer S. Eden, Esq.

</div>

25

**EXHIBIT C**
24 OF 40

(4) months after MVI filed the Third Complaint, and after the Court had granted Summary Judgment in favor of the Defendants on the Third Complaint.

52.    LSEB had no ability to correct or withdraw the Second Complaint after withdrawing as counsel, and were not even aware that the Defendants were still seeking sanctions with respect to the Second Complaint. LSEB was not even served with the Third Sanctions Motion until after the Order granting Summary Judgment was entered.  LSEB is clearly prejudiced by the Defendants' course of conduct. The Defendants should have filed the First Sanctions Motion and Second Sanctions Motion with the Bankruptcy Court prior to being transmitted to this Court, or at a minimum prior to LSEB's withdrawal as counsel. Accordingly, the First Sanctions Motion and the Second Sanctions Motion should be denied for failing to comply with the procedural requirements of Federal Rule of Bankruptcy Procedure 9011.

## REQUESTED RELIEF

53.    LSEB requests the Court enter an order denying the First Sanctions Motion and the Second Sanctions Motion. In addition, LSEB requests the Court conduct an evidentiary hearing on the allegations made in the First Sanctions Motion and the Second Sanctions Motion and allow LSEB to present testimonial evidence in support of the averments contained herein.

54.    Furthermore, to the extent LSEB prevails in opposing the First Sanctions Motion and the Second Sanctions Motion, LSEB request the Court award the reasonable expenses and attorney's fees incurred in opposing the motions pursuant to Federal Rule of Bankruptcy Procedure 9011(c)(1)(A).

24

**EXHIBIT C**
25 OF 40

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

In re:                                          Case No.: 6:09-cv-01974-GAP-DAB

MIRABILIS VENTURES, INC.                        Bkry. Case No. 6:08-bk-04327-KSJ

            Debtor.

_____/

MIRABILIS VENTURES, INC.,

            Plaintiff,

v.                                              Case No.: 6:09-cv-01974-GAP-DAB

SAXON, GILMORE, CARRAWAY,
GIBBONS, LASH & WILCOX, P.A.,
and HANS CHRISTIAN BEYER,

            Defendants.

_____/

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 23rd, 2010, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to the following: Joseph H. Varner, III and Justin L. Dees, attorneys for Defendants, HOLLAND & KNIGHT LLP, P.O. Box 1288, Tampa, Florida 33601-1288; Robert C. Widman, attorney for Plaintiff, MORRIS & WIDMAN, P.A., 245 N. Tamiami Trail, Suite E, Venice, Florida 34285; Roy S. Kobert and Todd K. Norman, attorneys for Plaintiff, BROAD & CASSEL, 390 N. Orange Avenue, Suite 1400, Orlando, Florida 32801; and Jerry R. Linscott, attorney for Elizabeth A. Green, BAKER & HOSTETLER, LLP, 2300 Sun Trust Center, 200 South Orange Avenue, P.O. Box 12, Orlando, Florida 32802.

                          /s/ R. Scott Shuker_____
                          R. Scott Shuker, Esquire

EXHIBIT C
26 OF 40

# TAB 5

**EXHIBIT C**
27 OF 40

## AFFIDAVIT OF FRANK L. AMODEO

STATE OF FLORIDA

COUNTY OF ORANGE

On this day, appeared before me, the undersigned, duly authorized to administer

oaths and take acknowledgements, Frank L. Amodeo, after being duly sworn, deposes

and says as follows:

1.      I am over the age of twenty-one (21) years, am of sound mind, and am

competent to make this affidavit based upon my personal knowledge.

2.      Edith Curry ("Curry") was a member of the Board of Directors of

Mirabilis Ventures, Inc. ("Mirabilis") beginning January 3, 2005, and ending October 31,

2006.

3.      Curry was an Officer of Mirabilis, specifically Secretary and Treasurer for

Mirabilis, beginning January 3, 2005 and ending October 1, 2005.

4.      Curry was the President of Nexia Strategy Corporation ("Nexia"), a

wholly-owned subsidiary of Mirabilis engaged by Presidion Corporation ("Presidion") in

a consultancy capacity, beginning in or about April 2005 and ending in or about October

2006.

5.      Additionally, Curry received eight million (8,000,000) shares of Presidion

stock, making her the fourth largest shareholder at the time.

