UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

MIRABILIS VENTURES, INC. and
NEXIA STRATEGY CORPORATION,

        Plaintiffs,

-vs-                                Case No.  6:07-cv-1788-Orl-28KRS

PALAXAR GROUP, LLC; PALAXAR
HOLDINGS, LLC; FRANK HAILSTONES;
EDITH CURRY a/k/a EDITH
BROADHEAD; and TERENCE CHU,

        Defendants,

-vs-

MIRABILIS VENTURES, INC., NEXIA
STRATEGY CORPORATION, AQMI
STRATEGY CORPORATION,
WELLINGTON CAPITAL GROUP, INC.,
YANIV AMAR, FRANK AMODEO, AARON
BATES, MATTHEW MOKWA, ROBERT
POLLOCK, and JAMES V. SADRIANNA,

        Third-Party
        Defendants.

---

# ORDER

    This case concerns the development and marketing of an anti-fraud certification

program known as Nexia Certification. Defendants Palaxar Group, LLC ("Palaxar Group"),

Palaxar Holdings, LLC ("Palaxar Holdings"), Frank Hailstones, and Edith Curry (collectively,

"Defendants"), have moved for summary judgment on each of Plaintiffs' seven claims

against them.  (Doc. 75, reinstated at Doc. 189).  Plaintiffs Mirabilis Ventures, Inc.

("Mirabilis") and Nexia Strategy Corporation ("Nexia Strategy") have filed a response in

opposition. (Doc. 193). Based upon the parties' submissions, summary judgment must be granted for Defendants on each of Plaintiffs' seven claims.

I. Background

During the time period relevant to this case, Mirabilis was an equity fund that invested in a variety of ventures, and Nexia Strategy was a wholly-owned subsidiary of Mirabilis. (Second Am. Compl. ¶¶ 12-13; Doc. 205 (hereinafter, "Cuthill Aff.") ¶ 4). Frank Amodeo was, at times, the Chairman, Sole Director, and Shareholder of Mirabilis.[1] Amodeo frequently appointed and replaced Mirabilis officers and directors and exercised tight control over the affairs of both Mirabilis and Nexia Strategy.[2]

Hailstones served as President or CEO of Mirabilis from January 2, 2006 until December 31, 2006, and he served as a member of Mirabilis's Board of Directors from

_____

[1] R.W. Cuthill, the President of Mirabilis since May 27, 2008, asserts that "[b]ased upon Mirabilis' corporate books and records, Frank Amodeo was not an officer or Director of Mirabilis." (Cuthill Aff. ¶ 5). However, the minutes of a special joint meeting of the Mirabilis Directors and Shareholders, dated February 15, 2005, were signed by Frank Amodeo as "Chairman" and as "Sole Director and Shareholder." (Doc. 75-1 (hereinafter, "March Curry Aff.") Ex. 6). Cuthill further maintains that Amodeo held preferred stock representing less than 1% of the total shares outstanding and no common stock in Mirabilis. (Cuthill Aff. ¶ 6). Contrary to Cuthill's assertion, as of August 26, 2005, Amodeo held at least 24,000 shares of Mirabilis Class "A" common stock. (Doc. 75-11 (hereinafter, "Holtz Aff.") Ex. 1). It is unclear from the evidence in the record, including the Mirabilis Shareholders' Agreement, whether these Class "A" shares or any other shares gave Amodeo voting control of Mirabilis. (March Curry Aff. Ex. 1 at 2).

[2] Hailstones asserts that although Amodeo claimed to be a mere consultant for Mirabilis, he attended and directed the actions of most of the board meetings, appointed and replaced officers at his pleasure, and made all significant financial and administrative decisions for Mirabilis and Nexia Strategy. (Doc. 75-20 (hereinafter, "January Hailstones Aff.") ¶¶ 9, 20-26, Ex. A). Similarly, Curry maintains that she observed Amodeo assert "exclusive and personal control over the day-to-day affairs of Mirabilis and Nexia [Strategy]." (Doc. 41-7 (hereinafter, "January Curry Aff.") ¶ 7; *see also* Holtz Aff. ¶ 5). Plaintiffs offer no evidence contradicting these statements. Rather, the host of corporate resolutions produced by Plaintiffs showing the frequent addition and removal of officers and directors from Mirabilis only corroborates the assertions of Hailstones and Curry. (Cuthill Aff. Ex. 1-2; Doc. 24-1 (hereinafter, "Jaiman Decl.") Ex. 1).

January 26, 2006 until January 31, 2007. (January Hailstones Aff. ¶ 19). Hailstones had no written employment agreement with either Mirabilis or Nexia Strategy.[3] (Doc. 75-9 (hereinafter, "March Hailstones Aff.") ¶ 3). As President of Mirabilis, Hailstones was authorized to sign contracts and agreements on behalf of Mirabilis that were approved by its shareholders or board of directors. (Jaiman Decl. Ex. 2 ¶ 4.09).

Prior to her involvement with Mirabilis and Nexia Strategy, Curry worked for the Department of Defense and had participated in creating IUSF, a method for using individuals' personal financial behavior to assess their suitability for positions of trust. (January Curry Aff. ¶ 5). After leaving government service and before working for Nexia Strategy, Curry and Michael Dement began to formulate, but did not fully develop, a commercial application for IUSF. (Id.).

Curry was employed by Nexia Strategy from June 1, 2005 until October 31, 2006. (January Curry Aff. ¶ 6). Curry's employment agreement with Nexia Strategy specified that her job duties included, but were not limited to, "the business development and/or management of any current or prospective client-related activities" and "the development and/or management of the Virginia branch of Nexia Strategy Corporation." (Jaiman Decl. Ex. 4 at 75). Curry asserts that she was recruited and hired by Amodeo to perform general consulting and negotiating for Mirabilis and Nexia Strategy and to establish and operate

---

[3] Plaintiffs argue that Hailstones admitted to signing an employment agreement governing his conduct in this case. (Resp. at 5 (citing Doc. 200-1 (hereinafter, "Hailstones Dep.") at 33-34); Doc. 198-3 at 15-29). Hailstones testified during his deposition that he signed Deposition Exhibit 61, (Hailstones' Dep. at 33-34), and that he did not sign Deposition Exhibit 62, (id. at 39-40). Finding no evidence to the contrary, the Court rejects Plaintiffs' assertion that Deposition Exhibit 62 is Hailstones's signed employment agreement. (Resp. at 5). Moreover, the Court finds no evidence in the record of an employment agreement signed by Hailstones.

a Richmond Office for Mirabilis and Nexia Strategy housing a call center and the accounting, payroll, insurance, benefits, and other services for the professional employer organizations ("PEOs") owned by Mirabilis ("PEO Processing Center"). (January Curry Aff. ¶ 6). From January 1, 2006 until October 31, 2006, Curry was the President of Nexia Strategy. (Id. ¶ 4). From October 2005 until October 31, 2006, Curry was the Secretary-Treasurer of Mirabilis and served on its Board of Directors. (Id.).

