UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION


CASE NO.   6:07-CV-1788-ORL-28-GJK


MIRABILIS VENTURES, INC., and
NEXIA STRATEGY CORPORATION,

        Plaintiffs,

 v.

PALAXAR GROUP, LLC,
PALAXAR HOLDINGS, LLC,
FRANK HAILSTONES; EDITH CURRY
a/k/a EDITH BROADHEAD; and
TERENCE CHU,

        Defendants,
vs.

MIRABILIS VENTURES, INC., et al.,

        Counterclaim and
         Third Party Defendants.


- - - - - - - - - - - - - - - - - - x

                866  South Dixie Highway
                Coral Gables, Florida
                October 5, 2010
                9:30 a.m. - 4:50 p.m.


DEPOSITION OF YANIV AMAR


    Taken Before JAN L. BRONIS, a Notary Public
for the State of Florida at Large, pursuant to
Notice of Taking Deposition filed in the above
cause.

APPEARANCES


  The Havener Law Firm, LLC
  15511 Russell Road
  Chagrin Falls, Ohio 44022
  BY:  KATHLEEN B. HAVENER, ESQ.
  On behalf of the Counterclaim Plaintiffs
  Tele: (440) 893-01888


  Broad & Cassel
  390 North Orange Street, Suite 1400
  Orlando, Florida 32801
  BY:  NICOLETTE VILMOS, ESQ. (By Telephone)
  On behalf of Mirabilis and Nexia
  Tele: (407)839-4200




ALSO PRESENT


  EDITH CURRY

  AARON BATES (By Telephone)
==============================

INDEX

<u>YANIV AMAR</u>                                          5

DIRECT EXAMINATION BY MS. HAVENER            6

EXHIBITS

Plaintiff's Exhibit 450 for                  130
Identification
Plaintiff's Exhibit 451 for                  131
Identification
Plaintiff's Exhibit 452 for                  142
Identification
Plaintiff's Exhibit 453 for                  157
Identification
Plaintiff's Exhibit 454 for                  160
Identification
Plaintiff's Exhibit 455 for                  165
Identification
Plaintiff's Exhibit 456 for                  172
Identification
Plaintiff's Exhibit 457 for                  177
Identification
Plaintiff's Exhibit 458 for                  188
Identification
Plaintiff's Exhibit 459 for                  194
Identification
Plaintiff's Exhibit 460 for                  200
Identification
Plaintiff's Exhibit 461 for                  207
Identification
Plaintiff's Exhibit 462 for                  220
Identification
Plaintiff's Exhibit 463 for                  224
Identification
Plaintiff's Exhibit 464 for                  225
Identification
Plaintiff's Exhibit 465 for                  236
Identification
Plaintiff's Exhibit 466 for                  240
Identification
Plaintiff's Exhibit 467 for                  244
Identification
Plaintiff's Exhibit 468 for                  255
Identification

EXHIBITS (CONTINUED)

Plaintiff's Exhibit 469 for                 261
Identification
Plaintiff's Exhibit 470 for                 264
Identification
Plaintiff's Exhibit 471 for                 268
Identification
Plaintiff's Exhibit 472 for                 293
Identification
Plaintiff's Exhibit 473 for                 296
Identification
Plaintiff's Exhibit 474 for                 299
Identification
Plaintiff's Exhibit 475 for                 303
Identification

5

Thereupon--

YANIV AMAR

was called as a witness by the Third Party

Plaintiffs, and, having been first duly sworn,

testified as follows:

      MS. HAVENER:  Can we enter appearances,

   please?  My name is Kathleen Havener for the

   Counterclaim Plaintiffs, Edith Curry, Frank

   Hailstones, Palaxar, P-a-l-a-x-a-r, Group,

   LLC, and Palaxar Holdings, LLC.

     And, Nicolette, do you want to go next?

      MS. VILMOS:  Yes.  This is Nicolette

   Vilmos on behalf of Mirabilis.

      MS. HAVENER:  And do you want to say your

   law firm and stuff?

      MS. VILMOS:  My law firm is Broad & Cassel

   and I'm out of the Orlando office; 390 North

   Orange Avenue, Suite 1400, Orlando, Florida

   32801.

      MS. HAVENER:  Are you also appearing for

   Nexia?

      MS. VILMOS:  I guess I am appearing for

   Nexia.  Thank you.  Mirabilis and Nexia.

      MS. HAVENER:  Okay.

DIRECT EXAMINATION

BY MS. HAVENER:

Q.   And you?

A.   Yaniv Amar, representing myself.

Q.   And would you give her your address, please?

A.   3475 Northeast 191st Street, Number 10, Aventura, Florida 33180.

Q.   Mr. Amar, have you ever had your deposition taken before?

A.   No.

Q.   For the record, and for the benefit of ourselves and the court reporter, I want to just tell you what the ground rules are.  Have you ever attended a deposition before?

A.   No.

Q.   I'm going to be asking you questions for the record.  It's exactly as if you have sworn an oath before a jury in front of a court of law.  I presume you take the oath very seriously.  I know that you're an observant -- a religious person. They are for the record, they can be read to the jury or to the judge, they can be used for purposes of impeaching you at trial, they can be used for many purposes.  But it's exactly as if you're

1   appearing in a courtroom.

2       The most important thing from my perspective

3   is that you make sure that you understand the

4   question I'm asking you.  So if you don't

5   understand, please let me know.  Because I don't

6   want you to answer a question that you think I'm

7   asking but I'm not asking.

8       A.    Okay.

9       Q.    So I'd like to have your agreement that if

10  you don't know exactly what I'm asking you, please

11  let me know so that I can clarify the question for

12  you.

13      The second thing is, because we're both being

14  recorded and the court reporter is taking down what

15  we're saying, I want us to be as courteous as we

16  can to each other and to please be careful not to

17  speak over each other.  I have a very bad habit, I

18  acknowledge, of interrupting if I think you're

19  answering a question that I didn't mean to ask.

20  And so please remind me to let you finish your

21  answer, and then, if I'm correct, I'll say, "That's

22  not the question I was asking; here's what I'm

23  asking."

24      A.    Fine.

25      Q.    But she can't take down what we're saying

1    if we're talking at the same time.  So it's just to

2    make it much easier for her.

3         A.   Okay.

4         Q.   The other things are just, you know,

5    customary.  I have no intention of being too

6    personal or inquiring into things that are not my

7    business, but just to make sure that it's

8    appropriate for us to continue, I want to make sure

9    that you haven't taken any kind of drug in the last

10   24 hours that would impair your memory or would

11   make you unable to answer questions.

12        A.   I have not.

13        Q.   And you haven't indulged in alcohol this

14   morning or anything else that would make it hard

15   for you to answer questions?

16        A.   No.  No, I have not.

17        Q.   Okay.  And if for any reason you don't

18   understand what I'm saying, please make sure that

19   you let me know.  You can take a break whenever you

20   want to.  Just let me know that you need to take a

21   break.  Other than when it's not appropriate to

22   take a break is when there's a question pending.

23   And the only reason that that would be okay is if

24   there's some reason why you think you might need to

25   go speak to your counsel.  But given that you're

1    not represented and I have no intention of going

2    into anything that might --

3         A.    Outside the scope of this Palaxar suit.

4         Q.    Right.

5         A.    Fine.

6         Q.    Exactly.  Well, it's not limited to the

7    events that happened in Scottsdale, because you're

8    also a fact witness to the other things that

9    happened at Mirabilis and Palaxar, if you

10   understand what I mean.  That you were there and,

11   therefore, you have information about what happened

12   that have to do with other parts of the lawsuit.

13        A.    Fine.

14        Q.    Okay.  Mr. Amar, where were you born?

15        A.    Israel.

16        Q.    When did you come to this country to live?

17        A.    I came to this country to live in 1998,

18   but I grew up in Canada.

19        Q.    Where did you grow up?

20        A.    Montreal.

21        Q.    Are you married?

22        A.    Yes.

23        Q.    And what is your wife's name, please?

24        A.    Natalie.

25        Q.    Do you have children?

1        A.    Yes.

2        Q.    How many?

3        A.    Two.

4        Q.    How old are they?

5        A.    Three and one.

6        Q.    Could you please tell me when you first

7    met Frank Amodeo?

8        A.    Roughly, 2000.  Maybe early 2000.  Late

9    '99, early 2000.  I don't recall exactly.  It's

10   been over ten years.

11       Q.    Under what circumstances did you meet him?

12       A.    We were introduced by a mutual

13   acquaintance.

14       Q.    And who was that person, please?

15       A.    Wayne -- I forgot his last name, but Wayne

16   something or other.

17       Q.    And do you know why Wayne introduced you

18   to Mr. Amodeo?

19       A.    Wayne introduced me to Mr. Amodeo because

20   he was working for a Kenneth Mueller, CPA, in

21   Orlando.  I was living in Orlando at the time.  And

22   Wayne was doing some bookkeeping work for a friend

23   of mine's company, he and I had met, and he wanted

24   to introduce me to Frank Amodeo, thought that, you

25   know, it might make friends.  And that was it,

1    really.  I was actually curious to meet him because

2    he spoke so highly of Frank.  So --

3         Q.    Could you tell me -- I'd like to know

4    about your background, starting with high school.

5         A.    What about it?

6         Q.    Where did you go to high school?

7         A.    I went to high school in Montreal.

8         Q.    And did you do any post secondary

9    education?

10        A.    Yes.  I went to school in New York City;

11   Yeshiva University.

12        Q.    And have you done anything post grad?

13        A.    No.  I actually -- I left my junior year

14   for a semester and it's been 17 years.  So I only

15   completed the first two years.

16        Q.    When did you move to Florida?

17        A.    In, roughly, '99.

18        Q.    What was the year that you dropped out of

19   school?

20        A.    "Drop out" is an interesting term, but

21   yeah, I left in '93.

22        Q.    Okay.  When you left school.

23        A.    '93.

24        Q.    Left in '93.  And between '93 and '99,

25   what were you doing occupationally?

1     A.   I bartended, I waitered.  Did a few things

2  in Montreal, you know, late teens, early 20's.

3     Q.   Do you remember where you were when you

4  first -- you said you were in Orlando -- but when

5  Wayne first introduced you to Mr. Amodeo?

6     A.   Where we met?

7     Q.   Yes.

8     A.   It was at a restaurant.  I don't know if

9  it was a Perkins or some -- like a diner

10  restaurant.

11     Q.   What was your first professional job?

12     A.   My first professional job?

13     Q.   In terms of that wasn't bartending or

14  waiting tables, or that was headed in the direction

15  that, you know, you considered -- well, let's put

16  it this way:  What do you consider to be your

17  occupation?

18     A.   I'm a consultant.

19     Q.   What kind of consultant?

20     A.   Marketing and HR services.

21     Q.   And what is your employment history in

22  marketing and employment services?

23     A.   Dating back to when?

24     Q.   Ever.

25     A.   Ever?

1    Q.   Yes.

2    A.   I did some consulting in '05 for

3    Mirabilis.  In '06, I had an intern position at

4    AEM.  And post that, I've been doing some marketing

5    and consulting work.

6    Q.   Did you have any work for any company

7    associated with Mr. Amodeo before '05?

8    A.   Yes.

9    Q.   And what was that?

10    A.   I mean, I wasn't really working for him,

11    but interesting history that Frank and I have, he

12    had owed me some money and I was kind of trying to

13    collect that money.  So --

14    Q.   How did it come about that Mr. Amodeo owed

15    you money?

16    A.   I lent him some money and he never paid me

17    back.

18    Q.   What was the circumstance under which you

19    lent him money?

20    A.   It was in late -- it was in early '01.  I

21    had a business in Orlando, it had to be liquidated,

22    it wasn't doing well, and there was a whole bunch

23    of receivables that he was supposed to pay me on

24    and never did.

25    Q.   What was the business?

1    A.   It was a call center.

2    Q.   A call center.  What does that mean?

3    A.   Telemarketing operation.

4    Q.   And do you mean by your previous question

5    that you sold the receivables to Mr. Amodeo?

6    A.   No.  I didn't sell the receivables to Mr.

7    Amodeo, no.

8    Q.   Were you doing telemarketing for Mr.

9    Amodeo?

10   A.   No, no, no.  For myself.

11   Q.   So -- well, first of all, what was the

12   name of the call center?

13   A.   ComCard.

14   Q.   ComCard?

15   A.   Yeah.

16   Q.   Did it have any kind of business

17   appelation afterwards?  Was it an LLC organization?

18   A.   Inc.

19   Q.   Inc.

20   A.   ComCard, Incorporated.

21   Q.   And was it incorporated in the State of

22   Florida?

23   A.   Yes.

24   Q.   And how did Mr. Amodeo come -- I still

25   want to understand how he came to owe you money as

1    a result of the call center.  How did one thing

2    lead to the next?

3         A.   Well, the company wasn't doing very well.

4    Frank was a -- introduced himself as able to

5    liquidate the assets of the company and pay me some

6    moneys from the receivables that were left over.

7    And, yeah, I never got paid on those receivables.

8    I mean, I've collected over the years, but I, you

9    know --

10        Q.   Why would he pay money on the receivables?

11   I don't understand.

12             MS. VILMOS:  Object to the form.

13   BY MS. HAVENER:

14        Q.   That's okay.  You can still answer.

15        A.   Yeah, I just -- I also had lent him money

16   as a personal favor.  It was --

17        Q.   Was that -- was the money that -- I'm

18   sorry.  I interrupted you.  Were you finished with

19   your answer?

20        A.   Yes.

21        Q.   Was the money that you lent him as a

22   personal favor reduced to writing?

23        A.   No.

24        Q.   So it was an oral agreement?

25        A.   It was a handshake, yeah.

1          Q.    Okay.  How much money?

2          A.    I don't recall.

3          Q.    Can you give me an estimate?  Was it

4     10,000?  Was it closer to 100,000?

5          A.    It was a couple hundred thousand.

6          Q.    Okay.  And how much money did he owe you

7     on the receivables?

8          A.    I don't recall.  It's been about ten

9     years.

10          Q.    Again --

11          A.    Total, it was about 200,000, between the

12     personal loans and the receivables of the assets

13     after we sold off everything.

14          Q.    When were you first in a business venture

15     with Mr. Amodeo?

16          A.    In a business venture with Amodeo?

17          Q.    Let me ask the question more carefully.

18     And when I'm asking this question, I'm looking for

19     any kind of business in which you were involved in

20     which Mr. Amodeo was also involved, whether as an

21     investor, as a consultant, as an employee or

22     officer or director.  You know, any business

23     relationship that you had with a company with which

24     Mr. Amodeo also had a relationship.

25          A.    In '03, there was a company that Mr.

1    Amodeo was working on called -- I forgot the name

2    of the -- it was a printing roll up that he was

3    working on.  And it was a company called Ameriplast

4    out of -- somewhere in South Florida.  It was in

5    Boca Raton.  And I thought I could bring a very

6    large client to the table so that --

7        Q.    What do you mean by a roll up?

8        A.    He wanted to merge a few printing

9    companies, a few struggling companies.  Roll them

10   all up into one and make one successful company.

11       Q.    Do you know the names of the ones that he

12   was going to merge?

13       A.    No, I was just involved in the -- well,

14   I'm not really involved.  I was trying to market

15   the products from Ameriplast.  They're a plastic

16   printing company.

17       Q.    Have you made loans in the nature of

18   100,000 or several hundred thousand dollars to

19   other people?

20       A.    I don't make a practice of it, no.

21       Q.    You don't make a practice of it; is that

22   what you said?

23       A.    Correct, yeah.

24       Q.    Thank you.  Was anyone else involved in

25   the Ameriplast -- is it fair to call it a deal, or

1    the Ameriplast roll up?

2         A.    Anybody else.   What do you mean by

3    "anybody else"?   There were a few people involved

4    in it.

5         Q.    Okay.   Could you name the people who were

6    involved in it?

7         A.    No, not really.

8         Q.    Was Mr. Sadrianna involved in it?

9         A.    Mr. Sadrianna was involved not in the

10   actual Ameriplast.   I think he was involved with

11   Frank in Orlando.   I was working out of the Boca

12   Raton site, but I believe Mr. Sadrianna might have

13   been involved.   I don't really recall.

14        Q.    When you say the Boca Raton site, was

15   Ameriplast located in Boca Raton?

16        A.    Yes.   Yeah, I had mentioned that.

17        Q.    And where were the other companies that

18   were being rolled up into Ameriplast located?

19        A.    I have no idea.   I really wasn't involved

20   in the roll up.   I was just trying to bring a large

21   client to the Ameriplast --

22        Q.    And what was that client?

23        A.    I don't remember the name of it, but it

24   was a phonecard company that needed the plastic

25   manufacturing.   It was a very large company out of

1    New Jersey.

2         Q.   And what was your relationship with the

3    phonecard company?

4         A.   I knew some people that worked there and

5    that could make the proper introductions if

6    Ameriplast could deliver.

7         Q.   What was Frank's relationship to the deal?

8    How was he involved?

9         A.   That's a question I really can't answer,

10   Kathleen.  Frank had his -- he got into the deal

11   somehow.  He, you know -- I really don't know.

12        Q.   When you did loan the money to Frank that

13   we spoke about earlier, what reason did you have

14   for doing that?

15        A.   He was a -- you know, he was kind of

16   struggling, he wasn't doing too well, and I -- I'm

17   a bit of a softie, I lent him some money, and I

18   thought I'd get paid back when he liquidated the

19   assets and he's worked out some things.  I was

20   always very impressed with Frank's abilities to,

21   you know, to accomplish certain things.

22        Q.   Do you know -- I think you said that that

23   was -- let me see.  Excuse me.  When did you lend

24   him the money?  You met him in late '99 or 2000?

25        A.   Uh-huh.  Early 2000.  I believe it was in

1    early '01.

2         Q.   That you loaned him the money?

3         A.   Yeah.

4         Q.   Did you already know about his history in

5    Georgia and his having spent time in prison?

6         A.   Nope.

7         Q.   You didn't?

8         A.   No.

9         Q.   When did you learn about that?

10        A.   After I lent him the money, yeah.   I

11   wasn't aware of his whole history.   I didn't know

12   he was a disbarred attorney and a convicted felon

13   and all.

14        Q.   When did you learn that information?

15        A.   I mean, I learned it in bits and pieces

16   along the way sometime between '01 and '03, you

17   know.   He didn't start publicizing it until the

18   Mirabilis scandal.

19        Q.   Mr. Amodeo, as you know, has been, at

20   least in the most recent years that I'm aware of,

21   very open about his history.

22        A.   Uh-huh.

23        Q.   But I'm gathering from your answers that

24   that was not the case when you first knew him.

25        A.   That was not the case, no.

1       Q.    When you did learn it, how did you learn

2   it?

3       A.    I don't recall.  But I did approach him

4   about it.

5       Q.    So someone else told you?

6       A.    I think someone else hinted to it and then

7   I approached him and we talked about it.  And I

8   don't think he confessed everything at once, but,

9   like I told you, I learned bits and pieces over

10  some time.

11      Q.    Do you know who else -- I apologize.

12  Strike that.

13       Do you know who the person was who hinted

14  about it?

15      A.    No.  I don't recall, actually.

16      Q.    Did Mr. Amodeo ever pay you back that

17  money?

18      A.    In bits and pieces.  Not really in

19  payment, but like in consulting contracts and some

20  moneys here and there.

21      Q.    After the Ameriplast deal, what was the

22  next interaction you had on a business basis with

23  Mr. Amodeo?

24      A.    I mean, I was -- I spent some time in the

25  office that he had built.  I think it was in late

1     '04.  I'm not exactly sure, but he had an office in

2     downtown Orlando.  Trafalgar, Matrix; there were

3     several entities that were operating out of

4     downtown Orlando office space.

5          Q.   You said before that you were impressed

6     with Frank's abilities?

7          A.   Yeah.

8          Q.   Did your attitude change after you learned

9     about his criminal history?

10         A.   No, it didn't.

11         Q.   When you became familiar -- you said you

12    spent some time in the offices of Trafalgar and

13    Matrix.  Were you involved with those companies?

14         A.   Not really.  I just thought it was -- you

15    know, he offered me to come and spend some time

16    over there.  I believed the only way I'd have a

17    chance of actually getting repaid is spending

18    considerable time over there, so I was --

19         Q.   So what were you doing there?

20         A.   I had an office space.  I really was not

21    doing much, and then after a few months I started

22    to get involved with a possible payroll processing

23    company.

24         Q.   What was that?  What was that company?

25         A.   I really don't recall the name.

1    Q.   You don't know the first payroll

2    processing company you were involved with?

3    A.   No.

4    Q.   What was the business of Trafalgar?

5    A.   The business of Trafalgar was trying to

6    turn precious metal concentrate into cash.  That's

7    what I understood.  I didn't really understand

8    everything else.

9    Q.   What was everything else?

10   A.   I really don't --

11   Q.   Do you understand it now?

12   A.   No.  No.

13   Q.   What was Matrix?

14   A.   A consulting firm of some sort.

15   Q.   Who did it consult for?  Do you know?

16   A.   I don't know of any of the clients.

17   Q.   When you said you were impressed with

18   Frank's abilities, to what were you referring?

19   A.   Be more specific, Kathleen.  What do you

20   mean by --

21   Q.   Well, what was it about Frank that

22   impressed you?

23   A.   I think Frank is a brilliant person.  He

24   just always came across as an extremely brilliant

25   person.

24

1        Q.    Do you still believe that?

2        A.    Yes, I do.

3        Q.    I'm going to go through -- and not because

4    I don't know this myself -- I want to know the

5    names of all the companies in which you were a

6    participant in which Frank was also a participant

7    in any capacity.  So I take it you were not a

8    participant in Trafalgar or Matrix?

9        A.    No.  Not actively, no.

10       Q.    Not actively.  Did you --

11       A.    There was another company, but I don't

12   recall.  There were so many corporations, Kathleen,

13   over the years.  I really don't recall.

14       Q.    Did you consult for either of those

15   companies?

16       A.    No.

17       Q.    Do you remember the first consulting

18   contract you had that involved a company of Mr.

19   Amodeo's or Mirabilis?

20       A.    It was probably in early '05 when I was

21   consulting for Presidion through -- whether it was

22   Mirabilis or Matrix or one of those companies.

23       Q.    I don't understand what you mean.  Were

24   you personally consulting for Presidion, or did you

25   mean that -- well --

1      A.    For Mirabilis, but the contract was

2  Presidion.

3      Q.    So were you at that time an employee of

4  Mirabilis?

5      A.    I don't know if it was Mirabilis or Common

6  Paymaster, but one of the entities owned by

7  Mirabilis.

8      Q.    Mr. Cuthill testified a couple of weeks

9  ago that Common Paymaster and Mirabilis were always

10  separate companies.

11      A.    Uh-huh.

12      Q.    So when you were working for Mirabilis,

13  you weren't sure if you worked for Common Paymaster

14  or Mirabilis?

15      A.    Well, I entered into an agreement with

16  Common Paymaster in late '05.  That's when I

17  entered into a contractual agreement with them.

18  But for most -- for probably six or seven months

19  preceding that I was consulting for Presidion.

20      Q.    Via -- was there a vehicle through which

21  you were consulting for Presidion?  In other words,

22  who signed your paycheck?

23      A.    I believe we were a PEO client of

24  Presidion.  So it's a -- you know.

25      Q.    Okay.  Do you know the name of it?

1      A.   Of the vehicle?  It was Presidion.

2      Q.   Of who signed your paycheck.  Whatever --

3      A.   It was Presidion.  It was Presidion at

4  that time.

5      Q.   Okay.  And that's Presidion Corporation?

6      A.   One of the seventeen companies, but, yeah

7  I think it was Presidion.

8      Q.   So but we're now talking about the public

9  company.

10      A.   At that time, yeah.

11      Q.   Okay.  And at another time were you paid

12  by a different Presidion organization?

13      A.   No, no, no.  It went from there to Common

14  Paymaster.

15      Q.   And while you were being paid by Common

16  Paymaster, for what entities did you provide

17  services?

18      A.   For Presidion Corporation.

19      Q.   Any others?

20      A.   No.  And Mirabilis, that was working on

21  some kind of a solution to help the distressed

22  Presidion.  And I believe Nexia was the actual

23  contract.

24      Q.   Nexia had a contract with whom?

25      A.   I believe they had a consulting agreement

1    with Mirabilis, that had an agreement with

2    Presidion.  I really don't know the exact

3    structures, Kathleen.  I wasn't privy to that

4    information.  Nor did I care.

5         Q.   You mentioned earlier that you then became

6    associated with AEM, I think?

7         A.   Yes.

8         Q.   And when was that?

9         A.   That was --

10        Q.   I'm sorry.  Initials A-E-M.

11        A.   -- late '05.  Third quarter or fourth

12   quarter of 2005.

13        Q.   Okay.  So in early '05 you were consulting

14   for Presidion; correct?  Did I understand that

15   correct?

16        A.   Correct.

17        Q.   And then sometime in '05 you signed a

18   contract with Common Paymaster.

19        A.   Yeah.  In late '05, yes.

20        Q.   And you were working -- associated in some

21   way with AEM also in late '05?

22        A.   Correct.

23        Q.   What was your role with AEM?

24        A.   I was the Interim President to AEM.

25        Q.   How long was the interim?

1    A.    Five months and change.

2    Q.    What time period?

3    A.    The official date I believe was

4    January 1st through June 13th.

5    Q.    Of?

6    A.    '06.

7    Q.    Did you ever hold any office in any of the

8    other Mirabilis-associated entities?

9    A.    No.  Aside from AEM, no.

10   Q.    Were you ever on the Board of Directors of

11   any of the Mirabilis-associated entities?

12   A.    Not to my knowledge.

13   Q.    Did you ever hold an office in any of the

14   Amodeo-associated entities?  And just to make that

15   clear, do you understand what I mean when I say --

16   A.    Yes.

17   Q.    -- Mirabilis-associated or

18   Amodeo-associated, or I might otherwise say

19   Mirabilis-related or Amodeo-related?  Do you

20   understand what I mean by the difference?

21   A.    Yes.  Aside from that payroll processing

22   company I told you in '03, '04, no, I don't recall

23   holding office in any other --

24   Q.    And were you ever on a Board of Directors?

25   A.    No.

1    Q.   Did you ever sign contracts on behalf of

2  AEM?

3    A.   Yes.

4    Q.   As president?

5    A.   Yes.

6    Q.   In any other role?

7    A.   No.  Not to my recollection.

8    Q.   Did you ever sign contracts on behalf of

9  Mirabilis?

10    A.   Not to my recollection.

11    Q.   Did you ever sign as a shareholder of

12  Mirabilis?

13    A.   There was a shareholder agreement that I

14  was handed.  I don't recall ever signing it.

15    Q.   Did you ever sign, for example, the

16  minutes of a Board of Directors meeting?

17    A.   For which company?

18    Q.   For anybody.  Any of the -- I'm going to

19  use now the term, "under the Mirabilis umbrella."

20  And by that I mean both Amodeo-associated and

21  Mirabilis-associated entities.

22    A.   Yeah.

23    Q.   I understand that there were a million.

24    A.   Yeah, yeah.  Not to my recollection.  It

25  could be.  I mean, I don't recall being a member of

1    any board or signing any corporate minutes.

2          Q.    What's FYI Enterprises?

3          A.    FYI Enterprises?

4          Q.    Yes.

5          A.    It's a company.  It was a corporation that

6    was defunct years ago.

7          Q.    What did it do?

8          A.    Nothing, really.  It was meant to do a few

9    things, but it didn't end up doing anything.

10         Q.    What was it intended to do?

11         A.    It was actually set up to buy a property

12   in Naples, but that deal never went through.  I

13   believe Frank had invested some money in it, but --

14         Q.    Who were the owners of FYI Enterprises?

15         A.    Myself.

16         Q.    You and only you?

17         A.    Yeah.

18         Q.    So, okay.  Let me get this straight.  Mr.

19   Amodeo had invested some money in a property in

20   Naples.

21         A.    Correct.

22         Q.    And it was intended that FYI Enterprises

23   would purchase that property or further invest?

24         A.    Correct.

25         Q.    And you were the sole owner of FYI.

1      A.    Correct.

2      Q.    What did FYI stand for, if anything?

3      A.    For Your Information.

4      Q.    Were you involved in any of -- I'm just

5   going to go off the top of my head.  I remember

6   from looking at papers a Very Private Eye, for

7   example.  Two Wheel Tunes.  I mean, there's many,

8   many companies that --

9      A.    No.

10      Q.    -- were under the Mirabilis umbrella.  Is

11   there anything that you were associated with that

12   you haven't told me about?

13      A.    No.  Well, not to my recollection,

14   Kathleen.

15      Q.    If we were told that Mr. Amodeo was a half

16   owner of FYI, is that incorrect?

17      A.    That is incorrect.

18      Q.    How much did you invest in FYI

19   Enterprises?

20      A.    Not too much.  It was a mechanism for me

21   to get some of the money back that Frank had owed

22   me.

23      Q.    And how was that intended to work?  If you

24   could explain the process by which you expected to

25   get some kind of return of --

1          A.    If there was a gain on that property, then

2     I would hopefully share in that and get some of my

3     money back.

4          Q.    Did you ever get that money back?

5          A.    No, not all of it.

6          Q.    Did you ever own any stock in Mirabilis

7     itself?

8          A.    Yes.

9          Q.    And please tell me the context of that,

10    your ownership of stock in Mirabilis.

11         A.    What do you mean, "the context of that"?

12         Q.    Did you purchase stock in Mirabilis?

13         A.    No.  No.

14         Q.    How did it come about that you became an

15    owner of stock?

16         A.    Shares were issued in late '05 and I

17    relinquished them in early '06.

18         Q.    Why were they issued to you in late '05?

19         A.    They were issued to 30, 40-some-odd

20    people.  I don't know why.  That's why I

21    relinquished them in late January of '06.  I was

22    like this is ridiculous how many shareholders there

23    were at the company.

24         Q.    Were you ever the only shareholder of

25    Mirabilis?

1      A.   Not to my knowledge.  Somebody tried to

2   tell me that that was the case, but, no, I wasn't.

3      Q.   Do you have any recollection of having

4   signed a proxy for your vote -- well, first -- I'm

5   sorry.  Let me start over.

6       Were your shares voting shares?

7      A.   Not to my recollection.

8      Q.   Do you know what type of stock you were

9   issued?

10      A.   What class?  No.

11      Q.   Correct.  I mean, you understand --

12      A.   I actually never received certificates.  I

13   just signed a shareholder agreement -- or I was

14   handed one.  I don't recall signing it.  And then I

15   handed them back a very short period of time later.

16      Q.   But you know, I think, from the

17   shareholders agreement, just like I do, that there

18   were supposed to be several classes of stock, and

19   they went by both letters and colors.  Do you

20   remember --

21        MS. VILMOS:  Object to the form.

22   BY MS. HAVENER:

23      Q.   Okay.  Do you remember the classes of

24   stock at Mirabilis?

25      A.   No.

1    Q.   Are you aware that there were different

2    classes of stock that went by letters, names?

3    A.   Or colors, whatever, yes.

4    Q.   Do you know what letter form you held?

5    A.   No.

6    Q.   Do you know what color form you held?

7    A.   I used to refer to it as toilet paper, to

8    be honest with you.

9    Q.   How did it come about that you believed

10   that stock was issued to you?  You just testified a

11   few moments ago that you never had shares in your

12   hand.

13   A.   Correct.

14   Q.   Under what circumstances was it conveyed

15   to you that you owned these shares of stock?

16   A.   I don't recall exactly, but it was a

17   meeting in late '05, and there were shares issued

18   to some people at Mirabilis.

19   Q.   And were you told verbally?  Were you told

20   in writing?

21   A.   No, I was told verbally, and I told you I

22   was handed a shareholder agreement which I don't

23   recall executing because, you know, to me, I didn't

24   really see much value in them.

25   Q.   To be clear, if I can, how long a time

1    period between late '05 and your relinquishing in

2    '06 was it?

3         A.    In late January in '06 I attended a

4    shareholders' meeting in downtown Orlando, I

5    believe in the AmSouth building.  And I saw 35, 40

6    people in there, I didn't know most of them, and I

7    was told that they were all shareholders.  And I

8    didn't know how anybody earned their shares in the

9    company, I didn't know if anybody purchased their

10   shares in the company.  And I was actually so

11   appalled and disgusted by what I witnessed that I

12   relinquished the shares verbally with Laurie Holtz

13   and Richard Berman as my witnesses.  And, you know,

14   I don't think I ever -- I don't think they were

15   officially relinquished until my resignation in

16   early June.

17        Q.    Did you relinquish the shares in writing?

18        A.    In late January, no.

19        Q.    No.

20        A.    No.

21        Q.    You just verbally expressed your desire to

22   relinquish the shares and Mr. Holtz and Mr. Berman

23   were there; right?

24        A.    Correct.  And I also made it very clear

25   that I hoped that they find a replacement for me as

1    soon as possible because I didn't really want much

2    involvement with Mirabilis.

3        Q.    And why was that?

4        A.    Because, Kathleen, I saw a bunch of

5    sycophants and liars and abusers and idiots in that

6    company.

7        Q.    Tell me who.

8        A.    Tell you who?  Primarily, your client,

9    Edith Curry; primarily, your other client, Frank

10   Hailstones; primarily, Richard Berman; and,

11   primarily, Laurie Holtz.  Those four, above all,

12   but there were 30 or 40 others.

13       Q.    Can you name some of those people?

14       A.    Paul Glover, Sharmila Khanorkar, James

15   Vandevere, Mr. Konicki -- I don't know.  I mean,

16   you have the names, Kathleen.  I didn't bring that

17   list with me.

18       Q.    Konicki?

19       A.    Yeah.

20       Q.    That's one I don't recognize.  And what

21   made you think that they were sycophants or idiots?

22       A.    Because I witnessed Frank talking a lot of

23   craziness at that meeting, Kathleen.  That he's

24   going to have an office within every living human

25   being on the Planet Earth, 12,000 offices.  This

1    was in early '06.  And he claimed that by the year

2    2012, in roughly half a decade, he planned to have

3    12,000 offices within reach of every single human

4    being.  And people, intelligent people like your

5    client over here, just sat there, whew, that sounds

6    pretty logical.  And, you know what, Kathleen, it

7    wasn't logical.  It was craziness.  It was a manic

8    depressive who needed serious medication talking.

9    And I knew that.

10        Q.    You did know that?

11        A.    Everybody knew that, Kathleen.

12        Q.    How did you know that?

13        A.    That Frank was a manic depressive?

14        Q.    Yes.

15        A.    Because he told me he was a manic

16    depressive.  But he didn't have to tell me, because

17    I thought he was.  I saw that he was.  He was not

18    all there.

19        Q.    Are you a psychiatrist?

20        A.    I'm not a psychiatrist, no.

21        Q.    So what caused you to believe he was manic

22    depressive?

23        A.    Aside from the fact that he told me?  I

24    saw some symptoms that he was a manic depressive.

25        Q.    Could you describe the symptoms for me?

1   A.   Yeah.  Either extremely, extremely happy

2   or extremely depressed.  And I believe that Frank

3   suffers also from a Napoleonic complex.  I'm not a

4   psychiatrist, but I just think that the things that

5   he's tried to accomplish in his life are way out of

6   reach.  Very, very smart, brilliant man, but --

7   Q.   Well, Napoleon accomplished a lot.

8   A.   Yeah, he did.  He did.  But he ended up in

9   jail; did he not?

10   Q.   No.  He ended up on an isolated island

11   living encumbered.

12   A.   It was a prison.  Well, it was a prison.

13   Yeah, and Frank was -- at this point, it was known

14   to all, because it was published, that Frank was a

15   disbarred attorney, convicted felon, and recently

16   bankrupt.

17   Q.   Do you know how many times he went

18   bankrupt?

19   A.   No.

20   Q.   Could you name -- when you said that there

21   were a large number of shareholders and that you

22   saw how many people were at the shareholders'

23   meeting, besides my client, who is a sycophant and

24   an idiot, and besides my other client --

25   A.   No, I believe everybody in that room was.

1        Q.    Okay.

2        A.    Not particularly your client, but, yes,

3    she, I believe, is one of them, yeah.

4        Q.    And my other clients, Mr. Hailstones and

5    Mr. Holtz and Mr. Berman, name some more people who

6    were at that meeting among those many -- too many

7    shareholders.

8        A.    Woody Johnson, Horton Johnson, whatever he

9    goes by.  Marty Flynn, James Sadrianna, Daniel

10   Myers.  There were so many of them.  Honestly,

11   there were so many of them, I really -- I don't

12   recall.  There was that professor of Indian

13   descent.  I forgot his name.

14       Q.    Rama somebody?

15       A.    Rama, yeah, Inguva.  Rama Inguva.  There

16   were a few others.  A whole bunch of others,

17   actually.  I didn't recognize most of them,

18   actually.  I believe that's the meeting I was

19   introduced to Laurie Holtz.  Oh, yeah, Richard

20   Berman was there, of course.  I think I mentioned

21   that.

22       Q.    So what had changed in the time period

23   between, I think it was, '03 and '06?  '03 you lent

24   him $200,000.

25       A.    No, that was in '01.

1     Q.    '01.  Okay.  So in '01 you had lent him

2     $200,000, which --

3     A.    That's not correct.  Lent him some money,

4     plus there were some moneys from that -- I was

5     supposed to get from the liquidation of the assets,

6     yes.

7     Q.    But you don't lend money to somebody that

8     you think is crazy and manic depressive and --

9     A.    At that time, I didn't know that.  No, I

10    didn't know that --

11    Q.    So what changed?  How did you -- what

12    changed about your knowledge?

13    A.    My problem, Kathleen, was not particularly

14    with Frank.  My problem was with everybody that

15    Frank surrounded himself with.

16    Q.    I understand.  But what changed about

17    Frank that made you go from an attitude that caused

18    you to lend him a great deal of money -- what to me

19    seems like a great deal of money -- to believing

20    that everybody else in the room that was a

21    shareholder in Mirabilis was an idiot for having

22    any faith in him?

23    A.    Because when I knew Frank in '01, he never

24    had the delusions of grandeur to conquer the world

25    and to have 12,000 offices, Kathleen.  He could

1   hardly manage one office.  He never expressed those

2   delusions to me, anyhow.

3        Q.   Did you know anything about what I think

4   he now describes as his addictive behaviors?

5        A.   No, not in detail.

6        Q.   Was it your impression that he developed

7   his bipolar disease after 2001?

8        A.   I don't know when he developed it.  I

9   think he was born with it.

10       Q.   So he was keeping it hidden, or is that --

11       A.   From me, he was, for sure.

12       Q.   And when did you come about -- when did

13   you come to the understanding that he was not in

14   full possession of his faculties?

15       A.   I don't know if it was in late '04 or '05

16   sometime that, you know, he told me he was under

17   some -- seeking some treatment.  I don't know the

18   details.

19       Q.   Do you know with whom he was seeking

20   treatment?

21       A.   No.

22       Q.   Okay.  I understand the behavior.  You've

23   already described the behavior when he was manic,

24   when he was extremely on a high.

25       A.   Uh-huh.

1      Q.   Could you describe the behavior when he

2  was extremely depressed?

3      A.   No.  He was just very, very sullen, closed

4  himself off in a room and, you know, whatever.

5  Just --

6      Q.   Were there times when he completely

7  isolated himself and you didn't see him?

8      A.   During what periods, Kathleen?

9      Q.   Ever.

10     A.   No.  I mean, I live in -- you know, 250

11  miles away from him.  I was not there very often in

12  '06.  In late '05 I was in the Jupiter site or in

13  the Doral office in South Florida.

14     Q.   Well, but something must have changed

15  between the time that you loaned him the money and

16  the time that you say that he was crazy.

17     A.   Uh-huh.

18     Q.   And I'm trying to figure out when along

19  that timeline you developed the understanding of

20  Frank as a person with a mental illness.

21     A.   I believe it was in '05 where he actually

22  just divulged to me that he did have some mental

23  illnesses.  I knew of his criminal background and

24  of his, you know, being disbarred and bankrupt.

25     Q.   So he told you he was mentally ill.

1      A.    Correct.  I think he published it on his

2   Website.  He had a frankamodeo.net.

3      Q.    Were there any other people involved with

4   Mr. Amodeo of whom you had a good impression?

5      A.    Initially, quite a few people.

6      Q.    Could you name them for me?

7      A.    Richard Berman, Laurie Holtz, Frank

8   Hailstones.

9      Q.    And what caused you to have a good

10  impression of Mr. Berman?

11     A.    Mr. Berman was -- I met him at his office.

12  Senior partner of Berman, Kean, Riguera in South

13  Florida.  He told me --

14     Q.    Why did you meet him at his office?

15     A.    Why did I meet him at his office the first

16  time?  He was, I believe -- I believe he

17  represented Frank in some legal matter having to do

18  with that print roll up.  I'm not exactly sure.

19  Frank had some issue with Merrill Lynch and I

20  believe he hired Berman's firm, if I recall

21  correctly.

22     Q.    Were you involved in that issue with

23  Merrill Lynch at all?

24     A.    No.  No, no.  Not from -- no, no.  I just

25  -- the company went defunct, I didn't bring the

44

1    client on, thank you very much.  I didn't have any

2    actual involvement.

3         Q.   What company was it that was involved with

4    the problem with Merrill Lynch?

5         A.   It was the parent company or the parent

6    holding company of that Ameriplast.  It's Print

7    something.  I'm not exactly sure.

8         Q.   Do you know what other people were

9    involved in that either -- in that dispute with

10   Merrill Lynch?

11        A.   If I recall correctly, just Frank and

12   perhaps Mr. Sadrianna, but I'm not sure about that.

13        Q.   Did you know Dr. Pollack?

14        A.   Yes.

15        Q.   What was your impression of Dr. Pollack?

16        A.   My first impression of him?

17        Q.   That's where we'll start.

18        A.   My very first impression of him was, yeah,

19   not very good.  He didn't make a good impression

20   upon me.

21        Q.   Why was that?

22        A.   Kathleen, Mr. Pollack is a -- I don't know

23   how it's relevant to this, but I was not impressed

24   by him.  I thought he was -- to be honest with you,

25   I pretty much knew that he was of Jewish descent

1   and the first meeting I had he's telling me about

2   the glory of the light of Christ.  And I was like,

3   oh, I find that interesting.  You know?  So it's

4   just -- I shouldn't judge him for that, but I did.

5        Q.    And then -- okay.  You said that was your

6   first impression.  Did your impression change?

7        A.    No, no.  Not on -- no.

8        Q.    Was Dr. Pollack one of the people at the

9   January meeting that you referred to?

10        A.    I believe so, yes.  Like I said, there

11   were 40-some-odd people, participants in that

12   meeting.

13        Q.    Do you know if Mr. Sadrianna was there?

14        A.    Yes.

15        Q.    Was Mr. Broadhead there?

16        A.    Possibly.  Yeah, very possibly.

17        Q.    What is your impression of Mr. Broadhead?

18        A.    I have no opinion of Mr. Broadhead.  And

19   he was married to Edie Curry.  Nice enough guy, you

20   know.

21        Q.    Tell me any other people that you remember

22   were there.

23        A.    Name me the names that I named and I'll

24   tell you --

25        Q.    Okay.  Well, you've named Mr. Berman, Mr.

1    Holtz, Mr. Hailstones.  Oh, why did you have a good

2    impression of Mr. Hailstones?

3        A.   Mr. Hailstones was introduced to me in, I

4    believe, late December of '05 as a Sarbanes-Oxley

5    expert, came from London, and he had a lot of

6    background with PricewaterhouseCoopers, and was

7    announced the President of Mirabilis.  And when I

8    met Frank Hailstones, at first I was impressed

9    because he seemed humble enough.  He had the title

10   of President, didn't take a fancy corner office,

11   took a simple office.  And I just -- I thought that

12   it was a humble attribute that he had and I thought

13   that he was, you know -- I was glad that he was on

14   board initially.  Initially.

15       Q.   And what changed?

16       A.   His complete -- his lack of logic.  I mean

17   --

18       Q.   About what?

19       A.   What is a president of a company to do,

20   Kathleen?  It's manage the company, operate the

21   company; correct?  On top of Mr. Hailstones being

22   the President of Mirabilis Ventures, he also was

23   the controlling person at AEM for the Department of

24   Business and Professional Regulations, so he was

25   one of the responsible parties for AEM.  That made

1    me feel much more comfortable.  Because I met --

2        Q.   Were you a controlling person?

3        A.   Yes, I was, yeah.

4        Q.   Okay.  So keep going.

5        A.   I was comforted by the fact that Mr.

6    Hailstones was also a controlling person of the

7    company.  With his background, I thought, okay,

8    great.  I thought that a guy like Frank Hailstones

9    being the president of the company and the Board of

10   Directors being chaired by Laurie Holtz that the

11   company was in -- was going to be in good financial

12   standing.  But I was awfully wrong about that.

13       Q.   Mr. Holtz wasn't the Chairman of the Board

14   of AEM, was he?

15       A.   No.

16       Q.   And Mr. Hailstones wasn't the president of

17   AEM, was he?

18       A.   No.  He was the president of the parent

19   company.  AEM --

20       Q.   So AEM was a Mirabilis-owned company?

21       A.   Correct.

22       Q.   And how soon after your -- I mean, between

23   late '05 and Mr. Hailstones' departure wasn't that

24   long.  When did your impression --

25       A.   When was his departure?

```
 1        Q.   His departure was -- he was informed that

 2   he wouldn't have a job immediately after he

 3   returned from the Christmas holidays of '06, '07.

 4        A.   Oh, he was terminated?

 5        Q.   Yes.

 6        A.   I thought he had resigned.  Okay.

 7        Q.   Oh, no.

 8        A.   Oh, really.

 9        Q.   Really.

10        A.   Interesting.

11        Q.   No.

12        A.   He would have stayed there.  That's news

13   to me.

14        Q.   And he resigned on January 31st, 2007.

15        A.   Okay.

16        Q.   I mean, he was invited to resign and it

17   became official.  So when during that year did your

18   impression change?

19        A.   Fairly early on.  Fairly -- but --

20        Q.   Was it at that first meeting?

21        A.   No, no.  I didn't know him well enough at

22   that first meeting.  But my impression of him

23   changed throughout that year, yeah.

24        Q.   And who is Laurie Andrea?

25        A.   Laurie Andrea was another control person
```

1    of AEM.  She was the VP of Insurance.  She was --

2    you know, she --

3        Q.    Of what company?

4        A.    Of AEM.

5        Q.    Do you know if she owned any interest in

6    AEM?

7        A.    I don't recall.

8        Q.    And I can't remember, I think I already

9    asked you this, but did you own any interest in

10   AEM?

11       A.    In late '06 when it was a shell -- in late

12   '05, yes.  But then the company was -- had zero

13   employees, it had zero entities, and then it was

14   sold to Mirabilis Ventures.  I believe Edie Curry

15   negotiated the purchase of that shell corporation.

16   That's what I was told.

17       Q.    And who was she negotiating with?

18       A.    Former owners of Presidion; Mr. Sandlin

19   and Mr. Gaines, I was told.  I'm not sure.

20       Q.    Incidentally, did you know Mr. Sandlin is

21   dead?

22       A.    No.

23       Q.    He was murdered.

24       A.    He was murdered?

25       Q.    Yes.

1        A.    When was this?

2        Q.    September 16th, I think.  But --

3        A.    Of this year?

4        Q.    Yes.

5        A.    I had no idea.

6        Q.    I'll show you on the Internet.

7        A.    No, I had no idea.  Wow.

8        Q.    Was Laurie Andrea an idiot and a

9  sycophant?

10        A.    Yeah.  Not as much as the others, but --

11  I'll tell you, I categorize the people in -- I put

12  them in two categories, Kathleen.  Either they were

13  -- they drank Frank's Kool-Aid and they were really

14  -- they really believed his crap, or they were

15  kissing his ass and riding their coattails to the

16  -- to financial freedom.

17        Q.    And which one were you?

18        A.    I guess I might have been considered one

19  of the idiots.  But I had actually resigned after

20  that meeting, so, yeah.  Not resigned; sorry.  I

21  relinquished my shares.  And I had told them I

22  needed to be replaced as soon as possible thirty

23  days into my post.

24        Q.    And what was your post that you were

25  replaced from?

1      A.    Interim CEO.

2      Q.    Of?

3      A.    AEM.

4      Q.    And did you have any other posts in any

5  other companies?

6      A.    No.

7           MS. HAVENER:  Excuse me.  I just want to

8        check on the phone.  Have other people joined

9        the call besides Nicolette?  Is anybody there?

10       Nicolette, are you there?

11          MS. VILMOS:  I am here.

12          MS. HAVENER:  Okay.  And there is no one

13       else on the call?

14          MS. VILMOS:  I'm going to take that as a

15       no.

16          MS. HAVENER:  Yes, but I also have -- I

17       have evidence to the contrary, but we'll leave

18       that as it be.

19  BY MS. HAVENER:

20      Q.    Are you telling me that all your duties

21  with Mirabilis Ventures ceased in June of '06?

22      A.    Officially, yes.

23      Q.    And unofficially?

24      A.    I was asked to come back as a consultant

25  to help the transition with the new CEO.

1      Q.    And the new CEO being?

2      A.    Michael Stanley.

3      Q.    And did you come back as a consultant?

4      A.    Yes, I did.

5      Q.    What did you do as a consultant?

6      A.    I just helped transition whatever --

7   whatever was needed, but mostly sales.  The sales

8   department was dwindling.

9      Q.    What did you do as a salesperson?  What

10  were you selling?

11     A.    PEO services.

12     Q.    And to whom did you make sales of those

13  services?

14     A.    I just managed a small sales group out of

15  the South Florida office.

16     Q.    Do you have a consulting agreement for

17  that time period?

18     A.    No.

19     Q.    Did you have any responsibilities with AEM

20  after June of '06?

21     A.    No, aside from just sales, keeping --

22  trying to keep the sales intact, no.

23     Q.    But didn't you tell me that AEM was a

24  shell?

25     A.    No, but AEM was the company that I worked

53

1    for that was managing this --

2        Q.    So it went from a shell to being a PEO?

3        A.    Correct.

4        Q.    How were you paid?

5        A.    How was I paid?

6        Q.    Yes.

7        A.    By check or direct deposit.

8        Q.    It was a regular amount like you were

9    receiving a paycheck?

10       A.    When?  At the time that I was employed for

11   the company?

12       Q.    Okay.  Let's do that first.  At the time

13   -- and that was -- I want to know the dates.  You

14   said just from late '05 to --

15       A.    December 27th of '05 through June --

16       Q.    June of '06.

17       A.    Yeah.

18       Q.    And, otherwise, you didn't have any other

19   paying position related to Mirabilis or AEM?

20       A.    No, I was being paid by Common Paymaster,

21   and after that I --

22       Q.    During those six or seven months.

23       A.    Five-and-a-half, yeah.

24       Q.    And that's the only time that you were

25   getting paid by Common Paymaster?

54

1       A.    Correct.

2       Q.    And then how were you getting paid as a

3   consultant?

4       A.    I believe it was AEM or Mirabilis was

5   paying me on a monthly basis.

6       Q.    When was your first awareness that there

7   was any intent to sue Ms. Curry?

8       A.    Probably a week or two before the

9   conference in Scottsdale.

10      Q.    And is the same true for Mr. Hailstones?

11      A.    Yes.

12      Q.    Are you aware that claims against

13  Ms. Curry -- did you have any awareness that claims

14  against Ms. Curry and Mr. Hailstones were being

15  researched in February or March of '07?

16      A.    No.

17      Q.    And who told you about the conference in

18  Scottsdale?

19      A.    I believe it was Frank.

20      Q.    And do you know who told Frank?

21      A.    No.

22      Q.    What did Mr. Amodeo say to you about the

23  conference in Scottsdale?

24      A.    Frank told me, you won't believe this, but

25  there's a, you know, conference in Scottsdale going

1    on for Palaxar Group.  I said, what's Palaxar

2    Group.  And he told me, go online and check it out.

3    And I researched it and I -- I could not believe

4    the audacity, Kathleen.  I just could not believe

5    the audacity of your clients.

6        Q.   And what did you say to Mr. Amodeo?

7        A.   I said, I have to see it with my own eyes.

8    I cannot believe it.  I really thought -- I really

9    thought it was some elaborate prank.  That's the

10   honest truth.  I could not believe the audacity of

11   your clients.

12       Q.   Tell me why.

13       A.   The company in '07 was being investigated

14   for what I was told was the largest 941 tax fraud

15   in U.S. history, Kathleen.

16       Q.   "The company" being?

17       A.   Mirabilis and all of the 80-or-so

18   associated companies.

19       Q.   Uh-huh.

20       A.   And your clients were -- Frank Hailstones

21   was the President of Mirabilis Ventures, Edith

22   Curry was the Executive Secretary of the Board of

23   Directors.  I believe her role was corporate

24   compliance.  And the -- Laurie Holtz -- that's what

25   really struck me when I checked out the Website,

1    Laurie Holtz sat on the advisory committee.  He was

2    the Chairman of the Board of Mirabilis Ventures and

3    then he sat on the advisory committee of Palaxar.

4    I just -- I just could not believe my eyes when I

5    saw that site.

6         Q.   Well, did you understand -- well, explain

7    to me what you thought was audacious about it.

8         A.   Explain to you what I thought was

9    audacious?

10        Q.   Yes.

11        A.   Okay.  I printed out the Website here.

12   And I look at this and I'm saying to myself, wow,

13   this looks really impressive.  Wow, if I was a

14   first-time viewer of this site I'd be like, wow,

15   look at this; this is impressive.  Look at this

16   whole advisory committee.  Look at the

17   professionals involved in this.  But what really

18   struck me, the audacity that really struck me was

19   on the conferences page on the Website.  There is a

20   link to the Department of Justice, Kathleen, on

21   their Website.  They're being investigated by the

22   Department of Justice for the largest 941 tax fraud

23   in the history of the country.  I just thought it

24   was ridiculous.

25        Q.   Actually, what makes you believe that

1  Ms. Curry or Mr. Hailstones --

2       A.   No, I don't know who personally.  I know

3  the company they were very involved with.  They

4  were very involved in Mirabilis.

5       Q.   Neither was a CFO; correct?

6       A.   No.  Not to my recollection, no.

7       Q.   It's true that Mr. Glover was the CFO;

8  correct?

9       A.   For a period of time.  Then after that,

10 that switched, from what I was told.

11      Q.   Do you have any understanding that

12 pursuant to the laws of the State of Nevada, which

13 is where Mirabilis is incorporated, the Board of

14 Directors is entitled by law to rely on the

15 officers of the company to do their named roles, to

16 perform their named functions?

17      A.   Uh-huh.

18           MS. VILMOS:  Object to the form.

19           THE WITNESS:  I wasn't aware of that, but,

20      okay, you just informed me.

21 BY MS. HAVENER:

22      Q.   Did you know anything about Ms. Curry's

23 background before she came to Mirabilis?

24      A.   No, that she was an attorney, that she was

25 a CPA, that she worked for a couple of banks in the

1    Virginia area and --

2        Q.   Have you ever heard of PERSEREC?

3        A.   No.

4        Q.   Have you heard of it now?

5        A.   PERSEREC?  No.

6        Q.   Have you heard of -- did you know what

7    Nexia certification was?

8        A.   No.  Not until this lawsuit.

9        Q.   Do you have any understanding about it

10   now?

11       A.   Not any -- no, not really.

12       Q.   So tell me if I'm misinterpreting you,

13   because I want to make sure that I'm understanding

14   what you're trying to say.

15       A.   Please, clarify.

16       Q.   No, I'm not trying to clarify.  I just

17   want to make sure I'm understanding what you're

18   saying.

19        Are you testifying to the judge and jury --

20   because that's where this is going --

21       A.   Yes, I understand.

22       Q.   Are you testifying that you believed that

23   it was audacious of Ms. Curry and Mr. Hailstones to

24   be promoting their development of a product that

25   could potentially uncover fraud?

1      A.    Yes.

2      Q.    Now, did you have any understanding that

3   this product had ever been used while they were at

4   Mirabilis?

5      A.    No, none whatsoever.   I had --

6      Q.    And so if the product wasn't used at

7   Mirabilis, so, therefore, it was never applied --

8      A.    I didn't care for the product; I cared

9   about the people that were marketing the product.

10     Q.    Well, I don't think that the people that

11  were -- I'm sorry.   I don't mean to be arguing, but

12  nothing on the Website says that these people can

13  uncover fraud.

14     A.    Uh-huh.

15     Q.    If you --

16           MS. VILMOS:  Object to the form.   It

17      wasn't a question.

18  BY MS. HAVENER:

19     Q.    Do you understand the difference between

20  when I say that -- or do you understand what I'm

21  saying when I say there is a difference between

22  people saying that they can uncover fraud and

23  people saying that they have a product that can

24  uncover fraud?

25     A.    I do understand the difference.

1      Q.   Okay.  And the Website says that -- or

2   said that Ms. Curry and Mr. --

3      A.   No, it still says that.  I believe that

4   the Website is still active; right?

5      Q.   Yes, but I'm talking about at the time

6   that you saw it.

7      A.   Correct.

8      Q.   That Ms. Curry and Mr. Hailstones or --

9   and, actually, Mr. Hailstones was never a partner

10  in Palaxar, but they had a product that could

11  uncover fraud; is that right?

12          MS. VILMOS:  Object to the form.

13          THE WITNESS:  Is that a question?

14  BY MS. HAVENER:

15     Q.   Was that your understanding?

16     A.   Repeat the question.

17     Q.   Was it your understanding when you looked

18  at the Website that these people were representing

19  to the world that they had a product that could

20  uncover fraud?

21     A.   No, I didn't differentiate at the time

22  between the people and the product.  I really

23  wasn't aware of the product until after I was sued

24  in connection with this.

25     Q.   But you got angry; correct?

1       A.   I got angry, yes.  I got --

2       Q.   And what made you angry?

3       A.   What made me angry?  What made me angry is

4    that a lot of people, from my understanding, were

5    investigated, a lot of people's lives were on the

6    line.  And I believe that your clients failed

7    miserably in their fiduciary duties to the

8    shareholders and to the employees of the company,

9    Kathleen.  They failed miserably.  The way I see

10   it, Kathleen --

11      Q.   To the shareholders and who else?

12      A.   To the employees of the company and all

13   the subsidiary companies.  When this huge implosion

14   happened, Kathleen, what I understood -- I never

15   actually physically saw it, but what I understood

16   is that through '06 -- maybe it started late '05

17   and continued to early '07, but for sure in 2006

18   the burn rate of the company was $8-10 million a

19   month.  Over and above that, they were purchasing

20   companies, like four, five, six new companies a

21   month that I only knew about --

22      Q.   Okay.  Whose impression was it -- I mean

23   -- I'm sorry.  From where did you get the

24   impression that that was the, quote, "burn rate" of

25   the company?

1        A.    I believe Daniel Myers told me that.

2        Q.    And who was it, what human being was it

3   that you thought was responsible for purchasing all

4   these distressed companies?

5        A.    I don't think it was one person.  I think

6   it was a decision of the Board.  I don't have --

7        Q.    Did you believe, during the time that you

8   were associated with either Mirabilis or AEM, that

9   Mr. -- that the Board was in control of what

10  happened?

11       A.    Yes.

12       Q.    Was it never your understanding that Mr.

13  Amodeo was in control?

14       A.    No, I believe that Frank had some

15  influence.  I don't believe that he was in control.

16  That wasn't what I was told, and that's my --

17       Q.    That's what you were told by whom?

18       A.    By Frank, by Richard Berman, and by Laurie

19  Holtz.

20       Q.    And who was Dan Myers when he gave you

21  this information about the burn rate and the --

22       A.    Who was he?

23       Q.    Yes.

24       A.    I mean --

25       Q.    What was his role at the company?

1       A.   One of the myriad of CPAs in the company.

2  I don't know what his official title was, but he

3  was --

4       Q.   He wasn't the CFO.

5       A.   Not to my knowledge.

6       Q.   Did you have any other relationship with

7  Mr. Myers?

8       A.   No.  We were friendly, but, no.

9       Q.   Did he ever do any personal -- I mean, any

10  services for you?

11       A.   Oh, he -- yes.  He actually acted as my

12  CPA for two years.

13       Q.   And what did he do as your CPA?

14       A.   Just filed my taxes.

15       Q.   What company were you involved in in 2004?

16  You said your involvement with Mirabilis and AEM

17  was officially from late '05 to June '06.

18       A.   Uh-huh.

19       Q.   In what company were you -- or partnership

20  or enterprise, whatever word you want to use --

21  were you involved in 2004?

22       A.   Honestly, I don't recall exactly, but

23  there was a company, Primary Bookkeeping.  I don't

24  know if it was '04 or late '03.

25       Q.   And who owned Primary Bookkeeping?

1      A.   For a certain period of time, I believe

2   that I did.  It was, once again, another one of my

3   attempts to get paid back.

4      Q.   And for a certain period of time, you did.

5   Who else, and at what time period?  I know it was a

6   compound question.  Who else was involved at

7   Primary Bookkeeping at any other time?

8      A.   I don't recall.  I mean, Frank Amodeo was,

9   but I don't recall the exact dates and --

10      Q.   And what happened during 2004 with Primary

11   Bookkeeping?

12      A.   Frank got into some legal mess once again

13   with a company called Atlas Steel or something.  I

14   don't recall.  Atlas Welding.  Some welding company

15   out in Florida.

16      Q.   And what do you mean by he got into some

17   kind of legal trouble?

18      A.   I don't know.  He provided some services

19   for them, payroll services, and there was a legal

20   headache.  I don't know.  I don't recall.

21      Q.   And you were the owner?

22      A.   For a certain period of time, I believe I

23   was.

24      Q.   Well, and so whose role was it to

25   supervise what Mr. Amodeo was doing?

1      A.   At that time, he was responsible for his

2  own actions.

3      Q.   But you owned the company.

4      A.   Yes.  For a small period of time, yes.

5      Q.   And you didn't have any responsibility as

6  the owner?

7      A.   I may have had some responsibilities, but,

8  you know.  I wasn't party to the lawsuit.

9      Q.   Okay.  Did Primary Bookkeeping pay their

10  941 taxes?

11      A.   I don't recall.  I would hope that they

12  did.

13      Q.   As the owner of the company, can you tell

14  me who at Primary Bookkeeping would have been

15  responsible for that?

16      A.   No, I can't answer that question.  No, I

17  don't --

18      Q.   You don't know?

19      A.   I don't know.

20      Q.   Do you know who the other employees were

21  of Primary Bookkeeping?

22      A.   It was one gentleman out of West Palm

23  Beach who worked with Frank, and I don't recall his

24  name.

25      Q.   Who is Jerry Beavers?

1          A.    That would be him, yeah.

2          Q.    And what was his job?

3          A.    Payroll processing, you know.  I don't

4     know exactly, but -- what his job title or role

5     was.

6          Q.    And how is it that you owned the company

7     but you don't know what people's roles were?

8          A.    Yeah.  I didn't really act as the owner of

9     the company.  It was, once again, a mechanism to

10    get paid back.  But Charles McBurney out of, I

11    believe, Jacksonville clarified that.  I don't have

12    the agreement, but --

13         Q.    So there is a written agreement about your

14    role in Primary Bookkeeping?

15         A.    Yes.

16         Q.    Do you know when that was executed?

17         A.    Late '04, early '05.  I'm not sure

18    exactly.

19         Q.    And did you have a relationship with Mr.

20    McBurney?

21         A.    Yes.

22         Q.    Was he your attorney?

23         A.    He was the attorney for the company.

24         Q.    For Primary Bookkeeping?

25         A.    For Primary Bookkeeping.

1        Q.   For what other companies was he the

2   attorney, if any?

3        A.   I don't know.

4        Q.   Was Dan Myers an idiot?

5        A.   Yes.

6        Q.   Okay.  Why?

7        A.   Why?  Because I believe that, you know,

8   he, you know -- why was he an idiot?  There are a

9   lot of reasons why people are idiots, but, yeah, he

10   was one of the professionals involved in this

11   company.

12        Q.   But, nevertheless, you hired him to do

13   your taxes.

14        A.   Oh, before that.

15        Q.   No, he was an idiot afterwards; that's

16   what you're telling me?

17        A.   No.  Okay.

18             MS. VILMOS:  Object to the form.

19   BY MS. HAVENER:

20        Q.   No, I'm asking.  I'm asking the question.

21        A.   Yes.

22        Q.   When did he turn into an idiot?

23        A.   I believe everybody turned into an idiot

24   sometime in early '06.

25        Q.   What made that happen, do you think?

1      A.    Greed.

2      Q.    But you also testified a minute ago that

3   it was Dan Myers who was telling you about the burn

4   rate and the number of companies that were being

5   acquired?

6      A.    Well, no.  I found out about the number of

7   companies that were being acquired through a

8   publication called the Nexalist, which was a

9   monthly publication that came out of Mirabilis.

10     Q.    But you testified earlier that it was Dan

11   Myers who told you about the burn rate.

12     A.    The burn rate; correct.

13     Q.    So that didn't alter your opinion that he

14   was an idiot.

15     A.    No, it did.  I believe that it was absurd

16   that nobody there was curious -- at least not to

17   me, and I was very verbal and vocal about it --

18   that the company is spending more money than

19   it's -- you know, where is the revenues coming

20   from?

21     Q.    But who was doing all that?

22     A.    Who was doing what?

23     Q.    Who was burning through the money and

24   acquiring companies?

25     A.    I don't know if any one person was

1    responsible for that, Kathleen.  I believe it was

2    the decision of the Board to buy the companies.

3         Q.   Without the influence of Frank Amodeo?

4         A.   No, I believe Frank might have had some

5    influence, yes.

6         Q.   Is it your understanding that the role of

7    the Board was to control Frank?

8         A.   Not to control Frank, but to protect him

9    of himself.  To protect him and the shareholders

10   from Frank.  Frank, I believe, had an addiction.

11   As part of the -- I found out after the fact that

12   it's part of the manic depression.  It's just to

13   spend and not have any realistic understanding of,

14   you know, fiscal responsibility.

15        Q.   Did you ever try to cross Mr. Amodeo?

16        A.   Did I ever try to cross him?

17        Q.   Yes.

18        A.   No.  In his viewpoint, perhaps.  But, no,

19   I never tried to cross him.

20        Q.   Did you ever see anybody who did try to

21   cross him?

22        A.   What do you mean by "cross him"?

23        Q.   Stand up to him.  Challenge him.

24        A.   Oh, I stood up to him.  I don't call that

25   crossing, no.

1      Q.    Okay.   So you tried to stand up to him?

2      A.    Yes.

3      Q.    What happened when you did that?

4      A.    I had resigned right after the fact.

5  There was a series of events that led to my final

6  resignation.

7      Q.    But you said that after you resigned you

8  went back as a consultant; correct?

9      A.    Correct, yes.

10      Q.    Did you have any control -- were you ever

11  effective at controlling Mr. Amodeo's conduct?

12      A.    No.

13      Q.    Were you ever -- did you ever see anyone

14  else who could effectively control Mr. Amodeo's

15  conduct?

16      A.    I thought that he was very influenced by

17  Richard Berman and Laurie Holtz.  Extremely

18  influenced.  He actually referred to them as his

19  angels; one on his right shoulder, one on his left

20  shoulder.  That's how he referred to them and

21  that's what they represented to me as well, that

22  they were there to protect Frank from himself.

23      Q.    Do you have any reason to believe that

24  that's not also what they told my clients?

25      A.    That's not what they told your clients?

1      Q.   Well, if they told you that --

2      A.   They told me what?

3      Q.   That they were his angels --

4      A.   Correct.

5      Q.   -- and Frank told you that, do you have

6  any reason to believe that they did not also

7  represent the same thing to my clients?

8      A.   No.

9      Q.   So it's quite possible that my clients

10  were told exactly what you were told.

11      A.   It's possible.

12      Q.   And it's quite possible that --

13           MS. VILMOS:  Object to the form.

14  BY MS. HAVENER:

15      Q.   It's quite possible that they believed it;

16  correct?

17           MS. VILMOS:  Object to the form.

18           THE WITNESS:  I don't know what they

19      believed or what they didn't believe.

20  BY MS. HAVENER:

21      Q.   But it's possible that they believed it.

22      A.   Anything is possible, Kathleen.

23      Q.   And you just testified, am I correct, that

24  you had no reason to believe that they were not

25  told exactly the same things that you were told.

1        A.    I have no reason to believe otherwise.

2        Q.    Right.   Thank you.

3        When you owned Primary Bookkeeping and Mr.

4    Amodeo was involved, were you effective in

5    controlling him and protecting him against himself?

6        A.    I was not, no.

7        Q.    Did you ever see anybody effectively

8    control him?

9        A.    I just answered your question, Kathleen.

10   I believe that Richard Berman and Laurie Holtz were

11   quite effective for a period of time, yes.

12       Q.    When was that period of time?

13       A.    From their involvement through sometime in

14   the middle of '06.

15       Q.    Okay.   If they were effectively

16   controlling Frank, what was the reason for --

17       A.    I don't know if "controlling" is the fair

18   term, Kathleen.   They had --

19       Q.    Protecting him from himself; I think

20   that's what you said.

21       A.    And influencing him, yes.

22       Q.    Okay.   If they were protecting Frank from

23   himself and had influence -- which, let me make

24   this clear.   Did you consider that to be a positive

25   influence?

1      A.   I did.

2      Q.   Okay.   If you believed that Mr. Berman and

3   Mr. Holtz were a positive influence over Frank in

4   the first half of 2006, what caused you to resign?

5      A.   What caused me to resign?   My resignation

6   was very simple, Kathleen.   I received several

7   issues on a monthly basis of the Nexalist.   I saw

8   the company buying more and more companies,

9   spending like, I was told, $8-10 million a month,

10   and Richard Berman, Laurie Holtz, and a slew of

11   other people could not answer where the money was

12   coming from.   Nobody could answer a very simple

13   question:   How is Mirabilis generating all this

14   money?   But what I did witness was everybody

15   pitching Frank on new deals, on new ideas.   But

16   what really -- what really struck me as very

17   peculiar was Presidion, when Frank and company got

18   involved, this is common knowledge, was $50 million

19   in debt to the IRS.   And they were an extremely,

20   extremely, poorly-run company.   Like it was

21   ridiculous.   I'm not going to go bore you with all

22   the details of why I thought so, but it was really

23   quite ridiculous how poorly managed they were.   But

24   what I found very interesting is that in late '05

25   somebody had convinced Frank to separate the entire

1    sales department from the company.  And Frank had a

2    pipeline with his Board of Directors of

3    $5.3 billion in new PEO sales for early '06.  B.

4    Billion, with a B.  You understand that all the

5    PEOs in the world combined probably hardly process

6    $5.3 billion.

7         But the two clients that I recall that were

8    being pitched heavily to Frank Amodeo were Dollar

9    Tree and -- Smithfield Hams?  Was that the right

10   name?  I don't know if you're familiar with it.

11   Your client represented to Frank that she had two

12   companies; one was Dollar Tree and another one was

13   Smithfield Hams.  I believe she was working with a

14   gentleman called Mike Dement.  $550 million and

15   $600 million in payroll.  And I just thought it was

16   laughable.  I thought it was completely laughable.

17        Q.   Why?

18        A.   Because a company that has a half a

19   billion dollars in payroll will not outsource to a

20   PEO.  And for whatever reason, if they chose to

21   outsource to a PEO, it would not be a PEO with a

22   history like Presidion's.

23        Q.   Wasn't Mike Dement an employee of

24   Mirabilis?

25        A.   I don't know.  I don't know Mike Dement.

1    I just knew that he was working with your client,

2    Edie Curry, on bringing those two large clients to

3    bear.

4        Q.   Do you know if there is any documentation

5    of those, what you refer to as, pitches?

6        A.   No.   I just recall being in a meeting in

7    Orlando and being showed a pipeline sales report

8    with $5.3 billion.

9        Q.   When was that?

10       A.   I don't recall exactly, but probably

11   sometime early '06.

12       Q.   And what did you hear at that meeting?

13   Well, first of all, what kind of meeting was it?

14       A.   I don't think it was an official meeting.

15   It was just, you know, Frank --

16       Q.   Do you know why you were in Orlando?   I'm

17   sorry.   I interrupted you.

18       A.   I believe it was just, you know, Frank

19   flaunting that he's going to have $5 billion-plus

20   of new sales.

21       Q.   And it was sometime in '06; correct?

22       A.   Late '05, early '06.   It was late '05 that

23   he separated the sales force from Presidion and he

24   developed a new sales force called Synentre, or

25   something.   I don't recall --

1    Q.   Well, what was Synentre?

2    A.   I don't know.  I believe it was a sales

3    division for PEO sales and marketing of other

4    services, Mirabilis-related services.

5    Q.   Okay.  And when you said "he" separated

6    the sales force from Presidion, you said -- you

7    meant Frank Amodeo?

8    A.   Frank Amodeo.

9    Q.   And Frank Amodeo, apparently, am I correct

10   in understanding --

11   A.   Well, no.  Actually, it was -- officially,

12   I think it was Craig Vanderburg that did it on

13   Frank Amodeo's advice.

14   Q.   Okay.  Am I correct in understanding then

15   that it was Frank -- that Frank Amodeo had that

16   kind of power?

17   A.   That power?  In late '05 he believe he --

18   I don't believe it was power.  I think he advised

19   Craig Vanderburg -- he convinced Craig Vanderburg

20   that he's being properly advised by a whole bunch

21   of very intelligent people and, yeah, they --

22   Q.   And how was that an issue that impacted

23   Mirabilis?

24   A.   Well, it didn't impact -- I don't know how

25   it impacted Mirabilis, but I know it impacted the

1    PEO quite a bit.  He just decimated the entire

2    sales force.  You know, Presidion had a pretty

3    healthy sales division, and sales and customer

4    service.  They were referred to as FSRs; something

5    sales reps.  I'm not exactly sure.  I forgot --

6         Q.   Who were those people?

7         A.   I don't know.  It was 20-some-odd people.

8    I don't --

9         Q.   Can you name any of them?

10        A.   No.

11        Q.   Okay.  So Presidion had a sales force.

12        A.   Yeah, that had been doing pretty well.

13        Q.   That you thought was effective; correct?

14        A.   Correct.

15        Q.   And Frank Amodeo, it's your understanding,

16   advised Mr. Vanderburg to separate the sales force

17   from Presidion; correct?

18        A.   My understanding was that Frank was

19   advised by certain people -- and I don't know who

20   those certain people were -- at Mirabilis.

21        Q.   How did you come by that understanding?

22        A.   Because that's what Frank had told me.

23        Q.   So Frank told you that some people --

24        A.   What's so funny, Edie?

25        Q.   Frank told you that some people at

1     Mirabilis advised him to advise Craig Vanderburg to

2     separate the sales force from Presidion?

3          A.    Correct.

4          Q.    Correct?  And but Frank didn't tell you

5     who?

6          A.    He might have.  He probably did, but we're

7     going back five or six years, so I --

8          Q.    You don't remember who.

9          A.    -- I don't recall.

10         Q.    And how is Presidion related to Mirabilis

11    Ventures?

12         A.    Officially, I have no idea how to answer

13    that question.  Unofficially, Mirabilis was, you

14    know, helping this distressed company and took

15    ownership -- or took management of their PEO

16    division.

17         Q.    Did you resign in June of '06 because you

18    were unhappy with all the idiots?

19         A.    I was uncomfortable --

20              MS. VILMOS:  Object to the form.

21              THE WITNESS:  I was uncomfortable with the

22         situation.

23    BY MS. HAVENER:

24         Q.    Tell me exactly what you mean when you say

25    that you were uncomfortable with the situation.

1       A.      So in late '05 when the decision was made

2    to separate the sales force -- and forget my role.

3    My title was Interim CEO, but my real role --

4       Q.      Interim CEO of AEM; correct?

5       A.      Of AEM, correct.

6       Q.      Okay.

7       A.      But my day-to-day duties was sales.  My

8    goal was to help save this PEO by bringing on new

9    sales.

10      Q.      And when you say, "this PEO," you're still

11   talking about AEM.

12      A.      AEM, correct.

13      Q.      Okay.

14      A.      And when Frank made a decision to have a

15   national sales force and take these 20, 30-some-odd

16   people from Presidion as the working model and have

17   a national sales force and bring on this $5.3

18   billion of sales, I thought it was lunacy.  I tried

19   hard to talk him out of it.  I thought it was

20   completely ridiculous.

21      Q.      Tell me why.

22      A.      I just explained that to you.

23      Q.      No.  Why was it lunacy?

24      A.      Why was it lunacy?

25      Q.      Yes.

1     A.    Because if you combine the four or five

2   highest-grossing PEOs, they probably combined don't

3   have $5 billion of sales.  To organically grow with

4   $5 billion of sales would probably take twenty

5   years, but Frank thought it could be done in three

6   or four months.

7     Q.    And you tried to dissuade him from doing

8   it?

9     A.    I tried to dissuade him from doing it, and

10   I was partially successful.

11     Q.    Okay.  In what way were you successful?

12     A.    I was able to just keep a small skeleton

13   crew of four or five salespeople in the South

14   Florida office.  I made a deal with Frank, let me

15   just have Broward and Dade County; you take the

16   rest of the country.

17     Q.    Who were the people in that sales force in

18   South Florida?

19     A.    Maritza -- I forgot her last name.

20   Ophelia.  And there were one or two other

21   salespeople.  I don't recall their names.

22     Q.    And what do salespeople for a PEO do?

23     A.    They sell PEO services.

24     Q.    And they sell PEO services to what kind of

25   company?

1      A.    Any companies that have employees.

2      Q.    Okay.  When you made that deal to keep the

3   skeleton crew sales force in the South Florida

4   office, was that approved by the Mirabilis Board?

5      A.    I don't know.

6      Q.    Who gave you permission to do that?

7      A.    I don't recall anybody giving me

8   permission to do it, but Frank was okay with that.

9      Q.    So am I correct in understanding that it

10   was Frank Amodeo that you needed to convince to

11   keep your sales --

12      A.    Well, I believe that he needed the consent

13   of the Board, but that wasn't -- I never dealt with

14   the Board.

15      Q.    But you believe that you needed Mr.

16   Amodeo's approval to keep those employees in South

17   Florida; is that correct?

18      A.    I don't know if "approval" is the correct

19   word, but, yeah, I think -- I believe, as a

20   company, I believe that AEM needed approval of the

21   parent company, MVI.

22      Q.    Well, I think you just testified a minute

23   ago that you needed to convince -- that you tried

24   to convince Frank and you were successful.

25      A.    No.  I tried to convince Frank that the

1   idea of separating the sales force was lunacy.  It

2   was really ridiculous.

3        Q.   Okay.  And you were partially successful

4   in convincing Frank.

5        A.   To keep the skeleton crew.

6        Q.   To keep your skeleton crew.

7        A.   Correct.

8        Q.   So if someone else was in charge other

9   than Mr. Amodeo, why did you need to convince Mr.

10  Amodeo that what was going on was lunacy?

11       A.   I didn't have too much contact with many

12  other people aside from Frank at Mirabilis.

13       Q.   Why?

14       A.   Because I had lost respect for most of

15  them, to be quite honest, and I --

16       Q.   And had you not lost respect for Mr.

17  Amodeo, as well?

18       A.   Partially, yes.  I did.  But do you

19  understand though that -- do you -- I mean, am I

20  speaking logic to you?  Do you understand -- do you

21  know -- you probably don't know much about PEOs.

22  Do you realize how ridiculous it is to assert that

23  you're going to have $5.3 billion of sales?  Do you

24  realize how ridiculous it is that your client tried

25  to convince Frank that it was very feasible and

1    likely that he was going to have two clients,

2    Smithfield Hams for $550 million, and Dollar Tree

3    for $600 million in payroll?  Does that seem

4    likely?

5         Q.   And did you hear her say that to him?

6         A.   I don't recall.

7         Q.   So if you didn't, how do you know about

8    it?

9         A.   I may have been at a meeting where she was

10   saying it.  I just thought it was --

11        Q.   So do you or do you not remember hearing

12   Ms. Curry say that there were going to be

13   5-point-something billion in sales?

14        A.   I didn't have very many meetings with

15   Curry, so I don't recall her saying that.

16        Q.   So how do you know that it happened?

17        A.   Because I saw a pipeline sales report with

18   people who were responsible next to it.

19        Q.   And who prepared those?

20        A.   I have no idea.

21        Q.   What made you rely on them as solid

22   information?

23        A.   Because it came from the company.  It was

24   a pipeline report for --

25        Q.   And did everything that ever came from the

1    company turn out to be true?

2         A.   No, obviously not.

3         Q.   And so do you understand that -- what

4    you're sensing from me is frustration.  Do you

5    understand why that some of what you're saying

6    doesn't make sense to me?

7         A.   Uh-huh.

8              MS. VILMOS:   Object to the form.

9    BY MS. HAVENER:

10        Q.   Because sometimes what you see coming down

11   from the company in writing you're taking as gospel

12   and it's making you angry and it's causing you to

13   --

14        A.   I'm not taking it as gospel.  No, it

15   wasn't being taken as gospel.  It was just I saw a

16   report and I thought it was complete craziness.  I

17   told Frank that I would be impressed if they were

18   able to deliver one percent, one percent of that

19   5.3.  If you could bring on 53 million, I would be

20   elated.  One percent of the 5.3 billion.  They

21   never succeeded in that.

22        Q.   And who is "they"?

23        A.   The sales force and, you know.

24        Q.   So you got information from documentation

25   that was sent to you from the company; correct?

1    A.    It wasn't sent to me.  It was showed to

2  me.

3    Q.    Showed to you.  Who showed it to you?

4    A.    I think Bruce Walko or, possibly, Frank.

5    Q.    And you didn't know who prepared it.

6    A.    No.

7    Q.    You believed it to be true.

8    A.    No, I didn't believe it to be true.

9    Q.    Okay.

10    A.    I believed it to be lunacy.

11    Q.    And you tried to convince Mr. Amodeo that

12  it was lunacy.

13    A.    Uh-huh.

14    Q.    And you were successful to the extent that

15  you were allowed to keep a skeleton crew of sales

16  force in your South Florida office.

17    A.    In two counties.  How many counties are

18  there in the country?  15, 20,000 counties?  Yeah,

19  I kept two counties in the entire country.  Not in

20  the State of Florida; in the entire country.

21    Q.    Right.  Which means you were -- are you

22  suggesting to me that that's minimal success or

23  that's really good success?

24    A.    Extremely minimal success.  Extremely

25  minimal.  I mean, think about it.

1    Q.   And so you achieved minimal success in

2    convincing Mr. Amodeo to permit you to keep a

3    certain number of your -- what you consider to be

4    your skeleton sales crew in two counties in the

5    country?

6    A.   Correct.  Because he was being advised by

7    several dozen accountants and lawyers who were

8    saying the contrary.

9    Q.   Now, how do you know that Mr. Amodeo was

10   being advised by these people?

11   A.   Because I witnessed them advising him.

12   Q.   Mr. Amar, you just testified that you were

13   in very few meetings where my clients were present.

14   A.   Correct.

15   Q.   Okay.  In those meetings --

16   A.   I didn't say it was your clients.  Other

17   -- there were other accountants and attorneys aside

18   from your clients.

19   Q.   But, nevertheless, it was my client you

20   were angry with; correct?

21   A.   Correct.

22   Q.   And what I'm trying to get is for you to

23   tell me what the connection is between your not

24   knowing who was giving Mr. Amodeo bad advice and

25   your rage at my client.

1    A.   It was not rage.

2    Q.   Okay.  Your anger at my client.

3    A.   It was not rage.  No, rephrase that.  It

4  was definitely not -- it was not anger, it was not

5  rage.  It was just shock at the audacity of your

6  client.  I was --

7    Q.   You testified before that you were angry.

8    A.   I was angry when I saw the site.  I was

9  not angry at your clients.  I was just shocked at

10  the audacity.  I was angry when I actually saw the

11  Website, yes.

12    Q.   And you were angry because they were

13  selling an anti-fraud product.

14    A.   If they were selling an anti-fraud product

15  and there were these global experts in absolute

16  fraud protection, where was their expertise while

17  this fraud was going on?

18    Q.   What was Curry and Hailstones' connection

19  to the sales force at Presidion?

20    A.   Frank Hailstones was the control person of

21  the company, so he had some --

22    Q.   At Presidion?

23    A.   No, not at Presidion.  At AEM.  At AEM.

24    Q.   So tell me -- I don't understand the

25  connection.  I'm not getting it somehow.  It was

1    the sales force of Presidion that was being

2    separated.

3         A.    Correct.

4         Q.    And what was the connection to AEM?

5         A.    AEM was going to manage the book of

6    business and try to salvage some entity of the

7    company, try to salvage some revenues in the

8    company to keep the company afloat.

9              MS. VILMOS:  Ms. Havener, it's 11 o'clock.

10        Whenever you get a chance, if we could take a

11        break whenever it's a good stopping point for

12        you.

13             MS. HAVENER:  Okay.

14   BY MS. HAVENER:

15        Q.    Were Curry and/or Hailstones in charge of

16   the sales force at Presidion?

17        A.    Not to my knowledge.

18        Q.    Did Curry or Hailstones, to your

19   knowledge, have anything to do with the sales force

20   at Presidion?  Any connection to it?

21        A.    Aside from Ms. Curry marketing two very,

22   very, large clients, I believe there were carrots

23   being dangled in front of Frank.

24        Q.    What proof do you have that that happened?

25        A.    I saw the pipeline report and I was told

1    by Frank that Ms. Curry has the ability to bring

2    two very large clients.

3         Q.    And to what extent do you consider Frank

4    Amodeo's report to you reliable?

5         A.    At that time, I thought that they were

6    fairly reliable.  I mean, there was no reason that

7    he would lie to me.

8         Q.    Okay.  You've testified that you thought

9    he was crazy.

10        A.    Correct.

11        Q.    You thought he was manic-depressive.

12        A.    Uh-huh.

13        Q.    And, nevertheless, you believed everything

14   he said to you?

15        A.    No.

16        Q.    How did you pick and choose what you

17   believed and didn't believe?

18        A.    I -- if I saw something in writing and it

19   was presented to me by somebody other than Frank,

20   or even in the presence of Frank, I didn't believe

21   it, but I thought that it was accurately portraying

22   what the company expected.

23        Q.    Even if you didn't know who wrote it?

24        A.    No, I didn't --

25        Q.    Did you ever see documents that you

1    thought were inaccurate?

2        A.   No, I can't testify to the fact if they

3    were accurate or inaccurate.

4        Q.   You testified earlier that Frank did not

5    immediately tell you about his background.

6        A.   Correct.

7        Q.   At what point did Frank become a person

8    whose words you believed you could rely on?

9        A.   I never fully --

10       Q.   You said he had no reason to lie to you;

11   correct?

12       A.   Correct.  Correct.

13       Q.   So when?  I'm asking for a time.  At what

14   point did Mr. Amodeo go from being someone upon

15   whose word you could not rely because he didn't

16   tell you about his background to someone upon whom

17   you relied with some consistency?

18       A.   I don't know exactly at what point that

19   happened or at what point that didn't happen.  It

20   kind of --

21       Q.   But it did happen; correct?

22       A.   No, not completely.  It wasn't a complete

23   -- it wasn't a black or white situation, Kathleen.

24       Q.   Okay.

25            MS. HAVENER:  We'll take a break now.

1          (Thereupon a brief recess was taken, after

2      which the following proceedings were had:)

3          MS. HAVENER:  Nicolette, we're going back

4      on.  Aaron Bates has joined us.  So if you'll

5      make a record, Aaron, A-a-r-o-n, Bates,

6      B-a-t-e-s.

7          Are you here appearing as a party, Aaron,

8      or on behalf of Bates Mokwa?  Or do you want

9      to make an appearance, is what I'm asking.

10         MR. BATES:  No, I'm appearing as a party.

11         MS. HAVENER:  Okay.

12  BY MS. HAVENER:

13     Q.   Do you know that Dr. Pollack is a doctor?

14     A.   Yes.

15     Q.   Did you know at the time that these events

16  that we're discussing were happening that he was a

17  psychiatrist?

18     A.   Yes.

19     Q.   Did he ever say anything to you about Mr.

20  Amodeo's mental health?

21     A.   We've discussed it, yes.

22     Q.   During what time period did you discuss it

23  with Dr. Pollack?

24     A.   Probably late '05.  I don't recall exactly

25  and I don't recall the exact conversation, but we

1      did discuss it.

2          Q.   You can't remember what he told you?

3          A.   No.

4          Q.   No part of it?  Any --

5          A.   No.  He just acknowledged that Frank did

6      have some mental illnesses and that he was there

7      and -- kind of help keep an eye out for him.

8          Q.   But you didn't feel any need to resign at

9      that time?

10         A.   No, no.

11         Q.   When is the last time you spoke with Mr.

12     Sadrianna?

13         A.   Probably about a week ago.

14         Q.   And what was the context of that

15     conversation?

16         A.   Just asked him if he was being deposed by

17     Mr. Keller in the near future, because there were

18     some scheduling issues when I had spoken with Mr.

19     Keller's office last, and that was it.

20         Q.   Had he at that time been deposed by us?

21         A.   When did you depose him?  What date?

22         Q.   September 20 -- oh, no, it was the 24th.

23     It was a Friday, September 24th.

24         A.   I may have spoken to him for a couple

25     minutes after that.

1      Q.    Did you discuss the deposition at all?

2      A.    No.

3      Q.    Is it possible that it was Mr. Sadrianna

4   who told you about what was happening in

5   Scottsdale?

6      A.    No, it's not.

7      Q.    And why is that?

8      A.    Because I hadn't spoken to Mr. Sadrianna

9   from, I believe, February of '07 through the

10  pretrial mediation that we had in June.  I hadn't

11  spoken to him in three years.  A little bit over

12  three years.

13     Q.    So if Mr. Sadrianna remembers that he told

14  you about it, he would be lying?

15     A.    No, just -- I don't believe that he'd be

16  lying; just different recollections.  I don't

17  recall talking to him from the first quarter of '07

18  through June of --

19     Q.    Okay.  So please tell me now, I want to

20  move to the events -- oh, when was the -- just, I'm

21  sorry, one more question about that.

22         When was the last time you spoke to Mr. Bates?

23     A.    Mid September sometime probably.

24     Q.    And what was the context of that

25  conversation?

1     A.    He and I are good friends.  We just -- you

2  know.  Friendly conversation.

3     Q.    Okay.  Would you please tell me when was

4  the first time you heard anything about what was

5  going to be happening in Scottsdale.

6     A.    You asked that question already, Kathleen.

7  I believe it was about two weeks before the

8  conference.

9     Q.    And I think you testified that it was Mr.

10  Amodeo who told you; correct?

11     A.    Correct.

12     Q.    Do you remember what he said?

13     A.    No.  He just -- we spoke on the phone and

14  he told me, you're not going to believe this.  You

15  know?

16     Q.    And what did you say?

17     A.    I didn't say anything.  I said -- he just

18  said, look at the site, I went to the look at the

19  site, I called him back, and I was like, I don't

20  believe the audacity.

21     Q.    And then did you talk to him in advance

22  about your going out to Arizona?

23     A.    No, I had mentioned to him that first

24  conversation we had about it, or after I viewed the

25  Website, that I have got to see this to believe it.

1    Like I had to see it with my own eyes.  So I wasn't

2    really making any imminent plans to go, but I did

3    mention to him that, hey, I got to see this with my

4    own eyes.  The sheer audacity of your clients I had

5    to see with my eyes.  And I believe I likened -- I

6    believe in the conversation I had with him I

7    likened it to 30, 40 people in a room and somebody

8    dying of cardiac arrest and finding out a few days

9    later that two people in the room are global

10   experts in cardiology or heart surgeons, but they

11   didn't save that client.

12       So it's the same thing I felt about Edie Curry

13   and Frank Hailstones.  I'm like, if they're such

14   experts and if this patented software is so

15   successful, you know, why didn't they detect this

16   fraud?  How did they not detect this fraud?

17       See, the way I viewed it is very simple.

18   Either they were part of the problem with Mirabilis

19   or they were grossly negligent.  I don't see a

20   third solution.  I don't see -- what do you claim,

21   that your clients are just ignorant, were so

22   ignorant that, oh, they believed everything Frank

23   told them?  Is that what you're alleging?

24       Q.   It's not my job to answer questions.

25       A.   Okay.  I'm asking rhetorically, but I

1    don't need an answer.

2        Q.   I understand.  Did anybody else during the

3    time that -- I mean, during the time that you're

4    aware of that they were at Mirabilis, detect fraud?

5        A.   Detect fraud?

6        Q.   Did Paul Glover ever say, God, Yaniv, you

7    know, there's gross fraud going on and, you know,

8    we need to stop it?

9        A.   No, he told me there was gross negligence

10   going on.  Because he was -- a few times we had

11   conversations where he was extremely agitated and

12   -- you know.

13       Q.   Did Dan Myers ever say, oh, my God,

14   there's terrible things going on at Mirabilis?

15       A.   Not to me, no.  Not to me.  I don't know

16   --

17       Q.   But have you heard him saying it to

18   someone else?

19       A.   No.

20       Q.   Did Mr. Holtz ever say, oh, my God, you

21   know, there's terrible things going on here?

22       A.   No, no, no.  Holtz actually gave me

23   assurances that things were --

24       Q.   Did Mr. Sadrianna -- he's a CPA; right?

25       A.   Uh-huh.

1      Q.    He used to be an IRS agent; right?

2      A.    I don't know that.  I'd assume that.

3      Q.    And did Mr. Sadrianna ever say, oh, my

4  God, there's terrible things going on at Mirabilis?

5      A.    Not to me.  I don't know what they said to

6  other people.  Like I said, I was not there often

7  in '06.

8      Q.    So after you said, I've got to see this

9  with my own eyes, what happened next?

10     A.    Maybe a week or ten days go by.  I had

11 spoken with Matt and Aaron, and we were just kind

12 of laughing about it, to be quite honest.  I was

13 like -- I just -- really, I thought it was some

14 elaborate hoax.  And then when I realized it wasn't

15 a hoax, I was like, I think I'm going to fly out

16 and see this for myself.  I'm --

17     Q.    Okay.  Go ahead.

18     A.    Yeah, and it was three days before the

19 conference, I believe on the -- I sent you

20 everything on Expedia.  I think I booked it on the

21 11th.  I went for 27 hours, yeah.

22     Q.    And what did Matt and Aaron say to you

23 when you were laughing about it?

24     A.    No, they said that they were -- it wasn't

25 for sure, but they were planning on going just to

1    serve Mr. Hailstones and Ms. Curry.  They wanted to

2    make sure that they could serve Hailstones while he

3    was in town or in the country.  I had no idea what

4    they were serving them, what lawsuit.  I was not

5    party to that suit, nor did I care.

6         Q.   Did you have any understanding of any

7    plans before that to file suit -- for Mirabilis to

8    file suit against Ms. Curry or Mr. Hailstones?

9         A.   No, I just -- that was probably a few days

10   before the conference.

11        Q.   When Mr. Amodeo spoke to you about the

12   conference and said, can you believe this --

13        A.   Uh-huh.

14        Q.   I think that's what you testified to.

15        A.   Yeah.

16        Q.   Did he tell you that there was a lawsuit

17   being prepared?

18        A.   No, he told me that they were trying to

19   recover assets, but I don't recall him specifically

20   telling me that he was suing Edie or Frank.

21        Q.   What did he mean when he said they were

22   trying to recover assets?

23        A.   Exactly what it means -- what it says,

24   that there were a whole bunch of -- -

25        Q.   Who is "they"?

1       A.    Mirabilis.   Whatever remnant of Mirabilis

2   was left was trying to recover some assets and

3   retrieve whatever moneys they could.

4       Q.    At that stage, so September of '07, what

5   was your impression of who was left at Mirabilis?

6       A.    Not many people.   Not many people.   Frank,

7   Marty, a couple of attorneys and executive

8   assistants.

9       Q.    Who were the attorneys?

10      A.    Well, Aaron Bates and Matt Mokwa were two

11  of the attorneys, and there were a whole bunch of

12  outside law firms.   And --

13      Q.    Jodi Jaiman?

14      A.    Jodi Jaiman was there, Jay Stollenwerk.   I

15  believe Shane, also, but I don't know in what

16  capacity they were there.

17      Q.    So you spoke with Matt and Aaron about it

18  and what came out of that conversation?

19      A.    Exactly what I just said.   They were

20  tentatively thinking about going to make sure they

21  could sue -- serve notice to Frank Hailstones.

22      Q.    And did you say, I'm going to come too?

23      A.    I said, you know what, I -- no, I told

24  them before that, I go, I think I have to see this

25  with my own eyes.   I gotta go see this.

1    Q.    And they said they were going.

2    A.    They said they may go.  They weren't sure

3    yet.

4    Q.    Okay.

5    A.    They weren't sure yet.

6    Q.    So how did it come about that you knew

7    that you were going to be in Scottsdale at the same

8    time?

9    A.    I booked, I believe, the Thursday prior to

10   that Sunday flight.  Three or four days when I made

11   the final decision.

12   Q.    Okay.  So at this time did Mr. Bates and

13   Mr. Mokwa inform you about the lawsuit?

14   A.    They told me they were going to serve

15   Frank Hailstones.

16   Q.    With the lawsuit.

17   A.    With the lawsuit.

18   Q.    Did you ask what the lawsuit was about?

19   A.    No.

20   Q.    So at some point you learned that you were

21   all going to be in Scottsdale at the same time.

22   A.    Correct.

23   Q.    When was that?

24   A.    When I booked, I believe it was Thursday

25   night, I think I called him on Friday and asked him

1  if they were going.

2      Q.  You called them both?

3      A.  I called Matt, I believe, and he said that

4  he and Aaron were going to be there for a football

5  game on Saturday, Matt lives there, and then we'll

6  meet up on Sunday.

7      Q.  Okay.  And did you meet on Sunday?

8      A.  Yes.

9      Q.  And what was the context of your meeting

10  on Sunday?

11      A.  We went to a bar and watched a football

12  game.  We're friends.

13      Q.  Where was the bar?

14      A.  Somewhere in Scottsdale.

15      Q.  Where were you staying?

16      A.  I gave you the hotel reservation.  Some

17  hotel in Scottsdale.

18      Q.  And when you were at the bar, did you talk

19  about what was going to happen?

20      A.  I'm sure we talked about it, but I don't

21  recall any specifics.  We were just -- we are

22  friends, Kathleen.

23      Q.  I understand.  Were you discussing with

24  them -- did you ever discuss with them, oh, my God,

25  I can't believe the audacity of these people?

1      A.    Yes, yes, absolutely.

2      Q.    And did that happen at that Sunday

3  conversation?

4      A.    No.  At that point, I don't think we

5  discussed it.  I think I just kind of laughed at

6  it.  I just -- you know?  I don't recall any

7  specifics of that.

8      Q.    When I asked you a few minutes ago who was

9  still at Mirabilis and I asked you about Jodi and

10  Jay and Shane, and you said that Frank and Marty

11  and Aaron and Matt --

12      A.    And a couple of security guards.

13      Q.    Yes.

14      A.    I don't recall all the people.

15      Q.    Were you hanging around -- were you still

16  involved with Mirabilis at that time?

17      A.    I was not still involved with Mirabilis,

18  but I was hanging around occasionally, yeah.

19      Q.    What were you doing hanging around?

20      A.    I was just trying to stay close to the

21  information, because I was honestly quite -- I was

22  extremely scared.  And I don't scare easily,

23  Kathleen.

24      Q.    What were you scared of?

25      A.    I was scared of the investigation into the

1    largest 941 fraud in U.S. history.

2        Q.    When did you find out about that

3    investigation?

4        A.    I found out about that investigation in

5    early '07, January of '07, I believe.

6        Q.    And who told you about it?

7        A.    I believe it was Frank.

8        Q.    And so just let me make sure I heard this

9    correctly.  You were hanging around at Mirabilis

10   because you were afraid about the investigation?

11       A.    No, I wanted to stay close to the

12   information.

13       Q.    But you said you were afraid.

14       A.    Yes.

15       Q.    What were you afraid of?

16       A.    Consequences.

17       Q.    For yourself?

18       A.    For myself and for others.

19       Q.    What, specifically, were you afraid of?

20       A.    I've -- aside from a few traffic

21   infractions, I've never had an experience in

22   anything like this, so I just didn't know what to

23   expect.  But I -- you know, there was obviously a

24   concern that a company that I was involved with is

25   being investigated for one of the largest frauds in

 1    this country's history.

 2          Q.    With regard to Mirabilis, Mirabilis

 3    Ventures, or AEM or Nexia Strategy, identify for me

 4    any person of whom you are aware as you sit here

 5    today who had any criminal history of fraud.

 6          A.    The only one that I know of is Frank.

 7          Q.    When Mr. Amodeo told you about the

 8    investigation, do you remember what he said?

 9          A.    About which investigation?  Into --

10          Q.    Into the biggest 941 fraud in U.S.

11    history.

12          A.    No, I don't recall the words, but I recall

13    my reaction.  It was not a good one.

14          Q.    What was your reaction?

15          A.    I was visibly very upset.

16          Q.    Describe your reaction for me.

17          A.    How do I describe a reaction?  I was

18    upset.

19          Q.    Okay.

20          A.    I had a stomachache.  I had a headache.

21          Q.    Rumpelstiltskin was upset.

22          A.    Okay.

23          Q.    You know, were you jumping up and down --

24          A.    No, I wasn't jumping up and down.

25          Q.    -- were you throwing things out the

1    window?

2        A.    No.

3        Q.    I'm asking for a description.

4        A.    No.  I had a stomachache, a headache, and

5    I was like -- I just was not happy.

6        Q.    Were you angry?

7        A.    Yes, I was angry.

8        Q.    Who were you angry at?

9        A.    At Frank and at all his professionals that

10   he had hired to protect the company and --

11   including myself -- from this kind of craziness of

12   happening.  I suspected that there was an issue six

13   months prior to that.  That's why I had resigned.

14       Q.    So when you suspected there was an issue,

15   did you call the authorities?

16       A.    I did not.

17       Q.    Why?

18       A.    I didn't think it was my responsibility to

19   call the authorities.  But I did speak to the

20   professionals that I thought could help.

21       Q.    Who did you speak to?

22       A.    Richard Berman, Laurie Holtz.

23       Q.    When was that?

24       A.    Probably a week prior to my resignation in

25   June of '06.

         Q.    When you discussed it with Mr. Berman and

1

2   Mr. Holtz, do you know if there was any record of

3   that meeting?

4         A.    No.

5         Q.    Did anybody take notes?

6         A.    No.

7         Q.    Did you make notes of it yourself

8   afterwards?

9         A.    No, I did not have a stenographer present,

10  no.

11        Q.    That wasn't my question.  I'm not --

12        A.    No, I didn't --

13        Q.    I'm really not trying to be mocking.  I'm

14  just trying to figure out what happened.

15        A.    No, there were no notes.  There were no

16  notes taken.

17        Q.    Okay.  When Mr. Stanley took over, that

18  was after you; correct?

19        A.    That was -- I think he took control

20  officially in May or June as soon as he got

21  approved by the DBPR.

22        Q.    And so you transitioned -- did you begin

23  transitioning out at that time?

24        A.    No.  I actually resigned and left, I took

25  a trip to Israel, and while I was in Israel I got a

1   call from Mike Stanley and Laurie Andrea and --

2   three-hour conversation, and they -- they asked me

3   to stay on.  I refused.  And after three hours of

4   influencing and convincing I agreed to come back

5   after my two- or three-week vacation and help

6   transition --

7        Q.   As a consultant?

8        A.   As a consultant.

9        Q.   Did you tell Mr. Stanley or Miss -- is it

10  Ms., or Mr. Andrea?

11       A.   Mrs. Andrea.

12       Q.   Did you tell Mr. Stanley or Mrs. Andrea

13  about your concerns?

14       A.   Yes.

15       Q.   And what was their reaction?

16       A.   Their reaction -- well, I mean, I really

17  spoke to Mike Stanley about it.  And he -- he was,

18  I believe, a CPA by trade.  He had a lot of

19  experience in the human resource domain.  I think

20  he was named the Mirabilis HR domain -- President

21  of the HR domain.  And I was given some assurances

22  that things were going to be fiscally responsible

23  and --

24       Q.   Did he comment about the purported fraud

25  in the past?

1    A.    No, he didn't, but he did comment that he

2    believed that AEM's 941 status was in good

3    standing.

4    Q.    And did he tell you what gave him that

5    impression?

6    A.    I don't know.  Just the paper trail that

7    he --

8    Q.    So are you telling me that Mr. Stanley

9    wasn't concerned about the investigation?

10   A.    There was no investigation yet at that

11   time.

12   Q.    Oh, right.  Okay.  Sorry.  But you told

13   him about your concerns?

14   A.    Yeah, I was very vocal about my concerns.

15   Everybody knew my concerns.

16   Q.    And Mr. Stanley reassured you and said he

17   thought there were no concerns.

18   A.    He didn't give me any reassurances.  He

19   just told me he thought -- he just spoke to AEM.

20   He didn't speak to Mirabilis.  He just spoke to

21   AEM.  He believed at that time that AEM was in good

22   standing.

23   Q.    So when you found out about the

24   investigation, were you angry with Mr. Stanley?

25   A.    Very.

1     Q.   Did you vocalize that?

2     A.   Yes.

3     Q.   Okay.  Whose job did you think it was to

4  detect fraud at Mirabilis?

5     A.   Well, I thought it was -- you know, I was

6  very comforted -- I can only speak to myself.  I

7  don't know what the official duties were and what

8  the official jobs were, but when I see Laurie Holtz

9  being the dean of forensic accounting, he

10  practically invented the industry of forensic

11  accounting, when I see Frank Hailstones having his

12  anti-fraud Sarbanes-Oxley background, when I see

13  your attorney being, you know, a corporate

14  compliance --

15     Q.   Excuse me.  I don't have an attorney.

16     A.   Excuse me.  Your client, who is an

17  attorney and in charge of corporate compliance for

18  the company, I believed that things were going to

19  be done correctly.  So whose job did I think?  I

20  thought it was all their jobs.  I certainly didn't

21  believe it was Frank's job.

22     Q.   Did you think it was yours?

23     A.   To a certain extent, yes.

24     Q.   So you thought that you had failed as well

25  as everybody else.

1       A.   I never saw a financial statement, I never

2   saw a bank statement, I never transferred a single

3   penny out of any account.

4       Q.   Were you aware that it was Mr. Glover's

5   job to produce financial statements for 2005 in

6   2006?

7       A.   For the first couple of months in '06,

8   yes.  And then I believe that he was marginalized.

9   You know, he was put out to pasture.  I believe

10  that's how I was told.

11      Q.   Who told you that?

12      A.   He did.

13      Q.   Did you know that he was being asked --

14  that he was continually asked, where are the

15  financial statements?

16      A.   Right.  And he got audited financials, I

17  believe, for AEM, or for Mirabilis Ventures.  I

18  don't recall, but there were James Moore & Co --

19      Q.   Do you know when that was?

20      A.   Sometime in the second quarter, I believe,

21  of '06, if I recall correctly.  I don't have it in

22  front of me, but I did see that.  I did see the

23  audited financials.

24      Q.   Did James Moore find fraud?

25      A.   If the financials were audited, I believe

1    they didn't.

2         Q.   So does that lead you to conclude that

3    somebody was hiding fraud?

4         A.   Possibly.  Anybody -- I believe, Kathleen,

5    that anybody that conducts fraud trys to hide the

6    fraud.  But it's -- you know, how can they hide it

7    from 30, 40, 50 accountants and attorneys?  I just

8    -- I don't think any one person is that clever.  I

9    don't think Frank was that clever.

10        Q.   So you think somebody knew about it and

11   covered it up?

12        A.   Yes.

13        Q.   And who do you think that was?

14        A.   Well, I witnessed in -- sometime in '07, I

15   witnessed a video of a Board of Directors meeting

16   that was taken, I believe, April 18th of '06.

17        Q.   Yes.  And you sent that to me in

18   production.

19        A.   Correct.

20        Q.   Right.

21        A.   And they acknowledged -- I don't recall

22   the exact number, but they acknowledged at that

23   time an enormous, enormous tax debt.  And what I

24   recall from seeing that video is that Frank

25   Hailstones, the President of Mirabilis, member of

1    the Board of directors of Mirabilis -- your client

2    here, Edie Curry, was at that meeting --

3    acknowledged that there was an enormous, to the

4    tune of tens of millions, possibly over a hundred

5    million dollars of tax debt.  Oh, but that's a

6    Presidion issue.  Oh, we'll just wrap up the second

7    quarter.  It was already two weeks into the first

8    quarter -- into the second quarter, but it was

9    like, we'll just wrap it up and start fresh

10   July 1st.

11        Q.   Was Mr. Glover at that meeting?

12        A.   If I recall correctly, yes.

13        Q.   Does the fact that there is a problem

14   with, quote, payroll taxes acknowledged necessarily

15   mean that there's a fraud?

16        A.   If we're talking about a rounding error,

17   then no.  But we're talking about a sum that is so

18   huge.

19        Q.   When did you see that April 16th video?

20        A.   Sometime in early '07 I believe Frank gave

21   it to me.

22        Q.   Did you notify the DBPR?

23        A.   The DBPR?  No.

24        Q.   Did you notify the authorities?

25        A.   I did hand a copy to my attorney and asked

1    him if he wanted to share it with the authorities.

2         Q.   Did that happen?

3         A.   I believe so.

4         Q.   Did you know in early '07 that Mr. Amodeo

5    was already in negotiations with Mr. Gold?

6         A.   No.

7         Q.   Do you know that now?

8         A.   Yes.

9         Q.   How did you find out when Mr. Amodeo's

10   negotiations with Mr. Gold started?

11        A.   I don't recall exactly how I found out,

12   but I think I read somewhere on one of the Orlando

13   Sentinel articles that he was an informant.  I had

14   no knowledge of that.

15        Q.   And you also know he pled guilty to

16   committing the fraud.

17        A.   Yes.

18        Q.   So if you're aware that Mr. Amodeo

19   confessed to it, as that's one premise, and if you

20   believe that someone who's committing fraud

21   ordinarily tries to cover it up --

22        A.   Uh-huh.

23        Q.   -- then why is it that you're not angry at

24   Frank Amodeo for the fraud?

25        A.   I'm not saying that I'm not angry at Frank

1    Amodeo.  But I believe that he hired all these

2    professionals to protect him from himself.

3         Q.   And, nevertheless, he did it and confessed

4    to doing it --

5         A.   I don't believe he was that clever --

6         Q.   -- and he succeeded --

7         A.   I don't believe he was that clever to hide

8    it from the -- we're not talking one or two

9    professionals, Kathleen.  We're talking about 80,

10   90 accountants and attorneys, forensic accountants,

11   Sarbanes-Oxley experts.  Yeah, I don't believe he

12   was that clever.  I believe Frank was clever.  I

13   think he's a genius, really.  Personally, I do.  I

14   don't think any one person in the world is that

15   clever, Kathleen.  I really don't.

16        Q.   You didn't suspect it.

17        A.   Oh, I certainly suspected there was

18   something going on very early on.

19        Q.   But you didn't say anything?

20        A.   Of course, I said something.

21        Q.   What did you say?

22        A.   I believe I had a meeting with Laurie

23   Holtz in late March.  He was the only professional

24   that ever -- the only member of the Board that ever

25   came to the company -- to the Doral office.  He

 1    came down with Fernando Simo, who was -- had held a

 2    title at Mirabilis and --

 3         Q.   He was actually the President of

 4    Mirabilis.

 5         A.   He took over from Frank -- I thought Frank

 6    Hailstones was the President of Mirabilis.

 7         Q.   I think Fernando --

 8         A.   I thought he was COO, if I recall

 9    correctly.

10         Q.   Yes.  Right.  Okay.

11         A.   Right.  So he was head of operations.  He

12    wanted to come and see the operation.  Every new

13    person that was introduced to me, it was like -- it

14    was laughable.  Yes, I just need a couple of weeks

15    to get things installed, everything will be

16    fiscally responsibile.  And every time somebody new

17    was introduced, yeah, yeah, we're going to make

18    sure that everything is fiscally responsible.

19         So they came down to see the operation.  They

20    saw that I was running pretty much the same amount

21    of payroll that Presidion was running with -- I

22    believe they had nine offices and 240 internal

23    employees.  I had cut it down to one office and

24    like 70 employees, so just to show how grossly --

25         Q.   You were cut back?

1       A.    Yeah.  But I was still successful in

2   keeping the business operational.  And what I found

3   very funny was -- and I explained this to Fernando

4   Simo and Laurie Holtz -- I go, it's funny that they

5   had a -- Mirabilis, had a $5.3 billion sales

6   pipeline and the entire country to sell their

7   services in and I have four people in one little

8   office.  I think I was responsible for bringing on

9   $95 million of new sales in '06.  You know?  That's

10  noteworthy.

11      Q.    Yes.  And you were -- but you stayed on --

12  Mike Stanley and Ms. Andrea or Mrs. Andrea

13  convinced you to stay on as a consultant.

14      A.    Correct.

15      Q.    So did you consider yourself to be one of

16  the professionals who was supposed to be protecting

17  Frank from himself?

18      A.    No.  No.  I'm not a professional.

19      Q.    Okay.

20      A.    I don't hold any professional degrees.

21      Q.    So was your consultancy focused only on

22  sales?

23      A.    Only on sales?

24      Q.    Yes.  For what were you a consultant?

25      A.    Well, to keep the sales force intact.

1    And, also, Mike Stanley had no plans of moving down

2    to South Florida.  So he asked me to stay on board

3    because, you know, he had concerns that he was

4    going to not be able to earn the respect of all the

5    employees down there.  I believe that's how he

6    worded it to me.

7         Q.   When you resigned, what was your plan for

8    your next venture?

9         A.   I was going to take a little sabbatical

10   and enjoy the first year of marriage with my wife

11   and then find something else to do.  I wasn't

12   concerned.

13        Q.   How much were you paid when you were

14   employed as the President of AEM?

15        A.   It was -- it started out at $8,000 and it

16   moved up to $10,000 a month.

17        Q.   A month.

18        A.   Yeah.

19        Q.   Okay.  I want to finish what we were -- we

20   got sidetracked when we were speaking about

21   Scottsdale.

22         You had the meeting with Mr. Bates and Mr.

23   Mokwa on Sunday.  And what happened after that?

24        A.   After the meeting after the football game?

25        Q.   Yes.

1      A.   I think we had dinner, they went to their

2  hotel room, I went back to my hotel room, and we

3  reconvened the next day.

4      Q.   You were staying in separate hotels?

5      A.   Yes.

6      Q.   All three of you?

7      A.   I don't know where they were staying.  I

8  just --

9      Q.   Okay.  And what happened the next morning?

10     A.   The next morning, we met at -- I believe

11 it was the Renaissance, wherever the conference was

12 being held.  Matt and Aaron met with the process

13 server.

14     Q.   You weren't there?

15     A.   No, I was there, yeah.

16     Q.   Okay.

17     A.   But I had no -- I was not party to that

18 conversation.  And we --

19     Q.   What was the conversation at that meeting

20 with the process server?

21     A.   No, nothing.  Just they --

22     Q.   Well, it can't be nothing.

23     A.   No, no.  But they handed -- I don't know.

24 I mean, they handed him the lawsuit or whatever and

25 he said, okay, just he'll find them and serve them.

1    That was it.

2        Q.   Who said, go find them and serve them?

3        A.   No, not -- I didn't say go find.  I said I

4    think they -- I don't recall exactly the

5    conversation, but they said that they were going to

6    point out Edie Curry and Frank Hailstones.

7        Q.   Did somebody see Ms. Curry out the window?

8        A.   No.  Not to my -- no.

9        Q.   Did anybody show Mr. Zollars a picture of

10   either Ms. Curry or Mr. Hailstones?

11       A.   I don't recall them showing a picture.

12       Q.   Okay.  So then I presume after the meeting

13   you all walked out together from the casita where

14   you were meeting; is that right?

15       A.   What's a casita?

16       Q.   Well, the room where you were meeting.

17       A.   Yes.

18       Q.   And then just describe for me what

19   happened, please.

20       A.   We walked -- it's an outdoor hotel.  It's

21   not like an indoor hotel, so it's an outdoor hotel.

22   We walked out of the room where we -- I wasn't

23   staying there, but where we met.  And we were

24   probably, if I recall, I don't know, 60, 70 feet

25   away from the entrance of where the conference was

1    being held.  It was around 8:30 in the morning.

2    And Edie Curry and Frank Hailstones were in the

3    parking lot, the same parking lot we were at,

4    outside.  So they approached us.  And that was

5    interesting.  Edie Curry approached me and said,

6    "Is that Yaniv Amar?"  You know, she was being

7    rhetorical.  And she proceeded to hug me.  And I

8    pulled back and said, "This is not a social call."

9       Q.   Okay.  Can you please use the same tone of

10   voice and at the same pitch and volume --

11      A.   That Edie Curry used?

12      Q.   That you used.

13      A.   What do you mean?

14      Q.   When you pulled back and you said --

15      A.   "This is not a social call."

16      Q.   So it was in a normal tone of voice?

17      A.   A normal tone of voice.

18      Q.   Okay.  And then what?

19      A.   And then she said, "Well, what are you

20   doing here?"  And she goes -- and then she

21   proceeded to -- and then she was -- she acted very

22   defensive.  "If you're here about the lawsuit,

23   well, I can explain."  I was like, "I don't know

24   anything about this lawsuit."

25      Q.   How did Ms. Curry know anything about the

 1    lawsuit?  She hadn't been served yet.

 2         A.   I don't know.  I believe she might have

 3    read the article that just came out two days prior.

 4    There was a newspaper article that came out

 5    Saturday.

 6         Q.   Okay.  Do you know when the conference

 7    started?

 8         A.   I believe it started on the 14th,

 9    October 14th, if I recall correctly.  It's right

10    here.  I don't know.

11         Q.   Okay.

12         A.   Yeah, it started the 14th.  We met the

13    morning of the 15th.

14         Q.   And what did the article say about the

15    lawsuit?

16         A.   You read the article.  I don't recall.

17    It's just Mirabilis recovering assets, and there

18    was one paragraph about Edie Curry and Frank

19    Hailstones in there.  Do you want me to read it?  I

20    have it right there.

21         Q.   If you have it, just tell me what it said

22    about the lawsuit.

23         A.   "A suit against Palaxar Group LLC,

24    ex-Mirablils President Hailstones, and

25    ex-Secretary-Treasurer Edith Curry."

1      Q.    What's the date on that one?  Excuse me.

2  I didn't mean to interrupt you.

3      A.    October 13th, 2007.

4      Q.    Okay.  Go ahead.

5      A.    "Alleges the executives breached contracts

6  to Mirabilis and misappropriated trade secrets and

7  patents developed by the company before they left.

8  The suit said the former executives are marketing

9  an anti-fraud product that would deprive Mirabilis

10  of revenue.  Neither could be reached for comment."

11      Q.    But it doesn't say anything about them not

12  having detected fraud; right?

13      A.    No.  That's what it says.

14      Q.    And why would you think that Ms. Curry --

15  you know she lived in Richmond.

16      A.    Uh-huh.

17      Q.    And she had been in Scottsdale for the

18  weekend; correct?

19      A.    Uh-huh.

20      Q.    Why would you have thought that she would

21  have read the article?

22      A.    Oh, maybe somebody notified her of it,

23  maybe she checked Orlandosentinel.com, you know.  I

24  don't know.

25      Q.    Did somebody have the article with them at

1    that time?

2        A.   At that meeting on Monday morning?

3        Q.   Right.  Yes.

4        A.   Yes.

5        Q.   Who was that?

6        A.   I believe Matt Mokwa had a copy with him.

7        Q.   Okay.  And then what happened?

8        A.   What happened when?  After Edie --

9        Q.   After Edie -- you said she became

10   defensive.

11       A.   Yes.

12       Q.   What did you say next?

13       A.   I said, "Edie, I really" -- "I'm not here"

14   -- "I couldn't care less about this lawsuit."  She

15   goes, "Well, what are you doing here?"  So I

16   responded with a question of my own.  I said,

17   "Well, if you're such a global expert in anti-fraud

18   detection, where in the fuck was your expertise

19   while this fraud was going on?"

20       Q.   Was that the tone of voice you were using?

21       A.   Yes, yes.

22       Q.   Okay.  And who was standing around?  Who

23   was there?

24       A.   Aaron Bates, Matt Mokwa, the process

25   server.  I forgot his name, but Aaron Bates' nurse

124

1    was maybe 10, 15 feet away.  And that was it.

2         Q.   Not Mr. Hailstones?

3         A.   Oh, Mr. Hailstones, of course.  Mr.

4    Hailstones, yes.

5         Q.   And you didn't see anyone else?

6         A.   No.

7         Q.   Nowhere near.

8         A.   No.  There was some people at the entrance

9    of the conference, but that was not near where we

10   were.

11        Q.   When you say, "not near;" how far away?

12        A.   I didn't measure, but 60, 70 feet.

13        Q.   And were you shouting?

14        A.   No.

15        Q.   Okay.  Why in your Answers to

16   Interrogatories was it all written in capital

17   letters?

18        A.   That's how I write.  That's just --

19        Q.   Well, some of it wasn't.

20        A.   That's -- show it to me.  I mean, no, I

21   didn't insinuate that I was shouting because I

22   wrote in capital letters.  That's how I write.

23        Q.   Okay.  Do you remember what else you said

24   after -- you said, "Where the fuck was your

25   expertise when --"

1      A.    This $200 million fraud was going on.

2      Q.    Okay.  And did you say anything else?

3      A.    Well, Edie responded with a -- with a very

4  cynical smile, "Well, we'll just let Randy decide

5  about that."  I said, "Randy?"  I said, "Wow,

6  you're on first-name basis with the U.S. Attorney."

7  Okay.  I just found that interesting that she, you

8  know --

9      Q.    Why?

10     A.    Why?

11     Q.    Yes.

12     A.    No, I -- "We'll just let Randy decide."

13  That's not the answer I expected, you know.

14     Q.    Why were you surprised that she was on a

15  first-name basis with the U.S. Attorney?

16     A.    Because I referred to him as "Mr. Gold,"

17  you know, with some reverence.  So Edie Curry was

18  on a first-name basis with him, I thought, okay,

19  you know, that's interesting.

20     Q.    What did you think was interesting about

21  that?

22     A.    I just thought it was interesting.  I

23  didn't think anything other than, oh, wow,

24  interesting.

25     Q.    What did Mr. Mokwa say?

1    A.   Mr. Mokwa said something to the effect --

2  I think Edie said, "What is it in your hands?"

3  Something, you know, "What's the paper?"  She goes,

4  "Hey."  "It's the newspaper; the Orlando Sentinel.

5  Here.  You made the front page."  Something to that

6  effect.

7    Q.   And did he say anything else?

8    A.   Not to my recollection.

9    Q.   Did he say why they made the front page?

10    A.   No.  I don't recall.

11    Q.   When he said, "You made the front page,"

12  how did Ms. Curry respond?

13    A.   She goes, "Can I see that?"  She asked if

14  she could see it.  And she said, "Oh, we made the

15  front page.  Oh."

16    Q.   Had you gone at any time to the

17  presentation or to any part of the seminar?

18    A.   No.

19    Q.   Did you speak -- what happened immediately

20  after the confrontation?

21    A.   We walked away.

22    Q.   What did you say to each other, if

23  anything?

24    A.   I didn't say anything to Edie.  Her and I

25  didn't discuss anything.  And I just --

1    Q.   What did you say to Mr. Bates and Mr.

2    Mokwa?

3    A.   After we left?

4    Q.   Yes.

5    A.   Nothing.  We just --

6    Q.   Nothing?

7    A.   I mean, we said, what, you know, whatever.

8    It's done.  I don't know what we talked about.  We

9    just said, you know, wow, okay, that was easy.

10   Q.   Okay.  And what did they say to each

11   other?

12   A.   What did Matt Mokwa and Aaron Bates say to

13   each other?

14   Q.   Uh-huh.

15   A.   I don't recall.

16   Q.   Did you walk away in silence?

17   A.   No, I walked away.  I believe I was

18   chuckling a little bit.  I was just like -- once

19   again, I was just still amazed by the whole

20   audacity.

21   Q.   So you flew all the way to Scottsdale to

22   have this, you know --

23   A.   I didn't -- I flew there -- I flew to

24   Scottsdale to witness with my own eyes to see if

25   this was actually happening.

1    Q.   What?  She was walking around the parking

2  lot?

3    A.   No.  That she was the keynote speaker and

4  this global expert in anti-fraud detection, while

5  she or the company she was very involved with was

6  being investigated for a very large fraud.

7    Q.   That not only Ms. Curry didn't find, but

8  nobody else found either.

9    A.   I don't know.  I don't know who found

10  what.  I know that I suspected things fairly early

11  on.  And I'm --

12    Q.   But you didn't do anything about it.

13    A.   I resigned.  And I expressed my concerns

14  with the Board of Directors.

15    Q.   Did you express your concerns to the Board

16  of Directors with Ms. Curry present?

17    A.   No.

18    Q.   And even though you were --

19    A.   I had very little contact -- I explained

20  that to you, I had very little contact with Ms.

21  Curry during 2006.  We had one confrontation about

22  her trying to convince Frank Amodeo to move the PEO

23  processing center to Richmond, Virginia.  I thought

24  that was another one of her laughable moves.

25    Q.   Why?

1    A.   Because we just -- the company just spent

2    an enormous amount of time, energy, and suffered a

3    huge amount of client attrition for moving the

4    processing center from Jupiter, Florida, down to

5    Doral, Florida.  And two months after doing it,

6    somewhat successfully, Edie Curry is trying to

7    convince Frank to move the processing center to

8    Richmond, Virginia, to process payroll.  I just

9    found that interesting.

10    Q.   Well, I also want to go back to Scottsdale

11    for a second.  You flew all the way out to

12    Scottsdale because you said you wanted to see for

13    yourself --

14    A.   For myself.

15    Q.   -- that she was the keynote speaker, or

16    somebody was the keynote speaker, at this

17    presentation about anti-fraud.

18    A.   Yeah.

19    Q.   But you didn't go to see the speech.

20    A.   No.

21    Q.   You didn't go to see the presentation.

22    A.   I wasn't a member.  I wasn't invited to

23    the presentation.

24    Q.   And you weren't interested in what they

25    had to say?

1          A.    No.  I just wanted to see if they were

2      really actually -- if they really had the audacity

3      to show up.

4          Q.    Did you have any reason to believe that

5      they wouldn't?

6          A.    No.  I just --  it's one of those things

7      that I wanted to see for myself.

8          Q.    And -- okay.

9          A.    Is that so hard for you to believe,

10     Kathleen, that I had to -- I wanted to see this

11     with my own eyes?

12         Q.    I'm not here to answer questions.

13         A.    Yeah.

14             MS. HAVENER:  Would you please mark this

15         -- we only need to write it on mine.  She'll

16         mark one and -- oh, we only need one.  I

17         didn't realize -- I forgot I made a copy for

18         your counsels.  We'll start with 450.

19             (Thereupon a document was marked

20         Plaintiff's Exhibit 450 for Identification in

21         the proceeding.)

22     BY MS. HAVENER:

23         Q.    You're holding in your hand a copy of

24     what's been marked as 450.  Do you recognize this

25     as your resignation from Common Paymaster?

1    A.    Yes.

2    Q.    What did you mean when you said that --

3    oh.  Just would you read your last paragraph, the

4    third paragraph?

5    A.    "My employment in your company has been

6    professionally rewarding and I appreciate the

7    interest you have showed in my career since I have

8    joined the company.  I wish Common Paymaster

9    continued success."

10   Q.    And you copied it to?

11   A.    Marty Flynn, Laurie Holtz, Frank Amodeo.

12   Q.    And what did you mean by when you said it

13   had been professionally rewarding?

14   A.    It was just a polite way of handing in my

15   resignation.  I didn't really mean anything by it.

16   It wasn't necessarily that rewarding, but I just

17   wanted to be polite in my departure.

18         (Thereupon a document was marked

19      Plaintiff's Exhibit 451 for Identification in

20      the proceeding.)

21   BY MS. HAVENER:

22   Q.    I'm handing you what is marked as

23   Exhibit 451, Plaintiff's Exhibit 451.  And it's the

24   Minutes of a Special Meeting of the Board of

25   Directors of Mirabilis Ventures, LLC, held on

1    December 28th, 2006.

2         A.   Uh-huh.

3         Q.   Now, I think I asked you before, but I

4    just need to remind myself.  Were you ever on the

5    Board of Directors of Mirabilis?

6         A.   Like I told you, in early or mid '05 I may

7    have been, but --

8         Q.   And at some point you were a shareholder

9    in Mirabilis.

10        A.   Correct.

11        Q.   At any point were you aware of being the

12   sole shareholder at Mirabilis?

13        A.   Like I said, somebody tried to convince me

14   of that in early '07, but --

15        Q.   Are you aware of having been the only

16   shareholder who owned any voting shares in

17   Mirabilis?

18        A.   Once again, somebody tried to convince me

19   of that in early '07.

20        Q.   And I think you testified before that it

21   was never your impression that Mr. Amodeo had

22   control over Mirabilis Ventures.

23        A.   No, I didn't say that.

24        Q.   Well, what did you say?

25        A.   I said I didn't believe he ever had the

1    sole control over Mirabilis Ventures.

2        Q.   Oh, I remember what I wanted to ask you.

3    You were at the company in February of '06;

4    correct?

5        A.   Correct.

6        Q.   Were you a participant in the telephone

7    call that happened that was referred to as the

8    "all hands call" that occurred on February 28th,

9    2006?

10       A.   Refresh my memory.  I don't recall that

11   telephone call.

12       Q.   There was a conference call which Mr.

13   Amodeo asked everyone in the company to dial into,

14   and during that phone call he expressed very

15   extreme dissatisfaction, as I understand it, with

16   Ms. Curry.  Do you remember that?

17       A.   I don't remember it being on that call,

18   but I recall that -- something happening.  This was

19   in February of '06?

20       Q.   Yes.  On February 28th of '06.  You don't

21   remember being on the call?

22       A.   I don't recall being on that call.

23       Q.   Do you remember having any discussions

24   about that call?

25       A.   No.

1      Q.   Do you remember hearing about the call?

2      A.   I remember something, there was some kind

3  of a rift between them, but I didn't recall -- I

4  didn't think it was that early.  I thought it had

5  been after my departure.  I don't recall it being

6  in February or March of '06.

7      Q.   So you don't -- okay.  Thank you.

8           MS. HAVENER:  I'm sorry.  For those on the

9       phone, did I finish reading into the record

10      what this exhibit is?

11          MS. VILMOS:  The Board meeting minutes?

12          MS. HAVENER:  Yes.

13          MS. VILMOS:  Yes.  December 28th, 2006?

14          MS. HAVENER:  Correct.

15          MS. VILMOS:  Yes.

16  BY MS. HAVENER:

17      Q.   Do you know if you've ever seen this

18  document before?

19      A.   I have not.

20      Q.   And who signed it, please?

21      A.   Mark J. Bernet.

22      Q.   And who is that?

23      A.   I believe he replaced Richard Berman as

24  the corporate counsel for Mirabilis.

25      Q.   Did you ever know him?

1      A.    Yes.

2      Q.    How did you know him?

3      A.    He contacted me in early '07 introducing

4  himself as the new counsel at Mirabilis.

5      Q.    And what else did he say?

6      A.    What else did he say when?

7      Q.    When he contacted you in early '07.

8      A.    What did --

9      Q.    Why did he call you to introduce himself?

10  What was your connection with Mirabilis at the

11  time?

12      A.    I had no connection with Mirabilis aside

13  from consulting and --

14      Q.    So you were a consultant at the time?

15      A.    Correct.

16      Q.    Do you know why Mr. Mark Bernet called

17  you?

18      A.    No.  He had heard about me and wanted to

19  introduce himself to me.  And he did.

20      Q.    And you don't know why?

21      A.    No.  Just -- I don't know why.  I guess he

22  -- whatever remnant was left he wanted to speak

23  with and investigate the situation.

24      Q.    Okay.  If you'll take a look at these

25  minutes.

1     A.   Yes.

2     Q.   I'm just going to read into the record for

3 the benefit of the people on the phone.

4     A.   Which paragraph are you reading?

5     Q.   I'm starting at the third paragraph where

6 the bullet points -- with the "Mr. Bernet..."

7   "Mr. Bernet suggested the following agenda for

8 the meeting:

9    - A report from Mr. Walsh and Mr. Hailstones

10 concerning their conversation of December 22, 2006,

11 with Frank Amodeo, relating to the funding issues

12 of the Company."

13     A.   Uh-huh.

14     Q.   Okay.  Second:

15   "A discussion concerning a potential

16 $9 million tax credit held by AEM, Inc., and Marty

17 Flynn's request that a portion of that credit be

18 used to pay delinquent taxes owed by

19 SecureSolution."

20     A.   Uh-huh.

21     Q.   "A discussion concerning the issuance of

22 'target' letters by the United States Attorney to

23 Marty Flynn, Bob Palumbo, Bob Konicki, Dan Meiers

24 [sic] and Bob Curry.

25   " - A discussion concerning the status of the

1    sale of the PEO assets."

2        A.   Uh-huh.

3        Q.   And then at the bottom of the next

4    paragraph it says:  "Mr. Bernet reported that in

5    his conversation with Mike Stanley prior to the

6    Board's meeting, Stanley reported that he could not

7    value the companies."

8         Would you please read the next paragraph into

9    the record?

10        A.   "Holtz said that the PEO sales are another

11   example of the control that Frank Amodeo has over

12   MVI.  Holtz said that Mr. Amodeo has always had

13   control of MVI, but that he was to turn control of

14   MVI over to professional business managers and an

15   independent board of directors.  So far, this has

16   not happened, but the current Board needs to take

17   steps to assure that it occurs."

18        Q.   And the next page, the last paragraph on

19   the page.

20        A.   "Mr. Walsh then led a discussion

21   concerning the meeting last week involving Mr.

22   Walsh, Mr. Hailstones and Mr. Amodeo.  Mr. Walsh

23   stated that Mr. Amodeo agreed that after

24   December 31, 2006, MVI will control all of its bank

25   accounts, and that only MVI would be permitted to

1    commit MVI to any transactions.  Mr. Walsh told Mr.

2    Amodeo that MVI has a cash need of approximately

3    $17 million for 2007, in response to which Mr.

4    Amodeo suggested that Titanium would retain SimDag

5    until at least April 1, since most of its funding

6    needs would be fulfilled at that time."

7         Q.   Okay.  You can stop now.  Unless if you

8    want to continue, feel free.

9         A.   No, that's fine.

10        Q.   What's SimDag?

11        A.   I don't know.  One of the companies.  I've

12   heard that name before.

13        Q.   Okay.

14        A.   One of the Mirabilis-held entities.

15        Q.   And you said before that Mr. Bernet signed

16   this.

17        A.   That's what it shows here.

18        Q.   And he signed it as the Acting Secretary;

19   correct?

20        A.   Yeah.  I don't know that that's his

21   signature, but it says, "Mark J. Bernet, Acting

22   Secretary."

23        Q.   Okay.  Do you have any reason to suspect

24   that Mr. Bernet would sign something that was

25   false.

1      A.   No.

2      Q.   So does it make sense to you that these

3   are the correct minutes of that meeting?

4      A.   Yes.

5      Q.   And does that reflect in any way your

6   understanding of the way Mirabilis had worked up

7   until that point?

8      A.   This is the first time I'm reading this

9   document.

10      Q.   I understand.

11      A.   Yeah.

12      Q.   But we've had several conversations and

13   had several questions and answers about Mr.

14   Amodeo's control versus the Board's control.

15      A.   Yeah.  This --

16      Q.   Do you recall those?

17      A.   No, I don't recall, but this doesn't --

18   this, to me, doesn't reflect the way things

19   happened at Mirabilis.  This is dated December 28th

20   of 2006.  I think this was already when the

21   situation was about to implode and people were

22   trying to save --

23      Q.   Well, not only you were gone, but Ms.

24   Curry was gone too.

25      A.   I don't know when she resigned.  When did

1    she resign?

2        Q.   In October -- or actually she was told in

3    September that her -- that the Richmond base of

4    Nexia Strategy was no longer going to be funded and

5    her resignation was effective at the end of October

6    of 2006.

7        A.   Okay.

8        Q.   But beginning in September, they were

9    negotiating her departure.

10       A.   Uh-huh.

11       Q.   So you're not the only person who left.

12       A.   I was the first though.

13       Q.   Really?

14       A.   I'm proud to say that I believe I was the

15   first.  I don't know if anybody -- that's what I

16   believe.  I don't know if it's factual or not, but

17   that's, you know --

18       Q.   And when you resigned, were you taking a

19   stand?  Was that your understanding of what --

20       A.   Yes.  Because I resigned, I did not ask

21   for any of my severance pay that I was entitled to,

22   and I did not ask to hold on to my shares.  I

23   resigned and I relinquished all my shares known and

24   unknown to me, and I didn't demand my severance

25   pay.

1      Q.    Is there any reason why those stats are

2   not conveyed in your resignation letter?

3      A.    No, but they are conveyed in the Hold

4   Harmless Agreement that I was handed a week later.

5      Q.    Do you have a copy of that?

6      A.    I don't know if I have it here, but I do

7   have a copy of that.

8      Q.    Could you provide that to me, please?

9      A.    My Hold Harmless Agreement?

10     Q.    Yes.  At your earliest convenience.

11     A.    Yes, I suppose I can.  I didn't bring a

12   copy of it.

13     Q.    Are you aware of the terms of Ms. Curry's

14   separation?

15     A.    No.

16     Q.    Do you know if she gave up her shares?

17     A.    I have no idea.

18     Q.    Do you know if she ever owned any shares?

19     A.    I saw her at the shareholders meeting in

20   January so I presume that she was a shareholder,

21   but, no.

22     Q.    Do you know if any shares were ever issued

23   to Ms. Curry?

24     A.    No.

25     Q.    And you don't know the terms of her

1   separation.

2       A.   No.

3       Q.   Do you know if she accepted her severance?

4       A.   I have no idea, Kathleen.

5       Q.   Would that make any difference to you?

6       A.   No, none whatsoever.

7            MS. HAVENER:   Okay.   Would you please mark

8       this as the next in succession.

9            (Thereupon a document was marked

10      Plaintiff's Exhibit 452 for Identification in

11      the proceeding.)

12  BY MS. HAVENER:

13      Q.   Okay.   I'm showing you what's been marked

14  as Exhibit 452 in this deposition.

15      A.   Yes.

16      Q.   Do you recognize this document, Mr. Amar?

17      A.    Not offhand, but I don't -- if I did see

18  this, I haven't seen it in four-and-a-half years so

19  I don't recall it, but --

20      Q.   Okay.   As you know, when you get an e-mail

21  stream they don't start at the top, they start at

22  the bottom.

23      A.   Okay.

24      Q.   At the bottom of the first page --

25      A.   Yes.

1   Q. -- do you see that Mr. Vanderburg is

2 sending an e-mail to himself and to Tessah Ivey?

3 Do you --

4   A. No.  Isn't --

5   Q. At the bottom of the first page.

6   A. Oh.  Craig Vanderburg is sending it to

7 himself and to Tessah, yes.

8   Q. Do you agree with me that it was not

9 uncommon for Mr. Amodeo to use other people's

10 e-mail addresses to communicate?

11   A. Well, he had executive assistants that

12 communicated for him, yes.

13   Q. I understand.  And so when Ms. Ivey was

14 sending out an e-mail, it was not uncommon for

15 people to be communicating with her because they

16 wanted Mr. Amodeo to know something; correct?

17   A. That's my understanding.  I didn't

18 communicate via Tessah, but --

19   Q. Did you have Mr. Amodeo's e-mail?

20   A. I had his cellphone number.  I mostly

21 called him on his cellphone.

22   Q. So you don't remember communicating with

23 him via e-mail?

24   A. I'm sure we have on rare occasions, but I

25 really spoke to him on the cellphone.

1    Q.    Do you know if you ever communicated with

2    Ms. Ivey or Mr. Williams or --

3    A.    Yeah, I'm sure I have, yeah --

4    Q.    -- other people --

5    A.    -- and traced all the work, yes, I'm sure

6    I --

7    Q.    -- intending to get the message to Mr.

8    Amodeo?

9    A.    Yes.

10    Q.    Okay.  And in this e-mail, which is dated

11    February 1st, 2006 --

12    A.    Uh-huh.

13    Q.    -- Mr. Vanderburg is communicating with

14    Tessah and he says he wanted to follow up with

15    Frank on this.  "Yaviv--" which I presume refers to

16    you "-- is pushing to get this account/checkbook.

17    Thanks."

18    A.    Yes.

19    Q.    Do you remember what that's referring to?

20    A.    Yes.

21    Q.    Could you explain it to me?

22    A.    I actually didn't have any financial

23    control over the PEO, so every time we needed to

24    get something approved it would have to go through

25    the chain of command, the whole Mirabilis chain,

1    until it got accepted or approved by the -- some

2    form of subcommittee from the Board of Directors.

3    So I asked --

4         Q.   Even though you were AEM?

5         A.   Correct.  Well, AEM was --

6         Q.   A subsidiary, yes.

7         A.   -- a subsidiary of MVI.

8         Q.   Yes.  But it didn't have its own Board?

9         A.   No, it did not have its own Board.  But I

10   was pushing to get, what I referred to, WD-40

11   money.  I needed a few thousand dollars in a

12   standalone account where I could take care of

13   little things, whether it be marketing, but I

14   remember why I was pushing hard for it at this

15   time.

16        Q.   Can you tell me why you were asking Frank

17   and not the Board?

18        A.   I -- I didn't follow protocol.

19        Q.   Would you say that it was unusual for

20   people to ask Frank rather than the Board?

21        A.   I don't know what was usual or unusual.  I

22   just know that I didn't follow the protocol.

23        Q.   You didn't go through the Board to get

24   something you wanted from Mr. Amodeo?

25        A.   In this instance, I recall talking to

1    Frank Amodeo and Daniel Myers about it, saying that

2    I need a standalone account.

3        Q.    So you have given me the impression in

4    this deposition that you expected that the Board of

5    Directors should be overseeing what Mr. Amodeo was

6    doing.

7        A.    Uh-huh.

8        Q.    Nevertheless, you did not approach the

9    Board of Directors, or anybody on it; you went

10   directly to Mr. Amodeo.

11       A.    In this case --

12            MS. VILMOS:  Object to the form.

13            THE WITNESS:  In this case, I believe I

14        went to Daniel Myers and then it was escalated

15        to Frank Amodeo.

16   BY MS. HAVENER:

17       Q.    Okay.  Thank you.

18            MS. HAVENER:  This one has already been

19        marked as another exhibit.  It's already been

20        marked by one of the other court reporters, if

21        you understand what I'm saying, Edie.  One of

22        the other court reporters has the original

23        copy.

24            THE WITNESS:  Is that for me?

25   BY MS. HAVENER:

1      Q.   Yes.  This has already been marked as

2   Exhibit 412 in a different deposition.  If you

3   would just look through this series of e-mails,

4   please.

5           MS. HAVENER:  For those of you on the

6       phone, it starts with an e-mail of July 7th,

7       2006, from Claudia Amell to Dan Myers.

8           THE WITNESS:  Uh-huh.  Who is Claudia

9       Amell?

10  BY MS. HAVENER:

11     Q.   I have no idea.

12     A.   What was that?

13     Q.   Edie believes that she was Dan Myers'

14  assistant.

15     A.   Okay.

16     Q.   Okay.  If you'll turn to the back page,

17  please.  I'm showing you what is -- the back page

18  of this exhibit is Page 124 of Mr. Gold's cross

19  examination of Frank Amodeo.  I'm sorry, I don't

20  know what date it is.  I think it's May 14th of

21  2009.  It's part of the sentencing transcript.

22     A.   Okay.

23     Q.   And if you'll look at -- start at Line 8

24  --

25     A.   Uh-huh.

1      Q.    -- and go down to the end of the page.

2      A.    Okay.

3      Q.    The question is:

4      "All right.  And that is the minutes of

5  Mirabilis Ventures, Inc., dated February 15th,

6  2005, a Special Joint Meeting of the Directors and

7  Shareholders, is that correct?"

8      The answer is:  "That's correct."

9      And it's Mr. Amodeo who is answering the

10  questions.  I'm just explaining to you.

11      A.    I understand.

12      Q.    Question -- and on Page 2 it says:

13      "It's signed by you; is it not?

14      "A.  Yes, it is.

15      "Q.  It says Frank Amodeo is sole director and

16  shareholder?

17      "A.  Yes, it does.

18      "Q.  So --

19      "A.  We've been over this, Mr. Gold.  You know

20  I was only a proxy for Mr. Amar.  They didn't give

21  me the stock.  He held the stock because he didn't

22  get his money.  By the time he got his payments,

23  they didn't release the shares to me.  They didn't

24  want me involved.

25      "Q.  My question is, does that say you were

1     the sole director and shareholder?

2          "A.  It does say that."

3          Did I read that correctly?

4     A.   Yes.

5     Q.   What's your understanding of the situation

6     around February 15th, 2005, as to who owned the

7     shares in Mirabilis?

8     A.   My understanding was it was Frank that

9     owned the shares at that time.

10    Q.   Okay.  Would you turn to the

11    next-to-the-last page, please.

12    A.   Yes.

13    Q.   Have you ever seen this document before?

14    A.    If I have, it's been six-and-a-half years,

15    so, I mean --

16         MS. HAVENER:  For those of you on the

17         phone, this is the Revocable Proxy; as always,

18         unsigned.

19         MS. VILMOS:  Did you mark it as a new

20         exhibit number?

21         MS. HAVENER:  No.  It's part of a

22         composite exhibit.  I'm going to tell you --

23         MS. VILMOS:  Oh, 412?

24         MS. HAVENER:  Yes.  It's the

25         second-to-the-last page of 412.

1    BY MS. HAVENER:

2         Q.   Have you ever seen it?

3         A.   If I have, it's been six-and-a-half years,

4    so I --

5         Q.   Do you remember it being referred to

6    recently?

7         A.   No.

8         Q.   Did you ever sign an irrevocable proxy

9    with respect to shares in Mirabilis Ventures that

10   you recall?

11        A.   No.   This is unsigned.   And I assume if

12   there was a signed copy, you'd have it.   I don't

13   recall signing it, but I may have.

14        Q.   When Mr. Amodeo testified on the previous

15   page as we read into the record, was he telling the

16   truth?

17             MS. VILMOS:   Object to the form.

18   BY MS. HAVENER:

19        Q.   As you understand it.

20        A.   I don't know when this was dated and I

21   don't know if he was telling truth or not.

22        Q.   Well, the date is written in there

23   February 15th, 2005.   So it's as of that date.   He

24   testified, on the other hand, on May 14th, 2009,

25   but he's testifying about February 15th, 2005.

1      A.   I don't know what my impression is.   This

2  is the first time I've read this.   I don't know if

3  he was telling truth or not.

4      Q.   Well, he says he was a proxy for you.   Is

5  that right or not?

6      A.   Yeah, I'm not sure.   I'm not sure if it's

7  right or not.   I don't recall giving a proxy or

8  being the sole shareholder, but --

9      Q.   You don't recall ever being the sole

10  shareholder?

11      A.   I recall incorporating the company and

12  handing him, you know --

13      Q.   I'm sorry.   Excuse my coughing.   I didn't

14  hear what you said because I was coughing.

15      A.   I recall incorporating the company in

16  Nevada and handing Frank the company, the stock.

17      Q.   And -- that's interesting.   Do you

18  remember whether or not it was bearer stock?

19      A.   I recall something to that effect that it

20  was bearer stock.

21      Q.   And you handed the bearer stock to Mr.

22  Amodeo?

23      A.   I don't recall if there were actual

24  certificates or not, but I recall being explained

25  that bearer stock was whoever bears the stock owns

1    the stock.

2         Q.    Why did you hand the stock to Mr. Amodeo?

3         A.    Because there was never my intention to be

4    the owner of this company.

5         Q.    If you'll -- we're going backwards through

6    the exhibit.  The next is --

7         A.    The staple just came undone.

8         Q.    I'm sorry.  The next thing we're looking

9    at is at the bottom of what is the fourth page of

10   the exhibit, counting from the front.  So the third

11   to last.  And it's an e-mail from Yvette Ramos.  Do

12   you know who that is?

13        A.    Yvette Ramos?

14        Q.    Uh-huh.

15        A.    No.

16        Q.    To Claudia Amell.  And we've identified

17   Ms. Amell as Dan Myers' executive assistant.  And

18   Yvette Ramos appears to be -- this is an e-mail

19   dated Friday, July 7th, 2006, at 10:40 in the

20   morning.  And it says, "E-mailing Proxy."  And

21   apparently a document called "Proxy" was attached

22   to the e-mail.  Do you have any understanding of

23   what that is about?

24        A.    No.

25        Q.    And then the next is an e-mail from

1    Claudia Amell dated July 7th, 2006, at two minutes

2    later, and it's to Dan Myers.  Again, it says,

3    "E-mailing Proxy.  Is this what you're looking

4    for?"

5         The next one is Dan Myers, Friday, July 7th,

6    2006, e-mail at 11:25 to you.  Says:  "Subject:

7    E-mailing Proxy.  Here it is."

8         Do you recall that?

9         A.   From Dan Myers to me, "Here it is."  No, I

10   don't recall that, but --

11        Q.   And the next one is six minutes later,

12   Friday, July 7th, 2006, at 11:31 a.m., from you to

13   Richard Berman.  Subject is:  "E-mailing Proxy."

14   What's attached is a document called,

15   "proxydocpdf."  "Richard, here it is.  Let me know

16   if you need anything else.  Regards and good shava,

17   Yaniv."

18        A.   Yes.

19        Q.   Do you remember that at all?

20        A.   No, I don't recall this.

21        Q.   Do you even know what it's talking about?

22        A.   I'm going to assume that it has to do with

23   -- because he was drafting the Hold Harmless and

24   indemnification that I had requested after I

25   resigned, that he needed all the paperwork that led

1    to my employment and resignation.

2        Q.    So you didn't have the Hold Harmless

3    Agreement at the time that you resigned?

4        A.    No, no.  It was handed to me --

5        Q.    It was ex post facto.

6        A.    Yes.

7        Q.    Okay.

8        A.    What is ex post facto?  It's just after

9    the fact?

10       Q.    After the fact.

11       A.    After the fact.  It was probably two or

12   three weeks after, I received it.

13       Q.    Okay.  Now, the next one, for some reason,

14   is earlier.  It's Thursday, July 6th, at 6 o'clock

15   at night, 2006.  It's from Yaniv Amar to Dan Myers,

16   and the subject is, "Power of Attorney and -- well,

17   and "Proxy Control."  Do you know what you were

18   referencing with about twenty exclamation points

19   after it?

20       A.    Exclamation marks.

21       Q.    Do you remember what you were referencing

22   in that e-mail?

23       A.    I'd like to see the e-mail that Dan sent

24   me that I responded that way, but, no.

25       Q.    Well, I think that might be -- okay.

1    Well, I'm mistaken.  Dan Myers then e-mails a few

2    minutes later, or half an hour later, 6:44 p.m.,

3    the same date, July 6th, 2006.  He e-mails his own

4    executive assistant forwarding your e-mail, which

5    doesn't have a subject line.  So there's no

6    subject.  "Please help me find this.  Thanks."

7         A.   Uh-huh.

8         Q.   Presumably, that's referring to this Power

9    of Attorney and Proxy Control.  That would appear

10   correct; right?

11        A.   That's a fair presumption, yes.

12        Q.   And Claudia Amell then responds the next

13   morning at 9:12 to Dan Myers.  Again, the subject

14   is just, "Re," and it says, "For whom?"

15        A.   Uh-huh.

16        Q.   And Dan Myers responds five minutes later,

17   "Yaniv and Frank for control of Mirabilis.  Can't

18   you read my mind?"

19        Obviously -- well, obviously nothing.

20        Okay.  And then here's the e-mail again, your

21   July 6th, 6:14 in the evening --

22        A.   Why is it only the subject?  Where is the

23   rest of the text in that e-mail?  Did you have

24   that?  Or it was just --

25        Q.   No.  This was produced to us by Mirabilis.

1    It is what we got.

2         A.   Okay.  I would like to see where the

3    actual content of the e-mail went, but, okay.

4         Q.   You mean what you were referencing?

5         A.   I understand that I was probably

6    referencing, you know, part of the --

7         Q.   Something that --

8         A.   No, because Richard Berman had probably

9    asked me in order to correct -- and I will try to

10   get you a copy as soon as possible -- the

11   indemnification and Hold Harmless --

12        Q.   Okay.

13        A.   He asked to reference all the agreements

14   that were signed.

15        Q.   Okay.

16        A.   So I thought that Dan Myers or Procuri or

17   something had this beautiful document saving --

18        Q.   Pro --

19        A.   Procuri.  It was this document --

20        Q.   Oh, yes.  Okay.  A document management

21   system?

22        A.   Yeah, I believe it was Edie Curry's idea,

23   but --

24             MS. VILMOS:  Ms. Havener, I just wanted to

25        -- it's 12:20.  Were you planning on breaking

1          for lunch?  Or what's the plan?

2              MS. HAVENER:  Yes, I was going to stop at

3          12:30, if that's okay.

4              MS. VILMOS:  Okay.  That's fine.

5      BY MS. HAVENER:

6          Q.   And then apparently Ms. Amell asks

7      Ms. Ramos for it and she sends it, and then

8      Ms. Amell sends an e-mail to Mr. Myers and says,

9      "Is this what you were looking for?"

10          And you think that -- I'm just trying to get

11     this straight.  You believe that this is all in

12     association with your Hold Harmless Agreement and

13     the negotiations --

14         A.   And my resignation, yes.

15         Q.   Okay.  Thank you.

16             MS. HAVENER:  Would you mark this one as

17         the next in succession, please.  Am I correct,

18         it's 453?

19             (Thereupon a document was marked

20         Plaintiff's Exhibit 453 for Identification in

21         the proceeding.)

22     BY MS. HAVENER:

23         Q.   Mr. Amar, do you recognize this document?

24         A.   July of '05, five-and-a-half years ago, I

25     don't recall it, but I signed a lot of things six

1    years ago.  I do see my signature there.  That's

2    me.

3         Q.    And you signed as the Chairman of

4    Mirabilis Ventures; is that right?

5         A.    It appears to be, yes.

6         Q.    And do you recall that you were, in fact,

7    the Chairman of Mirabilis Ventures on the 6th day

8    of July 2005?

9         A.    No, I don't recall that, but I signed it.

10        Q.    Do you know why you would have signed it

11   if it wasn't correct?

12        A.    No, I don't think I knowingly signed it

13   incorrectly, but --

14        Q.    Is that your writing that says,

15   "Chairman"?

16        A.    It appears to be, yes.

17        Q.    Are you aware that in Mr. Amodeo's guilty

18   plea agreement he said that the fraud that he

19   perpetrated started in December of '04?

20             MS. VILMOS:  Object to the form.

21             MS. HAVENER:  I just asked him if he's

22        aware of that.

23             THE WITNESS:  No.

24   BY MS. HAVENER:

25        Q.    Were you ever on the Board of Directors of

1    Mirabilis?   You're signing as the Chairman.

2        A.   As Chairman.  I guess in '05 I may have

3    been, yeah.  I mean, you know --

4        Q.   But you don't recall it?

5        A.   I don't recall ever being in the boardroom

6    and having an executive board that responded to me.

7        Q.   Well, do you know why you would sign

8    something that way if it wasn't right?   And

9    actually write in, in your own handwriting, the

10   word "Chairman"?

11       A.   No, I don't know why I did that six years

12   ago.

13       Q.   And you don't -- excuse me.  If, in fact,

14   you were the Chairman of the Board of Directors,

15   wasn't it your job at that point to be overseeing

16   Frank Amodeo and watching out for fraud?

17       A.   At this point in time, I wasn't aware of

18   any business dealings that Mirabilis had in the PEO

19   world.  Presidion still managed its own book of

20   business at this time.

21       Q.   In '05?

22       A.   Yes.

23       Q.   Am I incorrect that that transfer happened

24   in the very beginning of '05?

25       A.   No.  There was a management contract or

1    some kind of a consulting contract.  But my

2    understanding was that the transfer happened in

3    late '05 with an effective date of December '06.

4    Or, excuse me, of January of '06.

5         Q.   Right.  But -- okay.  Well, but just to go

6    back to my point.  As the Chairman of the Board of

7    Mirabilis, did you or did you not consider it your

8    role to be overseeing what Frank Amodeo was doing?

9         A.   I didn't think I had the qualifications to

10   oversee what Frank was doing.

11        (Thereupon a document was marked

12        Plaintiff's Exhibit 454 for Identification in

13        the proceeding.)

14        MS. HAVENER:  For those of you on the

15        phone, these are the Minutes of Annual Meeting

16        of the Shareholders of Mirabilis Ventures,

17        Inc., dated January 25, 2006.

18        MS. VILMOS:  Is that 453?

19        MS. HAVENER:  454.  I'm sorry.  453 was --

20        and I didn't describe it.  I apologize.  It's

21        Document 198-2 filed in the case; Page 7 of

22        54.  It's an Assignment and Acceptance.

23        Assignor is Mirabilis Ventures, Assignee is

24        Laurie Andrea, and it's signed by Yaniv Amar

25        and handwritten in is written -- it, Mirabilis

1        Ventures, Inc., is the Assignor, and it says,

2        "Name:  Yaniv Amar.  Its:  Chairman."  And

3        it's handwritten.  That's 453.

4            454 is Document 198-1, the Minutes of the

5        Annual Meeting of the Shareholders of

6        Mirabilis Ventures, Inc.

7            MS. VILMOS:  Thank you.

8   BY MS. HAVENER:

9        Q.   This document says, am I correct, Mr.

10  Amar, that the meeting of the shareholders of

11  Mirabilis Ventures, Inc., convened at 4 p.m. on

12  January 25th, 2006?

13       A.   Uh-huh.

14       Q.   "Present at the meeting was Yaniv Amar,

15  sole Class A shareholder."  Do you see that?

16       A.   Yes.

17       Q.   What does that mean?

18       A.   I'm not sure.  I don't recall seeing this

19  agreement.

20       Q.   But do you know what it means, whether you

21  saw the agreement or not?  It's not an agreement,

22  first of all.  It's minutes.

23       A.   Minutes.

24       Q.   Do you know what it means, Class A

25  shareholder?

1     A.    Well, it's pretty literal.  I mean, that I

2  was a sole Class A shareholder.

3     Q.    What were Class A shares?

4     A.    I have no idea what Class A, B, or C

5  shares were.

6     Q.    And it says, "several Class B shareholder

7  candidates."  Do you remember who those were?

8     A.    No.

9     Q.    And when, again, was the meeting that you

10  said you attended that had 30 or 40 potential

11  shareholders?

12     A.    Right around this date.

13     Q.    Okay.  And so --

14     A.    And it wasn't several.  It was several

15  dozen, actually, that attended.

16     Q.    Well, although it says several, you

17  believe that there were several dozen people

18  present.

19     A.    I don't believe.  There were several dozen

20  people present.

21     Q.    Okay.  And who is Phil Kaprow?

22     A.    He was an attorney at Mirabilis.

23     Q.    And was that his job at Mirabilis?  Was he

24  counsel at Mirabilis, or did he have a different

25  job?

1      A.   I don't know what his role was.  I know he

2  was an attorney.

3      Q.   Okay.  Is there any reason why Mr. Kaprow

4  would have misrepresented the facts in the minutes?

5      A.   I can't speak to what Philip Kaprow did,

6  but I --

7           MS. VILMOS:  Object to the form.  Sorry.

8      Go ahead.

9           THE WITNESS:  But I certainly do not

10      recall ever seeing this document, and I never

11      -- I could tell you absolutely, would never

12      assign these people to a Board of Directors.

13      Never.

14  BY MS. HAVENER:

15      Q.   Well, but --

16      A.   And especially not in early '06 when I was

17  already appalled by what I was witnessing.  So --

18      Q.   Well, who did assign members to the Board

19  of Directors?

20      A.   I don't know, but it certainly was not me.

21      Q.   But you don't know who?

22      A.   No.

23      Q.   Wasn't it Mr. Amodeo?

24      A.   I -- that's probably, you know --

25           MS. VILMOS:  Object to the form.

1          THE WITNESS:  He might have had some --

2      yeah, something to do with it, I don't know if

3      he did or not, but I know it was not me.

4  BY MS. HAVENER:

5      Q.   Do you know of anyone else, other than Mr.

6  Amodeo, who had input into who went on the Board of

7  Directors?

8      A.   I think, you know, Richard Berman and

9  Laurie Holtz, because they were the Chairman and

10  corporate counsel.

11      Q.   Did you ever give the bearer stock to

12  anyone but Mr. Amodeo?

13      A.   No.

14      Q.   Are you aware of Mr. Amodeo's ever giving

15  it to anyone else?

16      A.   No.

17      Q.   Was it your understanding that Mr. Amodeo

18  was the only voting shareholder in Mirabilis?

19      A.   No, it was not my understanding.

20      Q.   Who did you believe had voting shares in

21  Mirabilis?

22      A.   I thought several of the members of the

23  Board of Directors had some voting shares.  I

24  really don't even know the difference between a

25  Class A or a Class B.  I told you, I referred to

1    these shares as toilet paper.  I really did.

2    Because I thought that, you know, they were

3    worthless.

4         MS. HAVENER:  Okay.  It's 12:30.  We have

5      one more document if you'll bear with me.  Is

6      that okay?  Hello?

7         MS. VILMOS:  Yes, that's fine.

8         MS. HAVENER:  If you'll mark that as the

9      next in succession.

10         (Thereupon a document was marked

11      Plaintiff's Exhibit 455 for Identification in

12      the proceeding.)

13   BY MS. HAVENER:

14      Q.   This is an e-mail from Dan Myers to Yaniv

15   Amar, dated Wednesday, November 2nd, 2005.  It's

16   produced by Mirabilis in this litigation.  Can you

17   please tell me what this is, Mr. Amar?

18      A.   This seems like a statement of net worth.

19      Q.   And keep looking.  And it's from whom to

20   whom?

21      A.   It's from Dan Myers to me.

22      Q.   And who is Dan Myers, at that time?

23      A.   In this capacity, he was my accountant.

24      Q.   But what's his title?

25      A.   I told you, I wasn't aware of his title at

1    Mirabilis.

2         Q.   It's right there written on this page.

3         A.   Oh.

4         Q.   Executive Vice President of Finance.

5         A.   Executive Vice President of Finance, yes.

6         Q.   Is that correct, to your understanding?

7         A.   Of which company?  I'm not sure.  It says

8    EVP of Finance, but it doesn't say which company.

9         Q.   Okay.  Whose phone number is that,

10   407-318-8000?

11        A.   I don't recall.  I don't recall what the

12   phone number was six years ago.

13        Q.   Okay.  Do you see the statement of net

14   worth?

15        A.   Yes.

16        Q.   And was one of your assets, Mirabilis

17   Ventures B stock, worth $4,750,000?

18        A.   That's what it says here.

19        Q.   That was toilet paper?

20        A.   Yeah, absolutely.  I don't recall seeing

21   this statement of net worth, and if I would have

22   seen it then or now I'd laugh at it.  'Cause it's

23   Mirabilis Ventures B, I guess that's referring to B

24   Class shares, and it 4.75 million.  How do they

25   base that?  I have no idea.  To me, it was

1    worthless.

2        Q.    So did you respond to Mr. Myers and say,

3    you know, what are you talking about?

4        A.    Quite possibly.  Six years ago, I don't

5    recall.

6        Q.    Can you produce that --

7        A.    My response to him?

8        Q.    -- your response?

9        A.    No, it probably was a verbal response.

10       Q.    You give -- or Mr. Myers lists your

11   occupation as business owner.  Do you see that on

12   the last page?  Oh, I'm sorry.  Attached to the

13   e-mail -- the e-mail was dated November 2nd, 2005.

14   The first attachment is a statement of net worth

15   with the same date listing -- of Yaniv Amar, I'm

16   sorry, listing assets, liabilities, and net worth.

17   And under "Other Assets" it lists, "Mirabilis

18   Ventures B" at a value of $4,750,000.  It says on

19   the next page it was prepared by Titanium

20   Consulting, which has a different address than Dan

21   Myers as Executive Vice President.

22       A.    Correction.  It says Dan Myers prepared

23   the tax returns.  Not this statement of net worth.

24       Q.    Well, but they're attached to the same

25   document, and Mr. Myers -- all of this was attached

1    --

2         A.    Oh, all of this was one attachment?

3         Q.    Yes.

4         A.    Okay.

5         Q.    And it lists your occupation as business

6    owner.  Could you tell me what business you owned

7    at the time?

8         A.    In 2004?

9         Q.    Uh-huh.

10        A.    I believe it was Primary Bookkeeping at

11   the time.

12        Q.    And is it correct that Primary Bookkeeping

13   had a $12,649.00 loss that year?  If you'll look at

14   -- well, there's no wages listed; correct; on this

15   2004 tax return --

16        A.    Uh-huh.

17        Q.    -- which is Mr. Amar's tax return.  And so

18   I'm presuming that the 12,649 is the net

19   operating loss of the business that you owned.

20        A.    Uh-huh.

21        Q.    Is that correct?

22        A.    It's fair to say that, yes.

23        Q.    Okay.  Do you know if Primary Bookkeeping

24   paid its 941 taxes?

25        A.    I do not recall.  I would ask Dan Myers or

1    Mr. McHenry.

2         Q.   But it was your company?

3         A.   It was one of the mechanisms to get paid

4    back from Frank.

5         Q.   But it was your company; correct?

6         A.   The ownership was mine for a short period

7    of time, yes.

8         Q.   And attached after the 2004 tax return is

9    your 2003 tax return; is that correct?

10        A.   Uh-huh.

11        Q.   And, again, it lists a "business owner" as

12   your occupation.

13        A.   Yes.

14        Q.   It lists $300,000 in wages, salaries, and

15   tips.  From where were those wages?

16        A.   In 2003?

17        Q.   Uh-huh.

18        A.   I really have to go back and look what

19   happened seven-and-a-half years ago.  I don't

20   recall.  I really --

21        Q.   And from what business was there a -- it

22   says rental real estate royalties, partnerships, S

23   corporations, trusts, et cetera, and it asks for a

24   Schedule E.  What was the business that lost

25   $335,018.00?  Do you recall?

1        A.    It was one of the companies associated

2    with the call center that I had in 2000, 2001, I

3    believe, but I don't recall the company.

4        Q.    Was it Professional Sales Force, Inc.?

5        A.    That's what it says.

6        Q.    And tell me again, what was Professional

7    Sales Force, Inc.?

8        A.    Professional Sales Force, Inc., was a

9    company that was supposed to bring in some nurse

10   staffing to the U.S.

11       Q.    And did it have anything to do with Mr.

12   Amodeo?

13       A.    Not initially, but, yes, he got involved.

14       Q.    And how did that happen?

15       A.    I don't recall exactly what happened seven

16   years ago, Kathleen, but I ran into some issues

17   with trying to bring in Indian and Filipino nurses

18   into the country.

19       Q.    You were associated with it first; is that

20   right?

21       A.    I don't recall.  I really don't recall

22   from seven years ago.

23       Q.    But did you say that this was one of the

24   companies that you were involved with as a means of

25   trying to get your payment back from your loan?

1      A.   Yeah.   There were a few of them.   You just

2   refreshed my memory.   I haven't even heard that

3   name in a long time, but, yes.

4      Q.   But you don't remember if you were

5   associated first or Mr. Amodeo?

6      A.   No.

7      Q.   Okay.   And then also attached to this is

8   an IRS e-file from 2005.   Do you recognize this,

9   Mr. Amar?

10      A.   I don't believe I have that.

11      Q.   Oh, you don't have it in your --

12      A.   I don't think so.   An e-file from '05?

13      Q.   Okay.   Do you have your tax return from

14   '05?

15      A.   No.   Just '03 and '04.

16      Q.   Okay.   We can skip that for now.

17           MS. HAVENER:   We're going to go off the

18      record now and take a break.   It's 20 till

19      1:00 right now.   We'll come back at 20 to

20      2:00.   Or let's make it 1:30.

21           (Thereupon a lunch recess was taken, after

22      which the following proceedings were had:)

23           MS. HAVENER:   Would you mark this as the

24      next in succession, please.

25

172

 1            (Thereupon a document was marked

 2        Plaintiff's Exhibit 456 for Identification in

 3        the proceeding.)

 4   BY MS. HAVENER:

 5        Q.   Mr. Amar, I've handed you what's been

 6   marked as 456 in this deposition, Mr. Amar.  First

 7   of all, if you'd just look it over.  I'm confused

 8   about the initial -- about the e-mail, because the

 9   e-mail is dated December 30th, 2004, but it

10   references a fax that it says is dated 12/28/07.

11   However, the fax is actually dated 12/28/04.

12        A.   Okay.

13        Q.   Do you remember anything about this

14   document?

15        A.   No.

16        Q.   What was Mr. Myers' role at Primary

17   Bookkeeping?

18        A.   A CPA, I believe.

19        Q.   Was he an officer of Primary Bookkeeping?

20        A.   Not to my recollection.

21        Q.   Was he an employee associated with the

22   company?

23        A.   I don't recall.

24        Q.   Was he at Titanium Consulting?  Do you

25   remember that?

1     A.   I believe he was involved in that company,

2   yes.  That's his company.

3     Q.   And it's Titanium Consulting.  Was that

4   Data Services?

5     A.   No.

6     Q.   Was that ever called Data Services?

7     A.   Not that I know of.

8     Q.   Okay.  Did it ever have any other name?

9     A.   Not that I know of.

10    Q.   And do you know who M. Berkowitz is?

11    A.   Ms. Berkowitz?

12    Q.   Do you think that the "M" stands for

13  "Ms."?

14    A.   I believe so, yeah.  Ms. Berkowitz, yeah.

15    Q.   Oh, Ms. Berkowitz.

16    A.   Yeah, Ms. Berkowitz.

17    Q.   And the fax says:  "Ms. Berkowitz, I hope

18  you had a happy holiday season.  I can't find a

19  record of sending you the 941C for 9/30/03, the 941

20  for 12/31/03, or the 1120S for 2003.  Additionally,

21  attached is a letter with specific language from

22  Mr. Amodeo.  The original check I have is for the

23  incorrect amount.  I made a mathematical error.  A

24  new check should be waiting for me today (which I

25  will confirm this morning).  Please let me know if

1    you have any questions.  Dan Myers."

2        Do you remember anything about this event?

3        A.   No.  What was the attachment to this

4    e-mail?

5        Q.   This fax.

6        A.   The fax and the actual copy of the check?

7        Q.   Yes.  And the letter that's on the back of

8    the page.

9        A.   Okay.

10       Q.   Do you see the letter as well?

11       A.   I see the letter, yes.

12       Q.   And the letter is dated December 28th,

13   2004; Re:  Primary Bookkeeping.  It's addressed to

14   Ms. Berkowitz at the Internal Revenue Service.

15       "Dear Ms. Berkowitz, Mr. Amodeo has asked his

16   commercial accounting firm to review the following

17   language in order to insure it meets the objectives

18   of resolving 'trust fund' liability and

19   non-impairing collection action against other

20   responsible parties for contribution if needed.

21       "The firm reviewing language is Rachlin, Cohen

22   & Holtz LLP; in particular, the principal assigned

23   to Mr. Amodeo's tax matters:  Jose Marrero.  Mr.

24   Marrero will return from a personal leave on

25   12/29/04.  It is our belief this matter can be

1    resolved on 1/3/04."

2        And then the language she refers to is:

3    "Frank Amodeo tenders to Internal Revenue Service

4    the amount of $253,362.71, which constitutes the

5    'so-called' trust fund liability related to

6    employment taxes that Primary Bookkeeping, Inc.,

7    was supposed to, but did not collect, during 2003.

8    This amount is payment-in-full, but does not impair

9    Amodeo's rights of contribution against other

10   persons.  Further, Service in cooperation with

11   Primary Bookkeeping, Inc., shall attempt to collect

12   obligations owed to Primary Bookkeeping, Inc.  Any

13   excess over remaining PBI tax liabilities shall be

14   remitted to Amodeo.

15       "If you have any questions, please do not

16   hesitate to contact me.

17       "Sincerely, Dan Myers."

18       And then there's a check attached to it for

19   $253,362.71.  Do you remember anything about this?

20   A.   No.

21   Q.   Do you know whose signature this is on the

22   check?

23   A.   No.

24   Q.   Oh, I'm sorry.  Its a Cashier's Check.

25   That was my mistake.  Whose handwriting is on the

1    check?

2        A.    It's not mine.

3        Q.    Do you see it says Frank Amodeo is the

4    purchaser?

5        A.    Yes.

6        Q.    And it's made out to the Internal Revenue

7    Service; correct?

8        A.    Yes.

9        Q.    And you don't remember anything about this

10    transaction?

11        A.    No.

12        Q.    Did you not tell me that you were

13    President of Primary Bookkeeping at the end of '04?

14        A.    Yes.

15        Q.    So why is it that you didn't know anything

16    about this transaction although you were the

17    President?

18        A.    I don't know.  I can't answer that

19    question, Kathleen.  I don't recall.

20        Q.    And I think just before the break you said

21    that you couldn't recall if there were ever any 941

22    taxes that were not paid by Primary Bookkeeping.

23        A.    Correct.

24        Q.    So do you understand from this that this

25    was making up for past nonpayment?

1    A.    For that year.

2    Q.    Yes.

3    A.    Right.

4    Q.    How many executives were at Primary

5  Bookkeeping in 2004?

6    A.    I don't recall.

7    Q.    Were there more than one?

8    A.    I really -- I really have very little

9  recollection about that.  Whether you asked me if

10  Dan Myers was an executive or Frank or just --

11    Q.    Were there five?  Were there ten?  Were

12  there a hundred?

13    A.    No.

14    Q.    You have no idea?

15    A.    No idea.

16    Q.    No idea at all?

17    A.    No.

18    Q.    Okay.

19         (Thereupon a document was marked

20         Plaintiff's Exhibit 457 for Identification in

21         the proceeding.)

22  BY MS. HAVENER:

23    Q.    This is marked 457 in this deposition.

24  It's a fax cover page showing that the faxes were

25  received, and it's from Laurie -- I'm sorry, Mr.

1    Berman to Laurie Holtz, dated January 25th, 2005.

2    The "Re" line says, "Frank Amodeo/General Matters."

3    Attached to it is a memorandum.  Do you see that?

4         A.   Yes.

5         Q.   And the memorandum purports to be from

6    Frank Amodeo to Richard Berman.  Do you see that?

7         A.   Yes.

8         Q.   And this says:  "This memo is meant to

9    clarify the ownership of certain companies within

10   my influence.  Also to provide a guideline to how

11   the ownership will change and a baseline for future

12   acquisitions."  It lists Frank L. Amodeo, 100% of

13   AQMI Strategy Corporation, which is a C-Corp.  Does

14   comport with your understanding?

15        A.   No.  But, I mean, I can read that.

16        Q.   100% of Wellington Capital Group, Inc., as

17   a C Corp.  Does that comport with your

18   understanding?

19        A.   That's what it says.  I, you know --

20        Q.   But do you know who owns AQMI Strategy or

21   Wellington?

22        A.   I knew Frank did, but I thought there were

23   some other owners.

24        Q.   Okay.  100% of Mirabilis Ventures, Inc.,

25   as a C Corp.  Does that comport with your

1  understanding?

2       A.   It did up until you showed me these

3  proxies that I supposedly signed that I owned it.

4  But, yes.

5       Q.   10% of Quantum Delta Enterprises, a

6  C Corp.  Did you have any understanding about that

7  company?

8       A.   No.

9       Q.   2%; 3,000,000 shares of Presidion

10 Corporation; did you have any understanding about

11 that?

12      A.   No.

13      Q.   And 50% of FYI Enterprises, Inc.  Does

14 that comport with your understanding?

15      A.   No.

16      Q.   And am I correct that you testified

17 earlier that it was your belief that you alone

18 owned FYI Enterprises, Inc.?

19      A.   Yes.

20      Q.   And what was your investment in FYI that

21 led you to that belief?

22      A.   I did not make an investment in FYI.

23      Q.   You started the company?

24      A.   Yes.

25      Q.   And what was FYI intended to do?

1        A.    Acquire a piece of real estate in Naples.

2        Q.    Yes.  I'm sorry.  I forgot.  But so -- I'm

3    sorry.  I'm going to go down to -- did I miss it

4    somehow -- FYI Enterprises, Inc., on the next page.

5    Do you see that?

6        A.    Yes.

7        Q.    "FYI Enterprises, Inc., is my

8    'partnership' with Yaniv Amar and does not have any

9    current projects or significant assets."

10        Was that untrue?

11        A.    He was not a partner in the company, but

12    we were going to do a profit share if we were going

13    to make money on that deal in Naples.

14        Q.    So at this point he did not own 50%.

15        A.    No.

16        Q.    Do you have any understanding as to why

17    Mr. Amodeo would make that representation to Mr.

18    Berman?

19        A.    No.  I have no idea why he made any of

20    these representations, and it obviously contradicts

21    with some things that you showed me evidence to the

22    contrary, so --

23        Q.    Right.  Thank you.  This has already been

24    introduced.  I'm showing you what's been marked as

25    Exhibit 413.  It's an e-mail from Dan Myers to

1    Shane Williams dated May 8th, 2006, at 11:43 a.m.,

2    saying, "Funding for AEM and FYI."  And it says,

3    "Shane, can you check with Frank on funding in the

4    amount of $20,000 for the AEM standalone account

5    and $1,080,000 for the FYI account?"

6        Do you have any recollection about those

7    transactions?

8        A.    The 20,000, yes.  And the -- for AEM

9    standalone account.  And the FYI account, we were

10   supposed to make an investment.

11       Q.    But do you recall that money being

12   transferred into the FYI account or receiving those

13   funds in any way?

14       A.    No.

15       Q.    If you'll look on the -- so if Jim

16   Sadrianna testified to having transferred that

17   money, and we have bank statements also that show

18   that transaction, are they just mistaken?

19       A.    No, I don't know that they're mistaken.  I

20   need to review everything for the last five, six

21   years of my life and try to pinpoint this.

22       Q.    Well, a million dollar transaction is

23   something you would forget about?

24       A.    No, no.

25       Q.    But you don't recall this one.

1        A.   I do recall something to that effect.   I

2   don't recall the exact circumstances.

3        Q.   Okay.  But do you know what happened to

4   that million dollars?  $1,080,000?

5        A.   It was invested in a project.

6        Q.   So you do recall getting a million

7   dollars.

8        A.   I don't -- I don't recall the transfer of

9   the million eighty.

10       Q.   Oh.  What was the million eighty -- why

11  was it transferred to FYI Enterprises?

12       A.   For an investment.

13       Q.   And what was it invested in?

14       A.   In a piece of property.

15       Q.   Where was that?

16       A.   In Louisiana.

17       Q.   And who owns it now?

18       A.   It's a bankrupt entity.

19       Q.   Who owns the property?

20       A.   I am not sure.  I couldn't make the cash

21  call, so I kind of haven't been involved in the

22  last four years.

23       Q.   How was it transferred from FYI

24  Enterprises to another entity?

25       A.   I don't know if I wrote a check or if I

1    wired the funds.

2         Q.    No, I'm trying to figure out how -- you,

3    at some point, invested in it; correct?

4         A.    Correct.

5         Q.    But did that mean that you owned the

6    property or just a portion of it?

7         A.    A tiny little portion of it.

8         Q.    And am I understanding that you simply

9    lost your investment?

10        A.    Yes.

11        Q.    You don't know the name of the bankrupt

12   entity?  Do you know the name of the bankrupt

13   entity?

14        A.    Market Street Properties.

15        Q.    Do you know who owns it?

16        A.    No.

17        Q.    Was it associated with Lou Pearlman, to

18   your knowledge?

19        A.    No.

20        Q.    Do you know anybody that was associated

21   with it?

22        A.    No.

23        Q.    Can you name any person, any human being

24   that was associated with Market Street Properties?

25        A.    There was -- the gentleman who told me

1    about it was Elie Mimoun.

2        Q.    Can you spell that for me?

3        A.    M-i-m-o-u-n.

4        Q.    M-i-m-o-u-n.  And Elie is E-l-i-e?

5        A.    I believe so, yeah.  Or E-l-i.

6        Q.    And what about this -- you told me earlier

7    that this standalone account was for if you needed

8    to make small purchases for AEM.

9        A.    Yes.

10       Q.    So what was the $20,000 spent for?

11       A.    The first transaction was to pay for a

12   prosthetic limb for one of the employees.  The rest

13   of the money was spent on some marketing, some

14   lunch.  And I don't recall the --

15       Q.    How much was the prosthetic limb?

16       A.    I think it was $16,000, but I was able to

17   negotiate and just get a premium of like 2 or

18   3,000, if I recall correctly.

19       Q.    Okay.  And who was the person?

20       A.    One of the employees in the company and,

21   unfortunately, I don't recall her name, but really

22   nice girl.

23       Q.    Had she been injured in an accident?

24       A.    I don't know.  I think she was born with a

25   malady of some sort.

1    Q.   Do you know where the $1,080,000 that was

2    transferred into the FYI account came from?

3    A.   No.

4    Q.   Would it surprise you to know that it was

5    unpaid payroll taxes?

6    A.   It would surprise me to know that.

7    Q.   And why is that?

8    A.   Because I obviously would not have taken

9    it if it was unpaid payroll taxes.

10   Q.   If you'll look back at that transaction,

11   the transfer into FYI Enterprises, it took place on

12   5/15/2006; correct?

13   A.   I thought it was sooner than that.  I

14   thought it was earlier than that, but that's what

15   it says there.

16   Q.   And that was immediately before you

17   resigned; correct?

18   A.   I recall it being sooner than that.

19   Q.   But you think -- so do you think this is

20   wrong?

21   A.   No, I just -- I can't -- I can't know for

22   sure if it is or not.  I'd like to see the

23   statements, but --

24   Q.   Excuse me for just a second.

25   Earlier in the day you testified that you had some

1    suspicion about -- some suspicions -- correct me if

2    I'm misspeaking, about -- in early '06 --

3         A.    Uh-huh.

4         Q.    -- in January of '06, about the funding of

5    Mirabilis; correct?  And you believed that there

6    was --

7         A.    I became suspicious in June right before

8    my resignation.

9         Q.    Oh, not in January.

10        A.    No, I had some concerns as to how the

11   company was generating its revenues because it was

12   spending, you know, 10 million a month, but --

13        Q.    So your concerns didn't solidify until

14   June?

15        A.    Until I finally resigned, yeah.

16        Q.    And what changed between January and June

17   to make you come to the realization that your

18   concerns were genuine or that there was something

19   true about the company that you had suspected

20   earlier?

21        A.    Nothing solidified.  Just questions went

22   unanswered, and the company, Nexia, was buying

23   companies and companies and companies every month.

24   Nobody could give me a straight answer.  I decided

25   to resign.

1     Q.   But you didn't hesitate to take this

2   million dollars even though you were --

3     A.   It didn't come from any of the -- I was --

4   the way I was explained, it didn't come from any of

5   the related entities.

6     Q.   Where did it come from?

7     A.   I'd need to see the statements, I don't

8   recall exactly, but I thought it was a loan from

9   Titanium.

10     Q.   Titanium?  Which Titanium?  Oh, I'm sorry.

11   This is another -- was Titaniium a Frank Amodeo

12   company?  Forget about that one right now.  I

13   handed it to you too early.

14     A.   I don't know if it was a -- it was --

15   there was some relation to Frank Amodeo with that

16   company, yes.

17     Q.   Okay.  When you say some relationship,

18   does that mean Mirabilis owned it or Frank Amodeo

19   owned it?

20     A.   I thought Dan Myers owned it.

21     Q.   Where would Titanium Technologies have

22   gotten a million dollars?

23     A.   I'm not sure.

24     Q.   Was that the kind of company it was that

25   operated on that scale?

1      A.   I really don't know.  You have to ask the

2   owners of Titanium.  But I don't know.

3      Q.   And what was -- how was FYI connected to

4   Titanium?

5      A.   It was not connected.  It just -- Titanium

6   made an investment in FYI, a loan to FYI, to make

7   this investment.

8      Q.   Was it repaid?

9      A.   No.

10      Q.   Was it documented by a Promissory Note?

11      A.   I don't recall one.

12         MS. HAVENER:  Okay.  Will you mark this as

13      the next in succession, please.

14         (Thereupon a document was marked

15      Plaintiff's Exhibit 458 for Identification in

16      the proceeding.)

17   BY MS. HAVENER:

18      Q.   Will you please look at this document, Mr.

19   Amar, and tell me if you recognize it in any way.

20      A.   No, I don't -- I don't recognize it.

21      Q.   Well, it's my understanding that it's a

22   composite of companies in which Mr. Amodeo had some

23   kind of ownership interest or with which he had

24   some connection.  Would that comport with your

25   understanding?

1      A.   No.  But, okay, I'm looking it over.

2      Q.   Okay.  Is it accurate that you were the

3  President of Professional Sales Force on 4/8 of 03?

4      A.   I presume.  That's what it says.

5      Q.   Was the company reinstated in 4/8/03?

6      A.   I don't recall, but where does it state

7  that?

8      Q.   It says -- under "Event," it says -- at

9  the columns at the top, or the list at the top,

10  under "Event," it says, "Inactive," but reinstated

11  -- or "Reinstatement."

12      A.   Is that on Page 1?

13      Q.   Yes.

14      A.   HRM, HRM; Professional Sales Force,

15  Reinstatement, 4/8/03.

16      Q.   And it lists you as the President;

17  correct?

18      A.   That's what it says, yes.

19      Q.   And Mr. Sadrianna is the Registered Agent?

20      A.   I don't recall that, but, okay.

21      Q.   Whose address is 3107 West Hallandale

22  Beach Boulevard?

23      A.   That's an office that I occupied.

24      Q.   I'm representing to you, because I know,

25  that this is information acquired from Sunbiz.org.

1   Do you remember that you became the President of

2   Primary Bookkeeping, Inc., on 9/9/03?  Oh,

3   actually, I'm sorry.  I'm misspeaking.  You already

4   were the President of Primary Bookkeeping, Inc.,

5   and the change was a change of Registered Agent.

6   Actually, it's a change of address.  Do you see

7   what I'm talking about?

8        A.   Yeah, on Page 2?

9        Q.   The only change appears to be the address;

10  is that right?

11       A.   For what?  For Primary Bookkeeping?

12       Q.   No.  For whatever is 456 South Orange

13  Avenue to 457 South Orange Avenue.

14       A.   What page is this?

15       Q.   The second page.

16       A.   Oh.

17       Q.   At the third and fourth from the top.

18       A.   Registered Agent address; okay.

19       Q.   Okay.  And then the next one down, what

20  was Beverages, Inc.?

21       A.   I don't know.  I thought that was a

22  company that Mr. Beavers had or was involved with.

23       Q.   So you don't recall that you were ever the

24  President?

25       A.   No, I don't.

1          Q.    And you don't recall that you were ever

2    the Registered Agent?

3          A.    No.

4          Q.    But that is your address.

5          A.    That is the office address that I occupied

6    at that time, yes.

7          Q.    Okay.  If you'll go down the list a little

8    bit farther and look at Professional Sales Force.

9          A.    Yes.

10         Q.    And an annual report was filed on 4/24/04.

11   Is it correct that you were the President at that

12   time?

13         A.    4/28/04?

14         Q.    Yes.  I'm sorry.  I misspoke.  4/28/04,

15         A.    I'm just reading what it says here.  Yeah.

16   I don't know whether -- yeah.

17         Q.    Okay.  But you don't have any independent

18   recollection?

19         A.    From seven years ago, no.  Six-and-a-half

20   years ago, no.

21         Q.    Okay.  And then go one down from that.  Is

22   the Market Street Villages -- is that the Market

23   Street that you were referring to a moment ago?

24         A.    No.

25         Q.    So Market Street Properties is not

1    connected to Market Street Villages?

2        A.    No.

3        Q.    It's just a coincidence, as far as you

4    know?

5        A.    I assume there are a lot of Market

6    Streets.

7        Q.    But it lists Marty Flynn as the President

8    of Market Street; correct?

9        A.    That's what it says.

10       Q.    And then Wellington Capital, is it

11   consistent with your understanding that Mr. Amodeo

12   was the President?

13       A.    Of Wellington?

14       Q.    Yes.

15       A.    There were quite a few people there, but,

16   yes, it can be consistent.  We had a few people

17   involved at Wellington.  I thought Daniel Jitu was

18   the President, but, okay.  I'm just reading what it

19   says here.

20       Q.    And Trafalgar Capital, did you understand

21   Mr. Amodeo to be the Director, the President, and

22   the Secretary?

23       A.    No.

24       Q.    Who did you understand to hold those

25   positions?

1     A.    I thought there was a Daniel Jitu and

2   there was another gentleman.  I thought he was the

3   President of that company.

4     Q.    Daniel -- could you spell the last name

5   for me?

6     A.    Jitu, I believe, is J-i-t-u.  And there's

7   a John Murphy, I believe.  I thought he was the

8   President of Trafalgar.

9     Q.    Were you still the President of Primary

10   Bookkeeping on 4/12/05?

11     A.    That's what it says here.

12     Q.    Do you remember that to be true?

13     A.    No.

14     Q.    Do you remember someone else being the

15   president or you just --

16     A.    I remember a document that Charles

17   McBurney wrote that showed some kind of a change in

18   ownership.  I don't know if it was in late '04 or

19   early '05.

20     Q.    And what was the change?

21     A.    That the company really belonged to Frank

22   Amodeo.

23     Q.    Okay.  But Mr. McBurney is listed as the

24   Registered Agent at this time; right?

25     A.    Yes.

1    Q.    And when did you say you remembered that

2    document from?  Late '04 or '05?  Is that what you

3    said?

4        A.    Yeah.

5        Q.    Okay.

6             (Thereupon a document was marked

7        Plaintiff's Exhibit 459 for Identification in

8        the proceeding.)

9    BY MS. HAVENER:

10       Q.    Mr. Amar, would you pleases look over this

11   document for me.

12       A.    Yes.

13       Q.    Do you recognize it?

14       A.    No.

15       Q.    Would you turn the page, please.

16            MS. HAVENER:  I'm sorry.  The document is

17       an e-mail from Kevin Leonard -- for the people

18       on the phone -- from Kevin Leonard, dated

19       August 22nd, 2006, to Dan Myers.

20   BY MS. HAVENER:

21       Q.    And Mr. Myers says, "I --" I think it's

22   supposed to say, "I am unclear exactly the content

23   of the confirmation needed by the auditors to make

24   them happy regarding the 2004 Bank of Commerce

25   $500,000.

1       "Below is a draft of simple letter that Yaniv

2   could sign to confirm the existence and use of the

3   $500,000.  I believe this is what the auditors

4   required.  Yaniv could address this to the auditors

5   directly.

6       "Let me know if you had something else in

7   mind.  Kevin."

8       And then the example letter says,

9   "This letter will confirm that on February 10th,

10  2005, I withdrew from Mirabilis' Bank of Commerce

11  account the amount of $500,000.  I was the

12  authorized signer for Mirabilis for this Bank of

13  Commerce Account.

14      "The $500,000 was used to purchase the stock

15  of Caribbean Data & PSF.  In turn Caribbean Data

16  was --"  I think it's supposed to say "sold,"

17  although it says, "old to Wellington Capital for

18  for $1,000,000.  Signed, Yaniv Amar."

19       Do you remember the letter that's attached?

20      A.   No.

21      Q.   No.  Do you remember an account at the

22  Bank of Commerce in 2004 for which you were the

23  sole signatory?

24      A.   Yes.

25      Q.   And what was that account?

1      A.    It was an account that was opened with the

2   Mirabilis Ventures corporation.

3      Q.    And what was in that account?

4      A.    I don't recall this amount of money being

5   in that account.

6      Q.    What amount do you recall being in that

7   account?

8      A.    I remember opening the account with

9   several hundred dollars.

10      Q.    Do you remember acquiring Caribbean Data

11   Corporation with that account?

12      A.    No.

13      Q.    Do you remember acquiring Caribbean Data

14   Corporation at all?

15      A.    No.

16      Q.    Is that your signature at the bottom?

17      A.    It appears to be, yes.

18      Q.    So do you just not remember or do you --

19      A.    No, I -- first of all, I don't remember.

20   And, second of all, many, many -- I'm sure as

21   evidenced by what you have -- many documents were

22   handed to me and I was asked to sign by either Dan

23   Myers or Frank Amodeo and I signed certain

24   documents that I -- without full knowledge.

25      Q.    Including something for $500,000?

1      A.   Yes.

2      Q.   After you resigned?

3      A.   The dates show that it appears to be, yes.

4      Q.   Okay.  Would you have signed something

5    after you resigned?  Does that make sense?

6      A.   If I -- if it's my signature, then I

7    obviously did.

8      Q.   From a company that you were already

9    suspicious had fraud going on?

10          MS. VILMOS:   Object to the form.

11   BY MS. HAVENER:

12     Q.   Does it make sense to you that you would

13   have signed something after you resigned from a

14   company involving a $500,000 transfer when you

15   already suspected that the company was engaged in

16   fraud?

17     A.   If I did it, I did it.  It doesn't make

18   sense the way you phrase it, but --

19     Q.   Okay.  How would you phrase it?

20     A.   No, you phrase it -- but, you know, you're

21   right.  If I signed it, I -- I was handed many

22   things by Richard Berman or Daniel Myers --

23     Q.   Okay.  Under what circumstances were you

24   handed things to sign after you resigned from the

25   company?

1     A.   Under what circumstances?  Under

2  circumstances like this, where I was asked to sign

3  certain things.

4     Q.   And they were e-mailed to you as --

5     A.   No.  A lot of times I still met with

6  Richard Berman at his office.  I met with Frank and

7  Richard Berman at the office.

8     Q.   For what purpose?

9     A.   For what purpose?

10     Q.   Yes.

11     A.   Richard and I still remained friends for

12  some time after my resignation.

13     Q.   Okay.  Do you know if this was handed to

14  you by Richard Berman?

15     A.   I don't recall.

16     Q.   Do you remember being involved in a

17  transaction that Kevin Leonard was involved in?

18     A.   No.

19     Q.   But you do remember Mr. Myers sometimes

20  gave you documents to sign.

21     A.   Correct.

22     Q.   And would you have -- did you have

23  sufficient confidence in Mr. Myers to simply sign

24  the document without examining it?

25     A.   At that time, evidently, I did.

1      Q.   So this was after -- this is dated after

2    your statement of net worth that Mr. Myers sent to

3    you attached to his e-mail --

4      A.   Uh-huh.

5      Q.   -- in which he valued your Mirabilis stock

6    at four million plus.

7      A.   Uh-huh.

8      Q.   Do you recall that?

9      A.   I recall you showing me that document.  I

10   don't recall the actual statement of net worth.

11     Q.   Okay.  In other words, you don't remember

12   seeing it at the time.

13     A.   I don't recall a document from six or

14   seven years ago, no.

15     Q.   Okay.  But -- all right.  Nevertheless, he

16   gave you a document a year later, or perhaps

17   sometime around the same time.  Actually, now that

18   I think of it, that tax return was late in the

19   year.  I'm sorry.  I think I misspoke.  That tax

20   return was e-mailed to you in November of '05.  So

21   -- and this was approximately a year later.

22     A.   Okay.

23     Q.   And you had no reason to doubt Mr. Myers',

24   you know, accuracy or trustworthiness; is that

25   correct?

1        A.   I wouldn't say that.  I obviously did if I

2   had resigned, but I see that I signed this

3   document.  I don't recall seeing it or signing it,

4   but that is my signature.

5        Q.   Okay.

6             MS. HAVENER:  Would you mark this, please.

7             (Thereupon a document was marked

8        Plaintiff's Exhibit 460 for Identification in

9        the proceeding.)

10  BY MS. HAVENER:

11       Q.   This document is -- was this the Minushka

12  you were speaking about earlier?  Did you name this

13  person?

14       A.   No.

15       Q.   No.  Okay.  You gave the name of some of

16  your employees.

17       A.   Minushka?

18       Q.   Yes.  I can't -- it was a name --

19       A.   Oh, Maritza.

20       Q.   Maritza.

21       A.   No, no.  I don't believe this is the same

22  person.

23       Q.   Okay.

24             MS. HAVENER:  This is -- for those on the

25        phone, it's an e-mail from Dan Myers dated

1          Wednesday, February 14th, 2007.  It's sent to

2          Minushka Ramirez, M-i-n-u-s-h-k-a, Ramirez;

3          copy to Marty Flynn, and it says, Financial

4          Statement."  And then the comment is only,

5          "Here you go."

6               And then underneath, Mimi Ramirez, who I

7          assume is Minushka Ramirez, earlier in the day

8          is -- she's assistant to Marty Flynn, so the

9          e-mail reflects.  She's asking Dan to please

10         forward Marty Flynn's financial statement to

11         her and she needs it as soon as possible.

12    BY MS. HAVENER:

13         Q.   Do you see on the next page, Mr. Amar,

14    that Mirabilis Ventures was valued at $500 per

15    share per an independent valuation by Titanium

16    Technologies on 9/11/06?  That's in the footnote.

17         A.   I see that.

18         Q.   And Titanium Technologies has committed to

19    loan up to $250 per share of Mirabilis Ventures,

20    with the sole collateral for the loan being the

21    stock.  Do you see that?

22         A.   I see that.

23         Q.   And Titanium Technologies was Dan Myers;

24    correct?

25         A.   I believe so, yes.

1     Q.   But you testified earlier that you did not

2  believe the stock was valued at anything close to

3  that amount.  Is that --

4     A.   I thought it was worthless, yeah.

5     Q.   So we've seen several documents here today

6  where Dan Myers seems to be making a whole lot of

7  errors with respect to the value of certain things;

8  correct?

9     A.   You know, I don't know if that's a

10  question, but, yeah, it looks like it wasn't a

11  hundred percent accurate.  If it was -- I don't

12  know what Mirabilis (1) means.  On my statement you

13  showed me it was Mirabilis B.  I don't know what

14  Mirabilis Ventures (1) means.  I don't know what

15  that refers to.  Oh, that's just a footnote.  If

16  that's what class stock that was or --

17     Q.   No, no.  That's just the footnote.

18     A.   Okay.

19     Q.   Would you go back to 459, please.  This is

20  the document that has the letter attached to it

21  that you signed.  And both -- am I right that both

22  Kevin Leonard --

23     A.   459?  I don't have a number on it.

24     Q.   I'm sorry.  It's the e-mail from Kevin --

25  the top says Kevin Leonard to Dan Myers.

1      A.   Okay.  Yes.

2      Q.   Am I right that both of those people are

3  CPAs?

4      A.   Dan Myers is.  Kevin Leonard, I thought he

5  was an MBA.  I didn't know that he was a CPA.

6      Q.   Okay.  And this is the one that you said

7  that you received $500,000 from Mirabilis for the

8  acquisition of Caribbean Data Corporation?

9      A.   Uh-huh.

10      Q.   This is the representation that you said

11  you thought was inaccurate?

12      A.   No, I just can't speak to the accuracy.

13      Q.   Oh, you can't recall it.

14      A.   Yeah, I don't recall.

15      Q.   But it was a representation you made to

16  the Mirabilis Board; am I correct?

17      A.   That's what it says here, yes.

18      Q.   Now, am I correct in understanding that

19  the Board of Directors -- well, if you'll turn back

20  to the previous page of that letter.

21      A.   Yes.

22      Q.   Kevin Leonard represented to Dan that

23  there was confirmation needed by the auditors;

24  right?

25      A.   (Witness nods head.)

1    Q.   So am I safe in assuming that you were

2  making this representation to the Board of

3  Directors to be provided to the auditors?

4    A.   I didn't know that at the time.  There was

5  no indication of that.  I never saw this e-mail

6  before.  It was between Kevin and Dan.

7    Q.   But you knew that you were making the

8  representation to the Board of Directors.

9    A.   Not for the audit.  Not for the purposes

10  of the audit.

11    Q.   But, nevertheless --

12    A.   Yes, if I signed this, I -

13    Q.   -- you were making --

14    A.   -- it was addressed.

15    Q.   And would you anticipate that the Board of

16  Directors of Mirabilis would rely on a

17  communication from you?

18    A.   I don't know if they would or not, but I

19  would assume that they would.

20    Q.   Thank you.  Mr. Amodeo, we were talking

21  earlier about --

22    A.   My name is Mr. Amar.

23    Q.   I'm sorry.  You know what, I did the same

24  thing to Mr. Sadrianna and to Mr. Cuthill.  I so

25  apologize.  I have one thing on the brain.

1          We were talking earlier about the trip to

2     Scottsdale.

3          A.    Uh-huh.

4          Q.    And you said you wanted to see for

5     yourself.

6          A.    Yes.

7          Q.    What did you want to accomplish when you

8     went there, other than just to see for yourself?

9          A.    Nothing, Kathleen.  I didn't want to

10    accomplish anything.  I just really wanted to see

11    why.  I wanted to -- you know, I was hoping to have

12    a -- you know, to witness for myself, and if I had

13    a chance to speak with Edie, which I'm glad she

14    approached me and I did have a chance to speak with

15    her.  I just asked her why, if she's such an expert

16    in fraud, why could she not have detected this one.

17         Q.    And did she answer that question for you?

18         A.    No.

19         Q.    Did you speak with Mr. Amodeo about it

20    afterwards?

21         A.    After the conference?

22         Q.    Yes.

23         A.    Yes.

24         Q.    And under what circumstances?  When did

25    that happen and how did that happen?

1      A.    Probably when I was at the airport.  I had

2   to ride back to the airport.

3      Q.    And why did you call Mr. Amodeo?

4      A.    Just to tell him what happened.  I wasn't

5   reporting back to him.  It just --

6      Q.    And what was his reaction?

7      A.    Nothing.  I don't recall.  He was kind of

8   nonchalant about it.  He was -- you know, he was

9   glad that they were served and that was it.

10      Q.    I'm trying to figure out why you would

11   call Mr. Amodeo.  Why would Mr. Amodeo care?

12      A.    Why would he care?

13      Q.    Uh-huh.  Who made the decision to sue

14   Ms. Curry and --

15      A.    I have no idea.  I had no knowledge of

16   this suit until a few days before this --

17      Q.    And you didn't ask whose decision it was

18   to sue them?

19      A.    No.  I didn't really care.

20      Q.    Who was in control of Mirabilis Ventures

21   at that time, as far as you knew?

22      A.    I thought Frank and his Board.

23      Q.    And his Board at that time was Jodi Jaiman

24   and Shane Williams and Jay Stollenwerk; correct?

25      A.    As I understand it, yes.

1      Q.   So it's your understanding that Mr.

2   Amodeo, with the Board, made the decision to sue

3   Ms. Curry and Mr. Hailstones.

4      A.   Yes.

5      Q.   But, again, you didn't have any reason to

6   believe that Mr. Amodeo would care one way or the

7   other about what you had to say about the service

8   of process.

9      A.   No, he -- I think he -- he just expressed

10  that he was glad that they were served and that was

11  it.  He didn't --

12     Q.   So what made you call him?

13     A.   What made me call him?  I spoke to Frank

14  quite regularly at that point.  You know?

15     Q.   And you didn't need a reason.  It was just

16  --

17     A.   No.  No.

18     Q.   Okay.  Thank you.

19         (Thereupon a document was marked

20      Plaintiff's Exhibit 461 for Identification in

21      the proceeding.)

22  BY MS. HAVENER:

23     Q.   Were you still receiving any money from

24  Mr. Amodeo in any capacity at that time?

25     A.   Which time?

 1          Q.    In around the time that the suit was filed

 2     and served.

 3          A.    No.  I believe my consulting contract

 4     ended in April or May of that year, of '07.

 5          Q.    And after that you had no connection with

 6     any Mirabilis or Amodeo-related entity?

 7          A.    Not financially, no.

 8          Q.    What other way?

 9          A.    No, I told you, I was just kind of trying

10     to get information.  I was, you know, concerned

11     about the outcome.

12          Q.    Were you concerned about the outcome of

13     the investigation as it might impact you?

14          A.    Primarily, yes.  And a few other people.

15          Q.    And in what way were you worried that it

16     might affect you?

17          A.    I was the Interim CEO for a good period of

18     the time that this took place and I had signed a

19     whole bunch of agreements that I didn't fully

20     understand what I was signing, so I was concerned.

21          Q.    When you were the CEO, you stayed CEO even

22     though you were suspecting fraud.  I know you

23     resigned at the end of the period.

24          A.    At the end of what period?

25          Q.    Of --

209

```
 1        A.    In June.

 2        Q.    In June of '06.

 3        A.    Uh-huh.

 4        Q.    But you told us that you first started

 5   being concerned in January of '06.

 6        A.    End of January, yes.

 7        Q.    And so for that period you remained CEO.

 8        A.    Correct.

 9        Q.    You suspected that fraud was going on;

10   correct?

11        A.    No, I suspected that something didn't add

12   up.  I suspected that a lot didn't add up.

13        Q.    Okay.  And you didn't report it to

14   anybody.

15        A.    To Richard Berman and to Laurie Holtz.

16        Q.    Nobody else?

17        A.    I spoke to Dan Myers about it, I spoke to

18   Paul Glover about it, I spoke to Sharmila Khanorkar

19   about it.

20        Q.    And did Paul Glover say to you anything

21   that made -- caused you to be -- to have further

22   suspicion?

23        A.    No.  Paul Glover expressed a lot of

24   frustration that he couldn't get accurate

25   financials -- even though he was the CFO at the
```

1    period in question, he couldn't get accurate

2    financials because he said that the Lawson system

3    for the PEO was so outdated or messed up or

4    whatever he just couldn't get accurate financials.

5         Q.   And what was the Lawson system?

6         A.   That was the PEO system, the software, the

7    database for the company.

8         Q.   Like a financial database?

9         A.   It was a payroll processing software with

10   a back end.  I don't know if it was Great Plains or

11   whatever.

12        Q.   Whose idea was the Lawson program --

13        A.   It was --

14        Q.   -- to use the Lawson program?

15        A.   It was a Presidion decision from years

16   before Mirabilis ever got involved.

17        Q.   Okay.

18             MS. HAVENER:  Have you marked this

19        document?

20             THE COURT REPORTER:  I marked 461.

21   BY MS. HAVENER:

22        Q.   Can I give you one, please?

23        A.   Yes.

24        Q.   If you'll just take a look at this.

25             MS. HAVENER:  For those people on the

1          phone, it begins with an e-mail from Paul

2          Glover to Dan Myers and Frank Amodeo dated

3          Tuesday, April 11th, 2006, at 1:57 p.m.

4          The subject line is, "FW:  Letters."  The

5          attachments it says is, "Kevin Monroe

6          Verification Letter 060215WJ.doc."  And then

7          MHR --

8               MS. VILMOS:  Sorry.

9               MS. HAVENER:  Sorry?

10               MS. VILMOS:  From Glover to whom?

11               MS. HAVENER:  To Dan Myers and Frank

12          Amodeo.

13               MS. VILMOS:  Thank you.

14               MS. HAVENER:  And then the second part of

15          the subject line says, "MHR Self Audit Program

16          060213.doc."  And Mr. Glover is signing as

17          Executive Vice President and CFO of Mirabilis

18          Ventures, and says to Mr. Myers and Mr.

19          Amodeo:  "Have we made any commitments that I

20          need to be aware of?"

21     BY MS. HAVENER:

22          Q.   Do you see that, Mr. Amar?

23          A.   Yes.

24          Q.   Do you know what Mr. Glover was paid?

25          A.   No.

1      Q.    I'll represent to you that his annual

2   salary in 2006 was $585,000 a year.

3      A.    That was his salary?

4      Q.    Yes.

5      A.    Wow.

6            MS. VILMOS:   Object to the form.

7            THE WITNESS:   Okay.

8   BY MS. HAVENER:

9      Q.    Do you see that you -- at the bottom of

10   this, a few hours before, on Tuesday, April 11th,

11   2006, at 11:09 -- forwarded from yourself to Frank

12   Hailstones an e-mail called "Letters."  And what

13   you forwarded was Woody Johnson's e-mail to you

14   from several months before, February 16th, 2006,

15   with a cc to Jeffrey Rutzen; is that correct?  Is

16   that how you pronounce it?  I don't know.

17      A.    I don't recall Rutzen.  I think it was

18   Rutzen, but I don't -- I knew the name; I didn't

19   know him.

20      Q.    Okay.  And his e-mail to you that you then

21   forwarded to Mr. Hailstones said:  "Yaniv, Last

22   versions of letters, attached.  These are without

23   any edits that Frank may have made.  Woody."

24      A.    Okay.

25      Q.    Do you understand that he was talking

1    about Frank Amodeo?

2        A.    You know, it was F1 or F2 if he was

3    referring to Frank Amodeo or Frank Hailstones.   So

4    I don't know if he was referring to Frank Amodeo or

5    Frank Hailstones.

6        Q.    But would Woody Johnson have had a

7    significant interchange with Mr. Hailstones?

8        A.    I wouldn't know.

9        Q.    Wasn't it more common for Mr. Johnson to

10   deal with Mr. Amodeo?

11       A.    I really -- I don't know.  I don't know

12   his interaction with both Franks.

13       Q.    Well, at the back of this, as there are

14   several letters attached, one of which is

15   February 10th, 2006, from Kevin Munroe, CPA.  Was

16   Kevin Munroe an outside accountant to Mirabilis?

17       A.    I thought he was an inside accountant to

18   Mirabilis.

19       Q.    But does this give you any indication that

20   he was from inside, this particular letter?

21       A.    No.

22       Q.    And it's dated February 10th, 2006;

23   correct?

24       A.    Uh-huh.

25       Q.    And it says -- it's addressed to Mirabilis

1    HR.   What address is that, 8095 Northwest 12th

2    Street, Suite 301, Miami?

3         A.    That was the Doral office.

4         Q.    Doral office of Mirabilis HR?

5         A.    Yes.  Of AEM.

6         Q.    Of AEM?

7         A.    Yes.

8         Q.    Is AEM the same thing as Mirabilis HR?

9         A.    Yes.

10        Q.    And he's writing to Mirabilis HR about

11   Presidion Solutions, Inc.  Do you see that?

12        A.    Yes.

13        Q.    And it says, "Dear Sirs:  I have reviewed

14   the payroll tax Account Summary provided by the

15   Internal Revenue Service concerning Presidion

16   Solutions, Inc., as of January 24th, 2006, and per

17   these documents, Presidion Solutions, Inc., has

18   overpaid a total of $508,961."

19        Do you see that?

20        A.    Yes.

21        Q.    Did that comport with your understanding

22   at the time?

23        A.    No.

24        Q.    What did you know that contradicted this

25   representation?

1      A.   I didn't know anything.  I actually

2   implemented what's audit review program.  I asked

3   for this to be implemented.  I ran it by Dan Myers,

4   Paul Glover, and Frank Amodeo.

5      Q.   Uh-huh.  And then they did implement it,

6   apparently.

7      A.   They -- no, they didn't implement it.

8   They wrote this letter, this letter went out to all

9   the clients at the time, and we were supposed to be

10  able to provide the quarterly statements to the

11  clients and we never did.

12     Q.   So seeing this document, would it be

13  unreasonable for the Board of Directors of

14  Mirabilis to rely on the representation of Kevin

15  Munroe?

16          MS. VILMOS:  Object to the form.

17          THE WITNESS:  I don't know what their

18      interaction was with Kevin Munroe.

19  BY MS. HAVENER:

20     Q.   Would it be unreasonable for anyone to

21  rely on the representation of Mr. Munroe?

22     A.   It was intended for the clients --

23          MS. VILMOS:  Object to the form.

24  BY MS. HAVENER:

25     Q.   I don't understand what you mean.  What do

216

1    you mean --

2         A.   This was intended for the clients of the

3    PEO.

4         Q.   What do you mean by "the clients"?

5         A.   The client companies of the PEO.

6         Q.   Of Mirabilis HR/AEM?

7         A.   Slash Presidion, slash whatever, yes.

8         Q.   Were they all the same; Presidion, AEM,

9    and Mirabilis HR?

10        A.   I wish I could answer that, but it was a

11   bit of a confusion.

12        Q.   Why would the clients be getting different

13   information from the Board?

14        A.   No, I don't know that they would.  I

15   didn't know that this went to the Board.  I asked

16   for this to be implemented for the clients.

17        Q.   Okay.  Well, so when it was sent to

18   Mirabilis HR, who did that mean?  Who got it?

19        A.   Well, it was regarding Presidion

20   Solutions.

21        Q.   I understand.

22        A.   It was addressed to Mirabilis HR and it

23   was addressed to Presidion Solutions, so I believe

24   this was intended for all the clients that AEM

25   managed for Presidion.

1    Q.    Was it true?

2    A.    I don't know.  I never saw evidence that

3  it was true.  I asked for a quarterly statement.

4    Q.    Did you see evidence that it was false?

5    A.    No.

6    Q.    Okay.  So given that these -- there's

7  also, I'm sorry, attached to this same -- the

8  letter that -- two letters before that.

9    A.    Yes.

10    Q.    One is -- well, I'm sorry.  One letter

11  before it is a sample.  And it says it's -- the

12  "Re" line -- it's not addressed to anyone, it's not

13  dated.  It says, "Dear xxxx."

14    A.    Uh-huh.

15    Q.    The "Re" line is, "Auditor Review Program

16  for Mirabilis HR."

17    A.    Yes.

18    Q.    And it has similar language about the

19  audits that  -- no, I'm sorry.  It has language,

20  apparently, that you asked for that you -- to

21  notify the clients that they were launching an

22  auditor review program.

23    A.    Uh-huh.

24    Q.    Right?

25    A.    Correct.

1     Q.   Okay.  And on Mr. Munroe's stationary,

2  although unsigned, there's a letter dated February

3  15th, 2006.  So just a few days after the letter

4  that I showed you that was signed.  Do you see

5  that?  One is February 10th; one is February 15th.

6     A.   Yes.

7     Q.   And the language is essentially -- well,

8  it's very, very similar; correct?

9     A.   Yes.

10     Q.   And one of them says Presidion Solutions

11  has overpaid a total of $508,961; the other one

12  says they've overpaid by $500,000; correct?

13     A.   Correct.

14     Q.   And I just want to make sure that I'm

15  correct in understanding that you, had you seen

16  this at the time, that it did not comport with your

17  understanding that this was false?

18     A.   No, I didn't know that it was false.  I

19  was hoping that it was correct.

20     Q.   Okay.  Would the clients have been

21  entitled to rely on it?

22     A.   I believe the clients did rely on it, yes.

23     Q.   And why would the clients have been

24  getting different information than the Board?

25     A.   I don't know.  I don't believe they did.

1           MS. VILMOS:  Object to the form.

2    BY MS. HAVENER:

3        Q.   You don't know that they did, or you don't

4    believe that they did?

5        A.   I don't know that they did.  I don't know

6    that they got different information than the Board.

7        Q.   Okay.  So if the Board got the same

8    information, again from a CPA who was looking at

9    and examining the account summary from the IRS to

10   Presidion, why would you expect the Board to have

11   assumed something different was true?

12       A.   Because the Board had different

13   information than the client companies.

14           MS. VILMOS:  Object to the form.

15   BY MS. HAVENER:

16       Q.   What was the different information the

17   Board had?

18       A.   Well, they had insider information as to

19   the dealings of the company, of the predecessor

20   company that they acquired or they managed for.  It

21   was always sort of ambiguous whether Mirabilis

22   bought Presidion or just had a contract with them

23   to manage the payroll.  They were rescinding deals

24   back and forth.  It was never a clearcut situation.

25           MS. HAVENER:  Okay.  Excuse me.  Could we

1          go off the record for a second?  We're going

2          to go off the record for a second because I'm

3          looking for a particular document.

4              (Discussion held off the record.)

5              (Thereupon a document was marked

6          Plaintiff's Exhibit 462 for Identification in

7          the proceeding.)

8    BY MS. HAVENER:

9          Q.    462.  Mr. Amodeo -- I did it again.  I'm

10   so sorry.  Mr. Amar.

11         A.    I take offense to that, Kathleen.

12         Q.    I'm sorry.  I'm very sorry.  I would too.

13   Just take a few minutes to look over this e-mail.

14   It's front and back and there are several -- it's a

15   series of documents.

16         A.    Okay.

17         Q.    Can you tell me, what's Darwin?

18         A.    Darwin is a payroll software.

19         Q.    And how was it associated with Mirabilis

20   or any of the Mirabilis or Amodeo entities?

21         A.    In -- sometime in the summer of '06 a

22   decision was made to switch out of the Lawson

23   software platform and to convert to a new one.  And

24   I was asked -- because I was a consultant at the

25   time -- I was asked to attend a meeting.  And I

1   strongly advised against going with Darwin based on

2   some questions I've asked from people that I knew

3   in the industry.  They said that the system does

4   not have anywhere near the capacity to handle the

5   40,000 worksite employees that this book of

6   business managed.  Once again, it fell upon deaf

7   ears, and they made the decision to go with Darwin

8   and it was a colossal failure

9        Q.   And you didn't like Lawson either, did

10  you?

11       A.   No.

12       Q.   Was there some other program that you were

13  --

14       A.   Yes.  There was one called Scorpio or

15  Pyramid HR.

16       Q.   Okay.  I just want to -- we're populating

17  the field here.  Is Marty Flynn an idiot?  You used

18  the term "idiots and sycophants."

19       A.   Yeah, I believe he was a sycophant.

20       Q.   Was Carlos Delgado an idiot?

21       A.   He was not part of the Board, no.

22       Q.   Was Laurie Andrea an idiot?

23       A.   No, it's not fair to say that.

24       Q.   Was she a sycophant?

25       A.   Somewhat, yes.

1      Q.    How about Mike Stanley?

2      A.    Mike Stanley was an idiot, yes.

3      Q.    Okay.  Dan Sharp?

4      A.    Yes.  I -- yes.  I don't know exactly if

5  he was an idiot or a sycophant but, yeah, Dan Sharp

6  was --

7      Q.    Tom Leach?

8      A.    I don't recall Tom Leach.  I think he was

9  one of the tech guys involved with the company.

10     Q.    Debra Cole?

11     A.    She worked for Mike Stanley.  I don't know

12  her.

13     Q.    Lilly Gutierrez?

14     A.    She works in sales for the company.

15     Q.    You said you didn't know about Carlos

16  Delgado; right?

17     A.    No, I knew that he didn't work in the --

18  for Mirabilis direct, but he was an employee of

19  AEM.

20     Q.    Okay.  And they weren't idiots.

21     A.    Okay.  I don't know.  No, in this case,

22  they were not.

23     Q.    Why was this referred to in parts as a

24  hurricane?  Was that your term?

25     A.    No.

1    Q.   Okay.  Do you see where it --

2    A.   No, I think there was an actual hurricane

3    at the time.

4    Q.   Oh, okay.  Hurricane Darwin?

5    Q.   Is that what it was referred to?  I didn't

6    see that.

7    Q.   Well, on it's Page 3 of 3.

8    A.   I see 2 of 3.

9    Q.   Yeah, look at Page 3 of 3.

10    "Yaniv/Mike.  The 9:00 a.m. advisory on

11    hurricane Darwin.  We are still importing history

12    and about 165 batches need to run.  If there are

13    errors, they must be corrected.  This task should

14    take about 6 hours to complete and if everything

15    goes well.  The Miami staff will be ready to

16    conduct parallels about 1:00 p.m.  I will give you

17    the next advisory this afternoon."

18    Do you see that?

19    A.   Yeah, I guess it was referred to a

20    hurricane, yes.

21    Q.   Okay.  And you were consulting at this

22    time?

23    A.   Correct.

24    Q.   In spite of the fact that you thought all

25    the people you were dealing with were either idiots

1    or sycophants.

2        A.    Correct.

3        Q.    Okay.  I'm finished with that one.

4             (Thereupon a document was marked

5        Plaintiff's Exhibit 463 for Identification in

6        the proceeding.)

7    BY MS. HAVENER:

8        Q.    Will you take a look at this, please.

9             MS. HAVENER:  For those on the phone, it's

10       an e-mail from James Sadrianna to Mike Stanley

11       dated Thursday, August 31st, 2006.  The

12       subject line is, "FW:  PEOs - Yaniv Amar."

13       And then there's a series.  It's a

14       page-and-a-half.

15   BY MS. HAVENER:

16       Q.    Do you remember this exchange, Mr. Amar?

17       A.    No.

18       Q.    You don't remember asking for the

19   information that's referred to in the second e-mail

20   from Nichole Beamer to Mr. Sadrianna; "Hi, Jim."

21   You don't remember asking for that information?

22       A.    It could be that I did ask for that

23   information, but I don't recall talking to Nichole

24   Beamer or Sadrianna about this.

25       Q.    What's Argent Firma, Inc.?

1     A.     That's another one of the entities.   I

2    recall that name now that you mention it, but I

3    haven't heard it since '06.

4     Q.     Okay.   But you don't remember what it did?

5     A.     No.

6            (Thereupon a document was marked

7     Plaintiff's Exhibit 464 for Identification in

8     the proceeding.)

9    BY MS. HAVENER:

10    Q.     This is 464.   It's an e-mail.   It starts

11   off with an e-mail from James Sadrianna to Tessah

12   Ivey dated July 8th, 2005.   Now, at that time, you

13   were still there; correct?

14    A.     July of '05?

15    Q.     Uh-huh.

16    A.     Was I still there?

17    Q.     Yes.

18    A.     Yes, I was working out of the Jupiter

19   office.

20    Q.     In the office for AEM?

21    A.     No.

22    Q.     In the Miami office?

23    A.     No.   In July of '05 I was working out of

24   the Jupiter office.

25    Q.     Jupiter.   Sorry.

1      A.   Yes.

2      Q.   But not in Orlando.

3      A.   No.

4      Q.   You never worked in Orlando.

5      A.   No, no.  I would go to Orlando, but I

6   didn't work out of Orlando.

7      Q.   If you'll look at the Page 2 of 3.  It's

8   an e-mail from Thomas Maida.  Is that how you

9   pronounce it?

10      A.   I don't know.  I don't know who this

11   person is.

12      Q.   You don't know who that is?

13      A.   No.

14      Q.   Okay.  Do you know what L-I-C-O-A is?

15      A.   No.

16      Q.   Could it have something to do with Legend

17   Insurance?

18      A.   It could be.  I'm --

19      Q.   Okay.  This is a document, an e-mail from

20   someone named Thomas Maida.  It doesn't have a "To"

21   line, but it's addressed to someone named Brian.

22   The next page -- it's forwarded by someone named

23   Brian Fischer, so I presume that was the original

24   person to whom it was addressed.

25      Who was Brian Fischer?

1          A.     He was one of the employees of Mirabilis.

2          Q.     You don't know what his job was?

3          A.     No, he was an attorney and he was supposed

4     to do something with regarding to the workers' comp

5     insurance.

6          Q.     Okay.

7          A.     I don't recall his title or his role.

8          Q.     If you'll look at the e-mail on Page 2 of

9     3.

10         A.     Uh-huh.

11         Q.     Mr. Maida is following up on a

12    conversation apparently he'd had with Mr. Fischer.

13         "I want to follow up on our conversation this

14    morning, by confirming a couple of points and

15    asking for your help in answering a couple of

16    questions we'll need to understand for application

17    purposes.

18         "My understanding is that the initial board of

19    LICOA will consist of you, Bob Konicki, Jerry

20    Goodmark, Edie Broadhead, Jeff Rendell, Jason

21    Carlson, and Bob Pollack.  A couple of questions

22    and comments:  First, why isn't Yaniv Amar serving

23    on the LICOA board if he is the sole shareholder of

24    Mirabilis and, therefore, an ultimate controlling

25    person of LICOA?"

1          Was that consistent with your understanding at

2     that time?

3          A.    What was consistent?

4          Q.    That you were the sole shareholder of

5     Mirabilis and, therefore, an ultimate controlling

6     person of LICOA?

7          A.    No.

8          Q.    The next paragraph:

9          "I also understand that Mr. Amar is the sole

10    shareholder of Mirabilis..."

11         You also did not believe that to be true;

12    correct?

13         A.    Correct.  Well, that's the same question

14    you just asked.

15              MS. CURRY:  We need to go off the record

16         for a minute.

17              MS. HAVENER:  Yes.  We just spilled

18         something.

19                   (Off the record.)

20              MS. HAVENER:  We can go back on.

21    BY MS. HAVENER:

22         Q.    So, Mr. Fischer is being asked again by

23    this person named Mr. Maida, and, as I just said,

24    you disagree with your having been referred to as

25    the sole shareholder of Mirabilis; correct?

1    A.    Correct.

2    Q.    "We also need to know - for application

3 purposes - whether the loan from Frank Amodeo to

4 Mr. Amar (which apparently funded the start-up of

5 Mirabilis) is secured in any fashion whatsoever."

6     Are you familiar with any such loan, Mr. Amar?

7    A.    No.

8    Q.    Do you know what was, in fact, used for

9 the funding, the initial funding of Mirabilis?

10    A.    I told you I opened the account at Bank of

11 Commerce with several hundred dollars.

12    Q.    And that's the original account of

13 Mirabilis?

14    A.    The original -- to my knowledge, yes.  The

15 original account that was opened in Nevada was

16 under a thousand dollar balance.

17    Q.    And I think you testified before, I just

18 want to make sure, that you took the shares that

19 were handed to you at some point --

20    A.    Uh-huh.

21    Q.    -- and you handed those shares to Mr.

22 Amodeo.  Did you ever see those shares again?

23    A.    No.

24    Q.    And, to this day, you've never seen them

25 again.

1    A.   No.

2    Q.   And you also -- I just want to remind you

3    that you testified that you understood that it was

4    bearer stock.

5    A.   Correct.

6    Q.   And could you explain for the record what

7    your understanding is of bearer stock?

8    A.   My understanding is, as it was explained

9    to me, was bearer stock is owned by whoever bears

10   the stock.

11   Q.   In other words --

12   A.   Whoever holds --

13   Q.   -- whoever's holding on to it.

14   A.   Whoever's in possession of it.

15   Q.   Okay.  Who explained that to you?

16   A.   I believe it was Mr. Sadrianna, and I may

17   have asked Mr. Berman about it, or I may have

18   Googled it.

19   Q.   Did you know Mr. Sadrianna at the time

20   that Mirabilis started up?

21   A.   Yes.

22   Q.   And Mr. Berman as well?

23   A.   Mr. Berman, I don't recall when I met him,

24   but I did know him since '04.

25   Q.   And that started in '04.  The opening of

231

1    the bank account was in '04?

2        A.   I believe it was in '05.

3        Q.   Okay.

4        A.   I'm not sure exactly.

5        Q.   How did it come about that you went to

6    Nevada with Mr. Amodeo?

7        A.   No, I didn't go with Mr. Amodeo, and I

8    didn't go either.  I just contacted a company

9    called Business Solutions or something to set up

10   the corporation, business address.

11       Q.   And they sent you the stock.

12       A.   Yes.

13       Q.   And you immediately handed it to Mr.

14   Amodeo.

15       A.   I don't know if it was immediate.  I don't

16   recall exactly when I did hand it to him, but, yes,

17   I handed him the shares.

18       Q.   What occasioned the formation of

19   Mirabilis?

20       A.   Frank had asked me to set up a company in

21   Nevada and it was supposed to be a holding entity

22   for some transaction he was working out with

23   Presidion.

24       Q.   And how did it change, if you know, from a

25   holding company for some transaction that was

1    happening with Presidion to a year later there was

2    going to be an office within every half hour of

3    every 12,000 people on Earth, or whatever the --

4         A.   I cannot -- I can't answer that question.

5    I don't know.

6         Q.   So where did the money come from that was

7    several thousand dollars that was --

8         A.   Several hundred dollars.

9         Q.   Oh, I'm sorry.  Several hundred dollars.

10        A.   Frank either sent me a check or -- I don't

11   exactly remember, but he gave me enough money to

12   just incorporate the company and set up a bank

13   account.

14        Q.   So it wasn't a loan.  It was simply -- if

15   I'm understanding you correctly; please correct me

16   if I'm wrong -- it wasn't a loan.  It was simply he

17   gave you funds in order for you to use those funds

18   to accomplish some task he instructed you to do.

19        A.   That sounds right.

20        Q.   Correct?

21        A.   That sounds right.

22        Q.   And you said that you never saw that

23   bearer stock again.  Did you ever see any other

24   stock?

25        A.   No.  I saw some shareholder agreement in

1    late '05, but --

2         Q.   But did you ever see any other shares?

3         A.   Actual physical shares?

4         Q.   Correct.

5         A.   I don't recall seeing that.  I thought

6    that -- I thought that at one point they were

7    working on the distribution of shares.  He may have

8    showed them at a meeting, but I don't actually

9    remember.

10        Q.   Do you know if any shares were actually

11   issued?

12        A.   Not that I'm aware of.

13        Q.   You mean you --

14        A.   Not -- I --

15        Q.   Okay.  I just need to clarify that answer.

16   Do you mean that you are not aware of any stock

17   being issued, or you are aware that no stock was

18   issued?

19        A.   I am not aware of any stock being issued.

20        Q.   So it could have been issued and you

21   wouldn't be aware.

22        A.   Correct.

23        Q.   Why did Frank not simply set Mirabilis up

24   himself?

25        A.   I don't know.

1        Q.    What was your relationship with him at the

2    time?

3        A.    We were friends.  He asked me to do a

4    favor for him and I complied.

5        Q.    Did it have anything to do, as far as you

6    understood, with you actually might get finally

7    paid back?

8        A.    Something to that effect.  I mean, he was

9    working on a large contract with Presidion, I

10   thought he was going to get paid a lot of money and

11   at long last I was able to, hopefully, see my money

12   back.

13       Q.    And that has never happened; correct?

14       A.    Not fully, no.

15       Q.    When is the last time you saw Mr. Amodeo?

16       A.    I think you asked me that question on the

17   Interrogatories.  I thought it was sometime in

18   early '08.

19       Q.    When is the last time you spoke with him?

20       A.    Right around the same time, give or take a

21   few days apart.

22       Q.    So you have not spoken to him since he's

23   been incarcerated.

24       A.    No, no, no.

25       Q.    Have you spoken to him after he was

1    indicted?

2        A.   I don't know when he was indicted.  I'm

3    not sure when he was indicted.

4        Q.   I can't remember.  Sorry.

5        A.   But it was sometime, I think, in early or

6    middle of '08.  It's been over two years.

7        Q.   I think it was August.

8        A.   What was August?

9        Q.   He was indicted.  August '08.

10       A.   Oh.

11       Q.   If you'll turn the page, I just wanted to

12   point out to you that Thomas Maida is a partner at

13   Foley & Lardner LLP.

14       A.   Okay.

15       Q.   It's got an 850 area code, which is

16   Tallahassee or Pensacola.  Does that refresh your

17   recollection?  Have you ever dealt with Foley &

18   Lardner, to your knowledge?

19       A.   Not to my knowledge.  There were a lot of

20   law firms that were involved in it at the time, but

21   I've heard the name Foley & Lardner, but I've never

22   dealt with anybody there that I can recall.

23       Q.   Okay.

24

25

1              (Thereupon a document was marked

2         Plaintiff's Exhibit 465 for Identification in

3         the proceeding.)

4    BY MS. HAVENER:

5         Q.   I'm showing you what's marked as 465 in

6    this deposition.

7              MS. HAVENER:   This is an e-mail, for those

8         of you on the phone, from Mike Stanley dated

9         Monday, April 10th, 2006.  It's addressed to a

10        significant number of people.  It starts with

11        Carlos Delgado and Dean Armitage, Jeff

12        Reichel, Jim Vandevere, Jim Waldvogel, John

13        Swygert.

14   BY MS. HAVENER:

15        Q.   Are you familiar with all those names?

16        A.   Most of them.

17        Q.   Are they all idiots?

18        A.   I don't know if that's a fair comment, but

19   some of them are.

20        Q.   I'm trying to figure out who are the

21   people that, you know, were not figuring this

22   problem out in 2006 when you already suspected it

23   and were waiting, essentially, for confirmation or

24   for your suspicions to be at least solidified.

25        A.   Who of these people?

237

1     Q.   Yes.  It was rhetorical.  I'm sorry.  But

2  one of those people listed, if you look at the last

3  person listed, is you.  You're not an idiot; right?

4     A.   I -- I can be considered one, yes.

5     Q.   And then it's copied to Paul Glover, Frank

6  Amodeo, Dan Myers.  The subject is, "Premier HR

7  Lawson Integration."  It's talking about National

8  Med Staff Integration with assignments; National

9  Med Staff Integration with assignments that are

10  labeled V6 and V5.  They're Excel spreadsheets that

11  are supposedly attached, although we don't have the

12  attachments.

13     What I'm interested in is, the first sentence

14  says, "The Premier HR Lawson Integration is a go."

15     Do you remember what the Premier HR Lawson

16  Integration is?

17     A.   No.  I assume this was the software

18  integration, but it happened later than this date.

19     Q.   Well, the Darwin that we just talked about

20  a few minutes ago that you recommended against was

21  later in the same year; correct?

22     A.   Correct.

23     Q.   And that was going to be replacing Lawson.

24     A.   Yes, but Lawson was already in place for

25  --

1    Q.   Oh, so you're saying this is later than

2  the replacement of Lawson.

3    A.   No.  My recollection was that Presidion

4  already was using Lawson for some time.  I don't

5  know what the Premier HR part of it is, but Lawson

6  was already in place for some time.

7    Q.   Okay.  And the next sentence just says,

8  "In discussions with Frank Amodeo it was decided

9  that it is in the Company's best interest to

10  immediately integrate Premier HR, Allstaff

11  Management, Neighborly Services and E.H. Sellars,

12  Inc., into the Lawson system.  Mike Stanley has

13  been designated as the point person for this

14  project.  In order for Mike to accomplish this

15  task, a team has been put together to accomplish

16  this tasks.

17     "The team members are:"  And the first name is

18  Yaniv Amar.

19    Do you remember being on this team?

20    A.   No.

21    Q.   Do you remember anything about this?

22    A.   This was around the time that they were

23  trying to roll up several PEOs.

24    Q.   Now, we've already established that Frank

25  Amodeo was not on the Board.

1     A.   Okay.

2     Q.   And we've talked before and you said that

3  the Board was in control.

4     A.   Correct.

5     Q.   Why would it then be in discussions with

6  Mr. Amodeo it was decided that it was in the

7  company's best interest to accomplish this?

8     A.   You would have to ask Mike Stanley that

9  question.

10     Q.   But just to be clear, was it unusual, in

11  fact, for Mr. Amodeo actually to make the decisions

12  about the day-to-day operations of the company?

13     A.   No, I believe he influenced a lot of the

14  decisions.  I don't know if he actually made the

15  final decisions, but he did influence them.

16     Q.   Okay.  Can you give me an example of any

17  time when you wanted to accomplish something that

18  you went to the Board to ask -- or to make a pitch?

19     A.   Aside from talking to Richard Berman or

20  Laurie Holtz mostly one on one, I never actually

21  went to the Board and made a pitch.

22     Q.   Did you ever go ask permission or make a

23  pitch to Mr. Amodeo?

24     A.   Yes.

25     Q.   How many times?

1          A.    I don't recall.

2          Q.    Dozens?  Scores?

3          A.    A few.  During that time in '06 --

4          Q.    Less than 10?

5          A.    You know, it depends.  What?  Decisions

6     like what?  Like the standalone account?

7          Q.    Any decisions.

8          A.    Yes, I had a direct communication with

9     Frank.

10          Q.    So you often asked Mr. Amodeo for, you

11    know, for approval or for approval of decisions you

12    wanted to implement; is that correct?

13          A.    Correct.

14          MS. HAVENER:  466.

15          (Thereupon a document was marked

16          Plaintiff's Exhibit 466 for Identification in

17          the proceeding.)

18          MS. HAVENER:  For those of you on the

19          phone, Exhibit 466 is an e-mail from Mike

20          Stanley to Frank Amodeo with a cc to Yaniv

21          Amar dated the day after your resignation, in

22          fact; June 22nd, 2006; correct?

23          THE WITNESS:  Yes.

24    BY MS. HAVENER:

25          Q.    And I just want to point out that -- am I

1    correct that no Board members are copied on this

2    e-mail?

3         A.   It does not appear to be the case.

4         Q.   Okay.  Yesterday -- the e-mail says -- the

5    subject line is, "AEM & the DBPR."

6         "Yesterday after the meeting and after talking

7    with you and Yaniv, I talked to Mike Miller to see

8    if he had any additional information about Jerry

9    Lancaster's complaints.  Mike's only statement was

10   that Jerry was a volatile man and Mike didn't know

11   how to take his objections."

12        Who is Mike Miller?

13        A.   If I remember correctly, he was an

14   attorney that dealt with PEOs in the State of

15   Florida.

16        Q.   From the DBPR?

17        A.   No, not from the DBPR.

18        Q.   Oh.  But he represented PEOs in front of

19   the DBPR?  Is that your understanding?

20        A.   That sounds about right.  That sounds

21   fair.

22        Q.   Okay.  Who is Jerry Lancaster?

23        A.   Jerry Lancaster is, I believe, one of the

24   owners of a workers' comp company, insurance

25   company out of Texas.

1    Q.   Okay.  And the next paragraph says, "Mike

2   said he would be out of town for the next week but

3   suggested that instead of waiting for him to get

4   back we very quickly get with Brian Nugent to make

5   sure we can answer the following questions to the

6   state's satisfaction:"

7       The first question is:  "Who owns AEM, Inc.?

8   The DBPR license indicates it is Yaniv Amar."

9       Is that correct?

10   A.   That's what it says.

11   Q.   Is that correct?

12   A.   In June of '06?

13   Q.   Yes.

14   A.   I don't think it would be correct because

15   I would have relinquished any shares that I had,

16   but that's what it says.

17   Q.   Okay.  "If someone else owns a majority of

18   AEM, did AEM fail to notify the DBPR of an

19   ownership change?"

20       Do you recall relinquishing your shares in AEM

21   officially?

22   A.   It may have been in the Hold Harmless

23   Agreement.  I have to look it up.

24   Q.   Why would Mr. Stanley have gone to you or

25   have come to you and Mr. Amodeo to get the answers

1    to these questions and not to the Board?

2        A.    I don't know.   I thought he reported to

3    Bob Pollack, is what I understood he reported

4    directly to.

5        Q.    Bob Pollack's not copied on here at all;

6    is he?

7        A.    Where?   No, he's not copied here, no.

8        Q.    And nor is he mentioned anywhere in this

9    e-mail.

10       A.    No, but I know that Mike Stanley asked Bob

11   Pollack for permission to come down to Miami when I

12   asked if he would come down and introduce himself

13   to his staff.

14       Q.    So what was Mr. Pollock's role over Mr.

15   Stanley?

16       A.    I don't know exactly what his official

17   role or title was, but I know that Mike Stanley

18   needed permission from him to fly down to Miami.

19       Q.    Was Mirabilis HR a, quote -- in the last

20   bullet point it says, "If Mirabilis HR was DBA for

21   Presidion..."

22           Was that, in fact, the case?   Was Mirabilis --

23       A.    No.

24       Q.    -- HR a DBA for Presidion?

25       A.    No.

1      Q.    What was the connection between Mirabilis

2   HR and Presidion?

3      A.    That's an interesting question, Kathleen.

4   I really -- like it was a moving target.   Whether

5   we managed -- whether AEM managed the book or

6   whether Mirabilis bought the book, whether -- there

7   were several contracts that went back and forth and

8   were rescinded.

9      Q.    But you were the CEO of AEM; correct?

10     A.    Yes.

11     Q.    But you didn't know whether -- what the

12   official relationship of your company was with

13   Presidion or with Mirabilis HR?

14     A.    There were two separate groupings in the

15   software.   One was for the new business that AEM

16   brought on in -- the $95 million that was brought

17   on in '06, and one was the $4-500 million in

18   business from Presidion.   I don't know if it was

19   ever officially transferred.

20     Q.    That was supposed to be 5 billion or

21   something.

22     A.    5.3 billion.

23          (Thereupon a document was marked

24     Plaintiff's Exhibit 467 for Identification in

25     the proceeding.)

1          MS. HAVENER:  For those of you on the

2      phone, 467 is an e-mail from Tessah Ivey dated

3      Thursday, February 23rd, 2006, to Craig

4      Vanderburg.  The subject is AEM and Lawson

5      employees.

6   BY MS. HAVENER:

7      Q.   It says, "I made Frank aware of the

8   exchange this morning.  I will provide your insight

9   to him as well.  Thanks, Tessah."

10       If you'll go to the back, please.  Okay.

11   There's an e-mail from Chris O'Connor to you dated

12   February 22nd, 2006.  The subject is -- and copied

13   to Sue Schumacher.  Who is Chris O'Connor?

14       A.   He was the former CFO of Presidion, I

15   believe.  I don't know if that was his title, but

16   he acted as the CFO of Presidion.

17       Q.   Of the public company?

18       A.   Yes.

19       Q.   I mean, there are seven Presidions or

20   something.

21       A.   I thought there were more than that,

22   actually.  But, yes.

23       Q.   I've only seen up to seven.

24       Would you please read the -- who is Sue

25   Schumacher, please?

246

1      A.   She was the CPA/CFO of the company.

2      Q.   Of what company?

3      A.   Of Presidion.

4      Q.   CPA/CFO?

5      A.   Yep.

6      Q.   Well, you just said -- oh, so Chris

7   O'Connor was the former CFO and she was the current

8   --

9      A.   She reported to Chris O'Connor while he

10  was there and after he had resigned.  I believe he

11  resigned in late '05 or early '06.

12     Q.   So she was later; after this e-mail.

13     A.   I don't know what her title was, but I

14  know she was involved with the day-to-day finances

15  of that company.

16     Q.   Okay.  But eventually she took over his

17  role; is that your understanding?

18     A.   She took over a financial role in the

19  company.  I don't know if it was his roles or not.

20     Q.   Could you read that e-mail into the

21  record?  It continues on to the next page.

22     A.   I only have two pages.

23     Q.   It's on the back.

24     A.   Okay.  Starting from Chris O'Connor to

25  Yaniv Amar?

1      Q.    Uh-huh.

2      A.    "Yaniv, After discussions with Melanie, we

3  have determined that AEM, Inc., doing business as

4  Mirabilis HR is reporting worksite employees

5  outside the State of Florida (in multiple states).

6      "As you are aware, MHR is not registered or

7  licensed in most of these states nor does it have

8  the applicable SUTA and Withholding accounts

9  established.  In addition, MHR does not have

10  workers' compensation insurance in any state but

11  Florida.

12      "Per my discussion with Melanie, she has made

13  ISI aware of this problem with Lawson for quite

14  some time.  There has been minimal response to this

15  problem.  As it stands, MHR is not in a position to

16  report these wages to the applicable states.

17      "I have come across this issue in regards to

18  my consulting assignment on State Income Tax

19  preparation consulting, and I feel obligated to

20  make you aware of the facts.

21      "I have asked Melanie to prepare a list of

22  those states and forward to you.  Please let me

23  know if I can assist in further reconciliation."

24      Q.    Do you remember this exchange?

25      A.    No, I don't actually, but --

1      Q.   Could you read your response to him, which

2   is about six minutes later, from Yaniv Amar to

3   Chris O'Connor, Wednesday, February 22nd, 2006.

4      A.   At 4:00 p.m.?

5      Q.   At 4 o'clock.

6      A.   "Chris, are you aware that Mirabilis HR is

7   merely servicing the out of state clients for

8   Paradyme?  There is a one year agreement in place

9   between the two entities."

10      Q.   And to your understanding, what knowledge

11   does that make?  Or what -- what knowledge.  What

12   difference does that make?

13      A.   What difference does what make?

14      Q.   That there was merely a servicing

15   agreement and not -- and that --

16      A.   The way I had understood it, Mirabilis HR

17   was acting as a PEO to the PEO.  Just like Common

18   Paymaster was -- you know, Common Paymaster was

19   processing the payroll for the Presidion employees

20   and for the AEM employees, which didn't make a

21   great deal of sense, but that's the way I

22   understood the agreement to read.

23      Q.   Okay.  Now, the next one starts at the

24   bottom of the first page and continues on to the

25   next page.  It's Chris O' Connor to you, dated

1    February 22nd, 9:03 p.m.  And the subject is the

2    same, AEM & Lawson Employees.  Would you please

3    read that into the record?

4         A.   "I am not aware of that.  I don't

5    understand how that could work in a co-employment

6    relationship (who do the employees belong to).  I

7    have never heard of mixing PEO and ASO service

8    between organizations.

9         "Tax Problems.  Regardless, you still are not

10   processing payroll correctly in Lawson nor are you

11   paying applicable payroll state withholding and

12   SUTA correctly.  Melanie is completely unaware of

13   this relationship, so you have unreported taxes on

14   the appropriate FEIN for state withholding and SUTA

15   accounts.  This is already a problem in any

16   withholding situations as she has not reported the

17   withholding (typically due on a monthly basis).

18        "You will then have a problem if not reported

19   from a SUTA perspective on April 30th, or 30 days

20   after each quarter end.

21        "WC Problems.  MHR is piggy-backing on

22   Paradyme's policy unless there is common ownership.

23   If there is common ownership, then Providence needs

24   to be made aware of the change via a new ERM 14.

25        "Accounting Problems.  This will create

1    problems in accounting as I am certain they are not

2    aware of the ASO relationship.  You cannot

3    co-mingle the cash if you are truly servicing the

4    accounts.

5         "I have not seen the documents, so it's hard

6    to be conclusive on the issues.  Someone needs to

7    give Melanie some direction on tax reporting and

8    Sue on the accounting side.  It's a real mess in

9    Troy because there is no information flow."

10        Q.    Okay.  Who was Chris O'Connor?

11        A.    At this time?

12        Q.    Yes.

13        A.    A consultant for Hourglass PC, whatever

14   that is.

15        Q.    How did you know him?

16        A.    I knew him when he was working for

17   Presidion in '05.  I met him in late '05.

18        Q.    He didn't have any connection to you, so

19   far as you knew, in '06?

20        A.    No.  This is probably the first

21   communication I had with him in '06.

22        Q.    Well, why would he have been looking at

23   the AEM/Mirabilis HR reporting?

24        A.    Because I believe he still did some

25   consulting work for Presidion at the time.

1       Q.    And because nobody knows the difference

2  between Presidion and AEM and Mirabilis HR, was he

3  consulting for them as well?

4       A.    This is the only communication that I ever

5  had with him, apparently.  I don't know.  I never

6  -- I don't recall ever talking to him.

7       Q.    Do you know how much experience Mr.

8  O'Connor had in the PEO industry?

9       A.    No, I don't.

10       Q.    What's an ASO agreement?

11       A.    I'm not sure.

12       Q.    So when you got this e-mail, did it cause

13  you concern?

14       A.    I don't recall seeing it like at the time,

15  but I imagine it would.

16       Q.    And the next e-mail is from Craig

17  Vanderburg to Tessah Ivey and with a copy to

18  himself.  And it's addressed to Frank, and we've

19  already discussed that Tessah Ivey was a

20  communicant for Frank.

21       A.    Yes.

22       Q.    "Frank, FYI, please see the exchange

23  between Yaniv and Chris below.  Yaniv --"  I

24  presume that means "-- has instructed that the

25  former Paradyme clients be populated into AEM by

1    IT.   The official move from Paradyme to AEM did

2    occur at that point, now Yaniv is stating that AEM

3    is only 'servicing these clients' for Paradyme.

4    The problem here is that Yaniv and IT moved the

5    clients to the AEM directory and for the past 2

6    months they have been included in all AEM tax base

7    and workers' comp, etc.

8         "Not trying to get in the middle of this but

9    it will be a problem at quarters end if Yaniv does

10   not fix it."

11        A.   Uh-huh.

12        Q.   Do you recall anything about what happened

13   as a result of this exchange?

14        A.   No, because I -- this is the first time I

15   see this e-mail.

16        Q.   Well, do you remember what happened as a

17   result of the communication between Chris O'Connor

18   and you?

19        A.   Not exactly, but I assume I brought it to

20   Frank's attention.

21        Q.   Well, we at least know Mr. Vanderburg did;

22   right?

23        A.   Yes.

24        Q.   And that was the next day, so --

25        A.   Okay.

1      Q.    -- somehow Mr. Amodeo knows about this.

2    Isn't this a pretty big deal?   These are pretty

3    significant problems; am I correct?

4      A.    Correct.

5      Q.    But you don't recall what happened as a

6    result of this?

7      A.    No, I recall that -- you know, not this

8    one in particular, but when other issues like this

9    -- there were a lot of big deals that occurred.

10   But I imagine I would have taken it to -- brought

11   it to Frank's attention, and I was always assured

12   that there are dozens of accountants and attorneys

13   and I need not worry about these issues.

14     Q.    But you went to Frank; not the Board.

15     A.    Correct.

16     Q.    And so how did the Board find out about

17   this, to your knowledge?

18     A.    I don't know.

19     Q.    Do you know if it did?

20     A.    No.

21     Q.    So it's very possible --

22     A.    You just brought it to my attention now.

23   This is --

24     Q.    Right.

25     A.    -- four-and-a-half years after the fact.

254

1       Q.   But it's absolutely possible -- what I'm

2   trying to get at is, Mr. Amar, isn't it possible

3   that the Board knew nothing about this?

4             MS. VILMOS:  Object to the form.

5             THE WITNESS:  It's a possibility, yes.

6   BY MS. HAVENER:

7       Q.   If the Board knew about it, they would not

8   have heard about it from you; correct?

9             MS. VILMOS:  Object to the form.

10            THE WITNESS:  I may have discussed this

11       with Richard Berman.  Like I spoke --

12   BY MS. HAVENER:

13       Q.   Okay.  But if you discussed it with

14   Richard Berman, that's not the same thing as

15   discussing it with the Board.

16       A.   Correct.

17       Q.   Mr. Berman was general counsel for the

18   company; correct?

19       A.   Right.

20       Q.   So you could be discussing it with Mr.

21   Berman in his role as general counsel and never

22   speak to the Board, and the information never gets

23   to the Board; correct?

24       A.   Correct.

25       Q.   So when we were focussing at the very

1    beginning of this deposition on your -- I think

2    your word was that you were appalled -- or, no, how

3    audacious it was for my clients to have served on

4    the Board of the company and not have heard of

5    malfeasance or misfeasance occurring within the

6    PEOs and not understanding the depth of the

7    problem, do you now understand that even you didn't

8    communicate problems that you saw and that were

9    pointed out to you to the Board?

10            MS. VILMOS:  Object to the form.

11            THE WITNESS:  Are you asking a question or

12        making a statement?

13   BY MS. HAVENER:

14        Q.   Yes.  I said:  Do you now understand that

15   even you didn't report things to the Board?

16        A.   I do understand that I -- I always knew

17   that I didn't report things to the Board.

18        Q.   You reported them to Frank; correct?

19        A.   Yes.

20        Q.   And so it's -- well, enough said.  Thank

21   you.

22            (Thereupon a document was marked

23        Plaintiff's Exhibit 468 for Identification in

24        the proceeding.)

25   BY MS. HAVENER:

1       Q.    This is an e-mail from Paul Glover dated

2   April 28th, 2006, 6:50 p.m., addressed to Yaniv

3   Amar, Frank Amodeo, James Sadrianna, Frank

4   Hailstones, Bob Pollack, Fernando Simo.

5       And it reads:  "Once more with feeling!

6   Attached are the audited financial statements for

7   AEM, Inc., and Human Resource Enterprise

8   Corporation for the year ended December 31st, 2005,

9   released moments ago by James Moore and Company.

10  Pleasure reading for each of you I am sure.  Have a

11  great weekend everyone!"  Signed by Paul Glover,

12  Executive Vice President Finance, CFO Mirabilis

13  Ventures, Inc.

14       Do you see that?

15      A.    Yes.

16      Q.    Did I read it correctly?

17      A.    Yes.

18      Q.    And attached to it is the Independent

19  Auditors Report of James Moore & Co., dated

20  April 26th, 2006; correct?

21      A.    Uh-huh.

22      Q.    Can you show me anywhere in this document

23  -- and, please, take your time -- where there is a

24  problem reported with respect to AEM and Human

25  Resource Enterprise Corporation to anyone on the

1    Board?

2         A.    I don't believe one was reported in the --

3         Q.    Okay.  But you -- okay.  Thank you.  Thank

4    you.  I'm sorry I interrupted.

5         Didn't you tell me earlier in this deposition

6    that you went to Paul Glover and explained to him

7    your concerns?

8         A.    Yes.

9         Q.    And did you communicate the concerns that

10   were reported to you by Chris O'Connor in this

11   e-mail that was Number 467 to Mr. Glover?

12        A.    I don't recall.

13        Q.    Okay.  That was -- this was, if you'll

14   compare them, a month -- two months earlier;

15   correct?

16        A.    The financials were two months after, yes.

17   Yes.

18        Q.    But the e-mails to you --

19        A.    Yes.

20        Q.    -- were in February reporting these

21   problems.

22        A.    Yes.

23        Q.    And you're not sure if you reported those

24   problems to Mr. Glover; correct?

25        A.    No, I recall reporting them to Frank and I

1    probably did report them to Richard Berman as well.

2        Q.    But not to Paul Glover.

3        A.    I don't think I would have reported them

4    to Paul Glover.

5        Q.    So in reporting them to Mr. Amodeo and Mr.

6    Berman, in what way did you believe that they were

7    going to be communicated to the Board?

8        A.    I don't know.

9        Q.    Okay.  Am I correct in understanding that

10   at this time in April 28th, 2006, given those

11   e-mails that we just saw a second ago in Number

12   467, you knew that those problems had existed;

13   correct?

14       A.    The problems with the out-of-state

15   clients?

16       Q.    Correct.

17       A.    I knew what was communicated to me, yes.

18       Q.    And do you know how those problems were

19   resolved?

20       A.    No, but I was given certain assurances

21   that they were being handled with counsel.

22       Q.    By whom were you given such assurances?

23       A.    By Frank and/or Richard.

24       Q.    And so if you looked -- would you have

25   looked at this document and read it carefully -- it

1    is addressed to you, the AEM financials -- would

2    you have reviewed this document with care?

3         A.    I reviewed the cover letter, not the

4    actual statements, and they told me they were

5    properly audited and --

6         Q.    But you're the CEO of the company;

7    correct?

8         A.    Yes.

9         Q.    Now, knowing what you knew about the

10   problems that had happened in just two months

11   earlier, and that you had -- that what you had done

12   about it is report them to counsel and to Frank,

13   did you examine this document to see if those

14   problems were reflected anywhere in this document?

15        A.    I read the cover letter and I was told

16   that the financials were audited.  I --

17        Q.    And so you didn't -- that's as far as it

18   went; correct?  You didn't do anything more.

19        A.    I don't believe I did anything more, no.

20        Q.    So you were satisfied, because of the

21   cover letter, that it was a-okay; correct?

22        A.    I don't know if that's a fair statement.

23   I don't think I was satisfied that it was a-okay,

24   but I was told that the financials were audited, I

25   was surprised, and I said okay.

1          Q.     Were you satisfied that it was good

2     enough?

3          A.    I don't recall exactly if I was satisfied

4     that it was good enough then, but it was definitely

5     a -- some relief that the financials were audited.

6          Q.     Now, I just want to make sure that given

7     those problems and given your sense of relief,

8     given the problems that were reported on

9     Exhibit 467 about the out-of-state clients and the

10    other issues that were raised by Chris O'Connor,

11    and then given the audited financial statements and

12    the clear or clean opinion letter -- you know what

13    I mean by "clean opinion letter," correct?

14         A.    Yes.

15         Q.     -- and your sense of relief at the clean

16    opinion letter, am I correct in understanding that

17    you did not feel any obligation to examine this

18    more carefully and/or to report those problems to

19    the Board?

20         A.    The problems from two months prior?

21         Q.    Correct.

22         A.    No, I didn't report them to the Board.

23         Q.    Nor did you feel a responsibility to

24    examine this with care to see that those problems

25    had been addressed.

1    A.   No, I discussed this with Paul Glover and

2  with some other accountants.  I really can't

3  understand the financial statement properly.  I

4  don't have that formal education.

5    Q.   Well, neither can I, but that's not my

6  job.  And I'm not a CEO of a company.  I mean, I

7  would expect --

8    A.   I didn't have the qualifications to be

9  CEO.  I was an Interim CEO.  But that's --

10          MS. VILMOS:  Ms. Havener, I'm going to

11      move to strike your comment.  That's

12      inappropriate.  If you have a question, then

13      ask him a question.

14          MS. HAVENER:  I apologize if I was

15      inappropriate.

16          (Thereupon a document was marked

17      Plaintiff's Exhibit 469 for Identification in

18      the proceeding.)

19  BY MS. HAVENER:

20    Q.   Exhibit 469 is an e-mail from Scott

21  Goldberg dated Tuesday, June 21st, 2005, at 10:14

22  a.m. to Michelle Hladky.  Do you know who that

23  Michelle Hladky is?

24    A.   No.

25    Q.   I'm representing to you I believe that

1   that's Mr. Sadrianna's secretary.  I think that's

2   what he told us in his deposition.

3       A.   Very possible.

4       Q.   Attached is Resolution of Board of

5   Directors - Yaniv - Ratify.

6       The e-mail says, "Michelle, attached are the

7   Minutes for the Board of Directors, with Yaniv

8   signing.  Please have Jim review --" and I presume

9   that's referring to Mr. Sadrianna, since Jim's

10  assistant was the recipient "-- and let me know

11  what changes he wants.  Thank you ever so kindly,

12  Scott Goldberg, Esq."

13      And the below e-mail is from Michelle, about

14  45 minutes earlier, Tuesday, June 21st, 2005, 9:27

15  a.m., to Scott, saying, "Hi, Scott, Jim needs you

16  to draw up the Minutes that Yaniv can sign to

17  ratify the Resolution from yesterday.  List Yaniv

18  as Director.  You do not need to include the

19  notary.  Thanks, Michelle."

20      Now, if you'll look at the next page, it

21  reads, "Minutes of Mirabilis Ventures, Inc.,

22  Special Meeting of Board of Directors."

23      It's not signed; correct?

24      A.   Correct.

25      Q.   And the next page, the meeting of -- the

1    next one is the wrong date, but it has the same

2    resolution on it.  I'm not sure why.  Mirabilis

3    Ventures, Special Joint Meeting of the Board of

4    Directors.

5         Do you remember serving as the Chairman of a

6    meeting of the Board of Directors of Mirabilis

7    Ventures on either June 21st, 2005, or July 6th,

8    2005?

9         A.   No.  You asked me this question already

10   and I answered.  No.

11        Q.   And you don't -- I'm sorry, but you don't

12   remember ever signing --

13        A.   No, this is my signature.

14        Q.   Yes.  But you don't remember signing it?

15        A.   I don't remember signing it.  And, like I

16   told you before, I was handed a lot of documents

17   and I, unfortunately, signed a few of them without

18   proper counsel or understanding.

19        Q.   Okay.  If you see what's attached a few

20   pages later, it's another set of Minutes of

21   Mirabilis Ventures, Inc., another Special Joint

22   Meeting of Directors and Shareholders, dated

23   April 7th, 2005.  And this one is signed by Frank

24   Amodeo as Chairman.  Do you see that?

25        A.   Yes.

1      Q.   Do you have any recollection of anything

2   having occurred between April 7th, 2005, and

3   July 7th, 2005?  I mean, did anything occur that

4   would have caused the office of Chairman to have

5   changed from Mr. Amodeo to you?

6      A.   Something may have happened, but I really

7   don't recall from, you know, five years ago,

8   five-and-a-half years ago, what happened in that

9   period of time.

10     Q.   Do you happen to recall, if you look at

11  the page that's dated July 6th, 2005, with your

12  signature on it, do you remember a resolution that

13  the company was authorized and directed to issue

14  1,000,000 shares of Preferred Stock of $0.00 par

15  value each?

16     A.   No, I don't recall.  But that is my

17  signature.

18          (Thereupon a document was marked

19      Plaintiff's Exhibit 470 for Identification in

20      the proceeding.)

21  BY MS. HAVENER:

22     Q.   470.  This is an e-mail from Mark Bernet

23  dated Wednesday, February 7th, 2007, at 6:02 p.m.

24  It's addressed to Mike Stanley, Kevin Leonard, Bill

25  Walsh, Robert Nevill, with a cc to Yaniv Amar;

1    Re: CHS payroll.

2         What is CHS, Mr. Amar?

3         A.   I don't know.

4         Q.   Could it be Community Health Systems?

5         A.   I really don't know.

6         Q.   Do you remember any business that you had

7    any involvement with called Community Health

8    Systems?

9         A.   No.

10        Q.   Would you please read the first e-mail

11   into the record, please.

12        A.   The one from Mark Bernet to myself?

13        Q.   Correct.  Oh, you're just copied, but,

14   yes.

15        A.   Oh, yeah.  "Can AEM acquire Florida PEO

16   assets?  What was the original intent for HRE?  I

17   appreciate that we don't necessarily want to waste

18   $125,000, but if we're not doing anything with it

19   and we can shut it down easily, we should consider

20   doing so.  My guess is that the $50,000 isn't

21   coming back any time soon."

22        Q.   Okay.  This is dated February 7th, 2007.

23   What was your role at that time?

24        A.   At that time, I was just trying to save

25   whatever PEO assets were left and sell them off to

1    another company.

2        Q.   In what capacity?

3        A.   Consultant.

4        Q.   Why?

5        A.   Why?

6        Q.   Uh-huh.  Were you being paid as a

7    consultant?

8        A.   Yeah.  I've answered your question

9    already.  I was being paid through May of '07.

10       Q.   Through May of '07.

11       A.   April or May of '07.  I don't recall.

12       Q.   I'm sorry.  You said April?

13       A.   April or May of '07.

14       Q.   Okay.  Well, I want to go -- now, I read

15   just the first one, which is actually the last one

16   in the string.

17       A.   Okay.

18       Q.   Where I want to start is at the -- who is

19   Robert Nevill?  At the bottom of the second page

20   there's an e-mail from Robert Nevill to Kevin

21   Leonard, with a copy to Jay Stollenwerk and Bob

22   Konicki.  And that appears to be the first one

23   that's referencing the CHS payroll.  Do you see

24   that?

25       A.   Yes.

1      Q.    And that reads, "Kevin - Here is all the

2   information you should need.  Fax over

3   authorization letter (on MVI letterhead if

4   available) to Cathy at 407-420-2819."

5      A.    Yes.

6      Q.    Do you know who Cathy is?

7      A.    No.

8      Q.    And then there's an instruction for a wire

9   transfer; is that correct?

10      A.    It appears to be, yes.

11      Q.    From Human Resource Enterprise dba/

12   management, and there's an account number for

13   $50,000.00 on behalf of Cadent to Sky Bank.

14   Account Name:  PSI -- that's Presidion Solutions,

15   Inc.; is that right?  Number VII?

16      A.    PSI VII, Inc., yes.

17      Q.    Yes.  And it says at the bottom, "We will

18   be able to cover the $16,256.96 out of Cadent's

19   books.  Please note that will leave them extremely

20   strapped for cash."

21       Do you have any recollection what this is

22   referring to?

23      A.    No.

24      Q.    Do you know why you became involved in the

25   exchange later the same day, approximately an hour

1    later?

2         A.    Why Mark included me?

3         Q.    Well, it looks like it was Mike Stanley

4    who included you.  From Mike Stanley.  See at the

5    top of the --

6         A.    Oh, of the second paragraph?

7         Q.    Uh-huh.

8         A.    No, I don't know why Mike Stanley included

9    me in that.

10        Q.    And so you have no recollection of what

11   this is about; am I correct?

12        A.    I don't know what -- that's correct.

13             (Thereupon a document was marked

14        Plaintiff's Exhibit 471 for Identification in

15        the proceeding.)

16   BY MS. HAVENER:

17        Q.    471, for those of you on the phone, is an

18   e-mail from -- it starts out with an e-mail from

19   Yaniv Amar to Mike Stanley dated Friday,

20   December 29th, 2006.  The "Re" line is AEM &

21   Mirabilis.

22         If you don't mind, Mr. Amar I'd like you to

23   start at the bottom, which is the first e-mail in

24   the string, and it's Friday, December 29th, 2006,

25   at 12:48, so not long before, from Mike Stanley to

1    you.   Subject line is AEM & Mirabilis.

2        And that says, "The understanding throughout

3    the company is that Mirabilis HR and WTS --" which

4    I believe is Workers Temporary Staffing; is that

5    correct?

6        A.   That's correct.

7        Q.   " -- are owned by Mirabilis Ventures.   I

8    did not understand that to be the case.   Could you

9    clarify with Frank?"  And then, "Mike Stanley,"

10   with a phone number after it, is the signature

11   line.

12       Could you read your response to Mr. Stanley?

13       A.   "The truth of the matter is that the IRS

14   owns MHR and WTS at this point in time!!"

15   Exclamation, exclamation.

16       Q.   What did you mean by that, Mr. Amar?

17       A.   I think this was right around the time

18   that I had discovered that there was probably a --

19   I don't know if it was give or take a couple days

20   that I found out that there was a large

21   investigation going on.   So Mike Stanley, it seemed

22   like, was trying to find some kind of a solution

23   and I responded.   Looked like I was pretty upset

24   about the situation.

25       Q.   So you weren't being flip.

1      A.   Flip?

2      Q.   It wasn't your intention to be sarcastic

3  or --

4      A.   No.  No.

5      Q.   You were upset.

6      A.   I was upset.

7      Q.   What did you do when you found out about

8  the investigation?

9      A.   What did I do?

10      Q.   Uh-huh.

11      A.   Tried to gather some information and that

12  was about it.

13      Q.   How did you find out about it?

14      A.   You had asked me that question already,

15  Kathleen.

16      Q.   I'm sorry.  I don't remember the answer.

17      A.   Frank had told me.

18      Q.   Okay.  Did you discuss it with anyone

19  else?

20      A.   Yes.

21      Q.   You didn't discuss it with anyone besides

22  Frank?

23      A.   No, I said, "yes."  I answered your

24  question, "yes."

25      Q.   And who was it?

1    A.   I discussed it with Mike Stanley, Mark

2  Bernet, Richard Berman, I believe.

3    Q.   Paul Glover?

4    A.   Paul Glover, yes.

5    Q.   Mr. Mokwa?

6    A.   I don't -- maybe in passing, but Mr.

7  Mokwa wasn't really very relevant.

8    Q.   Mr. Bates?

9    A.   I may have discussed it with him, but,

10  once again, it wasn't of any relevance.  Maybe it

11  was just in passing, but --

12    Q.   Mr. Sadrianna?

13    A.   Most likely.

14    Q.   Mr. Holtz?

15    A.   No, I don't believe I discussed it with

16  Mr. Holtz.

17    Q.   So I missed one.  You said Frank Amodeo,

18  Mr. Stanley, Mr. Berman, and Mr. Bernet.  Did I

19  miss somebody?

20    A.   No.  If you could repeat it.  I don't

21  know.

22    Q.   Oh, Glover.  I'm sorry.

23    A.   Yes.

24    Q.   And then on 471, the next e-mail in the

25  string from Mike Stanley to you says, "I have the

272

1    Finance/Accounting people asking for financial

2    information from the PEO.

3        "I am concerned that if MHR is owned by

4    Mirabilis Ventures we will still be dancing to

5    their whims and needs."

6        A.    Uh-huh.

7        Q.    Did you understand Mr. Stanley to be

8    referring to Mirabilis Ventures' whims and needs?

9        A.    As opposed to what?  That's what it says.

10       Q.    I mean -- well, I didn't know who "their"

11   meant in the e-mail.

12        And then your response to him  was, "Give them

13   my contact information."  Do you know who you

14   meant?

15       A.    Most likely, the Board of Directors, yes.

16   I mean, that's what it appears to be.

17       Q.    And do you remember who the Board of

18   Directors was at that time?

19       A.    I don't recall who was left.  It was a bit

20   of a revolving door.

21       Q.    Moving target, shall we say?

22       A.    Yeah, it was a revolving door.  Yes.  But

23   this was the time that Mike Stanley was trying to

24   find some kind of a creative solution and try to

25   separate Mirabilis HR from the other entities.

1          MS. HAVENER:  Do we not have third one?

2     Oh, I'm sorry.  It's already been introduced.

3     BY MS. HAVENER:

4          Q.   This is Exhibit Number 402.  It's an

5     e-mail from Paul Glover dated Tuesday,

6     December 19th, 2006, at 4:48 p.m.  It's addressed

7     to Frank Amodeo with cc's to Shane Williams and Jay

8     Stollenwerk.  The subject line is, "Transition

9     Plans."  Would you just please read that to

10    yourself.  You see it's got another page.

11         A.   I'm not finished the first page.  I just

12    skimmed through it, yes.

13         Q.   Okay.  Do you see that the last bullet

14    point was Mr. Glover -- well, the context --

15    correct me if I'm wrong, but it's my impression

16    that the context of this e-mail is Mr. Glover

17    trying to make clear to Mr. Amodeo essentially what

18    he had accomplished during 2006; is that a correct

19    --

20         MS. VILMOS:  Object to the form.

21    BY MS. HAVENER:

22         Q.   Is that a correct interpretation, as far

23    as you can see?

24         A.   That seems what he was getting at.

25         Q.   And the last bullet point of this e-mail

1    Mr. Glover says to Mr. Amodeo that he tried to

2    offload cash management, corporate governance,

3    fiscal responsibility and daily operational

4    management from you in 2006.  Is that correct?  Did

5    I read it correctly?

6         A.   Yes.

7         Q.   So is it consistent with your

8    understanding that Mr. Amodeo had, in 2005,

9    responsibility for cash management, corporate

10   governance, fiscal responsibility, and daily

11   occupational management at Mirabilis?

12        A.   In 2005 or 2006?

13        Q.   2005.

14        A.   I don't know if he was the sole

15   responsible party for all that, but he definitely

16   had some influence, yes.

17        Q.   And would you say he was chiefly

18   responsible for those matters in 2005?

19        A.   To the -- to what?  To Mirabilis Ventures

20   or what --

21        Q.   To Mirabilis Ventures for cash management,

22   corporate governance, fiscal responsibility, and

23   daily operational management in 2005.

24        A.   He had a slew of accountants reporting to

25   him and advising him, but I believe that he had

1    some influence in the decisions, yes.

2         Q.    I understand who he had reporting to you.

3    I'm asking you if he had -- yes or no, did he have

4    primary responsibility for cash management in 2005?

5         A.    I don't know.

6         Q.    Did he have primary responsibility for

7    corporate governance in 2005?

8         A.    I don't think so.

9         Q.    Did he have primary responsibility for

10   fiscal responsibility or fiscal issues in 2005?

11        A.    I really don't think so.  He was the most

12   fiscally irresponsible person I know, so I don't

13   think so.

14        Q.    And who took care of daily operational

15   management in 2005?

16        A.    I believe it was Dan Myers, James

17   Sadrianna, and a few other CPAs that he had.

18        Q.    I'm trying to reconcile that answer with

19   the fact that every time you ask a question -- in

20   the documents that we've seen today at least -- the

21   person that you go to is Mr. Amodeo.

22        A.    Right.

23        Q.    How can you reconcile that fact with these

24   other people being responsible for those issues?

25        A.    Because I don't know who was actually

1    ultimately responsible. I know that Frank had

2    certain influence on the decision making, but I

3    think that he set up the company where he wouldn't

4    be chiefly responsible. That's how it was always

5    explained to me by him, Berman, and Holtz.

6        Q.    But, nevertheless -- well, first of all,

7    was Holtz there in 2005?

8        A.    No.  He was -- not actively, but --

9        Q.    So we're talking about 2005.

10       A.    Okay.

11       Q.    So in 2005 there's a slew of accountants

12   and other financial people reporting to him --

13       A.    Attorneys, yeah.

14       Q.    -- and you believe he set up this chain of

15   responsibility, and all of these other people have

16   chief responsibility for the issues that I've just

17   mentioned; is that right?

18       A.    I believe he put certain measures in place

19   to protect the company from himself.

20       Q.    But, nevertheless, when you wanted a word

21   of permission or influence over a decision you were

22   making, the person you went to was not this slew of

23   accountants and all these people that were going to

24   protect Frank from himself, but to Frank himself;

25   correct?

```
1        A.    That would be correct.
2              MS. VILMOS:  Object to the form.
3   BY MS. HAVENER:
4        Q.    Mr. Cuthill testified in his deposition
5   that before the operations of Mirabilis were shut
6   down -- and we were at that time talking about, I
7   think, the takeover of Mirabilis -- the seizure of
8   Mirabilis' assets, as Mr. Amodeo referred to it, by
9   AQMI Strategy -- Mr. Cuthill testified that it was
10  his understanding that Mr. Amodeo gave to you a
11  hard drive; what he referred to as a great western
12  hard drive.  Do you know what I'm talking about?
13       A.    It's not a great western hard drive.
14             MS. VILMOS:  Object to the form.
15  BY MS. HAVENER:
16       Q.    Did Mr. Amodeo give you some -- a hard
17  drive?
18       A.    Yes.
19       Q.    Where is it?
20       A.    It's in a storage facility that I own.
21       Q.    Do you know what's on it?
22       A.    I believe -- I've never actually opened
23  it, but I believe that there's a whole bunch of
24  video recordings in there.  That's what I was told.
25       Q.    And who told you what to do with it?
```

1      A.     Nobody ever told me anything to do with

2   it.  Frank just gave it to me.

3      Q.     With no instructions at all.

4      A.     No.

5      Q.     And why did you decide to keep it in a

6   storage unit?

7      A.     Because it's a large box and inside

8   there's a hard drive in there and he told me

9   there's all the video in there and --

10      Q.     And do you believe that that likely

11   contains evidence that's relevant to the

12   investigation of Mirabilis?

13      A.     No, because I think that most things that

14   have evidence were -- were sort of cherry picked

15   and given in -- taped over -- in much smaller

16   recordings.  I mean, from what he told me, it was

17   two terabytes.  It would take me, I don't know, two

18   years to review it all.

19      Q.     Did you not think it was your

20   responsibility to turn it over to the authorities?

21      A.     Turn it over to the authorities?

22      Q.     Uh-huh.

23      A.     I did turn over certain videos to the

24   authorities.

25      Q.     But what you picked.

1          A.     No, not what I picked.  No.

2          Q.     Okay.  What did you -- so some of what --

3          A.     The ones that I viewed, I reported.  I

4     never viewed the hard drive.

5          Q.     So you don't know what's on it.

6          A.     No.  I just know what I was told.

7          Q.     And you weren't told anything about it?

8          A.     No, I was told it's a lot, a lot of video.

9          Q.     And you did not -- it belonged to whom,

10    in your mind?

11         A.     It was handed to me.  It belonged --

12         Q.     By Frank Amodeo.

13         A.     Correct.

14         Q.     Did you believe it belonged to him

15    personally?

16         A.     No, I didn't -- I never gave it any

17    thought as to who -- to whom it belonged to.

18         Q.     And you didn't think you had any

19    responsibility to do something with it other than

20    to just put it away in a storage locker?

21         A.     No.

22         Q.     Okay.  At that time, you knew that Mr.

23    Amodeo was a convicted felon; correct?

24         A.     Yes.

25         Q.     You knew that he was under investigation

1    again for a felony; correct?

2         A.   Yes.

3         Q.   You knew that Mirabilis itself was under

4    investigation for a felony; correct?

5         A.   Correct.

6         Q.   But you still felt no responsibility, is

7    that correct, to turn that over to the authorities

8    or to an attorney or to anybody?

9         A.   No.

10         Q.   I'm going to ask for you to produce it,

11    please.

12         A.   The entire hard drive?

13         Q.   Yes.

14         A.   Well, I don't know how I'm supposed to

15    copy it, but --

16         Q.   If I make those arrangements, can you --

17         A.   Yes.

18         Q.   Okay.  Thank you.

19         A.   If you subpoena them, then, yeah.  Or you

20    just request them --

21         Q.   I have to subpoena it?

22         A.   No, just request them.

23         Q.   Okay.  Well, I'm formally requesting it

24    now, but I will send you a letter confirming the

25    things that we've talked about that I'm asking you

1    to produce.

2         Did you ever talk to your personal attorney

3    about this?

4              MS. VILMOS:  Ms. Havener, can you make

5         sure that you copy me with that?  Because, to

6         the extent that this is property of Mirabilis,

7         I'm going to need to review it before it's

8         turned over.

9              MS. HAVENER:  No, it's not property of

10        Mirabilis.  Mirabilis let go of it.  It's now

11        in his possession.

12             MS. VILMOS:  Well, I'll make that

13        determination if he --

14             MS. HAVENER:  Mr. Amar has testified that,

15        to his knowledge, it belongs to Frank Amodeo.

16        And Mr. Amodeo said -- I mean, Mr. Cuthill

17        said in his deposition that Mr. Amodeo had

18        entirely waived the privilege and had no

19        authority -- and, also, your position so far

20        --

21             MS. VILMOS:  Ms. Havener, Ms. Havener, we

22        can deal with this offline.

23             MS. HAVENER:  First of all, my name is

24        Havener.

25             MS. VILMOS:  Send me a copy of your

1       request and we will deal with it offline.  I

2       don't need to make this deposition go any

3       longer because it's been excruciating thus

4       far.

5            MS. HAVENER:  I'm just going to say one

6       more thing, Ms. Vilmos, and that is that it

7       has been your position -- your client's

8       position throughout this litigation that Mr.

9       Amodeo had no control over Mirabilis and that

10      he was simply a consultant.  So if Mr. Amar

11      has possession from somebody who had no

12      control over Mirabilis, I don't see how you

13      can claim this is as Mirabilis' property.  But

14      we'll deal with it offline.

15   BY MS. HAVENER:

16      Q.   Mr. Amar, did you ever discuss this hard

17   drive with Randy Gold?

18      A.   Not to my recollection.

19      Q.   To your knowledge, does Mr. Gold even know

20   it exists?

21      A.   Yes, I would think so.

22      Q.   How do you know that?

23      A.   I mean, I would assume.  It wasn't a

24   secret that there were a lot of videos going on in

25   that building.  And it was part of the huge

1    summation that Frank and Mirabilis were working on.

2    So I --

3        Q.    That hard drive is part of the summation?

4        A.    No, I don't know.  I don't know if it was

5    or not, but I had no reason to believe it was a

6    secret hard drive.

7        Q.    When did he give it to you?

8        A.    Probably sometime in the middle of '07.

9    Maybe early to middle '07.

10       Q.    So you knew that the company was under

11   investigation; that was absolutely clear.

12       A.    Yes.

13       Q.    Why did you think he gave it to you?

14       A.    I don't know why.  You'd have to ask him.

15       Q.    Did you ask him?

16       A.    No.  He gave it to me, it was good

17   information to have in case I ever need it, God

18   forbid, and I have it in my possession.  That's it.

19       Q.    Okay.  Go back to 402.  I think it was

20   just --

21       A.    Yes.

22       Q.    Is there anything on this list -- you said

23   that you read it fully.  If you want to look at it

24   again, that's fine.  Is there anything on this list

25   or in this e-mail that gives anyone who's reading

1    it any reason to suspect that there was fraud going

2    on at Mirabilis?

3         A.   I don't know what people should suspect,

4    but --

5         Q.   Well, but you said you did; right?

6         A.   Yes.  I don't know what others suspect.  I

7    never saw this document, so --

8         Q.   But you said you talked to Glover about

9    it.  You testified earlier that you spoke to Mr.

10   Glover about your concerns.

11        A.   Yes.  Not about this e-mail.

12        Q.   No.  But about your concerns.

13        A.   Right.

14        Q.   So I'm just wondering if Mr. Glover made

15   it public.

16        A.   I don't know if he made it public or not.

17   It was never made public to me.

18        Q.   Have you ever met with Mr. Gold?

19        A.   Yes.

20        Q.   How many times?

21        A.   Twice.

22        Q.   Did he ever ask you if you had anything in

23   your possession that was relevant to Mirabilis?

24        A.   He never asked me about the hard drive.

25        Q.   Did he ask you about papers?

1      A.   Yes.

2      Q.   Were you subpoenaed?

3      A.   No.

4      Q.   So you went voluntarily?

5      A.   It was just a -- kind of a cordial thing.

6   He spoke to my attorney about it and --

7      Q.   And you went voluntarily?

8      A.   Correct.

9      Q.   Did he ask you to bring any documents?

10      A.   I believe he asked my attorney to give him

11   the documents.

12      Q.   And did you ever discuss -- you answered

13   that you've never told your attorney you had this

14   hard drive.

15      A.   No, I never said -- I said I -- I told my

16   attorney I had a whole bunch of videos and the hard

17   drive.  My attorney handed over certain videos to

18   the --

19      Q.   But only the ones he chose off that same

20   hard drive?

21      A.   He never viewed the hard drive.  The hard

22   drive was never opened.  I let him know that I had

23   a hard drive that would take a couple of years to

24   review it.  I'm not exaggerating.  From what I was

25   told, it was terabytes and terabytes of video

1    information.  I never opened it.

2        Q.   Yes, I understand.  We're in the middle of

3    reviewing our own terabytes that Mirabilis

4    produced.

5        A.   All right.

6        Q.   Are you familiar with what I'm going to

7    refer to as the Lou Pearlman case?

8        A.   Yes.

9        Q.   What do you know about it?

10       A.   Just what I heard about it on television.

11       Q.   And tell me what that was.

12       A.   That Lou Pearlman conducted a very large

13   Ponzi scheme and liked little boys.

14       Q.   Do you know who discovered that he had

15   conducted a Ponzi scheme?

16       A.   I actually was surprised to find out it

17   was Mr. Glover.

18       Q.   And why were you surprised to find that

19   out?

20       A.   Because I just read the book.  Somebody

21   told me that the book came out, I read the book,

22   and I saw that.  I was just surprised.  I didn't

23   know that he had any connection with Mr. Pearlman.

24       Q.   Do you know who wrote the book?

25       A.   No.

1      Q.   I'm representing to you that the book --

2   are you talking about the book that's called "Boy

3   Bands"?

4      A.   No.

5      Q.   Something like that?  "Hit Charade."

6   "The Hit Charade."

7      A.   I believe that's the name of the book.

8      Q.   Is that it?  Well, I'm representing to you

9   that it was written by Tyler Gray, the same person

10  who wrote this article.

11     A.   Okay.

12     Q.   This is Exhibit 222.  It's an article that

13  was introduced in Mr. Cuthill's deposition, who

14  testified that he'd never heard of Tyler Gray.

15      If you will look at the first full paragraph

16  in the second column, and I'll just read it into

17  the record.

18      "That was where Glover came in.  The

19  48-year-old CPA was brought into Pearlman's

20  flailing operation by Frank Amodeo, a secretive

21  'distressed business manager' who, for two years,

22  had been working quitely behind the scenes to bail

23  out Trans Con."

24      Were you aware that Mr. Amodeo was -- I'm

25  sorry.  I'm not reading now.  I'm asking a

1    question.  Were you were aware that Mr. Amodeo had

2    been trying to bail out Trans Con?

3        A.   No.

4        Q.   "At Amodeo's request, Pearlman ordered his

5    executives to open the corporate books to Glover,

6    presuming the accountant would be a team player.

7    Big mistake."

8         I'm sorry.  I'm back reading now.

9         "By 3 p.m. that January afternoon, Glover had

10   set up camp in Pearlman's spacious third-floor

11   corner office - accented with a faux tiger rug,

12   shower, and motorized draperies - and begun poring

13   over documents as Trans Con senior executive Bob

14   Fischetti and Pearlman's executive assistant, Janet

15   Hart, hovered anxiously nearby.

16        "Among the documents the accountant discovered

17   were boxes of angry certified letters from

18   investors in a $500 million savings account scheme

19   that had kept cash flowing to Pearlman's faltering

20   music management company.  The investors wanted

21   their money.  But there was no money.  Instead,

22   records clearly indicated that 'that half-billion

23   dollars was going straight into Lou's hands,'

24   Glover says.  'Immediately, I'm thinking, This is a

25   Ponzi scheme.'"

1        Do you see that?

2        A.   I wasn't following, but, yes.

3        Q.   So it surprised you that Mr. Glover had

4   found fraud at Mr. Pearlman's company; correct?

5        A.   Yes.

6        Q.   Does it surprise you more that he found it

7   within a couple of hours?

8        A.   I never gave it any thought.

9        Q.   But you've indicated to us today, I think,

10   that Mr. Glover never, to your knowledge, reported

11   anything about potential fraud at Mirabilis to the

12   Board; correct?

13        A.   He never reported it to me.  I don't know

14   what he reported to the Board.

15        Q.   And, nevertheless, you did go to Mr.

16   Glover and express your concerns to him.

17        A.   Yes.  Yes, I did.

18        Q.   This is 403.  It was introduced at Mr.

19   Cuthill's deposition.  It is a -- well, it starts

20   out on the bottom.  It is an e-mail from Paul

21   Glover, Wednesday, April 19th, 2006, 5:35 p.m., to

22   Frank Hailstones, Fernando Simo, Richard Berman.

23   The subject is "Trust Fund Taxes."

24        "I just read a memorandum prepared by Elena

25   Wildemuth of Berman, Kean & Riguera which concludes

1    with, 'Accordingly, from the fax provided, it would

2    be very unlikely for the IRS to impose liability on

3    Presidion for the payroll taxes of the Sunshine

4    entities pursuant to Section 6672.  AEM, Inc., is

5    at least a full arm's length away under the

6    contract for management services agreement.  Add to

7    that the fact that AEM has not, nor has any of its

8    officers, directors, shareholders or employees been

9    responsible for authorizing which creditors to pay,

10   to sign and file Forms 940 or 941, nor to make

11   federal tax deposits, nor collect trust fund taxes,

12   nor sign checks on behalf of the owner of the book

13   of business for which trust fund taxes would

14   otherwise be due from, and the result is further

15   insulation from the liability for the payroll taxes

16   of the Sunshine entities."

17        Do you understand that?  Did I read that

18   correctly?

19        A.   Yes.

20        Q.   And Mr. Berman responds a few days later

21   to the same -- to Mr. Glover, Mr. Hailstones and

22   Mr. Simo:  "Light reading, Paul."

23        So I want to confirm again that, based on

24   this e-mail, as well as what you've testified to

25   earlier, despite the fact that Mr. Glover made

1    $585,000 a year and was CFO of Mirabilis

2    Enterprises, he never reported, to your knowledge,

3    any suspicion of fraud.

4         A.   He would not report it to me if he had.

5              MS. VILMOS:  Form.

6              MS. HAVENER:  I'm sorry.  Did you say,

7         "hold on"?  You said, "form," or "hold on,"

8         Nicolette?

9              MS. VILMOS:  Object to the form.

10   BY MS. HAVENER:

11        Q.   Okay.  He would not have reported it to

12   you, but are you aware of him having reported it to

13   anyone?

14        A.   No, I'm not aware of him reporting it or

15   not reporting it.

16        Q.   Were you angry at Mr. Glover?

17        A.   I was angry at quite a few people.

18        Q.   Did you happen to go to Mr. Glover's new

19   place of employment and you had to see for yourself

20   and raise Cain that he had not reported fraud --

21        A.   Yes --

22        Q.   -- or discovered fraud despite his

23   expertise?

24        A.   -- I'm sure I would have if I had found

25   out that he was all of a sudden a global expert in

1    fraud detection and he didn't -- you know?  I don't

2    know what he does for his employment.

3         Q.   Well, he was -- apparently, he became an

4    expert on fraud detection.

5         A.   I just read that book a few months ago.

6    It's not -- I didn't know about it in '07.

7         Q.   But, you know, he's represented to be an

8    expert in fraud detection; correct?

9         A.   Correct.

10        Q.   And very shortly --

11        A.   Well, it seems like it.  I don't know.  I

12   mean --

13        Q.   Very shortly after he left Mirabilis.  In

14   fact, even before -- this is in February of '07;

15   right?

16        A.   That's what it says.

17        Q.   But you didn't think that it was necessary

18   --

19        A.   I didn't see this article until just now

20   and I didn't read the book until a few months ago.

21        Q.   Okay.

22             MS. HAVENER:  I want to take about -- what

23        time is it?  I want to take about five

24        minutes, please.

25

1          (Thereupon a brief recess was taken, after

2     which the following proceedings were had:)

3          MS. HAVENER:  Okay.  We just have a couple

4     more things and then we're going to show you a

5     video that we're going to ask you to

6     transcribe.  I think it's only about seven

7     minutes.

8          MS. CURRY:  Not even that long.

9          MS. HAVENER:  This is next in succession,

10     please.

11          (Thereupon a document was marked

12     Plaintiff's Exhibit 472 for Identification in

13     the proceeding.)

14  BY MS. HAVENER:

15     Q.   Mr. Amar, I'm showing you what's been

16  marked in this deposition as Exhibit 472.  Do you

17  recognize this document?

18     A.   No.

19     Q.   Is it your handwriting?

20     A.   It appears to be.

21     Q.   And is it your signature at the end of it?

22     A.   It appears to be, yes.

23     Q.   The signature is dated 2/10/05; correct?

24     A.   Yes.

25     Q.   Do you recall signing an Affidavit for the

1     State of Ohio Department of Insurance?

2         A.    I really have zero recollection of this

3     document, but it appears to be my writing.

4         Q.    Okay.  And so you can't answer the

5     question for whom were you applying for insurance?

6         A.    No.

7         Q.    What we're looking at is a Biographical

8     Affidavit that says, "(Print or Type)."  It's for

9     the State of Ohio Department of Insurance.  It's an

10    Authority for Release of Information and a

11    Biographical Affidavit.  They're both signed by

12    Yaniv and both notarized by Tessah Ivey on the 10th

13    of February of 2005.

14         It represents, does it not, that the full name

15    and address of company is Mirabilis Ventures, Inc.;

16    is that correct?

17        A.    Yes.

18        Q.    The business address is down below, 20

19    North Orange Avenue, although that says, "Affiant's

20    Business Address,"  which means yours.

21        A.    Where does it say that?

22        Q.    We're at Number 5.

23        A.    Oh.  Yes.

24        Q.    It says, "Affiant."

25        A.    Yes.

1   Q.   Meaning yours -- it actually means yours,

2   but you were putting the business address of

3   Mirabilis Ventures; correct?

4   A.   Yes.

5   Q.   Oh.  Actually, would you please give me

6   that document back?  Both of you.  The one that

7   you're looking at right now, I need to redact from

8   it.

9   A.   What does "redact" mean?

10   Q.   It means to cross out the Social Security

11   number.  We're not allowed to put that in a court

12   document.  It's for your protection.

13   A.   Thank you for protecting me, Kathleen.

14   That's very kind of you.

15   Q.   Well, you're welcome.

16    So is there any reason that you can think of

17   why you would have been signing an Affidavit on

18   behalf of Mirabilis Ventures to apply for

19   insurance?

20   A.   I don't recall, Kathleen.  This was in

21   February of '05 and, as I told you several times

22   through this deposition, I signed many documents

23   without full knowledge.

24

25

1              (Thereupon a document was marked

2         Plaintiff's Exhibit 473 for Identification in

3         the proceeding.)

4    BY MS. HAVENER:

5         Q.   This is 473.  It's an e-mail dated

6    August 3rd -- well, the first one is August 2nd,

7    2006, from Michelle Claussen.  Who is Michelle

8    Claussen, Mr. Amar?

9         A.   I believe she's one of the accountants or

10   CPAs.  I don't recall exactly who Michelle Claussen

11   is.

12        Q.   And it's dated Wednesday, August 2nd,

13   2006.  That's after you resigned; correct?

14        A.   Correct.

15        Q.   And it's addressed to you, Nichole Beamer,

16   Tessah Ivey, Dan Myers, James Sadrianna, Kevin

17   Leonard, Paul Glover, Fernando Simo, Jay

18   Stollenwerk and Shane Williams; correct?

19        A.   Uh-huh.  Yes.

20        Q.   And carbon copies to Mike Stanley and

21   Tracy Taylor; correct?

22        A.   Correct.

23        Q.   And it refers to:  "Cash Flashes for today

24   8/2/06."  Do you see that?

25        A.   Yes.

1       Q.   And the top one is Tessah Ivey forwarding

2   the same information to Mr. Amodeo.  Do you see

3   that?

4       A.   Yes.

5       Q.   What are cash flashes?

6       A.   I'm not sure.

7       Q.   So you have no idea what this document

8   means?

9       A.   I have an idea of what a cash flash is;

10  I'm just not a hundred percent sure.

11      Q.   Well, can you look at the thing that's

12  attached and see if you recognize it?

13      A.   That's what I'm looking at right now.

14      Q.   It says at the top, "AEM, Inc., doing

15  business as Mirabilis HR, Combined Bank Report."

16      A.   Yes.

17      Q.   And it has, "Incoming.  ACH credits -

18  clients.  Wire credits - clients.  Deposits -

19  clients.  Deposits - miscellaneous.  Miscellaneous

20  credits."

21      A.   Yes.

22      Q.   Correct?

23      A.   Correct.

24      Q.   Would those be, if you know, deposits of

25  payroll taxes by Mirabilis -- by AEM, Inc.'s

 1   clients?

 2       A.   I don't know if they'd be payroll taxes.

 3   I think they'd be just gross payroll profits or the

 4   gross profits being deposited.  That's what I would

 5   assume.

 6       Q.   Okay.

 7       A.   Because look at the numbers from Monday to

 8   Tuesday to -- I mean, it goes up in large

 9   increments.  I don't know if that was all taxes.  I

10   think that's just the gross profit.

11       Q.   Should payroll taxes have been paid every

12   day as well?

13       A.   My understanding was that they should have

14   been put in a separate bucket.  I think they were

15   paid quarterly, but they should have been

16   transitioned to a special account.

17       Q.   So on the Thursday, 7/27, and the Tuesday,

18   8/1/2006, when there are tax wires for AEM and for

19   NMS -- that's National Medical Staffing, I think?

20       A.   Okay.

21       Q.   That's a debit; right?  Are those debits,

22   those being put into different buckets?  Is that --

23       A.   I don't know.  I can't answer that

24   question.  But it appears to be payments for 941

25   taxes.

1      Q.   So would those have been actual payments,

2   or would those have been just separating out the

3   funds?

4      A.   I would assume that they would be made for

5   payments, but it could have been just put into

6   separate buckets for safekeeping.

7           (Thereupon a document was marked

8        Plaintiff's Exhibit 474 for Identification in

9        the proceeding.)

10  BY MS. HAVENER:

11     Q.   This is Exhibit 474.  It is a DBPR EL-4504

12  Quarterly Report Form, State of Florida, Department

13  of Business and Professional Regulation.

14      Could you tell me what this is, Mr. Amar?

15  It's dated December 31st, 2006.  Do you see that on

16  the right-hand side at the top?

17     A.   No.  March 31st.

18     Q.   Oh, I'm sorry.  March 31st; you're right.

19  And then underneath that, the company name is AEM,

20  Inc., doing business as Mirabilis HR; correct?

21     A.   Correct.

22     Q.   And then there's a CEO statement.  Could

23  you read that to me, please.

24     A.   "I hereby certify that all health

25  insurance, life insurance, workers' compensation

1    insurance and any other employee benefits accruing

2    either to our employees or their dependents have

3    been and are being paid to the proper payees as

4    required by contract, law, or other obligatory

5    documents, and these requirements are on a current

6    and timely basis.  I certify further that I

7    understand that maintenance of positive working

8    capital is required by Chapter 488-" -- I believe

9    it's "-- 526(3)(d), Florida Statutes, and that our

10   company is in compliance with these requirements.

11   I certify that I understand that this periodic

12   certification is incomplete unless the proof of

13   valid workers' compensation insurance is attached

14   to this form."

15        Q.    And then you signed it; correct?

16        A.    Yes.

17        Q.    And the date is 6/13/06; correct?

18        A.    Correct.

19        Q.    And then below there's a "Controlling

20   Person Statement" that you've also signed.  Could

21   you read that to me, please.

22        A.    "I have reviewed the information above and

23   certify that it is true and correct to the best of

24   my knowledge and belief."

25        Q.    And you signed it on 6/13/06.

1      A.    Correct.

2      Q.    Is that correct, as you understood things

3  to be at that time, Mr. Amar?

4      A.    I was -- it was reported to me that the

5  insurance was in good standing, yes.

6      Q.    So it was reported to you.  By whom was it

7  reported to you?

8      A.    I don't know exactly, I don't recall, but

9  I believe it would have been reported to me by

10  Laurie Andrea.  That would have been one of her

11  responsibilities.

12     Q.    And you relied on what Ms. Andrea told you

13  and you signed this document to the State of

14  Florida, although you are -- you reported that you

15  had suspicions that something else was going on;

16  correct?

17     A.    Well, this is just talking about the

18  insurance being paid properly.

19     Q.    We'll, it says -- okay.  I'm sorry.  Well,

20  in Mr. Glover's -- do you know if Mr. Glover ever

21  signed this document?

22     A.    I assume that Mr. Glover and Mr.

23  Hailstones and Laurie Andrea also signed it.  I'm

24  not sure though.

25     Q.    But you don't know.

1      A.    No, I wouldn't know.

2      Q.    But Mr. Glover says, "I certify that the

3   federal, state, and local payroll taxes have been

4   paid as required by regulations of each applicable

5   taxing authority.  I further certify that all

6   workers' compensation premiums and employee benefit

7   payments for this quarter have been paid as due.  I

8   have attached copies of the current quarter's

9   balance sheet and income statement."

10     Now, would you have signed this if those were

11   not attached?

12     A.    I don't know what I would have signed or

13   what -- if I did, then I'd like to see it.  I don't

14   know.

15     Q.    Well --

16     A.    This was for AEM.  This wasn't for the

17   entire PEO.  This is for the AEM portion of --

18     Q.    So you didn't have any suspicions about

19   AEM; is that right?

20     A.    No.  No.  From what I was told by Mike

21   Stanley as soon as he came on is that AEM was

22   current.  But AEM was only the organic business

23   that we brought on.  It had nothing to do with the

24   predecessor book of business.

25     Q.    Okay.

1          (Thereupon a document was marked

2       Plaintiff's Exhibit 475 for Identification in

3       the proceeding.)

4   BY MS. HAVENER:

5       Q.   This is 475.  It's two-sided, but we'll

6   start on the side that's from Craig Vanderburg.  I

7   think that's correct.  Craig Vanderburg, dated

8   Friday, July 29th, 2005.  It's addressed to Frank

9   Amodeo, Yaniv Amar, Craig Vanderburg, Jim Baiers,

10  Chris O'Connor.  The subject is "Presidion / AEM."

11       It says, "Gentlemen, Just a few things to

12  keep in mind if we attempt to move the contracts to

13  AEM next week.  We have significant 'straddle

14  payroll' issues that could amount to very material

15  dollars needing to continue to flow through

16  Presidion before they could be released to AEM or

17  other.  In addition we have not tested any

18  electronic banking transactions for any AEM bank

19  accounts at this point.  This could lead to major

20  service interruptions if we attempt to start ACH

21  debits/credits next week.

22       "If at all possible we really need our new

23  carrier to pick up the additional time necessary

24  (August) to cover the current Presidion book and

25  then start the AEM coverage period.  This will also

1    allow us the ability to address such issues as

2    Health care, 401(k) and other with respect to the

3    changes."

4         A.   Yes.

5         Q.   Do you understand what this is referring

6    to?

7         A.   Yes, I do.

8         Q.   Could you explain it to me, please?

9         A.   This is -- I'll give you the context.  I

10   believe the original plan that Mirabilis Ventures

11   had was to transition the Presidion book of

12   business in the third quarter of '05.  And then

13   Frank was strongly advised against it by some

14   attorneys and accountants and decided to make it

15   1/1 of '06.

16        Q.   So this was to transfer Presidion to AEM?

17   Am I understanding that correctly?

18        A.   That's what it reads.

19        Q.   Yes.  Okay.  Is there any documentation

20   that you're aware of that the attorneys and

21   accountants advised Mr. Amodeo against it?

22        A.   No, I'm not aware of it, but --

23        Q.   Did Mr. Amodeo tell you that?

24        A.   Mr. Amodeo told me that, Craig told me

25   that, and I believe also Jeff Rendell and Chris

1    O'Connor were two of the key people who influenced

2    the decision not to do it in the third quarter --

3    in the fourth quarter.

4         Q.   Were they at Mirabilis?

5         A.   No, they were Presidion employees.

6         Q.   Okay.  And on the next page -- it's

7    actually just a few minutes later from -- one

8    e-mail is at 10 o'clock, 10:01; and then the next

9    one is 10:17 from Tessah Ivey to Craig Vanderburg;

10   same subject line.  "Craig, I have accounted for

11   this.  I will explain later.  Frank.  Dictated but

12   not read."

13        Now, that was routine; correct; for him to

14   put, "Dictated but not read."

15        A.   I've seen it before.

16        Q.   Now, is it your understanding that in

17   those 16 minutes Mr. Amodeo consulted with his

18   attorneys or --

19        A.   No.  It was probably prior to this.

20        Q.   But Mr. Amodeo already had a response for

21   Mr. Vanderburg.  In other words, what I'm asking

22   is:  Was it your understanding that by this time

23   Mr. Amodeo already knew that he was going to

24   postpone it until January?

25             MS. VILMOS:  Object to the form.

 1          THE WITNESS:  I don't recall.  You'd have

 2      to ask him what his intention was.

 3          MS. HAVENER:  Thank you.  Okay.  We are

 4      going to show a video.  We need a few minutes

 5      to set it up.

 6                   (Off the record.)

 7          MS. HAVENER:  Let me just say, this took

 8      place in March of '07, and it's a meeting in a

 9      conference room and I think -- who are those

10      two people, Edie?  The back is Yaniv Amar.

11          MS. CURRY:  I don't know.  This is after I

12      left.  So Mr. Amar will have to --

13  BY MS. HAVENER:

14      Q.   Can you identify that other person?

15      (Thereupon, a DVD recording was played and was

16  reported as follows:)

17          MR. AMAR:  Bottom line is, in these times,

18      he said that I've dealt with so many

19      distresses in my life as -- you know, as it

20      pertains to business.  Best thing to do is put

21      on a brave face, clean suit, and say we're

22      going to get through this.  And if we don't,

23      let's ease out of the situation.  But just

24      sort of hiding in his office and losing all

25      the weight, he's just -- and it's scaring

1          everybody.  Because nothing's ever been what

2          they want to see in a leader.

3               UNIDENTIFIED SPEAKER:  No,

4               MR. AMAR:  You come to the Miami office,

5          people are, you know, of course, pissed,

6          people are concerned, but when they see me --

7               UNIDENTIFIED SPEAKER:  Yeah.

8               MR. AMAR:  You know?

9               UNIDENTIFIED SPEAKER:  Right.

10               MR. AMAR:  All right.  We're still here.

11          You know what I mean?

12               UNIDENTIFIED SPEAKER:  Uh-huh.  Yeah,

13          Mike, he's internalized it and he's just

14          become angry and bitter.

15                    (The DVD was paused.)

16               THE WITNESS:  Who is that?

17               MS. HAVENER:  Bill Walsh, I think?  Is it?

18                    (The DVD was resumed.)

19               MR. AMAR:  Exactly.  And he also wears his

20          emotions on his sleeve.  Now, I'm telling you

21          what, Mike has reason for concern.  I think,

22          you know --

23               UNIDENTIFIED SPEAKER:  Uh-huh.

24               MR. AMAR:  Bottom line is, it's -- it's --

25          it's not a pleasant situation.  Mike made his

1           last day Friday, 5 p.m.  He's no longer an

2           employee.  He called the banks yesterday.

3                UNIDENTIFIED SPEAKER:  I know.  That was

4           --

5                MR. AMAR:  I called him yesterday, last

6           night after I met with (unintelligible) here.

7           You were probably meeting with Frank.  I said,

8           Mike, Frank is the captain of the ship.  I

9           warned him there's an iceberg, I warned him

10          that there was a -- a storm.  I warned him.

11          He still navigated the ship.  The ship sunk.

12          I'm going to try to provide the best life

13          boat, the biggest life boat I can.  It's

14          impossible to fit all the companies in the

15          life boat, but I will not let Frank off this

16          ship.  I'm telling you right now, by you doing

17          what you did, it makes this life boat --

18          you're sinking the life boat.  Because what do

19          you think, Frank Amodeo's gonna send me the

20          accounts now?  And we're talking you did it

21          for eight months.  He transferred tens of

22          millions of dollars.  I'm asking for nine more

23          days until the insurance cancels and then you

24          can walk.  And then fool yourself into walking

25          off into the sunset with your wife and your

1      kids and think you're going to have a

2      happy-ever-after kind of life.  It's not going

3      to happen.

4          UNIDENTIFIED SPEAKER:  No, it's not.

5          MR. AMAR:  It's not going to happen.

6          UNIDENTIFIED SPEAKER:  No.

7          MR. AMAR:  So I go, right now, this is

8      going -- this is what I'm doing right now,

9      it's a mitigating effect.  It's going to

10     mitigate the damage (unintelligible) -- first

11     of all, if we don't do it this way, wage

12     issues, Department of Labor issues, the DBPR,

13     the state, the Feds, everybody comes on this

14     thing and it becomes ugly.  Plus, you have

15     22,000 displaced worksite employees, 1,700

16     client companies who are going to -- now they

17     don't have a reason to file a lawsuit, but

18     there is going to be a couple of class action

19     lawsuits coming if we let this thing implode.

20     I go, if you walk, Laurie walks, I walk,

21     nobody can get off this.  The (unintelligible)

22     he gets now -- he, Laurie and I developed a

23     few months back sort of like this tripod of

24     support.  Every time I was really pissed,

25     (unintelligible) and vice versa.

1          UNIDENTIFIED SPEAKER:  Well, that's a good

2     thing.

3          MR. AMAR:  You know, I was in Israel with

4     my wife over the summer --

5               (The DVD concludes.)

6          MS. HAVENER:  Is that it?

7          MS. CURRY:  Yeah, that's it.

8  BY MS. HAVENER:

9     Q.   Okay.  Could you understand that?

10     A.   Not fully.

11     Q.   But did you hear the comments that you

12  made where you said, you repeated several times, I

13  warned him about this and I warned him about that?

14     A.   Mike Stanley?

15     Q.   No.  You were referring to -- I think you

16  were referring to Mr. Amodeo.

17     A.   No, I believe I was referring to Mike

18  Stanley.

19     Q.   Oh, you warned Mr. Stanley?  What were you

20  warning him about?

21     A.   No, I was warning him not to resign when

22  he did.

23               (The DVD resumes.)

24          MR. AMAR:  Bottom line is, in these times,

25     he said that I've dealt with so many

1    distresses in my life as -- you know, as it

2    pertains to business.  Best thing to do is put

3    on a brave face, clean suit, and say we're

4    going to get through this.  And if we don't,

5    let's ease out of the situation.  But just

6    sort of hiding in his office and losing all

7    the weight, he's just --  and it's scaring

8    everybody.  Because nothing's ever been what

9    they want to see in a leader.

10           UNIDENTIFIED SPEAKER:  No.

11                (The DVD was paused.)

12   BY MS. HAVENER:

13       Q.    Who was hiding in his office?

14       A.    Mike Stanley.  I was referring to Mike

15   Stanley in that.

16       Q.    Okay.

17                (The DVD resumes play.)

18           MR. AMAR:  You come to the Miami office,

19   people are, you know, of course, pissed,

20   people are concerned, but when they see me --

21           UNIDENTIFIED SPEAKER:  Yeah.

22           MR. AMAR:  You know?

23           UNIDENTIFIED SPEAKER:  Right.

24           MR. AMAR:  All right.  We're still here.

25   You know what I mean?

1          UNIDENTIFIED SPEAKER:  Uh-huh.  Yeah,

2      Mike, he's internalized it and he's just

3      become angry and bitter.

4          MR. AMAR:  Exactly.  And he also wears his

5      emotions on his sleeve.

6                  (The DVD was paused.)

7          THE WITNESS:  Uh-huh.  And I saw that guy

8      lose weight, become gaunt, and the poor guy

9      looked suicidal.  So I kind of felt bad for

10      him and his family.

11  BY MS. HAVENER:

12      Q.   You referred to you were trying to build

13  the biggest life boat you could for Mr. Amodeo.

14      A.   No, for the company.  For whatever assets

15  can be salvaged from this -- from this huge --

16      Q.   Okay.  What did you mean?

17      A.   Try to sell off the PEO assets which I

18  helped broker, the sale of the PEO assets to

19  another PEO and the proceeds purportedly went to

20  the IRS.

21      Q.   I think I heard you say that you warned

22  Frank about a big iceberg.  Did I misunderstand?

23      A.   I don't know what I said three-and-a-half

24  years ago, Kathleen.

25                  (The DVD was resumed.)

1          MR. AMAR:  Bottom line is, it's -- it's

2     -- it's not a pleasant situation.  Mike made

3     his last day Friday, 5 p.m.  He's no longer an

4     employee.  He called the banks yesterday.

5          UNIDENTIFIED SPEAKER:  I know.  That was

6     --

7          MR. AMAR:  I called him yesterday, last

8     night after I met with (unintelligible) here.

9     You were probably meeting with Frank.  I said,

10    Mike, Frank is the captain of the ship.  I

11    warned him there's an iceberg, I warned him

12    that there was a -- a storm.  I warned him.

13    He still navigated the ship.  The ship sunk.

14                    (The DVD was paused.)

15          THE WITNESS:  "Frank is the captain of the

16    ship," I believe I said.

17   BY MS. HAVENER:

18       Q.   But you warned him about the iceberg, that

19   the ship sunk.

20       A.   This was in March of '07 after everybody

21   had left.  But the context, you have to understand

22   the context, Kathleen.

23       Q.   Okay.  Explain the context.

24       A.   Yes, the context was that at the last

25   moment -- it was around this time.  I don't know

1    the exact time, but there was a last-ditch effort

2    by a gentleman called Mike Traina (phonetic).  And

3    I'm not exactly sure what the company was, but it

4    was a publicly-traded company, a NASDAQ-traded

5    company, I completely forgot the name of the

6    company, wanted to buy the assets.  And right in

7    the middle of the negotiations, in the middle of

8    trying to salvage some of the assets, which could

9    have been, you know, quite significant because

10   there was still about $4- or 500 million in payroll

11   at the time, I think this was right before all the

12   negative articles started to come out that just

13   ravaged the book, Mike Stanley, that's it, looked

14   gaunt, looked faint, looked suicidal and resigned.

15   And how could you have a negotiation with a

16   publicly-traded company when the CEO just resigned?

17   They knew Mirabilis was in trouble at the time.

18        Q.   But Mirabilis wasn't a -- oh, you mean the

19   other side was a publicly-traded company.

20        A.   Yeah.  It was a publicly-traded company.

21   It was a NASDAQ-traded company.  It was -- I'm

22   trying to jog my memory.  I don't recall exactly,

23   but it was a NASDAQ-traded HR company.

24        Q.   Okay.  And who is the person you're

25   speaking to there?

```
 1        A.    I heard Edie say Bill Walsh.  I don't --

 2        Q.    But you don't know?

 3        A.    I don't recognize him.  No, I don't

 4   recognize him, and it's --

 5        Q.    But she doesn't know him either.

 6        A.    Yeah, I had very little contact with him.

 7   That was maybe one of two or three conversations

 8   that I had with him, but I can't tell from this

 9   video.

10             MS. HAVENER:  Okay.  Do you actually know

11        it's Bill Walsh?  I'm sorry.

12   BY MS. HAVENER:

13        Q.    Was the book of business the 400 million?

14   Is that what you said?

15        A.    (Witness nods head.)

16        Q.    Was that it's value on an annual basis?

17        A.    That was just its gross processing value.

18        Q.    Okay.  Was that before or after the unpaid

19   payroll taxes were applied to it?  Was that the

20   gross value or the net value?

21        A.    No, it's not a value.  It's the gross

22   number of payroll that was being processed by the

23   PEO.

24        Q.    Every year?

25        A.    Every year, yes.
```

1       Q.    That was my question.

2       A.    It was the annualized gross payroll.

3       Q.    Okay.  That was my question.

4       A.    The profits were miniscule.

5       Q.    Okay.  So the profits were small, but if

6    someone bought that they -- am I correct in

7    understanding they would also be buying this huge

8    payroll liability?

9       A.    No.  They were trying to buy it without

10    the payroll liability.  But they were trying to pay

11    the proceeds to the IRS.  That's the way the deal

12    was being structured.

13       Q.    Okay.

14            MS. HAVENER:  We're done.  Off the record.

15       Or at least I'm done.  Do you guys have

16       questions?

17            MS. VILMOS:  I don't have any questions.

18            MR. BATES:  This is Aaron.  No questions.

19       I just want to make sure these exhibits will

20       be included with the deposition transcript.

21            MS. HAVENER:  If you order it.  Could you

22       guys hold on a second.  Nicolette, are you

23       still there?

24            MS. VILMOS:  I am.

25            MS. HAVENER:  We need to take two minutes.

1       My client just advised me we need to take two

2    minutes.

3          (Thereupon a brief recess was taken, after

4    which the following proceedings were had:)

5          MS. HAVENER:  The only thing I need to say

6    to wrap up -- we don't have any more

7    questions.  I just need to remind you that I'm

8    going to write you a letter and ask you to

9    produce the hard drive that you were -- and we

10   can make arrangements for it to be copied,

11   however you want that to be done.  I'll send

12   you a drive, we'll send a person to get that

13   done.  And I've already said twice what the

14   other things were and I can't remember.

15         MS. CURRY:  Oh, the e-mail.

16         MS. HAVENER:  Yes.  The e-mail that

17   started the chain that --

18         MS. CURRY:  For the proxy.

19         THE WITNESS:  If I can locate that.  I'm

20   not sure I --

21         MS. HAVENER:  But you know which one I'm

22   talking about.

23         THE WITNESS:  Yes.  I have the

24   indemnification; right?

25         MS. HAVENER:  The Hold Harmless Agreement.

1        THE WITNESS:  That's the indemnification.

2    That was the one agreement.

3        MS. HAVENER:  Yes, that's one document.

4    And the other one is the e-mail with about

5    twenty exclamation points.  You were going to

6    try to find the one that started it; right?

7        THE WITNESS:  I'll try to find that, yeah,

8    if I can.

9        MS. HAVENER:  All right.  And I'll send

10   you a letter to confirm that.  And, Nicolette,

11   we can talk offline about the hard drive.

12       MS. VILMOS:  That's fine.  Thank you.

13       MS. HAVENER:  Okay.  So long.

14       THE COURT REPORTER:  Do you want to

15   explain waiving to him?

16       MS. HAVENER:  Yes.  Wait.  You have the

17   right to read this deposition and sign it to

18   make sure she's taken down your words

19   correctly.

20       THE WITNESS:  Okay.

21       MS. HAVENER:  You also have the right to

22   waive that right.  If you want to read it and

23   sign it, you must do it within thirty days.

24       THE WITNESS:  Okay.

25       MS. HAVENER:  So do you want to read and

1       sign?

2               THE WITNESS:  Yes.

3               MS. HAVENER:  Okay.  Thank you.  Thanks,

4       guys.

5               MS. HAVENER:  You can't change what you

6       said.  You can only -- if she misunderstood

7       your words you can --

8               THE WITNESS:  No, I understand that.

9               (Thereupon the taking of the deposition was

10      concluded.)

11

12

13                      _____

14                      YANIV AMAR

15

16

17              Sworn to and subscribed before me this

18

19      _____ day of _____ 2010.

20

21

22

23

24

25

## CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF MIAMI-DADE


     I, the undersigned authority, certify that YANIV AMAR, personally appeared before me and was duly sworn.


     WITNESS my hand and official seal this day of  October 12, 2010.


_____

     JAN L. BRONIS

     Notary Public - State of Florida

     My Commission expires:  05-16-2011

     Commission No. DD 675181

## REPORTER'S DEPOSITION CERTIFICATE

STATE OF FLORIDA

COUNTY OF MIAMI-DADE


        I, JAN L. BRONIS, certify that I was

authorized to and did stenographically report the

deposition of YANIV AMAR; that a review of the

transcript was requested; and that the transcript

is a true and complete record of my stenographic

notes.


        I further certify that I am not a

relative, employee, attorney, or counsel of any of

the parties, nor am I a relative or employee of any

of the parties' attorney or counsel connected with

the action, nor am I financially interested in the

action.

        DATED this day of October 12, 2010.


        _____


        JAN L. BRONIS

# CORRECTION SHEET

Re: Mirabilis Ventures vs. Palaxar, et al
Deponent: YANIV AMAR
October 5, 2010

PAGE NO.    LINE NO.      CORRECTION OR CHANGE

_____    _____    _____
_____    _____    _____
_____    _____    _____
_____    _____    _____
_____    _____    _____
_____    _____    _____
_____    _____    _____
_____    _____    _____
_____    _____    _____
_____    _____    _____
_____    _____    _____
_____    _____    _____
_____    _____    _____
_____    _____    _____
_____    _____    _____
_____    _____    _____
_____    _____    _____
_____    _____    _____
_____    _____    _____
_____    _____    _____
_____    _____    _____

                     _____
                       YANIV AMAR
Sworn to and subscribed to before me this _____day
of _____, 2010 by _____ who
produced_____ as Identification.


                   _____
                   Notary Public-State of Florida
                   My Commission No.
                   Expires:

CHOICE REPORTING SERVICE, INC.
REGISTERED PROFESSIONAL REPORTERS / VIDEOTAPE
DEPOSITIONS COMPUTER TRANSCRIPTION / LITIGATION
VIDEO TELECONFERENCING

Jan L. Bronis, Court Reporter
Ft. Lauderdale (954) 792-4446  Miami (305)374-2222

October 12, 2010

RE:  Mirabilis Ventures v Palaxar, et al

YANIV AMAR
3475 Northeast 191 Street
Suite 10
Aventura, Florida 33180

Dear Mr. Amar,
        With reference to your deposition taken on October 5, 2010, in connection with the above-captioned case, please be advised that the transcript of the deposition has been completed and is awaiting signature.
      Please arrange to stop by our office at 633 So. Andrews Ave, Ste. 202, Ft. Lauderdale, Florida, for the purpose of reading and signing the transcript of the deposition. Office hours are from 9:00 a.m. until 4:30 p.m., Monday through Friday.
              PLEASE TELEPHONE IN ADVANCE.
      If this has not been taken care of, however, within the next 15 days or by the time of trial, whichever comes first, we shall conclude that the reading and subscribing of the deposition have been waived without further notice.

        Sincerely,

        BY: _____
            Jan L. Bronis