EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

ORLANDO DIVISION

CASE NO.:  6:07-CV-1788-ORL-28-KRS

MIRABILIS VENTURES, INC. and

NEXIA STRATEGY CORPORATION,

                    Plaintiffs,

VS.

PALAXAR GROUP, LLC;

PALAXAR HOLDINGS, LLC;

FRANK HAILSTONES, EDITH CURRY

A/k/a EDITH BROADHEAD; and

TERENCE CHU,

                    Defendants.

- - - - - - - - - - - - - - - x


DEPOSITION OF:
MATTHEW MOKWA


    Examination of a witness beginning at 9:00 AM and

concluding at 3:00 PM, on August 11, 2010 taken at 390

North Orange Avenue, Orlando, Florida before DAWN

ROSCHER, Notary Public, State of Florida at Large.

```
1        A P P E A R A N C E S:

2

3        ADAM LOEWY, ESQ., OF:  Barry & Loewy, LLP, 401 Congress

4        Avenue, Suite 1450, Austin, Texas 78701, appearing on

5        behalf of Matthew S. Mokwa.

6

7

8        KATHLEEN B. HAVENER, ESQ., OF:  The Havener Law Firm,

9        LLC, 15511 Russell Road, Chagrin Falls, Ohio 44022,

10       appearing on behalf of Edith Curry, Frank Hailstones,

11       Palaxar Group, LLC and Palaxar Holdings, LLC.

12

13

14       ALSO PRESENT:  EDITH CURRY

15

16

17            *      *      *      *      *      *

18

19

20

21

22

23

24

25
```

1                        I N D E X

2

3     MATTHEW MOKWA

4        Direct Examination by Ms. Havener        4

5

6                 *    *    *    *    *    *

7

8                    E X H I B I T S

9

10        Exhibit No. 124          Page 103

11        Exhibit No. 125          Page 105

12        Exhibit No. 126          Page 120

13        Exhibit No. 127          Page 123

14        Exhibit No. 128          Page 127

15        Exhibit No. 129          Page 129

16        Exhibit No. 130          Page 132

17        Exhibit No. 131          Page 150

18        Exhibit No. 132          Page 156

19        Exhibit No. 133          Page 158

20        Exhibit No. 134          Page 159

21        Exhibit No. 135          Page 164

22

23

24

25

D a w n   R o s c h e r ,   C o u r t   R e p o r t e r
P .   O .   B o x   5 3 3 4 0 6 ,   O r l a n d o   F l o r i d a   3 2 8 5 3
4 0 7 . 2 4 6 . 0 9 9 8          F a x   4 0 7 . 2 4 6 . 0 5 9 8

1                        P R O C E E D I N G S

2      THEREUPON:

3                         MATTHEW MOKWA

4      Having been first duly sworn to tell the truth, the

5      whole truth and nothing but the truth, testified as

6      follows:

7                        DIRECT EXAMINATION

8      BY MS. HAVENER:

9          Q.   Good morning, Mr. Mokwa.  As you know, my

10     name is Kathleen Havener.  I represent Ms. Curry,

11     Mr. Hailstones and the Palaxar Party in this

12     litigation.  I presume that you are familiar with

13     the procedure in a deposition?

14         A.   I am.

15         Q.   Have you ever taken a deposition?

16         A.   A couple, not many, less than five.

17         Q.   Less than five?

18         A.   Yes.

19         Q.   The procedure, I'm just going to explain on

20     the record for the purpose of the record, not

21     because I think you need to be educated.  As you

22     know, I will be asking you questions.  Your Counsel

23     will be objecting to protect the record.  In this

24     jurisdiction only attorney/client is a sufficient

25     reason for you not to answer.

1          We can take a break whenever you want, so

2     long as there's not a question pending.  For the

3     sake of the record, are you on any prescription

4     medications or any drugs that would cause you not

5     to be able to answer?

6          A.   No.

7          Q.   Okay.  Is there anything that would be

8     impairing your memory today?

9          A.   No.

10         Q.   Okay.  We should be careful -- and I'm not

11    always very good at this -- to try not to speak

12    over each other.  Please let me finish the question

13    before you answer and I will try my very best to

14    let you finish answering before I pounce with

15    another question.  Okay?

16         A.   Okay.

17         Q.   What's your date of birth, please?

18         A.   6/13/77.

19         Q.   And your full name?

20         A.   Matthew Scott Mokwa.

21         Q.   Could you tell me your education since high

22    school, please?

23         A.   I went to Dobson High School in Mesa,

24    Arizona.  I graduated in 1995.  I went to the

25    University of Arizona.

1    Q.   Is that the one in Tucson?

2    A.   That's that one in Tucson.  I graduated in

3    1999.  I went to the University of Texas School of

4    Law.  I graduated in 2003.

5    Q.   Did you do anything in-between college and

6    law school?

7    A.   Not anything substantive.  I didn't have

8    really a formal position.

9    Q.   Did you take the Bar immediately after law

10   school?

11   A.   I did not take the Bar until February.  I

12   could have taken it in July, but I did not.

13   Q.   How come?

14   A.   I was working on some projects and just

15   pushed it off.

16   Q.   What kind of projects?

17   A.   Some start-up companies.

18   Q.   Can you give me some names?

19   A.   The names of the companies I worked with,

20   there was one called ThermoCode.  I worked with a

21   company called True Technologies.  I worked with a

22   company called MedPond and a real estate holding

23   company called Man-a-War Ventures.  I worked with a

24   company called CoBolt.  There were some more in

25   there, I'm sure.

1     Q.   And what were you doing for these companies?

2     A.   Primarily consulting work with helping

3 companies raise financing and various legal work.

4     Q.   Did you have experience with raising capital

5 for start-ups?

6     A.   Not necessarily prior to then, but I was

7 involved, I would say, in raising capital or

8 attempting to raise capital with some companies.

9     Q.   When you were doing legal work for these

10 start-ups, were you working under the supervision

11 of another lawyer?

12     A.   At times and then there was probably times

13 where I was not.

14     Q.   Was there any similarity between all of

15 these companies?

16     A.   No.

17     Q.   Okay.   What was MedPond?

18     A.   It had some sort of a hardware slash

19 software product that they were working on in the

20 medical device industry.

21     Q.   Did you work for any law firms or legal

22 entities while you were in law school?

23     A.   Yes.

24     Q.   Okay.

25     A.   I worked for a company or a law firm out of

1    Phoenix called Meyer, Hendricks & Bivens.  That's

2    all that I recall for right now.

3        Q.   And was that between second and third year?

4        A.   That was actually between first and second.

5        Q.   Okay.  What did you do between second and

6    third?

7        A.   I took a summer school course.  I may have

8    been -- I can't remember if I only took a summer

9    school course or if I was working on an article

10   that I published later.

11       Q.   During law school?

12       A.   I can't remember if I began that between

13   second or third.

14       Q.   But when was it published, before or after

15   you graduated?

16       A.   I believe it was during.  I can't recall

17   precisely.

18       Q.   What did you do after you took the Bar?

19       A.   Similar stuff.  Basically, all the projects

20   I listed earlier, all of that ran together.

21       Q.   Then what was your first official job?  Not

22   that these weren't official jobs.

23       A.   Well, I graduated in 2003 and I worked on --

24   the company that I had, which was primarily my own

25   company, was called Sharp Ventures.  I did a lot of

1    contract work out of that entity through most of

2    those years prior to coming on board here.

3        Q.   You were a contract attorney?

4        A.   I mean, they were consulting -- I had

5    various projects.  I had a few different

6    individuals that I did work with; one was a

7    gentleman that worked for Austin Ventures.  They

8    would ask me on occasion to, you know, do various

9    different projects that might last for several

10   months.

11       Q.   Other than your own company, did you have an

12   employer before you came here?

13       A.   Certain of the companies, I believe I was

14   technically employed by.

15       Q.   Did you receive a W2?

16       A.   I believe I did on -- I don't recall

17   precisely.  It would have been a part-time

18   position.  It would have just been their preference

19   to set it up that way as opposed to a 1099 type

20   situation or as opposed to just paying the entity

21   directly.

22       Q.   And otherwise, you didn't have an employer

23   like a traditional position or employment with a

24   law firm or a corporation?

25       A.   That's correct.

1     Q.   Until you came here?

2     A.   Yes.

3     Q.   And when did you meet Aaron Bates?

4     A.   I met Aaron Bates during his interview with

5     Mirabilis.

6     Q.   When was that?

7     A.   I wouldn't know the exact time, but

8     somewhere during the first quarter of 2006.

9     Q.   Did you ever work for Enron?

10    A.   No.

11    Q.   That's what your article was about?

12    A.   That's correct.   It was about earnings

13    management and obviously Enron was the hot topic at

14    that time.

15    Q.   First quarter of 2006 is when you said you

16    met Aaron Bates?

17    A.   That's correct.   It was during his

18    interview, I probably spent ten or fifteen minutes

19    meeting with him.

20    Q.   How did it come about that you moved to

21    Orlando?   How did you come to be employed by

22    Mirabilis and or one of its entities?

23    A.   I was in Phoenix during the USC Arizona

24    State game and Shane Williams was also there.   We

25    began talking and he put me in touch with

1    Mirabilis.  Then I came out and interviewed in, I

2    believe November or December of 2005.

3        Q.  Was that just a regular season game or was

4    it a --

5        A.  I would have to look it up.  It was a

6    regular season game.

7        Q.  And was it just happenstance that you met

8    Mr. Williams?

9        A.  No, I went to high school with Mr. Williams.

10   So we knew each other.

11       Q.  So is it fair to say that Mr. Williams set

12   up your interview with Mirabilis?

13       A.  He at least submitted my resume.

14       Q.  I believe you said you interviewed in

15   November or December of 2005?

16       A.  That's correct.

17       Q.  When did you become employed by Mirabilis or

18   any of its subsidiaries?

19       A.  January of 2006.

20       Q.  When did you meet Mr. Amodeo?

21       A.  I met Mr. Amodeo during my interview.

22       Q.  What was your first impression?

23       A.  I actually really liked him.  He was very

24   charismatic, very exciting.  He had all kinds of

25   neat things he was telling me about that they were

1  working on and thought I would be a good fit with

2  the organization.

3     Q.  Were there any other lawyers employed by the

4  company at that time?

5     A.  Yes, several.

6     Q.  Were they employed in legal capacities?

7     A.  To my knowledge, they were.

8     Q.  Who were they?

9     A.  When I began in January?

10    Q.  Yes.

11    A.  Let's see, Tom Broadhead, I believe was

12  general counsel and Larry Habor.

13    Q.  What was Mr. Habor's title, do you know?

14    A.  I don't recall.

15    Q.  Okay.

16    A.  Richard Berman.

17    Q.  Was he an employee of the company?

18    A.  I do not know.  He was someone, I believe I

19  met with when I interviewed or at least -- I

20  actually did meet him when I interviewed.  I don't

21  know what his title was.

22    Q.  Okay.

23    A.  Chad Walters.

24    Q.  Do you know his title?

25    A.  I do not.

1     Q.  Okay.

2     A.  Scott Goldberg, Phil Kaprow.

3     Q.  Was Mr. Kaprow working in his legal capacity

4  at that time?

5     A.  My understanding was, yes.

6     Q.  Do you know his title?

7     A.  No.

8     Q.  Okay.

9     A.  Then obviously Ms. Curry and Mr. Sadrianna.

10    Q.  Were they working in their legal capacities?

11    A.  I don't know.  I do know that I've come to

12  learn that they have both stated now that they were

13  not.  I don't know at the time.  I don't know if I

14  had first-hand knowledge at the time.  I just knew

15  that they both had law degrees and had passed the

16  Bar.

17    Q.  With whom did you interview when you came in

18  November and/or December?

19    A.  It was a full-day interview.  I believe I

20  had kind of a round table interview that consisted

21  of Dan Myers, Jim --

22    Q.  What was Mr. Myers -- I'm going to ask you

23  what everybody did.  What was Mr. Myers' function

24  in the company?

25    A.  At that time of my interview?

1      Q.   Yes.

2      A.   I don't know if I recall.

3      Q.   What was his function at any later time that

4    you do recall?

5      A.   He was definitely in finance.  I don't know

6    his formal title off the top of my head.

7      Q.   With whom else did you interview?

8      A.   Jim Sadrianna, Woody Johnson, Dr. Bob

9    Pollack.

10     Q.   What was Mr. Johnson's function?

11     A.   I believe he did something with regard to

12   marketing and public relations.

13     Q.   Anyone else?

14     A.   I believe those were the four for that

15   portion of the interview.

16     Q.   Okay.  And who else did you interview with?

17     A.   If I'm not mistaken, I interviewed

18   informally with Scott Goldberg, and I can't say

19   with certainty, but I believe also Chad and Phil

20   Kaprow.

21     Q.   Chad Walters?

22     A.   Chad Walters, correct.

23     Q.   You don't know either of their titles?

24     A.   I do not.

25     Q.   What was Scott Goldberg's function at the

1    time?

2        A.   I understood -- I suppose I understood all

3    of them to be in-house counsel.

4        Q.   Was there an office of legal counsel in the

5    organization?  I mean, obviously Mr. Broadhead was

6    general counsel, but was there a structure of

7    lawyers who reported to him?

8        A.   Obviously, at the time of my interview, I

9    would not have known that.  With regard to moving

10   forward, I don't know if they had a formal

11   structure of who did what.  I know that different

12   people, I suppose, were assigned to different areas

13   and may have reported to different people.

14       Q.   Did you have any idea what Mr. Goldberg's

15   area of focus was at that time?

16       A.   I understood that his background was in

17   entertainment law and intellectual property.  I

18   also understood him to be a corporate attorney.

19       Q.   Did he have any cause to exercise his

20   expertise in entertainment law while he was at

21   Mirabilis?

22       A.   I believe he did.  I believe we had a few

23   projects that he worked on.

24       Q.   Like what?

25       A.   There was one wrestling project.  I don't

1    know the exact -- I'm trying to recall the details,

2    but it was something along the lines of we

3    sponsored a Paid Preview wrestling event with

4    legends of the past and he put that together.  He

5    also worked on a DVD project that was referred, I

6    believe as Trailer Court Justice, which also

7    featured an individual who was a former wrestling

8    persona.

9        So there were projects -- there were several

10   projects, I'm sure that he dealt with in that

11   capacity.  Those are off the top of my head and I'm

12   not one hundred percent certain of the details.

13       Q.  How long after you interviewed, were you

14   offered a job?

15       A.  Within a day.

16       Q.  And what did you anticipate, before you

17   came, was going to be your own function with the

18   company?

19       A.  My understanding was that I was to work in

20   mergers and acquisitions, private equity type stuff

21   was what was essentially represented to me.

22       Q.  And is that what you actually did when you

23   got here?

24       A.  That's where I started.  I would say I

25   worked in that capacity for probably three months.

1    Q.  And then what?

2    A.  At some point, I moved from that area to the

3    human resourcing department or company of

4    Mirabilis, which was called Common Pay Master.

5    Q.  Did you work for any of the other entities?

6    A.  I may have provided services, but through,

7    at least the time period we're at right now, that

8    first three months, I believe I provided services

9    only to Mirabilis.  Then I went over to Common Pay

10   Master, let's say in March.

11   Q.  March of 2006?

12   A.  Yes.

13   Q.  And then what next?

14   A.  I'm not sure I understand exactly.

15   Q.  You have worked for several different

16   entities within the Mirabilis, let's say family of

17   companies.  Did you also work for entities that

18   were within the Amodeo family of companies?  When I

19   say that, first of all, do you understand what I

20   mean?

21   A.  I do.  For me I worked, like I said, I

22   started doing the acquisitions.

23   Q.  That was from January to March?

24   A.  Yes.  At March, I was moved over to Common

25   Pay Master Corporation.

1     Q.  So you moved over to Common Pay Master?

2     A.  Yes.

3     Q.  And?

4     A.  And that was actually an entirely different

5     building.  I reported to a gentleman named Marty

6     Flynn.  To be honest, I was not very happy about

7     getting taken out of the merger and acquisition

8     stuff.  I went on to do what would be primarily, I

9     guess HR and in-house responsibilities for that

10    entity, Common Pay Master.

11    Q.  Who did you report to when you were doing

12    mergers and acquisitions?

13    A.  Jim Sadrianna.  However, I also reported to

14    some of the other attorneys.  Obviously, I was new

15    and somewhat younger.

16    Q.  Name the other attorneys that you reported

17    to during that first three months?

18    A.  It would be on a project by project basis.

19    I reported to Tom Broadhead on my first

20    acquisition.  I reported to Scott Goldberg on some.

21    I reported to Chad Walters on another.

22    Q.  Can you name those projects?

23    A.  I can probably -- or I can try.  Absolute

24    Packaging was one that I worked on.

25    Q.  And who did you report to for that?

1     A.   I think Tom did at least a portion of it.   I

2  can't remember if it was Scott or Chad, also

3  Richard Berman's associate from his law firm, Angel

4  Armas, worked on that one.

5          We did several acquisitions during those

6  three months.   I'm drawing a blank on some of them

7  now.

8     Q.   For what project did you report to Mr.

9  Sadrianna?

10    A.   Mr. Sadrianna would have been -- even on

11  Absolute Packaging, Sadrianna I also reported to.

12  I would say I reported to both Mr. Broadhead and

13  Mr. Sadrianna.   They both had significant input.

14    Q.   Did you remember any other projects besides

15  that Absolute Packaging?

16    A.   Secured Solutions was one that we did.

17    Q.   Who did you report to?

18    A.   Chad Walters worked on that with me.   Jim

19  Sadrianna, I would say, oversaw that.

20    Q.   Was Chad Walters your contemporary or was he

21  senior to you?

22    A.   I would say when I began they were senior to

23  me, but --

24    Q.   Who is they?

25    A.   Goldberg, Kaprow, Walters.   I know they all

1   had five or six more years experience, at least.

2   As time went by, I would say we became more

3   contemporaries.

4       Q.  Okay.  When you moved from mergers and

5   acquisitions to Common Pay Master, who moved you?

6       A.  Marty Flynn notified me.  Sometime in

7   February, I would say, I was asked to assist with

8   the employment contracts in addition to the M&A

9   work.

10      Q.  Asked by whom?

11      A.  Marty Flynn, I believe, was the one who

12  asked me.

13      Q.  Okay.

14      A.  And Matt Porter was handling that before

15  that time, I believe.

16      Q.  Matt Porter is also a lawyer?

17      A.  No.  I believe he went to law school for a

18  year or two and left.  He was serving as some sort

19  of a paralegal slash secretarial role.

20      Q.  When you said you weren't happy about moving

21  to Common Pay Master; did you talk to anyone about

22  that?

23      A.  I may have.  Actually, I'm sure I vented a

24  little bit to everybody, but I didn't have any kind

25  of formal complaint.  I accepted the fact that I

1    was being asked to work on something else.

2        Q.  Did you have any day to day interaction at

3    that time with Mr. Amodeo?

4        A.  During the merger and acquisition phase,

5    some, but not a lot.

6        Q.  How frequent?

7        A.  Pretty infrequent it would have been.

8        Q.  Once a week?  Twice a week?  Once a month?

9        A.  Not more than once a week, less than that.

10   Others may have had interaction with him, but I

11   wouldn't have been included in those.  On occasion,

12   I might have sat in on a meeting where someone else

13   was meeting with Mr. Amodeo.

14       Q.  How much time did you spend with Mr. Amodeo

15   during the interview process?

16       A.  Thirty minutes, maybe more.

17       Q.  What happened after you were assigned to

18   Common Pay Master?

19       A.  What do you mean?

20       Q.  How long did you stay affiliated essentially

21   with Common Pay Master?

22       A.  I moved over to Common Pay Master in

23   approximately March of 2006.

24       Q.  Did you physically move offices?

25       A.  I physically moved offices to the Wachovia

1    building.

2         Q.   And where had you been?

3         A.   I had been in the AmSouth building, where my

4    understanding was Mirabilis was headquartered at

5    the time.

6         Q.   So is it fair to say that Mr. Amodeo's

7    office was in the AmSouth building?

8         A.   Yes.

9         Q.   And when you moved to Wachovia, you went to

10   something of a satellite office?

11        A.   I went to Wachovia, which would be a

12   satellite office.  They were not nearly as nice.

13   It was -- that was actually a very normal position,

14   if you will.  I kind of lost out on all of the

15   excitement that everyone else was experiencing at

16   the time at the AmSouth building.

17        Q.   Were you resentful in some way?  Did you

18   think that you were being punished or that it was

19   some kind of negative job action?

20        A.   No.

21        Q.   What do you mean by missing out on the

22   excitement?

23        A.   I was a corporate attorney prior to coming

24   to Mirabilis.  That's the kind of work that I

25   enjoyed doing and that I wanted to do in my career.

1      I was asked by Mr. Flynn to go work at Common Pay

2      Master.  They were doing a lot of hiring and et

3      cetera and to work at that entity.  I would have

4      preferred to continue to work on deals, if I could

5      have.

6          Q.   Prior to coming to Mirabilis, had you done

7      mergers and acquisitions?

8          A.   I had been involved -- I had not been

9      involved, per se, in actually purchasing companies.

10     I had done more joint venture agreements.  I had

11     the skill set to easily do all of that type of

12     work.  That's what I had wanted to do for my

13     career.

14         Q.   I may have already asked this in a slightly

15     different way, but did you express your

16     disappointment to anybody?  You said in general,

17     but I'd like to know specifically if you remember

18     speaking to anybody?

19         A.   I remember speaking to Goldberg.  I think I

20     just generally kind of complained that somebody who

21     wanted to do merger and acquisition work was going

22     to go become HR counsel at --

23         Q.   At a subsidiary?

24         A.   Yes.  However, I absolutely loved working

25     with Marty Flynn and that whole team, actually.  It

1      was actually a very good experience.  Marty told me

2      that he had his pick of all the attorneys and he

3      liked me best.  So it was kind of a double-edged

4      sword, I guess.

5          Q.  Who else was part of Mr. Flynn's team?

6          A.  Mr. Flynn's was growing, but the core was

7      Mr. Flynn, Shane Cobb was the, I guess chief

8      operational officer.

9          Q.  What was Mr. Flynn's title, did he have one?

10         A.  President of Common Pay Master.

11         Q.  Okay.

12         A.  Laurie Andrea handled benefits.  A woman by

13     the name of Diane McQue, who also handled benefits

14     and administration.  There was a woman by the name

15     of Jenny -- I'm blanking on her last name, but she

16     was the accountant that handled the financial stuff

17     for Common Pay Master.

18             There was a gentleman named Luis Gonzalez,

19     who handled, I guess signing people up when they

20     came in and Diana Kristona handled HR.

21         Q.  When you say signing people up, what do you

22     mean?

23         A.  Going over their agreements and handbooks

24     and signing them up for the insurance, et cetera.

25         Q.  What was the atmosphere among the team?  Was

1    it good communication?  Was it a comfortable team

2    to work with?

3        A.  I would say when we began, it was somewhat

4    chaotic and some of the internal controls were not

5    there.  Within three or four months, things really

6    started to get going quite a bit better.  Shane

7    Cobb did, I believe, a fantastic job running the

8    organization as in having team meetings and getting

9    the work done that they needed to do.

10           We also had a gentleman named Frank Garrino,

11   who handled safety.  We began attempting to put in

12   controls in projects.  Yeah, I mean everyone got

13   along very well and I really did enjoy working with

14   all of them.

15       Q.  When you said projects and safety; do you

16   mean safety, like as in OSHA?

17       A.  Yes.

18       Q.  Did you ever work on establishing internal

19   controls or anything of that nature at Common Pay

20   Master?

21       A.  That was something that -- there was

22   obviously a learning curve when I came in from

23   having a background in corporate work to trying to

24   work on some of the HR type stuff, everything from

25   non-disclosure agreements to the non-compete

1   agreements.  We also had these employment

2   agreements in place and et cetera.  I attempted to

3   learn all of that and improve upon all of that.

4        I'm sorry, I lost your question there.

5   Q.   I was asking about internal controls.  I was

6   wondering what kind of internal controls were not

7   there that you felt that you helped put in place?

8   A.   One example would be the employment

9   agreements.  The executives had access to, I guess

10  the template, if you will.  As people were being

11  hired, they were often negotiating their own

12  employment agreements and just kind of getting them

13  signed and whether they made them into the files or

14  not, that type of stuff.

15  Q.   When you say executives had access and they

16  were negotiating their own; do you mean that the

17  executives on the Mirabilis side were using the

18  template to create employment agreements for new

19  hires?

20  A.   Yes.

21  Q.   Okay.

22  A.   So as an example, if you hired somebody who

23  you had brought into the company, you may have

24  negotiated much of your own contract and it might

25  have been signed and handed to HR and put into

1   their personnel file and it might be entirely

2   inconsistent or unacceptable with what was going

3   on.

4          So I tried to create a system, where I was

5   the only person that was doing those agreements

6   moving forward and code them, so I knew which ones

7   were deviating from the standard template and to

8   create some different varieties that I would know.

9          So when litigation happened over an

10  employment agreement, it would be my responsibility

11  to say I drafted that agreement.  If somebody was

12  owed some absurd amount of money, sometimes they

13  came and people literally did not know how in the

14  world someone had been promised certain sums of

15  money and it was actually in writing.

16      Q.  I have two follow-up questions, at least for

17  the moment.  Can you give me examples of

18  individuals who had employment agreements that

19  deviated from the appropriate standard?

20      A.  I would have to look through all of the

21  files or go back through my information.  There

22  were decent ones.

23      Q.  What does that mean?

24      A.  There were several.

25      Q.  Can you give me some examples of people who

1    litigated over their employment contracts?

2        A.   I really can't off the top of my head.   I

3    would say most of the litigation over employment

4    agreements tended to happen after Common Pay Master

5    shut down in December and January.

6        Q.   What year?

7        A.   December of 2006, January of 2007.   I don't

8    believe there were many formal disputes.   Much of

9    the litigation would not have been handled by me;

10   it would have been handled by Mr. Berman and his

11   firm.

12       Q.   Did you handle any litigation?

13       A.   I oversaw some of the litigation and helped

14   manage outside counsel.

15       Q.   So is it fair to say that you oversaw Mr.

16   Berman's firm and their litigation of employment

17   agreements?

18       A.   That would have been -- in certain

19   circumstances, that may have been the case.

20       Q.   Did you oversee work with any other outside

21   counsel?

22       A.   Yes.

23       Q.   Could you name either the litigants or the

24   lawyers?

25       A.   There was litigation that came out of

1    Colorado regarding a deal that we had done.

2        Q.  Did it have to do with an employee?

3        A.  It had to do with several employees.

4        Q.  Did it arise from Mirabilis's acquisition of

5    a PEO?

6        A.  It arose from Mirabilis's acquisition or

7    involvement with a company called Synergy.  It was

8    a fabrication company.

9        Q.  What kind of company was it?

10       A.  Some sort of a fabrication, metal

11   fabrication.  I don't know with any kind of

12   certainty.

13       Q.  But was that employment litigation or did

14   that --

15       A.  Employment litigation.

16       Q.  Who was in that case the employer involved?

17       A.  I believe Common Pay Master was the

18   employer.  It was a similar set-up to Mirabilis's

19   entire network where Common Pay Master was the

20   actual employer.

21       Q.  I've heard this multiple times during this

22   litigation, that Common Pay Master was the actual

23   employer; when did that come to pass?

24       A.  That was something I inherited when I began.

25   I don't know who created it or who came up with the

1    idea.  It was something that I tried to figure out

2    as I was working there.

3        Q.  Besides the litigation in Colorado; was

4    there any other employment litigation that you

5    remember?

6        A.  There was.  FIE, which was a subsidiary.

7        Q.  What does that stand for, do you know?

8        A.  Florida Industrial Electric.

9        Q.  Now, that was a subsidiary of Mirabilis?

10       A.  That's my understanding.

11       Q.  Is it a utility?

12       A.  It is.

13       Q.  Publically regulated?

14       A.  I don't know that.

15       Q.  Does it provide electric power, as the name

16   would suggest?

17       A.  I honestly wouldn't know exactly what they

18   did.

19       Q.  Okay.  How long would you say that you were

20   focused on the work with Common Pay Master?

21       A.  I worked with Common Pay Master all the way

22   through it being shut down in the end of 2006.  I

23   also worked on dealing with a lot of the issues

24   that came from that, which bled into 2007.

25       Q.  When you finished at Common Pay Master or

1    when it was wrapping up; did you physically move

2    offices again or had you done so in the mean time?

3         A.   I stayed at Common Pay Master in my same

4    office from when I was moved over there in March

5    all the way through the middle to the end of

6    January of 2007.

7         Q.   And since Common Pay Master was defunct

8    after December of 2006; who then was your employer?

9         A.   I went to work with the AEM, which was

10   another Mirabilis subsidiary.

11        Q.   And what was AEM?

12        A.   It was the Mirabilis PEO.

13        Q.   Explain what you mean by that.

14        A.   Can you clarify it a little bit?

15        Q.   Well, I know that a PEO basically functions

16   as the person who or the entity that handles

17   payroll, that handles benefits, that manages the

18   employees, the paperwork for employees for another

19   company or many more companies.  You said AEM was

20   Mirabilis's PEO; had Common Pay Master been its PEO

21   before?

22        A.   Oh, I understand your question now.  Common

23   Pay Master was similar to a PEO, but it was

24   actually not a PEO and it was not licensed as such.

25   Essentially, there was an exception that allowed

1    you to act as a PEO so long as you did it within

2    the same controlled entity.

3         So Common Pay Master would have handled all

4    of the HR functions within the Mirabilis umbrella

5    of companies.

6         Q.   Did that include Amodeo companies?

7         A.   I believe it did include Amodeo companies.

8         Q.   So what's the difference between CPC and

9    AEM?

10        A.   AEM was an external PEO that advertised and

11   solicited PEO clients outside of Mirabilis.

12        Q.   So Common Pay Master was a captive PEO and

13   did only Mirabilis's HR work?

14        A.   I'm not sure captive is the best word, but I

15   understand what you're saying.  Common Pay Master

16   was basically more or less the HR division or

17   department of Mirabilis, I would say.  It handled

18   it for -- I would consider myself an employee of

19   Mirabilis.  If someone would have asked me where I

20   worked; I would have said I work for Mirabilis.

21   With that being said, my employment agreement was

22   with Common Pay Master.

23        Q.   What would you say about a person whose

24   employment agreement was with Mirabilis itself or

25   an employment agreement that was with Nexia or an

1   employment agreement that was with Axena, but they

2   were paid by Common Pay Master?

3       A.  I would say that goes back to the internal

4   control issues that when I came in that probably

5   shouldn't have been the case.

6       Q.  When did Common Pay Master begin its

7   operations?

8       A.  I don't know, but my understanding for sure

9   sometime in 2005.  I couldn't tell you how early or

10  how late.  When I came aboard, the company was

11  operating in the way that it was operating and the

12  structure had been developed and it was explained

13  to me.

14      Q.  Well, let me ask this, if Common Pay Master

15  came to exist sometime in 2005 and you're not sure

16  when; then the employees, who were engaged by

17  Mirabilis or Nexia or another subsidiary, before

18  the existence of Common Pay Master, would remain

19  the employees of their original employers; is that

20  correct?

21      A.  I would disagree with that.  They were being

22  paid by Common Pay Master.  I think that it was

23  everyone's understanding, at least in my opinion,

24  that Common Pay Master was essentially their

25  employment or their employer.  With that being

1   said, that was one of the projects that I thought

2   should have been dealt with, which was going back

3   and addressing that very issue.

4      Q.  Was it your position that someone who had an

5   employment contract with another entity, that was

6   part of or under the Mirabilis umbrella, should

7   execute a new contract and become an employee of

8   Common Pay Master?

9      A.  Sometimes if you look at it in the PEO

10   industry, for example, sometimes you will have

11   actually two employment agreements or one

12   employment agreement.  I would have preferred

13   probably to have it have been one and consolidated.

14      Q.  Are you suggesting that people would be

15   subject to two employment agreements at the same

16   time?

17      A.  Sometimes they are, yes.

18      Q.  Can you give me an example of someone for

19   whom that became true?

20      A.  In our company?

21      Q.  Yes.

22      A.  Oh, I don't know if that was the case in

23   Mirabilis.  I'm saying with a PEO in general.

24      Q.  Okay.  When you were talking about internal

25   controls, with respect to that statement; was there

1    any kind of formal process by which an employee of

2    one of the Mirabilis's entities was formally

3    transferred to become an employee of Common Pay

4    Master?

5        A.   That would have been slightly outside of the

6    scope of what, I guess, I did.  Maybe Marty or

7    Shane Cobb would have better answers of how

8    employees were moved within divisions or how that

9    worked.

10       Q.   When you were moved, yourself, over to

11   Common Pay Master; did you have any understanding

12   that Mr. Flynn needed to get approval to do that

13   from someone else?

14       A.   I don't believe I had any understanding one

15   way or the other.

16       Q.   Did you have any understanding that Mr.

17   Flynn reported to anyone who was superior to him?

18       A.   No.

19       Q.   You gave examples of Shane Cobb and Mr.

20   Flynn; is that right?

21       A.   Yes.

22       Q.   Would there be a record of everybody who was

23   formally transferred from some other entity to CPC?

24       A.   From CPC moving them amongst other entities

25   within the Mirabilis network or coming from them

1   and then moving into CPC?

2      Q.   Well, you were saying, if I understood you

3   correctly, but I believe you were saying that you

4   would have been more comfortable, that it would

5   have been more appropriate had people who had

6   contracts with other entities under the Mirabilis

7   umbrella to have those contracts essentially

8   superceded by another contract with Common Pay

9   Master, rather than there being a circumstance

10   where there was a physical contract between an

11   employee and, let's say Mirabilis itself and then

12   sort of an informal, never the less, active

13   employee/employer relationship between Common Pay

14   Master and that same employee, that would have been

15   a more appropriate way for things to have occurred,

16   but that that wasn't what normally occurred; is

17   that fair?

18

19      MR. LOEWY:   Is that a question?

20      MS. HAVENER:   I was trying to sort of lay

21   the foundation and make sure that I understood what

22   he said.

23

24      A.   Let's go this way; I can't say that I agree

25   with what you said, but I think I kind of

1    understand where you're getting at and I'll try to

2    answer it.

3        Q.   If you'll just explain what I said that was

4    wrong.  Maybe I just totally misspoke, but what I

5    understood you to say is that it would have been

6    more appropriate in your view, as the lawyer, who

7    did the work for CPC, if people who had formal

8    employment agreements with other entities in the

9    Mirabilis family became formally employees of CPC

10   and that their prior employment agreements were

11   superceded?

12       A.   Okay.

13       Q.   Am I correct in that?

14       A.   You're somewhat correct.

15       Q.   Correct me.

16       A.   Okay.  When I came in in March, there was a

17   system in place and it was a system that I didn't

18   necessarily think was fantastic.  A lot of what, I

19   guess, you just explained was not information that

20   was just readily available the day I walked in.  It

21   was information that as time came by, we may have

22   had a complaint or an issue and whether it was

23   Richard Berman or whomever, I would review an

24   agreement that was completely outside what at that

25   point I may have never seen it before.

1          I guess, what I was able to do was at least

2     move things moving forward to be somewhat -- have

3     somewhat better controls moving forward, but a lot

4     of the past, I may not have even known that it

5     existed at that time.  I found out about it as I

6     went and one of the things that I had actually

7     planned to do and that we had begun to do when

8     everything fell apart, if you will, was to go back

9     and to do a full audit of everyone's employment

10    files and to figure out what we had.

11         Q.  Did you physically have an employment file

12    for -- did, you, Common Pay Master physically have

13    an employment file, whether on a computer or on

14    paper, for everyone who worked within the Mirabilis

15    family?

16         A.  I believe the answer would be yes.

17         Q.  Okay.  You mentioned when you first started

18    talking about after you left CPC, that you then

19    moved to AEM?

20         A.  Yes.

21         Q.  Because my notes are incomplete, I can't

22    tell whether you said AEM and Mirabilis or AEM and

23    then Mirabilis; could you explain that to me?

24         A.  I will clarify that.  Again, it was

25    Mirabilis doing acquisitions for the first three

1    months.   It was Common Pay Master beginning

2    sometime through March all the way deep into

3    January, February, maybe even further, continuing

4    to deal with things that came out of that.

5           Towards the end of 2006, I also began

6    assisting AEM with one pretty specific task with

7    licensing for their PEO's.  However, I did that on

8    the side, if you will, while I was working

9    primarily for Common Pay Master.  When Common Pay

10   Master was essentially shut down and the employees

11   were laid off or moved to other entities, I was

12   moved to AEM.

13          At that point, I would say, I guess

14   full-time, even though I was still working quite a

15   bit on Common Pay Master, at which point I moved,

16   towards the end of January, if I'm not mistaken,

17   out to Sanford, which was where AEM at the time was

18   operating.

19       Q.   When you were still working for CPC in late

20   2006, but you were doing some work for AEM; to whom

21   were you reporting at AEM?

22       A.   Mike Stanley.

23       Q.   And what specifically were you doing for AEM

24   at that time?

25       A.   At that time they had a plan to have AEM,

1    Inc. licensed in all fifty states to provide PEO

2    services.

