EXHIBIT 3

1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION


CASE NO.  6:07-CV-1788-ORL-28-GJK


MIRABILIS VENTURES, INC., and
NEXIA STRATEGY CORPORATION,

          Plaintiffs,

  v.

PALAXAR GROUP, LLC,
PALAXAR HOLDINGS, LLC,
FRANK HAILSTONES; EDITH CURRY
a/k/a EDITH BROADHEAD; and
TERENCE CHU,

          Defendants,
vs.

MIRABILIS VENTURES, INC., et al.,

          Counterclaim and
          Third Party Defendants.





- - - - - - - - - - - - - - - - - - x

                  866  South Dixie Highway
                  Coral Gables, Florida
                  October 5, 2010
                  9:30 a.m. - 4:50 p.m.


## DEPOSITION OF YANIV AMAR


     Taken Before JAN L. BRONIS, a Notary Public
for the State of Florida at Large, pursuant to
Notice of Taking Deposition filed in the above
cause.

2

<u>APPEARANCES</u>

The Havener Law Firm, LLC
15511 Russell Road
Chagrin Falls, Ohio 44022
BY:  KATHLEEN B. HAVENER, ESQ.
On behalf of the Counterclaim Plaintiffs
Tele: (440) 893-01888


Broad & Cassel
390 North Orange Street, Suite 1400
Orlando, Florida 32801
BY:  NICOLETTE VILMOS, ESQ. (By Telephone)
On behalf of Mirabilis and Nexia
Tele: (407)839-4200



<u>ALSO PRESENT</u>

EDITH CURRY

AARON BATES (By Telephone)
_____

3

<u>INDEX</u>

<u>YANIV AMAR</u>                                              5

DIRECT EXAMINATION BY MS. HAVENER                 6


<u>EXHIBITS</u>


Plaintiff's Exhibit 450 for                       130
Identification
Plaintiff's Exhibit 451 for                       131
Identification
Plaintiff's Exhibit 452 for                       142
Identification
Plaintiff's Exhibit 453 for                       157
Identification
Plaintiff's Exhibit 454 for                       160
Identification
Plaintiff's Exhibit 455 for                       165
Identification
Plaintiff's Exhibit 456 for                       172
Identification
Plaintiff's Exhibit 457 for                       177
Identification
Plaintiff's Exhibit 458 for                       188
Identification
Plaintiff's Exhibit 459 for                       194
Identification
Plaintiff's Exhibit 460 for                       200
Identification
Plaintiff's Exhibit 461 for                       207
Identification
Plaintiff's Exhibit 462 for                       220
Identification
Plaintiff's Exhibit 463 for                       224
Identification
Plaintiff's Exhibit 464 for                       225
Identification
Plaintiff's Exhibit 465 for                       236
Identification
Plaintiff's Exhibit 466 for                       240
Identification
Plaintiff's Exhibit 467 for                       244
Identification
Plaintiff's Exhibit 468 for                       255
Identification

4

<u>EXHIBITS (CONTINUED)</u>

Plaintiff's Exhibit 469 for                        261
Identification
Plaintiff's Exhibit 470 for                        264
Identification
Plaintiff's Exhibit 471 for                        268
Identification
Plaintiff's Exhibit 472 for                        293
Identification
Plaintiff's Exhibit 473 for                        296
Identification
Plaintiff's Exhibit 474 for                        299
Identification
Plaintiff's Exhibit 475 for                        303
Identification

1    Thereupon--

2                      YANIV AMAR

3    was called as a witness by the Third Party

4    Plaintiffs, and, having been first duly sworn,

5    testified as follows:

6            MS. HAVENER:  Can we enter appearances,

7        please?  My name is Kathleen Havener for the

8        Counterclaim Plaintiffs, Edith Curry, Frank

9        Hailstones, Palaxar, P-a-l-a-x-a-r, Group,

10       LLC, and Palaxar Holdings, LLC.

11           And, Nicolette, do you want to go next?

12           MS. VILMOS:  Yes.  This is Nicolette

13       Vilmos on behalf of Mirabilis.

14           MS. HAVENER:  And do you want to say your

15       law firm and stuff?

16           MS. VILMOS:  My law firm is Broad & Cassel

17       and I'm out of the Orlando office; 390 North

18       Orange Avenue, Suite 1400, Orlando, Florida

19       32801.

20           MS. HAVENER:  Are you also appearing for

21       Nexia?

22           MS. VILMOS:  I guess I am appearing for

23       Nexia.  Thank you.  Mirabilis and Nexia.

24           MS. HAVENER:  Okay.

25

6

1              DIRECT EXAMINATION

2    BY MS. HAVENER:

3         Q.    And you?

4         A.    Yaniv Amar, representing myself.

5         Q.    And would you give her your address,

6    please?

7         A.    3475 Northeast 191st Street, Number 10,

8    Aventura, Florida 33180.

9         Q.    Mr. Amar, have you ever had your

10   deposition taken before?

11        A.    No.

12        Q.    For the record, and for the benefit of

13   ourselves and the court reporter, I want to just

14   tell you what the ground rules are.  Have you ever

15   attended a deposition before?

16        A.    No.

17        Q.    I'm going to be asking you questions for

18   the record.  It's exactly as if you have sworn an

19   oath before a jury in front of a court of law.  I

20   presume you take the oath very seriously.  I know

21   that you're an observant -- a religious person.

22   They are for the record, they can be read to the

23   jury or to the judge, they can be used for purposes

24   of impeaching you at trial, they can be used for

25   many purposes.  But it's exactly as if you're

1    appearing in a courtroom.

2        The most important thing from my perspective

3    is that you make sure that you understand the

4    question I'm asking you.  So if you don't

5    understand, please let me know.  Because I don't

6    want you to answer a question that you think I'm

7    asking but I'm not asking.

8        A.   Okay.

9        Q.   So I'd like to have your agreement that if

10   you don't know exactly what I'm asking you, please

11   let me know so that I can clarify the question for

12   you.

13       The second thing is, because we're both being

14   recorded and the court reporter is taking down what

15   we're saying, I want us to be as courteous as we

16   can to each other and to please be careful not to

17   speak over each other.  I have a very bad habit, I

18   acknowledge, of interrupting if I think you're

19   answering a question that I didn't mean to ask.

20   And so please remind me to let you finish your

21   answer, and then, if I'm correct, I'll say, "That's

22   not the question I was asking; here's what I'm

23   asking."

24       A.   Fine.

25       Q.   But she can't take down what we're saying

8

1    if we're talking at the same time.  So it's just to

2    make it much easier for her.

3         A.   Okay.

4         Q.   The other things are just, you know,

5    customary.  I have no intention of being too

6    personal or inquiring into things that are not my

7    business, but just to make sure that it's

8    appropriate for us to continue, I want to make sure

9    that you haven't taken any kind of drug in the last

10   24 hours that would impair your memory or would

11   make you unable to answer questions.

12        A.   I have not.

13        Q.   And you haven't indulged in alcohol this

14   morning or anything else that would make it hard

15   for you to answer questions?

16        A.   No.  No, I have not.

17        Q.   Okay.  And if for any reason you don't

18   understand what I'm saying, please make sure that

19   you let me know.  You can take a break whenever you

20   want to.  Just let me know that you need to take a

21   break.  Other than when it's not appropriate to

22   take a break is when there's a question pending.

23   And the only reason that that would be okay is if

24   there's some reason why you think you might need to

25   go speak to your counsel.  But given that you're

1    not represented and I have no intention of going

2    into anything that might --

3         A.   Outside the scope of this Palaxar suit.

4         Q.   Right.

5         A.   Fine.

6         Q.   Exactly.  Well, it's not limited to the

7    events that happened in Scottsdale, because you're

8    also a fact witness to the other things that

9    happened at Mirabilis and Palaxar, if you

10   understand what I mean.  That you were there and,

11   therefore, you have information about what happened

12   that have to do with other parts of the lawsuit.

13        A.   Fine.

14        Q.   Okay.  Mr. Amar, where were you born?

15        A.   Israel.

16        Q.   When did you come to this country to live?

17        A.   I came to this country to live in 1998,

18   but I grew up in Canada.

19        Q.   Where did you grow up?

20        A.   Montreal.

21        Q.   Are you married?

22        A.   Yes.

23        Q.   And what is your wife's name, please?

24        A.   Natalie.

25        Q.   Do you have children?

1    A.   Yes.

2    Q.   How many?

3    A.   Two.

4    Q.   How old are they?

5    A.   Three and one.

6    Q.   Could you please tell me when you first

7  met Frank Amodeo?

8    A.   Roughly, 2000.  Maybe early 2000.  Late

9  '99, early 2000.  I don't recall exactly.  It's

10  been over ten years.

11    Q.   Under what circumstances did you meet him?

12    A.   We were introduced by a mutual

13  acquaintance.

14    Q.   And who was that person, please?

15    A.   Wayne -- I forgot his last name, but Wayne

16  something or other.

17    Q.   And do you know why Wayne introduced you

18  to Mr. Amodeo?

19    A.   Wayne introduced me to Mr. Amodeo because

20  he was working for a Kenneth Mueller, CPA, in

21  Orlando.  I was living in Orlando at the time.  And

22  Wayne was doing some bookkeeping work for a friend

23  of mine's company, he and I had met, and he wanted

24  to introduce me to Frank Amodeo, thought that, you

25  know, it might make friends.  And that was it,

1    really.  I was actually curious to meet him because

2    he spoke so highly of Frank.  So --

3        Q.   Could you tell me -- I'd like to know

4    about your background, starting with high school.

5        A.   What about it?

6        Q.   Where did you go to high school?

7        A.   I went to high school in Montreal.

8        Q.   And did you do any post secondary

9    education?

10       A.   Yes.  I went to school in New York City;

11   Yeshiva University.

12       Q.   And have you done anything post grad?

13       A.   No.  I actually -- I left my junior year

14   for a semester and it's been 17 years.  So I only

15   completed the first two years.

16       Q.   When did you move to Florida?

17       A.   In, roughly, '99.

18       Q.   What was the year that you dropped out of

19   school?

20       A.   "Drop out" is an interesting term, but

21   yeah, I left in '93.

22       Q.   Okay.  When you left school.

23       A.   '93.

24       Q.   Left in '93.  And between '93 and '99,

25   what were you doing occupationally?

1      A.   I bartended, I waitered.  Did a few things

2  in Montreal, you know, late teens, early 20's.

3      Q.   Do you remember where you were when you

4  first -- you said you were in Orlando -- but when

5  Wayne first introduced you to Mr. Amodeo?

6      A.   Where we met?

7      Q.   Yes.

8      A.   It was at a restaurant.  I don't know if

9  it was a Perkins or some -- like a diner

10  restaurant.

11      Q.   What was your first professional job?

12      A.   My first professional job?

13      Q.   In terms of that wasn't bartending or

14  waiting tables, or that was headed in the direction

15  that, you know, you considered -- well, let's put

16  it this way:  What do you consider to be your

17  occupation?

18      A.   I'm a consultant.

19      Q.   What kind of consultant?

20      A.   Marketing and HR services.

21      Q.   And what is your employment history in

22  marketing and employment services?

23      A.   Dating back to when?

24      Q.   Ever.

25      A.   Ever?

1    Q.   Yes.

2    A.   I did some consulting in '05 for

3    Mirabilis.  In '06, I had an intern position at

4    AEM.  And post that, I've been doing some marketing

5    and consulting work.

6    Q.   Did you have any work for any company

7    associated with Mr. Amodeo before '05?

8    A.   Yes.

9    Q.   And what was that?

10   A.   I mean, I wasn't really working for him,

11   but interesting history that Frank and I have, he

12   had owed me some money and I was kind of trying to

13   collect that money.  So --

14   Q.   How did it come about that Mr. Amodeo owed

15   you money?

16   A.   I lent him some money and he never paid me

17   back.

18   Q.   What was the circumstance under which you

19   lent him money?

20   A.   It was in late -- it was in early '01.  I

21   had a business in Orlando, it had to be liquidated,

22   it wasn't doing well, and there was a whole bunch

23   of receivables that he was supposed to pay me on

24   and never did.

25   Q.   What was the business?

1       A.   It was a call center.

2       Q.   A call center.  What does that mean?

3       A.   Telemarketing operation.

4       Q.   And do you mean by your previous question

5  that you sold the receivables to Mr. Amodeo?

