1      if they were going.

2          Q.   You called them both?

3          A.   I called Matt, I believe, and he said that

4      he and Aaron were going to be there for a football

5      game on Saturday, Matt lives there, and then we'll

6      meet up on Sunday.

7          Q.   Okay.  And did you meet on Sunday?

8          A.   Yes.

9          Q.   And what was the context of your meeting

10     on Sunday?

11         A.   We went to a bar and watched a football

12     game.  We're friends.

13         Q.   Where was the bar?

14         A.   Somewhere in Scottsdale.

15         Q.   Where were you staying?

16         A.   I gave you the hotel reservation.  Some

17     hotel in Scottsdale.

18         Q.   And when you were at the bar, did you talk

19     about what was going to happen?

20         A.   I'm sure we talked about it, but I don't

21     recall any specifics.  We were just -- we are

22     friends, Kathleen.

23         Q.   I understand.  Were you discussing with

24     them -- did you ever discuss with them, oh, my God,

25     I can't believe the audacity of these people?

1      A.   Yes, yes, absolutely.

2      Q.   And did that happen at that Sunday

3  conversation?

4      A.   No.  At that point, I don't think we

5  discussed it.  I think I just kind of laughed at

6  it.  I just -- you know?  I don't recall any

7  specifics of that.

8      Q.   When I asked you a few minutes ago who was

9  still at Mirabilis and I asked you about Jodi and

10  Jay and Shane, and you said that Frank and Marty

11  and Aaron and Matt --

12      A.   And a couple of security guards.

13      Q.   Yes.

14      A.   I don't recall all the people.

15      Q.   Were you hanging around -- were you still

16  involved with Mirabilis at that time?

17      A.   I was not still involved with Mirabilis,

18  but I was hanging around occasionally, yeah.

19      Q.   What were you doing hanging around?

20      A.   I was just trying to stay close to the

21  information, because I was honestly quite -- I was

22  extremely scared.  And I don't scare easily,

23  Kathleen.

24      Q.   What were you scared of?

25      A.   I was scared of the investigation into the

1    largest 941 fraud in U.S. history.

2        Q.    When did you find out about that

3    investigation?

4        A.    I found out about that investigation in

5    early '07, January of '07, I believe.

6        Q.    And who told you about it?

7        A.    I believe it was Frank.

8        Q.    And so just let me make sure I heard this

9    correctly.  You were hanging around at Mirabilis

10   because you were afraid about the investigation?

11       A.    No, I wanted to stay close to the

12   information.

13       Q.    But you said you were afraid.

14       A.    Yes.

15       Q.    What were you afraid of?

16       A.    Consequences.

17       Q.    For yourself?

18       A.    For myself and for others.

19       Q.    What, specifically, were you afraid of?

20       A.    I've -- aside from a few traffic

21   infractions, I've never had an experience in

22   anything like this, so I just didn't know what to

23   expect.  But I -- you know, there was obviously a

24   concern that a company that I was involved with is

25   being investigated for one of the largest frauds in

1   this country's history.

2       Q.   With regard to Mirabilis, Mirabilis

3   Ventures, or AEM or Nexia Strategy, identify for me

4   any person of whom you are aware as you sit here

5   today who had any criminal history of fraud.

6       A.   The only one that I know of is Frank.

7       Q.   When Mr. Amodeo told you about the

8   investigation, do you remember what he said?

9       A.   About which investigation?  Into --

10      Q.   Into the biggest 941 fraud in U.S.

11  history.

12      A.   No, I don't recall the words, but I recall

13  my reaction.  It was not a good one.

14      Q.   What was your reaction?

15      A.   I was visibly very upset.

16      Q.   Describe your reaction for me.

17      A.   How do I describe a reaction?  I was

18  upset.

19      Q.   Okay.

20      A.   I had a stomachache.  I had a headache.

21      Q.   Rumpelstiltskin was upset.

22      A.   Okay.

23      Q.   You know, were you jumping up and down --

24      A.   No, I wasn't jumping up and down.

25      Q.   -- were you throwing things out the

1    window?

2        A.   No.

3        Q.   I'm asking for a description.

4        A.   No.  I had a stomachache, a headache, and

5    I was like -- I just was not happy.

6        Q.   Were you angry?

7        A.   Yes, I was angry.

8        Q.   Who were you angry at?

9        A.   At Frank and at all his professionals that

10   he had hired to protect the company and --

11   including myself -- from this kind of craziness of

12   happening.  I suspected that there was an issue six

13   months prior to that.  That's why I had resigned.

14       Q.   So when you suspected there was an issue,

15   did you call the authorities?

16       A.   I did not.

17       Q.   Why?

18       A.   I didn't think it was my responsibility to

19   call the authorities.  But I did speak to the

20   professionals that I thought could help.

21       Q.   Who did you speak to?

22       A.   Richard Berman, Laurie Holtz.

23       Q.   When was that?

24       A.   Probably a week prior to my resignation in

25   June of '06.

1    Q.   When you discussed it with Mr. Berman and

2   Mr. Holtz, do you know if there was any record of

3   that meeting?

4    A.   No.

5    Q.   Did anybody take notes?

6    A.   No.

7    Q.   Did you make notes of it yourself

8   afterwards?

9    A.   No, I did not have a stenographer present,

10  no.

11   Q.   That wasn't my question.  I'm not --

12   A.   No, I didn't --

13   Q.   I'm really not trying to be mocking.  I'm

14  just trying to figure out what happened.

15   A.   No, there were no notes.  There were no

16  notes taken.

17   Q.   Okay.  When Mr. Stanley took over, that

18  was after you; correct?

19   A.   That was -- I think he took control

20  officially in May or June as soon as he got

21  approved by the DBPR.

22   Q.   And so you transitioned -- did you begin

23  transitioning out at that time?

24   A.   No.  I actually resigned and left, I took

25  a trip to Israel, and while I was in Israel I got a

1    call from Mike Stanley and Laurie Andrea and --

2    three-hour conversation, and they -- they asked me

3    to stay on.  I refused.  And after three hours of

4    influencing and convincing I agreed to come back

5    after my two- or three-week vacation and help

6    transition --

7         Q.  As a consultant?

8         A.  As a consultant.

9         Q.  Did you tell Mr. Stanley or Miss -- is it

10   Ms., or Mr. Andrea?

11        A.  Mrs. Andrea.

12        Q.  Did you tell Mr. Stanley or Mrs. Andrea

13   about your concerns?

14        A.  Yes.

15        Q.  And what was their reaction?

16        A.  Their reaction -- well, I mean, I really

17   spoke to Mike Stanley about it.  And he -- he was,

18   I believe, a CPA by trade.  He had a lot of

19   experience in the human resource domain.  I think

20   he was named the Mirabilis HR domain -- President

21   of the HR domain.  And I was given some assurances

22   that things were going to be fiscally responsible

23   and --

24        Q.  Did he comment about the purported fraud

25   in the past?

1      A.   No, he didn't, but he did comment that he

2   believed that AEM's 941 status was in good

3   standing.

4      Q.   And did he tell you what gave him that

5   impression?

6      A.   I don't know.  Just the paper trail that

7   he --

8      Q.   So are you telling me that Mr. Stanley

9   wasn't concerned about the investigation?

10      A.   There was no investigation yet at that

11   time.

12      Q.   Oh, right.  Okay.  Sorry.  But you told

13   him about your concerns?

14      A.   Yeah, I was very vocal about my concerns.

15   Everybody knew my concerns.

16      Q.   And Mr. Stanley reassured you and said he

17   thought there were no concerns.

18      A.   He didn't give me any reassurances.  He

19   just told me he thought -- he just spoke to AEM.

20   He didn't speak to Mirabilis.  He just spoke to

21   AEM.  He believed at that time that AEM was in good

22   standing.

23      Q.   So when you found out about the

24   investigation, were you angry with Mr. Stanley?

25      A.   Very.

1      Q.   Did you vocalize that?

2      A.   Yes.

3      Q.   Okay.  Whose job did you think it was to

4    detect fraud at Mirabilis?

5      A.   Well, I thought it was -- you know, I was

6    very comforted -- I can only speak to myself.  I

7    don't know what the official duties were and what

8    the official jobs were, but when I see Laurie Holtz

9    being the dean of forensic accounting, he

10   practically invented the industry of forensic

11   accounting, when I see Frank Hailstones having his

12   anti-fraud Sarbanes-Oxley background, when I see

13   your attorney being, you know, a corporate

14   compliance --

15     Q.   Excuse me.  I don't have an attorney.

16     A.   Excuse me.  Your client, who is an

17   attorney and in charge of corporate compliance for

18   the company, I believed that things were going to

19   be done correctly.  So whose job did I think?  I

20   thought it was all their jobs.  I certainly didn't

21   believe it was Frank's job.

22     Q.   Did you think it was yours?

23     A.   To a certain extent, yes.

24     Q.   So you thought that you had failed as well

25   as everybody else.

1     A.    I never saw a financial statement, I never

2    saw a bank statement, I never transferred a single

3    penny out of any account.

4     Q.    Were you aware that it was Mr. Glover's

5    job to produce financial statements for 2005 in

6    2006?

7     A.    For the first couple of months in '06,

8    yes.  And then I believe that he was marginalized.

9    You know, he was put out to pasture.  I believe

10    that's how I was told.

11     Q.    Who told you that?

12     A.    He did.

13     Q.    Did you know that he was being asked --

14    that he was continually asked, where are the

15    financial statements?

16     A.    Right.  And he got audited financials, I

17    believe, for AEM, or for Mirabilis Ventures.  I

18    don't recall, but there were James Moore & Co --

19     Q.    Do you know when that was?

20     A.    Sometime in the second quarter, I believe,

21    of '06, if I recall correctly.  I don't have it in

22    front of me, but I did see that.  I did see the

23    audited financials.

24     Q.    Did James Moore find fraud?

25     A.    If the financials were audited, I believe

1    they didn't.

2        Q.   So does that lead you to conclude that

3    somebody was hiding fraud?

4        A.   Possibly.  Anybody -- I believe, Kathleen,

5    that anybody that conducts fraud trys to hide the

6    fraud.  But it's -- you know, how can they hide it

7    from 30, 40, 50 accountants and attorneys?  I just

8    -- I don't think any one person is that clever.  I

9    don't think Frank was that clever.

10        Q.   So you think somebody knew about it and

11    covered it up?

12        A.   Yes.

13        Q.   And who do you think that was?

14        A.   Well, I witnessed in -- sometime in '07, I

15    witnessed a video of a Board of Directors meeting

16    that was taken, I believe, April 18th of '06.

17        Q.   Yes.  And you sent that to me in

18    production.

19        A.   Correct.

20        Q.   Right.

21        A.   And they acknowledged -- I don't recall

22    the exact number, but they acknowledged at that

23    time an enormous, enormous tax debt.  And what I

24    recall from seeing that video is that Frank

25    Hailstones, the President of Mirabilis, member of

1    the Board of directors of Mirabilis -- your client

2    here, Edie Curry, was at that meeting --

3    acknowledged that there was an enormous, to the

4    tune of tens of millions, possibly over a hundred

5    million dollars of tax debt.  Oh, but that's a

6    Presidion issue.  Oh, we'll just wrap up the second

7    quarter.  It was already two weeks into the first

8    quarter -- into the second quarter, but it was

9    like, we'll just wrap it up and start fresh

10   July 1st.

11        Q.   Was Mr. Glover at that meeting?

12        A.   If I recall correctly, yes.

13        Q.   Does the fact that there is a problem

14   with, quote, payroll taxes acknowledged necessarily

15   mean that there's a fraud?

16        A.   If we're talking about a rounding error,

17   then no.  But we're talking about a sum that is so

18   huge.

19        Q.   When did you see that April 16th video?

20        A.   Sometime in early '07 I believe Frank gave

21   it to me.

22        Q.   Did you notify the DBPR?

23        A.   The DBPR?  No.

24        Q.   Did you notify the authorities?

25        A.   I did hand a copy to my attorney and asked

1    him if he wanted to share it with the authorities.

2         Q.   Did that happen?

3         A.   I believe so.

4         Q.   Did you know in early '07 that Mr. Amodeo

5    was already in negotiations with Mr. Gold?

6         A.   No.

7         Q.   Do you know that now?

8         A.   Yes.

9         Q.   How did you find out when Mr. Amodeo's

10   negotiations with Mr. Gold started?

11        A.   I don't recall exactly how I found out,

12   but I think I read somewhere on one of the Orlando

13   Sentinel articles that he was an informant.  I had

14   no knowledge of that.

15        Q.   And you also know he pled guilty to

16   committing the fraud.

