1          Wednesday, February 14th, 2007.  It's sent to

2          Minushka Ramirez, M-i-n-u-s-h-k-a, Ramirez;

3          copy to Marty Flynn, and it says, Financial

4          Statement."  And then the comment is only,

5          "Here you go."

6               And then underneath, Mimi Ramirez, who I

7          assume is Minushka Ramirez, earlier in the day

8          is -- she's assistant to Marty Flynn, so the

9          e-mail reflects.  She's asking Dan to please

10         forward Marty Flynn's financial statement to

11         her and she needs it as soon as possible.

12    BY MS. HAVENER:

13         Q.   Do you see on the next page, Mr. Amar,

14    that Mirabilis Ventures was valued at $500 per

15    share per an independent valuation by Titanium

16    Technologies on 9/11/06?  That's in the footnote.

17         A.   I see that.

18         Q.   And Titanium Technologies has committed to

19    loan up to $250 per share of Mirabilis Ventures,

20    with the sole collateral for the loan being the

21    stock.  Do you see that?

22         A.   I see that.

23         Q.   And Titanium Technologies was Dan Myers;

24    correct?

25         A.   I believe so, yes.

1      Q.   But you testified earlier that you did not

2  believe the stock was valued at anything close to

3  that amount.  Is that --

4      A.   I thought it was worthless, yeah.

5      Q.   So we've seen several documents here today

6  where Dan Myers seems to be making a whole lot of

7  errors with respect to the value of certain things;

8  correct?

9      A.   You know, I don't know if that's a

10  question, but, yeah, it looks like it wasn't a

11  hundred percent accurate.  If it was -- I don't

12  know what Mirabilis (1) means.  On my statement you

13  showed me it was Mirabilis B.  I don't know what

14  Mirabilis Ventures (1) means.  I don't know what

15  that refers to.  Oh, that's just a footnote.  If

16  that's what class stock that was or --

17      Q.   No, no.  That's just the footnote.

18      A.   Okay.

19      Q.   Would you go back to 459, please.  This is

20  the document that has the letter attached to it

21  that you signed.  And both -- am I right that both

22  Kevin Leonard --

23      A.   459?  I don't have a number on it.

24      Q.   I'm sorry.  It's the e-mail from Kevin --

25  the top says Kevin Leonard to Dan Myers.

1       A.    Okay.  Yes.

2       Q.    Am I right that both of those people are

3  CPAs?

4       A.    Dan Myers is.  Kevin Leonard, I thought he

5  was an MBA.  I didn't know that he was a CPA.

6       Q.    Okay.  And this is the one that you said

7  that you received $500,000 from Mirabilis for the

8  acquisition of Caribbean Data Corporation?

9       A.    Uh-huh.

10      Q.    This is the representation that you said

11  you thought was inaccurate?

12      A.    No, I just can't speak to the accuracy.

13      Q.    Oh, you can't recall it.

14      A.    Yeah, I don't recall.

15      Q.    But it was a representation you made to

16  the Mirabilis Board; am I correct?

17      A.    That's what it says here, yes.

18      Q.    Now, am I correct in understanding that

19  the Board of Directors -- well, if you'll turn back

20  to the previous page of that letter.

21      A.    Yes.

22      Q.    Kevin Leonard represented to Dan that

23  there was confirmation needed by the auditors;

24  right?

25      A.    (Witness nods head.)

1      Q.   So am I safe in assuming that you were

2   making this representation to the Board of

3   Directors to be provided to the auditors?

4      A.   I didn't know that at the time.  There was

5   no indication of that.  I never saw this e-mail

6   before.  It was between Kevin and Dan.

7      Q.   But you knew that you were making the

8   representation to the Board of Directors.

9      A.   Not for the audit.  Not for the purposes

10   of the audit.

11      Q.   But, nevertheless --

12      A.   Yes, if I signed this, I -

13      Q.   -- you were making --

14      A.   -- it was addressed.

15      Q.   And would you anticipate that the Board of

16   Directors of Mirabilis would rely on a

17   communication from you?

18      A.   I don't know if they would or not, but I

19   would assume that they would.

20      Q.   Thank you.  Mr. Amodeo, we were talking

21   earlier about --

22      A.   My name is Mr. Amar.

23      Q.   I'm sorry.  You know what, I did the same

24   thing to Mr. Sadrianna and to Mr. Cuthill.  I so

25   apologize.  I have one thing on the brain.

1          We were talking earlier about the trip to

2     Scottsdale.

3          A.    Uh-huh.

4          Q.    And you said you wanted to see for

5     yourself.

6          A.    Yes.

7          Q.    What did you want to accomplish when you

8     went there, other than just to see for yourself?

9          A.    Nothing, Kathleen.  I didn't want to

10    accomplish anything.  I just really wanted to see

11    why.  I wanted to -- you know, I was hoping to have

12    a -- you know, to witness for myself, and if I had

13    a chance to speak with Edie, which I'm glad she

14    approached me and I did have a chance to speak with

15    her.  I just asked her why, if she's such an expert

16    in fraud, why could she not have detected this one.

17         Q.    And did she answer that question for you?

18         A.    No.

19         Q.    Did you speak with Mr. Amodeo about it

20    afterwards?

21         A.    After the conference?

22         Q.    Yes.

23         A.    Yes.

24         Q.    And under what circumstances?  When did

25    that happen and how did that happen?

1        A.    Probably when I was at the airport.  I had

2   to ride back to the airport.

3        Q.    And why did you call Mr. Amodeo?

4        A.    Just to tell him what happened.  I wasn't

5   reporting back to him.  It just --

6        Q.    And what was his reaction?

7        A.    Nothing.  I don't recall.  He was kind of

8   nonchalant about it.  He was -- you know, he was

9   glad that they were served and that was it.

10       Q.    I'm trying to figure out why you would

11  call Mr. Amodeo.  Why would Mr. Amodeo care?

12       A.    Why would he care?

13       Q.    Uh-huh.  Who made the decision to sue

14  Ms. Curry and --

15       A.    I have no idea.  I had no knowledge of

16  this suit until a few days before this --

17       Q.    And you didn't ask whose decision it was

18  to sue them?

19       A.    No.  I didn't really care.

20       Q.    Who was in control of Mirabilis Ventures

21  at that time, as far as you knew?

22       A.    I thought Frank and his Board.

23       Q.    And his Board at that time was Jodi Jaiman

24  and Shane Williams and Jay Stollenwerk; correct?

25       A.    As I understand it, yes.

1      Q.   So it's your understanding that Mr.

2    Amodeo, with the Board, made the decision to sue

3    Ms. Curry and Mr. Hailstones.

4      A.   Yes.

5      Q.   But, again, you didn't have any reason to

6    believe that Mr. Amodeo would care one way or the

7    other about what you had to say about the service

8    of process.

9      A.   No, he -- I think he -- he just expressed

10   that he was glad that they were served and that was

11   it.  He didn't --

12     Q.   So what made you call him?

13     A.   What made me call him?  I spoke to Frank

14   quite regularly at that point.  You know?

15     Q.   And you didn't need a reason.  It was just

16   --

17     A.   No.  No.

18     Q.   Okay.  Thank you.

19          (Thereupon a document was marked

20      Plaintiff's Exhibit 461 for Identification in

21      the proceeding.)

22   BY MS. HAVENER:

23     Q.   Were you still receiving any money from

24   Mr. Amodeo in any capacity at that time?

25     A.   Which time?

1      Q.   In around the time that the suit was filed

2   and served.

3      A.   No.  I believe my consulting contract

4   ended in April or May of that year, of '07.

5      Q.   And after that you had no connection with

6   any Mirabilis or Amodeo-related entity?

7      A.   Not financially, no.

8      Q.   What other way?

9      A.   No, I told you, I was just kind of trying

10  to get information.  I was, you know, concerned

11  about the outcome.

12     Q.   Were you concerned about the outcome of

13  the investigation as it might impact you?

14     A.   Primarily, yes.  And a few other people.

15     Q.   And in what way were you worried that it

16  might affect you?

17     A.   I was the Interim CEO for a good period of

18  the time that this took place and I had signed a

19  whole bunch of agreements that I didn't fully

20  understand what I was signing, so I was concerned.

21     Q.   When you were the CEO, you stayed CEO even

22  though you were suspecting fraud.  I know you

23  resigned at the end of the period.

24     A.   At the end of what period?

25     Q.   Of --

1      A.   In June.

2      Q.   In June of '06.

3      A.   Uh-huh.

4      Q.   But you told us that you first started

5   being concerned in January of '06.

6      A.   End of January, yes.

7      Q.   And so for that period you remained CEO.

8      A.   Correct.

9      Q.   You suspected that fraud was going on;

10   correct?

11      A.   No, I suspected that something didn't add

12   up.  I suspected that a lot didn't add up.

13      Q.   Okay.  And you didn't report it to

14   anybody.

15      A.   To Richard Berman and to Laurie Holtz.

16      Q.   Nobody else?

17      A.   I spoke to Dan Myers about it, I spoke to

18   Paul Glover about it, I spoke to Sharmila Khanorkar

19   about it.

20      Q.   And did Paul Glover say to you anything

21   that made -- caused you to be -- to have further

22   suspicion?

23      A.   No.  Paul Glover expressed a lot of

24   frustration that he couldn't get accurate

25   financials -- even though he was the CFO at the

210

1    period in question, he couldn't get accurate

2    financials because he said that the Lawson system

3    for the PEO was so outdated or messed up or

4    whatever he just couldn't get accurate financials.

5        Q.   And what was the Lawson system?

6        A.   That was the PEO system, the software, the

7    database for the company.

8        Q.   Like a financial database?

9        A.   It was a payroll processing software with

10   a back end.  I don't know if it was Great Plains or

11   whatever.

12       Q.   Whose idea was the Lawson program --

13       A.   It was --

14       Q.   -- to use the Lawson program?

15       A.   It was a Presidion decision from years

16   before Mirabilis ever got involved.

17       Q.   Okay.

18            MS. HAVENER:  Have you marked this

19       document?

20            THE COURT REPORTER:  I marked 461.

21   BY MS. HAVENER:

22       Q.   Can I give you one, please?

23       A.   Yes.

24       Q.   If you'll just take a look at this.

25            MS. HAVENER:  For those people on the

1      phone, it begins with an e-mail from Paul

2      Glover to Dan Myers and Frank Amodeo dated

3      Tuesday, April 11th, 2006, at 1:57 p.m.

4      The subject line is, "FW: Letters."  The

5      attachments it says is, "Kevin Monroe

6      Verification Letter 060215WJ.doc."  And then

7      MHR --

8           MS. VILMOS:  Sorry.

9           MS. HAVENER:  Sorry?

10          MS. VILMOS:  From Glover to whom?

11          MS. HAVENER:  To Dan Myers and Frank

12      Amodeo.

13          MS. VILMOS:  Thank you.

14          MS. HAVENER:  And then the second part of

15      the subject line says, "MHR Self Audit Program

16      060213.doc."  And Mr. Glover is signing as

17      Executive Vice President and CFO of Mirabilis

18      Ventures, and says to Mr. Myers and Mr.

19      Amodeo:  "Have we made any commitments that I

20      need to be aware of?"

21  BY MS. HAVENER:

22      Q.   Do you see that, Mr. Amar?

23      A.   Yes.

24      Q.   Do you know what Mr. Glover was paid?

25      A.   No.

212

1       Q.   I'll represent to you that his annual

2   salary in 2006 was $585,000 a year.

3       A.   That was his salary?

4       Q.   Yes.

5       A.   Wow.

6            MS. VILMOS:   Object to the form.

7            THE WITNESS:   Okay.

8   BY MS. HAVENER:

9       Q.   Do you see that you -- at the bottom of

10  this, a few hours before, on Tuesday, April 11th,

11  2006, at 11:09 -- forwarded from yourself to Frank

12  Hailstones an e-mail called "Letters."  And what

13  you forwarded was Woody Johnson's e-mail to you

14  from several months before, February 16th, 2006,

15  with a cc to Jeffrey Rutzen; is that correct?  Is

16  that how you pronounce it?  I don't know.

17      A.   I don't recall Rutzen.  I think it was

18  Rutzen, but I don't -- I knew the name; I didn't

19  know him.

20      Q.   Okay.  And his e-mail to you that you then

21  forwarded to Mr. Hailstones said:  "Yaniv, Last

22  versions of letters, attached.  These are without

23  any edits that Frank may have made.  Woody."

24      A.   Okay.

25      Q.   Do you understand that he was talking

1    about Frank Amodeo?

2        A.   You know, it was F1 or F2 if he was

3    referring to Frank Amodeo or Frank Hailstones.  So

4    I don't know if he was referring to Frank Amodeo or

5    Frank Hailstones.

6        Q.   But would Woody Johnson have had a

7    significant interchange with Mr. Hailstones?

8        A.   I wouldn't know.

9        Q.   Wasn't it more common for Mr. Johnson to

10   deal with Mr. Amodeo?

11       A.   I really -- I don't know.  I don't know

12   his interaction with both Franks.

13       Q.   Well, at the back of this, as there are

14   several letters attached, one of which is

15   February 10th, 2006, from Kevin Munroe, CPA.  Was

16   Kevin Munroe an outside accountant to Mirabilis?

17       A.   I thought he was an inside accountant to

18   Mirabilis.

19       Q.   But does this give you any indication that

20   he was from inside, this particular letter?

21       A.   No.

22       Q.   And it's dated February 10th, 2006;

23   correct?

24       A.   Uh-huh.

25       Q.   And it says -- it's addressed to Mirabilis

214

1   HR.  What address is that, 8095 Northwest 12th

2   Street, Suite 301, Miami?

3        A.   That was the Doral office.

4        Q.   Doral office of Mirabilis HR?

5        A.   Yes.  Of AEM.

6        Q.   Of AEM?

7        A.   Yes.

8        Q.   Is AEM the same thing as Mirabilis HR?

9        A.   Yes.

10       Q.   And he's writing to Mirabilis HR about

11   Presidion Solutions, Inc.  Do you see that?

12       A.   Yes.

13       Q.   And it says, "Dear Sirs:  I have reviewed

14   the payroll tax Account Summary provided by the

15   Internal Revenue Service concerning Presidion

16   Solutions, Inc., as of January 24th, 2006, and per

17   these documents, Presidion Solutions, Inc., has

18   overpaid a total of $508,961."

19        Do you see that?

20       A.   Yes.

21       Q.   Did that comport with your understanding

22   at the time?

23       A.   No.

24       Q.   What did you know that contradicted this

25   representation?

1      A.   I didn't know anything.  I actually

2  implemented what's audit review program.  I asked

3  for this to be implemented.  I ran it by Dan Myers,

4  Paul Glover, and Frank Amodeo.

5      Q.   Uh-huh.  And then they did implement it,

6  apparently.

7      A.   They -- no, they didn't implement it.

8  They wrote this letter, this letter went out to all

9  the clients at the time, and we were supposed to be

10  able to provide the quarterly statements to the

11  clients and we never did.

12      Q.   So seeing this document, would it be

13  unreasonable for the Board of Directors of

14  Mirabilis to rely on the representation of Kevin

15  Munroe?

16          MS. VILMOS:  Object to the form.

17          THE WITNESS:  I don't know what their

18      interaction was with Kevin Munroe.

