EXHIBIT 4

080310ab

1

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE MIDDLE DISTRICT OF FLORIDA
 2                      ORLANDO DIVISION
             CASE NO.  6:07-CV-1788-ORL-28-GJK
 3

 4   MIRABILIS VENTURES, INC., and
     NEXIA STRATEGY CORPORATION,
 5
                 Plaintiffs,
 6
          vs.
 7
     PALAXAR GROUP, LLC;
 8   PALAXAR HOLDINGS, LLC;
     FRANK HAILSTONES;
 9   EDITH CURRY; AND TERENCE CHU,

10              Defendants,

11        vs.

12   MIRABILIS VENTURES, INC., et al,

13              Counterclaim and
                Third Party Defendants
14                                          /

15

16   DEPOSITION OF: AARON BATES

17   TAKEN BY:     The Defendants

18   DATE:         Tuesday, August 3, 2010

19   TIME:         9:03 a.m. to 3:31 p.m.

20   LOCATION:     Litchford & Christopher
                   390 N. Orange Avenue
21                 Orlando, Florida 32801

22   REPORTED BY:  CHRISTINE L. PRICE, Registered
                   Professional Reporter, Notary
23                 Public, State of Florida at Large

24

25
```

COPY

2

080310ab

1    A P P E A R A N C E S:

2    Atheseus R. Lockhart, Esquire

3        Meier, Bonner, Muszynski, O'Dell & Harvey, P.A.
         260 Wekiva Springs Road, Suite 2000
4        Longwood, Florida 32779
         407.872.7774
5
            On behalf of Aaron Bates
6

7    Kathleen B. Havener, Esquire

8        The Havener Law Firm, LLC
         1511 Russell Road
9        Chagrin Falls, Ohio 44022
         440.893.0188
10
            On behalf of the Defendants
11

12   ALSO PRESENT:  Edith Curry and Matthew Mokwa

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                      I N D E X

2    AARON BATES

3        Direct Examination by Ms. Havener        5
         Cross Examination by Mr. Lockhart        176
4        Redirect Examination by Ms. Havener      178
                       Page 2

080310ab

5    Certificate of Oath                 182
    Certificate of Reporter       183

6

7              E X H I B I T S

8   Exhibit No. 100                 26
   (Email from Matthew Mokwa to Richard Berman)
9

10  Exhibit No. 101                26
   (Email from James Sadrianna dated 7/31/2006)

11  Exhibit No. 102                29
   (Email from Phil Kaprow dated 6/9/2006)
12

13  Exhibit No. 103                36
   (Minutes of Mirabilis Ventures, Inc. 7/6/2005)

14  Exhibit No. 104                37
   (Bylaws of Nexia Strategy Corporation)
15

16  Exhibit No. 105                42
   (Minutes of Mirabilis Ventures, Inc. 2/15/2005)

17  Exhibit No. 106                45
   (Minutes of Mirabilis Ventures, Inc. 4/7/2005)
18

19  Exhibit No. 107                51
   (Web page from palaxar.com)

20  Exhibit No. 108                53
   (Shareholders' Agreement dated 9/22/2005)
21

22  Exhibit No. 109 (Handwritten note)    56

23  Exhibit No. 110                60
   (Declaration of Frank L. Amodeo regarding Palaxar)

24  Exhibit No. 111                63
   (Nexia Strategy Corporation Balance Sheet)
25

4

1  Exhibit No. 112                69
   (30(b)(6) Deposition of Jay Stollenwerk)
2

3  Exhibit No. 113                78
   (Affidavits of Elizabeth M. Callaghan and
    Robert A. Mooney)
4

5  Exhibit No. 114                97
   (Interrogatories of Yaniv Amar)

6  Exhibit No. 115              119
   (Transcript of the Statement of Frank Amodeo
7    taken on May, 9, 2008)

080310ab

8    Exhibit No. 116                                                125
     (Written Consent of the Board of Directors of
9    Mirabilis Ventures, Inc., A Nevada Corporation
     In Lieu of a Meeting)
10
     Exhibit No. 117                                                127
11   (Affidavit of Jay Stollenwerk)

12   Exhibit No. 118                                                138
     (Affidavit of Steven McCabe)
13
     Exhibit No. 119                                                140
14   (Order in the Bachlin, Cohen & Holtz case)

15   Exhibit No. 120                                                142
     (Order in the Saxon Gilmore and Hans Beyer case)
16
     Exhibit No. 121                                                145
17   (Latham Shuker Eden & Beaudine, LLP and
     Jennifer S. Eden, Esq.'s Response to the
18   Defendants' Motions for Sanctions)

19   Exhibit No. 122                                                159
     (Declaration of Aaron C. Bates)
20
     Exhibit No. 123                                                162
21   (Affidavit of Elizabeth A. Green)

22

23

24

25

5

1                    P R O C E E D I N G S

2    THEREUPON:

3                       AARON BATES

4    having first sworn or affirmed to tell the truth, the

5    whole truth and nothing but the truth, testified as

6    follows:

7                 THE WITNESS:  I do.

8                 MS. HAVENER:  Do you want to enter

9         appearances on the record?

10                My name is Kathleen Havener, H-A-V-E-N-E-R.

11        I represent Edie Curry, Frank Hailstones,

Page 4

080310ab

12    Palaxar Group and Palaxar Holdings.

13         MR. LOCKHART:  Atheseus Lockhart on behalf of

14    Mr. Bates.

15              DIRECT EXAMINATION

16    BY MS. HAVENER:

17         Q.    Mr. Bates, I know you're an experienced

18    litigator.  I hope that you are familiar with the

19    process of deposition.

20         A.    I am.

21         Q.    And you know what we're about here today,

22    that I'll be asking questions of you, the court reporter

23    is taking down responses and your own attorney will be

24    objecting for the record to preserve the record.

25         A.    Okay.

                                                    6

1         Q.    You're welcome to take a break at any time,

2    other than when a question is pending.

3              Are you agreeable to that?

4         A.    Yes.

5         Q.    Could you please tell me your background,

6    starting with high school.

7         A.    I graduated from Stanton College Preparatory

8    in 1998.

9         Q.    And where is that?

10        A.    Jacksonville, Florida.  I graduated from

11    Florida State University in 2001 with a BS in Political

12    Science and International Affairs.  And then I graduated

13    from Florida State College of Law in 2001.

14        Q.    Wait, when did you graduate from Florida

                        Page 5

080310ab

15    State?

16    A.    2001 from Florida State.  2003 from Florida

17    State University College of Law.  I misspoke.

18    Q.    The Florida State University?

19    A.    College of Law, 2003.

20    Q.    Did you go summers and --

21    A.    I had a year of college credit --

22    Q.    Of law school credit?

23    A.    -- from high school and then in law school I

24    had a -- went both summers, correct.

25    Q.    Did you have any special course study in law

7

1    school?  Did you take typical curriculum?

2    A.    Typical curriculum.

3    Q.    When you were in law school, were you able --

4    oh, you went through the summers.  Were you able to

5    work?  Were you employed at all during law school?

6    A.    I worked for the State Attorney's Office in

7    the Second Judicial Circuit in Leon County my last

8    summer of law school.

9    Q.    Could you describe for me, please, your job

10    search when you got out of law school.

11    A.    I had multiple offers from the State

12    Attorney's Office in Tallahassee, Ocala, which is the

13    Fifth Circuit and I don't remember, I had three or four

14    pending offers to go work as an assistant state

15    attorney; however, the state salary for an assistant

16    prosecutor was somewhere in the range of 38 to $40,000 a

17    year starting out.  My personal care attendant ran

18    somewhere between 28 and $32,000 a year.  Obviously I

080310ab

19    need help getting in and out of bed and out of my

20    wheelchair and assistance through the day with standard

21    activities of daily living, so I could not take the job

22    because of the salary.

23           I then went to live with my family who was in

24    Southwestern Virginia at the time.  And I went to work

25    for a law firm there called Hale, Lyle & Russell.  I

8

1    worked there -- I couldn't tell you off the top of my

2    head the dates, but I can provide a resume.

3           Q.    Could you tell me the name again?

4           A.    Hale, Lyle & Russell.

5           Q.    Hale?

6           A.    H-A-L-E, L-Y-L-E and Russell, R-U-S-S-E-L-L.

7           Q.    And that's in Southwest Virginia?

8           A.    Yes.

9           Q.    Are you licensed to practice in Virginia?

10          A.    No, I was working essentially as a paralegal,

11   beefed-up paralegal.  I didn't make any appearances in

12   court or anything of that nature.

13          Q.    You've taken the Bar in Florida?

14          A.    I have.

15          Q.    When was that?

16          A.    I took the Bar in Florida in 2000 -- February

17   of 2005 and we're skipping ahead.  I worked in Virginia

18   for about a year and a half.  Then my family moved to

19   Alabama, and I had to obviously move with them because

20   they were acting as my primary caregivers.

21           So when I moved to Alabama, this is probably

Page 7

080310ab

22   around 2004, I decided that following my family around

23   wasn't going to work, so I began working with lobbyists

24   in Tallahassee to get a cross disability bill passed

25   that provided personal care attendant services to

9

1    individuals that were disabled and gainfully employed.

2    That took about a year and a half.

3         Q.    Were you successful?

4         A.    I was.  That ended up getting passed.  It

5    took three years to get it passed, but it ended up

6    getting passed.

7              However, when I was in Alabama I was offered

8    a job, again offered a job as an assistant state

9    attorney.  And I met with Governor Bush and

10   Governor Bush's Deputy Chief of Staff for Health Care.

11        Q.    Excuse me for just a minute.  You were in

12   Alabama, but you were looking for an assistant state

13   attorney job in Florida?

14        A.    Correct.  I wanted to move back to Florida

15   where I was from.

16        Q.    Where in Alabama were you?

17        A.    Mobile.  Outside of Mobile.

18        Q.    Where outside of Mobile?

19        A.    In a town called Grove Hill.

20        Q.    Okay.  And then I only ask that because I

21   lived in Mobile for 12 years.

22              So then in 2004 you were in Grove Hill, but

23   you were remaining in contact with the state attorney;

24   correct?

25        A.    Thereabout.  I was in Alabama, around 2004 I

Page 8

080310ab

10

1   was looking to go back to Florida and work. Obviously

2   go back to the state I grew up in and the state I was

3   trained in.

4           And the State of Florida thought they had

5   found interim funding to pay for a personal care

6   attendant so I could take a job with the state

7   attorney's office.  This time the state attorney's

8   office offered me actually a higher salary.  I don't

9   remember what the salary was, but it was an additional 8

10  to $10,000 a year on top of the base salary.  They were

11  going to bring me in at essentially a circuit prosecutor

12  salary.

13          And as I was heading down to Ocala to take

14  the job, I got a call from the governor's office saying

15  the funding had fell through and they couldn't provide

16  the funding.  And at that point the newspapers picked up

17  the story and another year and a half, two years later

18  the bill was eventually passed.

19      Q.    Were you being paid while you were working

20  with the lobbyist to get the bill passed?

21      A.    No, it was all free.

22      Q.    How did it come about that you came to be

23  employed by whatever entity that was associated with

24  Mr. Amodeo?

25      A.    Could you rephrase the question?

11

080310ab

1     Q.    How did you get your job in Orlando?

2     A.    I got a call from a Dr. Bob Pollack sometime

3 in late 2005, early 2006.  They had seen one of the

4 multiple articles run either in the Florida Bar News or

5 the Orlando Sentinel about the advocacy work I was doing

6 in Tallahassee.  They said, you know, we're a company

7 here in Orlando, Florida that does venture capital work.

8 We're hiring --

9     Q.    Did they say what the company was?

10    A.    Mirabilis Ventures, Inc. was the name of the

11 company.

12    Q.    Go ahead.

13    A.    And said we're looking to hire inhouse staff

14 attorneys.  You would be an entry-level staff attorney,

15 would you be interested in the job?  I said I would be

16 more than happy to come down and interview for the job.

17 I came down and interviewed in early 2006.

18    Q.    You took The Florida Bar in 2005.  February

19 or July?

20    A.    February.

21    Q.    Have you taken any other Bar exams?

22    A.    No.

23    Q.    And what happened when you came down and

24 interviewed?

25    A.    I interviewed with -- it was an all-day

12

1 interview, I interviewed with Richard Berman, I

2 interviewed with four other staff attorneys.  I don't

3 know if you'd call it a staff attorney meeting/

4 interview, it was more to get to know the other staff

080310ab

5  attorneys and that included Chad Walters,

6  Scott Goldberg, Phil Kaprow, I think I met Matt Mokwa

7  for the first time there.  And then I interviewed with

8  Richard Berman.  I interviewed with Jim Sadrianna.

9      Q.    Chad Walters, Mr. Mokwa, and who was the

10 third?

11     A.    Scott Goldberg, Phil Kaprow, Richard Berman.

12     Q.    And then you met with Mr. Sadrianna?

13     A.    Met with Mr. Sadrianna, met with Mr. Pollack,

14 met with Martin Flynn.  I met with at least 10 to 15

15 people that day.  But those were the names off the top

16 of my head.

17     Q.    You said somebody between Sadrianna and

18 Flynn.

19     A.    Pollack.

20     Q.    Okay.  And tell me what happened next after

21 the day you interviewed.

22     A.    I interviewed.  It was an all-day interview.

23 I went back to Alabama.  I got a call somewhere around

24 two weeks to a month later offering me a job with the

25 company.

                                                      13

1      Q.    With Mirabilis Ventures, Inc.?

2      A.    Mirabilis Ventures, Inc.

3      Q.    And could you tell me what the arrangements

4  were, the financial arrangements?

5      A.    You mean my salary?

6      Q.    Yes.

7      A.    My salary was 66,000 a year and they also

                    Page 11

080310ab

8    paid for my attendant at 30 to 32,000 a year.  I don't
9    know off of the top of my --
10        Q.    Was that paid to you and you paid your
11   attendant or --
12        A.    I believe they paid the attendant directly.
13   But I could be wrong because I had multiple attendants.
14   They may have paid me.  I don't really recall off the
15   top of my head.
16        Q.    When did you start at Mirabilis Ventures?
17        A.    March of 2006.
18        Q.    Who did you report to?
19        A.    Multiple people.  Richard Berman.
20        Q.    But he wasn't inhouse; correct?
21        A.    He was the general counsel.  We were told any
22   questions we had as staff counsel, go to Richard Berman
23   and to his firm down in South Florida.
24        Q.    Did you collaborate with your fellow in-house
25   counsel?

                                                    14

1         A.    I was kind of bounced all over the place.  I
2    worked with Chad.  I worked with Scott.  The first three
3    to five months, which was, you know, most of my time
4    there, I was essentially kind of bounced around to get a
5    view of what everybody did in the legal department.
6              So I did -- I worked on some acquisitions,
7    helping out with that.  I worked on, you know, some of
8    the real estate stuff with Chad.  I was kind of bounced
9    around.  I didn't have a set job.
10             I worked with -- you know, the first three to
11   five months I was reporting to Sadrianna, Hans.  I think
                        Page 12

080310ab

12    I reported to Scott Goldberg for a while.  Then in late

13    summer, early fall of '06 I was transferred to work

14    under Hans Beyer, who was an attorney out of Tampa who

15    spent at least a day or two in the Orlando Mirabilis

16    offices.

17        Q.    A day a week?

18        A.    I would say a day to two days a week on

19    average.  Sometimes he'd spend more, sometimes he'd

20    spend less.

21        Q.    Where was your office physically located?

22        A.    I was first located in the AmSouth Building.

23        Q.    Where in the AmSouth Building?

24        A.    As far as the floor?

25        Q.    Yes.

15

1         A.    20th floor.

2         Q.    And tell me who were in the same suite that

3     you were in, same --

4         A.    I don't recall.  I mean, there were a lot of

5     people on that floor.  Scott -- I mean, I can give you

6     some names.  Scott Goldberg, Jim Sadrianna, Matt Porter.

7         Q.    Were you ever located on the same floor and

8     in the same suite as Mr. Amodeo?

9         A.    Near the end of 2006 I was moved to the 28th

10    floor over at SunTrust and Mr. Amodeo had an office

11    there.

12        Q.    Did you know why that move happened?

13        A.    No.

14        Q.    Nobody ever discussed it with you?

Page 13

080310ab

15     A.    No.  Office moves were kind of common in the

16  company.

17     Q.    Did other people move with you?

18     A.    Yeah, people moved.  They had just moved into

19  SunTrust and shortly thereafter people were moved to

20  SunTrust.

21     Q.    Who is they?  When you say they had just

22  moved into SunTrust --

23     A.    Mirabilis had expanded over to SunTrust.

24     Q.    And that included Mr. Amodeo?

25     A.    Over at SunTrust?

16

1      Q.    Yes.

2      A.    Yeah, he was in SunTrust.

3      Q.    And when you moved, did anyone else move with

4   you to SunTrust?

5      A.    Yes, but I don't recall who moved.  There was

6   at least 20 to 25 offices on a given floor, so -- I mean

7   it was a 300-employee company.  I don't remember the

8   employees that were moving.

9      Q.    Wasn't there a special suite of offices that

10  was only accessible to a particular group of

11  individuals?

12     A.    All of our floors were secured.

13     Q.    And you don't remember who the other people

14  were in your immediate vicinity?

15     A.    I mean, I can tell you who was near my

16  office, I think.

17     Q.    Okay.

18     A.    You know, maybe Woody Johnson was on my side

Page 14

080310ab

19    of the office, Chad Walters, that's --

20        Q.    How close was your office to Mr. Amodeo's?

21        A.    It was on the other side of the floor.

22        Q.    How many offices away?  10?  15?

23        A.    I would say 10 to 15, thereabout.

24        Q.    At this point were you still working for

25    Mirabilis Ventures?

17

1        A.    Yes.

2        Q.    Did you ever work for AQMI?

3        A.    As an employee of AQMI, not that I know of.

4    I had an employment agreement with Common Paymaster,

5    Inc. and my understanding was Common Paymaster was

6    essentially the payroll entity for all the Mirabilis

7    entities.

8              And on my Common Paymaster paycheck every two

9    weeks I would have an entity on the memo line for

10   services I had rendered to whatever entity.

11             And for the first three to six months it was

12   Mirabilis Ventures, Inc. and thereafter it was the

13   company that Hans was heading up.  It was Earthsource

14   Holdings.

15             And now that you mention that, actually when

16   we moved over to SunTrust, I was on the 28th floor of

17   SunTrust to begin with and that was Earthsource with

18   like Paul Glover and his group, it was Stratis with

19   Kevin Billings and his group.  So we were on the 28th

20   floor of SunTrust -- 27th and 28th was Mr. Amodeo and

21   another 20, 25 offices.

Page 15

080310ab

22      Q.      Kevin Billings did you say with Stratis?

23      A.      Yes, ma'am.

24      Q.      And what was Mr. Amodeo's role with all of

25      these companies?

18

1               MR. LOCKHART:  Object to form.

2               MS. HAVENER:  Let me rephrase.

3       Q.      What was Mr. Amodeo's role with respect to

4       AQMI?

5               MR. LOCKHART:  Object to form.

6       A.      My understanding was he was the sole owner of

7       AQMI.

8       Q.      What was Mr. Amodeo's relationship with

9       Common Paymaster?

10              MR. LOCKHART:  Object to form.

11      A.      I don't know.  I don't know that he had a

12      relationship with Common Paymaster.

13      Q.      What was the company that dealt with the

14      issues in the Democratic Republic of the Congo?

15              MR. LOCKHART:  Object to form.  Do not answer

16      the question.  It's outside the scope of the

17      deposition notice.  Also it's outside the scope of

18      the counts referred to Mr. Bates in your

19      counterclaim.  And also it's going to

20      attorney/client privilege.

21              MS. HAVENER:  Thank you.  And I understand

22      where you are coming from.  It's our position that

23      while the Notice of Deposition addresses the events

24      of October 15th in Scottsdale and the planning of

25      that, Mr. Bates is also a person to be a fact

Page 16

080310ab

19

1      witness.  And the fact of his representation is not

2      privileged.  I didn't ask him about any

3      communications.  And anything that led up to the

4      event that happened in the Congo, including his

5      relationships with his coworkers, could lead to the

6      discovery of admissible evidence about the planning

7      of this event.

8              MR. LOCKHART:  The planning of which event?

9              MS. HAVENER:  Of the events in October

10     of 2007.

11             MR. LOCKHART:  So it is your position today

12     that events that occurred or may not have occurred

13     with the Congo has something to do with service of

14     process in Arizona?

15             MS. HAVENER:  Conceivably, yes.  All I'm

16     looking for -- I'm not going to go into any details

17     about the Congo, all I was asking for was which

18     company was he rendering services when he dealt with

19     the issue in the Democratic Republic of Congo.

20     That's all I asked.

21             MR. LOCKHART:  And I keep the same objection

22     and also advise my client not to respond to the

23     question.  We can certify the question and keep

24     moving forward.

25             MS. HAVENER:  I think we should call the

20

080310ab

1    magistrate.

2        MR. LOCKHART:  If you feel the need to call

3    the magistrate -- the reality is you have a

4    complaint in which you've named Counts V, let's go

5    through here, Count V, Count VIII, Count IX,

6    regarding Mr. Bates specifically as to the civil

7    conspiracy to commit slander and everything

8    occurring with the events in Arizona.

9        At no point in time, there's no mention

10   whatsoever of anything that have to do with the

11   Congo.  It's understood and known at that time

12   Mr. Bates was representing a number of different

13   entities as counsel and therefore that information

14   at some point is going to be privileged.  And it's

15   our position that information is privileged and

16   should not be considered at this time as we do this

17   deposition.

18       MS. HAVENER:  I'm sorry --

19       MR. LOCKHART:  Atheseus.

20       MS. HAVENER:  Atheseus.  I don't know your

21   last name.

22       MR. LOCKHART:  Lockhart.

23       MS. HAVENER:  Lockhart, thank you.

24   Mr. Lockhart, in addition to what you've discussed,

25   Mr. Bates is a percipient fact witness and there are

                                        21

1    other issues that are simply background that we

2    believe that we're entitled to get an answer to.

3        One of them is -- one of the issues that

4    occurred surrounding the filing and service of the

                    Page 18

080310ab

5     lawsuit were a number of press releases.  In

6     addition to that, there were press releases that

7     were associated with the events that happened in the

8     Congo.

9          And therefore it could lead to the discovery

10    of admissible evidence for Mr. Bates to tell us what

11    entity he was working for when we know that

12    Mr. Bates was related to the operation with the

13    press on the Congo.

14         MR. LOCKHART:  My objections stay the same.

15     Q.    Are you going to follow the instruction,

16 Mr. Bates?

17     A.    Yes.

18         MS. HAVENER:  I think we will probably

19    schedule a call with the magistrate at lunch or at

20    the first break.

21         MR. LOCKHART:  No problem.

22         MS. HAVENER:  We'll go off the record for a

23    moment.

24         (Break taken.)

25

22

1  BY MS. HAVENER:

2     Q.    Mr. Bates, was Common Paymaster in some way

3  or form superior to Mirabilis, AQMI, Stratis and the

4  other entities that you indicated that you had worked

5  for?

6     A.    What do you mean by superior?

7     Q.    Well, if we were to draw a org chart, where

080310ab

8   does Common Paymaster fit in the Mirabilis universe,

9   let's say?

10      A.   My understanding it was a wholly-owned

11   subsidiary of Mirabilis.

12      Q.   And its function was?

13      A.   To act as the payroll entity for all of the

14   Mirabilis affiliates and subsidiaries, to the best of my

15   knowledge.  I don't know.  I wasn't involved with

16   Common Paymaster.

17      Q.   So am I correct that it wasn't

18   Common Paymaster or someone from Common Paymaster who

19   assigned you to work on particular matters for

20   particular clients; was it?

21          MR. LOCKHART:  Object to form.

22      A.   Sometimes I'd get a call from Marty Flynn

23   telling me to go here or go there.  So, I mean, my

24   understanding was Marty Flynn was the president of

25   Common Paymaster and I was told to go work with certain

23

1   individuals by him sometimes.  Sometimes I wasn't,

2   sometimes I was instructed by Richard Berman.  Sometimes

3   I was yanked or asked by one of the other attorneys.  I

4   mean, it was kind of whoever was above me, which was

5   pretty much everybody, I did what I was told to do.

6      Q.   Okay.  At some point in time,

7   Mirabilis Ventures was taken over to -- if I may use

8   that word, and you can correct my word if that's

9   appropriate, by AQMI Strategy; correct?

10      A.   I don't know that I understand your question.

11          MR. LOCKHART:  Object to form.

080310ab

12      Q.     Isn't it true that at some point

13  AQMI Strategy came in as the secured creditor of

14  Mirabilis and took over the assets and began functioning

15  essentially as the head of Mirabilis Ventures?

16              MR. LOCKHART:  Object to form.

17              MS. HAVENER:  I'm sorry?

18              MR. LOCKHART:  I objected to the form.  You

19      can answer if you know.

20      A.     That's a fair statement.  My understanding is

21  -- not my understanding, in 2007 -- as of December 2006,

22  Mirabilis and all of its affiliates essentially ceased

23  doing business and began liquidating.

24              At that point in time I would say 70 to

25  80 percent of the company's officers, directors,

24

1  managers, supervisors left the company.  In between

2  December of '06 and January of '07, sometime in the

3  first quarter of '07 HMI, through its secured creditor

4  position, began essentially directing the operation of

5  Mirabilis.  And by operations of Mirabilis, there

6  weren't any operations, it was just winding down,

7  selling assets, defending lawsuits, things of that

8  nature and we were working --

9      Q.     And pressing lawsuits; correct?

10      A.     Not until the latter half of the year.  But

11  in the first half of '07 it was mainly defending

12  lawsuits.  People smelled blood in the water and they

13  began filing lawsuits.  Something like 30 to 35 lawsuits

14  were filed and the vast majority of those were dismissed

Page 21

080310ab

15  early on.

16      Q.   And at the time, after -- I'm sorry, let me

17  be very clear.  When, to your recollection, was it that

18  AQMI exercised its position as a secured creditor to

19  take over the operations of Mirabilis?

20      A.   To the best of my knowledge, sometime during

21  the first quarter of '07.

22      Q.   At that point, who was directing the

23  wind-down and the liquidation operations of

24  Mirabilis Ventures?

25      A.   I'll answer that question in two parts.

25

1  During the first half of '07, you know, I'm not really

2  sure.  I worked with Mark Burnett, who was the general

3  counsel who replaced Richard Berman in December of '06.

4  So to answer your question who directed, Mirabilis had

5  officers and directors that were appointed in sometime

6  around April or May of '07 and that was Jodi Jaiman,

7  Jay Stollenwerk and Jay Williams.  They were essentially

8  the liquidating officers of the company and they worked

9  for Mr. Amodeo who advised and worked with them in

10  winding down the company.

11      Q.   Would you --

12      A.   To answer your question.

13      Q.   Do you deny that Mr. Amodeo was, in fact, the

14  person that was controlling the operations of Mirabilis

15  at that time?

16          MR. LOCKHART:  Object to form.

17      A.   No, I don't deny it.  He was generally in

18  control of winding down the company.  I think I said

Page 22

080310ab

19   that.

20      Q.    Do you deny that Mr. Amodeo was, in fact, the

21   person who, whether on paper or not, behind the scenes

22   directed Mirabilis prior to 2007?

23      A.    I'm sorry, could you rephrase the question?

24      Q.    Could you read it back, please.

25            (Question read.)

                                                    26

1       A.    Yeah.

2       Q.    You deny that?

3       A.    Yeah.

4             (Exhibit No. 100 was marked for

5       identification.)

6       Q.    Mr. Bates, are you familiar with this kind of

7    document?

8             MR. LOCKHART:  Object to form.

