1

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION


### CASE NO.  6:07-CV-1788-ORL-28-GJK


MIRABILIS VENTURES, INC., and
NEXIA STRATEGY CORPORATION,

        Plaintiffs,

 v.

PALAXAR GROUP, LLC,
PALAXAR HOLDINGS, LLC,
FRANK HAILSTONES; EDITH CURRY
a/k/a EDITH BROADHEAD; and
TERENCE CHU,



        Defendants,

vs.

MIRABILIS VENTURES, INC., et al.,

        Counterclaim and
         Third Party Defendants.


- - - - - - - - - - - - - - - - - - x

          866  South Dixie Highway
          Coral Gables, Florida
          October 5, 2010
          9:30 a.m. - 4:50 p.m.


## <u>DEPOSITION OF YANIV AMAR</u>


    Taken Before JAN L. BRONIS, a Notary Public
for the State of Florida at Large, pursuant to
Notice of Taking Deposition filed in the above
cause.



2

APPEARANCES


The Havener Law Firm, LLC
15511 Russell Road
Chagrin Falls, Ohio 44022
BY:  KATHLEEN B. HAVENER, ESQ.
On behalf of the Counterclaim Plaintiffs
Tele: (440) 893-01888


Broad & Cassel
390 North Orange Street, Suite 1400
Orlando, Florida 32801
BY:  NICOLETTE VILMOS, ESQ. (By Telephone)
On behalf of Mirabilis and Nexia
Tele: (407)839-4200



ALSO PRESENT

EDITH CURRY

AARON BATES (By Telephone)

## INDEX

YANIV AMAR                                          5

DIRECT EXAMINATION BY MS. HAVENER                   6


## EXHIBITS


Plaintiff's Exhibit 450 for                       130
Identification
Plaintiff's Exhibit 451 for                       131
Identification
Plaintiff's Exhibit 452 for                       142
Identification
Plaintiff's Exhibit 453 for                       157
Identification
Plaintiff's Exhibit 454 for                       160
Identification
Plaintiff's Exhibit 455 for                       165
Identification
Plaintiff's Exhibit 456 for                       172
Identification
Plaintiff's Exhibit 457 for                       177
Identification
Plaintiff's Exhibit 458 for                       188
Identification
Plaintiff's Exhibit 459 for                       194
Identification
Plaintiff's Exhibit 460 for                       200
Identification
Plaintiff's Exhibit 461 for                       207
Identification
Plaintiff's Exhibit 462 for                       220
Identification
Plaintiff's Exhibit 463 for                       224
Identification
Plaintiff's Exhibit 464 for                       225
Identification
Plaintiff's Exhibit 465 for                       236
Identification
Plaintiff's Exhibit 466 for                       240
Identification
Plaintiff's Exhibit 467 for                       244
Identification
Plaintiff's Exhibit 468 for                       255
Identification

4

## EXHIBITS (CONTINUED)

Plaintiff's Exhibit 469 for                261
Identification
Plaintiff's Exhibit 470 for                264
Identification
Plaintiff's Exhibit 471 for                268
Identification
Plaintiff's Exhibit 472 for                293
Identification
Plaintiff's Exhibit 473 for                296
Identification
Plaintiff's Exhibit 474 for                299
Identification
Plaintiff's Exhibit 475 for                303
Identification

5

1   Thereupon--

2                      YANIV AMAR

3   was called as a witness by the Third Party

4   Plaintiffs, and, having been first duly sworn,

5   testified as follows:

6           MS. HAVENER:  Can we enter appearances,

7       please?  My name is Kathleen Havener for the

8       Counterclaim Plaintiffs, Edith Curry, Frank

9       Hailstones, Palaxar, P-a-l-a-x-a-r, Group,

10      LLC, and Palaxar Holdings, LLC.

11          And, Nicolette, do you want to go next?

12          MS. VILMOS:  Yes.  This is Nicolette

13      Vilmos on behalf of Mirabilis.

14          MS. HAVENER:  And do you want to say your

15      law firm and stuff?

16          MS. VILMOS:  My law firm is Broad & Cassel

17      and I'm out of the Orlando office; 390 North

18      Orange Avenue, Suite 1400, Orlando, Florida

19      32801.

