**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | | |
|---|---|---|
| MIRABILIS VENTURES, INC. and<br>NEXIA STRATEGY CORPORATION, | ) )  ) | Case No.: 6:07-CV-1788-ORL-28-JA-GJK |
| Plaintiffs, | ) | |
| -vs.- | ) ) | |
| PALAXAR GROUP, LLC;<br>PALAXAR HOLDINGS, LLC;<br>FRANK HAILSTONES; EDITH CURRY<br>a/k/a EDITH BROADHEAD; and<br>TERENCE CHU, | ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| vs. | ) ) | |
| MIRABILIS VENTURES, INC., et al., | ) ) | |
| Counterclaim and Third<br>Party Defendants. | ) ) | |

## SECOND AMENDED COUNTERCLAIMS AND THIRD PARTY CLAIMS OF DEFENDANTS EDITH CURRY AND FRANK HAILSTONES

Defendants Edith Curry ("Curry"), Frank Hailstones, ("Hailstones"), by and through their undersigned attorneys, for their Second Amended Counterclaims and Third Party Claims, allege and state as follows:

### THE PARTIES

1. Counterclaim and Third Party Plaintiff Edith L. Curry is a resident and citizen of Henrico County, Virginia.

2. Counterclaim and Third Plaintiff Frank Hailstones is a resident and citizen of the United Kingdom.

3. Counterclaim Defendant Nexia Strategy Corporation ("Nexia") is a corporation organized under the laws of the State of Florida with its principal place of business in Orange County, Florida.

4. Former Counterclaim Defendant Mirabilis Ventures, Inc. ("MVI") was the parent of the wholly-owned subsidiary Nexia.  The actions of MVI are critical to an understanding of the claims set forth herein.  MVI is a corporation organized under the laws of the State of Nevada, with its principal place of business located in Orlando, Florida.  MVI filed for bankruptcy protection in May 2008.  On December 2, 2009, Counterclaim and Third Party Plaintiffs Curry and Hailstones dismissed their Counterclaims against MVI in the interest of having the stay of this case lifted and the proceedings go forward.

5. Third Party Defendant Yaniv Amar ("Amar") is an individual who is a resident of Miami-Dade County, Florida, and who, upon information and belief, at times relevant to this action, was an executive or shareholder at Mirabilis ("MVI") and/or one of its affiliated companies.

6. Third Party Defendant Frank Amodeo ("Amodeo") is an individual who, upon information and belief, at all times relevant to this action, was a resident and citizen of the state of Florida.  During the time that the action has been pending, Amodeo's residence has changed from Orlando, Florida to the Federal Correctional Center at Coleman, Florida.

7. Third Party Defendant Aaron Bates ("Bates") is an individual who, upon information and belief, is a resident and citizen of Orange County, Florida, who was formerly counsel to MVI and/or one or more of its affiliate companies and was originally counsel to Plaintiffs herein.

8. Third Party Defendant Matthew Mokwa ("Mokwa") is an individual who, upon information and belief, is a resident and citizen of Orange County, Florida, who was formerly counsel to

MVI and/or one or more of its affiliate companies and was associated with Goldberg Bates, PLLC, which was originally counsel to Plaintiffs in this case.

JURISDICTION AND VENUE

9.  Jurisdiction exists pursuant to 28 U.S.C § 1331 and 28 § 1332(a)(1) and (a)(3), by virtue of diversity of citizenship.  This is an action between citizens of different states and in which a party is a citizen or subject of a foreign state and the amount in controversy exceeds, by far, the sum or value of Seventy-Five Thousand Dollars ($75,000), exclusive of interest and costs.

ALLEGATIONS RELEVANT TO ALL CLAIMS

10. Counterclaim and Third Party Plaintiff Curry joined Nexia on June 17, 2005, as a Master Strategist with the title of Senior Regional Office Manager, and was employed by Nexia until October 31, 2006.  (*See* Doc. 24-5).

11. Counterclaim and Third Party Plaintiff Hailstones, a citizen of the United Kingdom, began working with MVI and Nexia on October 3, 2005, when MVI took a 25% stake in Hailstones' company, Axena, Inc. ("Axena"), at which time Amodeo committed that via MVI he would pay all further expenses of Axena and maintain Hailstones' United States employment visa status, a promise that MVI and Amodeo broke.

12. Amodeo funded and controlled all financial decisions of MVI and Nexia, and was the only individual with the authority to commit to or approve payment of any transaction involving a debt on the part of any of the entities involved; on May 16, 2006, Amodeo notified all MVI/Nexia executives that he was MVI's (and Nexia's) CEO/President designate.

13. According to the December 13, 2006 Nexia Strategy Written Action of the Shareholders minutes, "from April 20, 2005 through December 13, 2006, Frank Amodeo was listed as the sole shareholder and sole director of Nexia Strategy Corporation." (*See* Doc. 24-2)

COUNT 1: FRAUD IN THE INDUCEMENT / CURRY VS. AMODEO AND NEXIA.
(Nexia Employment Agreement)

14. Counterclaim and Third Party Plaintiffs restate the allegations in Paragraphs 1 through 14 as if fully set forth herein.

