FILED

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION    2010 DEC 20   PM 12:55
oOo

US DISTRICT COURT
MIDDLE DISTRICT OF FL

MIRABILIS VENTURES, INC. and
NEXIA STRATEGY CORPORATION,
           Plaintiffs,

-v-                                    Case No.:
                                       6:07-cv-1788-Orl-28-GJK
PALAXAR GROUP, LLC;
PALAXAR HOLDINGS, LLC;
FRANK HAILSTONES; EDITH CURRY
a/k/a EDITH BROADHEAD; and
TERENCE CHU,
           Defendants,

-v-

MIRABILIS VENTURES, INC., et.al.       **FRANK L. AMODEO'S REPLY**
           Counterclaim and Third      **TO DEFENDANT'S MOTION**
           Party Defendants.           **TO DISMISS**
_____/

       COMES NOW, Frank L. Amodeo, and files this reply to the
defendants' motion to dismiss Mr. Amodeo's counterclaim.

       The motion to dismiss, complains the counterclaim's
allegations are purely conclusory, there not; especially in
conjunction with Amodeo's affidavit incorporated by reference
into the counterclaim. Significantly, the Defendants' motion
ignores the approximately 1100 page sworn declaration on file in
this case. A declaration under penalty of perjury by Mr. Amodeo,
which contains specific dates, particular events, and references
documents and video, not just, directly relevant, but authored
by Ms. Curry and Mr. Hailstones, all of which corroborate the
allegations in the counterclaim.



SCANNED

### Ms. Curry's Malpractice

Ms. Curry denies representing Mr. Amodeo, as counsel, yet on several occasions Ms. Curry's actions and words belie Ms. Curry's denial:

(1)    In December of 2004, during the disposition of Professional Benefits Solutions, Inc., (PBS), by Laurie Andrea, and acquisition of PBS by Presidion, Ms. Curry represented to the attorneys for PBS and Presidion,  that Ms. Curry represented Mr. Amodeo's separate interest in that transaction.  <u>See Ms. Curry's notebook</u>, on file.

(2)    Ms. Curry by email confirms, Ms. Curry is drafting corporate minutes and corporate contracts at Mr. Amodeo's direction in order to protect Mr. Amodeo's personal fees from post contractural expropriation by Presidion or Presidion's principals; <u>Id</u>.

(3)    Ms. Curry reviewed, commented upon, and revised portions of the first Berman, Keene and Riguera tax memorandum, provided to assure Mr. Amodeo and AQMI Strategy Corporation (AQMI), that the tax liability would be limited to the Sunshine companies.  <u>See Memorandum of April of 2005 filed with the Declaration</u>.



(4)     Contrary to the assertion in the motion to
        dismiss, Mr. Amodeo's declaration makes it
        clear Mr. Amodeo considered Ms. Curry, an
        attorney of Mr. Amodeo's again, Ms. Curry had
        several discusssions with Mr. Amodeo,
        where Ms. Curry affirmatively, or by
        confirmation of others' opinions, advised Mr.
        Amodeo of the following:

                    (a) that not paying the payroll taxes
                    was not criminal, but only a civil
                    violation, which subjected certain
                    individuals to personal liability;
                    (b) that the existence of a properly
                    perfected preexisting security
                    interest in the taxpayer's assets
                    "primed" the Internal Revenue
                    Service's claim, i.e., making the
                    assets (money) property of the
                    priming creditor.

But so there is no doubt about Mr. Amodeo's position, Mr.
Amodeo restates (#4) above is made under penalty of perjury
pursuant to title 28 U.S.C. § 1746.

The foregoing factual allegations, alone, are sufficient to
overcome a motion to dismiss and sustain the cause of action,
but a review of the previously filed (and uncontravened)

declaration provides numerous specific facts, not just allegations, which would support the claim for malpractice, as well as other counts of the counterclaim.

The above allegations identify three specific events where Ms. Curry acted as an attorney for Mr. Amodeo. In each case Ms. Curry was negligent in advising Mr. Amodeo. The results were contrary to Ms. Curry's conclusions. First, Mr. Amodeo's fees were not protected and have been lost; second, the nonpayment of taxes (even deferment) is subject to criminal sanctions, See 26 U.S.C. § 7202; and third, a properly perfected security interest does not have priority over the Internal Revenue Service's claim for trust fund taxes.

If Ms. Curry had advised Mr. Amodeo correctly in November 2004, January 2005, March 2005, May 2005, June 2005, all the way through until April 2006, (although, arguably, not as counsel after June 2005, but legal advise nonetheless), Mr. Amodeo would not have lost Mr. Amodeo's fees, nor would Mr. Amodeo have allowed the taxpayers (to the extent Mr. Amodeo could have intervened) to defer payment of the taxes, consequently, Amodeo would not have become liable for the corporations' actions.

In the simplest of terms, but for Ms. Curry's advice, Mr. Amodeo would not have become liable for the approximately $181,000,000.00 in taxes that went unpaid by the Sunshine Companies (Sunshine), Professional Benefits Solution, Inc. (PBS) and AEM, Inc. (AEM).

Ms. Curry was Mr. Amodeo's counsel by her own statements to third parties, also by the nature of Ms. Curry's activities on behalf of Mr. Amodeo. Activities which included those traditionally provided by an attorney; drafting minutes, drafting contracts, reviewing legal memoranda and interpreting statutes. Ms. Curry's advice to Mr. Amodeo and Ms. Curry's preparation of documents, which facilitated an unknowing criminal act, were breaches of the duty of care and the duty of loyalty.

Finally, on this issue, as has been typical of Ms. Curry, throughout Ms. Curry's representation of Mr. Amodeo, Ms. Curry's involvement with Mirabilis Ventures, Inc., Ms. Curry's activities with Presidion, and Ms. Curry's conduct during the last four years of investigation, Ms. Curry subtly misapplies or misquotes facts.

On page seven of the motion to dismiss, Ms. Curry attempts to use Mr. Amodeo's very exact responses, regarding hiring attorneys for information on a Presidion transaction; to show Ms. Curry was not hired by Mr. Amodeo and did not advise Mr. Amodeo, about the taxes. At best, the arguments' logic is flawed, more likely the pleadings are intentionally deceptive.

That Mr. Amodeo hired attorneys for advice on a particular issue (Presidion's liability), does not exclude Mr. Amodeo from having sought and received Ms. Curry's or any other professional's advice on another matter.



The questions referenced, were about, who advised Presidion Corporation as to Presidion Corporation's liability; not who advised Mr. Amodeo about Mr. Amodeo's liability.  To a certain extent, Ms. Curry is correct, Mr. Amodeo did not hire Ms. Curry to advise Mr. Amodeo, whether Presidion Corporation was liable for Presidion's subsidiary's taxes, This counterclaim is not about that negligence. This countercomplaint is about Ms. Curry's bad advice.

