## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

| | | |
|---|---|---|
| MIRABILIS VENTURES, INC. and NEXIA STRATEGY CORPORATION, | ) ) ) | |
| Plaintiffs, | ) ) | Case No.:  6:07-CV-1788-ORL-28-GJK |
| -vs.- | ) ) | |
| PALAXAR GROUP, LLC; PALAXAR HOLDINGS, LLC; FRANK HAILSTONES; EDITH CURRY a/k/a EDITH BROADHEAD; and TERENCE CHU, | ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| vs. | ) ) | **MOTION OF DEFENDANTS PALAXAR HOLDINGS, LLC,PALAXAR GROUP,LLC, EDITH CURRY AND FRANK HAILSTONES FOR ATTORNEYS' FEES AND INCORPORATED MEMORANDUM OF LAW** |
| MIRABILIS VENTURES, INC., et al. | ) ) ) | |
| Counterclaim and Third Party Defendants. | ) ) | |

_____

MARTIN R. RASKIN
Florida Bar No. 315206
JANE SERENE RASKIN
Florida Bar No. 848689
RASKIN & RASKIN, P.A.
866 South Dixie Highway
Coral Gables, Florida 33146
Telephone: (305) 444-3400
Facsimile: (305) 445-0266
mraskin@raskinlaw.com

Attorneys for Defendant Curry
Palaxar Group LLC, and Palaxar
Holdings, LLC

KATHLEEN B. HAVENER
THE HAVENER LAW FIRM, LLC
15511 Russell Road
Chagrin Falls, OH 44022
Phone: 440-893-0188
Cell: 216-288-6009
Fax: 440-893-9326
kbhavener@havenerlaw.com

Attorney for Defendants Curry,
Hailstones, Palaxar Group LLC, and
Palaxar Holdings, LLC

COME NOW Defendants Palaxar Holdings LLC, Palaxar Group, LLC, Edith Curry ("Curry") and Frank Hailstones, ("Hailstones") (Collectively "Defendants"), pursuant to the Florida Uniform Trade Secrets Act § 688.005,[1] 28 U.S.C. § 1927, and the Court's inherent authority, and seek an award of attorneys' fees and costs[2] against Mirabilis Ventures, Inc. ("MVI"), Nexia Strategy Corporation ("Nexia") (collectively "Plaintiffs"), William R. Cuthill, Jr. ("Cuthill"),[3] Aaron Bates, Esq., ("Bates"), Matthew Mokwa, Esq. ("Mokwa"),[4] the law firm of GoldbergBates, PLLC, ("GB") BatesMokwa, PLLC ("BM"), Allen Estes, Esq. ("Estes"), J. Russell Campbell, Esq. ("Campbell"), the law firm of Balch & Bingham LLP ("Balch"), Nicolette Vilmos, Esq. ("Vilmos"), Todd K. Norman, Esq. ("Norman"), and the law firm of Broad and Cassel ("B&C"), (collectively "Attorneys") for filing the frivolous and baseless Complaint and Amended Complaints, for propounding false and misleading statements to the Court, and for knowingly, willfully and vexatiously maintaining the litigation despite clear obligations to discontinue it.   Plaintiffs,

---

[1] Fla. Stat. 688.005:  Attorney's fees.--If a claim of misappropriation is made in bad faith, a motion to terminate an injunction is made or resisted in bad faith, or willful and malicious misappropriation exists, the court may award reasonable attorney's fees to the prevailing party. Thirty-nine states and the District of Columbia have statutes authorizing a fees award to trade secrets defendants where the lawsuit was brought in bad faith.

[2] *See* Attachments 1-9, Affidavits and Supporting Documentation of Entitlement to Attorneys' Fees and Verified Statement of Costs through August 2010.  Most (but not all) subsequent billings are related to the Counterclaims

[3] Courts have held that where an individual is an extremely sophisticated litigant who has actively litigated major conflicts, as a bankruptcy trustee or as principal of a debtor, the individual can personally be subject to sanctions for pursuing vexatious litigation. *See In re Singer,* 261 B.R. 745, 749-50 (M.D. Fla. 2001) (holding president of debtor liable for sanctions under Rule 11); *See also In re Eighty South Lake, Inc.,* 63 B.R. 501, 511-12 (C.D. Cal. 1986) (awarding sanctions against principal of debtor and its counsel jointly).  Cuthill is no stranger to bankruptcy proceedings in this Court, or the knowledge of sanctionable behavior, since he was president of another debtor in 2007 which successfully moved for sanctions against attorneys who exhibited far less egregious behavior than what occurred in this case. *See In re Evergreen Security, Ltd.,* 2007 WL 4919780 (M.D. Fla. Nov. 16, 2007).

[4] Mokwa, in-house counsel for MVI, reviewed Curry's October 2006 Separation Agreement shortly after its execution, *see* Dkt. 317-6, and was employed at GoldbergBates PLLC and/or Bates Mokwa PLLC during the relevant times of this lawsuit.  He participated in the drafting, review, service and litigation of this case.

Attorneys, and Cuthill knew the claims filed against Defendants were baseless; the claims were filed expressly to retrieve funds for the then-undisclosed beneficiary, Frank Amodeo ("Amodeo".)[5]   This was a jointly-planned, well-organized effort to execute a scorched-earth strategy to retrieve $188M Amodeo, admittedly, stole.   The Attorneys were complicit in the bad-faith pursuit of this lawsuit as one part of that strategy.   The law addressing "bad faith" under 28 U.S.C. § 1927, under Florida's version of the Uniform Trade Secrets Act, and this Court's inherent authority all support an award of attorneys' fees and costs.

## INTRODUCTION

This lawsuit was ***never*** about recovering the anti-fraud certification program known as "Nexia Certification."   In the three years, since this litigation commenced, not a shred of evidence was produced that supports Plaintiffs' claims: not a single document, not one competent witness.   The patent application was not stolen.   Plaintiffs' information was not confidential or proprietary, nor did the alleged trade secrets, research studies and company strategies exist.   Ever.   And Plaintiffs and Attorneys knew it.

This action was one of seventy-nine[6] lawsuits planned, funded, and executed by a convicted felon, while he faced criminal indictment on twenty seven counts and a possible 305 year prison sentence.   Concurrent with his plea negotiations with AUSA I. Randall Gold ("Gold"), but prior to his indictment, Amodeo conspired to shake down at least 124 individuals and 132 companies, professional organizations, banks, lending institutions, insurance companies, and

---

[5] *See* Exhibit A - Affidavit of Barry Lynch.  (*For ease of reference and convenience to the Court, the exhibits and attachments are being filed as a separate Docket Entry.*)

[6] *See* Composite Exhibit B - Amodeo's Litigation Plans.

government agencies to falsely obtain from others the $188M he admitted to having diverted from the Internal Revenue Service.  He wanted the "Lou Pearlman sentencing deal"—one month off for each $1M repaid to the IRS.  Amodeo also wanted to find out via discovery in this case what information Curry and Hailstones may have provided while voluntarily cooperating with Gold.  Using laundered funds, together with a cadre of well-paid law firms, including Balch, Mateer & Harbert ("M&H"), Latham, Shuker, et al. ("Latham"), Maher, Guiley & Maher ("Maher"), GB,[7]  Leventhal & Slaughter ("Slaughter") and MVI's former in-house attorneys, Mokwa and Bates, Amodeo devised a plan to try to divert Gold's attention toward 100 other individuals and to finagle $245M from the various targets of his litigation strategy.[8]

Amodeo's criminal counsel, Slaughter, had possession of all MVI (et al.) corporate documents and records, which rendered any civil defendant's discovery virtually impossible. The Attorneys were well-motivated to participate in the scheme: Amodeo promised them contingency fees of 45 to 55% of $245M (plus costs).  In addition to his criminal defense fees, Slaughter negotiated a 20% "referral fee" from the civil Attorneys' take.  While Slaughter was negotiating Amodeo's criminal plea agreement, in which Amodeo never raised the defense of "advice of counsel" or "reliance on professionals," the Attorneys were drafting and serving complaints on numerous professionals, directors & officers' insurance carriers, former

---

[7] "The conduct of an attorney is imputed to his client." *S.E.C. v. McNulty*, 137 F.3d 732, 739 (2d Cir. 1998); *United States v. Cirami*, 563 F.2d 26, 34 (2d Cir. 1977) ("[E]ach party is deemed bound by the acts of his lawyer-agent and is considered to have notice of all facts, **notice of which can be charged upon the attorney**." (internal quotation marks omitted) (emphasis added)).  *See also Kurzberg v. Ashcroft*, No. 04 CV 3950 (JG), 2006 WL 2738991 (E.D.N.Y. Sept. 25, 2006) *quoting Reilly v. NatWest Mkts. Grp., Inc.*, 181 F.3d 253, 271 (2d Cir. 1999).

