UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

FILED

2011 FEB 14  PM 1:48

US DISTRICT COURT
MIDDLE DISTRICT OF FL
ORLANDO FLORIDA

MIRABILIS VENTURES, INC. and
NEXIA STRATEGY CORPORATION,
            Plaintiffs,

v.                          CASE NO.:  6:07-CV-1788-ORL-28-JA-GJK

PALAXAR GROUP, LLC;
PALAXAR HOLDINGS, LLC;
FRANK HAILSTONES: EDITH CURRY
a/k/a EDITH BROADHEAD; and
TERRENCE CHU,
            Defendants,

v.


MIRABILIS VENTURES, INC., et al.
            Counterclaim and Third
                Party Defendants.
_____/

## AMENDED ANSWER AND COUNTERCLAIMS

COMES NOW, FRANK L. AMODEO, and files this Amended Answer
to the Second Amended Counterclaims and Third Party Claims
("SAC") of the Defendants, Edith Curry and Frank Hailstones.

Mr. Amodeo's answers remain more factual than typical
answers.  In other words, not just blanket denials.

Mr. Amodeo has numbered the paragraphs in the this
Amended Answer to correspond to the paragraphs in the SAC.
And the paragraphs of the counterclaim are sequential from
there.

Finally, Mr. Amodeo incorporates Mr. Amodeo's previously
filed declaration into each and every count by reference, as if
fully restated; especially the Edith Curry's Notebook contained
in the Declaration's adendum.

## GENERAL ANSWER

### (1)

Amodeo admits the allegations contained in paragraph 1 of SAC.

### (2)

Amodeo admits the allegations contained in paragraph 2 of SAC.

### (3)

Amodeo admits the allegations contained in paragraph 3 of SAC.

### (4)

Amodeo admits the allegations contained in paragraph 4 of the SAC, except Amodeo is unaware of the reason for the dismissal of Mirabilis Ventures, Inc. (The bankruptcy stay does not generally affect litigation involving nondebtors, thus the reason stated for the dismissal is suspect.)

### (5)

Mr. Amodeo admits, Mr. Amar was an officer of a Mirabilis affiliate and at one time possessed the single issued common share of Mirabilis Ventures, Inc. Stock; however sometime in early 2006, Mr. Amar surrendered the share of stock to Richard Berman, Esq. (Mr. Amar's recollection of this is different as to the timing and recipient of the stock.)

Mr. Amar was disgusted with the spending habits of the directors and officers of Mirabilis Ventures, Inc.

Mr. Amar could not believe the officers and directors were approving millions of dollars in expenses and investments while not making any money.

Mr. Amar, further, feared the Mirabilis' directors and officers would again raid the PEO's (AEM,Inc.) taxes to cover the operating losses; especially for their own compensation.

Consequently, at some period in early 2006, Mr. Awar was not even arguably, a shareholder.

I don't recall Mr. Amar ever being a director or officer of Mirabilis, although early on Mr. Amar have had a title, but Mr. Amar did not want to be associated with "those people" (Mirabilis Directors and Officers); despite the Mirabilis executives' credentials.

### (6)

Mr. Amodeo admits the allegations contained in paragraph 6 of "SAC."

### (7)

Mr. Amodeo admits that Mr. Bates was a counsel for Mirabilis, possibly a counsel for Nexia Strategy Corporation, although such representation probably only occurred upon cessation of business operation. To the extent of any other inference, Mr. Amodeo denies this allegation.

### (8)

Mr. Amodeo admits the allegations in paragraph 8 of SAC with the same qualifications as set forth in paragraph 7 above.

### (9)

Mr. Amodeo admits the jurisdictional and venue allegations of SAC paragraph 9.

### (10)

Mr. Amodeo denies the allegations in paragraph 10 as Ms. Curry was involved without title in Nexia from at least May 2005. Ms. Curry was instrumental in developing the Presidion Reorganization Plan and negotiating the contract between Nexia and Presidion. This contract and the fee-value of the contract is what caused Ms. Curry, to want to be an officer of Nexia; as well as Mirabilis Ventures, Inc.

Mr. Amodeo admits Ms. Curry employment with Nexia ended on or about October 31, 2010.

### (11)

The allegations in paragraph 11 are denied Mr. Hailstones began working with Mirabilis much earlier in 2005. The project involved modeling Presidion Corporation, then a Mirabilis subsidiary, for the purpose of developing antifraud and Sarbanes-Oxley software.

Mr. Amodeo denies the allegations of paying Axena's expenses or breaking any promises, but further discussion of Axena is unneeded at this stage of the litigation.

Mr. Amodeo would like to note to the extent Mirabilis broke an agreement, Mr. Hailstones was Mirabilis' Chief Executive Officer, thus responsible for any such breach. All other allegations are denied.

### (12)

Mr. Amodeo denies the allegations of the similarly numbered paragraph of SAC and specifically points out Mr. Amodeo was always happy with being president of AQMI Strategy Corporation and never wanted or planned to be president of Mirabilis Ventures, Inc.

### (13)

Mr. Amodeo, with Ms. Curry's agreement, sold the "shell" corporation of Nexia Strategy Corporation to Mirabilis in or about May 2005. Mr. Amodeo was not a shareholder, let alone the sole shareholder of Nexia after that date. As Mr. Amodeo has not been provided a copy of Doc 24-2, Mr. Amodeo is unable to answer specifically, therefore denies this and other allegations, generally.