6.      In or about November 2004, I retained Curry to represent and advise me as

to the implications and potential consequences resulting from my plan for

deconsolidation from Presidion, divestiture, and liquidation of Sunshine Staff Leasing,

Inc. a/k/a Presidion Solutions, I, Inc. ("Sunshine Staffing"); Sunshine Companies, II, Inc.

("Sunshine II"); Sunshine Companies, III, Inc. a/k/a Presidion Solutions, IV, Inc.

**EXHIBIT C**

28 OF 40

3

("Sunshine III"); and Sunshine Companies, IV, Inc. a/k/a Presidion Solutions, V, Inc. ("Sunshine IV") (collectively the "Sunshine Companies").

7.      My proposed reorganization strategy called for the divestiture and liquidation of the Sunshine Companies so that creditors could be paid, including the Internal Revenue Service.

8.      Additionally, my proposed strategy allowed Presidion to deconsolidate its financials and separate itself from the excessive liabilities associated with its subsidiaries, allowing it to continue to conduct business as a going concern (collectively the "Sunshine Companies Plan").

9.      I was officially retained by Presidion in October 2004.

10.     Because of the complexities involved in the Sunshine Companies Plan, particularly with regard to legal and tax implications of the proposed strategy, I sought advice and opinions from multiple professionals, including Curry, other attorneys, and accountants qualified to provide such advice.

11.     On December 21, 2004, I met with Curry, Richard E. Berman ("Berman"), a director of the law firm of Berman, Kean, & Riguera, P.A. ("BKR"), Laurie Holtz ("Holtz") and José I. Marrero ("Marrero"), principals of Rachlin, Cohen, & Holtz, LLP ("Rachlin"), James Baiers ("Baiers"), the General Counsel of Presidion, and various other professionals met to develop a detailed assignment of tasks with respect to the Sunshine Companies Plan.

12.     At this meeting, Curry was tasked with performing due diligence of Presidion and the Sunshine Companies, as well as acting as the chief negotiator between the Sunshine Companies and their various creditors.

**EXHIBIT C**
29 OF 40

4

13.     Specifically, Curry negotiated with Robert Gaines and Fred Sandlin, the then secured creditors of the Sunshine Companies, regarding changing the magnitude and makeup of their security interests (i.e. converting portions of the debt into equity and changing their stock option prices), using the unpaid payroll "trust fund" taxes of the Sunshine Companies as leverage during the negotiations.

14.     Moreover, as part of the December 21st meeting, it was agreed that Berman, Holtz, Marrero, and Rachlin would contact the IRS Criminal Investigation Division and the U.S. Attorney's Office for South Florida, so as to arrange for a meeting between the USAO, Curry, and I, to discuss the Sunshine Companies Plan.

15.     Subsequent to the December 21st meeting, I began to implement the Sunshine Companies Plan as Wellington Capital Group, Inc. ("Wellington"), a company wholly-owned by me, purchased the Sunshine Companies from Presidion, immediately dissolved the Sunshine Companies, and liquidated their remaining assets for a total liquidated value of approximately $3,000,000.00, all of which was paid over to the Internal Revenue Service.

16.     On January 6, 2005, Berman, Marrero, Daniel Myers, Hans C. Beyer ("Beyer"), and I attended a meeting at the Plantation, Florida Internal Revenue Service collections office (the "Plantation Office") in which the details of the Sunshine Companies Plan were specifically discussed, including the non-payment of taxes by the Sunshine Companies, of which the Internal Revenue Service was unaware.

**EXHIBIT C**
30 OF 40

5

criminal liability, despite multiple inquiries I made as to the potential consequences of the Sunshine Companies Plan.

23.     Moreover, Curry specifically informed me that the directors and officers of the entity which failed to pay over the payroll taxes could have personal civil liability, but not criminal exposure.

24.     In or about May 2005, I was again approached by Presidion regarding problems they were encountering with certain other PEO subsidiaries, particularly problems relating to worker's compensation insurance coverage, shortfall of working capital for the PEO operating subsidiaries, and a tax liability which had increased to over $80,000,000.00 since August 2004.

25.     The affected Presidion subsidiaries were Presidion Solutions, Inc. ("PSI"), and its wholly-owned PEO operating subsidiaries, Professional Benefits Solutions, Inc. a/k/a Presidion Solutions, VII, Inc. ("PBS") and Paradyme, Inc. ("Paradyme").