In early 2006, Curry asked Amodeo if he would be interested in funding the development and commercialization of IUSF. (Id. ¶ 9). Amodeo proposed that he, Mirabilis, or Nexia Strategy would fund the development and commercialization of IUSF in exchange for a license to use the product if Nexia Strategy successfully set up the Richmond office. (Id.). The commercialization of IUSF was known as "Nexia Certification." (Id.). Curry maintains Amodeo's proposal was never reduced to writing and that she did not agree to assign ownership of IUSF to Mirabilis or Nexia Strategy. (Id. ¶ 10).

Hailstones, Laurie Holtz, and, to a much lesser extent, other employees at Nexia Strategy and Mirabilis assisted Curry in developing Nexia Certification. (Id. ¶ 11). All of the Nexia Strategy and Mirabilis employees in Richmond were primarily tasked with establishing the PEO Processing Center, and there was no separate office space in Richmond dedicated to the development of Nexia Certification. (Id.). Although neither Curry nor any other Nexia Strategy employee used or relied on information obtained from Mirabilis or Nexia Strategy in developing Nexia Certification, (March Curry Aff. ¶ 3), Mirabilis and Nexia Strategy invested in the development and marketing of Nexia Certification by paying legal fees, travel costs, and other similar costs over the span of several months. (January Curry Aff. ¶ 11). At some point, a patent application was filed

-4-

for Nexia Certification, and Curry stated that the patent would be owned by Nexia Strategy.[4] (Doc. 199 (hereinafter, "Curry Dep.") at 90, 113-14, 132, 148). Plaintiffs paid $1.5 million towards the development of and patent application for Nexia Certification. (Jaiman Decl. ¶ 8(a); *cf.* Cuthill Aff. ¶ 7 (claiming that $1.2 million was spent developing Nexia Certification)). On the other hand, Curry contends that she personally paid more than $20,000 in development expenses while she was affiliated with Nexia Strategy. (January Curry Aff. ¶ 23).

By the end of March 2006, Curry had determined, based on discussions with outside advisors, that Nexia Certification could not be offered by a company controlled by any individuals, who like Frank Amodeo, had significantly negative financial or criminal histories.[5] (*Id.* ¶ 12). On June 26, 2006, Laurie Holtz informed Curry that upon presenting a business plan to Amodeo and completing the sale of the Mirabilis PEOs, Amodeo would fund a separate corporation that would market Nexia Certification. (*Id.* ¶ 14, Ex. B).

On July 28, 2006, Curry and Amodeo met in Orlando, Florida. (*Id.* ¶ 15). At this meeting, Amodeo agreed that Curry "would separate from Mirabilis and take Nexia Certification with [her] to be further developed and marketed by a new and independent company." (*Id.*). Amodeo requested that Curry remain with Mirabilis through the end of the year to ensure that the Richmond facility ran correctly, and Curry agreed. (*Id.*). At this

---

[4] Curry claims that she misspoke when she stated in an email dated March 2, 2006, that Nexia Strategy owned the patent and trademark rights for Nexia Certification. (January Curry Aff. ¶ 20).

[5] Curry knew that Amodeo had a prior federal felony conviction for fraud, was disbarred in Georgia, and had filed personal bankruptcy. (January Curry Aff. ¶ 12).

meeting, Amodeo signed and dated a handwritten document ("Amodeo Directive") which

stated:

> Because Edie Curry is the Earth Goddess, Mirabilis and Nexia Strategy
> Corp., its successors and assigns, surrenders (sic) all rights, ownership, and
> interest in Nexia Certification effective this date subject to subsequent
> economic negotiations of reasonableness reflecting actual investment and
> nondisclosure until public Mirabilis Ventures shareholders on 1/1/07.

(Id. ¶ 15, Ex. C).

At Curry's request, Scott Goldberg, the attorney for Mirabilis, prepared two

assignment agreements, both of which took effect on August 1, 2006 (collectively,

"Assignment Agreements"). (Id. ¶ 16). Pursuant to the first assignment agreement ("First

Assignment Agreement"), Hailstones, in his capacity as President of Mirabilis, assigned all

of Mirabilis's ownership rights in Nexia Certification to Hailstones, Curry, Holtz, and

Dement, reserving only a "worldwide, royalty-free, fully paid up, perpetual, irrevocable, non-

exclusive license" for Mirabilis's "internal use" of Nexia Certification. (Curry Answer Ex. A

at 5-6). Curry maintains that Hailstones executed the First Assignment Agreement in her

presence and in the presence of and at the express direction of Amodeo. (January Curry

Aff. ¶ 16). Under the second assignment agreement ("Second Assignment Agreement"),

Hailstones, Rama Inguva, Holtz, and Dement assigned all of their ownership rights in Nexia

Certification to Curry, reserving only a "worldwide, royalty-free, fully paid up, perpetual,

irrevocable, non-exclusive license" for the "internal use" of Nexia Certification. (Id. Ex. D

at 4-5).

In early September 2006, Amodeo announced that Mirabilis would cut the funding

of Nexia Strategy's Richmond operation in October 2006, which led to the negotiation of

a separation agreement between Curry, Nexia Strategy, and Mirabilis. (Id. ¶ 17). Curry,

Holtz, Amodeo, Hailstones, and Richard Berman were involved in the negotiations.

(January Curry Aff. ¶ 18, Ex. E). The executed Separation Agreement provided as follows:

1.  All right, title, and interest in and to the Nexia Certification program will be assigned to [Curry]. Payment for same is hereinafter described.

    . . .