3        Q.   Okay.

4        A.   And I don't know the details, but, you know,

5    there was supposed to be some type of a roll-up of

6    all of these smaller subsidiary companies and they

7    were supposed to be consolidated at some point.

8        Q.   The smaller subsidiary companies; do you

9    mean the ones that Mirabilis had acquired over the

10   course of time, like for example, the Alliance

11   Group that was out of Nebraska and Pay Source that

12   was in Ohio?  I mean, give me examples of the

13   companies -- BCA; is that one of the ones that was

14   going to be rolled up into AEM?

15       A.   I don't know the details of all of the

16   various entities that were going to roll-up.  I

17   just don't know all the details.  I'm not sure who

18   was orchestrating.  I don't know if anyone was

19   orchestrating the overall master plan of what was

20   going in where, but there was definitely -- as it

21   was told to me, it was to put everything together.

22   It also included the Presidion Book of business,

23   which was --

24       Q.   More PEO's?

25       A.   Right.  I know that there was PEO's all over

1     the place.  Again, my understanding was that AEM,

2     Inc. was going to be the entity, which everything

3     was to be consolidated into.

4         Q.   Okay.  What would you estimate to be the

5     total number of PEO's that ultimately would be

6     rolled up into AEM, Inc.?

7         A.   I couldn't even give you a fair estimate on

8     that especially at this point, everyone seems to

9     disagree what is what.

10        Q.   Fair enough.  What was Mr. Stanley's title

11    at AEM, Inc.?

12        A.   I believe he was president.

13        Q.   And what was Yaniv Amar's role in the

14    Mirabilis family?

15        A.   By the time I got -- I didn't have much

16    interaction with Yaniv, other than seeing him on

17    occasion and knowing that he had a close

18    relationship with Frank Amodeo.  He was largely

19    removed from my operations or my dealings, I guess.

20        Q.   Regardless of his removal or lack of removal

21    from your, let's say function; what was your

22    understanding of his role in Mirabilis, if any?

23        A.   My understanding was he had left at some

24    point and had come back on some kind of arrangement

25    that he reached with whomever.

1      Q.   Is whomever Frank Amodeo?

2      A.   I don't know.  I remember Mike Stanley

3    discussing that he really needed Yaniv and others.

4    I don't know.  I was not privy to any of those

5    discussions.  I really don't have any first-hand

6    knowledge.  I do know Yaniv had a close

7    relationship operationally with the PEO's in Miami.

8

9

10                    (Recess taken).

11

12   BY MS. HAVENER:

13      Q.   Mr. Mokwa, you said a few minutes ago that

14   Yaniv Amar left at some point and then came back?

15      A.   Yes.

16      Q.   Do you know what he was doing when he left?

17      A.   My understanding -- you know, I don't know.

18   I didn't have a lot of interaction with Mr. Amar at

19   that time.  I believe he went to Israel for a month

20   or something.  Then at some point, he agreed to

21   come back and get involved.  Again, all of that is

22   third-hand stuff that I was told.

23      Q.   And why would Mr. Stanley say he needed

24   Yaniv Amar?

25      A.   I don't know.  I just believe he had a close

1     relationship with the employees that were actually

2     doing the payroll processing, the selling, et

3     cetera.

4         Q.  Did Yaniv Amar have an employment agreement,

5     to your knowledge?

6         A.  I don't recall.

7         Q.  Did you?

8         A.  I did, yes.

9         Q.  And yours was with whom?

10        A.  With Common Pay Master.

11        Q.  And never with anyone else?

12        A.  Never with anyone else.

13        Q.  So when you first started, even though you

14    were assigned to do merger and acquisition work;

15    did you then have an employment agreement with

16    Common Pay Master?

17        A.  Yes.

18        Q.  Then, even though, you moved; nothing

19    changed?  Your employment agreement always stayed

20    with Common Pay Master?

21        A.  Yes.  My understanding was that everyone in

22    kind of the Mirabilis umbrella of companies had

23    their agreement, you know, with Common Pay Master

24    and worked for various other companies within

25    Mirabilis.

1      Q.   Are you excepting from that, people who came

2    before Common Pay Master existed?

3      A.   Obviously, those individuals would be a

4    different situation.   Certain other individuals

5    would have had agreements directly with Mirabilis,

6    directly with Nexia, especially a lot of the older

7    executives.

8      Q.   By that, do you mean the ones who had been

9    there longer?

10     A.   Yes.   I think most of the more senior

11   executives, however you want to phrase it, had

12   agreements with either Mirabilis or Nexia or one of

13   those entities, the ones that had been around from

14   early 2005 or so.

15     Q.   Did you ever, yourself, hire anyone?

16     A.   No.

17     Q.   Did you ever negotiate any terminations or

18   dismissals?

19     A.   I negotiated quite a few employment

20   agreements when individuals were hired and I

21   negotiated quite a few dismissal and termination

22   agreements.

23     Q.   Did you ever negotiate any employment

24   agreements that contained either an entitlement to

25   stock or stock options?

1    A.   I don't recall off the top of my head how

2    that worked and if I negotiated those.  I can't

3    think of one specifically.

4    Q.   Can you name somebody whose employment

5    agreement you negotiated?

6    A.   I didn't understand our stock compensation

7    very well.

8    Q.   Can you name anybody whose employment

9    agreement you negotiated, stock or not?

10   A.   I would say virtually all employment

11   agreements I negotiated from March forward.

12   Q.   And what terms were at issue?  What was

13   there to be negotiated?  Clearly, it wasn't just --

14   I mean, maybe you mean that they just signed the

15   Common Pay Master handbook, but do you, in fact,

16   mean that there was a separate written agreement

17   with Common Pay Master?

18   A.   Yes, there was an employment agreement that

19   existed prior to when I had gotten there.

20   Q.   And what were the negotiable terms?

21   A.   I would say that the entire agreement

22   theoretically was negotiable.  If someone raised

23   something, we would deal with it and it's a

24   negotiation.

25   Q.   Give me an example.

1     A.   The non-compete was often an issue.

2     Q.   What else?  Compensation?

3     A.   Those type of things, probably would have

4  been more dealt with by Marty Flynn.  It was a

5  ten-page document, so.

6     Q.   Were benefits negotiable?

7     A.   No.  It was just legal language within a

8  contract.

9     Q.   Well, if every contract was negotiable and

10  every term in the contract was negotiable, carrying

11  that to its logical conclusion; I would conclude

12  that all the contracts were different?

13     A.   Well, typically speaking, your average

14  individual signs the contract as is and certain

15  people, whether they're represented by counsel or

16  themselves, usually had specific requests.  As any

17  attorney, who negotiates a contract, sometimes it

18  was a matter of explaining to them what the

19  contract meant and sometimes I would advise that we

20  didn't need certain aspects of our contract.

21        That's what I said before with the internal

22  controls; I tried to closely monitor, if there was

23  anything that was done that was significant.  Like

24  if someone got their non-compete deleted out, I

25  tried to come up with a way to notate; put my

1    little initials on every single contract with the

2    date.   Then I tried to come up with some codings

3    that would show me what I was dealing with, I

4    guess.

5        Q.   Is Mr. Flynn a lawyer?

6        A.   He is not.

7        Q.   Were there any other lawyers who were

8    involved in negotiating employment agreements?

9        A.   Richard Berman, especially towards the end,

10   he kind of got back involved, but for the most

11   part, it was something that I did.

12       Q.   If Mr. Berman was consulted; was that a

13   decision that you unilaterally made that you needed

14   assistance from somebody?

15       A.   There was a time at the end of 2006, where

16   Mr. Berman tried to kind of exert control back over

17   the legal team of Mirabilis.  He was an option, I

18   suppose, if I needed to contact through the general

19   counsel of the company, if I felt that there was

20   something that I could ask for help for.  I also

21   asked all of the attorneys, as in Scott Goldberg.

22   I went to Scott Goldberg quite a bit for assistance

23   in negotiating contracts.

24       Q.   What about Mr. Sadrianna?

25       A.   I don't think I would have asked him

1    expressed terms, but possibly.  See, a lot of the

2    employment agreements came from Sadrianna as in he

3    would do an acquisition and then that would require

4    employment agreements.

5         So might say Matt, I have eight new

6    employees coming; we need to work on their

7    employment agreements.  He would be the one that

8    would put me in touch with them.

9         Q.  I want to go back to the time when you were

10   interviewing just for a minute.  You said you

11   thought it was neat and you thought that the

12   company had some aspirations that you thought were

13   important and it was something you wanted to be

14   involved in?

15        A.  Yes.

16        Q.  Were there any representations made to you

17   at the time that you were interviewing that caused

18   you to take the job?

19        A.  Sure.  I was told that I would be in-house

20   counsel.  I wasn't told expressly that I would get

21   to do the type of work that I exactly wanted to do,

22   but I definitely assumed that was the case.  It was

23   represented to me that Mirabilis was a private

24   equity fund.  We discussed some of the projects and

25   different things that they were working on, all of

1    which, as I stated, were incredibly exciting.

2        Q.   Can you tell me who told you that you were

3    going to be in-house counsel?

4        A.   I mean, I think that was kind of a general

5    understanding.

6        Q.   And who told you that Mirabilis was a

7    private equity fund and what it was engaged in?

8        A.   I believe essentially every single person I

9    spoke with.

10       Q.   When you were moved from the mergers and

11   acquisitions to Common Pay Master, you said you

12   were not happy about that decision; did you feel

13   that anybody had sort of re-nigged on the deal that

14   you would be able to do the kind of work you wanted

15   to do?

16       A.   I wouldn't say re-nigged.  I just viewed it

17   as it is what it is.  I was working for a company

18   and that they had needed me to serve a different

19   function and I accepted it, I suppose.

20       Q.   Okay.  What did Mr. Amodeo have to do with

21   your hiring?

22       A.   With my hiring?

23       Q.   Yes.

24       A.   I don't know precisely.  I met with Mr.

25   Amodeo and he seemed to really like me.  We hit it

1    off well.  It was, if I remember correctly, Marty

2    who I spent a good portion of my day meeting with

3    him.  I believe he was the one that kind of

4    extended me the offer.  We went through the pay and

5    all those type of things.

6        Q.  But he was also the person who was your boss

7    at CPC?

8        A.  Correct.

9        Q.  So when he extended you the offer; did you

10   put those two together?

11       A.  No, I understood Marty to basically be in

12   charge of that department.  In a different company,

13   it might not have been a subsidiary.  It might have

14   been a department.  I understood Marty to be in

15   charge of HR.

16       Q.  I see.  So he was like a recruiter?

17       A.  Not necessarily, but he was relaying the HR

18   portion of what my job was to be with Mirabilis.

19       Q.  And who lead you to believe that you would

20   be doing the kind of work you wanted to do?

21       A.  I would say essentially everyone.  I mean,

22   that was what I applied for.  Everything, from when

23   I talked to Shane and I told him the kind of job

24   that, you know, that I wanted to do and what I was

25   looking to get into.

1          Everything, I would say, that was on my

2      resume, would lead one to believe that I was

3      interested in doing that type of work.  That's what

4      I discussed at my interview.  That is what they

5      represented that was going on in that company.

6          Q.  Now, in the contract -- I know you said that

7      you didn't understand the stock process?

8          A.  Yes.

9          Q.  But was stock a typical form of compensation

10     for employees after you began working for CPC?

11         A.  It was -- I'm trying to think.  Again, I'm

12     not sure I one hundred percent understood what they

13     were doing with the stock.  Yes, there was no

14     question that individuals were supposed to be

15     awarded stock and there was, you know, various

16     classes.  I mean I didn't necessarily understand

17     any of that, but I do know that yes, there was

18     people that came in and thought they were going to

19     have been given stock or were given stock, et

20     cetera.

21         Q.  And were they?

22         A.  My understanding is that they were promised

23     it -- I don't know.  Our investigations after the

24     fact, you know, which would probably be privileged

25     and work product, came to show that there were some

1       issues with some of the stock grants.

2           Q.   I'm trying to translate what you just said.

3       Are you saying that it's your understanding that

4       there was some people who were promised stock, but

5       did not believe later when they became separated

6       from Mirabilis, did not have any stock?

7           A.   I'm not sure.  To be honest, I just don't

8       know.  It was my understanding that we had stock

9       and that we had shareholder meetings, et cetera.  I

10      don't know who came up with how all of that worked

11      or the validity of it or the value of it or what it

12      was worth at the time they got it or what it's

13      worth today.

14          Q.   Well, Mirabilis is bankrupt.

15          A.   That's kind of my point.

16          Q.   So I can't imagine that the stock had any

17      value.

18          A.   Exactly.

19          Q.   When that was going on and you realized that

20      -- and I'm not asking you the contents, but you

21      realized that there was some questions about

22      whether or not people had received, at least the

23      people themselves believed they had been promised;

24      did you go ask anybody?

25          A.   I would think that that would all be

1   privileged, would be my communications with my

2   respect to the stock.

3       Q.   Is that to say that you represented every

4   single entity in the Mirabilis group?

5       A.   I don't think that's what I said.  As I

6   pointed out, I did have some concerns with the

7   stock and I did raise those.

8       Q.   Well, I'm not asking you about the content

9   of the communications.  I'm just asking, did you

10  ask somebody?

11      A.   I did.

12      Q.   Okay.  You also said that you were

13  negotiating terms in the employment agreements; did

14  you negotiate stock or stock options?

15      A.   I don't think that I did.  Often I don't

16  recall ever directly issuing or negotiating stock

17  or really understanding what that was.  Usually it

18  might have been people who came and said here's

19  what my stock is or it was communicated to me.

20      Q.   When you came and you negotiated your own

21  employment; who did you negotiate it with?

22      A.   I believe my agreement was sent to me by

23  Matt Porter, who, as I said, was handling that

24  before me.

25      Q.   But you kind of gave me the impression that

1    he was in more of a paralegal slash secretarial

2    role?

3        A.   I mean, he gave me my employment agreement

4    and I read through it.  I might not have agreed

5    with some of what was in there, but I wasn't

6    worried about it.

7        Q.   Did you get stock?

8        A.   I did not get stock.

9        Q.   Did you ever get stock?

10       A.   No.  I mean, I was not promised any stock,

11   to my knowledge, and I didn't receive any stock.

12       Q.   We've seen in our review of the documents a

13   term Exception Letter?

14       A.   Yes.

15       Q.   Do you know what it means?

16       A.   I do.

17       Q.   Would you tell me, please?

18       A.   That was one of the ways -- again, it's

19   something I kind of inherited.  That was done so

20   whether it's say beforehand it would have been an

21   employment agreement and then I guess in a perfect

22   world just had the standard agreement and then all

23   exception letters, which is what I think they were

24   trying to do a non-compete would be moved by an

25   exception letter.

1     Q.   Which would mean, if I'm understanding you

2     correctly, someone who wanted to challenge

3     something about their employment situation after

4     the fact, they would need not only their employment

5     agreement, but every single exception letter that

6     applied to them?

7     A.   Generally, just one.  I don't know why that

8     was done that way.  That was something I tried to

9     eliminate.

10     Q.   Am I correct, then, in understanding that,

11     instead of exception letters, you were trying to

12     deal with the issues up front, so that the

13     employment agreement actually represented what

14     their agreement was between the individual and the

15     employer.

16     A.   Yes, with the exception, which is a letter I

17     did that, often dealt with, let's say bonus type

18     issues.  It would actually deal with that type of

19     thing or -- I don't recall it off the top of my

20     head, but there was one or two areas, where the

21     exception letters, I felt would be something you

22     could do appropriately.

23     Q.   Who signed your employment agreement?

24     A.   Marty Flynn and myself.

25     Q.   Did you challenge anything in it?

1      A.   No, I didn't challenge anything in mine.

2      Q.   You talked about when CPC sort of ceased to

3  exist, Nexia kind of ceased to exist and Mirabilis

4  kind of ceased to exist and that everything was

5  kind of falling apart, correct?

6      A.   Correct.

7      Q.   Can you give me examples of the people with

8  whom you handled the termination?

9      A.   At that point, Mark Bernet joined the

10  company.  He was fantastic.  Shane Cobb was also

11  fantastic.

12      Q.   The guy who recruited you?

13      A.   No, no.  Shane Williams recruited me.  Shane

14  Cobb had, you know, public company HR experience.

15  He was a senior HR kind of guy.  So he really knew

16  what he was doing.  Shane Cobb and myself would

17  have probably been primarily the two and Bernet was

18  also involved.

19      Q.   I must have misspoke.  I'm asking, not who

20  were your co-negotiators, but whom or with whom you

21  were handling terminations?

22      A.   Oh, I'd have to go back and look at my

23  documents.  I think, I probably have them.

24      Q.   I want to give you a piece of paper.  Do you

25  have a pen?

1      A.   Sure.

2      Q.   So just to be clear, you do still have in

3    your possession some of the documents from when you

4    were employed at Mirabilis, at least copies?

5      A.   I may have some stuff.

6      Q.   Do you believe that you do?

7      A.   I do.

8      Q.   Okay.  Back to that piece of paper.

9      A.   Just to clarify, it would be like the forms

10   I used.

11     Q.   That's fine.  You started in January of

12   2006?

13     A.   Yes.

14     Q.   I want to just get the timeline straight.

15     A.   Okay.

16     Q.   So from January to March of 2006 you went to

17   Common Pay Master?

18     A.   Yes.

19     Q.   And here you were at Mirabilis, correct?

20     A.   Yes, in the AmSouth building.

21     Q.   And you were doing this up until --

22   exclusively this, am I correct, until the last

23   quarter of, let's say October of 2006?

24     A.   I would say somewhere around there, yeah.

25     Q.   So at this point, you're Common Pay Master

1   plus AEM?

2       A.  Yes.

3       Q.  And that lasts until the end of the year,

4   correct?

5       A.  Correct.  CPC got incredibly busy in

6   December and January due to it being shut down.

7   Then at that point, it was essentially gone.

8       Q.  Well, I believe you told me that you were

9   still doing some CPC work up until about March?

10      A.  I think I did a little bit for a while.

11      Q.  Okay.  So this sort of period goes until

12  through the first quarter of 2007?

13      A.  Yes.

14      Q.  What comes after?  Please fill in the blanks

15  if I've missed something.

16

17      MR. LOEWY:  Let me object to vagueness.

18  What's the question here?  We're not going to do a

19  full timeline.  I don't want him writing this stuff

20  down.  So if you want to ask a question, ask a

21  question.

22

23      Q.  Tell me what you were working on and for

24  whom.

25

1           MR. LOEWY:  Objection.  Vague.

2

3      Q.   When did you stop being employed by

4    Mirabilis or one of its entities?

5      A.   I believe I was employed by Mirabilis, let's

6    say the 3/07, even all the way through, I think

7    June of 2007, I believe would have been the end of

8    Mirabilis.

9      Q.   Okay.  And you didn't get a paycheck from

10   any Mirabilis entity after that?

11     A.   Not to my knowledge, no.

12     Q.   But for what entities were you working for

13   during this time period?

14     A.   If I remember correctly, it was Mirabilis.

15   It was Mirabilis or its various subsidiaries, which

16   would have been AEM.

17     Q.   So it's Mirabilis and its subsidiaries and

18   in particular AEM?

19     A.   There was just a little bit of an overlap

20   between all of those companies during that first

21   quarter.

22     Q.   I understand.  When did CPC stop issuing

23   checks?

24     A.   I would not know.

25     Q.   Do you know if it issued any in 2007?

1      A.   I do not.

2      Q.   Okay.  When you stopped being paid by CPC;

3   what entity issued your checks?

4      A.   I believe AEM issued my checks.

5      Q.   Where did you work during those last -- did

6   you ever move back to the head quarters of

7   Mirabilis?

8      A.   At that time, I don't even know if that

9   building was still standing, if you will, in the

10   first quarter of 2007.

11     Q.   Well, where were you physically located?

12     A.   I was physically located in Sanford through

13   I would say -- I don't even know the exact date, if

14   it was March or at sometime during that first

15   second kind of quarter of 2007 that I left Sanford.

16   It had to be March.  That's when I went to the Sun

17   Trust building, which is where essentially what was

18   left of Mirabilis and Frank and all of that had

19   been consolidated.

20     Q.   After June of 2007; who was your employer?

21     A.   Then it would have been Goldberg, Bates.

22     Q.   What was your title at Goldberg, Bates?

23     A.   I don't know what my exact title was.  I was

24   obviously an attorney, but I was not licensed by

25   the Florida Bar at that time.  So the work that I

1   did had to be supervised by, you know, Mr. Goldberg

2   or Mr. Bates.

3        Q.  Do you know, if under the rules you were

4   allowed to sign letters?  I know you can't sign

5   pleadings.

6        A.  I don't know.  My understanding is I was

7   still a licensed attorney and my understanding is

8   that, you know, I'm allowed to do certain things as

9   long as it was under the supervision of other

10  licensed attorneys.

11       Q.  Was there ever an entity that was just your

12  name, a law office that had only your own name in

13  that time period or ever?

14       A.  I think I maintained law offices also when I

15  was in Texas that were under my name.

16       Q.  So it was --

17       A.  Not an office, but I kept -- I practiced

18  law.

19       Q.  Through an entity?

20       A.  Yes.

21       Q.  What was the name of it?

22       A.  I'm trying to think.  I don't know if I

23  formally incorporated it, but held myself out as

24  Matthew Mokwa Law Office.

25       Q.  Okay.  What work did you do at Goldberg,

1    Bates in the second half of 2007?

2        A.   I did almost exclusively the sale of

3    entities and dealing with just, you know a

4    multitude of issues that were coming from

5    liquidating all of those companies.

6        Q.   Could you be more specific?  Do you mean the

7    sale of entities that were formed by Mirabilis

8    entities?

9        A.   Yes.

10       Q.   Okay.  Formerly Amodeo owned entities?

11       A.   I'm trying to think of which ones would be

12   which, but I may have been involved in some of the

13   sale of Amodeo entities, yes.

14       Q.   Okay.  Do you recall any of the buyers of

15   those entities?

16       A.   The big ones, which I think the date was

17   actually May 1st of 2007 for them, was where the

18   PEO's went to.

19       Q.   All the PEO's?

20       A.   That we still had.  I guess the authority at

21   that point -- no, it would have been a portion of

22   the PEO's; I believe AEM, National Med Staff,

23   Presidion.  There could be more, but I believe

24   there was an asset sale.

25       Q.   Presidion --

1    A.   You know, I don't know the details, but at

2    some point in 2007, whether it was Presidion or

3    whomever, that collective book was sold.

4    Q.   Mr. Bates testified that it was sold to O2

5    HR; who owned O2 HR?

6    A.   I don't know.  There was a gentleman named

7    Tom Bean that I dealt primarily with.

8    Q.   Had he been affiliated with AQMI, Mirabilis

9    or Amodeo before these entities?

10   A.   Not to my knowledge.  That was who we

11   ultimately sold to, but there were several

12   negotiations with a lot of companies.  I mean,

13   there was another one that we really wanted to sell

14   to which was a public company.

15   Q.   What was the name of that company?

16   A.   I want to say that -- I forget the name, but

17   I could come up with it.  We went pretty deep into

18   negotiations with them.

19   Q.   With a public company that you can't

20   remember the name of?

21   A.   Right, I can't remember.  I'm sorry.

22   Q.   Were you the lead in the negotiations with

23   Mr. Bean?

24   A.   I believe Mr. Bernet was still with us.  He

25   was definitely supervising me.  I did a good chunk

1    of the work.

2        Q.   Okay.   You were here when Mr. Bates

3    testified?

4        A.   Yes.

5        Q.   He testified that at some point Mr. Amodeo,

6    as the owner of AQMI, and AQMI was the secured

7    creditor of Mirabilis, took over the management of

8    the company; am I correct in that?

9        A.   I don't know.   I don't understand a lot of

10   the involvement between Mr. Amodeo and Mirabilis.

11   At that point, they were cooperating and everyone

12   seemed to have this common goal of shutting

13   everything down.

14       Q.   Was Mr. Amodeo exerting control of directing

15   people's activities?

16       A.   He was definitely involved.   I can only

17   speak to my knowledge of what I dealt with with

18   him.   He had involvement with regard to, you know,

19   the sales.   He was involved, as was Yaniv, helping

20   out at that point and I believe Mr. Bernet was also

21   involved.   So it was everybody.

22       Q.   Everybody including Aaron?

23       A.   I don't think Aaron was involved in any of

24   that stuff.

25       Q.   So it was you, Mr. Amodeo, Yaniv Amar,

1     correct?

2     A.  We didn't all sit together, but I would say

3 that people would contact one another with regard

4 to that sale.

5     Q.  At what time period are we talking about

6 that you and Mr. Amodeo and Mr. Amar would contact

7 each other?

8     A.  This would have been during the sale of

9 those companies.

10    Q.  And what's the time period?

11    A.  In March of 2007.

12    Q.  Between March and June of 2007?

13    A.  Through June.  I don't think Amar -- he just

14 helped on that one specific deal.

15    Q.  Where were you physically located between

16 March and June of 2007?

17    A.  At the Sun Trust building.

18    Q.  Had Soone Business Development been opened

19 that point?

20    A.  Not to my knowledge.

21    Q.  So did Jodi Jaiman and Shane Williams and

22 Jay Stollenwerk still work for MVI at that time?

23    A.  I don't know, but I believe so.  They were

24 on that floor and they were working the same,

25 similar stuff that I was?

1      Q.   To wrap up, to sell certain --

2      A.   Yes.

3      Q.   And they were on that floor?

4      A.   Yes.

5      Q.   After June of 2007, you went to work for

6 Goldberg, Bates?

7      A.   Yes.

8      Q.   And where were you physically located then?

9      A.   That was -- there were offices on Maguire

10 Boulevard.

11     Q.   So what's the address of Sun Trust -- if I

12 say the Sun Trust building; you and I agree that

13 we're talking about the Mirabilis offices on a

14 certain floor in the Sun Trust building, correct?

15     A.   Correct.

16     Q.   And that you were there; you were on that

17 floor, correct?

18     A.   Yes, from March to June.

19     Q.   Right.   We're only talking about that time

20 period.

21     A.   Okay.

22     Q.   Was Mr. Bates on that floor?

23     A.   Yes.

24     Q.   Was Mr. Goldberg on that floor?

25     A.   Yes.

1      Q.  Was Ms. Jaiman on that floor?

2      A.  Yes.

3      Q.  Was Mr. Amodeo on that floor?

4      A.  Yes.

5      Q.  Was Mr. Flynn on that floor?

6      A.  No.

7      Q.  Where was Mr. Flynn's office?

8      A.  I think Mr. Flynn had resigned at that

9 point.

10     Q.  Was Mr. Stollenwerk's office on that floor?

11     A.  Yes.

12     Q.  Was Mr. Williams on that floor?

13     A.  Yes.

14     Q.  Okay.  Was there anyone else on that floor?

15 We've named six, seven people.

16     A.  It was kind of -- Mirabilis began to

17 continue to shrink from the end of 2006 all the way

18 through, you know, whenever.

19     Q.  But from March to June there was a crew of

20 seven, at least?

21     A.  No, I believe there was still quite a bit of

22 more people.  I believe Steve Bonck hadn't left

23 yet.  He was there when I first came in March.

24     Q.  What does he do or what did he do?

25     A.  I believe he was the tax manager for

1   Mirabilis.  I don't know when Paul Glover left.  He

2   may have still been there.  I don't know when Bill

3   Walsh left.

4       Q.  Were these people that you're now naming,

5   Mr. Bonck, Mr. Glover and Mr. Walsh; were they

6   located on the same floor?

7       A.  I believe -- I don't know with certainty.  I

8   know Steve Bonck was.  There was another woman that

9   worked with him named Angela West.  She was there

10  when I was there.  Mark Bernet was there.  There

11  was a gentleman by the name of Dan Barks who was

12  there.

13      Q.  And did these people, that you've just

14  named, Ms. West, Mr. Bonck, Mr. Glover, Mr. Walsh,

15  Mr. Barks; did those people leave between March and

16  June?

17      A.  Yes, I believe everyone left at various

18  times.  By June, at that point, we were essentially

19  done.  All the companies had been more or less

20  closed down.  The floors were vacated and deals had

21  been negotiated or attempted.

22      Q.  Subleases?

23      A.  Well, yeah, the floor for AmSouth, the floor

24  for Wachovia.  There was multiple floors and we had

25  for employees anymore.  So people were in the

1    process of negotiating out of these, what may have

2    been five, ten long-term leases.  It was a process

3    of shutting things down and continuing to shrink.

4        Q.  Did you have anything to do with negotiating

5    the space, the space issues?  I mean, if I

6    understood you correctly, you were saying that

7    Mirabilis was emptying out a lot of space that it

8    had leased?

9        A.  It was defaulting on all of its obligations.

10       Q.  In other words, there was no negotiations

11   trying to sublease or --

12       A.  I mean, we did what we could.  We were just

13   attempting to mitigate damages, I guess.

14       Q.  Okay.

15       A.  We had lines of credit.  We were being

16   called.  Bank accounts were being closed.

17   Foreclosures were coming into place.

18       Q.  Foreclosures on what?

19       A.  For not paying rent.

20       Q.  So lease foreclosures?

21       A.  Right.  It was just those type of issues.

22   They were being balanced by trying to sell off the

23   assets by, you know, can we please keep our

24   accounts open for another month or two while we

25   tried to complete some of these transactions.

1     Q.   How did you become aware of that situation?

2     Did you know when Common Pay Master was closing,

3     that Mirabilis hadn't long for this world?

4     A.   I don't know if towards the end of 2007 or

5     towards the end of 2006 -- I'm sorry -- I really

6     knew quite how bad stuff was.  I think that my

7     levels of communication, when I was communicating

8     with Mr. Bernet, I began to become privy to a lot

9     more information.

10     Q.   And what was the timing of that?

11     A.   That would have been the first quarter of

12     2007, probably later as in the February, March

13     portion of that?

14     Q.   And is that when Mr. Bernet moved?  Well,

15     was he already in the Sun Trust building?

16     A.   I don't know.  To my knowledge, he was

17     always in the Sun Trust building for every time

18     that I ever met with him.  He didn't come until

19     December of 2006 and he was gone by May, I think,

20     or so.

21     Q.   Were you ever general counsel for Mirabilis?

22     A.   No.

23     Q.   What's the DBPR?

24     A.   Department of business -- I don't know.  The

25     regulatory department, I believe, for the PEO's,

1    for all licensing divisions.

2        Q.   In the state?

3        A.   Well, whatever rolled in underneath them, I

4    wouldn't know, but I believe with reference to me,

5    it probably would have been dealing with the PEO's.

6        Q.   Did you ever attend DBPR meetings?

7        A.   I attended a single DBPR meeting.

8        Q.   Do you know when it was?

9        A.   I do not.  It was a meeting in order to

10   attempt to get an approval.  When you have the

11   situation that we had, it obviously was not done, I

12   guess normally as they would have liked to see for

13   a regulated and licensed entity.

14       Q.   You mean normally, according to the DBPR?

15       A.   Normally as according to just the word

16   normal.  I mean, we liquidated the companies as

17   best we could.  It was a service industry.  So it

18   was dissipating by the day.  We had to actually get

19   -- you have to apply and get approval to sell a

20   regulated company as in a PEO.  So we actually had

21   to have a hearing to see whether or not they would

22   let the sale from AEM go through to O2 HR.

23       Q.   Okay.  So am I correct in saying that you

24   were continuing to act as an attorney between

25   January and June of 2007?

1    A.   I would say yes.

2    Q.   And who was your client?

3    A.   My client would have been primarily, I

4  believe Mirabilis at the time.

5    Q.   What is Mirabilis HR?

6    A.   Mirabilis HR was what they call a fictitious

7  filing, which is just essentially using a different

8  name for an entity.

9    Q.   And what was the different entity?

10   A.   AEM, Inc..

11   Q.   So they're essentially equivalent; Mirabilis

12  HR equals AEM, Inc.?

13   A.   Yeah, it would be AEM, Inc. doing business

14  as Mirabilis HR would be its legal name.

15   Q.   When you say AEM, Inc., and you've been very

16  careful to say that several times, are you

17  distinguishing it from any other AEM?

18   A.   No.

19   Q.   Okay.  Just checking.  During the time

20  period, when you and Aaron and Scott and Jodi and

21  Jay and Shane, to whom were you individually

22  reporting to?

23   A.   Prior to the Goldberg, Bates era, if you

24  will?

25   Q.   Correct.

1      A.   Mark Bernet was there and Dan Barks was who

2   I reported to through -- I don't know the exact

3   time they left, but I would say May maybe, like

4   early May, first week of May.

5      Q.   Okay.  And then who?

6      A.   At that point, it was kind of like, I don't

7   know if we knew who we were reporting to.  Clearly,

8   Frank was calling many of the shots.

9      Q.   So Mr. Amodeo was directing your activities

10   at the very end?

11      A.   For that month, I think -- it's difficult to

12   remember exactly what was going on during that

13   month or what we were doing.  I don't know if I had

14   my own projects or what was going on.  I don't know

15   to whom Jodi, Jay and Shane reported to.  I guess

16   it would have varied, but there's no question, that

17   he was involved.

18      Q.   Are you familiar with the deposition Ms.

19   Jaiman gave?  Do you know what the Hendricks'

20   litigation is?

21      A.   Yes.

22      Q.   You're aware of the Hendricks' litigation?

23      A.   I'm aware of it.

24      Q.   Did you have any involvement with it?

25      A.   No.

1       Q.   Have you ever reviewed Jodi Jaiman's

2       deposition in that case?

3       A.   I don't believe so.  I may have skimmed it

4       in your production, not even substantive.

5       Q.   Okay.  I want to go through the names of

6       some entities and ask whether you did any legal

7       work for them while you were working at Mirabilis

8       or Common Pay Master, whichever?

9       A.   Okay.

10      Q.   Did you do any work for Presidion?

11      A.   Not to my knowledge.

12      Q.   Did you do any work for Titanium

13      Technologies?

14      A.   No.

15      Q.   Did you do any work for Tenshi?

16      A.   Yes.

17      Q.   What did you do for Tenshi?

18      A.   I drafted an equipment lease for them.

19      Q.   At whose direction?

20      A.   Jodi Jaiman.

21      Q.   So for that deal specifically; Tenshi was

22      your client?

23      A.   Yeah.  I don't know the exact relationship,

24      but she asked me to do some work and I did it.

25      Q.   Did you do any work for AQMI?

```
 1        A.   What time period?

 2        Q.   Before?

 3        A.   Goldberg, Bates?

 4        Q.   June of 2006.

 5        A.   I don't think that I did.

 6        Q.   Did you do any work for Nexia?

 7        A.   Again, I can't recall a circumstance that I

 8   did.

 9        Q.   You've already told me about AEM?

10        A.   Yes.

11        Q.   Did you do any work for the Sunshine

12   Company?

13        A.   No.

14        Q.   Did you do any work for Presidion?

15        A.   No.

16        Q.   Did you do any work for Peridyne?

17        A.   I don't believe so.  I'll clarify; when we

18   did sell the companies, it was kind of -- how it

19   was done was it was done based on the accounting

20   records that existed at the time and most of the

21   individuals, who had first-hand knowledge, were

22   gone at that point.  That agreement was done, kind

23   of bifurcated, as in putting the employees under

24   Peridyne or Presidion that were reported under

25   Peridyne or Presidion in the accounting records and
```

1      AEM separately.

2           I can't recall with certainty.  I don't

3      think we negotiated -- I don't remember if I was

4      involved, if I did the Presidion part of that, too.

5      Again, Bernet was still involved and I know that --

6      I seem to recall some kind of argument over Frank

7      wanted things done one way, Bernet wanted them done

8      another way.  I don't remember if I did the

9      Presidion part, too, or if that was done by

10     Sadrianna or by Frank.

11          Q.  Mr. Amodeo was also an attorney, correct?

12          A.  He was a disbarred attorney, so I

13     understand.

14          Q.  But trained as an attorney?

15          A.  Yes.

16          Q.  Did you ever represent Mr. Amodeo

17     individually before June of 2007?

18          A.  No.

19          Q.  Up through June of 2007?

20          A.  I don't believe that I did.

21

22                    (Recess taken).

23

24     BY MS. HAVENER:

25          Q.  Just before we broke, you said that you did

1    not know in June of 2007 to whom Shane, Jay and

2    Jodi reported?

3        A.   Okay.

4        Q.   Did you at the time that you first came,

5    know to whom Shane at least reported?

6        A.   I don't think when I first came, no.

7        Q.   What did Shane tell you about his job that

8    made you decide to come interview?

9        A.   Well, he definitely had a high respect for

10   Mr. Amodeo.  He just spoke about -- I mean, to be

11   honest, the entire executive staff was pretty

12   impressive.  He just told me a lot about the

13   projects that they were working on.

14       Q.   Do you remember any projects specifically

15   that he talked about?

16       A.   I don't.  There was a lot of different

17   stuff.  It was just primarily acquisitions.  I

18   remember that one of the things was some kind of

19   Congo water treatment facility.  None of it was

20   formally represented to me.  It was just as in

21   small talk at a bar.

22       Q.   You said you didn't know who Shane reported

23   to when you first came?

24       A.   Yes.

25       Q.   Did you ever know to whom Shane reported to?

1          A.   At some point, Shane reported directly to

2     Frank as -- I mean, I don't know what his exact

3     title was, but it seemed to be almost as a

4     secretary.