6       A.   No.  I didn't sell the receivables to Mr.

7  Amodeo, no.

8       Q.   Were you doing telemarketing for Mr.

9  Amodeo?

10      A.   No, no, no.  For myself.

11      Q.   So -- well, first of all, what was the

12  name of the call center?

13      A.   ComCard.

14      Q.   ComCard?

15      A.   Yeah.

16      Q.   Did it have any kind of business

17  appelation afterwards?  Was it an LLC organization?

18      A.   Inc.

19      Q.   Inc.

20      A.   ComCard, Incorporated.

21      Q.   And was it incorporated in the State of

22  Florida?

23      A.   Yes.

24      Q.   And how did Mr. Amodeo come -- I still

25  want to understand how he came to owe you money as

1  a result of the call center.  How did one thing

2  lead to the next?

3      A.  Well, the company wasn't doing very well.

4  Frank was a -- introduced himself as able to

5  liquidate the assets of the company and pay me some

6  moneys from the receivables that were left over.

7  And, yeah, I never got paid on those receivables.

8  I mean, I've collected over the years, but I, you

9  know --

10     Q.  Why would he pay money on the receivables?

11  I don't understand.

12         MS. VILMOS:  Object to the form.

13  BY MS. HAVENER:

14     Q.  That's okay.  You can still answer.

15     A.  Yeah, I just -- I also had lent him money

16  as a personal favor.  It was --

17     Q.  Was that -- was the money that -- I'm

18  sorry.  I interrupted you.  Were you finished with

19  your answer?

20     A.  Yes.

21     Q.  Was the money that you lent him as a

22  personal favor reduced to writing?

23     A.  No.

24     Q.  So it was an oral agreement?

25     A.  It was a handshake, yeah.

1     Q.   Okay.  How much money?

2     A.   I don't recall.

3     Q.   Can you give me an estimate?  Was it

4  10,000?  Was it closer to 100,000?

5     A.   It was a couple hundred thousand.

6     Q.   Okay.  And how much money did he owe you

7  on the receivables?

8     A.   I don't recall.  It's been about ten

9  years.

10    Q.   Again --

11    A.   Total, it was about 200,000, between the

12  personal loans and the receivables of the assets

13  after we sold off everything.

14    Q.   When were you first in a business venture

15  with Mr. Amodeo?

16    A.   In a business venture with Amodeo?

17    Q.   Let me ask the question more carefully.

18  And when I'm asking this question, I'm looking for

19  any kind of business in which you were involved in

20  which Mr. Amodeo was also involved, whether as an

21  investor, as a consultant, as an employee or

22  officer or director.  You know, any business

23  relationship that you had with a company with which

24  Mr. Amodeo also had a relationship.

25    A.   In '03, there was a company that Mr.

1    Amodeo was working on called -- I forgot the name

2    of the -- it was a printing roll up that he was

3    working on.  And it was a company called Ameriplast

4    out of -- somewhere in South Florida.  It was in

5    Boca Raton.  And I thought I could bring a very

6    large client to the table so that --

7        Q.   What do you mean by a roll up?

8        A.   He wanted to merge a few printing

9    companies, a few struggling companies.  Roll them

10   all up into one and make one successful company.

11       Q.   Do you know the names of the ones that he

12   was going to merge?

13       A.   No, I was just involved in the -- well,

14   I'm not really involved.  I was trying to market

15   the products from Ameriplast.  They're a plastic

16   printing company.

17       Q.   Have you made loans in the nature of

18   100,000 or several hundred thousand dollars to

19   other people?

20       A.   I don't make a practice of it, no.

21       Q.   You don't make a practice of it; is that

22   what you said?

23       A.   Correct, yeah.

24       Q.   Thank you.  Was anyone else involved in

25   the Ameriplast -- is it fair to call it a deal, or

1    the Ameriplast roll up?

2        A.   Anybody else.  What do you mean by

3    "anybody else"?  There were a few people involved

4    in it.

5        Q.   Okay.  Could you name the people who were

6    involved in it?

7        A.   No, not really.

8        Q.   Was Mr. Sadrianna involved in it?

9        A.   Mr. Sadrianna was involved not in the

10   actual Ameriplast.  I think he was involved with

11   Frank in Orlando.  I was working out of the Boca

12   Raton site, but I believe Mr. Sadrianna might have

13   been involved.  I don't really recall.

14       Q.   When you say the Boca Raton site, was

15   Ameriplast located in Boca Raton?

16       A.   Yes.  Yeah, I had mentioned that.

17       Q.   And where were the other companies that

18   were being rolled up into Ameriplast located?

19       A.   I have no idea.  I really wasn't involved

20   in the roll up.  I was just trying to bring a large

21   client to the Ameriplast --

22       Q.   And what was that client?

23       A.   I don't remember the name of it, but it

24   was a phonecard company that needed the plastic

25   manufacturing.  It was a very large company out of

1      New Jersey.

2          Q.   And what was your relationship with the

3      phonecard company?

4          A.   I knew some people that worked there and

5      that could make the proper introductions if

6      Ameriplast could deliver.

7          Q.   What was Frank's relationship to the deal?

8      How was he involved?

9          A.   That's a question I really can't answer,

10     Kathleen.  Frank had his -- he got into the deal

11     somehow.  He, you know -- I really don't know.

12         Q.   When you did loan the money to Frank that

13     we spoke about earlier, what reason did you have

14     for doing that?

15         A.   He was a -- you know, he was kind of

16     struggling, he wasn't doing too well, and I -- I'm

17     a bit of a softie, I lent him some money, and I

18     thought I'd get paid back when he liquidated the

19     assets and he's worked out some things.  I was

20     always very impressed with Frank's abilities to,

21     you know, to accomplish certain things.

22         Q.   Do you know -- I think you said that that

23     was -- let me see.  Excuse me.  When did you lend

24     him the money?  You met him in late '99 or 2000?

25         A.   Uh-huh.  Early 2000.  I believe it was in

1    early '01.

2         Q.   That you loaned him the money?

3         A.   Yeah.

4         Q.   Did you already know about his history in

5    Georgia and his having spent time in prison?

6         A.   Nope.

7         Q.   You didn't?

8         A.   No.

9         Q.   When did you learn about that?

10        A.   After I lent him the money, yeah.  I

11   wasn't aware of his whole history.  I didn't know

12   he was a disbarred attorney and a convicted felon

13   and all.

14        Q.   When did you learn that information?

15        A.   I mean, I learned it in bits and pieces

16   along the way sometime between '01 and '03, you

17   know.  He didn't start publicizing it until the

18   Mirabilis scandal.

19        Q.   Mr. Amodeo, as you know, has been, at

20   least in the most recent years that I'm aware of,

21   very open about his history.

22        A.   Uh-huh.

23        Q.   But I'm gathering from your answers that

24   that was not the case when you first knew him.

25        A.   That was not the case, no.

21

1      Q.   When you did learn it, how did you learn

2  it?

3      A.   I don't recall.  But I did approach him

4  about it.

5      Q.   So someone else told you?

6      A.   I think someone else hinted to it and then

7  I approached him and we talked about it.  And I

8  don't think he confessed everything at once, but,

9  like I told you, I learned bits and pieces over

10  some time.

11      Q.   Do you know who else -- I apologize.

12  Strike that.

13      Do you know who the person was who hinted

14  about it?

15      A.   No.  I don't recall, actually.

16      Q.   Did Mr. Amodeo ever pay you back that

17  money?

18      A.   In bits and pieces.  Not really in

19  payment, but like in consulting contracts and some

20  moneys here and there.

21      Q.   After the Ameriplast deal, what was the

22  next interaction you had on a business basis with

23  Mr. Amodeo?

24      A.   I mean, I was -- I spent some time in the

25  office that he had built.  I think it was in late

1    '04.  I'm not exactly sure, but he had an office in

2    downtown Orlando.  Trafalgar, Matrix; there were

3    several entities that were operating out of

4    downtown Orlando office space.

5        Q.    You said before that you were impressed

6    with Frank's abilities?

7        A.    Yeah.

8        Q.    Did your attitude change after you learned

9    about his criminal history?

10       A.    No, it didn't.

11       Q.    When you became familiar -- you said you

12   spent some time in the offices of Trafalgar and

13   Matrix.  Were you involved with those companies?

14       A.    Not really.  I just thought it was -- you

15   know, he offered me to come and spend some time

16   over there.  I believed the only way I'd have a

17   chance of actually getting repaid is spending

18   considerable time over there, so I was --

19       Q.    So what were you doing there?

20       A.    I had an office space.  I really was not

21   doing much, and then after a few months I started

22   to get involved with a possible payroll processing

23   company.

24       Q.    What was that?   What was that company?

25       A.    I really don't recall the name.

23

1      Q.   You don't know the first payroll

2  processing company you were involved with?

3      A.   No.

4      Q.   What was the business of Trafalgar?

5      A.   The business of Trafalgar was trying to

6  turn precious metal concentrate into cash.  That's

7  what I understood.  I didn't really understand

8  everything else.

9      Q.   What was everything else?

10      A.   I really don't --

11      Q.   Do you understand it now?

12      A.   No.  No.

13      Q.   What was Matrix?

14      A.   A consulting firm of some sort.

15      Q.   Who did it consult for?  Do you know?

16      A.   I don't know of any of the clients.

17      Q.   When you said you were impressed with

18  Frank's abilities, to what were you referring?

19      A.   Be more specific, Kathleen.  What do you

20  mean by --

21      Q.   Well, what was it about Frank that

22  impressed you?

23      A.   I think Frank is a brilliant person.  He

24  just always came across as an extremely brilliant

25  person.

24

1    Q.   Do you still believe that?

2    A.   Yes, I do.

3    Q.   I'm going to go through -- and not because

4  I don't know this myself -- I want to know the

5  names of all the companies in which you were a

6  participant in which Frank was also a participant

7  in any capacity.  So I take it you were not a

8  participant in Trafalgar or Matrix?

9    A.   No.  Not actively, no.

10   Q.   Not actively.  Did you --

11   A.   There was another company, but I don't

12  recall.  There were so many corporations, Kathleen,

13  over the years.  I really don't recall.

14   Q.   Did you consult for either of those

15  companies?

16   A.   No.

17   Q.   Do you remember the first consulting

18  contract you had that involved a company of Mr.

19  Amodeo's or Mirabilis?

20   A.   It was probably in early '05 when I was

21  consulting for Presidion through -- whether it was

22  Mirabilis or Matrix or one of those companies.

23   Q.   I don't understand what you mean.  Were

24  you personally consulting for Presidion, or did you

25  mean that -- well --

1     A.   For Mirabilis, but the contract was

2  Presidion.

3     Q.   So were you at that time an employee of

4  Mirabilis?

5     A.   I don't know if it was Mirabilis or Common

6  Paymaster, but one of the entities owned by

7  Mirabilis.

8     Q.   Mr. Cuthill testified a couple of weeks

9  ago that Common Paymaster and Mirabilis were always

10  separate companies.

11     A.   Uh-huh.

12     Q.   So when you were working for Mirabilis,

13  you weren't sure if you worked for Common Paymaster

14  or Mirabilis?

15     A.   Well, I entered into an agreement with

16  Common Paymaster in late '05.  That's when I

17  entered into a contractual agreement with them.

18  But for most -- for probably six or seven months

19  preceding that I was consulting for Presidion.

20     Q.   Via -- was there a vehicle through which

21  you were consulting for Presidion?  In other words,

22  who signed your paycheck?

23     A.   I believe we were a PEO client of

24  Presidion.  So it's a -- you know.

25     Q.   Okay.  Do you know the name of it?

1      A.   Of the vehicle?  It was Presidion.

2      Q.   Of who signed your paycheck.  Whatever --

3      A.   It was Presidion.  It was Presidion at

4   that time.

5      Q.   Okay.  And that's Presidion Corporation?

6      A.   One of the seventeen companies, but, yeah

7   I think it was Presidion.

8      Q.   So but we're now talking about the public

9   company.

10      A.   At that time, yeah.

11      Q.   Okay.  And at another time were you paid

12   by a different Presidion organization?

13      A.   No, no, no.  It went from there to Common

14   Paymaster.

15      Q.   And while you were being paid by Common

16   Paymaster, for what entities did you provide

17   services?

18      A.   For Presidion Corporation.

19      Q.   Any others?

20      A.   No.  And Mirabilis, that was working on

21   some kind of a solution to help the distressed

22   Presidion.  And I believe Nexia was the actual

23   contract.

24      Q.   Nexia had a contract with whom?

25      A.   I believe they had a consulting agreement

1   with Mirabilis, that had an agreement with

2   Presidion.  I really don't know the exact

3   structures, Kathleen.  I wasn't privy to that

4   information.  Nor did I care.