17        A.   Yes.

18        Q.   So if you're aware that Mr. Amodeo

19   confessed to it, as that's one premise, and if you

20   believe that someone who's committing fraud

21   ordinarily tries to cover it up --

22        A.   Uh-huh.

23        Q.   -- then why is it that you're not angry at

24   Frank Amodeo for the fraud?

25        A.   I'm not saying that I'm not angry at Frank

1    Amodeo.  But I believe that he hired all these

2    professionals to protect him from himself.

3         Q.  And, nevertheless, he did it and confessed

4    to doing it --

5         A.  I don't believe he was that clever --

6         Q.  -- and he succeeded --

7         A.  I don't believe he was that clever to hide

8    it from the -- we're not talking one or two

9    professionals, Kathleen.  We're talking about 80,

10   90 accountants and attorneys, forensic accountants,

11   Sarbanes-Oxley experts.  Yeah, I don't believe he

12   was that clever.  I believe Frank was clever.  I

13   think he's a genius, really.  Personally, I do.  I

14   don't think any one person in the world is that

15   clever, Kathleen.  I really don't.

16        Q.  You didn't suspect it.

17        A.  Oh, I certainly suspected there was

18   something going on very early on.

19        Q.  But you didn't say anything?

20        A.  Of course, I said something.

21        Q.  What did you say?

22        A.  I believe I had a meeting with Laurie

23   Holtz in late March.  He was the only professional

24   that ever -- the only member of the Board that ever

25   came to the company -- to the Doral office.  He

1    came down with Fernando Simo, who was -- had held a

2    title at Mirabilis and --

3        Q.   He was actually the President of

4    Mirabilis.

5        A.   He took over from Frank -- I thought Frank

6    Hailstones was the President of Mirabilis.

7        Q.   I think Fernando --

8        A.   I thought he was COO, if I recall

9    correctly.

10       Q.   Yes.  Right.  Okay.

11       A.   Right.  So he was head of operations.  He

12   wanted to come and see the operation.  Every new

13   person that was introduced to me, it was like -- it

14   was laughable.  Yes, I just need a couple of weeks

15   to get things installed, everything will be

16   fiscally responsibile.  And every time somebody new

17   was introduced, yeah, yeah, we're going to make

18   sure that everything is fiscally responsible.

19       So they came down to see the operation.  They

20   saw that I was running pretty much the same amount

21   of payroll that Presidion was running with -- I

22   believe they had nine offices and 240 internal

23   employees.  I had cut it down to one office and

24   like 70 employees, so just to show how grossly --

25       Q.   You were cut back?

1     A.   Yeah.  But I was still successful in

2   keeping the business operational.  And what I found

3   very funny was -- and I explained this to Fernando

4   Simo and Laurie Holtz -- I go, it's funny that they

5   had a -- Mirabilis, had a $5.3 billion sales

6   pipeline and the entire country to sell their

7   services in and I have four people in one little

8   office.  I think I was responsible for bringing on

9   $95 million of new sales in '06.  You know?  That's

10  noteworthy.

11    Q.   Yes.  And you were -- but you stayed on --

12  Mike Stanley and Ms. Andrea or Mrs. Andrea

13  convinced you to stay on as a consultant.

14    A.   Correct.

15    Q.   So did you consider yourself to be one of

16  the professionals who was supposed to be protecting

17  Frank from himself?

18    A.   No.  No.  I'm not a professional.

19    Q.   Okay.

20    A.   I don't hold any professional degrees.

21    Q.   So was your consultancy focused only on

22  sales?

23    A.   Only on sales?

24    Q.   Yes.  For what were you a consultant?

25    A.   Well, to keep the sales force intact.

1    And, also, Mike Stanley had no plans of moving down

2    to South Florida.  So he asked me to stay on board

3    because, you know, he had concerns that he was

4    going to not be able to earn the respect of all the

5    employees down there.  I believe that's how he

6    worded it to me.

7        Q.   When you resigned, what was your plan for

8    your next venture?

9        A.   I was going to take a little sabbatical

10   and enjoy the first year of marriage with my wife

11   and then find something else to do.  I wasn't

12   concerned.

13       Q.   How much were you paid when you were

14   employed as the President of AEM?

15       A.   It was -- it started out at $8,000 and it

16   moved up to $10,000 a month.

17       Q.   A month.

18       A.   Yeah.

19       Q.   Okay.  I want to finish what we were -- we

20   got sidetracked when we were speaking about

21   Scottsdale.

22        You had the meeting with Mr. Bates and Mr.

23   Mokwa on Sunday.  And what happened after that?

24       A.   After the meeting after the football game?

25       Q.   Yes.

118

1      A.   I think we had dinner, they went to their

2   hotel room, I went back to my hotel room, and we

3   reconvened the next day.

4      Q.   You were staying in separate hotels?

5      A.   Yes.

6      Q.   All three of you?

7      A.   I don't know where they were staying.  I

8   just --

9      Q.   Okay.  And what happened the next morning?

10     A.   The next morning, we met at -- I believe

11  it was the Renaissance, wherever the conference was

12  being held.  Matt and Aaron met with the process

13  server.

14     Q.   You weren't there?

15     A.   No, I was there, yeah.

16     Q.   Okay.

17     A.   But I had no -- I was not party to that

18  conversation.  And we --

19     Q.   What was the conversation at that meeting

20  with the process server?

21     A.   No, nothing.  Just they --

22     Q.   Well, it can't be nothing.

23     A.   No, no.  But they handed -- I don't know.

24  I mean, they handed him the lawsuit or whatever and

25  he said, okay, just he'll find them and serve them.

 1    That was it.

 2        Q.   Who said, go find them and serve them?

 3        A.   No, not -- I didn't say go find.  I said I

 4    think they -- I don't recall exactly the

 5    conversation, but they said that they were going to

 6    point out Edie Curry and Frank Hailstones.

 7        Q.   Did somebody see Ms. Curry out the window?

 8        A.   No.  Not to my -- no.

 9        Q.   Did anybody show Mr. Zollars a picture of

10    either Ms. Curry or Mr. Hailstones?

11        A.   I don't recall them showing a picture.

12        Q.   Okay.  So then I presume after the meeting

13    you all walked out together from the casita where

14    you were meeting; is that right?

15        A.   What's a casita?

16        Q.   Well, the room where you were meeting.

17        A.   Yes.

18        Q.   And then just describe for me what

19    happened, please.

20        A.   We walked -- it's an outdoor hotel.  It's

21    not like an indoor hotel, so it's an outdoor hotel.

22    We walked out of the room where we -- I wasn't

23    staying there, but where we met.  And we were

24    probably, if I recall, I don't know, 60, 70 feet

25    away from the entrance of where the conference was

1    being held.  It was around 8:30 in the morning.

2    And Edie Curry and Frank Hailstones were in the

3    parking lot, the same parking lot we were at,

4    outside.  So they approached us.  And that was

5    interesting.  Edie Curry approached me and said,

6    "Is that Yaniv Amar?"  You know, she was being

7    rhetorical.  And she proceeded to hug me.  And I

8    pulled back and said, "This is not a social call."

9        Q.   Okay.  Can you please use the same tone of

10   voice and at the same pitch and volume --

11       A.   That Edie Curry used?

12       Q.   That you used.

13       A.   What do you mean?

14       Q.   When you pulled back and you said --

15       A.   "This is not a social call."

16       Q.   So it was in a normal tone of voice?

17       A.   A normal tone of voice.

18       Q.   Okay.  And then what?

19       A.   And then she said, "Well, what are you

20   doing here?"  And she goes -- and then she

21   proceeded to -- and then she was -- she acted very

22   defensive.  "If you're here about the lawsuit,

23   well, I can explain."  I was like, "I don't know

24   anything about this lawsuit."

25       Q.   How did Ms. Curry know anything about the

1  lawsuit?  She hadn't been served yet.

2      A.  I don't know.  I believe she might have

3  read the article that just came out two days prior.

4  There was a newspaper article that came out

5  Saturday.

6      Q.  Okay.  Do you know when the conference

7  started?

8      A.  I believe it started on the 14th,

9  October 14th, if I recall correctly.  It's right

10  here.  I don't know.

11      Q.  Okay.

12      A.  Yeah, it started the 14th.  We met the

13  morning of the 15th.

14      Q.  And what did the article say about the

15  lawsuit?

16      A.  You read the article.  I don't recall.

17  It's just Mirabilis recovering assets, and there

18  was one paragraph about Edie Curry and Frank

19  Hailstones in there.  Do you want me to read it?  I

20  have it right there.

21      Q.  If you have it, just tell me what it said

22  about the lawsuit.

23      A.  "A suit against Palaxar Group LLC,

24  ex-Mirablils President Hailstones, and

25  ex-Secretary-Treasurer Edith Curry."

1      Q.   What's the date on that one?  Excuse me.

2   I didn't mean to interrupt you.

3      A.   October 13th, 2007.

4      Q.   Okay.  Go ahead.

5      A.   "Alleges the executives breached contracts

6   to Mirabilis and misappropriated trade secrets and

7   patents developed by the company before they left.

8   The suit said the former executives are marketing

9   an anti-fraud product that would deprive Mirabilis

10  of revenue.  Neither could be reached for comment."

11     Q.   But it doesn't say anything about them not

12  having detected fraud; right?

13     A.   No.  That's what it says.

14     Q.   And why would you think that Ms. Curry --

15  you know she lived in Richmond.

16     A.   Uh-huh.

17     Q.   And she had been in Scottsdale for the

18  weekend; correct?

19     A.   Uh-huh.

20     Q.   Why would you have thought that she would

21  have read the article?

22     A.   Oh, maybe somebody notified her of it,

23  maybe she checked Orlandosentinel.com, you know.  I

24  don't know.

25     Q.   Did somebody have the article with them at

1      that time?

2          A.   At that meeting on Monday morning?

3          Q.   Right.  Yes.

4          A.   Yes.

5          Q.   Who was that?

6          A.   I believe Matt Mokwa had a copy with him.

7          Q.   Okay.  And then what happened?

8          A.   What happened when?  After Edie --

9          Q.   After Edie -- you said she became

10     defensive.

11         A.   Yes.

12         Q.   What did you say next?

13         A.   I said, "Edie, I really" -- "I'm not here"

14     -- "I couldn't care less about this lawsuit."  She

15     goes, "Well, what are you doing here?"  So I

16     responded with a question of my own.  I said,

17     "Well, if you're such a global expert in anti-fraud

18     detection, where in the fuck was your expertise

19     while this fraud was going on?"

20         Q.   Was that the tone of voice you were using?

21         A.   Yes, yes.

22         Q.   Okay.  And who was standing around?  Who

23     was there?

24         A.   Aaron Bates, Matt Mokwa, the process

25     server.  I forgot his name, but Aaron Bates' nurse

124

1    was maybe 10, 15 feet away.  And that was it.

2        Q.   Not Mr. Hailstones?

3        A.   Oh, Mr. Hailstones, of course.  Mr.

4    Hailstones, yes.

5        Q.   And you didn't see anyone else?

6        A.   No.

7        Q.   Nowhere near.

8        A.   No.  There was some people at the entrance

9    of the conference, but that was not near where we

10   were.

11       Q.   When you say, "not near;" how far away?

12       A.   I didn't measure, but 60, 70 feet.

13       Q.   And were you shouting?

14       A.   No.

15       Q.   Okay.  Why in your Answers to

16   Interrogatories was it all written in capital

17   letters?

18       A.   That's how I write.  That's just --

19       Q.   Well, some of it wasn't.

20       A.   That's -- show it to me.  I mean, no, I

21   didn't insinuate that I was shouting because I

22   wrote in capital letters.  That's how I write.

23       Q.   Okay.  Do you remember what else you said

24   after -- you said, "Where the fuck was your

25   expertise when --"

125

1      A.   This $200 million fraud was going on.

2      Q.   Okay.  And did you say anything else?

3      A.   Well, Edie responded with a -- with a very

4  cynical smile, "Well, we'll just let Randy decide

5  about that."  I said, "Randy?"  I said, "Wow,

6  you're on first-name basis with the U.S. Attorney."

7  Okay.  I just found that interesting that she, you

8  know --

9      Q.   Why?

10     A.   Why?

11     Q.   Yes.

12     A.   No, I -- "We'll just let Randy decide."

13  That's not the answer I expected, you know.

14     Q.   Why were you surprised that she was on a

15  first-name basis with the U.S. Attorney?

16     A.   Because I referred to him as "Mr. Gold,"

17  you know, with some reverence.  So Edie Curry was

18  on a first-name basis with him, I thought, okay,

19  you know, that's interesting.

20     Q.   What did you think was interesting about

21  that?