19  BY MS. HAVENER:

20      Q.   Would it be unreasonable for anyone to

21  rely on the representation of Mr. Munroe?

22      A.   It was intended for the clients --

23          MS. VILMOS:  Object to the form.

24  BY MS. HAVENER:

25      Q.   I don't understand what you mean.  What do

1   you mean --

2       A.   This was intended for the clients of the

3   PEO.

4       Q.   What do you mean by "the clients"?

5       A.   The client companies of the PEO.

6       Q.   Of Mirabilis HR/AEM?

7       A.   Slash Presidion, slash whatever, yes.

8       Q.   Were they all the same; Presidion, AEM,

9   and Mirabilis HR?

10      A.   I wish I could answer that, but it was a

11  bit of a confusion.

12      Q.   Why would the clients be getting different

13  information from the Board?

14      A.   No, I don't know that they would.  I

15  didn't know that this went to the Board.  I asked

16  for this to be implemented for the clients.

17      Q.   Okay.  Well, so when it was sent to

18  Mirabilis HR, who did that mean?  Who got it?

19      A.   Well, it was regarding Presidion

20  Solutions.

21      Q.   I understand.

22      A.   It was addressed to Mirabilis HR and it

23  was addressed to Presidion Solutions, so I believe

24  this was intended for all the clients that AEM

25  managed for Presidion.

217

1      Q.   Was it true?

2      A.   I don't know.  I never saw evidence that

3   it was true.  I asked for a quarterly statement.

4      Q.   Did you see evidence that it was false?

5      A.   No.

6      Q.   Okay.  So given that these -- there's

7   also, I'm sorry, attached to this same -- the

8   letter that -- two letters before that.

9      A.   Yes.

10      Q.   One is -- well, I'm sorry.  One letter

11   before it is a sample.  And it says it's -- the

12   "Re" line -- it's not addressed to anyone, it's not

13   dated.  It says, "Dear xxxx."

14      A.   Uh-huh.

15      Q.   The "Re" line is, "Auditor Review Program

16   for Mirabilis HR."

17      A.   Yes.

18      Q.   And it has similar language about the

19   audits that  -- no, I'm sorry.  It has language,

20   apparently, that you asked for that you -- to

21   notify the clients that they were launching an

22   auditor review program.

23      A.   Uh-huh.

24      Q.   Right?

25      A.   Correct.

218

1      Q.   Okay.  And on Mr. Munroe's stationary,

2   although unsigned, there's a letter dated February

3   15th, 2006.  So just a few days after the letter

4   that I showed you that was signed.  Do you see

5   that?  One is February 10th; one is February 15th.

6      A.   Yes.

7      Q.   And the language is essentially -- well,

8   it's very, very similar; correct?

9      A.   Yes.

10      Q.   And one of them says Presidion Solutions

11   has overpaid a total of $508,961; the other one

12   says they've overpaid by $500,000; correct?

13      A.   Correct.

14      Q.   And I just want to make sure that I'm

15   correct in understanding that you, had you seen

16   this at the time, that it did not comport with your

17   understanding that this was false?

18      A.   No, I didn't know that it was false.  I

19   was hoping that it was correct.

20      Q.   Okay.  Would the clients have been

21   entitled to rely on it?

22      A.   I believe the clients did rely on it, yes.

23      Q.   And why would the clients have been

24   getting different information than the Board?

25      A.   I don't know.  I don't believe they did.

1           MS. VILMOS:  Object to the form.

2   BY MS. HAVENER:

3      Q.   You don't know that they did, or you don't

4   believe that they did?

5      A.   I don't know that they did.  I don't know

6   that they got different information than the Board.

7      Q.   Okay.  So if the Board got the same

8   information, again from a CPA who was looking at

9   and examining the account summary from the IRS to

10  Presidion, why would you expect the Board to have

11  assumed something different was true?

12     A.   Because the Board had different

13  information than the client companies.

14          MS. VILMOS:  Object to the form.

15  BY MS. HAVENER:

16     Q.   What was the different information the

17  Board had?

18     A.   Well, they had insider information as to

19  the dealings of the company, of the predecessor

20  company that they acquired or they managed for.  It

21  was always sort of ambiguous whether Mirabilis

22  bought Presidion or just had a contract with them

23  to manage the payroll.  They were rescinding deals

24  back and forth.  It was never a clearcut situation.

25          MS. HAVENER:  Okay.  Excuse me.  Could we

220

1           go off the record for a second?  We're going

2           to go off the record for a second because I'm

3           looking for a particular document.

4                (Discussion held off the record.)

5                (Thereupon a document was marked

6           Plaintiff's Exhibit 462 for Identification in

7           the proceeding.)

8    BY MS. HAVENER:

9           Q.   462.  Mr. Amodeo -- I did it again.  I'm

10   so sorry.  Mr. Amar.

11          A.   I take offense to that, Kathleen.

12          Q.   I'm sorry.  I'm very sorry.  I would too.

13   Just take a few minutes to look over this e-mail.

14   It's front and back and there are several -- it's a

15   series of documents.

16          A.   Okay.

17          Q.   Can you tell me, what's Darwin?

18          A.   Darwin is a payroll software.

19          Q.   And how was it associated with Mirabilis

20   or any of the Mirabilis or Amodeo entities?

21          A.   In -- sometime in the summer of '06 a

22   decision was made to switch out of the Lawson

23   software platform and to convert to a new one.  And

24   I was asked -- because I was a consultant at the

25   time -- I was asked to attend a meeting.  And I

221

1  strongly advised against going with Darwin based on

2  some questions I've asked from people that I knew

3  in the industry.  They said that the system does

4  not have anywhere near the capacity to handle the

5  40,000 worksite employees that this book of

6  business managed.  Once again, it fell upon deaf

7  ears, and they made the decision to go with Darwin

8  and it was a colossal failure

9       Q.   And you didn't like Lawson either, did

10 you?

11      A.   No.

12      Q.   Was there some other program that you were

13 --

14      A.   Yes.  There was one called Scorpio or

15 Pyramid HR.

16      Q.   Okay.  I just want to -- we're populating

17 the field here.  Is Marty Flynn an idiot?  You used

18 the term "idiots and sycophants."

19      A.   Yeah, I believe he was a sycophant.

20      Q.   Was Carlos Delgado an idiot?

21      A.   He was not part of the Board, no.

22      Q.   Was Laurie Andrea an idiot?

23      A.   No, it's not fair to say that.

24      Q.   Was she a sycophant?

25      A.   Somewhat, yes.

222

1    Q.   How about Mike Stanley?

2    A.   Mike Stanley was an idiot, yes.

3    Q.   Okay.  Dan Sharp?

4    A.   Yes.  I -- yes.  I don't know exactly if

5    he was an idiot or a sycophant but, yeah, Dan Sharp

6    was --

7    Q.   Tom Leach?

8    A.   I don't recall Tom Leach.  I think he was

9    one of the tech guys involved with the company.

10   Q.   Debra Cole?

11   A.   She worked for Mike Stanley.  I don't know

12   her.

13   Q.   Lilly Gutierrez?

14   A.   She works in sales for the company.

15   Q.   You said you didn't know about Carlos

16   Delgado; right?

17   A.   No, I knew that he didn't work in the --

18   for Mirabilis direct, but he was an employee of

19   AEM.

20   Q.   Okay.  And they weren't idiots.

21   A.   Okay.  I don't know.  No, in this case,

22   they were not.

23   Q.   Why was this referred to in parts as a

24   hurricane?  Was that your term?

25   A.   No.

223

1      Q.   Okay.  Do you see where it --

2      A.   No, I think there was an actual hurricane

3 at the time.

4      Q.   Oh, okay.  Hurricane Darwin?

5      Q.   Is that what it was referred to?  I didn't

6 see that.

7      Q.   Well, on it's Page 3 of 3.

8      A.   I see 2 of 3.

9      Q.   Yeah, look at Page 3 of 3.

10    "Yaniv/Mike.  The 9:00 a.m. advisory on

11 hurricane Darwin.  We are still importing history

12 and about 165 batches need to run.  If there are

13 errors, they must be corrected.  This task should

14 take about 6 hours to complete and if everything

15 goes well.  The Miami staff will be ready to

16 conduct parallels about 1:00 p.m.  I will give you

17 the next advisory this afternoon."

18    Do you see that?

19      A.   Yeah, I guess it was referred to a

20 hurricane, yes.

21      Q.   Okay.  And you were consulting at this

22 time?

23      A.   Correct.

24      Q.   In spite of the fact that you thought all

25 the people you were dealing with were either idiots

1    or sycophants.

2        A.   Correct.

3        Q.   Okay.  I'm finished with that one.

4            (Thereupon a document was marked

5        Plaintiff's Exhibit 463 for Identification in

6        the proceeding.)

7    BY MS. HAVENER:

8        Q.   Will you take a look at this, please.

9            MS. HAVENER:  For those on the phone, it's

10       an e-mail from James Sadrianna to Mike Stanley

11       dated Thursday, August 31st, 2006.  The

12       subject line is, "FW:  PEOs - Yaniv Amar."

13       And then there's a series.  It's a

14       page-and-a-half.

15   BY MS. HAVENER:

16       Q.   Do you remember this exchange, Mr. Amar?

17       A.   No.

18       Q.   You don't remember asking for the

19   information that's referred to in the second e-mail

20   from Nichole Beamer to Mr. Sadrianna; "Hi, Jim."

21   You don't remember asking for that information?

22       A.   It could be that I did ask for that

23   information, but I don't recall talking to Nichole

24   Beamer or Sadrianna about this.

25       Q.   What's Argent Firma, Inc.?

225

1       A.   That's another one of the entities.   I

2  recall that name now that you mention it, but I

3  haven't heard it since '06.

4       Q.   Okay.  But you don't remember what it did?

5       A.   No.

6            (Thereupon a document was marked

7       Plaintiff's Exhibit 464 for Identification in

8       the proceeding.)

9  BY MS. HAVENER:

10      Q.   This is 464.  It's an e-mail.  It starts

11 off with an e-mail from James Sadrianna to Tessah

12 Ivey dated July 8th, 2005.  Now, at that time, you

13 were still there; correct?

14      A.   July of '05?

15      Q.   Uh-huh.

16      A.   Was I still there?

17      Q.   Yes.

18      A.   Yes, I was working out of the Jupiter

19 office.

20      Q.   In the office for AEM?

21      A.   No.

22      Q.   In the Miami office?

23      A.   No.  In July of '05 I was working out of

24 the Jupiter office.

25      Q.   Jupiter.  Sorry.

1     A.   Yes.

2     Q.   But not in Orlando.

3     A.   No.

4     Q.   You never worked in Orlando.

5     A.   No, no.  I would go to Orlando, but I

6 didn't work out of Orlando.

7     Q.   If you'll look at the Page 2 of 3.  It's

8 an e-mail from Thomas Maida.  Is that how you

9 pronounce it?

10     A.   I don't know.  I don't know who this

11 person is.

12     Q.   You don't know who that is?

13     A.   No.

14     Q.   Okay.  Do you know what L-I-C-O-A is?

15     A.   No.

16     Q.   Could it have something to do with Legend

17 Insurance?

18     A.   It could be.  I'm --

19     Q.   Okay.  This is a document, an e-mail from

20 someone named Thomas Maida.  It doesn't have a "To"

21 line, but it's addressed to someone named Brian.

22 The next page -- it's forwarded by someone named

23 Brian Fischer, so I presume that was the original

24 person to whom it was addressed.

25     Who was Brian Fischer?

227

1     A.    He was one of the employees of Mirabilis.

2     Q.    You don't know what his job was?

3     A.    No, he was an attorney and he was supposed

4  to do something with regarding to the workers' comp

5  insurance.

6     Q.    Okay.

7     A.    I don't recall his title or his role.

8     Q.    If you'll look at the e-mail on Page 2 of

9  3.

10    A.    Uh-huh.

11    Q.    Mr. Maida is following up on a

12  conversation apparently he'd had with Mr. Fischer.

13       "I want to follow up on our conversation this

14  morning, by confirming a couple of points and

15  asking for your help in answering a couple of

16  questions we'll need to understand for application

17  purposes.

18       "My understanding is that the initial board of

19  LICOA will consist of you, Bob Konicki, Jerry

20  Goodmark, Edie Broadhead, Jeff Rendell, Jason

21  Carlson, and Bob Pollack.  A couple of questions

22  and comments:  First, why isn't Yaniv Amar serving

23  on the LICOA board if he is the sole shareholder of

24  Mirabilis and, therefore, an ultimate controlling

25  person of LICOA?"

1        Was that consistent with your understanding at

2    that time?

3        A.   What was consistent?

4        Q.   That you were the sole shareholder of

5    Mirabilis and, therefore, an ultimate controlling

6    person of LICOA?

7        A.   No.

8        Q.   The next paragraph:

9        "I also understand that Mr. Amar is the sole

10   shareholder of Mirabilis..."

11       You also did not believe that to be true;

12   correct?

13       A.   Correct.  Well, that's the same question

14   you just asked.

15           MS. CURRY:  We need to go off the record

16       for a minute.

17           MS. HAVENER:  Yes.  We just spilled

18       something.

19                (Off the record.)

20           MS. HAVENER:  We can go back on.

21   BY MS. HAVENER:

22       Q.   So, Mr. Fischer is being asked again by

23   this person named Mr. Maida, and, as I just said,

24   you disagree with your having been referred to as

25   the sole shareholder of Mirabilis; correct?

229

1      A.   Correct.

2      Q.   "We also need to know - for application

3    purposes - whether the loan from Frank Amodeo to

4    Mr. Amar (which apparently funded the start-up of

5    Mirabilis) is secured in any fashion whatsoever."

6         Are you familiar with any such loan, Mr. Amar?

7      A.   No.

8      Q.   Do you know what was, in fact, used for

9    the funding, the initial funding of Mirabilis?

10     A.   I told you I opened the account at Bank of

11   Commerce with several hundred dollars.

12     Q.   And that's the original account of

13   Mirabilis?

14     A.   The original -- to my knowledge, yes.  The

15   original account that was opened in Nevada was

16   under a thousand dollar balance.

17     Q.   And I think you testified before, I just

18   want to make sure, that you took the shares that

19   were handed to you at some point --

20     A.   Uh-huh.

21     Q.   -- and you handed those shares to Mr.

22   Amodeo.  Did you ever see those shares again?

23     A.   No.

24     Q.   And, to this day, you've never seen them

25   again.

1        A.   No.

2        Q.   And you also -- I just want to remind you

3   that you testified that you understood that it was

4   bearer stock.

5        A.   Correct.

6        Q.   And could you explain for the record what

7   your understanding is of bearer stock?

8        A.   My understanding is, as it was explained

9   to me, was bearer stock is owned by whoever bears

10  the stock.

11       Q.   In other words --

12       A.   Whoever holds --

13       Q.   -- whoever's holding on to it.

14       A.   Whoever's in possession of it.

15       Q.   Okay.  Who explained that to you?

16       A.   I believe it was Mr. Sadrianna, and I may

17  have asked Mr. Berman about it, or I may have

18  Googled it.

19       Q.   Did you know Mr. Sadrianna at the time

20  that Mirabilis started up?