9       A.    It appears to be an email, chain of emails.

10      Q.    And at the very top it's an email from

11   Matt Mokwa to Richard Berman; correct?

12      A.    That's what it appears to be.

13      Q.    And the first sentence says:  Frank and Jim

14   Sadrianna made all the decisions as to how much stock

15   individuals should receive; correct?

16      A.    That's what's on the email, correct.

17      Q.    Is it not your understanding that that's

18   referring -- that the word Frank was referring to

19   Mr. Amodeo?

20      A.    I don't know.  I'm not on the email.

21      Q.    I understand.

                        Page 23

080310ab

22    A.    Could be Frank Hailstones for all I know, who

23    was the CEO of Mirabilis at the time.

24          (Exhibit No. 101 was marked for

25    identification.)

27

1     Q.    Mr. Bates, do you recognize this document?

2     A.    It appears to be an email from

3     James Sadrianna to Fernando Simo, Frank Hailstones,

4     Laurie home, Aaron Bates, Bob Pollack, Dan Myers,

5     Edie Curry, Jason Carlson, Jim Vandevere, Jodi Jaiman,

6     Mark Ochab, Bob Pollack, Dan Myers, Edie Curry,

7     Jason Carlson, Jim Vandevere, Jodi Jaiman, Mark Ochab,

8     Marty Flynn, Matthew Mokwa, Paul Glover, Pete Anderson,

9     Stephen Bonck, Tom Broadhead, Woody Johnson, and it's

10    cc'd to Nichole Beamer, Irene Pons, Scott Goldberg,

11    Phil Kaprow, Chad Walters, Larry Haber, Hans Beyer,

12    Shane Williams, Jay Stollenwerk, reb@bermankean.com,

13    which I assume is Richard Berman and Angel Armas, which

14    was an attorney in Mr. Berman's firm.

15    Q.    And you are actually in the to line twice;

16    isn't that correct?

17    A.    Yes, ma'am, it appears to be that way.  I

18    don't know why.

19    Q.    And this is dated July 31st, 2006; correct?

20    A.    Correct.

21    Q.    And it represents -- well, the attachment

22    appears to be a Summary and Deal Sheet for every known

23    Amodeo and Mirabilis Ventures, Inc. entity; correct?

24    A.    That's correct.

25    Q.    And the final sentence of the first paragraph

Page 24

080310ab

28

1    of the email says:  Please note that several companies

2    have been transferred from Mirabilis Ventures, Inc. to

3    Amodeo controlled entities; correct?

4         A.    That's what it says.

5         Q.    If you know, under whose authority did those

6    companies change from Mirabilis entities to Amodeo

7    entities?

8         A.    I assume taking control of them as Amodeo

9    entities, Mr. Amodeo would have accepted those entities

10   or accepted control of those entities.

11              As far as Mirabilis Ventures, Inc., we had a

12   board and we had the board-appointed officers and we had

13   managers and supervisors for those parts who made that

14   decision.  I can't tell you.  I can tell you who the

15   officers and directors were to the best of my knowledge.

16        Q.    Did you ever attend a Mirabilis Ventures

17   board meeting?

18        A.    No, ma'am.

19        Q.    Did you ever attend a board meeting for any

20   of the other Mirabilis or Amodeo related entities?

21        A.    Not to my knowledge.  May have attended a

22   board meeting for Earthsource Holdings, Mr. Beyer,

23   during 2006.  I did not attend any board meetings to my

24   knowledge.

25        Q.    Who is Nichole Beamer?

29

Page 25

080310ab

1      A.    She was Jim Sadrianna's paralegal,

2   Chad Walters' paralegal and then during the wind-down

3   she acted as Mark Burnett's paralegal and then all of

4   the remaining staff attorneys' paralegal.

5      Q.    Where is she now?

6      A.    I believe she works for Chad Walters.

7      Q.    And where is Mr. Walters now?

8      A.    He's here in Orlando, Florida.  I believe he

9   has an office in Winter Park.

10     Q.    Did she ever work for you?

11     A.    She did.

12     Q.    When was that?

13     A.    She worked for Bates Mokwa -- or it was

14   Goldberg Bates and then changed the name to Bates Mokwa.

15   She worked for us from July of '07 through somewhere

16   around October of '07.  Prior to July of '07, between

17   January of '07 and June of '07, she worked for

18   essentially Mark Burnett and all the rest of the

19   attorneys.  She acted as a paralegal for all of the

20   remaining attorneys.

21          MS. HAVENER:  Would you mark this as the next

22     exhibit.

23          (Exhibit No. 102 was marked for

24     identification.)

25     Q.    Do you recognize this document, Mr. Bates?

30

1      A.    It appears to be an email from Phil Kaprow,

2   one of the staff attorneys for Mirabilis Ventures dated

3   Friday, June 9, 2006, to Jim Sadrianna, lholtz@rachlin,

4   which I assume is Laurie Holtz, the chairman of the

Page 26

080310ab

5    Mirabilis Board during 2006, Edie Curry, Tom Broadhead,

6    Jason Carlson, Bob Pollack, Richard Berman, Bruce Walko,

7    Frank Hailstones and it's cc'd Frank Amodeo and

8    Joe Robinson.

9         Q.    And am I correct that this says:  At a

10   meeting of the Class A Common Shareholders this

11   afternoon, a request has been made that the board

12   meeting scheduled for June 13th, 2006 at 3:00 p.m. be

13   cancelled and that instead the next board of directors

14   meeting be held in July; is that right?

15        A.    That's what the email says.

16        Q.    Who were or was the Class A Common

17   Shareholders to which this refers?

18             MR. LOCKHART:  Object to form.

19        A.    Do you want my answer based on what I knew in

20   '06 or what I know now?

21        Q.    Both.

22        A.    Based in '06 I had no idea.  I wasn't

23   familiar, didn't have any involvement with the

24   shareholders or the divisions or classes of shares.

25        Q.    And what do you know now?

31

1         A.    Based upon what I know now, I don't know that

2    I can answer.  It would be things obtained during

3    representing my clients.

4         Q.    I'm sorry?

5         A.    It would be things I obtained, information I

6    obtained by representing my clients.  I don't know that

7    I can tell you what I gleaned during the 2007 and 2008

Page 27

080310ab

8    -- first half of 2008.

9        Q.    You mean this was something that was

10    communicated to you by your client?

11        A.    No, this is things I gleaned while reviewing

12    thousands and thousands of documents.

13        Q.    If you go back to, I think it's 101, in which

14    Mr. Amodeo accepted -- or you testified that Mr. Amodeo

15    accepted control of some of the companies --

16        A.    What I testified to it is it would appear

17    from the email that they were transferred to Amodeo

18    controlled entities.  And to the extent they were

19    transferred to Amodeo controlled entities, Mr. Amodeo,

20    if they were his entities, would make that decision.

21        Q.    You also suggested that the MVI Board would

22    be involved?

23            MR. LOCKHART:  Object to form.

24    Misrepresentation of testimony.

25        A.    I mean I would assume.  I would assume the

32

1    board of any company would be involved in transferring a

2    company.

3        Q.    When Mr. Sadrianna sent that email in July

4    of '06, do you know whether there's any board minutes to

5    approve those changes?

6        A.    I don't.

7        Q.    Isn't it true that the Class A Common

8    Shareholders were singular and it was Mr. Amodeo?

9            MR. LOCKHART:  Object to form.

10        A.    The answer to your question is not that

11    simple.  From what we determined in 2007, I don't know

Page 28

080310ab

12     that there were any shareholders of the company.  That's

13     the big reveal that once we dug in and went through the

14     documents, it appears that none of the shares were

15     properly authorized, properly issued, so I don't know

16     that the company had any shareholders.  But we sought to

17     retain expert counsel in both Nevada and Florida to

18     determine that.  But based on my limited knowledge, it

19     didn't appear that we had -- that Mirabilis Ventures,

20     Inc. had any shareholders during 2006.

21          Q.    Isn't it true that Mr. Amodeo represented

22     himself to be the sole shareholder?

23          A.    Never represented that to me during 2006.

24          Q.    But are you aware of him representing it at

25     any time?

                                                            33

1          A.    I may have heard that said by other people

2     over the course of the last three years.

3                MR. LOCKHART:  Excuse me, if I may.  I'd like

4          to put this on the record.  I have some concerns.

5                One, I'm objecting to this line of

6          questioning because it has nothing whatsoever to

7          relate to these claims that you have in your

8          complaint as to Mr. Bates.

9                And it seems like we are treading on some

10         thin ice here because it's known to all parties

11         involved that Mr. Bates acted as legal counsel to a

12         number of different entities.

13               And as so far as this complaint goes to

14         specifically civil conspiracy to commit slander, I

                         Page 29

080310ab

15    don't understand how this line of questioning with

16    regard to Mr. Amodeo furthers your quest for

17    information as to conspiracy to commit slander.

18         MS. HAVENER:  Mr. Lockhart, Mr. Amodeo is one

19    of the named co-conspirators and therefore if we can

20    establish that at some time during the relationship

21    with Mr. Bates, Mr. Bates was aware of Mr. Amodeo

22    exerting sole control over the entity for which he

23    was employed, that is absolutely relevant to these

24    claims.

25         MR. LOCKHART:  It's absolutely relevant to

34

1    what, his employment and his work with these

2    entities or relevant to the civil conspiracy to

3    commit slander?

4         MS. HAVENER:  Both.

5         MR. LOCKHART:  In what regard would how

6    Mr. Amodeo controlled companies have to do with

7    slander?

8         MS. HAVENER:  Well, if Mr. Amodeo assisted in

9    any way or if Mr. Bates was representing Mr. Amodeo

10    at the time that these events in October of 2007

11    occurred and he was subject to the direction of

12    Mr. Amodeo, it goes to one of the elements of the

13    conspiracy.

14         MR. LOCKHART:  Okay.

15    BY MS. HAVENER:

16         Q.    Again, Mr. Bates, are you aware at any time

17    of Mr. Amodeo exerting control over Mirabilis Ventures?

18         A.    During 2006 I wasn't aware of him directly

Page 30

080310ab

19   exerting control of Mirabilis Ventures, Inc.  During

20   2007, yes, he exerted control over Mirabilis Ventures,

21   Inc. during the wind-down.

22        Q.    Did Mr. Amodeo direct your employment or your

23   tasks during 2007?

24        A.    During the first half of 2007 Mark Burnett

25   directed me.

35

1         Q.    Was Mark Burnett a conduit of information

2    from Mr. Amodeo to you?

3               MR. LOCKHART:  Object to form.

4         A.    Not to my knowledge.

5         Q.    Do you know to whom Mr. Burnett reported?

6         A.    No, I do not.  He was essentially in charge

7    of the wind-down liquidation.  He was a bankruptcy

8    expert or bankruptcy trustee and he was essentially

9    brought in to help wind things down in '06.

10        Q.    So -- sorry.

11        A.    And that was --

12        Q.    Is it your testimony that there was no

13   relationship between Mr. Amodeo and Mark Burnett?

14        A.    I don't believe that was my testimony.  I

15   just said I don't know who Mark Burnett was taking

16   direction from.  I know Mark Burnett was in charge of

17   winding down the companies.

18              He was working with the U.S. Attorney, he was

19   working with former officers of Mirabilis, the then

20   current officers of Mirabilis, the new officers of

21   Mirabilis.  He worked with various people.  I don't know

Page 31

080310ab

22    who he was directly taking direction from.  You'd have

23    to ask Mr. Burnett that.

24             MS. HAVENER:  Could you mark this as the next

25    in succession.

36

1             (Exhibit No. 103 was marked for

2        identification.)

3        Q.    I know before I start on this document that

4    you were not at Mirabilis at the time that these minutes

5    were issued, but is it not true that this document

6    represents that Mr. Amar was the chairman of the

7    shareholders and the sole -- or represented himself to

8    be -- let me rephrase.

9             Is it not true that in this document Mr. Amar

10   represented himself to be the sole director and

11   shareholder of Mirabilis Ventures?

12            MR. LOCKHART:  Object to form.

13       A.    I mean, the document says what the document

14   says.  It's signed by Yaniv Amar as chairman.  These are

15   minutes of Mirabilis Ventures, Inc. Special Joint

16   Meeting of the Board of Directors and Shareholders,

17   July 6, 2005.

18       Q.    Yes, and the signature at the bottom says --

19       A.    Says Yaniv Amar, Director and Sole

20   Shareholder.

21       Q.    So Mr. Amar represented himself to be the

22   sole shareholder of Mirabilis at that time; is that

23   correct?

24            MR. LOCKHART:  Object to form.

25       A.    That's what this says as of July 6 of '05.

Page 32

080310ab

37

1     Q.     Thank you.  Do you know who served on the

2   board of directors of Nexia?

3     A.     I don't.  Unless you have documents.  I mean,

4   they have corporate governance.  I could tell you that

5   the corporate governance would tell me who was on the

6   board of Nexia and who are the officers and directors of

7   Nexia for a given period of time, but I don't recall

8   that information off the top of my head.

9     Q.     Do you know when Nexia Strategy was formed?

10    A.     Off the top of my head, I do not.

11           MS. HAVENER:  Okay.  Would you please mark

12    this as the next in succession.

13           (Exhibit No. 104 was marked for

14    identification.)

15    Q.     Mr. Bates, does this appear to be the bylaws

16   of Nexia Strategy?

17    A.     These are bylaws of Nexia Strategy

18   Corporation and they appear date-stamped from the

19   Palaxar -- Mirabilis, Inc. vs. Palaxar case,

20   Document 198-3 filed on February 16, 2010 and they are

21   bylaws signed by Frank Amodeo as of April 18, 2005 as

22   Director of Nexia.

23           And my understanding is that at some point in

24   time during '05, Nexia was transferred in some form or

25   fashion to Mirabilis Ventures, Inc. because as of '06

38

Page 33

080310ab

1  and '07, Nexia was a wholly-owned subsidary of

2  Mirabilis.

3     Q.   Does the fact that it was a wholly-owned

4  subsidiary of Mirabilis negate somehow the possibility

5  that Mr. Amodeo could be a director?

6        MR. LOCKHART:  Object to form.

7     A.   Yes, based on my memory, and like I said, I

8  have to look at the corporate governance of the company,

9  my understanding is that he relinquished his interest in

10  Nexia sometime in the middle of '05.

11     Q.   Does one have to have an interest in the

12  company to be a director?

13     A.   No, ma'am.

14        MR. LOCKHART:  Object to form.

15     A.   No, ma'am.  But I don't believe he was a

16  director once the company was transferred to Mirabilis.

17     Q.   There would be no bar to him being a

18  director?

19     A.   No, ma'am.  Not to my knowledge.

20     Q.   Mr. Bates, are you aware of any documents

21  evidencing the transfer of Nexia Strategy to Mirabilis?

22     A.   I believe, and I don't specifically recall,

23  that there are documents evidencing that transfer in the

24  records of Mirabilis, but that entails the review of

25  millions of pages of documents.

                                           39

1        But I do believe when we were organizing the

2  corporate governance of the company I did see a document

3  to that effect, but I don't recall that.  Mirabilis

4  would know better than I would.

080310ab

5      Q.     Do you know why that was never disclosed to

6   the Defendants in this case?

7      A.     I don't.

8             MR. LOCKHART:  Object to form.

9      A.     To the extent it exists, it should be

10   disclosed.  It may or may not exist.  I thought I

11   remember seeing it.  I could be wrong.

12      Q.     It should have been disclosed, is that your

13   testimony?

14             MR. LOCKHART:  Object to form.

15      A.     I think if it existed, it would be disclosed,

16   correct.  You have to keep in mind that we're dealing

17   with -- if you've been to the warehouse, I don't know

18   that you've been there yet, but we are dealing with tens

19   of thousands of boxes of documents covering millions of

20   pages of documents collated from offices all over the

21   country and offices all over the City of Orlando.

22             So I know during my time I only got a chance

23   to look at probably 25 to 35 percent of the total number

24   of documents.  I know that Mr. Cuthill has been through

25   different documents since he's been in charge of

                                                    40


1   Mirabilis.

2      Q.     Mr. Bates, do you know why -- I'm going back

3   to the time that you were counsel for Mirabilis and

4   Nexia in this case.

5      A.     I was counsel for Mirabilis and Nexia in this

6   case from the date of the filing of the complaint, which

7   was sometime in October of '07 through May of 2008.

Page 35

080310ab

8    Q.    And do you know why of the thousands of pages
9  of documents and hours, hundreds of hours of videotape
10  that you referenced in your affidavit, only 200 pages
11  have been disclosed?

12           MR. LOCKHART:  Object to form.

13    A.    I think you are mischaracterizing what I
14  testified to in my affidavit.  I said that thousands of
15  pages of documents have been reviewed, generally
16  speaking, with regard to a company that had 80
17  subsidiaries.

18    Q.    Correct.

19    A.    Not with regard to this particular
20  litigation.

21    Q.    Well, but you indicated that you had reviewed
22  thousands of pages of documents and hundreds of hours of
23  videotape and that that review was the information upon
24  which the allegations in this case -- against the
25  Defendants in this case were based.

41

1    A.    I know that just the corporate governance
2  itself consisted of almost a thousand pages, so I don't
3  know about the 200 pages you're referring to.

4    Q.    You were involved in collecting the initial
5  disclosure; am I correct?

6    A.    You are correct.

7    Q.    And is it your testimony that of those
8  thousands of pages and hundreds of hours of videotape,
9  only those 200 documents were --

10    A.    At that time, yeah.  We had just gotten the
11  documents moved into the central warehouse as of the
Page 36

080310ab

12    middle of '07, so this was approximately a month or two

13    before the lawsuit was filed.  We had just begun

14    reviewing documents.  So as of the time the lawsuit was

15    filed, that was the information that we currently had.

16         Q.    To your knowledge, has it been supplemented?

17         A.    I don't know.  The case was stayed in --

18         Q.    May?

19         A.    -- June of '08 --

20         Q.    You are right, June of '08.

21         A.    -- for over a year and a half, so once the

22    stay was lifted, I was no longer counsel for Mirabilis.

23    I haven't been counsel for Mirabilis since May of '08,

24    May or June, thereabout.

25         Q.    When did you formally leave the employ of

42

1    Mirabilis and move to be self-employed?

2         A.    Around May or June of '07.

3         Q.    And you originally went into a law firm with

4    Mr. Goldberg; is that correct?

5         A.    That's correct.  Mr. Mokwa wasn't a licensed

6    attorney in Florida, only licensed in Texas.  So he went

7    and took the Florida Bar in the summer of '07.  So he

8    was gone for three or four months there in the middle of

9    '07.

10              MS. HAVENER:  Would you mark this as the next

11    in succession.

12              (Exhibit No. 105 was marked for

13              identification.)

14         Q.    I know you weren't at Mirabilis in February

Page 37

080310ab

15  of '05, but I want you to look at the signature, the

16  very last signature on this -- on these Minutes of the

17  Special Joint Meeting of Directors and Shareholders.

18          Am I not correct that Mr. Amodeo signed the

19  waiver and consent as the Sole Director and Shareholder

20  of Mirabilis Ventures?

21      A.    These are minutes of Mirabilis Ventures, Inc.

22  Special Joint Meeting of Director and Shareholders,

23  February 15, 2005.  And it appears stamped as

24  Document 198-2 in the Palaxar litigation, February 16,

25  2010.  And it's Page 22 of 54.  And it does appear that

43

1   Mr. Amodeo signed as Chairman and then Waiver and

2   Consent as Sole Director and Shareholder.

3       Q.    Do you have any reason to believe there's

4   something wrong with that signature?

5           MR. LOCKHART:  Object to form.

6       A.    I don't know.  I couldn't tell you.  I mean,

7   it appeared to be his signature, but I'm not him.

8       Q.    Mr. Bates, when did you meet Mr. Mokwa?

9       A.    I believe I previously testified the first

10  time I met him was when I interviewed with the company

11  sometime in February or March of 2006.  And then I

12  didn't have very much interaction with Mr. Mokwa at all

13  during 2006.  He worked in a different building than I

14  did.

15      Q.    Where did Mr. Mokwa work when you went to the

16  -- you moved from one place to SunTrust; correct?

17      A.    Yes.

18      Q.    And where did Mr. Mokwa work while you were

Page 38

080310ab

19  at AmSouth?

20      A.    I don't -- I don't know where he was at at

21  the time I was at AmSouth.  I know he was in Wachovia

22  for a while, the Wachovia Bank Building on

23  Orange Avenue.  I know that he was out in Sanford for a

24  while.  And I think a very short time out in Sanford.

25  And I think he moved into SunTrust when Mr. Burnett took

44

1   over in '07, sometime around February '07, but I'm not

2   entirely certain.

3       Q.    So you were at SunTrust before he was?

4       A.    Yes.

5       Q.    When Mr. Mokwa was at Wachovia, who else was

6   in the suite of offices?

7       A.    I don't know.  I was in Wachovia maybe twice

8   in the year I was with the company.  I think Mr. --

9       Q.    Is that where Mr. Amodeo's office was?

10      A.    Not to my knowledge.

11      Q.    Where was Mr. --

12      A.    I think he had offices there at some point in

13  time earlier, but I don't know.

14      Q.    While you were at AmSouth, where was

15  Mr. Amodeo's office?

16      A.    His office was in, I think first in Wachovia,

17  then in AmSouth, then in SunTrust 28th floor.  I

18  couldn't tell you what dates he was in which office.

19      Q.    And what was Mr. Mokwa doing in Sanford?

20      A.    I think he went out to Sanford at the very

21  end of '06 and I don't know.  I think AEM was out in

Page 39

080310ab

22      Sanford, but I'm not certain.  You have to ask

23      Mr. Mokwa.

24          Q.    When did you meet Mr. Amodeo?

25          A.    It was sometime after I was employed by the

45

1      company.  Probably within my second or third week of

2      working for Mirabilis.  I was just introduced to him

3      briefly.

4          Q.    What do you mean by briefly?

5          A.    I was just introduced, this is Mr. Frank

6      Amodeo, he shook my hand, said welcome aboard and that

7      was it.  I mean, I honestly don't recall the

8      conversation.  It was a hi, how are you doing and that

9      was it.

10          Q.    When did you get to know Mr. Amodeo better?

11          A.    It wasn't until 2007 that I had any extended

12      interaction with Mr. Amodeo.

13              MS. HAVENER:  Would you please mark that as

14          106.

15              (Exhibit No. 106 was marked for

16          identification.)

17          Q.    Again, Mr. Bates, the document speaks for

18      itself and you don't need to read into the record where

19      it came from and the case number, et cetera.

20              But am I correct that these are the minutes

21      -- or a copy of the minutes of Mirabilis Ventures, Inc.

22      Special Joint Meeting of Directors and Shareholders,

23      April 7, 2005?

24          A.    Correct.  These appear to be filed as

25      Doc. 198-2 Page 12 of 54.

080310ab

46

1      Q.     And do you recognize Frank Amodeo's signature

2   of both the Minutes and the Waiver and Consent as

3   Chairman of Mirabilis Ventures?

4      A.     He's listed as signer on -- as Chairman on

5   these particular minutes.

6      Q.     Mr. Bates, how did you first become aware of

7   the possibility of filing a lawsuit against Ms. Curry

8   and Mr. Hailstones and the Palaxar entities?

9      A.     We had a list of lawsuits and assets that was

10  compiled over the course of a year and this was just one

11  on the list.  It wasn't anything particularly personal

12  to Ms. Curry or Mr. Hailstones, it was just one on a

13  long list of lawsuits either being defended or to be

14  prosecuted that were compiled with multiple firms of

15  which I was involved.

16          And just for context, you have to understand

17  that when all of the officers and directors of the

18  company left in December '06, it was essentially the

19  wild, wild west, it was a free-for-all in terms of

20  winding down the company.

21          Like I said earlier, everybody and their

22  mother filed lawsuits against Mirabilis and its

23  subsidiaries.  So for the bulk of '07, I was involved in

24  defending 30 to 40 lawsuits against the company, the

25  bulk of which were just absolutely frivolous, which is

47

Page 41

080310ab

1   played out by the fact that most of those lawsuits went

2   away in short fashion.

3           Beginning in late '07, I would say the end of

4   the third quarter of '07, beginning of the fourth

5   quarter of '07, I began working with various other law

6   firms in pushing forward affirmative litigation to

7   recover the assets of the company.

8           MS. HAVENER:  I move to strike the answer as

9       nonresponsive.  Could you read back the question,

10      please.

11          (Question read.)

12      A.    I previously answered it was one on a long

13  list of asset-recovery lawsuits that were to be filed.

14      Q.    Who compiled the list?

15      A.    It was compiled by numerous people.

16      Q.    Could you name them, please.

17      A.    Jay Stollenwerk, Jodi Jaiman, Shane Williams.

18  Mark Burnett worked on the list at some point in time.

19  Nichole Beamer worked on the list at some point in time,

20  I worked on the list at some point in time.  I'm sure

21  Mr. Amodeo reviewed the list at some point in time.  It

22  was really just kind of a litigation spreadsheet.

23      Q.    Mr. Mokwa?

24      A.    I don't know if Mr. Mokwa.  I mean, Mr. Mokwa

25  was more in charge of selling off companies for the

48

1   first three quarters of '07 -- actually all of '07.

2       Q.    Mr. Goldberg?

3       A.    I don't know if Mr. Goldberg did either.  I

4   think Mr. Goldberg was involved in selling off

Page 42

080310ab

5    companies, too.  He helped defend some lawsuits, but he
6    was a corporate attorney.
7         Q.    Do you know which of those people that you
8    named was the one who added Ms. Curry and Mr. Hailstones
9    and the Palaxar entities to the list?
10        A.    There were multiple.  That wasn't the only --
11   I know there was essentially one on the list with regard
12   to Fox Technologies and Mr. Hailstones filed.  He was
13   listed more than once.  And I don't know if Ms. Curry
14   was listed more than once.  But that was work product of
15   the attorneys.
16        Q.    Do you know when, during the compiling of the
17   list, the idea of suing Ms. Curry and Mr. Hailstones,
18   based on Nexia certification came up?
19        A.    I don't.  It would have been sometime in the
20   middle of '07 to late '07.
21        Q.    Who researched the potential claims against
22   Ms. Curry and Mr. Hailstones?
23        A.    I know I did, I know Balch & Bingham did and
24   that was based on information given to us by
25   Jay Stollenwerk, Jodi Jaiman, Shane Williams,

                                                          49


1    Frank Amodeo.  I think Marty Flynn may have been
2    involved at that time.  I mean, at some point in time in
3    '07, Marty Flynn, Jim Sadrianna.  I mean, there was
4    still, I'd say a solid 20, 25 people involved in the
5    company at some point in time during the first half of
6    '07.  By the time this lawsuit was filed, we had
7    whittled down to a small group to wind down the

080310ab

8   companies.

9          In terms of who actually researched this, it

10  was whoever was working to collate documents in the

11  warehouse.  We asked for documents supporting the claims

12  and the allegations and they gave us the documents they

13  had at that time.

14          Q.    Who is they?

15          A.    Whoever was working at the warehouse at that

16  time.  There was multiple people.  I think Mr. Lynch was

17  out there.  I think Mr. Flynn was out there.  I think

18  Jason Brownell was one of the ones working at the

19  warehouse.  Jodi, Jay and Shane were working at the

20  warehouse.  I spent time at the warehouse off and on.

21  So before the lawsuit was filed and drafted, we asked

22  for support for the lawsuit and I believe that support

23  was provided.

24          Q.    During the process of researching the various

25  claims that you said were brought, I think you said in

50

1   the last quarter of --

2           A.    Last two quarters.

3           Q.    Last two quarters --

4           A.    Correct.

5           Q.    -- of 2007?

6           A.    The firm litigation started with

7   counterclaims and defense of litigation.  Those began as