20          MS. HAVENER:  Are you also appearing for

21      Nexia?

22          MS. VILMOS:  I guess I am appearing for

23      Nexia.  Thank you.  Mirabilis and Nexia.

24          MS. HAVENER:  Okay.

25

## DIRECT EXAMINATION

BY MS. HAVENER:

Q.   And you?

A.   Yaniv Amar, representing myself.

Q.   And would you give her your address, please?

A.   3475 Northeast 191st Street, Number 10, Aventura, Florida 33180.

Q.   Mr. Amar, have you ever had your deposition taken before?

A.   No.

Q.   For the record, and for the benefit of ourselves and the court reporter, I want to just tell you what the ground rules are.  Have you ever attended a deposition before?

A.   No.

Q.   I'm going to be asking you questions for the record.  It's exactly as if you have sworn an oath before a jury in front of a court of law.  I presume you take the oath very seriously.  I know that you're an observant -- a religious person. They are for the record, they can be read to the jury or to the judge, they can be used for purposes of impeaching you at trial, they can be used for many purposes.  But it's exactly as if you're

1    appearing in a courtroom.

2         The most important thing from my perspective

3    is that you make sure that you understand the

4    question I'm asking you.  So if you don't

5    understand, please let me know.  Because I don't

6    want you to answer a question that you think I'm

7    asking but I'm not asking.

8         A.   Okay.

9         Q.   So I'd like to have your agreement that if

10   you don't know exactly what I'm asking you, please

11   let me know so that I can clarify the question for

12   you.

13        The second thing is, because we're both being

14   recorded and the court reporter is taking down what

15   we're saying, I want us to be as courteous as we

16   can to each other and to please be careful not to

17   speak over each other.  I have a very bad habit, I

18   acknowledge, of interrupting if I think you're

19   answering a question that I didn't mean to ask.

20   And so please remind me to let you finish your

21   answer, and then, if I'm correct, I'll say, "That's

22   not the question I was asking; here's what I'm

23   asking."

24        A.   Fine.

25        Q.   But she can't take down what we're saying

1    if we're talking at the same time.  So it's just to

2    make it much easier for her.

3        A.   Okay.

4        Q.   The other things are just, you know,

5    customary.  I have no intention of being too

6    personal or inquiring into things that are not my

7    business, but just to make sure that it's

8    appropriate for us to continue, I want to make sure

9    that you haven't taken any kind of drug in the last

10   24 hours that would impair your memory or would

11   make you unable to answer questions.

12       A.   I have not.

13       Q.   And you haven't indulged in alcohol this

14   morning or anything else that would make it hard

15   for you to answer questions?

16       A.   No.  No, I have not.

17       Q.   Okay.  And if for any reason you don't

18   understand what I'm saying, please make sure that

19   you let me know.  You can take a break whenever you

20   want to.  Just let me know that you need to take a

21   break.  Other than when it's not appropriate to

22   take a break is when there's a question pending.

23   And the only reason that that would be okay is if

24   there's some reason why you think you might need to

25   go speak to your counsel.  But given that you're

1    not represented and I have no intention of going

2    into anything that might --

3        A.   Outside the scope of this Palaxar suit.

4        Q.   Right.

5        A.   Fine.

6        Q.   Exactly.  Well, it's not limited to the

7    events that happened in Scottsdale, because you're

8    also a fact witness to the other things that

9    happened at Mirabilis and Palaxar, if you

10   understand what I mean.  That you were there and,

11   therefore, you have information about what happened

12   that have to do with other parts of the lawsuit.

13       A.   Fine.

14       Q.   Okay.  Mr. Amar, where were you born?

15       A.   Israel.

16       Q.   When did you come to this country to live?

17       A.   I came to this country to live in 1998,

18   but I grew up in Canada.

19       Q.   Where did you grow up?

20       A.   Montreal.

21       Q.   Are you married?

22       A.   Yes.

23       Q.   And what is your wife's name, please?

24       A.   Natalie.

25       Q.   Do you have children?

1       A.   Yes.

2       Q.   How many?

3       A.   Two.

4       Q.   How old are they?

5       A.   Three and one.

6       Q.   Could you please tell me when you first

7  met Frank Amodeo?