15. In late 2004, The Brookmeade Group LLC ("Brookmeade"), of which Curry was the controlling member, was engaged for negotiation of creditor disputes by Presidion Solutions, Inc. ("PSI").

16. A fee arrangement was negotiated between PSI and Curry for the work she had performed for PSI pursuant to which Curry, through Brookmeade, was to receive $2,000,000 in Presidion Corporation stock, then a public company and the parent company of PSI, and a $500,000 promissory note from PSI. (Doc. 59-3).  On April 15, 2005, Brookmeade was issued what was represented to be $2,000,000 worth of stock in Presidion Corporation.  In fact, the stock, on the date it was issued, was worth less than 10% of that amount, and within months thereafter, the stock became worthless.

17. The Brookmeade Secured Promissory Note, ("Brookmeade Agreement"), was executed by Craig Vanderburg, the President and CEO of PSI on January 26, 2005. Pursuant to the terms of the Secured Promissory Note, PSI was to remit $20,833.34 per month for a period of twenty-four months.

18. In early June 2005, Amodeo acquired PSI and ceased paying the Brookmeade Agreement. Curry, on behalf of Brookmeade, approached Amodeo in search of a resolution because between January 26, 2005 and June 2005, PSI had made its monthly payments on a timely

basis, but Amodeo had ceased payments.  A total amount of $104,166.70 had been paid, leaving a balance of $395,833.30, plus interest, unpaid.

19. On June 17, 2005, in reliance on a number of promises by Amodeo, including honoring the Brookmeade Agreement, as well as representing to Curry that the indemnity provisions contained in Mirabilis' Articles of Incorporation, the indemnity provisions and warranties that that Amodeo would follow "all applicable laws contained in the AQMI Strategy/MVI consulting agreement, indemnity and warranty provisions contained in the May 1, 2005 MVI/Nexia consulting agreement (signed by Amodeo as President of Nexia), and indemnity provisions  contained in the Nexia Employment Agreement were binding (but all of which Amodeo knew to be false), Curry signed a written employment agreement with Nexia.

20. Curry signed her written contract with Nexia based upon false representations by Nexia and Amodeo including those that that Nexia and/or MVI planned to open an accounting operations center for all MVI and Nexia's Professional Employee Operations ("PEOs") in Richmond, Virginia, which Curry would manage.

21. Curry immediately began preparing a business plan for the proposed operation, *i.e.*, Curry met with a number of public officials in Virginia, including the Office of the Governor, three cabinet members, the Virginia Chamber of Commerce, the Virginia Economic Development Commission, The Richmond Times Dispatch, Senator George Allen, and local businesses, all in her efforts to establish the Richmond facility.

22. Amodeo pledged to Curry that he also would soon acquire manufacturing domains and manufacturing businesses in Richmond which would be under the direction of Curry and the Richmond facility.

23. On or about May 3, 2006, after MVI had negotiated and acquired a lease on premises as the base for the business referred to above and had hired five Nexia staff pursuant to the plan described above who were based at the planned Richmond facility, Curry and other Richmond personnel repeatedly notified Amodeo that the Richmond facility was non-operational, *i.e.*, that it had no telephones or computers.

24. In addition, the Richmond staff were tasked with selling PEO's in Virginia, although it was later confirmed, as Curry had stated at the beginning despite Amodeo's assurances to the contrary, that MVI-affiliated PEO's were not licensed to operate in Virginia.

25. On June 5, 2006, Curry sent an email to MVI/Nexia asking the status of the manufacturing domains.  She was then informed that Amodeo had moved all manufacturing domains to his personal control.

26. None of the commitments Amodeo or Nexia made to Curry concerning the Richmond operation were fulfilled.

27. Amodeo and Nexia misrepresented material facts which they knew or should have known to be false at the time they were made in an effort in an effort to induce Curry to enter into her employment contract and to continue her employment at Nexia.

28. Amodeo and Nexia intended that Curry rely on their misrepresentations in order to induce her to accept and continue her employment with Nexia in part so she would not enforce the payment provisions of the Brookmeade Agreement.

29. With respect to Count One, Curry has suffered damages, as a result of having been fraudulently induced to enter into the employment contract with Nexia, in an amount in excess of $2,395,833.30, plus interest, as well as forgone opportunities, lost profits, and

damage to her personal and professional reputation in her home, the Commonwealth of Virginia.

<u>COUNT 2: BREACH OF SEPARATION AGREEMENT / CURRY VS. NEXIA</u>

30. Counterclaim and Third Party Plaintiffs restate the allegations in Paragraphs 1 through 29 as if fully set forth herein.