What Mr. Amodeo did ask from Ms. Curry is whether Mr. Amodeo would be liable for the taxes and whether the preexisting security interests permitted lawful use of the funds as long as the secured creditors gave permission. Also, requested was Ms. Curry's (the admittedly more careful and conscientious person, as well as the licensed attorney) advice about how to insure Mr. Amodeo's fees and interest were protected.

Ms. Curry's advice was wrong.

### Controlling Persons of the Taxpayers

Ms. Curry's and Mr. Hailstones' response to the controlling person allegations is to assert there is evidence which exists, but not identified, suggesting Mr. Amodeo somehow hid the status of the payroll tax liability from Ms. Curry and Mr. Hailstones.

If this were so it would still be irrelevant as a matter of law, and the allegation is completely untrue anyway.  A simple examination of the video recordings referenced in Amodeo's declaration, as well as those referenced in the Edith Curry



Notebook, (records made contemporaneously with the creation of the tax liability) provide stark evidence Ms. Curry and Mr. Hailstones knew of the unpaid taxes. Further, the documents provide irrefutable proof that Ms. Curry and Mr. Hailstones not only had access to the tax information, but control of that information. Legally, neither Ms. Curry, nor Mr. Hailstones can delegate their duties for payment of the taxes.   They also cannot abandon their duties imposed by statute.

### Ms. Curry and Mr. Hailstones had<br>Fiduciary Duties to Creditors

Mr. Amodeo was undisputably a creditor of Mirabilis Ventures, Inc., Ms. Curry and Mr. Hailstones ratified those debt agreements in their roles as members of Mirabilis Ventures Inc.'s board of directors.

Under Florida Law, when a corporation becomes insolvent, the directors and officers by operation of law become fiduciaries to the creditors. Mirabilis Ventures, Inc. was continuously insolvent from at least August 2005 until effective cessation of operations in or about January of 2007. Ms. Curry (until October 2006) and Mr. Hailstones were directors and officers during this time period.

Ms. Curry and Mr. Hailstones where actually aware of the insolvency and under all circumstance should have been aware of the insolvency. Therefore both, were fiduciaries to Mr. Amodeo at the very least in Mr. Amodeo's status as a creditor.

-7-



At this stage in these proceedings allegations alone are sufficient, but specific factual events can also be identified, where Ms. Curry and Mr. Hailstones were informed, by third parties of Mirabilis Ventures, Inc.'s financial problems and that the obvious source of Mirabilis' funding was the unpaid taxes of PBS or AEM.

At a Mirabilis Ventures's Inc. board of directors meeting in or about March 2006, Mr. Amodeo, attending by invitation, informed the directors that according to the draft financial statements provided by Ms. Curry and Mr. Hailstones' subordinates, Mirabilis was only generating enough money to cover 3% of Mirabilis operating expenses. At this point, any prudent director and officer would have checked on their company's financial status, but, alas, Ms. Curry and Mr. Hailstones were already aware of the insolvent status, but had a separate agenda.

The same, when a Professional Employer Organization licensing board sought to delicense AEM and All Staff (another Mirabilis PEO) in May 2006. The PEO board told Ms. Curry, Mr. Holtz, et.al. about Mirabilis not paying the taxes. Again notice of insolvency and unpaid taxes, but no action by Ms. Curry or Mr. Hailstones.

Not only did Ms. Curry and Mr. Hailstones, not act to protect the creditors interest, instead each encouraged and directed Mirabilis Ventures, Inc., and its affiliates, to pay



significant sums of money to Ms. Curry, to Mr. Hailstones, to their friends, towards the development of the intellectual property utilized by Palaxar, and for the purchase of other interests which benefited insiders, but not the creditors.

Numerous, contemporaneous business records exist of these actions by Ms. Curry and Mr. Hailstones (audio/video recordings, emails), which shall be introduced, during the appropriate phase of the proceedings, but for this phase the allegations, which must be taken as true, are sufficient to set forth a claim that both Ms. Curry and Mr. Hailstones were in violation of their fiduciary duties. <u>See Ms. Curry's notebook attached to the Declaration. See Mini memorandums attached as exhibits "A" and "B"</u>.

Because of Ms. Curry's and Mr. Hailstones' actions, inadvertant and intentional, Mr. Amodeo has become liable for over one hundred million dollars. Prudent and dutiful action by Ms. Curry and Mr. Hailstones would have resulted in the funds having been paid to the government and other creditors and not being owed by Mr. Amodeo.

<u>Ms. Curry and Mr. Hailstones were Consultants</u>

A difficulty with comprehending the issues in matters related to Mirabilis Ventures, Inc. results from the rapidly evolving relationships of the professionals. Ms. Curry's original involvement with Mr. Amodeo was to conducts due diligence on behalf of her husband Tom Broadhead, her brother



Robert Curry and her friends Ian Myers and Jason Carlson, due diligence of Mr. Amodeo and the principals of Matrix Network, Inc.. This occured in 2004, and suggests some of Ms. Curry's prior misstatements are not just wrong, but perjurious.

As a result of this due diligence, Matrix Network Orlando, LLC. was formed, by Ms. Curry's friends and others, without Mr. Amodeo as a principal. Because Mr. Amode's prior felany convition, and then existing supervised release, would have presented E&O insurance and marketing difficulties.

However over time, Matrix Network Orlando, LLC. failed, and the principals wanted to become part of Trafalgar Capital Group, Inc. (an Amodeo owned company); in order to have an opportunity to participate in certain lucrative, upcoming contracts like the Presidion Turnaround Project.

A problem arose when Mr. Broadhead received, contemporaneously, an offer from Citifinancial to work as assistant general counsel. Mr. Broadhead was torn about what to do; whether to stay with Matrix Netowrk Orlando (or Trafalgar Capital) and work on the Presidion project or take the job.

Mr. Carlson and Mr. Amodeo convinced Mr. Broadhead to take the job, and agreed to allow Ms. Curry - Mr. Broadheads' wife-to substitute for Mr. Broadhead on the Presidion Turnaround Project. [1]

--------

1/ Further because Mr. Amodeo was unacquainted with public companies and would been help with the Presidion Turnarond Project, Mr. Amodeo agreed to absorb the principal consultants of Matrix. Eventually, the principal consultants would become Mirabilis Ventures, Inc.. And since Mirabilis was suppose to go public, these principals again decided Mr. Amodeo's history would be detrimental and Mr. Amodeo should be separated.