[8] *See* Composite Exhibit C - Amodeo Finalizes the Litigation Plans.

employees, etc., alleging exactly that.  And as the civil cases progressed, Slaughter was getting the documents Amodeo's Attorneys obtained through the civil discovery process.  *See* Exhibit K.

I.     **THE ATTORNEYS KNEW MVI AND NEXIA WERE NOT TRUE PARTIES-IN-INTEREST—AMODEO HAD SEIZED MVI'S ASSETS IN EARLY 2007.**

MVI and Nexia were Plaintiffs in name only.  Ten months prior to filing, both companies had been seized by the senior secured creditor AQMI Strategy.  (Amodeo, the sole shareholder of AQMI, had been MVI's senior secured creditor since 2005).[9]  Despite Goldberg's and Bates' notifications to other MVI litigants regarding AQMI's asset seizure in early 2007, Plaintiffs, Balch and BM expressly denied it in the present case (D.E. 72 ¶¶6, 16, 130 - 135).  This case was brought by Amodeo, for his benefit, and the Attorneys admitted it,[10] if not to this Court.

Record evidence before this and other courts, however, illustrates that AQMI retained the law firms,[11] AQMI paid the attorneys,[12] AQMI paid the MVI Officers' salaries,[13] AQMI directed the litigation,[14] and AQMI drafted and issued the press releases.[15]

---

[9] *See* Composite Exhibit D - AQMI, GB, Bates, and Goldberg's Notices of AQMI's taking possession of MVI - *See* pps. 4, 6: "Currently, it has been determined that MVI's primary secured creditor and the Internal Revenue Service hold priority positions over all other creditors of Mirabilis." July 9, 2007 - Scott Goldberg; July 10, 2007 - Aaron Bates.

[10] "Maintenance "is the act of one improperly, and for the purpose of stirring up litigation and strife, encouraging others either to bring [an] action or to ... defend [a suit] which they have no right to make...." 9 Fla.Jur.2d Champerty and Maintenance § 1 (1979).  Champerty is a form of maintenance wherein one will carry on a suit in which he has no subject-matter interest at his own expense or will aid in doing so in consideration of receiving, if successful, some part of the benefits recovered. 14 C.J.S. Champerty and Maintenance § 1a (1991).  Maintenance and champerty have been supplanted by the causes of action of malicious prosecution and abuse of process coupled with other remedies. The Florida Legislature has several statutes designed to combat groundless lawsuits and the filing of frivolous suits that were the evils intended to be curtailed by allowing causes of action for champerty and maintenance.  Section 57.105 of the Florida Statutes (1997), as amended in 1999, 28 USC §1927 as well as this Court's inherent authority permits courts to sanction litigants and attorneys for filing frivolous lawsuits. Also, rule 4-3.1 of the Florida Rules of Professional Conduct prohibits attorneys from bringing or defending a proceeding, unless there is a basis for doing so that is not frivolous.

[11] *See* Composite Exhibit E - AQMI retains law firms pursuant to the diagramed plan in Exhibit B p. 1.

[12] *See* Exhibit E - p. 11.

On July 17, 2007, Bates, counsel for MVI, signed interrogatory responses stating:[16]

. . . [O]n or about June 30, 2007, Mirabilis' first priority secured creditor, AQMI Strategy Corporation, secured its position via the assets of Mirabilis after Mirabilis' default on repayment of the obligations owed to AQMI.  Mirabilis has taken the position that all amounts allegedly outstanding and owed to its priority secured creditors, *namely the IRS and AQMI* must be assessed and resolved before any other alleged obligations are satisfied.

(Emphasis added.)  On August 30, 2007, Bates responded to interrogatories as follows:[17]

**INTERROGATORY 12**:  Please identify what role, if any, Frank Amodeo currently has with Mirabilis Ventures, Inc., and when that relationship was developed.

**ANSWER**:  . . . Frank Amodeo is the President of AQMI Strategy Corporation, which holds a first position secured interest over the assets of Mirabilis since May 6, 2005.

On October 23, 2007, MVI's President Jaiman, represented by and in the presence of Estes (from Balch) and Bates testified:  "AQMI had taken over its position as a secured creditor for Mirabilis...the secured creditor had seized everything."[18]   On November 15, 2007, Bates, counsel for MVI, Amodeo, and AQMI signed the following Answer:[19]

**COMPLAINT GENERAL ALLEGATION ¶4**:  Defendant, Amodeo, is an individual resident of Orange County Florida.  Amodeo is technically a "consultant" to

---

[13] *See* Exhibit F.  *Kenneth Hendricks v. Mirabilis Ventures, Inc., et al.* Case No.: 8:07-cv-661-T17EEAJ (Answer ¶4-5)

[14] *See* Exhibit C.

[15] *See* Composite Exhibit G - *Kenneth Hendricks v. Mirabilis Ventures, Inc., et al.* Case No.: 8:07-cv-661-T17EEAJ (Motion to Transfer Venue & Affidavits of Frank Amodeo and Jodi Jaiman; pps, 8, 10 at ¶4-5).

[16] *See* Exhibit H - Interrogatory Answer - p. 5 at ¶7.  *Liberty Property Limited Partnership v Mirabilis Ventures, Inc.* et al. Case No: 2007-0034642-CA (Duval County, Florida).

[17] *See* Exhibit I - p. 5 ¶12. - *John Burcham v MVI.,* Circuit Court Broward County Case No: 07008432

[18] *See* Exhibit J - transcript p26, l 18-24.  October 23, 2007 Deposition of Jodi Jaiman - *Kenneth Hendricks v. Mirabilis Ventures, Inc., et al.* Case No.: 8:07-cv-661-T17EEAJ

[19] *See* Exhibit F.  *Kenneth Hendricks v. Mirabilis Ventures, Inc., et al.* Case No.: 8:07-cv-661-T17EEAJ (p. 6 at 18-15)

Mirabilis and holds no formal position in the company.  However . . . Amodeo in fact directly controls all aspects of Mirabilis.

**ANSWER:** MVI admits the first sentence . . . with respect to the second and third sentences of ¶4, MVI admits that Amodeo has, at times, been a consultant to MVI and that as president of AQMI (senior secured creditor of MVI), Amodeo exercises some control over MVI.   MVI Defendants deny any remaining allegations in ¶4.

**COMPLAINT GENERAL ALLEGATION** ¶5:   Defendant, AQMI, is a Florida corporation . . . Amodeo is the president of AQMI and directly controls all the company's activities.  Amodeo, through AQMI, pays the salaries of all current officers and employees of MVI.

**ANSWER:** MVI Defendants admit the allegations in ¶5.

The general rule is that a party is bound by the admissions in his pleadings. *See e.g., Consol. Rail Corp. v. Providence & Worchester Co., 540 F. Supp. 1210, 1220 n. 12 (D. Del. 1982), citing Giannone v. United States Steel Corp.*, 238 F.2d 544, 547 (3d Cir. 1956); *See State Farm*, 405 F.2d at 686 (8th Cir. 1968) (judicial admissions act as substitute for evidence and do away with need for evidence on the issue.)   Admissions in pleadings and in responses to requests for admission are binding on the party and obviate the need for evidence on that issue. *In re Crawford*, 274 B.R. 798, 804-05 (8th Cir. BAP 2002); *Bender v. Xcel Energy, Inc.*, 507 F.3d 1161, 1168 (8th Cir. 2007); *Pagett v. Allied Mut. Ins. Co.*, 2006 U.S. Dist. LEXIS 54258, at *11 n.4 (E.D. Mo. Aug. 4, 2006); *Hill v. FTC*, 124 F.2d 104, 106 (5th Cir. 1941).  In *Hill*, the Fifth Circuit Court of Appeals stated, "judicial admissions are proof possessing the highest possible probative value."