### COUNT I

### (14)

This allegation is self-evident and does not require admittance or denial, but to the extent a response is required the allegation is denied.

**(15)**

The allegation in this paragraph is admitted but allegation is under inclusive as to Brookmeade's duties and objectives so the allegation is denied.

**(16)**

This allegation is again only partially true Ms. Curry was aware of the Presidion Corporation stock's market value and told Mr. Amodeo the stock is worthless unless, "we turn this pile of dog---- around." The allegation is denied as being limited.

**(17)**

Mr. Amodeo admits the description of the documents sounds correct, at least to the best of Mr. Amodeo's knowledge. The purpose was to provide a layer of protection in case the Presidion Reorganization failed and the IRS and others creditors came after the Presidion assets.

**(18)**

In June of 2005, an agreement was made for an Amodeo owned company to buy and close-down Presidion Solution, Inc. and its subsidiaries. The operating assets were to be transferred to AEM, Inc., a company owned by Mirabilis, AEM, Inc. The company (AEM) was acquired by Mirabilis at Ms. Curry's direction and with Ms. Curry negotiating the purchase.

 In effect Ms. Curry's company controlled the income producing assets and Ms. Curry simply chose not to pay herself, at least as of July 28, 2005. The allegation are otherwise denied.

**(19)**

Mr. Amodeo admits the agreement existed, but such agreements were prepared by or at the direction of Ms. Curry. Ms. Curry was an officer or director of Mirabilis and Mr. Amodeo as did everyone else, then at Mirabilis, relied on Ms. Curry's knowledge and expertise; especially regarding corporate governance and contract compliance.

 If anything, Mr. Amodeo relied on Ms. Curry, and Mr. Amodeo needs to bring an additional claim against Ms. Curry because of these "facts."

 Other than as specified the allegations of paragraph 19 are denied.

**(20)**

These allegations are denied Ms. Curry signed the contract with Nexia so she could handle the reorganization of Presidion into AEM, Inc. and Mirabilis and get paid from a solvent entity.

 Ms. Curry insisted upon these representations and commitments for Richmond, Virginia. However, a prerequisite was the projects would only be effectuated when Ms. Curry arranged over ten million dollars in grants. Amongst lots of other promises, which now suggest Ms. Curry was as crazy as Mr. Amodeo. Ms. Curry just seems to have known how to hide it better; the allegations are denied.

### (21)

Ms. Curry may have begun developing a business plan, but otherwise the allegations are denied.

### (22)

Mr. Amodeo only pledged to "takeover the world and make it a better place," any other "Pledge" was Ms. Curry's plan; the allegations are denied.

### (23)

Ms. Curry was trying to make it appear Mr. Amodeo was making these decisions in order to cover Ms. Curry's receipt and use of the tax funds. Neither Mirabilis, nor Nexia, needed Mr. Amodeo to turn on the telephone or to conduct day to day operations. The allegations are denied.

### (24)

Ms. Curry was the lawyer, and Mirabilis was under Ms. Curry's guidance as an officer and director, she did not rely on Mr. Amodeo. The allegations are denied.

### (25)

The allegations are denied, Ms. Curry sending an email to her own company may have happened; but this was not sent to Mr. Amodeo.

### (26)

Ms. Curry was in a position to have made Nexia fulfill the agreements, if they were actually not fulfilled, it was Ms. Cuury's fault. The allegations are denied.

### (27)

The allegation is conclusory and the allegation is illogical because Ms. Curry was Nexia. Otherwise the allegations are denied.

### (28)

The allegation is denied, the assets of Presidion and Nexia both were transferred to Mirabilis, where Ms. Curry stood to benefit from Mirabilis' success to an amount in excess of 30 million dollars. Ms. Curry was intimately involved in every Presidion, Nexia, and Mirabilis' decision.

### (29)

The allegation is denied Ms. Curry, inadvertently or intelligently, took advantage of Mr. Amodeo's mental health problem for personal gain. Any other allegations are denied.

## COUNT 2

Mr. Amodeo restates the answers set forth in paragraph 1 thru 29 as if fully set forth herein.

### (31)

In early September 2006, Ms. Curry represented she and certain consultants wanted to establish a separate operation which could be able to pursue Nexis Certification project and act as the holding company for the "Empire's" financial institutions. This company would be controlled by Ms. Curry without any interference from Mirabilis Ventures, Inc. Mr. Amodeo told Ms. Curry; in principle, Mr. Amodeo had no problem with the plan as long as Mirabilis Ventures, Inc. received the proceeds in full until such time as the Internal Revenue Service was paid. At which time, the ownership interest could be allocated in kind against the Mirabilis Ventures, Inc. equity position of Ms. Curry and the other consultants, as far as Mr. Amodeo was concerned. But neither Ms. Curry; nor any other Mirabilis principle should take anything until the "capital partner" had been repaid. The rest of the allegation in this paragraph of the SAC are denied.

### (32)

The allegation in the like numbered paragraph of SAC are denied. Mr. Amodeo did not participate in the negotiations between Ms. Curry and Mirabilis.