26.     On or about July 28, 2005, during a meeting in Miami, Florida at the offices of Rachlin between Holtz, Berman, myself, and other professionals regarding general matters related to the development of Mirabilis, a venture capital firm I founded in early 2005, I was contacted by the principals of Presidion regarding the impending loss of worker's compensation insurance coverage for the clients of PBS and Paradyme.

27.     The lack of worker's compensation insurance would have been particularly catastrophic, as it would have caused the value of PSI, PBS, and Paradyme assets to drop drastically as well as triggered additional defaults under a variety of loan and security agreements which would have resulted in PSI, PBS, and Paradyme assets becoming subject to immediate expropriation by secured creditors.

**EXHIBIT C**
31 OF 40

7

17.     In preparation for the January 6, 2005 meeting, Curry prepared a legal brief on what, if any, personal "responsible person"[1] liability may arise or inure to the detriment of me, or my staff, by engaging in the Sunshine Companies Plan.

18.     Furthermore, during the Sunshine Companies Plan, I sought and received extensive legal and tax advice from various professionals, including Curry, which provided, in pertinent part, that any tax liabilities incurred by a subsidiary would remain with that subsidiary and such liability would not attach to the detriment of the parent company or affiliated subsidiaries pursuant to a strict silo theory of tax liability.

19.     Curry advised me that the Sunshine Companies Plan, and the actions taken in connection therewith, complied with all local, state, and federal laws.

20.     Research and written opinions were further provided by the professionals I retained, including Curry, to validate the opinion of the requirements of the Internal Revenue Code, including a memorandum of law prepared in April 2005 by BKR which specifically addressed the question of what, if any, liability may arise or inure to the detriment of me, or my staff, by engaging in the Sunshine Companies Plan (the "April 2005 Memo").

21.     Curry was consulted and actively involved in the preparation of the April 2005 Memo.

22.     The April 2005 Memo failed to inform me that persons with the authority to exercise significant control over the financial affairs of a company have a statutory duty to collect, withhold, truthfully account for, and pay over payroll "trust fund" taxes and a failure to intervene to stop and/or mitigate the nonpayment of collected payroll "trust fund" taxes collected could result in significant personal liability, particularly

---

[1] *See* 26 U.S.C. § 6672.

**EXHIBIT C**
32 OF 40

6

28.     Immediately subsequent to the call from Presidion, Berman and I left the Rachlin offices to meet with principals of Presidion in their Miami, Florida offices to discuss and seek a resolution to the worker's compensation coverage problem.

29.     Over the course of the next two (2) days, and based on the previous legal opinions provided by the professionals I retained, including Curry, I proposed a strategy to resolve the problems encountered by Presidion, PSI, PBS, and Paradyme, whereby:

     a.  The lack of worker's compensation insurance was resolved through me obtaining insurance coverage by virtue of an agreement where I would act as a personal indemnitor with regard to the obligations owed to the insurer; and

     b.  The lack of working capital would be provided through:

          i.  PSI truthfully and accurately accounting and reporting the taxes collected by PBS and/or Paradyme, relevant to their respective federal employer identification numbers ("FEIN"); and

          ii.  Using the collected payroll tax funds to pay for services to be rendered by PSI to PBS and/or Paradyme in the ordinary course of business (i.e. worker's compensation premium payments, administrative services, information technology, critical vendor payments, etc...) (collectively the "PBS Plan").

30.     Curry was actively engaged in, and a part of, the development of the PBS Plan.

EXHIBIT C
33 OF 40

31.     As part of this two (2) day development process, it was expressly discussed between Curry, Rachlin, me, and various other professionals, that collected payroll "trust fund" tax deposits would be used to fund the worker's compensation collateral requests so as to ensure continuing coverage.

32.     Additionally, during the development of the PBS Plan, Curry was specifically charged with insuring an effective reorganization of Presidion and continued in an active role in Presidion through June 2006.

33.     The PBS Plan would allow for accrued tax liabilities to remain with the FEIN of PBS and/or Paradyme, while providing additional funds to enable PEO operations to continue until the business was restored to a position wherein it could pay all of its outstanding liabilities.

34.     As part of the PBS Plan, Wellington subsequently purchased PSI on or about July 28, 2005, in order to preserve the value of the assets for creditors of PSI, and to preserve PSI as a viable entity so it could pursue the recovery of certain substantial claims.