6.  As compensation for the transfer to you of all right, title, and interest in and to Nexia Certification, you have agreed to designate or create a new entity ("Newco") for the purpose of advancing Nexia Certification and/or for performing consulting work. This entity will execute a note payable to an entity to be formed, Newco B, as hereinafter described. The note shall be for the sum of [$500,000.00] . . . and shall accrue from October 31, 2006 until paid (the "Note"). . . . The Note shall be payable from the first profits earned by Newco.

7.  Nexia consultants will form a separate company ("Newco B") and will not have any controlling shareholders or employees with a history of fraud or other criminal activity. Newco B shall be formed for the specific purpose of working with Newco on the Nexia Certification program and related Anti-Fraud consulting. The gross revenues from consulting on this joint venture shall be shared equally between the two "Newco" entities. The parties agree to execute a final an[d] complete joint venture agreement between the "Newco" entities by October 31, 2006.

8.  All obligations (other than current salary which terminated by agreement of October 15, 2006 and unpaid expenses) owed to you as of October 31, 2006, by Mirabilis . . . or any other affiliate or subsidiary of Mirabilis pursuant to any employment or any other oral or written agreement that you have with such entity shall be null[,] void[,] and of no further force or effect.

    . . .

    If this letter accurately sets forth our agreement, kindly execute and return the enclosed copy of this letter.

(Curry Answer Ex. B). The Separation Agreement received by Curry was signed by

Hailstones as the President of Mirabilis. (*Id.*). On October 20, 2006, Curry signed and

returned the Separation Agreement to Mirabilis. (*Id.*; January Curry Aff. ¶ 19).

Curry maintains that she formed Palaxar Group intending it to be the "NewCo"

contemplated in the Separation Agreement and the entity through which Nexia Certification

would be promoted. (*Id.* ¶ 21). Between October and December 2006, Curry had several meetings with Hailstones in his capacity as President of Nexia Strategy to discuss joint client proposals and marketing. (*Id.*). On December 15, 2006, Hailstones and Curry made a joint presentation to Wachovia Securities in Richmond for a consulting assignment, but no business was generated from that presentation. (*Id.*). It is undisputed that Mirabilis took no efforts after December 2006 to fulfill its obligations under the Separation Agreement. (*Id.* ¶ 22). Mirabilis did not form the "NewCo B" entity contemplated by the Separation Agreement, and the Note contemplated by the Separation Agreement was never executed. (*Id.*; Curry Dep. at 235). It is also undisputed that Curry spent thousands of dollars in travel costs, marketing, and legal fees to support Palaxar Group and Nexia Certification and that no revenue has been generated to date by Curry, Palaxar Group, or Palaxar Holdings through Nexia Certification. (*Id.* ¶ 23; January Hailstones Aff. ¶ 54). Further, there is no evidence in the record contradicting Hailstones's assertion that the presentation conducted by Hailstones and Curry at a professional symposium in Scottsdale, Arizona, in October 2007 was unrelated to Nexia Certification. (January Hailstones Aff. ¶ 52).

On October 11, 2007, Nexia Strategy was reinstated as a Florida corporation, and its board of directors passed a resolution "authoriz[ing] and [approv[ing] the reinstatement of the Corporation for the purpose of filing and maintaining lawsuits against third-parties." (January Curry Aff. ¶ 22, Ex. F). Thereafter, Mirabilis and Nexia Strategy filed the instant action against the Defendants. Plaintiffs' Second Amended Complaint contains the following claims against Defendants: (1) breach of contract (Count I); (2) breach of fiduciary duty (Count II); (3) misappropriation of trade secrets (Count III); (4) conversion (Count IV);

(5) civil conspiracy (Count V); (6) injunctive relief (Count VI); and (7) unjust enrichment (Count VII). (Doc. 56).

## II. Discussion

### A. Summary Judgment Standards

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). The moving party bears the burden of establishing that no genuine issues of material fact remain. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). However, summary judgment should be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997).

"'In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial.' Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Sawyer v. Sw. Airlines*

*Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (quoting *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988), and *Anderson v. Liberty Lobby, Inc..*, 477 U.S. 242, 251-52 (1986)).

### B. The Merits of the Motion

The parties' dispute over the ownership of Nexia Certification lies at the core of each of Plaintiffs' seven claims against Defendants and will be addressed at the outset. Defendants maintain that Plaintiffs never owned Nexia Certification or, alternatively, that Plaintiffs relinquished all rights to Nexia Certification under the First Assignment Agreement and the Separation Agreement. (Motion at 13-17). Plaintiffs argue in response that there are genuine issues of material fact concerning the initial ownership of Nexia Certification and the validity of the First Assignment and Separation Agreements.

Although it cannot be determined at this stage of the proceedings which party owned Nexia Certification upon its invention, there is no genuine issue of material fact concerning the validity of the First Assignment Agreement or the Separation Agreement. Accordingly, even if Plaintiffs owned Nexia Certification when it was invented, their ownership rights were transferred to Curry under the First Assignment Agreement or, alternatively, the Separation Agreement. As a result, summary judgment must be granted for Defendants on each of Plaintiffs' claims.

### 1. Initial Ownership of Nexia Certification

It is undisputed that Nexia Certification was invented while Curry was employed by Nexia Strategy. After Curry began working for Nexia Strategy, she asked Amodeo to fund the development and commercialization of Curry's IUSF algorithm into what became known as Nexia Certification. (January Curry Aff. ¶ 9). Curry and other Nexia Strategy

employees developed Nexia Certification using Nexia Strategy's funds and while on Nexia Strategy's time. (*Id.* ¶ 11; March Curry Aff. ¶ 3; Jaiman Decl. ¶ 8(a); Cuthill Aff. ¶ 7).

"Consistent with the presumption that the inventor owns his invention, an individual owns the patent rights even though the invention was conceived and/or reduced to practice during the course of employment." *Teets v. Chromalloy Gas Turbine Corp.*, 83 F.3d 403, 407 (Fed. Cir. 1996). However, "[a]n employee may freely consent by contract to assign all rights in inventive ideas to the employer." *Id.* State law governs contracts to assign inventive rights, *id.*, and Florida law governs Curry's employment agreement. (Jaiman Decl. Ex. 4 at 72). "[A] Florida employer can[]not claim ownership of an employee's invention 'unless the contract of employment by express terms or unequivocal inference shows that the employee was hired for the express purpose of producing the thing patented.'" *Teets*, 83 F.3d at 407 (quoting *State v. Neal*, 12 So. 2d 590, 591 (Fla. 1943)); *see also City of Cocoa v. Leffler*, 803 So. 2d 869, 872 (Fla. 5th DCA 2002) ("[A]n employer seeking patent rights to an employee's invention must prove that '[t]he contract of employment by express terms or unequivocal inference shows that the employee was hired for the express purpose of producing the thing patented.'" (quoting *State Bd. of Educ. v. Bourne*, 7 So. 2d 838, 840 (Fla. 1942))). An implied-in-fact assignment of inventive rights also exists if there is an "unequivocal inference" that an employee was hired for a general purpose and later tasked with developing a device or process. *Teets*, 83 F.3d at 408 (citing *Neal*, 12 So. 2d at 591).