5          Q.   Back to the timeline map.  This very first

6     part, you were in the Sun Trust building?

7          A.   No.  I was in AmSouth, but I don't know when

8     -- Sun Trust was being built out and came to be at

9     some point and I don't know when that was.

10          Q.   Okay.  And then you were moved to?

11          A.   Wachovia.

12          Q.   And this is just for me.

13          A.   Okay.

14          Q.   And then you were moved again to Sanford?

15          A.   Right.

16          Q.   And when was that?

17          A.   At the end of January, I think it was the

18     last week of January of 2007.

19          Q.   Okay.  And how long were you there?

20          A.   Until March of 2007.

21          Q.   Okay.  And then for this last period of time

22     in March, April, May and June; where were you

23     located?

24          A.   Sun Trust.

25          Q.   Okay.  Tell me your impression of Mr.

1    Amodeo.  You worked with him for a year and a half.

2    Tell me your impression of him at the beginning at

3    the time you worked with him.

4        A.  So in January of 2006?

5        Q.  Or when you interviewed, let's say.

6        A.  I mean, because it kind of changes.  When I

7    interviewed, I was really taken by him.  I found

8    him to be incredibly charismatic and very smart.

9        Q.  I think you already answered this, because I

10   remember the word charismatic.

11       A.  Then in January of 2006, when I came on, I

12   could tell the entire organization had very high

13   esteem for him.  I didn't have much contact with

14   him, but with that being said, he was always very

15   nice to me and to everybody else.

16       Q.  When did you start to have more close

17   contact with him?

18       A.  He really -- I really didn't have hardly any

19   contact with him until, I would say March of 2007

20   and maybe only five or so meetings where I was

21   present.  One time he left me a voice mail on my

22   phone when I got to work telling me he saw

23   something that I did and he thought it was a good

24   job.  That was really probably five times and he

25   left me a voice mail.

1    Q.  And then you worked fairly closely with him,

2    if I understood you correctly, between March and

3    June?

4    A.  Yeah, it was myself and the people that we

5    discussed.  Beginning in February, I viewed myself

6    as reporting to Mark Bernet.  I think Bill Walsh

7    was still present at that time.  That began to

8    unravel during the first, second quarter.

9    Q.  But at the end, you said that it was just

10   the seven of you on the floor or in the suite?

11   A.  Yeah, for about a month.

12   Q.  And what was your impression at that time?

13   A.  Of Mr. Amodeo?

14   Q.  Yes.

15   A.  I don't know, not necessarily the business

16   extraordinare that I had thought of when I

17   originally interviewed.  He was someone that I

18   think was pretty candid.  He was trying to take

19   responsibility and figure out what had happened

20   precisely with regard to everything.  That's all I

21   really recall.

22   Q.  When did you become aware of the criminal

23   investigation?

24   A.  Against Mirabilis?

25   Q.  And/or against Frank.

1    A.   I can't say with certainty.   I don't think I

2    was really privy to any of it until, probably -- I

3    don't think I knew much about it until the first

4    quarter of 2007.   Even then, I didn't understand

5    the significance or the scope really until I spoke

6    with Mark Bernet in 2007.

7    Q.   Was anybody in the first quarter of 2007?

8    Am I correct that the target letters came out in

9    December of 2006?

10    A.   I wouldn't have known.   It wasn't discussed

11    with me.

12    Q.   So what did you learn from Mark Bernet?

13    A.   That would have obviously been privileged.

14    Q.   Well, it was Mr. Amodeo that was being

15    investigated at that point?

16    A.   I think Mirabilis at this point has been

17    indicted and convicted.

18    Q.   Now, but not then.

19    A.   Well, not then, but it goes without saying

20    that people collectively were trying to figure out

21    exactly what was going on, what happened, who was

22    responsible for what areas of the company.

23    Q.   You just told me a few minutes ago that you

24    did not represent Frank individually?

25    A.   At that time.

1    Q.   Right, so I don't understand how a

2    conversation about what was going on with criminal

3    investigation with Mr. Amodeo was privileged?

4    A.   It wasn't regarding just Mr. Amodeo.  It was

5    regarding collectively everything.

6    Q.   So you never spoke about Mr. Amodeo's -- the

7    target letter or what Mr. Amodeo was specifically

8    charged with?

9    A.   No, nothing.

10    Q.   Even though Mirabilis wasn't even --

11    A.   I had a general understanding of what

12    essentially had happened.  I didn't know whose

13    role, whether it was the company or Mr. Amodeo or

14    whomever.  I really had very little knowledge of

15    any of that.  That's something, in addition to

16    liquidating, that I was working with Mr. Bernet on

17    trying to collect documents and trying to piece

18    this together.

19    Q.   As I understand it, AEM got subpoenas; is

20    that correct?

21    A.   I don't know that for certainty.  I wouldn't

22    have been involved.

23    Q.   So you were not involved in collecting

24    documents for AEM?

25    A.   No.

1    Q.   And this is a fact, it's not communications.

2    A.   Sure.

3    Q.   Were you involved in collecting documents to

4    respond to any subpoenas?

5    A.   Not to my knowledge.  I didn't work on

6    collecting documents for the subpoena.  What I was

7    discussing earlier was more limited to doing an

8    internal investigation per Bernet and per Walsh and

9    some of these people in trying to talk to our own

10   employees and get documents that might have

11   relevance and analyze them.

12   Q.   When was the first time you ever had any

13   awareness that Mr. Amodeo might have had a mental

14   illness?

15   A.   I don't know.  I know that he had discussed

16   it pretty candidly in 2007 when we were kind of

17   going through this whole process that I was

18   discussing that he definitely, you know, attributed

19   some of the behavior to that.

20   Q.   Did you perceive him to be mentally ill up

21   through June of 2007?

22   A.   No, not up through June of 2007 other than

23   what I might have heard from other people.

24   Q.   Do you mean what you might have heard about

25   conduct or what you might have heard about a

1   diagnosis?

2       A.   I think both.   I think I had become aware of

3   it by that time, I would say in either the first or

4   second quarter.   In fact, I was aware of it in the

5   first quarter, you know, when it would have been

6   when I discussed it.

7       Q.   Did you ever discuss it with Dr. Pollack?

8       A.   No.

9       Q.   Did you ever discuss it with Mr. Amodeo,

10  himself?

11      A.   Yes, not at that time, though.   I would have

12  discussed it later second quarter, I would say.

13      Q.   Okay.   What was your relationship like with

14  Mr. Goldberg?

15      A.   Good.   He was somewhat of a mentor, I would

16  say when I first began.

17      Q.   Did you like him?

18      A.   Yeah, absolutely.

19      Q.   Did you socialize with him?

20      A.   Not regularly.   I may have had one or two

21  happy hours with him.   I think I played golf with

22  him once or twice.

23      Q.   Were you aware that Mirabilis had offices in

24  Texas?

25      A.   Not that I knew of.

1      Q.   I know that at sometime you, along with

2   other people, spent time at the warehouse reviewing

3   documents.  Do you recall that?

4      A.   I would have been one of the people that

5   would have had much less, you know, involvement in

6   that.  I was only out there, that I can recall,

7   probably two times or three times.  So I wasn't

8   someone that was actually going through physical

9   documents.

10     Q.   Were you going through physical documents

11  somewhere else?

12     A.   I may have reviewed other documents that had

13  been gathered or someone had pointed them out and

14  thought that they might have had relevance.

15     Q.   Did you ever do any of the review of the

16  documents that were in summation?

17     A.   I don't think that I did, no.

18     Q.   Do you know who did?

19     A.   I would just be guessing.  There was a

20  decent amount of people.  There were people who

21  were actually staffed at the physical warehouse.

22  There was some people that seemed to report, you

23  know, to Frank and to deal with that stuff.  I

24  don't know precisely.

25     Q.   Where did you get the information about what

1    you needed to review to do your internal

2    investigation?

3        A.   Well, my internal investigation was before

4    the warehouse existed.

5        Q.   But you said you reviewed other documents

6    elsewhere; am I wrong in suggesting that the review

7    of other documents was part of your internal

8    investigation?

9        A.   Yeah, I'll answer the question.

10   Surprisingly, there didn't seem to be any

11   consolidated group of all of these documents and

12   transactions, et cetera.  Nobody appeared to have

13   any, you know, clear-cut answers for who owned what

14   and where it was.

15       So I sought about with the help of Mr.

16   Bernet trying to collect everything that had to do

17   with these relevant documents and analyze them.

18       Q.   And was this effort to collect documents in

19   response to a criminal investigation?

20       A.   There's obviously a significant overlap

21   between both the civil and the criminal with regard

22   to that.  It was, I think more than anything,

23   trying to understand who owned what and who had

24   responsibilities for what was what I was trying to

25   achieve, at least on paper.

1    Q.  So do I understand you to be saying that it

2    wasn't necessarily in response to the criminal

3    investigation?

4    A.  I would actually say from my knowledge, not

5    at all.  Now, whether the people that were kind of

6    instructing me, maybe, but to my knowledge, I was

7    viewing this at that time still as a very civil

8    problem amongst these various entities and saying

9    we need to find out who owns what and who stands

10   where, so we can deal with it.

11   Q.  Were you aware that the offices were

12   videotaped, that Mirabilis's offices were

13   videotaped?

14   A.  Yes.

15   Q.  When did you learn that?

16   A.  I think it was just general knowledge.  The

17   Wachovia building, where I was in, was not, but

18   AmSouth and Sun Trust, to my understanding, just

19   always were.

20   Q.  Did that cause you any concern as a lawyer?

21   A.  I mean, I guess I really never thought about

22   it.

23   Q.  Do you know who reviewed the tapes, if

24   anybody?

25   A.  I don't know who reviewed them.  I know Mr.

1    Amodeo -- I guess Mr. Amodeo was reviewing them.  I

2    don't know in conjunction with who, however.

3        Q.  Do you know if those tapes were turned over

4    to the Government?

5        A.  I don't know.

6        Q.  Are you aware that the warehouse was also

7    taped, is also taped?

8        A.  I may have heard that before.  I wouldn't

9    have had involvement in that directly.

10       Q.  When you started working for Goldberg, Bates

11   later in, say July of 2007; is that about right?

12       A.  Yeah.  I don't know exactly, but somewhere

13   between June, July, August, yes.

14       Q.  Was someone paying you for that month?

15       A.  I don't think I got paid that month.

16       Q.  Were any of those offices taped?

17       A.  I don't believe so.

18       Q.  Do you know if anyone else has seen the

19   tapes?

20       A.  I believe lots of people have seen the

21   tapes.

22       Q.  Can you name the people that you think have

23   seen the tapes?

24       A.  I know that several people have seen

25   snippets that were taken out of -- my understanding

1      is there was approximately, whatever that number

2      has been that's been thrown around, which is twenty

3      thousand hours or something in total recordings.

4      Whomever would watch them, would obviously try to

5      pull out things that they may or may not consider

6      relevant.  Those snippets, I don't know who watched

7      that part.

8              I don't know if anyone has ever sat down and

9      watched all of it.  I don't know who has possession

10     of the actual videos.  I don't know who has

11     possession of copies, but my understanding is that

12     they are out there.

13         Q.  Who were the people who created the snippets

14     that you were just talking about?

15         A.  I don't know precisely who did what or how

16     many people were involved.  I think Frank Amodeo

17     did a lot of the watching of the videos.  I don't

18     know if Ms. Jaiman did.  I don't know about, you

19     know, Shane -- I don't think Shane did.  I don't

20     know, really.

21         Q.  Do you know if when, who ever did it,

22     created the snippets, the originals were kept?

23         A.  The original?

24         Q.  Tapes.

25         A.  My understanding is that the Government has

1          the originals.

2              Q.   Well, if the Government has the originals;

3          how can they be privileged?

4              A.   I don't know.   I don't know if they are

5          privileged.   I wouldn't think they were privileged.

6              Q.   Well, if there's twenty thousand hours worth

7          of tapes and the Government has them, then they've

8          been disclosed to a third party.

9              A.   Okay.

10             Q.   That means that if a conversation occurred

11         in the offices, it's not privileged.

12

13             MR. LOEWY:   Is that a question or statement?

14

15             A.   I wouldn't know.   Obviously, that's a legal

16         question.

17             Q.   You're a lawyer, right?

18             A.   I am.

19             Q.   Is it not your understanding that if a third

20         party has possession of what a conversation on tape

21         that was at one time privileged, the privilege is

22         breached?

23             A.   My understanding is -- I don't know if

24         privilege has been waived.   I don't know.   My

25         understanding is that both Mirabilis and Frank were

1    cooperating with the Government.  I don't know what

2    they've turned over.  I don't know who's counsel.

3    I really just don't know the specific questions.  I

4    understand your general theory.

5        I'd probably want to take a look at it and

6    brief some of it prior to making a legal

7    conclusion, but I really don't know the caliber of

8    privilege as it relates to 2006 or how it relates

9    with both Frank or Mirabilis.

10       Q.  We were talking about Mr. Amodeo's mental

11   illness?

12       A.  Yes.

13       Q.  After June of 2007; what was your impression

14   in dealing with Mr. Amodeo of his mental state?

15       A.  I don't think that -- he seemed pretty level

16   headed and he seemed very humble.

17       Q.  What do you mean by that?

18       A.  He was trying to, as he would refer to it,

19   as do the right thing.

20       Q.  Prior to that time, so up until the end of

21   June 2007, had you ever experienced Mr. Amodeo as

22   having delusions of grandeur as have been described

23   in some of the papers?

24       A.  Prior to 2007?

25       Q.  Yes.

1       A.   Absolutely not.

2       Q.   Did you see any of that during the first

3  half of 2007?

4       A.   No.

5       Q.   Did you see any of that in the second half

6  of 2007?

7       A.   I don't know about the second half of 2007.

8       Q.   You don't know; meaning that you --

9       A.   I mean, it's difficult obviously to answer a

10  question, if someone had delusions of grandeur.

11       Q.   Well, I have seen a document and read

12  testimony that was provided at his sentencing, Mr.

13  Amodeo's sentencing hearing saying that he

14  anticipated that by a certain date there would be a

15  Mirabilis office within thirty minutes of everybody

16  in the world.  Did you consider that reasonable?

17       A.   In hindsight looking back, absolutely not,

18  but when I was sitting in my Wachovia office, I

19  said I wish I could be involved in whatever it is

20  that they're doing that is leading to all of this

21  cool stuff that's going on.  So I didn't really --

22  I didn't have a lot of personal knowledge as to

23  that.  Beginning in 2007, it was looking like a lot

24  of that was not necessarily the case.

25       Q.   In other words, that there wasn't going to

1    be a Mirabilis office within thirty minutes of

2    everybody?

3         A.   I think about January or February of 2007,

4    that's a fair statement.

5         Q.   Did you ever say to yourself or talk to

6    somebody else about that and say gee, that was kind

7    of wacky?

8         A.   In 2007?

9         Q.   Yes.

10        A.   Yes.

11        Q.   So sometime in 2007, you became conscious of

12   what appeared to be symptoms of a mental illness?

13        A.   I think not necessarily just with Frank.  I

14   wasn't answering that question just as to Frank,

15   but I was saying wow, the whole Frank, Mirabilis,

16   everything definitely appeared to be a little

17   wacky.

18        Q.   When you had conversations like that about

19   Mr. Amodeo's conduct or his predictions about the

20   future of Mirabilis; who did you talk to about it?

21        A.   Are we talking in hindsight?

22        Q.   Yes.

23        A.   These are very --

24        Q.   We're talking both.  As it dawned on you

25   that while you're sitting over at Wachovia or maybe

1    you're back over here at Sun Trust and you're

2    thinking somehow, I don't think this is going to

3    come to fruition and maybe it was kind of wacky in

4    the first place; with whom were you coming to those

5    conclusions, if anyone?

6        A.   I would say in 2006, I didn't know per se

7    what we were doing.  I thought it had to be

8    something absolutely amazing, just based on what

9    was going.  I just really didn't know.  Beginning

10   in 2007, when I began to really look through

11   everything, it was a very long process, I would

12   say, to try to figure out where we you all sit here

13   today with the information.  There's a lot of ups

14   and downs as far as my knowledge base, my learning

15   curve.

16       Q.   At some point, Mr. Amodeo was in the

17   hospital, correct?

18       A.   That's correct.

19       Q.   When was that?

20       A.   I don't know precisely.  It was in maybe May

21   of 2008 or June of 2008 or something along those

22   lines.  I would have to look to give you an

23   accurate answer.

24       Q.   Did you ever discuss this with Shane

25   Williams, this topic?

1        A.   During this time?

2        Q.   Ever.   Did you ever discuss the topic of Mr.

3    Amodeo's mental health with Shane Williams?

4        A.   I don't know.   I would assume that I

5    probably did, especially after the fact.

6        Q.   Are you and Mr. Williams friends?

7        A.   Yes.

8        Q.   You went to high school together?

9        A.   Yes.

10       Q.   Have you stayed in touch since that time?

11       A.   Yeah.   I mean, we haven't talked nearly as

12   much as we once did.   I'd say that actually I

13   talked to him relatively recently and I hadn't

14   talked with him months before that.

15       Q.   When you were talking earlier about doing

16   the internal investigation, you said it was in the

17   first half of 2007 and you were reviewing documents

18   with respect to that investigation; who was

19   providing the documents to you?

20       A.   I had -- that was kind of the issue.   They

21   were everywhere and they were very difficult to

22   collect.

23       Q.   So were you collecting them yourself?

24       A.   Yes.

25       Q.   Was anyone instructing you where you might

1    choose to look?

2       A.   I went to -- I mean, I had fairly good

3    relationships with the other attorneys and most of

4    the executives.  I just said what is the company,

5    what's going on, who did these documents.  I mean,

6    they came from a lot of different attorneys working

7    on a lot of different deals.

8       Q.   And then what did you do with the

9    information after you gathered it?

10      A.   I guess, that would be privileged and work

11   product how I compiled it and how I thought about

12   it.

13      Q.   To whom you did you report?

14      A.   To Bernet and Bill Walsh at the time.

15      Q.   After Bernet left, which was before you

16   finished the process, if I'm correct; whom did you

17   report after that?  To whom did you report after

18   that?

19      A.   It would depend on what the question is.  At

20   that point, most of that stuff we had a much better

21   idea, I guess, of what happened.  We didn't know

22   who had done what or who was responsible for what.

23   I wasn't so much as sitting reviewing documents.  I

24   had shifted.  That was more from a January through

25   March deal.  I had more shifted onto, you know,

1     liquidating these companies.

2          Q.   So by March, did you believe that the

3     information gathering process was done?

4          A.   Maybe my part of it.

5          Q.   Okay.  So then your focus became selling the

6     assets of Mirabilis, correct?

7          A.   There again, it was fluid, but more so.

8          Q.   Have you ever been deposed before?

9          A.   I've not.

10         Q.   I'm giving you a document that was marked

11    last week as Exhibit No. 100 in this case.  Do you

12    recognize the document?

13         A.   I recognize it through your production.

14         Q.   Do you not remember the communications?

15         A.   I really don't recall the communications.  I

16    have kind of a vague memory of dealing with some of

17    these issues.

18         Q.   And when you refer in the e-mail at the top,

19    that is essentially at the end of the e-mail chain,

20    that says Frank and Jim Sadrianna made all the

21    decisions as to how much stock individuals should

22    receive.  You are referring to Frank Amodeo,

23    correct?

24         A.   Yes, it would appear that way.

25         Q.   Thank you.  You were there at Mirabilis in

1    June of 2006, correct?

2        A.   Yes.

3        Q.   Did you have any understanding in June of

4    2006 as to who the shareholders of Mirabilis were?

5        A.   Kind of.  Again, I had no involvement in any

6    of that and was over at Wachovia.  I knew we had

7    shareholders and I knew that we had meetings.

8        Q.   How did you know that?

9        A.   Just from hearsay, comments, people telling

10   me we're going to meetings.  I was not a

11   shareholder.  I never drafted any minutes or had

12   any involvement or subsequently looked at it.

13       Q.   Are you aware that it appears from some of

14   the documents in the case that Mr. Amodeo was the

15   only shareholder?

16       A.   I'm aware, yeah, that definitely has been --

17   in my opinion that's been the case.

18       Q.   Meaning that it's true?

19       A.   No, meaning that that's where the two sides

20   differ upon their analysis.  I don't know whether

21   there's been a resolution of those issues or not.

22       Q.   Well, are you aware of Judge Presnell's

23   orders, not in this case, but in --

24       A.   I don't think I've reviewed them.  Were they

25   produced to me?

1      Q.   Yes.

2      A.   I probably have skimmed them.

3      Q.   In both the Rachlin, Cohen & Holtz case and

4  the Saxton, Gilmer case, Judge Presnell has ruled

5  that, and I believe the sentence is identical in

6  both decisions, Mirabilis was controlled by Frank

7  Amodeo, who used the company in a web of

8  subsidiaries and related companies.  Do you

9  disagree with that?

10     A.   I don't believe that I have first-hand

11 knowledge of that.  I know that that was a big

12 issue with regard to everything that we've

13 discussed and with regard to Mirabilis and Frank

14 and Presidion and everybody else.

15     Q.   And are you aware he plead to that?

16     A.   When he plead to that, I would assume at

17 that point it is what it is.

18     Q.   Were you aware at the time that you were

19 working at Mirabilis that Mr. Amodeo shifted MVI

20 controlled entities and Amodeo controlled entities

21 back and forth pretty much at random?

22     A.   I wouldn't say that I was aware that Mr.

23 Amodeo did it.  I know that they were doing --

24 collectively Mirabilis and Amodeo were doing a lot

25 of shifting sometimes that necessarily didn't make

1    sense.

2        Q.   When did you become aware of the work that

3    Palaxar was doing?

4        A.   I don't know.   I would say someone might

5    have mentioned it to me.   I may have pulled up the

6    website.   That would really be the extent of my

7    knowledge of involvement with Palaxar.

8        Q.   Do you know when you would have done that?

9        A.   I don't know.   It would have to have been in

10   August or maybe later.   I don't know.

11       Q.   This has been marked as Exhibit No. 107 in

12   this case.   This is what was produced to us in the

13   initial disclosures.   Is it possible that it was

14   actually June when you pulled up the website?

15       A.   No, that wouldn't have been me.

16       Q.   But it appears that somebody did; do you

17   agree with that?

18       A.   I agree.   I mean, the document obviously

19   speaks for itself.   I can only speak to my own

20   knowledge.

21       Q.   Okay.   When were you aware of the assignment

22   agreements that were prepared by Scott Goldberg

23   around the 1st of August of 2006?

24       A.   I don't know what you're referring to.

25       Q.   Are you aware of what has been referred to

1     as the Earth Goddess note?

2         A.   I am aware of the documents, the three

3     documents that you've referenced.

4         Q.   Okay.   Do you know when you first saw this?

5         A.   No.   I don't think that I saw that document

6     until very late in the litigation, probably not

7     until I was a party to the litigation.

8         Q.   So from that answer, is it also true that

9     you were not actively involved in the litigation

10    until you became a party?

11        A.   I would say that that's a fair statement.

12        Q.   Did you have anything to do with drafting

13    the Complaint?

14        A.   I didn't have anything to do with drafting

15    the Complaint or any pleadings.   The only thing

16    that I can recall is maybe discussing some issues

17    or maybe even researching some issues, very small

18    stuff, though.

19        Q.   Okay.   Have you ever visited Mr. Amodeo in

20    prison?

21        A.   I have.

22        Q.   What was the purpose of the visit?

23        A.   I don't recall how many times I visited or

24    what times.   When he was in county prison, I think

25    it was -- it wasn't necessarily as legal counsel.

1    He was obviously having some, you know -- he was

2    going through a lot of counseling and having a lot

3    of problems.  I think, I more just to check on him.

4       Q.  Did you ever help him draft an affidavit?

5       A.  Not to my knowledge, no, I have not.

6       Q.  Did you review his plea agreement?

7       A.  I don't recall if I reviewed the final plea

8    agreement.  I did review some draft of his plea

9    agreement.  That was ongoing for a couple of months

10   prior to being entered.

11      Q.  Is that something that you and Mr. Bates

12   were doing together or did you review it

13   independently?

14      A.  I don't know precisely how that worked.  I

15   don't recall the details.

16      Q.  Were you aware, at the time that it was

17   happening, of Ms. Curry's termination?

18      A.  I don't understand that question.

19      Q.  Were you aware contemporaneously with its

20   occurrence of Ms. Curry's separation from Nexia

21   Strategy?

22      A.  I actually did not.

23      Q.  Did you know at the time she was terminated

24   that she left?

25      A.  As I recall, my only knowledge with regard

1    to Ms. Curry, and I guess that goes for the entire

2    Richmond group, and I didn't recall this at the

3    time, but I saw it in your production, was at some

4    point there were issues regarding, whether it was

5    payments or benefits, at Common Pay Master while I

6    was at Common Pay Master and her documentation

7    hadn't been properly processed.  I think in

8    November I became somewhat privy to it.

9        Q.   In what capacity did you review Mr. Amodeo's

10   plea agreement?

11       A.   Like in what legal capacity?

12       Q.   Yes.

13       A.   I would definitely not have considered

14   myself criminal counsel.  I was asked to review it

15   largely, I think, because Mr. Amodeo asked criminal

16   counsel to have us review it.  I don't know the

17   capacity.  I viewed myself as one of Frank's civil

18   attorneys with the specific task of kind of

19   shutting down his interest along with the Mirabilis

20   interest.

21

22            (Exhibit No. 124 marked and attached for

23   identification purposes).

24

25       Q.   This has been marked as Exhibit No. 124 in

1    this litigation.  Do you recognize this document?

2         A.   I believe it was something that was

3    produced.  I think, I did skim this document.

4         Q.   And if you'll look at the second paragraph;

5    Mr. Berman is discussing this with Mr. Hailstones

6    and Laurie Holtz.  He says I don't want to use any

7    pre-existing forms for these deals.  Let's be

8    thorough.  There is plenty of consideration and a

9    mere recitation of consideration coupled with this

10   new deal is quite sufficient.  I would like to see

11   whatever "forms" Matt is using.  Is that you?

12        A.   Yes.

13        Q.   Is he referring to you?

14        A.   I believe so.

15        Q.   Do you understand what he's talking about

16   when he's referring to forms?

17        A.   If I recall, Shane Cobb, who as I stated

18   before, was kind of my supervisor with regard to

19   these issues.  Normally, he and I would have

20   handled a separation.  The forms would have been

21   kind of what I said, we had very specific ones,

22   which we had worked in tandem, and I believe Ford,

23   Harrison had worked on them, to create various

24   releases for employees that dealt with everything

25   from, you know, the COBRA, et cetera.

1          My understanding, I believe this was also

2     something that you all produced, was that Shane

3     Cobb had offered to have me be involved.

4          Q.  Okay.

5          A.  And Berman is essentially replying and

6     saying that he wants to do it.

7          Q.  Okay.  This will be the next exhibit.  This

8     is Exhibit No. 25.  It's a series of e-mails.  If

9     you'll turn to the one marked 11/15 of 2006 at the

10    bottom.  It's page 1 of 3.  There's one from

11    Richard Berman to Sheryl LaVine.  I'm looking at

12    six or seven pages in.  The date is at the bottom.

13         A.  I have it, yes.

14

15         (Exhibit No. 125 marked and attached for

16    identification purposes).

17

18         Q.  Do you recognize this series of e-mails?

19    It's an e-mail chain.

20         A.  It starts where?

21         Q.  Well, given that e-mail chain starts at the

22    bottom.  It actually starts at 3 of 3.

23         A.  Okay.  I've reviewed these through your

24    production.

25         Q.  Okay.

1    A.   I guess, I have a vague recollection of the

2  actual event.

3    Q.   So you're familiar with the document that's

4  referred to in this e-mail as the Draft Letter of

5  Intent to Edie Curry?

6    A.   I'm familiar with it now.

7    Q.   Were you not familiar with it at the time?

8    A.   I guess, I was familiar with it.  I was

9  familiar with it for the sole reason that I think

10  they were trying to pay the severance and wrap

11  everything up.  No one had really communicated with

12  the Common Pay Master group.

13    Q.   Did you know the terms of the separation

14  agreement?

15    A.   I did not.  My sole -- I mean, if I remember

16  correctly, the only thing -- and I got this from

17  reviewing your production -- was I asked Berman

18  what was going on, because I didn't know who had

19  come up with that document.  He essentially wrote

20  back and notified me that he was handling it.

21    Q.   Did you handle the severance for the

22  Richmond employees?

23    A.   I don't recall, but I may have.

24    Q.   Were you aware at the time that Ms. Curry

25  did not receive a severance?

1      A.   I don't recall.  From reviewing these

2    e-mails in production and having them somewhat

3    refresh my recollection, my understanding was that

4    that was the issue, that either she didn't receive

5    her severance or she was still being paid and

6    should not have been paying or was not getting

7    benefits.  I don't know what it was, but it was

8    largely because the Common Pay Master group, I

9    would say, didn't really know what was going on.

10      Q.   Would you turn the page of that exhibit and

11    the e-mail, two pages later.

12      A.   (Witness complies).

13      Q.   It's from Richard Berman to you and Frank

14    Hailstones with a copy to Angel Armas?

15      A.   Yes.

16      Q.   Would you look at the second e-mail down?

17      A.   (Witness complies).

18      Q.   That's from you?

19      A.   Yes.

20      Q.   And read the first paragraph of your e-mail

21    to Richard Berman?

22      A.   This is from November 14th of 2006.

23    Richard, the final settlement letter I was

24    forwarding regarding Edie states:  Draft of Letter

25    of Intent to Edie Curry.  Is there another version

1    or should we re-execute the attached letter without

2    the draft language or is it okay as is?  Then I

3    attached a copy of the letter.

4        Q.  Doesn't that indicate to you, at least that

5    you looked at it and read it at the time?

6        A.  It doesn't exactly, because I don't remember

7    what they were looking for, but the only thing that

8    I really looked at it was the fact that it said

9    draft letter of intent.  It would have been my job

10   to create a document like that.  It wouldn't have

11   been my job to, I guess, meet its terms as in with

12   regard to what they were trying to do, which

13   whether it was severance or COBRA payments or

14   cancelling benefits.

15       If I remember, none of that got done in

16   these cases for whatever reason.  That's more what

17   that was with regard to.  I don't believe -- I

18   mean, I have zero recollection of reading that

19   document, substantively.

20       Q.  Would you turn over to an e-mail from Angel

21   Armas to you on November 14th?

22       A.  (Witness complies).

23       Q.  He's asking you, Matt, what needs to be done

24   to consummate this transaction?

25       A.  Yes.

1    Q.  Do you remember that you had -- that was

2    your role in this transaction that they were

3    looking to you to make sure that things happened

4    according to the separation agreement?

5    A.  No, I would completely disagree with that.

6    For one, I have a response to this e-mail, which is

7    not here, which says Angel, I have no idea of what

8    you're talking about.  I had nothing to do with

9    this transaction.  Then he responds back again

10   saying thanks.  Richard then proceeds to deal with

11   the issue, as I understood through your production,

12   for the remainder and I paid no attention to it.

13       So I communicated back to him and said I was

14   not doing it.  I mean, Richard handled Ms. Curry's

15   severance.  He did the job that he did.

16   Q.  You referred earlier to the personnel files?

17   A.  Yes.

18   Q.  I can't remember if we determined whether

19   they were paper or electronic; which were they?

20   A.  They were paper.

21   Q.  Would Ms. Curry's Draft Letter of Intent

22   have been in her personnel file?

23   A.  I don't think that it would have been.  I

24   think that because this deal was done by Richard

25   Berman at his law office in Fort Lauderdale instead

1    of with us, there wasn't anything.  I think that's

2    why her separation agreement, if I'm not mistaken

3    in reviewing the production, was from October 15th.

4         Q.  Do you see the e-mail that is produced as

5    the immediate prior page in this from Shane Cobb to

6    Frank Hailstones?

7         A.  Yes.

8         Q.  Apparently, Mr. Cobb, who is who you

9    reported to, correct?

10        A.  Yes.

11        Q.  Mr. Cobb was aware based on this e-mail from

12   a conversation with Frank Hailstones about what was

13   supposed to happen; does that appear so?

14        A.  This is the one that says 6:01 PM?

15        Q.  Yes.

16        A.  I don't know if I reviewed this.

17        Q.  It also refers to F1; is that Frank Amodeo?

18        A.  Correct.  And Ms. Curry is included in this

19   four separation, all four separations will be

20   treated?

21        Q.  No.

22        A.  Or are these different people?

23        Q.  That was the Richmond office.

24        A.  Okay.  I may have done the Richmond office

25   people.  I don't remember.

1    Q.   How much involvement did you have in

2    payroll?

3    A.   None.   I mean, when I look at this, it looks

4    like Shane Cobb was going to have me do it and

5    Richard, instead, said I want to do it and I was

6    not really in the loop at all.

7    Q.   If you'll turn one more page?

8    A.   (Witness complies).

9    Q.   You'll see an e-mail from Frank Hailstones

10   to Richard Berman with a copy to you?

11   A.   Uh-huh.

12   Q.   And it's explaining to you the answer to

13   your question, I think, which is in the next e-mail

14   down.   You said you saw the Draft Letter of Intent.

15   A.   Well, to be honest, at this point, I think I

16   got my answer from Berman, who said that he was

17   going to call Edie and ask if Hailstones was around

18   and then furthermore from Angel Armas, who said --

19   I view that as my general counsel was doing this.

20   I was not doing this.   I don't think I read any of

21   these and to the extent I did, I skimmed them.

22   Q.   Well, how did you find out when to pay her

23   or what date to terminate her pay?

24   A.   I wouldn't have made that decision.   That

25   was the question being asked of me, when I

1    originally e-mailed the copy off to Mr. Berman.

2    They didn't know.  They were coming to me to see if

3    I had drafted these agreements.

4        Q.  Who was coming to you?

5        A.  I believe Diana Kristona.

6        Q.  Do you remember what was decided about that?

7    What happened about the pay?

8        A.  I do not.

9        Q.  Well, remember the one you looked at a

10   minute ago from Shane Cobb?

11       A.  The one from October?

12       Q.  Correct.

13       A.  Yes.

14       Q.  Number 2 of that says we can lump sum the

15   severance on 11/5.  On 10/20, they'll receive

16   regular pay for the pay period ending 10/15.  Do

17   you know if that was the procedure that was

18   followed?

19       A.  I absolutely have no idea.  I wasn't copied

20   on those or included.

21       Q.  When you said that Ford, Harrison worked on

22   your forms; am I not correct when I say that there

23   were more than one outside counsel to Mirabilis?

24       A.  I'm sure Mirabilis had all sorts of outside

25   counsel.

1      Q.   Did you work with Ford, Harrison?

2      A.   I don't know if you want to quote me on the

3 fact that Ford, Harrison looked at that.   I

4 remember those documents came from Shane Cobb.

5 They were something he helped me with.   My

6 understanding was that they were either reviewed or

7 we got them from Ford, Harrison or Jackson Lewis,

8 someone that specialized in employment law.

9      Q.   But isn't it true that you were general

10 counsel for Common Pay Master?

11      A.   I wouldn't use the phrase general counsel.

12 I was the attorney that was assigned to work at

13 Common Pay Master.   I was the only attorney there,

14 but within -- I mean, to me general counsel has

15 somewhat of a legal meaning.

16      Q.   Are you familiar with the departure of any

17 executives prior to Ms. Curry's departure?

18      A.   Executives?

19      Q.   Yes, for lack of a better word.

20      A.   You mean higher profile people?

21      Q.   If that's what you considered Ms. Curry?

22      A.   I just don't know off the top of my head who

23 had left and who had not left at what time period.

24      Q.   Now, you said that you did not consider

25 yourself to be Mr. Amodeo's criminal counsel at

1        all?

2            A.   Correct.

3            Q.   I want to show you what has been marked as

4        Exhibit No. 115.  Do you remember this occurrence?

5            A.   I remember this occurrence.

6            Q.   Can you tell me why it was done?

7            A.   I have absolutely no idea why it was done.

8            Q.   But wasn't it done with your assistance?

9            A.   My assistance as in I was asked to sit in

10       with Mr. Amodeo while he had already --

11           Q.   But you didn't plan it?

12           A.   I didn't plan it.  I didn't arrange it.  I

13       had no advance knowledge.  I would say five minutes

14       before this thing, he said that he would like me to

15       sit in on this and that was that.

16           Q.   But it happened at your office, correct?

17           A.   It did.

18           Q.   Who asked you to sit in?

19           A.   Mr. Amodeo.

20           Q.   Are you familiar with the attached document

21       that describes the Motivation of Defense Attorneys

22       for a Guilty Plea?

23           A.   I'm not.  I don't think I've ever read it,

24       but I might have, though.

25           Q.   Did you believe Mr. Amodeo's guilty plea was

1    false?

2        A.   I think Mr. Amodeo's guilty plea speaks for

3    itself.   It's his plea.   I would have no idea what

4    is in his mind.

5        Q.   If you'll turn to the fourth page after the

6    Appendix 6 title in this document?

7        A.   (Witness complies).

8        Q.   The second full paragraph reads the falsity

9    of the plea had been independently confirmed by two

10   other attorneys, Aaron Bates and Matt Mokwa; is

11   that true?