5       Q.   You mentioned earlier that you then became

6   associated with AEM, I think?

7       A.   Yes.

8       Q.   And when was that?

9       A.   That was --

10      Q.   I'm sorry.  Initials A-E-M.

11      A.   -- late '05.  Third quarter or fourth

12   quarter of 2005.

13      Q.   Okay.  So in early '05 you were consulting

14   for Presidion; correct?  Did I understand that

15   correct?

16      A.   Correct.

17      Q.   And then sometime in '05 you signed a

18   contract with Common Paymaster.

19      A.   Yeah.  In late '05, yes.

20      Q.   And you were working -- associated in some

21   way with AEM also in late '05?

22      A.   Correct.

23      Q.   What was your role with AEM?

24      A.   I was the Interim President to AEM.

25      Q.   How long was the interim?

1          A.     Five months and change.

2          Q.     What time period?

3          A.     The official date I believe was

4     January 1st through June 13th.

5          Q.     Of?

6          A.     '06.

7          Q.     Did you ever hold any office in any of the

8     other Mirabilis-associated entities?

9          A.     No.  Aside from AEM, no.

10         Q.     Were you ever on the Board of Directors of

11    any of the Mirabilis-associated entities?

12         A.     Not to my knowledge.

13         Q.     Did you ever hold an office in any of the

14    Amodeo-associated entities?  And just to make that

15    clear, do you understand what I mean when I say --

16         A.     Yes.

17         Q.     -- Mirabilis-associated or

18    Amodeo-associated, or I might otherwise say

19    Mirabilis-related or Amodeo-related?  Do you

20    understand what I mean by the difference?

21         A.     Yes.  Aside from that payroll processing

22    company I told you in '03, '04, no, I don't recall

23    holding office in any other --

24         Q.     And were you ever on a Board of Directors?

25         A.     No.

1      Q.   Did you ever sign contracts on behalf of

2  AEM?

3      A.   Yes.

4      Q.   As president?

5      A.   Yes.

6      Q.   In any other role?

7      A.   No.  Not to my recollection.

8      Q.   Did you ever sign contracts on behalf of

9  Mirabilis?

10      A.   Not to my recollection.

11      Q.   Did you ever sign as a shareholder of

12  Mirabilis?

13      A.   There was a shareholder agreement that I

14  was handed.  I don't recall ever signing it.

15      Q.   Did you ever sign, for example, the

16  minutes of a Board of Directors meeting?

17      A.   For which company?

18      Q.   For anybody.  Any of the -- I'm going to

19  use now the term, "under the Mirabilis umbrella."

20  And by that I mean both Amodeo-associated and

21  Mirabilis-associated entities.

22      A.   Yeah.

23      Q.   I understand that there were a million.

24      A.   Yeah, yeah.  Not to my recollection.  It

25  could be.  I mean, I don't recall being a member of

1    any board or signing any corporate minutes.

2         Q.   What's FYI Enterprises?

3         A.   FYI Enterprises?

4         Q.   Yes.

5         A.   It's a company.  It was a corporation that

6    was defunct years ago.

7         Q.   What did it do?

8         A.   Nothing, really.  It was meant to do a few

9    things, but it didn't end up doing anything.

10        Q.   What was it intended to do?

11        A.   It was actually set up to buy a property

12   in Naples, but that deal never went through.  I

13   believe Frank had invested some money in it, but --

14        Q.   Who were the owners of FYI Enterprises?

15        A.   Myself.

16        Q.   You and only you?

17        A.   Yeah.

18        Q.   So, okay.  Let me get this straight.  Mr.

19   Amodeo had invested some money in a property in

20   Naples.

21        A.   Correct.

22        Q.   And it was intended that FYI Enterprises

23   would purchase that property or further invest?

24        A.   Correct.

25        Q.   And you were the sole owner of FYI.

1    A.    Correct.

2    Q.    What did FYI stand for, if anything?

3    A.    For Your Information.

4    Q.    Were you involved in any of -- I'm just

5    going to go off the top of my head.  I remember

6    from looking at papers a Very Private Eye, for

7    example.  Two Wheel Tunes.  I mean, there's many,

8    many companies that --

9    A.    No.

10    Q.    -- were under the Mirabilis umbrella.  Is

11    there anything that you were associated with that

12    you haven't told me about?

13    A.    No.  Well, not to my recollection,

14    Kathleen.

15    Q.    If we were told that Mr. Amodeo was a half

16    owner of FYI, is that incorrect?

17    A.    That is incorrect.

18    Q.    How much did you invest in FYI

19    Enterprises?

20    A.    Not too much.  It was a mechanism for me

21    to get some of the money back that Frank had owed

22    me.

23    Q.    And how was that intended to work?  If you

24    could explain the process by which you expected to

25    get some kind of return of --

32

1       A.   If there was a gain on that property, then

2    I would hopefully share in that and get some of my

3    money back.

4       Q.   Did you ever get that money back?

5       A.   No, not all of it.

6       Q.   Did you ever own any stock in Mirabilis

7    itself?

8       A.   Yes.

9       Q.   And please tell me the context of that,

10   your ownership of stock in Mirabilis.

11      A.   What do you mean, "the context of that"?

12      Q.   Did you purchase stock in Mirabilis?

13      A.   No.  No.

14      Q.   How did it come about that you became an

15   owner of stock?

16      A.   Shares were issued in late '05 and I

17   relinquished them in early '06.

18      Q.   Why were they issued to you in late '05?

19      A.   They were issued to 30, 40-some-odd

20   people.  I don't know why.  That's why I

21   relinquished them in late January of '06.  I was

22   like this is ridiculous how many shareholders there

23   were at the company.

24      Q.   Were you ever the only shareholder of

25   Mirabilis?

33

1      A.   Not to my knowledge.  Somebody tried to

2 tell me that that was the case, but, no, I wasn't.

3      Q.   Do you have any recollection of having

4 signed a proxy for your vote -- well, first -- I'm

5 sorry.  Let me start over.

6       Were your shares voting shares?

7      A.   Not to my recollection.

8      Q.   Do you know what type of stock you were

9 issued?

10      A.   What class?  No.

11      Q.   Correct.  I mean, you understand --

12      A.   I actually never received certificates.  I

13 just signed a shareholder agreement -- or I was

14 handed one.  I don't recall signing it.  And then I

15 handed them back a very short period of time later.

16      Q.   But you know, I think, from the

17 shareholders agreement, just like I do, that there

18 were supposed to be several classes of stock, and

19 they went by both letters and colors.  Do you

20 remember --

21           MS. VILMOS:  Object to the form.

22 BY MS. HAVENER:

23      Q.   Okay.  Do you remember the classes of

24 stock at Mirabilis?

25      A.   No.

34

1      Q.   Are you aware that there were different

2  classes of stock that went by letters, names?

3      A.   Or colors, whatever, yes.

4      Q.   Do you know what letter form you held?

5      A.   No.

6      Q.   Do you know what color form you held?

7      A.   I used to refer to it as toilet paper, to

8  be honest with you.

9      Q.   How did it come about that you believed

10  that stock was issued to you?  You just testified a

11  few moments ago that you never had shares in your

12  hand.

13      A.   Correct.

14      Q.   Under what circumstances was it conveyed

15  to you that you owned these shares of stock?

16      A.   I don't recall exactly, but it was a

17  meeting in late '05, and there were shares issued

18  to some people at Mirabilis.

19      Q.   And were you told verbally?  Were you told

20  in writing?

21      A.   No, I was told verbally, and I told you I

22  was handed a shareholder agreement which I don't

23  recall executing because, you know, to me, I didn't

24  really see much value in them.

25      Q.   To be clear, if I can, how long a time

1   period between late '05 and your relinquishing in

2   '06 was it?

3        A.   In late January in '06 I attended a

4   shareholders' meeting in downtown Orlando, I

5   believe in the AmSouth building.  And I saw 35, 40

6   people in there, I didn't know most of them, and I

7   was told that they were all shareholders.  And I

8   didn't know how anybody earned their shares in the

9   company, I didn't know if anybody purchased their

10  shares in the company.  And I was actually so

11  appalled and disgusted by what I witnessed that I

12  relinquished the shares verbally with Laurie Holtz

13  and Richard Berman as my witnesses.  And, you know,

14  I don't think I ever -- I don't think they were

15  officially relinquished until my resignation in

16  early June.

17       Q.   Did you relinquish the shares in writing?

18       A.   In late January, no.

19       Q.   No.

20       A.   No.

21       Q.   You just verbally expressed your desire to

22  relinquish the shares and Mr. Holtz and Mr. Berman

23  were there; right?

24       A.   Correct.  And I also made it very clear

25  that I hoped that they find a replacement for me as

1    soon as possible because I didn't really want much

2    involvement with Mirabilis.

3        Q.    And why was that?

4        A.    Because, Kathleen, I saw a bunch of

5    sycophants and liars and abusers and idiots in that

6    company.

7        Q.    Tell me who.

8        A.    Tell you who?  Primarily, your client,

9    Edith Curry; primarily, your other client, Frank

10   Hailstones; primarily, Richard Berman; and,

11   primarily, Laurie Holtz.  Those four, above all,

12   but there were 30 or 40 others.

13       Q.    Can you name some of those people?

14       A.    Paul Glover, Sharmila Khanorkar, James

15   Vandevere, Mr. Konicki -- I don't know.  I mean,

16   you have the names, Kathleen.  I didn't bring that

17   list with me.

18       Q.    Konicki?

19       A.    Yeah.

20       Q.    That's one I don't recognize.  And what

21   made you think that they were sycophants or idiots?

22       A.    Because I witnessed Frank talking a lot of

23   craziness at that meeting, Kathleen.  That he's

24   going to have an office within every living human

25   being on the Planet Earth, 12,000 offices.  This

1   was in early '06.  And he claimed that by the year

2   2012, in roughly half a decade, he planned to have

3   12,000 offices within reach of every single human

4   being.  And people, intelligent people like your

5   client over here, just sat there, whew, that sounds

6   pretty logical.  And, you know what, Kathleen, it

7   wasn't logical.  It was craziness.  It was a manic

8   depressive who needed serious medication talking.

9   And I knew that.

10          Q.   You did know that?

11          A.   Everybody knew that, Kathleen.

12          Q.   How did you know that?

13          A.   That Frank was a manic depressive?

14          Q.   Yes.

15          A.   Because he told me he was a manic

16   depressive.  But he didn't have to tell me, because

17   I thought he was.  I saw that he was.  He was not

18   all there.

19          Q.   Are you a psychiatrist?

20          A.   I'm not a psychiatrist, no.

21          Q.   So what caused you to believe he was manic

22   depressive?

23          A.   Aside from the fact that he told me?  I

24   saw some symptoms that he was a manic depressive.

25          Q.   Could you describe the symptoms for me?

38

1      A.   Yeah.   Either extremely, extremely happy

2   or extremely depressed.   And I believe that Frank

3   suffers also from a Napoleonic complex.   I'm not a

4   psychiatrist, but I just think that the things that

5   he's tried to accomplish in his life are way out of

6   reach.   Very, very smart, brilliant man, but --

7      Q.   Well, Napoleon accomplished a lot.

8      A.   Yeah, he did.   He did.   But he ended up in

9   jail; did he not?

10     Q.   No.   He ended up on an isolated island

11  living encumbered.

12     A.   It was a prison.   Well, it was a prison.

13  Yeah, and Frank was -- at this point, it was known

14  to all, because it was published, that Frank was a

15  disbarred attorney, convicted felon, and recently

16  bankrupt.

17     Q.   Do you know how many times he went

18  bankrupt?

19     A.   No.

20     Q.   Could you name -- when you said that there

21  were a large number of shareholders and that you

22  saw how many people were at the shareholders'

23  meeting, besides my client, who is a sycophant and

24  an idiot, and besides my other client --

25     A.   No, I believe everybody in that room was.

1    Q.    Okay.

2    A.    Not particularly your client, but, yes,

3    she, I believe, is one of them, yeah.

4    Q.    And my other clients, Mr. Hailstones and

5    Mr. Holtz and Mr. Berman, name some more people who

6    were at that meeting among those many -- too many

7    shareholders.

8    A.    Woody Johnson, Horton Johnson, whatever he

9    goes by.  Marty Flynn, James Sadrianna, Daniel

10   Myers.  There were so many of them.  Honestly,

11   there were so many of them, I really -- I don't

12   recall.  There was that professor of Indian

13   descent.  I forgot his name.