22     A.   I just thought it was interesting.  I

23  didn't think anything other than, oh, wow,

24  interesting.

25     Q.   What did Mr. Mokwa say?

1    A.   Mr. Mokwa said something to the effect --

2    I think Edie said, "What is it in your hands?"

3    Something, you know, "What's the paper?"  She goes,

4    "Hey."  "It's the newspaper; the Orlando Sentinel.

5    Here.  You made the front page."  Something to that

6    effect.

7    Q.   And did he say anything else?

8    A.   Not to my recollection.

9    Q.   Did he say why they made the front page?

10   A.   No.  I don't recall.

11   Q.   When he said, "You made the front page,"

12   how did Ms. Curry respond?

13   A.   She goes, "Can I see that?"  She asked if

14   she could see it.  And she said, "Oh, we made the

15   front page.  Oh."

16   Q.   Had you gone at any time to the

17   presentation or to any part of the seminar?

18   A.   No.

19   Q.   Did you speak -- what happened immediately

20   after the confrontation?

21   A.   We walked away.

22   Q.   What did you say to each other, if

23   anything?

24   A.   I didn't say anything to Edie.  Her and I

25   didn't discuss anything.  And I just --

127

1      Q.   What did you say to Mr. Bates and Mr.

2 Mokwa?

3      A.   After we left?

4      Q.   Yes.

5      A.   Nothing.   We just --

6      Q.   Nothing?

7      A.   I mean, we said, what, you know, whatever.

8 It's done.   I don't know what we talked about.   We

9 just said, you know, wow, okay, that was easy.

10      Q.   Okay.   And what did they say to each

11 other?

12      A.   What did Matt Mokwa and Aaron Bates say to

13 each other?

14      Q.   Uh-huh.

15      A.   I don't recall.

16      Q.   Did you walk away in silence?

17      A.   No, I walked away.   I believe I was

18 chuckling a little bit.   I was just like -- once

19 again, I was just still amazed by the whole

20 audacity.

21      Q.   So you flew all the way to Scottsdale to

22 have this, you know --

23      A.   I didn't -- I flew there -- I flew to

24 Scottsdale to witness with my own eyes to see if

25 this was actually happening.

1   Q.   What?  She was walking around the parking

2   lot?

3   A.   No.  That she was the keynote speaker and

4   this global expert in anti-fraud detection, while

5   she or the company she was very involved with was

6   being investigated for a very large fraud.

7   Q.   That not only Ms. Curry didn't find, but

8   nobody else found either.

9   A.   I don't know.  I don't know who found

10   what.  I know that I suspected things fairly early

11   on.  And I'm --

12   Q.   But you didn't do anything about it.

13   A.   I resigned.  And I expressed my concerns

14   with the Board of Directors.

15   Q.   Did you express your concerns to the Board

16   of Directors with Ms. Curry present?

17   A.   No.

18   Q.   And even though you were --

19   A.   I had very little contact -- I explained

20   that to you, I had very little contact with Ms.

21   Curry during 2006.  We had one confrontation about

22   her trying to convince Frank Amodeo to move the PEO

23   processing center to Richmond, Virginia.  I thought

24   that was another one of her laughable moves.

25   Q.   Why?

1    A.   Because we just -- the company just spent

2    an enormous amount of time, energy, and suffered a

3    huge amount of client attrition for moving the

4    processing center from Jupiter, Florida, down to

5    Doral, Florida.  And two months after doing it,

6    somewhat successfully, Edie Curry is trying to

7    convince Frank to move the processing center to

8    Richmond, Virginia, to process payroll.  I just

9    found that interesting.

10    Q.   Well, I also want to go back to Scottsdale

11    for a second.  You flew all the way out to

12    Scottsdale because you said you wanted to see for

13    yourself --

14    A.   For myself.

15    Q.   -- that she was the keynote speaker, or

16    somebody was the keynote speaker, at this

17    presentation about anti-fraud.

18    A.   Yeah.

19    Q.   But you didn't go to see the speech.

20    A.   No.

21    Q.   You didn't go to see the presentation.

22    A.   I wasn't a member.  I wasn't invited to

23    the presentation.

24    Q.   And you weren't interested in what they

25    had to say?

130

1      A.   No.  I just wanted to see if they were

2  really actually -- if they really had the audacity

3  to show up.

4      Q.   Did you have any reason to believe that

5  they wouldn't?

6      A.   No.  I just --  it's one of those things

7  that I wanted to see for myself.

8      Q.   And -- okay.

9      A.   Is that so hard for you to believe,

10  Kathleen, that I had to -- I wanted to see this

11  with my own eyes?

12      Q.   I'm not here to answer questions.

13      A.   Yeah.

14      MS. HAVENER:  Would you please mark this

15      -- we only need to write it on mine.  She'll

16      mark one and -- oh, we only need one.  I

17      didn't realize -- I forgot I made a copy for

18      your counsels.  We'll start with 450.

19      (Thereupon a document was marked

20      Plaintiff's Exhibit 450 for Identification in

21      the proceeding.)

22  BY MS. HAVENER:

23      Q.   You're holding in your hand a copy of

24  what's been marked as 450.  Do you recognize this

25  as your resignation from Common Paymaster?

1      A.   Yes.

2      Q.   What did you mean when you said that --

3  oh.  Just would you read your last paragraph, the

4  third paragraph?

5      A.   "My employment in your company has been

6  professionally rewarding and I appreciate the

7  interest you have showed in my career since I have

8  joined the company.  I wish Common Paymaster

9  continued success."

10      Q.   And you copied it to?

11      A.   Marty Flynn, Laurie Holtz, Frank Amodeo.

12      Q.   And what did you mean by when you said it

13  had been professionally rewarding?

14      A.   It was just a polite way of handing in my

15  resignation.  I didn't really mean anything by it.

16  It wasn't necessarily that rewarding, but I just

17  wanted to be polite in my departure.

18          (Thereupon a document was marked

19      Plaintiff's Exhibit 451 for Identification in

20      the proceeding.)

21  BY MS. HAVENER:

22      Q.   I'm handing you what is marked as

23  Exhibit 451, Plaintiff's Exhibit 451.  And it's the

24  Minutes of a Special Meeting of the Board of

25  Directors of Mirabilis Ventures, LLC, held on

1    December 28th, 2006.

2        A.   Uh-huh.

3        Q.   Now, I think I asked you before, but I

4    just need to remind myself.  Were you ever on the

5    Board of Directors of Mirabilis?

6        A.   Like I told you, in early or mid '05 I may

7    have been, but --

8        Q.   And at some point you were a shareholder

9    in Mirabilis.

10       A.   Correct.

11       Q.   At any point were you aware of being the

12   sole shareholder at Mirabilis?

13       A.   Like I said, somebody tried to convince me

14   of that in early '07, but --

15       Q.   Are you aware of having been the only

16   shareholder who owned any voting shares in

17   Mirabilis?

18       A.   Once again, somebody tried to convince me

19   of that in early '07.

20       Q.   And I think you testified before that it

21   was never your impression that Mr. Amodeo had

22   control over Mirabilis Ventures.

23       A.   No, I didn't say that.

24       Q.   Well, what did you say?

25       A.   I said I didn't believe he ever had the

1    sole control over Mirabilis Ventures.

2       Q.   Oh, I remember what I wanted to ask you.

3    You were at the company in February of '06;

4    correct?

5       A.   Correct.

6       Q.   Were you a participant in the telephone

7    call that happened that was referred to as the

8    "all hands call" that occurred on February 28th,

9    2006?

10      A.   Refresh my memory.  I don't recall that

11   telephone call.

12      Q.   There was a conference call which Mr.

13   Amodeo asked everyone in the company to dial into,

14   and during that phone call he expressed very

15   extreme dissatisfaction, as I understand it, with

16   Ms. Curry.  Do you remember that?

17      A.   I don't remember it being on that call,

18   but I recall that -- something happening.  This was

19   in February of '06?

20      Q.   Yes.  On February 28th of '06.  You don't

21   remember being on the call?

22      A.   I don't recall being on that call.

23      Q.   Do you remember having any discussions

24   about that call?

25      A.   No.

1          Q.    Do you remember hearing about the call?

2          A.    I remember something, there was some kind

3     of a rift between them, but I didn't recall -- I

4     didn't think it was that early.  I thought it had

5     been after my departure.  I don't recall it being

6     in February or March of '06.

7          Q.    So you don't -- okay.  Thank you.

8               MS. HAVENER:  I'm sorry.  For those on the

9          phone, did I finish reading into the record

10         what this exhibit is?

11              MS. VILMOS:  The Board meeting minutes?

12              MS. HAVENER:  Yes.

13              MS. VILMOS:  Yes.  December 28th, 2006?

14              MS. HAVENER:  Correct.

15              MS. VILMOS:  Yes.

16    BY MS. HAVENER:

17         Q.    Do you know if you've ever seen this

18    document before?

19         A.    I have not.

20         Q.    And who signed it, please?

21         A.    Mark J. Bernet.

22         Q.    And who is that?

23         A.    I believe he replaced Richard Berman as

24    the corporate counsel for Mirabilis.

25         Q.    Did you ever know him?

1     A.   Yes.

2     Q.   How did you know him?

3     A.   He contacted me in early '07 introducing

4  himself as the new counsel at Mirabilis.

5     Q.   And what else did he say?

6     A.   What else did he say when?

7     Q.   When he contacted you in early '07.

8     A.   What did --

9     Q.   Why did he call you to introduce himself?

10  What was your connection with Mirabilis at the

11  time?

12     A.   I had no connection with Mirabilis aside

13  from consulting and --

14     Q.   So you were a consultant at the time?

15     A.   Correct.

16     Q.   Do you know why Mr. Mark Bernet called

17  you?

18     A.   No.  He had heard about me and wanted to

19  introduce himself to me.  And he did.

20     Q.   And you don't know why?

21     A.   No.  Just -- I don't know why.  I guess he

22  -- whatever remnant was left he wanted to speak

23  with and investigate the situation.

24     Q.   Okay.  If you'll take a look at these

25  minutes.

1    A.   Yes.

2    Q.   I'm just going to read into the record for

3  the benefit of the people on the phone.

4    A.   Which paragraph are you reading?

5    Q.   I'm starting at the third paragraph where

6  the bullet points -- with the "Mr. Bernet..."

7    "Mr. Bernet suggested the following agenda for

8  the meeting:

9    - A report from Mr. Walsh and Mr. Hailstones

10  concerning their conversation of December 22, 2006,

11  with Frank Amodeo, relating to the funding issues

12  of the Company."

13    A.   Uh-huh.

14    Q.   Okay.  Second:

15    "A discussion concerning a potential

16  $9 million tax credit held by AEM, Inc., and Marty

17  Flynn's request that a portion of that credit be

18  used to pay delinquent taxes owed by

19  SecureSolution."

20    A.   Uh-huh.

21    Q.   "A discussion concerning the issuance of

22  'target' letters by the United States Attorney to

23  Marty Flynn, Bob Palumbo, Bob Konicki, Dan Meiers

24  [sic] and Bob Curry.

25    " - A discussion concerning the status of the

137

1    sale of the PEO assets."

2        A.    Uh-huh.

3        Q.    And then at the bottom of the next

4    paragraph it says:  "Mr. Bernet reported that in

5    his conversation with Mike Stanley prior to the

6    Board's meeting, Stanley reported that he could not

7    value the companies."

8         Would you please read the next paragraph into

9    the record?

10       A.    "Holtz said that the PEO sales are another

11   example of the control that Frank Amodeo has over

12   MVI.  Holtz said that Mr. Amodeo has always had

13   control of MVI, but that he was to turn control of

14   MVI over to professional business managers and an

15   independent board of directors.  So far, this has

16   not happened, but the current Board needs to take

17   steps to assure that it occurs."

18       Q.    And the next page, the last paragraph on

19   the page.

20       A.    "Mr. Walsh then led a discussion

21   concerning the meeting last week involving Mr.

22   Walsh, Mr. Hailstones and Mr. Amodeo.  Mr. Walsh

23   stated that Mr. Amodeo agreed that after

24   December 31, 2006, MVI will control all of its bank

25   accounts, and that only MVI would be permitted to

1    commit MVI to any transactions.  Mr. Walsh told Mr.

2    Amodeo that MVI has a cash need of approximately

3    $17 million for 2007, in response to which Mr.

4    Amodeo suggested that Titanium would retain SimDag

5    until at least April 1, since most of its funding

6    needs would be fulfilled at that time."

7         Q.   Okay.  You can stop now.  Unless if you

8    want to continue, feel free.

9         A.   No, that's fine.

10        Q.   What's SimDag?

11        A.   I don't know.  One of the companies.  I've

12   heard that name before.