21       A.   Yes.

22       Q.   And Mr. Berman as well?

23       A.   Mr. Berman, I don't recall when I met him,

24  but I did know him since '04.

25       Q.   And that started in '04.  The opening of

231

1    the bank account was in '04?

2        A.   I believe it was in '05.

3        Q.   Okay.

4        A.   I'm not sure exactly.

5        Q.   How did it come about that you went to

6    Nevada with Mr. Amodeo?

7        A.   No, I didn't go with Mr. Amodeo, and I

8    didn't go either.  I just contacted a company

9    called Business Solutions or something to set up

10   the corporation, business address.

11       Q.   And they sent you the stock.

12       A.   Yes.

13       Q.   And you immediately handed it to Mr.

14   Amodeo.

15       A.   I don't know if it was immediate.  I don't

16   recall exactly when I did hand it to him, but, yes,

17   I handed him the shares.

18       Q.   What occasioned the formation of

19   Mirabilis?

20       A.   Frank had asked me to set up a company in

21   Nevada and it was supposed to be a holding entity

22   for some transaction he was working out with

23   Presidion.

24       Q.   And how did it change, if you know, from a

25   holding company for some transaction that was

1  happening with Presidion to a year later there was

2  going to be an office within every half hour of

3  every 12,000 people on Earth, or whatever the --

4       A.   I cannot -- I can't answer that question.

5  I don't know.

6       Q.   So where did the money come from that was

7  several thousand dollars that was --

8       A.   Several hundred dollars.

9       Q.   Oh, I'm sorry.  Several hundred dollars.

10      A.   Frank either sent me a check or -- I don't

11 exactly remember, but he gave me enough money to

12 just incorporate the company and set up a bank

13 account.

14      Q.   So it wasn't a loan.  It was simply -- if

15 I'm understanding you correctly; please correct me

16 if I'm wrong -- it wasn't a loan.  It was simply he

17 gave you funds in order for you to use those funds

18 to accomplish some task he instructed you to do.

19      A.   That sounds right.

20      Q.   Correct?

21      A.   That sounds right.

22      Q.   And you said that you never saw that

23 bearer stock again.  Did you ever see any other

24 stock?

25      A.   No.  I saw some shareholder agreement in

1    late '05, but --

2         Q.   But did you ever see any other shares?

3         A.   Actual physical shares?

4         Q.   Correct.

5         A.   I don't recall seeing that.  I thought

6    that -- I thought that at one point they were

7    working on the distribution of shares.  He may have

8    showed them at a meeting, but I don't actually

9    remember.

10        Q.   Do you know if any shares were actually

11   issued?

12        A.   Not that I'm aware of.

13        Q.   You mean you --

14        A.   Not -- I --

15        Q.   Okay.  I just need to clarify that answer.

16   Do you mean that you are not aware of any stock

17   being issued, or you are aware that no stock was

18   issued?

19        A.   I am not aware of any stock being issued.

20        Q.   So it could have been issued and you

21   wouldn't be aware.

22        A.   Correct.

23        Q.   Why did Frank not simply set Mirabilis up

24   himself?

25        A.   I don't know.

1      Q.   What was your relationship with him at the

2  time?

3      A.   We were friends.  He asked me to do a

4  favor for him and I complied.

5      Q.   Did it have anything to do, as far as you

6  understood, with you actually might get finally

7  paid back?

8      A.   Something to that effect.  I mean, he was

9  working on a large contract with Presidion, I

10  thought he was going to get paid a lot of money and

11  at long last I was able to, hopefully, see my money

12  back.

13      Q.   And that has never happened; correct?

14      A.   Not fully, no.

15      Q.   When is the last time you saw Mr. Amodeo?

16      A.   I think you asked me that question on the

17  Interrogatories.  I thought it was sometime in

18  early '08.

19      Q.   When is the last time you spoke with him?

20      A.   Right around the same time, give or take a

21  few days apart.

22      Q.   So you have not spoken to him since he's

23  been incarcerated.

24      A.   No, no, no.

25      Q.   Have you spoken to him after he was

1    indicted?

2        A.   I don't know when he was indicted.  I'm

3    not sure when he was indicted.

4        Q.   I can't remember.  Sorry.

5        A.   But it was sometime, I think, in early or

6    middle of '08.  It's been over two years.

7        Q.   I think it was August.

8        A.   What was August?

9        Q.   He was indicted.  August '08.

10       A.   Oh.

11       Q.   If you'll turn the page, I just wanted to

12   point out to you that Thomas Maida is a partner at

13   Foley & Lardner LLP.

14       A.   Okay.

15       Q.   It's got an 850 area code, which is

16   Tallahassee or Pensacola.  Does that refresh your

17   recollection?  Have you ever dealt with Foley &

18   Lardner, to your knowledge?

19       A.   Not to my knowledge.  There were a lot of

20   law firms that were involved in it at the time, but

21   I've heard the name Foley & Lardner, but I've never

22   dealt with anybody there that I can recall.

23       Q.   Okay.

24

25

1            (Thereupon a document was marked

2       Plaintiff's Exhibit 465 for Identification in

3       the proceeding.)

4    BY MS. HAVENER:

5       Q.   I'm showing you what's marked as 465 in

6    this deposition.

7            MS. HAVENER:   This is an e-mail, for those

8       of you on the phone, from Mike Stanley dated

9       Monday, April 10th, 2006.   It's addressed to a

10      significant number of people.   It starts with

11      Carlos Delgado and Dean Armitage, Jeff

12      Reichel, Jim Vandevere, Jim Waldvogel, John

13      Swygert.

14   BY MS. HAVENER:

15      Q.   Are you familiar with all those names?

16      A.   Most of them.

17      Q.   Are they all idiots?

18      A.   I don't know if that's a fair comment, but

19   some of them are.

20      Q.   I'm trying to figure out who are the

21   people that, you know, were not figuring this

22   problem out in 2006 when you already suspected it

23   and were waiting, essentially, for confirmation or

24   for your suspicions to be at least solidified.

25      A.   Who of these people?

237

1    Q.   Yes.   It was rhetorical.   I'm sorry.   But

2    one of those people listed, if you look at the last

3    person listed, is you.   You're not an idiot; right?

4    A.   I -- I can be considered one, yes.

5    Q.   And then it's copied to Paul Glover, Frank

6    Amodeo, Dan Myers.   The subject is, "Premier HR

7    Lawson Integration."   It's talking about National

8    Med Staff Integration with assignments; National

9    Med Staff Integration with assignments that are

10   labeled V6 and V5.   They're Excel spreadsheets that

11   are supposedly attached, although we don't have the

12   attachments.

13   What I'm interested in is, the first sentence

14   says, "The Premier HR Lawson Integration is a go."

15   Do you remember what the Premier HR Lawson

16   Integration is?

17   A.   No.   I assume this was the software

18   integration, but it happened later than this date.

19   Q.   Well, the Darwin that we just talked about

20   a few minutes ago that you recommended against was

21   later in the same year; correct?

22   A.   Correct.

23   Q.   And that was going to be replacing Lawson.

24   A.   Yes, but Lawson was already in place for

25   --

1      Q.   Oh, so you're saying this is later than

2   the replacement of Lawson.

3      A.   No.  My recollection was that Presidion

4   already was using Lawson for some time.  I don't

5   know what the Premier HR part of it is, but Lawson

6   was already in place for some time.

7      Q.   Okay.  And the next sentence just says,

8   "In discussions with Frank Amodeo it was decided

9   that it is in the Company's best interest to

10  immediately integrate Premier HR, Allstaff

11  Management, Neighborly Services and E.H. Sellars,

12  Inc., into the Lawson system.  Mike Stanley has

13  been designated as the point person for this

14  project.  In order for Mike to accomplish this

15  task, a team has been put together to accomplish

16  this tasks.

17     "The team members are:"  And the first name is

18  Yaniv Amar.

19     Do you remember being on this team?

20     A.   No.

21     Q.   Do you remember anything about this?

22     A.   This was around the time that they were

23  trying to roll up several PEOs.

24     Q.   Now, we've already established that Frank

25  Amodeo was not on the Board.

239

A.   Okay.

Q.   And we've talked before and you said that the Board was in control.

A.   Correct.

Q.   Why would it then be in discussions with Mr. Amodeo it was decided that it was in the company's best interest to accomplish this?

A.   You would have to ask Mike Stanley that question.

Q.   But just to be clear, was it unusual, in fact, for Mr. Amodeo actually to make the decisions about the day-to-day operations of the company?

A.   No, I believe he influenced a lot of the decisions.  I don't know if he actually made the final decisions, but he did influence them.

Q.   Okay.  Can you give me an example of any time when you wanted to accomplish something that you went to the Board to ask -- or to make a pitch?

A.   Aside from talking to Richard Berman or Laurie Holtz mostly one on one, I never actually went to the Board and made a pitch.

Q.   Did you ever go ask permission or make a pitch to Mr. Amodeo?

A.   Yes.

Q.   How many times?

1      A.   I don't recall.

2      Q.   Dozens?  Scores?

3      A.   A few.  During that time in '06 --

4      Q.   Less than 10?

5      A.   You know, it depends.  What?  Decisions

6  like what?  Like the standalone account?

7      Q.   Any decisions.

8      A.   Yes, I had a direct communication with

9  Frank.

10     Q.   So you often asked Mr. Amodeo for, you

11  know, for approval or for approval of decisions you

12  wanted to implement; is that correct?

13     A.   Correct.

14          MS. HAVENER:  466.

15          (Thereupon a document was marked

16     Plaintiff's Exhibit 466 for Identification in

17     the proceeding.)

18          MS. HAVENER:  For those of you on the

19     phone, Exhibit 466 is an e-mail from Mike

20     Stanley to Frank Amodeo with a cc to Yaniv

21     Amar dated the day after your resignation, in

22     fact; June 22nd, 2006; correct?

23          THE WITNESS:  Yes.

24  BY MS. HAVENER:

25     Q.   And I just want to point out that -- am I

241

1  correct that no Board members are copied on this

2  e-mail?

3      A.   It does not appear to be the case.

4      Q.   Okay.  Yesterday -- the e-mail says -- the

5  subject line is, "AEM & the DBPR."

6      "Yesterday after the meeting and after talking

7  with you and Yaniv, I talked to Mike Miller to see

8  if he had any additional information about Jerry

9  Lancaster's complaints.  Mike's only statement was

10 that Jerry was a volatile man and Mike didn't know

11 how to take his objections."

12     Who is Mike Miller?

13     A.   If I remember correctly, he was an

14 attorney that dealt with PEOs in the State of

15 Florida.

16     Q.   From the DBPR?

17     A.   No, not from the DBPR.

18     Q.   Oh.  But he represented PEOs in front of

19 the DBPR?  Is that your understanding?

20     A.   That sounds about right.  That sounds

21 fair.

22     Q.   Okay.  Who is Jerry Lancaster?

23     A.   Jerry Lancaster is, I believe, one of the

24 owners of a workers' comp company, insurance

25 company out of Texas.

1      Q.   Okay.  And the next paragraph says, "Mike

2  said he would be out of town for the next week but

3  suggested that instead of waiting for him to get

4  back we very quickly get with Brian Nugent to make

5  sure we can answer the following questions to the

6  state's satisfaction:"

7      The first question is:  "Who owns AEM, Inc.?

8  The DBPR license indicates it is Yaniv Amar."

9      Is that correct?

10     A.   That's what it says.

11     Q.   Is that correct?

12     A.   In June of '06?

13     Q.   Yes.

14     A.   I don't think it would be correct because

15  I would have relinquished any shares that I had,

16  but that's what it says.

17     Q.   Okay.  "If someone else owns a majority of

18  AEM, did AEM fail to notify the DBPR of an

19  ownership change?"

20     Do you recall relinquishing your shares in AEM

21  officially?

22     A.   It may have been in the Hold Harmless

23  Agreement.  I have to look it up.

24     Q.   Why would Mr. Stanley have gone to you or

25  have come to you and Mr. Amodeo to get the answers

243

1    to these questions and not to the Board?

2        A.   I don't know.  I thought he reported to

3    Bob Pollack, is what I understood he reported

4    directly to.

5        Q.   Bob Pollack's not copied on here at all;

6    is he?

7        A.   Where?  No, he's not copied here, no.

8        Q.   And nor is he mentioned anywhere in this

9    e-mail.

10       A.   No, but I know that Mike Stanley asked Bob

11   Pollack for permission to come down to Miami when I

12   asked if he would come down and introduce himself

13   to his staff.

14       Q.   So what was Mr. Pollock's role over Mr.

15   Stanley?

16       A.   I don't know exactly what his official

17   role or title was, but I know that Mike Stanley

18   needed permission from him to fly down to Miami.

19       Q.   Was Mirabilis HR a, quote -- in the last

20   bullet point it says, "If Mirabilis HR was DBA for

21   Presidion..."

22            Was that, in fact, the case?  Was Mirabilis --

23       A.   No.

24       Q.   -- HR a DBA for Presidion?

25       A.   No.

244

1       Q.   What was the connection between Mirabilis

2  HR and Presidion?

3       A.   That's an interesting question, Kathleen.

4  I really -- like it was a moving target.  Whether

5  we managed -- whether AEM managed the book or

6  whether Mirabilis bought the book, whether -- there

7  were several contracts that went back and forth and

8  were rescinded.

9       Q.   But you were the CEO of AEM; correct?

10      A.   Yes.

11      Q.   But you didn't know whether -- what the

12 official relationship of your company was with

13 Presidion or with Mirabilis HR?

14      A.   There were two separate groupings in the

15 software.  One was for the new business that AEM

16 brought on in -- the $95 million that was brought

17 on in '06, and one was the $4-500 million in

18 business from Presidion.  I don't know if it was

19 ever officially transferred.

20      Q.   That was supposed to be 5 billion or

21 something.

22      A.   5.3 billion.

23           (Thereupon a document was marked

24      Plaintiff's Exhibit 467 for Identification in

25      the proceeding.)

245

```
 1            MS. HAVENER:  For those of you on the

 2       phone, 467 is an e-mail from Tessah Ivey dated

 3       Thursday, February 23rd, 2006, to Craig

 4       Vanderburg.  The subject is AEM and Lawson

 5       employees.

 6   BY MS. HAVENER:

 7       Q.  It says, "I made Frank aware of the

 8   exchange this morning.  I will provide your insight

 9   to him as well.  Thanks, Tessah."

10        If you'll go to the back, please.  Okay.

11   There's an e-mail from Chris O'Connor to you dated

12   February 22nd, 2006.  The subject is -- and copied

13   to Sue Schumacher.  Who is Chris O'Connor?

14       A.  He was the former CFO of Presidion, I

15   believe.  I don't know if that was his title, but

16   he acted as the CFO of Presidion.

17       Q.  Of the public company?

18       A.  Yes.

19       Q.  I mean, there are seven Presidions or

20   something.

21       A.  I thought there were more than that,

22   actually.  But, yes.

23       Q.  I've only seen up to seven.

24        Would you please read the -- who is Sue

25   Schumacher, please?
```

246

1       A.   She was the CPA/CFO of the company.

2       Q.   Of what company?

3       A.   Of Presidion.

4       Q.   CPA/CFO?

5       A.   Yep.

6       Q.   Well, you just said -- oh, so Chris

7    O'Connor was the former CFO and she was the current

8    --

9       A.   She reported to Chris O'Connor while he

10   was there and after he had resigned.  I believe he

11   resigned in late '05 or early '06.