8   early as the beginning of '07.  And the actual

9   litigation with Mirabilis as a plaintiff began in the

10  second half of '07.

11          Q.    Did you meet Elizabeth Green at any time

Page 44

080310ab

12  during '07?

13      A.    I don't recall.  I met her either at the end

14  of '07 or the beginning of '08.

15      Q.    And what was the context?

16      A.    I believe one of the subsidiaries of

17  Mirabilis was in bankruptcy and I don't recall which

18  subsidiary that was.

19      Q.    In 2007?

20      A.    Yeah.  And we were looking for bankruptcy

21  counsel to assist.

22      Q.    Was she engaged by AQMI?

23      A.    I don't know who she was engaged by.

24      Q.    You don't know whom she was engaged by?

25      A.    No, ma'am.

51

1       Q.    When did you first become aware of

2   Mr. Cuthill's involvement?

3       A.    Mr. Cuthill became involved in May of '08

4   when the company was placed into bankruptcy.

5       Q.    And before that did you have any knowledge of

6   Mr. Cuthill at all?

7       A.    No, I did not.

8             MS. HAVENER:  Please mark this as the next in

9       succession.

10            (Exhibit No. 107 was marked for

11      identification.)

12      Q.    Mr. Bates, do you recognize this document?

13      A.    It appears to be a printout from a web page

14  for palaxar.com filed multiple -- it's got different

Page 45

080310ab

15   filing marks at the top of the document in the Palaxar

16   litigation.  24-10 filed January 1st, '08 and 251-5

17   filed on May 24, 2010.

18       Q.   Who's UAM; do you know?  At the top there are

19   two case numbers.  One ends with GJK, which is

20   Magistrate Kelley and I'm curious as to who UAM is.

21       A.   I have no idea.

22       Q.   This was produced, was it not, by Mirabilis

23   to Palaxar; correct?

24       A.   I don't recall.  I do believe the website was

25   part of --

52

1       Q.   Well, it's stamped --

2       A.   -- some filing, yeah.

3       Q.   It's stamped MVI Palaxar.

4       A.   If you have the rest of the filing.  This is

5   a page out of some filing in the litigation, so I assume

6   it's been filed in the case.

7       Q.   Well, before it was filed, Mr. Bates, it was

8   produced in the case as is indicated by the mark at the

9   bottom, MVI/Palaxar.

10       A.   I see the Bates stamp.

11       Q.   And it was produced by Plaintiffs; correct?

12       A.   I don't recall what the Bates stamp for this

13   case was.

14       Q.   Well, I'm representing to you --

15       A.   That this is the Plaintiffs Bates stamp?

16       Q.   Correct.

17       A.   Then yes, if that's the case, then this was

18   produced by Plaintiffs.

080310ab

19      Q.      And it bears the date, am I correct, of
20   6/25/2007?
21      A.      That's correct.
22      Q.      So that would indicate that at least by June
23   of 2007 there was a lawsuit being considered by
24   Mirabilis and Nexia against Palaxar?
25      A.      That's a fair assessment.

53

1              MR. LOCKHART:  Object to form.
2      A.      I mean, I don't know.  This didn't come under
3   my radar until December of '07.  I didn't begin looking
4   at this case, particular case.
5              MS. HAVENER:  Could you please mark this as
6      108.
7              (Exhibit No. 108 was marked for
8      identification.)
9      Q.      Again, Mr. Bates, I know that you are not at
10   Mirabilis at the -- on the 22nd of September, 2005 when
11   this shareholders agreement appears to have been
12   prepared, but if you would look at the signature page,
13   which is on the very back.
14      A.      (Witness complies.)
15      Q.      And the signature as shareholder is
16   Frank Amodeo, proxy for shareholder.
17              Do you have any knowledge of under what
18   authority this document was signed?
19      A.      I do not.  I mean, I assume there's something
20   in the corporate governance of the company.  I don't
21   know.

Page 47

080310ab

22    Q.    Does this indicate to you in any way that the

23  shares were issued -- that any shares were issued?

24    A.    I'd have to read it.

25          MR. LOCKHART:  Object to form.

54

1           MS. HAVENER:  Actually, if we could take a

2     break.  Go off the record, please.

3           (Break taken.)

4  BY MS. HAVENER:

5     Q.    Mr. Bates, I want to move forward to the

6  events surrounding the preparation of the complaint

7  against my clients.  Who drafted the Palaxar complaint?

8     A.    I believe the first draft was completed by

9  Walter Neal, Lindsay Reese, specifically, but I could be

10  wrong.

11    Q.    And it's Lindsay Reese & Associates?

12    A.    I believe so.  She was at the time.

13    Q.    You said in your responses to interrogatories

14  that you were introduced to Balch & Bingham by a partner

15  at Bradley Arant?

16    A.    Yes.

17    Q.    Who was that?

18    A.    I don't recall.  I was looking for counsel.

19    Q.    Where did you get the name of Bradley Arant?

20    A.    I went looking for a firm in Northern

21  Alabama.  I came across Bradley Arant.  They had a high

22  rating on Martindale.  I called them.  I believe it was

23  with regard to a lawsuit filed by one of the PEO's

24  against Mirabilis, the Hancock Group.  And we needed

25  counsel in Northern Alabama.  And Bradley Arant came up.

Page 48

080310ab

55

1   They referred us to Balch & Bingham.

2        Q.    Were you considering engaging Bradley Arant?

3        A.    We were just looking for counsel.  Yeah, I

4   went to them first.

5        Q.    And did they have a conflict or just refused

6   the case?

7        A.    I don't recall.  I think it was something --

8   it was more down -- it was more within the wheelhouse of

9   Balch & Bingham.  I don't recall why they sent us to

10  Balch & Bingham.  I know they didn't take the

11  representation.  I don't recall the reason they didn't

12  take the representation.

13       Q.    When you took the steps to engage counsel in

14  Northern Alabama, why were you looking for counsel in

15  Northern Alabama to take this case?

16       A.    No, what happened is they were retained early

17  in '07 when I was handling -- defending all the lawsuits

18  that were going on.  We had attorneys all over the

19  place.  Because the company did business all over the

20  country, we had lawsuits pending in different

21  jurisdictions.

22             We worked with them for probably four or

23  five months and they seemed to be really knowledgeable

24  about what they were doing, seemed real competent to

25  handle this bulk of litigation, so we started giving

56

Page 49

080310ab

1   them more and more work and they decided to -- we

2   decided -- I decided, essentially I recommended we

3   needed larger and more competent counsel to handle the

4   bulk of cases.  It was too much for one individual to

5   handle.  Even coordinating everything.

6           So we brought Balch & Bingham in and met with

7   them and without getting into the specifics of what was

8   discussed, they decided to take a more active role in

9   the litigation.

10      Q.    And then after Balch & Bingham prepared it,

11  did you -- after Ms. Reese or Mr. --

12      A.    Ms. Reese.

13      Q.    After Ms. Reese prepared it, did you review

14  it?

15      A.    I did.  I'm sure I did.

16      Q.    Did Mr. Goldberg?

17      A.    No, I don't believe he did.

18      Q.    Did you speak with Mr. Amodeo during the

19  preparation of the complaint to get his understanding of

20  the events prior to filing?

21      A.    I'm sure I did.  I'm sure I talked to him and

22  various other people.

23          MS. HAVENER:  Would you mark these, please.

24          (Exhibit No. 109 was marked for

25          identification.)

57

1       Q.    Mr. Bates, are you familiar with this

2   document?

3       A.    I've seen it before.  It was filed by either

4   yourself or whoever was representing Palaxar, Ms. Curry

Page 50

080310ab

5   and Mr. Hailstones in early '08 I think was the first

6   time I saw this document.

7       Q.    And so when you say it's the first time you

8   saw it, were you aware of it before that time?

9       A.    No, ma'am.

10      Q.    Do you recognize Mr. Amodeo's signature on

11  the fourth line from the bottom, bottom right?  At the

12  very bottom it says date, then 7/28/07, then

13  Frank Amodeo in Edie's handwriting and above that is

14  Mr. Amodeo's signature; am I correct?

15      A.    I don't know.  There appears to be a

16  signature there.

17      Q.    It doesn't say Frank Amodeo?

18      A.    It's faded out, but yeah, maybe.  I don't

19  know.

20      Q.    Would you take the last exhibit, please, 108

21  and compare the two signatures and tell me if they don't

22  resemble each other at least?

23            MR. LOCKHART:  Object to form.

24      A.    They appear similar.  To the best of my --

25      Q.    Who researched the patent law when you were

                                                        58


1   preparing to file this suit?

2       A.    I don't recall.  I think the case was looked

3   at more from an unjust enrichment standpoint, but I

4   don't know who specifically researched it to the patent

5   law.  I know at some point it was researched by Mr.

6   Estes, Ms. Reese, maybe myself sometime in late '07,

7   early '08 when it was raised either on the motion for

                        Page 51

080310ab

8    judgment on the pleadings or the response to the motion

9    for temporary injunction.  I know at some point in time

10   it was researched because it was raised at the hearing.

11        Q.    You were still working at -- in late July of

12   '06 and August of '06 --

13        A.    Of 2006?

14        Q.    Yes -- you were still working at Mirabilis;

15   correct?

16        A.    That's correct.  I was working for either

17   Mirabilis or Earthsource Holdings.

18        Q.    Or?

19        A.    Earthsource Holdings.  I was being paid by

20   Common Paymaster.

21        Q.    Was your office located near Mr. Goldberg's

22   at that time?

23        A.    I don't know.  I know at some point in time

24   around that period of time I wasn't close to

25   Mr. Goldberg.

59

1         Q.    You mean in proximity?

2         A.    In proximity.  I wasn't even on the same

3    floor as Mr. Goldberg.  I don't know that I was in the

4    same building as Mr. Goldberg for a large portion of the

5    summer of '06, fall of '06.  I was on the 27th floor of

6    SunTrust.  I don't know if Mr. Goldberg was on the 28th

7    floor of SunTrust or if he was in AmSouth still.  I

8    don't recall.  You'd have to ask Mr. Goldberg.

9         Q.    Well, you didn't move to the 28th floor at

10   SunTrust you said until the end of 2006.

11        A.    Beginning of -- best of my recollection,

Page 52

080310ab

12  beginning of '07, end of -- beginning of '07 sometime I

13  was on the 28th floor of SunTrust.  I may have been

14  there for a very short period of time when they were

15  building out the 27th floor of SunTrust, maybe sometime

16  in mid '06.  If I was there, I wasn't there for more

17  than a week or two.

18       Q.    When you said -- we've already clarified that

19  when you said you weren't close to Mr. Goldberg, you

20  were talking about the proximity of your offices; right?

21       A.    Right.

22       Q.    Were you close to him personally?

23       A.    We were friendly.  I didn't like -- I didn't

24  fraternize with him outside of work on a regular basis.

25  I may have went to lunch with him on an every other week

60

1  basis or something like that, but we weren't

2  particularly close.

3       Q.    Do you now?

4       A.    Do I now what?

5       Q.    Do you now socialize with him?

6       A.    No.

7       Q.    How did it come about you went into

8  partnership with him?

9       A.    We had worked together pretty close

10  throughout most of '07 when the company officially shut

11  down and we continued to work on litigation.  I knew I

12  was going to go out on my own and I offered him to come

13  aboard and work with me as we continued to wind down the

14  companies.

Page 53

080310ab

15          (Exhibit No. 110 was marked for

16      identification.)

17      Q.    Before we go to 110, Mr. Bates, did you have

18  a chance to look at 108 during the break?

19      A.    What was 108?  I did.

20      Q.    And would you conclude, based on that

21  document, that shares in Mirabilis were, in fact,

22  issued?

23      A.    I don't know.  It says that in the recitals

24  that shareholders own and hold a number of shares and it

25  mentions four or five different classes of shares.  And

61

1   the owners were identified on schedules attached hereto,

2   but there's no schedules attached to the document you

3   provided me.  So from the recitals it says that shares

4   are owned and hold -- owned and held by shareholders.

5       Q.    Now, if you will turn to 110, please.

6             Do you recognize this document, Mr. Bates?

7       A.    I don't believe I've seen this before.

8       Q.    I'd like for you to take a few minutes to

9   just read it.

10      A.    Okay.

11      Q.    Okay.  When you spoke with Mr. Amodeo during

12  the time that the complaint against my clients was being

13  prepared, did Mr. Amodeo inform you that he had

14  discussed the formation of a separate company by

15  Ms. Curry in 2006?

16      A.    I don't recall.  I know there was some talk

17  either from Mr. Amodeo or from the documents that a

18  separate entity by the name of Palastar or Palaxar was

Page 54

080310ab

19    contemplated.

20         But everything I had received in terms of

21    documents showed that those bills were being paid by

22    Mirabilis and it appeared to be something affiliated

23    with Mirabilis.

24         So it fit within my general concept of what I

25    was tasked to do with, which was go out and try to

62

1     recover to the best of our ability either assets with

2     the cash equivalent of assets that had been funded by

3     the company.

4          Just for purposes of Exhibit 110, I have not

5     seen this affidavit before.

6     Q.    Well, it was filed in this case; correct?

7     A.    Yes, but I mean my attorney hasn't shown me

8     this affidavit.  I'm not on the certificate of service.

9     I don't see my attorney on the certificate of service.

10    Q.    Could you read the last answer back to me

11    just prior to the -- the second to last one about

12    Mr. Amodeo.

13         (Answer read.)

14    Q.    And what was the asset that you were

15    referring to in that answer?

16    A.    Well, from the best I can tell from the

17    documents that I had reviewed, Nexia was in the business

18    of essentially anti-fraud or early fraud detection

19    consulting.  So that's all Nexia had done for 2006.

20         And several million dollars had been pumped

21    into Nexia, both for purposes of payroll and for

080310ab

22    purposes of legal bills and for purposes of, you know,

23    other things associated with running a company.

24            And to the best of my knowledge, from what I

25    could tell, it seemed like when the company folded at

63

1    the end of '06, beginning of '07, Mr. Hailstones and/or

2    Ms. Curry walked out with potentially all of the assets

3    of Nexia, that included the goodwill of the business,

4    anything that was being worked on in '06 as it pertains

5    to Nexia and we had nothing to show for somewhere

6    between 2 and $3 million that had been dumped into the

7    company.

8        Q.    What assets are you referring to?

9        A.    I'm talking about general assets of the

10    business, not just -- you're trying to say was there a

11    desk or a vehicle, I'm talking about goodwill of the

12    business, intellectual property.  I mean, assets covers

13    a wide range of things.

14        Q.    We were speaking a few minutes ago about

15    Mr. Goldberg and you said you worked closely with him.

16    Do you recall that?

17        A.    I do.  We worked closely together during '07.

18        Q.    But not during '06?

19        A.    No.

20        Q.    Is that correct?

21        A.    Correct.

22            (Exhibit No. 111 was marked for

23    identification.)

24        Q.    I'm showing you what's been marked as

25    Exhibit 111 in this litigation.  As you can see, it is a

080310ab

64

1  Balance Sheet of Nexia Strategy Corporation prepared as
2  of July 31st, '06 at 5:09 p.m.
3      A.    That's what the document purports to say.
4      Q.    Could you show me on this balance sheet any
5  asset that you alleged in the complaint Ms. Curry and
6  Mr. Hailstones took with them?
7          MR. LOCKHART:  Object to form and I'm also
8      instructing my client not to answer that question.
9      It deals with attorney/client privilege, as well as
10     work product privilege.
11         MS. HAVENER:  Could you explain that to me?
12     This is a balance sheet.
13         MR. LOCKHART:  Yes, it is a balance sheet.
14     And now you would like him to testify as to the
15     facts to prove your case or disprove --
16         MS. HAVENER:  No.
17         MR. LOCKHART:  -- the actual case that is at
18     issue and I'm instructing him not to answer the
19     question.
20         MS. HAVENER:  I'm asked him what asset -- one
21     of the things he included in his list was the IP and
22     I was asking him to point out on this balance sheet
23     what asset constituted the IP.
24         MR. LOCKHART:  And I believe that's work
25     product privilege and I'm requesting him not to

65

Page 57

080310ab

1    answer that question.

2         MS. HAVENER:  Mr. Lockhart, are you

3    suggesting that this was prepared by an attorney,

4    the balance sheet?

5         MR. LOCKHART:  I don't know who this was

6    prepared by, but you are asking for his mental

7    impressions as to what constitutes IP on this

8    balance sheet and I'm advising him not to answer

9    that question.

10   Q.   Is it your understanding that a patent

11   application is an asset?

12        MR. LOCKHART:  Object to form of the

13   question.

14   A.   I don't know the answer to that.  My

15   understanding is that -- my understanding is that a

16   patent that's being worked on would be an asset to the

17   company.  I don't know.  I honestly don't know.

18   Q.   Do you know of any reason why a patent

19   application or patent being worked on by the company

20   would not be listed on the balance sheet?

21   A.   I don't.

22   Q.   You don't know what I mean?

23   A.   I don't understand your question.

24   Q.   If IP of a company, any company, is

25   considered to be an asset of the company, that's your

66

1    understanding as you just testified; correct?

2         MR. LOCKHART:  Object to form.

3    Misrepresentation of testimony.

4    A.   I don't believe that's what I testified to.

Page 58

080310ab

5      MS. HAVENER:   Could you read back the

6    testimony about -- that had to do with IP as it

7    relates to assets of the company.

8      (Answer read.)

9    Q.    Mr. Bates, are you aware, do you have any

10   knowledge whatsoever, that Mr. Amodeo and Dr. Pollack

11   filed for a patent in April 2005 for, quote,

12   insurance/PEO processes, close quote?

13     MR. LOCKHART:   Object to form.

14   A.    No.

15   Q.    You have no knowledge of that?

16   A.    I'm not aware of that.

17   Q.    If that were true, I want you to assume

18   hypothetically that Mr. Amodeo and Dr. Pollack indeed

19   filed for a patent in April of 2005 for, quote,

20   insurance/PEO processes, close quote.

21     Do you understand that's the premise?

22   A.    Okay.

23   Q.    Would that patent or patent application in

24   your mind be an asset of the company?

25     MR. LOCKHART:   Object to form.  Asked and

67

1    answered with regard to asset of a company in the

2    form of a patent.

3    A.    I would view assets of the company anything

4    that the company funded in terms of if it funded --

5    assets of the company would be anything that's funded by

6    the company.  So to the extent the company funded

7    payroll and the work of its employees, anything the

Page 59

080310ab

8  employees produced or created while they were employed

9  by the company and their payroll and salary is being

10  paid by the company, that would be the property of the

11  company. Generally business goodwill is something

12  that's intangible. It's hard to put your hands around.

13      Q.    You testified a few minutes ago that there

14  were several million dollars invested by the company in

15  the asset that you allege that Ms. Curry and

16  Mr. Hailstones had --

17      A.    I believe my testimony was there was several

18  million dollars involved in Nexia and what Nexia was

19  doing during 2006, based on the documents provided to me

20  by, I believe, Mr. Stollenwerk.

21      Q.    And didn't you also testify that

22  Mr. Hailstones and Ms. Curry absconded -- you didn't use

23  that word, but essentially took 100 percent of the

24  assets of Nexia with them?

25          MR. LOCKHART: Object to form.

68

1      A.    Not exactly -- I'll explain what I said. The

2  company of Nexia was essentially its employees and what

3  they were working on. I don't know. I didn't work with

4  Nexia. I didn't work with Mr. Hailstones. I didn't

5  work with Ms. Curry. What I can tell from the documents

6  and emails and what I reviewed, they were working on

7  some kind of suite of fraud consulting products,

8  services.

9          And when -- during 2006, the company, being

10  Mirabilis, Inc., funded Nexia to the tune of 2 million

11  to $4 million for the suite of whatever they worked on

Page 60

080310ab

12  and the company had absolutely nothing to show for it

13  when we went to wind down the companies and liquidate

14  assets, we had to find out what happened to that

15  $3 million and account for that $3 million.

16      Q.    When you were preparing the complaint, were

17  you aware of the existence of the three assignment

18  documents that waived any rights Mirabilis had in the

19  intellectual property of Nexia certification?

20          MR. LOCKHART:  Object to form.  Do not answer

21      that question.  Work product privilege.

22      Q.    If the assignment documents are considered to

23  be work product, does that indicate that Mirabilis

24  prepared them?

25          MR. LOCKHART:  Same objection.  I'm

69

1      instructing him not to answer that question.  You

2      are getting into his mental impressions at the time

3      he was doing this litigation when he was employed on

4      behalf of his former client.

5      Q.    His awareness of the existence of a document

6  is not --

7          MR. LOCKHART:  You can rephrase your question

8      if you think you can clean it up a little better to

9      get around my objection.

10     Q.    Mr. Bates, were you aware of the fact that

11  there were assignment documents in which Mirabilis

12  waived any right in future to --

13         MR. LOCKHART:  Same prior objection.  I'm

14     sorry, I apologize.

Page 61

080310ab

15    Q.    Where did you come up with the number of 2 to

16  $3 million?

17    A.    I was provided a spreadsheet by

18  Mr. Stollenwerk showing what had been funded to Nexia

19  during 2006 and that number, I believe, came from that.

20  Or may have been part of a larger spreadsheet.  I don't

21  really recall.

22          (Exhibit No. 112 was marked for

23      identification.)

24    Q.    Mr. Bates, do you recognize this document?

25    A.    I do not.

70

1    Q.    You've never seen it before?

2    A.    No, ma'am.

3    Q.    Were you not counsel for Wellington Capital

4  in this litigation?

5    A.    Not in this litigation, no, ma'am.  Not to my

6  knowledge.

7    Q.    Not to your knowledge?

8    A.    I don't see myself as counsel of record in

9  this case.  I was counsel in, I think I've testified

10  previously, a lot of cases.

11    Q.    Were you --

12    A.    I don't remember being counsel in the case

13  pending in Nebraska.  I do remember the case versus

14  Mr. Mapes.

15    Q.    Were you corporate counsel?

16          MR. LOCKHART:  Object to form.

17    A.    Not on February 6 of 2008, I was not

18  corporate counsel.

Page 62

080310ab

19      Q.      If you would turn to Page 73 of the

20    transcript.  And I'm representing to you that in this

21    section of the deposition the questioning is about the

22    valuation of the Alliance entities that were bought by

23    Wellington and then either were or were not transferred

24    to Mirabilis.  Are you familiar with that pattern?

25      A.      I'll go off of what you said.

                                                      71


1      Q.      And do you see that Mr. Passarelli, who

2    represented Mr. Mapes and the Alliance entities asked

3    the question of Mr. Stollenwerk -- let me go back for a

4    second.  Mr. Stollenwerk gave a 30(b)(6) deposition in

5    the case of Michael Mapes, et al versus Wellington

6    Capital Group.  Are you aware of that?

7      A.      Um.

8      Q.      Were you aware of that?

9      A.      I'm sure I was.  I know at this point in

10    time, I mean the companies were essentially wound down,

11    so all that was really left was Jay, Jodi and Shane in

12    terms of officers or director of the company.  So to the

13    extent we needed a corporate representative,

14    Jay Stollenwerk would have been that.

15      Q.      Do you see on Page 73 that you are named as

16    Wellington and Mirabilis counsel by the witness?

17      A.      It says -- yeah, then it says lastly,

18    Mr. Stollenwerk, he says -- Mr. Passarelli asked what

19    conversation are you referring to?  Mr. Stollenwerk

20    says:  That is based on three conversations, one is

21    overhearing Mr. Amodeo on the phone with a broker saying

Page 63

080310ab

22      this was going to be a transaction driven by or the

23      price was going to be determined by earnings, so I'm

24      equating earnings and net profit in my mind.  Mr. Amodeo

25      had -- in talking with him last week, had indicated it

72

1       was based upon earnings as well.  And then lastly, the

2       Wellington and Mirabilis counsel.  Mr. Passarelli asked:

3       And who is that?  And he said:  That would be

4       Aaron Bates.

5           Q.     And do you agree with that representation of

6       your role in that case?

7           A.     I would agree I was Mirabilis counsel, yes,

8       ma'am.  I wouldn't agree I was Wellington counsel in

9       this case.

10          Q.     Would you turn to Page 41 of the deposition,

11      please.

12          A.     Okay.

13          Q.     Would you read into the record, if you don't

14      mind, from Line 6 through Line 24?

15          A.     It's a question from Mr. Passarelli:  Have

16      you seen a financial statement of Mirabilis Ventures,

17      Inc.?  I assume Mr. Stollenwerk answers:  I had.  I had

18      seen one in -- I had seen one certainly in June of '07.

19      He asked, Mr. Passarelli asked:  What occasioned that?

20      Mr. Stollenwerk said:  The reason being in June of '07,

21      I was involved with the wind-down of Mirabilis, the

22      settling with creditors and winding down Mirabilis, and

23      for that reason, we secured the Mirabilis financials,

24      which were being kept in QuickBooks in which I ran

25      reports, and quite frankly, there was so much history in

Page 64

080310ab

73

1    there that did not provide a clear picture in my

2    opinion.  There was so much history in there and so many

3    people had been involved in that bookkeeping of

4    Mirabilis that we left that version of the books

5    untouched from that time period -- or close to that time

6    period.  We have not been actively using those

7    financials.

8         Q.    Would you continue to Line 7 of the next

9    page?

10        A.    So it's fair to say that at least from your

11   observation the QuickBooks database was not reliable?

12        Q.    Excuse me, you left out a word.

13        A.    Mr. Passarelli asked:  So it's fair to say

14   that at least from your observation the QuickBooks

15   database was probably not reliable?  Mr. Stollenwerk

16   answered yes.

17              Next question by Mr. Passarelli:  And that

18   observation was made by you in June of '07?

19   Mr. Stollenwerk said:  Yes, that's my opinion in looking

20   at it.

21        Q.    And Mr. Stollenwerk, in this particular

22   deposition, was a 30(b)(6) witness; correct?

23        A.    That's what it states on the cover.

24        Q.    And therefore that was the testimony of

25   Wellington Capital; correct?

74

080310ab

1     A.     That's what the deposition says, yes.

2     Q.     Do you agree with Mr. Stollenwerk's

3   assessment of the financials of Mirabilis at that time?

4     A.     I don't know.  I didn't have any involvement

5   in the financials of Mirabilis.

6     Q.     A few moments ago you testified that you

7   relied on a spreadsheet that was prepared by

8   Jay Stollenwerk to determine the assets of Nexia and the

9   company's investment in Nexia.

10    A.     Correct.

11    Q.     I'm trying to reconcile Mr. Stollenwerk's

12   impression that the books were, in 2007, in June

13   of 2007, unreliable.  And that you nevertheless relied

14   around the same time on a spreadsheet that he prepared

15   that listed the assets or -- I'm sorry, that listed

16   Mirabilis' investment in Nexia.

17    A.     Yeah, that's --

18           MR. LOCKHART:  Object to form.  Go ahead.

19    A.     That spreadsheet was based upon the bank

20   statements of the company.  That was done by

21   Mr. Stollenwerk, not based off QuickBooks, based off the

22   bank statements.

23    Q.     When the salaries of individuals were counted

24   in that 2 or $3 million assessment of the value that you

25   testified to earlier --

75

1           MR. LOCKHART:  Object to form.

2           MS. HAVENER:  I'm just laying a foundation.

3     Q.     You recall that you testified that there was

4   a list of investments by Mirabilis, prepared by

Page 66

080310ab