8       A.   Roughly, 2000.  Maybe early 2000.  Late

9  '99, early 2000.  I don't recall exactly.  It's

10  been over ten years.

11       Q.   Under what circumstances did you meet him?

12       A.   We were introduced by a mutual

13  acquaintance.

14       Q.   And who was that person, please?

15       A.   Wayne -- I forgot his last name, but Wayne

16  something or other.

17       Q.   And do you know why Wayne introduced you

18  to Mr. Amodeo?

19       A.   Wayne introduced me to Mr. Amodeo because

20  he was working for a Kenneth Mueller, CPA, in

21  Orlando.  I was living in Orlando at the time.  And

22  Wayne was doing some bookkeeping work for a friend

23  of mine's company, he and I had met, and he wanted

24  to introduce me to Frank Amodeo, thought that, you

25  know, it might make friends.  And that was it,

1   really.  I was actually curious to meet him because
2   he spoke so highly of Frank.  So --
3        Q.   Could you tell me -- I'd like to know
4   about your background, starting with high school.
5        A.   What about it?
6        Q.   Where did you go to high school?
7        A.   I went to high school in Montreal.
8        Q.   And did you do any post secondary
9   education?
10       A.   Yes.  I went to school in New York City;
11   Yeshiva University.
12       Q.   And have you done anything post grad?
13       A.   No.  I actually -- I left my junior year
14   for a semester and it's been 17 years.  So I only
15   completed the first two years.
16       Q.   When did you move to Florida?
17       A.   In, roughly, '99.
18       Q.   What was the year that you dropped out of
19   school?
20       A.   "Drop out" is an interesting term, but
21   yeah, I left in '93.
22       Q.   Okay.  When you left school.
23       A.   '93.
24       Q.   Left in '93.  And between '93 and '99,
25   what were you doing occupationally?

12

1    A.   I bartended, I waitered.  Did a few things

2  in Montreal, you know, late teens, early 20's.

3    Q.   Do you remember where you were when you

4  first -- you said you were in Orlando -- but when

5  Wayne first introduced you to Mr. Amodeo?

6    A.   Where we met?

7    Q.   Yes.

8    A.   It was at a restaurant.  I don't know if

9  it was a Perkins or some -- like a diner

10  restaurant.

11    Q.   What was your first professional job?

12    A.   My first professional job?

13    Q.   In terms of that wasn't bartending or

14  waiting tables, or that was headed in the direction

15  that, you know, you considered -- well, let's put

16  it this way:  What do you consider to be your

17  occupation?

18    A.   I'm a consultant.

19    Q.   What kind of consultant?

20    A.   Marketing and HR services.

21    Q.   And what is your employment history in

22  marketing and employment services?

23    A.   Dating back to when?

24    Q.   Ever.

25    A.   Ever?

13

1    Q.   Yes.

2    A.   I did some consulting in '05 for

3    Mirabilis.  In '06, I had an intern position at

4    AEM.  And post that, I've been doing some marketing

5    and consulting work.

6    Q.   Did you have any work for any company

7    associated with Mr. Amodeo before '05?

8    A.   Yes.

9    Q.   And what was that?

10   A.   I mean, I wasn't really working for him,

11   but interesting history that Frank and I have, he

12   had owed me some money and I was kind of trying to

13   collect that money.  So --

14   Q.   How did it come about that Mr. Amodeo owed

15   you money?

16   A.   I lent him some money and he never paid me

17   back.

18   Q.   What was the circumstance under which you

19   lent him money?

20   A.   It was in late -- it was in early '01.  I

21   had a business in Orlando, it had to be liquidated,

22   it wasn't doing well, and there was a whole bunch

23   of receivables that he was supposed to pay me on

24   and never did.

25   Q.   What was the business?

14

1      A.   It was a call center.

2      Q.   A call center.  What does that mean?

3      A.   Telemarketing operation.

4      Q.   And do you mean by your previous question

5   that you sold the receivables to Mr. Amodeo?

6      A.   No.  I didn't sell the receivables to Mr.

7   Amodeo, no.

8      Q.   Were you doing telemarketing for Mr.

9   Amodeo?

10      A.   No, no, no.  For myself.

11      Q.   So -- well, first of all, what was the

12   name of the call center?