31. By early September 2006, Curry was advised of Amodeo's decision to terminate her contract together with those of the other Nexia staff based in Richmond.

32. Between September 8 and October 31, 2006, MVI, Nexia, and Curry negotiated the terms of Curry's separation from MVI and Nexia.  Amodeo approved all aspects of these negotiations, and fully participated in them, as did General Counsel Richard Berman, Chairman of the Board Laurie Holtz, Nexia President Frank Hailstones, and MVI-HR counsel Matthew Mokwa.  The negotiations led to the execution of a Confidential Separation Agreement between MVI/Nexia, and Curry (Doc. 8-2).

33. On October 20, 2006, Curry and MVI/Nexia signed the Confidential Separation Agreement that clearly stated the terms of Curry's separation from MVI and all of its affiliate companies effective October 31, 2006. (Doc. 8-2).

34. The Confidential Separation Agreement constitutes a valid contract, assigning all right, title, and interest in "Nexia Certification" to Curry, an assignment for which Curry gave significant consideration.

35. The Confidential Separation Agreement commits that "neither party shall disparage the other and [the parties] shall agree upon a statement to be made to any third party who may inquire as to the reasons for separation."

36. Nexia, through its agents, including but not limited to Amodeo, Mokwa, Bates, and Amar, has disparaged Curry by filing and continuing to prosecute the Amended Complaint, and by making other false and disparaging statements, including press releases and oral statements stating Curry "absconded with [Nexia] assets," and was responsible for "[MVI's loss] of $220 Million;" by the means of service of the Complaint on Curry; by the unreasonable continuation of the lawsuit after the bankruptcy and stay of these proceedings even after it became clear that continued prosecution was legally deficient and inequitable.  These and every other false and disparaging statements about Curry by any agent of Nexia constituted a material breach of the Confidential Separation Agreement.

37. The Confidential Separation Agreement provided that Nexia would accomplish certain tasks that would allow for Curry to work with Nexia in a joint venture to launch the anti-fraud solution.  Nexia failed to accomplish any of those tasks, which failure was and continues as a material breach of the Confidential Separation Agreement.

38. The Confidential Separation Agreement provided that the Brookmeade Agreement (of January 2005) would remain in full force and effect.  Nexia's continued failure to honor the 2005 Brookmeade Agreement was and continues as a material breach of the Confidential Separation Agreement.

39. As a result of the actions described in this Count Two, Curry has suffered severe monetary damages as a result of MVI and Nexia's breach of the Confidential Separation Agreement in an amount far in excess of in excess of $2,395,833.30, plus interest, as well as damages including but not limited to damage to her personal and professional reputation, lost opportunities, lost profits, and the expenditure and/or incurring of attorneys' fees.

COUNT 3: CIVIL CONSPIRACY TO COMMIT SLANDER /
CURRY AND HAILSTONES V. AMODEO, AMAR, BATES, AND MOKWA

40. Counterclaim/Third Party Plaintiffs Curry and Hailstones restate the allegations in Paragraphs 1 through 39 as if fully set forth herein.

41. In February 2007, MVI and Nexia were notified that Curry was voluntarily cooperating with AUSA I. Randall Gold and the Federal Grand Jury Investigation of Amodeo and all his related entities, including MVI and Nexia.

42. In March 2007, within 5 months of negotiating the Confidential Settlement Agreement with Curry and within two months of negotiating Frank Hailstones' Termination Agreement, Amodeo hired former MVI President, James Sadrianna ("Sadrianna") to investigate possible claims on which to base the filing a lawsuit against Curry, Hailstones, and the Palaxar entities.

43. By no later than June 2007, Sadrianna notified Amodeo and Amar that Curry and Hailstones were scheduled to speak at the "58th Audit Directors & Managers Symposium" (the "Conference") in Scottsdale, Arizona in October 2007.

44. On August 30, 2007 Bates and Amodeo devised the press release plan whereby Amodeo would "go after those people who [he believed] helped put [him] in this situation [of having to repay the $220 million in trust fund taxes Amodeo admitted to stealing.]"

45. By no later than September 2007, Bates and Mokwa developed the plan to travel to Arizona for the purpose of serving Curry and Hailstones with process in this lawsuit in front of their peers at the Conference, ideally while Curry and Hailstones were making a public presentation, in order to cause them "maximum embarrassment."

46. In or about September 2007, Bates and Mokwa consulted Amodeo, who wholeheartedly endorsed Bates and Mokwa's plan to serve Curry and Hailstones in front of their peers at the

Conference, in particular during a presentation, to cause Curry and Hailstones maximum humiliation and damage to their professional reputations.

47. In or about September 2007, Amodeo informed Amar that Bates and Mokwa intended to travel to Arizona to serve Curry and Hailstones.  Amar expressed the opinion that the plan was a "great idea" and informed Bates and Mokwa that he too would travel to Arizona in order to participate in the effort to cause "maximum embarrassment" to Curry and Hailstones.