Over the next few months all due diligence was conducted by or under the direction of Ms. Curry. This ultimately lead to the consluting contract between Presidion Solutions, Inc., and AQMI Strategy Corporations, plus a collateral contract with the Bookmeade Group, LLC.. Ironically, the only reason for the separate Brookmeade contract, which Presidion initially opposed, was to create a separate "unrelated" secured creditor. In this way one more friendly layer was placed between the assets at Presidion and the other Presidion creditors, including expressly the IRS. This was done just in case "Craig Vanderburg and John Burham [messed] it up again, [then Ms. Curry et.al.] could grab the assets" [although Ms. Curry's colloquialism for [messed] was not so nice].

During this time, Presidion and AQMI records show Ms. Curry regularly reporting to Mr. Amodeo not Presidion. Also, Presidion personnel and officers frequently contacted Mr. Amodeo, because they felt Ms. Curry was overstepping the bounds of due diligence. The reason Presidion called Mr. Amodeo was "since Ms. Curry was only really there to advise and assist Mr. Amodeo".

In January of 2005, the professional relationship evolved, while Ms. Curry was still rendering legal advice to Mr. Amodeo and to her fellow Mirabilis directors (Jason Carlson, MBA and Robert Pollack, M.D.). [2]

2/ Mr. Carlson and Dr. Pollack, because they were serving as Mirabilis' representation on Presidion Corporation's Broad of Directors. Each was also a member of Mirabilis' Broad of Directors with Ms. Curry.



Ms. Curry was no longer consulting for Mr. Amodeo, she was consulting for herself, since Ms. Curry was now an officer and director of Mirabilis. Unfortunately the negligence had already happened, Ms. Curry had previously opined on the viability of the Sunshine and Presidion projects and the projects' value.

If Ms. Curry had done the due diligence, as Ms. Curry purported, then Ms. Curry would have detected the Aldrostar fraud and the frequent use of a "tax shifting" scheme by Sunshine. Ms. Curry would have known Presidion was hopelessly insolvent and advised against any non-bankruptcy turnaround strategy.

Ms. Curry's advice was incorrect and resulted in over twenty five million dollars in losses for Mr. Amodeo. Yet, Ms. Curry gained hundreds of thousands of dollars in fees, plus the potential for millions of dollar more in equity and stock gains.

Mr. Hailstones, on the other hand, became involved because Presidion, Mirabilis and Mr. Hailstones' Axena companies made a deal. There was no pecuniary consideration in the deal for Mr. Amodeo, even though Mr. Amodeo facilitated the contract. When asked by Mr. Hailstones, "what he (Mr. Amodeo) would want?"; Mr. Amodeo said, "all I expect is a full report on Presidion's financial health and the prospects for a successful turnaround" and "a warning about any problems".

Mr. Hailstones, after spending several months using Presidion as a model for developing antifraud software, told Mr.



Amodeo, Presidion had good practices and was viable with the right management. [3]

Mr. Hailstones did not report: Presidion did not have a method to check the profitability of the contracts or that Presidion had a second set of records in the Alpha V database or that Presidion was utilizing an illegal deductible reinsurance policy as part of the workers compensation package, if Mr. Hailstones had, then Mr. Amodeo would not have reengaged with Presidion, thus would have avoided incurring 150 million dollars of debt of the $181 million dollar debt.

Mr. Hailstones in agreeing to compensate Mr. Amodeo with advice, instead of cash or equity, became Mr. Amodeo's consultant and Mr. Hailstones' advice was bad; accordingly Mr. Hailstones should compensate Mr. Amodeo for the detriment.

In summary, the motion to dismiss filed by the defendants' expresses factual disputes. Disputes which are not determinable from Mr. Amodeo's pleading, alone; thus not basis for dismissal.

The only facts, within the record, [4] are contained in Mr. Amodeo's declaration, which identifies contracts, emails, video recordings, etc... that support the allegations of the counterclaim and suggest an outcome favorable to Mr. Amodeo.

---

3/ At the beginning of the Presidion Plan in June 2005, Ms. Curry was the senior turnaround officer in charge. Beginning in late 2005, the consultants, e.g. Dan McHenry, began reporting to Frank Hailstones.

4/At least as far as Mr. Amodeo is aware.



### Ms. Curry's and Mr. Hailstones' Conspiracy

The defendants seem to lack a full comprehension of either notice pleading or the liberal construction afforded pro se litigants.[5]

Therefore, Mr. Amodeo will attempt to reiterate the conspiracy allegations consistent with the defendants' request:

(1)     Ms. Curry and Mr. Hailstones entered into an agreement in or about January of 2006;

(2)     to utilize their positions with Mirabilis Ventures, Inc. to finance themselves and finance businesses each owned separate from Mirabilis. This was done without disclosure to Mirabilis. Part of the plan was to use their relationship to Mr. Amodeo to ensure Mr. Amodeo remained sufficiently involved with Mirabilis. The purpose of this involvement was to preserve Mr. Amodeo as a "bumper". (A bumper is the equivalent of a "scapegoat", i.e., when the car hits something the bumper drops off and the car drives away). If the grand plan to take Mirabilis public failed, then Mr. Amodeo

---

5/Although the Bureau of Prison has seemed to have stabilized Mr. Amodeo' mental illness, in part by removing Mr. Amodeo from the antipsychotic medication, and even though Mr. Amodeo is developing considerable legal proficiency through assisting other inmates as a writ writer, Mr. Amodeo is still pro se, legally incompetent, and handicapped by being a prisoner. An example of which is this document was completed on December 15, 2010, and saved in the memory of a more than 20 year old IBM typewriter, during an attempt to print the "previous" final version the memory failed and the document was lost.

would be left holding the bag. Undoubtedly,
"going out" in a manic blaze of glory, thereby
covering Ms. Curry's and Mr. Hailstones' trail.
The next aspect of the plan was to allow
(encourage) a massive use of AEM taxes, in
order to provide additional cover for the
portion of the taxes diverted to Ms. Curry, Mr.
Hailstones and their separate interests.;

(3)   Also, in furtherance of this agreement, Ms.
Curry and Mr. Hailstones allowed AEM to not pay
taxes throughout 2006, and authorized
misleading letters to PEO customers to ensure
cash flow continued. Ms. Curry kept Mr. Iimodeo
involved, or at least having the appearance of
involvement, in a variety of decisions outside
Mr. Amodeo's skill set or authority to provide
cover should the scheme became exposed.
Finally;

(4)   the result of this scheme was, that Mr. Amodeo
became vicarious liable for an additional $101
million dollars in unpaid taxes during 2006,
plus Mr. Amodeo lost tens of million of dollars
in personal net worth.