## II.   IN APRIL 2007, SLAUGHTER RECEIVED[20] "BINDERS" WITH THE DOCUMENTS THAT PLAINTIFFS IN THIS CASE CLAIMED DIDN'T EXIST OR WERE "FRAUDULENT."

---

[20] *See* Composite Exhibit K – not produced by Plaintiffs to Defendants until ***September 2010***.

As further evidence that Amodeo directed the litigation against Defendants, former MVI President, James Sadrianna ("Sadrianna"), who resigned from MVI but continued to work for Amodeo via AQMI through August 2007, testified:

> A.  I was asked -- I was trying to get information about this [Palaxar] case.  And Mr. Flynn shared with me the blue folders -- the preparation of the blue (gesturing [toward a folder]) -- the blue, whatever they're called.
>
> Q.  Do you know the significance of the blue folders?
>
> A.  Yes….
>
> A.  I believe that Mr. Amodeo had put together over 100 different blue folders -- I believe this is already on the record -- where he was trying to deflect responsibility from himself to a whole bunch of other people.[21]

The binders and folders prepared by the Attorneys and Amodeo were delivered to Slaughter in April and May 2007.  Curry's April 20, 2007, 273 page binder contained her Separation Agreement, the patent application, and the extensive email communications evidencing her separation negotiations between MVI CEO and fellow inventor Hailstones, MVI General Counsel Richard Berman, and MVI Chairman and fellow inventor Laurie Holtz, as well as Amodeo. Similarly, Hailstones' binder contained his employment agreement with Axena, Inc. and his fully executed January 31, 2007 Termination Agreement.   Laurie Holtz's 386 page binder contained the August 1, 2006 "Nexia Certification" Assignment Agreements as well as an entry in the "Laurie Holtz Timeline" referencing the Assignments.  There is no indication in any of these binders suggesting that the Assignments or Separation Agreements were invalid.[22]  In a related case, Plaintiffs, Cuthill and B&C provided the "Laurie Holtz Timeline" (containing the

---

[21] *See* Sadrianna Depo (D.E. 317- 7 pp. 76-77)

[22] *See* Composite Exhibit L - The April 20, 2007 Binder for Curry and Holtz delivered to Slaughter.

Assignment Agreements that in **_this_** case they alleged Defendants falsified), as credible "evidence" to be considered by Plaintiffs' expert witness. See *MVI v. Rachlin et al.* Case No.: 6:09-cv-00271 (D.E. 82-7 p. 49).

**III.  THIS LITIGATION WAS DIRECTED BY AND ON BEHALF OF AMODEO TO GET A REDUCED SENTENCE - BY DEFINITION AN IMPERMISSIBLE PURPOSE - AND USING $5.5M THAT THIS COURT NOTED SHOULD HAVE BEEN TURNED OVER TO THE GOVERNMENT.**

Amodeo's criminal attorney, Kenton Sands, stated to this Court on May 19, 2009:

> Amodeo is…actually seeking another means to pay back the government, which was a major part, **_however badly executed_**, that was his effort for the last two years in terms of trying to recover monies for the government by using these various attorneys to prosecute all of these lawsuits to try to bring the money back. Would it benefit Mr. Amodeo in the sense ultimately of reducing the amount of his loss, the amount of the restitution that would have to be paid? Absolutely. Would it ultimately bring it down to zero?  That hardly seems likely.[23]

This Court, on May 26, 2009 noted:

> Much of the sentencing hearing was, as Mr. Gold points out, an effort to shift or share culpability with others.  He [Amodeo] has gone so far as to initiate lawsuits blaming others for his conduct, and he's frustrated the prosecutor by filing bankruptcy petitions without notice to the government or his own lawyers.  And finally, he appropriated a large refund from an insurance company [the $5.5M payment that Amodeo stole to divert to these law firms for the pursuit of this and related litigation] that he should have turned over to the government…[24]

Amodeo testified on May 13, 2009:

> …we began to take the information we've been compiling and organizing it to go after the individuals on this sheet[25]and others who still owed MVI money…and I commenced 30 lawsuits with different firms all over the country… …**_and by [late]_**

---

[23] *See* Composite Exhibit M, - *United States v. Frank Amodeo*, Case No.: 6:08-CR-176 - Sentencing Transcripts - May 19, 2009, p 68, at 2-13.

[24] *See* Exhibit M - May 26, 2009 Sentencing Transcript, p. 43 at 8-17.

[25] *See* Exhibit B.

*September [2007] the first affirmative actions were filed.*[26]*…the twenty attorneys, they were told what was going on when I hired them, they knew it…*[27]  (Emphasis Added)

Slaughter[28] on May 13, 2009 stated to this Court:

I brought in two law firms [M&H] and [Maher]…they were brought in on a contingency…to go after some of the insurance money.  There was a pretty good bit of insurance money out there….I also knew [Amodeo] was working with [Balch]…[29]  I was getting reports from [Amodeo] that these lawyers thought that he had great suits and they were taking a contingency….I talked to Mr. Gold about it and he didn't like some of the pleadings they were putting in.  But then I heard from Mr. Amodeo that [M&H] had done some work and thought he had a great case and I don't know who they were looking at, and I don't know who [Balch] were looking at, but we certainly had our hands full with Chris Searcy [Searcy Denney Scarola Barnhart & Shipley] and the Maher firm going after four or five [professionals]… [30]

## IV.  AMODEO AND THE ATTORNEYS FINALIZED AND IMPLEMENTED AMODEO'S LITIGATION PLAN.

---

[26] Exhibit M, *supra*, - May 13, 2009 Sentencing Transcript p. 80 at 5-21. *See also* Jaiman Affidavit (Doc. 164-2), Stollenwerk Affidavit (Doc. 162-2 p. 40-43), McCabe Affidavit (Doc. 162-2 p. 44-45). Federal Rules of Evidence - 804(b)(1) Former Testimony and 804(b)(3) Statement against interest - a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability; and (B) is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability.  *United States v. Thomas,* 571 F.2d 285 (5th Cir. 1978),  *See United States v. Saget,* 377 F.3d 223 (2nd C.A. 2004).

[27] *Id.*  Exhibit M, s*upra,* p. 85 at 4-10.

[28] It is fundamental that the statements of counsel are not evidence. Barry Russell, Bankruptcy Evidence Manual, 1995-96, § 101.1 at 174.   Counsel's unequivocal statements may, nevertheless, be given the effect of judicial admissions.  *Glick v. White Motor Company*, 458 F.2d 1287, 1291 (3d Cir. 1972); *In re Sanglier*, 124 B.R. 511, 513 n.3 (Bankr.E.D.Mich.1991); *In re Eagson Corp.*, 37 B.R. 471,481 n. 35 (Bankr.E.D.Pa.1984); 2 McCormick on Evidence § 257, at 147 & n. 2 (John W. Strong ed., 4th ed. 1992).   In this instance, counsel's description of the events leading up to the filing of the case made to the Court will be treated as judicial admissions.  *In re Stephenson,* 205 B.R. 52 (Bankr. E.D. Pa. 1997).   Concessions made by counsel in open court are binding as judicial admissions. *In re Menell*, 160 B.R. 524, 525 n. 3 (Bankr. D.N.J. 1993).

[29] Exhibit M, *supra,* p. 97 at 2-25 and p. 98 at 3-6

[30] Exhibit M, *supra,* p. 98 at 3-6 and p. 99.