### (33)

Mr. Amodeo admits Ms. Curry signed the agreements, but is not aware of any other person signing the agreements and if Ms. Curry separated on paper, Ms. Curry remained in regular contact with Nexia and Mirabilis projects for the next several weeks, until the grand jury investigation became known.

### (34)

The agreement was not valid, under any conceivable doctrine. And to clarify a particular contention by several parties, Mr. Amodeo never authorized or agreed to this agreement or any particular agreement [Ironic, my deposition has not been taken by any party; nor has anyone asked for any discovery] The allegations of the SAC's similarly numbered is denied.

### (35)

The contract was not valid, but Ms. Curry's disparaging would have substantially out-weighed Mirabilis's. The allegations of paragraph 35 of SAC are denied.

### (36)

The allegations of paragraph 36 of SAC are denied. In the first instance Mr. Amodeo's primary discussion about the lawsuit was with Randall Gold and members of the United States Attorney's Office in the Middle District of Florida.

During one of the "debriefing sessions," where discussions continued about Mr. Amodeo's plans to utilize AGMI Strategy Corporation's security interest to recover money for the IRS. Again liquidation of Mirabilis in general, and the "recovery Strategy Corporation, and the UASO/IRS-CID.

### (37)

The allegation of paragraph 37 of SAC are denied, except for the allegation the words were printed in the agreement, Mr. Amodeo was unaware of these terms.

### (38)

The answer of paragraph 37 repeated here in answer to 38.

### (39)

The allegation is denied. Ms. Curry's losses are the result of Ms. Curry's own conduct including trying to "out shine" Ms. Curry's former Bank One colleagues.

## COUNT 3
### (40)

The answers to paragraph 1 through 39 are restated as if fully set forth in this Count 3

### (41)

Mr. Amodeo was never informed Ms. Curry was cooperating, discovering the claim for the first time because of a pleading failed in this action by Ms. Curry. The allegations are otherwised denied.

### (42)

Mr. Hailstones termination was negotiated with Mark Bernet, Jason Carlton and other Mirabilis officers, Mr. Sadrianna was not hired to determine the existence of any civil claims. The allegations of SAC 42 are denied.

### (43)

Mr. Sadrianna is proficient on the internet, this is how Mr. Sadrianna found out about the Symposium. Mr. Sadrianna was as shocked as Mr. Amodeo, Mr. Gold, Mr. Slaughter, Mr. Panoff etc... The allegations of SAC 43 are denied.

### (44)

The allegations in SAC 44 are denied. Mr. Amodeo devised the public relations campaign in conjuction with outside advisors and Mr. Amnodeo's criminal counsel. Ms Curry complaining of a person communicating with the press is like the [stygian] pot calling a [charcoal] gray kettle, black." By the way, Mr. Amodeo never admitted to stealing any taxes.

### (45)

The allegations in SAC 45 are denied.

**(46)**

The allegations in SAC 46 through SAC 75 are denied.

The equipment of the prison malfunctioned and this portion was
lost from the limited memory. The typewriter then ceased functioning.
Since the remainder was in order I chose the simpler route of
general denial, rather than further delay. *Fred Ondo*

## Count 4

### (76)

The answers contained in paragraph 1 through 74 are restated as if fully set forth in this count 4.

### (77)

The allegation in SAC 77 is denied. As to Mr. Hailstones not being served, it would seem actual service has occurred. If the prosecutor somehow failed to perfect service, this error is long rectified.

### (78)

The allegation in SAC 78 is denied. Mr. Amodeo understands the parking was nearly or completely empty.

### (79)

The allegation in SAC 79 is denied. Mr. Amodeo is reasonably familiar with Mr. Mokwa's personality, it is reserved, Mr. Mokwa is unlikely to have loudly announced this statement, but Mr. Mokwa may have made the statement quietly, since Mr. Mokwa was offended by the despicable behavior of these two supposedly distinguished professionals.

### (80)

The allegation of SAC 80 is denied. The statement, if made, only reflected the newspaper's take and therefore was true.

### (81)

The allegation of SAC 81 is denied. Again no one was present and the Defendants have admitted Mr. Mokwa did not contact the newspaper.

### (82)

The allegation of SAC 82 is denied. This type vituperate allegation is meant to sway the readers of the complaint emotionally. It is silly and conclusory, I am embarassed to point this out, but I likewise expect many people unfamiliar with litigation to view the pleadings.

### (83)

The allegation in SAC 83 is denied. Mr. Amodeo did not care when or where service was perfected.

## (84)

The allegation in SAC 84 is denied. Ms. Curry and Mr. Hailstones reputation was not affected by the lawsuit.

## (85)

The allegation in SAC 85 is denied. Mr. Hailstones and Ms. Curry are dishonest, so even if the statements were made, the statements are true. A simple comparison of Ms. Curry's testimony and the "Curry Notebook" attached to Mr. Amodeo's sworn declaration permits this conclusion.

## (86)

The allegation of SAC 86 is denied. Ms. Curry and Mr. Hailstones are unbondable, because both their competency and trustworthiness were made apparent by the manner in which each performed their duties at Mirabilis Ventures, Inc.

## Count 5

## (87)

The answers of paragraphs 1 through 86 are restated in this Count 5 as if fully set forth.