35.     Moreover, prior to, during, and after the implementation of the PBS Plan, I again sought professional advice and counsel from Curry as to what, if any, personal civil or criminal liability may arise or inure to the detriment of me or my staff by engaging in the PBS Plan.

36.     Curry advised me that the PBS Plan, and all actions in connection therewith, complied with all local, state, and federal laws.

37.     Curry also informed Brian Taylor ("Taylor"), a former Federal Bureau of Investigation agent I retained as a security consultant, that the Sunshine Companies Plan

**EXHIBIT C**
34 OF 40

and PBS Plan, and all actions in connection therewith, complied with all local, state, and federal laws.

38.     At all times Curry was actively involved in providing advice relevant to, and directly participating in, the development and implementation of the Sunshine Companies Plan and PBS Plan, in particular:

a. Curry attended numerous meetings with the Internal Revenue Service, on behalf of PSI, the Sunshine Companies, PBS, Paradyme, and I in which the non-payment of payroll "trust fund" taxes was discussed;

b. Curry assisted in answering questions asked to PSI, the Sunshine Companies, PBS, Paradyme, and I by the District Counsel for the Plantation Office;

c. Curry participated in the revision of a narrative describing the Sunshine Companies Plan and PBS Plan;

d. Curry reviewed and commented on multiple memorandums of law prepared by the professionals I retained which analyzed and provided advice related to the potential consequences of the Sunshine Companies Plan and PBS Plan, including: (i) the April 2005 Memo; (ii) a memo discussing the respective priority of perfected liens and taxes pursuant to the Federal Tax Lien Act; and (iii) a memo discussing the ramifications of the Debt Refinancing Agreement between PSI and Mirabilis;

e. On or about August 29, 2006, Curry attended a mock deposition of Amodeo in preparation of potential depositions in connection with

**EXHIBIT C**

civil proceedings arising out of the Sunshine Companies Plan and PBS Plan, specifically with regard to the tax strategy employed (the "Mock Deposition").

39.    At no time did Curry advise me that persons with the authority to exercise significant control over the financial affairs of a company have a statutory duty to collect, withhold, truthfully account for, and pay over payroll "trust fund" taxes and that failure to intervene to stop and/or mitigate the nonpayment of collected payroll "trust fund" taxes collected could result in significant liability, particularly criminal liability, despite multiple requests from Amodeo as to the potential consequences of the Sunshine Companies Plan and PBS Plan.

40.    At no time did Curry advise me that criminal liability may result from the actions taken in connection with the Sunshine Companies Plan or PBS Plan.

41.    As opposed to advising me of the aforementioned criminal liability potentially resulting from the Sunshine Companies Plan and PBS Plan, and resigning/terminating her representation of me if I did not cease the potentially illegal conduct, Curry chose obtain a direct pecuniary interest from her representation of me.

42.    Moreover, records for the Sunshine Companies, PBS, Paradyme, and Mirabilis indicate that Curry was put on notice of the increasing liability for unpaid payroll taxes by various parties, including:

  a.    On or about March 14, 2005 during settlement negotiations with Robert Gaines and his attorney, Patrick McGee, Curry was made aware that one of Mr. Gaines main concerns was that he would be left

**EXHIBIT C**
36 OF 40

11

liable for the non-payment of payroll taxes by the Sunshine Companies;

b.  On or about August 29, 2005, Curry reviewed Daniel McHenry's valuation report on Presidion where tax arrearages were discussed. Curry subsequently used this as a bargaining tool to negotiate Fred Sandlin's settlement agreement as part of the Sunshine Companies Plan;

c.  In or about October 2005 Curry and Taylor interviewed Baiers at which time old and new tax liabilities of Presidion's PEOs were discussed.   Curry stated at this meeting that the non-payment of payroll taxes was not illegal; and

d.  On or about May 21, 2006, Curry attended a meeting with representatives of the Employer Services Assurance Corporation ("ESAC") to discuss removal of ESAC certification because of the non-payment of payroll taxes by the Mirabilis and/or Presidion PEOs.

43.   Furthermore, Curry developed several business interests which she knew would utilize the unpaid payroll taxes of PBS, including Tireflys/Theory 3 and Nexia Certification, which is now being used by Palaxar, LLC.

Further affiant saith not.

_____
Frank L. Amodeo

**EXHIBIT C**
37 OF 40

12

STATE OF FLORIDA

COUNTY OF ORANGE

The foregoing instrument was subscribed and sworn to before me this _____ day of April, 2007, by Frank L. Amodeo, who is personally known to me or who has produced _____ as identification.