Curry's employment agreement does not provide that she was hired for the express purpose of inventing Nexia Certification. The only job duties explicitly listed in Curry's employment agreement were "the business development and/or management of any

-11-

current or prospective client-related activities" and "the development and/or management of the Virginia branch of Nexia Strategy Corporation." (Jaiman Decl. Ex. 4 at 75). Consistent with these duties, Curry asserts that she was recruited and hired by Amodeo to perform general consulting and negotiating for Mirabilis and Nexia Strategy and to establish and operate a Richmond Office for Mirabilis and Nexia Strategy housing a call center and the accounting, payroll, insurance, benefits, and other services for the PEOs owned by Mirabilis. (January Curry Aff. ¶ 6).

Curry's employment agreement provided that Nexia Strategy "shall retain all the benefits, emoluments, profits, or other returns from or incidental to any and all work, services, advice, and mental efforts of [Curry] that arise during the term of this Agreement . . . ." (Jaiman Decl. Ex. 4 at 70). It is unclear whether "benefits" or "other returns" includes the invention of Nexia Certification. In any case, this provision does not create a valid assignment of inventive rights under Florida law because neither it nor any other part of Curry's employment agreement indicates that Curry was hired for the express purpose of producing Nexia Certification. *Teets*, 83 F.3d at 407.

Although there is no evidence of a valid written assignment of inventive rights, there is a genuine issue of material fact of an "unequivocal inference" that Nexia Strategy specifically tasked Curry to invent Nexia Certification, thereby creating an implied-in-fact assignment of inventive rights from Curry to Nexia Strategy. In *Neal*, the Florida Supreme Court found that the "unequivocal inference" standard was met where: (1) the employee was paid by the state from a special federal fund limited to investigations and experiments regarding agricultural products; (2) the employee devoted a "major portion" of his time to the project; (3) the employee used state facilities; (4) the state paid all expenses in

-12-

obtaining the patents; (5) the employee was given the specific task of developing a new method to dry citrus waste; (6) the employee at first attempted to obtain the patent in the name of the employer; and (7) the parties' correspondence conclusively showed that the purpose of the project was to create a new method. 12 So. 2d at 591. In Teets, the Federal Circuit found an implied-in-fact assignment contract where: (1) the inventor was assigned as the chief engineer on the invention project; (2) the inventor spent 70% of his time on that project; (3) the inventor reduced the invention to practice using his employer's resources, employees, shop tools, materials, and time; (4) the employer paid for the prosecution of a patent; and (5) the inventor had acknowledged through statements and the patent application that another employee was a co-inventor. 83 F.3d at 408.

Viewing the evidence in the record in Plaintiffs' favor, there is a genuine issue of material fact of an "unequivocal inference" that Nexia Strategy tasked Curry to invent Nexia Certification. Like the employers in Neal and Teets, Nexia Strategy made significant investments in developing Nexia Strategy. Nexia Strategy spent over $1 million developing Nexia Certification, and several Nexia Strategy employees other than Curry assisted in developing Nexia Certification. (Jaiman Decl. ¶ 8(a); Cuthill Aff. ¶ 7; January Curry Aff. ¶ 11). In contrast, Curry personally spent only $20,000 towards developing Nexia Certification while employed at Nexia Strategy. (January Curry Aff. ¶ 23). A patent application was drafted for Nexia Strategy which, like the patent application in Teets, specified multiple employees as inventors.[6] In addition, an email from Tessah Ivey

---

[6] The patent application for Nexia Strategy listed Curry, Holtz, Hailstones, and Frank Dement as the inventors. (Curry Dep. at 41). Curry, Holtz, and Hailstones were employed by Nexia Strategy. (January Curry Aff. ¶ 11). Dement was employed by Common Pay Master, another entity (continued...)

assigning work to Curry and other personnel in Richmond listed "Nexia Certification" as one of Curry's assignments.[7]  (Jaiman Decl. Ex. 7 at 3).

Curry's conduct consistent with Nexia Strategy's ownership of Nexia Certification also is probative of an implied-in-fact assignment of inventive rights. *See Teets*, 83 F.3d at 408 (considering "most important" that the inventor-employee "repeatedly acknowledged" his employer's role in the development of the invention).  Curry had several discussions with Frank Amodeo and outside advisors about the marketing of Nexia Certification. (January Curry Aff. ¶ 12). Curry's repeated attempts to obtain an assignment of Nexia Certification, when viewed in the light most favorable to Plaintiffs, shows Curry's belief that she did not own Nexia Certification upon its invention.  (January Curry Aff. ¶¶ 15-19). Further, notwithstanding Curry's insistence that she "misspoke," the Court cannot ignore Curry's email stating that Nexia Strategy owned the patent and trademark rights to Nexia Certification. (January Curry Aff. ¶ 20).  Based on this evidence, there is a genuine issue of material fact as to whether Nexia Strategy owned Nexia Certification upon its invention pursuant to an implied-in-fact contract.

### 2. First Assignment and Separation Agreements

Pursuant to the First Assignment Agreement, which took effect on August 1, 2006, Mirabilis transferred all of its interests in Nexia Strategy to Curry, Hailstones, Holtz, and Dement in exchange for a "worldwide, royalty-free, fully paid up, perpetual, irrevocable,

---

(...continued)
related to Mirabilis, and Frank Amodeo directed Dement's work on Nexia Certification. (Curry Dep. at 42).