12       A.   I wouldn't say that the falsity of the plea.

13   My statement was obviously Frank took a different

14   position in the plea than he had prior.   To the

15   extent that I disagreed with it, that would have

16   been my reasoning.

17       Q.   Are you saying that Mr. Amodeo's statement

18   two paragraphs down, Bates and Mokwa knew the plea

19   agreement to be false, not only from what Amodeo

20   said, but from their own personal knowledge and

21   research of the evidence; is that consistent with

22   what you were just saying?

23       A.   I think it's consistent.   I don't think that

24   I could possibly have personal knowledge of Mr.

25   Amodeo's plea and mental state.   It would have been

1    going off of what Mr. Amodeo had communicated to

2    me.

3        Q.   You reviewed the plea more than once, as you

4    testified earlier, correct?

5        A.   Yes.

6        Q.   Did you make suggestions or comments?

7        A.   I definitely made comments and suggestions.

8        Q.   And in that effort, did you suggest that it

9    was your opinion that or it was your impression

10   that what was being prepared as his plea was not

11   what you knew to be true?

12       A.   I mean, I think it goes back to what I said

13   earlier, which was Frank obviously had criminal

14   counsel and he had very, very good criminal

15   counsel.  They were working on a plea agreement.

16   Frank and them were working together.  They would

17   ask us our opinion.  Whether Frank asked for it, I

18   don't know.

19        I do know that certain respects of the plea

20   were things that Frank had felt adamant about not

21   being the case and especially as worded in earlier

22   drafts.  I think that would have been what that

23   statement means or at least means to me.

24       Q.   Okay.  You've stated very clearly that you

25   were never Mr. Amodeo's criminal counsel.  Do you

1    believe that anyone outside of the relationship

2    between you and Mr. Bates and Mr. Amodeo might have

3    been given the impression or might have understood

4    you to have been participating in some degree as

5    his criminal counsel?

6        A.   I don't believe so.

7        Q.   Why did Mr. Slaughter have you review

8    documents, like the plea agreements?

9        A.   I don't know why Mr. Slaughter would have

10   asked me to review things.

11       Q.   Who collected the documents for Mr.

12   Slaughter for Mr. Amodeo's defense?

13       A.   In what respect?

14       Q.   In any respect.

15       A.   Again, I don't have first-hand knowledge of

16   everything.

17       Q.   Did you participate, at all, in gathering

18   documents to provide to Mr. Slaughter for Frank's

19   defense?

20       A.   Not that I recall, specifically.  That

21   wasn't really something that I worked on.  There

22   may have been -- there were times definitely when I

23   discussed things with Mr. Slaughter.  There were

24   other individuals of Frank's that were working more

25   closely with Mr. Slaughter.  Mr. Slaughter actually

1    had his own employees that he hired specifically

2    for this case to go through documents.

3         Q.   What individuals, quote, of Frank's were

4    working more closely with Mr. Slaughter?

5         A.   I would say primarily Shane and then Mr.

6    Slaughter had one or two people that actually may

7    have been coming up with more documents than

8    anything that Frank was that were working full-time

9    on that issue.

10        Q.   Who were the people that were employed by

11   Mr. Slaughter that were working on them?

12        A.   A gentleman by the name of Andy Denda.   I

13   don't know all of them.

14        Q.   And who from MVI, again?

15        A.   There was a lot of people.   There was a

16   group at the warehouse.   I don't know precisely

17   what they did.

18        Q.   But do you know who they were?

19        A.   I don't know all of their names or who they

20   were.

21        Q.   Can you list those?

22        A.   I know Barry was at the warehouse.   There

23   was some outside consultants and people.   I don't

24   know if this was MVI or this was stuff that Mr.

25   Slaughter was doing.   I don't know if it was in

1    cooperation with the Government.  I don't really

2    know how the custody of all of that was working,

3    but there was a company that was hired to deal with

4    a lot of that, a gentleman by the name of Richard

5    Conner.  I mean, there was a great deal of people

6    and individuals and companies that were creating

7    all of that.

8        Q.  Were any of them Shane Williams, Jay

9    Stollenwerk, Jodi Jaiman, anybody else from MVI?

10       A.  As I recall, Jodi was working, because I

11   worked quite a bit with Jodi and a lot of what she

12   was working on was settling debts.  I don't know if

13   she had other involvement, but that's what I have

14   first-hand knowledge of.

15       Jay was working on a lot of financial stuff,

16   like reconciling bank statements or what have you.

17   So I don't think they were specifically going

18   through documents.

19       Q.  Mr. Flynn?

20       A.  I believe both Mr. Flynn and Shane were

21   working with Frank.  I don't know exactly what they

22   were doing.

23       Q.  Shane Williams?

24       A.  Yes.

25       Q.  Who was president of Nexia from March of

1      2007 forward?

2          A.   I'm not sure that I knew; Jodi Jaiman, I

3      assume.

4          Q.   Who was the president of Mirabilis, I should

5      have said?

6          A.   That was Jodi Jaiman.

7

8               (Exhibit No. 126 marked and attached for

9      identification purposes).

10

11         Q.   Are you familiar with this affidavit?

12         A.   I don't know how familiar I am or am not

13     with this.

14         Q.   If you'll, please, look at paragraph 2, the

15     last answer?

16         A.   (Witness complies).

17         Q.   Once they formed their firm, almost all of

18     Bates and Mokwa's work consisted of representing

19     Mirabilis at the behest of Amodeo; is that true?

20         A.   I mean, all of our -- I would say a majority

21     of the work that we were doing involved Mirabilis

22     and it also involved the Amodeo companies

23     collectively of shutting everything down.

24         Q.   And the person that you worked with at

25     Mirabilis was Frank, correct?

1    A.   Well, Frank obviously held out the position

2    that he was in charge of certain companies.  With

3    that being said, he obviously made a lot of

4    decisions with regard to all of our activities.

5    Q.   If you'll look at paragraph 5; Jodi

6    testifies, am I correct, that one of my

7    responsibilities was to gather documents so that

8    Amodeo and his defense attorneys could provide

9    documents to the United States pursuant to the

10   grand jury subpoenas, which were executed in late

11   2006.  Is that consistent with your understanding

12   of what she did?

13   A.   More or less.  That may have been one of her

14   responsibilities.  I mean, clearly at that point

15   she was the president.  If the United States

16   attorney wanted documents, I'm sure she had the

17   duty to comply.

18   Q.   Would you look at paragraph 10, please?

19   A.   (Witness complies).

20   Q.   Would you read that out loud?

21   A.   Paragraph 10?

22   Q.   Yes.

23   A.   It is my understanding through Bates and

24   Amodeo that Green proposed the bankruptcy

25   proceeding to Bates.  Green believes that filing

1    bankruptcy was the best way to save the litigation.

2    Bates spoke with Amodeo and Amodeo then advised me

3    to speak with Bates concerning the bankruptcy.

4    Bates advised me that Green suggested placing

5    Mirabilis into bankruptcy to save the litigation.

6        Q.   Did you have any contemporaneous knowledge

7    of the conversations between Mr. Bates and Mr.

8    Amodeo and Ms. Green?

9        A.   Not that I can recall.

10       Q.   When did you first become aware of the plan

11   for Mirabilis to file bankruptcy?

12       A.   I don't know the exact date.  It was

13   something that -- the Mirabilis bankruptcy came

14   into place sometime after the seizure warrants,

15   which were issued, I don't know the exact date.

16   Then obviously the day of the actual filing of the

17   petition.  So I would say somewhere in-between

18   those two things, I'm sure that it was communicated

19   to me that Mirabilis planned to file bankruptcy.

20       Q.   But you didn't know before?

21       A.   Before when?

22       Q.   Sometime between the seizure warrant and the

23   filing of the bankruptcy, you didn't know that

24   there was already a plan in place to file

25   bankruptcy?

1      A.   My understanding -- yeah, I had no knowledge

2    that there was any plan prior to that.

3      Q.   Okay.  This will be Exhibit No. 127.  Can

4    you tell me what that document is, please?

5      A.   This is the first time I've seen that.

6

7           (Exhibit No. 127 marked and attached for

8    identification purposes).

9

10     Q.   But can you tell me what it is?

11     A.   It's an unsigned letter by Mr. Bates to

12   Elizabeth Green of Latham, Shuker, apparently, on

13   behalf of Mirabilis.

14     Q.   And were you aware, until this moment, that

15   the bankruptcy of Mirabilis was actually planned

16   nine months before the petition were filed?

17     A.   I would doubt that to be the case.  I guess

18   for starters, my answer is no, I was not aware.  I

19   believe this had to do with certain subsidiaries

20   were placed in bankruptcy.  I mean, Mirabilis had

21   two or three subsidiaries that were placed in

22   bankruptcy handled by Ms. Green's firm, not

23   Mirabilis as the entity itself at that point.

24   That's a guess.

25     Q.   Did you know anything about a potential

1   complaint against the officers and directors of

2   Mirabilis and AEM?

3       A.   I was generally aware that was something

4   that was being looked at.

5       Q.   And when did you become aware of that?

6       A.   I wouldn't have the exact date.  I don't

7   know if it was in early 2008.

8       Q.   Are you aware of it at this time?

9       A.   In August of 2007?

10      Q.   Yes.  Do you see where Mr. Bates is --

11      A.   I see that.  I wouldn't have very detailed

12   knowledge of something like that.  It's definitely

13   possible that it had been discussed.  I just don't

14   know.

15      Q.   Did you work on any of the draft complaints?

16      A.   Not to my knowledge.  I don't think that I

17   did, no.

18      Q.   Okay.  If you'll just take a few seconds to

19   look through this, No. 117?

20      A.   Okay.

21      Q.   If you'll notice in paragraph 2, Mr.

22   Stollenwerk says that he knows this information

23   from, in part, discussions with you, correct?

24      A.   He lists several individuals that have

25   provided him with information, one of which is

1    myself.

2         Q.  And if you'll look at paragraph 9?

3         A.  (Witness complies).

4         Q.  Does it comport with your understanding that

5    Ms. Green proposed the bankruptcy to Mr. Amodeo?

6         A.  I don't have any knowledge of that, any

7    first-hand knowledge.  I don't know who said what.

8         Q.  If you'll read paragraph 10 into the record,

9    please?

10        A.  I was present at a meeting with Bates,

11   Mokwa, Jaiman, Williams, Green and Shuker at Green

12   and Shuker's office in which Shuker and Green

13   discussed how to handle the bankruptcy.  They

14   talked about their experience and what they

15   referred to as the Church Street case.

16        Jaiman, Williams and I would resign as

17   officers and directors.  We were to appoint Michael

18   E. Moecker as a member of the board of directors.

19   Moecker would then appoint R.W. (Bill) Cuthill, Jr.

20   as president of Mirabilis.  They wanted to talk

21   with the Office of the United States Trustee, as

22   they believed that they had found a loophole, which

23   would allow them to proceed without a trustee.

24        Green was concerned that the United States

25   would seize attorney fees, but they decided that

1    they could use the money received from the

2    settlement of two case with RKT Constructors, Inc.

3    to fund the bankruptcies.

4         Q.   Do you remember that meeting?

5         A.   I do remember being present at two meetings

6    that involved Ms. Green and I believe that this was

7    the first.

8         Q.   When the seizure warrants were served on the

9    law firm; was money seized from your account?

10        A.   The seizure warrant was served upon us.  I

11   believe how it -- because it was a trust account,

12   it seized, what they believed to be whatever it

13   was.  We had a meeting with Mr. Gold to discuss the

14   seizure warrants and I believe at that point we did

15   not have any money that they considered to be

16   seizable.

17        Q.   When you say we in that answer; do you mean

18   Bates --

19        A.   Our law firm.

20        Q.   Do you have any reason to doubt Mr.

21   Stollenwerk's information in this affidavit?

22        A.   No.  I mean, only the fact that I believe he

23   signed the affidavit at behest of the United States

24   of America.

25        Q.   And that causes you to think that it's not

1    true?

2        A.   No, I didn't say it wasn't true.  I don't

3    have any reason to think otherwise.

4        Q.   Thank you.  Can you tell me your

5    understanding, if you have any, of what Mr.

6    Stollenwerk is referring to when he says that Ms.

7    Green proposed the bankruptcy proceeding, because

8    she believed that filing the bankruptcy was the

9    best way, quote, to save the litigation?

10       A.   I would be speculating as to Mr.

11   Stollenwerk's comments.  Generally speaking, I

12   believe that Mirabilis, as an entity, believed that

13   it had value in its litigation.  I believe they

14   felt that post-seizure, they obviously could no

15   longer hire attorneys and possibly the bankruptcy

16   would provide an entity to help them move forward

17   with that litigation.

18       Q.   Did you ever work on any of the draft

19   complaints against the former officers and

20   directors of Mirabilis or AEM?

21       A.   Not to my knowledge, I don't believe that I

22   did.

23

24            (Exhibit No. 128 marked and attached for

25   identification purposes).

1

2      Q.  Mr. Mokwa, do you recognize this document

3  that's been marked as the next exhibit, No. 128?

4      A.  I do not.

5      Q.  Do you think you've every seen it before?

6      A.  I have not seen it before.  The only thing

7  that I have any knowledge with regard to it is a

8  lawsuit that Mr. Cuthill apparently brought against

9  Fifth Third, because he felt it was conversion?

10     Q.  Do you have any knowledge of the purchase of

11 this cashier's check?

12     A.  I have no knowledge of this cashier's check

13 at all.

14     Q.  Can you explain for any sensible reasoning

15 for Mr. Amodeo to have cashed it?

16

17         MR. LOEWY:  Objection.  Speculation.

18

19     A.  I don't know why Mr. Amodeo would have

20 cashed this check.

21     Q.  Was it customary for your -- well, first of

22 all, was there ever an organization called Mokwa,

23 Bates Law Group?

24     A.  No.

25     Q.  Are you aware that Mr. Cuthill has claimed

1       that AEM had to replace this check?

2           A.   I don't know if I'm aware of that specific

3       allegation.

4           Q.   Are you aware of Mr. Cuthill having claimed

5       that he had to replace some checks that were

6       representative of payments to AEM to your law firm?

7           A.   I'm aware that there was a lawsuit.  That's

8       about all I know.

9           Q.   Do you know whether on January 10th of 2008

10      that your firm was due this money?

11          A.   I don't think that we were.  It would

12      probably have been retainer money.

13          Q.   And did retainer money go through your trust

14      account?

15          A.   Yeah, obviously, if it was unearned.

16

17              (Exhibit No. 129 marked and attached for

18      identification purposes).

19

20          Q.   Mr. Mokwa, before we look at this document,

21      which is Exhibit No. 129, was your retainer

22      agreement or engagement letter between Bates, Mokwa

23      and Mr. Amodeo the same as Goldberg, Bates, if you

24      know?

25          A.   First, I don't know what this thing is.

1       Q.   Okay.

2       A.   So --

3       Q.   Doesn't it appear to be a retainer letter

4    between Goldberg, Bates and Mr. Amodeo?  It's

5    unsigned, I acknowledge.

6       A.   Yes, and it's also drafted to Mr. Bean.

7       Q.   Do you know who he is?

8       A.   Yeah, the 02 HR gentleman.  I can't comment

9    on that, to be honest.

10      Q.   When Goldberg, Bates was supplanted, if

11   that's a characterization by Bates, Mokwa, did you

12   replace retainer agreements that were already

13   active between Goldberg, Bates and clients?

14      A.   No.

15      Q.   And it's true, is it not, that you were paid

16   -- that the firm was paid forty-five thousand

17   dollars a month to represent Mr. Amodeo's interest?

18      A.   That is not entirely true.  The engagement

19   agreement -- this is not the engagement agreement.

20   The engagement agreement was not -- it was just

21   very different.  No, it was not just Mr. Amodeo's

22   interest.  It was the interest of the company, et

23   cetera.

24      Q.   If you'll look at the second sentence in the

25   second paragraph; you agree that the firm may

1   deposit such funds in our general operating account

2   and that these funds need not be held in our trust

3   account.   Was that a provision in the ultimate

4   retainer agreement?

5       A.   As I stated, I have no idea what this

6   agreement is.   I also don't, per se, know what Mr.

7   Goldberg or whomever executed this or made the

8   financial decisions before I did.   I can tell you

9   when money was earned, sometimes it was transferred

10  directly into operating when there's an outstanding

11  receivable, et cetera, but unearned money wouldn't

12  have flowed into the operating account.

13      Q.   Did you personally handle the receivables

14  and the payables in your firm?

15      A.   I handled the receivables and payables

16  beginning in probably February, or so, at some

17  point when I took over from Goldberg.   It was him

18  and then it transitioned to myself.

19      Q.   Okay.   I'm looking at No. 128 now.   Did Mr.

20  Cuthill file a lawsuit against Fifth Third Bank;

21  you said that you were aware of that lawsuit?

22      A.   Yes.

23      Q.   Was that lawsuit filed without your advanced

24  knowledge?

25      A.   Yeah, I don't believe that I was involved

1    with that lawsuit or had any knowledge of it.

2

3              (Luncheon recess taken).

4

5    BY MS. HAVENER:

6        Q.  Mr. Mokwa, I'm handing you what's been

7    marked as Exhibit No. 130 in this deposition.  I

8    want you to think back to the time when you were

9    first working with Goldberg, Bates?

10       A.  Yes.

11

12             (Exhibit No. 130 marked and attached for

13   identification ).

14

15       Q.  I want to ask if this is a relatively or if

16   this is an accurate drawing of the way the offices

17   were laid out in that corner of the floor on

18   Maguire?

19       A.  It's not entirely inaccurate.  Obviously,

20   it's a rough sketch.  Yeah, I would say it's

21   accurate.

22       Q.  And am I correct that the suites to Frank

23   Amodeo's office had a coded lock, a computer lock?

24       A.  I don't know.  I don't recall that.

25       Q.  Is this one of the things that's wrong, this

1    door?  It was my impression that the door to Bates,

2    Mokwa went that way; is that correct?

3         A.   Let me think here.  Yeah, there was some

4    hallways in here, like this was a hall and I

5    actually think the entrance to Frank's -- it did

6    have a lock, actually -- was here.

7         Q.   Will you put it on there where it was in

8    blue ink, please?  The original is in black ink.

9         A.   Yes.  So this would have been a hallway and

10   there was a door here.

11        Q.   With a coded lock?

12        A.   I believe so, but I can't say that with one

13   hundred percent certainty.

14        Q.   Okay.  And then if you wanted to go from

15   Frank's office to Bates, Mokwa's suite; how would

16   you go?

17        A.   I don't remember if there was a door here.

18   I believe there was.

19        Q.   Okay.

20        A.   That could be entirely inaccurate.  You

21   could go look at the suites, I'm sure.

22        Q.   But you did have to go outside of his suite

23   and enter into a separate suite?

24        A.   I did or did not?

25        Q.   I'm asking you whether or not you did.  Am I

1    correct that one had to exit Mr. Amodeo's suite in

2    order to access Bates, Mokwa's suite?

3        A.   I believe that's correct.

4        Q.   And am I also correct that one had to exit

5    Bates, Mokwa's suite in order to enter Soone

6    Business Development's suite?

7        A.   Yes, I believe they were all three separate

8    suites that, I guess if we didn't have them,

9    someone else could have had them.  They weren't

10   connected.

11       Q.   And regardless of the scale, overlooking

12   that, this wasn't Bates, Mokwa's door; it was

13   obviously some place closer to here?  I'm guessing.

14       A.   That's not entirely inaccurate.

15       Q.   All right.  Then there was a war room that

16   was next to Mr. Amodeo's office, but you had to go

17   all the way around?

18       A.   The war room was a room with a conference

19   table that was part of our office.  Frank's suite

20   actually had offices of its own.

21       Q.   I understand.  What I'm trying to get at is

22   that, although you had to go outside into the hall

23   to access one another's suite; is this essentially

24   the order in which offices were laid out?

25       A.   I'm not sure.  It's close, some things.  I

1    don't know about Jeff Boone.

2         Q.   Who is Jeff Boone?

3         A.   He was a salesman.

4         Q.   For Soone?

5         A.   Originally for Mirabilis.  I don't know how

6    his affiliation got where it was with Soone.  I

7    don't know what that was about.

8         Q.   How long were you in these offices with this

9    kind of proximity?

10        A.   As in me personally or the firm?

11        Q.   Both.

12        A.   Well, Goldberg, Bates probably went in

13   there, I'd say July through January.

14        Q.   July 2007 --

15        A.   July 2007 through the end of the year would

16   have been when it was Goldberg, Bates.  We were

17   there during that time.  Then during the time where

18   it became Bates, Mokwa, we were still there all the

19   way through to, I think we moved in August.

20        Q.   Of 2008?

21        A.   Yes.  With that being said, I think Soone

22   and Frank moved out at least sixty days sooner than

23   that.

24        Q.   So they moved out in approximately May of

25   2008?

1      A.   During the bankruptcy seizer stuff.

2      Q.   What's the war room?

3      A.   The war room was not the war room.   It was a

4  conference room.

5      Q.   But didn't you call it the war room?

6      A.   Not to my knowledge.

7      Q.   What was your understanding of Mr. Amar's

8  status as a shareholder, or not, of Mirabilis?

9      A.   My understanding was he had some type of

10  interest and he apparently relinquished it in July

11  of 2006.

12      Q.   Do you know in what way he relinquished it?

13      A.   I really don't know the details.

14      Q.   Do you know anything about his ownership of

15  stock in any other Mirabilis entity?

16      A.   I do not.

17      Q.   At what point was the board of directors of

18  Mirabilis dissolved?

19      A.   Excuse me?

20      Q.   At what point in time was the board of

21  directors of Mirabilis dissolved?

22      A.   I don't think it's ever been dissolved.

23      Q.   So when did Jodi, Jay and Shane become the

24  board?

25      A.   I believe that it was actually Fernando Simo

1    was still on the board for a while.  At some point

2    he resigned.  I don't know the details of how they

3    -- how the old officers or the old directors were

4    replaced for those three.  I believe it was those

5    three that were all on Mirabilis.  It was something

6    that at that point -- Mark Bernet might be the

7    better source.

8        Q.  Okay.  How frequent was your day-to-day

9    interaction with Mr. Amodeo during the time that

10   you were in the suite that is reflected on Exhibit

11   No. 130?

12       A.  It was frequent, but he had a lot of other

13   stuff going on, specifically, I think the criminal

14   stuff and he was often -- I mean, he was often gone

15   for periods of time.

16       Q.  Was it daily?  Was it weekly?  Was it twice

17   weekly?

18       A.  At times it would be, maybe daily and at

19   times --

20       Q.  More than daily?

21       A.  There could be days where it would be

22   weekly.  It would just vary.

23       Q.  If he was in the office, were you more

24   likely than not to see him during the day?

25       A.  It depended.  There were several times where

1    he would be in the office and I didn't see him.

2    There's not an entirely accurate answer to that.

3        Q.   Do you remember Mr. Flynn being in the

4    office quite frequently?

5        A.   He was towards the end, yes.

6        Q.   Towards the end, meaning what time period?

7        A.   Maybe January through April of 2008.

8        Q.   And how frequent was your interaction with

9    Jodi, Jay and Shane?

10       A.   Probably very similar; sometimes everyday

11   and sometimes a couple times a week.

12       Q.   And are you aware that there was a

13   resolution late in 2007 that gave Mr. Amodeo

14   essentially the power to exercise control over

15   Mirabilis?

16       A.   I don't know if I am aware of that

17   resolution.

18       Q.   This was an exhibit marked last week as No.

19   116.  What's the date of that document, please?

20       A.   November 21st of 2007.

21       Q.   Will you look at that last paragraph,

22   please?

23       A.   The last paragraph?

24       Q.   Yes.

25       A.   Okay.

1      Q.   Am I correct that this is a written consent

2   of the board of directors of Mirabilis Ventures,

3   Inc., a Nevada Corporation, in lieu of a meeting?

4      A.   I have never seen this before.  So I am

5   reading this for the first time, but, yeah, that's

6   definitely what it states here.

7      Q.   Will you read the last paragraph into the

8   record, please?

9      A.   Sure.   Further resolved, that Frank L.

10  Amodeo and any of the officers or directors of the

11  Corporation are hereby authorized and directed in

12  the name of and on behalf of this Corporation to

13  take any and all actions as they shall deem

14  necessary or advisable to carry out the foregoing

15  resolutions.

16     Q.   And was it your experience that Mr. Amodeo

17  essentially was directing your activities of the

18  activities of the law firm starting at some point

19  in 2007 through the time that your representation

20  of him?

21     A.   No, I'd entirely disagree with that

22  statement.

23     Q.   Who was directing your activities?

24     A.   Of the law firm?

25     Q.   Yes.

1     A.   Who was the client or who was directing the

2     activities of the law firm?

3     Q.   If you have a client, which is a

4     corporation, is it not correct that you have to

5     speak to a human being to get direction from that

6     client?

7     A.   I would agree with that, yes.

8     Q.   From what human being did you most

9     frequently obtain direction, from the time period

10    that you were involved with Goldberg, Bates through

11    the time that you stopped representing Mirabilis

12    Ventures, Inc.?

13    A.   Frank Amodeo definitely gave us -- I had a

14    lot of meetings with Frank on a lot of different

15    issues, but I also met with Ms. Jaiman on a lot of

16    stuff.  Those would have been the primary two for

17    me.

18    Q.   Was there a difference in the character of

19    matter that Mr. Amodeo would speak to you about

20    versus the character of matter that Ms. Jaiman

21    would speak to you about?

22    A.   Ms. Jaiman and I were primarily dealing with

23    pretty pure liquidation issues, settlement of

24    debts, et cetera.  I mean, a lot of Frank's stuff

25    -- Frank was kind of a strategizer.  He would

1    just, you know, talk.

2         Q.   Who directed the litigation in 2007?

3         A.   Who directed it?

4         Q.   Yes.   Who at Mirabilis Ventures was the

5    interface?   What human being at Mirabilis Ventures

6    was the interface with you and or Aaron Bates with

7    respect to the litigation?

8         A.   I guess it would be all of those people

9    again.   It definitely would have been Frank Amodeo

10   and it would have definitely been Ms. Jaiman.   It

11   wasn't one person.   You wouldn't have made a

12   decision -- Frank wouldn't have made a decision and

13   we wouldn't have just done it without consulting

14   other people as in the officers or directors.

15        Again, I did not have much interaction with

16   the litigation myself.   I mean, I'm primarily a

17   corporate attorney.

18        Q.   Did Mirabilis Ventures have a press agent?

19        A.   I believe they did, yes.

20        Q.   Are you familiar -- who is Samuel Manusch?

21        A.   No idea.

22        Q.   Do you know what I'm talking about?

23        A.   From your production.

24        Q.   Did you ever witness Mr. Amodeo dictating

25   material to Ms. Jaiman that was then posted on the

1          Mirabilis or Presidion blog?

2              A.   I did not witness that, no.

3              Q.   Did you ever yourself take dictation from

4       Mr. Amodeo and post it to a blog?

5              A.   No.

6              Q.   Did you ever give, text or dictate to Ms.

7       Jaiman to post on the blog?

8              A.   No.

9              Q.   Do you know who the press agent was?

10             A.   The company or his name?

11             Q.   His name.

12             A.   I believe his name was Bob O'Malley.

13             Q.   And he was at Ron Sacks Communications,

14      correct?

15             A.   Correct.

16             Q.   Did you ever post to the blog at all?

17             A.   I did not, no.

18             Q.   Never made an entry to the blog?

19             A.   Not one time, no.

20             Q.   Did you witness anyone posting to the blog?

21             A.   I did not.  I can't think of anybody, no.

22             Q.   Are you aware that an MVI receptionist was

23      terminated for posting to the blog in May 2007?

24             A.   I was not aware of that.

25             Q.   Did you ever discuss the blog with anyone?

1      A.   I may have discussed the blog generally with

2   people.

3      Q.   And what do you mean by generally?

4      A.   Just discussed the blog, I guess.

5      Q.   Did anyone ever tell you that Samuel Manusch

6   and Frank Amodeo were the same person?

7      A.   No, they did not.

8      Q.   I'm handing you what's been previously

9   marked as Exhibit No. 114.

10      A.   Sure.

11      Q.   Have you reviewed -- these are the

12   interrogatories responses of Yaniv Amar.

13      A.   Uh-huh.

14      Q.   Have you reviewed them?

15      A.   I have reviewed them.

16      Q.   And do you agree with Mr. Amar's accounts of

17   what occurred on October 15, 2007?

18      A.   Where am I looking?

19      Q.   Well, the account that I'm referring to

20   specifically is in to response number 18.

21      A.   Okay.

22      Q.   A and D, actually.

23      A.   I agree with A.

24      Q.   Do you agree with C?

25      A.   I do agree with C. I think that's a fairly

1    accurate account.

2        Q.   In what way is it not accurate?

3        A.   I mean, there's a couple comments in here

4    that I just don't recall them identically to how

5    Mr. Amar recalls them.

6        Q.   And how do you recall them differently?

7        A.   I remember that Ms. Curry and Mr. Hailstones

8    walked over to us after the process server had

9    served them.  I agree that she gave Mr. Amar a hug

10   and she said is that Yaniv Amar.  Actually, she

11   said is that Yaniv Amar first and then gave him a

12   hug.

13        She also said hello to me and shook my hand.

14   I don't recall Yaniv Amar saying this is not a

15   social call, but he very well may have.  I do

16   recall Ms. Curry talking quite a bit about the

17   software and the litigation.  I do remember Mr.

18   Amar saying that he had no interest in that.  More

19   or less, I agree with it, yes.

20        Q.   Did you talk at all during this exchange?

21        A.   The only things that I said were hello when

22   my hand was shaken and there was a point where I

23   had the newspaper folded up under my arm.  I was

24   asked if we made the newspaper and if Ms. Curry

25   could see it and I handed it to her.

1    Q.   How did it come about that you were there?

2    A.   I spoke to Mr. Bates, who informed me that

3    he was planning on going out to Arizona to serve

4    process upon Mr. Hailstones and Ms. Curry.  He

5    essentially asked me if I wanted to go along as

6    well.

7    Q.   How long before you went, did you have the

8    conversation with Mr. Bates?

9    A.   Two weeks at the most, probably less.

10   Q.   Did you ever discuss it in the presence of

11   other people?

12   A.   Not to my knowledge.

13   Q.   If we had a witness, or more than one

14   witness, who has reported to us that this had a

15   code name, that this effort to serve Ms. Curry had

16   a code name, they would be mistaken?

17   A.   I would think that they would be completely

18   mistaken, yes.

19   Q.   What precipitated Ms. Curry asking to see

20   the paper?

21   A.   I don't recall.  I just remember her

22   pointing to the newspaper and asking if she could

23   see it.  I remember her saying we made the

24   newspaper.

25   Q.   How could she have possibly known that?

1     A.  I don't know.

2     Q.  Why did you give Mr. Zollers a copy of the

3     newspaper article?

4     A.  I did not give Mr. Zollers a copy of the

5     newspaper article.

6     Q.  Did you see someone else give him a copy of

7     the newspaper article?

8     A.  I don't recall.  I saw that he had one in

9     his affidavit.

10    Q.  Whose casita was it that you met in?

11    A.  Whose?

12    Q.  Who rented it for the night?

13    A.  I did.

14    Q.  What advanced discussions, if any, did you

15    have with Mr. Amar?

16    A.  The only discussions I had with Mr. Amar, I

17    think I had two phone calls with Mr. Amar both less

18    than two to three minutes.  He simply asked me if I

19    was going to Arizona with Mr. Bates.  I said that I

20    was.  Then he informed me that he thought he was

21    going to go as well.  Then I think there would have

22    been one more conversation where he gave me his

23    actual flight information.

24    Q.  Isn't it true that you had been looking for

25    Ms. Curry for at least a day before you actually

1      found her?

2          A.   That's completely not true.

3          Q.   And is it not true that you saw Ms. Curry

4      and Mr. Hailstones walking across the parking lot

5      and it was by happenstance that the four of you

6      walked out and accomplished service?

7          A.   I'm not sure that I understand that.

8          Q.   Did you see Ms. Curry from the casita?

9          A.   No.

10         Q.   You were here last Tuesday at Aaron Bates'

11     deposition, correct?

12         A.   Correct.

13         Q.   What was your reason for going to Arizona?

14         A.   To serve Mr. Hailstones and Ms. Curry.

15         Q.   Why did you believe that to be necessary?

16         A.   The primary factor was the fact that Mr.

17     Hailstones was a resident of the United Kingdom and

18     we knew that he was going to be in town speaking.

19         Q.   When did you first read the complaint

20     against Ms. Curry and Mr. Hailstones and Palaxar?

21         A.   I'm not sure that I have ever read it.

22         Q.   And why, for example, did you not send Mr.

23     Zollers a photograph of Mr. Hailstones?

24         A.   The decision was made to go out and to serve

25     Mr. Hailstones and Ms. Curry.  That was just the

1      decision that was made.

2          Q.   And whose decision was it?

3          A.   Mr. Bates, I believe.

4          Q.   And why did it take three people to

5      accomplish the task?

6          A.   I'm not sure that it had to take three

7      people to accomplish the task.  I mean, Mr. Bates

8      told me that he was going out to Arizona to serve

9      the complaint on Mr. Hailstones due to the fact

10     that he was a resident of the United Kingdom and

11     that he was going to be in town.

12             He asked me if I wanted to go along with him

13     and assist.  I said yes.  A large motivation for me

14     was that my family lives in Phoenix and I went.

15         Q.   Did you ever discuss it with either Ms.

16     Jaiman or Mr. Amodeo before it happened?

17         A.   I can't recall if I discussed it with Ms.

18     Jaiman.  I don't believe I discussed it with Mr.

19     Amodeo.

20         Q.   Did you discuss it with anyone else?

21         A.   My going to Arizona or my going to Arizona

22     to serve the complaint?

23         Q.   Your going to Arizona to serve the

24     complaint.

25         A.   I believe the only person I discussed it

1    with was Mr. Bates and obviously the two

2    conversations I had with Mr. Amar.

3        Q.  Why were you staying in the casita instead

4    of with your family?

5        A.  I stayed with my family the entire time that

6    I was there, but for Sunday night.  The reason was

7    that I just wanted to make sure that we got them

8    served.  We had gone out there and I wanted to make

9    sure that we got them served.  I wanted to be there

10   and ready to go in the morning.  It was just that

11   simple.

12       Q.  You just testified a few minutes ago that

13   you had not read the complaint; you don't know if

14   you've ever read it?

15       A.  That's correct.  I said I wasn't entirely

16   sure.  I don't recall.

17       Q.  So would I be correct in understanding that

18   you didn't know what the suit was about when you

19   went out to serve Ms. Curry and Mr. Hailstones?

20       A.  No, I understood what the suit was about.  I

21   just hadn't sat down and read every allegation in

22   the complaint.

23       Q.  Did you understand the contents of the

24   complaint before you served it?

25       A.  I did.

1    Q.   Did that trigger any recollection of Ms.

2    Curry's separation agreement?

3    A.   It did not.

4    Q.   Did it trigger any recollection of the two

5    assignment agreements that Mr. Goldberg had

6    prepared?

7    A.   It did not.

8    Q.   You were here last week at Mr. Bates'

9    deposition, correct?

10   A.   Correct.

11

12   (Exhibit No. 131 marked and attached for

13   identification purposes).

14

15   Q.   And you heard Mr. Bates say that you didn't

16   have a photograph of Mr. Hailstones?

17   A.   I don't know if I recall specifically, but

18   yes, that sounds accurate.

19   Q.   In fact, do you remember this issue of the

20   Nexialist?

21   A.   No.

22   Q.   Do you remember that you had your picture in

23   the Nexialist showing off the Mirabilis ties?

24   A.   I do remember that, yes.

25   Q.   And would you look at the next page of the

1    Nexialist where there's a photograph of Mr.

2    Hailstones?

3        A.   I see that.

4        Q.   So, in fact, there was a photograph

5    available that could have been sent to Mr. Zollers,

6    correct?

7        A.   I would disagree with that.  I have no idea.

8    I don't have this.

9        Q.   In January of 2006 someone at Nexia had a

10   photograph that could be e-mailed from one place to

11   another, correct?

12       A.   In January?

13       Q.   Of 2006.

14       A.   Yes, I would agree that in January of 2006

15   Mr. Hailstones' picture was in the Nexialist.

16       Q.   And therefore was available somewhere on a

17   computer system within Nexia?

18       A.   That's correct.

19       Q.   But you're now testifying that that was not

20   true in October of 2007?

21       A.   I didn't say that.  I said that I was

22   uncertain whether it was true or not true.  You

23   also have to understand that the documents and the

24   availability of certain things may or may not have

25   been available.

1    Q.   You were involved or at least you saw a copy

2    of Ms. Curry's -- we saw from another document

3    earlier today -- separation agreement?

4    A.   I remember the e-mail.  As I testified, I

5    didn't read it substantially, other than I knew she

6    had left the company.

7    Q.   Were you familiar with Mr. Amodeo's attitude

8    towards Ms. Curry?

9    A.   I was not.

10   Q.   Ever?  Are you today?

11   A.   I would say that today I would agree with

12   that, yes.