14   Q.    Rama somebody?

15   A.    Rama, yeah, Inguva.  Rama Inguva.  There

16   were a few others.  A whole bunch of others,

17   actually.  I didn't recognize most of them,

18   actually.  I believe that's the meeting I was

19   introduced to Laurie Holtz.  Oh, yeah, Richard

20   Berman was there, of course.  I think I mentioned

21   that.

22   Q.    So what had changed in the time period

23   between, I think it was, '03 and '06?  '03 you lent

24   him $200,000.

25   A.    No, that was in '01.

40

1      Q.   '01.  Okay.  So in '01 you had lent him

2    $200,000, which --

3      A.   That's not correct.  Lent him some money,

4    plus there were some moneys from that -- I was

5    supposed to get from the liquidation of the assets,

6    yes.

7      Q.   But you don't lend money to somebody that

8    you think is crazy and manic depressive and --

9      A.   At that time, I didn't know that.  No, I

10   didn't know that --

11     Q.   So what changed?  How did you -- what

12   changed about your knowledge?

13     A.   My problem, Kathleen, was not particularly

14   with Frank.  My problem was with everybody that

15   Frank surrounded himself with.

16     Q.   I understand.  But what changed about

17   Frank that made you go from an attitude that caused

18   you to lend him a great deal of money -- what to me

19   seems like a great deal of money -- to believing

20   that everybody else in the room that was a

21   shareholder in Mirabilis was an idiot for having

22   any faith in him?

23     A.   Because when I knew Frank in '01, he never

24   had the delusions of grandeur to conquer the world

25   and to have 12,000 offices, Kathleen.  He could

1    hardly manage one office.  He never expressed those

2    delusions to me, anyhow.

3        Q.   Did you know anything about what I think

4    he now describes as his addictive behaviors?

5        A.   No, not in detail.

6        Q.   Was it your impression that he developed

7    his bipolar disease after 2001?

8        A.   I don't know when he developed it.   I

9    think he was born with it.

10       Q.   So he was keeping it hidden, or is that --

11       A.   From me, he was, for sure.

12       Q.   And when did you come about -- when did

13   you come to the understanding that he was not in

14   full possession of his faculties?

15       A.   I don't know if it was in late '04 or '05

16   sometime that, you know, he told me he was under

17   some -- seeking some treatment.  I don't know the

18   details.

19       Q.   Do you know with whom he was seeking

20   treatment?

21       A.   No.

22       Q.   Okay.  I understand the behavior.  You've

23   already described the behavior when he was manic,

24   when he was extremely on a high.

25       A.   Uh-huh.

42

1      Q.   Could you describe the behavior when he

2   was extremely depressed?

3      A.   No.  He was just very, very sullen, closed

4   himself off in a room and, you know, whatever.

5   Just --

6      Q.   Were there times when he completely

7   isolated himself and you didn't see him?

8      A.   During what periods, Kathleen?

9      Q.   Ever.

10     A.   No.  I mean, I live in -- you know, 250

11  miles away from him.  I was not there very often in

12  '06.  In late '05 I was in the Jupiter site or in

13  the Doral office in South Florida.

14     Q.   Well, but something must have changed

15  between the time that you loaned him the money and

16  the time that you say that he was crazy.

17     A.   Uh-huh.

18     Q.   And I'm trying to figure out when along

19  that timeline you developed the understanding of

20  Frank as a person with a mental illness.

21     A.   I believe it was in '05 where he actually

22  just divulged to me that he did have some mental

23  illnesses.  I knew of his criminal background and

24  of his, you know, being disbarred and bankrupt.

25     Q.   So he told you he was mentally ill.

1      A.   Correct.  I think he published it on his

2   Website.  He had a frankamodeo.net.

3      Q.   Were there any other people involved with

4   Mr. Amodeo of whom you had a good impression?

5      A.   Initially, quite a few people.

6      Q.   Could you name them for me?

7      A.   Richard Berman, Laurie Holtz, Frank

8   Hailstones.

9      Q.   And what caused you to have a good

10  impression of Mr. Berman?

11     A.   Mr. Berman was -- I met him at his office.

12  Senior partner of Berman, Kean, Riguera in South

13  Florida.  He told me --

14     Q.   Why did you meet him at his office?

15     A.   Why did I meet him at his office the first

16  time?  He was, I believe -- I believe he

17  represented Frank in some legal matter having to do

18  with that print roll up.  I'm not exactly sure.

19  Frank had some issue with Merrill Lynch and I

20  believe he hired Berman's firm, if I recall

21  correctly.

22     Q.   Were you involved in that issue with

23  Merrill Lynch at all?

24     A.   No.  No, no.  Not from -- no, no.  I just

25  -- the company went defunct, I didn't bring the

44

1    client on, thank you very much.  I didn't have any

2    actual involvement.

3        Q.   What company was it that was involved with

4    the problem with Merrill Lynch?

5        A.   It was the parent company or the parent

6    holding company of that Ameriplast.  It's Print

7    something.  I'm not exactly sure.

8        Q.   Do you know what other people were

9    involved in that either -- in that dispute with

10   Merrill Lynch?

11       A.   If I recall correctly, just Frank and

12   perhaps Mr. Sadrianna, but I'm not sure about that.

13       Q.   Did you know Dr. Pollack?

14       A.   Yes.

15       Q.   What was your impression of Dr. Pollack?

16       A.   My first impression of him?

17       Q.   That's where we'll start.

18       A.   My very first impression of him was, yeah,

19   not very good.  He didn't make a good impression

20   upon me.

21       Q.   Why was that?

22       A.   Kathleen, Mr. Pollack is a -- I don't know

23   how it's relevant to this, but I was not impressed

24   by him.  I thought he was -- to be honest with you,

25   I pretty much knew that he was of Jewish descent

1    and the first meeting I had he's telling me about

2    the glory of the light of Christ.  And I was like,

3    oh, I find that interesting.  You know?  So it's

4    just -- I shouldn't judge him for that, but I did.

5         Q.   And then -- okay.  You said that was your

6    first impression.  Did your impression change?

7         A.   No, no.  Not on -- no.

8         Q.   Was Dr. Pollack one of the people at the

9    January meeting that you referred to?

10        A.   I believe so, yes.  Like I said, there

11   were 40-some-odd people, participants in that

12   meeting.

13        Q.   Do you know if Mr. Sadrianna was there?

14        A.   Yes.

15        Q.   Was Mr. Broadhead there?

16        A.   Possibly.  Yeah, very possibly.

17        Q.   What is your impression of Mr. Broadhead?

18        A.   I have no opinion of Mr. Broadhead.  And

19   he was married to Edie Curry.  Nice enough guy, you

20   know.

21        Q.   Tell me any other people that you remember

22   were there.

23        A.   Name me the names that I named and I'll

24   tell you --

25        Q.   Okay.  Well, you've named Mr. Berman, Mr.

1    Holtz, Mr. Hailstones.  Oh, why did you have a good

2    impression of Mr. Hailstones?

3        A.   Mr. Hailstones was introduced to me in, I

4    believe, late December of '05 as a Sarbanes-Oxley

5    expert, came from London, and he had a lot of

6    background with PricewaterhouseCoopers, and was

7    announced the President of Mirabilis.  And when I

8    met Frank Hailstones, at first I was impressed

9    because he seemed humble enough.  He had the title

10   of President, didn't take a fancy corner office,

11   took a simple office.  And I just -- I thought that

12   it was a humble attribute that he had and I thought

13   that he was, you know -- I was glad that he was on

14   board initially.  Initially.

15       Q.   And what changed?

16       A.   His complete -- his lack of logic.  I mean

17   --

18       Q.   About what?

19       A.   What is a president of a company to do,

20   Kathleen?  It's manage the company, operate the

21   company; correct?  On top of Mr. Hailstones being

22   the President of Mirabilis Ventures, he also was

23   the controlling person at AEM for the Department of

24   Business and Professional Regulations, so he was

25   one of the responsible parties for AEM.  That made

1      me feel much more comfortable.  Because I met --

2          Q.   Were you a controlling person?

3          A.   Yes, I was, yeah.

4          Q.   Okay.  So keep going.

5          A.   I was comforted by the fact that Mr.

6      Hailstones was also a controlling person of the

7      company.  With his background, I thought, okay,

8      great.  I thought that a guy like Frank Hailstones

9      being the president of the company and the Board of

10     Directors being chaired by Laurie Holtz that the

11     company was in -- was going to be in good financial

12     standing.  But I was awfully wrong about that.

13         Q.   Mr. Holtz wasn't the Chairman of the Board

14     of AEM, was he?

15         A.   No.

16         Q.   And Mr. Hailstones wasn't the president of

17     AEM, was he?

18         A.   No.  He was the president of the parent

19     company.  AEM --

20         Q.   So AEM was a Mirabilis-owned company?

21         A.   Correct.

22         Q.   And how soon after your -- I mean, between

23     late '05 and Mr. Hailstones' departure wasn't that

24     long.  When did your impression --

25         A.   When was his departure?

1     Q.   His departure was -- he was informed that

2   he wouldn't have a job immediately after he

3   returned from the Christmas holidays of '06, '07.

4     A.   Oh, he was terminated?

5     Q.   Yes.

6     A.   I thought he had resigned.  Okay.

7     Q.   Oh, no.

8     A.   Oh, really.

9     Q.   Really.

10     A.   Interesting.

11     Q.   No.

12     A.   He would have stayed there.  That's news

13   to me.

14     Q.   And he resigned on January 31st, 2007.

15     A.   Okay.

16     Q.   I mean, he was invited to resign and it

17   became official.  So when during that year did your

18   impression change?

19     A.   Fairly early on.  Fairly -- but --

20     Q.   Was it at that first meeting?

21     A.   No, no.  I didn't know him well enough at

22   that first meeting.  But my impression of him

23   changed throughout that year, yeah.

24     Q.   And who is Laurie Andrea?

25     A.   Laurie Andrea was another control person

1    of AEM.  She was the VP of Insurance.  She was --

2    you know, she --

3         Q.   Of what company?

4         A.   Of AEM.

5         Q.   Do you know if she owned any interest in

6    AEM?

7         A.   I don't recall.

8         Q.   And I can't remember, I think I already

9    asked you this, but did you own any interest in

10   AEM?

11        A.   In late '06 when it was a shell -- in late

12   '05, yes.  But then the company was -- had zero

13   employees, it had zero entities, and then it was

14   sold to Mirabilis Ventures.  I believe Edie Curry

15   negotiated the purchase of that shell corporation.

16   That's what I was told.

17        Q.   And who was she negotiating with?

18        A.   Former owners of Presidion; Mr. Sandlin

19   and Mr. Gaines, I was told.  I'm not sure.

20        Q.   Incidentally, did you know Mr. Sandlin is

21   dead?

22        A.   No.

23        Q.   He was murdered.

24        A.   He was murdered?

25        Q.   Yes.

50

1      A.   When was this?

2      Q.   September 16th, I think.  But --

3      A.   Of this year?

4      Q.   Yes.

5      A.   I had no idea.

6      Q.   I'll show you on the Internet.

7      A.   No, I had no idea.  Wow.

8      Q.   Was Laurie Andrea an idiot and a

9  sycophant?

10      A.   Yeah.  Not as much as the others, but --

11  I'll tell you, I categorize the people in -- I put

12  them in two categories, Kathleen.  Either they were

13  -- they drank Frank's Kool-Aid and they were really

14  -- they really believed his crap, or they were

15  kissing his ass and riding their coattails to the

16  -- to financial freedom.

17      Q.   And which one were you?

18      A.   I guess I might have been considered one

19  of the idiots.  But I had actually resigned after

20  that meeting, so, yeah.  Not resigned; sorry.  I

21  relinquished my shares.  And I had told them I

22  needed to be replaced as soon as possible thirty

23  days into my post.

24      Q.   And what was your post that you were

25  replaced from?

1        A.    Interim CEO.

2        Q.    Of?

3        A.    AEM.

4        Q.    And did you have any other posts in any

5    other companies?

6        A.    No.

7             MS. HAVENER:  Excuse me.  I just want to

8        check on the phone.  Have other people joined

9        the call besides Nicolette?  Is anybody there?

10        Nicolette, are you there?

11             MS. VILMOS:  I am here.

12             MS. HAVENER:  Okay.  And there is no one

13        else on the call?

14             MS. VILMOS:  I'm going to take that as a

15        no.