13        Q.   Okay.

14        A.   One of the Mirabilis-held entities.

15        Q.   And you said before that Mr. Bernet signed

16   this.

17        A.   That's what it shows here.

18        Q.   And he signed it as the Acting Secretary;

19   correct?

20        A.   Yeah.  I don't know that that's his

21   signature, but it says, "Mark J. Bernet, Acting

22   Secretary."

23        Q.   Okay.  Do you have any reason to suspect

24   that Mr. Bernet would sign something that was

25   false.

139

1     A.   No.

2     Q.   So does it make sense to you that these

3 are the correct minutes of that meeting?

4     A.   Yes.

5     Q.   And does that reflect in any way your

6 understanding of the way Mirabilis had worked up

7 until that point?

8     A.   This is the first time I'm reading this

9 document.

10     Q.   I understand.

11     A.   Yeah.

12     Q.   But we've had several conversations and

13 had several questions and answers about Mr.

14 Amodeo's control versus the Board's control.

15     A.   Yeah.  This --

16     Q.   Do you recall those?

17     A.   No, I don't recall, but this doesn't --

18 this, to me, doesn't reflect the way things

19 happened at Mirabilis.  This is dated December 28th

20 of 2006.  I think this was already when the

21 situation was about to implode and people were

22 trying to save --

23     Q.   Well, not only you were gone, but Ms.

24 Curry was gone too.

25     A.   I don't know when she resigned.  When did

1    she resign?

2       Q.   In October -- or actually she was told in

3    September that her -- that the Richmond base of

4    Nexia Strategy was no longer going to be funded and

5    her resignation was effective at the end of October

6    of 2006.

7       A.   Okay.

8       Q.   But beginning in September, they were

9    negotiating her departure.

10      A.   Uh-huh.

11      Q.   So you're not the only person who left.

12      A.   I was the first though.

13      Q.   Really?

14      A.   I'm proud to say that I believe I was the

15   first.  I don't know if anybody -- that's what I

16   believe.  I don't know if it's factual or not, but

17   that's, you know --

18      Q.   And when you resigned, were you taking a

19   stand?  Was that your understanding of what --

20      A.   Yes.  Because I resigned, I did not ask

21   for any of my severance pay that I was entitled to,

22   and I did not ask to hold on to my shares.  I

23   resigned and I relinquished all my shares known and

24   unknown to me, and I didn't demand my severance

25   pay.

1     Q.   Is there any reason why those stats are

2   not conveyed in your resignation letter?

3     A.   No, but they are conveyed in the Hold

4   Harmless Agreement that I was handed a week later.

5     Q.   Do you have a copy of that?

6     A.   I don't know if I have it here, but I do

7   have a copy of that.

8     Q.   Could you provide that to me, please?

9     A.   My Hold Harmless Agreement?

10    Q.   Yes.  At your earliest convenience.

11    A.   Yes, I suppose I can.  I didn't bring a

12   copy of it.

13    Q.   Are you aware of the terms of Ms. Curry's

14   separation?

15    A.   No.

16    Q.   Do you know if she gave up her shares?

17    A.   I have no idea.

18    Q.   Do you know if she ever owned any shares?

19    A.   I saw her at the shareholders meeting in

20   January so I presume that she was a shareholder,

21   but, no.

22    Q.   Do you know if any shares were ever issued

23   to Ms. Curry?

24    A.   No.

25    Q.   And you don't know the terms of her

1   separation.

2       A.   No.

3       Q.   Do you know if she accepted her severance?

4       A.   I have no idea, Kathleen.

5       Q.   Would that make any difference to you?

6       A.   No, none whatsoever.

7           MS. HAVENER:   Okay.   Would you please mark

8       this as the next in succession.

9           (Thereupon a document was marked

10      Plaintiff's Exhibit 452 for Identification in

11      the proceeding.)

12  BY MS. HAVENER:

13      Q.   Okay.   I'm showing you what's been marked

14  as Exhibit 452 in this deposition.

15      A.   Yes.

16      Q.   Do you recognize this document, Mr. Amar?

17      A.   Not offhand, but I don't -- if I did see

18  this, I haven't seen it in four-and-a-half years so

19  I don't recall it, but --

20      Q.   Okay.   As you know, when you get an e-mail

21  stream they don't start at the top, they start at

22  the bottom.

23      A.   Okay.

24      Q.   At the bottom of the first page --

25      A.   Yes.

1    Q.   -- do you see that Mr. Vanderburg is

2    sending an e-mail to himself and to Tessah Ivey?

3    Do you --

4    A.   No.  Isn't --

5    Q.   At the bottom of the first page.

6    A.   Oh.  Craig Vanderburg is sending it to

7    himself and to Tessah, yes.

8    Q.   Do you agree with me that it was not

9    uncommon for Mr. Amodeo to use other people's

10   e-mail addresses to communicate?

11   A.   Well, he had executive assistants that

12   communicated for him, yes.

13   Q.   I understand.  And so when Ms. Ivey was

14   sending out an e-mail, it was not uncommon for

15   people to be communicating with her because they

16   wanted Mr. Amodeo to know something; correct?

17   A.   That's my understanding.  I didn't

18   communicate via Tessah, but --

19   Q.   Did you have Mr. Amodeo's e-mail?

20   A.   I had his cellphone number.  I mostly

21   called him on his cellphone.

22   Q.   So you don't remember communicating with

23   him via e-mail?

24   A.   I'm sure we have on rare occasions, but I

25   really spoke to him on the cellphone.

1     Q.   Do you know if you ever communicated with

2   Ms. Ivey or Mr. Williams or --

3     A.   Yeah, I'm sure I have, yeah --

4     Q.   -- other people --

5     A.   -- and traced all the work, yes, I'm sure

6   I --

7     Q.   -- intending to get the message to Mr.

8   Amodeo?

9     A.   Yes.

10     Q.   Okay.  And in this e-mail, which is dated

11   February 1st, 2006 --

12     A.   Uh-huh.

13     Q.   -- Mr. Vanderburg is communicating with

14   Tessah and he says he wanted to follow up with

15   Frank on this.  "Yaviv--" which I presume refers to

16   you "-- is pushing to get this account/checkbook.

17   Thanks."

18     A.   Yes.

19     Q.   Do you remember what that's referring to?

20     A.   Yes.

21     Q.   Could you explain it to me?

22     A.   I actually didn't have any financial

23   control over the PEO, so every time we needed to

24   get something approved it would have to go through

25   the chain of command, the whole Mirabilis chain,

1    until it got accepted or approved by the -- some

2    form of subcommittee from the Board of Directors.

3    So I asked --

4        Q.   Even though you were AEM?

5        A.   Correct.  Well, AEM was --

6        Q.   A subsidiary, yes.

7        A.   -- a subsidiary of MVI.

8        Q.   Yes.  But it didn't have its own Board?

9        A.   No, it did not have its own Board.  But I

10   was pushing to get, what I referred to, WD-40

11   money.  I needed a few thousand dollars in a

12   standalone account where I could take care of

13   little things, whether it be marketing, but I

14   remember why I was pushing hard for it at this

15   time.

16       Q.   Can you tell me why you were asking Frank

17   and not the Board?

18       A.   I -- I didn't follow protocol.

19       Q.   Would you say that it was unusual for

20   people to ask Frank rather than the Board?

21       A.   I don't know what was usual or unusual.  I

22   just know that I didn't follow the protocol.

23       Q.   You didn't go through the Board to get

24   something you wanted from Mr. Amodeo?

25       A.   In this instance, I recall talking to

1   Frank Amodeo and Daniel Myers about it, saying that

2   I need a standalone account.

3       Q.   So you have given me the impression in

4   this deposition that you expected that the Board of

5   Directors should be overseeing what Mr. Amodeo was

6   doing.

7       A.   Uh-huh.

8       Q.   Nevertheless, you did not approach the

9   Board of Directors, or anybody on it; you went

10  directly to Mr. Amodeo.

11      A.   In this case --

12          MS. VILMOS:  Object to the form.

13          THE WITNESS:  In this case, I believe I

14      went to Daniel Myers and then it was escalated

15      to Frank Amodeo.

16  BY MS. HAVENER:

17      Q.   Okay.  Thank you.

18          MS. HAVENER:  This one has already been

19      marked as another exhibit.  It's already been

20      marked by one of the other court reporters, if

21      you understand what I'm saying, Edie.  One of

22      the other court reporters has the original

23      copy.

24          THE WITNESS:  Is that for me?

25  BY MS. HAVENER:

1      Q.   Yes.   This has already been marked as

2   Exhibit 412 in a different deposition.   If you

3   would just look through this series of e-mails,

4   please.

5           MS. HAVENER:   For those of you on the

6        phone, it starts with an e-mail of July 7th,

7        2006, from Claudia Amell to Dan Myers.

8           THE WITNESS:   Uh-huh.   Who is Claudia

9        Amell?

10  BY MS. HAVENER:

11     Q.   I have no idea.

12     A.   What was that?

13     Q.   Edie believes that she was Dan Myers'

14  assistant.

15     A.   Okay.

16     Q.   Okay.   If you'll turn to the back page,

17  please.   I'm showing you what is -- the back page

18  of this exhibit is Page 124 of Mr. Gold's cross

19  examination of Frank Amodeo.   I'm sorry, I don't

20  know what date it is.   I think it's May 14th of

21  2009.   It's part of the sentencing transcript.

22     A.   Okay.

23     Q.   And if you'll look at -- start at Line 8

24  --

25     A.   Uh-huh.

1      Q.   -- and go down to the end of the page.

2      A.   Okay.

3      Q.   The question is:

4      "All right.  And that is the minutes of

5    Mirabilis Ventures, Inc., dated February 15th,

6    2005, a Special Joint Meeting of the Directors and

7    Shareholders, is that correct?"

8          The answer is:  "That's correct."

9          And it's Mr. Amodeo who is answering the

10   questions.  I'm just explaining to you.

11     A.   I understand.

12     Q.   Question -- and on Page 2 it says:

13     "It's signed by you; is it not?

14     "A.  Yes, it is.

15     "Q.  It says Frank Amodeo is sole director and

16   shareholder?

17     "A.  Yes, it does.

18     "Q.  So --

19     "A.  We've been over this, Mr. Gold.  You know

20   I was only a proxy for Mr. Amar.  They didn't give

21   me the stock.  He held the stock because he didn't

22   get his money.  By the time he got his payments,

23   they didn't release the shares to me.  They didn't

24   want me involved.

25     "Q.  My question is, does that say you were

1   the sole director and shareholder?

2      "A.  It does say that."

3      Did I read that correctly?

4      A.  Yes.

5      Q.  What's your understanding of the situation

6   around February 15th, 2005, as to who owned the

7   shares in Mirabilis?

8      A.  My understanding was it was Frank that

9   owned the shares at that time.

10      Q.  Okay.  Would you turn to the

11   next-to-the-last page, please.

12      A.  Yes.

13      Q.  Have you ever seen this document before?

14      A.  If I have, it's been six-and-a-half years,

15   so, I mean --

16         MS. HAVENER:  For those of you on the

17         phone, this is the Revocable Proxy; as always,

18         unsigned.

19         MS. VILMOS:  Did you mark it as a new

20         exhibit number?

21         MS. HAVENER:  No.  It's part of a

22         composite exhibit.  I'm going to tell you --

23         MS. VILMOS:  Oh, 412?

24         MS. HAVENER:  Yes.  It's the

25         second-to-the-last page of 412.

1  BY MS. HAVENER:

2      Q.   Have you ever seen it?

3      A.   If I have, it's been six-and-a-half years,

4  so I --

5      Q.   Do you remember it being referred to

6  recently?

7      A.   No.

8      Q.   Did you ever sign an irrevocable proxy

9  with respect to shares in Mirabilis Ventures that

10  you recall?

11      A.   No.  This is unsigned.  And I assume if

12  there was a signed copy, you'd have it.  I don't

13  recall signing it, but I may have.

14      Q.   When Mr. Amodeo testified on the previous

15  page as we read into the record, was he telling the

16  truth?

17          MS. VILMOS:  Object to the form.

18  BY MS. HAVENER:

19      Q.   As you understand it.

20      A.   I don't know when this was dated and I

21  don't know if he was telling truth or not.

22      Q.   Well, the date is written in there

23  February 15th, 2005.  So it's as of that date.  He

24  testified, on the other hand, on May 14th, 2009,

25  but he's testifying about February 15th, 2005.

151

1       A.   I don't know what my impression is.   This

2    is the first time I've read this.   I don't know if

3    he was telling truth or not.

4       Q.   Well, he says he was a proxy for you.   Is

5    that right or not?