12      Q.   So she was later; after this e-mail.

13      A.   I don't know what her title was, but I

14   know she was involved with the day-to-day finances

15   of that company.

16      Q.   Okay.  But eventually she took over his

17   role; is that your understanding?

18      A.   She took over a financial role in the

19   company.  I don't know if it was his roles or not.

20      Q.   Could you read that e-mail into the

21   record?  It continues on to the next page.

22      A.   I only have two pages.

23      Q.   It's on the back.

24      A.   Okay.  Starting from Chris O'Connor to

25   Yaniv Amar?

1          Q.    Uh-huh.

2          A.    "Yaniv, After discussions with Melanie, we

3     have determined that AEM, Inc., doing business as

4     Mirabilis HR is reporting worksite employees

5     outside the State of Florida (in multiple states).

6          "As you are aware, MHR is not registered or

7     licensed in most of these states nor does it have

8     the applicable SUTA and Withholding accounts

9     established.  In addition, MHR does not have

10     workers' compensation insurance in any state but

11     Florida.

12          "Per my discussion with Melanie, she has made

13     ISI aware of this problem with Lawson for quite

14     some time.  There has been minimal response to this

15     problem.  As it stands, MHR is not in a position to

16     report these wages to the applicable states.

17          "I have come across this issue in regards to

18     my consulting assignment on State Income Tax

19     preparation consulting, and I feel obligated to

20     make you aware of the facts.

21          "I have asked Melanie to prepare a list of

22     those states and forward to you.  Please let me

23     know if I can assist in further reconciliation."

24          Q.    Do you remember this exchange?

25          A.    No, I don't actually, but --

1          Q.   Could you read your response to him, which

2     is about six minutes later, from Yaniv Amar to

3     Chris O'Connor, Wednesday, February 22nd, 2006.

4          A.   At 4:00 p.m.?

5          Q.   At 4 o'clock.

6          A.   "Chris, are you aware that Mirabilis HR is

7     merely servicing the out of state clients for

8     Paradyme?  There is a one year agreement in place

9     between the two entities."

10         Q.   And to your understanding, what knowledge

11    does that make?  Or what -- what knowledge.  What

12    difference does that make?

13         A.   What difference does what make?

14         Q.   That there was merely a servicing

15    agreement and not -- and that --

16         A.   The way I had understood it, Mirabilis HR

17    was acting as a PEO to the PEO.  Just like Common

18    Paymaster was -- you know, Common Paymaster was

19    processing the payroll for the Presidion employees

20    and for the AEM employees, which didn't make a

21    great deal of sense, but that's the way I

22    understood the agreement to read.

23         Q.   Okay.  Now, the next one starts at the

24    bottom of the first page and continues on to the

25    next page.  It's Chris O' Connor to you, dated

249

1    February 22nd, 9:03 p.m.  And the subject is the

2    same, AEM & Lawson Employees.  Would you please

3    read that into the record?

4        A.   "I am not aware of that.  I don't

5    understand how that could work in a co-employment

6    relationship (who do the employees belong to).  I

7    have never heard of mixing PEO and ASO service

8    between organizations.

9        "Tax Problems.  Regardless, you still are not

10   processing payroll correctly in Lawson nor are you

11   paying applicable payroll state withholding and

12   SUTA correctly.  Melanie is completely unaware of

13   this relationship, so you have unreported taxes on

14   the appropriate FEIN for state withholding and SUTA

15   accounts.  This is already a problem in any

16   withholding situations as she has not reported the

17   withholding (typically due on a monthly basis).

18       "You will then have a problem if not reported

19   from a SUTA perspective on April 30th, or 30 days

20   after each quarter end.

21       "WC Problems.  MHR is piggy-backing on

22   Paradyme's policy unless there is common ownership.

23   If there is common ownership, then Providence needs

24   to be made aware of the change via a new ERM 14.

25       "Accounting Problems.  This will create

250

1    problems in accounting as I am certain they are not

2    aware of the ASO relationship.  You cannot

3    co-mingle the cash if you are truly servicing the

4    accounts.

5        "I have not seen the documents, so it's hard

6    to be conclusive on the issues.  Someone needs to

7    give Melanie some direction on tax reporting and

8    Sue on the accounting side.  It's a real mess in

9    Troy because there is no information flow."

10       Q.   Okay.  Who was Chris O'Connor?

11       A.   At this time?

12       Q.   Yes.

13       A.   A consultant for Hourglass PC, whatever

14   that is.

15       Q.   How did you know him?

16       A.   I knew him when he was working for

17   Presidion in '05.  I met him in late '05.

18       Q.   He didn't have any connection to you, so

19   far as you knew, in '06?

20       A.   No.  This is probably the first

21   communication I had with him in '06.

22       Q.   Well, why would he have been looking at

23   the AEM/Mirabilis HR reporting?

24       A.   Because I believe he still did some

25   consulting work for Presidion at the time.

1        Q.   And because nobody knows the difference

2   between Presidion and AEM and Mirabilis HR, was he

3   consulting for them as well?

4        A.   This is the only communication that I ever

5   had with him, apparently.  I don't know.  I never

6   -- I don't recall ever talking to him.

7        Q.   Do you know how much experience Mr.

8   O'Connor had in the PEO industry?

9        A.   No, I don't.

10       Q.   What's an ASO agreement?

11       A.   I'm not sure.

12       Q.   So when you got this e-mail, did it cause

13   you concern?

14       A.   I don't recall seeing it like at the time,

15   but I imagine it would.

16       Q.   And the next e-mail is from Craig

17   Vanderburg to Tessah Ivey and with a copy to

18   himself.  And it's addressed to Frank, and we've

19   already discussed that Tessah Ivey was a

20   communicant for Frank.

21       A.   Yes.

22       Q.   "Frank, FYI, please see the exchange

23   between Yaniv and Chris below.  Yaniv --"  I

24   presume that means "-- has instructed that the

25   former Paradyme clients be populated into AEM by

1    IT.  The official move from Paradyme to AEM did

2    occur at that point, now Yaniv is stating that AEM

3    is only 'servicing these clients' for Paradyme.

4    The problem here is that Yaniv and IT moved the

5    clients to the AEM directory and for the past 2

6    months they have been included in all AEM tax base

7    and workers' comp, etc.

8        "Not trying to get in the middle of this but

9    it will be a problem at quarters end if Yaniv does

10   not fix it."

11       A.   Uh-huh.

12       Q.   Do you recall anything about what happened

13   as a result of this exchange?

14       A.   No, because I -- this is the first time I

15   see this e-mail.

16       Q.   Well, do you remember what happened as a

17   result of the communication between Chris O'Connor

18   and you?

19       A.   Not exactly, but I assume I brought it to

20   Frank's attention.

21       Q.   Well, we at least know Mr. Vanderburg did;

22   right?

23       A.   Yes.

24       Q.   And that was the next day, so --

25       A.   Okay.

1    Q.   -- somehow Mr. Amodeo knows about this.

2  Isn't this a pretty big deal?   These are pretty

3  significant problems; am I correct?

4    A.   Correct.

5    Q.   But you don't recall what happened as a

6  result of this?

7    A.   No, I recall that -- you know, not this

8  one in particular, but when other issues like this

9  -- there were a lot of big deals that occurred.

10  But I imagine I would have taken it to -- brought

11  it to Frank's attention, and I was always assured

12  that there are dozens of accountants and attorneys

13  and I need not worry about these issues.

14    Q.   But you went to Frank; not the Board.

15    A.   Correct.

16    Q.   And so how did the Board find out about

17  this, to your knowledge?

18    A.   I don't know.

19    Q.   Do you know if it did?

20    A.   No.

21    Q.   So it's very possible --

22    A.   You just brought it to my attention now.

23  This is --

24    Q.   Right.

25    A.   -- four-and-a-half years after the fact.

1          Q.   But it's absolutely possible -- what I'm

2    trying to get at is, Mr. Amar, isn't it possible

3    that the Board knew nothing about this?

4               MS. VILMOS:   Object to the form.

5               THE WITNESS:   It's a possibility, yes.

6    BY MS. HAVENER:

7          Q.   If the Board knew about it, they would not

8    have heard about it from you; correct?

9               MS. VILMOS:   Object to the form.

10              THE WITNESS:   I may have discussed this

11         with Richard Berman.   Like I spoke --

12    BY MS. HAVENER:

13         Q.   Okay.   But if you discussed it with

14    Richard Berman, that's not the same thing as

15    discussing it with the Board.

16         A.   Correct.

17         Q.   Mr. Berman was general counsel for the

18    company; correct?

19         A.   Right.

20         Q.   So you could be discussing it with Mr.

21    Berman in his role as general counsel and never

22    speak to the Board, and the information never gets

23    to the Board; correct?

24         A.   Correct.

25         Q.   So when we were focussing at the very

1    beginning of this deposition on your -- I think

2    your word was that you were appalled -- or, no, how

3    audacious it was for my clients to have served on

4    the Board of the company and not have heard of

5    malfeasance or misfeasance occurring within the

6    PEOs and not understanding the depth of the

7    problem, do you now understand that even you didn't

8    communicate problems that you saw and that were

9    pointed out to you to the Board?

10         MS. VILMOS:  Object to the form.

11         THE WITNESS:  Are you asking a question or

12     making a statement?

13   BY MS. HAVENER:

14    Q.  Yes.  I said:  Do you now understand that

15    even you didn't report things to the Board?

16    A.  I do understand that I -- I always knew

17    that I didn't report things to the Board.

18    Q.  You reported them to Frank; correct?

19    A.  Yes.

20    Q.  And so it's -- well, enough said.  Thank

21    you.

22         (Thereupon a document was marked

23     Plaintiff's Exhibit 468 for Identification in

24     the proceeding.)

25   BY MS. HAVENER:

1       Q.   This is an e-mail from Paul Glover dated

2   April 28th, 2006, 6:50 p.m., addressed to Yaniv

3   Amar, Frank Amodeo, James Sadrianna, Frank

4   Hailstones, Bob Pollack, Fernando Simo.

5       And it reads:  "Once more with feeling!

6   Attached are the audited financial statements for

7   AEM, Inc., and Human Resource Enterprise

8   Corporation for the year ended December 31st, 2005,

9   released moments ago by James Moore and Company.

10   Pleasure reading for each of you I am sure.  Have a

11   great weekend everyone!"  Signed by Paul Glover,

12   Executive Vice President Finance, CFO Mirabilis

13   Ventures, Inc.

14       Do you see that?

15       A.   Yes.

16       Q.   Did I read it correctly?

17       A.   Yes.

18       Q.   And attached to it is the Independent

19   Auditors Report of James Moore & Co., dated

20   April 26th, 2006; correct?

21       A.   Uh-huh.

22       Q.   Can you show me anywhere in this document

23   -- and, please, take your time -- where there is a

24   problem reported with respect to AEM and Human

25   Resource Enterprise Corporation to anyone on the

1   Board?

2       A.   I don't believe one was reported in the --

3       Q.   Okay.  But you -- okay.  Thank you.  Thank

4   you.  I'm sorry I interrupted you.

5           Didn't you tell me earlier in this deposition

6   that you went to Paul Glover and explained to him

7   your concerns?

8       A.   Yes.

9       Q.   And did you communicate the concerns that

10  were reported to you by Chris O'Connor in this

11  e-mail that was Number 467 to Mr. Glover?

12      A.   I don't recall.

13      Q.   Okay.  That was -- this was, if you'll

14  compare them, a month -- two months earlier;

15  correct?

16      A.   The financials were two months after, yes.

17  Yes.

18      Q.   But the e-mails to you --

19      A.   Yes.

20      Q.   -- were in February reporting these

21  problems.

22      A.   Yes.

23      Q.   And you're not sure if you reported those

24  problems to Mr. Glover; correct?

25      A.   No, I recall reporting them to Frank and I

1    probably did report them to Richard Berman as well.

2        Q.   But not to Paul Glover.

3        A.   I don't think I would have reported them

4    to Paul Glover.

5        Q.   So in reporting them to Mr. Amodeo and Mr.

6    Berman, in what way did you believe that they were

7    going to be communicated to the Board?

8        A.   I don't know.

9        Q.   Okay.  Am I correct in understanding that

10   at this time in April 28th, 2006, given those

11   e-mails that we just saw a second ago in Number

12   467, you knew that those problems had existed;

13   correct?

14       A.   The problems with the out-of-state

15   clients?

16       Q.   Correct.

17       A.   I knew what was communicated to me, yes.

18       Q.   And do you know how those problems were

19   resolved?

20       A.   No, but I was given certain assurances

21   that they were being handled with counsel.

22       Q.   By whom were you given such assurances?

23       A.   By Frank and/or Richard.

24       Q.   And so if you looked -- would you have

25   looked at this document and read it carefully -- it

1   is addressed to you, the AEM financials -- would

2   you have reviewed this document with care?

3        A.   I reviewed the cover letter, not the

4   actual statements, and they told me they were

5   properly audited and --

6        Q.   But you're the CEO of the company;

7   correct?

8        A.   Yes.

9        Q.   Now, knowing what you knew about the

10  problems that had happened in just two months

11  earlier, and that you had -- that what you had done

12  about it is report them to counsel and to Frank,

13  did you examine this document to see if those

14  problems were reflected anywhere in this document?

15       A.   I read the cover letter and I was told

16  that the financials were audited.  I --

17       Q.   And so you didn't -- that's as far as it

18  went; correct?  You didn't do anything more.

19       A.   I don't believe I did anything more, no.

20       Q.   So you were satisfied, because of the

21  cover letter, that it was a-okay; correct?

22       A.   I don't know if that's a fair statement.

23  I don't think I was satisfied that it was a-okay,

24  but I was told that the financials were audited, I

25  was surprised, and I said okay.

1      Q.   Were you satisfied that it was good

2   enough?

3      A.   I don't recall exactly if I was satisfied

4   that it was good enough then, but it was definitely

5   a -- some relief that the financials were audited.

6      Q.   Now, I just want to make sure that given

7   those problems and given your sense of relief,

8   given the problems that were reported on

9   Exhibit 467 about the out-of-state clients and the

10  other issues that were raised by Chris O'Connor,

11  and then given the audited financial statements and

12  the clear or clean opinion letter -- you know what

13  I mean by "clean opinion letter," correct?

14     A.   Yes.

15     Q.   -- and your sense of relief at the clean

16  opinion letter, am I correct in understanding that

17  you did not feel any obligation to examine this

18  more carefully and/or to report those problems to

19  the Board?

20     A.   The problems from two months prior?

21     Q.   Correct.

22     A.   No, I didn't report them to the Board.

23     Q.   Nor did you feel a responsibility to

24  examine this with care to see that those problems

25  had been addressed.

1    **A.**   No, I discussed this with Paul Glover and

2    with some other accountants.  I really can't

3    understand the financial statement properly.  I

4    don't have that formal education.