```
 5   Mr. Stollenwerk on which you relied, to determine the
 6   value of the investment by Mirabilis and Nexia; correct?
 7        A.    Yes.
 8        Q.    And included in those investments were the
 9   salaries of certain individuals; correct?
10        A.    I don't recall.  I would assume it had -- I
11   don't remember.  I don't have the spreadsheet in front
12   of me, but I recall there being some kind of notation
13   for payroll expended or something of that nature.
14        Q.    Do you know whether salaries, for example, of
15   Ms. Curry, were counted 100 percent toward Nexia
16   certification?
17        A.    I don't know how Mr. Stollenwerk counted
18   them.  I don't know how he counted individual employees,
19   no, ma'am.
20        Q.    Do you know how many bank accounts Mirabilis
21   had?
22        A.    Lots.  I don't have a number.
23        Q.    10?  20?  Can you give me an estimate?
24        A.    Well, you had 80 affiliates, so Mirabilis and
25   his companies had probably hundreds of bank accounts.
```

76

```
 1        Q.    How many that were just in the name of MVI?
 2        A.    I don't know.
 3        Q.    Can you give me an estimate?  5?  10?  15?
 4   20?
 5        A.    I have no knowledge.  I don't know.
 6        Q.    Did you ever receive a check from a bank
 7   account of MVI?
```

080310ab

8      A.    (No response.)

9      Q.    You or your law firm?

10     A.    I don't recall what bank or account that came

11  from.  I didn't handle the finances of the firm.

12     Q.    So when your law firm --

13     A.    I can tell you that during my employment with

14  Mirabilis, I received paychecks from Common Paymaster

15  and maybe in '07 I received checks from Mirabilis

16  because Common Paymaster stopped operating in December

17  of '06.  I don't know.  I don't have my pay stubs in

18  front of me.

19     Q.    I'm not talking about pay stubs at this

20  point, I'm talking about receipts of your law firm after

21  you had left employ of Mirabilis.

22     A.    Are you talking about our engagement

23  agreement with the company?

24     Q.    Yes.

25     A.    Who we were paid by?

77

1      Q.    Yes.  Did you receive any checks in that

2  context from a Mirabilis Ventures bank account?

3      A.    I don't know.  I'm assuming we would have.

4      Q.    What other Mirabilis or Amodeo related

5  entities would you have received checks from?

6      A.    I don't know maybe -- I don't know.

7      Q.    Did you receive any from AQMI?

8      A.    I don't recall.

9      Q.    Were you engaged by AQMI?

10     A.    For?

11     Q.    Was your law firm engaged by AQMI?

080310ab

12    A.    We represented AQMI at some point in time,

13  yes, ma'am.

14    Q.    But you don't recall if you were ever paid by

15  AQMI?

16    A.    We represented AQMI and they had litigation

17  ongoing at some point in time, so I know I filed an

18  appearance for AQMI.

19    Q.    Were you engaged by AEM?

20    A.    We were engaged -- you're asking about

21  individual subsidiaries. We were engaged by Mirabilis,

22  its affiliates and subsidiaries to help wind down the

23  company and assist in either winding down or selling off

24  companies and/or recovering assets. That would include

25  Mirabilis and all of its affiliates, if that would help

78

1  you out.

2         MS. HAVENER:  Okay.  Would you mark this as

3     the next exhibit, please.

4         (Exhibit No. 113 was marked for

5     identification.)

6    Q.    Mr. Bates, are you familiar with this

7  document?

8    A.    I'm not.  I see my name mentioned in it.

9    Q.    Is Ms. Callaghan the person whom you engaged

10  on behalf of Wellington Capital to represent that entity

11  in the litigation in Nebraska?

12    A.    Mr. Mooney, I think, was my primary contact

13  with Gross & Welch.  And I dealt with Mr. Mooney, his

14  son and I may have had conversations with Ms. Callaghan.

Page 69

080310ab

15  I know we were looking for Nebraska counsel for both

16  Mirabilis and Wellington.

17      Q.   And on the third page of the document, which

18  has an Exhibit 1 sticker at the bottom of the copy.

19      A.   Uh-huh.

20      Q.   In the second paragraph, the second full

21  sentence: My primary contact during 2007 was

22  Aaron Bates, who at that time was an attorney for

23  Wellington Capital Group in Orlando, Florida.

24          Mr. Bates retained my firm and provided us

25  with information to prepare a defense on behalf of

79

1  Wellington.

2          Have I read that correctly?

3      A.   That's what it states, yes.

4      Q.   Do you agree with that statement?

5      A.   I would agree with that.  Just to clarify,

6  because I wasn't an attorney for Wellington Capital, I

7  didn't enter an appearance in this action.  Among the

8  entities that we were winding down, Wellington was

9  involved in that, though, if litigation was brought

10  against Wellington.

11          I think this litigation may have initially

12  been against Mirabilis and Wellington and then it was

13  narrowed down to Wellington, but I'm not -- I never

14  filed an appearance in this action.

15      Q.   What's your basis for saying that it

16  originally included Mirabilis?

17      A.   Just based on my knowledge.  I mean, based on

18  my memory, I could be wrong.  I just know that

Page 70

080310ab

19    originally Mr. Mapes came to -- may have sent a letter

20    to Mirabilis or may have contacted Mirabilis.

21          Q.    Do you have any recollection of the

22    transaction which was the basis of this lawsuit?

23          A.    I wasn't involved in the acquisition of

24    Mr. Mapes' PEO.

25          Q.    Do you have any recollection of a

                                                                    80

1    circumstance in which Mirabilis was negotiating to

2    purchase the Alliance companies -- negotiating with

3    Mr. Mapes, et cetera, and then at the last minute,

4    Wellington Capital Group came in as the buyer?

5          A.    I wasn't involved in that aspect.

6          Q.    You are unfamiliar with that fact pattern

7    entirely?

8          A.    In '06 I had no knowledge of that.  In '07 I

9    may have seen documents to that effect or minutes to

10    that effect.

11          Q.    I'm talking about August 3rd, 2010.

12          A.    August 3rd, okay.

13          Q.    Do you have knowledge right now, today, of

14    that transaction I described occurred?

15          A.    I don't recall.  If you have documents

16    showing the transaction, I'm sure I could review them

17    and tell you if I've seen those documents before.

18                I can tell you that the amount of transaction

19    documents that were involved with Mirabilis, keep in

20    mind there's 80 affiliates and acquisitions, there were

21    hundreds of acquisition documents.

                           Page 71

080310ab

22      So with regard to Mr. Mapes and Wellington
23  Capital Group and the PEO involved here, I don't -- the
24  fact pattern you are asking about, I don't recall that
25  fact pattern.  I would have to see the documents.

81

1       Q.     Is Wellington Capital Group a Mirabilis
2   subsidiary?
3       A.     I think that's a company that was wholly
4   owned by Mr. Amodeo.
5       Q.     And therefore not a subsidiary or affiliate
6   of MVI?
7       A.     Not as of the time we were winding down
8   Mirabilis.  I don't know if it was an affiliate of
9   Mirabilis at some point in time.  I don't know.
10      Q.     Who was Wellington's officer and director?
11      A.     I don't know.  You'd have to review the
12  corporate governance.  I know it was owned by
13  Mr. Amodeo.
14      Q.     If you look at Paragraph 5 of this affidavit
15  -- I'm sorry, this is the affidavit of Mr. Mooney.  This
16  is a compilation of several affidavits.  Page 7 of 8.
17  If you'd review Paragraph 5.
18      A.     Okay.
19      Q.     Moreover, we recently learned about changes
20  in our client's status.  Do you see where I'm reading?
21      A.     Yes.
22      Q.     Including but not limited to various criminal
23  and civil proceedings against Frank Amodeo, Wellington's
24  sole officer and director, via online versions of the
25  local newspaper or from Plaintiffs' counsel rather than
Page 72

080310ab

82

1    from our client.

2         A.    Okay.

3         Q.    So do you agree with the statement that

4    Mr. Amodeo was Wellington's sole officer and director?

5         A.    At the time he probably was.  I don't know,

6    I'd have to see the corporate governance.

7         Q.    Do you remember in this case that there were

8    several agreements that Mr. Amodeo would appear for

9    deposition in the case and then the depositions would

10   cancel at the last minute?

11        A.    You would have to talk to Mr. Amodeo's

12   criminal counsel about that.  He was involved in either

13   not allowing Mr. Amodeo to be deposed or allowing him to

14   be deposed.  I didn't make those calls.

15        Q.    In this litigation, wasn't it you personally

16   who communicated with Mr. Mooney and Ms. Callaghan?

17        A.    Yes.

18        Q.    And was it not you who communicated to them

19   when Mr. Amodeo was available?

20        A.    Yes, I was informed he wouldn't be appearing

21   by his criminal counsel, to the best of my recollection.

22   It was two years ago.

23        Q.    You're familiar with the target letters that

24   were issued by the Assistant United States Attorney in

25   December '06?

83

Page 73

080310ab

1     A.    I've never seen them.  I know that they were

2   issued.

3     Q.    Isn't it true you were assisting with the

4   criminal defense of Mr. Amodeo early in 2007?

5     A.    No, ma'am.  I never assisted in the criminal

6   defense.  I provided information to his criminal

7   attorneys as they asked for it.

8     Q.    But you never assisted in the criminal

9   defense?

10    A.    No, ma'am.  I never filed a appearance or

11  anything in Mr. Amodeo's criminal proceedings, never met

12  with the U.S. Attorney on behalf of Mr. Amodeo, never

13  had any involvement in his criminal defense.  I was

14  solely tasked with winding down the companies.

15    Q.    You were aware, were you not, that there were

16  documents in the possession of Mr. Amodeo's criminal

17  counsel that would not be available for discovery in

18  this case?

19          MR. LOCKHART:  Object to form.

20    A.    I was aware that the documents that were part

21  of this 80, 90, 100 company conglomerate were under

22  subpoena.  And under the supervision of Mr. Slaughter

23  and Mr. Gold, those documents were being collated and

24  organized by various staff members, which I've laid out

25  previously.

84

1     Q.    And what was your involvement in that, if

2   any?

3     A.    I reviewed documents off and on.  I didn't,

4   obviously, physically move documents or organize

Page 74

080310ab

5   documents.

6        Q.    When you review documents, Mr. Bates, do you

7   do it using a computer?

8        A.    That's correct.  They had a system set up at

9   the warehouse.  I think it was CT Summation.

10       Q.    Is it your testimony that you reviewed

11   documents in CT Summation that were then contributed to

12   or conveyed somehow to Mr. Amodeo's criminal counsel?

13              MR. LOCKHART:  Object to form.

14       A.    No, I don't believe that was my testimony at

15   all.  I -- if I was asked for information regarding the

16   companies and the wind-down because Mr. Slaughter was

17   communicating with the U.S. Attorney, I would provide

18   whatever information I had available to Mr. Slaughter.

19              As far as where those documents came from, I

20   don't recall giving him documents.  To the extent I gave

21   him documents, I don't recall right now where those

22   documents came from, i.e., did they come from summation

23   or did they come from the banker's boxes at the

24   warehouse.

25              A lot of the time when Mr. Slaughter asked

                                                            85

1   for something, Shane Williams would be the one to pull

2   it, along with various staff members at Mr. Slaughter's

3   office.  As far as providing information to

4   Mr. Slaughter, if he had questions, he would often ask

5   me questions.

6        Q.    I just want to be clear about the summation

7   database.  What documents are contained in the summation

                        Page 75

080310ab

8  database?

9      A.    I don't know.

10     Q.    If not --

11     A.    I didn't put the documents in summation.

12     Q.    Is it your understanding that it is some

13 subset of the documents that are in the boxes?

14     A.    I would assume documents that are in boxes

15 are also in summation to some extent.  I don't know that

16 all the scanning took place.

17     Q.    Do you know the number of documents in

18 summation?

19     A.    I don't.  I know it's easily hundreds of

20 thousands, if not millions.

21     Q.    Are you adept at summation?

22     A.    No.  It was not fun.

23     Q.    Are you familiar with doing searches in

24 summation?

25     A.    I am.

86

1      Q.    And acquiring subsets of documents based on

2 searches?

3      A.    I am.

4      Q.    Did you ever conduct searches on behalf of

5 Mr. Amodeo's criminal counsel?

6      A.    No, not that I recall.

7      Q.    Okay.  Are you familiar with a threat or an

8 alleged threat against Mark Burnett that he could

9 conceivably be charged with money laundering?

10     A.    I may have heard Ms. Jaiman say that.

11 Mr. Burnett didn't reveal that threat to me to my

Page 76

080310ab

12    knowledge.

13         Q.    Are you familiar with a videotaped statement

14    that was given by Frank Amodeo at your offices,

15    Bates Mokwa, on May 9, 2008?

16         A.    I don't know that I was present.  I think

17    Mr. Amodeo told me about it after the fact or maybe

18    Mr. Mokwa told me about it.  I'm aware that a statement

19    exists.  I haven't read it or seen it.

20         Q.    You have not read it or seen it?

21         A.    No, ma'am.

22         Q.    Tell me again -- I'm sorry, I've lost my

23    concentration for a second.  What did you know about

24    Mr. Burnett and an alleged threat?

25         A.    I may have heard that from Jodi Jaiman.  I

87

1    don't know that I heard that directly from Mr. Burnett.

2         Q.    Did you ever hear it from Mr. Amodeo?

3         A.    No, not that I recall.

4         Q.    Was it ever reported to you by someone else

5    that Mr. Amodeo said it?

6         A.    Not that I recall.

7         Q.    If you were not involved in the criminal

8    defense of Mr. Amodeo, and the statement was given by

9    Mr. Amodeo in your offices, again Mr. Mokwa oversaw it,

10    on May 9, 2008, did it not concern you that it could

11    negatively affect Mr. Amodeo's criminal defense?

12              MR. LOCKHART:  Object to form.

13         A.    I haven't read the statement or seen the

14    statement, so I don't know.  I don't know.  Mr. Amodeo

080310ab

15   was mentally ill, so to the extent he was giving

16   videotaped statements of himself, that sounds par for

17   the course for Mr. Amodeo.  Mr. Slaughter may have very

18   well been aware of that.  You have to ask Mr. Slaughter.

19        Q.    You just mentioned Mr. Amodeo being mentally

20   ill?

21        A.    Correct.

22        Q.    What time period would you say Mr. Amodeo was

23   mentally ill?

24        A.    I found out about his bipolar disorder

25   sometime in '07.

88

1        Q.    Do you know when in '07?

2        A.    I don't recall.  Sometime early to middle of

3   '07 he may have told me about it.

4        Q.    So it was your understanding that Mr. Amodeo

5   was mentally ill during at least part of the wind-down

6   process of Mirabilis?

7             MR. LOCKHART:  Object to form.

8        A.    I know that he had bipolar disorder and that

9   it got progressively worse as the criminal prosecution

10   proceeded.  And at some point in time his criminal

11   counsel saw that he was put into treatment at Harvard.

12   And you'll have to talk to Mr. Slaughter about that.

13        Q.    Well, how frequently during the wind-down did

14   you have interaction with Mr. Amodeo?

15        A.    I would say on average every other day.

16        Q.    Did you perceive that his mental state was

17   deteriorating during that time?

18        A.    As we got near -- I mean, I'm not a doctor,

Page 78

080310ab

19    but in '08 you could tell -- the swings were

20    progressively worse.

21        Q.    What about in '07, you said you became aware

22    of bipolar illness in '07, did it manifest itself, in

23    your opinion?

24        A.    Knowing that he had bipolar disorder, in

25    retrospect, yeah, I could see it.  At the time I don't

89

1    know whether I was aware of him having good days or bad

2    days.  In retrospect you could say, yeah, he had his

3    good days or he had his bad days.

4        Q.    Well, it wasn't really retrospect, was it, if

5    you knew about his bipolar disorder in the middle of

6    '07?

7        A.    That it was getting progressively worse, and

8    once we read the reports after he came back.  I knew he

9    had bipolar disorder, I didn't know the significance or

10    severeness of it until after he went to Harvard.

11        Q.    Is it not true that Mr. Amodeo had a very

12    significant role in the wind-down of Mirabilis and

13    assessing and determining what lawsuits would be brought

14    and how certain lawsuits would be defended?

15        A.    No, generally the attorneys made those calls.

16    He was pretty differential to the attorneys in that

17    regard.

18        Q.    But he --

19        A.    In other words, if we had a lawsuit come in

20    and we defended the lawsuit, he wasn't in any way

21    involved in the decisions made with regard to the

080310ab

22    defense of the lawsuit.  With regard to affirmative

23    lawsuits that were brought, you know, in terms of

24    getting information, if I couldn't find information from

25    documents or from Jay, Jodi or Shane, I would ask him

90

1    and to the best of his ability, he would give us

2    information.

3            But it was generally our practice to make

4    sure we had multiple sources of information backing up

5    whatever lawsuits we brought.  But, I mean, if you are a

6    litigator, you know sometimes you bring to the best of

7    your ability a lawsuit and as discovery plays out, the

8    allegations change drastically.

9       Q.    I think we've gotten your testimony earlier

10   that Mr. Amodeo took over the assets of Mirabilis --

11   well, let me put it this way, that AQMI, as the secured

12   creditor, took over the assets of Mirabilis as part of

13   the wind-down of Mirabilis; correct?

14      A.    Correct.

15      Q.    And Mr. Amodeo was the sole shareholder and

16   director of AQMI; correct?

17            MR. LOCKHART:  Object to form.

18      A.    To the best of my knowledge he was, yes.

19      Q.    And during the process of winding down

20   Mirabilis in 2007, who was your client?

21      A.    The companies.

22      Q.    Could you give me a list?

23      A.    No, there's 80 Mirabilis affiliates and

24   subsidiaries.  I could go back and look at records and

25   see, but I turned over all those records to Ms. Green

Page 80

080310ab

91

1    and her firm.

2         Q.     who was your client in the determination and

3    research of this case?

4         A.     well, the entities that brought this case

5    were Mirabilis Ventures, Inc. and Nexia Strategy

6    Corporation.

7         Q.     And is it your testimony they were being

8    directed by AQMI at the time?

9         A.     At the time litigation was being brought?  I

10   think that's a fair assessment, yes.

11        Q.     And is it your testimony that AQMI was being

12   overseen by Mr. Amodeo?

13        A.     Yes, I think I've testified to that.

14        Q.     Okay.  So is it fair to say that while your

15   clients were Mirabilis and Nexia, the person from whom

16   you were taking instructions or at least checking and

17   reporting to as your client was Mr. Amodeo?

18               MR. LOCKHART:  Object to form.

19        A.     No, I wouldn't agree with that.  I took -- I

20   generally reported to and by reported I mean I would

21   give them -- let them know what was going on, it would

22   be Jodi, Jay and Shane and Frank would be involved in

23   any final determinations, i.e., are we going to settle

24   the case?  Is the case, you know, going to be dismissed,

25   et cetera?  But in terms of, hey, I'm doing this or hey,

92

Page 81

080310ab

1  I'm doing that, I would go to Jodi, Jay or Shane. They

2  were the officers or directors of the Mirabilis entities

3  at the time and they stepped in to fill that gap while

4  we wound things down.

5       So I think the more accurate description

6  would be they took their direction from Mr. Amodeo. But

7  I generally dealt with Jodi, Jay and Shane in terms of

8  issues that arose with regard to the companies.

9       If they didn't have the answer or didn't know

10  the answer to the question or didn't have the ability to

11  answer my question, then they would send me to

12  Mr. Amodeo or Mr. Amodeo would get involved.

13      Q.   You testified a few moments ago that you

14  spoke to Mr. Amodeo during this time period every other

15  day or so?

16      A.   I think on average it would be every other

17  day I talked to him.

18      Q.   If you weren't talking about the lawsuits,

19  what were you talking about?

20      A.   Talking about winding down litigation, we

21  were talking about how the litigation was progressing.

22  You have to keep in mind there were 30 to 50 lawsuits

23  ongoing at the time, so he's checking in to see how

24  things are going?  I was working 24/7 at the time, so

25  how things were going would be they're going.  That

93

1  would be the answer to his question.

2            MR. LOCKHART:  Off the record.

3            (Lunch recess taken. )

4  BY MS. HAVENER:

Page 82

080310ab

5      Q.     Mr. Bates, if you don't mind, would you

6   please, in your own words, tell me the story of the two

7   weeks leading up to your travel to Scottsdale.

8      A.     The two weeks leading up?

9             MR. LOCKHART:  Object to form.

10     A.     I don't recall -- I mean, I don't recall what

11  happened in the two weeks leading up to when I traveled

12  to Arizona.  Regarding this litigation, there wasn't

13  anything noteworthy.

14     Q.     On what date would you estimate that the

15  complaint was ready to be filed?

16     A.     I would say sometime in early October.

17     Q.     You indicated in your responses to

18  interrogatories that you found out sometime in September

19  that Mr. Hailstones was going to be speaking in Arizona?

20     A.     Correct.  I was researching how to serve an

21  alien, non-resident alien defendant and while doing

22  research on where Mr. Hailstones was currently residing,

23  I found his name in a brochure for a speaking engagement

24  and so sometime in late September I found that.

25     Q.     If documents were produced to us by Mirabilis

94

1   that indicate information about that speaking engagement

2   as early as June, is it your testimony that you did not

3   know about the speaking engagement earlier?

4      A.     I didn't know about the speaking engagement

5   until September.  I didn't even touch this case probably

6   until September.

7      Q.     And how did you get ahold of the brochure?

Page 83

080310ab

8   Where did it come from?

9       A.   It was online.  I believe I found it.

10      Q.   And what did you do at that point when you

11   found out that Mr. Hailstones was going to be in

12   Arizona?

13      A.   Well, I made the decision that I needed to go

14   out and make sure he was served while he was in the

15   states for this singular point in time.  Keep in mind he

16   was living in the UK at the time.

17      Q.   Yes.  Of course, I'm sure you're familiar

18   with the Hague Convention and the ways of serving --

19      A.   We researched that.  We found out it was

20   easier to catch him while he was in the United States.

21   It was a lot harder to serve him out-of-state -- out of

22   country.

23      Q.   Why do you believe it was necessary you

24   travel yourself to go rather than providing a picture,

25   for example, or having Mr. Zollars inquire of the

95

1   director of the conference of who Mr. Hailstones and

2   Ms. Curry were?

3       A.   I just made the decision to travel out there.

4   I didn't have a picture of Mr. Hailstones.

5       Q.   But one was available to you.  There are

6   pictures of Mr. Hailstones; correct?

7       A.   I didn't have any digital photos of

8   Mr. Hailstones that I could provide to the process

9   server.  I didn't have any photos I could provide to the

10   process server.  I made the decision independently to go

11   out there and accompany the process server.

Page 84

080310ab

12      Q.      And at that point who did you talk to about

13  it?

14      A.      I'm pretty sure I informed my client at some

15  point in time I was going out there.

16      Q.      Who was that?  What person?

17      A.      I'm pretty sure I informed Ms. Jaiman.  I may

18  have informed Mr. Amodeo.  I don't recall specifically

19  informing him.

20      Q.      What did Ms. Jaiman say?

21      A.      Nothing.  I don't recall them saying one

22  thing or another.  They didn't care.  We had multiple

23  lawsuits being served at that time, so they could care

24  less whatever decision I made in terms of service of

25  process.

96

1       Q.      And who else did you talk to about it?

2       A.      I don't recall.

3       Q.      Did you talk to your personal assistant?

4       A.      No, I didn't talk to him about going --

5   service process.  Whenever I travel somewhere, I let him

6   know I'm going to X or going to Y.

7       Q.      Did he go with you on the trip?

8       A.      He did.

9       Q.      And you not only personally served

10  Mr. Hailstones, you personally served Ms. Curry; right?

11      A.      Correct.

12      Q.      Besides Ms. Jaiman and Mr. Amodeo, before you

13  left, you did not -- you just testified that you did not

14  speak with your personal assistant or you did?

Page 85

080310ab

15   A.   About?

16   Q.   About going to Arizona.

17   A.   I speak to my personal assistant every day,

18   yeah.  If I told him I'm traveling to Arizona, he would

19   assist me in traveling to Arizona.

20   Q.   That was Mr. Grooms?

21   A.   Yes.

22   Q.   At which point did you discuss the trip with

23   Mr. Amar?

24   A.   I don't know that I ever discussed the trip

25   with him, i.e., that I'm going out there.  He called me

97

1   possibly sometime the week before the conference and

2   said he was going to go out there independently.  I

3   think I told him I don't know if that would be a great

4   idea, but he made that decision independently.  And I

5   don't know that he made his final decision until right

6   before that weekend.

7   Q.   Why did you think it wasn't a good idea?

8   A.   Because he wasn't going out there for service

9   of process.  He said he wanted to go out there and ask

10   him some questions and that wasn't in any way related to

11   what I wanted to do.

12   Q.   I'm sure you are familiar with Mr. Amar's

13   responses to interrogatories?

14   A.   I haven't sat down and read them, no, ma'am.

15   Q.   You haven't?

16   A.   No.  I've seen them.

17        MS. HAVENER:  If you'll mark this as the next

18   exhibit.

Page 86

080310ab

19          (Exhibit No. 114 was marked for

20      identification.)

21      Q.    These were served on your attorney last

22  Thursday.  You have seen them; is that your testimony?

23      A.    I think I've seen them.  I don't know that

24  I've sat down and reviewed them in detail.

25      Q.    Okay.  No. 3, the question essentially was:

98

1   Identify any individual that -- or entity that Mr. Amar

2   spoke with about going to Scottsdale.

3       A.    I'm sorry, one second.

4       Q.    It's No. 3.

5       A.    I know.  One second.  Are these signed?

6             MR. LOCKHART:  I didn't see a signature.

7       Q.    The signature page is the very last page of

8   the document.  It's on the back.

9       A.    All right.  I see No. 3.

10      Q.    Okay.

11      A.    And Mr. Amar says I discussed the possibility

12  of going to the conference in person with Frank Amodeo.

13      Q.    Okay.  I telephoned Matt Mokwa and

14  Aaron Bates to let them know that I booked my flight to

15  Scottsdale and if they were planning on going, I'd meet

16  them there.

17            Does that comport with your recollection?

18      A.    Yeah, I think I testified that he gave me a

19  call sometime within a week or so before I traveled out

20  there so that comports with that.

21      Q.    And what was Mr. Amar's reaction when you

Page 87

080310ab

22   said it wasn't a good idea?

23        A.    If you met Mr. Amar, he does what he wants to

24   do.  I wasn't inviting Mr. Amar.  If he made a decision,

25   he made a decision.  I believe I know, myself and

99

1    Mr. Mokwa said it probably wouldn't be a good idea.

2        Q.    In the next question, in the question that I

3    asked him to identify any documents that he had reviewed

4    and if so, to please identify them.

5              And in response to Question D, he indicated

6    that he has two audio video recordings of Mirabilis'

7    board April 18, 2006.

8        A.    Okay.

9        Q.    Do you see that?

10       A.    Yes, ma'am.

11       Q.    Do you have any idea what happened at that

12   particular board meeting?

13       A.    I'm sure I've seen this videotape.

14       Q.    Could you tell me what's on it, please?

15       A.    I don't recall.

16       Q.    The date means nothing to you?

17       A.    No.

18       Q.    You don't recall this video as opposed to

19   others?

20       A.    No.  There's many videos.

21       Q.    Are there many videos that support the claims

22   against Ms. Curry and Mr. Hailstones regarding Nexia

23   certification?

24       A.    I don't recall.

25       Q.    In response to Interrogatory No. 6, Mr. Amar

080310ab

100

1    says he learned about the speaking engagement of
2    Mr. Hailstones and Ms. Curry from Frank Amodeo.
3         A.    Okay.
4         Q.    Do you know who made Frank Amodeo aware?
5         A.    I don't.
6         Q.    It was not you?
7         A.    I may have made him aware.  I think I
8    testified previously that I may have told him or
9    Ms. Jaiman that I was going out to serve process at the
10   conference, so he may have been independently aware or
11   he may have been aware from me, I'm not sure.
12        Q.    And you were not staying at the
13   Scottsdale Renaissance; correct?
14        A.    No, I did not stay there.
15        Q.    Who was of the three of you?
16        A.    I believe Mr. Mokwa stayed there only on
17   Sunday night.  I remember him staying with his family
18   the rest of the week.
19        Q.    What about Mr. Amar?
20        A.    I don't know where he stayed.
21        Q.    Do you know in what capacity Mr. Amar was
22   going to Scottsdale?
23        A.    His individual capacity.
24        Q.    At the time was he an employee or shareholder
25   of Mirabilis or Nexia?

101

Page 89

080310ab

1     A.     I don't know.  I don't believe he was an

2     employee.

3     Q.     Are you aware of any interest Mr. Amar would

4     have had in this lawsuit?

5     A.     No.

6     Q.     And in the review of documents and the

7     thousands of pages of documents and hundreds of hours of

8     videotape, you don't have any idea of any relationship