13      A.   ComCard.

14      Q.   ComCard?

15      A.   Yeah.

16      Q.   Did it have any kind of business

17   appelation afterwards?  Was it an LLC organization?

18      A.   Inc.

19      Q.   Inc.

20      A.   ComCard, Incorporated.

21      Q.   And was it incorporated in the State of

22   Florida?

23      A.   Yes.

24      Q.   And how did Mr. Amodeo come -- I still

25   want to understand how he came to owe you money as

1  a result of the call center.  How did one thing

2  lead to the next?

3      A.   Well, the company wasn't doing very well.

4  Frank was a -- introduced himself as able to

5  liquidate the assets of the company and pay me some

6  moneys from the receivables that were left over.

7  And, yeah, I never got paid on those receivables.

8  I mean, I've collected over the years, but I, you

9  know --

10      Q.   Why would he pay money on the receivables?

11  I don't understand.

12          MS. VILMOS:  Object to the form.

13  BY MS. HAVENER:

14      Q.   That's okay.  You can still answer.

15      A.   Yeah, I just -- I also had lent him money

16  as a personal favor.  It was --

17      Q.   Was that -- was the money that -- I'm

18  sorry.  I interrupted you.  Were you finished with

19  your answer?

20      A.   Yes.

21      Q.   Was the money that you lent him as a

22  personal favor reduced to writing?

23      A.   No.

24      Q.   So it was an oral agreement?

25      A.   It was a handshake, yeah.

1      Q.   Okay.  How much money?

2      A.   I don't recall.

3      Q.   Can you give me an estimate?  Was it

4   10,000?  Was it closer to 100,000?

5      A.   It was a couple hundred thousand.

6      Q.   Okay.  And how much money did he owe you

7   on the receivables?

8      A.   I don't recall.  It's been about ten

9   years.

10      Q.   Again --

11      A.   Total, it was about 200,000, between the

12   personal loans and the receivables of the assets

13   after we sold off everything.

14      Q.   When were you first in a business venture

15   with Mr. Amodeo?

16      A.   In a business venture with Amodeo?

17      Q.   Let me ask the question more carefully.

18   And when I'm asking this question, I'm looking for

19   any kind of business in which you were involved in

20   which Mr. Amodeo was also involved, whether as an

21   investor, as a consultant, as an employee or

22   officer or director.  You know, any business

23   relationship that you had with a company with which

24   Mr. Amodeo also had a relationship.

25      A.   In '03, there was a company that Mr.

1    Amodeo was working on called -- I forgot the name

2    of the -- it was a printing roll up that he was

3    working on.  And it was a company called Ameriplast

4    out of -- somewhere in South Florida.  It was in

5    Boca Raton.  And I thought I could bring a very

6    large client to the table so that --

7        Q.   What do you mean by a roll up?

8        A.   He wanted to merge a few printing

9    companies, a few struggling companies.  Roll them

10   all up into one and make one successful company.

11       Q.   Do you know the names of the ones that he

12   was going to merge?

13       A.   No, I was just involved in the -- well,

14   I'm not really involved.  I was trying to market

15   the products from Ameriplast.  They're a plastic

16   printing company.

17       Q.   Have you made loans in the nature of

18   100,000 or several hundred thousand dollars to

19   other people?

20       A.   I don't make a practice of it, no.

21       Q.   You don't make a practice of it; is that

22   what you said?

23       A.   Correct, yeah.

24       Q.   Thank you.  Was anyone else involved in

25   the Ameriplast -- is it fair to call it a deal, or

1    the Ameriplast roll up?

2        A.   Anybody else.   What do you mean by

3    "anybody else"?   There were a few people involved

4    in it.

5        Q.   Okay.   Could you name the people who were

6    involved in it?

7        A.   No, not really.

8        Q.   Was Mr. Sadrianna involved in it?

9        A.   Mr. Sadrianna was involved not in the

10   actual Ameriplast.   I think he was involved with

11   Frank in Orlando.   I was working out of the Boca

12   Raton site, but I believe Mr. Sadrianna might have

13   been involved.   I don't really recall.