48. On or about October 11 or 12, 2007, Bates, funded by knowingly laundered money, prepared Jaiman's false affidavit, and using an unsigned "employment agreement" for Hailstones, two obviously-altered employee handbooks from Common Paymaster (a non-party to the suit), filed the instant law suit.

49. On or about October 11 or 12, 2007, at the direction of and funded by Amodeo and with the participation of Bates, Mokwa, Jodi Jaiman, (then president of MVI, Nexia, AEM, Tenshi, Titanium, AQMI, Soone Business Development, and other MVI-owned or Amodeo-owned entities), and Ron Sachs Communications, implemented their August 30, 2007 plan whereby MVI issued a press release to the Orlando Sentinel discussing both the disappearance of over $220 million and the lawsuit against Palaxar, Curry, and Hailstones alleging that they absconded with certain assets of MVI and were responsible for the missing $220 million, which resulted in the publication of a news article reflecting these false allegations on Saturday, October 13, 2007.  Further, Amodeo directed that a webblog ("blog") be initiated to provide himself, Bates, Mokwa and others a vehicle for anonymously commenting on the litigation once it was underway.  This resulted in the creation and maintenance of www.Mirabilisventures.blogspot.com and www.presidionsolutions.blogspot.com, to which,

upon information and belief, Amodeo and Mokwa, among others, with Jodi Jaiman's assistance, were frequent contributors.

50. Upon information and belief, Bates, Mokwa, and Amar intended to serve Hailstones and Curry earlier during the Conference, specifically during their own presentation to the participants, in order to cause greater embarrassment, but by the morning of October 15, 2007, they had failed to accomplish service.

51. On or about October 15, 2007, and at various times prior thereto, Defendants Amodeo, Bates (original counsel to Plaintiffs in this lawsuit and former MVI and Nexia in-house attorney), Amar (a former MVI employee and/or shareholder) and Mokwa (a current or former attorney of MVI, later to be hired by Goldberg & Bates, PLLC, original counsel to Plaintiffs in this lawsuit) met, joined together, planned, and conspired to slander Curry, Hailstones and the Palaxar entities.

52. Upon information and belief, Defendants Nexia, Amodeo, Bates, Amar and Mokwa agreed and understood that the purpose of their meetings and agreements were unlawful and would result in injury to Plaintiffs, and agreed and understood that each in furtherance of the plan would constitute an act in concert with the others to achieve this purpose. Amodeo in particular expressed that to serve Curry and Hailstones in public would have maximum impact in humiliating them, in damaging their reputation, and—he hoped—would put them out of business.

53. The gravamen of the Complaint in this lawsuit was that when Curry and Hailstones left the employ of MVI and Nexia, they conspired and took with them certain intellectual property and trade secrets, including "Nexia Certification."

54. Amodeo, Bates, and Mokwa had actual knowledge of the terms of Curry's legal and binding Separation Agreement and therefore knew that the allegations in the Complaint against Curry, Hailstones, and Palaxar were false.

55. Curry had left the employ of Nexia approximately one (1) year prior and Hailstones left MVI approximately nine (9) months prior to the time the Complaint was filed.  At no time prior to the date that the complaint was served on Curry did anyone representing either MVI or Nexia ever express any dissatisfaction about "Nexia Certification" and no demand was ever made.

56. Amodeo, Amar, Bates, and Mokwa did not contact the Conference organizers to attempt to prevent Curry and Hailstones from presenting at the Conference, despite the fact that they had filed for a preliminary injunction and constructive trust allegedly concerned that Nexia Certification would be promoted for Hailstones and Curry's personal gain and or benefit.

57. Amodeo, Amar, Bates, and Mokwa never made any effort to contact Curry or Hailstones to request that they refrain from presenting at the Conference, despite the fact that they were allegedly concerned that Nexia Certification would be promoted.  Amar, Bates and Mokwa was physically present in Scottsdale, Arizona where the Conference was held prior to and during the same time that Curry and Hailstones were presenting.

58. Plaintiffs' Motion for Preliminary Injunction (Doc. 3), filed on October 12, 2007, along with the Complaint (Doc. 2), asked this Court to enjoin Curry and Hailstones from using "Nexia Certification" during their scheduled October 14, 2007, presentations at the Scottsdale, Arizona Conference.

59. On the morning of October 15, 2007, in a hotel suite rented by Mokwa;  Amar, Mokwa and Bates (along with Bates' personal assistant Clinton Groomes) met with Arizona process server Thomas Zollars ("Zollars").   During this meeting, Mokwa showed Zollars the

Saturday, October 13, 2007 edition of the Orlando Sentinel newspaper bearing the banner headline "[MVI] Lost $220 Million."   Mokwa also provided Zollars with a copy of the newspaper article.