These allegations as stated meet the test for a conspiracy
claim as identified by the Defendants in the motion to dismiss.

Further as stated previously, these allegation are augmented by admissible evidence, such as the business records in the filed declaration.

At a minimum, Mr. Amodeo makes factual allegations which, if true, entitle Mr. Amodeo to relief.

The defendants' motion, merely, suggests the defendants disagree with Mr. Amodeo's allegations, and do not like the inferences drawn from those factual allegations. In which case the controversies should be subjected to the adversarial process and submitted to the jury.

## Defendants are not Liable in Contribution

The defendants' response to the current claim for contribution is not applicable. The cause of action does not rely on Florida Tort Law or any tort law whatsoever, but instead upon federal statutes.

Each and every responsible person is jointly and severally liable for the so called trust fund tax obligation. By virtue of the agreements between Mr. Amodeo, the United States Attorney's Office, the Internal Revenue Service and the Mirabilis bankruptcy estate, each and every payment from any source inures to Mr. Amodeo's personal benefit, thus is a payment from Mr. Amodeo. Consequently, Mr. Amodeo is entitled to contribution from all other responsible persons for all monies paid.

Additionally, the imposition of the tax liability against Mr. Amodeo itself creates an interest which give rise to a cause of action for contribution. For purpose of notice pleading, Mr.

Amodeo's claim is understandable. But out of an extreme abundance of caution Mr. Amodeo reiterates; Ms. Curry and Mr. Hailstones were shareholders, directors, and officers of the company with the authority to direct payment of the taxes. They chose not to ensure the taxes were paid by the taxpayers, thus becoming responsible persons.

In addition, Mr. Hailstones' was statutory controlling person and bank account signer of the taxpayer that collected and did not remit the taxes (AEM). Ms. Curry knew of this unpaid taxes and was instrumental in developing of the presentation made to the Internal Revenue Service in April 2006. Whether Ms. Curry assisted as either an attorney, a consultant, or an officer matters not; the assistance was rendered as an employee or agent of Mirabilis.

The facts, in both the prior paragraphs, are separate bases for "responsible person status" for Ms. Curry and Mr. Hailstones. As responsible person, Ms. Curry and Mr. Hailstones are jointly and severably liable for the unpaid taxes to the IRS and in contribution to Mr. Amodeo for a pro rata portion of either Mr. Amodeo's responsible person liability or any payments applied to the tax debt.

The defendants motion to dimiss, does not raise a valid legal defense and is without merit.



### Mr. Amodeo's Claims are Consistent with the Circumstances of Mr. Amodeo's Criminal Case

### Evidence and Testimony

The attempt to interpose Amodeo not providing more evidence to the government is again not relevant. Mr. Amodeo's job was not to indict the other targets of the investigation, even targets like Ms. Curry. Interestingly, Mr. Gold said, Mr. Gold was "disappointed to see her in the attendance at the April 19, 2006", so called, "Chairman's meeting". Further, Agents Mr. Smith and Mr. McCabe, often commented to Mr. Amodeo, Mr. Dinda, Mr. Sands, Mr. Slaughter, and Mr. Panoff, how these individuals were culprits, but because of the complexity of the case and the status of the "crooks" (lawyers, accountants, etc...,) it was tough to get authority to prosecute them.

Contrary to the defendants' assertion in their motion, the IRS agents admitted, that the evidence establishes each of these people (directors, officers) had civil liability and were undoubtably "in the know" as to the unpaid tax plan. But even though this was the position of the agents, for "other reasons", it was necessary to prosecute Mr. Amodeo, at least, first. Motivation for prosecuting Mr. Amodeo, is not yet relevant to this proceeding, but does cast a long light on the defendants' comment in the motion to dismiss.

Next in the motion to dismiss is another of the habitual misstatements and misdirections (deception attempts) of Ms.

Curry. The evidence of Ms. Curry's and Mr. Hailstones' involvement with Presidion Corporation is not the issue, (p. of the Response ), their involvement with Mirabilis Ventures and the $150 million dollars in unpaid taxes which arose under Mirabilis/AEM's watch is. Maybe this Presidion obfuscation is what has protected Ms. Curry and Mr. Hailstones from prosecution, so far.

Likely so, since this same misdirection was used to justify the misconduct in the first place. Ms. Curry and Mr. Hailstones, amongst others, confirmed the belief articulated by Richard Berman, Esq.; that only the directors, officers, and controlling persons of Presidion Solutions, Inc.. were civilly liable for the unpaid taxes. Significantly, no one but Brian Taylor (former FBI Organized Crime Task Force Supervisor) ever suggest the conduct might be criminal. Mr. Taylor told this to Ms. Curry and James Baiers, (Presidion general counsel) in or about October 2005. Ms. Curry, with the imprimatur of her attorney's license, instructed Mr. Taylor, that it was not illegal, but just resulted in penalties. Mr. Taylor, Mr. Amodeo's Security Advisor, never made such a statement to Mr. Amodeo, nor did Ms. Curry, Esq., or James Baiers, Esq..

Even if Ms. Curry and Mr. Hailstones had been right about the legal position, i.e., the "Presidion did it" the defense. The defense would not help them here, because over 101 million dollars of the taxes never went to a Presidion bank account;

instead the taxes went straight to an AEM account and were disbursed from AEM to Mirabilis' expenses including Ms. Curry and Mr. Hailstones six figure salary. During that time, no checks were issued by Presidion, no invoices were issued by Presidion, no UTC-6 Presidion employee reports were filed, no insurance claims were made by Presidion--the point is--AEM not Presidion (PBS) collected and did not pay the taxes. "Presidion did it" is simply a post hoc explanation created to provide plausible deniability for the directors and officers of Mirabilis. Directors and officers, like Ms. Curry and Mr. Hailstones, who are responsible for unpaid taxes.

Mr. Hailstones has never explained how 101 million dollars of taxes can be deposited into a bank account on which Mr. Hailstones signs, and none of the money, or at least most of the money, is neither sent to the IRS nor to Presidion, whom the money supposedly belongs.

## Ms. Curry's Misrepresentation

Ms. Curry claims not to have been hired by Mirabilis, until June or July 2005. This is not true, a review of the documents in the Edith Curry notebook attached to Amodeo's declaration, shows numerous examples of Ms. Curry's participation with Presidion between September 2004 and January 1, 2005. See also, exhibit "A" attached. Further examples of Ms. Curry's involvement during the period Ms. Curry claims not to be involved are described next.

On January 1, 2005, Ms. Curry became one of three Mirabilis officers and directors; i.e., employed, even if compensated primarily in stock.