**A.  In early 2007 AQMI retained the law firms - Balch was responsible for the due diligence and assessing viability of the litigation plans.**

In July 2007, Goldberg (from GB) believed that patent applications filed by a former employee of an MVI subsidary (Ed Files from 2Wheel Tunes, Inc.) belonged to MVI. Accordingly, Goldberg, on behalf of Plaintiffs, sent a letter to Ed Files' patent attorneys seeking additional information to potentially correct the record at the United States Patent Office. Under the identical fact pattern however, Curry, Hailstones, and the Palaxar defendants were given no notice; they were sued, accosted and victimized by a global press campaign.  Even more remarkably, a patent application filed, jointly with Amodeo, by another former MVI officer, Robert Pollack, was neither assigned to MVI nor was there any action taken to "recover that asset."[31]  In March 2008, Amodeo was still personally maintaining the patent application.

In August 2007, Balch billed over 215 hours for Litigation Due Diligence; which included meeting in Orlando, Florida to "discuss litigation management and due diligence on potential claims…in meetings with Bates, Amodeo, Goldberg and Mokwa;" and specifically on August 29, 2007, "locating tax timeline and case synopsis in preparation for determining litigation strategy for *Palaxar*, RKT, and Stratus Authority; reviewing tax timeline and case synopsis to determine key individuals."  Notably, not a single meeting was held with the "officers of MVI," Jodi Jaiman, Jay Stollenwerk, or Shane Williams.  On August 30, 2007, Balch instructed Amodeo:[32]

- *I [Amodeo] did it, it was my plan and I now know it was wrong* [This particular statement was never released to the press, however.]

---

[31] *See* Composite Exhibit N - Goldberg and Amodeo Patent information.

[32] *See* Exhibit O - Balch directs defamatory press campaign.

- ***While it is not an excuse, there is a reason.  I got bad advice.***  *[Notably, Amodeo did not raise the defense of "advice of counsel" in his criminal plea.]*
- ***I am ultimately responsible, however, and I accept that responsibility.*** *[This particular statement was never released to the press either.]*
- ***I am working to be sure there is no victim, I am working to be sure the government is paid.***
- ***I will, however go after those that help put me in this situation.***

Thus, the Attorneys were assisting in the drafting of false and defamatory press releases prefacing the coming deluge of litigation.

### B.   Amodeo's criminal attorney, Slaughter, was in control of all documents.

In his April 21, 2010 deposition (in a related case), Cuthill stated:

Most of my meetings with Mr. Slaughter were ***in the beginning of the case*** [May 27, 2008.]  And most of them had to do with the custody of the -- what I'm going to call the Mirabilis documents.  The -- when I got into the case, I couldn't tell who was in charge of the Mirabilis documents.  And since I was Mirabilis, or representing Mirabilis at that point in time, if the documents belonged to Mirabilis, I wanted to take possession of them.[33]

As long as Slaughter, during his criminal defense of Amodeo, had control of all documents, it was impossible to for civil defendants, including Palaxar, Curry, and Hailstones, to have full and fair discovery pursuant to Fed. R. Civ. P. 26, without compromising Amodeo's criminal defense.  In *Bray & Gillespie Management, LLC.* ["B&G"]*, et. al. v. Lexington Insurance Company*, 2009 WL 2407754 (M.D. Fla. Aug. 3, 2009), the Court found that "B&G, through its counsel, acted willfully and in bad faith in violation of the Federal Rules of Civil Procedure and the Court's orders" by "B&G's unrelenting campaign to thwart Lexington's legitimate discovery efforts and that caused significant, incurable prejudice to Lexington.")  Accordingly, the Court

---

[33] Exhibit P, Cuthill Deposition, Volume 1, page 68 - 69, lines 20 - 25 and 1 - 3 respectively. Notably, Mr. Cuthill did not take possession of all MVI related documents: Frank Amodeo's brother Dean Amodeo had possession of documents as late as August, 2009.  (Case No: 6:08-bk-04681 (Doc. 134, p 9 - June 30, 2009 entry).

imposed the drastic sanction of dismissal with prejudice upon B&G, "not only to remedy the unfair prejudice to Lexington but also to uphold the integrity of the discovery process by warning other parties and their counsel that willful disregard of their responsibilities under the Federal Rules of Civil Procedure and Court orders will not be tolerated."  The Court granted Defendant's Motion for Sanctions, dismissed the Plaintiff's case with prejudice and permitted Defendants to submit a bill of costs and a Motion for Attorney's fees.

Here, Plaintiffs, Amodeo and the Attorneys didn't "thwart" the discovery process.  They intentionally designed and implemented a means to obstruct it altogether.  *See* Exhibit B, p. 1.

## V.   THE PALAXAR LITIGATION

On October 11, 2007, after Balch and Bates reviewed "thousands of documents and hours of video tapes" to determine Plaintiffs' claims against defendants,[34] Balch, GB, together with MVI in-house counsel Mokwa, retained and paid by AQMI,[35] reinstated the defunct Nexia, for the sole purpose of filing this complaint.[36]  The ostensible Plaintiffs brought suit against ***only two of four inventors***,[37] Curry and Hailstones, and two entities, Palaxar Group, LLC, and Palaxar

---

[34] *See* Affidavits of J. Russell Campbell, Allen Estes and Aaron Bates (Doc. 251 ¶6 - 9, Doc. 252-1 p3 at ¶5 - 6, Doc. 253-1 p3 at ¶5 - 6).

[35] *See* Exhibit J - (p. 69 at 8-18)October 23, 2007 Deposition of Jodi Jaiman, *Kenneth Hendricks v. Mirabilis Ventures, Inc., et al.* Case No.: 8:07-cv-661-T17EEAJ (p. 69 at 8-18).

[36] *See* D.E. 75-24, Doc. 24-2 at p. 8: Minutes of Special Meeting of the Board of Directors of Nexia Strategy Corporation dated October 11, 2007, signed by then-Sole Director of the Corporation, Jodi Jaiman.

[37] In June 2006, four inventors, Edith Curry, Frank Hailstones, Laurie Holtz and Michael Dement, while employed by three separate corporations, filed for a business-process patent.  Black letter patent law requires inventors be natural persons.  Curry's and Dement's employment agreements were with Nexia, Hailstones' with Axena, Inc., (of which Mirabilis Ventures, Inc. was a minority shareholder), and Holtz's with Common Paymaster Corporation.  *See* Plaintiffs' Exhibit (D.E. 24-7 p. 3).  Plaintiffs alleged the Assignment Agreements were invalid, executed by "insiders" as part of their conspiracy to steal "Nexia Certification." Thus, as there were **four inventors**, even had Plaintiffs prevailed in this lawsuit, they would not have had exclusive or controlling rights to the patent.

Holdings, LLC ("Palaxar") (D.E. 2) seeking $20M in damages.  Plaintiffs, Balch, and GB alleged:  (i) **Breach of Contract;** (ii) **Breach of Fiduciary Duty** (iii) **Misappropriation of Trade Secrets and Confidential Information;**[38] (iv) **Conversion; (v) Injunctive Relief; and (iv) Count VI – Unjust Enrichment.**

Plaintiffs' complaint was based on: (1) an affidavit of a Fed. R. Civ. P. 30(b)(6) witness, MVI's then president, Jodi Jaiman,[39] (2) select paragraphs from Curry's Nexia Employment Agreement[40] (not the agreement as a whole); (3) two obviously-altered employee handbooks[41] of a non-party to the suit,[42] Common Paymaster Corporation,  (4) an unsigned and invalid on-

---

[38] Under Florida's Uniform Trade Secrets Act, a trade secret is information that: (1) derives actual or potential independent economic value from not being generally known to, and not being readily ascertainable through proper means by, other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.  Plaintiffs' supposed "trade secrets" met none of these criteria.

[39] Ms. Jaiman's affidavit was not based on personal knowledge, but (as a 30(b)(6) witness) only on her review of the corporate business records - she was not employed by MVI or Nexia until 2007.  Also, in September 2008 she recanted the statements made in her previous affidavits.  *See* January 25, 2008 Transcript of Preliminary Injunction Hearing (D.E. 75-19 p. 9, l 2-11).  "MR. ESTES: The affidavit of Jodi Jaiman, the president of Nexia Strategy. THE COURT: She wasn't there, right? MR. ESTES: She was not, but she has reviewed the business records and the business records show the monies that were expended at the time; number one. Number two; Miss Curry admits in her affidavit -- THE COURT: Well, you agree that that is disputed by the people who were there."