## (88)

The allegation in SAC 88 is denied because of the superfluous language, Mr. Amodeo admits Ms. Curry and Mr. Hailstones were served the complaint on October 15, 2007.

## (89)

The allegations in SAC 89 is admitted to the extent everyone feared the grand jury investigation. Mr. Amodeo did give Mr. Amar some video evidence, just as Mr. Amodeo provided the government and the bankruptcy, but alas it appears no one including Mr. Amar has ever reviewed the evidence. The government had all the evidence and Mr. Amodeo has explained some of it to them. Mr. Amar had nothing Mr. Gold did not have, that was the arrangement between Mr. Gold and Mr. Amodeo. Remember, the government left Mr. Amodeo in exclusive control of the evidence for the greatest part of the investigation.

## (90)

The allegation in SAC 90 is denied. Mr. Amar is not likely to make a public spectacle of himself or anyone else.

**(91)**

The allegation in SAC 91 is denied. It is out of character for Mr. Amar to yell in public, the more probable explanation is Ms. Curry imagined Mr. Amar yelling.

**(92)**

The allegation in SAC 92 is denied. Ms. Curry more than Mr. Hailstones, but Mr. Hailstones nonetheless utilized tax funds to create Nexia Certification and certain consulting receipts remain unaccounted for even to this day. The statements are true.

**(93)**

This allegation in SAC 93 is denied.

**(94)**

This allegation in SAC 94 is denied.

**(95)**

This allegation in SAC 95 is denied. Once again any reputation damage arises from the Defendant's performance as officer and directors of Mirabilis or as counsel and consultant to Mr. Amodeo and Presidion.

**(96)**

The allegation in SAC 96 is denied. The statements are probably true or not true, if the statements ever occurred and Mr. Amar was not Nexia's representative.

**(97)**

The allegation in SAC 97 is denied. Any reputational damage arises from their respective performance as officers and representatives in those capacities; such as telling the PEO certification committee that, Mirabilis' PEO's were current on taxes and uninvolved with Presidion's PEO's.

## Count 6

**(98)**

The answers in paragraphs 1 through 97 are restated in this count 6 as if fully set forth.

**(99)**

The allegation of SAC 99 is admitted.

**(100)**

This allegation in SAC 100 is another of the Defendant's misleading statements. Mr. Amodeo was aware of the "Wachovia Contract" in the summer of 2006. Mr. Amar, Mr. Bates and Mr. Mokwa were not, this was to be kept secret, so Mirabilis' other principals did not "F - up" the deal. (Ms. Curry's language, not Mr. Hailstones or Mr. Amodeo's). The allegations of SAC 100 are denied.

**(101)**

The allegation in SAC 101 is denied. This is an impossibility since the only Nexia to know of the contract were Ms. Curry and Mr. Hailstones. Mr. Amodeo's only concern was that the Defendants' not misappropriate funds ear marked to the IRS.

**(102)**

The allegation in SAC 102 is denied.

**(103)**

The allegation in SAC 103 is denied. Any prudent party would have researched Ms. Curry's background (Mr. Hailstones too) and discovered the terrible track record: Axena, Presidion, AFM, Inc., Mirabilis, etc... . No damage occurred from the lawsuit, only from Ms. Curry and Mr. Hailstones conduct.

**(104)**

The allegation in SAC 104 is denied.

**Count 7**

**(105)**

The answers of paragraph 1 through 105 are restated as if fully set forth in this count 7.

**(106)**

The allegation in SAC 106 is denied. Mr. Amodeo spoke with Mr. Gold, other USAO and IRS personnel and Mr. Slaughter and told them AGMI was going to initiate collection actions against Ms. Curry and Mr. Hailstones. The government only wanted to make sure the proceeds after legal fees went to the IRS.

**(107)**

The allegation in SAC 107 is denied. The Defendants understanding of the conspiracy law appears a shade simplistic, resulting in the contrived allegations.

**(108)**

The allegation in SAC 108 is denied. Mr. Amodeo did not care about how, when or where service was perfected, and certainly did not want to damage a service of contribution.

**(109)**

The allegation in SAC 109 is denied. The statements if made at all were not public. The only person's to have heard them were Ms. Curry and Mr. Hailstones, both of whom are responsible for the unpaid taxes.

**(110)**

The allegation in SAC 110 is denied.

**(111)**

The allegation in SAC 111 is denied. If damage exists it is because Ms. Curry an Mr. Hailstones as full-time officers and directors did not make their company pay roughly 200 million dollars in taxes.

### Count 8

**(112)**

The answers to parapgraphs 1 through 111 are restated in this paragraph as if fully set forth.

**(113)**

The allegation in SAC 113 is denied. The agreement was drafted in great part for Nexia by Ms. Curry and thus if the provision reads as Ms. Curry claims should be invalidated.

**(114)**

The allegation in SAC 114 is denied. Ms. Currys' and Mr. Hailstones' abuse of position would extinguish any such indemnity's force and effect.

**(115)**

The allegation in SAC 115 is denied.

## Count 9

### (116)

The answers of paragraphs 1 through 115 are restated in this paragraph as if fully set forth.

### (117)

The allegation in SAC 117 is admitted to the extent of a claim for breach of fiduciary duty, which Mr. Amodeo remembers as part of the original complaint (a copy of which Mr. Amodeo does not have) otherwise the allegations of SAC 117 are denied.