_____

Printed Name:_____
Notary Public
My Commission Expires:

**EXHIBIT C**
38 OF 40

13

Amodeo's action indicates a lack of intent; because instead of being deceptive about Amodeo's plan, Amodeo or one of Amodeo's advisors told the Internal Revenue Service what was happening.

In October 2004, Amodeo instructed Jim Baiers to keep the United States Attorney for the Eastern District of Michigan informed of Amodeo's plan and actions. Baiers indicated Baiers would do so and then that Baiers had done so. Baiers evidenced this by producing a letter dated February 4, 2005 from IRS Special Agent Gary R. Patterson indicating the criminal investigation against Presidion had been concluded. Baiers further stated Patterson had specifically commented that delinquent taxes ($35 – $52 million with penalties and interest) were only a civil, not criminal matter.

On or about December 21, 2004 Amodeo specifically instructed Amodeo's personal attorney, Richard E. Berman, to contact the U.S. Attorney's Office, especially since Richard Berman had a client purportedly in charge of the Organized Crime Division and apprise the U.S. Attorney of Amodeo's plan. Further, maintain a relationship and continue to keep the U.S. Attorney apprised of developments in order to prevent any conflicts.

At the same meeting Amodeo's personal accountant, Laurie Holtz, was directed to have a principal in Holtz's firm, Jose Marrero, contact the Criminal Investigation Division of the IRS to determine what help could be provided with any IRS inquiry into Presidion and to apprise the CID/IRS of Amodeo's actions and plan. This was especially appropriate since Marrero had 28 years of experience with the IRS, part of which included serving as deputy director in the Criminal Investigation Division.

Amodeo again on this day directed Ken Levine of Tew Cardenas to contact he appropriate State of Florida agencies, particularly the Department of Insurance and inform the Department and other appropriate agencies of Amodeo's action and plans. Levine as a trustee for the Department of Insurance and because of a close professional relationship with the Department head was exceptionally suited for the task. On December 28, 2004 Amodeo reaffirmed these instructions in an e-mail communication to Berman and Holtz.

On January 6, 2005 Amodeo personally went to the Internal Revenue Service and reported what was believed to be an unpaid tax debt greater than $25 million and possibly double that number. The Internal Revenue Service officer, Judy Berkowitz, requested Amodeo change the location of the taxpayer's corporate headquarters in order for the case to be assigned to her. The location Berkowitz suggested was a private mailbox in Hollywood, Florida, which Amodeo had used in prior cases. Present with Amodeo was Berman, Marrero, Hans Beyer of Buchanan Ingersoll (Bankruptcy Creditor Rights Expert) and Daniel Myers, CPA. Edith Curry Broadhead participated in the debriefing by telephone after the actual meeting.

At the conclusion of the meeting Amodeo instructed all five professionals to be "more than open" and "too much disclosure is not enough" in communicating with the IRS; maintaining this relationship was very important. The IRS must be able to rely upon us. Amodeo is informed by Marrero and Myers that everything is going well with the IRS and movement is being made toward an acceptable solution.

**EXHIBIT C**
39 OF 40

In or about May 2006 Presidion's auditors discover an asset Presidion had hid from Amodeo. The asset was a large deposit with an insurance company. In order to correct the oversight Presidion promptly issued a promissory note to the Sunshine Companies. Amodeo took the note and gave it to Dan Myers and had Myers send the note to the IRS (Berkowitz).

Berkowitz received the note but said this did not do the IRS any good and Sunshine should just send cash. Myers told Berkowitz the note could be sold to a related party at 10% of face value. Berkowitz agreed and Mirabilis sent the payments to the IRS, attention Berkowitz; effectively purchasing the note from the IRS.

In or about July 2005, the next engagement was to commence; this time a complete reorganization of the Presidion assets and sale of assets. Edie Curry was placed in charge of this reorganization. Curry was instructed to contact the U.S. Attorney's Office and explain what was occurring.

During this period of time consisting of most of 2005, Marrero and Myers were in contact with the IRS on a regular basis (several in person visits; hundreds of other communications).

In January of 2006, Amodeo asked Myers, Beyers and Sharmila Khanorkar (forensic accountant in Holtz's firm) to visit with the IRS and do a thorough review of the current state of affairs including the new liability owing from PBS.

**EXHIBIT C**
40 OF 40