[7] This email also instructed Dement to discontinue working on Nexia Certification. (Jaiman Decl. Ex. 7 at 4).

non-exclusive license to use" Nexia Certification. (Curry Answer Ex. A ¶ 3.1). The parties do not dispute the validity of the Second Assignment Agreement, under which Hailstones, Holtz, Dement, and Inguva transferred all of their interests in Nexia Strategy to Curry effective August 1, 2006. (January Curry Aff. Ex. D ¶ 3.1). Accordingly, if the First Assignment Agreement is valid, all of Plaintiffs' claims alleging improper use of Nexia Certification by Curry or Hailstones after August 1, 2006 are without merit, and any disputes concerning the ownership of Nexia Certification prior to August 1, 2006 are moot.

Similarly, pursuant to the Separation Agreement, which took effect on October 31, 2006, Mirabilis assigned "[a]ll right, title, and interest in and to the Nexia Certification program" to Curry. (Curry Answer Ex. B ¶ 1). If the Separation Agreement is valid, all of Plaintiffs' claims alleging improper use of Nexia Certification by Curry or Hailstones after October 31, 2006 are without merit, and any disputes concerning the ownership of Nexia Certification prior to October 31, 2006 are moot.

Defendants argue that there is no genuine issue of material fact concerning the validity or enforceability of the First Assignment or Separation Agreements. Plaintiffs contend that the Agreements are invalid and unenforceable because they were transactions involving an interested director and because there is no evidence in the record that the Agreements were properly ratified pursuant to Mirabilis's bylaws.

As President of Nexia Strategy and an officer and director of Mirabilis, Curry had fiduciary duties to both organizations.[8] *See Snead v. U.S. Trucking Corp.*, 380 So. 2d 1075, 1078 (Fla. 1st DCA 1980) ("The relationship of a director and of an officer to the

_____

[8] Because both Plaintiffs and Defendants argue that Florida corporate law governs Mirabilis's actions here, the Court will apply Florida law.

corporation and its stockholders is that of a fiduciary."). "A fiduciary owes to its beneficiary the duty to refrain from self-dealing, the duty of loyalty, the overall duty to not take unfair advantage and to act in the best interest of the other party, and the duty to disclose material facts." *Capital Bank v. MVB, Inc.*, 644 So. 2d 515, 520 (Fla. 3d DCA 1994) (citation omitted). Notwithstanding these fiduciary duties, "[a] fiduciary obligor is not precluded from contracting with his beneficiary." *Cohen v. Hattaway*, 595 So. 2d 105, 107-08 (Fla. 5th DCA 1992). "A purchase by a fiduciary obligor of property belonging to the fiduciary beneficiary is not void but rather is voidable at the option of the fiduciary beneficiary, with the burden of showing the validity of such a contract and the fairness and honesty of such a transaction being on the fiduciary obligor." *Id.* at 108; *see also Orlando Orange Groves Co. v. Hale*, 144 So. 674, 677 (Fla. 1932) ("[A] purchase by a director, officer, or agent of a corporation of property from the corporation is not void, but is voidable at the option of the corporation, and . . . the burden of showing the validity of such a contract, and the fairness and honesty of such a transaction with the corporation is on the director, officer, or agent.").

There is no evidence in the record that the First Assignment or Separation Agreements were ratified pursuant to Section 3.16 of Mirabilis' Bylaws, which sets forth the procedures for ratifying a transaction with an interested director or officer. (Resp. Ex. 12, at 30-31). Thus, the First Assignment and Separation Agreements are voidable by Mirabilis unless the transactions are shown to be valid, fair, and honest.

### a. Validity

Both the First Assignment and Separation Agreements are signed by Hailstones, as President of Mirabilis, and by Curry. (Curry Answer Ex. A, B). They appear on their

face and from the undisputed evidence in the record to be valid contracts. Plaintiffs raise several challenges to the validity of these Agreements, each of which is without merit.

## I. Meeting of the Minds

Plaintiffs argue that because the essential terms of the promissory note contemplated by the Separation Agreement were never finalized, there was no meeting of the minds under the Separation Agreement. (Response at 15-16). "[I]n order for a contract to be binding and enforceable, there must be a meeting of the minds on all essential terms and obligations of the contract." *Browning v. Peyton*, 918 F.2d 1516, 1521 (11th Cir. 1990) (citing *O'Neill v. Corporate Trs., Inc.*, 376 F.2d 818, 820 (5th Cir. 1967)). Both Hailstones, as President of Mirabilis, and Curry signed the Separation Agreement, (Curry Answer Ex. B), thereby expressing their intent to be bound by the provisions contained therein. *See Gendzier v. Bielecki*, 97 So. 2d 604, 608 (Fla. 1957) ("The writing itself is the evidence of what [the parties] meant or intended by signing it."). The emails documenting the negotiations of the Separation Agreement also reflect the parties' intent to be bound by the terms of the Settlement Agreement. (January Curry Aff. ¶ 18, Ex. E).

In exchange for Mirabilis's rights to Nexia Certification, Curry promised under the Separation Agreement to form an entity that would execute a promissory note in favor of a new entity to be created by Mirabilis. (Curry Answer Ex. B). Notwithstanding Plaintiffs' argument to the contrary, (Resp. at 16), all essential terms of the promissory note are found in the Separation Agreement. The Separation Agreement identified the parties to the note, the principal amount of the note, the applicable interest rate, the date from which interest accrues on the note, and the proceeds from which the note is payable. (Curry

Answer Ex. B). Accordingly, there was a meeting of the minds concerning the Separation Agreement.

Plaintiffs' argument that there was no meeting of the minds on the Separation Agreement also fails because Curry detrimentally relied on the Agreement, and thus, as the drafters of the Separation Agreement, (*id.* at 2), Plaintiffs are estopped from asserting that the Separation Agreement is invalid due to a defect in a matter of form. *See Cox v. La Pota*, 76 So. 2d 662, 663 (Fla. 1954) ("One who leads another to act upon a supposed contract and to incur expenses or otherwise change his position by reason thereof is estopped to refuse compliance with his own obligations thereunder upon a pretext of some defect in a matter of form."); *see also Bajrangi v. Magnethel Enters., Inc.*, 589 So. 2d 416, 420 (Fla. 5th DCA 1991) (finding that lessor was estopped from denying the enforceability of a lease due to a defect in property description where the lessor drafted the lease and the lessee made two years of payments) (citing *Cox*, 76 So. 2d at 663). Curry has demonstrated that she detrimentally relied on the Separation Agreement by spending thousands of dollars to promote Nexia Certification and by attending several joint meetings and client presentations with Hailstones between October and December 2006. (January Curry Aff. ¶¶ 21, 23). For the foregoing reasons, the Court rejects Plaintiffs' argument that the Separation Agreement is invalid for lack of a meeting of the minds.