13   Q.   And what is Mr. Amodeo's attitude towards

14   Ms. Curry?

15   A.   My understanding is that the two of them do

16   not care for one another.

17   Q.   Would you classify that as something of an

18   understatement?

19   A.   Honestly, I don't know.  I didn't have

20   detailed conversations about Ms. Curry with Mr.

21   Amodeo.

22   Q.   Did you know that Ms. Curry during 2007 was

23   meeting with the US Attorney and providing

24   information to the US Attorney?

25   A.   I did not.

1      Q.   With whom did you speak about the service of

2      process incident after it occurred?

3      A.   Nobody, to my knowledge.

4      Q.   Am I correct that you did not report back to

5      Mr. Flynn, for example?

6      A.   I wouldn't have been reporting to Mr. Flynn

7      at that time.

8      Q.   Did you speak to Mr. Amodeo?

9      A.   I don't recall speaking to Mr. Amodeo about

10     it.

11     Q.   Did you speak to Ms. Jaiman about it?

12     A.   I mean, I may have had casual conversations

13     about it, but nothing sticking out in my memory

14     right now.

15     Q.   You do remember that the offices were

16     videotaped?

17     A.   Which offices?

18     Q.   Well, we talked about it before; Mr.

19     Amodeo's office on Maguire and the warehouse.

20     A.   I don't recall that they were videotaped.

21     Q.   You already testified today that you knew

22     the warehouse -- -

23     A.   Oh, the warehouse, yes.

24     Q.   And would you be surprised if someone had

25     informed us that there was a very celebratory sort

1    of high-five, handshaking self-congratulatory

2    episode at the warehouse after the service of

3    process?

4         A.   Was I involved in this?

5         Q.   Yes.   If a witness told us that; would that

6    surprise you?

7         A.   That would surprise me, yes.

8         Q.   You don't have any memory of an episode of

9    that nature?

10        A.   I don't recall that, no.

11        Q.   And you've never heard the phrase in

12   connection with this episode; maximum

13   embarrassment?

14        A.   No, not that I recall.

15        Q.   Describe the contents of the war room,

16   please?

17        A.   It was a conference room, no different than

18   this one that we're in now, with a conference table

19   and chairs.

20        Q.   What was contained in it?   No documents?   No

21   boxes?

22        A.   I don't any being in there.   I mean, from

23   time to time there may have been.

24        Q.   Do you remember being part of a group of

25   people who reviewed papered documents while sitting

1        around a table at the warehouse?

2            A.   Can you be more specific?

3            Q.   Do you remember being at the warehouse

4        sitting around a table with Jodi Jaiman, Shane

5        Williams, Marty Flynn, I think Jay Stollenwerk, but

6        I'm not sure, and Aaron Bates, who was present, but

7        obviously not reviewing the papered documents, or

8        at least was assisting in doing so; do you have any

9        recollection of an event of that nature?

10           A.   It doesn't really ring a bell.  I don't

11       recall that.  I know that I was at the warehouse a

12       couple times reviewing documents.

13           Q.   Do you remember ever being in a meeting,

14       such as I described, and someone at the meeting was

15       actually scanning documents in at the time that you

16       were there?

17           A.   Not that I recall.

18           Q.   Are you aware that documents were actually

19       chosen at the warehouse, put into boxes and carried

20       out to a dumpster?

21           A.   No, not at all.

22           Q.   You've never heard of that happening?

23           A.   No.

24           Q.   Do you deny that it happened?

25

156

1          MR. LOEWY:  Objection.  Asked and answered.

2          MS. HAVENER:  It's a different question.

3          MR. LOEWY:  It's the same question.

4          MS. HAVENER:  I disagree.

5

6      Q.  Have you ever heard of a meeting like that?

7  Have you ever heard of documents being destroyed or

8  disposed of?

9      A.  What documents are we talking about here?

10     Q.  You can't see them on film.

11

12         MR. LOEWY:  Is that a question?

13         MS. HAVENER:  I'm answering his question.

14

15     Q.  I'm handing you what will be marked as

16  Exhibit No. 132.  Mr. Mokwa, do you recall this

17  document?

18     A.  I recall documents that were somewhat

19  similar.  I don't think I recall this precise

20  document.

21

22         (Exhibit No. 132 marked and attached for

23  identification purposes).

24

25     Q.  Do you remember a document like this being

1    posted in the war room in your office?

2        A.  I don't recall that.

3        Q.  Do you remember ever discussing with Mr.

4    Bates or Mr. Goldberg the potential causes of

5    action on behalf of Mirabilis?

6        A.  I'm sure I did.

7        Q.  Did you have any involvement in choosing

8    other counsel, like the Maher Law Firm?

9        A.  Me personally?

10       Q.  Yes.

11       A.  No.

12       Q.  You never had anything to do with those

13   kinds of choices?

14       A.  I didn't.

15       Q.  Did you assist in drafting any complaints?

16       A.  I don't believe that I did, no.

17       Q.  Who is Dean Amodeo?

18       A.  Frank Amodeo's brother.

19       Q.  Have you ever met him?

20       A.  I have.

21       Q.  Are you aware of documents having been

22   prepared and put into boxes for Dean Amodeo to take

23   out of the warehouse?

24       A.  No.

25       Q.  Do you know what an orange pelican bag is?

1      A.   No.

2      Q.   Do you remember Jodi ever talking about a

3   telethon?

4      A.   No.

5      Q.   Do you know whose idea it was to sue the

6   professionals, such as the accountants and Mr.

7   Berman?

8      A.   Individually who?

9      Q.   Who decided or who had the idea of filing

10  suit against the professionals?

11     A.   I think as early as December of 2006,

12  January of 2007 those actions were being looked at.

13     Q.   So it could have been Mark Bernet?

14     A.   Yes.

15     Q.   Do you remember Mark Bernet ever talking

16  about it?

17     A.   I mean, that would be a privileged

18  conversation.

19     Q.   Please look at what's been marked as Exhibit

20  No. 133?

21     A.   Okay.

22

23          (Exhibit No. 133 marked and attached for

24  identification purposes).

25

1      Q.   Mr. Mokwa, do you recognize this document?

2      A.   It appears to be some kind of a litigation

3   summary.

4      Q.   Do you know who prepared it?

5      A.   I do not.

6

7           (Exhibit No. 134 marked and attached for

8   identification purposes).

9

10     Q.   Do you recognize this document, Exhibit No.

11   134, Mr. Mokwa?  Have you ever seen it before?

12     A.   It appears to be the seizer warrant.

13     Q.   Do you know who Mr. Smith is?

14     A.   I do.

15     Q.   And who is he?

16     A.   He's a special agent with the IRS.

17     Q.   And do you know who Mr. Jones is?

18     A.   I do not know who Mr. Jones is.

19     Q.   Whose handwriting appears on the pages, the

20   first several pages and perhaps all of the pages of

21   this copy of the seizure warrant?

22     A.   I can't say with certainty, but it looks to

23   be Mr. Amodeo's handwriting.

24     Q.   And how do you know Mr. Smith?

25     A.   I only know him from the service of that

1   seizure warrant and from the meeting that I spoke

2   about earlier.

3      Q.   If you'll look at the third page of the fax?

4      A.   (Witness complies).

5      Q.   Paragraph 3 and number 8?

6      A.   (Witness complies).

7      Q.   Now, I asked you earlier if there was

8   anything in the trust account of either your firm

9   or your predecessor firm that was seized?

10     A.   Yes.

11     Q.   Do you see that this lists four hundred and

12  thirty-five thousand dollars?

13     A.   I do.

14     Q.   Was that the money that you said that you

15  discussed with the IRS and they decided that that

16  was not subject to seizure?

17     A.   There is an amended affidavit.  I believe

18  they amended this affidavit, but yes, it would have

19  been that money.

20     Q.   So your recollection is that no funds were

21  taken from your law firm or its predecessor?

22     A.   That's correct.

23     Q.   Why did you have a copy of the Saturday,

24  Orlando Sentinel on Monday, October 15th of 2007?

25     A.   I flew out very early on Saturday morning.

1    I was getting my coffee and some magazines and I

2    saw the Orlando Sentinel article for the first time

3    sitting there with the title that it had with Frank

4    Amodeo's picture on the front.

5        Q.   And why did you carry it with you to serve

6    process?

7        A.   I carried it with me to show Mr. Amar and

8    Mr. Bates.   I just had it with me, generally.

9        Q.   Are you aware that it was planned in advance

10   that Mr. Hailstones would be required to leave the

11   United States?

12       A.   I don't understand that question.

13       Q.   Were you ever aware that before the time

14   that Mr. Hailstones was required to leave the

15   United States, that someone within Mirabilis or

16   some set of people within Mirabilis, purposely

17   devised a plan that would require Mr. Hailstones to

18   leave the Country?

19       A.   I don't understand that question, but to the

20   extent that I do understand it, the answer is no.

21       Q.   Do you have any awareness of the deal by

22   which Mirabilis acquired a percentage of the shares

23   in a company called Axena?

24       A.   I know that there was a company Axena that

25   was somehow involved with Mirabilis.   I know

1    nothing more than that.

2        Q.   Did you know that Mr. Hailstones' visa was

3    tied to Axena?

4        A.   I did not.

5        Q.   Were you familiar with Mr. Hailstones'

6    employment agreement?

7        A.   I don't believe that I was, no.

8        Q.   Were you aware with any of the deal

9    documents having to do with Mr. Hailstones' sale,

10   part interest in Axena to Mirabilis?

11       A.   I was not, no.

12       Q.   Would you look at the seizure warrant,

13   Exhibit No. 134?

14       A.   (Witness complies).

15       Q.   Was that delivered to you by Mr. Smith?

16       A.   I believe it was served upon Mr. Bates by

17   Mr. Smith.

18       Q.   Would you turn to page 25 of the fax, 24 of

19   the document?

20       A.   Okay.

21       Q.   And it starts with the sentence The AEM and

22   the AQMI bank accounts had other transactions in

23   and out of the accounts that are not detailed in

24   these charts.   The first transaction reveals that

25   on July 21, 2007 Amodeo received funds of two

1    hundred and ninety thousand from the law firm in

2    Tampa, DLA Piper.  Those funds were then deposited

3    into AQMI's account at Fifth Third.  The next day

4    Amodeo moved a hundred thirty-five thousand dollars

5    from the AQMI Fifth Third account to pay a retainer

6    to the law firm of Goldberg, Bates.

7        Scott Goldberg and Aaron Bates were

8    previously in-house counsel for Amodeo's company

9    during the time the wire fraud scheme was taking

10   place.  Sometime after the United States started

11   its investigation, Goldberg and Bates left to form

12   their own firm.  The bulk of their business came

13   from providing services to Amodeo.  At that time,

14   the Bates, Goldberg offices were in Amodeo's

15   offices.  They dissolved their firm recently and

16   Bates is now with Bates and Mokwa.

17       Then, four days later, Amodeo removed a

18   hundred thousand dollars from the AQMI Fifth Third

19   account to pay a retainer to Akerman, Senterfitt.

20   Then there's a chart that details several

21   transactions.  Do you see that?

22   A.  Yes.

23   Q.  Do you know if this information was

24   contained in the newly drafted affidavit that you

25   just testified about?

1      A.   I believe it was removed.

2      Q.   Do you know why?

3      A.   Because I believe it had been inaccurate.

4      Q.   Would you turn to the next two pages, page

5   26, the second sentence of the first full

6   paragraph.

7      A.   Yes.

8      Q.   Go ahead and read that to yourself to save

9   time.

10      A.   (Witness complies).

11      Q.   Did that appear in the second affidavit?

12      A.   I don't believe it did, no.

13      Q.   What individuals discussed the seizer

14   warrant and to point out to Mr. Smith what that

15   person believed to be error?

16      A.   You're asking me who met with the US

17   Attorney and Mr. Smith?

18      Q.   Yes.

19      A.   Myself and Mr. Bates.

20

21           (Exhibit No. 135 marked and attached for

22   identification purposes).

23

24      Q.   This is the last one, Mr. Mokwa.  Did you

25   have anything to do with drafting the discovery

1    that was addressed to Ms. Curry and Mr. Hailstones

2    in this case?

3        A.  I did not.  I don't recall doing it, at

4    least.

5        Q.  Were you aware that Ms. Curry and Mr.

6    Hailstones were asked in detail about AEM and

7    certain facts about AEM?

8        A.  I don't know exactly what I knew at the time

9    or not.

10       Q.  Am I correct that you prepared this memo?

11       A.  It appears that way.

12       Q.  Do you remember it?

13       A.  I mean, I somewhat remember it.  As I

14   stated, I was doing quite a bit of legal work at

15   that time regarding some of these issues.  So I

16   don't know if it was a draft or if it was a final

17   one or what exactly is in it, but it appears to be.

18       Q.  What is an ASO relationship?

19       A.  An ASO is basically the same as --

20       Q.  Well, what does it stand for?

21       A.  I don't know.  It's similar to a PEO, but

22   the PEO, I think you actually assume responsibility

23   for the employees as your own employees whereas an

24   ASO you just process the payroll on behalf of the

25   other company as an agent, I guess.

1      Q.   If you'd turn the page over, please, where

2   it says conclusion and recommendations?

3      A.   (Witness complies).

4      Q.   Do you remember preparing this conclusion?

5      A.   Obviously, this is an incredibly privileged

6   document.   I don't know if privilege has been

7   waived.   It appears it got here somehow, though.

8      Q.   It was produced.

9      A.   It was produced by whom?

10      Q.   Mirabilis.

11      A.   Mirabilis produced this document?

12      Q.   Mirabilis said come look at the warehouse

13   and get whatever you want.

14      A.   I mean, if that's the case -- as I stated, I

15   remember looking at those issues as I testified to

16   earlier.

17      Q.   Would you agree that in reviewing these

18   documents, it would appear that things were not

19   particularly well organized at Mirabilis?

20      A.   Yes.

21

22                  (Recess taken).

23

24   BY MS. HAVENER:

25      Q.   Mr. Mokwa, having reviewed this document,

1    would you agree with me that the conclusions in

2    this document and the recommendations going

3    forward, and in fact, the information provided

4    therein and that what is reflected in this

5    document, conflicts with the proposed complaints

6    against the professionals?

7        A.   First, I don't know exactly what complaints

8    you're talking about.  I just got this document

9    right now.  I do know that -- and I also don't know

10   it to be not privileged, even though you've

11   represented to me that it is not privilege.

12       Q.   We got it somehow and we didn't berate

13   somebody's office in the middle of the night.

14       A.   I don't know precisely what complaints

15   you're talking about, but I will say that based on

16   these conclusions, I find that many of the

17   professionals should have done a substantially

18   better job of keeping an eye on everything that was

19   going on.  I guess, that's my opinion.

20       Q.   How many hours a week does Mr. Bates work at

21   Bates, Mokwa?

22       A.   Now?

23       Q.   Yes.

24       A.   It varies.

25       Q.   Isn't he also employed by the Maher Law

1    Firm?

2        A.   He is.

3        Q.   So does he have dual employment?

4        A.   We're shutting the firm down.

5        Q.   Is it your intention to change the name of

6    the firm sometime in the near future?

7        A.   I don't know.  I mean, we're working

8    through.  We still have a decent amount of cases

9    that we're shutting down.

10       Q.   Are you aware that contrary to the rules of

11   professional conduct in Florida to have the name of

12   a partner in the firm who is not either working

13   there or a dead guy?

14       A.   Well, he is a partner and he is working

15   there.

16       Q.   I know I already asked this, but I didn't

17   hear the answer; how many hours a week is Mr. Bates

18   working?

19       A.   Substantially.  We have two trials in

20   September.

21       Q.   Is he being paid a full salary by the Maher

22   Law Firm?

23       A.   You would have to talk to Mr. Bates about

24   that.

25       Q.   Are you going to participate in the trials?

1     A.  No.

2     Q.  Am I correct that Mr. Bates handles all of

3  the litigation?

4     A.  No, I handle some of the litigation.

5     Q.  What other clients do you have?

6     A.  Now?

7     Q.  Yes.

8

9     MR. LOEWY:  Hold on.  Objection.  That's

10  totally irrelevant.  It goes to privilege issues

11  and has no bearing whatsoever on this case.  So I'm

12  instructing him not to answer that.

13

14     Q.  Do you have any clients of the firm that

15  were formerly connected with Mirabilis or Amodeo?

16     A.  I can't think of any off the top of my head.

17  I think we have a credit card dispute.

18     Q.  Did you help Mr. Amodeo prepare an appeal

19  after he was in incarcerated?

20     A.  No.

21     Q.  Okay.  Thank you.

22

23     MS. HAVENER:  No more questions.

24     MR. LOEWY:  No questions.

25

1              C E R T I F I C A T E   O F   O A T H

2

3     STATE OF FLORIDA )

4     COUNTY OF ORANGE )

5

6          I, Dawn Roscher, being a Notary Public, State of

7     Florida at Large, do hereby certify that **MATTHEW MOKWA**,

8     personally appeared before me and was duly sworn.

9

10          Witness my hand and official seal this 31st day

11    of August, 2010.

12

13

14

15

16                    Court Reporter

17                    Notary Public, State of FL

18                    Notary Comm. No. DD0702693

19                    Comm. Expires: 08-06-2011

20

21

22

23

24

25

1                           C E R T I F I C A T E

2

3       STATE OF FLORIDA   )

4       COUNTY OF ORANGE   )

5

6             I, Dawn Roscher, certify that I was

7       authorized to and did stenographically report the

8       deposition of **MATTHEW MOKWA**; that a review of

9       transcript WAS requested; and that the transcript

10      is a true and complete record of my stenographic

11      notes.

12            I further certify that I am not a relative,

13      employee, attorney, or counsel of any of the

14      parties, nor am I a relative or employee of any of

15      the parties' attorney or counsel connected with the

16      action, nor am I financially interested in the

17      action

18            DATED this 31st day of August, 2010.

19

20

21            _____

22            Dawn Roscher

23

24

25

| | | | | |
|---|---|---|---|---|
| **0** | 107:22, 121:11,<br>136:11, 151:9,<br>151:13, 151:14,<br>158:11 | **A/k/a** - 1:12 | **advanced** - 131:23,<br>146:14 | **Amar** - 42:14, 42:18,<br>42:24, 43:4, 64:25, |

**0**

**02** - 130:8
**08-06-2011** - 170:19

**1**

**1** - 105:10
**10** - 121:18, 121:21,
125:8
**10/15** - 112:16
**10/20** - 112:15
**100** - 97:11
**103** - 3:10
**105** - 3:11
**107** - 100:11
**1099** - 9:19
**10th** - 129:9
**11** - 1:21
**11/15** - 105:9
**11/5** - 112:15
**114** - 143:9
**115** - 114:4
**116** - 138:19
**117** - 124:19
**120** - 3:12
**123** - 3:13
**124** - 3:10, 103:22,
103:25
**125** - 3:11, 105:15
**126** - 3:12, 120:8
**127** - 3:13, 3:14,
123:3, 123:7
**128** - 3:14, 127:24,
128:3, 131:19
**129** - 3:15, 129:17,
129:21
**130** - 3:16, 132:7,
132:12, 137:11
**131** - 3:17, 150:12
**132** - 3:16, 3:18,
156:16, 156:22
**133** - 3:19, 158:20,
158:23
**134** - 3:20, 159:7,
159:11, 162:13
**135** - 3:21, 164:21
**1450** - 2:4
**14th** - 107:22,
108:21
**15** - 143:17
**150** - 3:17
**15511** - 2:9
**166** - 3:18
**158** - 3:19
**159** - 3:20
**15th** - 110:3, 160:24
**164** - 3:21
**18** - 143:20
**1995** - 5:24
**1999** - 6:3
**1st** - 62:17, 100:23

**2**

**2** - 112:14, 120:14,
124:21
**2003** - 6:4, 8:23
**2005** - 11:2, 11:15,
33:9, 33:15, 44:14
**2006** - 10:8, 10:15,
11:19, 17:11, 21:23,
28:7, 30:22, 31:8,
39:5, 39:20, 47:15,
57:12, 57:16, 57:23,
67:17, 70:5, 70:19,
75:4, 79:4, 79:11,
81:9, 91:8, 94:6, 98:1,
98:4, 100:23, 105:9,

**2007** - 28:7, 30:24,
31:6, 58:12, 59:7,
59:25, 60:10, 60:15,
60:20, 62:1, 62:17,
63:2, 65:11, 65:12,
65:16, 66:5, 70:4,
70:12, 71:25, 76:17,
76:19, 77:1, 78:18,
78:20, 79:19, 81:4,
81:6, 81:7, 83:16,
83:21, 83:22, 88:11,
91:13, 91:21, 91:24,
92:3, 92:6, 92:7,
92:23, 93:3, 93:8,
93:11, 94:10, 95:17,
120:1, 124:9, 135:14,
135:15, 138:13,
138:20, 139:19,
141:2, 142:23,
143:17, 151:20,
152:22, 158:12,
160:24, 162:25
**2008** - 94:21, 124:7,
129:9, 135:20,
135:25, 138:7
**2010** - 1:21, 170:11,
171:18
**21** - 162:25
**21st** - 138:20
**24** - 162:18
**25** - 105:8, 162:18
**26** - 164:5

**3**

**3** - 105:10, 105:22,
160:5
**3/07** - 59:6
**31st** - 170:10,
171:18
**390** - 1:21
**3:00** - 1:21

**4**

**4** - 3:4
**401** - 2:3
**44022** - 2:9

**5**

**5** - 121:5

**6**

**6** - 115:6
**6/13/77** - 5:18
**6:01** - 110:14
**6:07-cv-1788-ori-28
-krs** - 1:4

**7**

**78701** - 2:4

**8**

**8** - 160:5

**9**

**9** - 125:2
**9:00** - 1:20

**A**

**A/k/a** - 1:12
**Aaron** - 10:3, 10:4,
10:16, 64:22, 64:23,
72:20, 115:10, 141:6,
147:10, 155:6, 163:7
**able** - 5:5, 38:1,
49:14
**aboard** - 33:10
**Absolute** - 18:23,
19:11, 19:15
**absolutely** - 23:24,
84:18, 92:17, 94:8,
112:19, 114:7
**Absolutely** - 92:1
**absurd** - 27:12
**accepted** - 20:25,
49:19
**access** - 26:9,
26:15, 134:2, 134:23
**accomplish** - 148:5,
148:7
**accomplished** -
147:6
**according** - 71:14,
71:15, 109:4
**account** - 126:9,
126:11, 129:14,
131:1, 131:3, 131:12,
143:19, 144:1, 160:8,
163:3, 163:5, 163:19
**accountant** - 24:16
**accountants** -
158:6
**accounting** - 75:19,
75:25
**accounts** - 69:16,
69:24, 143:16,
162:22, 162:23
**accurate** - 94:23,
132:16, 132:21,
138:2, 144:1, 144:2,
150:18
**achieve** - 86:25
**acknowledge** -
130:5
**acquired** - 40:9,
161:22
**acquisition** - 18:7,
18:20, 21:4, 23:21,
29:4, 29:6, 43:14,
48:3
**acquisitions** -
16:20, 17:22, 18:12,
19:5, 20:5, 23:7,
38:25, 49:11, 77:17
**act** - 32:1, 71:24
**action** - 22:19,
157:5, 171:16, 171:17
**actions** - 139:13,
158:12
**active** - 36:12,
130:13
**actively** - 101:9
**activities** - 64:15,
73:9, 121:4, 139:17,
139:18, 139:23, 140:2
**actual** - 29:20,
29:22, 89:10, 106:2,
122:16, 146:23
**Adam** - 2:3
**adamant** - 116:20
**addition** - 67:8,
82:15
**address** - 66:11
**addressed** - 165:1
**addressing** - 34:3
**administration** -
24:14
**advance** - 114:13,
161:9

**advanced** - 131:23,
146:14
**advertised** - 32:10
**advisable** - 139:14
**advise** - 45:9
**advised** - 122:2,
122:4
**Aem** - 31:9, 31:11,
31:19, 32:9, 32:10,
38:19, 38:22, 39:6,
39:12, 39:17, 39:20,
39:21, 39:23, 39:25,
40:14, 41:1, 41:6,
41:11, 58:1, 59:16,
59:18, 60:4, 62:22,
71:22, 72:10, 72:12,
72:13, 72:15, 72:17,
75:9, 76:1, 82:19,
82:24, 124:2, 127:20,
129:1, 129:6, 162:21,
165:6, 165:7
**affidavit** - 102:4,
120:11, 126:21,
126:23, 146:9,
160:17, 160:18,
163:24, 164:11
**affiliated** - 21:20,
63:8
**affiliation** - 135:6
**agent** - 141:18,
142:9, 159:16, 165:25
**ago** - 42:13, 81:23,
112:10, 149:12
**agree** - 36:24,
66:12, 100:17,
100:18, 130:25,
140:7, 143:16,
143:23, 143:24,
143:25, 144:9,
144:19, 151:14,
152:11, 166:17, 167:1
**agreed** - 42:20, 54:4
**agreement** - 27:10,
27:11, 32:21, 32:24,
32:25, 33:1, 34:12,
37:24, 43:4, 43:15,
43:19, 43:23, 45:5,
45:9, 45:16, 45:18,
45:21, 53:22, 54:3,
54:21, 54:22, 55:5,
55:13, 55:14, 55:23,
75:22, 102:6, 102:8,
102:9, 103:10,
106:14, 109:4, 110:2,
115:19, 116:15,
122:22, 130:19,
130:20, 131:4, 131:6,
150:2, 152:3, 162:6
**agreements** -
23:10, 24:23, 25:25,
26:1, 26:2, 26:9,
26:12, 26:18, 27:5,
27:18, 28:4, 28:17,
34:11, 34:15, 37:8,
37:10, 44:5, 44:12,
44:20, 44:22, 44:24,
45:11, 47:8, 48:1,
48:4, 48:7, 53:13,
100:22, 112:3, 117:8,
130:12, 150:5
**ahead** - 164:8
**Akerman** - 163:19
**allegation** - 129:3,
149:21
**Alliance** - 40:10
**allow** - 125:23
**allowed** - 31:25,
61:4, 61:8
**almost** - 62:2, 78:3,
120:17

**Amar** - 42:14, 42:18,
42:24, 43:4, 64:25,
65:6, 65:13, 143:12,
144:5, 144:9, 144:10,
144:11, 144:14,
144:18, 146:15,
146:16, 146:17,
149:2, 161:7
**Amar's** - 41:13,
136:7, 143:16
**amazing** - 94:8
**amended** - 160:17,
160:18
**America** - 126:24
**Amodeo** - 11:20,
11:21, 17:18, 21:3,
21:13, 21:14, 32:6,
32:7, 41:18, 42:1,
49:20, 49:25, 62:10,
62:13, 63:9, 64:5,
64:10, 64:14, 64:25,
65:6, 67:3, 73:9,
76:11, 76:16, 77:10,
79:1, 80:13, 81:14,
82:3, 82:4, 82:7,
82:13, 83:13, 84:9,
88:1, 89:16, 91:14,
92:21, 94:16, 97:22,
98:14, 99:7, 99:19,
99:20, 99:23, 99:24,
101:19, 103:15,
110:17, 114:10,
114:19, 115:19,
116:1, 117:2, 120:19,
120:22, 121:8,
121:24, 122:2, 122:8,
125:5, 128:15,
128:19, 129:23,
130:4, 137:9, 138:13,
139:10, 139:16,
140:13, 140:19,
141:9, 141:24, 142:4,
143:6, 148:16,
148:19, 152:21,
153:8, 153:9, 157:17,
157:22, 162:25,
163:4, 163:13,
163:17, 169:15,
169:18
**Amodeo's** - 22:6,
82:6, 91:10, 92:13,
93:19, 95:3, 103:9,
113:25, 114:25,
115:2, 115:17,
115:25, 116:25,
117:12, 130:17,
130:21, 132:23,
134:1, 134:16, 152:7,
152:13, 153:19,
157:18, 159:23,
161:4, 163:8, 163:14
**amount** - 27:12,
85:20, 168:8
**Amsouth** - 22:3,
22:7, 22:16, 57:20,
68:23, 78:7, 87:18
**analysis** - 98:20
**analyze** - 83:11,
86:17
**Andrea** - 24:12
**Andy** - 118:12
**Angel** - 19:3,
107:14, 108:20,
109:7, 111:18
**Angela** - 68:9
**another's** - 134:23
**answer** - 4:25, 5:5,
5:13, 37:2, 38:16,
86:9, 92:9, 94:23,
101:8, 111:12,

111:16, 120:15,
123:18, 126:17,
138:2, 161:20,
168:17, 169:12
answered - 79:9,
156:1
answering - 5:14,
93:14, 156:13
answers - 35:7,
86:13
anticipate - 16:16
anticipated - 92:14
apart - 38:8, 56:5
appeal - 169:18
appear - 97:24,
110:13, 130:3,
164:11, 166:18
appeared - 86:12,
93:12, 93:16, 170:8
appearing - 2:4,
2:10
Appendix - 115:6
applied - 50:22,
55:6
apply - 71:19
appoint - 125:17,
125:19
appropriate - 27:19,
36:5, 36:15, 37:6
appropriately -
55:22
approval - 35:12,
71:10, 71:19
April - 78:22, 138:7
Aqmi - 63:8, 64:6,
74:25, 162:22, 163:5,
163:18
Aqmi's - 163:3
area - 15:15, 17:2
areas - 15:12,
55:20, 81:22
argument - 76:6
arise - 29:4
Arizona - 5:24, 5:25,
10:23, 145:3, 146:19,
147:13, 148:8,
148:21, 148:23
arm - 144:23
Armas - 19:4,
107:14, 108:21,
111:18
arose - 29:6
arrange - 114:12
arrangement -
41:24
article - 8:9, 10:11,
146:3, 146:5, 146:7,
161:2
Aso - 165:18,
165:19, 165:24
aspects - 46:20
aspirations - 48:12
asset - 62:24
assets - 69:23, 97:6
assigned - 15:12,
21:17, 43:14, 113:12
assignment -
100:21, 150:5
assist - 20:7,
148:13, 157:15
assistance - 47:14,
47:22, 114:8, 114:9
assisting - 39:6,
155:8
associate - 19:3
assume - 95:4,
99:16, 120:3, 165:22
assumed - 48:22
atmosphere - 24:25
attached - 103:22,

105:15, 108:1, 108:3,
114:20, 120:8, 123:7,
127:24, 129:17,
132:12, 150:12,
156:22, 158:23,
159:7, 164:21
attempt - 71:10
attempted - 26:2,
68:21
attempting - 7:8,
25:11, 69:13
attend - 71:6
attended - 71:7
attention - 109:12
attitude - 152:7,
152:13
attorney - 9:3,
15:18, 22:23, 46:17,
60:24, 61:7, 71:24,
76:11, 76:12, 76:14,
113:12, 113:13,
121:16, 125:25,
141:17, 171:13,
171:15
Attorney - 152:23,
152:24, 164:17
attorney/client -
4:24
Attorneys - 114:21
attorneys - 18:14,
18:16, 24:2, 47:21,
61:10, 96:3, 96:6,
103:18, 115:10,
121:8, 127:15
attributed - 83:18
audit - 38:9
August - 1:21,
88:13, 100:10,
100:23, 124:9,
135:19, 170:11,
171:18
Austin - 2:4, 9:7
authority - 62:20
authorized -
139:11, 171:7
availability - 151:24
available - 37:20,
151:5, 151:16, 151:25
Avenue - 1:22, 2:4
average - 46:13
awarded - 51:15
aware - 70:1, 73:22,
73:23, 80:22, 84:2,
84:4, 84:23, 87:11,
88:6, 98:13, 98:16,
98:22, 99:15, 99:18,
99:22, 100:2, 100:21,
100:25, 101:2,
102:16, 102:19,
106:24, 110:11,
122:10, 123:14,
123:18, 124:3, 124:5,
124:8, 128:25, 129:2,
129:4, 129:7, 131:21,
138:12, 138:16,
142:22, 142:24,
155:18, 157:21,
161:9, 161:13, 162:8,
165:5, 168:10
awareness - 83:13,
161:21
Axena - 33:1,
161:23, 161:24,
162:3, 162:10

B

background -
15:16, 25:23
bad - 70:6

bag - 157:25
balanced - 69:22
bank - 119:16,
162:22
Bank - 69:16,
131:20
bankrupt - 52:14
bankruptcies -
126:3
bankruptcy -
121:24, 122:1, 122:3,
122:5, 122:11,
122:13, 122:19,
122:23, 122:25,
123:13, 123:20,
123:22, 126:5,
125:13, 127:7, 127:8,
127:15, 136:1
Bar - 6:9, 6:11, 8:18,
13:16, 60:25
bar - 77:21
Barks - 68:11,
68:15, 73:1
Barry - 2:3, 118:22
base - 94:14
based - 75:19, 94:8,
110:11, 167:15
basis - 18:18
Bates - 10:3, 10:4,
10:16, 60:21, 60:22,
61:2, 62:1, 63:4, 64:2,
66:6, 66:22, 72:23,
75:3, 88:10, 102:11,
115:10, 115:18,
117:2, 120:18,
121:23, 121:25,
122:2, 122:3, 122:4,
122:7, 123:11,
124:10, 125:10,
126:18, 128:23,
129:22, 129:23,
130:4, 130:10,
130:11, 130:13,
132:2, 133:1, 133:15,
134:2, 134:5, 134:12,
135:12, 135:16,
135:18, 140:10,
141:6, 145:2, 145:8,
146:19, 148:3, 148:7,
149:1, 150:15, 155:6,
157:4, 161:8, 162:16,
163:6, 163:7, 163:11,
163:14, 163:16,
164:19, 167:20,
167:21, 168:17,
168:23, 169:2
Bates' - 147:10,
150:8
Bca - 40:13
Bean - 63:7, 63:23,
130:6
bearing - 169:11
became - 20:2,
34:19, 37:9, 52:5,
93:11, 97:5, 101:10,
103:8, 135:18
become - 11:17,
23:22, 34:7, 35:3,
70:1, 70:8, 80:22,
84:2, 100:2, 122:10,
124:5, 136:23
beforehand - 54:20
began - 8:12, 10:25,
12:9, 19:22, 25:3,
25:11, 29:24, 39:5,
51:10, 67:16, 70:8,
80:7, 84:16, 94:10
begin - 33:6
Beginning - 80:5,
92:23, 94:9

beginning - 1:20,
39:1, 79:2, 131:16
begun - 38:7
behalf - 2:5, 2:10,
123:13, 139:12,
157:5, 165:24
behavior - 83:19
behest - 120:19,
126:23
believes - 121:25
bell - 155:10
benefits - 24:12,
24:13, 31:17, 46:6,
103:5, 107:7, 108:14
berate - 167:12
Berman - 12:16,
28:10, 37:23, 47:9,
47:12, 47:16, 104:5,
105:5, 105:11,
106:17, 107:13,
107:21, 109:25,
111:10, 111:16,
112:1, 158:7
Berman's - 19:3,
28:16
Bernet - 56:9, 56:17,
63:24, 64:20, 68:10,
70:8, 70:14, 73:1,
76:5, 76:7, 80:6, 81:6,
81:12, 82:16, 83:8,
86:16, 96:14, 96:15,
137:6, 158:13, 158:15
best - 5:13, 24:3,
32:14, 71:17, 122:1,
127:9
better - 25:6, 35:7,
38:3, 96:20, 113:19,
137:7, 167:18
Between - 65:12
between - 6:5, 7:14,
8:3, 8:4, 8:5, 8:12,
32:8, 36:10, 36:13,
55:14, 59:20, 64:10,
65:15, 68:15, 71:24,
80:2, 86:21, 88:13,
117:2, 122:7, 122:17,
122:22, 129:22,
130:4, 130:13
bifurcated - 75:23
big - 62:16, 99:11
Bill - 68:2, 80:6,
96:14, 125:19
birth - 5:17
bit - 20:24, 25:6,
31:14, 39:15, 47:22,
58:10, 59:19, 67:21,
119:11, 144:16,
165:14
Bivens - 8:1
black - 133:8
blank - 19:6
blanking - 24:15
blanks - 58:14
bled - 30:24
blog - 142:1, 142:4,
142:7, 142:16,
142:18, 142:20,
142:23, 142:25,
143:1, 143:4
blue - 133:8
board - 9:2, 125:18,
136:17, 136:20,
136:24, 137:1, 139:2
Bob - 14:8, 142:12
Bonck - 67:22, 68:5,
68:8, 68:14
bonus - 55:17
Book - 40:22
book - 63:3
Boone - 135:1,

135:2
boss - 50:6
bottom - 105:10,
105:12, 105:22
Boulevard - 66:10
boxes - 154:21,
155:19, 157:22
breached - 90:22
break - 5:1
brief - 91:6
Broadhead - 1:12,
12:11, 15:5, 18:19,
19:12
broke - 76:25
brother - 157:18
brought - 26:23,
128:8
building - 18:5,
22:1, 22:3, 22:7,
22:16, 57:20, 60:9,
60:17, 65:17, 66:12,
66:14, 70:15, 70:17,
78:6, 87:17
built - 78:8
bulk - 163:12
Business - 65:18,
134:6
business - 40:22,
70:24, 72:13, 80:15,
163:12
busy - 58:5
buyers - 62:14