16             MS. HAVENER:  Yes, but I also have -- I

17        have evidence to the contrary, but we'll leave

18        that as it be.

19    BY MS. HAVENER:

20        Q.    Are you telling me that all your duties

21    with Mirabilis Ventures ceased in June of '06?

22        A.    Officially, yes.

23        Q.    And unofficially?

24        A.    I was asked to come back as a consultant

25    to help the transition with the new CEO.

1      Q.   And the new CEO being?

2      A.   Michael Stanley.

3      Q.   And did you come back as a consultant?

4      A.   Yes, I did.

5      Q.   What did you do as a consultant?

6      A.   I just helped transition whatever --

7  whatever was needed, but mostly sales.  The sales

8  department was dwindling.

9      Q.   What did you do as a salesperson?  What

10  were you selling?

11      A.   PEO services.

12      Q.   And to whom did you make sales of those

13  services?

14      A.   I just managed a small sales group out of

15  the South Florida office.

16      Q.   Do you have a consulting agreement for

17  that time period?

18      A.   No.

19      Q.   Did you have any responsibilities with AEM

20  after June of '06?

21      A.   No, aside from just sales, keeping --

22  trying to keep the sales intact, no.

23      Q.   But didn't you tell me that AEM was a

24  shell?

25      A.   No, but AEM was the company that I worked

1    for that was managing this --

2        Q.   So it went from a shell to being a PEO?

3        A.   Correct.

4        Q.   How were you paid?

5        A.   How was I paid?

6        Q.   Yes.

7        A.   By check or direct deposit.

8        Q.   It was a regular amount like you were

9    receiving a paycheck?

10       A.   When?  At the time that I was employed for

11   the company?

12       Q.   Okay.  Let's do that first.  At the time

13   -- and that was -- I want to know the dates.  You

14   said just from late '05 to --

15       A.   December 27th of '05 through June --

16       Q.   June of '06.

17       A.   Yeah.

18       Q.   And, otherwise, you didn't have any other

19   paying position related to Mirabilis or AEM?

20       A.   No, I was being paid by Common Paymaster,

21   and after that I --

22       Q.   During those six or seven months.

23       A.   Five-and-a-half, yeah.

24       Q.   And that's the only time that you were

25   getting paid by Common Paymaster?

54

1      A.   Correct.

2      Q.   And then how were you getting paid as a

3  consultant?

4      A.   I believe it was AEM or Mirabilis was

5  paying me on a monthly basis.

6      Q.   When was your first awareness that there

7  was any intent to sue Ms. Curry?

8      A.   Probably a week or two before the

9  conference in Scottsdale.

10      Q.   And is the same true for Mr. Hailstones?

11      A.   Yes.

12      Q.   Are you aware that claims against

13  Ms. Curry -- did you have any awareness that claims

14  against Ms. Curry and Mr. Hailstones were being

15  researched in February or March of '07?

16      A.   No.

17      Q.   And who told you about the conference in

18  Scottsdale?

19      A.   I believe it was Frank.

20      Q.   And do you know who told Frank?

21      A.   No.

22      Q.   What did Mr. Amodeo say to you about the

23  conference in Scottsdale?

24      A.   Frank told me, you won't believe this, but

25  there's a, you know, conference in Scottsdale going

1    on for Palaxar Group.  I said, what's Palaxar

2    Group.  And he told me, go online and check it out.

3    And I researched it and I -- I could not believe

4    the audacity, Kathleen.  I just could not believe

5    the audacity of your clients.

6        Q.   And what did you say to Mr. Amodeo?

7        A.   I said, I have to see it with my own eyes.

8    I cannot believe it.  I really thought -- I really

9    thought it was some elaborate prank.  That's the

10   honest truth.  I could not believe the audacity of

11   your clients.

12       Q.   Tell me why.

13       A.   The company in '07 was being investigated

14   for what I was told was the largest 941 tax fraud

15   in U.S. history, Kathleen.

16       Q.   "The company" being?

17       A.   Mirabilis and all of the 80-or-so

18   associated companies.

19       Q.   Uh-huh.

20       A.   And your clients were -- Frank Hailstones

21   was the President of Mirabilis Ventures, Edith

22   Curry was the Executive Secretary of the Board of

23   Directors.  I believe her role was corporate

24   compliance.  And the -- Laurie Holtz -- that's what

25   really struck me when I checked out the Website,

1    Laurie Holtz sat on the advisory committee.  He was

2    the Chairman of the Board of Mirabilis Ventures and

3    then he sat on the advisory committee of Palaxar.

4    I just -- I just could not believe my eyes when I

5    saw that site.

6        Q.   Well, did you understand -- well, explain

7    to me what you thought was audacious about it.

8        A.   Explain to you what I thought was

9    audacious?

10       Q.   Yes.

11       A.   Okay.  I printed out the Website here.

12   And I look at this and I'm saying to myself, wow,

13   this looks really impressive.  Wow, if I was a

14   first-time viewer of this site I'd be like, wow,

15   look at this; this is impressive.  Look at this

16   whole advisory committee.  Look at the

17   professionals involved in this.  But what really

18   struck me, the audacity that really struck me was

19   on the conferences page on the Website.  There is a

20   link to the Department of Justice, Kathleen, on

21   their Website.  They're being investigated by the

22   Department of Justice for the largest 941 tax fraud

23   in the history of the country.  I just thought it

24   was ridiculous.

25       Q.   Actually, what makes you believe that

1    Ms. Curry or Mr. Hailstones --

2        A.   No, I don't know who personally.  I know

3    the company they were very involved with.  They

4    were very involved in Mirabilis.

5        Q.   Neither was a CFO; correct?

6        A.   No.  Not to my recollection, no.

7        Q.   It's true that Mr. Glover was the CFO;

8    correct?

9        A.   For a period of time.  Then after that,

10   that switched, from what I was told.

11       Q.   Do you have any understanding that

12   pursuant to the laws of the State of Nevada, which

13   is where Mirabilis is incorporated, the Board of

14   Directors is entitled by law to rely on the

15   officers of the company to do their named roles, to

16   perform their named functions?

17       A.   Uh-huh.

18            MS. VILMOS:  Object to the form.

19            THE WITNESS:  I wasn't aware of that, but,

20       okay, you just informed me.

21   BY MS. HAVENER:

22       Q.   Did you know anything about Ms. Curry's

23   background before she came to Mirabilis?

24       A.   No, that she was an attorney, that she was

25   a CPA, that she worked for a couple of banks in the

1   Virginia area and --

2       Q.   Have you ever heard of PERSEREC?

3       A.   No.

4       Q.   Have you heard of it now?

5       A.   PERSEREC?   No.

6       Q.   Have you heard of -- did you know what

7   Nexia certification was?

8       A.   No.   Not until this lawsuit.

9       Q.   Do you have any understanding about it

10  now?

11      A.   Not any -- no, not really.

12      Q.   So tell me if I'm misinterpreting you,

13  because I want to make sure that I'm understanding

14  what you're trying to say.

15      A.   Please, clarify.

16      Q.   No, I'm not trying to clarify.   I just

17  want to make sure I'm understanding what you're

18  saying.

19       Are you testifying to the judge and jury --

20  because that's where this is going --

21      A.   Yes, I understand.

22      Q.   Are you testifying that you believed that

23  it was audacious of Ms. Curry and Mr. Hailstones to

24  be promoting their development of a product that

25  could potentially uncover fraud?

1      A.   Yes.

2      Q.   Now, did you have any understanding that

3   this product had ever been used while they were at

4   Mirabilis?

5      A.   No, none whatsoever.  I had --

6      Q.   And so if the product wasn't used at

7   Mirabilis, so, therefore, it was never applied --

8      A.   I didn't care for the product; I cared

9   about the people that were marketing the product.

10     Q.   Well, I don't think that the people that

11   were -- I'm sorry.  I don't mean to be arguing, but

12   nothing on the Website says that these people can

13   uncover fraud.

14     A.   Uh-huh.

15     Q.   If you --

16          MS. VILMOS:  Object to the form.  It

17     wasn't a question.

18   BY MS. HAVENER:

19     Q.   Do you understand the difference between

20   when I say that -- or do you understand what I'm

21   saying when I say there is a difference between

22   people saying that they can uncover fraud and

23   people saying that they have a product that can

24   uncover fraud?

25     A.   I do understand the difference.

60

1          Q.   Okay.  And the Website says that -- or

2     said that Ms. Curry and Mr. --

3          A.   No, it still says that.  I believe that

4     the Website is still active; right?

5          Q.   Yes, but I'm talking about at the time

6     that you saw it.

7          A.   Correct.

8          Q.   That Ms. Curry and Mr. Hailstones or --

9     and, actually, Mr. Hailstones was never a partner

10    in Palaxar, but they had a product that could

11    uncover fraud; is that right?

12              MS. VILMOS:  Object to the form.

13              THE WITNESS:  Is that a question?

14    BY MS. HAVENER:

15         Q.   Was that your understanding?

16         A.   Repeat the question.

17         Q.   Was it your understanding when you looked

18    at the Website that these people were representing

19    to the world that they had a product that could

20    uncover fraud?

21         A.   No, I didn't differentiate at the time

22    between the people and the product.  I really

23    wasn't aware of the product until after I was sued

24    in connection with this.

25         Q.   But you got angry; correct?

1      A.   I got angry, yes.  I got --

2      Q.   And what made you angry?

3      A.   What made me angry?  What made me angry is

4    that a lot of people, from my understanding, were

5    investigated, a lot of people's lives were on the

6    line.  And I believe that your clients failed

7    miserably in their fiduciary duties to the

8    shareholders and to the employees of the company,

9    Kathleen.  They failed miserably.  The way I see

10   it, Kathleen --

11     Q.   To the shareholders and who else?

12     A.   To the employees of the company and all

13   the subsidiary companies.  When this huge implosion

14   happened, Kathleen, what I understood -- I never

15   actually physically saw it, but what I understood

16   is that through '06 -- maybe it started late '05

17   and continued to early '07, but for sure in 2006

18   the burn rate of the company was $8-10 million a

19   month.  Over and above that, they were purchasing

20   companies, like four, five, six new companies a

21   month that I only knew about --

22     Q.   Okay.  Whose impression was it -- I mean

23   -- I'm sorry.  From where did you get the

24   impression that that was the, quote, "burn rate" of

25   the company?

1    A.   I believe Daniel Myers told me that.

2    Q.   And who was it, what human being was it

3  that you thought was responsible for purchasing all

4  these distressed companies?

5    A.   I don't think it was one person.  I think

6  it was a decision of the Board.  I don't have --

7    Q.   Did you believe, during the time that you

8  were associated with either Mirabilis or AEM, that

9  Mr. -- that the Board was in control of what

10  happened?

11    A.   Yes.

12    Q.   Was it never your understanding that Mr.

13  Amodeo was in control?

14    A.   No, I believe that Frank had some

15  influence.  I don't believe that he was in control.

16  That wasn't what I was told, and that's my --

17    Q.   That's what you were told by whom?

18    A.   By Frank, by Richard Berman, and by Laurie

19  Holtz.

20    Q.   And who was Dan Myers when he gave you

21  this information about the burn rate and the --

22    A.   Who was he?

23    Q.   Yes.

24    A.   I mean --

25    Q.   What was his role at the company?

1      A.   One of the myriad of CPAs in the company.

2  I don't know what his official title was, but he

3  was --

4      Q.   He wasn't the CFO.

5      A.   Not to my knowledge.

6      Q.   Did you have any other relationship with

7  Mr. Myers?

8      A.   No.  We were friendly, but, no.

9      Q.   Did he ever do any personal -- I mean, any

10  services for you?

11      A.   Oh, he -- yes.  He actually acted as my

12  CPA for two years.

13      Q.   And what did he do as your CPA?

14      A.   Just filed my taxes.

15      Q.   What company were you involved in in 2004?

16  You said your involvement with Mirabilis and AEM

17  was officially from late '05 to June '06.

18      A.   Uh-huh.

19      Q.   In what company were you -- or partnership

20  or enterprise, whatever word you want to use --

21  were you involved in 2004?

22      A.   Honestly, I don't recall exactly, but

23  there was a company, Primary Bookkeeping.  I don't

24  know if it was '04 or late '03.

25      Q.   And who owned Primary Bookkeeping?

1      A.   For a certain period of time, I believe

2  that I did.  It was, once again, another one of my

3  attempts to get paid back.