6       A.   Yeah, I'm not sure.   I'm not sure if it's

7    right or not.   I don't recall giving a proxy or

8    being the sole shareholder, but --

9       Q.   You don't recall ever being the sole

10   shareholder?

11      A.   I recall incorporating the company and

12   handing him, you know --

13      Q.   I'm sorry.   Excuse my coughing.   I didn't

14   hear what you said because I was coughing.

15      A.   I recall incorporating the company in

16   Nevada and handing Frank the company, the stock.

17      Q.   And -- that's interesting.   Do you

18   remember whether or not it was bearer stock?

19      A.   I recall something to that effect that it

20   was bearer stock.

21      Q.   And you handed the bearer stock to Mr.

22   Amodeo?

23      A.   I don't recall if there were actual

24   certificates or not, but I recall being explained

25   that bearer stock was whoever bears the stock owns

1    the stock.

2        Q.   Why did you hand the stock to Mr. Amodeo?

3        A.   Because there was never my intention to be

4    the owner of this company.

5        Q.   If you'll -- we're going backwards through

6    the exhibit.  The next is --

7        A.   The staple just came undone.

8        Q.   I'm sorry.  The next thing we're looking

9    at is at the bottom of what is the fourth page of

10   the exhibit, counting from the front.  So the third

11   to last.  And it's an e-mail from Yvette Ramos.  Do

12   you know who that is?

13       A.   Yvette Ramos?

14       Q.   Uh-huh.

15       A.   No.

16       Q.   To Claudia Amell.  And we've identified

17   Ms. Amell as Dan Myers' executive assistant.  And

18   Yvette Ramos appears to be -- this is an e-mail

19   dated Friday, July 7th, 2006, at 10:40 in the

20   morning.  And it says, "E-mailing Proxy."  And

21   apparently a document called "Proxy" was attached

22   to the e-mail.  Do you have any understanding of

23   what that is about?

24       A.   No.

25       Q.   And then the next is an e-mail from

1    Claudia Amell dated July 7th, 2006, at two minutes

2    later, and it's to Dan Myers.  Again, it says,

3    "E-mailing Proxy.  Is this what you're looking

4    for?"

5         The next one is Dan Myers, Friday, July 7th,

6    2006, e-mail at 11:25 to you.  Says:  "Subject:

7    E-mailing Proxy.  Here it is."

8         Do you recall that?

9    A.   From Dan Myers to me, "Here it is."  No, I

10   don't recall that, but --

11   Q.   And the next one is six minutes later,

12   Friday, July 7th, 2006, at 11:31 a.m., from you to

13   Richard Berman.  Subject is:  "E-mailing Proxy."

14   What's attached is a document called,

15   "proxydocpdf."  "Richard, here it is.  Let me know

16   if you need anything else.  Regards and good shava,

17   Yaniv."

18   A.   Yes.

19   Q.   Do you remember that at all?

20   A.   No, I don't recall this.

21   Q.   Do you even know what it's talking about?

22   A.   I'm going to assume that it has to do with

23   -- because he was drafting the Hold Harmless and

24   indemnification that I had requested after I

25   resigned, that he needed all the paperwork that led

154

1    to my employment and resignation.

2         Q.   So you didn't have the Hold Harmless

3    Agreement at the time that you resigned?

4         A.   No, no.  It was handed to me --

5         Q.   It was ex post facto.

6         A.   Yes.

7         Q.   Okay.

8         A.   What is ex post facto?  It's just after

9    the fact?

10        Q.   After the fact.

11        A.   After the fact.  It was probably two or

12   three weeks after, I received it.

13        Q.   Okay.  Now, the next one, for some reason,

14   is earlier.  It's Thursday, July 6th, at 6 o'clock

15   at night, 2006.  It's from Yaniv Amar to Dan Myers,

16   and the subject is, "Power of Attorney and -- well,

17   and "Proxy Control."  Do you know what you were

18   referencing with about twenty exclamation points

19   after it?

20        A.   Exclamation marks.

21        Q.   Do you remember what you were referencing

22   in that e-mail?

23        A.   I'd like to see the e-mail that Dan sent

24   me that I responded that way, but, no.

25        Q.   Well, I think that might be -- okay.

1    Well, I'm mistaken.  Dan Myers then e-mails a few

2    minutes later, or half an hour later, 6:44 p.m.,

3    the same date, July 6th, 2006.  He e-mails his own

4    executive assistant forwarding your e-mail, which

5    doesn't have a subject line.  So there's no

6    subject.  "Please help me find this.  Thanks."

7         A.   Uh-huh.

8         Q.   Presumably, that's referring to this Power

9    of Attorney and Proxy Control.  That would appear

10   correct; right?

11        A.   That's a fair presumption, yes.

12        Q.   And Claudia Amell then responds the next

13   morning at 9:12 to Dan Myers.  Again, the subject

14   is just, "Re," and it says, "For whom?"

15        A.   Uh-huh.

16        Q.   And Dan Myers responds five minutes later,

17   "Yaniv and Frank for control of Mirabilis.  Can't

18   you read my mind?"

19        Obviously -- well, obviously nothing.

20        Okay.  And then here's the e-mail again, your

21   July 6th, 6:14 in the evening --

22        A.   Why is it only the subject?  Where is the

23   rest of the text in that e-mail?  Did you have

24   that?  Or it was just --

25        Q.   No.  This was produced to us by Mirabilis.

1   It is what we got.

2        A.   Okay.  I would like to see where the

3   actual content of the e-mail went, but, okay.

4        Q.   You mean what you were referencing?

5        A.   I understand that I was probably

6   referencing, you know, part of the --

7        Q.   Something that --

8        A.   No, because Richard Berman had probably

9   asked me in order to correct -- and I will try to

10  get you a copy as soon as possible -- the

11  indemnification and Hold Harmless --

12       Q.   Okay.

13       A.   He asked to reference all the agreements

14  that were signed.

15       Q.   Okay.

16       A.   So I thought that Dan Myers or Procuri or

17  something had this beautiful document saving --

18       Q.   Pro --

19       A.   Procuri.  It was this document --

20       Q.   Oh, yes.  Okay.  A document management

21  system?

22       A.   Yeah, I believe it was Edie Curry's idea,

23  but --

24            MS. VILMOS:  Ms. Havener, I just wanted to

25       -- it's 12:20.  Were you planning on breaking

1          for lunch?  Or what's the plan?

2                MS. HAVENER:  Yes, I was going to stop at

3          12:30, if that's okay.

4                MS. VILMOS:  Okay.  That's fine.

5     BY MS. HAVENER:

6          Q.   And then apparently Ms. Amell asks

7     Ms. Ramos for it and she sends it, and then

8     Ms. Amell sends an e-mail to Mr. Myers and says,

9     "Is this what you were looking for?"

10         And you think that -- I'm just trying to get

11    this straight.  You believe that this is all in

12    association with your Hold Harmless Agreement and

13    the negotiations --

14         A.   And my resignation, yes.

15         Q.   Okay.  Thank you.

16               MS. HAVENER:  Would you mark this one as

17         the next in succession, please.  Am I correct,

18         it's 453?

19               (Thereupon a document was marked

20         Plaintiff's Exhibit 453 for Identification in

21         the proceeding.)

22    BY MS. HAVENER:

23         Q.   Mr. Amar, do you recognize this document?

24         A.   July of '05, five-and-a-half years ago, I

25    don't recall it, but I signed a lot of things six

158

1    years ago.  I do see my signature there.  That's

2    me.

3         Q.   And you signed as the Chairman of

4    Mirabilis Ventures; is that right?

5         A.   It appears to be, yes.

6         Q.   And do you recall that you were, in fact,

7    the Chairman of Mirabilis Ventures on the 6th day

8    of July 2005?

9         A.   No, I don't recall that, but I signed it.

10        Q.   Do you know why you would have signed it

11   if it wasn't correct?

12        A.   No, I don't think I knowingly signed it

13   incorrectly, but --

14        Q.   Is that your writing that says,

15   "Chairman"?

16        A.   It appears to be, yes.

17        Q.   Are you aware that in Mr. Amodeo's guilty

18   plea agreement he said that the fraud that he

19   perpetrated started in December of '04?

20             MS. VILMOS:  Object to the form.

21             MS. HAVENER:  I just asked him if he's

22        aware of that.

23             THE WITNESS:  No.

24   BY MS. HAVENER:

25        Q.   Were you ever on the Board of Directors of

1    Mirabilis?   You're signing as the Chairman.

2        A.   As Chairman.   I guess in '05 I may have

3    been, yeah.   I mean, you know --

4        Q.   But you don't recall it?

5        A.   I don't recall ever being in the boardroom

6    and having an executive board that responded to me.

7        Q.   Well, do you know why you would sign

8    something that way if it wasn't right?   And

9    actually write in, in your own handwriting, the

10   word "Chairman"?

11       A.   No, I don't know why I did that six years

12   ago.

13       Q.   And you don't -- excuse me.   If, in fact,

14   you were the Chairman of the Board of Directors,

15   wasn't it your job at that point to be overseeing

16   Frank Amodeo and watching out for fraud?

17       A.   At this point in time, I wasn't aware of

18   any business dealings that Mirabilis had in the PEO

19   world.   Presidion still managed its own book of

20   business at this time.

21       Q.   In '05?

22       A.   Yes.

23       Q.   Am I incorrect that that transfer happened

24   in the very beginning of '05?

25       A.   No.   There was a management contract or

1       some kind of a consulting contract.  But my

2       understanding was that the transfer happened in

3       late '05 with an effective date of December '06.

4       Or, excuse me, of January of '06.

5           Q.   Right.  But -- okay.  Well, but just to go

6       back to my point.  As the Chairman of the Board of

7       Mirabilis, did you or did you not consider it your

8       role to be overseeing what Frank Amodeo was doing?

9           A.   I didn't think I had the qualifications to

10      oversee what Frank was doing.

11              (Thereupon a document was marked

12          Plaintiff's Exhibit 454 for Identification in

13          the proceeding.)

14              MS. HAVENER:  For those of you on the

15          phone, these are the Minutes of Annual Meeting

16          of the Shareholders of Mirabilis Ventures,

17          Inc., dated January 25, 2006.

18              MS. VILMOS:  Is that 453?

19              MS. HAVENER:  454.  I'm sorry.  453 was --

20          and I didn't describe it.  I apologize.  It's

21          Document 198-2 filed in the case; Page 7 of

22          54.  It's an Assignment and Acceptance.

23          Assignor is Mirabilis Ventures, Assignee is

24          Laurie Andrea, and it's signed by Yaniv Amar

25          and handwritten in is written -- it, Mirabilis

1          Ventures, Inc., is the Assignor, and it says,

2          "Name:  Yaniv Amar.  Its:  Chairman."  And

3          it's handwritten.  That's 453.

4               454 is Document 198-1, the Minutes of the

5          Annual Meeting of the Shareholders of

6          Mirabilis Ventures, Inc.

7               MS. VILMOS:  Thank you.

8     BY MS. HAVENER:

9          Q.   This document says, am I correct, Mr.

10    Amar, that the meeting of the shareholders of

11    Mirabilis Ventures, Inc., convened at 4 p.m. on

12    January 25th, 2006?

13         A.   Uh-huh.

14         Q.   "Present at the meeting was Yaniv Amar,

15    sole Class A shareholder."  Do you see that?

16         A.   Yes.

17         Q.   What does that mean?

18         A.   I'm not sure.  I don't recall seeing this

19    agreement.

20         Q.   But do you know what it means, whether you

21    saw the agreement or not?  It's not an agreement,

22    first of all.  It's minutes.

23         A.   Minutes.

24         Q.   Do you know what it means, Class A

25    shareholder?

1    A.   Well, it's pretty literal.  I mean, that I

2  was a sole Class A shareholder.

3    Q.   What were Class A shares?

4    A.   I have no idea what Class A, B, or C

5  shares were.

6    Q.   And it says, "several Class B shareholder

7  candidates."  Do you remember who those were?

8    A.   No.

9    Q.   And when, again, was the meeting that you

10  said you attended that had 30 or 40 potential

11  shareholders?

12    A.   Right around this date.

13    Q.   Okay.  And so --

14    A.   And it wasn't several.  It was several

15  dozen, actually, that attended.

16    Q.   Well, although it says several, you

17  believe that there were several dozen people

18  present.

19    A.   I don't believe.  There were several dozen

20  people present.

21    Q.   Okay.  And who is Phil Kaprow?

22    A.   He was an attorney at Mirabilis.

23    Q.   And was that his job at Mirabilis?  Was he

24  counsel at Mirabilis, or did he have a different

25  job?