5        **Q.**   Well, neither can I, but that's not my

6    job.  And I'm not a CEO of a company.  I mean, I

7    would expect --

8        **A.**   I didn't have the qualifications to be

9    CEO.  I was an Interim CEO.  But that's --

10           MS. VILMOS:  Ms. Havener, I'm going to

11       move to strike your comment.  That's

12       inappropriate.  If you have a question, then

13       ask him a question.

14           MS. HAVENER:  I apologize if I was

15       inappropriate.

16           (Thereupon a document was marked

17       Plaintiff's Exhibit 469 for Identification in

18       the proceeding.)

19   BY MS. HAVENER:

20       **Q.**   Exhibit 469 is an e-mail from Scott

21   Goldberg dated Tuesday, June 21st, 2005, at 10:14

22   a.m. to Michelle Hladky.  Do you know who that

23   Michelle Hladky is?

24       **A.**   No.

25       **Q.**   I'm representing to you I believe that

1   that's Mr. Sadrianna's secretary.  I think that's

2   what he told us in his deposition.

3       A.   Very possible.

4       Q.   Attached is Resolution of Board of

5   Directors - Yaniv - Ratify.

6       The e-mail says, "Michelle, attached are the

7   Minutes for the Board of Directors, with Yaniv

8   signing.  Please have Jim review --" and I presume

9   that's referring to Mr. Sadrianna, since Jim's

10   assistant was the recipient "-- and let me know

11   what changes he wants.  Thank you ever so kindly,

12   Scott Goldberg, Esq."

13       And the below e-mail is from Michelle, about

14   45 minutes earlier, Tuesday, June 21st, 2005, 9:27

15   a.m., to Scott, saying, "Hi, Scott, Jim needs you

16   to draw up the Minutes that Yaniv can sign to

17   ratify the Resolution from yesterday.  List Yaniv

18   as Director.  You do not need to include the

19   notary.  Thanks, Michelle."

20       Now, if you'll look at the next page, it

21   reads, "Minutes of Mirabilis Ventures, Inc.,

22   Special Meeting of Board of Directors."

23       It's not signed; correct?

24       A.   Correct.

25       Q.   And the next page, the meeting of -- the

1      next one is the wrong date, but it has the same

2      resolution on it.  I'm not sure why.  Mirabilis

3      Ventures, Special Joint Meeting of the Board of

4      Directors.

5           Do you remember serving as the Chairman of a

6      meeting of the Board of Directors of Mirabilis

7      Ventures on either June 21st, 2005, or July 6th,

8      2005?

9           A.   No.  You asked me this question already

10     and I answered.  No.

11          Q.   And you don't -- I'm sorry, but you don't

12     remember ever signing --

13          A.   No, this is my signature.

14          Q.   Yes.  But you don't remember signing it?

15          A.   I don't remember signing it.  And, like I

16     told you before, I was handed a lot of documents

17     and I, unfortunately, signed a few of them without

18     proper counsel or understanding.

19          Q.   Okay.  If you see what's attached a few

20     pages later, it's another set of Minutes of

21     Mirabilis Ventures, Inc., another Special Joint

22     Meeting of Directors and Shareholders, dated

23     April 7th, 2005.  And this one is signed by Frank

24     Amodeo as Chairman.  Do you see that?

25          A.   Yes.

1       Q.   Do you have any recollection of anything

2   having occurred between April 7th, 2005, and

3   July 7th, 2005?  I mean, did anything occur that

4   would have caused the office of Chairman to have

5   changed from Mr. Amodeo to you?

6       A.   Something may have happened, but I really

7   don't recall from, you know, five years ago,

8   five-and-a-half years ago, what happened in that

9   period of time.

10      Q.   Do you happen to recall, if you look at

11  the page that's dated July 6th, 2005, with your

12  signature on it, do you remember a resolution that

13  the company was authorized and directed to issue

14  1,000,000 shares of Preferred Stock of $0.00 par

15  value each?

16      A.   No, I don't recall.  But that is my

17  signature.

18          (Thereupon a document was marked

19      Plaintiff's Exhibit 470 for Identification in

20      the proceeding.)

21  BY MS. HAVENER:

22      Q.   470.  This is an e-mail from Mark Bernet

23  dated Wednesday, February 7th, 2007, at 6:02 p.m.

24  It's addressed to Mike Stanley, Kevin Leonard, Bill

25  Walsh, Robert Nevill, with a cc to Yaniv Amar;

1    Re: CHS payroll.

2        What is CHS, Mr. Amar?

3    A.   I don't know.

4    Q.   Could it be Community Health Systems?

5    A.   I really don't know.

6    Q.   Do you remember any business that you had

7    any involvement with called Community Health

8    Systems?

9    A.   No.

10   Q.   Would you please read the first e-mail

11   into the record, please.

12   A.   The one from Mark Bernet to myself?

13   Q.   Correct.  Oh, you're just copied, but,

14   yes.

15   A.   Oh, yeah.  "Can AEM acquire Florida PEO

16   assets?  What was the original intent for HRE?  I

17   appreciate that we don't necessarily want to waste

18   $125,000, but if we're not doing anything with it

19   and we can shut it down easily, we should consider

20   doing so.  My guess is that the $50,000 isn't

21   coming back any time soon."

22   Q.   Okay.  This is dated February 7th, 2007.

23   What was your role at that time?

24   A.   At that time, I was just trying to save

25   whatever PEO assets were left and sell them off to

1   another company.

2        Q.   In what capacity?

3        A.   Consultant.

4        Q.   Why?

5        A.   Why?

6        Q.   Uh-huh.  Were you being paid as a

7   consultant?

8        A.   Yeah.  I've answered your question

9   already.  I was being paid through May of '07.

10       Q.   Through May of '07.

11       A.   April or May of '07.  I don't recall.

12       Q.   I'm sorry.  You said April?

13       A.   April or May of '07.

14       Q.   Okay.  Well, I want to go -- now, I read

15  just the first one, which is actually the last one

16  in the string.

17       A.   Okay.

18       Q.   Where I want to start is at the -- who is

19  Robert Nevill?  At the bottom of the second page

20  there's an e-mail from Robert Nevill to Kevin

21  Leonard, with a copy to Jay Stollenwerk and Bob

22  Konicki.  And that appears to be the first one

23  that's referencing the CHS payroll.  Do you see

24  that?

25       A.   Yes.

1        Q.   And that reads, "Kevin - Here is all the

2   information you should need.  Fax over

3   authorization letter (on MVI letterhead if

4   available) to Cathy at 407-420-2819."

5        A.   Yes.

6        Q.   Do you know who Cathy is?

7        A.   No.

8        Q.   And then there's an instruction for a wire

9   transfer; is that correct?

10       A.   It appears to be, yes.

11       Q.   From Human Resource Enterprise dba/

12   management, and there's an account number for

13   $50,000.00 on behalf of Cadent to Sky Bank.

14   Account Name:  PSI -- that's Presidion Solutions,

15   Inc.; is that right?  Number VII?

16       A.   PSI VII, Inc., yes.

17       Q.   Yes.  And it says at the bottom, "We will

18   be able to cover the $16,256.96 out of Cadent's

19   books.  Please note that will leave them extremely

20   strapped for cash."

21        Do you have any recollection what this is

22   referring to?

23       A.   No.

24       Q.   Do you know why you became involved in the

25   exchange later the same day, approximately an hour

1    later?

2         A.    Why Mark included me?

3         Q.    Well, it looks like it was Mike Stanley

4    who included you.  From Mike Stanley.  See at the

5    top of the --

6         A.    Oh, of the second paragraph?

7         Q.    Uh-huh.

8         A.    No, I don't know why Mike Stanley included

9    me in that.

10        Q.    And so you have no recollection of what

11   this is about; am I correct?

12        A.    I don't know what -- that's correct.

13             (Thereupon a document was marked

14        Plaintiff's Exhibit 471 for Identification in

15        the proceeding.)

16   BY MS. HAVENER:

17        Q.    471, for those of you on the phone, is an

18   e-mail from -- it starts out with an e-mail from

19   Yaniv Amar to Mike Stanley dated Friday,

20   December 29th, 2006.  The "Re" line is AEM &

21   Mirabilis.

22             If you don't mind, Mr. Amar I'd like you to

23   start at the bottom, which is the first e-mail in

24   the string, and it's Friday, December 29th, 2006,

25   at 12:48, so not long before, from Mike Stanley to

1    you.   Subject line is AEM & Mirabilis.

2        And that says, "The understanding throughout

3    the company is that Mirabilis HR and WTS --" which

4    I believe is Workers Temporary Staffing; is that

5    correct?

6        A.    That's correct.

7        Q.    " -- are owned by Mirabilis Ventures.   I

8    did not understand that to be the case.   Could you

9    clarify with Frank?"   And then, "Mike Stanley,"

10   with a phone number after it, is the signature

11   line.

12       Could you read your response to Mr. Stanley?

13       A.    "The truth of the matter is that the IRS

14   owns MHR and WTS at this point in time!!"

15   Exclamation, exclamation.

16       Q.    What did you mean by that, Mr. Amar?

17       A.    I think this was right around the time

18   that I had discovered that there was probably a --

19   I don't know if it was give or take a couple days

20   that I found out that there was a large

21   investigation going on.   So Mike Stanley, it seemed

22   like, was trying to find some kind of a solution

23   and I responded.   Looked like I was pretty upset

24   about the situation.

25       Q.    So you weren't being flip.

1     A.   Flip?

2     Q.   It wasn't your intention to be sarcastic

3  or --

4     A.   No.  No.

5     Q.   You were upset.

6     A.   I was upset.

7     Q.   What did you do when you found out about

8  the investigation?

9     A.   What did I do?

10     Q.   Uh-huh.

11     A.   Tried to gather some information and that

12  was about it.

13     Q.   How did you find out about it?

14     A.   You had asked me that question already,

15  Kathleen.

16     Q.   I'm sorry.  I don't remember the answer.

17     A.   Frank had told me.

18     Q.   Okay.  Did you discuss it with anyone

19  else?

20     A.   Yes.

21     Q.   You didn't discuss it with anyone besides

22  Frank?

23     A.   No, I said, "yes."  I answered your

24  question, "yes."

25     Q.   And who was it?

271

1          A.   I discussed it with Mike Stanley, Mark

2     Bernet, Richard Berman, I believe.

3          Q.   Paul Glover?

4          A.   Paul Glover, yes.

5          Q.   Mr. Mokwa?

6          A.   I don't -- maybe in passing, but Mr.

7     Mokwa wasn't really very relevant.

8          Q.   Mr. Bates?

9          A.   I may have discussed it with him, but,

10    once again, it wasn't of any relevance.  Maybe it

11    was just in passing, but --

12         Q.   Mr. Sadrianna?

13         A.   Most likely.

14         Q.   Mr. Holtz?

15         A.   No, I don't believe I discussed it with

16    Mr. Holtz.

17         Q.   So I missed one.  You said Frank Amodeo,

18    Mr. Stanley, Mr. Berman, and Mr. Bernet.  Did I

19    miss somebody?

20         A.   No.  If you could repeat it.  I don't

21    know.

22         Q.   Oh, Glover.  I'm sorry.

23         A.   Yes.

24         Q.   And then on 471, the next e-mail in the

25    string from Mike Stanley to you says, "I have the

272

1   Finance/Accounting people asking for financial

2   information from the PEO.

3       "I am concerned that if MHR is owned by

4   Mirabilis Ventures we will still be dancing to

5   their whims and needs."

6       A.   Uh-huh.

7       Q.   Did you understand Mr. Stanley to be

8   referring to Mirabilis Ventures' whims and needs?

9       A.   As opposed to what?   That's what it says.

10      Q.   I mean -- well, I didn't know who "their"

11  meant in the e-mail.

12       And then your response to him  was, "Give them

13  my contact information."  Do you know who you

14  meant?

15      A.   Most likely, the Board of Directors, yes.

16  I mean, that's what it appears to be.

17      Q.   And do you remember who the Board of

18  Directors was at that time?

19      A.   I don't recall who was left.  It was a bit

20  of a revolving door.

21      Q.   Moving target, shall we say?

22      A.   Yeah, it was a revolving door.  Yes.  But

23  this was the time that Mike Stanley was trying to

24  find some kind of a creative solution and try to

25  separate Mirabilis HR from the other entities.

1          MS. HAVENER:  Do we not have third one?

2     Oh, I'm sorry.  It's already been introduced.

3  BY MS. HAVENER:

4     Q.   This is Exhibit Number 402.  It's an

5  e-mail from Paul Glover dated Tuesday,

6  December 19th, 2006, at 4:48 p.m.  It's addressed

7  to Frank Amodeo with cc's to Shane Williams and Jay

8  Stollenwerk.  The subject line is, "Transition

9  Plans."  Would you just please read that to

10  yourself.  You see it's got another page.

11     A.   I'm not finished the first page.  I just

12  skimmed through it, yes.

13     Q.   Okay.  Do you see that the last bullet

14  point was Mr. Glover -- well, the context --

15  correct me if I'm wrong, but it's my impression

16  that the context of this e-mail is Mr. Glover

17  trying to make clear to Mr. Amodeo essentially what

18  he had accomplished during 2006; is that a correct

19  --

20          MS. VILMOS:  Object to the form.

21  BY MS. HAVENER:

22     Q.   Is that a correct interpretation, as far

23  as you can see?

24     A.   That seems what he was getting at.

25     Q.   And the last bullet point of this e-mail

274

1    Mr. Glover says to Mr. Amodeo that he tried to

2    offload cash management, corporate governance,

3    fiscal responsibility and daily operational

4    management from you in 2006.  Is that correct?  Did

5    I read it correctly?

6        A.   Yes.

7        Q.   So is it consistent with your

8    understanding that Mr. Amodeo had, in 2005,

9    responsibility for cash management, corporate

10   governance, fiscal responsibility, and daily

11   occupational management at Mirabilis?

12       A.   In 2005 or 2006?

13       Q.   2005.

14       A.   I don't know if he was the sole

15   responsible party for all that, but he definitely

16   had some influence, yes.

17       Q.   And would you say he was chiefly

18   responsible for those matters in 2005?

19       A.   To the -- to what?  To Mirabilis Ventures

20   or what --

21       Q.   To Mirabilis Ventures for cash management,

22   corporate governance, fiscal responsibility, and

23   daily operational management in 2005.

24       A.   He had a slew of accountants reporting to

25   him and advising him, but I believe that he had

1    some influence in the decisions, yes.

2        Q.   I understand who he had reporting to you.

3    I'm asking you if he had -- yes or no, did he have

4    primary responsibility for cash management in 2005?

5        A.   I don't know.

6        Q.   Did he have primary responsibility for

7    corporate governance in 2005?

8        A.   I don't think so.

9        Q.   Did he have primary responsibility for

10   fiscal responsibility or fiscal issues in 2005?

11       A.   I really don't think so.  He was the most

12   fiscally irresponsible person I know, so I don't

13   think so.

14       Q.   And who took care of daily operational

15   management in 2005?

16       A.   I believe it was Dan Myers, James

17   Sadrianna, and a few other CPAs that he had.

18       Q.   I'm trying to reconcile that answer with

19   the fact that every time you ask a question -- in

20   the documents that we've seen today at least -- the

21   person that you go to is Mr. Amodeo.