9     between Mr. Amar and either Mirabilis or Nexia; is that

10    correct?

11    A.     I'm sorry, can you ask your question again?

12    Q.     In the course of your review of the thousands

13    of pages of documents and hundreds of hours of

14    videotape, you are not aware of any relationship between

15    Mr. Amar and Mirabilis or Nexia; is that correct?

16    A.     That's not what you asked.  You asked

17    previously if I was aware of a relationship at that time

18    and I said I don't believe there was a relationship at

19    that time.  Are you saying at any time?

20    Q.     Yes.

21    A.     Yeah, I believe he was an employee of the

22    company at some point in time.

23    Q.     Employee of what company?

24    A.     I don't know.  At some point in time he

25    worked with Mirabilis or one of the subsidiaries.

102

1     Q.     Did you ever work closely with Mr. Amar?

2     A.     No.

3     Q.     Do you know if Mr. Mokwa and Mr. Amar worked

4     closely?

Page 90

080310ab

5     A.   I don't know.

6     Q.   I think it was in your interrogatories that
7 you responded that you had dinner on the night before
8 with Mr. Mokwa and Mr. Yates on October 14th, 2007?

9     A.   Yeah, to watch a football game.

10    Q.   Do you recall any conversation that occurred
11 at that dinner about what you expected to happen the
12 following day?

13    A.   No, there was no conversation about what we
14 expected to happen that following day.  I expected to
15 serve process and leave town.

16    Q.   You also said in your interrogatories that
17 you reached out to Mr. Mokwa to ask him about a football
18 game?

19    A.   Yeah.

20    Q.   And how long in advance of your trip did you
21 speak to Mr. Mokwa?

22    A.   It was within two to three weeks of my trip.

23    Q.   Did you tell him at the time that you were
24 going out there for the purpose of serving
25 Mr. Hailstones and Ms. Curry?

103

1     A.   I'm sure I did.  He would probably ask why I
2 was going to Arizona.

3     Q.   And do you remember any further conversation
4 with Mr. Mokwa --

5     A.   No.

6     Q.   -- at that time?

7     A.   It was solely about I knew his dad was a

080310ab

8   professor at Arizona State, so I was asking him if he

9   could get me tickets to the football game that weekend.

10      Q.   How did you get Mr. Zollars' name?

11      A.   I think I asked my paralegal to get a process

12   server in Phoenix and he was just a random find.

13      Q.   You indicated in your interrogatories you did

14   not receive any fees with respect to your travel to

15   Arizona and the service of process; is that correct?

16      A.   I'd have to see my interrogatory responses.

17   Do you have it?

18      Q.   This is the only copy we have.  It was served

19   on us this morning.  I'm just looking for the right one.

20   Oh, sorry, just skip that for the time being.

21           What interface did you have, if any, with

22   Mr. Bob O'Malley?

23      A.   For what?  I mean, can you -- what do you

24   mean?

25      Q.   Do you know Mr. O'Malley?

                                                      104


1       A.   I do.  I met him.

2       Q.   Who is he?

3       A.   In '07 he was an employee of Ron Sachs.

4       Q.   And in what context did you meet him?

5       A.   He was the individual tasked with providing

6   press advisory services to various Mirabilis affiliates

7   during the wind-down.

8       Q.   And who provided the information to

9   Mr. O'Malley that he then disseminated in press

10   releases?

11      A.   I would assume Ms. Jaiman, Mr. Stollenwerk,
                    Page 92

080310ab

12    Mr. Williams or Mr. Amodeo.  I know that I possibly

13    reviewed press releases, but I never provided him

14    information.

15         Q.    Did you review the press release that was

16    going out in connection with the filing of the Palaxar

17    lawsuit?

18         A.    I don't recall.  Possibly.

19         Q.    When is the last time you saw Mr. Amodeo?

20               MR. LOCKHART:  Object to form.

21         A.    Sometime in late '09.

22         Q.    Did you visit him in the prison?

23         A.    I did.

24         Q.    Under what circumstances?

25         A.    As far as?

105

1          Q.    Was it as an attorney/client or a friendly

2     visit?  In what capacity were you visiting?

3          A.    It was a friendly visit.

4          Q.    Are you familiar with Mr. Slaughter?

5          A.    I am.

6          Q.    Have you worked with him?

7          A.    In what capacity?

8          Q.    In any capacity.

9          A.    I've worked with him in the course of

10    Mr. Amodeo's case.

11         Q.    And what kind of work did you do with him in

12    Mr. Amodeo's case?

13         A.    I've already provided that information to

14    you.  I answered his questions as he had questions.

Page 93

080310ab

15      Q.      Did you conduct any document review?

16      A.      For what?

17      Q.      For Mr. Slaughter.

18      A.      Not at Mr. Slaughter's behest, I don't

19  recall.

20      Q.      At Mr. Amodeo's request?

21      A.      No, I reviewed documents as far as winding

22  the companies down, trying to piece back together what

23  occurred.

24      Q.      Who retained Ron Sachs Communication?

25      A.      I don't know.

106

1       Q.      Was it any cause of concern for you that

2   Mr. Amodeo was dealing with Mr. O'Malley at a time when

3   you knew that he was bipolar?

4               MR. LOCKHART:  Object to form.

5       A.      No, not at the time.  He appeared pretty

6   lucid at the time.

7       Q.      Did your co-counsel in any of the cases ever

8   raise any concerns about Mr. Amodeo's conduct as regards

9   mood swings or any symptoms of his bipolar disorder?

10              MR. LOCKHART:  Object to form.

11      A.      I don't know that I can testify as to what

12  conversations I had with my co-counsel.

13      Q.      Did Jodi Jaiman ever raise any concerns about

14  Mr. Amodeo's behavior?

15              MR. LOCKHART:  Object to form.

16      A.      Can I answer?

17              MR. LOCKHART:  Read the question, please.

18              (Question read.)

Page 94

080310ab

19          MR. LOCKHART:  No.  I'm going to instruct him
20     not to answer.
21          MS. HAVENER:  On what grounds?
22          MR. LOCKHART:  On the grounds that it's going
23     to attorney/client privilege and possibly work
24     product privilege, also.
25     Q.     Was Ms. Jaiman your client?

                                                      107

1      A.     Ms. Jaiman was an officer and director of
2 Mirabilis.
3      Q.     Was she your client individually?
4      A.     As an agent of the company.
5      Q.     But never in her individual capacity?
6      A.     I don't recall.  I may have represented her
7 individually after '08 in a personal matter, yes.
8      Q.     You met Mr. Zollars along with Mr. Mokwa and
9 Mr. Amar on the morning of the 15th of October, 2007;
10 correct?
11     A.     Yes.
12     Q.     What was said during that conversation?
13     A.     I don't recall anything specifically, just
14 said that, you know, the conference was set to begin
15 later on that morning, I think 9:00 or 9:30, that we
16 wanted to serve process as they were coming in for
17 breakfast.
18          And essentially we specifically stated that
19 we wanted to make sure a scene wasn't made.  And he
20 expressed the same concern.  So we made sure he was
21 aware of that.

080310ab

22          I came out of the back, and just by

23  happenstance they were coming out of the parking lot,

24  Ms. Curry and Mr. Hailstones.  I pointed them out to the

25  process server and he went out and served them.

108

1       Q.    And was there any scene?

2       A.    No, not at all.

3       Q.    Did Mr. Mokwa have a copy of The Orlando

4   Sentinel from the Saturday?

5       A.    I believe he had a folded-up copy he picked

6   it up at the airport on the way out.

7       Q.    Do you remember what the headline was?

8       A.    I have to look at my interrogatory response.

9   I believe I looked it up.  I think it was Mirabilis lost

10  at least 220 million.

11      Q.    Do you have a copy of your interrogatory?

12      A.    No, I have the previous one you had for

13  Mr. Amar.

14      Q.    If you want to refer to these in responding

15  to anything I ask you.  Would you read, please the

16  question that I asked Mr. Amar, No. 18:  Please describe

17  in your own words every detail that you can remember

18  about the morning on which the service of process in the

19  instant suit occurred, including but not limited to

20  identifying any and all persons whom you met, describing

21  any conversations that you had that included any or all

22  of yourself, Mr. Mokwa, Mr. Bates and/or Mr. Thomas

23  Zollars and any subset -- and/or any subset of the same.

24          Please state whether any member of the

25  above-named group carried a copy of any date's edition

Page 96

1    of The Orlando Sentinel.  Please identify such person,

2    any and all words exchanged among you, Mr. Mokwa,

3    Mr. Bates, Mr. Hailstones and Ms. Curry.

4            Would you please read Mr. Amar's answer to

5    subquestion D into the record?

6        A.    Mr. Amar states Ms. Curry approached me and

7    gave me a hug.  She asked is -- it's cut off, is

8    something Yaniv Amar?  I responded:  This is not a

9    social call, end quote.  She then became -- I assume

10   that's offensive and explained why she believed the

11   Nexia software was hers.  I cut her off and said:  I

12   could care less about the software or the legal dispute,

13   end quote.

14           Ms. Curry looked surprised and asked me what

15   I was doing there.  I then responded with a question:

16   Here you are, marketing yourself as a global expert in

17   early fraud detection.  Where the -- there's an

18   expletive there -- was your expertise while the 220

19   million Mirabilis fraud was occurring, question mark,

20   end quote.

21           Ms. Curry then responded with a gleeful

22   smile:  Well, we'll just let Randy decide about that.  I

23   then remark, quote, wow, you're on a first name basis

24   with the Assistant U.S. Attorney, end quote.  I don't

25   recall the specifics of her question to Mr. Mokwa

110

080310ab

1  regarding the newspaper particle.  I don't recall any

2  exchange of words between Frank Hailstones and I.

3       Q.    Do you take issue with any of that response?

4             MR. LOCKHART:  Object to form.

5       Q.    Do you disagree with any part of that

6  response?

7             MR. LOCKHART:  Same objection.

8             MS. HAVENER:  What's the basis for the

9       objection?

10            MR. LOCKHART:  Well, we've already

11       established that these are the interrogatories of

12       Mr. Amar.  They speak for themselves.  That's

13       Mr. Amar's recollection.

14            MS. HAVENER:  Yes, but I'm asking if

15       Mr. Bates disagrees with them.  So I'm asking

16       Mr. Bates' recollection of the same conversation.

17       Is it still objectionable?

18            MR. LOCKHART:  I'll keep my same objection on

19       the record.

20       A.    I don't recall the not a social call part.  I

21  don't recall her stating anything about the Nexia

22  software being hers, Ms. Curry that is.  Everything else

23  seems to be what I recollect happened.

24       Q.    And you don't refer to that as a scene?

25            MR. LOCKHART:  Object to form.

111

1       A.    No.  I mean, Ms. Curry and Mr. Hailstones

2  came up and hugged Mr. Amar and it was very amicable,

3  like a conversation that you and I are having right now.

4  There was no loud voices.  It was just a conversation

Page 98

080310ab

5    with any group of people in the parking lot.

6        Q.    Of all the lawsuits that you were involved in

7    as plaintiff or on behalf of Mirabilis or any of its --

8    of the Mirabilis or Amodeo related entities, or

9    counterclaims in such actions, how many times did you

10   personally serve your opposing party?

11        A.    None.

12        Q.    Did I understand you to testify that Mr. Amar

13   went to Arizona because he wanted to talk to you?

14        A.    No.

15        Q.    Are you aware of Mr. Mokwa ever personally

16   serving anyone else in the same cases that I asked you

17   about a few moments ago?

18        A.    I'm not aware.

19        Q.    You don't know the answer?

20        A.    I don't know.  I'm not aware of that.

21        Q.    When the event had been completed, did you

22   make any telephone calls?

23        A.    No.

24        Q.    Did you speak with anyone back in Orlando?

25        A.    No.  I'm sure I did when I got back.

                                                 112

1        Q.    Who did you speak to when you got back?

2        A.    I don't recall.  But I'm sure I told Jodi or

3    someone that process was served.

4        Q.    You didn't call Mr. Amodeo?

5        A.    No, I didn't call Mr. Amodeo.

6        Q.    Mr. Amar stated in his interrogatories that

7    when he was at the Phoenix airport awaiting for his

080310ab

8   flight back to Miami, he did, in fact, telephone

9   Mr. Amodeo and relayed the events to him.

10      A.   Okay.

11      Q.   Were you aware of that?

12      A.   Not before you just read it or before I read

13   it in the interrogatory responses.  I didn't travel back

14   to the airport with Mr. Amar.

15      Q.   Yes, I understand.  You said before, if I'm

16   correct, that all three of you were on different

17   flights; correct?

18      A.   Correct.

19      Q.   When did Mr. Mokwa go, if you know?

20      A.   When did he go where?

21      Q.   To Phoenix?

22      A.   I believe he left on Saturday, the 13th.

23      Q.   You left the day before?

24      A.   Right.

25      Q.   Why?  Why did you go on the 12th?

113

1      A.   I always try to book in advance.  It's hard

2   for me to travel and I book my ticket.  I was the first

3   to book my ticket.  So I booked it to fly in Friday

4   night.  I wanted to go to the football game on Saturday.

5      Q.   Was that a day game or night game?

6      A.   Night game -- I think afternoon game,

7   probably 4:00 kick-off or something.  I don't really

8   recall.  So I got in late Friday night, went to the

9   football game on Saturday.

10      Q.   Bear with me for a few moments.  When you

11   book your travel, I see that attached to your

Page 100

080310ab

12   interrogatory answers, which that's my only copy --

13       A.    You need them back?

14       Q.    I need them back at some point.  But it

15   appears you made the reservations through Orbitz; is

16   that right?

17       A.    That's what the receipt shows.  I don't

18   recall making that reservation.  I had to go look.

19       Q.    Did you buy a ticket for Mr. Grooms?

20       A.    At the time?  I'm sure I did.  That's always

21   my standard operating to make sure I book a ticket for

22   myself and the attendant and then depending on the

23   airline, sometimes the attendant is comped, sometimes

24   they are not.  I don't recall if he was comped on this

25   flight or not.

114

1        Q.    When you check in for a flight -- when you

2    travel, do you take your wheelchair with you?

3        A.    I do.

4        Q.    How do they deal with the battery?

5        A.    As long as --

6              MR. LOCKHART:  Object to form.

7        A.    I'm sorry.  As long as it's a dry-cell

8    battery, I believe the battery remains on the chair.

9        Q.    And is the chair put in the hold of the

10   plane?

11       A.    That's correct.  I'm carried on the plane by

12   the attendant and they take the chair at the gate and

13   put it in the belly of the plane.

14       Q.    You have to use an aisle chair?

Page 101

080310ab

15    A.    I don't use an aisle chair.  I'm lifted and
16   carried in.  Aisle chairs aren't made to support me or
17   my disability.  Sitting in that is just like dropping a
18   rag doll into something and it just doesn't work.
19    Q.    Is it your belief that security is more
20   difficult for you, rather than an able-bodied person?
21    A.    No.
22         MR. LOCKHART:  Object to form.
23    Q.    Could you describe the security procedure
24   when you are checking into a flight?
25         MR. LOCKHART:  Object to form.

115

1    A.    I go through security and they pat me down
2   and I go on.  I mean, I don't --
3    Q.    How do they check the wheelchair and its
4   contents?
5         MR. LOCKHART:  Object to form.
6    A.    They look at it.  I mean, I don't know.  I'm
7   not familiar with what their protocol is.  I know they
8   check the chair out, they check me out, they send me
9   through.
10    Q.    You don't find that it takes longer for you
11   than somebody else?
12    A.    Not at all.  Actually it's quicker for me.
13    Q.    The actual security process itself --
14    A.    Yes.
15    Q.    -- is quicker for you or the fact you don't
16   have to wait in line makes it quicker for you?
17    A.    The whole process is quicker.
18    Q.    So you don't find it difficult to travel?

080310ab

19          MR. LOCKHART:  Object to form.

20          A.    It's very difficult to travel.  But I don't

21    find the security makes it difficult to travel.

22          Q.    Given the difficulty in traveling, did you

23    not think that someone else who was not necessarily

24    counsel in the case would have been a more appropriate

25    choice to accomplish service of process?

116

1          A.    Because something is difficult doesn't mean I

2    don't do it.  I think you are implying because something

3    is difficult somebody else should do it.  Everything is

4    difficult.  Getting up in the morning is difficult for

5    me, that doesn't mean I ask somebody else to get up and

6    do my job.  No, I don't think I would ask anybody else

7    to go.

8          Q.    It didn't occur to you that someone from

9    Balch & Bingham could go?  It didn't occur to you that

10    Mr. Goldberg could go?

11          A.    No, actually it didn't occur to me.  I went

12    on my own and --

13          Q.    Once you knew that Mr. Amar was going, you

14    still believed it was necessary for you to go?

15          A.    Yeah, at that point my ticket was booked and

16    Mr. Amar wasn't going out there to assist the process

17    server.  He was going out there on his own accord.

18          Q.    You said just because something is difficult,

19    it doesn't mean you don't do your job?

20          A.    I said because something is difficult,

21    doesn't mean I don't do it.  And then I further said,

Page 103

080310ab

22   akin to me saying because it's difficult for me getting

23   up in the morning, someone else should do my job.  No, I

24   get up and I do my job.  As a specific answer.

25        Q.    Is it your job to serve process on opposing

117

1    parties?

2              MR. LOCKHART:  Object to form.

3         A.    I don't know that I can -- that's what a

4    process server is for.

5         Q.    In your entire career, have you been involved

6    in the service of process on an opposing party?

7         A.    I don't believe I have.

8         Q.    In your entire career, have you ever heard of

9    any other lawyer who's counsel to a case being involved

10   in service of process?

11        A.    Yes.

12        Q.    Can you tell me of that situation?

13        A.    It used to happen a lot up in Virginia when I

14   worked up there.

15        Q.    Given the importance of this asset that you

16   were suing Ms. Curry and Mr. Hailstones with reference

17   about, is there some reason why you, as counsel for the

18   Plaintiffs, did not -- or chose not to issue a cease and

19   desist letter?

20             MR. LOCKHART:  Object to form.  Don't answer

21        that question.  It calls for work product.

22        Q.    Was there anything that barred you from

23   picking up the phone and calling Ms. Curry?

24             MR. LOCKHART:  Same objection.

25             MS. HAVENER:  That question was worded a
                              Page 104

080310ab

118

1     little bit differently.  I asked if there was

2     anything that prevented him, that barred was the

3     specific word, that prevented you from calling

4     Ms. Curry.

5          MR. LOCKHART:  Same objection.

6          MS. HAVENER:  Is it your position that's

7     privileged?

8          MR. LOCKHART:  Oh, most definitely because

9     the bar could be anything under the sun, whether it

10    be conversation with his client, something he saw or

11    reviewed or his own thoughts that he, himself,

12    barred himself from calling.  So same objection,

13    same response, don't answer.

14         MS. HAVENER:  The only person who could

15    possibly know that is Mr. Bates himself.  And if

16    it's privileged, I will accept his representation

17    that it's privileged.  If it's not, I think you

18    should answer the question.

19         MR. LOCKHART:  Okay.  I made my objection,

20    I've given my instruction to my client.  Don't

21    answer the question.

22    Q.   Are you going to follow your lawyer's advice?

23    A.   Yes.  Yes, I am.

24    Q.   When the motion for preliminary injunction

25    was filed in this case, you will recall -- or do you

119

080310ab

1   recall that there was an affidavit that accompanied the

2   motion that was signed by Jodi Jaiman?

3       A.   I do recall that.

4       Q.   Did you have anything to do with assisting in

5   drafting that affidavit?  I'm not asking about

6   communications, I'm simply asking if you had anything to

7   do with it?

8       A.   Yes.

9       Q.   Are you aware that some eight to nine months

10  later, Ms. Jaiman signed another affidavit that

11  accompanied Mr. Gold's motion to intervene in this case

12  and his motion for -- to dismiss based on bad faith

13  filing in the bankruptcy.

14           Are you familiar with that affidavit?

15      A.   I'm not familiar with that affidavit.  I'm

16  aware of it.  I'm not familiar with it.  Can I take a

17  break?

18           MS. HAVENER:  Sure.

19           (Break taken.)

20           (Exhibit No. 115 was marked for

21      identification.)

22  BY MS. HAVENER:

23      Q.   Mr. Bates, do you recognize Exhibit 115?

24  Please go all the way through it.

25      A.   Okay.

120

1       Q.   You've had a chance to review that document,

2   Mr. Bates?

3       A.   I have.

4       Q.   If you could turn to Pages 4 and 5 of the

Page 106

080310ab

5    affidavit -- first of all, do you recognize the

6    document?

7         A.    I do not.

8         Q.    We spoke before about a statement that

9    Mr. Amodeo had made -- a sworn statement that he had

10   made on the record and you indicated that you had not

11   been present.  Do you recall that testimony?

12        A.    Yes.

13        Q.    At Page 4, I just want to point out at

14   Line 14 that the antecedent to the testimony that we're

15   about to go over is last May.  Do you see that?

16        A.    Okay.

17        Q.    And then if you go immediately across the

18   page to Page 5, Line 9.

19        A.    Okay.

20        Q.    In the year that has followed, so in other

21   words the year that followed May 2007, is that -- am I

22   correct in that?

23        A.    Okay.

24              MR. LOCKHART:  Object to form.

25        Q.    Approximately the same day that I seized

                                                    121


1    Mirabilis' assets through execution of a UCC-1 properly

2    perfected by AQMI Strategy in 2004 and since that day I

3    have managed the liquidation of Mirabilis and all of its

4    entities.  Do you disagree with that?

5         A.    Disagree with what?

6         Q.    With Mr. Amodeo's statement that he has

7    managed the liquidation of Mirabilis and all of its

                          Page 107

080310ab

8   entities?

9        A.    No.

10       Q.    So Mr. Amodeo did manage the liquidation

11   process between May 2007 and May 2008?

12       A.    Mr. Amodeo, along with Mr. Stollenwerk,

13   Mr. Williams and Ms. Jaiman.

14       Q.    And several other people, correct, and that

15   includes you?

16       A.    I think he mentioned that I was an attorney,

17   but yeah, I managed the litigation side of the

18   liquidation wind-down.

19       Q.    On Page 7 of the affidavit, Mr. Amodeo goes

20   to great lengths to say that the government refused to

21   take possession of the documents, Lines 11 to 22.

22       A.    Okay.

23       Q.    Did you participate in any conversation with

24   the government in which they indicated that the

25   government would not take possession of the documents?

122

1        A.    No.

2        Q.    Was there any document that you are aware of

3    that was unavailable to you beginning in May '07 until

4    now, until you stopped being counsel for Mirabilis and

5    Nexia in this case?

6        A.    I'm sorry, could you rephrase the question?

7        Q.    Is there any document that you are aware of

8    or any subset of documents that was unavailable to you

9    to review between May '07 and December of '09 when you

10   stopped being Mirabilis' and Nexia's counsel?

11       A.    I don't know.  I don't know if all the

Page 108

080310ab

12    documents were there or not.

13        Q.    Are you aware of Mr. Dean Amodeo having

14    possession of any documents?

15        A.    No.

16        Q.    And if you'll turn to Appendix 6.  The reason

17    that these documents are together is that they appeared

18    together in an appeal that Mr. Amodeo filed pro se.

19        A.    Okay.

20        Q.    Disregarding the cover page, Appendix 6, I

21    would like you to go to the fourth page of this

22    document.

23        A.    Okay.

24        Q.    The first full paragraph begins this plan at

25    the same time.

123

1        A.    Okay.

2        Q.    Would you look at the next paragraph after

3    the one I just opened with.

4        A.    Okay.

5        Q.    The falsity of the plea has been

6    independently confirmed by two other attorneys,

7    Aaron Bates and Matt Mokwa.  Do you agree with that?

8        A.    I can't answer that question without getting

9    into conversations I had with other attorneys, so I

10    can't answer that.

11        Q.    Well, the privilege has been waived by

12    Mr. Amodeo's having published this.

13        A.    I don't know that Mr. Amodeo released

14    Mr. Slaughter or any of his other attorneys to discuss

Page 109

080310ab

15  these conversations, so until I have an independent

16  waiver of the privilege, I'm not going to talk about

17  conversations I had with Mr. Slaughter.

18      Q.    So if it was a privileged conversation, in

19  what way was it privileged?  Was Mr. Amodeo your client?

20      A.    At some point in time he was.

21      Q.    In the criminal action?

22      A.    No, ma'am.

23      Q.    Now, you did review the plea agreement;

24  correct?

25      A.    I don't recall if I reviewed it or I spoke to

124

1   Mr. Slaughter and Mr. Phillips about it, but I don't

2   recall.

3       Q.    And you knew the plea agreement to be false;

4   is that correct?

5             MR. LOCKHART:  Object to form.

6       Q.    Did you believe that the plea agreement was

7   false?

8       A.    What plea agreement?

9       Q.    Mr. Amodeo's plea agreement.

10      A.    Which one?

11      Q.    Mr. Amodeo's plea agreement in the case U.S.

12  versus Amodeo.

13      A.    I don't believe -- the one that's been signed

14  and filed, no, I didn't believe that to be false.

15      Q.    So you disagree with Mr. Amodeo's statements

16  in this appendix?

17      A.    If it relates to the plea agreement that was

18  entered, yes.

Page 110

080310ab

19    Q.    How many plea agreements did you review?

20    A.    I was -- can I answer that?

21         MR. LOCKHART:  Hold on.  Let me think about

22    it.

23    Q.    Let me put it this way, how many plea

24    agreements are you aware of?

25         MR. LOCKHART:  Same question.

125

1         MS. HAVENER:  No, I'm sorry, a plea agreement

2    is entered in open court.  His awareness of it is

3    certainly not privileged.

4    A.    I'm aware of multiple drafts of one.

5    Q.    Okay.  And you did review drafts of it?

6    A.    Did I review drafts of it?  I've seen drafts,

7    I wouldn't say I reviewed drafts.

8         MS. HAVENER:  Would you mark that as 116.

9         (Exhibit No. 116 was marked for

10    identification.)

11    Q.    Do you recognize this document, Mr. Bates?

12    A.    I don't recognize this document.

13    Q.    Do you see that it was filed in this case

14    this year?

15    A.    I do.

16    Q.    But you haven't reviewed it before?

17    A.    I don't independently recall this document.

18    Q.    Do you see where in the second indented

19    paragraph:  Further resolved, that the Board of

20    Directors do hereby authorize Frank L. Amodeo to waive

21    the attorney/client with Mr. Berman and BKR in

Page 111

080310ab

22    connection with their -- that's Berman, Kean & Riguera,

23    I think, do you agree?  Do you know any other BKR?

24         A.    That's what the document says, the law firm

25    of Berman, Kean & Riguera, BKR.

126

1         Q.    Okay.  In connection with their

2    representation of the following subsidiary and/or

3    affiliated companies.  And then there's a list that

4    includes Nexia Strategy Corporation.

5         A.    Okay.

6         Q.    And it's dated November 21st, 2007.

7         A.    Okay.

8         Q.    Signed by directors Shane Williams and

9    Jay Stollenwerk.

10        A.    Okay.

11        Q.    So am I correct in my conclusion from this

12   document that the attorney/client privilege between

13   Mr. Berman and BKR and the companies in that list is

14   waived?

15             MR. LOCKHART:  Objection.  Calls for a legal

16        conclusion.

17        Q.    You can answer.

18        A.    That's what the document says.

19        Q.    And it's signed by Shane Williams and

20   Jay Stollenwerk as directors; correct?

21        A.    That's what the document appears to say.

22        Q.    So as counsel for MVI, even though this

23   purports to waive the attorney/client privilege, you are

24   not aware of it?

25        A.    I don't recall this document.

Page 112

080310ab

127

1          (Exhibit No. 117 was marked for
2      identification.)
3      Q.    Mr. Bates, are you familiar with this
4  document?
5      A.    I'm not familiar with this document.
6      Q.    This document, I'm representing to you, was
7  filed in the bankruptcy case as part of Randy Gold's
8  Motion to Dismiss for bad faith filing.
9      A.    Okay.
10     Q.    I'd like to go through it, if you don't mind.
11  I'd like -- No. 2, I'm going to read into the record:
12  I, that is Jay Stollenwerk, know the information
13  contained in the following paragraphs through
14  conversations with Frank L. Amodeo (Amodeo);
15  Shane Williams (Williams); Jodi Jaiman (Jaiman);
16  Scott Shuker, Esquire (Shuker); and Elizabeth Green,
17  Esquire (Green), who are partners in the law firm of
18  Lantham -- it should say Latham, Shuker, et al, and/or
19  Aaron Bates, Esquire (Bates) and Matthew Mokwa, Esquire
20  (Mokwa).  Bates and Mokwa were previously inhouse
21  counsel of Mirabilis Ventures, Inc. (Mirabilis) and are
22  partners in the law firm of Bates and Mokwa.  Once they
23  formed their firm, almost all of Bates and Mokwa's work
24  consisted of representing Mirabilis at the behest of
25  Amodeo.  Did I read that correctly?

128

Page 113

080310ab

1    A.    That's what the document says.

2    Q.    Is there anything that you disagree with in

3    that paragraph?

4    A.    Just the last sentence.  I would wouldn't say

5    all of our work consisted of representing Mirabilis at