14       Q.   When you say the Boca Raton site, was

15   Ameriplast located in Boca Raton?

16       A.   Yes.   Yeah, I had mentioned that.

17       Q.   And where were the other companies that

18   were being rolled up into Ameriplast located?

19       A.   I have no idea.   I really wasn't involved

20   in the roll up.   I was just trying to bring a large

21   client to the Ameriplast --

22       Q.   And what was that client?

23       A.   I don't remember the name of it, but it

24   was a phonecard company that needed the plastic

25   manufacturing.   It was a very large company out of

1  New Jersey.

2      Q.   And what was your relationship with the

3  phonecard company?

4      A.   I knew some people that worked there and

5  that could make the proper introductions if

6  Ameriplast could deliver.

7      Q.   What was Frank's relationship to the deal?

8  How was he involved?

9      A.   That's a question I really can't answer,

10  Kathleen.  Frank had his -- he got into the deal

11  somehow.  He, you know -- I really don't know.

12      Q.   When you did loan the money to Frank that

13  we spoke about earlier, what reason did you have

14  for doing that?

15      A.   He was a -- you know, he was kind of

16  struggling, he wasn't doing too well, and I -- I'm

17  a bit of a softie, I lent him some money, and I

18  thought I'd get paid back when he liquidated the

19  assets and he's worked out some things.  I was

20  always very impressed with Frank's abilities to,

21  you know, to accomplish certain things.

22      Q.   Do you know -- I think you said that that

23  was -- let me see.  Excuse me.  When did you lend

24  him the money?  You met him in late '99 or 2000?

25      A.   Uh-huh.  Early 2000.  I believe it was in

1    early '01.

2         Q.   That you loaned him the money?

3         A.   Yeah.

4         Q.   Did you already know about his history in

5    Georgia and his having spent time in prison?

6         A.   Nope.

7         Q.   You didn't?

8         A.   No.

9         Q.   When did you learn about that?

10        A.   After I lent him the money, yeah.   I

11   wasn't aware of his whole history.   I didn't know

12   he was a disbarred attorney and a convicted felon

13   and all.

14        Q.   When did you learn that information?

15        A.   I mean, I learned it in bits and pieces

16   along the way sometime between '01 and '03, you

17   know.   He didn't start publicizing it until the

18   Mirabilis scandal.

19        Q.   Mr. Amodeo, as you know, has been, at

20   least in the most recent years that I'm aware of,

21   very open about his history.

22        A.   Uh-huh.

23        Q.   But I'm gathering from your answers that

24   that was not the case when you first knew him.

25        A.   That was not the case, no.

1     Q.   When you did learn it, how did you learn

2   it?

3     A.   I don't recall.  But I did approach him

4   about it.

5     Q.   So someone else told you?

6     A.   I think someone else hinted to it and then

7   I approached him and we talked about it.  And I

8   don't think he confessed everything at once, but,

9   like I told you, I learned bits and pieces over

10   some time.

11     Q.   Do you know who else -- I apologize.

12   Strike that.

13      Do you know who the person was who hinted

14   about it?

15     A.   No.  I don't recall, actually.

16     Q.   Did Mr. Amodeo ever pay you back that

17   money?

18     A.   In bits and pieces.  Not really in

19   payment, but like in consulting contracts and some

20   moneys here and there.

21     Q.   After the Ameriplast deal, what was the

22   next interaction you had on a business basis with

23   Mr. Amodeo?

24     A.   I mean, I was -- I spent some time in the

25   office that he had built.  I think it was in late

1    '04.  I'm not exactly sure, but he had an office in

2    downtown Orlando.  Trafalgar, Matrix; there were

3    several entities that were operating out of

4    downtown Orlando office space.

5         Q.   You said before that you were impressed

6    with Frank's abilities?

7         A.   Yeah.

8         Q.   Did your attitude change after you learned

9    about his criminal history?