60. On October 15, 2007, Mokwa, Bates, and Amar, together with Zollars, served Curry **but not Hailstones** with the Complaint that initiated this litigation. The service of the initial complaint took place in Scottsdale, Arizona, at the "58th Audit Directors & Managers Symposium," a Conference which was attended by some 75 delegates including numerous professional acquaintances of both Hailstones and Curry.

61. Amar, Mokwa, and Bates confronted Curry and Hailstones within earshot of a group of the organizers and attendees of the Conference having breakfast.

62. At that time, Mokwa held up and displayed a copy of the Saturday, October 13, 2007 Orlando Sentinel featuring the banner headline: "[MVI] Lost $220 Million." Mokwa loudly announced, "See, you are on the front page of the paper for stealing assets." Such conduct was an overt act in furtherance of the conspiracy.

63. Amar loudly stated to Ms. Curry, "This is not a social call."

64. When Curry said to Amar, Bates and Mokwa that the intellectual property at issue had been "addressed by a series of three agreements," again putting Bates, Mokwa and Amar on notice, Amar responded, "I could care less about the software [sic] or the legal dispute. . . . Here you are marketing yourself as a global expert in early fraud detection.  Where the f-ck was your expertise while the $220 million [MVI] fraud was occurring?"  This was an overt act in furtherance of the conspiracy.

65. Amar yelled at Curry and Hailstones about what they had done with the money [that Amodeo was in current plea negotiations for having stolen] or where the money had gone.  Such conduct was an overt act in furtherance of the conspiracy.

66. Amar then mocked and taunted Hailstones saying, "I guess you have to go back to the UK now, huh?" Such conduct was an overt act in furtherance of the conspiracy.

67. The above statements were false, misleading, and not relevant to the judicial proceedings concerning the complaint filed in Florida.

68. In addition, the false and misleading statements were published to a group of the organizers and attendees of the Conference, persons having no relationship to the proposed or pending judicial proceeding.

69. On information and belief, at the time that these false and misleading statements were made, Bates was electronically recording the proceedings.

70. Despite their stated purpose of flying to Scottsdale to "serve Frank Hailstones" the process server only served Curry.  Nothing was served upon Hailstones.

71. The defamatory false and misleading statements made by Amar and Mokwa about Curry and Hailstones constitute slander *per se* because they stated that Curry and Hailstones had committed illegal or dishonest acts which were not the subject of the lawsuit they were there to serve.

72. Defendants made the knowingly false statements set forth above with malice and intent to injure Plaintiffs.

73. Only hours after the confrontation, Amar telephoned Amodeo from the Phoenix airport to report the events.  When they returned to Orlando, Mokwa and Bates met with Jaiman,

Amodeo and others in the law offices of GoldbergBates and adjoining Amodeo's offices, and were laughing and celebrating their success in accomplishing service as planned.

74. Amodeo, Bates and Mokwa then issued another press release on October 17, 2007 to 305 newswires on the web announcing the service and the litigation: "Anti-Fraud Company sued for Absconding Assets."

75. As a result of the Counterclaim Defendants' actions described in this Count Three, Curry and Hailstones were injured in their good name and reputation, were brought into public scandal and public scandal and disgrace by many persons with whom they previously had social and business relationships, have suffered mental anguish, have been injured in their businesses by having lost business opportunities, and have been damaged in their personal lives. Curry and Hailstones have suffered severe damages in an amount far in excess of $75,000 as a result of Third Party Defendants' conspiracy to commit slander against them.

COUNT 4: SLANDER *PER SE* / CURRY AND HAILSTONES V. NEXIA AND MOKWA

76. Counterclaim and Third Party Plaintiffs Curry and Hailstones restate the allegations in Paragraphs 1 through 76 as if fully set forth herein.

77. As set forth in Count 3 above, on October 15, 2007, Nexia, through its agent Mokwa, personally served Curry **but not** Hailstones with the Complaint that initiated this litigation in Scottsdale, Arizona, at the Conference. The Conference was attended by some 75 delegates, including numerous professional acquaintances of both Hailstones and Curry.

78. At that time, within earshot of approximately 25 to 40 of the organizers and attendees of the Conference, Defendant Mokwa held up and displayed a copy of the Saturday, October 13, 2007 Orlando Sentinel featuring the banner headline: "[MVI] Lost $220 Million," Mokwa

loudly announced, "See, you are on the front page of the paper for ***stealing assets***" as though Curry and Hailstones had already been tried and convicted.

79. The statement by Mokwa was made of and concerning Curry and Hailstones.

80. Mokwa had actual knowledge the above statements were false, misleading, designed to be prejudicial and not relevant to this judicial proceeding.

81. The false and misleading statement was orally published to approximately 25 to 40 of the organizers and attendees of the Conference; persons having no relationship to a proposed or pending judicial proceeding, as well as all readers of the Orlando Sentinel news publication and posted to the world-wide web.