Further on or about, January 6, 2005, a check of Dan Myers, CPA mobile telephone records will reveal; that immediately upon completing the initial meeting with the IRS, about the Sunshine taxes Mr. Myers called Ms. Curry and briefed Ms. Curry on the meeting, for somebody not involved for another six months this is a little unusual.

A review of the communications and drafts concerning the first tax memorandum will show the working drafts were circulated to and commented upon by Ms. Curry in March and April of 2005, three months before Ms. Curry's "employment".

The attorneys for Fred Sandlin will confirm Ms. Curry approached Mr. Sandlin to purchase AEM, Inc. in early 2005. And that Ms. Curry, exclusively, negotiated the acquistion of AEM, Inc. on behalf of Mirabilis Ventures, Inc..

Numerous witnesses from Presidion and Mirabilis will testify Ms. Curry was in charge of the Presidion reorganization, which started before "before" Ms. Curry was supposedly hired. See <u>witness list contained in the declaration appendix.</u>

In the deposition testimony of Presidion's officers in the litigation with Ken Hendricks, all identify Ms. Curry as a principal consultant on the tax issues and an agent and officer of Mirabilis Ventures, Inc. during the first six months of 2005.

For emphasis all, of these events were before the date Ms. Curry claims to have been hired. See Deposition Transcripts of Mr. Vanderburg, Mr. Baiers and Mr. Burcham.

Finally, although not available to Mr. Amodeo, because of the incarceration,[6] the depositions of Ms. Curry, and Mr. Hailstones are apparently replete with statements, which are in direct contradiction of the video recordings and documents. Documents which will be available for the court's review, in the due course of these proceedings or are available in Amodeo's declaration. This evidence can be compared with Ms. Curry's or Mr. Hailstones' deposition, thereby placing the veracity of Ms. Curry and Mr. Hailstones' pleadings and statements in the appropriate light.

The Guilty Plea

The guilty plea of Mr. Amodeo does not contradict the cause of actions in the counterclaim. First, even if the plea's validity is ultimately upheld, it does not excuse Ms. Curry or Mr. Hailstones separate failures in duty, nor extinguish there responsible person liability.

Second, whether Mr. Amodeo is criminally liable is not relevant to Ms. Curry's or Mr. Hailstones' contributory responsibility or negligence during periods not within the ambit of the guilty plea's factual basis. Obviously, the temporal misalignments suggest any such fact issue is not implicated

---

6/A separate and interesting due process issue in and of itself.



in the criminal judgment. Also, the factual predicate for the guilty plea itself, renders the plea's credibility questionable. Mr. Amodeo states in Mr. Amodeo's sentencing memorandum, that only in December of 2006 was Mr. Amodeo made aware of potential criminal liability; when Harrison Slaughter informed Mr. Amodeo of Mr. Amodeo and others potential exposure. This occurred only after the taxes had not been paid, thereby raising mens rea concerns from the existing record.

The memorandum containing the recitation of the subjective knowledge, or lack thereof, has been stipulated to by the United States of America. Obviously, this suggests a problem with the acceptance of, and the factual basis of, the guilty plea.

Additionally, at no time, (and Mr. Amodeo will produce numerous witnesses, including Harrison Slaughter, Esq., Kenton Sands, Esq., Brian Phillips, Esq., Mike Maher, Esq., Brent Smith., Esq., Aaron Bates, Esq., Matt Mokwa, Esq., and many others, to confirm this point) did Mr. Amodeo ever admit or ever agree, that Mr. Amodeo believed prior to December 2006, Mr. Amodeo had a duty to ensure the taxes were paid. The same witnesses will also confirm Mr. Amodeo did not believe anyone, including the bank account signers Craig Vanderburg or Mike Stanley, was subject to criminal sanctions, at least until Mr. Slaughter's December 2006 advice.

A review of the plea agreement facts, sentencing memorandum, sentencing transcripts and plea colloquy will show a careful parsing of words by all involved to keep Mr. Amodeo from

answering the "knowing" question; alas, this issue is for another proceeding, after Certiorari is completed. In the meantime the factual predicate does not bolster the position of the defendents, but instead suggests a trial is necessary to adduce the real facts and the appropriate implications of issue is for the criminal proceeding, if any, to any of the counts of the counterclaim.

## CONCLUSION

The counterclaim's allegations alone suggest denial of the motion to dismiss is required, when combined with the only evidence currently within the record, the record suggests, if anything, that Ms. Curry and Mr. Hailstones are as a matter of law responsible persons and liable in contribution.

As to the other issues a trial (or at least discovery and summary judgment motions) is needed to ascertain the veracity of the parties, the correct inferences from the evidence and the appropriate, fair and lawful relief.

Respectfully submitted this 16th day of December, 2010 by:



Frank L. Amodeo #48883-019
Federal Correctional Complex
P.O. Box 1031 (Low)
Coleman, Florida 33521-1031

---

Endnote: Mr. Amodeo has included mini memoranda on some of the other individuals named in the pleadings, full notebook exists on these person and all other key personnel, but the mini's should provide sufficient context of the events for these limited purpose of this portion of the proceedings.

## Certificate of Service

Copies of this reply are being sent to the named parties in this action and other interested parties by U.S. Mail, because of the inaccessibility of copying equipment, these service copies will not be mailed until December 20, 2010; the original is being filed on December 16, 2010.

So certifies Frank L. Amodeo this 16th day of December 2010.

Frank L. Amodeo

# Exhibit Summary

The minimemoranda attached do not contain internal exhibits, but the narrative portion seems sufficient for the limited purposes of the current proceedings.

In addition to the exhibits referenced in the body of the Reply, three other exhibits have been attached. These exhibits provide context to individuals mentioned in the Reply.

The memoranda identify evidence which can be used to prove each person's knowledge of the unpaid taxes and the tax-funded reorganization plan.

## List of Exhibits

Exhibit "A"   — Edith Curry, Esq.
Exhibit "B"   — Frank Hailstones, CHA
Exhibit "C"   — James Baiers, Esq.
Exhibit "D"   — Jason Carlson, MBA
Exhibit "E"   — Robert Pollack, M.D

## EDITH CURRY
### MEMORANDUM

The purpose of this memorandum is to explain Edith Curry's ("Curry") involvement with the professional employer organization ("PEO") subsidiaries of Presidion Corporation ("Presidion") and Mirabilis Ventures, Inc. ("Mirabilis"), including her knowledge of the increasing payroll tax liabilities of the Presidion PEOs and the use of those funds for the benefit of Mirabilis.

1.      Curry is a licensed attorney and an expert in "Sarbanes-Oxley" and "corporate fraud detection."

2.      Curry regularly lectures on corporate governance and fraud detection. She is a featured guest speaker at this year's "Sarbanes-Oxley Strategic Symposium" in Orlando, Florida on March 23rd and 24th, 2009. She will be speaking on the topic of "Is Your Anti-Fraud Strategy Strong Enough to be SOX-compliant?"