[40] Curry's Employment Agreement with Nexia states at ¶9(b): "Employer shall hold harmless, indemnify, and defend Employee from any and all claims, demands, damages, losses, expenses, causes of action, judgments, and liability arising out of any fraudulent or deliberately wrongful act of  Employer, independent contractor, or other affiliate Employer and further for any acts or omissions arising out of Employee's employment with Employer, unless caused by the active gross negligence of Employee."

[41] *See Plaintiffs' Exhibits* (D.E. 24-5 p. 38-66, and p. 17-18 respectively), showing the cover page of the Common Paymaster Employee Handbook, a revision date of September 22, 2005 (lower left corner), but indicating Curry's signature on the front page on August 1, 2005 - six weeks before the document's creation.  Then Curry purportedly signed the last page six weeks later on September 21, 2005 - the day before the document's creation.  Hailstones' Common Paymaster handbook contains different dates as well.

[42] *See In re Mirabilis Ventures, Inc.,* 6:08-bk-04327-KSJ (D.E. 326 at 22 - 23):  "Mirabilis is a completely separate legal entity from Common Paymaster Corporation ("CPC").  There are no agreements or facts that would indicate Mirabilis assumed the liabilities of CPC." *See also* Exhibit Q - MVI president Cuthill's September 22, 2010 deposition testimony at p. 98 lines 1-26: "[Common Paymaster] is a separate corporation and being that corporations are legal entities; it is a completely separate legal entity from Mirabilis. Q. Are [there any] agreements or facts that

its-face employment agreement of Hailstones,[43] and (5) screen prints of Palaxar's website.

Plaintiffs and the Attorneys ignored, and in fact, denied, the contrary evidence contained in

Plaintiffs' own files which they had given to Slaughter six months earlier: (1) the Assignment

Agreements drafted by Goldberg (Doc. 24-10), (2) Curry and Hailstones Separation Agreements,

previously verified by Plaintiffs' sole in-house counsel Mokwa with MVI's former General

Counsel, Richard Berman (Doc. 24-5 p.19, 24-10 p.3), (3) MVI Articles of Incorporation, (4) MVI

Bylaws, (5) Nexia Bylaws (Doc. 24-3 p.22), (6) MVI Board Minutes attesting to Amodeo's control

(Doc. 24-2 p.47-57), and (7) Amodeo's own hand-written Agreement.

### A.      The Press Releases - pursuant to Balch's instructions

Within an hour of filing the baseless lawsuit, Plaintiffs issued the first of a series of

knowingly false, defamatory and inflammatory news articles, press releases, and scores of blog

entries:

**October 12, 2007**  - **"Mirabilis Ventures Announces Lawsuits to recover 285 Million Dollars in Losses"**[44]
**October 13, 2007**  - **"Mirabilis Lost at least $220M"**[45]
**October 17, 2007**  - **"Anti-Fraud Company sued for Absconding Assets."**[46]

---

would indicate Mirabilis assumed the liabilities of CPC? A. I know of none."  Despite this knowledge by both Plaintiffs' counsel and President, they persisted for three years in using those "documents" of a non-party to this suit to challenge Defendants' Motion for Summary Judgment. (D.E. 193 at ¶8.)

[43] *See* D.E. 75-9 (Hailstones Affidavit) at ¶ 3

[44] Exhibit R - October 12, 2007, Orlando Sentinel and www.orlandosentinel.com - "Mirabilis, a holding company that announced earlier this month it lost at least $220 million, has shut down nearly all of its operations and is trying to generate cash to pay a large tax bill anticipated from an ongoing Internal Revenue Service probe. 'Basically, Mirabilis doesn't want to get stuck with someone else's tax bill,' said Bob O'Malley, an Orlando public relations consultant hired by Mirabilis. 'We're seeking to collect what could be the total amount of taxes.'"

[45] Exhibit R - October 13, 2007, Orlando Sentinel and www.orlandosentinel.com - "A suit against Palaxar Group LLC, ex-Mirabilis President Frank Hailstones and ex-secretary-treasurer Edith Curry alleges the executives breached contracts with Mirabilis and misappropriated trade secrets and patents developed by the company before they left.  The suit said the former executives are marketing an anti-fraud product that would deprive Mirabilis of revenue.  Neither could be reached for comment."

October 17, 2007 - "Mirabilis files suit against former execs."[47]

The press releases were based on false allegations in the lawsuit which the Attorneys knew, and

Plaintiffs now admit in court pleadings, to be false.  Such conduct is reprehensible.

### B.    Service of Process

Almost immediately after filing the baseless lawsuit and issuing the press releases, MVI

shareholder Yaniv Amar ("Amar"), Bates,[48] and Mokwa (the "Troupe") flew from Miami and

Orlando respectively to Scottsdale, Arizona, to serve the Complaint.  Plaintiffs stated it was "a

necessary action given Hailstones' residence in the UK."  On October 15, 2007, 8:30 a.m. the

Troupe and an Arizona process server confronted Hailstones and Curry in the street of the

---

[46]  Exhibit  R  -  http://www.prnewswire.com/news-releases/anti-fraud-company-sued-for-absconding-assets-58713682.html ORLANDO, Fla., Oct. 17 /PRNewswire/ -- Orlando-based private equity fund Mirabilis Ventures, Inc. has filed a lawsuit and a preliminary injunction against Palaxar, LLC and its founding members, Frank Hailstones and Edith Curry, to enjoin them from utilizing property, trade secrets and confidential/proprietary information that rightfully belongs to Mirabilis. Hailstones and Curry were formerly CEO and Executive Vice President, respectively, of Mirabilis Ventures, Inc. According to its Web site, Palaxar provides clients with anti-fraud solutions. These solutions are based on research, studies, strategies and software products developed while Hailstones and Curry were employed by Mirabilis. Mirabilis is seeking approximately $20 million in damages. Hailstones and Curry were served today with the lawsuit during an anti-fraud symposium in Scottsdale, Arizona, a necessary action given Hailstones' residence in the United Kingdom. Hailstones and Curry were featured speakers at the symposium; their presentation titled, "Dealing With a Likely Fraud Situation: Audit Management's Responsibilities." The lawsuit against Palaxar is among a series of actions by Mirabilis to collect unpaid loans made to other companies as well as assets absconded with by former Mirabilis officers. Mirabilis recently announced it has divested all operating and non-financial assets. Proceeds from its asset sales and collection actions have been assigned to the Internal Revenue Service (IRS) until a determination can be made if Mirabilis is liable for unpaid payroll taxes incurred by Presidion Solutions, Inc., to which Mirabilis was a creditor and vendor. Presidion was dissolved on July 1, 2007. Frank Hailstones and Edith Curry were officers of Mirabilis during the two years Mirabilis had business relationships with Presidion and during which Presidion subsidiaries failed to pay $173 million in payroll taxes. SOURCE Mirabilis Ventures, Inc.

[47] Exhibit R - October 17, 2007 - Orlando Business Journal - MVI announced Wednesday it was seeking $20M in damages from its former top officers and they company they founded…proceeds from its asset sales and collections actions have been assigned to the Internal Revenue Service until a determination can be made if MVI is liable for unpaid payroll taxes incurred by Presidion Solutions Inc., to which Mirabilis was as creditor and vendor. Presidion was dissolved on July 1. Hailstones and Curry were officers of MVI during the two years MVI had business relationships with Presidion, which failed to pay $173M in payroll taxes.