### (118)

The allegation in SAC 118 is denied. The funds were not laundered. The United States was aware of the funds and the action, thus no concealment existed. And the Defendant's are seemingly unaware of the developing law concerning the meaning of money laundering which would render this allegation nonsensical.

### (119)

The allegation in SAC 119 is denied. Ultimately, Mr. Hailstones' and Ms. Curry' cooperation with the United States' was welcome because if there were self serving misrepresentations, by either ultimately this would show the truth about what occurred. The government was aware of and consented to the lawsuit, further the government initiated a consultation with Mr. Amodeo about whether the proceedings should be stayed. Intimidation would not have been a likely outcome, because of the USAO's involvement.

### (120)

The allegation in SAC 120 is denied. A quick glance at the exhibits to Mr. Amodeo's response to the motion to dismiss, the addendum to Mr. Amodeo's declaration, or a viewing of the April 19, 2006 "Chairman's meeting" will reveal Mr. Amodeo did not need to discredit either defendant's testimony; they did fine on their own.

### (121)

The allegation in SAC 121 is denied. Mr. Amodeo had accumulated virtually all the evidence anyway, and stored it in the warehouse, scanned and indexed it on computer.

### (122)

The allegation in SAC 122 is denied. The officers and directors

were already negligent for failing to maintain an accounting system which properly accounted for sources of revenues and payment of taxes. Mr. Amodeo did not believe leniency was needed, this was Mr. Amodeo's attorneys' mantra.

### (123)

The allegation in SAC 123 is denied. As described above Ms. Curry and Mr. Hailstones failed to perform competently at Mirabilis, that and Ms. Curry's antics are the cause of any damages, if any exist.

## ALLEGATIONS COMMON TO THIRD PARTY
## COUNTERCLAIMS AND CROSSCLAIMS

### (124)

Edith Curry Esq., was engaged, individually, and through the Brookmeade Group, LLC to assist and advise Frank Amodeo with a tax controversy solution for Presidion Corporation in or about September 2004.

### (125)

Edith Curry conducted due diligence for Mr. Amodeo with regards to Presidion Corporation.

### (126)

Edith Curry assisted in development of the Sunshine Liquidation Plan.

### (127)

Edith Curry approved the Sunshine Liquidation Plan.

### (128)

Edith Curry advised Mr. Amodeo of the efficacy of obtaining and protecting the fee payments from Presidion Corporation, through the use of UCC financing statements and liens.

### (129)

Edith Curry attended the Sunshine Liquidation Plan implementation meeting in December 2004.

### (130)

Edith Curry Esq. acted as attorney for Frank Amodeo in regards to the disposition of any claim Mr. Amodeo had on Professional Benefits Solutions, Inc. (PBS) before PBS was to be sold to Presidion.

**(131)**

Edith Curry became one of the largest share holders of Presidion Corporation.

**(132)**

Edith Curry became an officer of Mirabilis Ventures Inc. in January 2005.

**(133)**

Edith Curry became a director of Mirabilis Ventures Inc., in January of 2005.

**(134)**

Edith Curry proposed the takeover by Mirabilis of Presidion's professional employer organizations in or about March 2005.

**(135)**

To effectuate the takeover, Ms. Curry recommended, and conducted, the acquisition of AEM, Inc., by Mirabilis in 2005.

**(136)**

Ms. Curry requested and was granted the lead consultant role, for the PBS reorganization engagement.

**(137)**

Ms. Curry insisted on the formation of a new Mirabilis owned entity to conduct the engagement, to allow for increased control of the use of the fees.

**(138)**

Consequently, Nexia Strategy was formed and "sold" to Mirabilis.

**(139)**

Nexia Strategy, always operated under the control and at the direction of Mirabilis.

**(140)**

Until Mr. Hailstones employment, Ms. Curry was considered Nexia's principal consultant.

. . .

**(141)**

Ms. Curry, prior to and during the formation of Nexia, had an opportunity to review and revise the Tax Memorandum of April 2005 produced by Elena Wildemuth, Esq.

**(142)**

Ms. Curry advised Mr. Amodeo the memorandum provided excellent coverage with regards to any responsibility for the unpaid taxes of the Sunshine Companies.

**(143)**

Ms. Curry advised, that in conjunction with the acquisition of existing security interests and the appropriate perfection (UCC-1) of new security interests, the fees were safe from creditors and Presidion misbehavior:

**(144)**

Ms. Curry advised that the use of funds to reorganize Presidion would require approval of the secured creditors, but not the unsecurred creditors.

**(145)**

Ms. Curry was placed in charge of the Presidion reorganization team at Nexia Strategy Corporation.

**(146)**

Ms. Curry advised Mr. Amodeo, and others, the past unpaid taxes created civil, but not criminal liability, for Craig Vanderburg, James Baiers, John Burcham, Fred Sandlin, Ken Hendricks and David Firestone, plus certain other officers.

**(147)**

Ms. Curry advised Mr. Amodeo the continuing nonpayment of taxes create civil liability for Mr. Vanderburg, Mr. Baiers, Sue Schumacher and Chris O'Connor, but not Mr. Amodeo or anyone at AGMI or Maribilis.