### ii. Consideration

Plaintiffs next argue that the Separation Agreements fails for want of consideration because the parties never executed the Note contemplated in the Separation Agreement. (Response at 18). This argument is without merit. Mutual obligations or promises to perform, including a promise to execute a promissory note with particular terms, are

sufficient consideration to form a contract. *See Johnson Enters. of Jacksonville, Inc. v. FPL Group, Inc.*, 162 F.3d 1290, 1311 (11th Cir. 1998) ("In a bilateral contract, the exchange of promises by both parties constitutes consideration.") (citation omitted). Curry's obligations to form "Newco," to execute a promissory note payable to "Newco B," and to pay the note from the first profits of Newco, constitute sufficient consideration to support Mirabilis's transfer of Nexia Certification to Curry. (Curry Answer Ex. B ¶¶ 6-7).

### iii. Authority of Hailstones to Execute Agreements

Plaintiffs argue that Hailstones lacked sufficient authority from the Mirabilis Board of Directors or Shareholders to enter into the First Assignment Agreement or Separation Agreement with Curry. (Resp. at 16-18). Although there is no evidence in the record that Hailstones obtained prior approval from the Mirabilis Board of Directors to execute the Agreements, this is not fatal to the validity of the Agreements because Hailstones had apparent authority to execute the Agreements and because Plaintiffs are estopped from denying the validity of those Agreements.

Hailstones possessed apparent authority to enter into the Assignment and Separation Agreements as President of Mirabilis. "Three elements are needed to establish an apparent agency: (1) a representation by the purported principal; (2) reliance on that representation by a third party; and (3) a change in position by the third party in reliance upon such representation." *Lensa Corp. v. Poinciana Gardens Ass'n*, 765 So. 2d 296, 298 (Fla. 4th DCA 2000). A third party's reliance "must be reasonable and rest in the actions of or appearances created by the principal . . . ." *Id.* "As to acts in the ordinary course of business, courts have consistently recognized that a presumption of authority exists in the case of acts made or done by presidents." *Id.*

The Assignment Agreements were prompted by the Amodeo Directive, which provided that Mirabilis and Nexia Strategy would assign "all rights, ownership, and interest in Nexia Certification" from Mirabilis and Nexia Strategy to Curry, "subject to subsequent economic negotiations . . . ." (January Curry Aff. ¶ 15, Ex. C). Curry handed the Amodeo Directive to Mirabilis' attorney, Scott Goldberg, and Goldberg prepared the Assignment Agreements at Curry's request. (*Id.* ¶ 16). Curry witnessed Hailstones execute the First Assignment Agreement in the presence of and at the express direction of Amodeo at the conference table outside Amodeo's office. (*Id.*). In view of the manner in which the First Assignment Agreement was executed and Amodeo's control over the day-to-day affairs of Mirabilis, *see supra* note 2, Mirabilis represented to Curry that Hailstones had authority to execute the First Assignment Agreement on its behalf. Curry changed her position in reasonable reliance on this representation by executing the Second Assignment Agreement. (January Curry Aff. Ex. D). Accordingly, Hailstones's execution of the First Assignment Agreement was done with the apparent authority of Mirabilis.

There is no issue of material fact as to whether Hailstones had apparent authority to execute the Separation Agreement. Considering the frequency that officers and directors were appointed to and removed from Mirabilis and Nexia Strategy, *see supra* note 2, Hailstones's execution of a separation agreement with Curry, who served as an officer and director of Mirabilis and as the President of Nexia Strategy, was an act in the ordinary course of Mirabilis's business. *Cf. Cambridge Credit Counseling Corp. v. 7100 Fairway, LLC*, 993 So. 2d 86, 90 (Fla. 4th DCA 2008) (noting that the execution of a lease guaranty is within the ordinary course of business, whereas the sale of all corporate assets is not). The negotiation and execution of the Separation Agreement by Hailstones as President

-20-

of Mirabilis, (January Curry Aff. Ex. E), constitute representations by Mirabilis satisfying the first element of apparent agency. *See Cambridge Credit Counseling Corp.*, 993 So. 2d at 90 ("Given the presumption of authority on behalf of the president to execute the contract, the evidence established the first element of apparent agency."); *see also Lensa Corp.*, 765 So. 2d at 298 (collecting cases for this proposition). In light of Amodeo's control over the day-to-day affairs of Mirabilis, *see supra* note 2, and the numerous emails memorializing the Separation Agreement negotiations exchanged between Amodeo, Curry, Hailstones, Holtz, and Berman, (January Curry Aff. ¶¶ 17-18, Ex. E), Curry reasonably relied on the representations of Hailstones in executing the Separation Agreement. Finally, Curry relied on the Separation Agreement to her detriment by, *inter alia*, resigning from her positions with Mirabilis and Nexia Strategy, forming Palaxar Group pursuant to the Separation Agreement, and incurring expenses to market Nexia Certification. (*Id.* ¶¶ 4, 19, 21, 23; Curry Answer Ex. B). Finding no evidence in the record creating a genuine issue of material fact to the contrary, Hailstones had apparent authority to execute the Separation Agreement.

Regardless of whether Hailstones had authority to execute the Separation Agreement, Mirabilis has accepted benefits under the Separation Agreement and thus is estopped from denying its obligations thereunder. *See Cambridge Credit Counseling Corp.*, 993 So. 2d at 90-91 ("A principal may not accept the benefits of a transaction negotiated by the agent and disavow the obligations of that same transaction." (quoting *Mercury Ins. Co. of Fla. v. Sherwin*, 982 So. 2d 1266, 1270 (Fla. 4th DCA 2008))). Pursuant to the Separation Agreement, Mirabilis received the benefit of Curry's resignation as an officer and director of Mirabilis and its affiliates, Curry's waiver of any benefits under

-21-

her employment agreement with Nexia Strategy, and a promise to execute a $500,000 note payable to an entity to be created by Mirabilis. (Curry Answer Ex. B). Mirabilis also received the benefit of several joint client proposals and marketing meetings conducted by Curry and Hailstones between October and December of 2006. (January Curry Aff. ¶ 21). In view of these facts, Mirabilis is estopped from disavowing its transfer of Nexia Certification to Curry under the Separation Agreement.