C

caliber - 91:7
cancelling - 108:14
candid - 80:18
candidly - 83:16
capacities - 12:6,
13:10
capacity - 13:3,
16:11, 16:25, 103:9,
103:11, 103:17
capital - 7:4, 7:7,
7:8
captive - 32:12,
32:14
card - 169:17
care - 152:16
career - 22:25,
23:13
careful - 5:10, 72:16
carried - 15:19,
161:7
carry - 139:14,
161:5
carrying - 46:10
case - 28:19, 29:16,
33:5, 34:22, 48:22,
74:2, 92:24, 97:11,
98:14, 98:17, 98:23,
99:3, 99:4, 100:12,
116:21, 118:2,
123:17, 125:15,
126:2, 165:2, 166:14,
169:11
Case - 1:4
cases - 108:16,
168:8
cashed - 128:15,
128:20
cashier's - 128:11,
128:12
casita - 146:10,
147:8, 149:3
casual - 153:12
caused - 48:17
causes - 126:25,
157:4

ceased - 56:2, 56:3, 56:4
celebratory - 153:25
certain - 16:12, 27:14, 28:18, 46:14, 46:20, 61:8, 66:1, 66:14, 92:14, 116:19, 121:2, 123:19, 151:24, 165:7
Certain- 9:13, 44:4
certainty - 14:19, 29:12, 68:7, 76:2, 81:1, 82:21, 133:13, 159:22
certify - 170:7, 171:6, 171:12
cetera - 23:3, 24:24, 26:2, 43:3, 51:20, 52:9, 86:12, 104:25, 130:23, 131:11, 140:24
Chad- 12:23, 14:19, 14:21, 14:22, 18:21, 19:2, 19:18, 19:20
Chagrin- 2:9
chain - 97:19, 105:19, 105:21
chairs - 154:19
challenge - 55:2, 55:25, 56:1
change - 168:5
changed - 43:19
changes - 79:6
chaotic - 25:4
character - 140:18, 140:20
characterization - 130:11
charge - 50:12, 50:15, 121:2
charged - 82:8
charismatic - 11:24, 79:8, 79:10
chart - 163:20
charts - 162:24
check - 102:3, 128:11, 128:12, 128:20, 129:1
checking - 72:19
checks - 59:23, 60:3, 60:4, 129:5
chief - 24:7
choices - 157:13
choose - 96:1
choosing - 157:7
chosen - 155:19
Chu- 1:13
chunk - 63:25
Church- 125:15
circumstance - 36:9, 75:7
circumstances - 28:19
civil - 86:21, 87:7, 103:17
claimed - 128:25, 129:4
clasify - 31:14, 38:24, 57:9, 75:17
classes - 51:16
classify - 152:17
clear - 57:2, 86:13
clear-cut - 86:13
Clearly- 45:13, 73:7
clearly - 116:24, 121:14
client - 72:2, 72:3, 74:22, 140:1, 140:3, 140:6

clients - 32:11, 130:13, 169:5, 169:14
close - 41:17, 42:6, 42:25, 79:16, 134:25
closed - 68:20, 69:16
closely - 46:22, 80:1, 117:25, 118:4
closer - 134:13
closing - 70:2
co - 56:20
co-negotiators - 56:20
Cobb- 24:7, 25:7, 35:7, 35:19, 56:10, 56:14, 56:16, 104:17, 105:3, 110:5, 110:8, 110:11, 111:4, 112:10, 113:4
Cobolt- 6:24
Cobra- 104:25, 108:13
code - 27:6, 145:15, 145:16
coded - 132:23, 133:11
codings - 47:2
coffee - 161:1
Cohen- 99:3
collect - 82:17, 86:16, 86:18, 95:22
collected - 117:11
collecting - 82:23, 83:3, 83:6, 95:23
collective - 63:3
collectively - 81:20, 82:5, 99:24, 120:23
college - 6:5
Colorado- 29:1, 30:3
comfortable - 25:1, 36:4
coming - 9:2, 22:23, 23:6, 35:25, 48:6, 62:4, 69:17, 94:4, 112:2, 112:4, 118:7
Comm- 170:18, 170:19
comment - 130:8
comments - 98:9, 116:6, 116:7, 127:11, 144:3
common - 64:12
Common- 17:4, 17:9, 17:24, 18:1, 18:10, 20:5, 20:21, 21:18, 21:21, 21:22, 23:1, 24:10, 24:17, 25:19, 28:4, 29:17, 29:19, 29:22, 30:20, 30:21, 30:25, 31:3, 31:7, 31:20, 31:22, 32:3, 32:12, 32:15, 32:22, 33:2, 33:6, 33:14, 33:18, 33:22, 33:24, 34:8, 35:3, 35:11, 36:8, 36:13, 38:12, 39:1, 39:9, 39:15, 43:10, 43:16, 43:20, 43:23, 44:2, 45:15, 45:17, 49:11, 57:17, 57:25, 70:2, 74:8, 103:5, 103:6, 106:12, 107:8, 113:10, 113:13
communicated - 53:19, 106:11, 109:13, 116:1, 122:18
communicating - 70:7

communication - 25:1, 70:7
Communications - 142:13
communications - 53:1, 53:9, 83:1, 97:14, 97:15
companies - 6:17, 6:19, 7:1, 7:3, 7:8, 7:15, 9:13, 17:17, 17:18, 23:9, 31:19, 32:5, 32:6, 32:7, 40:6, 40:8, 40:13, 43:22, 43:24, 59:20, 62:5, 63:12, 65:9, 68:19, 71:16, 75:18, 97:1, 99:8, 119:6, 120:22, 121:2
Company - 75:12
company - 6:21, 6:22, 6:23, 6:24, 7:25, 8:24, 8:25, 9:11, 12:4, 12:17, 13:24, 16:18, 17:3, 26:23, 29:7, 29:8, 29:9, 31:19, 33:10, 34:20, 47:19, 48:12, 49:17, 50:12, 51:5, 56:10, 56:14, 63:14, 63:15, 63:19, 64:8, 71:20, 81:22, 82:13, 96:4, 99:7, 119:3, 130:22, 142:10, 152:6, 161:23, 161:24, 163:8, 165:25
compensation - 45:6, 51:9
Compensation - 46:2
compete - 25:25, 46:1, 46:24, 54:24
compiled - 96:11
complained - 23:20
complaint - 20:25, 37:22, 124:1, 147:19, 148:9, 148:22, 148:24, 149:13, 149:22, 149:24
Complaint- 101:13, 101:15
complaints - 127:19, 157:15, 167:5, 167:7, 167:14
complete - 69:25, 171:10
completely - 37:24, 108:5, 145:17, 147:2
complies - 107:12, 107:17, 108:22, 111:8, 115:7, 120:16, 121:19, 125:3, 160:4, 160:6, 162:14, 164:10, 166:3
comply - 121:17
comport - 125:4
computer - 38:13, 132:23, 151:17
concern - 87:20
concerned - 125:24
concerning - 122:3
concerns - 53:6
conclude - 46:11
concluding - 1:21
conclusion - 46:11, 91:7, 166:2, 166:4
conclusions - 94:5, 167:1, 167:16
conduct - 83:25, 93:19, 168:11

conference - 134:18, 136:4, 154:17, 154:18
confirmed - 115:9
conflicts - 167:5
Congo- 77:19
congratulatory - 154:1
Congress- 2:3
conjunction - 88:2
connected - 134:10, 169:15, 171:15
connection - 154:12
Conner- 119:5
conscious - 93:11
consent - 139:1
consider - 32:18, 89:5, 92:16, 113:24
consideration - 104:8, 104:9
considered - 103:13, 113:21, 126:15
consisted - 13:20, 120:18
consistent - 115:21, 115:23, 121:11
consolidated - 34:13, 40:7, 41:3, 60:19, 86:11
Constructors - 126:2
consultants - 118:23
consulted - 47:12
consulting - 7:2, 9:4, 141:13
consummate - 108:24
contact - 47:18, 65:3, 65:6, 79:13, 79:17, 79:19
contained - 44:24, 154:20, 163:24
contemporaneous - 122:6
contemporaneously - 102:19
contemporaries - 20:3
contemporary - 19:20
content - 53:8
contents - 52:20, 149:23, 154:15
continue - 23:4, 67:17
continuing - 39:3, 69:3, 71:24
contract - 9:1, 9:3, 26:24, 34:5, 34:7, 36:8, 36:10, 46:8, 46:9, 46:10, 46:14, 46:17, 46:19, 46:20, 47:1, 51:6
contracts - 20:8, 28:1, 36:6, 36:7, 46:12, 47:23
contrary - 168:10
control - 33:4, 47:16, 64:14, 138:14
controlled - 32:2, 99:6, 99:20
controls - 25:4, 25:12, 25:19, 26:5, 26:6, 34:25, 38:3, 46:22
conversation - 82:2, 90:10, 90:20,

110:12, 145:8, 146:22, 158:18
conversations - 93:18, 122:7, 149:2, 152:20, 153:12
conversion - 128:9
convicted - 81:17
cool - 92:21
cooperating - 64:11, 91:1
cooperation - 119:1
copied - 112:19
copies - 57:4, 89:11
copy - 107:14, 108:3, 111:10, 112:1, 146:2, 146:4, 146:6, 152:1, 159:21, 160:23
core - 24:6
corner - 132:17
corporate - 15:18, 22:23, 25:23, 141:17
Corporation - 1:6, 17:25, 139:3, 139:11, 139:12
corporation - 9:24, 140:4
Correct- 37:15, 50:8, 56:6, 58:5, 66:15, 72:25, 110:18, 112:12, 114:2, 142:15, 147:12, 150:10
correct - 9:25, 10:12, 10:17, 11:16, 14:22, 33:20, 37:13, 37:14, 55:10, 56:5, 57:19, 57:22, 58:4, 64:8, 65:1, 66:14, 66:17, 71:23, 76:11, 81:8, 82:20, 94:17, 94:18, 96:16, 97:6, 97:23, 98:1, 110:9, 112:22, 114:16, 116:4, 120:25, 121:6, 124:23, 132:22, 133:2, 134:1, 134:3, 134:4, 139:1, 140:4, 142:14, 147:11, 149:15, 149:17, 150:9, 151:6, 151:11, 151:18, 153:4, 160:22, 165:10, 169:2
correctly - 36:3, 50:1, 55:2, 59:14, 69:6, 80:2, 106:16
Counsel- 4:22
counsel - 12:12, 15:3, 15:4, 15:6, 23:22, 28:14, 28:21, 46:15, 47:19, 48:20, 49:3, 70:21, 91:2, 101:25, 103:14, 103:16, 111:19, 112:23, 112:25, 113:10, 113:11, 113:14, 113:25, 116:14, 116:15, 116:25, 117:5, 157:8, 163:8, 171:13, 171:15
counseling - 102:2
Country- 161:18
County- 170:4, 171:4
county - 101:24
couple - 4:16, 102:9, 138:11, 144:3, 155:12
coupled - 104:9
course - 8:7, 8:9, 40:10

Court- 1:1, 16:6, 170:16
Cpc- 32:8, 35:23, 35:24, 36:1, 37:7, 37:9, 38:18, 39:19, 50:7, 51:10, 56:2, 58:5, 58:9, 59:22, 60:2
create - 26:18, 27:4, 27:8, 104:23, 108:10
created - 29:25, 89:13, 89:22
creating - 119:6
credit - 69:15, 169:17
creditor - 64:7
crew - 67:19
criminal - 80:22, 82:2, 86:19, 86:21, 87:2, 103:14, 103:15, 113:25, 116:13, 116:14, 116:25, 117:5, 137:13
Curry - 1:11, 2:10, 2:14, 4:10, 13:9, 103:1, 106:5, 106:24, 107:25, 110:18, 113:21, 144:7, 144:16, 144:24, 145:4, 145:15, 145:19, 146:25, 147:3, 147:8, 147:14, 147:20, 147:25, 149:19, 152:8, 152:14, 152:20, 152:22, 165:1, 165:5
Curry's- 102:17, 102:20, 109:14, 109:21, 113:17, 150:2, 152:2
curve - 25:22, 94:15
custody - 119:2
customary - 128:21
cut - 86:13
Cuthill - 125:19, 128:8, 128:25, 129:4, 131:20

D

daily - 137:16, 137:18, 137:20
damages - 69:13
Dan - 13:21, 68:11, 73:1
date - 5:17, 47:2, 60:13, 62:16, 92:14, 105:12, 111:23, 122:12, 122:15, 124:6, 138:19
Dated - 171:18
Dawn - 1:22, 170:6, 171:6, 171:21
dawned - 93:24
day-to-day - 137:8
days - 135:22, 137:21, 163:17
Dbpr- 70:23, 71:6, 71:7, 71:14
Dd0702693 - 170:18
dead - 168:13
deal - 29:1, 39:4, 45:23, 49:13, 55:12, 55:18, 65:14, 74:21, 85:23, 87:10, 96:25, 104:10, 109:10, 109:24, 119:3, 119:5, 161:21, 162:8
dealing - 30:23, 47:3, 62:3, 71:5,

91:14, 97:16, 140:22
dealings - 41:19
deals - 23:4, 68:20, 96:7, 104:7
dealt - 16:10, 34:2, 46:4, 55:17, 63:7, 64:17, 104:24
Dean - 157:17, 157:22
debts - 119:12, 140:24
December - 11:2, 11:15, 13:18, 28:5, 28:7, 31:8, 58:6, 70:19, 81:9, 158:11
decent - 27:22, 85:20, 168:8
decide - 77:8
decided - 112:6, 125:25, 158:9, 160:15
decision - 47:13, 49:12, 111:24, 141:12, 147:24, 148:1, 148:2
decisions - 97:21, 99:6, 121:4, 131:8
deem - 139:13
deep - 39:2, 63:17
defaulting - 69:9
Defendants - 1:14
Defense - 114:21
defense - 117:12, 117:19, 121:8
definitely - 14:5, 40:20, 48:22, 63:25, 64:16, 77:9, 83:18, 93:16, 98:16, 103:13, 116:7, 117:22, 124:12, 139:6, 140:13, 141:9, 141:10
defunct - 31:7
degree - 117:4
degrees - 13:15
deleted - 46:24
delivered - 162:15
delusions - 91:22, 92:10
Denda - 118:12
deny - 155:24
Department - 70:24
department - 17:3, 32:17, 50:12, 50:14, 70:25
departure - 113:16, 113:17
depended - 137:25
deposed - 97:8
deposit - 131:1
deposited - 163:2
Deposition - 1:18
deposition - 4:13, 4:15, 73:18, 74:2, 132:7, 147:11, 150:9, 171:8
Describe - 154:15
described - 91:22, 155:14
describes - 114:21
destroyed - 156:7
detail - 165:6
detailed - 124:11, 152:20, 162:23
details - 16:1, 16:12, 40:4, 40:15, 40:17, 63:1, 102:15, 136:13, 137:2, 163:20
determined - 109:18
developed - 33:12
Development -

65:18
Development's - 134:6
deviated - 27:19
deviating - 27:7
device - 7:20
devised - 161:17
diagnosis - 84:1
Diana - 24:20, 112:5
Diane - 24:13
dictate - 142:6
dictating - 141:24
dictation - 142:3
differ - 98:20
difference - 32:8, 140:18
different - 9:5, 9:9, 15:11, 15:12, 15:13, 17:15, 18:4, 23:15, 27:8, 44:4, 46:12, 48:25, 49:18, 50:12, 72:7, 72:9, 77:16, 96:6, 96:7, 110:22, 115:13, 130:21, 140:14, 154:17, 156:2
differently - 144:6
difficult - 73:11, 92:9, 95:21
Direct - 3:4, 4:7
directed - 139:11, 141:2, 141:3
directing - 64:14, 73:9, 139:17, 139:23, 140:1
direction - 74:19, 140:5, 140:9
directly - 9:21, 44:5, 44:6, 53:16, 78:1, 88:9, 131:10
directors - 124:1, 125:17, 125:18, 127:20, 136:17, 136:21, 137:3, 139:2, 139:10, 141:14
disagree - 33:21, 41:9, 99:9, 109:5, 139:21, 151:7, 156:4
disagreed - 115:15
disappointment - 23:16
disbarred - 76:12
disclosed - 90:8
disclosure - 25:25
disclosures - 100:13
discovery - 164:25
discuss - 84:7, 84:9, 94:24, 95:2, 126:13, 142:25, 145:10, 148:15, 148:20
discussed - 48:24, 51:4, 80:5, 81:10, 83:15, 84:6, 84:12, 99:13, 117:23, 124:13, 125:13, 143:1, 143:4, 148:17, 148:18, 148:25, 160:15, 164:13
discussing - 42:3, 83:7, 83:18, 101:16, 104:5, 157:3
discussions - 42:5, 124:23, 146:14, 146:16
dismissal - 44:21
dismissals - 44:18
disposed - 156:8
dispute - 169:17
disputes - 28:8

dissipating - 71:18
dissolved - 136:18, 136:21, 136:22, 163:15
distinguishing - 72:17
District- 1:1, 1:2
division - 32:16
Division - 1:3
divisions - 35:8, 71:1
Dla- 163:2
Dobson - 5:23
document - 46:5, 92:11, 97:10, 97:12, 100:18, 101:5, 104:1, 104:3, 106:3, 106:19, 108:10, 108:19, 114:20, 115:6, 123:4, 128:2, 129:20, 138:19, 152:2, 156:17, 156:20, 156:25, 159:1, 159:10, 162:19, 166:6, 166:11, 166:25, 167:2, 167:5, 167:8
documentation - 103:6
documents - 54:12, 56:23, 57:3, 82:17, 82:24, 83:3, 83:6, 83:10, 85:3, 85:9, 85:10, 85:12, 85:16, 86:5, 86:7, 86:11, 86:17, 86:18, 95:17, 95:19, 96:5, 96:23, 98:14, 101:2, 101:3, 113:4, 117:8, 117:11, 117:18, 118:2, 118:7, 119:18, 121:7, 121:9, 121:16, 151:23, 154:20, 154:25, 155:7, 155:12, 155:15, 155:18, 156:7, 156:9, 156:18, 157:21, 162:9, 166:19
dollars - 130:17, 160:12, 163:4, 163:18
done - 23:6, 23:10, 25:9, 29:1, 31:2, 46:23, 54:19, 55:8, 68:19, 71:11, 75:19, 75:22, 76:7, 76:9, 96:22, 97:3, 100:8, 108:15, 108:23, 109:24, 110:24, 114:6, 114:7, 114:8, 141:13, 167:17
door - 133:1, 133:10, 133:17, 134:12
double - 24:3
double-edged - 24:3
doubt - 123:17, 126:20
down - 28:5, 30:22, 39:10, 58:6, 58:20, 64:13, 68:20, 69:3, 89:8, 103:19, 107:16, 111:14, 115:18, 120:23, 149:21, 168:4, 168:9
downs - 94:14
Dr- 14:8, 84:7
draft - 102:4, 102:8, 108:2, 108:9, 124:15, 127:18, 165:16
Draft - 106:4,

107:24, 109:21, 111:14
drafted - 27:11, 74:18, 98:11, 112:3, 130:6, 163:24
drafting - 101:22, 101:14, 157:15, 164:25
drafts - 116:22
drawing - 19:6, 132:16
drugs - 5:4
dual - 168:3
due - 58:6, 129:10, 148:9
duly - 4:4, 170:8
dumpster - 155:20
During - 8:11, 21:4, 72:19, 95:1, 136:1
during - 8:16, 10:4, 10:8, 10:17, 10:23, 11:21, 18:17, 19:5, 21:15, 29:21, 59:13, 59:20, 60:5, 60:14, 65:8, 73:12, 80:8, 92:2, 135:17, 137:9, 137:24, 144:20, 152:22, 163:9
duty - 121:17
Dvd- 16:5

E

e-mail - 97:18, 97:19, 105:19, 105:21, 106:4, 107:11, 107:16, 107:20, 108:20, 109:6, 110:4, 110:11, 111:9, 111:13, 152:4
e-mailed - 112:1, 151:10
e-mails - 105:8, 105:18, 107:2
early - 33:9, 44:14, 73:4, 124:7, 158:11, 160:25
earned - 131:9
earnings - 10:12
Earth- 101:1
easily - 23:11
edged - 24:3
Edie - 106:5, 107:24, 107:25, 111:17
Edith - 1:11, 1:12, 2:10, 2:14
educated - 4:21
education - 5:21
effort - 86:18, 116:8, 145:15
eight - 48:5
either - 14:23, 28:23, 44:12, 44:24, 84:3, 107:4, 113:6, 148:15, 160:8, 168:12
Electric - 30:8
electric - 30:15
electronic - 109:19
eliminate - 55:9
Elizabeth - 123:12
elsewhere - 86:6
embarrassment - 154:13
employed - 9:14, 10:21, 11:17, 12:3, 12:6, 57:4, 59:3, 59:5, 118:10, 167:25
employee - 12:17, 29:2, 32:18, 34:7,

35:1, 35:3, 36:11,
36:14, 171:13, 171:14
 **employee/
employer** - 36:13
 **employees** - 29:3,
31:18, 33:16, 33:19,
35:8, 37:9, 39:10,
43:1, 48:6, 51:10,
68:25, 75:23, 83:10,
104:24, 106:22,
118:1, 165:23
 **employer** - 9:12,
9:22, 29:16, 29:18,
29:20, 29:23, 31:8,
33:25, 55:15, 60:20
 **employers** - 33:19
 **employment** - 9:23,
20:8, 26:1, 26:8,
26:12, 26:18, 27:10,
27:18, 28:1, 28:3,
28:16, 29:13, 30:4,
32:21, 32:24, 32:25,
33:1, 33:25, 34:5,
34:11, 34:12, 34:15,
37:8, 37:10, 38:9,
38:11, 38:13, 43:4,
43:15, 43:19, 44:19,
44:23, 45:4, 45:8,
45:10, 45:18, 47:8,
48:2, 48:4, 48:7,
53:13, 53:21, 54:3,
54:21, 55:3, 55:4,
55:13, 55:23, 113:8,
162:6, 168:3
 **Employment** -
29:15
 **emptying** - 69:7
 **end** - 30:22, 31:5,
39:5, 39:16, 47:9,
47:15, 58:3, 59:7,
67:17, 70:4, 70:5,
73:10, 78:17, 80:9,
91:20, 97:19, 135:15,
138:5, 138:6
 **ending** - 112:16
 **engaged** - 33:16,
49:7
 **engagement** -
129:22, 130:18,
130:19, 130:20
 **enjoy** - 25:13
 **enjoyed** - 22:25
 **Enron** - 10:9, 10:13
 **enter** - 133:23,
134:5
 **entered** - 102:10
 **entertainment** -
15:17, 15:20
 **entire** - 29:19,
45:21, 77:11, 79:12,
103:1, 149:5
 **entirely** - 18:4, 27:1,
130:18, 132:19,
133:20, 134:14,
138:2, 139:21, 149:15
 **entitles** - 7:22,
10:22, 17:5, 17:16,
17:17, 35:2, 35:24,
36:6, 37:8, 39:11,
40:16, 44:13, 59:4,
59:12, 62:3, 62:7,
62:8, 62:10, 62:13,
62:15, 63:9, 74:6,
87:8, 99:20
 **entitlement** - 44:24
 **entity** - 9:1, 9:20,
18:10, 23:3, 31:16,
32:2, 34:5, 35:23,
41:2, 53:4, 59:10,
60:3, 61:11, 61:19,

71:13, 72:8, 72:9,
123:23, 127:12,
127:16, 136:15
 **entrance** - 133:5
 **entry** - 142:18
 **episode** - 154:2,
154:8, 154:12
 **equals** - 72:12
 **equipment** - 74:18
 **equity** - 16:20,
48:24, 49:7
 **equivalent** - 72:11
 **era** - 72:23
 **error** - 164:15
 **especially** - 41:8,
44:6, 47:9, 95:5,
116:21
 **Esq** - 2:3, 2:8
 **essentially** - 16:21,
21:20, 33:24, 36:7,
39:10, 49:8, 50:21,
58:7, 60:17, 68:18,
72:7, 72:11, 82:12,
97:19, 105:5, 106:19,
134:23, 138:14,
139:17, 145:5
 **Essentially** - 31:25
 **establishing** -
25:18
 **estate** - 6:22
 **esteem** - 79:13
 **estimate** - 41:4,
41:7
 **et** - 23:2, 24:24,
26:2, 43:2, 51:19,
52:9, 86:12, 104:25,
130:22, 131:11,
140:24
 **event** - 16:3, 106:2,
155:9
 **everyday** - 138:10
 **everywhere** - 95:21
 **evidence** - 115:21
 **exact** - 10:7, 16:1,
60:13, 60:23, 73:2,
74:23, 78:2, 122:12,
122:15, 124:6
 **Exactly** - 52:18
 **exactly** - 17:14,
30:17, 48:21, 73:12,
81:21, 88:12, 108:6,
119:21, 165:8,
165:17, 167:7
 **Examination** - 1:20,
3:4, 4:7
 **example** - 26:8,
26:22, 34:10, 34:18,
40:10, 45:25, 147:22,
153:5
 **examples** - 27:17,
27:25, 35:19, 40:12,
56:7
 **excepting** - 44:1
 **exception** - 31:25,
54:23, 54:25, 55:5,
55:11, 55:16, 55:21
 **Exception** - 54:13
 **exchange** - 144:20
 **excitement** - 22:15,
22:22
 **exciting** - 11:24,
49:1
 **exclusively** - 57:22,
62:2
 **Excuse** - 136:19
 **execute** - 34:7,
108:1
 **executed** - 121:10,
131:7
 **executive** - 77:11

 **Executives** - 113:18
 **executives** - 26:9,
26:15, 26:17, 44:7,
44:11, 96:4, 113:17
 **exercise** - 15:19,
138:14
 **exert** - 47:16
 **exerting** - 64:14
 **Exhibit** - 3:10, 3:11,
3:12, 3:13, 3:14, 3:15,
3:16, 3:17, 3:18, 3:19,
3:20, 3:21, 97:11,
100:11, 103:22,
103:25, 105:8,
105:15, 114:4, 120:8,
123:3, 123:7, 127:24,
127:17, 129:21,
132:7, 132:12,
137:10, 143:9,
150:12, 156:16,
156:22, 158:19,
158:23, 159:7,
159:10, 162:13,
164:21
 **exhibit** - 105:7,
107:10, 128:3, 138:18
 **exist** - 33:15, 56:3,
55:4
 **existed** - 38:5, 44:2,
45:19, 75:20, 86:4
 **existence** - 33:18
 **existing** - 104:7
 **exit** - 134:1, 134:4
 **experience** - 7:4,
20:1, 24:1, 56:14,
125:14, 139:16
 **experienced** - 91:21
 **experiencing** -
22:15
 **expertise** - 15:20
 **Expires** - 170:19
 **Explain** - 31:13
 **explain** - 4:19, 37:3,
38:23, 128:14
 **explaining** - 12:13,
37:19
 **explaining** - 46:18,
111:12
 **express** - 23:15
 **expressed** - 48:1
 **expressly** - 48:20
 **extended** - 50:4,
50:9
 **extent** - 100:6,
111:21, 115:15,
161:20
 **external** - 32:10
 **extraordinare** -
80:16
 **eye** - 167:18

## F

 **F1** - 110:17
 **fabrication** - 29:8,
29:10, 29:11
 **facility** - 77:19
 **fact** - 20:25, 45:15,
51:24, 55:4, 83:1,
84:4, 95:5, 108:8,
113:3, 126:22,
147:16, 148:9,
150:19, 151:4, 167:3
 **factor** - 147:10
 **facts** - 165:7
 **fail** - 11:11, 22:6,
28:15, 36:17, 41:7,
93:4, 101:11
 **Fair** - 41:10
 **fairly** - 80:1, 96:2,

143:25
 **falling** - 56:5
 **Falls** - 2:9
 **false** - 115:1,
115:19
 **falsity** - 115:8,
115:12
 **familiar** - 4:12,
73:18, 106:3, 106:6,
106:7, 106:8, 106:9,
113:16, 114:20,
120:11, 120:12,
141:20, 152:7, 162:5
 **family** - 17:16,
17:18, 37:9, 38:15,
41:14, 148:14, 149:4,
149:5
 **fantastic** - 25:7,
37:18, 56:10, 56:11
 **far** - 94:14
 **fax** - 160:3, 162:18
 **featured** - 16:7
 **February** - 6:11,
20:7, 39:3, 70:12,
80:5, 93:3, 131:16
 **fees** - 125:25
 **fell** - 38:8
 **felt** - 26:7, 47:19,
55:21, 116:20,
127:14, 128:9
 **Fernando** - 136:25
 **few** - 9:5, 15:22,
42:13, 44:19, 44:21,
81:23, 124:18, 149:12
 **fictitious** - 72:6
 **Fie** - 30:6
 **fifteen** - 10:18
 **Fifth** - 128:9, 131:20,
163:3, 163:5, 163:18
 **fifty** - 40:1
 **figure** - 30:1, 38:10,
80:19, 81:20, 94:12
 **file** - 27:1, 38:11,
38:13, 109:22,
122:11, 122:19,
122:24, 131:20
 **files** - 26:13, 27:21,
38:10, 109:16
 **filing** - 72:7, 121:25,
122:16, 122:23,
127:8, 158:9
 **fill** - 58:14
 **film** - 156:10
 **final** - 102:7,
107:23, 165:15
 **finance** - 14:5
 **financial** - 24:16,
119:15, 131:8
 **financially** - 171:16
 **financing** - 7:3
 **fine** - 57:11
 **finish** - 5:12, 5:14
 **finished** - 30:25,
96:16
 **Firm** - 2:8, 157:8,
168:1, 168:22
 **firm** - 7:25, 9:24,
19:3, 28:11, 28:16,
120:17, 123:22,
126:9, 126:19, 129:6,
129:10, 130:16,
130:25, 131:14,
135:10, 139:18,
139:24, 140:2, 160:8,
160:9, 160:21, 163:1,
163:6, 163:12,
163:15, 168:4, 168:6,
168:12, 169:14

 **firms** - 7:21
 **First** - 10:15, 129:25,
167:7
 **first** - 4:4, 8:4, 8:21,
10:8, 11:22, 13:14,
17:8, 17:19, 18:17,
18:19, 38:17, 38:25,
42:5, 43:13, 58:12,
59:20, 60:10, 60:14,
67:23, 70:11, 73:4,
75:21, 77:4, 77:6,
77:23, 78:5, 80:8,
81:3, 81:7, 83:12,
84:3, 84:5, 84:16,
92:2, 94:4, 95:17,
99:10, 101:4, 107:20,
117:15, 119:14,
122:10, 123:5, 125:7,
126:7, 128:21, 132:9,
139:5, 144:11,
147:19, 159:20,
161:2, 162:24, 164:5
 **first-hand** - 13:14,
42:5, 75:21, 99:10,
117:15, 119:14, 125:7
 **fit** - 12:1
 **five** - 4:16, 4:17,
20:1, 69:2, 79:20,
79:24, 114:13,
130:16, 154:1,
160:12, 163:4
 **Fl** - 170:17
 **flew** - 160:25
 **flight** - 146:23
 **floor** - 65:24, 66:3,
66:14, 66:17, 66:22,
66:24, 67:1, 67:3,
67:5, 67:10, 67:12,
67:14, 68:6, 68:23,
80:10, 132:17
 **floors** - 68:20, 68:24
 **Florida** - 1:2, 1:22,
1:23, 30:8, 60:25,
168:11, 170:3, 170:7,
171:3
 **flowed** - 131:12
 **fluid** - 97:7
 **Flynn** - 18:6, 20:6,
20:11, 23:1, 23:25,
24:7, 35:12, 35:17,
35:20, 46:4, 47:5,
55:24, 67:5, 67:8,
119:19, 119:20,
138:3, 153:5, 153:6,
155:5
 **Flynn's** - 24:5, 24:6,
24:9, 67:7
 **focus** - 15:15, 97:5
 **focused** - 30:20
 **folded** - 144:23
 **follow** - 27:16
 **follow-up** - 27:16
 **followed** - 112:18
 **follows** - 4:6
 **Ford** - 104:22,
112:21, 113:1, 113:3,
113:7
 **Foreclosures** -
89:17, 69:18
 **foreclosures** -
69:20
 **foregoing** - 139:14
 **forget** - 63:16
 **form** - 51:9, 163:11
 **formal** - 6:8, 14:6,
15:10, 20:25, 28:8,
35:1, 37:7
 **formally** - 35:2,
35:23, 37:9, 61:23,
77:20

formed - 62:7,
120:17
former - 16:7,
127:19
Formerly - 62:10
formerly - 169:15
forms - 57:9, 104:7,
104:11, 104:16,
104:20, 112:22
Fort- 109:25
forth - 99:21
forty - 130:16
forty-five - 130:16
forward - 15:10,
27:6, 38:2, 38:3,
45:11, 120:1, 127:16,
167:3
forwarding - 107:24
foundation - 36:21
four - 14:14, 25:5,
110:19, 147:5,
160:11, 163:17
fourth - 115:5
Frank- 1:11, 2:10,
25:10, 41:18, 42:1,
60:18, 73:8, 76:6,
76:10, 78:2, 80:25,
81:24, 85:23, 89:16,
90:25, 91:9, 93:13,
93:14, 93:15, 97:20,
97:22, 99:6, 99:13,
107:13, 110:6,
110:12, 110:17,
111:9, 115:13,
116:13, 116:16,
116:17, 116:20,
118:8, 119:21,
120:25, 121:1,
132:22, 135:22,
139:9, 140:13,
140:14, 140:25,
141:9, 141:12, 143:6,
157:18, 161:3
Frank's- 103:17,
117:18, 117:24,
118:3, 133:5, 133:15,
134:19, 140:24
fraud - 163:9
frequent - 21:6,
137:8, 137:12, 138:8
frequently - 138:4,
140:9
friends - 95:6
front - 55:12, 161:4
fruition - 94:3
full - 5:19, 13:19,
38:9, 39:14, 58:19,
115:8, 118:8, 164:5,
168:21
full-day - 13:19
full-time - 39:14,
118:8
function - 13:23,
14:3, 14:10, 14:25,
16:17, 41:21, 49:19
functions - 31:15,
32:4
fund - 48:24, 49:7,
126:3,
funds - 131:1,
131:2, 160:20,
162:25, 163:2
furthermore -
111:16
future - 93:20,
168:6

**G**

game - 10:24, 11:3,

11:6
Garrino - 25:10
gather - 121:7
gathered - 85:13,
96:9
gathering - 97:3,
117:17
gee - 93:6
general - 12:12,
15:6, 23:16, 34:23,
47:18, 49:4, 70:21,
82:11, 87:16, 91:4,
111:19, 113:9,
113:11, 113:14, 131:1
Generally - 55:7,
127:11
generally - 23:20,
124:3, 143:1, 143:3,
161:8
gentleman - 9:7,
18:5, 24:18, 25:10,
63:6, 68:11, 118:12,
119:4, 130:8
Gilmer- 99:4
given - 51:19,
105:21, 117:3
Glover- 68:1, 68:5,
68:14
goal - 64:12
Goddess- 101:1
Gold- 126:13
Goldberg- 13:2,
14:18, 18:20, 19:25,
23:19, 47:21, 47:22,
60:21, 60:22, 61:1,
61:25, 65:6, 66:24,
72:23, 75:3, 84:14,
88:10, 100:22,
129:23, 130:4,
130:10, 130:13,
131:7, 131:17, 132:9,
135:12, 135:16,
140:10, 150:5, 157:4,
163:6, 163:7, 163:11,
163:14
Goldberg's- 14:25,
15:14
golf - 84:21
Gonzalez- 24:18
Government- 88:4,
89:25, 90:2, 90:7,
91:1, 119:1
graduated - 5:24,
6:2, 6:4, 8:15, 8:23
grand - 121:10
grandeur- 91:22,
92:10
grants - 52:1
great - 119:5
Green- 121:24,
121:25, 122:4, 122:8,
123:12, 125:5,
125:11, 125:12,
125:24, 126:6, 127:7
Green's- 123:22
Group- 19, 2:11,
40:11, 128:23
group - 53:4, 86:11,
103:2, 106:12, 107:8,
118:16, 154:24
growing - 24:6
guess - 18:9, 24:4,
24:7, 24:19, 26:9,
35:6, 37:19, 38:1,
39:13, 41:19, 47:4,
54:21, 62:20, 69:13,
71:12, 73:15, 87:21,
88:1, 96:10, 96:21,
103:1, 106:1, 106:8,
108:11, 123:17,

123:24, 134:8, 141:8,
143:4, 165:25, 167:19
guessing - 85:19,
134:13
Guilty - 114:22
guilty - 114:25,
115:2
guy - 56:12, 56:15,
168:13