4      Q.   And for a certain period of time, you did.

5  Who else, and at what time period?  I know it was a

6  compound question.  Who else was involved at

7  Primary Bookkeeping at any other time?

8      A.   I don't recall.  I mean, Frank Amodeo was,

9  but I don't recall the exact dates and --

10     Q.   And what happened during 2004 with Primary

11  Bookkeeping?

12     A.   Frank got into some legal mess once again

13  with a company called Atlas Steel or something.  I

14  don't recall.  Atlas Welding.  Some welding company

15  out in Florida.

16     Q.   And what do you mean by he got into some

17  kind of legal trouble?

18     A.   I don't know.  He provided some services

19  for them, payroll services, and there was a legal

20  headache.  I don't know.  I don't recall.

21     Q.   And you were the owner?

22     A.   For a certain period of time, I believe I

23  was.

24     Q.   Well, and so whose role was it to

25  supervise what Mr. Amodeo was doing?

1       A.   At that time, he was responsible for his

2   own actions.

3       Q.   But you owned the company.

4       A.   Yes.  For a small period of time, yes.

5       Q.   And you didn't have any responsibility as

6   the owner?

7       A.   I may have had some responsibilities, but,

8   you know.  I wasn't party to the lawsuit.

9       Q.   Okay.  Did Primary Bookkeeping pay their

10  941 taxes?

11      A.   I don't recall.  I would hope that they

12  did.

13      Q.   As the owner of the company, can you tell

14  me who at Primary Bookkeeping would have been

15  responsible for that?

16      A.   No, I can't answer that question.  No, I

17  don't --

18      Q.   You don't know?

19      A.   I don't know.

20      Q.   Do you know who the other employees were

21  of Primary Bookkeeping?

22      A.   It was one gentleman out of West Palm

23  Beach who worked with Frank, and I don't recall his

24  name.

25      Q.   Who is Jerry Beavers?

1    A.    That would be him, yeah.

2    Q.    And what was his job?

3    A.    Payroll processing, you know.  I don't

4    know exactly, but -- what his job title or role

5    was.

6    Q.    And how is it that you owned the company

7    but you don't know what people's roles were?

8    A.    Yeah.  I didn't really act as the owner of

9    the company.  It was, once again, a mechanism to

10   get paid back.  But Charles McBurney out of, I

11   believe, Jacksonville clarified that.  I don't have

12   the agreement, but --

13   Q.    So there is a written agreement about your

14   role in Primary Bookkeeping?

15   A.    Yes.

16   Q.    Do you know when that was executed?

17   A.    Late '04, early '05.  I'm not sure

18   exactly.

19   Q.    And did you have a relationship with Mr.

20   McBurney?

21   A.    Yes.

22   Q.    Was he your attorney?

23   A.    He was the attorney for the company.

24   Q.    For Primary Bookkeeping?

25   A.    For Primary Bookkeeping.

1      Q.   For what other companies was he the

2   attorney, if any?

3      A.   I don't know.

4      Q.   Was Dan Myers an idiot?

5      A.   Yes.

6      Q.   Okay.  Why?

7      A.   Why?  Because I believe that, you know,

8   he, you know -- why was he an idiot?  There are a

9   lot of reasons why people are idiots, but, yeah, he

10   was one of the professionals involved in this

11   company.

12      Q.   But, nevertheless, you hired him to do

13   your taxes.

14      A.   Oh, before that.

15      Q.   No, he was an idiot afterwards; that's

16   what you're telling me?

17      A.   No.  Okay.

18           MS. VILMOS:  Object to the form.

19   BY MS. HAVENER:

20      Q.   No, I'm asking.  I'm asking the question.

21      A.   Yes.

22      Q.   When did he turn into an idiot?

23      A.   I believe everybody turned into an idiot

24   sometime in early '06.

25      Q.   What made that happen, do you think?

1    A.   Greed.

2    Q.   But you also testified a minute ago that

3    it was Dan Myers who was telling you about the burn

4    rate and the number of companies that were being

5    acquired?

6    A.   Well, no.  I found out about the number of

7    companies that were being acquired through a

8    publication called the Nexalist, which was a

9    monthly publication that came out of Mirabilis.

10   Q.   But you testified earlier that it was Dan

11   Myers who told you about the burn rate.

12   A.   The burn rate; correct.

13   Q.   So that didn't alter your opinion that he

14   was an idiot.

15   A.   No, it did.  I believe that it was absurd

16   that nobody there was curious -- at least not to

17   me, and I was very verbal and vocal about it --

18   that the company is spending more money than

19   it's -- you know, where is the revenues coming

20   from?

21   Q.   But who was doing all that?

22   A.   Who was doing what?

23   Q.   Who was burning through the money and

24   acquiring companies?

25   A.   I don't know if any one person was

69

1    responsible for that, Kathleen.  I believe it was

2    the decision of the Board to buy the companies.

3         Q.   Without the influence of Frank Amodeo?

4         A.   No, I believe Frank might have had some

5    influence, yes.

6         Q.   Is it your understanding that the role of

7    the Board was to control Frank?

8         A.   Not to control Frank, but to protect him

9    of himself.  To protect him and the shareholders

10   from Frank.  Frank, I believe, had an addiction.

11   As part of the -- I found out after the fact that

12   it's part of the manic depression.  It's just to

13   spend and not have any realistic understanding of,

14   you know, fiscal responsibility.

15        Q.   Did you ever try to cross Mr. Amodeo?

16        A.   Did I ever try to cross him?

17        Q.   Yes.

18        A.   No.  In his viewpoint, perhaps.  But, no,

19   I never tried to cross him.

20        Q.   Did you ever see anybody who did try to

21   cross him?

22        A.   What do you mean by "cross him"?

23        Q.   Stand up to him.  Challenge him.

24        A.   Oh, I stood up to him.  I don't call that

25   crossing, no.

1    Q.    Okay.    So you tried to stand up to him?

2    A.    Yes.

3    Q.    What happened when you did that?

4    A.    I had resigned right after the fact.

5    There was a series of events that led to my final

6    resignation.

7    Q.    But you said that after you resigned you

8    went back as a consultant; correct?

9    A.    Correct, yes.

10    Q.    Did you have any control -- were you ever

11    effective at controlling Mr. Amodeo's conduct?

12    A.    No.

13    Q.    Were you ever -- did you ever see anyone

14    else who could effectively control Mr. Amodeo's

15    conduct?

16    A.    I thought that he was very influenced by

17    Richard Berman and Laurie Holtz.    Extremely

18    influenced.    He actually referred to them as his

19    angels; one on his right shoulder, one on his left

20    shoulder.    That's how he referred to them and

21    that's what they represented to me as well, that

22    they were there to protect Frank from himself.

23    Q.    Do you have any reason to believe that

24    that's not also what they told my clients?

25    A.    That's not what they told your clients?

1      Q.    Well, if they told you that --

2      A.    They told me what?

3      Q.    That they were his angels --

4      A.    Correct.

5      Q.    -- and Frank told you that, do you have

6  any reason to believe that they did not also

7  represent the same thing to my clients?

8      A.    No.

9      Q.    So it's quite possible that my clients

10  were told exactly what you were told.

11      A.    It's possible.

12      Q.    And it's quite possible that --

13          MS. VILMOS:  Object to the form.

14  BY MS. HAVENER:

15      Q.    It's quite possible that they believed it;

16  correct?

17          MS. VILMOS:  Object to the form.

18          THE WITNESS:  I don't know what they

19      believed or what they didn't believe.

20  BY MS. HAVENER:

21      Q.    But it's possible that they believed it.

22      A.    Anything is possible, Kathleen.

23      Q.    And you just testified, am I correct, that

24  you had no reason to believe that they were not

25  told exactly the same things that you were told.

1      A.   I have no reason to believe otherwise.

2      Q.   Right.   Thank you.

3      When you owned Primary Bookkeeping and Mr.

4   Amodeo was involved, were you effective in

5   controlling him and protecting him against himself?

6      A.   I was not, no.

7      Q.   Did you ever see anybody effectively

8   control him?

9      A.   I just answered your question, Kathleen.

10   I believe that Richard Berman and Laurie Holtz were

11   quite effective for a period of time, yes.

12      Q.   When was that period of time?

13      A.   From their involvement through sometime in

14   the middle of '06.

15      Q.   Okay.   If they were effectively

16   controlling Frank, what was the reason for --

17      A.   I don't know if "controlling" is the fair

18   term, Kathleen.   They had --

19      Q.   Protecting him from himself; I think

20   that's what you said.

21      A.   And influencing him, yes.

22      Q.   Okay.   If they were protecting Frank from

23   himself and had influence -- which, let me make

24   this clear.   Did you consider that to be a positive

25   influence?

1      A.   I did.

2      Q.   Okay.   If you believed that Mr. Berman and

3    Mr. Holtz were a positive influence over Frank in

4    the first half of 2006, what caused you to resign?

5      A.   What caused me to resign?   My resignation

6    was very simple, Kathleen.   I received several

7    issues on a monthly basis of the Nexalist.   I saw

8    the company buying more and more companies,

9    spending like, I was told, $8-10 million a month,

10   and Richard Berman, Laurie Holtz, and a slew of

11   other people could not answer where the money was

12   coming from.   Nobody could answer a very simple

13   question:   How is Mirabilis generating all this

14   money?   But what I did witness was everybody

15   pitching Frank on new deals, on new ideas.   But

16   what really -- what really struck me as very

17   peculiar was Presidion, when Frank and company got

18   involved, this is common knowledge, was $50 million

19   in debt to the IRS.   And they were an extremely,

20   extremely, poorly-run company.   Like it was

21   ridiculous.   I'm not going to go bore you with all

22   the details of why I thought so, but it was really

23   quite ridiculous how poorly managed they were.   But

24   what I found very interesting is that in late '05

25   somebody had convinced Frank to separate the entire

1    sales department from the company.  And Frank had a

2    pipeline with his Board of Directors of

3    $5.3 billion in new PEO sales for early '06.  B.

4    Billion, with a B.  You understand that all the

5    PEOs in the world combined probably hardly process

6    $5.3 billion.

7         But the two clients that I recall that were

8    being pitched heavily to Frank Amodeo were Dollar

9    Tree and -- Smithfield Hams?  Was that the right

10   name?  I don't know if you're familiar with it.

11   Your client represented to Frank that she had two

12   companies; one was Dollar Tree and another one was

13   Smithfield Hams.  I believe she was working with a

14   gentleman called Mike Dement.  $550 million and

15   $600 million in payroll.  And I just thought it was

16   laughable.  I thought it was completely laughable.

17        Q.   Why?

18        A.   Because a company that has a half a

19   billion dollars in payroll will not outsource to a

20   PEO.  And for whatever reason, if they chose to

21   outsource to a PEO, it would not be a PEO with a

22   history like Presidion's.

23        Q.   Wasn't Mike Dement an employee of

24   Mirabilis?

25        A.   I don't know.  I don't know Mike Dement.

1    I just knew that he was working with your client,

2    Edie Curry, on bringing those two large clients to

3    bear.

4         Q.   Do you know if there is any documentation

5    of those, what you refer to as, pitches?

6         A.   No.  I just recall being in a meeting in

7    Orlando and being showed a pipeline sales report

8    with $5.3 billion.

9         Q.   When was that?

10        A.   I don't recall exactly, but probably

11   sometime early '06.

12        Q.   And what did you hear at that meeting?

13   Well, first of all, what kind of meeting was it?

14        A.   I don't think it was an official meeting.

15   It was just, you know, Frank --

16        Q.   Do you know why you were in Orlando?  I'm

17   sorry.  I interrupted you.

18        A.   I believe it was just, you know, Frank

19   flaunting that he's going to have $5 billion-plus

20   of new sales.

21        Q.   And it was sometime in '06; correct?

22        A.   Late '05, early '06.  It was late '05 that

23   he separated the sales force from Presidion and he

24   developed a new sales force called Synentre, or

25   something.  I don't recall --

1        Q.   Well, what was Synentre?

2        A.   I don't know.  I believe it was a sales

3    division for PEO sales and marketing of other

4    services, Mirabilis-related services.

5        Q.   Okay.  And when you said "he" separated

6    the sales force from Presidion, you said -- you

7    meant Frank Amodeo?

8        A.   Frank Amodeo.

9        Q.   And Frank Amodeo, apparently, am I correct

10   in understanding --

11       A.   Well, no.  Actually, it was -- officially,

12   I think it was Craig Vanderburg that did it on

13   Frank Amodeo's advice.

14       Q.   Okay.  Am I correct in understanding then

15   that it was Frank -- that Frank Amodeo had that

16   kind of power?