1      A.    I don't know what his role was.  I know he
2    was an attorney.
3      Q.    Okay.  Is there any reason why Mr. Kaprow
4    would have misrepresented the facts in the minutes?
5      A.    I can't speak to what Philip Kaprow did,
6    but I --
7           MS. VILMOS:  Object to the form.  Sorry.
8        Go ahead.
9           THE WITNESS:  But I certainly do not
10       recall ever seeing this document, and I never
11       -- I could tell you absolutely, would never
12       assign these people to a Board of Directors.
13       Never.
14   BY MS. HAVENER:
15     Q.    Well, but --
16     A.    And especially not in early '06 when I was
17   already appalled by what I was witnessing.  So --
18     Q.    Well, who did assign members to the Board
19   of Directors?
20     A.    I don't know, but it certainly was not me.
21     Q.    But you don't know who?
22     A.    No.
23     Q.    Wasn't it Mr. Amodeo?
24     A.    I -- that's probably, you know --
25           MS. VILMOS:  Object to the form.

1           THE WITNESS:  He might have had some --

2       yeah, something to do with it, I don't know if

3       he did or not, but I know it was not me.

4   BY MS. HAVENER:

5       Q.   Do you know of anyone else, other than Mr.

6   Amodeo, who had input into who went on the Board of

7   Directors?

8       A.   I think, you know, Richard Berman and

9   Laurie Holtz, because they were the Chairman and

10  corporate counsel.

11      Q.   Did you ever give the bearer stock to

12  anyone but Mr. Amodeo?

13      A.   No.

14      Q.   Are you aware of Mr. Amodeo's ever giving

15  it to anyone else?

16      A.   No.

17      Q.   Was it your understanding that Mr. Amodeo

18  was the only voting shareholder in Mirabilis?

19      A.   No, it was not my understanding.

20      Q.   Who did you believe had voting shares in

21  Mirabilis?

22      A.   I thought several of the members of the

23  Board of Directors had some voting shares.  I

24  really don't even know the difference between a

25  Class A or a Class B.  I told you, I referred to

1     these shares as toilet paper.  I really did.

2     Because I thought that, you know, they were

3     worthless.

4          MS. HAVENER:  Okay.  It's 12:30.  We have

5       one more document if you'll bear with me.  Is

6       that okay?  Hello?

7          MS. VILMOS:  Yes, that's fine.

8          MS. HAVENER:  If you'll mark that as the

9       next in succession.

10         (Thereupon a document was marked

11       Plaintiff's Exhibit 455 for Identification in

12       the proceeding.)

13    BY MS. HAVENER:

14       Q.   This is an e-mail from Dan Myers to Yaniv

15    Amar, dated Wednesday, November 2nd, 2005.  It's

16    produced by Mirabilis in this litigation.  Can you

17    please tell me what this is, Mr. Amar?

18       A.   This seems like a statement of net worth.

19       Q.   And keep looking.  And it's from whom to

20    whom?

21       A.   It's from Dan Myers to me.

22       Q.   And who is Dan Myers, at that time?

23       A.   In this capacity, he was my accountant.

24       Q.   But what's his title?

25       A.   I told you, I wasn't aware of his title at

1    Mirabilis.

2        Q.   It's right there written on this page.

3        A.   Oh.

4        Q.   Executive Vice President of Finance.

5        A.   Executive Vice President of Finance, yes.

6        Q.   Is that correct, to your understanding?

7        A.   Of which company?  I'm not sure.  It says

8    EVP of Finance, but it doesn't say which company.

9        Q.   Okay.  Whose phone number is that,

10   407-318-8000?

11       A.   I don't recall.  I don't recall what the

12   phone number was six years ago.

13       Q.   Okay.  Do you see the statement of net

14   worth?

15       A.   Yes.

16       Q.   And was one of your assets, Mirabilis

17   Ventures B stock, worth $4,750,000?

18       A.   That's what it says here.

19       Q.   That was toilet paper?

20       A.   Yeah, absolutely.  I don't recall seeing

21   this statement of net worth, and if I would have

22   seen it then or now I'd laugh at it.  'Cause it's

23   Mirabilis Ventures B, I guess that's referring to B

24   Class shares, and it 4.75 million.  How do they

25   base that?  I have no idea.  To me, it was

1    worthless.

2        Q.   So did you respond to Mr. Myers and say,

3    you know, what are you talking about?

4        A.   Quite possibly.  Six years ago, I don't

5    recall.

6        Q.   Can you produce that --

7        A.   My response to him?

8        Q.   -- your response?

9        A.   No, it probably was a verbal response.

10       Q.   You give -- or Mr. Myers lists your

11   occupation as business owner.  Do you see that on

12   the last page?  Oh, I'm sorry.  Attached to the

13   e-mail -- the e-mail was dated November 2nd, 2005.

14   The first attachment is a statement of net worth

15   with the same date listing -- of Yaniv Amar, I'm

16   sorry, listing assets, liabilities, and net worth.

17   And under "Other Assets" it lists, "Mirabilis

18   Ventures B" at a value of $4,750,000.  It says on

19   the next page it was prepared by Titanium

20   Consulting, which has a different address than Dan

21   Myers as Executive Vice President.

22       A.   Correction.  It says Dan Myers prepared

23   the tax returns.  Not this statement of net worth.

24       Q.   Well, but they're attached to the same

25   document, and Mr. Myers -- all of this was attached

1   --

2        A.   Oh, all of this was one attachment?

3        Q.   Yes.

4        A.   Okay.

5        Q.   And it lists your occupation as business

6   owner.  Could you tell me what business you owned

7   at the time?

8        A.   In 2004?

9        Q.   Uh-huh.

10        A.   I believe it was Primary Bookkeeping at

11   the time.

12        Q.   And is it correct that Primary Bookkeeping

13   had a $12,649.00 loss that year?  If you'll look at

14   -- well, there's no wages listed; correct; on this

15   2004 tax return --

16        A.   Uh-huh.

17        Q.   -- which is Mr. Amar's tax return.  And so

18   I'm presuming that the 12,649 is the net

19   operating loss of the business that you owned.

20        A.   Uh-huh.

21        Q.   Is that correct?

22        A.   It's fair to say that, yes.

23        Q.   Okay.  Do you know if Primary Bookkeeping

24   paid its 941 taxes?

25        A.   I do not recall.  I would ask Dan Myers or

1   Mr. McHenry.

2       Q.   But it was your company?

3       A.   It was one of the mechanisms to get paid

4   back from Frank.

5       Q.   But it was your company; correct?

6       A.   The ownership was mine for a short period

7   of time, yes.

8       Q.   And attached after the 2004 tax return is

9   your 2003 tax return; is that correct?

10      A.   Uh-huh.

11      Q.   And, again, it lists a "business owner" as

12  your occupation.

13      A.   Yes.

14      Q.   It lists $300,000 in wages, salaries, and

15  tips.  From where were those wages?

16      A.   In 2003?

17      Q.   Uh-huh.

18      A.   I really have to go back and look what

19  happened seven-and-a-half years ago.  I don't

20  recall.  I really --

21      Q.   And from what business was there a -- it

22  says rental real estate royalties, partnerships, S

23  corporations, trusts, et cetera, and it asks for a

24  Schedule E.  What was the business that lost

25  $335,018.00?  Do you recall?

1    A.   It was one of the companies associated

2    with the call center that I had in 2000, 2001, I

3    believe, but I don't recall the company.

4    Q.   Was it Professional Sales Force, Inc.?

5    A.   That's what it says.

6    Q.   And tell me again, what was Professional

7    Sales Force, Inc.?

8    A.   Professional Sales Force, Inc., was a

9    company that was supposed to bring in some nurse

10   staffing to the U.S.

11   Q.   And did it have anything to do with Mr.

12   Amodeo?

13   A.   Not initially, but, yes, he got involved.

14   Q.   And how did that happen?

15   A.   I don't recall exactly what happened seven

16   years ago, Kathleen, but I ran into some issues

17   with trying to bring in Indian and Filipino nurses

18   into the country.

19   Q.   You were associated with it first; is that

20   right?

21   A.   I don't recall.  I really don't recall

22   from seven years ago.

23   Q.   But did you say that this was one of the

24   companies that you were involved with as a means of

25   trying to get your payment back from your loan?

1        A.   Yeah.   There were a few of them.   You just

2   refreshed my memory.   I haven't even heard that

3   name in a long time, but, yes.

4        Q.   But you don't remember if you were

5   associated first or Mr. Amodeo?

6        A.   No.

7        Q.   Okay.   And then also attached to this is

8   an IRS e-file from 2005.   Do you recognize this,

9   Mr. Amar?

10       A.   I don't believe I have that.

11       Q.   Oh, you don't have it in your --

12       A.   I don't think so.   An e-file from '05?

13       Q.   Okay.   Do you have your tax return from

14   '05?

15       A.   No.   Just '03 and '04.

16       Q.   Okay.   We can skip that for now.

17            MS. HAVENER:   We're going to go off the

18       record now and take a break.   It's 20 till

19       1:00 right now.   We'll come back at 20 to

20       2:00.   Or let's make it 1:30.

21            (Thereupon a lunch recess was taken, after

22       which the following proceedings were had:)

23            MS. HAVENER:   Would you mark this as the

24       next in succession, please.

25

172

```
 1              (Thereupon a document was marked
 2         Plaintiff's Exhibit 456 for Identification in
 3         the proceeding.)
 4    BY MS. HAVENER:
 5         Q.   Mr. Amar, I've handed you what's been
 6    marked as 456 in this deposition, Mr. Amar.  First
 7    of all, if you'd just look it over.  I'm confused
 8    about the initial -- about the e-mail, because the
 9    e-mail is dated December 30th, 2004, but it
10    references a fax that it says is dated 12/28/07.
11    However, the fax is actually dated 12/28/04.
12         A.   Okay.
13         Q.   Do you remember anything about this
14    document?
15         A.   No.
16         Q.   What was Mr. Myers' role at Primary
17    Bookkeeping?
18         A.   A CPA, I believe.
19         Q.   Was he an officer of Primary Bookkeeping?
20         A.   Not to my recollection.
21         Q.   Was he an employee associated with the
22    company?
23         A.   I don't recall.
24         Q.   Was he at Titanium Consulting?  Do you
25    remember that?
```

1      A.   I believe he was involved in that company,

2   yes.  That's his company.

3      Q.   And it's Titanium Consulting.  Was that

4   Data Services?

5      A.   No.

6      Q.   Was that ever called Data Services?

7      A.   Not that I know of.

8      Q.   Okay.  Did it ever have any other name?

9      A.   Not that I know of.

10     Q.   And do you know who M. Berkowitz is?

11     A.   Ms. Berkowitz?

12     Q.   Do you think that the "M" stands for

13  "Ms."?

14     A.   I believe so, yeah.  Ms. Berkowitz, yeah.

15     Q.   Oh, Ms. Berkowitz.

16     A.   Yeah, Ms. Berkowitz.

17     Q.   And the fax says:  "Ms. Berkowitz, I hope

18  you had a happy holiday season.  I can't find a

19  record of sending you the 941C for 9/30/03, the 941

20  for 12/31/03, or the 1120S for 2003.  Additionally,

21  attached is a letter with specific language from

22  Mr. Amodeo.  The original check I have is for the

23  incorrect amount.  I made a mathematical error.  A

24  new check should be waiting for me today (which I

25  will confirm this morning).  Please let me know if

1   you have any questions.  Dan Myers."

2       Do you remember anything about this event?

3       A.   No.  What was the attachment to this

4   e-mail?

5       Q.   This fax.

6       A.   The fax and the actual copy of the check?

7       Q.   Yes.  And the letter that's on the back of

8   the page.

9       A.   Okay.

10      Q.   Do you see the letter as well?

11      A.   I see the letter, yes.

12      Q.   And the letter is dated December 28th,

13  2004; Re:  Primary Bookkeeping.  It's addressed to

14  Ms. Berkowitz at the Internal Revenue Service.

15      "Dear Ms. Berkowitz, Mr. Amodeo has asked his

16  commercial accounting firm to review the following

17  language in order to insure it meets the objectives

18  of resolving 'trust fund' liability and

19  non-impairing collection action against other

20  responsible parties for contribution if needed.

21      "The firm reviewing language is Rachlin, Cohen

22  & Holtz LLP; in particular, the principal assigned

23  to Mr. Amodeo's tax matters:  Jose Marrero.  Mr.

24  Marrero will return from a personal leave on

25  12/29/04.  It is our belief this matter can be

1    resolved on 1/3/04."

2        And then the language she refers to is:

3    "Frank Amodeo tenders to Internal Revenue Service

4    the amount of $253,362.71, which constitutes the

5    'so-called' trust fund liability related to

6    employment taxes that Primary Bookkeeping, Inc.,

7    was supposed to, but did not collect, during 2003.