22       A.   Right.

23       Q.   How can you reconcile that fact with these

24   other people being responsible for those issues?

25       A.   Because I don't know who was actually

1   ultimately responsible.  I know that Frank had

2   certain influence on the decision making, but I

3   think that he set up the company where he wouldn't

4   be chiefly responsible.  That's how it was always

5   explained to me by him, Berman, and Holtz.

6       Q.   But, nevertheless -- well, first of all,

7   was Holtz there in 2005?

8       A.   No.  He was -- not actively, but --

9       Q.   So we're talking about 2005.

10      A.   Okay.

11      Q.   So in 2005 there's a slew of accountants

12  and other financial people reporting to him --

13      A.   Attorneys, yeah.

14      Q.   -- and you believe he set up this chain of

15  responsibility, and all of these other people have

16  chief responsibility for the issues that I've just

17  mentioned; is that right?

18      A.   I believe he put certain measures in place

19  to protect the company from himself.

20      Q.   But, nevertheless, when you wanted a word

21  of permission or influence over a decision you were

22  making, the person you went to was not this slew of

23  accountants and all these people that were going to

24  protect Frank from himself, but to Frank himself;

25  correct?

277

1      A.   That would be correct.

2           MS. VILMOS:  Object to the form.

3  BY MS. HAVENER:

4      Q.   Mr. Cuthill testified in his deposition

5  that before the operations of Mirabilis were shut

6  down -- and we were at that time talking about, I

7  think, the takeover of Mirabilis -- the seizure of

8  Mirabilis' assets, as Mr. Amodeo referred to it, by

9  AQMI Strategy -- Mr. Cuthill testified that it was

10  his understanding that Mr. Amodeo gave to you a

11  hard drive; what he referred to as a great western

12  hard drive.  Do you know what I'm talking about?

13      A.   It's not a great western hard drive.

14           MS. VILMOS:  Object to the form.

15  BY MS. HAVENER:

16      Q.   Did Mr. Amodeo give you some -- a hard

17  drive?

18      A.   Yes.

19      Q.   Where is it?

20      A.   It's in a storage facility that I own.

21      Q.   Do you know what's on it?

22      A.   I believe -- I've never actually opened

23  it, but I believe that there's a whole bunch of

24  video recordings in there.  That's what I was told.

25      Q.   And who told you what to do with it?

278

1      A.   Nobody ever told me anything to do with

2  it.  Frank just gave it to me.

3      Q.   With no instructions at all.

4      A.   No.

5      Q.   And why did you decide to keep it in a

6  storage unit?

7      A.   Because it's a large box and inside

8  there's a hard drive in there and he told me

9  there's all the video in there and --

10     Q.   And do you believe that that likely

11 contains evidence that's relevant to the

12 investigation of Mirabilis?

13     A.   No, because I think that most things that

14 have evidence were -- were sort of cherry picked

15 and given in -- taped over -- in much smaller

16 recordings.  I mean, from what he told me, it was

17 two terabytes.  It would take me, I don't know, two

18 years to review it all.

19     Q.   Did you not think it was your

20 responsibility to turn it over to the authorities?

21     A.   Turn it over to the authorities?

22     Q.   Uh-huh.

23     A.   I did turn over certain videos to the

24 authorities.

25     Q.   But what you picked.

279

1      A.   No, not what I picked.  No.

2      Q.   Okay.  What did you -- so some of what --

3      A.   The ones that I viewed, I reported.  I

4  never viewed the hard drive.

5      Q.   So you don't know what's on it.

6      A.   No.  I just know what I was told.

7      Q.   And you weren't told anything about it?

8      A.   No, I was told it's a lot, a lot of video.

9      Q.   And you did not -- it belonged to whom,

10  in your mind?

11     A.   It was handed to me.  It belonged --

12     Q.   By Frank Amodeo.

13     A.   Correct.

14     Q.   Did you believe it belonged to him

15  personally?

16     A.   No, I didn't -- I never gave it any

17  thought as to who -- to whom it belonged to.

18     Q.   And you didn't think you had any

19  responsibility to do something with it other than

20  to just put it away in a storage locker?

21     A.   No.

22     Q.   Okay.  At that time, you knew that Mr.

23  Amodeo was a convicted felon; correct?

24     A.   Yes.

25     Q.   You knew that he was under investigation

280

1    again for a felony; correct?

2        A.   Yes.

3        Q.   You knew that Mirabilis itself was under

4    investigation for a felony; correct?

5        A.   Correct.

6        Q.   But you still felt no responsibility, is

7    that correct, to turn that over to the authorities

8    or to an attorney or to anybody?

9        A.   No.

10       Q.   I'm going to ask for you to produce it,

11   please.

12       A.   The entire hard drive?

13       Q.   Yes.

14       A.   Well, I don't know how I'm supposed to

15   copy it, but --

16       Q.   If I make those arrangements, can you --

17       A.   Yes.

18       Q.   Okay.  Thank you.

19       A.   If you subpoena them, then, yeah.  Or you

20   just request them --

21       Q.   I have to subpoena it?

22       A.   No, just request them.

23       Q.   Okay.  Well, I'm formally requesting it

24   now, but I will send you a letter confirming the

25   things that we've talked about that I'm asking you

1    to produce.

2        Did you ever talk to your personal attorney

3    about this?

4            MS. VILMOS:  Ms. Havener, can you make

5        sure that you copy me with that?  Because, to

6        the extent that this is property of Mirabilis,

7        I'm going to need to review it before it's

8        turned over.

9            MS. HAVENER:  No, it's not property of

10       Mirabilis.  Mirabilis let go of it.  It's now

11       in his possession.

12           MS. VILMOS:  Well, I'll make that

13       determination if he --

14           MS. HAVENER:  Mr. Amar has testified that,

15       to his knowledge, it belongs to Frank Amodeo.

16       And Mr. Amodeo said -- I mean, Mr. Cuthill

17       said in his deposition that Mr. Amodeo had

18       entirely waived the privilege and had no

19       authority -- and, also, your position so far

20       --

21           MS. VILMOS:  Ms. Havener, Ms. Havener, we

22       can deal with this offline.

23           MS. HAVENER:  First of all, my name is

24       Havener.

25           MS. VILMOS:  Send me a copy of your

1        request and we will deal with it offline.   I

2        don't need to make this deposition go any

3        longer because it's been excruciating thus

4        far.

5             MS. HAVENER:   I'm just going to say one

6        more thing, Ms. Vilmos, and that is that it

7        has been your position -- your client's

8        position throughout this litigation that Mr.

9        Amodeo had no control over Mirabilis and that

10       he was simply a consultant.   So if Mr. Amar

11       has possession from somebody who had no

12       control over Mirabilis, I don't see how you

13       can claim this is as Mirabilis' property.   But

14       we'll deal with it offline.

15   BY MS. HAVENER:

16       Q.   Mr. Amar, did you ever discuss this hard

17   drive with Randy Gold?

18       A.   Not to my recollection.

19       Q.   To your knowledge, does Mr. Gold even know

20   it exists?

21       A.   Yes, I would think so.

22       Q.   How do you know that?

23       A.   I mean, I would assume.   It wasn't a

24   secret that there were a lot of videos going on in

25   that building.   And it was part of the huge

1    summation that Frank and Mirabilis were working on.

2    So I --

3        Q.   That hard drive is part of the summation?

4        A.   No, I don't know.  I don't know if it was

5    or not, but I had no reason to believe it was a

6    secret hard drive.

7        Q.   When did he give it to you?

8        A.   Probably sometime in the middle of '07.

9    Maybe early to middle '07.

10       Q.   So you knew that the company was under

11   investigation; that was absolutely clear.

12       A.   Yes.

13       Q.   Why did you think he gave it to you?

14       A.   I don't know why.  You'd have to ask him.

15       Q.   Did you ask him?

16       A.   No.  He gave it to me, it was good

17   information to have in case I ever need it, God

18   forbid, and I have it in my possession.  That's it.

19       Q.   Okay.  Go back to 402.  I think it was

20   just --

21       A.   Yes.

22       Q.   Is there anything on this list -- you said

23   that you read it fully.  If you want to look at it

24   again, that's fine.  Is there anything on this list

25   or in this e-mail that gives anyone who's reading

1    it any reason to suspect that there was fraud going

2    on at Mirabilis?

3         A.   I don't know what people should suspect,

4    but --

5         Q.   Well, but you said you did; right?

6         A.   Yes.  I don't know what others suspect.  I

7    never saw this document, so --

8         Q.   But you said you talked to Glover about

9    it.  You testified earlier that you spoke to Mr.

10   Glover about your concerns.

11        A.   Yes.  Not about this e-mail.

12        Q.   No.  But about your concerns.

13        A.   Right.

14        Q.   So I'm just wondering if Mr. Glover made

15   it public.

16        A.   I don't know if he made it public or not.

17   It was never made public to me.

18        Q.   Have you ever met with Mr. Gold?

19        A.   Yes.

20        Q.   How many times?

21        A.   Twice.

22        Q.   Did he ever ask you if you had anything in

23   your possession that was relevant to Mirabilis?

24        A.   He never asked me about the hard drive.

25        Q.   Did he ask you about papers?

1    A.   Yes.

2    Q.   Were you subpoenaed?

3    A.   No.

4    Q.   So you went voluntarily?

5    A.   It was just a -- kind of a cordial thing.

6  He spoke to my attorney about it and --

7    Q.   And you went voluntarily?

8    A.   Correct.

9    Q.   Did he ask you to bring any documents?

10    A.   I believe he asked my attorney to give him

11  the documents.

12    Q.   And did you ever discuss -- you answered

13  that you've never told your attorney you had this

14  hard drive.

15    A.   No, I never said -- I said I -- I told my

16  attorney I had a whole bunch of videos and the hard

17  drive.  My attorney handed over certain videos to

18  the --

19    Q.   But only the ones he chose off that same

20  hard drive?

21    A.   He never viewed the hard drive.  The hard

22  drive was never opened.  I let him know that I had

23  a hard drive that would take a couple of years to

24  review it.  I'm not exaggerating.  From what I was

25  told, it was terabytes and terabytes of video

1    information.  I never opened it.

2        Q.   Yes, I understand.  We're in the middle of

3    reviewing our own terabytes that Mirabilis

4    produced.

5        A.   All right.

6        Q.   Are you familiar with what I'm going to

7    refer to as the Lou Pearlman case?

8        A.   Yes.

9        Q.   What do you know about it?

10       A.   Just what I heard about it on television.

11       Q.   And tell me what that was.

12       A.   That Lou Pearlman conducted a very large

13   Ponzi scheme and liked little boys.

14       Q.   Do you know who discovered that he had

15   conducted a Ponzi scheme?

16       A.   I actually was surprised to find out it

17   was Mr. Glover.

18       Q.   And why were you surprised to find that

19   out?

20       A.   Because I just read the book.  Somebody

21   told me that the book came out, I read the book,

22   and I saw that.  I was just surprised.  I didn't

23   know that he had any connection with Mr. Pearlman.

24       Q.   Do you know who wrote the book?

25       A.   No.

1      Q.  I'm representing to you that the book --

2  are you talking about the book that's called "Boy

3  Bands"?

4      A.  No.

5      Q.  Something like that?  "Hit Charade."

6  "The Hit Charade."

7      A.  I believe that's the name of the book.

8      Q.  Is that it?  Well, I'm representing to you

9  that it was written by Tyler Gray, the same person

10  who wrote this article.

11      A.  Okay.

12      Q.  This is Exhibit 222.  It's an article that

13  was introduced in Mr. Cuthill's deposition, who

14  testified that he'd never heard of Tyler Gray.

15      If you will look at the first full paragraph

16  in the second column, and I'll just read it into

17  the record.

18      "That was where Glover came in.  The

19  48-year-old CPA was brought into Pearlman's

20  flailing operation by Frank Amodeo, a secretive

21  'distressed business manager' who, for two years,

22  had been working quitely behind the scenes to bail

23  out Trans Con."

24      Were you aware that Mr. Amodeo was -- I'm

25  sorry.  I'm not reading now.  I'm asking a

1    question.  Were you were aware that Mr. Amodeo had

2    been trying to bail out Trans Con?

3         A.   No.

4         Q.   "At Amodeo's request, Pearlman ordered his

5    executives to open the corporate books to Glover,

6    presuming the accountant would be a team player.

7    Big mistake."

8         I'm sorry.  I'm back reading now.

9         "By 3 p.m. that January afternoon, Glover had

10   set up camp in Pearlman's spacious third-floor

11   corner office - accented with a faux tiger rug,

12   shower, and motorized draperies - and begun poring

13   over documents as Trans Con senior executive Bob

14   Fischetti and Pearlman's executive assistant, Janet

15   Hart, hovered anxiously nearby.

16        "Among the documents the accountant discovered

17   were boxes of angry certified letters from

18   investors in a $500 million savings account scheme

19   that had kept cash flowing to Pearlman's faltering

20   music management company.  The investors wanted

21   their money.  But there was no money.  Instead,

22   records clearly indicated that 'that half-billion

23   dollars was going straight into Lou's hands,'

24   Glover says.  'Immediately, I'm thinking, This is a

25   Ponzi scheme.'"

1        Do you see that?

2        A.   I wasn't following, but, yes.

3        Q.   So it surprised you that Mr. Glover had

4    found fraud at Mr. Pearlman's company; correct?

5        A.   Yes.

6        Q.   Does it surprise you more that he found it

7    within a couple of hours?

8        A.   I never gave it any thought.

9        Q.   But you've indicated to us today, I think,

10   that Mr. Glover never, to your knowledge, reported

11   anything about potential fraud at Mirabilis to the

12   Board; correct?

13       A.   He never reported it to me.  I don't know

14   what he reported to the Board.

15       Q.   And, nevertheless, you did go to Mr.

16   Glover and express your concerns to him.

17       A.   Yes.  Yes, I did.

18       Q.   This is 403.  It was introduced at Mr.

19   Cuthill's deposition.  It is a -- well, it starts

20   out on the bottom.  It is an e-mail from Paul

21   Glover, Wednesday, April 19th, 2006, 5:35 p.m., to

22   Frank Hailstones, Fernando Simo, Richard Berman.

23   The subject is "Trust Fund Taxes."

24       "I just read a memorandum prepared by Elena

25   Wildemuth of Berman, Kean & Riguera which concludes

1    with, 'Accordingly, from the fax provided, it would

2    be very unlikely for the IRS to impose liability on

3    Presidion for the payroll taxes of the Sunshine

4    entities pursuant to Section 6672.  AEM, Inc., is

5    at least a full arm's length away under the

6    contract for management services agreement.  Add to

7    that the fact that AEM has not, nor has any of its

8    officers, directors, shareholders or employees been

9    responsible for authorizing which creditors to pay,

10   to sign and file Forms 940 or 941, nor to make

11   federal tax deposits, nor collect trust fund taxes,

12   nor sign checks on behalf of the owner of the book

13   of business for which trust fund taxes would

14   otherwise be due from, and the result is further

15   insulation from the liability for the payroll taxes

16   of the Sunshine entities."

17        Do you understand that?  Did I read that

18   correctly?