6    the behest of Amodeo.  A majority of our work consisted

7    of that and I wouldn't say it was at the behest of

8    Amodeo, it was at the behest of Mirabilis and whatever

9    entity we were representing.

10   Q.    And at the behest of Mirabilis -- well, I

11   think we've already gone through the -- (cell phone

12   ringing) -- I'm sorry.

13         I think we've already gone through the

14   syllogism that by this time the assets of Mirabilis had

15   been seized by AQMI; correct?

16   A.    If that's what -- yeah.

17   Q.    And that AQMI is essentially -- well, is

18   controlled entirely by Frank Amodeo; correct?

19   A.    Okay.

20   Q.    So if you're managing litigation for

21   Mirabilis, you would be, by definition, be doing it at

22   the behest of Amodeo.  Am I wrong somehow?

23         MR. LOCKHART:  Object to form.

24   A.    Yeah, I believe I previously testified that I

25   did it at the direction of Mirabilis and Amodeo was

129

1    controlling Mirabilis at the time.

2    Q.    Paragraph 3, Amodeo was the person that

3    controlled the above-referenced companies, as well as

4    Hoth Holdings, Inc. and others.  Do you agree with that?

Page 114

080310ab

5      A.     I'll disagree with that.  There's no time
6  constraint on that.

7      Q.     Well, can I say that's limited to the time
8  period beginning in 2007?

9      A.     I don't know if the document says that.
10  There's no limitation on time.

11      Q.     The time periods are set forth on the first
12  page.  From March 14, 2007, and the last date is May 23,
13  2008.

14      A.     Those just say when he was a member of the
15  board of directors.

16      Q.     Right.  I'm suggesting that that is the time
17  period that this affidavit refers to.  Is that not a
18  safe conclusion?

19           MR. LOCKHART:  Object.  Asked and answered.

20      A.     Yeah, I don't get that from the document.
21  But if you want to propose that, okay.

22      Q.     What time limitation would you put on
23  Paragraph 3?

24      A.     I don't know.  I didn't write this.

25      Q.     You said there should be a time limitation.

                                                          130

1      A.     I said there was no time limitation on this.

2      Q.     Were you not implying that there should be a
3  time limitation on that sentence?

4      A.     No.  I don't know, you'd have to read back
5  the question.  You asked me a question.  I said I
6  couldn't answer because there was no time limitation on
7  the paragraph.

                         Page 115

080310ab

8      Q.     Okay.  Do you agree that Amodeo was the

9  person who controlled the above-referenced companies,

10  which are in that list, as well as Hoth Holdings, Inc.

11  and others from May 2007 onward?

12      A.     I would say from May 2007 to May 2008, yes.

13      Q.     Okay.  Number 4.  One of my

14  responsibilities -- in other words Jay Stollenwerk's

15  responsibilities -- was to gather documents so that

16  Amodeo and his defense attorneys could provide documents

17  to the United States pursuant to grand jury subpoenas

18  which were executed in late 2006.

19             Were you one of the attorneys on whose behalf

20  Mr. Stollenwerk was gathering documents?

21      A.     No, not -- not to be provided to the

22  United States, no.

23      Q.     Number 5, another one of my -- that is

24  Jay Stollenwerk's -- responsibilities as an officer of

25  the above-referenced companies was to liquidate assets

131

1  of the company so that the funds could be paid to the

2  Internal Revenue Service (IRS) to pay back the IRS for

3  payroll tax monies (trust fund taxes) for which a

4  combination of Amodeo, other individuals, AEM and

5  Professional Benefits Solutions were responsible, but

6  which were not remitted to the IRS.

7             Amodeo knew that he was the target of a

8  Federal Grand Jury and was attempting to cooperate with

9  the United States in order to receive a reduced

10  sentence.

11             Amodeo told me that the reason he wanted to
Page 116

080310ab

12    pay back the IRS was that it would illustrate that there

13    was never an intent to defraud the IRS.

14          I surmise from this that Amodeo would use

15    these payments to seek leniency from a sentencing judge.

16          Is there anything in that paragraph that you

17    don't agree with?

18    A.    I don't know.  This is Mr. Stollenwerk's

19    testimony.  You'd have to ask Mr. Stollenwerk.

20    Q.    Were you aware that Amodeo was the target of

21    a federal grand jury investigation?

22          MR. LOCKHART:  Object to form.

23    A.    At some point in time I became aware of that.

24    Q.    At what point in time?

25    A.    Sometime in '07.

132

1     Q.    Were you aware that Mr. Amodeo was attempting

2     to cooperate with the United States in order to receive

3     a reduced sentence at some time in 2007?

4     A.    I don't know about a reduced sentence, I know

5     he was cooperating.

6     Q.    Did you not know that Mr. Amodeo believed he

7     would be able to receive leniency from a sentencing

8     judge if he showed his good faith in his efforts to pay

9     back the IRS?

10    A.    No.

11    Q.    You were not aware of that?

12    A.    No.  I know he was cooperating and attempting

13    to pay back the taxes.

14    Q.    Did you ever hear Mr. Amodeo discuss wanting

Page 117

080310ab

15   to have a deal that was similar to the Lou Pearlman

16   deal?

17          MR. LOCKHART:  Object to form.

18     A.   I don't recall.

19     Q.   Is the name Lou Pearlman familiar to you?

20     A.   Yes.

21     Q.   And in what context?

22     A.   It was in the newspaper here in Orlando.

23     Q.   For what?  Do you recall?

24     A.   Some kind of fraud.

25     Q.   And do you remember whether or not he was

133

1   convicted?

2     A.   I believe he was.

3     Q.   Do you remember what the broad outlines of

4   his sentencing were?

5     A.   No.

6     Q.   Number 7.  At the time that the bankruptcy

7   petitions were filed, lawsuits which Mirabilis had

8   instituted against other companies and individuals

9   comprised almost all of the assets of the companies.

10          Do you agree with that?

11     A.   I don't recall what remained and what didn't

12   remain in terms of assets.  I know litigation was a

13   large part of it.

14     Q.   Well, at this point AQMI had seized all of

15   the assets; correct?

16     A.   Depending on -- yeah, okay.

17     Q.   Do you recall in April, late April of 2008

18   when seizure warrants were served and funds were taken

080310ab

19    from the trust accounts of law firms?

20        A.    I do.  I recall that.  That's what

21    precipitated the bankruptcy.

22        Q.    Was anything taken from your law firm?

23        A.    We had a seizure warrant.  We complied with

24    the seizure warrant.

25        Q.    How much was taken from your trust account?

134

1        A.    I don't recall.

2        Q.    Number 9, it's my understanding that Green

3    proposed the bankruptcy proceedings.

4              Do you agree with that?

5        A.    I don't recall.  I don't know who initially

6    proposed it.  I know she was a bankruptcy attorney.

7        Q.    Were you involved in the lead-up to the

8    bankruptcy?

9              MR. LOCKHART:  Object to form.

10        A.    What do you mean?

11        Q.    You just testified a minute ago that because

12    of the seizure warrants, the bankruptcy was filed.

13        A.    Okay.

14        Q.    And I'm asking -- well, let me ask it this

15    way, did you have any participation in the preparation

16    for Mirabilis to file bankruptcy?

17        A.    No, I didn't prepare the company for

18    bankruptcy.

19        Q.    Have you heard it said before that Ms. Green,

20    quote, believed that filing bankruptcy was the best way

21    to save the litigation?

080310ab

22    A.    I'm sorry, what was --

23    Q.    That Ms. Green believed that filing

24 bankruptcy was the best way to save the litigation.

25          MR. LOCKHART:  Object to form.

135

1    A.    Is that what she said?

2    Q.    I said are you aware of Ms. Green having ever

3 said that?

4    A.    I don't recall her saying that to me.

5    Q.    Have you ever heard anyone say that filing

6 bankruptcy was a way to save the litigation or have you,

7 yourself, said it?

8          MR. LOCKHART:  Object to form.

9    A.    I don't specifically recall.

10    Q.    Well, in Number 9, Mr. Stollenwerk, the

11 second sentence, Green believed that filing bankruptcy

12 was the best way to save the litigation.

13    A.    Okay.

14    Q.    Amodeo then directed Mirabilis to file for

15 bankruptcy protection.

16    A.    Okay.

17    Q.    Do you even know what that means, that filing

18 bankruptcy was the best way to save the litigation?

19          MR. LOCKHART:  Object to form.

20    A.    No, I mean the best I could tell you is that

21 the officers and directors wanted to leave at that time,

22 so, you know, they decided to leave and they made

23 whatever decisions they wanted to make.  I don't know

24 best way to save the litigation.  I don't understand

25 that.

Page 120

080310ab

136

1        Q.    The next paragraph:  I was present at a

2    meeting with Bates, Mokwa, Jaiman, Williams, Green and

3    Shuker at Green and Shuker's office in which Shuker and

4    Green discussed how to handle the bankruptcy.  They

5    talked about their experience in what they referred to

6    as the Church Street case.  Jaiman, Williams and I would

7    resign as officers and directors.  We were to appoint

8    Michael E. Moecker.  I don't know how to pronounce that

9    word; do you?

10       A.    Moecker.

11       Q.    (Moecker) as a member of the board of

12   directors.  Moecker would then appoint R.W. (Bill)

13   Cuthill, Jr. (Cuthill) as president of Mirabilis.  They

14   wanted to talk with the office of the United States

15   trustee, as they believed that they had found a

16   loophole, which would allow them to proceed without a

17   trustee.  Green was concerned that the United States

18   would seize attorney fees, but they decided that they

19   could use the money received from the settlement of two

20   cases with RKT Constructors, Inc. to fund the

21   bankruptcies.

22              Do you remember being present at this

23   meeting?

24       A.    I do.

25       Q.    And is it still your testimony that you had

137

080310ab

1    nothing to do with planning the bankruptcy?

2        A.    I don't know if that was my testimony.  I

3    said I wasn't the bankruptcy attorney.

4        Q.    My question a few moments ago was if you had

5    anything to do with planning the bankruptcy.

6        A.    I said I didn't prepare the company for

7    bankruptcy.

8        Q.    So you were involved in planning for the

9    bankruptcy?

10            MR. LOCKHART:  Object to form.

11       A.    I don't understand your question.

12       Q.    Mr. Bates, were you or were you not involved

13   in planning Mirabilis' bankruptcy?

14       A.    I did not plan Mirabilis' bankruptcy.

15       Q.    Were you involved in planning Mirabilis'

16   bankruptcy?

17       A.    No, Mirabilis' bankruptcy counsel planned

18   Mirabilis' bankruptcy.

19       Q.    Why were you at this meeting if you were not

20   involved in planning Mirabilis' bankruptcy?

21            MR. LOCKHART:  Object to form.

22       A.    I don't know if I can get into the substance

23   of what happened at that meeting.  I don't know if he

24   waived his attorney/client privilege.

25       Q.    I'm not asking about anything privileged.  I

138

1    said if you didn't participate in the planning, why were

2    you there?

3        A.    I was there because I was previously counsel

4    for Mirabilis.

Page 122

080310ab

5      Q.      Previously counsel. Were you not counsel

6   after?

7      A.      No, not after the bankruptcy.

8      Q.      You didn't withdraw from this case until

9   December of '09?

10     A.      The case was stayed, I believe. I withdrew

11   the minute the stay was lifted.

12             (Exhibit No. 118 was marked for

13             identification.)

14     Q.      Mr. Bates, given your response to the

15   previous affidavit, which you said you were not familiar

16   with, I presume that I'm correct in assuming that you

17   did not -- you are not familiar with this document

18   either; is that correct?

19     A.      No, I'm not familiar with this.

20     Q.      Do you know Mr. McCabe?

21     A.      I don't.

22     Q.      Have you ever met him?

23     A.      I don't believe I have.

24     Q.      The third paragraph of this affidavit states

25   on May 14, 2008 -- excuse me, let me put on the record

139

1   this is an affidavit by IRS agent Steven McCabe that was

2   filed in the bankruptcy court 9/23/08. Paragraph 3

3   reads: On May 14, 2008, prior to the institution of the

4   instant case, was -- it should say I, the I is absent --

5   was present at a meeting of the Office of the

6   United States Trustee, which included, among others,

7   debtor's counsel, Scott Shuker and Elizabeth Green;

Page 123

080310ab

8  Assistant United States Attorneys I. Randall Gold and

9  Nicole Andrejko and Ken Meeker.  Debtor's counsel

10  explained that they had been hired by Frank L. Amodeo,

11  the controlling person of debtor Mirabilis and the

12  related debtors, and were considering whether to file a

13  Chapter 11 Bankruptcy for Mirabilis.

14          They advised that the Board of Directors at

15  that time, Jodi Jaiman, Shane Williams and

16  Jay Stollenwerk would appoint another individual as the

17  sole member of the board of directors and then resign.

18  The new member of the board of directors would then

19  appoint William Cuthill as president of Mirabilis.

20          At that time debtor 's counsel stated that

21  the sole reason for the filing of the bankruptcy in the

22  instant case and related cases was to use the bankruptcy

23  to continue civil litigation which, if settled or won,

24  would provide funds for Frank Amodeo to pay the Internal

25  Revenue Service some of the payroll taxes he owed the

140

1  IRS.

2          It was represented that the logic behind

3  paying the IRS with bankruptcy assets was to allow

4  Amodeo to present this information to the sentencing

5  judge in a potential criminal case against Amodeo,

6  hopefully so that he could receive a more lenient

7  sentence.

8          Are you familiar in general with the plan

9  that is outlined in that paragraph?

10      A.    No.

11              (Exhibit No. 119 was marked for

080310ab

12        identification.)
13        Q.    Mr. Bates, have you had any involvement in
14   the case of Mirabilis Ventures versus Rachlin Cohen and
15   Holtz?
16        A.    No.
17        Q.    Have you read this opinion before or are you
18   familiar with it in any way?
19        A.    No.
20        Q.    Would you turn to Page 2 of the opinion.  The
21   first sentence of the paragraph that is headed
22   Background.  Mirabilis was controlled by Frank Amodeo
23   (Amodeo).  Do you disagree with that clause?
24             MR. LOCKHART:  Object to form.
25        A.    What period of time?

                                                        141

1        Q.    Well, let me just keep going.  Mirabilis was
2   controlled by Frank Amodeo, who used the company and its
3   subsidiaries as vehicles for an enormous tax fraud and
4   money laundering scheme.
5             Do you disagree with that sentence?
6             MR. LOCKHART:  I would object to the line of
7        questioning with regards to this order which is
8        dated April 21st, 2010 by Judge Presnell,
9        United States District Judge, Middle District of
10       Florida because those are the findings of the Court
11       and their findings only.
12            And any sort of questions with regards to
13       what the Court's findings, after he said he's not
14       been involved in this case and is not even involved

                        Page 125

080310ab

15    in understanding this particular order, would be

16    improper.

17         MS. HAVENER:  Mr. Lockhart, I want to just

18    explain why I think your objection is inapplicable.

19    Mr. Bates was counsel for Mirabilis and has

20    testified that at certain points of time Mirabilis

21    was controlled by Frank Amodeo.  He was familiar

22    with the operations of Mirabilis and of the

23    activities of Mr. Amodeo and therefore is a

24    percipient fact witness as to one of the most -- is

25    in fact what I would say is the only question of

142

1    fact in this case, in the affirmative case by

2    Mirabilis and Nexia against Curry and Hailstones.

3         And that, the question is:  Did Mr. Amodeo

4    control Mirabilis?  And I'm asking Mr. Bates if he

5    agrees with the statement that Mirabilis was

6    controlled by Frank Amodeo and that Mr. Amodeo used

7    the company and its subsidiaries as vehicles for a

8    tax fraud and money laundering scheme.  Yes or no?

9    Just does he agree or not?

10    A.    I'm not here to witness against my client.

11         MR. LOCKHART:  I'm going to state that he

12    should not answer any questions with regard to this

13    order.  The order by Judge Presnell speaks for

14    itself.  At times he was counsel for Mirabilis and a

15    number of different entities and he can't answer

16    those questions.

17         MS. HAVENER:  Thank you.

18         (Exhibit No. 120 was marked for

Page 126

080310ab

19      identification.)

20      Q.   Mr. Bates, do you have any -- I'm not asking

21  you if you have any association with this case, I'm not

22  asking if you have any role in this case, I'm asking if

23  you have any familiarity with Mirabilis Ventures case

24  against Saxon, Gilmore, et cetera, and Hans Beyer?

25      A.   Yes, I'm aware of the case.

143

1       Q.   How are you aware of the case?

2       A.   I see the case right here and I've spoken to

3   Ms. Green about it in the past.

4       Q.   When was the first time you spoke with

5   Ms. Green about it?

6       A.   Sometime in '08.  Probably around May or June

7   of '08.

8       Q.   Did you participate in any way in this case?

9       A.   No.

10      Q.   Were you consulted in any way about

11  background facts in this case?

12      A.   Yes, Ms. Green called me on two or three

13  occasions to ask me questions about the case, based on

14  my previous representation of Mirabilis.

15      Q.   And this is an order of the Court in the

16  Hans Beyer case, and as you can see, it is also signed

17  by Judge Presnell.  And I just want to read into the

18  record:  Mirabilis was controlled by Frank Amodeo, who

19  used the company and a web of subsidiaries and related

20  companies as vehicles for an enormous tax fraud and

21  money laundering scheme.  And he dismissed this case.

080310ab

22          Were you aware of this opinion before today?

23     A.    I believe I was aware of it.

24     Q.    As a percipient witness who was present at

25 the company during the time that Mr. Amodeo was in

144

1  charge, I'm not talking about as an attorney for

2  Mr. Amodeo, but as a fact witness, do you have any

3  opinion as to whether or not Mr. Amodeo controlled

4  Mirabilis?

5          MR. LOCKHART:  Objection.  Work product,

6      attorney/client privilege and at all times in which

7      Mr. Bates worked for Mirabilis or any of the

8      subsidiaries, he was also counsel, so we would not

9      say he was a fact witness and advise him not to

10     answer the question.

11     Q.    Mr. Bates, do you believe that Mr. Amodeo did

12 not have control of Mirabilis?

13          MR. LOCKHART:  Same objection.

14          MS. HAVENER:  Excuse me, this is not,

15     absolutely not privileged.  In the preliminary

16     injunction hearing you were --

17     A.    Of counsel.

18     Q.    -- present in the courtroom --

19     A.    Of counsel.

20     Q.    -- when your co-counsel stated on the record

21 that Mr. Amodeo had nothing to do with controlling

22 Mirabilis.  Do you recall that?

23          MR. LOCKHART:  Same objection.

24          MS. HAVENER:  No, excuse me.  He can't say

25     whether he recalls a statement in open court or not?

Page 128

080310ab

145

| | | |
|---|---|---|
| 1 | | MR. LOCKHART:  That wasn't your original |
| 2 | question. | |
| 3 | | MS. HAVENER:  That was exactly the question. |
| 4 | Would you please read it back. | |
| 5 | | (Question read.) |
| 6 | A. | I recall Mr. Estes arguing before the Court, |
| 7 | yes.  I don't recall the exact statement he made. | |
| 8 | | (Exhibit No. 121 was marked for |
| 9 | | identification.) |
| 10 | Q. | Mr. Bates, have you seen this document |
| 11 | before? | |
| 12 | A. | Yes. |
| 13 | Q. | In what circumstances? |
| 14 | A. | I think I saw it after it was filed. |
| 15 | Q. | Was it shown to you by someone? |
| 16 | A. | No, I think I pulled it up on PACER. |
| 17 | Q. | What caused you to look for it on PACER? |
| 18 | A. | I had a conversation with Ms. Green about it. |
| 19 | Q. | After the opinion -- I'm sorry, after the |
| 20 | brief was filed, you had a conversation with Ms. Green? | |
| 21 | A. | I don't know if my conversation was before or |
| 22 | after the brief was filed. | |
| 23 | Q. | Okay. |
| 24 | A. | It was about the response.  Oh, I'm sorry, |
| 25 | this is -- I have to take this back, this is | |

146

Page 129

080310ab

1   Jennifer Eden. I have not seen this one. I'm not aware

2   of this one. I'm talking about Ms. Green. I'm aware of

3   Ms. Green's response.

4        Q.   Okay. Would you turn to Page 11 of the

5   document and read into the record Paragraph 26.

6             Before you read that, I want to confirm that

7   this is the submission of Latham Shuker, which was the

8   law firm Elizabeth Green was associated with at the time

9   the bankruptcy was filed; correct?

10       A.   Correct.

11       Q.   Would you please read Paragraph 26 into the

12   record.

13       A.   Upon his appointment as President of MVI,

14   Mr. Cuthill began the task of securing the corporate

15   records of MVI. Prior to the Petition date, MVI had two

16   separate warehouses containing over 5,000 boxes of

17   documents. The boxes were not organized, indexed or

18   accurately labeled, and some of the boxes were broken

19   and falling apart. It was clear from inspection the

20   boxes had been rummaged through and documents were

21   strewn about the warehouse.

22       Q.   Are you familiar with the condition of the

23   documents at the time that Mr. Cuthill would have first

24   encountered them?

25       A.   No.


                                                      147


1        Q.   You said that you began reviewing documents

2   in January of '08?

3        A.   No, I said I think --

4        Q.   I'm sorry, '07.
                         Page 130

080310ab

5      A.    Okay.

6      Q.    When did you stop reviewing documents?

7      A.    I don't recall.

8      Q.    Do you still have the copy of your

9   interrogatory responses?

10          MS. CURRY:  Right here.

11     Q.    Do you remember whether you were still

12   reviewing documents in 2008?

13     A.    When I stopped, it would have been late 2007,

14   early 2008.  But review would have tapered off

15   significantly in late '07, early '08.

16     Q.    If you could tie it to the filing of the

17   amended complaint in which Mr. Chu was named as a

18   Defendant, does that refresh your recollection?

19     A.    I don't remember what date that was filed.

20     Q.    It was in February of '07 -- '08, I'm sorry.

21     A.    Okay.  What's your question?

22     Q.    Does that refresh your recollection about

23   when you stopped reviewing documents?

24     A.    No.  I mean, there wasn't a hard date that I

25   can recall.

148

1      Q.    Mr. Bates, do you have any idea why no video

2   or audio recordings have ever been turned over to the

3   Defendants in this case?

4      A.    No.

5      Q.    Did you not believe that they were suitable

6   for initial disclosures in this case?

7          MR. LOCKHART:  Object to form.

Page 131

080310ab

8      A.    Could you ask your question again?

9      Q.    Did you not believe that they were suitable

10   for initial disclosures in this case?

11           MR. LOCKHART:  Object to form.  I'm going to

12      direct him not to answer that question due to work

13      product and attorney/client privilege.

14      Q.    Mr. Amodeo, who we saw a few moments ago, had

15   waived attorney/client privilege by the time initial

16   disclosures were filed -- were turned over, I'm sorry,

17   in this case.  That was represented in those board

18   minutes we just saw signed by Shane Williams and

19   Jay Stollenwerk.  Do you remember that document?

20      A.    He waived attorney/client privilege to

21   Mr. Berman for purposes of turning documents over to the

22   U.S. Attorney's Office.  That's what I remember reading.

23   I have to see the document.

24      Q.    Once privilege is waived, it's waived; isn't

25   that correct?

149

1      A.    I have to look at the document.

2           MR. LOCKHART:  Objection.  Calls for a legal

3      conclusion.

4      Q.    If you would please turn to -- oh, I know,

5   I'm sorry, what was the condition of the warehouse when

6   you last saw it in early 2008?

7      A.    Last time I saw the warehouse there were

8   boxes all over the place.  They were in the process of

9   being organized, but the documents that were brought in

10   were breaking down because they had been around for who

11   knows how long.

080310ab

12        Q.     Was it your impression that documents were

13   strewn around and boxes were out of order and --

14        A.     I don't recall that.  I mean, the boxes were

15   all over the place.  I don't recall, quote, unquote,

16   documents being strewn around.

17        Q.     Is it your recollection that boxes were, in

18   fact, quote, rummaged through?

19        A.     Document -- I mean it was clear boxes had

20   been packed with documents and, I mean, they weren't

21   pristine -- I don't know how to answer that question.

22        Q.     Okay.  But you have no recollection of

23   documents being strewn about the warehouse as that

24   paragraph says?

25        A.     I don't recall documents being strewn about

                                                              150


1    the warehouse.

2         Q.     Would you read Paragraph 28, sub ii into the

3    record, please.

4                MR. LOCKHART:  Which paragraph, I'm sorry?

5                MS. HAVENER:  28 subheading ii.

6         A.     The biographies of various professionals were

7    prepared by Aaron Bates, Matthew Mokwa, Shane Williams,

8    Jay Stollenwerk and Jodi Jaiman, employees of MVI and

9    entities owned by Frank Amodeo in preparation of

10   Frank Amodeo's criminal defense of the alleged criminal

11   conspiracy to misuse payroll tax funds.

12               The biography of Hans Beyer identifies him as

13   an attorney involved in Presidion related matters since

14   January of '05, prepared Presidion document files and

                          Page 133

080310ab

15  index.  The biography also states that he was the

16  primary editor of the IRS narrative, an officer of

17  Mirabilis and managing director of Tampa area and

18  foreign projects.

19      Q.    So Latham and Shuker is representing in this

20  document that you did, in fact, participate in at least

21  preparing certain documents as part of Mr. Amodeo's

22  criminal defense; correct?

23          MR. LOCKHART:  Object to form.

24      A.    That's what they're representing.

25      Q.    Do you deny that you did that?

151

1       A.    I prepared all types of things in my

2   representation of the entities of Mr. Amodeo.  I don't

3   know that I ever prepared anything in direct preparation

4   of his criminal defense.

5       Q.    Would you go down to Subparagraph iv, please.

6       A.    Okay.

7       Q.    And read the first sentence into the record.

8       A.    Unsigned Frank Amodeo Affidavit:  The

9   affidavit was prepared by Aaron Bates, Matthew Mokwa,

10  Shane Williams, Jay Stollenwerk and Jodi Jaiman,

11  employees of MVI and entities owned by Frank Amodeo in

12  preparation of Frank Amodeo's criminal defense of the

13  alleged criminal conspiracy to misuse payroll tax funds.

14      Q.    Do you know what affidavit this is referring

15  to?

16      A.    I don't.

17      Q.    Would you turn to the back of this document,

18  and it is 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14,

080310ab

19    15, 16 pages from the end.  At Tab 5.

20              MR. LOCKHART:  Is there a page number?

21              MS. HAVENER:  It's Page 3 after Tab 5.  It's

22    part of the Appendix.  It comes after the tax

23    timelines.

24              MR. LOCKHART:  Okay.  Tab 5.

25              MS. HAVENER:  Then there's Tab 5.

152

1              MR. LOCKHART:  Page 3 you said?  Starts at

2    the top Affidavit?

3              MS. HAVENER:  Yes.

4        Q.    Mr. Bates, would you please review that.

5    It's several pages, one, two, three, four.  I want to

6    give you a few minutes to look through that affidavit in

7    its entirety.

8              And in the meantime, I want to go off the

9    record, take a break to allow Mr. Bates to accomplish

10    that.

11              (Break taken.)

12    BY MS. HAVENER:

13        Q.    Mr. Bates, did you have anything to do with

14    drafting this affidavit?

15        A.    No, I don't recall drafting this particular

16    affidavit.

17        Q.    Is it therefore your position that

18    Subparagraph iv on Page 13 of Latham and Shuker's

19    submission is incorrect?

20        A.    What paragraph?

21        Q.    It's Paragraph 28, Subparagraph iv on

080310ab

22    Page 13, which says:  The affidavit was prepared by

23    Aaron C. Bates, Esquire, Matthew S. Mokwa, Esquire,

24    Shane Williams, James Stollenwerk and Jodi Jaiman.

25          A.    Yeah, I can say I didn't prepare that.

153

1          Q.    In your experience as an attorney, have you

2    known Mr. Williams, Mr. Stollenwerk and Ms. Jaiman to

3    draft affidavits for other people?

4          A.    I don't recall them doing that, no.

5          Q.    Would you find that typical?

6          A.    What?

7          Q.    Standard operating procedure for a layperson

8    to draft an affidavit for another party?

9                MR. LOCKHART:  Object to form.

10         A.    No.

11         Q.    Did you prepare the tax timelines that are

12   attached just in advance of the affidavit, if you

13   recall?

14         A.    No, I didn't prepare these timelines.  I've

15   seen them before, but I didn't prepare them.

16         Q.    Do you know who did?

17         A.    I don't know who prepared it, no.

18         Q.    But you are certain that you did not?

19         A.    Yeah, I know I didn't.

20         Q.    If you will turn to Tab 2 at Page 1 of 6, the

21   timeline called the Transparency Timeline Index.

22               Do you see where I am?

23         A.    Yes.

24         Q.    Did you have anything to do with preparing

25   that timeline?

Page 136

080310ab

154

1     A.    No.

2     Q.    So I take it that you would disagree with the

3  statement in Subparagraph xi on Page 15 which reads:

4  The Transparency Timeline Index was prepared by Aaron C.

5  Bates, Esquire, Matthew S. Mokwa, Esquire,

6  Shane Williams, James Stollenwerk and Jodi Jaiman,

7  employees of MVI and entities owned by Frank Amodeo in

8  preparation of Frank Amodeo's criminal defense of the

9  alleged criminal conspiracy to misuse payroll tax funds?

10    A.    Yes.

11    Q.    And you would also disagree with the

12  following paragraph, the first sentence which reads the

13  same as the previous one except it refers to the tax