10        A.   No, it didn't.

11        Q.   When you became familiar -- you said you

12   spent some time in the offices of Trafalgar and

13   Matrix.  Were you involved with those companies?

14        A.   Not really.  I just thought it was -- you

15   know, he offered me to come and spend some time

16   over there.  I believed the only way I'd have a

17   chance of actually getting repaid is spending

18   considerable time over there, so I was --

19        Q.   So what were you doing there?

20        A.   I had an office space.  I really was not

21   doing much, and then after a few months I started

22   to get involved with a possible payroll processing

23   company.

24        Q.   What was that?  What was that company?

25        A.   I really don't recall the name.

1    Q.    You don't know the first payroll

2  processing company you were involved with?

3    A.    No.

4    Q.    What was the business of Trafalgar?

5    A.    The business of Trafalgar was trying to

6  turn precious metal concentrate into cash.  That's

7  what I understood.  I didn't really understand

8  everything else.

9    Q.    What was everything else?

10    A.    I really don't --

11    Q.    Do you understand it now?

12    A.    No.  No.

13    Q.    What was Matrix?

14    A.    A consulting firm of some sort.

15    Q.    Who did it consult for?  Do you know?

16    A.    I don't know of any of the clients.

17    Q.    When you said you were impressed with

18  Frank's abilities, to what were you referring?

19    A.    Be more specific, Kathleen.  What do you

20  mean by --

21    Q.    Well, what was it about Frank that

22  impressed you?

23    A.    I think Frank is a brilliant person.  He

24  just always came across as an extremely brilliant

25  person.

24

1      Q.   Do you still believe that?

2      A.   Yes, I do.

3      Q.   I'm going to go through -- and not because

4   I don't know this myself -- I want to know the

5   names of all the companies in which you were a

6   participant in which Frank was also a participant

7   in any capacity.  So I take it you were not a

8   participant in Trafalgar or Matrix?

9      A.   No.  Not actively, no.

10     Q.   Not actively.  Did you --

11     A.   There was another company, but I don't

12  recall.  There were so many corporations, Kathleen,

13  over the years.  I really don't recall.

14     Q.   Did you consult for either of those

15  companies?

16     A.   No.

17     Q.   Do you remember the first consulting

18  contract you had that involved a company of Mr.

19  Amodeo's or Mirabilis?

20     A.   It was probably in early '05 when I was

21  consulting for Presidion through -- whether it was

22  Mirabilis or Matrix or one of those companies.

23     Q.   I don't understand what you mean.  Were

24  you personally consulting for Presidion, or did you

25  mean that -- well --

1    A.   For Mirabilis, but the contract was

2  Presidion.

3    Q.   So were you at that time an employee of

4  Mirabilis?

5    A.   I don't know if it was Mirabilis or Common

6  Paymaster, but one of the entities owned by

7  Mirabilis.

8    Q.   Mr. Cuthill testified a couple of weeks

9  ago that Common Paymaster and Mirabilis were always

10  separate companies.

11    A.   Uh-huh.

12    Q.   So when you were working for Mirabilis,

13  you weren't sure if you worked for Common Paymaster

14  or Mirabilis?

15    A.   Well, I entered into an agreement with

16  Common Paymaster in late '05.  That's when I

17  entered into a contractual agreement with them.

18  But for most -- for probably six or seven months

19  preceding that I was consulting for Presidion.

20    Q.   Via -- was there a vehicle through which

21  you were consulting for Presidion?  In other words,

22  who signed your paycheck?

23    A.   I believe we were a PEO client of

24  Presidion.  So it's a -- you know.

25    Q.   Okay.  Do you know the name of it?

26

1      A.    Of the vehicle?  It was Presidion.

2      Q.    Of who signed your paycheck.  Whatever --

3      A.    It was Presidion.  It was Presidion at

4  that time.

5      Q.    Okay.  And that's Presidion Corporation?

6      A.    One of the seventeen companies, but, yeah

7  I think it was Presidion.

8      Q.    So but we're now talking about the public

9  company.

10     A.    At that time, yeah.

11     Q.    Okay.  And at another time were you paid

12  by a different Presidion organization?

13     A.    No, no, no.  It went from there to Common

14  Paymaster.

15     Q.    And while you were being paid by Common

16  Paymaster, for what entities did you provide

17  services?

18     A.    For Presidion Corporation.

19     Q.    Any others?

20     A.    No.  And Mirabilis, that was working on

21  some kind of a solution to help the distressed

22  Presidion.  And I believe Nexia was the actual

23  contract.