82. The service of process junket involving Curry and Hailstones, along with the false and misleading statements and allegations that Curry and Hailstones were thieves, was deliberately staged to embarrass, humiliate, and discredit Hailstones and Curry in front of their colleagues and peers.

83. Amodeo in particular expressed that to serve Curry and Hailstones in public would have maximum impact in humiliating them, in damaging their reputation, and hopefully discredit their potential testimony in his criminal investigation.

84. Curry and Hailstones were injured in their good name and reputation and brought into public scandal and disgrace by many persons with whom they previously had social and business relationships, have suffered mental anguish, have been injured in their businesses by having lost business opportunities, and have been damaged in their personal lives.

85. The false and defamatory statements made about Curry and Hailstones by Mokwa constitute slander *per se* because they suggest that Curry and Hailstones committed illegal or dishonest acts.   Nexia is vicariously liable for Mokwa's false and defamatory statements, because

Mokwa acted intentionally and within his actual and apparent authority as Nexia's representative.

86. With respect to Count Four, Curry and Hailstones suffered damages as a result of the slander *per se* in an amount far in excess of $75,000, damages which were compounded because Curry, an accountant and licensed attorney, and Hailstones, a Chartered Accountant, are in the business of creating and distributing anti-fraud solutions, and the slanderous statements accused them of dishonest and illegal acts, rendering them professionally unbondable.

<u>COUNT 5: SLANDER *PER SE* / CURRY AND HAILSTONES V. NEXIA AND AMAR</u>

87. Counterclaim and Third Party Plaintiffs restate the allegations in Paragraphs 1 through 87 as if fully set forth herein.

88. As set forth in the Conspiracy to Commit Slander Count above, on October 15, 2007, through its agent Amar, served Curry and Hailstones personally with the complaint that initiated this litigation in Scottsdale, Arizona, at the Conference which was attended by some 75 delegates including numerous professional acquaintances of both Hailstones and Curry.

89. Amar, Amodeo's business associate since 2000, personally feared the Federal Grand Jury investigation of Amodeo and related entities.  In or about June or July 2007, Amodeo gave Amar a hard-drive containing MVI/Nexia video evidence "in case Amar ever needed it." Amar did not disclose this until October 5, 2010 which resulted in a Grand Jury Subpoena to seize the evidence being issued the following day.

90. At that time, within earshot of a group of the organizers and attendees of the Conference, Defendant Amar, in the company of defendants Bates and Mokwa, stated to and about Curry and Hailstones: "Here you are marketing yourself as a global expert in early fraud detection. Where the f-ck was your expertise while the $220 million [MVI] fraud was occurring?"

91. Amar yelled at Curry and Hailstones about what they had done with the money or where the money had gone.

92. The above statements are false, misleading and not relevant to this judicial proceeding.

93. The false and misleading statement was published to approximately 25 to 40 of the organizers and attendees of the Conference, persons having no relationship to a proposed or pending judicial proceeding.

94. The service of this lawsuit upon Curry in the presence of Hailstones, along with the false and misleading statements and implications that Curry and Hailstones were thieves, was deliberately staged to embarrass, humiliate, and discredit Hailstones and Curry in front of their colleagues and peers.

95. As a result of Amar's defamatory statement, Curry and Hailstones were injured in their good name and reputation, were brought into public scandal and disgrace by many persons with whom they previously had social and business relationships, have suffered physical and mental anguish, and have been injured in their businesses by having lost business opportunities.

96. The false and defamatory statement made about Curry and Hailstones by Amar constitutes slander *per se* because it suggests that Curry and Hailstones committed illegal or dishonest acts. Nexia is vicariously liable for Amar's false and defamatory statement because Amar acted intentionally and within his actual and apparent authority as Nexia's representative.

97. With respect to Count Five, Curry and Hailstones suffered damages as a result of the slander *per se* in an amount far in excess of $75,000. Said damages were compounded because Curry, an accountant and licensed attorney, and Hailstones, a Chartered Accountant, both are

in the business of creating and distributing anti-fraud solutions and the slanderous statements accused them of dishonest and illegal acts, rendering them professionally unbondable.

## COUNT 6: INTENTIONAL INTERFERENCE WITH ADVANTAGEOUS BUSINESS RELATIONSHIP / CURRY AND HAILSTONES V. NEXIA, AMODEO, AMAR, BATES, AND MOKWA

98. Counterclaim and Third Party Plaintiffs Curry and Hailstones restate the allegations in Paragraphs 1 through 98 as if fully set forth herein.

99. After their respective separations from MVI and Nexia, Hailstones and Curry were developing business relationships with various other parties in the hopes of marketing the anti-fraud solution that ultimately would result from their respective efforts.

100.    No later than July 2007, Nexia, Amodeo, Amar, Bates, and Mokwa knew that Curry and Hailstones were engaged in developing these business relationships and believed that they had an "approximately $2 million deal with Wachovia Securities."