3.      Curry was an Officer of Mirabilis, specifically Secretary and Treasurer of Mirabilis. Curry also was the president of Nexia Strategy Corporation ("Nexia"), a wholly-owned subsidiary of Mirabilis engaged by Presidion to provide consulting services.

4.      Curry was a Board Member of Mirabilis.

5.      Curry was the Chair of the Mirabilis Audit committee.

6.      Curry was the fourth largest shareholder of Presidion, owning 8 million shares of common stock.

7.      Curry was in charge of the AQMI Strategy Corporation ("AQMI") team of consultants tasked with the first piece of the Presidion reorganization (i.e. the Sunshine Companies Plan). In this capacity, she conducted the initial due diligence of Presidion, assisted in drafting the original AQMI consulting agreement with Presidion, and attended the December 21, 2004 meeting at the offices of Rachlin Cohen & Holtz, LLP where the initial Presidion reorganization strategy was developed. As a result, she was aware of the amount of taxes owed by Presidion's PEO subsidiaries beginning in October of 2004.

8.      Additionally, when the second piece of the Presidion reorganization began in July of 2005 (i.e. the PBS Plan), Curry was responsible for contacting the U.S. Department of Justice and coordinating the profit improvement analysis of the PEO book of business.

9.      On or about August 29, 2005, Curry reviewed Daniel McHenry's valuation report on Presidion where the Presidion tax liabilities were specifically discussed.

10.     In early-2006, Curry was a significant participant in the negotiations between Mirabilis and ESAC which ultimately prevented ESAC from notifying customers that Mirabilis had acquired Presidion and was not timely making payroll tax deposits.



11.     On or about March 23, 2006, Curry attended the Mirabilis Board of Directors meeting where Frank Amodeo ("Amodeo") announced that Presidion Solutions VII, Inc. ("PBS") had a $72 million payroll tax liability. Curry knew this to be a drastically increased amount based upon her original due diligence of PBS.   At that same meeting, Mirabilis' Board authorized over $8 million in capital expenditures.

12.     On or about April 18, 2006, Curry attended the Mirabilis chairman's executive meeting where an extensive discussion incurred regarding the PBS payroll tax liability, which had increased to approximately $144 million and was continuing to increase.  At the meeting, Curry acknowledged that AEM had notified all of the clients of PBS that they were customers of AEM and that AEM was current in the payment of their taxes.

13.     On or about August 29, 2006, Curry attended the Mock Deposition where Amodeo explained the Presidion reorganization plan in great detail; including the nonpayment of PBS payroll taxes. By this time, the unpaid payroll taxes were over $170 million.

14.     Curry also developed several business interests which were funded by the payroll taxes of PBS, including Tireflys/Theory 3 and Nexia Certification, which is now being used by Palaxar, LLC.





FRANK HAILSTONES
MEMORANDUM

The purpose of this memorandum is to explain Frank Hailstones' ("Hailstones") involvement with the professional employer organization ("PEO") subsidiaries of Presidion Corporation ("Presidion") and Mirabilis Ventures, Inc. ("Mirabilis"), including his knowledge of the increasing payroll tax liabilities of the Presidion PEOs and the use of those funds for the benefit of Mirabilis.

1.     Hailstones was an Officer of Mirabilis, specifically President and CEO for Mirabilis.

2.     Hailstones was a Board Member of Mirabilis.

3.     Hailstones was an Officer of Nexia Strategy Corporation ("Nexia"), a wholly owned subsidiary of Mirabilis.

4.     Hailstones was a statutory "Controlling Person" for AEM, Inc. ("AEM"), a wholly owned PEO operating subsidiary of Mirabilis.

5.     Prior to joining Mirabilis, Hailstones was the Managing Partner of Price Waterhouse Coopers Europe.

6.     Hailstones is an expert in "Sarbanes-Oxley" and "Business Governance," and specialist in "Enterprise Risk Management."

7.     Hailstones regularly lectures on corporate governance and fraud detection. He was a featured guest speaker at the 2008 "Fraud Summit" in Las Vegas, Nevada on April 13, 2008. Hailstones spoke on the following topics: "Fighting White Collar Fraud Now" and "How to Perform a Fraud Risk Assessment for the Internal Auditor."

8.     In or about March 2005, Hailstones was retained to ensure that Presidion and its PEOs were compliant with the requirements of "Sarbanes-Oxley."

9.     In or about October 2005 Hailstones recommended that Mirabilis and all of its affiliates add the following provision to their bylaws:

Company's method of doing business protocols shall be consistent with the requirements set forth under the Sarbanes-Oxley (SOA), by using and implementing "Axenaware" software applications.

10.    In or about October 2005 the aforementioned provision was added to the Mirabilis by laws.


"B"

11.   In or about January 2006, Hailstones had extensive discussions with Dan McHenry, a PEO consultant and former Presidion employee, regarding AEM's acquisition of the Presidion book of business and the payroll tax and operational problems of Presidion.

12.   On or about February 3, 2006, Hailstones attended the Mirabilis Executive Committee meeting where the PEO payroll tax matters were discussed, including, specifically, Jim Sadrianna's comment that all trust fund taxes owed by the PEO book of business would need to be paid from the date of Mirabilis' acquisition forward.

13.   On or about March 23, 2006, Hailstones attended the Mirabilis Board of Directors meeting where Frank Amodeo ("Amodeo") announced that Presidion Solutions VII, Inc. ("PBS") had a 72 million dollar payroll tax liability. At that same meeting, Mirabilis' Board authorized over $8 million in capital expenditures.

14.   On or about April 18, 2006 Hailstones attended the Mirabilis chairman's executive meeting where an extensive discussion incurred regarding the PBS payroll tax liability, which had increased to $144 million. At the meeting, Hailstones acknowledged that AEM has notified all of the clients of PBS that they were customers of AEM and that AEM was current in the payment of their taxes.

15.   In or about August 2006 Hailstones asked Kellie Tomeo and Bill Eplin to investigate Mirabilis' involvement in the Presidion reorganization for possible "predicate acts" that could constitute "racketeering."

16.   On or about August 29, 2006, Hailstones attended the Mock Deposition where Amodeo explained the Presidion reorganization plan in great detail; including the nonpayment of PBS payroll taxes.

17.   On or about August 30, 2006, Hailstones executed the Debt Refinancing Agreement on behalf of Mirabilis. The Debt Refinancing Agreement explained and justified the movement of tax money from Presidion Solutions, Inc. to Mirabilis.