[48] Bates, a quadriplegic, was accompanied by his personal assistant, Mr. Groomes.

conference center.  Mokwa held up an Orlando Sentinel newspaper from Saturday, October 13, 2007 featuring the bold headline "**Mirabilis Lost at least $220M**."  Waving it, Mokwa loudly declared, "See?  You're on the front page of the paper for stealing assets."  Amar's comments were more hostile and profane, and are set forth in Amar's Responses to Interrogatories (D.E. 317-10 at ¶ 18).  Curiously, only Curry was served.  Nothing was handed to Hailstones.[49]  This event was planned weeks earlier by Amodeo and the Troupe with the express goal to cause Curry and Hailstones "maximum embarrassment" and personal humiliation.  *See* Exhibit A, ¶ 18.

### C.      Defendants' Answer to Plaintiffs' Complaint

In December 2007, Defendants answered and provided the following—before any discovery:  (1) July 28, 2008 handwritten agreement signed by Amodeo,[50] (2) August 1, 2006 Intellectual Property Assignment Agreements,[51]   (3) Curry's October 31, 2006 Separation Agreement (Doc. 24-5 p.19, 24-10 p.3),[52] (4) Hailstones' January 31, 2007 Termination Agreement, (5) three Affidavits attesting to "no revenues, no insurance" for Palaxar or any defendant, (6)  Affidavits from 3 of the 4 inventors (Curry, Hailstones and Holtz) attesting to the validity of the intellectual property assignments and the nature of Plaintiffs' waiver of any

---

[49] Affidavit of Thomas Zollars (D.E. 317-3 p.12) "I handed the complaint to Ms. Curry."

[50] July 28, 2006, the senior secured creditor of Mirabilis Ventures, Inc, and Nexia Strategy Corporation, Frank Amodeo, waived any and all potential claims in the business process patent application in exchange for non-exclusive, royalty-free, worldwide rights.

[51] August 1, 2006, Mirabilis Ventures, Inc., waived any and all potential claims in the business process patent application in exchange for non-exclusive, royalty-free, worldwide rights.  Contemporaneously, the four inventors assigned their rights to Edith Curry, individually.

[52] Ms. Curry's Affidavit executed January 15, 2008 (D.E. 75-21) at ¶¶ 19, 21-23 noted that MVI General Counsel Berman declared at the time the Separation Agreement was authorized that it was "very fair."  *See* D.E. 75-20 at ¶38 (referring to email of Richard Berman dated October 11, 2006). *See also* D.E. 317-6.

claim, (7) seven Affidavits attesting to Amodeo's control and (8) over 1,000 documents supporting Defendants' position.

But none of that information was new to Plaintiffs or the Attorneys, as it was the very same information (including the information in most of the various affidavits) that had been provided to Slaughter ten months earlier.

### D.   Plaintiffs' and the Attorneys' Response

In March 2008, shunning their duties as officers of the Court, the Attorneys filed a Second Amended Complaint to include an additional party, Defendant Terence Chu [who was never employed by Plaintiffs in any capacity] and added a Claim of Civil Conspiracy, alleging that Curry, Hailstones and Chu conspired to misappropriate confidential and proprietary information and "Nexia Certification."  They then propounded discovery, seeking information that had nothing whatsoever to do with the instant case, but everything to do with assisting Amodeo's criminal defense.  AUSA Gold was therefore compelled to file a *Motion to Intervene and Stay Discovery* because the US government realized this civil case was being used improperly as a discovery tool for Amodeo's criminal defense. (Doc. 146, granted Doc. 150).  Gold stated:

> A surface reading of the complaint and counterclaim might suggest that the criminal investigation and the civil case do not substantially overlap.  A review of the discovery requests in the civil case, however, reflects that there is: 1) evidence being sought that is irrelevant to the civil case...[53]

### E.   Plaintiffs, Attorneys and Cuthill, have not produced *any evidence* in support of this law suit, nor informed this Court of the false affidavit filed by Jaiman.

---

[53] The information, however, was highly relevant to Amodeo's criminal defense, a fact that MVI Attorneys have previously *expressly denied* to Defendants and this Court (D.E. 72 ¶130-135).

17

Between October 12, 2007 and August 4, 2010, the Attorneys produced only 200 documents and 100 more as exhibits in their pleadings—of which not a single one was marked confidential or proprietary nor evidenced any trade secrets, confidential information, research studies and/or strategies with which they had alleged Defendants "willfully, intentionally, maliciously and without regards for the rights of Plaintiffs" absconded.   Additionally, none of their actual documents supported their claims.   ***To this day, not a single shred of evidence has been produced that supports their claims*** despite the statements of Plaintiffs, the Attorneys, and Cuthill that thousands of pages of documents and hours of video were reviewed and did support the lawsuit.[54]   Defendants, on the other hand, have produced more than 3,000 pages of documents, including affidavits and deposition testimony that refute Plaintiffs claims.   It was clear at the time, and even more clear in retrospect, that Plaintiffs and the Attorneys were acting in bad faith.   The suit was ostensibly brought to recover the trade secrets and/or invention that was at the core of Palaxar.   Yet, Plaintiffs sued only two of the four inventors listed on the patent application and, as a result, would not have had control over the invention even had they prevailed.   Amodeo and his Attorneys developed a corrupt strategy designed to destroy the reputations of Curry and Hailstones, as well as financially ruin them with the costs and publicity of this litigation.   An additional corrupt and improper motive of Amodeo and his

---

[54] Plaintiffs provided no supplemental production in three years.  After two years and nine requests, a 116 page, single-space (9 point font) ***index*** of the 6,000 boxes allegedly located in a warehouse in Orlando, Florida, along with an ***index*** of 14 terabytes of data, supposedly in electronic form, was provided leaving it "up to the Defendant to figure out which documents and video tapes were relevant."   This was clearly not responsive to Defendants' discovery requests but also demonstrated that Plaintiffs, Cuthill and the Attorneys did not have any additional documents.  Further, the Attorneys and Cuthill had not done any investigation of the claims beyond the materials prepared by Amodeo for his criminal defense and provided to them by Bates and Mokwa.  *See* (D.E. 59 p. 12 at ¶28 Case No: 6:09-cv-01974).

Attorneys was to use this civil case as a discovery tool for his criminal defense—and he did, in fact, provide Defendants' productions to Slaughter.[55]  This corrupt use of the judicial system defines bad faith.

While Amodeo was the initial mastermind of the strategy, the Attorneys (especially B&C) and Cuthill perpetuated this farce.  Even a cursory examination of the documents housed in Plaintiffs' warehouse revealed Amodeo's true motives - and the lack of any evidence for this case.  Cuthill maintains he reviewed "over 10,000 documents" over two years, billing over $765,526 through June 2010[56]—yet he wasn't able to find what Defendants located in only 2 days.  (Attached as the Exhibits to this Motion.)

Moreover, in this Court's own Order convicting MVI of the criminal charges, it stated:

> There is no representative of the Corporate Defendants with firsthand knowledge of facts that would be sufficient to constitute a factual basis upon which a guilty plea could be accepted.
>
> The Receiver is now the president of the Corporate Defendants, but as noted above, he had no involvement with them during the commission of the alleged crimes. The Receiver's assertion that he does not have knowledge of facts to support a plea of guilty is plausible. In fact, the only person who has been identified as having such knowledge is Mr. Amodeo, who is unavailable and no longer has standing to represent the Corporate Defendants.

Order dated June 17, 2010, in Case No. 6:08-cr-231-Orl-28KRS, *U.S. v. MVI, et al.*  Other than Amodeo, all (except one) who had personal knowledge of anything to do with the Assignment,

---

[55] *See* Exhibit K - Amodeo's handwritten notes to Slaughter discussing defendant's production in this case.

[56] As set forth in the Joint Amended Plan of Liquidation, Mirabilis was a defunct entity and "no attempt would be made to revive or reorganize the pre-petition business of the Debtor", the vast majority of the revenue of Debtor Mirabilis was expected to come from litigation, directed by Cuthill. [D.E. 234, pp. 11, 25, Case No. 6:08-bk-4327].

Separation, and Termination Agreements and/or Palaxar **had already testified in Defendants' favor by Affidavit in March 2008**.[57]   The Attorneys were undaunted by the absence of a competent witness to testify against Defendants at the time the Injunction was denied and thus failed to withdraw the case.  There is no excuse for B&C and Cuthill maintaining this case after the stay was lifted, in light of the documents readily available to them in MVI's warehouse.