**(148)**

Ms. Curry became a shareholder of Mirabilis in 2005.

**(149)**

Ms. Curry became chairperson of the Mirabilis audit committee.

**(150)**

Ms. Curry voted to have Mirabilis, even though a private company, comply with Sarbones Oxley.

**(151)**

Ms. Curry had regular interactions with the IRS liasons:  Dan Myers, CPA, Sharmilla Khanokar, CPA and Hans Beyer, ESq.

**(152)**

Ms. Curry designed the "talking points" for the April 2006 meeting with the IRS about unpaid taxes for Sunshine and PBS.

**(153)**

Ms. Curry attended the chairman's meeting on April 2006, where the tax liability was discussed.

**(154)**

In that meeting, or related meeting, Ms. Curry expressed an independent legal review was being conducted to determine if the continuing non-payment would affect Mirabilis or its officers.

**(155)**

Ms. Curry remained a fulltime officer and director of Mirabilis until October 31, 2006.

**(156)**

AEM, Inc. was placed in charge of managing the PBS book of business in or about August 2005.

**(157)**

In January 2006, AEM took complete control of the PBS and Paradyme business operations, including invoicing, collection of monies, disbursement of monies, insurance, all operating personnel and all licensing.

**(158)**

AEM, Inc. collected and failed to remit approximately 101 million dollars in 2006.

**(159)**

These funds were transferred from AEM, Inc. to vary subsidiaries of Mirabilis, or as payments on behalf of Mirabilis.

**(160)**

The disbursement were approved or conducted by Mirabilis'
board of directors.

**(161)**

The disbursements were part of the Presidion reorganization plan
designed to maximize the value of Mirabilis for a public
offering.

**(162)**

Ms. Curry had unrestricted access to Mirabilis and AEM financial
records.

**(163)**

Mr. Amodeo was a creditor of Mirabilis.

**(164)**

Companies owned by Mr. Amodeo were creditors of Mirabilis.

**(165)**

Ms. Curry never advised the Presidion reorganization could cause
civil or criminal liability to Mr. Amodeo.

**(166)**

Frank Hailstones was an officer of Mirabilis from in or about
July 2005 until in or about March 2007.

**(167)**

Mr. Hailstones was a director of Mirabilis from in or about
November 2005 through in or about March 2007.

**(168)**

Mr. Hailstones was president and chief executive officer of
Mirabilis from January 2006 through in or about March 2007.

**(169)**

Mr. Hailstones was a statutory controlling person of AEM, Inc.
from in or about the second quarter of 2006 until AEM, Inc.
ceased operations in May 2007.

**(170)**

Mr. Hailstones was authorized to sign on all Mirabilis and Mirabilis affiliate bank accounts.

**(171)**

Mr. Hailstones was the principal owner and president of certain companies known as Axena.

**(172)**

Axena and Mr. Hailstones utilized Presidion as a model to develop Sarbanes Oxley compliance software for PEO's.

**(173)**

Mr. Hailstones reported Presidion as a good business, except for some management problems.

**(180)**

Mr. Hailstones never advised Mr. Amodeo of the tax deficiencies.

**(181)**

Mr. Hailstones never advised Mr. Amodeo of the insurance under funding.

**(182)**

Mr. Hailstones never advised of the lack of controls at Presidion with regards to the profitability of the customer contracts.

**(183)**

Mr. Hailstones offered to provide this advice as consideration for Mr. Amodeo in getting Presidion to work with Axena.

**(184)**

This offer was made before Axena was acquired by Mirabilis.

**(185)**

This offer was made before Mr. Hailstones became a Mirabilis employee.

**(186)**

The offer was made in lieu of Mr. Amodeo sharing a bottle of

scotch or Rum with Mr. Hailstones and Robert Pollack, M.D. [I do not, nor ever have, consumed alcohol] and in lieu of  monetary or equity compensation.

### (187)

The offer was made in the Wachovia building.

### (188)

Mr. Hailstones was the (immediate supervisor) direct report of Dan McHenry CPA.

### (189)

Mr. McHenry was the Nexia consultant on location in Jupiter, Florida at the main operations center for Presidion, and then AEM.

### (190)

Mr. Hialstones had unrestricted access to AEM's financial records.

### (191)

Mr. Hailstones had unrestricted access to Mirabilis financial records.

### (192)

Mr. Hailstones knew Mirabilis was insolvent in or about April 2006.

### (193)

Ms. Curry knew Mirabilis was insolvent in or about February 2006.

### (194)

Ms. Curry attended the town hall meeting where Richard Berman, Esq. deposed Mr. Amodeo; also known as the mock deposition.

### (195)

Ms. Curry advised Mr. Amodeo to alter the presentation of the Presidion story, because the presentation failed to accurately reflect the "ad hoc nature of the events," instead made the story appear like a planned scheme.

### (196)

Ms. Curry had previously advised Mr. Amodeo in 2003 about the presentation of Mr. Amodeo's own story. Ms. Curry told Mr. Amodeo to emphasize the conditions under which Mr. Amodeo became addicted to psuedophedrine and experienced the extended mania. That is the life stressors, father's career, full time attendance at two different universities, effective adoption through marriage of a down syndrome and physically handicapped child, sitting for the Bar exam etc.... Ms. Curry thought this would humanize the story, rather than Mr. Amodeo sounding like a drug crazed lunatic.