### iv. Sale of Substantially All Assets

Plaintiffs argue that the First Assignment and Separation Agreements are invalid under section 607.1202, Florida Statutes, because those Agreements disposed of "substantially all" of Nexia Strategy's assets without shareholder approval. (Resp. at 17-18). This argument is without merit because Mirabilis, the sole shareholder of Nexia Strategy, (Cuthill Aff. ¶ 4), authorized the transfer of Nexia Certification to Curry under the First Assignment and Separation Agreements. (Curry Answer Ex. A, B.)

In summary, the evidence in the record presents no genuine issue of material fact challenging the validity of the First Assignment or Separation Agreements.

### b. Honesty and Fairness

The undisputed evidence in the record shows that the First Assignment and Separation Agreements were fair, and Plaintiffs produce no evidence and raise no argument to the contrary. All parties agreed that in light of the regulatory environment, Amodeo's checkered past, and Amodeo's chronic and pervasive control of Mirabilis and Nexia Strategy, only an entity completely devoid of Amodeo's control and influence would be able to market Nexia Certification. *See supra* note 2; (January Curry Aff. ¶¶ 12-14, Ex.

-22-

E). Both the First Assignment Agreement and the Separation Agreement accomplished that objective. (*Id.* ¶ 16, 21).

The fairness of the First Assignment and Separation Agreements is further shown by evidence of arm's length negotiations. The First Assignment Agreement was drafted by Mirabilis' counsel pursuant to the Amodeo Directive, and Amodeo directed Hailstones to execute that Agreement. (*Id.* ¶¶ 15-16). The terms of the Separation Agreement were negotiated by Curry and several officers and directors of Mirabilis, including Hailstones and Holtz, both of whom helped Curry develop Nexia Certification. (January Curry Aff. ¶¶ 11, 17-18, Ex. E). Berman, another Mirabilis officer participating in the negotiations, declared the Separation Agreement to be "very fair." (March Hailstones Aff. ¶ 6, Ex. 1). Amodeo also participated in these negotiations, and other officers and employees of Mirabilis and Nexia Strategy including Philip Kaprow, Matt Mokwa, Shane Williams, and Jay Stollenwerk were aware of the negotiations. (*Id.* ¶ 18). There is no evidence in the record that any of Mirabilis' officers and directors were unaware of the Separation Agreement or objected to any of its terms.

As further evidence of the honesty and fairness of the Separation Agreement, Curry's obligations and concessions under the Agreement were significant. Curry waived her rights under her employment agreement with Nexia Strategy, including a lump sum severance payment. (Jaiman Decl. Ex. 4 at 68; Curry Answer Ex. B ¶ 8). Curry also promised to cause the "Newco" entity to execute a $500,000.00 promissory note in favor of "Newco B," an entity to be created by Mirabilis. (Curry Answer Ex. B ¶ 6). Curry further agreed that the Note would be payable from the first profits earned by "Newco" and that the two "Newco" entities would share equally in the profits of a joint venture to market

Nexia Certification. (*Id.* ¶¶ 6-7). Curry spent significant sums of her own money promoting Nexia Certification after the Separation Agreement took effect, and there is no evidence in the record that Curry marketed Nexia Certification contrary to the terms of the Separation Agreement. (January Curry Aff. ¶ 23). Amodeo and a majority of the Mirabilis Board of Directors knew that Hailstones and Curry had attempted to market Nexia Certification pursuant to the Separation Agreement. (Holtz Aff. ¶ 5). In light of the foregoing and finding no evidence to the contrary, the First Assignment and Separation Agreements were fairly and honestly obtained by Curry. Each of Plaintiffs' claims will be considered accordingly.

### 3. Breach of Contract (Count I)

In Count I, Plaintiffs allege that Hailstones and Curry breached their employment contracts "by disclosing and communicating confidential information and trade secrets gathered in the course of their employment to other persons, businesses, and/or corporate entities, including" Palaxar Group and Palaxar Holdings and "by marketing, offering, and/or selling Nexia Certification" for the benefit of themselves or others. (Second Am. Compl. ¶¶ 40-41). Although the record contains an executed employment agreement between Curry and Nexia Strategy, (Jaiman Decl. Ex. 4 at 67), there is no executed employment agreement in the record obligating Hailstones to either Plaintiff. *See supra* note 3. Therefore, summary judgment is granted in favor Hailstones on Count I.

Summary judgment must also be granted for Curry on Count I. Plaintiffs assert that Curry breached her employment agreement with Nexia Strategy because Palaxar Group was incorporated on September 11, 2006, and because Curry was still employed by Plaintiffs on that date. (Resp. Ex. 10). Plaintiffs do not cite, and the Court does not find,

any provision of Curry's employment agreement that was breached by the mere formation of Palaxar Group. There is also no evidence in the record supporting Plaintiffs' allegation that Curry unlawfully disclosed confidential information gathered in the course of her employment with Nexia Strategy. Curry was permitted to disclose confidential information within the normal course and scope of [her] duties . . . and in a good faith effort to serve the best interests of [Nexia Strategy]." (Jaiman Decl. Ex. 4 at 70). Plaintiffs offer no evidence that Curry took any actions contrary to this provision prior to October 31, 2006. Further, the Separation Agreement establishes that Curry did not breach her employment agreement by marketing Nexia Certification after October 31, 2006.[9] (Curry Answer Ex. B). Accordingly, summary judgment must be granted in favor of Curry on the breach of contract claim in Count I.

### 4. Breach of Fiduciary Duty (Count II)

Hailstones and Curry, as officers and directors of Plaintiffs, allegedly breached their fiduciary duties to Plaintiffs by using Plaintiffs' property for their personal benefit and by transferring the rights to Nexia Certification to themselves. (Second Am. Compl. ¶¶ 44-45). Because the First Assignment and Separation Agreements are valid, see supra part II.B.2, neither Hailstones nor Curry breached fiduciary duties by transferring Nexia Certification to Curry. In addition, the record contains no evidence that Curry or Hailstones used Nexia Certification for their personal benefit prior to the effective dates of the First Assignment

---

[9] Alternatively, the First Assignment Agreement establishes that Curry did not breach her employment agreement by marketing Nexia Certification after August 1, 2006. (Curry Answer Ex. A).

and Separation Agreements. Therefore, summary judgment must be entered in favor of Hailstones and Curry on Plaintiffs' breach of fiduciary duty claim in Count II.