**H**

Habor- 12:12
Habor's- 12:13
Hailstones - 1:11,
2:10, 4:11, 104:5,
107:14, 110:6,
110:12, 111:9,
111:17, 144:7, 145:4,
147:4, 147:14,
147:17, 147:20,
147:23, 147:25,
148:9, 149:19,
150:16, 151:2,
161:10, 161:14,
161:17, 165:1, 165:6
Hailstones'-
151:15, 162:2, 162:5,
162:9
half - 62:1, 79:1,
92:3, 92:5, 92:7,
95:17
hall - 133:4, 134:22
hallway - 133:9
hallways - 133:4
hand - 13:14, 42:5,
42:22, 75:21, 99:10,
117:15, 119:14,
125:7, 144:13,
144:22, 170:10
handbook - 45:15
handbooks - 24:23
handbooks - 26:25,
144:25
handing - 132:6,
143:8, 156:15
handle - 28:12,
108:21, 125:13,
131:13, 169:4
handled - 24:12,
24:13, 24:16, 24:19,
24:20, 25:11, 28:9,
28:10, 32:3, 32:17,
56:8, 104:20, 109:14,
123:22, 131:15
handles - 31:16,
31:17, 169:2
handling - 20:14,
53:23, 56:21, 106:20
handshaking -
154:1
handwriting -
159:19, 159:23
happenstance -
11:7, 147:5
happy - 18:6, 20:20,
49:12, 84:21
hardly - 79:18
hardware - 7:18
Harrison - 104:23,
112:21, 113:1, 113:3,
113:7
Havener - 2:8, 3:4,
4:8, 4:10, 36:20,
42:12, 76:24, 132:5,
156:2, 156:4, 156:13,
166:24, 169:23
head - 14:6, 16:11,
28:2, 45:1, 55:20,
60:6, 113:22, 169:16

headed - 91:16
headquartered -
22:4
health - 95:3
hear - 168:17
heard - 29:21,
83:23, 83:24, 83:25,
88:8, 150:15, 154:11,
155:22, 156:6, 156:7,
hearing - 71:21,
92:13
hearsay - 98:9
held - 61:23, 121:1,
131:2
hello - 144:13,
144:21
help - 47:20, 86:15,
102:4, 127:16, 169:18
helped - 26:7,
28:13, 65:14, 113:5
helping - 7:2, 64:19
Hendricks - 8:1
Hendricks'- 73:19,
73:22
hereby - 139:11,
170:7
high - 5:21, 11:9,
77:9, 79:12, 95:8,
154:1
High- 5:23
high-five - 154:1
higher - 113:20
himself - 84:10
hindsight - 92:17,
93:21
hire - 44:15, 127:15
hired - 26:11, 26:22,
44:20, 116:1, 119:3
hires - 26:19
hiring - 23:2, 49:21,
49:22
hit - 49:25
Hold- 169:9
holding - 6:22
Holdings - 1:10,
2:11
Holtz - 99:3, 104:6
honest - 18:6, 52:7,
77:11, 111:15, 130:9
Honestly - 152:19
honestly - 30:17
hospital - 94:17
hot - 10:13
hours - 84:21, 89:3,
90:6, 167:20, 168:17
house - 15:3, 18:9,
48:19, 49:3, 163:8
Hr- 18:9, 23:22,
24:20, 25:24, 26:25,
32:4, 32:13, 32:16,
50:15, 50:17, 56:14,
56:15, 63:5, 71:22,
72:5, 72:6, 72:12,
72:14, 130:8
hug - 144:9, 144:12
human - 17:3,
140:5, 140:8, 141:5
humble - 91:16
hundred - 16:12,
51:12, 133:13,
160:11, 163:1, 163:4,
163:18

**I**

idea - 15:14, 30:1,
96:21, 109:7, 112:19,
114:7, 115:3, 131:5,
141:21, 151:7, 158:5,
158:9

identical - 99:5
identically - 144:4
identification -
103:23, 105:16,
120:9, 123:8, 127:25,
129:18, 132:13,
150:13, 156:23,
158:24, 159:8, 164:22
ill - 83:20
illness - 83:14,
91:11, 93:12
imagine - 52:16
immediate - 110:5
immediately - 6:9
impairing - 5:8
important - 48:13
impression - 11:22,
53:25, 78:25, 79:2,
80:12, 91:13, 116:9,
117:3, 133:1
impressive - 77:12
improve - 26:3
in-between - 6:5,
122:17
in-house - 15:3,
18:9, 48:19, 49:3,
163:8
inaccurate - 132:19,
133:20, 134:14, 164:3
Inc - 1:5, 40:1, 41:2,
41:6, 41:11, 72:10,
72:12, 72:13, 72:15,
126:2, 139:3, 140:12
incarcerated -
169:19
incident - 153:2
include - 32:6, 32:7
included - 21:11,
40:22, 110:18, 112:20
including - 64:22
incomplete - 38:21
inconsistent - 27:2
incorporated -
61:23
incredibly - 49:1,
58:5, 79:8, 166:5
independently -
102:13, 115:9
indicate - 108:4
indicted - 81:17
individual - 16:7,
46:14, 55:14
individually - 72:21,
76:17, 81:24
Individually - 158:8
individuals - 9:6,
27:18, 44:3, 44:4,
44:20, 51:14, 75:21,
97:21, 117:24, 118:3,
119:6, 124:24, 164:13
Industrial - 30:8
industry - 7:20,
34:10, 71:17
informal - 36:12
informally - 14:18
information - 27:21,
37:19, 37:21, 70:9,
85:25, 94:13, 96:9,
97:3, 124:22, 124:25,
126:21, 146:23,
152:24, 163:23, 167:3
informed - 145:2,
146:20, 153:25
infrequent - 21:7
inherited - 29:24,
54:19
initial - 100:13
initials - 47:1
ink - 133:8
input - 19:13

instead - 55:11, 109:25, 111:5, 149:3
instructing - 87:6, 95:25, 169:12
insurance - 24:24
intellectual - 15:17
Intent - 106:5, 107:25, 109:21, 111:14
intent - 108:9
intention - 168:5
interaction - 21:2, 21:10, 41:16, 42:18, 137:9, 138:8, 141:15
interest - 103:19, 103:20, 130:17, 130:22, 136:10, 144:18, 162:10
interested - 51:3, 171:16
interface - 141:5, 141:6
internal - 25:4, 25:18, 26:5, 26:6, 33:3, 34:24, 46:21, 83:8, 86:1, 86:3, 86:7, 95:16
interrogatories - 143:12
interview - 10:4, 10:18, 11:12, 11:21, 13:17, 13:19, 13:20, 13:25, 14:7, 14:15, 14:16, 15:8, 21:15, 51:4, 77:8
interviewed - 11:1, 11:14, 12:19, 12:20, 14:17, 16:13, 79:5, 79:7, 80:17
interviewing - 48:10, 48:17
investigated - 81:15
investigation - 80:23, 82:3, 83:8, 86:2, 86:3, 86:8, 86:19, 87:3, 95:16, 95:18, 163:11
investigations - 51:23
involved - 7:7, 23:8, 23:9, 29:16, 42:21, 47:8, 47:10, 48:14, 56:18, 62:12, 64:16, 64:19, 64:21, 64:23, 73:17, 76:4, 76:5, 82:22, 82:23, 83:3, 89:16, 92:19, 101:9, 105:3, 120:21, 120:22, 126:6, 131:25, 140:10, 152:1, 154:4, 161:25
involvement - 29:7, 64:10, 64:18, 73:24, 85:5, 88:9, 98:5, 98:12, 100:7, 111:1, 119:13, 157:7
irrelevant - 169:10
Irs - 159:16, 160:15
Israel - 42:19
issue - 34:3, 37:22, 45:12, 46:1, 95:20, 99:12, 107:4, 109:11, 118:9, 150:19
issued - 59:25, 60:3, 60:4, 122:15
issues - 30:23, 33:4, 52:1, 55:12, 55:18, 62:4, 69:5, 69:21, 97:17, 98:21, 101:16, 101:17,

103:4, 104:19, 140:15, 140:23, 165:15, 166:15, 169:10
issuing - 53:16, 59:22
itself - 32:24, 36:11, 100:19, 115:3, 123:23

## J

Jackson- 113:7
Jaiman- 65:21, 67:1, 73:19, 74:20, 89:18, 119:9, 120:2, 120:6, 125:11, 125:16, 140:15, 140:20, 140:22, 141:10, 141:25, 142:7, 148:16, 148:18, 153:11, 155:4
Jaiman's- 74:1
January- 11:19, 12:9, 17:23, 28:5, 28:7, 31:6, 39:3, 39:16, 57:11, 58:17, 58:6, 71:25, 78:17, 78:18, 79:4, 79:11, 93:3, 96:24, 129:9, 135:13, 138:7, 151:9, 151:12, 151:14, 158:12
Jay- 65:22, 72:21, 73:15, 77:1, 119:8, 119:15, 136:23, 138:9, 155:5
Jeff- 135:1, 135:2
Jenny- 24:15
Jim- 13:21, 14:8, 18:13, 19:18, 97:20
job - 8:21, 16:14, 22:19, 25:7, 48:18, 50:18, 50:23, 77:7, 79:24, 108:9, 108:11, 109:15, 167:18
jobs - 8:22
Jodi- 65:21, 72:20, 73:15, 74:1, 74:20, 77:2, 119:9, 119:10, 119:11, 120:2, 120:6, 121:5, 136:23, 138:9, 155:4, 158:2
Johnson- 14:8
Johnson's- 14:10
joined - 56:9
joint - 23:10
Jones- 159:17, 159:18
Jr- 125:19
Judge- 98:22, 99:4
July- 6:12, 88:11, 88:13, 135:13, 135:14, 135:15, 136:10, 162:25
June- 59:7, 60:20, 65:12, 65:13, 65:16, 66:5, 66:18, 67:19, 68:16, 68:18, 71:25, 75:4, 76:17, 76:19, 77:1, 78:22, 80:3, 83:21, 83:22, 88:13, 91:13, 91:21, 94:21, 98:1, 98:3, 100:14
jurisdiction - 4:24
jury - 121:10
Justice- 16:6

## K

Kaprow- 13:2, 13:3,

14:20, 19:25
Kathleen- 2:8, 4:10
keep - 69:23
keeping - 167:18
kept - 61:17, 89:22
Kind- 98:5
kind - 6:16, 13:20, 20:24, 22:14, 22:19, 22:24, 23:20, 24:3, 26:6, 26:12, 29:9, 29:11, 35:1, 36:25, 41:24, 43:22, 47:10, 47:16, 49:4, 49:14, 50:3, 50:20, 50:23, 52:15, 53:25, 54:19, 56:3, 56:4, 56:5, 56:15, 60:15, 67:16, 73:6, 75:18, 75:22, 76:6, 77:18, 79:6, 83:16, 87:5, 93:6, 94:3, 95:20, 97:16, 103:18, 104:18, 104:21, 135:9, 140:25, 159:2
kinds - 11:24, 157:13
Kingdom- 147:17, 148:10
knowing - 41:17
knowledge - 12:7, 13:14, 42:6, 43:5, 54:11, 59:11, 63:10, 64:17, 65:20, 70:16, 74:11, 75:21, 82:14, 83:5, 87:4, 87:6, 87:16, 92:22, 94:14, 99:11, 100:7, 100:20, 102:5, 102:25, 114:13, 115:20, 115:24, 117:15, 119:14, 122:6, 123:1, 124:12, 124:16, 125:6, 125:7, 127:21, 128:7, 128:10, 128:12, 131:24, 132:7, 136:6, 145:12, 153:3
known - 15:9, 38:4, 81:10, 145:25
knows - 124:22
Kristona- 24:20, 112:5

## L

lack - 41:20, 113:19
laid - 39:11, 132:17, 134:24
language - 46:7, 108:2
Large- 1:23, 170:7
large - 148:13
largely - 41:18, 103:15, 107:8
Larry- 12:12
last - 9:9, 24:15, 57:22, 60:5, 78:18, 78:21, 97:11, 120:15, 123:11, 129:22, 130:3
letters - 54:23, 55:11, 55:21, 61:4, 81:8
level - 91:15
levels - 70:7
Lewis- 113:7
licensed - 31:24, 40:1, 60:24, 61:7, 61:10, 71:13
licensing - 39:7, 71:1
lieu - 139:3
likely - 137:24

13:15, 15:17, 15:20, 19:3, 20:17, 61:12, 61:14, 61:18, 109:25, 113:8, 126:9, 126:19, 129:6, 139:18, 139:24, 140:2, 160:21, 163:1, 163:6
Law- 2:8, 6:4, 61:24, 128:23, 157:8, 167:25, 168:22
lawsuit - 126:8, 129:7, 131:20, 131:21, 131:23, 132:1
lawyer - 7:11, 20:16, 37:6, 47:5, 87:20, 90:17
lawyers - 12:3, 15:7, 28:24, 47:7
lay - 36:20
lead - 50:19, 51:2, 63:22
leading - 92:20
learn - 13:12, 26:3, 81:12, 87:15
learning - 25:22, 94:14
lease - 69:20, 74:18
leased - 69:8
leases - 69:2
least - 11:13, 12:19, 17:7, 19:1, 20:1, 27:16, 33:23, 38:1, 52:22, 57:4, 67:20, 77:5, 86:25, 108:4, 116:23, 135:22, 146:25, 152:1, 155:8, 165:4
leave - 68:15, 161:10, 161:14, 161:18
left - 20:18, 38:18, 41:23, 42:14, 42:16, 60:15, 60:18, 67:22, 68:1, 68:3, 68:17, 73:3, 79:21, 79:25, 96:15, 102:24, 113:23, 152:6, 163:11
legal - 7:3, 7:9, 7:21, 12:6, 13:3, 13:10, 15:4, 46:7, 47:17, 72:14, 74:6, 90:15, 91:6, 101:25, 103:11, 113:15, 165:14
legends - 16:4
less - 4:16, 21:9, 32:16, 36:12, 68:19, 85:5, 121:13, 144:19, 145:9, 146:17
Less- 4:17
Letter- 54:13, 106:4, 107:24, 109:21, 111:14
letter - 54:25, 55:5, 55:16, 82:7, 107:23, 108:1, 108:3, 108:9, 123:11, 129:22, 130:3
lasts - 58:3
late - 33:10, 39:19, 101:6, 121:10, 138:13
Latham- 123:12
Lauderdale- 109:25
Laurie- 24:12, 104:6
Lavine- 105:11
law - 6:6, 6:9, 7:21, 7:22, 7:25, 8:11, 9:24,

limited - 83:7
lines - 16:2, 69:15, 94:22
liquidated - 71:16
liquidating - 62:5, 82:16, 97:1
liquidation - 140:23
list - 118:21
listed - 8:20
lists - 124:24, 160:11
literally - 27:13
litigants - 28:23
litigated - 28:1
litigation - 4:12, 27:9, 28:3, 28:9, 28:12, 28:13, 28:16, 28:25, 29:13, 29:15, 29:22, 30:3, 30:4, 73:20, 73:22, 101:6, 101:7, 101:9, 104:1, 122:1, 122:5, 127:9, 127:13, 127:17, 141:2, 141:7, 141:16, 144:17, 159:2, 169:3, 169:4
lives - 148:14
Lic- 1:9, 1:10, 2:9, 2:11
Llp- 2:3
located - 60:11, 60:12, 65:15, 66:8, 68:6, 78:23
lock - 132:23, 133:6, 133:11
Loewy- 2:3, 36:19, 58:17, 59:1, 90:13, 126:17, 156:1, 156:3, 156:12, 169:9, 169:24
logical - 46:11
long-term - 69:2
look - 11:5, 27:20, 34:9, 56:22, 91:5, 94:10, 94:22, 96:1, 104:4, 107:16, 111:3, 120:14, 121:5, 121:18, 124:19, 125:2, 129:20, 130:24, 133:21, 138:21, 150:25, 158:19, 160:3, 162:12, 166:12
looked - 98:12, 108:5, 108:8, 112:9, 113:3, 124:4, 158:12
looking - 50:25, 92:17, 92:23, 105:11, 108:7, 109:3, 131:19, 143:18, 146:24, 166:15
looks - 111:3, 159:22
loop - 111:6
loophole - 125:22
lost - 22:14, 26:4
loud - 121:20
loved - 23:24
Luis- 24:18
lump - 112:14
Luncheon- 132:3

## M

M&a - 20:8
magazines - 161:1
Maguire - 66:9, 132:18, 153:19
Mainer - 157:8, 167:25, 168:21
mail - 79:21, 79:25,

97:18, 97:19, 105:19, 105:21, 106:4, 107:11, 107:16, 107:20, 108:20, 109:6, 110:4, 110:11, 111:9, 111:13, 152:4
mailed - 112:1, 151:10
mails - 105:8, 105:18, 107:2
maintained - 61:14
majority - 120:20
Man - 6:23
Man-a-war - 6:23
manage - 28:14
management - 10:13, 64:7
manager - 67:25
manages - 31:17
Manusch - 141:20, 143:5
map - 78:5
March - 17:10, 17:11, 17:23, 17:24, 21:23, 31:4, 37:16, 39:2, 45:11, 57:16, 58:9, 60:14, 60:16, 65:11, 65:12, 65:16, 66:18, 67:19, 67:23, 68:15, 70:12, 78:20, 78:22, 79:19, 80:2, 96:25, 97:2, 119:25
Mark - 56:9, 68:10, 73:1, 80:6, 81:6, 81:12, 137:6, 158:13, 158:15
marked - 97:10, 100:11, 103:22, 103:25, 105:9, 105:15, 114:3, 120:8, 123:7, 127:24, 128:3, 129:17, 132:7, 132:12, 138:18, 143:9, 150:12, 156:15, 156:22, 158:19, 158:23, 159:7, 164:21
marketing - 14:12
Marty - 18:5, 20:6, 20:11, 23:25, 24:1, 35:6, 46:4, 50:1, 50:11, 50:14, 55:24, 155:5
master - 40:19
Master - 17:4, 17:10, 17:25, 18:1, 18:10, 20:5, 20:21, 21:18, 21:21, 21:22, 23:2, 24:10, 24:17, 25:20, 28:4, 29:17, 29:19, 29:22, 30:20, 30:21, 30:25, 31:3, 31:7, 31:20, 31:23, 32:3, 32:12, 32:15, 32:22, 33:2, 33:6, 33:14, 33:18, 33:22, 33:24, 34:8, 35:4, 35:11, 36:9, 36:14, 38:12, 39:1, 39:9, 39:10, 39:15, 43:10, 43:16, 43:20, 43:23, 44:2, 45:15, 45:17, 49:11, 57:17, 57:25, 70:2, 74:8, 103:5, 103:6, 106:12, 107:8, 113:10, 113:13
material - 141:25
Matt - 20:14, 20:16, 48:5, 53:23, 104:11, 108:23, 115:10

matter - 46:18, 140:19, 140:20
Matthew - 1:19, 2:5, 3:3, 4:3, 5:20, 61:24, 170:7, 171:8
maximum - 154:12
Mcque - 24:13
mean - 9:4, 15:5, 17:20, 21:19, 22:21, 24:22, 25:12, 25:16, 26:16, 27:23, 31:2, 31:13, 40:9, 40:12, 44:8, 45:14, 45:16, 49:4, 50:21, 51:16, 54:3, 54:10, 55:1, 62:6, 63:12, 69:5, 69:12, 71:14, 71:16, 77:10, 78:2, 79:6, 83:24, 87:21, 91:17, 92:9, 95:11, 96:2, 96:5, 100:18, 106:15, 108:18, 109:14, 111:3, 113:14, 113:20, 116:12, 119:5, 120:20, 121:14, 123:20, 126:17, 126:22, 137:14, 140:24, 141:16, 143:3, 144:3, 148:7, 153:12, 154:22, 158:17, 165:13, 166:14, 168:7
meaning - 92:8, 98:19, 113:15, 138:6
Meaning - 98:18
means - 54:15, 90:10, 116:23
meant - 46:19
Med - 62:22
medical - 7:20
medications - 5:4
Medpond - 6:22, 7:17
meet - 10:3, 11:20, 12:20, 108:11
meeting - 10:19, 21:12, 21:13, 50:2, 71:7, 71:9, 125:10, 126:4, 126:13, 139:3, 152:23, 155:13, 155:14, 156:6, 160:1
meetings - 25:8, 52:9, 71:6, 79:20, 98:7, 98:10, 126:5, 140:14
member - 125:18
memo - 165:10
memory - 5:8, 97:16, 153:13, 154:8
mental - 83:13, 91:10, 91:14, 93:12, 95:3, 115:25
mentally - 83:20
mentioned - 38:17, 100:5
mentor - 84:15
mere - 104:9
merger - 18:7, 21:4, 23:21, 43:14
mergers - 16:20, 18:12, 20:4, 23:7, 49:10
Mesa - 5:23
met - 10:4, 10:16, 11:7, 11:21, 12:19, 49:24, 70:18, 140:15, 146:10, 157:19, 164:16
metal - 29:10
Meyer - 8:1

Miami - 42:7
Michael - 125:17
Middle - 1:2
middle - 31:5, 167:13
might - 9:9, 21:12, 26:24, 27:1, 48:5, 50:13, 53:18, 54:4, 83:10, 83:13, 83:23, 83:24, 83:25, 85:14, 95:25, 100:4, 114:24, 117:2, 117:3, 137:6
Mike - 39:22, 42:2
mind - 115:4
mine - 56:1
minute - 48:10, 112:10
minutes - 10:18, 21:16, 42:13, 81:23, 92:15, 93:1, 98:11, 114:13, 146:18, 149:12
Mirabilis - 1:5, 10:5, 10:22, 11:1, 11:12, 11:17, 15:21, 17:4, 17:9, 17:16, 22:4, 22:24, 23:6, 26:17, 30:9, 31:10, 31:12, 32:4, 32:11, 32:17, 32:19, 32:20, 32:24, 33:17, 34:6, 34:23, 35:25, 36:6, 36:11, 37:9, 38:14, 38:22, 38:23, 38:25, 40:9, 41:14, 41:22, 43:22, 43:25, 44:5, 44:12, 47:17, 48:23, 49:6, 50:18, 52:6, 52:14, 53:4, 56:3, 57:4, 57:19, 59:4, 59:5, 59:8, 59:10, 59:14, 59:15, 59:17, 60:7, 60:18, 62:7, 63:8, 64:7, 64:10, 66:13, 67:16, 68:1, 69:7, 70:3, 70:21, 72:4, 72:5, 72:6, 72:11, 72:14, 74:7, 80:24, 81:16, 82:10, 84:23, 90:25, 91:9, 92:15, 93:1, 93:15, 93:20, 97:6, 97:25, 98:4, 99:6, 99:13, 99:19, 99:24, 103:19, 112:23, 112:24, 120:4, 120:19, 120:21, 120:25, 122:5, 122:11, 122:13, 122:19, 122:13, 123:15, 123:20, 123:23, 124:2, 125:20, 127:12, 127:20, 135:5, 136:8, 136:15, 136:18, 136:21, 137:5, 138:15, 139:2, 140:11, 141:4, 141:5, 141:18, 142:1, 150:23, 157:5, 161:15, 161:16, 161:22, 161:25, 162:10, 166:10, 166:11, 166:12, 166:19, 169:15
Mirabilis's - 29:4, 29:6, 29:18, 31:20, 32:13, 35:2, 87:12
missed - 58:15
missing - 22:21
misspoke - 37:4,

56:19
mistaken - 14:17, 39:16, 110:2, 145:16, 145:18
mitigate - 69:13
Moecker - 125:18, 125:19
Mokwa - 1:19, 2:5, 3:3, 4:3, 4:9, 5:20, 42:13, 61:24, 115:10, 115:18, 125:11, 128:2, 128:22, 129:20, 129:22, 130:11, 132:6, 133:2, 135:18, 156:16, 159:1, 159:11, 163:16, 164:24, 166:25, 167:21, 170:7, 171:8
Mokwa's - 120:18, 133:15, 134:2, 134:5, 134:12
moment - 27:17, 123:14
Monday - 160:24
money - 27:12, 27:15, 126:1, 126:9, 126:15, 129:10, 129:12, 129:13, 131:9, 131:11, 160:14, 160:19
monitor - 46:22
month - 21:8, 42:19, 69:24, 73:11, 73:13, 80:11, 88:14, 88:15, 130:17
months - 9:10, 16:25, 17:8, 18:17, 19:6, 25:5, 39:1, 95:14, 102:9, 123:16
morning - 4:9, 149:10, 160:25
most - 9:1, 28:3, 44:10, 47:10, 75:20, 96:3, 96:20, 140:8, 145:9
motivation - 148:13
Motivation - 114:21
move - 21:24, 31:1, 38:2, 60:6, 127:16
moved - 10:20, 17:2, 17:24, 18:1, 20:4, 20:5, 21:22, 21:25, 22:9, 31:4, 35:8, 35:10, 38:19, 39:11, 39:12, 39:15, 43:18, 49:10, 54:24, 70:14, 78:10, 78:14, 135:19, 135:22, 135:24, 163:4
moving - 15:9, 20:20, 27:6, 35:24, 36:1, 38:2, 38:3
multiple - 29:21, 68:24
multitude - 62:4
must - 56:19
Mvi - 65:22, 99:19, 118:14, 118:24, 119:9, 142:22
Myers - 13:21, 13:22
Myers' - 13:23

**N**

name - 4:10, 5:19, 18:22, 24:13, 24:14, 24:15, 28:23, 30:15, 45:4, 45:8, 61:12,

61:15, 61:21, 63:15, 63:16, 63:20, 68:11, 72:8, 72:14, 88:22, 118:12, 119:4, 139:12, 142:10, 142:11, 142:12, 145:15, 145:16, 168:5, 168:11
Name - 18:16
named - 18:5, 24:18, 25:10, 63:6, 67:15, 68:9, 68:14
names - 6:18, 6:19, 74:5, 118:19
naming - 68:4
National - 62:22
nature - 25:19, 154:9, 155:9
near - 168:6
nearly - 22:12, 95:11
neat - 11:25, 48:11
Nebraska - 40:11
necessarily - 7:6, 37:18, 50:17, 51:16, 80:15, 87:2, 92:24, 93:13, 99:25, 101:25
necessary - 139:14, 147:15
need - 4:21, 46:20, 48:6, 55:4, 87:9, 131:2
needed - 25:9, 35:12, 42:3, 42:23, 47:13, 47:18, 49:18, 86:1
needs - 108:23
negative - 22:19
negotiable - 45:20, 45:22, 46:6, 46:9, 46:10
negotiate - 44:17, 44:23, 53:14, 53:21
negotiated - 26:24, 44:19, 44:21, 45:2, 45:5, 45:9, 45:11, 45:13, 53:20, 68:21, 76:3
negotiates - 46:17
negotiating - 26:11, 26:16, 47:8, 47:23, 53:13, 53:16, 69:1, 69:4
negotiation - 45:24
negotiations - 63:12, 63:18, 63:22, 69:10
negotiators - 56:20
network - 29:19, 35:25
Nevada - 139:3
never - 36:12, 37:25, 43:11, 82:6, 87:21, 98:11, 116:25, 139:4, 154:11, 155:22, 157:12
Never - 43:12, 142:18
new - 18:14, 26:18, 34:7, 48:5, 104:10
newly - 163:24
newspaper - 144:23, 144:24, 145:22, 145:24, 146:3, 146:5, 146:7
Nexia - 1:6, 32:25, 33:17, 44:6, 44:12, 56:3, 75:6, 102:20, 119:25, 151:9, 151:17
Nexialist - 150:20,

150:23, 151:1, 151:15
  next - 17:13, 105:7,
111:13, 128:3,
134:16, 150:25,
163:3, 164:4
  nice - 22:12, 79:15
  nigged - 49:13,
49:16
  night - 146:12,
149:6, 167:13
  nine - 123:16
  ninety - 163:1
  Nobody - 86:12,
153:3
  non - 25:25, 46:1,
46:24, 54:24
  non-compete -
25:25, 46:1, 46:24,
54:24
  non-disclosure -
25:25
  None - 77:19, 111:3
  none - 108:15
  normal - 22:13,
71:16
  Normally - 71:15,
104:19
  normally - 36:16,
71:12, 71:14
  North - 1:22
  Notary - 1:23, 170:6,
170:17, 170:18
  notate - 46:25
  note - 101:1
  notes - 38:21,
171:11
  nothing - 4:5,
43:18, 82:9, 109:8,
153:13, 162:1
  notice - 124:21
  notified - 20:6,
106:20
  November - 11:2,
11:15, 13:18, 103:8,
107:22, 108:21,
138:20
  number - 41:5,
89:1, 143:20, 160:5
  Number - 112:14

---

**O**

O'malley - 142:12
O2- 63:4, 63:5,
71:22
  object - 58:17
  objecting - 4:23
  Objection - 59:1,
128:17, 156:1, 169:9
  obligations - 69:9
  obtain - 140:9
  Obviously - 15:8,
18:14, 44:3, 90:15,
132:19, 166:5
  obviously - 10:13,
13:9, 15:5, 25:22,
60:24, 71:11, 81:13,
86:20, 89:4, 92:9,
100:18, 102:1,
115:13, 116:13,
121:1, 121:3, 122:16,
127:14, 129:15,
134:13, 149:1, 155:7
  occasion - 9:8,
21:11, 41:17
  occurred - 36:15,
36:16, 90:10, 143:17,
153:2
  occurrence -
102:20, 114:4, 114:5

---

October- 57:23,
110:3, 112:11,
143:17, 151:20,
160:24
  offer - 50:4, 50:9
  offered - 16:14,
105:3
  office - 15:4, 22:7,
22:10, 22:12, 31:4,
61:12, 61:17, 67:7,
67:10, 92:15, 92:18,
93:1, 109:25, 110:23,
110:24, 114:16,
125:12, 132:23,
133:15, 134:16,
134:19, 137:23,
138:1, 138:4, 153:19,
157:1, 167:13
  Office- 61:24,
125:21
  officer - 24:8
  officers - 124:1,
125:17, 127:19,
137:3, 139:10, 141:14
  offices - 21:24,
21:25, 31:2, 61:14,
66:9, 66:13, 84:23,
87:11, 87:12, 88:16,
90:11, 132:16,
134:20, 134:24,
135:8, 153:15,
153:17, 163:14,
163:15
  official - 8:21, 8:22,
170:10
  often - 26:11, 46:1,
55:17, 137:14
  Often- 53:15
  Ohio- 2:9, 40:12
  old - 137:3
  older - 44:6
  Once- 21:8, 120:17
  once - 21:9, 84:22,
95:12, 116:3
  one - 6:1, 6:2, 6:20,
9:6, 10:22, 15:25,
16:12, 18:24, 19:4,
19:16, 20:11, 24:9,
34:1, 34:11, 34:13,
35:2, 35:14, 38:6,
39:6, 40:13, 44:12,
45:3, 48:7, 50:3, 51:2,
51:12, 54:18, 55:7,
55:20, 59:4, 63:13,
65:3, 65:14, 76:7,
77:18, 84:20, 85:4,
90:21, 103:17, 105:9,
105:10, 106:11,
109:6, 110:14, 111:7,
112:9, 112:11,
112:23, 118:6, 121:6,
121:13, 124:25,
132:25, 133:12,
134:1, 134:4, 134:23,
141:11, 142:19,
145:13, 146:8,
146:22, 151:10,
152:16, 154:18,
164:24, 165:17
  One- 26:8, 79:21
  ones - 27:6, 27:22,
40:9, 40:13, 44:8,
44:13, 62:11, 62:16,
104:21
  ongoing - 102:9
  open - 69:24
  opened - 65:18
  operating - 33:11,
39:18, 131:1, 131:10,
131:12

---

operational - 24:8
  operationally - 42:7
  operations - 33:7,
41:19
  opinion - 33:23,
98:17, 116:9, 116:17,
167:19
  opposed - 9:19,
9:20
  option - 47:17
  options - 44:25,
53:14
  orange - 157:22
  Orange- 1:22,
170:4, 171:4
  orchestrating -
40:18, 40:19
  order - 71:9, 134:2,
134:5, 134:24
  orders - 98:23
  organization - 12:2,
15:5, 25:8, 79:12,
128:22
  organized - 166:19
  original - 33:19,
89:23, 133:8
  Originally - 135:5
  originally - 80:17,
112:1
  originals - 89:22,
90:1, 90:2
  Orlando- 1:3, 1:22,
10:21, 160:24, 161:2
  Osha- 25:16
  otherwise - 9:22,
127:3
  outside - 28:14,
28:20, 32:11, 35:5,
37:24, 112:23,
112:24, 117:1,
118:23, 133:22,
134:22
  outstanding -
131:10
  overall - 40:19
  overlap - 59:19,
86:20
  overlooking -
134:11
  oversaw - 19:19,
28:13, 28:15
  oversee - 28:20
  owed - 27:12
  own - 8:24, 9:11,
16:17, 26:11, 26:16,
26:24, 53:20, 61:12,
73:14, 83:9, 100:19,
115:20, 118:1,
134:20, 163:12,
165:23
  owned - 62:10,
63:5, 86:13, 86:23
  owner - 64:6
  ownership - 136:14
  owns - 87:9

---

**P**

Packaging - 18:24,
19:11, 19:15
  page - 46:5, 105:10,
107:10, 110:5, 111:7,
115:5, 150:25, 160:3,
162:18, 164:4, 166:1
  Page - 3:10, 3:11,
3:12, 3:13, 3:14, 3:15,
3:16, 3:17, 3:18, 3:19,
3:20, 3:21
  pages - 105:12,
107:11, 159:19,

---

159:20, 164:4
  Paid - 16:3
  paid - 33:2, 33:22,
60:2, 88:15, 107:5,
109:12, 130:15,
130:16, 168:21
  Palaxar - 1:9, 1:10,
2:11, 4:11, 100:3,
100:7, 147:20
  paper - 38:14,
56:24, 57:8, 86:25,
109:19, 109:20,
145:20
  papered - 154:25,
155:7
  papers - 91:23
  paperwork - 31:18
  Paragraph - 121:21,
160:5
  paragraph - 104:4,
107:20, 115:8,
120:14, 121:5,
121:18, 124:21,
125:2, 125:8, 130:25,
138:21, 138:23,
139:7, 164:6
  paragraphs -
115:18
  paralegal - 20:19,
54:1
  parking - 147:4
  part - 9:17, 24:5,
34:6, 47:11, 76:4,
76:9, 78:6, 86:7, 89:7,
97:4, 124:23, 134:19,
154:24, 162:10
  part-time - 9:17
  participate -
117:17, 168:25
  participating -
117:4
  particular - 59:18
  particularly -
166:19
  parties - 171:14
  parties' - 171:15
  partner - 168:12,
168:14
  Party - 4:11
  party - 90:8, 90:20,
101:7, 101:10
  pass - 29:23
  passed - 13:15
  past - 16:4, 38:4
  Paul - 68:1
  pay - 50:4, 106:10,
111:22, 111:23,
112:7, 112:16, 163:5,
163:19
  Pay - 17:4, 17:9,
17:25, 18:1, 18:10,
20:5, 20:21, 21:18,
21:21, 21:22, 23:1,
24:10, 24:17, 25:19,
28:4, 29:17, 29:19,
29:22, 30:20, 30:21,
30:25, 31:3, 31:7,
31:20, 31:23, 32:3,
32:12, 32:16, 32:22,
33:2, 33:6, 33:14,
33:18, 33:22, 33:24,
34:8, 35:3, 35:11,
36:8, 36:13, 38:12,
39:1, 39:9, 39:15,
40:11, 43:10, 43:16,
43:20, 43:23, 44:2,
45:15, 45:17, 49:11,
57:17, 57:25, 70:2,
74:8, 103:5, 103:6,
106:12, 107:8,

---

113:10, 113:13
  payables - 131:14,
131:15
  paycheck - 59:9
  paying - 9:20,
69:19, 88:14, 107:6
  payments - 103:5,
108:13, 129:6
  payroll - 31:17,
43:2, 111:2, 165:24
  pelican - 157:25
  pen - 56:25
  pending - 5:2
  Peo - 29:5, 31:12,
31:15, 31:20, 31:23,
31:24, 32:1, 32:10,
32:11, 32:12, 34:9,
34:23, 40:1, 71:20,
165:21, 165:22
  Peo's - 39:7, 40:24,
40:25, 41:5, 42:7,
62:18, 62:19, 62:22,
70:25, 71:5
  people - 15:12,
15:13, 24:19, 24:21,
26:10, 27:13, 27:25,
34:14, 36:5, 37:7,
44:1, 46:15, 51:18,
52:4, 52:22, 52:23,
53:18, 56:7, 65:3,
67:15, 67:22, 68:4,
68:13, 68:15, 68:25,
80:4, 81:20, 83:9,
83:23, 85:2, 85:4,
85:20, 85:22, 87:5,
88:20, 88:22, 88:24,
89:13, 89:16, 98:9,
110:22, 110:25,
113:20, 118:6,
118:10, 118:15,
118:23, 119:5, 141:8,
141:14, 143:2,
145:11, 148:4, 148:7,
154:25, 161:16
  people's - 64:15
  per - 23:9, 83:8,
94:6, 131:6
  perceive - 83:20
  percent - 16:12,
51:12, 133:13
  percentage -
161:22
  perfect - 54:21
  perhaps - 159:20
  Peridyne - 75:16,
75:24, 75:25
  period - 17:7,
58:11, 59:13, 61:13,
65:5, 65:10, 66:20,
72:20, 75:1, 78:21,
112:16, 113:23,
138:6, 140:9
  periods - 137:15
  person - 27:5,
31:16, 32:23, 49:8,
50:6, 120:24, 141:11,
143:6, 148:25, 164:15
  persona - 16:8
  personal - 92:22,
115:20, 115:24
  personally - 131:13,
135:10, 157:9, 170:8
  personnel - 27:1,
109:16, 109:22
  petition - 122:17,
123:16
  phase - 21:4
  Phil - 13:2, 14:19
  Phoenix - 8:1,
10:23, 148:14