17       A.   That power?  In late '05 he believe he --

18   I don't believe it was power.  I think he advised

19   Craig Vanderburg -- he convinced Craig Vanderburg

20   that he's being properly advised by a whole bunch

21   of very intelligent people and, yeah, they --

22       Q.   And how was that an issue that impacted

23   Mirabilis?

24       A.   Well, it didn't impact -- I don't know how

25   it impacted Mirabilis, but I know it impacted the

1    PEO quite a bit.  He just decimated the entire

2    sales force.  You know, Presidion had a pretty

3    healthy sales division, and sales and customer

4    service.  They were referred to as FSRs; something

5    sales reps.  I'm not exactly sure.  I forgot --

6        Q.   Who were those people?

7        A.   I don't know.  It was 20-some-odd people.

8    I don't --

9        Q.   Can you name any of them?

10       A.   No.

11       Q.   Okay.  So Presidion had a sales force.

12       A.   Yeah, that had been doing pretty well.

13       Q.   That you thought was effective; correct?

14       A.   Correct.

15       Q.   And Frank Amodeo, it's your understanding,

16   advised Mr. Vanderburg to separate the sales force

17   from Presidion; correct?

18       A.   My understanding was that Frank was

19   advised by certain people -- and I don't know who

20   those certain people were -- at Mirabilis.

21       Q.   How did you come by that understanding?

22       A.   Because that's what Frank had told me.

23       Q.   So Frank told you that some people --

24       A.   What's so funny, Edie?

25       Q.   Frank told you that some people at

1    Mirabilis advised him to advise Craig Vanderburg to

2    separate the sales force from Presidion?

3        A.   Correct.

4        Q.   Correct?  And but Frank didn't tell you

5    who?

6        A.   He might have.  He probably did, but we're

7    going back five or six years, so I --

8        Q.   You don't remember who.

9        A.   -- I don't recall.

10       Q.   And how is Presidion related to Mirabilis

11   Ventures?

12       A.   Officially, I have no idea how to answer

13   that question.  Unofficially, Mirabilis was, you

14   know, helping this distressed company and took

15   ownership -- or took management of their PEO

16   division.

17       Q.   Did you resign in June of '06 because you

18   were unhappy with all the idiots?

19       A.   I was uncomfortable --

20            MS. VILMOS:  Object to the form.

21            THE WITNESS:  I was uncomfortable with the

22       situation.

23   BY MS. HAVENER:

24       Q.   Tell me exactly what you mean when you say

25   that you were uncomfortable with the situation.

1       A.   So in late '05 when the decision was made

2   to separate the sales force -- and forget my role.

3   My title was Interim CEO, but my real role --

4       Q.   Interim CEO of AEM; correct?

5       A.   Of AEM, correct.

6       Q.   Okay.

7       A.   But my day-to-day duties was sales.   My

8   goal was to help save this PEO by bringing on new

9   sales.

10      Q.   And when you say, "this PEO," you're still

11  talking about AEM.

12      A.   AEM, correct.

13      Q.   Okay.

14      A.   And when Frank made a decision to have a

15  national sales force and take these 20, 30-some-odd

16  people from Presidion as the working model and have

17  a national sales force and bring on this $5.3

18  billion of sales, I thought it was lunacy.   I tried

19  hard to talk him out of it.   I thought it was

20  completely ridiculous.

21      Q.   Tell me why.

22      A.   I just explained that to you.

23      Q.   No.   Why was it lunacy?

24      A.   Why was it lunacy?

25      Q.   Yes.

1      A.   Because if you combine the four or five

2   highest-grossing PEOs, they probably combined don't

3   have $5 billion of sales.   To organically grow with

4   $5 billion of sales would probably take twenty

5   years, but Frank thought it could be done in three

6   or four months.

7      Q.   And you tried to dissuade him from doing

8   it?

9      A.   I tried to dissuade him from doing it, and

10  I was partially successful.

11     Q.   Okay.   In what way were you successful?

12     A.   I was able to just keep a small skeleton

13  crew of four or five salespeople in the South

14  Florida office.   I made a deal with Frank, let me

15  just have Broward and Dade County; you take the

16  rest of the country.

17     Q.   Who were the people in that sales force in

18  South Florida?

19     A.   Maritza -- I forgot her last name.

20  Ophelia.   And there were one or two other

21  salespeople.   I don't recall their names.

22     Q.   And what do salespeople for a PEO do?

23     A.   They sell PEO services.

24     Q.   And they sell PEO services to what kind of

25  company?

1      A.   Any companies that have employees.

2      Q.   Okay.  When you made that deal to keep the

3  skeleton crew sales force in the South Florida

4  office, was that approved by the Mirabilis Board?

5      A.   I don't know.

6      Q.   Who gave you permission to do that?

7      A.   I don't recall anybody giving me

8  permission to do it, but Frank was okay with that.

9      Q.   So am I correct in understanding that it

10  was Frank Amodeo that you needed to convince to

11  keep your sales --

12      A.   Well, I believe that he needed the consent

13  of the Board, but that wasn't -- I never dealt with

14  the Board.

15      Q.   But you believe that you needed Mr.

16  Amodeo's approval to keep those employees in South

17  Florida; is that correct?

18      A.   I don't know if "approval" is the correct

19  word, but, yeah, I think -- I believe, as a

20  company, I believe that AEM needed approval of the

21  parent company, MVI.

22      Q.   Well, I think you just testified a minute

23  ago that you needed to convince -- that you tried

24  to convince Frank and you were successful.

25      A.   No.  I tried to convince Frank that the

82

1    idea of separating the sales force was lunacy.  It

2    was really ridiculous.

3         Q.   Okay.  And you were partially successful

4    in convincing Frank.

5         A.   To keep the skeleton crew.

6         Q.   To keep your skeleton crew.

7         A.   Correct.

8         Q.   So if someone else was in charge other

9    than Mr. Amodeo, why did you need to convince Mr.

10   Amodeo that what was going on was lunacy?

11        A.   I didn't have too much contact with many

12   other people aside from Frank at Mirabilis.

13        Q.   Why?

14        A.   Because I had lost respect for most of

15   them, to be quite honest, and I --

16        Q.   And had you not lost respect for Mr.

17   Amodeo, as well?

18        A.   Partially, yes.  I did.  But do you

19   understand though that -- do you -- I mean, am I

20   speaking logic to you?  Do you understand -- do you

21   know -- you probably don't know much about PEOs.

22   Do you realize how ridiculous it is to assert that

23   you're going to have $5.3 billion of sales?  Do you

24   realize how ridiculous it is that your client tried

25   to convince Frank that it was very feasible and

1    likely that he was going to have two clients,

2    Smithfield Hams for $550 million, and Dollar Tree

3    for $600 million in payroll?  Does that seem

4    likely?

5        Q.   And did you hear her say that to him?

6        A.   I don't recall.

7        Q.   So if you didn't, how do you know about

8    it?

9        A.   I may have been at a meeting where she was

10   saying it.  I just thought it was --

11       Q.   So do you or do you not remember hearing

12   Ms. Curry say that there were going to be

13   5-point-something billion in sales?

14       A.   I didn't have very many meetings with

15   Curry, so I don't recall her saying that.

16       Q.   So how do you know that it happened?

17       A.   Because I saw a pipeline sales report with

18   people who were responsible next to it.

19       Q.   And who prepared those?

20       A.   I have no idea.

21       Q.   What made you rely on them as solid

22   information?

23       A.   Because it came from the company.  It was

24   a pipeline report for --

25       Q.   And did everything that ever came from the

84

1    company turn out to be true?

2        A.   No, obviously not.

3        Q.   And so do you understand that -- what

4    you're sensing from me is frustration.  Do you

5    understand why that some of what you're saying

6    doesn't make sense to me?

7        A.   Uh-huh.

8            MS. VILMOS:  Object to the form.

9    BY MS. HAVENER:

10       Q.   Because sometimes what you see coming down

11   from the company in writing you're taking as gospel

12   and it's making you angry and it's causing you to

13   --

14       A.   I'm not taking it as gospel.  No, it

15   wasn't being taken as gospel.  It was just I saw a

16   report and I thought it was complete craziness.  I

17   told Frank that I would be impressed if they were

18   able to deliver one percent, one percent of that

19   5.3.  If you could bring on 53 million, I would be

20   elated.  One percent of the 5.3 billion.  They

21   never succeeded in that.

22       Q.   And who is "they"?

23       A.   The sales force and, you know.

24       Q.   So you got information from documentation

25   that was sent to you from the company; correct?

85

1       A.   It wasn't sent to me.   It was showed to

2   me.

3       Q.   Showed to you.   Who showed it to you?

4       A.   I think Bruce Walko or, possibly, Frank.

5       Q.   And you didn't know who prepared it.

6       A.   No.

7       Q.   You believed it to be true.

8       A.   No, I didn't believe it to be true.

9       Q.   Okay.

10       A.   I believed it to be lunacy.

11       Q.   And you tried to convince Mr. Amodeo that

12   it was lunacy.

13       A.   Uh-huh.

14       Q.   And you were successful to the extent that

15   you were allowed to keep a skeleton crew of sales

16   force in your South Florida office.

17       A.   In two counties.   How many counties are

18   there in the country?   15, 20,000 counties?   Yeah,

19   I kept two counties in the entire country.   Not in

20   the State of Florida; in the entire country.

21       Q.   Right.   Which means you were -- are you

22   suggesting to me that that's minimal success or

23   that's really good success?

24       A.   Extremely minimal success.   Extremely

25   minimal.   I mean, think about it.

1     Q.   And so you achieved minimal success in

2  convincing Mr. Amodeo to permit you to keep a

3  certain number of your -- what you consider to be

4  your skeleton sales crew in two counties in the

5  country?

6     A.   Correct.  Because he was being advised by

7  several dozen accountants and lawyers who were

8  saying the contrary.

9     Q.   Now, how do you know that Mr. Amodeo was

10  being advised by these people?

11     A.   Because I witnessed them advising him.

12     Q.   Mr. Amar, you just testified that you were

13  in very few meetings where my clients were present.

14     A.   Correct.

15     Q.   Okay.  In those meetings --

16     A.   I didn't say it was your clients.  Other

17  -- there were other accountants and attorneys aside

18  from your clients.

19     Q.   But, nevertheless, it was my client you

20  were angry with; correct?

21     A.   Correct.

22     Q.   And what I'm trying to get is for you to

23  tell me what the connection is between your not

24  knowing who was giving Mr. Amodeo bad advice and

25  your rage at my client.

1        A.    It was not rage.

2        Q.    Okay.   Your anger at my client.

3        A.    It was not rage.   No, rephrase that.   It

4    was definitely not -- it was not anger, it was not

5    rage.   It was just shock at the audacity of your

6    client.   I was --

7        Q.    You testified before that you were angry.

8        A.    I was angry when I saw the site.   I was

9    not angry at your clients.   I was just shocked at

10   the audacity.   I was angry when I actually saw the

11   Website, yes.

12       Q.    And you were angry because they were

13   selling an anti-fraud product.

14       A.    If they were selling an anti-fraud product

15   and there were these global experts in absolute

16   fraud protection, where was their expertise while

17   this fraud was going on?

18       Q.    What was Curry and Hailstones' connection

19   to the sales force at Presidion?

20       A.    Frank Hailstones was the control person of

21   the company, so he had some --

22       Q.    At Presidion?

23       A.    No, not at Presidion.   At AEM.   At AEM.

24       Q.    So tell me -- I don't understand the

25   connection.   I'm not getting it somehow.   It was

1    the sales force of Presidion that was being

2    separated.

3         A.   Correct.

4         Q.   And what was the connection to AEM?

5         A.   AEM was going to manage the book of

6    business and try to salvage some entity of the

7    company, try to salvage some revenues in the

8    company to keep the company afloat.

9         MS. VILMOS:   Ms. Havener, it's 11 o'clock.

10        Whenever you get a chance, if we could take a

11        break whenever it's a good stopping point for

12        you.

13        MS. HAVENER:   Okay.

14   BY MS. HAVENER:

15        Q.   Were Curry and/or Hailstones in charge of

16   the sales force at Presidion?

17        A.   Not to my knowledge.

18        Q.   Did Curry or Hailstones, to your

19   knowledge, have anything to do with the sales force

20   at Presidion?  Any connection to it?

21        A.   Aside from Ms. Curry marketing two very,

22   very, large clients, I believe there were carrots

23   being dangled in front of Frank.