8    This amount is payment-in-full, but does not impair

9    Amodeo's rights of contribution against other

10   persons.  Further, Service in cooperation with

11   Primary Bookkeeping, Inc., shall attempt to collect

12   obligations owed to Primary Bookkeeping, Inc.  Any

13   excess over remaining PBI tax liabilities shall be

14   remitted to Amodeo.

15       "If you have any questions, please do not

16   hesitate to contact me.

17       "Sincerely, Dan Myers."

18       And then there's a check attached to it for

19   $253,362.71.  Do you remember anything about this?

20       A.   No.

21       Q.   Do you know whose signature this is on the

22   check?

23       A.   No.

24       Q.   Oh, I'm sorry.  Its a Cashier's Check.

25   That was my mistake.  Whose handwriting is on the

1    check?

2         A.   It's not mine.

3         Q.   Do you see it says Frank Amodeo is the

4    purchaser?

5         A.   Yes.

6         Q.   And it's made out to the Internal Revenue

7    Service; correct?

8         A.   Yes.

9         Q.   And you don't remember anything about this

10   transaction?

11        A.   No.

12        Q.   Did you not tell me that you were

13   President of Primary Bookkeeping at the end of '04?

14        A.   Yes.

15        Q.   So why is it that you didn't know anything

16   about this transaction although you were the

17   President?

18        A.   I don't know.  I can't answer that

19   question, Kathleen.  I don't recall.

20        Q.   And I think just before the break you said

21   that you couldn't recall if there were ever any 941

22   taxes that were not paid by Primary Bookkeeping.

23        A.   Correct.

24        Q.   So do you understand from this that this

25   was making up for past nonpayment?

1      A.   For that year.

2      Q.   Yes.

3      A.   Right.

4      Q.   How many executives were at Primary

5  Bookkeeping in 2004?

6      A.   I don't recall.

7      Q.   Were there more than one?

8      A.   I really -- I really have very little

9  recollection about that.  Whether you asked me if

10  Dan Myers was an executive or Frank or just --

11      Q.   Were there five?  Were there ten?  Were

12  there a hundred?

13      A.   No.

14      Q.   You have no idea?

15      A.   No idea.

16      Q.   No idea at all?

17      A.   No.

18      Q.   Okay.

19           (Thereupon a document was marked

20      Plaintiff's Exhibit 457 for Identification in

21      the proceeding.)

22  BY MS. HAVENER:

23      Q.   This is marked 457 in this deposition.

24  It's a fax cover page showing that the faxes were

25  received, and it's from Laurie -- I'm sorry, Mr.

1   Berman to Laurie Holtz, dated January 25th, 2005.

2   The "Re" line says, "Frank Amodeo/General Matters."

3   Attached to it is a memorandum.  Do you see that?

4        A.   Yes.

5        Q.   And the memorandum purports to be from

6   Frank Amodeo to Richard Berman.  Do you see that?

7        A.   Yes.

8        Q.   And this says:  "This memo is meant to

9   clarify the ownership of certain companies within

10   my influence.  Also to provide a guideline to how

11   the ownership will change and a baseline for future

12   acquisitions."  It lists Frank L. Amodeo, 100% of

13   AQMI Strategy Corporation, which is a C-Corp.  Does

14   comport with your understanding?

15        A.   No.  But, I mean, I can read that.

16        Q.   100% of Wellington Capital Group, Inc., as

17   a C Corp.  Does that comport with your

18   understanding?

19        A.   That's what it says.  I, you know --

20        Q.   But do you know who owns AQMI Strategy or

21   Wellington?

22        A.   I knew Frank did, but I thought there were

23   some other owners.

24        Q.   Okay.  100% of Mirabilis Ventures, Inc.,

25   as a C Corp.  Does that comport with your

1    understanding?

2        A.    It did up until you showed me these

3    proxies that I supposedly signed that I owned it.

4    But, yes.

5        Q.    10% of Quantum Delta Enterprises, a

6    C Corp.  Did you have any understanding about that

7    company?

8        A.    No.

9        Q.    2%; 3,000,000 shares of Presidion

10   Corporation; did you have any understanding about

11   that?

12       A.    No.

13       Q.    And 50% of FYI Enterprises, Inc.  Does

14   that comport with your understanding?

15       A.    No.

16       Q.    And am I correct that you testified

17   earlier that it was your belief that you alone

18   owned FYI Enterprises, Inc.?

19       A.    Yes.

20       Q.    And what was your investment in FYI that

21   led you to that belief?

22       A.    I did not make an investment in FYI.

23       Q.    You started the company?

24       A.    Yes.

25       Q.    And what was FYI intended to do?

1  A. Acquire a piece of real estate in Naples.

2  Q. Yes.  I'm sorry.  I forgot.  But so -- I'm

3 sorry.  I'm going to go down to -- did I miss it

4 somehow -- FYI Enterprises, Inc., on the next page.

5 Do you see that?

6  A. Yes.

7  Q. "FYI Enterprises, Inc., is my

8 'partnership' with Yaniv Amar and does not have any

9 current projects or significant assets."

10   Was that untrue?

11  A. He was not a partner in the company, but

12 we were going to do a profit share if we were going

13 to make money on that deal in Naples.

14  Q. So at this point he did not own 50%.

15  A. No.

16  Q. Do you have any understanding as to why

17 Mr. Amodeo would make that representation to Mr.

18 Berman?

19  A. No.  I have no idea why he made any of

20 these representations, and it obviously contradicts

21 with some things that you showed me evidence to the

22 contrary, so --

23  Q. Right.  Thank you.  This has already been

24 introduced.  I'm showing you what's been marked as

25 Exhibit 413.  It's an e-mail from Dan Myers to

1   Shane Williams dated May 8th, 2006, at 11:43 a.m.,

2   saying, "Funding for AEM and FYI."  And it says,

3   "Shane, can you check with Frank on funding in the

4   amount of $20,000 for the AEM standalone account

5   and $1,080,000 for the FYI account?"

6       Do you have any recollection about those

7   transactions?

8       A.   The 20,000, yes.  And the -- for AEM

9   standalone account.  And the FYI account, we were

10  supposed to make an investment.

11      Q.   But do you recall that money being

12  transferred into the FYI account or receiving those

13  funds in any way?

14      A.   No.

15      Q.   If you'll look on the -- so if Jim

16  Sadrianna testified to having transferred that

17  money, and we have bank statements also that show

18  that transaction, are they just mistaken?

19      A.   No, I don't know that they're mistaken.  I

20  need to review everything for the last five, six

21  years of my life and try to pinpoint this.

22      Q.   Well, a million dollar transaction is

23  something you would forget about?

24      A.   No, no.

25      Q.   But you don't recall this one.

1      A.   I do recall something to that effect.   I
2  don't recall the exact circumstances.
3      Q.   Okay.   But do you know what happened to
4  that million dollars?   $1,080,000?
5      A.   It was invested in a project.
6      Q.   So you do recall getting a million
7  dollars.
8      A.   I don't -- I don't recall the transfer of
9  the million eighty.
10      Q.   Oh.   What was the million eighty -- why
11  was it transferred to FYI Enterprises?
12      A.   For an investment.
13      Q.   And what was it invested in?
14      A.   In a piece of property.
15      Q.   Where was that?
16      A.   In Louisiana.
17      Q.   And who owns it now?
18      A.   It's a bankrupt entity.
19      Q.   Who owns the property?
20      A.   I am not sure.   I couldn't make the cash
21  call, so I kind of haven't been involved in the
22  last four years.
23      Q.   How was it transferred from FYI
24  Enterprises to another entity?
25      A.   I don't know if I wrote a check or if I

183

1    wired the funds.

2        Q.   No, I'm trying to figure out how -- you,

3    at some point, invested in it; correct?

4        A.   Correct.

5        Q.   But did that mean that you owned the

6    property or just a portion of it?

7        A.   A tiny little portion of it.

8        Q.   And am I understanding that you simply

9    lost your investment?

10       A.   Yes.

11       Q.   You don't know the name of the bankrupt

12   entity?  Do you know the name of the bankrupt

13   entity?

14       A.   Market Street Properties.

15       Q.   Do you know who owns it?

16       A.   No.

17       Q.   Was it associated with Lou Pearlman, to

18   your knowledge?

19       A.   No.

20       Q.   Do you know anybody that was associated

21   with it?

22       A.   No.

23       Q.   Can you name any person, any human being

24   that was associated with Market Street Properties?

25       A.   There was -- the gentleman who told me

1    about it was Elie Mimoun.

2        Q.   Can you spell that for me?

3        A.   M-i-m-o-u-n.

4        Q.   M-i-m-o-u-n.  And Elie is E-l-i-e?

5        A.   I believe so, yeah.  Or E-l-i.

6        Q.   And what about this -- you told me earlier

7    that this standalone account was for if you needed

8    to make small purchases for AEM.

9        A.   Yes.

10       Q.   So what was the $20,000 spent for?

11       A.   The first transaction was to pay for a

12    prosthetic limb for one of the employees.  The rest

13    of the money was spent on some marketing, some

14    lunch.  And I don't recall the --

15       Q.   How much was the prosthetic limb?

16       A.   I think it was $16,000, but I was able to

17    negotiate and just get a premium of like 2 or

18    3,000, if I recall correctly.

19       Q.   Okay.  And who was the person?

20       A.   One of the employees in the company and,

21    unfortunately, I don't recall her name, but really

22    nice girl.

23       Q.   Had she been injured in an accident?

24       A.   I don't know.  I think she was born with a

25    malady of some sort.

185

1      Q.   Do you know where the $1,080,000 that was

2 transferred into the FYI account came from?

3      A.   No.

4      Q.   Would it surprise you to know that it was

5 unpaid payroll taxes?

6      A.   It would surprise me to know that.

7      Q.   And why is that?

8      A.   Because I obviously would not have taken

9 it if it was unpaid payroll taxes.

10      Q.   If you'll look back at that transaction,

11 the transfer into FYI Enterprises, it took place on

12 5/15/2006; correct?

13      A.   I thought it was sooner than that.   I

14 thought it was earlier than that, but that's what

15 it says there.

16      Q.   And that was immediately before you

17 resigned; correct?

18      A.   I recall it being sooner than that.

19      Q.   But you think -- so do you think this is

20 wrong?

21      A.   No, I just -- I can't -- I can't know for

22 sure if it is or not.   I'd like to see the

23 statements, but --

24      Q.   Excuse me for just a second.

25 Earlier in the day you testified that you had some

1   suspicion about -- some suspicions -- correct me if

2   I'm misspeaking, about -- in early '06 --

3       A.   Uh-huh.

4       Q.   -- in January of '06, about the funding of

5   Mirabilis; correct?  And you believed that there

6   was --

7       A.   I became suspicious in June right before

8   my resignation.

9       Q.   Oh, not in January.

10      A.   No, I had some concerns as to how the

11  company was generating its revenues because it was

12  spending, you know, 10 million a month, but --

13      Q.   So your concerns didn't solidify until

14  June?

15      A.   Until I finally resigned, yeah.

16      Q.   And what changed between January and June

17  to make you come to the realization that your

18  concerns were genuine or that there was something

19  true about the company that you had suspected

20  earlier?

21      A.   Nothing solidified.  Just questions went

22  unanswered, and the company, Nexia, was buying

23  companies and companies and companies every month.

24  Nobody could give me a straight answer.  I decided

25  to resign.

187

1    Q.   But you didn't hesitate to take this

2    million dollars even though you were --

3    A.   It didn't come from any of the -- I was --

4    the way I was explained, it didn't come from any of

5    the related entities.

6    Q.   Where did it come from?

7    A.   I'd need to see the statements, I don't

8    recall exactly, but I thought it was a loan from

9    Titanium.

10   Q.   Titanium?  Which Titanium?  Oh, I'm sorry.

11   This is another -- was Titaniium a Frank Amodeo

12   company?  Forget about that one right now.  I

13   handed it to you too early.

14   A.   I don't know if it was a -- it was --

15   there was some relation to Frank Amodeo with that

16   company, yes.

17   Q.   Okay.  When you say some relationship,

18   does that mean Mirabilis owned it or Frank Amodeo

19   owned it?

20   A.   I thought Dan Myers owned it.

21   Q.   Where would Titanium Technologies have

22   gotten a million dollars?

23   A.   I'm not sure.

24   Q.   Was that the kind of company it was that

25   operated on that scale?

1      A.   I really don't know.  You have to ask the

2   owners of Titanium.  But I don't know.