19        A.   Yes.

20        Q.   And Mr. Berman responds a few days later

21   to the same -- to Mr. Glover, Mr. Hailstones and

22   Mr. Simo:  "Light reading, Paul."

23        So I want to confirm again that, based on

24   this e-mail, as well as what you've testified to

25   earlier, despite the fact that Mr. Glover made

1    $585,000 a year and was CFO of Mirabilis

2    Enterprises, he never reported, to your knowledge,

3    any suspicion of fraud.

4         A.   He would not report it to me if he had.

5              MS. VILMOS:  Form.

6              MS. HAVENER:  I'm sorry.  Did you say,

7         "hold on"?  You said, "form," or "hold on,"

8         Nicolette?

9              MS. VILMOS:  Object to the form.

10   BY MS. HAVENER:

11        Q.   Okay.  He would not have reported it to

12   you, but are you aware of him having reported it to

13   anyone?

14        A.   No, I'm not aware of him reporting it or

15   not reporting it.

16        Q.   Were you angry at Mr. Glover?

17        A.   I was angry at quite a few people.

18        Q.   Did you happen to go to Mr. Glover's new

19   place of employment and you had to see for yourself

20   and raise Cain that he had not reported fraud --

21        A.   Yes --

22        Q.   -- or discovered fraud despite his

23   expertise?

24        A.   -- I'm sure I would have if I had found

25   out that he was all of a sudden a global expert in

1    fraud detection and he didn't -- you know?  I don't

2    know what he does for his employment.

3        Q.   Well, he was -- apparently, he became an

4    expert on fraud detection.

5        A.   I just read that book a few months ago.

6    It's not -- I didn't know about it in '07.

7        Q.   But, you know, he's represented to be an

8    expert in fraud detection; correct?

9        A.   Correct.

10       Q.   And very shortly --

11       A.   Well, it seems like it.  I don't know.  I

12   mean --

13       Q.   Very shortly after he left Mirabilis.  In

14   fact, even before -- this is in February of '07;

15   right?

16       A.   That's what it says.

17       Q.   But you didn't think that it was necessary

18   --

19       A.   I didn't see this article until just now

20   and I didn't read the book until a few months ago.

21       Q.   Okay.

22            MS. HAVENER:  I want to take about -- what

23       time is it?  I want to take about five

24       minutes, please.

25

1              (Thereupon a brief recess was taken, after

2       which the following proceedings were had:)

3              MS. HAVENER:  Okay.  We just have a couple

4       more things and then we're going to show you a

5       video that we're going to ask you to

6       transcribe.  I think it's only about seven

7       minutes.

8              MS. CURRY:  Not even that long.

9              MS. HAVENER:  This is next in succession,

10      please.

11             (Thereupon a document was marked

12      Plaintiff's Exhibit 472 for Identification in

13      the proceeding.)

14   BY MS. HAVENER:

15      Q.   Mr. Amar, I'm showing you what's been

16   marked in this deposition as Exhibit 472.  Do you

17   recognize this document?

18      A.   No.

19      Q.   Is it your handwriting?

20      A.   It appears to be.

21      Q.   And is it your signature at the end of it?

22      A.   It appears to be, yes.

23      Q.   The signature is dated 2/10/05; correct?

24      A.   Yes.

25      Q.   Do you recall signing an Affidavit for the

1    State of Ohio Department of Insurance?

2        A.   I really have zero recollection of this

3    document, but it appears to be my writing.

4        Q.   Okay.  And so you can't answer the

5    question for whom were you applying for insurance?

6        A.   No.

7        Q.   What we're looking at is a Biographical

8    Affidavit that says, "(Print or Type)."  It's for

9    the State of Ohio Department of Insurance.  It's an

10   Authority for Release of Information and a

11   Biographical Affidavit.  They're both signed by

12   Yaniv and both notarized by Tessah Ivey on the 10th

13   of February of 2005.

14       It represents, does it not, that the full name

15   and address of company is Mirabilis Ventures, Inc.;

16   is that correct?

17       A.   Yes.

18       Q.   The business address is down below, 20

19   North Orange Avenue, although that says, "Affiant's

20   Business Address,"  which means yours.

21       A.   Where does it say that?

22       Q.   We're at Number 5.

23       A.   Oh.  Yes.

24       Q.   It says, "Affiant."

25       A.   Yes.

1    Q.   Meaning yours -- it actually means yours,

2    but you were putting the business address of

3    Mirabilis Ventures; correct?

4    A.   Yes.

5    Q.   Oh.  Actually, would you please give me

6    that document back?  Both of you.  The one that

7    you're looking at right now, I need to redact from

8    it.

9    A.   What does "redact" mean?

10   Q.   It means to cross out the Social Security

11   number.  We're not allowed to put that in a court

12   document.  It's for your protection.

13   A.   Thank you for protecting me, Kathleen.

14   That's very kind of you.

15   Q.   Well, you're welcome.

16    So is there any reason that you can think of

17   why you would have been signing an Affidavit on

18   behalf of Mirabilis Ventures to apply for

19   insurance?

20   A.   I don't recall, Kathleen.  This was in

21   February of '05 and, as I told you several times

22   through this deposition, I signed many documents

23   without full knowledge.

24

25

1           (Thereupon a document was marked

2      Plaintiff's Exhibit 473 for Identification in

3      the proceeding.)

4   BY MS. HAVENER:

5      Q.   This is 473.  It's an e-mail dated

6   August 3rd -- well, the first one is August 2nd,

7   2006, from Michelle Claussen.  Who is Michelle

8   Claussen, Mr. Amar?

9      A.   I believe she's one of the accountants or

10  CPAs.  I don't recall exactly who Michelle Claussen

11  is.

12     Q.   And it's dated Wednesday, August 2nd,

13  2006.  That's after you resigned; correct?

14     A.   Correct.

15     Q.   And it's addressed to you, Nichole Beamer,

16  Tessah Ivey, Dan Myers, James Sadrianna, Kevin

17  Leonard, Paul Glover, Fernando Simo, Jay

18  Stollenwerk and Shane Williams; correct?

19     A.   Uh-huh.  Yes.

20     Q.   And carbon copies to Mike Stanley and

21  Tracy Taylor; correct?

22     A.   Correct.

23     Q.   And it refers to:  "Cash Flashes for today

24  8/2/06."  Do you see that?

25     A.   Yes.

297

1      Q.   And the top one is Tessah Ivey forwarding

2   the same information to Mr. Amodeo.  Do you see

3   that?

4      A.   Yes.

5      Q.   What are cash flashes?

6      A.   I'm not sure.

7      Q.   So you have no idea what this document

8   means?

9      A.   I have an idea of what a cash flash is;

10   I'm just not a hundred percent sure.

11      Q.   Well, can you look at the thing that's

12   attached and see if you recognize it?

13      A.   That's what I'm looking at right now.

14      Q.   It says at the top, "AEM, Inc., doing

15   business as Mirabilis HR, Combined Bank Report."

16      A.   Yes.

17      Q.   And it has, "Incoming.  ACH credits -

18   clients.  Wire credits - clients.  Deposits -

19   clients.  Deposits - miscellaneous.  Miscellaneous

20   credits."

21      A.   Yes.

22      Q.   Correct?

23      A.   Correct.

24      Q.   Would those be, if you know, deposits of

25   payroll taxes by Mirabilis -- by AEM, Inc.'s

1   clients?

2       A.   I don't know if they'd be payroll taxes.

3   I think they'd be just gross payroll profits or the

4   gross profits being deposited.  That's what I would

5   assume.

6       Q.   Okay.

7       A.   Because look at the numbers from Monday to

8   Tuesday to -- I mean, it goes up in large

9   increments.  I don't know if that was all taxes.  I

10  think that's just the gross profit.

11      Q.   Should payroll taxes have been paid every

12  day as well?

13      A.   My understanding was that they should have

14  been put in a separate bucket.  I think they were

15  paid quarterly, but they should have been

16  transitioned to a special account.

17      Q.   So on the Thursday, 7/27, and the Tuesday,

18  8/1/2006, when there are tax wires for AEM and for

19  NMS -- that's National Medical Staffing, I think?

20      A.   Okay.

21      Q.   That's a debit; right?  Are those debits,

22  those being put into different buckets?  Is that --

23      A.   I don't know.  I can't answer that

24  question.  But it appears to be payments for 941

25  taxes.

299

1    Q.  So would those have been actual payments,

2  or would those have been just separating out the

3  funds?

4    A.  I would assume that they would be made for

5  payments, but it could have been just put into

6  separate buckets for safekeeping.

7        (Thereupon a document was marked

8        Plaintiff's Exhibit 474 for Identification in

9        the proceeding.)

10  BY MS. HAVENER:

11    Q.  This is Exhibit 474.  It is a DBPR EL-4504

12  Quarterly Report Form, State of Florida, Department

13  of Business and Professional Regulation.

14    Could you tell me what this is, Mr. Amar?

15  It's dated December 31st, 2006.  Do you see that on

16  the right-hand side at the top?

17    A.  No.  March 31st.

18    Q.  Oh, I'm sorry.  March 31st; you're right.

19  And then underneath that, the company name is AEM,

20  Inc., doing business as Mirabilis HR; correct?

21    A.  Correct.

22    Q.  And then there's a CEO statement.  Could

23  you read that to me, please.

24    A.  "I hereby certify that all health

25  insurance, life insurance, workers' compensation

300

1   insurance and any other employee benefits accruing

2   either to our employees or their dependents have

3   been and are being paid to the proper payees as

4   required by contract, law, or other obligatory

5   documents, and these requirements are on a current

6   and timely basis.  I certify further that I

7   understand that maintenance of positive working

8   capital is required by Chapter 488-" -- I believe

9   it's "-- 526(3)(d), Florida Statutes, and that our

10  company is in compliance with these requirements.

11  I certify that I understand that this periodic

12  certification is incomplete unless the proof of

13  valid workers' compensation insurance is attached

14  to this form."

15      Q.   And then you signed it; correct?

16      A.   Yes.

17      Q.   And the date is 6/13/06; correct?

18      A.   Correct.

19      Q.   And then below there's a "Controlling

20  Person Statement" that you've also signed.  Could

21  you read that to me, please.

22      A.   "I have reviewed the information above and

23  certify that it is true and correct to the best of

24  my knowledge and belief."

25      Q.   And you signed it on 6/13/06.

1      A.   Correct.

2      Q.   Is that correct, as you understood things

3  to be at that time, Mr. Amar?

4      A.   I was -- it was reported to me that the

5  insurance was in good standing, yes.

6      Q.   So it was reported to you.  By whom was it

7  reported to you?

8      A.   I don't know exactly, I don't recall, but

9  I believe it would have been reported to me by

10  Laurie Andrea.  That would have been one of her

11  responsibilities.

12      Q.   And you relied on what Ms. Andrea told you

13  and you signed this document to the State of

14  Florida, although you are -- you reported that you

15  had suspicions that something else was going on;

16  correct?

17      A.   Well, this is just talking about the

18  insurance being paid properly.

19      Q.   We'll, it says -- okay.  I'm sorry.  Well,

20  in Mr. Glover's -- do you know if Mr. Glover ever

21  signed this document?

22      A.   I assume that Mr. Glover and Mr.

23  Hailstones and Laurie Andrea also signed it.  I'm

24  not sure though.

25      Q.   But you don't know.

1     A.   No, I wouldn't know.

2     Q.   But Mr. Glover says, "I certify that the

3   federal, state, and local payroll taxes have been

4   paid as required by regulations of each applicable

5   taxing authority.  I further certify that all

6   workers' compensation premiums and employee benefit

7   payments for this quarter have been paid as due.  I

8   have attached copies of the current quarter's

9   balance sheet and income statement."

10     Now, would you have signed this if those were

11   not attached?

12     A.   I don't know what I would have signed or

13   what -- if I did, then I'd like to see it.  I don't

14   know.

15     Q.   Well --

16     A.   This was for AEM.  This wasn't for the

17   entire PEO.  This is for the AEM portion of --

18     Q.   So you didn't have any suspicions about

19   AEM; is that right?

20     A.   No.  No.  From what I was told by Mike

21   Stanley as soon as he came on is that AEM was

22   current.  But AEM was only the organic business

23   that we brought on.  It had nothing to do with the

24   predecessor book of business.

25     Q.   Okay.

1           (Thereupon a document was marked

2       Plaintiff's Exhibit 475 for Identification in

3       the proceeding.)

4    BY MS. HAVENER:

5       Q.    This is 475.  It's two-sided, but we'll

6    start on the side that's from Craig Vanderburg.  I

7    think that's correct.  Craig Vanderburg, dated

8    Friday, July 29th, 2005.  It's addressed to Frank

9    Amodeo, Yaniv Amar, Craig Vanderburg, Jim Baiers,

10   Chris O'Connor.  The subject is "Presidion / AEM."

11       It says, "Gentlemen, Just a few things to

12   keep in mind if we attempt to move the contracts to

13   AEM next week.  We have significant 'straddle

14   payroll' issues that could amount to very material

15   dollars needing to continue to flow through

16   Presidion before they could be released to AEM or

17   other.  In addition we have not tested any

18   electronic banking transactions for any AEM bank

19   accounts at this point.  This could lead to major

20   service interruptions if we attempt to start ACH

21   debits/credits next week.

22       "If at all possible we really need our new

23   carrier to pick up the additional time necessary

24   (August) to cover the current Presidion book and

25   then start the AEM coverage period.  This will also

1   allow us the ability to address such issues as

2   Health care, 401(k) and other with respect to the

3   changes."

4        A.   Yes.

5        Q.   Do you understand what this is referring

6   to?

7        A.   Yes, I do.

8        Q.   Could you explain it to me, please?

9        A.   This is -- I'll give you the context.  I

10   believe the original plan that Mirabilis Ventures

11   had was to transition the Presidion book of

12   business in the third quarter of '05.  And then

13   Frank was strongly advised against it by some

14   attorneys and accountants and decided to make it

15   1/1 of '06.

16        Q.   So this was to transfer Presidion to AEM?

17   Am I understanding that correctly?

18        A.   That's what it reads.

19        Q.   Yes.  Okay.   Is there any documentation

20   that you're aware of that the attorneys and

21   accountants advised Mr. Amodeo against it?

22        A.   No, I'm not aware of it, but --

23        Q.   Did Mr. Amodeo tell you that?

24        A.   Mr. Amodeo told me that, Craig told me

25   that, and I believe also Jeff Rendell and Chris

1    O'Connor were two of the key people who influenced

2    the decision not to do it in the third quarter --

3    in the fourth quarter.

4         Q.   Were they at Mirabilis?

5         A.   No, they were Presidion employees.

6         Q.   Okay.  And on the next page -- it's

7    actually just a few minutes later from -- one

8    e-mail is at 10 o'clock, 10:01; and then the next

9    one is 10:17 from Tessah Ivey to Craig Vanderburg;

10   same subject line.  "Craig, I have accounted for

11   this.  I will explain later.  Frank.  Dictated but

12   not read."

13        Now, that was routine; correct; for him to

14   put, "Dictated but not read."