14  timeline, rather than the transparency timeline?

15    A.    Yes.

16    Q.    If you will turn to Page 17 of the primary

17  document, please.

18    A.    Okay.

19    Q.    Under the title Investigation Prior to Filing

20  Adversary Proceeding.

21    A.    Okay.

22    Q.    Paragraph 29 reads:  In addition to the Beyer

23  documents, Mr. Cuthill also located several draft

24  complaints against Hans Beyer, BIR and Saxon, Gilmore,

25  Carraway, Gibbons, Lash & Wilcox, P.A. (collectively the

155

080310ab

1  Draft Complaints.)  The Draft Complaints allege causes
2  of action for negligence, breach of fiduciary duty and
3  self-dealing.
4          Paragraph 30.  The Draft Complaints were
5  prepared by or at the direction of Aaron C. Bates,
6  Esquire.  Mr. Bates was a former employee and in-house
7  counsel to MVI until June 2007.  Mr. Bates was then
8  subsequently engaged by MVI to commence legal action
9  against former officers, directors and professionals of
10  MVI.  Due to the nature, length and scope of Mr. Bates'
11  employment with MVI, Mr. Bates had firsthand knowledge
12  of the events in the Draft Complaint.
13          Did you, in fact, Mr. Bates, prepare the
14  Draft Complaints that are referenced in these
15  paragraphs?
16      A.    I'd have to see the draft complaint.  I know
17  I did put together a draft complaint for this at some
18  point in time.
19      Q.    Mr. Bates, when you were engaged in the
20  process of investigating potential causes of action that
21  might be filed on behalf of Mirabilis, I believe you
22  indicated in your affidavit that was submitted in
23  response to the motion for sanctions filed by Mr. Chu
24  that you spoke with some of the executives of
25  Mirabilis Ventures and Nexia certification before the

156

1  complaint was filed.  Do you recall that?
2      A.    Yes.
3      Q.    Could you name for me who those executives
4  were that you spoke with?

Page 138

080310ab

5      A.      I don't recall specifically. I know I spoke

6   to Mr. Flynn. I know I spoke to Ms. Jaiman. I know I

7   spoke to Mr. Williams. I know I spoke to

8   Mr. Stollenwerk. And I'm sure I spoke to other officers

9   and directors along the way with regard to questions we

10  had. I don't recall specifically who, that's three

11  years ago.

12     Q.      Am I correct you did not try to contact

13  Mr. Hailstones or Ms. Curry?

14     A.      Prior to filing the complaint?

15     Q.      Correct.

16     A.      No, I did not talk to Mr. Hailstones or

17  Ms. Curry.

18     Q.      While I'm on that subject, in my client's

19  initial disclosures to the third parties, we identified

20  Mr. Cramer, Joel Cramer, as a witness.

21             Have you ever spoken to Mr. Cramer?

22     A.      I believe I called -- I left Mr. Cramer a

23  message. I don't know that I've spoken -- I've never

24  spoken to Mr. Cramer.

25     Q.      Is there any reason why other than -- well,

                                                          157


1   obviously you tried to get in touch with him?

2      A.      Right. Just to find out what he would

3   testify to.

4      Q.      When you were preparing the complaint against

5   Ms. Curry and Mr. Hailstones and Palaxar, did you speak

6   with Mr. Holtz?

7             MR. LOCKHART:  Object to form. Don't answer.

                        Page 139

080310ab

8      Work product.  Attorney/client privilege.

9           MS. HAVENER:  He's already named some of the

10     people he did speak to.  Is there something

11     different about the people he didn't speak to?  In

12     fact, he's already answered questions about people

13     he didn't speak to in that he didn't speak to

14     Mr. Hailstones or Ms. Curry.

15          MR. LOCKHART:  Could you read the question

16     back again?

17          (Question read.)

18          MR. LOCKHART:  As specifically goes to the

19     complaint, which is litigation in which he was

20     representing Mirabilis Ventures and I advise him not

21     to answer that question.

22          MS. HAVENER:  Mr. Lockhart, he's already

23     answered that he talked to Jodi Jaiman,

24     Jay Stollenwerk.

25          MR. LOCKHART:  It wasn't with regard to the

                                                    158

1      complaint.

2           MS. HAVENER:  Yes, in fact, it was.

3           MR. LOCKHART:  No, it was not.

4           MS. HAVENER:  It was precisely that.

5      Can you read that question back?

6           MR. LOCKHART:  I think it was specifically

7      regarding the affidavit he filed with the Court.  It

8      was not with regards to the complaint.

9           (Question read.)

10          MS. HAVENER:  And he was allowed to answer

11     that question.  And the followup question, did you
                    Page 140

080310ab

12    speak with Ms. Curry or Mr. Hailstones, he was

13    allowed to answer that question and now I'm

14    intending on going through a short list.

15         MR. LOCKHART:  With regards to the affidavit

16    or complaint?

17         MS. HAVENER:  It was with regard to the

18    investigation of the claims that could be

19    potentially brought on behalf of Mirabilis Ventures

20    against Ms. Curry and Mr. Hailstones.

21         MR. LOCKHART:  Okay.  We've got two

22    different --

23         MS. HAVENER:  Pursuant to his affidavit that

24    was published.

25         MR. LOCKHART:  We've got two different

159

1    documents and two different times.

2         (Exhibit No. 122 was marked for

3    identification.)

4    Q.    Mr. Bates, do you recognize this document?

5    A.    I do.

6    Q.    Did you prepare it yourself?

7    A.    I did.

8    Q.    Would you please turn and read into the

9    record Paragraph 6?

10   A.    Before the filing of original complaint,

11   Balch & Bingham, Bates Mokwa and Plaintiffs conducted an

12   investigation to determine whether or not there was

13   sufficient evidentiary support to assert the allegations

14   set forth in the original complaint.

Page 141

080310ab

15               Aside from asking Plaintiffs numerous

16     questions (which were answered), the investigation

17     process (which occurred prior to the filing of the

18     original complaint and continued through the filing of

19     the Second Amended Complaint) included, without

20     limitation:  Speaking to former and current officers and

21     directors of Mirabilis and Nexia.

22         Q.   And you can stop there.  And that was the

23     question I asked.  With reference to your affidavit,

24     when you were preparing the original complaint, you've

25     already testified before the Court that you've

160

1     interviewed former and current officers and directors of

2     Mirabilis and Nexia.  I asked you to identify them.  You

3     gave me four names or five.  Then I asked you who you

4     did not interview and you gave me two names.  I asked

5     you their names specifically.

6         Now I would like to go through and try to

7     refresh your recollection as to whether or not you spoke

8     to certain other former officers and directors.

9         MR. LOCKHART:  Object to form.  Answer if you

10    know.

11    A.   Okay.

12    Q.   Mr. Holtz?

13    A.   No, I didn't speak to Mr. Holtz.

14    Q.   Mr. Berman?

15    A.   No, I did not speak to Mr. Berman.

16    Q.   Mr. Diment?

17    A.   No.

18    Q.   Mr. Broadhead?

080310ab

19    A.    No, I didn't speak to Mr. Broadhead.

20    Q.    Mr. Carlson?

21    A.    No, I didn't speak to Mr. Carlson.

22    Q.    Mr. Sadrianna?

23    A.    I don't recall if I spoke to Mr. Sadrianna or

24  not.

25    Q.    Thank you.  Okay.  We're now going back to

161

1  Exhibit 121 at Page 31.  This is now referencing the

2  Beyer complaint and the Beyer documents.  LSEB, which is

3  Latham and Shuker; correct?

4    A.    Where are we at?

5    Q.    Paragraph 31 on Page 17.

6    A.    Okay.

7    Q.    Latham and Shuker, LSEB, reviewed the Draft

8  Complaints and the Beyer Documents, as well as the civil

9  complaint and the Amodeo indictment.  During this time

10  LSEB attempted to contact several former officers and

11  directors for information on the Defendant's

12  involvement; however, due to the pending criminal

13  investigation, none of those contacted would voluntarily

14  comment.

15          Are you familiar in any way with Latham and

16  Shuker's attempts to contact former officers and

17  directors?

18    A.    No.

19    Q.    Did you give them at any time suggestions

20  about who to call?

21    A.    No.

080310ab

22      Q.    I'd like to go back to Paragraph 30, which

23  says:  The Draft Complaints were prepared by or at the

24  direction of Aaron C. Bates.  And then the last sentence

25  says:  Due to the nature, length and scope of Mr. Bates'

162

1   employment with MVI, Mr. Bates had firsthand knowledge

2   of the events in the draft complaint.

3           Do you recall that?  I mean, you see that's

4   in the --

5       A.    I do.

6       Q.    Do you agree with that?

7       A.    I'd have to see the Draft Complaint.

8       Q.    But you said earlier that you recalled

9   working on a draft complaint with regard to Mr. Beyer.

10      A.    I recall numerous Draft Complaints including

11  the one against Mr. Beyer.

12      Q.    And with respect to the one against

13  Mr. Beyer, is it true that you had personal knowledge of

14  the events in the Draft Complaint?

15      A.    I don't recall.  I'd have to see it.

16            (Exhibit No. 123 was marked for

17      identification.)

18      Q.    Mr. Bates, I'm showing you what's been marked

19  as Exhibit 123.

20      A.    Okay.

21      Q.    It's the affidavit of Elizabeth Green, which

22  was submitted on July 23rd, so two weeks ago,

23  approximately, in response to the Motion for Sanctions

24  that was filed by Mr. Beyer and Saxon Gilmore at the

25  invitation of Judge Presnell.  Do you recall that?

Page 144

080310ab

163

1       A.      I do.

2       Q.      Have you seen this before?

3       A.      I believe I did.  This is the one I pulled

4   off of PACER.

5       Q.      Okay.  The Draft Complaint is Exhibit A to

6   this document.  It's on Page 12 of 27.

7       A.      Okay.

8       Q.      Would you please review the draft complaint.

9   And the question I want you to keep in mind is whether

10  or not you had personal knowledge of the events that

11  occurred that are discussed in this complaint as alleged

12  by Latham and Shuker and Elizabeth Green.

13              Have you reviewed the complaint, Mr. Bates?

14      A.      I'm still reviewing it.

15              Okay.  I've read the allegations.

16      Q.      Are the facts alleged in the Draft Complaint

17  facts as to which you had personal knowledge?

18      A.      A few.  Most I don't.

19      Q.      Now, before we go on to my next question, I

20  want you to keep in mind the testimony we read just a

21  few moments ago in the Latham and Shuker response for

22  the Motion for Sanctions which said:  Upon his

23  appointment as President of MVI, Mr. Cuthill began the

24  task of securing the corporate records of MVI.  Prior to

25  the Petition date, MVI had two separate warehouses

164

Page 145

080310ab

1   containing over 5,000 boxes of documents.  The boxes
2   were not organized, indexed or accurately labeled and
3   some of the boxes were broken and falling apart.  It was
4   clear from inspection the boxes had been rummaged
5   through and documents were strewn about the warehouses.
6          The next paragraph says:  As soon as
7   Mr. Cuthill was able to obtain possession of the
8   documents in the warehouses in or around November 2008,
9   he began the task of moving, re-boxing, organizing and
10  indexing over 5,000 boxes.  Do you remember that?
11     A.    Yes.
12     Q.    Now, if you would look at the affidavit of
13  Elizabeth Green.
14     A.    Okay.
15     Q.    And turn to the third page.  And read --
16  would you please read into the record Paragraph 10?
17     A.    Ms. Green says:  At the time of the Petition,
18  all the corporate books and records of MVI, including
19  electronic records, were held by the USA pursuant to
20  grand jury subpoena.
21          The records were located in two warehouses
22  and were comprised of millions of pages of documents,
23  tens of thousands of hours of video and multiple
24  terabytes of electronic data.  There were between 5 and
25  6,000 boxes of documents between the two warehouses.

165

1          Due to concerns about the effect on the
2   criminal investigation, the USA would not give
3   Mr. Moecker and Mr. Cuthill access to the document
4   warehouse until early November 2009.  Mr. Cuthill did

080310ab

5    have some very limited access to MVI documents on one of

6    the MVI servers.

7         Q.    Now, obviously that statement by Ms. Green

8    and the prior statement I read in Latham and Shuker's

9    submission are directly opposed.  Do you agree?

10               MR. LOCKHART:  Object to form.

11        Q.    Well, Latham and Shuker says as soon as

12   Mr. Cuthill was able to obtain possession of the books

13   in the warehouses in or around November 2008, he began

14   organizing them.

15               And she says that when he took over on the

16   petition date, he was not given access and he did not

17   get it until early 2009 -- November 2009?

18        A.    Okay.

19        Q.    Which of those is true?

20        A.    I don't know.

21        Q.    Please go down to Paragraph 12 in Ms. Green's

22   affidavit.

23        A.    Okay.

24        Q.    Prior to the petition date the pre-petition

25   lawsuits were being prosecuted by a number of law firms

166

1    and were being overseen by Mr. Aaron Bates and

2    Mr. Matthew Mokwa of the firm of Bates and Mokwa; is

3    that correct?

4         A.    Yes.

5         Q.    Paragraph 13.  Mr. Bates had been the MVI

6    in-house counsel from March of 2006 for a period of

7    approximately one year and at the time of the filing of

Page 147

V

080310ab

8    the petition, he was outside counsel for MVI; is that

9    correct?

10       A.    Yes.

11       Q.    Paragraph -- I'm sorry, within 14, within

12   weeks of the petition date I met with Mr. Cuthill,

13   Mr. Bates and Mr. Mokwa to discuss the pre-petition

14   lawsuits and to commence an initial evaluation of the

15   validity and value of the potential claims of MVI's

16   bankruptcy state.

17           Paragraph 15.  At that meeting Mr. Bates

18   stated he spent the previous year analyzing and

19   gathering information related to the claims of MVI and

20   assisting with an orderly wind-down of MVI; is that

21   correct?

22       A.    Which one, 14 or 15?

23       Q.    Both.

24       A.    Yes.  14 is correct.  15 is correct.

25       Q.    Paragraph 16.  At that meeting Mr. Bates and

167

1    Mr. Mokwa stated that they believed, based on the facts

2    known to Mr. Bates at the time as former in-house

3    counsel and outside counsel, MVI held a valid claim

4    against Mr. Beyer, his current law firm Saxon Gilmore

5    and his former law firm Buchanan, Ingersoll for

6    malpractice related to his representation of MVI and his

7    advice and involvement with the 941 tax scheme.

8           During the course of the case I had multiple

9    conversations with Mr. Bates regarding the facts related

10   to Mr. Beyer and Saxon's representation of MVI and its

11   affiliates and their involvement or knowledge of the tax

080310ab

12    scheme; is that correct?

13        A.    Yes.

14        Q.    So that meeting was after the petition date;

15    correct?

16        A.    I don't recall if it was before or after the

17    petition date.

18        Q.    So you're suggesting that within weeks of the

19    petition dates could mean either before or after?

20        A.    I'm not suggesting one way or the other. I

21    just don't recall whether it was prior to the petition

22    date or after the petition date this particular meeting.

23    I believe I had two separate meetings. I don't remember

24    if they were before or after the bankruptcy. I know

25    they were very close to the filing of the bankruptcy.

                                                     168

1         Q.    I also want to inquire. You just testified a

2     few minutes ago you did not know which was correct,

3     whether Mr. Cuthill did not have access to the documents

4     because the USA had custody of them or whether

5     Mr. Cuthill did have access to the documents and -- but

6     they were in a mess and he got access around November

7     of 2008.

8         A.    Okay.

9         Q.    You testified that you didn't know --

10        A.    I don't know what happened to the documents

11    after -- yeah, I don't know what happened to the

12    documents after probably May or -- April or May of '08 I

13    don't know what happened to the documents.

14            MR. LOCKHART: Mrs. Havener, if I may

                        Page 149

080310ab

15  interrupt for a moment.  It is 3:15 in the
16  afternoon.  We've been sitting here for a
17  considerable period of time talking about things
18  that are wholly unrelated to the claims that are
19  against Mr. Bates in this particular case.
20      And I want to know if we are going to get to
21  the matter at hand with regard to the claims against
22  Mr. Bates or are we going to spend time talking
23  about other litigation that he's not involved with
24  such as Exhibits 122, 123 and a bunch of exhibits
25  before that?

169

1       If not, I'm going to have an objection with
2   regards to this continued line of questioning that
3   has nothing to do with the counterclaim that
4   involves Mr. Bates and I'm going to advise him not
5   to respond to any questions in that scope.
6       MS. HAVENER:  Relevance is an improper
7   objection at a deposition as you certainly know.
8       MR. LOCKHART:  Well, we have a Notice of
9   Deposition that says specifically we're here for a
10  specific scope and we are way beyond that scope.
11  And I think we've given it extreme latitude to ask
12  these questions.  And I think my client is not
13  coming back for another day of depositions when we
14  failed to address the stuff that was in your notice
15  for deposition in its entirety in the very beginning
16  of this deposition.
17      MS. HAVENER:  Mr. Lockhart, I believe we have
18  no more than about five more minutes.  If you could

080310ab

19    bear with me for a few more questions.  Are you

20    going to instruct your witness not to answer any

21    more questions?

22          MR. LOCKHART:  We'll see if you keep it to

23    five minutes.  If it's past five minutes, I'll make

24    another determination.

25          MS. HAVENER:  Okay.

                                                    170


1    BY MS. HAVENER:

2          Q.    My question, and I was referring to all these

3    affidavits and various allegations in the Hans Beyer

4    case in which you did have involvement early on;

5    correct?  You testified that you drafted the complaint?

6          A.    There was a Draft Complaint completed

7    sometime in '07.

8          Q.    Am I correct you had full access to the

9    documents up until approximately May of 2008?

10         A.    I don't know what access I had.  I don't know

11    if all the documents were there or not, we were still

12    collecting, they were still collating, I went to the

13    warehouse maybe three or four times during my entire

14    time out there.  Other people were at the warehouse

15    collecting documents.

16         Q.    So at the time that the complaint was filed,

17    you had not finished reviewing the documents?

18         A.    No.  Made it through maybe 25 percent.

19         Q.    In your affidavit, which is 122.

20         A.    Uh-huh.

21         Q.    If you will pull it up.  Paragraph 13 -- 12

Page 151

080310ab

22    and 13 say:  In approximately May 2008, the law firm of

23    Latham Shuker, et cetera began representing Plaintiffs

24    in light of the forthcoming bankruptcy proceeding.

25             At that time Bates Mokwa was relieved of any

171

1    authority to act on behalf of Plaintiffs by Mirabilis'

2    liquidating President R.W. Cuthill.

3             Does that coincide with your lack of access

4    to the documents?

5      A.    I'm sorry, could you rephrase the question?

6      Q.    Does May of 2008, when Latham and Shuker took

7    over the representation of Plaintiffs in light of the

8    forthcoming bankruptcy proceedings, and you said that

9    you were no longer involved in representing Mirabilis

10   and Nexia in this case --

11     A.    Okay.

12     Q.    -- was that coincidental with -- in time with

13   your not having access any longer to the documents in

14   the warehouse?

15             MR. LOCKHART:  Object to form.

16     A.    Best I can understand, you are asking me if

17   my access to the documents ceased when my representation

18   of Mirabilis ceased.  And if that's your question, then

19   the answer is yes.

20     Q.    Thank you.  Mr. Bates, you testified earlier

21   that you helped Ms. Jaiman draft the affidavit that was

22   submitted in the motion -- along with the motion for

23   preliminary injunction.  Do you recall that?

24     A.    I recall reviewing and working on that

25   affidavit, yes.

Page 152

080310ab

172

1     Q.     Do you also recall that Ms. Jaiman recanted
2  that testimony?

3     A.     I don't recall that.  I remember seeing that
4  in a pleading.

5     Q.     Have you ever seen an affidavit signed by
6  Jodi Jaiman saying that despite her testimony in other
7  affidavits, Mr. Amodeo did, in fact, control Mirabilis?

8     A.     I don't recall specifically seeing that
9  affidavit.  It may be filed in this action.

10    Q.     It was filed in the bankruptcy case and in
11 ours.  It was part of Mr. Gold's Motion to Dismiss the
12 Bankruptcy for Bad Faith Filing.

13           Did you review that pleading when it came
14 out?

15    A.     I don't recall reviewing it when it came out.

16    Q.     It was part of Mr. Chu's Motion For Sanctions
17 that you responded to.

18    A.     I may have reviewed it then.

19    Q.     So just to follow up, you are aware that
20 Ms. Jaiman testified precisely the opposite in two
21 different affidavits?

22    A.     I'd have to see the two affidavits.

23           MS. HAVENER:  We're going to take a quick
24    break just to see where we are.

25           (Break taken.)

173

Page 153

080310ab

1          MS. HAVENER:   Okay.   We're just going to sum

2     up.

3          Q.    Mr. Bates, I want to make sure that I

4     understand correctly.   Around the time period of

5     October 2007, you were supervising -- as we just saw in

6     these affidavits, and you agreed with the testimony that

7     was given in Ms. Green's affidavit, you were supervising

8     litigation all over the country involving Mirabilis and

9     its subsidiaries; correct?

10         A.    I was either supervising or involved in

11    litigation, yes.

12         Q.    And you were involved in the wind-down of

13    Mirabilis; correct?

14         A.    That's correct.

15         Q.    And nevertheless you took from October 12th,

16    13th, 14th and 15th to fly across the country, despite

17    the fact that travel is very difficult, in order to

18    personally serve Ms. Curry and Mr. Hailstones; correct?

19         A.    I don't agree with your statement.

20    Everything is difficult.   I travel all the time and it

21    was a weekend, so yes, I traveled across -- I traveled

22    to Arizona, went to a football game.

23         Q.    The 12th was Friday.

24         A.    Friday night.   After work Friday night.

25         Q.    And the 15th was a Monday.

174

1          A.    Okay.

2          Q.    That's four days, a four-day weekend.

3          A.    I left on Friday evening and I returned

4     Monday morning.

080310ab

5      Q.    But despite all of the work that you were

6    doing, you crossed the country, essentially, in order to

7    personally serve Ms. Curry and Mr. Hailstones?

8      A.    Yes.

9      Q.    And that is an act you have never done

10   before, personally served a defendant in a case?

11     A.    I didn't personally serve her.  I assisted

12   the process server.

13     Q.    Have you ever personally assisted a process

14   server in any other case?

15     A.    No, I have not.

16     Q.    Have you done it since?

17     A.    No.

18     Q.    And would you be surprised if that were

19   standard operating procedure for anybody in the legal

20   profession?

21          MR. LOCKHART:  Object to form.

22     A.    I'd be surprised if what?

23     Q.    If personally accompanying a process server

24   in order to serve defendants with a complaint were

25   standard operating procedure for any attorney in the

                                                          175


1    country?

2           MR. LOCKHART:  Object to form.

3      A.    Would I be surprised if that was standard

4    operating procedure?

5           MR. LOCKHART:  Object to form.

6      Q.    Yes.

7      A.    I don't know that I would be surprised.  It

                        Page 155

080310ab

8  would be out of the ordinary.

9       Q.    Okay.  And Mr. Zollars testified, am I

10  correct, that in 22 years of serving process, it has

11  never happened before in his experience.

12       A.    Okay.

13       Q.    And just for the record, one last question.

14  You did not assist in Frank Amodeo's criminal defense?

15       A.    I was not Mr. Amodeo's criminal defense

16  attorney.

17       Q.    Did you assist?

18       A.    I assisted his attorneys, as I previously

19  stated.

20       Q.    In his criminal defense?

21       A.    I assisted his attorneys.

22       Q.    In his criminal defense or not?

23       A.    I assisted his attorneys.

24       Q.    Mr. Bates, it's a simple question.

25       A.    I assisted his criminal defense attorneys.

176

1             MS. HAVENER:  The deposition is closed.

2  We'll see you next Tuesday.

3             MR. LOCKHART:  I have a few questions.

4             MS. HAVENER:  I'm sorry, you have questions.

5                   CROSS EXAMINATION

6  BY MR. LOCKHART:

7       Q.    Mr. Bates, at the time that you were working

8  on the complaint for this particular case that we're

9  here for, how long had you been a licensed attorney in

10  Florida?

11       A.    A little over two years.

Page 156

080310ab

12        Q.      Okay.  And during that time in the number of

13   cases you worked for Mirabilis Ventures, did you ever

14   have cause to need to serve a complaint on an individual

15   who was not a U.S. citizen and not located in the

16   United States?

17        A.      No.

18        Q.      Of the persons who were served with this

19   complaint, were any of those individuals non-U.S.

20   citizens and not in the United States at the time you

21   completed the complaint?

22        A.      I'm sorry, could you ask the question again?

23        Q.      At the time you completed this particular

24   complaint, were any of the individuals who needed to be

25   served non-U.S. citizens and as far as you know not in

177

1    the United States at that time?

2         A.      Yes.

3         Q.      Which individuals?

4         A.      Mr. Hailstones.

5         Q.      Okay.  And was Mr. Hailstones one of the

6    individuals who was served with the complaint in this

7    action when you went to Arizona?

8         A.      Yes.

9         Q.      Okay.  When you went to Arizona, did you do

10   anything else or perform any other activity, other than

11   assisting the process server to serve this complaint?

12        A.      No.

13        Q.      Did you attend any sports functions or any

14   other sports engagements?

080310ab

15      A.      I did.  I went to a football game on Saturday

16   and watched a football game on Sunday.

17      Q.      How long after service of process was

18   performed on Mr. Hailstones did you return to Florida?

19      A.      Same day.

20      Q.      With regards to the particular litigation

21   we're here for, were you one of the lead attorneys who

22   was responsible for this case?

23      A.      I was.

24      Q.      As an attorney, and at that particular time a

25   little over two years as an attorney, did you take your

178

1    responsibility as an attorney seriously?

2       A.      Yes, I did.

3       Q.      And the serving of Mr. Hailstones was outside

4    the norm of the cases you'd previously worked on; is

5    that correct?

6       A.      I'm sorry, what was the question?

7       Q.      The serving of Mr. Hailstones as a non-U.S.

8    citizen was outside of the normal scope of cases you had

9    previously worked on; correct?

10      A.      Correct.

11      Q.      Did you feel you had an obligation as

12   attorney on behalf of Mirabilis Ventures to ensure that

13   you carry out your responsibilities correctly?

14      A.      I did.

15      Q.      Was that one of the reasons you determined

16   that you would make sure the process server served the

17   right individual in Arizona?

18      A.      That was the only reason.

Page 158

080310ab

19          MR. LOCKHART:  I have no further questions.

20          MS. HAVENER:  I do want to follow up on your

21     cross.

22                    REDIRECT EXAMINATION

23     BY MS. HAVENER:

24          Q.    In addition to being -- well, you testified

25     just in response to Mr. Lockhart's question that you

                                                            179

1      were one of the lead counsel in this litigation;

2      correct?

3           A.    I did.

4           Q.    You also engaged co-counsel Balch & Bingham

5      from Northern Alabama in this case; correct?

6           A.    Yes.

7           Q.    Are you aware that Balch & Bingham has been

8      in existence for a hundred years?

9           A.    I'm not aware of how long they've been in

10     existence.

11          Q.    Are you aware that they are a long-standing

12     very well, very reputable Northern Alabama firm?

13          A.    I am.

14          Q.    Do you have any knowledge of Balch &

15     Bingham's background in suing international defendants?

16          A.    I don't.

17          Q.    And did you consult with Balch & Bingham

18     about serving an international defendant?

19          A.    No, I was responsible for that.

20          Q.    You were responsible for service by

21     agreement?

                        Page 159

080310ab

22      A.    I was responsible for service in the

23   complaint.  That fell in my wheelhouse of

24   Central Florida.

25      Q.    So you agreed to do that?

180

1      A.    Yes.

2      Q.    Between you and Balch & Bingham, that fell in

3   your area of responsibility?

4      A.    I don't know that there was an explicit

5   agreement, but I took responsibility for that.

6      Q.    And the case against Ms. Curry and

7   Mr. Hailstones that you researched for all of these

8   months and prepared with great care; correct?

9      A.    I'm sorry, what was that question?

10      Q.    You prepared for many months and prepared

11   this case with great care, the complaint that you

12   served?

13      A.    I filed the complaint in good faith based on

14   the information provided to me based on my clients and

15   based on a reasonable investigation, yes.

16      Q.    And based on your own experience at

17   Mirabilis; correct?

18         MR. LOCKHART:  Object to form.

19      A.    No, the complaint wasn't based on my own

20   experience, I had no experience with Nexia.

21      Q.    Are you aware that today the counsel that

22   took over the case, Broad and Cassel, has moved to

23   dismiss the case against Ms. Curry and Mr. Hailstones

24   without prejudice?

25      A.    I was aware that might happen.

Page 160

080310ab

181