24     Q.    Nexia had a contract with whom?

25     A.    I believe they had a consulting agreement

1    with Mirabilis, that had an agreement with

2    Presidion.  I really don't know the exact

3    structures, Kathleen.  I wasn't privy to that

4    information.  Nor did I care.

5         Q.   You mentioned earlier that you then became

6    associated with AEM, I think?

7         A.   Yes.

8         Q.   And when was that?

9         A.   That was --

10        Q.   I'm sorry.  Initials A-E-M.

11        A.   -- late '05.  Third quarter or fourth

12   quarter of 2005.

13        Q.   Okay.  So in early '05 you were consulting

14   for Presidion; correct?  Did I understand that

15   correct?

16        A.   Correct.

17        Q.   And then sometime in '05 you signed a

18   contract with Common Paymaster.

19        A.   Yeah.  In late '05, yes.

20        Q.   And you were working -- associated in some

21   way with AEM also in late '05?

22        A.   Correct.

23        Q.   What was your role with AEM?

24        A.   I was the Interim President to AEM.

25        Q.   How long was the interim?

1        A.    Five months and change.

2        Q.    What time period?

3        A.    The official date I believe was

4    January 1st through June 13th.

5        Q.    Of?

6        A.    '06.

7        Q.    Did you ever hold any office in any of the

8    other Mirabilis-associated entities?

9        A.    No.  Aside from AEM, no.

10        Q.    Were you ever on the Board of Directors of

11    any of the Mirabilis-associated entities?

12        A.    Not to my knowledge.

13        Q.    Did you ever hold an office in any of the

14    Amodeo-associated entities?  And just to make that

15    clear, do you understand what I mean when I say --

16        A.    Yes.

17        Q.    -- Mirabilis-associated or

18    Amodeo-associated, or I might otherwise say

19    Mirabilis-related or Amodeo-related?  Do you

20    understand what I mean by the difference?

21        A.    Yes.  Aside from that payroll processing

22    company I told you in '03, '04, no, I don't recall

23    holding office in any other --

24        Q.    And were you ever on a Board of Directors?

25        A.    No.

1    Q.   Did you ever sign contracts on behalf of

2  AEM?

3    A.   Yes.

4    Q.   As president?

5    A.   Yes.

6    Q.   In any other role?

7    A.   No.  Not to my recollection.

8    Q.   Did you ever sign contracts on behalf of

9  Mirabilis?

10    A.   Not to my recollection.

11    Q.   Did you ever sign as a shareholder of

12  Mirabilis?

13    A.   There was a shareholder agreement that I

14  was handed.  I don't recall ever signing it.

15    Q.   Did you ever sign, for example, the

16  minutes of a Board of Directors meeting?

17    A.   For which company?

18    Q.   For anybody.  Any of the -- I'm going to

19  use now the term, "under the Mirabilis umbrella."

20  And by that I mean both Amodeo-associated and

21  Mirabilis-associated entities.

22    A.   Yeah.

23    Q.   I understand that there were a million.

24    A.   Yeah, yeah.  Not to my recollection.  It

25  could be.  I mean, I don't recall being a member of

1  any board or signing any corporate minutes.

2      Q.   What's FYI Enterprises?

3      A.   FYI Enterprises?

4      Q.   Yes.

5      A.   It's a company.  It was a corporation that

6  was defunct years ago.

7      Q.   What did it do?

8      A.   Nothing, really.  It was meant to do a few

9  things, but it didn't end up doing anything.

10     Q.   What was it intended to do?

11     A.   It was actually set up to buy a property

12 in Naples, but that deal never went through.  I

13 believe Frank had invested some money in it, but --

14     Q.   Who were the owners of FYI Enterprises?

15     A.   Myself.

16     Q.   You and only you?

17     A.   Yeah.

18     Q.   So, okay.  Let me get this straight.  Mr.

19 Amodeo had invested some money in a property in

20 Naples.

21     A.   Correct.

22     Q.   And it was intended that FYI Enterprises

23 would purchase that property or further invest?

24     A.   Correct.

25     Q.   And you were the sole owner of FYI.