101.    Nexia, Amodeo, Amar, Bates, and Mokwa intentionally committed the acts set forth in the foregoing ¶¶ 40 through 98, including slander, for the purpose of interfering with those relationships.

102.    The conduct of Nexia, Amodeo, Amar, Bates, and Mokwa was outrageous.

103.    The conduct of Nexia, Amodeo, Amar, Bates, and Mokwa did interfere with Curry's and Hailstones' business relationships.

104.    As a result of the conduct of Nexia, Amodeo, Amar, Bates, and Mokwa described in this Count Six, Curry and Hailstones have suffered injuries in an amount far in excess of $75,000.

COUNT 7: CIVIL CONSPIRACY TO INTENTIONALLY INTERFERE WITH
ADVANTAGEOUS BUSINESS RELATIONSHIPS: CURRY AND HAILSTONES V. NEXIA,
AMODEO, AMAR, BATES, AND MOKWA

105.   Counterclaim and Third Party Plaintiffs Curry and Hailstones restate the allegations in

Paragraphs 1 through 105 as if fully set forth herein.

106.   On or about October 15, 2007, and at various times prior thereto, Defendants Nexia,

Amodeo, Bates, Amar and Mokwa met, joined together, planned, and conspired to interfere

with advantageous business relationships of Curry and Hailstones by engaging in the conduct

set forth in ¶¶ 31 through 108.

107.   Upon information and belief, Defendants Nexia, Amodeo, Bates, Amar and Mokwa

agreed or understood that the purpose of their meetings and agreements as described in ¶¶ 31

through 108 were unlawful and would result in injury to Plaintiffs, and agreed and

understood that each would act in concert with the others to achieve this purpose.

108.   Amodeo in particular expressed that to serve Curry and Hailstones in public would have

maximum impact in humiliating them, in damaging their reputation and credibility as

potential witnesses,

109.   On or about October 15, 2007, one or more defendants committed an overt act in

furtherance of the above-described conspiracy, to wit, Defendant Amar stated to Curry and

Hailstones in the presence of numerous attendees of the Conference in Scottsdale, Arizona:

"Here you are marketing yourself as a global expert in early fraud detection.  Where the f-ck

was your expertise while the $220 million [MVI] fraud was occurring?" and demanded to

know what Curry and Hailstones "had done with the money."  As an additional overt act in

furtherance of the conspiracy, Defendant Mokwa held up and displayed a copy of the

Saturday, October 13, 2007 Orlando Sentinel featuring the banner headline: "[MVI] Lost

$220 Million," Mokwa loudly announced, "See, you are on the front page of the paper for stealing assets."

110.    Defendants undertook the acts described in Paragraph 108 with malice and intent to injure Plaintiffs.

111.    By the acts described in this Count Seven, Curry and Hailstones suffered damages far in excess of $75,000.

<h2 style="text-align:center">COUNT 8: INDEMNITY / CURRY AND HAILSTONES V. NEXIA</h2>

112.    Counterclaim and Third Party Plaintiffs restate the allegations in Paragraphs 1 through 112 as if fully set forth herein.

113.    Nexia's By-laws at Article VIII (Doc. 198-3 p. 72) and Nexia's Employment Agreement with Curry (Doc. 24-5 p. 71, ¶9(b)), specify that the Nexia will indemnify the employee from and against all claims brought against him or her, and said agreements do not exclude claims brought by the Nexia.

114.    Nexia is required to indemnify Curry and Hailstones for any damages found against Curry and Hailstones.

115.    With respect to Count Eight, Nexia is liable to pay Curry's and Hailstones' expenses and attorneys' fees necessarily expended in defense of this lawsuit, an amount of damages far in excess of $1,100,000.

<h2 style="text-align:center">COUNT 9: CURRY AND HAILSTONES V. NEXIA / ABUSE OF PROCESS</h2>

116.    Counterclaim and Third Party Plaintiffs restate the allegations in Paragraphs 1 through 116 as if fully set forth herein.

117.    Nexia brought the claims in the instant lawsuit for purposes other than to recover the asset sued for, *i.e.*, so-called "Nexia Certification."

118.    Nexia maintained the cause of action, using knowingly laundered funds together with perjured affidavits when it had actual knowledge of the frivolous and baseless nature of their claims; and that their claims had no foundations in law or fact.

119.    Upon information and belief, the instant lawsuit was brought in an effort to intimidate Curry and Hailstones to prevent and/or impede their cooperation with the United States Attorney in his criminal investigation of Amodeo, MVI, and others.

120.    The instant lawsuit was brought for the further purpose of discrediting the testimony of Curry and Hailstones in the event of their testimony against any defendants who may be charged as a result of said investigation.

121.    The instant lawsuit was brought to improperly use discovery in this civil case to assist Amodeo's criminal defense.