18.   Hailstones developed and funded several personal business interests with the nonpayment of payroll taxes by PBS, these interests include:

(a)   Hailstones encouraged Mirabilis to fund 100% of the software development expenses of Axena, Inc. ("Axena") even though Mirabilis only owned 25% of Axena. Hailstones was the largest shareholder of Axena and profited greatly from Mirabilis' funding.

(b)   Hailstones proposed a merger between Axena and Fox Technologies, Inc. (FoxT) utilizing Mirabilis' financial resources. Hailstones held significant personal interests in Axena and FoxT. Pursuant to the agreement, Mirabilis invested $4,092,030.31 in FoxT, and received no financial benefit for its investment. After Hailstones resigned from Mirabilis, he completed the merger between Axena and FoxT. Mirabilis does not know what happened to its share of the money.





## JAMES E. BAIERS
## MEMORANDUM

The purpose of this memorandum is to explain Jim Baiers' ("Baiers") involvement with the professional employer organization ("PEO") subsidiaries of Presidion Corporation, including his knowledge of the increasing payroll tax liabilities of the Presidion PEOs and the use of those funds for the benefit of Mirabilis.

1.      Baiers is a licensed attorney who specializes in employment law, professional employer organizations, and the staffing industry. *See* **Exhibit A:** (i) Clark Hill Resume.

2.      Baiers was a Board member of the following Presidion companies: (i) Sunshine Companies, Inc.; (ii) Sunshine Staff Leasing, Inc.; (iii) Sunshine Companies II, Inc.; (iv) Sunshine Companies III, Inc. ("collectively, the Sunshine Companies"); (v) Presidion Corporation; (vi) Paradyme, Inc. ("Paradyme"); (vii) Presidion Solutions, Inc. ("PSI"); and (viii) Presidion Solutions VII, Inc. ("PBS"). *See generally,* Presidion corporate governance.

3.      Baiers was an Officer of the following Presidion Companies: (i) Sunshine Companies; (ii) Presidion Corporation; (iii) Paradyme; (iv) PSI; and (v) PBS. Specifically, Baiers was General Counsel and Secretary of the aforementioned companies. *See generally,* Presidion corporate governance.

4.      Pursuant to Florida Statutes §§ 468.520 – 468.535, Baiers was a licensed controlling person of the following Presidion companies: (i) Sunshine Companies; (ii) Paradyme; and (iii) PBS. As a controlling person Baiers had a duty to ensure that the companies paid all of the payroll taxes of their leased employees. *See* **Exhibit B:** (i) Florida DBPR License Summary of Baiers.

5.      Baiers owned 7.8 million shares of Presidion Corporation common stock. *See* **Exhibit C:** (i) 2003 Presidion 10k.

6.      As a result of Baiers' position as General Counsel, Officer, Director and Controlling Person, he reviewed, revised, executed, and/or ratified virtually every agreement entered into by Presidion, PBS, Paradyme, and/or the Sunshine Companies during his tenure. *See generally,* Presidion corporate documents.

7.      Beginning in 2002, Presidion began utilizing tax deposits held on behalf of the customers of its PEO subsidiaries as additional capital for operating costs. *See* **Exhibit D:** (i) 04/22/03 Andrew Alley email (No.042203 Master Timeline); (ii) 04/23/03 Andrew Alley email (No. 042303.1 Master Timeline); (iii) 4/29/03 email from Sue Schumacher notifying Baiers that the unpaid payroll taxes totaled $2,988,763 (No.042903 Master Timeline).

8.      Beginning in 2003 and continuing through late-2004, Baiers, on behalf of Presidion Corporation and its subsidiaries, communicated with the USAO and IRS Criminal Investigation Division regarding a grand jury investigation of Presidion for non-payment of payroll taxes. Baiers specifically misrepresented to the IRS and USAO that any outstanding

"C"

tax liability owed by Presidion was a surprise to him and that he believed all taxes had been properly paid and all forms had been properly filed. *See* **Exhibit E:** (i) 05/23/03 letter to Gary Patterson regarding unpaid payroll taxes for the Sunshine Companies and Presidion Solutions for the years 1997-2002 (No. 052303 Master Timeline); (ii) 10/18/04 email to Vanderberg telling him that they need to fill Frank in on the CID investigation so it does not screw up "Franks Plan." (No.101804 Master Timeline).

9.     Baiers was aware that Presidion failed to file its required state tax returns for 2001 - 2004. *See* **Exhibit F:** 03/24/06 email from UHY notifying Baiers that Presidion Corporation and its subsidiaries did not file their necessary state tax returns (No. 032406 Master Timeline).

10.     In May of 2004, Baiers was informed by attorneys for Ken Hendricks that the unpaid taxes of the Presidion PEOs were over $3 million. *See* **Exhibit G:** (i) 05/14/04 letter from Karl Leo (No.051404 Master Timeline).

11.     In September of 2004, Baiers was informed by attorneys for Ken Hendricks that the unpaid taxes of the Presidion PEOs were over $10 million. *See* **Exhibit H:** (i) 09/28/04 Letter from Karl Leo (No.092804.1 Master Timeline).

12.     In November of 2004, Baiers was informed by John Burcham that the unpaid taxes of the Presidion PEOs were over $18 million. *See* **Exhibit I:** (i) (11/17/04 Burcham resignation letter).

13.     Baiers attended the December 21, 2004 meeting at the offices of Rachlin Cohen & Holtz, LLP where the initial Presidion reorganization strategy was developed. *See* **Exhibit J:** (i) Baiers hand written notes from the meeting (No.122104.2 Master Timeline).

14.     In early 2005, Baiers reviewed and revised the April 2005 memorandum from Berman, Kean, & Riguera, PA which stated that Presidion Corporation would not be responsible for the Sunshine Companies' unpaid payroll taxes. Baiers specifically deleated all criminal references in the memo, including the memos reference to I.R.C. § 7202. *See* **Exhibit K:** (i) 040305 email from Baiers with memo and revisions attached.

15.     Beginning in January of 2005, Baiers communicated with Presidion's auditors, UHY, regarding the treatment of the unpaid payroll taxes of the Sunshine Companies and the contingent gain to Presidion arising from the discharge of the tax liabilities. *See* **Exhibit L:** (i) 12/30/04 email chain discussing Mirabilis/Wellington transactions with Presdion (No.010305.2 Master Timeline); (ii) 1/14/05 UHY Letter discussing Mirabilis/Wellington transactions with Presdion (No.011405 Master Timeline); (iii) 03/28/05 email between Baiers and Amodeo discussing AQMI fees (No.032805 Master Timeline); (iv) 05/10/05 O'Connor email and memo discussing contingent gain issue (No.051005 Master Timeline); (v) 5/16/05 draft 10k with comments and Baiers handwritten notes (No. 051305.2 Master Timeline).