Plaintiffs' bankruptcy counsel, Latham, Shuker, Eden & Beaudine, in a related case and in response to a *Motion for Sanctions* filed against them for the baseless suit they filed in Judge Presnell's court stated: (Doc. 59 p. 12 at ¶28 Case No: 6:09-cv-01974):

Mr. Cuthill identified and reviewed the following documents:

ii. Employee Bio: The biographies of various professionals *prepared by Aaron C. Bates, Esq., Matthew S. Mokwa, Esq.*, Shane Williams, Jay Stollenwerk and Jodi Jaiman, employees of MVI and entities owned by Frank Amodeo**, in preparation of Frank Amodeo's criminal defense…**

iv. Unsigned Frank Amodeo Affidavit:  The [**April 2007**] affidavit *prepared by Aaron C. Bates, Esq., Matthew S. Mokwa, Esq.,* Williams, Stollenwerk and Jaiman, employees of MVI and entities owned by Frank Amodeo, **in preparation of Frank Amodeo's criminal defense…**[58]

---

[57] Mr. Berman offered to submit an affidavit stating the negotiations between MVI and Ms. Curry concerning the Separation Agreement were at arm's length, entirely known to Amodeo and other members of the MVI Board of Directors, and that the resulting contract was "absolutely fair."  Defendants, however believed their nine Affidavits would be sufficient to establish that Curry's Separation Agreement and Assignment were valid.

[58]  In **this** case, however, in *Plaintiffs' Joint Answer and Affirmative Defenses to First Amended Counterclaims Against Mirabilis and Nexia* (Doc. 72, ¶131 - filed March 06, 2008), Plaintiffs expressly **denied** being "aware of an ongoing criminal investigation by the United States Attorney for the Middle District of Florida involving Mirabilis and Amodeo…" although MVI's Attorneys Bates and Mokwa had in fact been working on Amodeo's criminal defense for more than a year.  Although D.E. 59 ¶43 Case No: 6:09-cv-01974), the Unsigned Frank Amodeo Affidavit dated April 2007 discusses "Nexia Certification and Palaxar," Plaintiffs attested that the October 2007 service of process flight to Scottsdale, Arizona was necessary because Plaintiffs "became aware [of the events in the complaint]…**just days before the filing** of the complaint."  (Doc 72 at ¶75).  Critically, these documents reviewed by Cuthill are not "business records," although Cuthill has used them as such in this and related cases. Federal Rule of Evidence 803.6 **specifically excludes documents prepared for litigation.**  Admissible documents

xi. <u>Transparency Timeline Index</u>: The Transparency Timeline Index *prepared by Aaron C. Bates, Esq., Matthew S. Mokwa, Esq.,* Williams, Stollenwerk and Jaiman, employees of MVI and entities owned by Frank Amodeo, ***in preparation of Frank Amodeo's criminal defense…***

xii. <u>Tax Timeline:</u>  The Tax Timeline prepared by *Aaron C. Bates, Esq., Matthew S. Mokwa, Esq.,* Williams, Stollenwerk and Jaiman, employees of MVI and entities owned by Frank Amodeo***, in preparation of Frank Amodeo's criminal defense…***

Draft complaints were also prepared by, or at the direction of Aaron C. Bates, Esq.  Mr. Bates was a former employee and in-house counsel to MVI until June 2007.  Mr. Bates was subsequently engaged by MVI to commence legal action against former officers, directors and professionals of MVI.  ***Due to the nature, length and scope of Mr. Bates' employment with MVI, Mr. Bates had first hand knowledge of the events in the Draft Complaint(s)***. (Doc. 59 p.17 at ¶30 Case No: 6:09-cv-01974).

(Emphasis added).[59]  Sadly, Bates' (and Mokwa's) first-hand knowledge of the events in this case was that all the allegations were false and the Complaint was filed for improper purposes.

**F.**   **<u>The Attorneys and Cuthill had a financial incentive to continue the baseless claims against the Defendants.</u>**

The Attorneys and Cuthill perpetuated Amodeo's plans and did not dismiss the case when it was clear the claims were devoid of both evidence and merit.  The Attorneys stood to be handsomely rewarded based on contingency and referral fees promised - 55% and 20% respectively.  If Amodeo's plan had succeeded, 55% of $220M recovered, or $121M, would

---

must be "[a] record kept in the course of regularly conducted activity, and "cannot be prepared primarily for litigation." *Broadcast Music*, 855 F.2d at 238; *Williams*, 661 F.2d at 530; *Pan-Islamic Trade*, 632 F.2d at 560.

[59] According to documents and business records produced (in electronic format only) by Plaintiffs in September, 2010, Bates, Mokwa and/or Balch permitted Jaiman and/or Amodeo to submit (and, in fact, ***prepared***) knowingly false affidavits in at least the following six cases: Pennsylvania - *Coleman v. Mirabilis Chester County Case No.: 07-02615*, Florida - *Hendricks v. Mirabilis Ventures, Inc.*, Case No.: 8:07-cv-661-T17EAJ, *Mirabilis et al. v. Palaxar et al.*, Case No.: 6:07-cv-1788-ORL-28-GJK,  Texas - *HKS v. Mirabilis Ventures*, Case No.: 3-07CV0577-L (Doc. 8-4), Ohio - *Paysource, Inc., v Mirabilis Ventures, Inc.*, Case No.: 3:07CV0129 (Doc. 52-2), and Alabama - *Chaviers, et al., v. Mirabilis Ventures, Inc., and Amodeo*, Case No.: CV-07-0442-CLS.

have gone to the Attorneys, of which $24.2M would have been Slaughter's cut.  Finally, Cuthill, who claimed to have investigated the claims in this case when he was appointed President and the sole Board member of Mirabilis (not a Trustee), stood to receive **personally** $53,000 of each $1M recovered and then 3% of everything over $1M.  Even if Cuthill has to spend $1M of the Estate's money in legal fees to recover $1M, he gets paid based on the gross amount recovered - $1M, not based on the net brought to the Estate – zero.

### G.    This Court not condone this behavior—nor should anyone.

The Eleventh Circuit has stated that 28 U.S.C. § 1927 allows district courts to assess attorneys' fees against counsel and law firms who willfully abuse the judicial process by "conduct **tantamount** to bad faith." *Avirgan v. Hull,* 932 F.2d 1572, 1582 (11th Cir.1991 (emphasis added)); *Roadway Express Inc. v. Piper,* 447 U.S. 752, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980).  Moreover, the Eleventh Circuit has agreed with the Ninth Circuit that: "A finding of bad faith is warranted where an attorney knowingly or recklessly raises a frivolous argument." *Barnes v. Dalton,* 158 F.3d 1212, 1214 (11th Cir.1998) (*quoting Primus Automotive Fin. Servs., Inc. v. Batarse,* 115 F.3d 644, 649 (9th Cir.1997)).

Courts have also held that bad faith under Uniform Trade Secrets Act statutes requires an objective and a subjective analysis of a trade secret plaintiff's allegations.  Under this test, a claim is subjectively specious when the plaintiff knows (or is reckless in not knowing) that its claim is meritless, and a claim is objectively specious when there is a ***complete lack of evidence***

*to support the claim*.[60]   The standard is lower than the requirement for imposing ordinary civil sanctions, and frivolousness need not be demonstrated.[61]

In *FLIR Systems, Inc. v. Parrish*, 2d Civil No. B209964, 2009 WL 1653103 (Cal. App. 2d June 15, 2009) (affirming a $1.6 million attorneys' fee award to defendants upon a finding that misappropriation of trade secrets action was brought in bad faith), FLIR alleged a trade secrets misappropriation against former employees, when there was little or no evidence of actual damage, or of actual or even threatened misappropriation.   The Court found that attorneys' fees and costs can be awarded to a prevailing party in a bad faith trade secret misappropriation case where the claim was specious and there was subjective bad faith in bringing or maintaining the action.