### (197)

Ms. Curry emphasized the advice about the Presidion story was the same, the IRS and prospective new customers (Presidion like companies) had to be made to realize the problems and solutions in "threat nuetralization" consulting could not be planned in advance. Often what was a good idea one day, became a bad idea the next and had to be changed.

### (198)

Ms. Curry never advised Mr. Amodeo the utilization of the deferred taxes may be unlawful.

### (199)

Ms. Curry never advised Mr. Amodeo Presidion's PEO business was unprofitable and thus unreorganizable.

### (200)

Mr. Hailstones never advised Mr. Amodeo Presidion was incapable of reorganizing or repaying the tax debt.

### Third Party Counterclaim Count 1
### Edith Curry's Legal Malpractice

### (201)

All the allegations set forth in paragraphs 124 through 200 are restated in this count as if fully set forth.

### (202)

Edith Curry Esq. was Mr. Amodeo's attorney.

**(203)**

Edith Curry Esq. misadvised Mr. Amodeo about the implications of the U.C.C. filings.

**(204)**

Edith Curry Esq. misadvised Mr. Amodeo about the safety and security of receiving and retaining the consulting fees for the "Sunshine" contract with Presidion.

**(205)**

As a result of Ms. curry's misadvice Mr. Amodeo experienced financial losses in the amount of approximately 5 million dollars in assets and incurred 181 million dollars in liability.

## Third Party Counterclaim Count 2
## Edith Curry's Consulting Malpractice

**(206)**

All the allegations set forth in paragraph 124 through 200 are restated in this counterclaim count 2 as if fully set forth.

**(207)**

Ms. Curry, individually, whether as a Brookmeade agent or in her individual capacity acted as a consultant to Mr. Amodeo.

**(208)**

Ms. Curry as a consultant failed to conduct proper due diligence on Presidion Solutions, Inc. (Solution)

**(209)**

Ms. Curry failed to discover the extent of the insurance liability, which was not reported on the Presidion consolidated financial statement.

**(210)**

Ms. Curry helped create and implement the reorganization plan for Presidion, using AEM as the primary reorganization entity.

**(211)**

During that reorganization Ms. Curry failed to disclose or failed to detect AEM and its parent Mirabilis were using the unpaid taxes to subsidize overhead and operations, including Ms. Curry's salary and bonuses.

(212)

If Ms. Curry had so advised Mr. Amodeo of the inevitable failure of the reorganization strategy, Mr. Amodeo would have ceased Mr. Amodeo's participation and avoided as much as 181 million dollars in personal liability.

## THIRD PARTY COUNTERCLAIM COUNT 3
## EDITH CURRY'S BREACH OF FIDUCIARY DUTY
## TO FRANK AMODEO AS A CREDITOR

(213)

Paragraphs 124 through 200 are restated in this counterclaim count 3 as if fully set forth.

(214)

Edith Curry was a member of the board of directors in 2005 and 2006.

(215)

Edith Curry was an officer of Mirabilis Ventures, Inc. in 2005 and 2006.

(216)

Frank Amodeo was a creditor of Mirabilis Ventures Inc. in 2005 and 2006.

(217)

Mirabilis Ventures Inc. was insolvent in 2005 and 2006.

(218)

Edith Curry knew or should have known Mirabilis was insolvent in 2005 and 2006.

(219)

Mirabilis' insolvency made Ms. Curry a fiduciary to Mr. Amodeo.

(220)

Mirabilis' insolvency made Ms. Curry a fiduciary to other Mirabilis creditors.

### (221)

Ms. Curry' failure to perform Ms. Curry's duty cost Mr. Amodeo approximately 40 million dollars in net worth directly.

### (222)

Ms. Curry's failure to perform Ms. Curry's duty resulted in Mr. Amodeo incurring approximately 101 million dollars in liabilities.

### THIRD PARTY COUNTERCLAIM COUNT 4
### FRANK AMODEO'S CLAIM FOR CONTRIBUTION

### (223)

Paragraphs 124 through 200 are restated in this counterclaim count 4 as if fully set forth.

### (224)

Ms. Curry was an officer of Mirabilis Ventures, Inc.

### (225)

Ms. Curry was a director of Mirabilis Ventures Inc.

### (226)

Ms. Curry was a shareholder of Mirabilis Ventures Inc.

### (227)

Ms. Curry because of these positions, and because Ms. Curry had the legal authority to impede the non-payment of taxes by AEM, is a responsible person for payment of the PBS and AEM tax obligation.

### (228)

Ms. Curry is jointly and severally liable with Mr. Amodeo.

### (229)

Mr. Amodeo already caused between 20 and 30 million dollars to be repaid which by agreement inure to Mr. Amodeo's personal credit.

### (230)

Mr. Amodeo has been assessed for a total of 180 million dollar in unpaid taxes.

### (231)

Ms. Curry' should owe back to Mr. Amodeo, Ms. Curry's pro rata contribution.

## THIRD PARTY COUNTERCLAIM COUNT 5
## FRANK HAILSTONES' CONSULTING MALPRACTICE

### (232)

Paragraph 124 through 200 are restated in this counterclaim 5 as if fully set forth.