### 5. Misappropriation of Trade Secrets and Confidential Information (Counts III & VI)

Plaintiffs allege that Hailstones and Curry misappropriated trade secrets and confidential information in violation of the Uniform Trade Secret Act, section 688.001 *et seq.*, Florida Statutes, by using research studies and strategies relating to Nexia Certification developed during their employment with Plaintiffs for their own benefit. (Second Am. Compl. ¶¶ 49-51). Plaintiffs seek injunctive relief and the imposition of a constructive trust on the assets of Palaxar Group and Palaxar Holdings for the alleged misappropriations. (*Id.* ¶¶ 65-72).

"In a trade secret action [under Florida law], the plaintiff bears the burden of demonstrating both that the specific information it seeks to protect is secret and that it has taken reasonable steps to protect this secrecy." *Am. Red Cross v. Palm Beach Blood Bank, Inc.*, 143 F.3d 1407, 1410 (11th Cir. 1998) (citing *Lee v. Cercoa, Inc.*, 433 So. 2d 1, 2 (Fla. 4th DCA 1983)). Plaintiffs do not identify any "research studies and strategies . . . relating to Nexia Certification," let alone evidence that such information was secret or that Hailstones and Curry used such information for their own benefit. Any use of Nexia Certification itself cannot form the basis of a trade secret claim by Plaintiffs because Plaintiffs transferred "all right, title, and interest in and to Nexia Certification" to Curry under the Separation Agreement. (Curry Answer Ex. B ¶ 1). Alternatively, the use of Nexia Certification cannot form the basis of Plaintiffs' trade secret claim because Plaintiffs reserved only a non-exclusive right to use Nexia Certification under the First Assignment

-26-

Agreement. (Curry Answer Ex. A). Therefore, summary judgment must be granted in favor of Defendants as to Counts III and VI.

### 6. Conversion (Count IV)

Plaintiffs assert that Hailstones and Curry converted Nexia Certification for their own use and unlawfully transferred rights to Nexia Certification to themselves. (Second Am. Compl. ¶¶ 56, 58). "[C]onversion is an unauthorized act which deprives another of his property permanently or for an indefinite time." *Shelby Mut. Ins. Co. of Shelby, Ohio v. Crain Press, Inc.*, 481 So. 2d 501, 503 (Fla. 2d DCA 1985). Even if Plaintiffs possessed rights to Nexia Certification prior to the effective dates of the First Assignment and Separation Agreements, Plaintiffs produce no evidence that Hailstones or Curry converted such property prior to the effective date of those Agreements. Accordingly, summary judgment must be granted in favor of Hailstones and Curry on Count IV.

### 7. Civil Conspiracy (Count V)

Plaintiffs allege that Defendants are liable for civil conspiracy because they conspired to misappropriate confidential and proprietary information as well as Nexia Certification. (Second Am. Compl. ¶¶ 62-63). A civil conspiracy requires proof of "(a) a conspiracy between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts performed pursuant to the conspiracy." *Walters v. Blankenship*, 931 So. 2d 137, 140 (Fla. 5th DCA 2006). The record contains no evidence creating a genuine issue of material fact that Defendants conspired or made an agreement to do an unlawful act or that Defendants committed any overt act in furtherance of an unlawful act. *See supra* parts II.B.3-6 (noting that the record is devoid of evidence

that Curry and Hailstones misappropriated confidential and proprietary information or Nexia Certification or committed any other alleged tort or wrong). In addition, the parties do not address, and the Court finds no evidence supporting, the notion that Defendants possessed a "peculiar power of coercion" over Plaintiffs which may establish a conspiracy in the absence of an actionable underlying tort or wrong. *Walters*, 931 So. 2d at140. Accordingly, summary judgment must be granted in favor of Defendants on Plaintiffs' civil conspiracy claim.

### 8. Unjust Enrichment (Count VII)

Plaintiffs allege that Hailstones and Curry were unjustly enriched by retaining the benefits of access to confidential and proprietary information, company resources, and the anti-fraud model underlying Nexia Certification. (Second Am. Compl. ¶¶ 73-76).

"The elements of an unjust enrichment claim are 'a benefit conferred upon a defendant by the plaintiff, the defendant's appreciation of the benefit, and the defendant's acceptance and retention of the benefit under circumstances that make it inequitable for him to retain it without paying the value thereof.'" *Fla. Power Corp. v. City of Winter Park*, 887 So. 2d 1237, 1241 n.4 (Fla. 2004) (quoting *Ruck Bros. Brick, Inc. v. Kellogg & Kimsey, Inc.*, 668 So. 2d 205, 207 (Fla. 2d DCA 1995)). Plaintiffs have not produced any evidence creating a genuine issue of material fact that Hailstones or Curry retained the benefit of information derived from their employment with Mirabilis and Nexia Strategy other than Nexia Certification itself, which was transferred to Curry pursuant to the First Assignment and Separation Agreements. (Curry Answer Ex. B). Therefore, summary judgment must be granted in favor of Hailstones and Curry on Count VII.

-28-

III. Conclusion

In accordance with the foregoing, it is **ORDERED** and **ADJUDGED** that the Motion for Summary Judgment (Doc. 75, reasserted at Doc. 189) filed by Defendants Palaxar Group, LLC, Palaxar Holdings, LLC, Frank Hailstones, and Edith Curry is

a.   **GRANTED** in favor of Defendants Hailstones and Curry as to Count I;

b.   **GRANTED** in favor of Defendants Hailstones and Curry as to Count II;

c.   **GRANTED** in favor of Defendants Hailstones and Curry as to Count III;

d.   **GRANTED** in favor of Defendants Hailstones and Curry as to Count IV;

e.   **GRANTED** in favor of Defendants Hailstones, Curry, Palaxar Group, and Palaxar Holdings as to Count V;

f.   **GRANTED** in favor of Defendants Hailstones, Curry, Palaxar Group, and Palaxar Holdings as to Count VI; and

g.   **GRANTED** in favor of Defendants Hailstones and Curry as to Count VII.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on August 6 , 2010.

JOHN ANTOON II
United States District Judge

Copies furnished to:

Counsel of Record
Unrepresented Party