---

phone - 79:22,
146:17
photograph -
147:23, 150:16,
151:1, 151:4, 151:10
phrase - 44:11,
113:11, 154:11
physical - 36:10,
85:8, 85:10, 85:21
physically - 21:24,
21:25, 31:1, 38:11,
38:12, 60:11, 60:12,
65:15, 66:8
pick - 24:2
picture - 150:22,
151:15, 161:4
piece - 56:24, 57:8,
82:17
Piper - 163:2
place - 26:2, 26:7,
37:17, 41:1, 69:17,
94:4, 122:14, 122:24,
134:13, 151:10,
163:10
placed - 123:20,
123:21
placing - 122:4
Plaintiffs - 1:7
plan - 39:25, 40:19,
114:11, 114:12,
122:10, 122:24,
123:2, 161:17
planned - 38:7,
122:19, 123:15, 161:9
planning - 145:3
played - 84:21
plea - 102:6, 102:7,
102:8, 103:10,
114:25, 115:2, 115:3,
115:9, 115:12,
115:14, 115:18,
115:25, 116:3,
116:10, 116:15,
116:19, 117:8
Plea - 114:22
plead - 99:15, 99:16
pleadings - 61:5,
101:15
plenty - 104:8
plus - 58:1
Pm - 1:21, 110:14
point - 17:2, 37:25,
39:13, 39:15, 40:7,
41:8, 41:24, 42:14,
42:20, 52:15, 56:9,
57:25, 58:7, 62:21,
63:2, 64:5, 64:11,
64:20, 65:19, 67:9,
68:18, 73:6, 75:22,
78:1, 78:9, 81:15,
81:16, 94:16, 96:20,
99:17, 103:4, 111:15,
121:14, 123:23,
126:14, 131:17,
136:17, 136:20,
137:1, 137:6, 139:18,
144:22, 164:14
pointed - 53:6,
85:13,
pointing - 14:15,
Pollack - 14:9, 84:7
Porter - 20:14,
20:16, 53:23
portion - 14:15,
19:1, 50:2, 50:18,
62:21, 70:13
position - 6:8, 9:18,
9:23, 22:13, 34:4,
115:14, 121:1
possession - 57:3,

89:9, 89:11, 90:20
possible - 100:13,
124:13
possibly - 48:1,
115:24, 127:15,
145:25
post - 127:14,
142:4, 142:7, 142:16
post-seizure -
127:14
posted - 141:25,
157:1
posting - 142:20,
142:23
potential - 123:25,
157:4
pounce - 5:14
power - 30:15,
138:14
practiced - 61:17
pre - 104:7
pre-existing - 104:7
precipitated -
145:19
precise - 156:19
precisely - 8:17,
9:17, 49:24, 80:20,
85:24, 89:15, 94:20,
102:14, 118:16,
167:14
predecessor -
160:9, 160:21
predictions - 93:19
preference - 9:18
preferred - 23:4,
34:12
prepare - 169:18
prepared - 100:22,
116:10, 150:6,
157:22, 159:4, 165:10
preparing - 164:4
prescription - 5:3
presence - 145:10
present - 79:21,
80:7, 125:10, 126:5,
155:6
Present - 2:14
President - 24:10
president - 41:12,
119:25, 120:4,
121:15, 125:20
Presidion - 40:22,
62:23, 62:25, 63:2,
74:10, 75:14, 75:24,
75:25, 76:4, 76:9,
99:14, 142:1
Presnell - 99:4
Presnell's - 98:22
press - 141:18,
142:9
presume - 4:12
Pretty - 21:7
pretty - 39:6, 63:17,
77:11, 80:18, 83:16,
91:15, 99:21, 140:23
Preview - 16:3
previously - 143:8,
163:8
primarily - 8:24,
18:8, 39:9, 56:17,
63:7, 72:3, 77:17,
118:5, 140:22, 141:16
Primarily - 7:2
primary - 140:16,
147:16
prison - 101:20,
101:24
private - 16:20,
48:23, 49:7
privilege - 90:21,

90:24, 91:8, 166:6,
167:11, 169:10
privileged - 51:24,
53:1, 81:13, 82:3,
90:3, 90:5, 90:11,
90:21, 96:10, 158:17,
166:5, 167:10
privy - 42:4, 70:8,
81:2, 103:8
problem - 87:8
problems - 102:3
procedure - 4:13,
4:19, 112:17
proceed - 125:23
proceeding -
121:25, 127:7
proceeds - 109:10
process - 21:15,
35:1, 51:7, 69:1, 69:2,
83:17, 94:11, 96:16,
97:3, 144:8, 145:4,
153:2, 154:3, 161:6,
165:24
processed - 103:7
processing - 43:2
produced - 98:25,
100:12, 104:3, 105:2,
110:4, 166:8, 166:9,
166:11
product - 7:19,
51:25, 96:11
production - 74:4,
97:13, 103:3, 105:24,
106:17, 107:2,
109:11, 110:3, 141:23
professional -
168:11
professionals -
158:6, 158:10, 167:6,
167:17
profile - 113:20
project - 15:25,
16:5, 18:18, 19:8
projects - 6:14,
6:16, 8:19, 9:5, 9:9,
15:23, 16:9, 16:10,
18:22, 19:14, 25:12,
25:15, 34:1, 48:24,
73:14, 77:13, 77:14
promised - 27:14,
51:22, 52:4, 52:23,
54:10
properly - 103:7
property - 15:17
proposed - 121:24,
125:5, 127:7, 167:5
protect - 4:23
provide - 30:15,
40:1, 117:18, 121:8,
127:16
provided - 17:6,
17:8, 92:12, 124:25,
167:3
providing - 95:19,
152:23, 163:13
provision - 131:3
proximity - 135:9
public - 14:12,
56:14, 63:14, 63:19
Public - 1:23, 170:6,
170:17
Publically - 30:13
published - 8:10,
8:14
pull - 89:5
pulled - 100:5,
100:14
punished - 22:18
purchase - 128:10
purchasing - 23:9

pure - 140:23
purpose - 4:20,
101:22
purposely - 161:16
purposes - 103:23,
105:16, 120:9, 123:8,
127:25, 129:18,
150:13, 136:23,
158:24, 159:8, 164:22
pursuant - 121:9
pushed - 6:15
put - 10:25, 16:4,
25:11, 26:7, 26:25,
40:21, 46:25, 48:8,
50:10, 133:7, 155:19,
157:22
putting - 75:23

## Q

quarter - 10:8,
10:15, 57:23, 58:12,
59:21, 60:10, 60:15,
70:11, 80:8, 81:4,
81:7, 84:4, 84:5,
84:12
quarters - 60:6
questions - 4:22,
27:16, 52:21, 91:3,
169:23, 169:24
quite - 25:6, 39:14,
44:19, 44:21, 47:22,
67:21, 70:6, 104:10,
119:11, 138:4,
144:16, 165:14
quote - 113:2,
118:3, 127:9

## R

Rachlin- 99:3
raise - 7:3, 7:8, 53:7
raised - 45:22
raising - 7:4, 7:7
ran - 8:20
random - 99:21
rather - 36:9
re - 49:13, 49:16,
108:1
re-execute - 108:1
re-nigged - 49:13,
49:16
reached - 41:25
read - 54:4, 92:11,
107:20, 108:5,
111:20, 114:23,
121:20, 126:8, 139:7,
147:19, 147:21,
149:13, 149:14,
149:21, 152:5, 164:8
readily - 37:20
reading - 108:18,
139:5
reads - 115:8
ready - 149:10
real - 6:22
realized - 52:19,
52:21
really - 6:8, 11:23,
25:5, 25:13, 28:2,
42:3, 42:5, 49:25,
53:17, 56:15, 63:13,
70:5, 79:7, 79:18,
79:24, 80:21, 81:2,
81:5, 82:14, 87:21,
89:20, 91:3, 91:7,
92:21, 94:9, 94:10,
97:15, 100:6, 106:11,
107:9, 108:8, 111:6,
117:21, 119:1,

136:13, 155:10
reason - 4:25,
106:9, 108:16,
126:20, 127:3,
147:13, 149:6
reasonable - 92:16
reasoning - 115:16,
128:14
receivable - 131:11
receivables -
131:13, 131:15
receive - 9:15,
54:11, 97:22, 106:25,
107:4, 112:15
received - 52:22,
126:1, 162:25
recently - 95:13,
163:15
receptionist -
142:22
recess - 132:3
Recess- 42:10,
76:22, 166:22
recitation - 104:9
recognize - 97:12,
97:13, 104:1, 105:18,
128:2, 159:1, 159:10
recollection -
106:1, 107:3, 108:18,
150:1, 150:4, 155:9,
160:20
recommendations -
166:2, 167:2
reconciling -
119:16
record - 4:20, 4:23,
5:3, 35:22, 125:8,
139:8, 171:10
recordings - 89:3
records - 75:20,
75:25
recruited - 56:12,
56:13
recruiter - 50:16
refer - 91:18, 97:18
reference - 71:4
referenced - 101:3
referred - 16:5,
100:25, 106:4,
109:16, 126:15
referring - 97:22,
100:24, 104:13,
104:16, 127:6, 143:19
refers - 110:17
reflected - 137:10,
167:4
refresh - 107:3
regard - 14:11,
15:9, 64:18, 65:3,
80:20, 86:21, 99:12,
99:13, 102:25,
104:18, 108:12,
108:17, 121:4, 128:7
regarding - 29:1,
82:4, 82:5, 103:4,
107:24, 165:15
Regardless- 41:20
regardless - 134:11
regular - 11:3, 11:6,
112:16
regularly - 84:20
regulated - 30:13,
71:13, 71:20
regulatory - 70:25
related - 99:8
relates - 91:8
relations - 14:12
relationship -
36:13, 41:18, 42:7,
43:1, 74:23, 84:13,

117:1, 165:18
relationships - 96:3
relative - 171:12,
171:14
relatively - 95:13,
132:15
relaying - 50:17
releases - 104:24
relevance - 83:11,
85:14
relevant - 86:17,
89:6
relinquished -
136:10, 136:12
remain - 33:18
remainder - 109:12
remember - 8:8,
8:12, 19:2, 19:14,
23:17, 23:19, 30:5,
42:2, 50:1, 59:14,
63:20, 63:21, 73:12,
76:3, 76:8, 77:14,
77:18, 79:10, 97:14,
106:15, 108:6,
108:15, 109:1,
109:18, 110:25,
112:6, 112:9, 113:4,
114:4, 114:5, 126:4,
126:5, 133:17, 138:3,
144:7, 144:17,
145:21, 145:23,
150:19, 150:22,
150:24, 152:4,
153:15, 154:24,
155:3, 155:13,
156:25, 157:3, 158:2,
158:15, 165:12,
165:13, 166:4, 166:15
removal - 41:20
removed - 41:19,
163:17, 164:1
rent - 69:19
rented - 146:12
replace - 129:1,
129:5, 130:12
replaced - 137:4
replying - 105:5
report - 18:11,
18:25, 19:8, 19:17,
85:22, 96:13, 96:17,
153:4, 171:7
reported - 15:7,
15:13, 18:5, 18:13,
18:16, 18:19, 18:20,
18:21, 19:11, 19:12,
35:17, 73:2, 73:15,
75:24, 77:2, 77:5,
77:22, 77:25, 78:1,
110:9, 145:14
Reporter- 170:16
reporting - 39:21,
72:22, 73:7, 80:6,
153:6
represent - 4:10,
76:16, 81:24, 130:17
representation -
139:19
representations -
48:16,
representative -
129:6
represented -
16:21, 46:15, 48:23,
51:5, 53:3, 55:13,
77:20, 167:11
representing -
120:18, 140:11
requested - 171:9
requests - 46:16
require - 48:3,

161:17
required - 161:10,
161:14
research - 115:21
researching -
101:17
resentful - 22:17
resident - 147:17,
148:10
resign - 125:16
resigned - 67:8,
137:2
resolution - 98:21,
138:13, 138:17
resolutions -
139:15
resolved - 139:9
resourcing - 17:3
respect - 34:25,
53:2, 77:9, 95:18,
117:13, 117:14, 141:7
respects - 116:19
respond - 83:4
responds - 109:9
response - 86:19,
87:2, 109:6, 143:20
responses - 143:12
responsibilities -
18:9, 86:24, 121:7,
121:14
responsibility -
27:10, 80:19, 165:22
responsible -
81:22, 96:22
resume - 11:13,
51:2
retainer - 129:12,
129:13, 129:21,
130:3, 130:12, 131:4,
163:5, 163:19
reveals - 162:24
review - 37:23,
54:12, 85:15, 86:1,
86:6, 102:6, 102:8,
102:12, 103:9,
103:14, 103:16,
117:7, 117:10, 171:8
reviewed - 74:1,
85:12, 86:5, 87:23,
87:25, 98:24, 102:7,
105:23, 110:16,
113:6, 116:3, 143:11,
143:14, 143:15,
154:25, 166:25
reviewing - 85:2,
88:1, 95:17, 96:23,
106:17, 107:1, 110:3,
155:7, 155:12, 166:17
Richard- 12:16,
19:3, 37:23, 47:9,
105:11, 107:13,
107:21, 107:23,
109:10, 109:14,
109:24, 111:5,
111:10, 119:14
Richmond- 103:2,
106:22, 110:23,
110:24
ring - 155:10
Rkt- 126:2
Road- 2:9
role - 20:19, 41:13,
41:22, 54:2, 82:13,
109:2
roll - 40:5, 40:16
roll-up - 40:5, 40:16
rolled - 40:14, 41:6,
71:3
Ron- 142:13
room - 134:15,

134:18, 136:2, 136:3,
136:4, 136:5, 154:15,
154:17, 157:1
Roscher- 1:23,
170:6, 171:6, 171:21
rough - 132:20
round - 13:20
ruled - 99:4
rules - 61:3, 168:10
running - 25:7
Russell- 2:9
Rw- 125:19

S

Sacks - 142:13
Sadrianna- 13:9,
14:8, 18:13, 19:9,
19:10, 19:11, 19:13,
19:19, 47:24, 48:2,
76:10, 97:20
safety - 25:11,
25:15, 25:16
sake - 5:3
salary - 168:21
sale - 62:2, 62:7,
62:13, 62:24, 65:4,
65:8, 71:22, 162:9
sales - 64:19
salesman - 135:3
Samuel - 141:20,
143:5
Sanford - 39:17,
60:12, 60:15, 78:14
sat - 21:12, 89:8,
149:21
satellite - 22:10,
22:12
Saturday - 160:23,
160:25
save - 122:1, 122:5,
127:9, 164:8
saw - 79:22, 101:4,
101:5, 103:3, 111:14,
146:8, 147:3, 152:1,
152:2, 161:2
Saxton- 99:4
scale - 134:11
scanning - 155:15
scheme - 163:9
school - 5:22, 6:6,
6:10, 7:22, 8:7, 8:9,
8:11, 11:9, 20:17,
95:8
School - 5:23, 6:3
scope - 35:6, 81:23
Scott- 5:20, 13:2,
14:18, 14:25, 18:20,
19:2, 47:21, 47:22,
72:20, 100:22, 163:7
se - 23:9, 94:6,
131:6
seal - 170:10
season - 11:3, 11:6
second - 8:3, 8:4,
8:5, 8:13, 60:15, 62:1,
80:8, 84:4, 84:12,
92:5, 92:7, 104:4,
107:16, 115:8,
130:24, 130:25,
164:5, 164:11
seconds - 124:18
secretarial - 20:19,
54:1
secretary - 78:4
secured - 19:16
secured - 64:6
See - 48:1
see - 12:11, 50:16,
71:12, 71:21, 92:2,

92:5, 104:10, 110:4,
111:9, 112:2, 124:10,
124:11, 137:24,
138:1, 144:25,
145:19, 145:23,
146:6, 147:8, 151:3,
156:10, 160:11,
163:21
seeing - 41:16
seem - 76:6, 86:10
selzable - 126:16
selze - 125:25
seized - 126:9,
126:12, 160:9
seizer - 136:1,
159:12, 164:13
seizure - 122:14,
122:22, 126:8,
126:10, 126:14,
127:14, 159:21,
160:1, 160:16, 162:12
self - 154:1
self-congratulatory
- 154:1
self - 63:13, 66:1,
69:22, 71:19, 75:18
selling - 43:2, 97:5
send - 147:22
senior - 19:21,
19:22, 44:10, 56:15
sense - 100:1
sensible - 128:14
sent - 53:22, 151:5
sentence - 99:5,
130:24, 162:21, 164:5
sentencing - 92:12,
92:13
Senterfitt - 163:19
Sentinel - 160:24,
161:2
separate - 45:16,
133:23, 134:7
separated - 52:5
separately - 76:1
separation -
102:20, 104:20,
110:13, 109:4, 110:2,
110:18, 150:2, 152:3
separations -
110:19
September- 168:20
series - 105:8,
105:18
serve - 49:18,
145:3, 145:15,
147:14, 147:24,
148:8, 148:22,
148:23, 149:19, 161:5
served - 126:8,
126:10, 144:9, 149:8,
149:9, 149:24, 162:16
server - 144:8
service - 71:17,
147:6, 153:1, 154:2,
159:25
services - 17:6,
17:8, 40:2, 163:13
serving - 20:18
set - 9:19, 11:11,
23:11, 29:18, 161:16
set-up - 29:18
settlement - 107:23,
126:2, 140:23
settling - 119:12
seven - 67:15,
67:20, 80:10, 105:12
several - 9:9, 12:5,
16:9, 17:15, 19:5,
27:24, 29:3, 63:11,
72:16, 88:24, 124:24,

137:25, 159:20,
163:20
severance - 106:10,
106:21, 106:25,
107:5, 108:13,
109:15, 112:15
shaken - 144:22
shall - 139:13
Shane- 10:24, 24:7,
25:6, 36:7, 35:19,
50:23, 56:10, 56:13,
56:16, 65:21, 72:21,
73:15, 77:1, 77:5,
77:7, 77:22, 77:25,
78:1, 89:19, 94:24,
95:3, 104:17, 105:2,
110:5, 111:4, 112:10,
113:4, 118:5, 119:8,
119:20, 119:23,
136:23, 138:9, 165:4
shareholder - 52:9,
98:11, 98:15, 136:8
shareholders -
98:4, 98:7
shares - 161:22
Sharp - 8:25
Sheryl - 105:11
shifted - 96:24,
96:25, 99:19
shifting - 99:25
shook - 144:13
shots - 73:8
show - 47:3, 51:25,
114:3, 161:7
showing - 150:23
shrink - 67:17, 69:3
Shuker - 123:12,
125:11, 125:12
Shuker's - 125:12
shut - 28:5, 30:22,
39:10, 58:6
shutting - 64:12,
69:3, 103:19, 120:23,
168:4, 168:9
side - 26:17, 39:8
sides - 98:19
sign - 61:4
signed - 26:13,
26:25, 45:14, 55:23,
126:23
significance - 81:5
significant - 19:13,
46:23, 86:20
signing - 24:19,
24:21, 24:24
signs - 46:14
similar - 29:18,
31:23, 65:25, 138:10,
156:19, 165:21
Similar- 8:19
similarity - 7:14
Simo- 136:25
simple - 149:11
simply - 146:18
single - 47:1, 49:8,
53:4, 55:5, 71:7
sit - 65:2, 94:12,
114:3, 114:15, 114:18
sitting - 92:18,
93:25, 96:23, 154:25,
155:4, 161:3
situation - 9:20,
44:4, 55:3, 70:1,
71:11
six - 20:1, 67:15,
105:12
sixty - 135:22
sketch - 132:20
skill - 23:11
skim - 104:3

skimmed - 74:3, 99:2, 111:21
slash - 7:18, 20:19, 54:1
Slaughter - 117:7, 117:9, 117:12, 117:18, 117:23, 117:25, 118:4, 118:6, 118:11, 118:25
slightly - 23:14, 35:5
small - 77:21, 101:17
smaller - 40:6, 40:8
smart - 79:8
Smith - 159:13, 159:24, 162:15, 162:17, 164:14, 164:17
snippets - 88:25, 89:6, 69:13, 89:22
social - 144:15
socialize - 8:19
software - 7:19, 144:17
sold - 63:3, 63:4, 63:11
sole - 106:9, 106:15
solicited - 32:11
Solutions - 19:16
someone - 12:18, 21:12, 27:14, 32:19, 34:4, 34:18, 35:13, 45:22, 46:24, 55:2, 80:17, 85:8, 85:13, 88:14, 92:10, 100:4, 113:8, 134:9, 146:6, 151:9, 153:24, 155:14, 161:15
sometime - 33:9, 33:15, 39:2, 60:14, 85:1, 93:11, 122:14, 168:6
Sometime - 20:6, 122:22, 163:10
Sometimes - 34:9, 34:17
sometimes - 27:12, 34:10, 46:17, 46:19, 99:25, 131:9, 138:10, 138:11
somewhat - 18:15, 25:3, 37:14, 38:2, 38:3, 84:15, 103:8, 107:2, 113:15, 156:18, 165:13
somewhere - 10:8, 57:24, 85:11, 88:12, 122:17, 151:16
Soone - 65:18, 134:5, 135:4, 135:6, 135:21
sooner - 135:22
sorry - 26:4, 63:21, 70:5
sort - 7:18, 20:18, 29:10, 36:12, 36:20, 49:13, 56:2, 58:11, 153:25
sorts - 112:24
sought - 86:15
sounds - 150:18
source - 137:7
Source - 40:11
space - 69:5, 69:7
speaking - 23:18, 23:19, 46:13, 127:11, 147:18, 153:9
speaks - 100:19, 115:2

special - 159:16
specialized - 113:8
specific - 39:6, 46:16, 62:6, 65:14, 91:3, 103:18, 104:21, 129:2, 155:2
specifically - 23:17, 39:23, 45:3, 74:21, 77:14, 82:7, 117:20, 118:1, 119:17, 137:13, 143:20, 150:17
speculating - 127:10
Speculation - 128:17
spend - 21:14
spent - 10:18, 50:2, 85:2
sponsored - 16:3
staff - 77:11
Staff - 62:22
staffed - 85:21
stand - 30:7, 165:20
standard - 27:7, 27:19, 54:22
standing - 60:9
stands - 87:9
Stanley - 39:22, 42:2, 42:23
Stanley's - 41:10
start - 6:17, 7:5, 7:10, 79:16
start-up - 6:17
start-ups - 7:5, 7:10
started - 16:24, 17:22, 25:6, 38:17, 43:13, 57:11, 88:10, 163:10
starters - 123:18
starting - 139:18
starts - 105:20, 105:21, 105:22, 162:21
State - 1:23, 10:24, 170:3, 170:6, 170:17, 171:3
state - 71:2, 91:14, 115:25
statement - 34:25, 90:13, 93:4, 101:11, 115:13, 115:17, 116:23, 139:22
statements - 119:16
States - 1:1, 121:9, 121:15, 125:21, 125:24, 126:23, 161:11, 161:15, 163:10
states - 40:1, 107:24, 139:6
status - 136:8
stay - 21:20
stayed - 31:3, 43:19, 95:10, 149:5
staying - 149:3
stenographic - 171:10
stenographically - 171:7
Steve - 67:22, 68:8
sticking - 153:13
still - 39:14, 39:19, 57:2, 58:9, 60:9, 61:7, 62:20, 63:24, 65:22, 67:21, 68:2, 76:5, 80:7, 87:7, 107:5, 135:18, 137:1, 168:8
stock - 44:25, 45:6, 45:9, 51:7, 51:9,

51:13, 51:15, 51:19, 52:1, 52:4, 52:6, 52:8, 52:16, 53:2, 53:7, 53:14, 53:16, 53:19, 54:7, 54:8, 54:9, 54:10, 54:11, 97:21, 136:15
Stollenwerk - 65:22, 119:9, 124:22, 127:6, 155:5
Stollenwerk's - 67:10, 126:21, 127:11
stop - 59:3, 59:22
stopped - 60:2, 140:11
straight - 57:14
strategizer - 140:25
Strategy - 1:6, 102:21
Street - 125:15
structure - 15:6, 15:11, 33:12
stuff - 15:19, 16:20, 16:8, 24:16, 25:24, 26:14, 42:22, 57:5, 58:19, 64:24, 65:25, 70:6, 77:17, 85:23, 92:21, 96:20, 101:18, 118:24, 119:15, 136:1, 137:13, 137:14, 140:16, 140:24
subject - 34:15, 160:16
sublease - 69:11
Subleases - 68:22
submitted - 11:13
subpoena - 83:6
subpoenas - 82:19, 83:4, 121:10
subsequently - 98:12
subsidiaries - 11:18, 59:15, 59:17, 99:8, 123:19, 123:21
subsidiary - 23:23, 30:6, 30:9, 31:10, 33:17, 40:6, 40:8, 50:13
substantially - 152:5, 167:17
Substantially - 168:19
substantive - 6:7, 74:4
substantively - 108:19
sue - 158:5
sufficient - 4:24, 104:10
suggest - 30:16, 116:8
suggested - 122:4
suggesting - 34:14, 86:6
suggestions - 116:6, 116:7
suit - 149:18, 149:20, 158:10
Suite - 2:4
suite - 80:10, 133:15, 133:22, 133:23, 134:1, 134:2, 134:5, 134:6, 134:19, 134:23, 137:10
Suite - 132:22, 133:21, 134:8
sum - 112:14
summary - 159:3
summation - 85:16

summer - 8:7, 8:8
sums - 27:14
Sun - 60:16, 65:17, 66:11, 66:12, 66:14, 70:15, 70:17, 78:6, 78:8, 78:24, 87:18, 94:1
Sunday - 149:6
Sunshine - 75:11
superceded - 36:8, 37:11
superior - 35:17
supervised - 61:1
supervising - 63:25
supervision - 7:10, 61:9
supervisor - 104:18
supplanted - 130:10
suppose - 15:2, 15:12, 47:18, 49:19
supposed - 40:5, 40:7, 51:14, 110:13
surprise - 154:6, 154:7
surprised - 153:24
Surprisingly - 86:10
sword - 24:4
sworn - 4:4, 170:8
symptoms - 93:12
Synergy - 29:7
system - 27:4, 37:17, 151:17

T

table - 13:20, 134:19, 154:18, 155:1, 155:4
Tampa - 163:2
tandem - 104:22
tape - 90:20
taped - 88:7, 88:16
tapes - 87:23, 88:3, 88:19, 88:21, 88:23, 90:7
Tapes - 89:24
target - 81:8, 82:7
task - 39:6, 103:18, 148:5, 148:7
tax - 67:25
team - 23:25, 24:5, 24:25, 25:1, 25:8, 47:17
technically - 9:14
Technologies - 6:21, 74:13
telethon - 158:3
template - 26:10, 26:18, 27:7
ten - 10:18, 46:5, 69:2
ten-page - 46:5
tended - 28:4
Tenshi - 74:15, 74:17, 74:21
Terence - 1:13
term - 46:10, 54:13, 69:2
terminate - 111:23
terminated - 102:23, 142:23
termination - 44:21, 56:8, 102:17
terminations - 44:17, 56:21
terms - 45:12, 45:20, 48:1, 53:13, 106:13, 108:11
testified - 4:5, 63:4,

64:3, 64:5, 116:4, 149:12, 152:4, 153:21, 163:25, 166:15
testifies - 121:6
testifying - 151:19
testimony - 92:12
Texas- 2:4, 6:3, 61:15, 84:24
text - 142:6
themselves - 46:16, 52:23
theoretically - 45:22
theory - 91:4
therefore - 151:16
therein - 167:4
Thereupon- 4:2
Thermocode- 6:20
they've - 90:7, 91:2
thinking - 94:2
third - 8:3, 8:6, 8:13, 42:22, 90:8, 90:19, 160:3
Third- 128:9, 131:20, 163:3, 163:5, 163:18
third-hand - 42:22
thirty - 92:15, 93:1, 160:12, 163:4
Thirty- 21:16
thirty-five - 160:12, 163:4
thorough - 104:8
thousand - 89:3, 90:6, 130:16, 160:12, 163:1, 163:4, 163:18
three - 16:25, 17:8, 18:17, 19:6, 25:5, 38:25, 85:7, 101:2, 123:21, 134:7, 137:4, 137:5, 146:18, 148:4, 148:6
thrown - 89:2
tied - 162:3
ties - 150:23
timeline - 57:14, 58:19, 78:5
timing - 70:10
Titanium - 74:12
title - 12:13, 12:21, 12:24, 13:6, 14:6, 24:9, 41:10, 60:22, 60:23, 78:3, 115:6, 161:3
titles - 14:23
today - 5:8, 52:13, 94:13, 152:3, 152:10, 152:11, 153:21
together - 8:20, 16:4, 40:21, 50:10, 65:2, 82:18, 95:8, 102:12, 116:16
Tom- 12:11, 18:19, 19:1, 63:7
took - 6:7, 8:8, 8:18, 64:7, 115:13, 131:17
ten - 14:6, 16:11, 28:2, 45:1, 55:19, 97:18, 113:22, 169:16
topic - 10:13, 94:25, 95:2
total - 41:5, 89:3
totally - 37:4, 169:10
touch - 10:25, 48:8, 95:10
Towards- 39:5, 138:6
towards - 39:16,

47:9, 70:4, 70:5,
138:5, 152:8, 152:13
town - 147:18,
148:11
  traditional - 9:23
  Trailer- 16:6
  trained - 76:14
  transaction -
108:24, 109:2, 109:9,
162:24
  transactions -
69:25, 86:12, 162:22,
163:21
  transcript - 171:9
  transferred - 35:3,
35:23, 131:9
  transitioned -
131:18
  translate - 52:2
  treated - 110:20
  treatment - 77:19
  trials - 168:19,
168:25
  tried - 27:4, 30:1,
46:22, 46:25, 47:2,
47:16, 55:8, 69:25
  trigger - 150:1,
150:4
  true - 34:19, 98:18,
101:8, 113:9, 115:11,
116:11, 120:19,
127:1, 127:2, 130:15,
130:18, 146:24,
147:2, 147:3, 151:20,
151:22, 171:10
  True- 6:21
  Trust- 60:17, 65:17,
66:11, 66:12, 66:14,
70:15, 70:17, 78:6,
78:8, 78:24, 87:18,
94:1
  trust - 126:11,
129:13, 131:2, 160:8
  Trustee- 125:21
  trustee - 125:23
  truth - 4:4, 4:5
  try - 5:11, 5:13,
18:23, 37:1, 89:4,
94:12
  trying - 11:1, 25:23,
36:20, 51:11, 52:2,
54:24, 55:11, 61:22,
62:11, 69:11, 69:22,
80:18, 81:20, 82:17,
83:9, 86:16, 86:23,
86:24, 91:18, 106:10,
108:12, 134:21
  Tucson- 6:1, 6:2
  Tuesday- 147:10
  turn - 105:9, 107:10,
108:20, 111:7, 115:5,
162:18, 164:4, 166:1
  turned - 88:3, 91:2
  twenty - 89:2, 90:6
  twice - 84:22,
137:16
  Twice- 21:8
  Two- 145:9
  two- 20:18, 27:16,
34:11, 34:15, 50:10,
55:20, 56:17, 69:24,
84:20, 85:7, 98:19,
107:11, 115:9,
115:18, 118:6,
122:18, 123:21,
126:2, 126:5, 140:16,
146:17, 146:18,
149:1, 150:4, 152:15,
162:25, 164:4, 168:19
  type - 9:19, 16:20,

23:11, 25:24, 26:14,
40:5, 46:3, 48:21,
50:5, 51:3, 55:17,
55:18, 69:21, 136:9
  typical - 51:9
  typically - 46:13

U

  ultimate - 131:3
  ultimately - 41:5,
63:11
  umbrella - 32:4,
34:6, 36:7, 43:22
  unacceptable - 27:2
  uncertain - 151:22
  under - 7:10, 34:6,
36:6, 61:3, 61:9,
61:15, 75:23, 75:24,
144:23
  underneath - 71:3
  understatement -
152:18
  understood - 15:2,
15:16, 15:18, 36:2,
36:21, 37:5, 50:11,
50:14, 51:12, 69:6,
80:2, 109:11, 117:3,
149:20
  unearned - 129:15,
131:11
  unilaterally - 47:13
  United - 1:1, 121:9,
121:15, 125:21,
125:24, 126:23,
147:17, 148:10,
161:11, 161:15,
163:10
  University - 5:25,
6:3
  unravel - 80:8
  unsigned - 123:11,
130:5
  up - 6:17, 9:19,
11:5, 11:12, 24:19,
24:21, 24:24, 27:16,
29:18, 29:25, 31:1,
40:5, 40:14, 40:16,
41:6, 46:25, 47:2,
52:10, 55:12, 57:21,
58:9, 63:17, 66:1,
83:20, 83:22, 91:20,
100:5, 100:14,
106:11, 106:19,
118:7, 144:23
  Up- 76:19
  ups - 7:5, 7:10,
94:13
  Usc- 10:23
  utility - 30:11

V

  vacated - 68:20
  vague - 97:16,
106:1
  Vague- 59:1
  vagueness - 58:17
  validity - 52:11
  value - 52:11,
52:17, 127:13
  varied - 73:16
  varies - 167:24
  varieties - 27:8
  various - 7:3, 9:5,
9:8, 40:16, 43:24,
51:15, 59:15, 68:17,
87:8, 104:23
  vary - 137:22
  vented - 20:23

  venture - 23:10
  Ventures - 1:5, 6:23,
8:25, 9:7, 139:2,
140:12, 141:4, 141:5,
141:18
  version - 107:25
  versus - 140:20
  videos - 89:10,
89:17
  videotaped - 87:12,
87:13, 153:16, 153:20
  view - 37:6, 111:19
  viewed - 49:16,
80:5, 103:17
  viewing - 87:7
  virtually - 45:10
  visa - 162:2
  visit - 101:22
  visited - 101:19,
101:23
  voice - 79:21, 79:25
  Vs - 1:8

W

  W2 - 9:15
  Wachovia - 21:25,
22:9, 22:11, 68:24,
78:11, 87:17, 92:18,
93:25, 98:6
  wacky - 93:7, 93:17,
94:3
  waived - 90:24,
166:7
  walked - 37:20,
144:8, 147:6
  walking - 147:4
  Walsh- 68:3, 68:5,
68:14, 80:6, 83:8,
96:14
  Walters - 12:23,
14:21, 14:22, 18:21,
19:18, 19:20, 19:25
  wants - 105:6
  war - 6:23, 134:15,
134:18, 136:2, 136:3,
136:5, 154:15, 157:1
  warehouse - 85:2,
85:21, 86:4, 88:6,
118:16, 118:22,
153:19, 153:22,
153:23, 154:2, 155:1,
155:3, 155:11,
155:19, 157:23,
166:12
  warrant - 122:22,
126:10, 159:12,
159:21, 160:1,
162:12, 164:14
  warrants - 122:14,
126:8, 126:14
  watch - 89:4
  watched - 89:6,
89:9
  watching - 89:17
  water - 77:19
  ways - 54:18
  web - 99:7
  website - 100:6,
100:14
  week - 21:8, 21:9,
73:4, 78:18, 97:11,
138:11, 138:18,
150:8, 167:20, 168:17
  weekly - 137:16,
137:17, 137:22
  weeks - 145:9
  West- 68:9, 68:14
  whatsoever -
169:11

  whereas - 165:23
  whichever - 74:8
  whole - 4:5, 23:25,
83:17, 93:15
  Williams - 10:24,
11:8, 11:9, 11:11,
56:13, 65:21, 67:12,
94:25, 95:3, 95:6,
119:8, 119:23,
125:11, 125:16, 155:5
  wire - 163:9
  wish - 92:19
  witness - 1:20,
141:24, 142:2,
142:20, 145:13,
145:14, 154:5
  Witness- 107:12,
107:17, 108:22,
111:8, 115:7, 120:16,
121:19, 125:3, 160:4,
160:6, 162:14,
164:10, 166:3, 170:10
  woman - 24:12,
24:14, 68:8
  wondering - 26:6
  Woody - 14:8
  word - 32:14, 71:15,
79:10, 113:19
  worded - 116:21
  words - 69:10,
92:25
  world - 27:14,
54:22, 70:3, 92:16
  worried - 54:6
  worth - 52:12,
52:13, 90:6
  wow - 93:15
  wrap - 66:1, 106:10
  wrapping - 31:1
  wrestling - 15:25,
16:3, 16:7
  writing - 27:15,
58:19
  written - 45:16,
139:1
  wrote - 106:19

Y

  Yaniv - 41:13,
41:16, 42:3, 42:6,
42:14, 42:24, 43:4,
64:19, 64:25, 143:12,
144:10, 144:11,
144:14
  year - 8:3, 20:18,
28:6, 58:3, 79:1,
135:15
  years - 9:2, 20:1
  younger - 18:15
  yourself - 35:10,
44:15, 93:5, 95:23,
113:25, 142:3, 164:8

Z

  zero - 108:18
  Zollers - 146:2,
146:4, 147:23, 151:5