24        Q.   What proof do you have that that happened?

25        A.   I saw the pipeline report and I was told

89

1    by Frank that Ms. Curry has the ability to bring

2    two very large clients.

3         Q.   And to what extent do you consider Frank

4    Amodeo's report to you reliable?

5         A.   At that time, I thought that they were

6    fairly reliable.  I mean, there was no reason that

7    he would lie to me.

8         Q.   Okay.  You've testified that you thought

9    he was crazy.

10        A.   Correct.

11        Q.   You thought he was manic-depressive.

12        A.   Uh-huh.

13        Q.   And, nevertheless, you believed everything

14   he said to you?

15        A.   No.

16        Q.   How did you pick and choose what you

17   believed and didn't believe?

18        A.   I -- if I saw something in writing and it

19   was presented to me by somebody other than Frank,

20   or even in the presence of Frank, I didn't believe

21   it, but I thought that it was accurately portraying

22   what the company expected.

23        Q.   Even if you didn't know who wrote it?

24        A.   No, I didn't --

25        Q.   Did you ever see documents that you

90

1    thought were inaccurate?

2       A.   No, I can't testify to the fact if they

3    were accurate or inaccurate.

4       Q.   You testified earlier that Frank did not

5    immediately tell you about his background.

6       A.   Correct.

7       Q.   At what point did Frank become a person

8    whose words you believed you could rely on?

9       A.   I never fully --

10      Q.   You said he had no reason to lie to you;

11   correct?

12      A.   Correct.   Correct.

13      Q.   So when?   I'm asking for a time.   At what

14   point did Mr. Amodeo go from being someone upon

15   whose word you could not rely because he didn't

16   tell you about his background to someone upon whom

17   you relied with some consistency?

18      A.   I don't know exactly at what point that

19   happened or at what point that didn't happen.   It

20   kind of --

21      Q.   But it did happen; correct?

22      A.   No, not completely.   It wasn't a complete

23   -- it wasn't a black or white situation, Kathleen.

24      Q.   Okay.

25           MS. HAVENER:   We'll take a break now.

1          (Thereupon a brief recess was taken, after

2     which the following proceedings were had:)

3          MS. HAVENER:  Nicolette, we're going back

4     on.  Aaron Bates has joined us.  So if you'll

5     make a record, Aaron, A-a-r-o-n, Bates,

6     B-a-t-e-s.

7          Are you here appearing as a party, Aaron,

8     or on behalf of Bates Mokwa?  Or do you want

9     to make an appearance, is what I'm asking.

10         MR. BATES:  No, I'm appearing as a party.

11         MS. HAVENER:  Okay.

12  BY MS. HAVENER:

13     Q.   Do you know that Dr. Pollack is a doctor?

14     A.   Yes.

15     Q.   Did you know at the time that these events

16  that we're discussing were happening that he was a

17  psychiatrist?

18     A.   Yes.

19     Q.   Did he ever say anything to you about Mr.

20  Amodeo's mental health?

21     A.   We've discussed it, yes.

22     Q.   During what time period did you discuss it

23  with Dr. Pollack?

24     A.   Probably late '05.  I don't recall exactly

25  and I don't recall the exact conversation, but we

1    did discuss it.

2       Q.   You can't remember what he told you?

3       A.   No.

4       Q.   No part of it?  Any --

5       A.   No.  He just acknowledged that Frank did

6    have some mental illnesses and that he was there

7    and -- kind of help keep an eye out for him.

8       Q.   But you didn't feel any need to resign at

9    that time?

10      A.   No, no.

11      Q.   When is the last time you spoke with Mr.

12   Sadrianna?

13      A.   Probably about a week ago.

14      Q.   And what was the context of that

15   conversation?

16      A.   Just asked him if he was being deposed by

17   Mr. Keller in the near future, because there were

18   some scheduling issues when I had spoken with Mr.

19   Keller's office last, and that was it.

20      Q.   Had he at that time been deposed by us?

21      A.   When did you depose him?  What date?

22      Q.   September 20 -- oh, no, it was the 24th.

23   It was a Friday, September 24th.

24      A.   I may have spoken to him for a couple

25   minutes after that.

1      Q.   Did you discuss the deposition at all?

2      A.   No.

3      Q.   Is it possible that it was Mr. Sadrianna

4  who told you about what was happening in

5  Scottsdale?

6      A.   No, it's not.

7      Q.   And why is that?

8      A.   Because I hadn't spoken to Mr. Sadrianna

9  from, I believe, February of '07 through the

10  pretrial mediation that we had in June.  I hadn't

11  spoken to him in three years.  A little bit over

12  three years.

13      Q.   So if Mr. Sadrianna remembers that he told

14  you about it, he would be lying?

15      A.   No, just -- I don't believe that he'd be

16  lying; just different recollections.  I don't

17  recall talking to him from the first quarter of '07

18  through June of --

19      Q.   Okay.  So please tell me now, I want to

20  move to the events -- oh, when was the -- just, I'm

21  sorry, one more question about that.

22     When was the last time you spoke to Mr. Bates?

23      A.   Mid September sometime probably.

24      Q.   And what was the context of that

25  conversation?

94

1    A.   He and I are good friends.  We just -- you

2  know.  Friendly conversation.

3    Q.   Okay.  Would you please tell me when was

4  the first time you heard anything about what was

5  going to be happening in Scottsdale.

6    A.   You asked that question already, Kathleen.

7  I believe it was about two weeks before the

8  conference.

9    Q.   And I think you testified that it was Mr.

10  Amodeo who told you; correct?

11    A.   Correct.

12    Q.   Do you remember what he said?

13    A.   No.  He just -- we spoke on the phone and

14  he told me, you're not going to believe this.  You

15  know?

16    Q.   And what did you say?

17    A.   I didn't say anything.  I said -- he just

18  said, look at the site, I went to the look at the

19  site, I called him back, and I was like, I don't

20  believe the audacity.

21    Q.   And then did you talk to him in advance

22  about your going out to Arizona?

23    A.   No, I had mentioned to him that first

24  conversation we had about it, or after I viewed the

25  Website, that I have got to see this to believe it.

1    Like I had to see it with my own eyes.  So I wasn't

2    really making any imminent plans to go, but I did

3    mention to him that, hey, I got to see this with my

4    own eyes.  The sheer audacity of your clients I had

5    to see with my eyes.  And I believe I likened -- I

6    believe in the conversation I had with him I

7    likened it to 30, 40 people in a room and somebody

8    dying of cardiac arrest and finding out a few days

9    later that two people in the room are global

10   experts in cardiology or heart surgeons, but they

11   didn't save that client.

12       So it's the same thing I felt about Edie Curry

13   and Frank Hailstones.  I'm like, if they're such

14   experts and if this patented software is so

15   successful, you know, why didn't they detect this

16   fraud?  How did they not detect this fraud?

17       See, the way I viewed it is very simple.

18   Either they were part of the problem with Mirabilis

19   or they were grossly negligent.  I don't see a

20   third solution.  I don't see -- what do you claim,

21   that your clients are just ignorant, were so

22   ignorant that, oh, they believed everything Frank

23   told them?  Is that what you're alleging?

24       Q.   It's not my job to answer questions.

25       A.   Okay.  I'm asking rhetorically, but I

96

 1    don't need an answer.

 2         Q.   I understand.  Did anybody else during the

 3    time that -- I mean, during the time that you're

 4    aware of that they were at Mirabilis, detect fraud?

 5         A.   Detect fraud?

 6         Q.   Did Paul Glover ever say, God, Yaniv, you

 7    know, there's gross fraud going on and, you know,

 8    we need to stop it?

 9         A.   No, he told me there was gross negligence

10    going on.  Because he was -- a few times we had

11    conversations where he was extremely agitated and

12    -- you know.

13         Q.   Did Dan Myers ever say, oh, my God,

14    there's terrible things going on at Mirabilis?

15         A.   Not to me, no.  Not to me.  I don't know

16    --

17         Q.   But have you heard him saying it to

18    someone else?

19         A.   No.

20         Q.   Did Mr. Holtz ever say, oh, my God, you

21    know, there's terrible things going on here?

22         A.   No, no, no.  Holtz actually gave me

23    assurances that things were --

24         Q.   Did Mr. Sadrianna -- he's a CPA; right?

25         A.   Uh-huh.

1     Q.   He used to be an IRS agent; right?

2     A.   I don't know that.  I'd assume that.

3     Q.   And did Mr. Sadrianna ever say, oh, my

4  God, there's terrible things going on at Mirabilis?

5     A.   Not to me.  I don't know what they said to

6  other people.  Like I said, I was not there often

7  in '06.

8     Q.   So after you said, I've got to see this

9  with my own eyes, what happened next?

10     A.   Maybe a week or ten days go by.  I had

11  spoken with Matt and Aaron, and we were just kind

12  of laughing about it, to be quite honest.  I was

13  like -- I just -- really, I thought it was some

14  elaborate hoax.  And then when I realized it wasn't

15  a hoax, I was like, I think I'm going to fly out

16  and see this for myself.  I'm --

17     Q.   Okay.  Go ahead.

18     A.   Yeah, and it was three days before the

19  conference, I believe on the -- I sent you

20  everything on Expedia.  I think I booked it on the

21  11th.  I went for 27 hours, yeah.

22     Q.   And what did Matt and Aaron say to you

23  when you were laughing about it?

24     A.   No, they said that they were -- it wasn't

25  for sure, but they were planning on going just to

98

1    serve Mr. Hailstones and Ms. Curry.  They wanted to

2    make sure that they could serve Hailstones while he

3    was in town or in the country.  I had no idea what

4    they were serving them, what lawsuit.  I was not

5    party to that suit, nor did I care.

6        Q.   Did you have any understanding of any

7    plans before that to file suit -- for Mirabilis to

8    file suit against Ms. Curry or Mr. Hailstones?

9        A.   No, I just -- that was probably a few days

10   before the conference.

11       Q.   When Mr. Amodeo spoke to you about the

12   conference and said, can you believe this --

13       A.   Uh-huh.

14       Q.   I think that's what you testified to.

15       A.   Yeah.

16       Q.   Did he tell you that there was a lawsuit

17   being prepared?

18       A.   No, he told me that they were trying to

19   recover assets, but I don't recall him specifically

20   telling me that he was suing Edie or Frank.

21       Q.   What did he mean when he said they were

22   trying to recover assets?

23       A.   Exactly what it means -- what it says,

24   that there were a whole bunch of -- -

25       Q.   Who is "they"?

1      A.   Mirabilis.   Whatever remnant of Mirabilis

2  was left was trying to recover some assets and

3  retrieve whatever moneys they could.

4      Q.   At that stage, so September of '07, what

5  was your impression of who was left at Mirabilis?

6      A.   Not many people.   Not many people.   Frank,

7  Marty, a couple of attorneys and executive

8  assistants.

9      Q.   Who were the attorneys?

10     A.   Well, Aaron Bates and Matt Mokwa were two

11 of the attorneys, and there were a whole bunch of

12 outside law firms.   And --

13     Q.   Jodi Jaiman?

14     A.   Jodi Jaiman was there, Jay Stollenwerk.   I

15 believe Shane, also, but I don't know in what

16 capacity they were there.

17     Q.   So you spoke with Matt and Aaron about it

18 and what came out of that conversation?

19     A.   Exactly what I just said.   They were

20 tentatively thinking about going to make sure they

21 could sue -- serve notice to Frank Hailstones.

22     Q.   And did you say, I'm going to come too?

23     A.   I said, you know what, I -- no, I told

24 them before that, I go, I think I have to see this

25 with my own eyes.   I gotta go see this.

1    Q.   And they said they were going.

2    A.   They said they may go.  They weren't sure

3  yet.

4    Q.   Okay.

5    A.   They weren't sure yet.

6    Q.   So how did it come about that you knew

7  that you were going to be in Scottsdale at the same

8  time?

9    A.   I booked, I believe, the Thursday prior to

10  that Sunday flight.  Three or four days when I made

11  the final decision.

12    Q.   Okay.  So at this time did Mr. Bates and

13  Mr. Mokwa inform you about the lawsuit?

14    A.   They told me they were going to serve

15  Frank Hailstones.

16    Q.   With the lawsuit.

17    A.   With the lawsuit.

18    Q.   Did you ask what the lawsuit was about?

19    A.   No.

20    Q.   So at some point you learned that you were

21  all going to be in Scottsdale at the same time.

22    A.   Correct.

23    Q.   When was that?

24    A.   When I booked, I believe it was Thursday

25  night, I think I called him on Friday and asked him