3      Q.   And what was -- how was FYI connected to

4   Titanium?

5      A.   It was not connected.  It just -- Titanium

6   made an investment in FYI, a loan to FYI, to make

7   this investment.

8      Q.   Was it repaid?

9      A.   No.

10      Q.   Was it documented by a Promissory Note?

11      A.   I don't recall one.

12           MS. HAVENER:  Okay.  Will you mark this as

13      the next in succession, please.

14           (Thereupon a document was marked

15      Plaintiff's Exhibit 458 for Identification in

16      the proceeding.)

17   BY MS. HAVENER:

18      Q.   Will you please look at this document, Mr.

19   Amar, and tell me if you recognize it in any way.

20      A.   No, I don't -- I don't recognize it.

21      Q.   Well, it's my understanding that it's a

22   composite of companies in which Mr. Amodeo had some

23   kind of ownership interest or with which he had

24   some connection.  Would that comport with your

25   understanding?

1      A.   No.  But, okay, I'm looking it over.

2      Q.   Okay.  Is it accurate that you were the

3  President of Professional Sales Force on 4/8 of 03?

4      A.   I presume.  That's what it says.

5      Q.   Was the company reinstated in 4/8/03?

6      A.   I don't recall, but where does it state

7  that?

8      Q.   It says -- under "Event," it says -- at

9  the columns at the top, or the list at the top,

10  under "Event," it says, "Inactive," but reinstated

11  -- or "Reinstatement."

12      A.   Is that on Page 1?

13      Q.   Yes.

14      A.   HRM, HRM; Professional Sales Force,

15  Reinstatement, 4/8/03.

16      Q.   And it lists you as the President;

17  correct?

18      A.   That's what it says, yes.

19      Q.   And Mr. Sadrianna is the Registered Agent?

20      A.   I don't recall that, but, okay.

21      Q.   Whose address is 3107 West Hallandale

22  Beach Boulevard?

23      A.   That's an office that I occupied.

24      Q.   I'm representing to you, because I know,

25  that this is information acquired from Sunbiz.org.

1    Do you remember that you became the President of

2    Primary Bookkeeping, Inc., on 9/9/03?  Oh,

3    actually, I'm sorry.  I'm misspeaking.  You already

4    were the President of Primary Bookkeeping, Inc.,

5    and the change was a change of Registered Agent.

6    Actually, it's a change of address.  Do you see

7    what I'm talking about?

8        A.   Yeah, on Page 2?

9        Q.   The only change appears to be the address;

10   is that right?

11       A.   For what?  For Primary Bookkeeping?

12       Q.   No.  For whatever is 456 South Orange

13   Avenue to 457 South Orange Avenue.

14       A.   What page is this?

15       Q.   The second page.

16       A.   Oh.

17       Q.   At the third and fourth from the top.

18       A.   Registered Agent address; okay.

19       Q.   Okay.  And then the next one down, what

20   was Beverages, Inc.?

21       A.   I don't know.  I thought that was a

22   company that Mr. Beavers had or was involved with.

23       Q.   So you don't recall that you were ever the

24   President?

25       A.   No, I don't.

191

1      Q.   And you don't recall that you were ever

2   the Registered Agent?

3      A.   No.

4      Q.   But that is your address.

5      A.   That is the office address that I occupied

6   at that time, yes.

7      Q.   Okay.  If you'll go down the list a little

8   bit farther and look at Professional Sales Force.

9      A.   Yes.

10      Q.   And an annual report was filed on 4/24/04.

11   Is it correct that you were the President at that

12   time?

13      A.   4/28/04?

14      Q.   Yes.  I'm sorry.  I misspoke.  4/28/04,

15      A.   I'm just reading what it says here.  Yeah.

16   I don't know whether -- yeah.

17      Q.   Okay.  But you don't have any independent

18   recollection?

19      A.   From seven years ago, no.  Six-and-a-half

20   years ago, no.

21      Q.   Okay.  And then go one down from that.  Is

22   the Market Street Villages -- is that the Market

23   Street that you were referring to a moment ago?

24      A.   No.

25      Q.   So Market Street Properties is not

192

1    connected to Market Street Villages?

2        A.   No.

3        Q.   It's just a coincidence, as far as you

4    know?

5        A.   I assume there are a lot of Market

6    Streets.

7        Q.   But it lists Marty Flynn as the President

8    of Market Street; correct?

9        A.   That's what it says.

10       Q.   And then Wellington Capital, is it

11   consistent with your understanding that Mr. Amodeo

12   was the President?

13       A.   Of Wellington?

14       Q.   Yes.

15       A.   There were quite a few people there, but,

16   yes, it can be consistent.  We had a few people

17   involved at Wellington.  I thought Daniel Jitu was

18   the President, but, okay.  I'm just reading what it

19   says here.

20       Q.   And Trafalgar Capital, did you understand

21   Mr. Amodeo to be the Director, the President, and

22   the Secretary?

23       A.   No.

24       Q.   Who did you understand to hold those

25   positions?

1      A.   I thought there was a Daniel Jitu and

2   there was another gentleman.  I thought he was the

3   President of that company.

4      Q.   Daniel -- could you spell the last name

5   for me?

6      A.   Jitu, I believe, is J-i-t-u.  And there's

7   a John Murphy, I believe.  I thought he was the

8   President of Trafalgar.

9      Q.   Were you still the President of Primary

10  Bookkeeping on 4/12/05?

11     A.   That's what it says here.

12     Q.   Do you remember that to be true?

13     A.   No.

14     Q.   Do you remember someone else being the

15  president or you just --

16     A.   I remember a document that Charles

17  McBurney wrote that showed some kind of a change in

18  ownership.  I don't know if it was in late '04 or

19  early '05.

20     Q.   And what was the change?

21     A.   That the company really belonged to Frank

22  Amodeo.

23     Q.   Okay.  But Mr. McBurney is listed as the

24  Registered Agent at this time; right?

25     A.   Yes.

1      Q.   And when did you say you remembered that

2   document from?  Late '04 or '05?  Is that what you

3   said?

4      A.   Yeah.

5      Q.   Okay.

6           (Thereupon a document was marked

7       Plaintiff's Exhibit 459 for Identification in

8       the proceeding.)

9   BY MS. HAVENER:

10     Q.   Mr. Amar, would you pleases look over this

11  document for me.

12     A.   Yes.

13     Q.   Do you recognize it?

14     A.   No.

15     Q.   Would you turn the page, please.

16          MS. HAVENER:  I'm sorry.  The document is

17      an e-mail from Kevin Leonard -- for the people

18      on the phone -- from Kevin Leonard, dated

19      August 22nd, 2006, to Dan Myers.

20  BY MS. HAVENER:

21     Q.   And Mr. Myers says, "I --" I think it's

22  supposed to say, "I am unclear exactly the content

23  of the confirmation needed by the auditors to make

24  them happy regarding the 2004 Bank of Commerce

25  $500,000.

1        "Below is a draft of simple letter that Yaniv

2   could sign to confirm the existence and use of the

3   $500,000.  I believe this is what the auditors

4   required.  Yaniv could address this to the auditors

5   directly.

6        "Let me know if you had something else in

7   mind.  Kevin."

8        And then the example letter says,

9   "This letter will confirm that on February 10th,

10  2005, I withdrew from Mirabilis' Bank of Commerce

11  account the amount of $500,000.  I was the

12  authorized signer for Mirabilis for this Bank of

13  Commerce Account.

14       "The $500,000 was used to purchase the stock

15  of Caribbean Data & PSF.  In turn Caribbean Data

16  was --"  I think it's supposed to say "sold,"

17  although it says, "old to Wellington Capital for

18  for $1,000,000.  Signed, Yaniv Amar."

19       Do you remember the letter that's attached?

20       A.  No.

21       Q.  No.  Do you remember an account at the

22  Bank of Commerce in 2004 for which you were the

23  sole signatory?

24       A.  Yes.

25       Q.  And what was that account?

1      A.   It was an account that was opened with the

2   Mirabilis Ventures corporation.

3      Q.   And what was in that account?

4      A.   I don't recall this amount of money being

5   in that account.

6      Q.   What amount do you recall being in that

7   account?

8      A.   I remember opening the account with

9   several hundred dollars.

10      Q.   Do you remember acquiring Caribbean Data

11   Corporation with that account?

12      A.   No.

13      Q.   Do you remember acquiring Caribbean Data

14   Corporation at all?

15      A.   No.

16      Q.   Is that your signature at the bottom?

17      A.   It appears to be, yes.

18      Q.   So do you just not remember or do you --

19      A.   No, I -- first of all, I don't remember.

20   And, second of all, many, many -- I'm sure as

21   evidenced by what you have -- many documents were

22   handed to me and I was asked to sign by either Dan

23   Myers or Frank Amodeo and I signed certain

24   documents that I -- without full knowledge.

25      Q.   Including something for $500,000?

1    A.   Yes.

2    Q.   After you resigned?

3    A.   The dates show that it appears to be, yes.

4    Q.   Okay.  Would you have signed something

5  after you resigned?  Does that make sense?

6    A.   If I -- if it's my signature, then I

7  obviously did.

8    Q.   From a company that you were already

9  suspicious had fraud going on?

10       MS. VILMOS:  Object to the form.

11  BY MS. HAVENER:

12    Q.   Does it make sense to you that you would

13  have signed something after you resigned from a

14  company involving a $500,000 transfer when you

15  already suspected that the company was engaged in

16  fraud?

17    A.   If I did it, I did it.  It doesn't make

18  sense the way you phrase it, but --

19    Q.   Okay.  How would you phrase it?

20    A.   No, you phrase it -- but, you know, you're

21  right.  If I signed it, I -- I was handed many

22  things by Richard Berman or Daniel Myers --

23    Q.   Okay.  Under what circumstances were you

24  handed things to sign after you resigned from the

25  company?

1      A.   Under what circumstances?  Under

2  circumstances like this, where I was asked to sign

3  certain things.

4      Q.   And they were e-mailed to you as --

5      A.   No.  A lot of times I still met with

6  Richard Berman at his office.  I met with Frank and

7  Richard Berman at the office.

8      Q.   For what purpose?

9      A.   For what purpose?

10     Q.   Yes.

11     A.   Richard and I still remained friends for

12  some time after my resignation.

13     Q.   Okay.  Do you know if this was handed to

14  you by Richard Berman?

15     A.   I don't recall.

16     Q.   Do you remember being involved in a

17  transaction that Kevin Leonard was involved in?

18     A.   No.

19     Q.   But you do remember Mr. Myers sometimes

20  gave you documents to sign.

21     A.   Correct.

22     Q.   And would you have -- did you have

23  sufficient confidence in Mr. Myers to simply sign

24  the document without examining it?

25     A.   At that time, evidently, I did.

1      Q.   So this was after -- this is dated after

2   your statement of net worth that Mr. Myers sent to

3   you attached to his e-mail --

4      A.   Uh-huh.

5      Q.   -- in which he valued your Mirabilis stock

6   at four million plus.

7      A.   Uh-huh.

8      Q.   Do you recall that?

9      A.   I recall you showing me that document.  I

10  don't recall the actual statement of net worth.

11     Q.   Okay.  In other words, you don't remember

12  seeing it at the time.

13     A.   I don't recall a document from six or

14  seven years ago, no.

15     Q.   Okay.  But -- all right.  Nevertheless, he

16  gave you a document a year later, or perhaps

17  sometime around the same time.  Actually, now that

18  I think of it, that tax return was late in the

19  year.  I'm sorry.  I think I misspoke.  That tax

20  return was e-mailed to you in November of '05.  So

21  -- and this was approximately a year later.

22     A.   Okay.

23     Q.   And you had no reason to doubt Mr. Myers',

24  you know, accuracy or trustworthiness; is that

25  correct?

200

1      A.   I wouldn't say that.  I obviously did if I

2  had resigned, but I see that I signed this

3  document.  I don't recall seeing it or signing it,

4  but that is my signature.

5      Q.   Okay.

6           MS. HAVENER:  Would you mark this, please.

7           (Thereupon a document was marked

8      Plaintiff's Exhibit 460 for Identification in

9      the proceeding.)

10  BY MS. HAVENER:

11      Q.   This document is -- was this the Minushka

12  you were speaking about earlier?  Did you name this

13  person?

14      A.   No.

15      Q.   No.  Okay.  You gave the name of some of

16  your employees.

17      A.   Minushka?

18      Q.   Yes.  I can't -- it was a name --

19      A.   Oh, Maritza.

20      Q.   Maritza.

21      A.   No, no.  I don't believe this is the same

22  person.

23      Q.   Okay.

24           MS. HAVENER:  This is -- for those on the

25      phone, it's an e-mail from Dan Myers dated