15        A.   I've seen it before.

16        Q.   Now, is it your understanding that in

17   those 16 minutes Mr. Amodeo consulted with his

18   attorneys or --

19        A.   No.  It was probably prior to this.

20        Q.   But Mr. Amodeo already had a response for

21   Mr. Vanderburg.  In other words, what I'm asking

22   is:  Was it your understanding that by this time

23   Mr. Amodeo already knew that he was going to

24   postpone it until January?

25             MS. VILMOS:  Object to the form.

1         THE WITNESS:  I don't recall.  You'd have

2     to ask him what his intention was.

3         MS. HAVENER:  Thank you.  Okay.  We are

4     going to show a video.  We need a few minutes

5     to set it up.

6              (Off the record.)

7         MS. HAVENER:  Let me just say, this took

8     place in March of '07, and it's a meeting in a

9     conference room and I think -- who are those

10    two people, Edie?  The back is Yaniv Amar.

11        MS. CURRY:  I don't know.  This is after I

12    left.  So Mr. Amar will have to --

13  BY MS. HAVENER:

14    Q.  Can you identify that other person?

15    (Thereupon, a DVD recording was played and was

16  reported as follows:)

17        MR. AMAR:  Bottom line is, in these times,

18    he said that I've dealt with so many

19    distresses in my life as -- you know, as it

20    pertains to business.  Best thing to do is put

21    on a brave face, clean suit, and say we're

22    going to get through this.  And if we don't,

23    let's ease out of the situation.  But just

24    sort of hiding in his office and losing all

25    the weight, he's just -- and it's scaring

1      everybody.  Because nothing's ever been what

2      they want to see in a leader.

3          UNIDENTIFIED SPEAKER:  No,

4          MR. AMAR:  You come to the Miami office,

5      people are, you know, of course, pissed,

6      people are concerned, but when they see me --

7          UNIDENTIFIED SPEAKER:  Yeah.

8          MR. AMAR:  You know?

9          UNIDENTIFIED SPEAKER:  Right.

10         MR. AMAR:  All right.  We're still here.

11     You know what I mean?

12         UNIDENTIFIED SPEAKER:  Uh-huh.  Yeah,

13     Mike, he's internalized it and he's just

14     become angry and bitter.

15             (The DVD was paused.)

16         THE WITNESS:  Who is that?

17         MS. HAVENER:  Bill Walsh, I think?  Is it?

18             (The DVD was resumed.)

19         MR. AMAR:  Exactly.  And he also wears his

20     emotions on his sleeve.  Now, I'm telling you

21     what, Mike has reason for concern.  I think,

22     you know --

23         UNIDENTIFIED SPEAKER:  Uh-huh.

24         MR. AMAR:  Bottom line is, it's -- it's --

25     it's not a pleasant situation.  Mike made his

1      last day Friday, 5 p.m.  He's no longer an

2      employee.  He called the banks yesterday.

3          UNIDENTIFIED SPEAKER:  I know.  That was

4      --

5          MR. AMAR:  I called him yesterday, last

6      night after I met with (unintelligible) here.

7      You were probably meeting with Frank.  I said,

8      Mike, Frank is the captain of the ship.  I

9      warned him there's an iceberg, I warned him

10      that there was a -- a storm.  I warned him.

11      He still navigated the ship.  The ship sunk.

12      I'm going to try to provide the best life

13      boat, the biggest life boat I can.  It's

14      impossible to fit all the companies in the

15      life boat, but I will not let Frank off this

16      ship.  I'm telling you right now, by you doing

17      what you did, it makes this life boat --

18      you're sinking the life boat.  Because what do

19      you think, Frank Amodeo's gonna send me the

20      accounts now?  And we're talking you did it

21      for eight months.  He transferred tens of

22      millions of dollars.  I'm asking for nine more

23      days until the insurance cancels and then you

24      can walk.  And then fool yourself into walking

25      off into the sunset with your wife and your

309

1      kids and think you're going to have a

2      happy-ever-after kind of life.  It's not going

3      to happen.

4          UNIDENTIFIED SPEAKER:  No, it's not.

5          MR. AMAR:  It's not going to happen.

6          UNIDENTIFIED SPEAKER:  No.

7          MR. AMAR:  So I go, right now, this is

8      going -- this is what I'm doing right now,

9      it's a mitigating effect.  It's going to

10     mitigate the damage (unintelligible) -- first

11     of all, if we don't do it this way, wage

12     issues, Department of Labor issues, the DBPR,

13     the state, the Feds, everybody comes on this

14     thing and it becomes ugly.  Plus, you have

15     22,000 displaced worksite employees, 1,700

16     client companies who are going to -- now they

17     don't have a reason to file a lawsuit, but

18     there is going to be a couple of class action

19     lawsuits coming if we let this thing implode.

20     I go, if you walk, Laurie walks, I walk,

21     nobody can get off this.  The (unintelligible)

22     he gets now -- he, Laurie and I developed a

23     few months back sort of like this tripod of

24     support.  Every time I was really pissed,

25     (unintelligible) and vice versa.

310

1          UNIDENTIFIED SPEAKER:  Well, that's a good

2      thing.

3          MR. AMAR:  You know, I was in Israel with

4      my wife over the summer --

5              (The DVD concludes.)

6          MS. HAVENER:  Is that it?

7          MS. CURRY:  Yeah, that's it.

8  BY MS. HAVENER:

9      Q.   Okay.  Could you understand that?

10     A.   Not fully.

11     Q.   But did you hear the comments that you

12  made where you said, you repeated several times, I

13  warned him about this and I warned him about that?

14     A.   Mike Stanley?

15     Q.   No.  You were referring to -- I think you

16  were referring to Mr. Amodeo.

17     A.   No, I believe I was referring to Mike

18  Stanley.

19     Q.   Oh, you warned Mr. Stanley?  What were you

20  warning him about?

21     A.   No, I was warning him not to resign when

22  he did.

23              (The DVD resumes.)

24          MR. AMAR:  Bottom line is, in these times,

25      he said that I've dealt with so many

311

1    distresses in my life as -- you know, as it

2    pertains to business.  Best thing to do is put

3    on a brave face, clean suit, and say we're

4    going to get through this.  And if we don't,

5    let's ease out of the situation.  But just

6    sort of hiding in his office and losing all

7    the weight, he's just --  and it's scaring

8    everybody.  Because nothing's ever been what

9    they want to see in a leader.

10                UNIDENTIFIED SPEAKER:  No.

11                    (The DVD was paused.)

12   BY MS. HAVENER:

13        Q.    Who was hiding in his office?

14        A.    Mike Stanley.  I was referring to Mike

15   Stanley in that.

16        Q.    Okay.

17                    (The DVD resumes play.)

18          MR. AMAR:  You come to the Miami office,

19   people are, you know, of course, pissed,

20   people are concerned, but when they see me --

21          UNIDENTIFIED SPEAKER:  Yeah.

22          MR. AMAR:  You know?

23          UNIDENTIFIED SPEAKER:  Right.

24          MR. AMAR:  All right.  We're still here.

25   You know what I mean?

312

1              UNIDENTIFIED SPEAKER:  Uh-huh.  Yeah,

2        Mike, he's internalized it and he's just

3        become angry and bitter.

4              MR. AMAR:  Exactly.  And he also wears his

5        emotions on his sleeve.

6                      (The DVD was paused.)

7              THE WITNESS:  Uh-huh.  And I saw that guy

8        lose weight, become gaunt, and the poor guy

9        looked suicidal.  So I kind of felt bad for

10       him and his family.

11   BY MS. HAVENER:

12       Q.   You referred to you were trying to build

13   the biggest life boat you could for Mr. Amodeo.

14       A.   No, for the company.  For whatever assets

15   can be salvaged from this -- from this huge --

16       Q.   Okay.  What did you mean?

17       A.   Try to sell off the PEO assets which I

18   helped broker, the sale of the PEO assets to

19   another PEO and the proceeds purportedly went to

20   the IRS.

21       Q.   I think I heard you say that you warned

22   Frank about a big iceberg.  Did I misunderstand?

23       A.   I don't know what I said three-and-a-half

24   years ago, Kathleen.

25                      (The DVD was resumed.)

313

1          MR. AMAR:  Bottom line is, it's -- it's

2     -- it's not a pleasant situation.  Mike made

3     his last day Friday, 5 p.m.  He's no longer an

4     employee.  He called the banks yesterday.

5          UNIDENTIFIED SPEAKER:  I know.  That was

6     --

7          MR. AMAR:  I called him yesterday, last

8     night after I met with (unintelligible) here.

9     You were probably meeting with Frank.  I said,

10    Mike, Frank is the captain of the ship.  I

11    warned him there's an iceberg, I warned him

12    that there was a -- a storm.  I warned him.

13    He still navigated the ship.  The ship sunk.

14                    (The DVD was paused.)

15          THE WITNESS:  "Frank is the captain of the

16    ship," I believe I said.

17    BY MS. HAVENER:

18     Q.   But you warned him about the iceberg, that

19    the ship sunk.

20     A.   This was in March of '07 after everybody

21    had left.  But the context, you have to understand

22    the context, Kathleen.

23     Q.   Okay.  Explain the context.

24     A.   Yes, the context was that at the last

25    moment -- it was around this time.  I don't know

1    the exact time, but there was a last-ditch effort

2    by a gentleman called Mike Traina (phonetic).  And

3    I'm not exactly sure what the company was, but it

4    was a publicly-traded company, a NASDAQ-traded

5    company, I completely forgot the name of the

6    company, wanted to buy the assets.  And right in

7    the middle of the negotiations, in the middle of

8    trying to salvage some of the assets, which could

9    have been, you know, quite significant because

10   there was still about $4- or 500 million in payroll

11   at the time, I think this was right before all the

12   negative articles started to come out that just

13   ravaged the book, Mike Stanley, that's it, looked

14   gaunt, looked faint, looked suicidal and resigned.

15   And how could you have a negotiation with a

16   publicly-traded company when the CEO just resigned?

17   They knew Mirabilis was in trouble at the time.

18        Q.   But Mirabilis wasn't a -- oh, you mean the

19   other side was a publicly-traded company.

20        A.   Yeah.  It was a publicly-traded company.

21   It was a NASDAQ-traded company.  It was -- I'm

22   trying to jog my memory.  I don't recall exactly,

23   but it was a NASDAQ-traded HR company.

24        Q.   Okay.  And who is the person you're

25   speaking to there?

315

1          A.    I heard Edie say Bill Walsh.  I don't --

2          Q.    But you don't know?

3          A.    I don't recognize him.  No, I don't

4     recognize him, and it's --

5          Q.    But she doesn't know him either.

6          A.    Yeah, I had very little contact with him.

7     That was maybe one of two or three conversations

8     that I had with him, but I can't tell from this

9     video.

10          MS. HAVENER:  Okay.  Do you actually know

11          it's Bill Walsh?  I'm sorry.

12     BY MS. HAVENER:

13          Q.    Was the book of business the 400 million?

14     Is that what you said?

15          A.    (Witness nods head.)

16          Q.    Was that it's value on an annual basis?

17          A.    That was just its gross processing value.

18          Q.    Okay.  Was that before or after the unpaid

19     payroll taxes were applied to it?  Was that the

20     gross value or the net value?

21          A.    No, it's not a value.  It's the gross

22     number of payroll that was being processed by the

23     PEO.

24          Q.    Every year?

25          A.    Every year, yes.

1    Q.    That was my question.

2    A.    It was the annualized gross payroll.

3    Q.    Okay.  That was my question.

4    A.    The profits were miniscule.

5    Q.    Okay.  So the profits were small, but if

6    someone bought that they -- am I correct in

7    understanding they would also be buying this huge

8    payroll liability?

9    A.    No.  They were trying to buy it without

10   the payroll liability.  But they were trying to pay

11   the proceeds to the IRS.  That's the way the deal

12   was being structured.

13   Q.    Okay.

14         MS. HAVENER:  We're done.  Off the record.

15   Or at least I'm done.  Do you guys have

16   questions?

17         MS. VILMOS:  I don't have any questions.

18         MR. BATES:  This is Aaron.  No questions.

19   I just want to make sure these exhibits will

20   be included with the deposition transcript.

21         MS. HAVENER:  If you order it.  Could you

22   guys hold on a second.  Nicolette, are you

23   still there?

24         MS. VILMOS:  I am.

25         MS. HAVENER:  We need to take two minutes.

1     My client just advised me we need to take two

2     minutes.

3          (Thereupon a brief recess was taken, after

4     which the following proceedings were had:)

5          MS. HAVENER:  The only thing I need to say

6     to wrap up -- we don't have any more

7     questions.  I just need to remind you that I'm

8     going to write you a letter and ask you to

9     produce the hard drive that you were -- and we

10    can make arrangements for it to be copied,

11    however you want that to be done.  I'll send

12    you a drive, we'll send a person to get that

13    done.  And I've already said twice what the

14    other things were and I can't remember.

15         MS. CURRY:  Oh, the e-mail.

16         MS. HAVENER:  Yes.  The e-mail that

17    started the chain that --

18         MS. CURRY:  For the proxy.

19         THE WITNESS:  If I can locate that.  I'm

20    not sure I --

21         MS. HAVENER:  But you know which one I'm

22    talking about.

23         THE WITNESS:  Yes.  I have the

24    indemnification; right?

25         MS. HAVENER:  The Hold Harmless Agreement.

318

1          THE WITNESS:  That's the indemnification.

2     That was the one agreement.

3          MS. HAVENER:  Yes, that's one document.

4     And the other one is the e-mail with about

5     twenty exclamation points.  You were going to

6     try to find the one that started it; right?

7          THE WITNESS:  I'll try to find that, yeah,

8     if I can.

9          MS. HAVENER:  All right.  And I'll send

10    you a letter to confirm that.  And, Nicolette,

11    we can talk offline about the hard drive.

12         MS. VILMOS:  That's fine.  Thank you.

13         MS. HAVENER:  Okay.  So long.

14         THE COURT REPORTER:  Do you want to

15    explain waiving to him?

16         MS. HAVENER:  Yes.  Wait.  You have the

17    right to read this deposition and sign it to

18    make sure she's taken down your words

19    correctly.

20         THE WITNESS:  Okay.

21         MS. HAVENER:  You also have the right to

22    waive that right.  If you want to read it and

23    sign it, you must do it within thirty days.

24         THE WITNESS:  Okay.

25         MS. HAVENER:  So do you want to read and

319

1       sign?

2             THE WITNESS:  Yes.

3             MS. HAVENER:  Okay.  Thank you.  Thanks,

4       guys.

5             MS. HAVENER:  You can't change what you

6       said.  You can only -- if she misunderstood

7       your words you can --

8             THE WITNESS:  No, I understand that.

9             (Thereupon the taking of the deposition was

10      concluded.)

11

12

13                    _____

14                    YANIV AMAR

15

16

17            Sworn to and subscribed before me this

18

19      _____ day of _____ 2010.

20

21

22

23

24

25

CHOICE REPORTING SERVICE, INC.
Dade * Broward * Palm Beach
(305) 374-2222   (954) 728-9886

320

## CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF MIAMI-DADE

    I, the undersigned authority, certify that YANIV AMAR, personally appeared before me and was duly sworn.

    WITNESS my hand and official seal this day of  October 12, 2010.

JAN L. BRONIS

Notary Public - State of Florida

My Commission expires:  05-16-2011

Commission No. DD 675181