```
 1            MS. HAVENER:  Thank you.  You are, as you
 2    know, permitted to get a copy of the deposition and
 3    sign it.  Do you want to read and sign?
 4            THE WITNESS:  I'll read and sign.
 5            MS. HAVENER:  Thank you, everybody.
 6            (Deposition concluded at 3:31 p.m.)
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

182

080310ab

1

2               C E R T I F I C A T E    O F    O A T H

3

4

5   STATE OF FLORIDA   )

6   COUNTY OF ORANGE   )

7

8

9       I, CHRISTINE L. PRICE, being a Notary Public, State

10  of Florida at Large, and a Registered Professional

11  Reporter, do hereby certify that on Tuesday, August 3,

12  2010, AARON BATES, personally appeared before me and was

13  duly sworn.

14

15      Witness my hand and official seal this 9th day of

16  August 2010.

17

18

19

20

21

22                           Court Reporter
                             Notary Public, State of FL
23                           Notary Comm. No. DD 579243
                             Comm. Expires:  10/01/10

24

25

                                                    183

1

2                    C E R T I F I C A T E

3

4   STATE OF FLORIDA   )

080310ab

5    COUNTY OF ORANGE   )

6

7          I, CHRISTINE L. PRICE, Registered

8    Professional Reporter, certify that I was authorized to

9    and did stenographically report the deposition of

10   AARON BATES, on Tuesday, August 3, 2010, that a review

11   of the transcript was requested, and that the transcript

12   is a true and complete record of my stenographic notes.

13          I further certify that I am not a relative,

14   employee, or attorney, or counsel of any of the parties,

15   nor am I a relative or employee of any of the parties'

16   attorney or counsel connected with the action, nor am I

17   financially interested in the action

18          DATED this 9th day of August 2010.

19

20

21

22                    CHRISTINE L. PRICE, RPR

23

24

25