122.    The instant lawsuit was knowingly directed and funded by Amodeo as the "secured creditor or seized the assets of MVI/Nexia," brought for the further purpose of invoking the Directors and Officers portion of MVI's General Commercial Liability policy and its excess insurance policy as part of Amodeo's overall "Asset Recovery and Liquidation Plan" whereby Bates, Mokwa together with co-counsel were to sue as many people, companies, law firms, accounting firms, banks and lending institutions to get hold of as much money as possible so he could "get leniency at his sentencing" for the $180 million he plead guilty to stealing.

123.    With respect to Count Nine, Curry and Hailstones have suffered damages, in an amount far in excess of $1,100,000, as a result of MVI's and Nexia's abuse of process.

<u>PRAYERS FOR RELIEF</u>

WHEREFORE, Defendants Curry, Hailstones, Palaxar Group, and Palaxar Holdings pray

for judgment as follows:

1.  That they be awarded their costs and reasonable attorney's fees incurred in defending against Plaintiffs' original claims;

2.  With respect to Count One, Fraud in the Inducement / Curry vs. Amodeo and Nexia, that the Court award damages in an amount to be determined at trial, but in any event not less than $2,395,833.30, plus applicable interest;

3.  With respect to Count Two: Breach of Separation Agreement / Curry vs. Nexia, that the Court award damages to Curry in an amount to be determined at trial but in any event not less than $2,395,833.30, plus applicable interest;

4.  With respect to Count Three, Civil Conspiracy to Commit Slander / Curry and Hailstones vs. Nexia, Amodeo, Amar, Bates, and Mokwa, that the Court award damages to Hailstones and Curry in an amount to be determined at trial, but in any event not less than $20,000,000, plus applicable interest;

5.  With respect to Count Four, Slander *per se*: Curry and Hailstones vs. Nexia, and Mokwa, that the Court award damages to Curry and Hailstones in an amount to be determined at trial, but in any event not less than $5,000,000, plus applicable interest;

6.  With respect to Count Five, Slander *per se*: Curry and Hailstones vs. Nexia and Amar, that the Court award Curry and Hailstones damages in an amount to be determined at trial, but in any event not less than $5,000,000, plus applicable interest;

7.  With respect to Count Six, Intentional Interference with Advantageous Business Relationship / Curry and Hailstones v. Nexia, Amodeo, Amar, Bates, and Mokwa, that the Court award damages to Curry and Hailstones in an amount to be determined at trial, but in any event not less than $20,000,000, plus applicable interest;

8. With respect to Count Seven, Civil Conspiracy to Intentionally Interfere with Advantageous Business Relationships: Curry and Hailstones v. Nexia, Amodeo, Amar, Bates, and Mokwa, that the Court award damages to Curry and Hailstones in an amount to be determined at trial, but in any event not less than $20,000,000, plus applicable interest;

9. With respect to Count Eight, Indemnity: Curry and Hailstones v. Nexia, that the Court award damages to Hailstones and Curry in an amount equal to their attorneys' fees and costs expended in defending against this lawsuit, plus applicable interest;

10. With respect to Count Nine, Abuse of Process, Curry and Hailstones against Nexia, that the Court award damages in an amount to be determined at trial, but in any event not less than $53,000,000, plus applicable interest;

11. That the Court award punitive damages as appropriate and allowed by law, including, in particular, reasonable attorneys' fees and costs; and

12. That the Court order such other and further relief as is deemed just and proper.

Respectfully submitted,

Date: December 2, 2010

MARTIN R. RASKIN
Florida Bar No. 315206
JANE SERENE RASKIN
Florida Bar No. 848689
RASKIN & RASKIN, P.A.
866 South Dixie Highway
Coral Gables, Florida 33146
Telephone: (305) 444-3400
Facsimile: (305) 445-0266
mraskin@raskinlaw.com

Attorneys for Defendants Curry,
Palaxar Group, LLC and Palaxar Holdings, LLC

/s/ Kathleen B. Havener
KATHLEEN B. HAVENER
THE HAVENER LAW FIRM, LLC
15511 Russell Road
Chagrin Falls, OH 44022
Phone: 440-893-0188
Cell: 216-288-6009
Fax: 440-893-9326
kbhavener@havenerlaw.com

Attorney for Defendants Curry, Hailstones,
Palaxar Group, LLC and Palaxar Holdings, LLC

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on December 2, 2008, I electronically filed the foregoing Second Amended Counterclaims and Third Party Claims of Defendants Edith Curry and Frank Hailstones with the Clerk of Court using the CM/ECF system, which will send a notice of electric filing to all registrants in that system. I further certify that I have caused the foregoing to be served by the means indicated upon the following:

Terence Chu (via email)

Yaniv Amar (via email)

Adam Loewy (via email)

Frank L. Amodeo B-3 (via Priority Mail)
48883-019
Federal Correctiona; Complex – Low
P.O. Box 1031
Coleman, FL 33521

/s/ Kathleen B. Havener_____
KATHLEEN B. HAVENER