16.   In March of 2005, Baiers was informed that the Presidion tax manager had resigned due to Presidion's failure to timely remit its payroll tax deposits. *See* **Exhibit M:** (i) 03/28/05 Vanderburg email (No.032805.1 Master Timeline).

17.   On October 13, 2005, Baiers was interviewed by Brian Taylor and Edith Curry regarding various matters related to Presidion. Baiers acknowledges the unpaid payroll taxes of Presidion and the fraudulent letters of credit issued by Brentwood Capital. See **Exhibit N:** (i) Handwritten notes of Baiers (No.101305 Master Timeline).

18.   In January of 2006, Baiers specifically asked Vanderburg what the PBS tax liability was and was informed that PBS had made no payroll tax deposits in the preceding months and owed $71,757,999.76 in taxes. *See* **Exhibit O:** (i) 01/06/06 email from Shumacher with attachment (No.010606 Master Timeline).

21.   On June 14, 2006, Baiers received the Notice of Federal Tax Lien for PBS which showed that the unpaid payroll taxes for PBS had increased to over $97,070,415.15. *See* **Exhibit P:** (i) PBS Notice of Federal Tax Lien (No.062206 Master Timeline).





### JASON CARLSON
### MEMORANDUM

The purpose of this memorandum is to explain Jason Carlson's ("Carlson") involvement with the professional employer organization ("PEO") subsidiaries of Presidion Corporation ("Presidion") and Mirabilis Ventures, Inc. ("Mirabilis"), including his knowledge of the increasing payroll tax liabilities of the Presidion PEOs and the use of those funds for the benefit of Mirabilis.

1.    Carlson was an Officer of Mirabilis, specifically Executive Vice-President of Mirabilis.

2.    Carlson was a Board Member of Mirabilis beginning January 3, 2005 and ending February 28, 2007.

3.    Carlson was a Board Member of Presidion from January 5, 2005 through December 31, 2006.

4.    Carlson was one of the principal members of the AQMI Strategy Corporation ("AQMI") team of consultants tasked with the first piece of the Presidion reorganization (i.e. the Sunshine Companies Plan). In this capacity, he assisted in conducting the initial due diligence of Presidion, attended the December 21, 2004 meeting at the offices of Rachlin Cohen & Holtz where the initial Presidion reorganization strategy was developed, and worked with Presidion's auditors on the effect of the contingent gain resulting from the Sunshine Companies Plan. As a result, he was aware of the amount of taxes owed by Presidion's PEO subsidiaries beginning in October of 2004.

5.    In early 2005, Carlson distributed the consulting fees received by AQMI from Presidion for AQMI's successful completion of the Sunshine Companies Plan.

6. .    On or about March 23, 2006, Carlson attended the Mirabilis Board of Directors meeting where Amodeo announced that Presidion Solutions VII, Inc. ("PBS") had a $72 million payroll tax liability. At that same meeting, Mirabilis' Board authorized over $8 million in capital expenditures.

7.    On or about August 29, 2006, Carlson attended the Mock Deposition where Amodeo explained the Presidion reorganization plan in great detail; including the nonpayment of PBS payroll taxes. By this time, the unpaid payroll taxes were over $170 million.

8.    On or about December 16, 2006, Carlson attended the Mirabilis Board of Directors meeting where he specifically mentioned the unpaid payroll taxes of Presidion, the use of these funds for the benefit of Mirabilis, and the IRS's knowledge of the Presidion reorganization plan.

9.    Carlson also developed several business interests which were funded by the payroll taxes of PBS, including Tireflys/Theory 3 and Durand Media.



"D"

### ROBERT POLLACK
### MEMORANDUM

The purpose of this memorandum is to explain Robert Pollack's ("Pollack") involvement with the professional employer organization ("PEO") subsidiaries of Presidion Corporation ("Presidion") and Mirabilis Ventures, Inc. ("Mirabilis"), including his knowledge of the increasing payroll tax liabilities of the Presidion PEOs and the use of those funds for the benefit of Mirabilis.

1. Pollack was an Officer of Mirabilis, specifically Executive Vice-President.

2. Pollack was a Board Member of Mirabilis.

3. Pollack was a Board Member of Presidion.

4. Pollack was Chairman of the Mirabilis PEO steering committee.

5. Pollack is a licensed psychiatrist who regularly monitored and advised others as to Frank Amodeo's ("Amodeo") bipolar disorder and its effect on various business decisions.

6. Pollack provided oversight and conducted due diligence on all Mirabilis PEO acquisitions in 2006.

7. On or about May 31, 2005, Pollack executed the Assignment and Assumption Agreement for the Sunshine Companies Promissory Note on behalf of Mirabilis. This agreement allowed Mirabilis to purchase the $12.2 million debt owed by Paradyme to the Sunshine Companies for $1.2 million. As a result, Mirabilis was entitled to the remaining $11 million owed by Paradyme, as opposed to the funds being used to pay the tax liabilities of the Sunshine Companies.

8. Throughout late-2005, Pollack executed various documents associated with the reorganization of Presidion and its PEOs, including the document wherein Mirabilis agreed to indemnify Presidion for noted liabilities up to $70 million in exchange for $50 million. This agreement created another avenue of funding for Mirabilis derived from the non-payment of payroll taxes by the Presidion's PEOs.

9. On or about March 23, 2006, Pollack attended the Mirabilis Board of Directors meeting where Amodeo announced that Presidion Solutions VII, Inc. ("PBS") had a 72 million dollar payroll tax liability. At that same meeting, Mirabilis' Board authorized over $8 million in capital expenditures.

10. On or about August 29, 2006, Pollack attended the Mock Deposition where Amodeo explained the Presidion reorganization plan in great detail; including the nonpayment of PBS payroll taxes. By this time, the unpaid payroll taxes were over $170 million.



"E"



11.   Pollack was responsible for the Mirabilis "vanity" budget, securing and executing several corporate sponsorship agreements which were funded with the nonpayment of payroll taxes by PBS. These sponsorships included:

(a) The November 13, 2006 Mirabilis agreement to act as a corporate sponsor of the Orlando Magic for $2.4 million.

(b) The December 1, 2006 Mirabilis agreement to act as a corporate sponsor of the Jacksonville Jaguars for $140,000.

(c) The December 15, 2006 Mirabilis agreement to act as a corporate sponsor for the University of Florida's sports programs for $387,000.

(d) The Mirabilis agreement to act as a corporate sponsor for the New Orleans Saints. Amount?????