There is ample case law in which courts have determined that bad faith exists where a plaintiff *possessed the knowledge* that its information does not constitute a trade secret,[62] as was true in this case.   *Stilwell Dev. Inc. v. Chen, 11 U.S.P.Q.*2d 1328, 1332 (C.D. Cal. 1989) ("Our conclusion is buttressed by the fact that plaintiffs had superior, if not exclusive, knowledge of

---

[60] *See Gemini Aluminum Corp. v. California Custom Shapes, Inc.*, 95 Cal. App. 4th 1249, 1261-62 (Cal. Ct. App. 2002) (setting forth standard); *See also FAS Techs., Ltd. v. Dainippon Screen Mfg., Ltd.*, 2001 WL 1159776, at *3 (N.D. Cal. 2001); *Computer Econs, Inc. v. Gartner Group, Inc.,* 1999 WL 33178020, at *6-7 (S.D. Cal. 1999); *VSL Corp. v. General Techs., Inc.,* 46 U.S.P.Q.2d 1356, 1359 (N.D. Cal. 1998); *Alamar Biosciences, Inc. v. Difco Labs., Inc.,* 40 U.S.P.Q.2d 1437, 1438 (E.D. Cal. 1996); *Stilwell Dev., Inc. v. Chen,* 11 U.S.P.Q.2d 1328, 1331 (C.D. Cal. 1989) (creating objective/subjective analysis).

[61] *See Gemini*, 95 Cal. App. 4th at 1262.

[62] *See Computer Econs*, 1999 WL 33178020, at *6 (plaintiff claimed secrets in titles of newsletters it had disclosed to the public); *VSL Corp.*, 46 U.S.P.Q.2d at 1359 (bad faith to claim secrets in product already marketed and information freely disclosed by plaintiff); *Chen*, 11 U.S.P.Q.2d at 1331 (bad faith to assert secrets in a product already sold to customers before alleged misappropriation); *See also* Coast Bus. Sys., Inc. v. Armdap, Inc., 2001 WL 1324745, at *4-5 (Cal. Ct. App. 2001) (unpublished decision) (affirming fees upon vivid evidence of unfair tactics and a trade secret claim that the plaintiff "never believed" was secret and that it had publicly advertised on a brochure).

whether they undertook any effort to maintain the alleged secrets.")  Courts in Oregon and Wisconsin have found bad faith for refusing to identify alleged secrets and a plaintiff's failure, when pressed, to identify anything not in the public domain or to tell a coherent story of misappropriation,[63] again, the situation in this case.

There are also decisions in which trade secret defendants won sanctions against the plaintiff under the Federal Rules. *See Compuware Corp. v. Health Care Serv. Corp*., 2002 WL 485710, at *8 (N.D. Ill. 2002) (awarding fees and Rule 37 sanctions for plaintiff's repeated failure to specifically identify its alleged secrets; plaintiff had pointed to software programs without identifying what was allegedly secret within them); *Vista Mfg., Inc. v. Trac-4, Inc*., 131 F.R.D. 134, 140-42 (N.D. Ind. 1990).

Plaintiffs and Attorneys' abuse of the Court system in this case warrants a joint and several award of attorneys' fees and costs pursuant to Florida's Uniform Trade Secrets Act § 688.005, 28 U.S.C 1927, and this Court's inherent authority, as well as any other remedies this Court deems just and proper.   *See Peer v. Lewis*, 606 F.3d 1306, 1314 (11th Cir. 2010) (Court may impose sanctions under its inherent power even if other procedural rules sanction same conduct, citing *Glatter v. Mroz* (*In re Mroz*) 65 F.3d 1567, 1575 (11th Cir. 1995). The manner and purpose with which this cause of action was commenced, served, publicized, and maintained

---

[63] *See Telephone Management Corp. v. Gillette*, 2001 WL 210179, at *3 (D. Or. 2001) (fees awarded and plaintiff found to have acted without an objectively reasonable basis for its trade secret accusations under Oregon statute where it failed to identify a secret or tell a coherent story of misappropriation; court found that the plaintiff "has not articulated any supportable reasons for believing at the commencement of this lawsuit" that defendant acted wrongfully; discussion of pre-lawsuit secrecy investigation); *Automated Packaging Sys., Inc. v. Sharp Packaging, Inc.*, 1989 WL 223755, at *9 (E.D. Wis. 1989) (awarding fees under Wisconsin statute where *plaintiff acted in bad faith by filing allegations and seeking injunction but failing to identify any alleged secrets* and then identifying only information in the public domain).

exemplifies bad faith on the part of all who participated in planning, filing, publicizing, and maintaining it.  There is a glut of evidence in the record before this Court and in related cases to illustrate Plaintiffs' and Attorneys' bad faith conduct: pleadings, in-court statements, Plaintiffs' own document production, and sworn testimony.   Contrast that with what Plaintiffs have produced to support their claims – which is precisely *nothing*.  As the Eleventh Circuit held in *Avirgan v. Hull*, 932 F. 2d 1572, 1582 (11th Cir. 1991), "[w]hen it becomes apparent that discoverable evidence will not bear out the claim, the litigant and his attorney have a *duty* to discontinue their quest."  And as this Court held in *Scelta v. Delicatessen Support Servs. Inc.*, 146 F. Supp. 2d 1255, 1270-72 (M.D. Fla. 2001), plaintiff's counsel clearly breached its duty to discontinue the litigation and "was guilty of, at least, recklessly asserting a frivolous argument." *See also DeSisto College, Inc. v. Line*, 888 F. 2d 755, 764-66 (11th Cir. 1989) (affirming award of sanctions against counsel where it knew from first motion to dismiss that claim had no legal basis, and yet insisted on maintaining legal stance untenable under the law).

## CONCLUSION

"Attorneys are charged with knowing more about their case, about their client's various stories, about the contradictions in their client's testimony, and about the testimony of all the potential witnesses than a busy district court judge with a heavy docket can be expected to know." *See Norelus v. Denny's, Inc.*, 2010 WL 5298847 *15 (11th Cir. Dec. 28, 2010). They should not, as Plaintiffs, Attorneys and Cuthill did here, "relentlessly" pursue claims while blinding "themselves to as much of the contradictory evidence as they could" or "stubbornly ignore" the truth.  *Id*. at *10.  Surely this case, in which the acts of Plaintiffs, Attorneys, and Cuthill were committed in bad faith from start to finish, justifies an award of fees and costs.

25

Respectfully submitted,

| | |
|---|---|
| MARTIN R. RASKIN | /s/ Kathleen Balthrop Havener |
| Florida Bar No. 315206 | KATHLEEN BALTHROP HAVENER |
| JANE SERENE RASKIN | Ohio Bar No. 0068906 |
| Florida Bar No. 848689 | THE HAVENER LAW FIRM, LLC |
| RASKIN & RASKIN, P.A. | 15511 Russell Road |
| 866 South Dixie Highway | Chagrin Falls, OH 44022-2669 |
| Coral Gables, FL 33146 | Telephone: (440) 893-0188 |
| Telephone: (305) 444-3400 | Facsimile: (440) 893-9326 |
| Facsimile: (305) 445-0266 | Cellular: (216) 288-6009 |
| mraskin@raskinlaw.com | kbhavener@havenerlaw.com |

Attorneys for Defendants Curry, Palaxar Group, LLC, and Palaxar Holdings, LLC

Attorney for Defendants Curry, Hailstones, Palaxar Group, LLC, and Palaxar Holdings, LLC

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 13, 2011, I electronically filed the foregoing Defendants' Motion for Attorneys' Fees with the Clerk of Court using the CM/ECF system, which will send a notice of electric filing to all registrants in that system.  I further certify that I have caused the foregoing to be served by the means indicated upon the following:

Terence Chu (via email)

Yaniv Amar (via email)

Adam Loewy (via email)

Frank L. Amodeo B-3 (via Priority Mail)
48883-019
Federal Correctional; Complex – Low
P.O. Box 1031
Coleman, FL 33521

/s/ Kathleen B. Havener

KATHLEEN B. HAVENER