### (233)

Frank Hailstones, individually, and through Axena acted as a consultant to Mr. Amodeo.

### (234)

Mr. Hailstones advice concerning the conditions of Presidion was incorrect.

### (235)

As a result of Mr. Hailstones' inaccurate advice continued Mr. Amodeo's involvement with Presidion and incurred a 140 million dollars in obligations.

## THIRD PARTY COUNTERCLAIM COUNT 6
## FRANK HAILSTONES BREACH OF FIDUCIARY
## DUTY TO FRANK AMODEO AS A CREDITOR

### (236)

Paragraphs 124 through 200 are restated in this counterclaim 6 as if fully set forth.

### (237)

Frank Hailstones was a shareholder, director and officer of Mirabilis Ventures Inc. in 2005 and 2006.

### (238)

Frank Amodeo was a creditor of Mirabilis Ventures Inc. in 2005 and 2006.

**(239)**

Mr. Hailstones knew or should have known Mirabilis Ventures Inc.
was insolvent in 2005 and 2006.

**(240)**

By virtue of any of Mr. Hailstones' positions described in
paragraph 237, Mr. Hailstones  was a fiduciary to Mr. Amodeo and
other Mirabilis creditors.

**(241)**

Mr.  Hailstones  failed  to  execute  Mr.  Hailstones  authority
consistent with the duty to creditors.

**(242)**

Mr. Hailstones failure to perform the duty cost Mr. Amodeo 40
million dollars in assets and caused Mr. Amodeo to incur 101
million dollars in additional debt.

<u>**THIRD PARTY COUNTERCLAIM COUNT 7**</u>
<u>**FRANK HAILSTONES LIABILITY TO**</u>
<u>**FRANK AMODEO IN CONTRIBUTION**</u>

**(243)**

Paragraphs 124 through 200 are restated in this counterclaim count
7 as if fully restated.

**(244)**

Frank Hailstones was an officer, director and shareholder of
Mirabilis Ventures, Inc. in 2006.

**(245)**

Mr. Hailstones was a signer on the bank accounts of Mirabilis
and had authority over the bank accounts of all Mirabilis
subsidiaries in 2006.

**(246)**

Mr. Hailstones was the statutory controlling person of AEM, Inc.
in 2006.

**(247)**

By virtue of the positions identified in paragraphs 244-246, or
by virtue of Mr. Hailstones' authority impeded the flow of tax
monies, Mr. Hailstones is a responsible person for the unpaid
taxes.

**(248)**

As a responsible person Mr. Hailstones is jointly and severally liable with Mr. Amodeo.

**(249)**

Mr. Amodeo has already been credited with repaying between 20 and 30 million dollars and been assessed for 181 million.

**(250)**

Mr. Hailstones is obligated to Mr. Amodeo for Mr. Hailstones pro rate share.

## PRAYERS FOR RELIEF

Wherefore Frank Amodeo requests the court to enter the following judgment:

1. With respect to counterclaim count 1 award Mr. Amodeo such actual, consequential, exemplary and punitive damages as determined by the jury;

2. With respect to the consulting malpractice of Ms. Curry in counterclaim count 2, award Mr. Amodeo $181 million plus consequential damages;

3. With respective to counterclaim count 3 award Mr. Amodeo $141 million dollars plus consequential damages;

4. With respect to counterclaim count 4, award Mr. Amodeo contribution in the amount of 10 million dollars cash and a judgment of 61 million plus interest from each Ms. Curry and Mr. Hailstones;

5. With respect to counterclaim count 5, award Mr. Amodeo 140 million dollars and consequential damages;

6. With respect to counterclaim count 6, award Mr. Amodeo $151 million and consequential damages;

7. With respect to counterclaim count 7, award Mr. Amodeo a judgment of 60 million with 10 million due immediately, plus interest as the IRS might assess;

8. Award Mr. Amodeo the costs of this action including attorney fees;

9. Deny the relief sought by the Defendants;

10. And such other relief as is appropriate or fair.

Respectfully submitted this 10th day of February 2011.

Frank Amodeo #48883-019
Federal Correctional Complex-Low
P.O. Box 1031   Unit B-3
Coleman, FL 33521-1031

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT COURT
ORLANDO DIVISION


MIRABILIS VENTURES, INC. and
NEXIA STRATEGY CORPORATION,
             Plaintiffs,

v.                        CASE NO.: 6:07-CV-1788-ORL-28-JA-GJK

PALAXAR GROUP, LLC;
PALAXAR HOLDINGS, LLC;
FRANK HAILSTONES; EDITH CURRY
a/k/a EDITH BROADHEAD; and
TERRENCE CHU,
             Defendants,

v.

MIRABILIS VENTURES, INC., et al.
       Counterclaim and Third
            Party Defendants.
_____/

### CERTIFICATE OF SERVICE

A copy of this amended answer and counterclaim is filed with the court by deposit in the Federal Correctional Complex-(LOW) mail system on February 10, 2011. Due to the malfunctioning of the photo copying equipment at the prison. A second original was produced and sent to a copy facility, for retransmission to the other parties and their counsel. As a consequence of the typical out going mail delays service might be delayed as long as a week.

Certified this  10th  day of February, 2011 by:

Frank L. Amodeo