# EXHIBIT 4

1

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION


CASE NO.:   6:07-CV-1788-ORL-28-KRS

MIRABILIS VENTURES, INC.,
and NEXIA STRATEGY CORPORATION,

        Plaintiffs,

v.

PALAXAR GROUP, LLC; PALAXAR
HOLDINGS, LLC; FRANK HAILSTONES;
EDITH CURRY, a/k/a EDITH BROADHEAD;
and TERRENCE CHU,

        Defendants,

v.

AQMI STRATEGY CORPORATION;
WELLINGTON CAPITAL GROUP, INC.;
YANIV AMAR; FRANK AMODEO;
AARON BATES; MATTHEW MOKWA;
ROBERT POLLACK; JAMES SADRIANNA,

        Third-Party Defendants.
_____/


The Videotaped Deposition of:
FRANK HAILSTONES
Taken by the Third-Party Defendant
Matthew S. Mokwa

*Certified Copy*



# MJC REPORTING, INC.

1314 E. Robinson Street
Orlando, Florida 32801
407.894.7545
800.393.7545
Fax 407.894.5042

www.mjcreporting.com

```
 1

 2          DATE:          Thursday, October 7, 2010

 3

 4          TIME:          9:10 a.m. - 11:30 a.m.

 5

 6          LOCATION:      Litchford & Christopher
                           Bank of America Center
 7                         390 North Orange Avenue
                           Orlando, Florida  32801
 8

 9          REPORTER:      Nancy L. Hengehold

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1

 2    A P P E A R A N C E S:

 3
              ADAM J. LOEWY, ESQUIRE
 4            Barry & Loewy, LLP
              The Frost Tower
 5            401 Congress Avenue
              Suite 1540
 6            Austin, Texas  78701
              Counsel for Matthew Mokwa
 7

 8            KATHLEEN HAVENER, ESQUIRE
              15511 Russell Road
 9            Chagrin Falls, Ohio  44022
              Counsel for Edith Curry,
10            Frank Hailstones, Palaxar Group, LLC,
              and Palaxar Holdings, LLC
11            440-893-0188; 440-893-9326 (fax)
              kbhavener@havenerlaw.com
12

13    ALSO PRESENT:    Edith Curry

14

15

16                 S T I P U L A T I O N

17

18         It is hereby stipulated and agreed by and

19    between counsel for the respective parties, and by the

20    deponent, that the reading and signing of the deposition

21    be EXERCISED.

22

23                  *    *    *    *    *

24

25
```

1                        I N D E X

2

3                Thursday, October 7, 2010

4

5    TESTIMONY OF:   FRANK HAILSTONES

6                                                    PAGE

7        Direct Examination by MR. LOEWY              5

8        No Cross-Examination

9

10   ERRATA SHEET OF DEPONENT                         78

11

12   CERTIFICATE OF OATH                              79

13   CERTIFICATE OF REPORTER                          80

14

15                    -   -   -   -   -

16

17                  E X H I B I T S

18                                                    PAGE

19   DEFENSE EXHIBIT NO. 1                            25
          Counter-Claim
20
     DEFENSE EXHIBIT NO. 2                            28
21        List of Attendees at Arizona
             Conference.
22

23

24

25

```
1              P R O C E E D I N G S

2                                        9:10 a.m.

3          VIDEOGRAPHER:  Good morning.

4          The date is October 7, 2010.  This is the

5     deposition of Frank Hailstones being taken in the

6     matter of Mirabilis Ventures, Inc., et al., verse,

7     Palaxar Group, LLC., et al., verse, AQMI Strategy

8     Corporation, et al.

9          It's 9:11 a.m., we're on record.

10          Counsel, please introduce yourselves.

11          MR. LOEWY:  Adam Loewy representing Matthew

12     Mokwa.

13          MS. HAVENER:  Kathleen Havener for the

14     defendants, and, in particular, for the witness,

15     Mr. Hailstones.

16          VIDEOGRAPHER:  Court Reporter, please swear

17      in the witness.

18 WHEREUPON,

19                   FRANK HAILSTONES

20 having been first duly sworn/affirmed testified as

21 follows:

22          THE WITNESS:  I do.

23                   DIRECT EXAMINATION

24 BY MR. LOEWY:

25          Q.     Could you please state your name for the
```

1    record.

2         A.    Frank Hailstones.

3         Q.    Mr. Hailstones, my name is Adam Loewy.  I'm

4    an attorney.  I represent Matthew Mokwa in this matter.

5         Have you ever been deposed before?

6         A.    Yes, I have.

7         Q.    And just very quickly to go over the ground

8    rules.

9         You understand that you're under oath?

10        A.    Yes, I do.

11        Q.    And you understand what that means?

12        A.    Yes, I do.

13        Q.    Do you intend to give honest answers today?

14        A.    Yes, I do.

15        Q.    Can we have an agreement that you will listen

16    to all of my questions carefully and thoroughly?

17        A.    Yes.

18        Q.    And can we have an agreement that if you

19    don't understand one of my questions you will simply ask

20    me to restate it or rephrase it?

21        A.    Yes.

22        Q.    You have brought a counter-claim lawsuit

23    against my client, Matthew Mokwa; is that correct?

24        A.    Yes.

25        Q.    And what exactly are you seeking in this

1    lawsuit?

2         A.    I'm seeking to be made whole.

3         Q.    And what does that mean?

4         A.    It means that my reputation has been trashed

5    by your client and others.  It took me thirty-five years

6    to build it.  I want it back.

7         Q.    Okay.  And I want to focus for today's

8    deposition on what my client allegedly did.

9         So when you say that my client trashed your

10   reputation, how did he allegedly do so?

11        A.    Well, first of all, he turned up at an event

12   which I was co-presenting out in Scottsdale, held up a

13   copy of The Orlando Sentinel within earshot of

14   conference delegates and organizers and accused me and

15   my co-defendant of thievery.

16        Q.    What did he say exactly?

17        A.    He said, Have you seen the front page of The

18   Orlando Sentinel, where's the missing 220 million -- or

19   words to that effect.

20        Q.    And this is what Matt Mokwa allegedly said?

21        A.    Correct.

22        Q.    And who heard that?

23        A.    I heard it.  Ms. Curry heard it.  The

24   organizer of the event, Mr. Kramer, heard there was a

25   commotion, raised voices, and approached me immediately

1    after and asked what that was all about.

2         Q.    Was there any other participants at that

3    conference that allegedly heard what you just described?

4         A.    There were a number within earshot who could

5    have heard.

6         Q.    Can you name them?

7         A.    No.  Because at the time the last thing I

8    wanted to do was go around asking people if they'd heard

9    that I'd just been accused of thievery.

10        Q.    Do you believe Joel Kramer heard that you had

11   been accused of thievery?

12        A.    He heard there was a commotion and approached

13   me immediately after and asked me what it was all about.

14              MR. LOEWY:  Okay.  Let me object as

15        nonresponsive.

16        Q.    Did Joel Kramer ever tell you that he heard

17   you were accused of thievery?

18        A.    No.

19        Q.    So the only people who allegedly heard what

20   Mr. Mokwa said were you and Edith Curry, correct?

21        A.    Well, there were other people in Mr. Mokwa's

22   party.

23        Q.    Okay.  And who were they?

24        A.    Mr. Amar, Mr. Bates, the process server.

25        Q.    And you're aware that Mr. Amar and Mr. Bates

1   and the process server all dispute the claim that you're

2   making about what Mr. Mokwa allegedly said, correct?

3        A.   Well, I'm aware that Mr. Amar is -- I'm not

4   aware -- sorry -- restate the question, please.

5        Q.   You understand that you and Ms. Curry are

6   claiming that Mr. Mokwa said certain things regarding

7   thievery or stealing assets --

8        A.   Yeah.

9        Q.   -- and that Mr. Amar, Mr. Bates, and this

10  process server all dispute that those things were said.

11       A.   I'm aware that Mr. Amar and Mr. Bates have

12  disputed it; but, of course, they were with Mr. Mokwa in

13  that party.  The process server, I don't recall his

14  exact words.

15       Q.   Are you aware that the process server

16  executed an affidavit saying he did not hear what was

17  said?

18       A.   I'm aware he executed an affidavit.  I can't

19  remember his exact wording in the affidavit.

20       Q.   Okay.  Do you believe that Joel Kramer heard

21  what was said?

22            MS. HAVENER:   Objection.  Asked and answered.

23            Go ahead.  You can answer.

24       A.   Mr. Kramer heard there was a commotion.

25  Mr. Kramer at that point in time was in his mid-to-late

```
 1    sixties.  He was certainly within earshot and heard

 2    there was a commotion sufficient to approach me

 3    immediately after and ask what it was all about.

 4         He saw there was agitation.  He saw that we were at

 5    sorts.  He knew there was something wrong.

 6         Q.    Now, based on what Mr. Mokwa said, is it your

 7    contention in this lawsuit that what Mr. Mokwa said is

 8    what caused you harm?

 9         A.    Yes.

10         Q.    Is there anything else that Mr. Mokwa has

11    done that you believe has caused you harm?

12         A.    Yes.

13         Q.    Can you elaborate on that?

14         A.    Well, he held up a copy of The Orlando

15    Sentinel and exclaimed in a loud voice about something

16    to the effect, Where are the missing 220 million.

17         Q.    Okay.  You just said that already.

18         Is there anything else other than the incident in

19    Scottsdale --

20         A.    Perhaps you'll let me finish my answer.

21         Q.    Go ahead.

22         A.    Okay.  Thank you.

23         That was number one.

24         Number two, Mr. Mokwa was aware at that point in

25    time that Mr. Amodeo had taken the 220 million because
```

1   he was representing Mr. Amodeo at the time.

2       Number three, Mokwa made the journey to Scottsdale,

3   which is, I think, the process server, Unprecedented, he

4   says, in his twenty-odd years for a thirty-second

5   serving event.

6       Number four, blogs and press releases which

7   Mr. Mokwa contributed to.

8       So on an ongoing basis, both prior to the

9   Scottsdale event and in the period after it, Mr. Mokwa's

10  contribution amongst others have contributed to damaging

11  my reputation.

12      Q.   Okay.   Again, I want to focus right now on

13  Mr. Mokwa.

14      Is it your contention in this lawsuit that you have

15  brought against him that the main things that you've

16  brought against him relate to:  A, the incident in

17  Scottsdale; and, B, incidents on a blog?

18      A.   Managing a campaign against myself and my

19  co-defendant, Ms. Curry, amongst others, over a period

20  of time to cause us embarrassment, to damage our

21  reputation, to damage our credibility.   That's my

22  contention.

23      Q.   Okay.   But the specific instances relate to

24  what occurred in Scottsdale and what occurred on a blog,

25  correct?

1      A.      These specific instances relate over a period

2  of time to Mr. Mokwa being party to a campaign and

3  co-managing a campaign to damage my reputation and my

4  credibility.

5      Q.      Okay.  What are the specific instances or

6  examples of this campaign -- or have you already covered

7  them?

8      A.      Well, press releases.

9      Q.      What press release?

10      A.      Well, the press release to The Sentinel on

11  the 14th of October.  Blog entries over a period of

12  time, which the IP address was traced back to

13  Mr. Mokwa's offices.  Documentation, which I've seen,

14  which demonstrates that Mr. Mokwa amongst others was

15  aware and planned the Scottsdale event several months in

16  advance, all with the precise intention of damaging my

17  credibility and my reputation.

18      Q.      Okay.  The October 14 press release, what is

19  your problem or issue with that?

20      A.      What's my problem with it?  What -- being

21  accused of 220 million theft -- I'm sorry -- I'm not

22  understanding your question.

23      Q.      Well, what did the press release say?

24      A.      It said, Missing 220 million -- yeah.  It

25  said that we had -- there was a suit filed against us,

1    which at that point there wasn't.  It said that we had

2    absconded intellectual property that Mirabilis owned,

3    which we didn't.

4         What else did I need?

5         Q.    Do you believe that Matt Mokwa issued that

6    press release?

7         A.    I believe he was party to its release, yes.

8         Q.    And what's your evidence of that?

9         A.    I've seen documentation.  I've seen e-mails

10   to that effect.

11        Q.    What documents have you seen?

12        A.    I don't recall the specifics, but I've

13   certainly seen documents that were, I think, made

14   available from the plaintiff.

15        Q.    In regards to the IP address, is it your

16   contention that -- what blog are you talking about?

17        A.    Well, The Orlando Sentinel blog, the

18   Presidion blog.

19        Q.    And what is your evidence that Matt Mokwa

20   posted on these blogs?

21        A.    Well, the evidence that it came from the IP

22   address in that building that he was occupying -- with

23   others.

24        Q.    Was he the only person occupying that

25   building?

```
 1       A.      I have no evidence otherwise.

 2       Q.      Meaning -- what -- was there other people in

 3  the building?

 4       A.      I don't know.

 5       Q.      How big was the building?

 6       A.      I don't know.

 7       Q.      And do you have documentation showing that

 8  the IP address was to that building?

 9       A.      Traced back to that building.

10       Q.      Now, having discussed, gone over the issues

11  for the press release for this blog and for Scottsdale

12  -- the incident in Scottsdale -- it's your position in

13  this lawsuit that you've been damaged, correct?

14       A.      Yes.

15       Q.      How much money are you going to ask the jury

16  to award you for your alleged damages?

17       A.      I don't know.

18       Q.      Is that going to be your answer at trial?

19       A.      I'm sorry?

20       Q.      Is that going to be your answer at trial?

21       A.      I don't know.

22       Q.      Okay.  You understand that we are going to

23  show this videotape to the jury at trial, correct?

24       A.      Yes.

25       Q.      So when the jury is watching this, again my
```

```
 1    question to you is:  How much do you want the jury to
 2    award you for your alleged damages; what is your answer?
 3         A.    I haven't got a figure in mind yet.
 4         Q.    Are you planning to come up with a number
 5    anytime?
 6         A.    I will have to have a discussion with my
 7    counsel on that.
 8         Q.    How long has this lawsuit been going on for?
 9         A.    Three years.
10         Q.    So over the course of three years you've not
11    yet figured out a number that you think you are owed in
12    terms of compensation for what occurred.
13               MS. HAVENER:  Objection.  Form.
14               Go ahead.
15         A.    No.
16         Q.    You think you're owed 25,000?
17         A.    I'll refer you to my previous answer:  I
18    haven't worked out a number yet.  I haven't had that
19    discussion with my counsel yet.
20         Q.    So you're telling this jury and this judge
21    that you've been in a lawsuit for three years seeking
22    to, quote, be made whole, end quote, and in response to
23    a question of, What you want in terms of compensation,
24    you have no idea.
25         A.    No.  That's not what I said.
```

1        You are making a presumption that being made whole

2   is a financial component.   There are other components of

3   being made whole.

4        Q.    Okay.   So how could you be made whole --

5        A.    I want my reputation back.   I want an

6   admission by Mr. Mokwa and others that this was designed

7   specifically to assist Mr. Amodeo and his sentencing,

8   that we were pursued with malice over a period of time,

9   the intent being to damage my credibility, my

10  reputation.   I want it back.

11       Q.    If such an admission is made, do you feel

12  you'd be made whole?

13       A.    No.

14       Q.    Okay.   So then what else do you want --

15       A.    There are other components of it.   I have

16  suffered health-wise.   My reputation's suffered.

17  Emotionally.   My family.   Socially.   These are all

18  factors I need to take into account.   But my main driver

19  at this point has been, I want my name back.   I want my

20  reputation back, that's my main driver.

21       Q.    What does that mean, though?

22       A.    Well, it means that I spent thirty-five years

23  building up a reputation.   I was a senior partner in a

24  Big Four firm, and then almost overnight getting accused

25  of thievery.   I'm unemployable from that perspective.

1        In my industry, who's going to employ me?

2        Q.    Have you worked at all since this incident

3   occurred?

4        A.    I've done some part-time consulting work in

5   another industry, in property.

6        Q.    Then it's true though that you have spoken at

7   anti-fraud conferences, correct?

8        A.    It's true that I've spoken at audit

9   conferences and GRC conferences.  Those are components

10  -- which is anti-fraud, yeah.

11       Q.    Okay.  And do you feel that you were

12  prevented from speaking at those or you were not invited

13  to those because of this incident?

14       A.    Yeah, I do.  And I've also turned some down.

15       Q.    Have you worked at all since this incident?

16       A.    I haven't been employed since, no.

17       Q.    So what are you doing?

18       A.    I'm not doing anything.  I'm doing some

19  part-time -- self-employed doing some part-time

20  consulting, training, here and there, in another

21  industry, not my audit, GRC background.

22       Q.    Have you tried to get employment?

23       A.    Yes.

24       Q.    And --

25       A.    No response.

1      Q.      How many places have you applied to to get

2  employment?

3      A.      I've tried maybe five or six.

4      But the point here is -- maybe I'm not explaining

5  this properly -- that after thirty-five years building

6  up a reputation in this area, anti-fraud risk

7  management, to be accused of these things, anyone that

8  you apply to for employment that Googles you, if this

9  comes up, they're not going to employ you.

10     Q.      That's a fact?

11     A.      Well, would you?

12     Q.      Well, there's stuff about me on Google that's

13  not true and my career is perfectly fine.

14             MS. HAVENER:   Objection.

15     A.      They're not going to take -- they're not

16  going to take the chance.   And I got no response from

17  the ones that I tried.

18     It's not something that I've been looking to

19  promote with people, Oh, by the way, have you seen The

20  Orlando Sentinel, do you know what I've been accused of

21  -- is it okay if you still employ me.

22     Q.      You've never addressed that in any sort of

23  interviews?

24     A.      I haven't got to the interview stage.

25     Q.      Where are you living now?

```
1     A.     In London.

2     Q.     Where in London?

3     A.     In Croyton.

4     Q.     What's the address?

5     A.     Abercorn Close.

6     Q.     What?

7     A.     Abercorn Close.

8     Q.     Is there a number?

9     A.     10.

10    Q.     Have you lived -- after -- what was your role

11  with Mirabilis?

12    A.     My role with Mirabilis changed over the

13  period of fourteen, fifteen months I was there.

14  Essentially, it was helping to build out the Mirabilis

15  businesses, including Axena, which is the one I went

16  into Mirabilis with.

17    Q.     And when Mirabilis fell apart, do you feel

18  that your involvement with Mirabilis has caused you harm

19  in getting a subsequent job?

20           MS. HAVENER:  Objection.  Foundation.

21           Go ahead.

22    A.     It certainly hasn't helped.

23    Q.     And it's true that Mirabilis was found guilty

24  of a fraud business-wise?

25    A.     That's my understanding.
```

1    Q.    And is it true that you were the CEO at a

2    certain point?

3    A.    That's correct.

4    Q.    Okay.  Do you feel your role as a CEO of a

5    company that was found liable for fraud has any bearing

6    on your ability to gain subsequent employment?

7    A.    It wouldn't have helped, surely.

8    Q.    But if the jury is to weigh whether you're

9    alleged inability to get employment is affected by your

10   role as a CEO of a disgraced company or some incident

11   that occurred in Arizona, what should they give more

12   weight to in terms of what's hurt you?

13   A.    Well, I'll refer you to my previous answer:

14   It's not just the incident in Arizona, it was a campaign

15   over a period of time.

16   Q.    Okay.  So we're talking about -- again the

17   question is:  Is it your role as a CEO of a disgraced

18   company or what we'll call the campaign -- that, being,

19   the incident in Arizona, the blogs, and the press

20   release -- what do you think the jury should feel was

21   more responsible for your inability to get a job?

22          MS. HAVENER:  Objection to form.

23          Go ahead.

24   A.    Well, you're not comparing like with like.

25   And I was one of several officers at Mirabilis who were

1    duped.   The difference between the two circumstances is

2    that in the latter circumstance I was accused of theft

3    directly.   Now, that's different than being part of an

4    organization where something on toward happened.

5         Q.    Something what?

6         A.    On toward.

7         Q.    Were you aware of the fraud that was going on

8    at Mirabilis?

9         A.    No.

10        Q.    So you're telling the jury you were the CEO

11   of a company that was engaged in a multi-million dollar

12   fraud and you had no idea it was going on?

13        A.    Yes.

14        Q.    Have you ever gone before a federal criminal

15   grand jury about this?

16        A.    No.

17        Q.    Have you ever served as a government witness

18   on the criminal side about what occurred at Mirabilis?

19        A.    I have had input through my attorney to the

20   criminal prosecution.

21        Q.    Did you testify at Frank Amodeo's criminal

22   trial for Mr. Simpson?

23        A.    No.

24        Q.    Were you ever granted immunity by the U.S.

25   Attorney?

1     A.     No.

2     Q.     Who is your criminal defense attorney?

3     A.     It was --

4            MS. HAVENER:   Craig -- Craig --

5     A.     Giuliani and -- Craig Warkol.

6     Q.     Did you ever talk to -- you said you had

7     input -- did you ever talk to -- let me, just to

8     clarify, did you ever testify before a grand jury about

9     what occurred at Mirabilis?

10           MS. HAVENER:   Objection.

11    A.     No.

12           MS. HAVENER:   Asked and answered.

13    Q.     Sorry?

14    A.     No.

15    Q.     Okay.   When you said you provided input, does

16    that mean that you were consulting with the U.S.

17    Attorney?

18    A.     I provided information through my attorney to

19    the prosecutor.

20    Q.     Were you ever questioned by the prosecutor?

21    A.     No.

22    Q.     Going back to what you're seeking in this

23    lawsuit, when you say you're seeking your reputation

24    back, how is that going to occur?

25    A.     Well, winning this case and/or an admission

1   by the parties that it was a malicious action that was

2   brought against us that was promoted over a period of

3   time.  There was no justification for it.  That will

4   help.  It won't get it all back, but --

5       Q.    Are you aware of what Ms. Curry feels she is

6   owed from this lawsuit?

7       A.    In what respect?

8       Q.    Did you have a chance to review the

9   deposition of Ms. Curry that I took about seven, eight

10  weeks ago?

11      A.    No.

12      Q.    I posed the same question to her as I posed

13  to you about what she wanted the jury to award her; do

14  you know -- did you hear what her answers were?

15      A.    No.

16      Q.    It's my recollection that she felt that

17  Mr. Mokwa owed her five million dollars.  Mr. Bates owed

18  her five million.  Mr. Amar owed her five million.  And

19  Mr. Amodeo owed her five million.  So that comes out to

20  twenty million.

21      Do you think that that's a tad unreasonable to ask

22  a jury to award twenty million dollars for what

23  allegedly occurred here?

24          MS. HAVENER:   Objection to form.

25          Go ahead.

```
1        A.      Are you asking me whether I think it's

2    unreasonable for them to award twenty million to

3    Ms. Curry or to me?

4        Q.      Well, how about to Ms. Curry.

5        A.      I can't answer that question.  You'll have to

6    ask Ms. Curry.

7        Q.      Do you think awarding twenty million dollars

8    to you would be unreasonable?

9        A.      Again, I haven't been through any figures

10   with my counsel yet.

11       Q.      Why are you relying on your legal counsel to

12   give you figures as to what your case is worth?

13               MS. HAVENER:  Objection.

14       A.      I'm not an attorney.  I have no experience in

15   these matters, so I rely on my counsel.

16       Q.      Do you have a damages expert?

17       A.      Do I have --

18       Q.      Have you hired a valuation expert to

19   calculate your damages?

20       A.      No.

21       Q.      Do you plan to do so?

22       A.      I'd have to discuss that with my counsel.

23               MS. HAVENER:  I can represent to you that the

24       expert designation time period has expired.  We do

25       not have a damages expert.
```

1          MR. LOEWY:  Can you represent that you guys

2     have no damage number at all?

3          MS. HAVENER:  No.  I can represent to you

4     that we have not had a final -- well, we haven't

5     even had a preliminary discussion at which we have

6     arrived at a figure that we intend to ask the jury.

7  BY MR. LOEWY:

8     Q.   So as you're here under oath, you cannot tell

9  the jury what number you want them to award you?

10    **A.   Yes.**

11    Q.   You can't give a number right now.

12    **A.   That's correct.**

13         MR. LOEWY:  Let's take a break.

14         VIDEOGRAPHER:  Time is 9:37, we're off

15    record.

16              (Recess.)

17         VIDEOGRAPHER:  Time is 9:43 a.m., we are back

18    on the record.

19              (Defense Exhibit No. 1 marked for

20              identification.)

21  BY MR. LOEWY:

22    Q.   I want to hand you what we'll mark Exhibit 1.

23    I'll represent this is the counter-claim against my

24  client and others.  If you could turn to page 24, Count

25  Five, which is, I believe, the first count that

1    implicates my client, Matthew Mokwa, it's a civil

2    conspiracy to commit slander.

3         And I want to ask you about paragraph 71 stating

4    that, On or about October 15, 2007, defendants,

5    including Matt Mokwa, met, joined together, planned and

6    conspired to slander Curry, Hailstones, and Plaxar

7    Holdings.

8         What is your evidence that these individuals met

9    and conspired in this way?

10        A.    Well, number one, I've seen e-mails and

11   documentation which are dated from about June 2007, I

12   think it referenced litigation planning which includes

13   myself, Ms. Curry, Palaxar.  It was one of the cases

14   that was being planned and orchestrated by Mr. Amodeo

15   through Bates, Mokwa.

16        Q.    So is it your testimony this conspiracy was

17   done under the banner of litigation planning?

18        A.    Yes.  I think so.

19        Q.    And was the context in which this conspiracy

20   took place the development of a lawsuit that you

21   eventually became part of?

22        A.    The context was two-fold.  Number one, to

23   recover monies to support Amodeo's case in the criminal

24   case and get a better sentencing deal.  And, secondly,

25   to discredit Ms. Curry, in particular, and myself, as

```
 1    potential government witnesses.

 2         Q.    Okay.  But was -- at the time that you

 3    understood it, was Matt Mokwa a lawyer involved in

 4    representing Mr. Amodeo or his interests?

 5         A.    My understanding was that he was involved in

 6    representing Mr. Amodeo.

 7         Q.    So this claim for civil conspiracy when you

 8    are alleging it, you were alleging it against Mr. Mokwa

 9    at the time in his capacity as an attorney, correct?

10         A.    Yes.

11                    (Edith Curry joins deposition.)

12         Q.    Now, this goes on to talk about this

13    conference that you all were at in October of 2007,

14    which for the record, was three years ago, correct?

15         A.    That would be correct.

16         Q.    Almost to the day, actually.

17               MS. HAVENER:   Week.

18         Q.    To the week.

19         Why were you at this conference?

20         A.    Ms. Curry and I ran a workshop for audit

21    managers on the Sunday.  And I did a couple of

22    facilitations on the Monday.

23         Q.    And were you invited there by Mr. Kramer?

24         A.    Yes.

25         Q.    Now, if you could turn to page 27 -- 26.
```

1        Now, in paragraph 79 and 80 and 81, there's a

2   discussion about the actual event that occurred in

3   Arizona.  And if you'll take a look at that to refresh

4   your memory.

5        My first question is that when you say that it was

6   within earshot of --

7        A.    Sorry.  Could you -- do you mind if I --

8        Q.    Yes.  Go ahead.

9        A.    If you'll give me a moment.

10       Okay.  Sorry.

11       Q.    When you say that it was within earshot of a

12  group of organizers and attendees of the conference, can

13  you, as you sit here under oath, name anybody that you

14  know that actually heard these alleged statements?

15       A.    I think I've answered that question already.

16       The answer is no.

17                  (Defense Exhibit No. 2 marked for

18                  identification.)

19       Q.    Let me show you what we will mark Exhibit 2.

20       Have you seen that document before?

21       A.    Probably, yes.

22       Q.    I'll represent to you that it's my

23  understanding that those were apparently the attendees

24  at this conference in Arizona in 2007.

25       A.    That's what it would appear to be, correct.

1        Q.      And I believe there's roughly seventy-five

2    people listed on that document.

3        So in reviewing that document, as you sit here

4    today under oath, is it your testimony that you can't

5    name a single person on that document who allegedly

6    heard what Mr. Mokwa or any of his co-defendants said in

7    Arizona?

8        A.      Well, again, I'll refer you to my prior

9    answer, which was that at the time it was a rather

10   traumatic experience, and the last thing that I was

11   going to do was to walk around asking people if they'd

12   heard I'd just been accused of thievery.

13       Q.      Okay.  But the short answer is that, No, you

14   cannot name anyone who actually heard that?

15       A.      No.  The short answer is that the last thing

16   I was going to do was to walk around asking people if

17   they heard I'd been accused of thievery.

18       Q.      So do you think anyone actually heard on that

19   list that you'd been accused of this?

20       A.      They were in earshot and it's possible they

21   heard, but I wasn't going -- again -- go around and ask

22   them if they heard I'd just been accused of thievery.

23       Q.      But you'd agree that anything is generally

24   possible; is it probable that someone heard?

25       A.      They were certainly within earshot.

1     Q.     And who were "they"?

2     A.     A group of people.

3     Again, I didn't go looking specifically around them

4     after asking if they heard.

5     Q.     But how many people are we talking about?

6     A.     I'm guessing at that point, registration,

7     there would have been 15, 20, maybe 25 people in that

8     area -- that general area.

9     Q.     Was the alleged exchange inside the

10     conference center?

11     A.     No.

12     Q.     Where was it?

13     A.     Outside.

14     Q.     And there was roughly twenty-five people

15     congregated outside?

16     A.     The breakfast was outside.  The breakfast was

17     being served outside the conference center.

18     Q.     What were they serving for breakfast?

19     A.     Fruit, bagels, that kind of thing.

20     Q.     Now, what do you allege that Mr. Mokwa said

21     exactly?

22     A.     Again, I'll paraphrase, because it was a

23     rather traumatic experience, but he held up -- Mr. Amar

24     said something about, We had the nerve turning up

25     presenting anti-fraud products -- which we weren't -- at

```
 1    the conference when we were officers in a company where

 2    there was 220 million missing.

 3         Mr. Mokwa at that point held up the front page of

 4    The Orlando Sentinel and said, See, you made the front

 5    page, where's the 220 million.

 6         Q.   Can you, for the jury's sake, restate what

 7    Mr. Mokwa said at the level he said it at -- the volume

 8    level?

 9         A.   You want me --

10         Q.   You can stand right there.

11         A.   See, you made the front page of The Orlando

12    Sentinel, look, where's the 220 million.

13         Is that good enough?

14         Q.   Okay.

15         A.   Thank you.

16         Q.   So at that point after he said that, did

17    anyone come up to you?

18         A.   Mr. Kramer.

19              MS. HAVENER:  Objection.  Asked and answered.

20         Q.   And other than -- we discussed that

21    Mr. Kramer did not hear exactly what was said, correct?

22         A.   That's correct.

23         Q.   Other than Mr. Kramer did anyone else come up

24    to you?

25         A.   No.
```

1      Q.     Did you then give a speech that day?

2      A.     I facilitated a working session, I think,

3   that afternoon.

4      Q.     And were you traumatized the whole day?

5      A.     Yes.

6      Q.     When you say you were traumatized, like how

7   exactly -- what were the effects of the traumatization?

8      A.     The effects were concern.  The effects were

9   worry, confusion, just generally out of sorts.  As you

10  would, I'm sure understand, if you'd been accused of

11  thievery.

12     Q.     Would you agree that there was thievery that

13  occurred in Mirabilis?

14     A.     I'm sorry.  Could you be more specific in

15  your question?

16     Q.     Would you agree that there were acts of

17  thievery that occurred in the Mirabilis company or

18  companies?

19     A.     Well, Mirabilis got convicted of fraud, so I

20  guess the answer -- if that's what you mean -- is yes.

21     Q.     Okay.  And is it true when they were

22  convicted of fraud, during the time frame the fraud

23  occurred, you were, in fact, the CEO of the company?

24     A.     I was CEO for a part of the time.  Four

25  months.

1       Q.     Okay.  But you do admit that there was fraud

2   occurring while you were CEO, correct?

3       A.     It would appear it was within that time

4   scale, yes.

5       Q.     And is it true that you as the CEO owed a

6   duty, a fiduciary duty, to Mirabilis when you were

7   serving as CEO?

8              MS. HAVENER:  Objection.  Calls for a legal

9          conclusion.

10             You can answer, if you can.

11      A.     I, and a number of other senior officers,

12  were lied to, deceived, and duped as to the validity and

13  authenticity of the transactions that were being

14  performed.

15      Q.     So during the time that Mirabilis was

16  committing fraud while you were serving as the CEO is it

17  your testimony under oath that you had absolutely no

18  idea the fraud was occurring?

19      A.     Correct.

20      Q.     But is it also true that you're an anti-fraud

21  specialist?

22      A.     I lecture on anti-fraud, yeah.

23      Q.     So how is it that you lecture on anti-fraud,

24  but you had no idea the fraud was occurring right under

25  your own nose as you were the CEO?

1            MS. HAVENER:   Objection to form.

2       A.     Because it was a rather sophisticated fraud.

3   It involved collusion.   And, as any anti-fraud expert

4   could tell you, that most fraud is found through tip-off

5   in excess of 70, 75 percent.   Very few fraud is found

6   through controls operating effectively.   And when

7   there's collusion it's very difficult because there's

8   concealment, and there's more than one person involved.

9   And that's what happened at Mirabilis.

10      Q.     So is it your testimony that you had

11  absolutely no idea that there was fraudulent activity

12  occurring when you were at Mirabilis?

13           MS. HAVENER:   Objection.   Asked and answered.

14           Go ahead.

15      A.     Yes.

16      Q.     Are you aware of -- there are videotapes that

17  exist of meetings at Mirabilis while you were there?

18      A.     Yes.

19      Q.     Have you reviewed all those videotapes?

20      A.     No.

21      Q.     You can turn to -- excuse me -- page 31 of

22  the lawsuit.   Take a moment and read Count 8, which is

23  paragraphs 111 through 117 to refresh your memory.

24      A.     Okay.   Okay.

25      Q.     You're alleging here, are you not, that there

1    was the intentional interference of business

2    relationships that you had?

3        A.    Yes.

4        Q.    And that my client, Mr. Mokwa, intentionally

5    interfered with business relationships that you had?

6        A.    Yes.

7        Q.    Can you give an example to the jury of such a

8    relationship?

9        A.    Well, there were a number of opportunities

10   which Ms. Curry was pursuing which I helped support that

11   withered because of the actions of your client and

12   others.

13       Q.    Can you give an example of some of those?

14       A.    I don't know if I'm able to because of the

15   particulars of the relationships which have been

16   developed or the proposals which have been developed.

17           MS. HAVENER:   I can represent to you, Adam,

18       that many, if not all, of the then current

19       negotiations that were in play at the time are

20       subject to nondisclosure, but they have been

21       redacted and produced.

22       Q.    Can you give an example of any of these

23   business relationships that you claim that my client

24   interfered with?

25       A.    No.   I think that question has just been

1    answered.

2         Q.    Okay.  So it's your testimony that you cannot

3    give one example of these business relationships.

4         A.    No.  It's my testimony that I won't give an

5    example because of the circumstances which have just

6    been described.

7              MS. HAVENER:  Adam --

8              MR. LOEWY:  Hold on.  You're not testifying.

9         He's testifying.

10             MS. HAVENER:  No.  I'm going to ask a

11        question to clarify.

12             MR. LOEWY:  Go ahead.  I'm sorry.

13             MS. HAVENER:  Are you interested in the

14        description of a deal without -- or a potential

15        deal without names?

16             Mr. Hailstones is not at liberty to disclose

17        the identities of any of the parties involved in

18        current -- then current negotiations with Palaxar

19        or with Ms. Curry or himself.

20             First of all, he wasn't a member of Palaxar.

21        Second of all, they are subject to nondisclosures.

22        You have -- or at least you have access to copies

23        of nondisclosure agreements that discuss the

24        details of deals that have been redacted in order

25        to comply with the legal restrictions of the

```
 1        entities with whom the negotiations were being
 2        conducted.
 3             Mr. Hailstones -- I'm not -- I don't know
 4        whether Mr. Hailstones is, in fact, aware at this
 5        moment of an example of a particular deal that he
 6        could describe to you without the name.  I don't
 7        know the answer to that question.
 8             But everything that was in play at the time
 9        and prior to the events in Arizona and the bringing
10        of the lawsuit have been produced with names
11        redacted -- with identifying features redacted.
12             MR. LOEWY:  Okay.  You realize that he's
13        brought a lawsuit via counter-claim in federal
14        court alleging claims against my client, and we're
15        sitting here at a deposition, and I'm asking him to
16        give me an example, a factual example of the claim
17        -- or that supports the claim, and he is answering
18        under oath that he does not know.
19             MS. HAVENER:  No.  No.  That is not the
20        answer he gave.  The answer he gave is he's not at
21        liberty to do so.
22   BY MR. LOEWY:
23        Q.   And is that going to be your answer to the
24   jury?
25        A.   I'll have to take counsel advise on that.
```

1      Q.     But, as we're sitting here right now, you're

2   not going to give an example of a business relationship

3   that's been interfered with.

4      A.     Again, I'm not at liberty to give you a name

5   of a business relationship that was interfered with.

6      Q.     And that's because of an alleged

7   nondisclosure agreement?

8      A.     I don't know if they're alleged or otherwise,

9   but my advise was, and is, that I'm not at liberty to

10   give you a name.

11      Q.     Isn't it true that there's been no

12   interference whatsoever with a business relationship --

13          MS. HAVENER:   Objection

14      Q.     -- due to my client's actions?

15          MS. HAVENER:   Objection.

16      A.     That is not true.

17      Q.     Okay.  Why don't you tell the judge and jury,

18   and tell everyone here, give one example of a business

19   relationship that's been interfered with.

20      A.     I can only refer you to my previous answer,

21   which is, I'm not at liberty to give you a name.

22          MS. HAVENER:   Are you -- excuse me again --

23   are you interested in amounts of business deals

24   that were not excluded that were under negotiation?

25          MR. LOEWY:   I'm interested in why we're here.

```
 1              I mean, you have a lawsuit on slander, and
 2       you have a witness that can't even specify what he
 3       wants from a jury.  And then you have a lawsuit,
 4       which I think may be a little more legitimate if
 5       there actually was a lawsuit, which I don't think
 6       there is, but about business relationships and
 7       interference thereof, and you have your witness
 8       saying he can't say.
 9              MS. HAVENER:  No.
10              THE WITNESS:  Now, can I say -- let me just
11       correct a couple of things.
12       Q.    Sure.
13       A.    Number one, you've asked this question
14    several times and I've answered it several times, but
15    let me try another way.
16       You asked me what I wanted, and I told you I wanted
17    my reputation back.  I told you, you asked me how much I
18    wanted, and I told you, I hadn't had that discussion
19    with my counsel yet because my primary goal was to get
20    cleared, to get my reputation back.  You're making an
21    assumption I'm doing this for money.
22       Q.    Do you think there's anything the jury can
23    give you to get your reputation back?
24       A.    Justice.
25       Q.    Okay.  And what is justice?
```

```
 1        A.     Justice is the acknowledgement that this was
 2   a malicious case that was prosecuted against us over a
 3   period of time for other motives other than the fact
 4   that we had allegedly stolen IP.
 5        Indeed, your client in Scottsdale never referenced
 6   the IP, the case, he referenced the 220 million.
 7   Nothing to do with Nexia certification or the loss or
 8   the theft.
 9        Q.     So if my client, hypothetically speaking,
10   were to admit what you just said, you would dismiss the
11   lawsuit?
12               MS. HAVENER:   Objection.
13        A.     I would take guidance from my counsel on
14   that, but that would be a start.
15        Q.     Okay.  But you realize this is your lawsuit.
16        A.     Correct.
17        Q.     And, on that note, did you bring the lawsuit
18   on your own or were you following Ms. Curry's lead?
19               MS. HAVENER:   Objection.
20        A.     Well, it's my reputation, as well as
21   Ms. Curry's.  So I'm here because it's my reputation
22   that I'm wanting back.
23        Q.     Okay.  But as a quick follow-up to that,
24   you're seeking justice, but you're not going to tell the
25   jury -- or let me rephrase that.
```

1      Are you going to ask the jury for a financial

2   number?

3      A.    I'll have to discuss that with my counsel.

4      Q.    You're going to have to discuss with your

5   legal counsel if you want financial compensation.

6      A.    I'm going to have to discuss with my legal

7   counsel what's appropriate to ask for under the

8   circumstances.  Now, if this case goes on than -- if

9   further facts come to light, that will determine if and

10   when this goes to trial what my requests would be.

11      Q.    Just to go back to Count 8 here, regards to

12   the business relationship, as we're sitting here, are

13   you going to give an example of a business relationship

14   that's been interfered with?

15      A.    Again I'll refer you to my prior answer, I'm

16   not at liberty to give you a name of a business

17   relationship that's been interfered with.

18      Q.    Okay.  Now, if we look at Count 9, which is

19   civil conspiracy to intentionally interfere with

20   advantageous business relationships -- if you could

21   review that to refresh your memory.

22      A.    Okay.

23      Q.    This, of course, is the conspiracy claim of

24   -- related to, really, the prior Count 8 of intentional

25   interference.

1    I want to pose the same question on the conspiracy:

2  As you sit here under oath, can you give an example of a

3  business relationship that was conspired to be

4  interfered with?

5    A.    Specifically, the interference was general

6  with global because of their actions.

7        MR. LOEWY:  Let me object as nonresponsive.

8    Q.    Can you give a specific example of a business

9  relationship that was conspired to be interfered with

10  due to the actions of my client, Matthew Mokwa.

11    A.    Well, your client, I presume, would not have

12  been in a position to know which relationships we were

13  being -- we were pursuing; and, therefore, conspiring

14  against.  But, generally, their actions had a global

15  effect in the business relationships which were being

16  pursued.

17    Q.    And, again, can you give one example of such

18  a business relationship that's been negatively affected?

19    A.    I can only refer you again to my prior

20  answer, which is I'm not at liberty to give you a

21  specific relationship.

22    Q.    So let me get this straight, you've brought a

23  lawsuit in a federal court in the United States claiming

24  that business relationships have been interfered with,

25  and upon being questioned under oath, your answer is you

1    can't discuss what those relationships are?

2         A.    Yes.

3              MS. HAVENER:  Can I take a minute with my

4    client?

5              MR. LOEWY:  Yeah, that's fine.

6              VIDEOGRAPHER:  Time is 10:11 a.m.  We'll go

7    off record.

8                   (Recess.)

9              VIDEOGRAPHER:  Time is 10:18 a.m.  We are

10    back on record.

11              MS. HAVENER:  I wanted to clarify to Adam and

12    Matt that I wanted to discuss with my client the

13    details of some of the nondisclosure agreements and

14    make a determination as to what -- as to whether or

15    not there were particular deals and/or business

16    relationships that could be disclosed.

17              And it was for that reason that I asked for

18    the meeting, and I think you can revisit that line

19    of questioning, if you want to.  In other words, I

20    have come to the conclusion that there are some of

21    the NDAs that have expired; and, therefore, they're

22    no longer a restriction.

23              MR. LOEWY:  Okay.  Let me first say that

24    before the break -- or actually during the break,

25    we were produced two documents, they were allegedly

1      recordings or video transcripts.

2            First, I want to note for the record, there's

3      a case management order in place indicating the

4      discovery ended, literally, two months ago, and

5      these are now being produced now, which I think

6      violates the order.

7            MS. HAVENER:  Excuse me.  I have to interrupt

8      this.

9            This was produced to us less than three weeks

10     ago by a hard drive by Mirabilis.  It is not --

11     this is not that we are producing documents to you

12     other than our continuing duty to give you

13     documents that may be used at trial.  This was not

14     our production.  This was Mirabilis's production.

15     And we are discovering -- we are getting documents

16     on a daily basis from data mining, two terabytes,

17     of data that were given to us in raw form.

18           We had no control over the dates.  It was --

19     our discovery at the warehouse was conducted the

20     4th, 5th, and 6th.  It was -- the date -- it was

21     not delivered to us until the middle of September.

22           But I have absolutely no control, and we do

23     not -- we are not in violation of the order by

24     turning over to you documents that are in

25     plaintiff's production that we think may be useful

```
 1      to you, and that we believe we have a continuing

 2      duty to produce because we may use them at trial.

 3      We just got them.  We couldn't have given them to

 4      you within the discovery period.

 5           MR. LOEWY:  Okay.  And the other thing is, is

 6      there apparently was a deposition two days ago that

 7      we were never noticed for.

 8           MS. HAVENER:  That is absolutely not true.

 9           Every person in the case was noticed for

10      Yaniv Amar's deposition.  Mr. Mokwa's other counsel

11      -- oh, actually, I apologize -- Ms. Davies was

12      going to appear, but did not, instead Mr. Bates

13      appeared personally -- I mean, by phone.  Nicolette

14      Vilmos appeared.  And you were noticed by e-mail.

15           MR. LOEWY:  Okay.  I don't remember getting

16      that e-mail, but --

17           MS. HAVENER:  There were three notices of

18      deposition, two of them were wrong, and I had to

19      send out -- I think it was actually pointed out to

20      me by Kathleen Davies that one of them was -- that

21      it was incorrect.  And I had to send out an amended

22      notice of deposition, which you were also copied

23      on.

24           MR. LOEWY:  Okay.

25  BY MR. LOEWY:
```

1        Q.      Now, when we were -- we left off, we were

2    discussing Count 8 and 9 regarding this business

3    interference, and at the time you said you couldn't

4    discuss the factual bases for it, but after you've had a

5    chance to talk with your lawyer, and I assume,

6    Ms. Curry, and they told you what to say, what are you

7    going to say now?

8              MS. HAVENER:   Objection.   Please.   I'm going

9         to object not only to the form of the question, but

10        to the audacity of the suggestion that we told him

11        what to say.

12             We discussed with Mr. Hailstones the time

13        limit.   And, in fact, Ms. Curry was not present for

14        the majority of the conversation.   She came in and

15        left fifteen to twenty seconds.   We were discussing

16        times and whether three years had passed; and,

17        therefore, the nondisclosure agreement could be --

18        that at least certain parts of the deals could be

19        discussed.

20   BY MR. LOEWY:

21        Q.      Okay.   So let's go to Count 8, and we'll go

22   through these questions again.

23            You claim that due to Mr. Mokwa and others actions

24   there was intentional interference with potential

25   business relationships; can you give an example of such?

1      A.      One example would be Wachovia -- Wachovia

2   Bank.

3      Q.      Is this the 56 million dollar deal that

4   Ms. Curry talked about in her depo?

5      A.      I -- no.

6      Q.      Okay.  Go ahead.

7      A.      The second one was for a large 46 million

8   dollar deal for a large public body.

9      Q.      Are there any more?

10      A.      Personal business relationships unlike most

11   of my fellow senior partners from Price Waterhouse.  I

12   have no offers for nonexecutive positions on boards.

13      Q.      Are there any other examples?

14      A.      There was an organization in the U.K. called

15   Forensic Pathways which dried up as well.

16      Q.      Is there anything else?

17      A.      Well, there were others, but these are ones

18   -- you asked for examples -- these are ones I'm able to

19   give you.

20      Q.      But I'm trying to just pin you down on which

21   ones you're going to talk to the jury about when you're

22   saying there's the interference of business

23   relationships.

24      You've gone over -- we're going to go over these

25   four, but if there's any more, I'd like to know.

1    A.    Well, again there are others, but at this
2    point in time, I'm not at liberty to disclose names.
3    Q.    Okay.   What was the Wachovia deal?
4    A.    It was to do with brokerage and brokerage
5    fraud from memory.
6    Q.    And who was the person you were talking to at
7    Wachovia?
8    A.    I don't recall the name.   Ms. Curry was the
9    lead on that one.
10   Q.    And what do you claim occurred as the result
11   of Mr. Mokwa's alleged conduct?
12   A.    It stopped.   It dried up.
13   Q.    Did anyone from Wachovia say that it was
14   because of what Mr. Mokwa did?
15   A.    I'm not aware of that.
16   Q.    So it's just your personal opinion that it
17   dried up because of what was said in Arizona and the
18   campaign, as you call it?
19   A.    It's my opinion that any organization that's
20   looking to hire consultants in an area of fraud risk
21   management, and particularly in the financial sector, if
22   there are any allegations against them of impropriety --
23   I think in the U.S. you're not allowed to because you
24   can't be bonded -- and in any event, globally, no
25   organization is going to take that chance.

1      Q.      But, as you sit here, you don't have any

2      names of people -- Wachovia -- that will testify that

3      they did not do business with you because of Mr. Mokwa's

4      alleged actions.

5                    MS. HAVENER:   Objection.   Asked and answered.

6                    Go ahead.

7      A.      I don't have names with me, no.

8      Q.      Can you figure out some names?

9      A.      I don't know.

10                   MS. HAVENER:   Mr. Loewy, there have been

11                   documents produced.   Again -- and they're not

12                   redacted involving the Wachovia deal that have

13                   names of the personnel at Wachovia with whom

14                   negotiations would be conducted.

15                   MR. LOEWY:   But I find it strange that there

16                   was apparently, I guess, an eight-figure deal in

17                   the works with Wachovia, and the witness can't --

18                   or the seven-figure deal, whatever it is -- and the

19                   witness can't remember the name.

20                   MS. HAVENER:   The witness already testified

21                   that he wasn't the lead in that negotiation, but

22                   that he would have been -- he would have benefited

23                   from the conclusion of the deal, which was well

24                   underway and was not concluded.

25      BY MR. LOEWY:

```
 1        Q.    Okay.  Now, there was a deal with a public
 2   body; what public body was that?
 3              MS. HAVENER:  It's okay.
 4        A.    It was a government body.
 5        Q.    Is there a -- do you know the name?
 6        A.    I don't think it's appropriate to name it.
 7        Q.    Is this the Negroponte one?
 8              MS. HAVENER:  I don't know.  I'm sorry that
 9   it's amusing.
10              MR. LOEWY:  It's very amusing.
11              MS. HAVENER:  It is an agency of the United
12   States government.  The nondisclosure agreement is
13   still in place.  But you can discuss --
14              MR. LOEWY:  Is it the CIA?
15              MS. HAVENER:  He cannot disclose that.
16              MR. LOEWY:  Is he a CIA agent?
17              MS. HAVENER:  Ask him.
18   BY MR. LOEWY:
19        Q.    Are you a CIA agent?
20        A.    No.
21        Q.    M-9 -- what's the British term -- M-9?
22   Is M-9 British Intelligence?
23        A.    I've no idea.
24              MS. HAVENER:  Adam -- I'm sorry -- Mr. Loewy,
25   and to my witness, nobody's trying to hide
```

```
 1      anything.

 2              Mr. Hailstones, you can disclose the nature

 3      of and amount of -- the nature and the amount of

 4      the 46 million dollar deal that we both know about,

 5      but you can't disclose the government agency with

 6      whom you work with.

 7              THE WITNESS:  I understand.

 8   BY MR. LOEWY:

 9      Q.    So what was the nature of the deal?

10      A.    It was to do with clearances -- in the

11   clearance process.

12      Q.    But you're not -- as you sit here, you're not

13   going to name the public body that did the deal with

14   you?

15              MS. HAVENER:  That did not do the deal with

16      you.

17      Q.    Or they did not do the deal with you.

18      A.    Correct.

19      Q.    And that's because of an alleged

20   nondisclosure agreement?

21      A.    I don't know if it's alleged or otherwise,

22   but it would be inappropriate in my view at this stage.

23      Q.    At trial are you going to name it?

24      A.    Again, I will take advice from my counsel.

25      Q.    Are you paying your legal counsel?
```

```
 1      A.    Am I --

 2      Q.    Correct.

 3      A.    I'm sorry?

 4      Q.    Are you paying your legal counsel for the

 5   prosecution of this counter-claim?

 6      A.    Yes.

 7      Q.    Are you paying your legal counsel jointly

 8   with Ms. Curry?

 9      A.    I don't understand your question.

10      Q.    Ms. Curry's testified that she has paid her

11   legal counsel --

12      A.    Yeah.

13      Q.    -- and you have also paid your legal counsel.

14      A.    It's a joint action, yes.

15      Q.    Now, you also mentioned that there are boards

16   that you were --

17            MS. HAVENER:   I want to -- I'm sorry -- I

18        have to put on the record that I think that was a

19        mischaracterization of Ms. Curry's testimony.

20            MR. LOEWY:   Well, she said she paid you

21        initially, but she quit paying you.

22            MS. HAVENER:   That's correct.

23            MR. LOEWY:   So it's pro bono now -- it's a

24        pro bono matter?

25            MS. HAVENER:   No.
```

1    BY MS. LOEWY:

2         Q.    All right.  Now, these boards that you claim

3    that you were going to have business relationships with,

4    are you saying that you would have been put on the

5    board?

6         A.    I'm saying that a person with my background

7    and my seniority and experience, and that a number of my

8    contemporaries, sit on a number of nonexecutive board

9    positions, yeah.

10        Q.    Can you specify a board that you would have

11   sat on, but for the alleged conduct of Mr. Mokwa?

12        A.    Not specifically, no.

13        Q.    And, now, this Forensic Pathologies -- is it?

14        A.    Pathways.

15        Q.    Pathways.

16   What is your contention that it hurt your business

17   relationship with them?

18        A.    Well, the contention is that the business

19   relationship didn't continue.

20        Q.    Did they ever tell you it was because of

21   Mr. Mokwa's conduct?

22        A.    No.

23        Q.    Can you name a specific executed contract

24   that Mr. Mokwa allegedly interfered with?

25        A.    Well, again I'll refer you to my prior

1    response that the actions of Mr. Mokwa and his colleague

2    were designed to interfere with all of my business

3    relationships, and Ms. Curry's for that matter.

4                 MR. LOEWY:   Let me object as nonresponsive

5           and ask the question again.

6           Q.    Can you name a specific executed contract

7    that Mr. Mokwa interfered with?

8           A.    Could you define executed contract?

9           Q.    A signed contract that you had with another

10   entity or person that you believe Mr. Mokwa interfered

11   with.

12          A.    I thought the questioning was related to the

13   fact that we didn't have contracts because he

14   interfered.

15          Q.    Okay.   That is for the potential business

16   relationships, but I'm asking a different question.

17          Were there any executed contracts that Mr. Mokwa

18   interfered with?

19          A.    Executed --

20                MS. HAVENER:   Objection.   Vague as to time.

21                Go ahead.

22          Q.    In the context of this lawsuit, are you

23   alleging that Mr. Mokwa interfered with any executed

24   contracts that you had?

25          A.    Contracts that were signed at what point in

1     time or during which period?

2          Q.     At any time.

3          A.     Again my response is that the actions of

4     Mr. Mokwa and his colleague were designed to interfere

5     with all and every business relationship that we had.

6               MS. HAVENER:  Can I speak with my witness

7          outside, please -- actually, I don't mind speaking

8          about this right now --

9               MR. LOEWY:  Why don't you just answer the

10         question -- it would move faster.

11              MS. HAVENER:  No.  It's not testimony.  No.

12         It's not testimony.

13              MR. LOEWY:  Whatever.

14              MS. HAVENER:  I want to remind him that there

15         were contracts that you had with -- including your

16         termination agreement -- with Mirabilis, the Axena

17         situation, the Fox situation, those are totally

18         free to discuss, if you believe that they're

19         responsive.  I don't know the answer to that

20         question.

21     BY MR. LOEWY:

22          Q.     Okay.  Now that your counsel has told you how

23     to answer it, why don't you answer it now for the

24     record.

25              MS. HAVENER:  Excuse me.

```
 1                    Adam, you asked a question.  I told you that
 2        it was vague as to time.  It was my belief that my
 3        client was misunderstanding the time period you
 4        were asking about.  And you were asking about
 5        globally, you know, time from beginning of time
 6        until eternity.  And Mr. Hailstones was limiting
 7        his answer to a certain time period, and I wanted
 8        to remind him that he could talk about prior
 9        contracts.
10             MR. LOEWY:  Okay.
11   BY MR. LOEWY:
12        Q.   So let me ask the question for the fourth
13   time:  Can you give an example of an executed contract
14   that you were party to that you believe Mr. Mokwa
15   interfered with?
16        A.   And the time period is any time period.
17        Q.   Any time period.
18        I mean, you only knew Mr. Mokwa for three years,
19   correct?
20        A.   No.
21        Q.   You knew him for four years?
22        A.   No.
23        Q.   How long have you known him for?
24        A.   I met Mr. Mokwa sometime in 2006 when he
25   joined Mirabilis.  I left January 2007.  So I knew him
```

```
 1    not -- well, I knew him during that period.

 2         Q.    Okay.  So it was one year.

 3         A.    Less than a year.

 4         Q.    All right.  Again, can you give an example of

 5    any executed contracts that you had that you believe he

 6    interfered with?

 7         A.    Well, my understanding from the reviews of

 8    the -- by the plaintiffs is that Mr. Mokwa and Bates

 9    were employed by Mirabilis roundabout June 2007.  The

10    Scottsdale event took place in October of 2007, and the

11    planning which took place from June 2007 to October 2007

12    and beyond through the logs, et cetera.

13         So in June 2007, I was back in the U.K.  So from

14    June 2007, the relationships -- business relationships I

15    had here were supporting Ms. Curry and various proposals

16    and presentations, which we've covered already.

17         In the U.K., again, I mentioned earlier, that

18    because of the damage to my reputation, I wasn't able to

19    pursue business relationships in my area of expertise,

20    which is governance with compliance.  So the damage to

21    me was global.

22         Q.    But when you say you weren't able to pursue

23    it, can you give one example of why you were not able to

24    pursue it?

25         A.    Again, I'll refer you to my prior answer,
```

1    because the first thing an organization is going to do

2    if you are proposing for consulting work in governance

3    with compliance of fraud is they're going to check your

4    background.  And when you Google and it comes up, then

5    they're not going to employ me.

6         Q.    So that's your opinion as to why you weren't

7    getting called back.

8         A.    No.  I think that opinion will be shared with

9    -- by most people in my profession.

10        Q.    But again no one has ever told you that is

11   why you were not getting calls back.

12        A.    Nobody told me that that's why I wasn't

13   getting calls back, but I think it's obvious.  It would

14   be obvious.

15        Q.    Because that's what Ms. Curry said in her

16   depo, and there's a term for that called speculation,

17   that you're speculating that people didn't call you back

18   for this reason.

19        But would you agree it may have just been because

20   they found someone more qualified or --

21        A.    No.  I wouldn't agree.

22        Q.    So you were -- of all these positions you

23   applied for you were the most qualified?

24              MS. HAVENER:  Objection.

25        A.    Well, I was certainly more than qualified and

1   didn't get a call back.   Now that would be unusual.

2   Very unusual.

3        Q.     And you believe it's because of Mr. Mokwa's

4   conduct this occurred.

5        A.     I believe it's because of Mr. Mokwa and

6   others, that Mr. Mokwa was in party with who are out to

7   damage my reputation, my credibility.   And by stuff on

8   the blog and by the press release they managed to do

9   that.

10       Q.     Can you walk us through what your work

11  history has been since you left Mirabilis?

12       A.     Okay.   January 2007 until January 2008, I

13  didn't work at all.

14       Q.     So you took a whole year off?

15             MS. HAVENER:   Objection.

16  Mischaracterization.

17       A.     Not intentional.

18       Q.     What were you doing during that year?

19       A.     I was trying to develop business

20  opportunities and to find employment in various ways to

21  generate revenue to support myself and my family.

22       Q.     Were you living in London at the time?

23       A.     Yes.

24       Q.     How many jobs did you apply to during that

25  year?

```
 1        A.     I mentioned earlier, probably, five or six.
 2        Q.     Okay.  So after that year January 2008,
 3   what's your work history since then?
 4        A.     I had been speaking to a property consulting
 5   firm and did some research for them in property
 6   compliance.  And I managed to secure some part-time
 7   consulting work with them in the property compliance
 8   business.
 9        Q.     That's in London?
10        A.     In London, in the southeast, yes.
11        Q.     And is that all you've been doing since
12   January of 2008?
13        A.     Yes.
14        Q.     So you have a job right now.
15        A.     No.
16        Q.     Okay.  So you're working for free for them?
17               MS. HAVENER:  Objection.
18        A.     No.  I said part-time consulting work.
19        Q.     But that's a job, right?
20        A.     Part-time consulting work.
21        Q.     Well, do they pay you?
22        A.     For part-time consulting work, yes.
23        Q.     Okay.  What else do you do in your, you know,
24   the other part-time?
25        A.     Looking to develop other opportunities that
```

```
 1    might generate some revenue for me.

 2         Q.    Are you looking to move back to America?

 3         A.    No, not particularly.

 4         Q.    Why did you move to America to work for

 5    Mirabilis in the first place?

 6               MS. HAVENER:  Objection.  Assumes facts not

 7         in evidence.

 8         A.    I didn't move to America to work for

 9    Mirabilis.

10         Q.    Okay.  Why did you move to America?

11         A.    I moved to America because I set up a company

12    with a former business colleague in America.

13         Q.    What was the name of that company?

14         A.    Axena.

15         Q.    What did that company do?

16         A.    It provided software and consulting solutions

17    in risk management.

18         Q.    And when did that company start?

19         A.    2001.

20         Q.    And how long did that company go for?

21         A.    It was sold in 2006.

22         Q.    How much was it sold for?

23         A.    The value of the sale was about -- from

24    memory -- six million, thereabouts.

25         Q.    And then did you join Mirabilis after that?
```

1     A.    No.

2     Q.    What did you do after that?

3     A.    Went back to the U.K.

4     Q.    Did you work over there?

5     A.    We just had this conversation.

6     Q.    Where does Mirabilis fit in all this?

7     A.    Mirabilis took a twenty-five percent equity

8  position in Axena in 2005.

9     Q.    Okay.

10    A.    And then Axena was sold to a Californian

11 software company in October 2006, but Mirabilis never

12 honored the liquidation agreement with Axena; and,

13 consequently, Axena is still sitting out there.

14    Q.    What was the circumstances that led you to be

15 the CEO at Mirabilis?

16    A.    Part of the deal for Axena coming into the

17 Mirabilis network was two-fold.

18    Number one, we were led to believe that the Axena

19 risk management software was going to be used throughout

20 the Mirabilis network of companies.

21    And, number two, that the expertise of the senior

22 people within Axena would be utilized for dual benefit,

23 which was to build out Axena to be a more profitable

24 company, and at the same time to provide experience and

25 expertise in areas which Mirabilis at that time were a

1    bit light on.

2          Q.    Did you like working with Frank Amodeo?

3          A.    **Initially, yes.**

4          Q.    Did you ever do any work with Lou Perlman?

5          A.    **Lou?**

6                MS. HAVENER:  He did not hear you.

7          Q.    Lou Perlman?

8          A.    **No.**

9          Q.    Are you aware -- well, let me take a step

10   back.

11         How long have you known Ms. Curry for?

12         A.    **Since 2005.**

13         Q.    Would you characterize your relationship as

14   being good friends?

15         A.    **Yes.**

16         Q.    Are you aware that Ms. Curry was involved in

17   another defamation case before this?

18         A.    **Which case would that be?**

19         Q.    Ms. Curry sued her former employer, Nestle --

20         A.    **Yes.**

21         Q.    -- for defamation.

22         Are you aware that in that case there was an

23   allegation that Ms. Curry had misappropriated funds for

24   Nestle.

25               MS. HAVENER:  Objection.

1        Mischaracterization.

2        A.      I'm not familiar with the details of the

3    case, no.

4        Q.      And are you aware that Ms. Curry brought suit

5    against Nestle and the case was kicked out of court?

6                MS. HAVENER:   Objection.

7                Go ahead.

8        Q.      Did you know that?

9        A.      No.

10       Q.      Do you find it strange that Ms. Curry has now

11   brought two defamation cases in the last six years or

12   so?

13       A.      It depends on the circumstances, so, no.

14       Q.      Is defamation a common cause of action in the

15   U.K.?

16       A.      I'm not an attorney, so I don't know.

17       Q.      I mean, do you hear about defamation cases in

18   the U.K. a lot?

19       A.      Again, I'm not an attorney, so I don't read

20   that particular -- those journals or whatever, so.

21       Q.      Are you aware that there's been an offer of

22   judgment made in this case?

23       A.      Could you explain?

24       Q.      Do you know what an offer of judgment is?

25       A.      I'm not an attorney, so enlighten me.

1      Q.      Are you aware that if this case does actually

2   get to a trial and you lose the trial that you can be

3   responsible for my client's attorney's fees?

4      A.      Yes.

5      Q.      And are you aware that legally you would be

6   required to pay those fees?

7      A.      Yes.

8      Q.      So when this case, if it does get to a jury

9   and goes before the jury, what do you want the jury to

10  do here?

11     A.      We covered this already.  You asked --

12     Q.      You've had the chance to talk to your lawyer

13  now, so is there anything else you want to add?

14     A.      I've answered this question probably five

15  time now, but let me repeat it in case I'm not being

16  clear.

17     What I want is justice.  I want an admission that

18  it was a malicious case that was brought solely for the

19  purpose of discrediting my reputation, my credibility,

20  and that of Ms. Curry, sole purpose being to put

21  Mr. Amodeo in a better position for his sentencing.

22     Q.      And that's all you're seeking here?

23     A.      That's the main thing I'm after, I want my

24  name back.

25     Q.      And so if an admission were to occur, how

1    would you want that admission to be -- published on the

2    Web?

3        A.    Public.

4        Q.    You mean, like in this room or do you want it

5    announced on a loud speaker -- I mean, what do you mean

6    a public admission?

7        A.    Well, do you want me to answer sarcastic

8    questions or do you want me here to answer your

9    question?

10       Q.    No.  I'm trying to understand what a public

11   admission means.

12       A.    A public admission would be a press release.

13   It would be an admission in court -- whatever it takes.

14       Q.    So if my client and the other co-defendants

15   in this case were to issue a press release, and then

16   also in court admit what you want them to admit, you

17   would then dismiss the case?

18       A.    I'll take advice from my counsel.

19       Q.    But you understand this is your lawsuit,

20   correct?

21       A.    I don't understand your question.

22       Q.    I mean, you brought this lawsuit for a

23   certain reason or reasons, correct?

24       A.    Yes.

25       Q.    And the main thing you keep getting back to

1    is clearing your name and having an admission.

2         A.    That's my primary driver, but it's not the

3    only one.

4         Q.    Do you have hearing issues at all?

5         A.    Yes.

6         Q.    And can you explain what those issues are?

7         A.    I've had a problem recently with my right

8    ear.

9         Q.    Did you have that problem in 2007?

10        A.    No.  It's more recent than that.

11        Q.    Okay.  Have you sought any medical treatment

12   for what happened in Arizona?

13        A.    Yes.

14        Q.    Can you describe what that treatment was?

15        A.    Well, I had stress eczema, which I've been to

16   the doctor and I've seen a specialist about.

17        Q.    It's called stress eczema?

18        A.    Yes.

19              MS. HAVENER:  Eczema.

20        Q.    What's eczema --

21        A.    Eczema.  I don't know -- however you

22   pronounce it in the U.S.

23        Q.    Are you claiming that this event's caused you

24   mental anguish?

25        A.    Yes.

1    Q.    Have you been treated for this?

2    A.    Well, let me explain it this way.  Having

3    lived in the States for four or five years, we're a

4    different culture here.  Everyone's on medication.

5    Where I come from, I don't take aspirin or ibuprofen for

6    anything.  I don't take medication.  I've been to the

7    doctor very infrequently.

8          So my mental anguish -- I lost weight.  I couldn't

9    sleep.  Depression.  Moodiness.  The effect that it has

10   on my family.  Have I been to the doctor for treatment;

11   no, I'm dealing with it.  I'm trying to deal with it in

12   the best way I can.

13   Q.    What about this stress eczema --

14   A.    Yeah.

15   Q.    -- is that a condition?

16   A.    A condition -- it's a medical condition,

17   yeah.

18   Q.    And you've been treated for it, but only

19   briefly?

20   A.    Well, I had creams and I had antibiotics to

21   deal with it, and it flares up occasionally.

22   Q.    And do you believe this is from the actions

23   of my client, Matthew Mokwa?

24   A.    I believe it's from the events of the last

25   three years, yes.

1      Q.      Have you sought any counseling for what

2   occurred?

3      A.      In what respect?

4      Q.      Like going to a therapist or psychologist?

5      A.      Again, I come from a different culture.  We

6   don't have therapists.  And we don't have shrinks in

7   that context in the U.K.

8      Q.      There's no therapists in Britain?

9      A.      I'm sure there are therapists, but we don't

10  -- culturally, where I come from, we don't go to people

11  like that.  We deal with it.

12     Q.      You contend Americans don't deal with things

13  like that, they just go to shrinks?

14             MS. HAVENER:  Objection.

15     A.      No.  No.  I'm saying that were I come from,

16  people like me, don't do that, culturally.

17             MR. LOEWY:  Let me take a quick break.

18             VIDEOGRAPHER:  10:53, we'll go off record.

19                    (Recess.)

20             VIDEOGRAPHER:  Time is 11:09 a.m., we're back

21       on the record.

22  BY MR. LOEWY:

23     Q.      Just to cover a few more things, tie up some

24  few loose ends.

25             When you were the CEO of Mirabilis, is it your

1  testimony that you had no idea that a fraud was going

2  on?

3      A.    Again the answer to the question is yes.

4      Q.    And it's your testimony that it was Frank

5  Amodeo pulling the strings on this fraud?

6            MS. HAVENER:  Objection.

7      A.    Yes.

8      Q.    Now, in regards to the lawsuit that was

9  brought against you that is part of the lawsuit that you

10 responded to by filing the counter-claim, do you think

11 it was my client that brought the lawsuit or do you

12 think it was Frank Amodeo that was instructing him to do

13 so?

14     A.    I think your client was the vehicle through

15 which Amodeo brought the lawsuit.

16     Q.    But you would agree that my client was

17 bringing a lawsuit in his capacity as an attorney for

18 Frank Amodeo, correct?

19     A.    I'm not in a position to answer that

20 question.

21     Q.    Well, was he bringing the lawsuit

22 individually on behalf of Matt Mokwa?

23     A.    Okay.  No.  He was bringing the lawsuit,

24 presumably, directed by his client, Amodeo.

25     Q.    Okay.  So just like Amodeo was instructing

1    you to do certain things, would you not agree that

2    Amodeo was instructing my client, Matt Mokwa, to do

3    certain things?

4        A.    I'm sure he was, but the difference is

5    Mr. Mokwa knew, for example, with Ms. Curry's separation

6    agreement, he was one of the parties that signed it --

7    or was a party to it and was aware of it, yet he still

8    brought the case.

9        Q.    Okay.  But, I mean, how would you not have

10   known a multi-million dollar fraud was going on when you

11   were the CEO of a company?

12            MS. HAVENER:   Objection.

13       A.    I think I've answered that question earlier

14   that Mr. Amodeo was in collusion with others was able to

15   dupe a number of various senior professionals including

16   me.

17       Q.    Isn't it true that you signed an audit letter

18   confirming the numbers of Mirabilis that later turned

19   out to be fraudulent?

20       A.    No.

21       Q.    You never signed an audit letter?

22       A.    No.  Mr. Amodeo signed it.

23       Q.    And were you surprised when it turned out

24   that Mirabilis essentially was -- multi-million dollar

25   fraud?

1      A.      Yes.

2      Q.      Did you talk to Mr. Amodeo about what was

3   going on when all hell was breaking loose?

4            MS. HAVENER:   Objection.

5      A.      Could you be more specific in terms of

6   timing --

7      Q.      When did you begin to realize there may have

8   been a fraud taking place?

9      A.      The first I had any indication of an

10  investigation was sometime December 2006 when it

11  transpired that target letters had been issued.

12     Q.      That what was issued?

13     A.      Target letters.

14     Q.      And what was your reaction to that?

15     A.      Surprise.  Angst.

16     Q.      Did you talk to Mr. Amodeo at the time?

17     A.      I asked him and he confirmed that the tax --

18  the taxes had been paid, that he had several

19  communications from the IRS that they owed us a credit.

20     Q.      Did you ever personally advise Mr. Amodeo or

21  anyone from Mirabilis that the taxes need not be paid?

22     A.      No.

23     Q.      Other than the information that we've covered

24  today are there any other things that you're alleging

25  that Mr. Mokwa did wrong?

1          A.     As far as this case is concerned, my concerns

2     are that Mr. Mokwa in conjunction with Mr. Bates and

3     Mr. Amar flew halfway across the country to attend a

4     serving process, which in the affidavit process server

5     unprecedented in his experience in twenty-odd years,

6     that if the case that Mr. Mokwa and his colleagues were

7     bringing was about the theft of IP, it took them twelve

8     months to decide that.  They planned the Scottsdale

9     event for at least three months, four months, in

10    advance.  There was no communication with either

11    Ms. Curry or myself.  They issued a press release.  They

12    didn't tell us to cease and desist.  They never

13    contacted the conference organizers.  And they

14    deliberately set out to cause maximum embarrassment in

15    front of colleagues and potential clients in Scottsdale.

16         Now, why else would Mr. Mokwa had been there --

17    that's my contention.  And Mr. Mokwa was there on the

18    Sunday, and he approached us with his colleagues on the

19    Monday.

20         Q.     And this whole event out in Scottsdale just

21    ruined your life, huh?

22              MS. HAVENER:  Objection.

23              Answer, if you can.

24         A.     It's had a major impact on my life.

25         Q.     Even though you can't name anyone that heard

1    what was said out there other than the people that

2    you've sued.

3          A.      Again, I think you've asked that question

4    five times -- let me try it -- six times before -- yeah.

5          It was a rather traumatic experience.  And the last

6    thing I was seeking to do was go and find out if people

7    heard I'd just been accused of theft.

8          You understand a reputation is paramount in my

9    profession -- and I presume yours.  Or maybe not.

10         Q.      Well, things are written on the Web, you

11   know, it goes different ways, and, you know, most people

12   -- lives go on.  It's just strange to me that I've heard

13   testimony from Ms. Curry, not from you, that for three

14   years now, some event, some press releases, caused you

15   this much harm.

16              MS. HAVENER:  Objection.  There's no question

17         pending.  It's just comments.

18         Q.      Are you paying Ms. Havener?

19              MS. HAVENER:  Objection.  Asked and answered.

20              You can answer.

21              MR. LOEWY:  You're correct.

22         Q.      How much have you paid her?

23         A.      I don't know off the top of my head, but I'm

24   paying Ms. Havener regularly.

25         Q.      Are you seeking attorney's fees in this

1    matter?

2         A.    Yes.

3         Q.    So do you know how much to date you've paid

4    your attorney?

5         A.    My legal costs to date are of the order of

6    $200-, $250,000.

7              MR. LOEWY:  Pass the witness.

8              MS. HAVENER:  I'd like to take a break for a

9         few minutes, please.

10             VIDEOGRAPHER:  Time is 11:16, we'll go off

11        the record.

12                   (Recess.)

13             VIDEOGRAPHER:  Time is 11:25, we're on

14        record.

15             MS. HAVENER:  I have no questions for the

16        witness.

17             Do you want to explain waive and sign to the

18        witness?

19             MR. LOEWY:  Well, he's your client.

20             MS. HAVENER:  Everybody has a different rule

21        on this.

22             You are entitled to waive and sign the

23        deposition -- I mean, excuse me -- you are entitled

24        to read and sign the deposition.  You can't change

25        your testimony, but you can -- the purpose is to

1    make sure that the court reporter has taken down

2    your words properly.

3         We are not -- we don't intend to waive.  We

4    intend to read and sign.  There is something of a

5    problem because Mr. Hailstones lives in the United

6    Kingdom and will not be able to go to the court

7    reporter's office to read and sign.  So I think we

8    need to have either a text version or something

9    e-mailed to him so that he can read and sign.

10        MR. LOEWY:  Is that some custom in the

11   Central District here -- you have to go to the

12   court reporter's office?

13        MS. HAVENER:  No.  But if you don't want to

14   order a copy of the deposition, you have to go to

15   the court reporter's office.  And Mr. Hailstones

16   won't be able to do that.

17        MR. LOEWY:  We'll send him a copy.

18        MS. HAVENER:  Thank you.

19        And because he has thirty days, as soon as he

20   gets a copy, please -- if you send it to me so that

21   I can send it to him, and he'll do it as soon as

22   possible.

23        MR. LOEWY:  Is he planning to come back for

24   the trial?

25        MS. HAVENER:  Yes.

```
 1              We're off the record.  I think we're done.
 2              VIDEOGRAPHER:  Time is 11:26, we're off the
 3      record.
 4              COURT REPORTER:  Are you ordering the
 5      original at this time?
 6              MR. LOEWY:  Yes.
 7              COURT REPORTER:  And you're saying you don't
 8      want to order a copy?
 9              MR. MOKWA:  Well, that's not real fair,
10      because we're cheating her out of money.  So we
11      really should properly order the transcript.
12              MS. HAVENER:  So I could order a copy of the
13      transcript, okay.  You have my card, just e-mail it
14      to me, please.
15              (Deposition concluded at 11:30 a.m.)
16
17
18
19
20
21
22
23
24
25
```

```
1                          ERRATA   SHEET

2
    DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE
3
    RE:  Depo of FRANK HAILSTONES, taken October 7, 2010
4

5    Page        Line        Correction                Reason

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20
    Under penalties of injury, I declare that I have read my
21   deposition and that it is true and correct subject
    to any changes in form of substance entered here.
22

23

24        _____        _____
              DATE                 FRANK HAILSTONES, WITNESS

25   /nh
```

1

2

3

4

5

6

7

8                          CERTIFICATE OF OATH

9

10    STATE OF FLORIDA    )
      COUNTY OF ORANGE    )

11

12        I, Nancy L. Hengehold, Professional Court Reporter
      and Notary Public, certify that FRANK HAILSTONES
13    personally appeared before me and was duly sworn.

14        WITNESS my hand and official seal this 7th day of
      October 2010.

15

16    Nancy L. Hengehold
      Notary Public - State of FL
17    Commission Expires
      December 2010

18

19              NANCY L. HENGEHOLD
                MY COMMISSION # DD 614917
20              EXPIRES: December 17, 2010
                Bonded Thru Budget Notary Services

21

22

23

24

25

**MJC Reporting, Inc.**
**407-894-7545**

**1314 E. Robinson St.**                                    **Orlando, FL 32801**

1

2

3

4

5

6

7                         CERTIFICATE OF REPORTER

8
    STATE OF FLORIDA   )
9   COUNTY OF ORANGE   )

10
         I, NANCY L. HENGEHOLD, Court Reporter, certify that
11  I was authorized to and did stenographically report the
    deposition of FRANK HAILSTONES; that a review of the
12  transcript WAS requested; and that the foregoing
    transcript, pages 01 through 80 is a true record of the
13  testimony given by the witness.
         I further certify that I am not a relative,
14  employee, attorney, or counsel of any of the parties,
    nor am I a relative or employee of any of the attorneys
15  or counsel connected with the action, nor am I
    financially interested in the action.
16
         Dated this 7th day of October 2010.
17

18                          _____
                            NANCY L. HENGEHOLD, ASCR
19

20

21

22

23

24

25

## A

**AARON** 1:15
**Abercorn** 19:5,7
**ability** 20:6
**able** 35:14 47:18
  57:18,22,23
  71:14 76:6,16
**absconded** 13:2
**absolutely** 33:17
  34:11 44:22 45:8
**access** 36:22
**account** 16:18
**accused** 7:14 8:9
  8:11,17 12:21
  16:24 18:7,20
  21:2 29:12,17,19
  29:22 32:10 74:7
**acknowledgement**
  40:1
**action** 23:1 52:14
  64:14 80:15,15
**actions** 35:11 38:14
  42:6,10,14 46:23
  49:4 54:1 55:3
  68:22
**activity** 34:11
**acts** 32:16
**actual** 28:2
**Adam** 3:3 5:11 6:3
  35:17 36:7 43:11
  50:24 56:1
**add** 65:13
**address** 12:12
  13:15,22 14:8
  19:4
**addressed** 18:22
**admission** 16:6,11
  22:25 65:17,25
  66:1,6,11,12,13
  67:1
**admit** 33:1 40:10
  66:16,16
**advance** 12:16
  73:10
**advantageous**
  41:20

**advice** 51:24 66:18
**advise** 37:25 38:9
  72:20
**affidavit** 9:16,18
  9:19 73:4
**afternoon** 32:3
**agency** 50:11 51:5
**agent** 50:16,19
**agitation** 10:4
**ago** 23:10 27:14
  44:4,10 45:6
**agree** 29:23 32:12
  32:16 58:19,21
  70:16 71:1
**agreed** 3:18
**agreement** 6:15,18
  38:7 46:17 50:12
  51:20 55:16
  62:12 71:6
**agreements** 36:23
  43:13
**ahead** 9:23 10:21
  15:14 19:21
  20:23 23:25 28:8
  34:14 36:12 47:6
  49:6 54:21 64:7
**al** 5:6,7,8
**allegation** 63:23
**allegations** 48:22
**allege** 30:20
**alleged** 14:16 15:2
  20:9 28:14 30:9
  38:6,8 48:11 49:4
  51:19,21 53:11
**allegedly** 7:8,10,20
  8:3,19 9:2 23:23
  29:5 40:4 43:25
  53:24
**alleging** 27:8,8
  34:25 37:14
  54:23 72:24
**allowed** 48:23
**Amar** 1:14 8:24,25
  9:3,9,11 23:18
  30:23 73:3
**Amar's** 45:10

**amended** 45:21
**America** 2:6 61:2,4
  61:8,10,11,12
**Americans** 69:12
**Amodeo** 1:14 10:25
  11:1 16:7 23:19
  26:14 27:4,6 63:2
  65:21 70:5,12,15
  70:18,24,25 71:2
  71:14,22 72:2,16
  72:20
**Amodeo's** 21:21
  26:23
**amount** 51:3,3
**amounts** 38:23
**amusing** 50:9,10
**and/or** 22:25 43:15
**Angst** 72:15
**anguish** 67:24 68:8
**announced** 66:5
**answer** 9:23 10:20
  14:18,20 15:2,17
  20:13 24:5 28:16
  29:9,13,15 32:20
  33:10 37:7,20,20
  37:23 38:20
  41:15 42:20,25
  55:9,19,23,23
  56:7 57:25 66:7,8
  70:3,19 73:23
  74:20
**answered** 9:22
  22:12 28:15
  31:19 34:13 36:1
  39:14 49:5 65:14
  71:13 74:19
**answering** 37:17
**answers** 6:13 23:14
**antibiotics** 68:20
**anti-fraud** 17:7,10
  18:6 30:25 33:20
  33:22,23 34:3
**anybody** 28:13
**anytime** 15:5
**apart** 19:17
**apologize** 45:11

**apparently** 28:23
  45:6 49:16
**appear** 28:25 33:3
  45:12
**appeared** 45:13,14
  79:12
**applied** 18:1 58:23
**apply** 18:8 59:24
**approach** 10:2
**approached** 7:25
  8:12 73:18
**appropriate** 41:7
  50:6
**AQMI** 1:13 5:7
**area** 18:6 30:8,8
  48:20 57:19
**areas** 62:25
**Arizona** 4:21 20:11
  20:14,19 28:3,24
  29:7 37:9 48:17
  67:12
**arrived** 25:6
**ASCR** 80:18
**asked** 8:1,13 9:22
  22:12 31:19
  34:13 39:13,16
  39:17 43:17
  47:18 49:5 56:1
  65:11 72:17 74:3
  74:19
**asking** 8:8 24:1
  29:11,16 30:4
  37:15 54:16 56:4
  56:4
**aspirin** 68:5
**assets** 9:7
**assist** 16:7
**assume** 46:5
**Assumes** 61:6
**assumption** 39:21
**attend** 73:3
**attendees** 4:21
  28:12,23
**attorney** 6:4 21:19
  21:25 22:2,17,18
  24:14 27:9 64:16

**64:19,25 70:17
  75:4 80:14
**attorneys** 80:14
**attorney's** 65:3
  74:25
**audacity** 46:10
**audit** 17:8,21 27:20
  71:17,21
**Austin** 3:6
**authenticity** 33:13
**authorized** 80:11
**available** 13:14
**Avenue** 2:7 3:5
**award** 14:16 15:2
  23:13,22 24:2
  25:9
**awarding** 24:7
**aware** 8:25 9:3,4
  9:11,15,18 10:24
  12:15 21:7 23:5
  34:16 37:4 48:15
  63:9,16,22 64:4
  64:21 65:1,5 71:7
**Axena** 19:15 55:16
  61:14 62:8,10,12
  62:13,16,18,22,23
**a.m** 2:4,4 5:2,9
  25:17 43:6,9
  69:20 77:15
**a/k/a** 1:10

## B

**B** 4:17 11:17
**back** 7:6 12:12
  14:9 16:5,10,19
  16:20 22:22,24
  23:4 25:17 39:17
  39:20,23 40:22
  41:11 43:10
  57:13 58:7,11,13
  58:17 59:1 61:2
  62:3 63:10 65:24
  66:25 69:20
  76:23
**background** 17:21
  53:6 58:4

bagels 30:19
**Bank** 2:6 47:2
**banner** 26:17
**Barry** 3:4
based 10:6
bases 46:4
basis 11:8 44:16
**Bates** 1:15 8:24,25
9:9,11 23:17
26:15 45:12 57:8
73:2
bearing 20:5
beginning 66:5
behalf 70:22
belief 56:2
believe 8:10 9:20
10:11 13:5,7
25:25 29:1 45:1
54:10 55:18
56:14 57:5 59:3,5
62:18 68:22,24
benefit 62:22
benefited 49:22
best 68:12
better 26:24 65:21
beyond 57:12
big 14:5 16:24
bit 63:1
blog 11:17,24
12:11 13:16,17
13:18 14:11 59:8
blogs 11:6 13:20
20:19
board 53:5,8,10
boards 47:12 52:15
53:2
body 47:8 50:2,2,4
51:13
bonded 48:24
bono 52:23,24
break 25:13 43:24
43:24 69:17 75:8
breakfast 30:16,16
30:18
breaking 72:3
briefly 68:19

**bring** 40:17
**bringing** 37:9
70:17,21,23 73:7
**Britain** 69:8
**British** 50:21,22
**BROADHEAD**
1:10
brokerage 48:4,4
brought 6:22 11:15
11:16 23:2 37:13
42:22 64:4,11
65:18 66:22 70:9
70:11,15 71:8
build 7:6 19:14
62:23
building 13:22,25
14:3,5,8,9 16:23
18:5
business 35:1,5,23
36:3 38:2,5,12,18
38:23 39:6 41:12
41:13,16,20 42:3
42:8,15,18,24
43:15 46:2,25
47:10,22 49:3
53:3,16,18 54:2
54:15 55:5 57:14
57:19 59:19 60:8
61:12
businesses 19:15
business-wise
19:24

------
C
------
C 3:2 5:1
calculate 24:19
Californian 62:10
call 20:18 48:18
58:17 59:1
called 47:14 58:7
58:16 67:17
calls 33:8 58:11,13
campaign 11:18
12:2,3,6 20:14,18
48:18
capacity 27:9 70:17

**CAPITAL** 1:14
card 77:13
career 18:13
carefully 6:16
case 1:4 22:25
24:12 26:23,24
40:2,6 41:8 44:3
45:9 63:17,18,22
64:3,5,22 65:1,8
65:15,18 66:15
66:17 71:8 73:1,6
cases 26:13 64:11
64:17
cause 11:20 64:14
73:14
caused 10:8,11
19:18 67:23
74:14
cease 73:12
center 2:6 30:10,17
Central 76:11
CEO 20:1,4,10,17
21:10 32:23,24
33:2,5,7,16,25
62:15 69:25
71:11
certain 9:6 20:2
46:18 56:7 66:23
71:1,3
certainly 10:1
13:13 19:22
29:25 58:25
**CERTIFICATE**
4:12,13 79:8 80:7
certification 40:7
certify 79:12 80:10
80:13
cetera 57:12
Chagrin 3:9
chance 18:16 23:8
46:5 48:25 65:12
change 75:24
changed 19:12
changes 78:2,21
characterize 63:13
cheating 77:10

check 58:3
Christopher 2:6
CHU 1:10
CIA 50:14,16,19
circumstance 21:2
circumstances 21:1
36:5 41:8 62:14
64:13
civil 26:1 27:7
41:19
claim 9:1 27:7
35:23 37:16,17
41:23 46:23
48:10 53:2
claiming 9:6 42:23
67:23
claims 37:14
clarify 22:8 36:11
43:11
clear 65:16
clearance 51:11
clearances 51:10
cleared 39:20
clearing 67:1
client 6:23 7:5,8,9
25:24 26:1 35:4
35:11,23 37:14
40:5,9 42:10,11
43:4,12 56:3
66:14 68:23
70:11,14,16,24
71:2 75:19
clients 73:15
client's 38:14 65:3
Close 19:5,7
colleague 54:1 55:4
61:12
colleagues 73:6,15
73:18
collusion 34:3,7
71:14
come 15:4 31:17,23
41:9 43:20 68:5
69:5,10,15 76:23
comes 18:9 23:19
58:4

coming 62:16
comments 74:17
**Commission** 79:17
commit 26:2
committing 33:16
common 64:14
commotion 7:25
8:12 9:24 10:2
communication
73:10
communications
72:19
companies 32:18
62:20
company 20:5,10
20:18 21:11 31:1
32:17,23 61:11
61:13,15,18,20
62:11,24 71:11
comparing 20:24
compensation
15:12,23 41:5
compliance 57:20
58:3 60:6,7
comply 36:25
component 16:2
components 16:2
16:15 17:9
concealment 34:8
concern 32:8
concerned 73:1
concerns 73:1
concluded 49:24
77:15
conclusion 33:9
43:20 49:23
condition 68:15,16
68:16
conduct 48:11
53:11,21 59:4
conducted 37:2
44:19 49:14
conference 4:21
7:14 8:3 27:13,19
28:12,24 30:10
30:17 31:1 73:13

conferences 17:7,9
17:9
confirmed 72:17
confirming 71:18
confusion 32:9
congregated 30:15
Congress 3:5
conjunction 73:2
connected 80:15
consequently 62:13
conspiracy 26:2,16
26:19 27:7 41:19
41:23 42:1
conspired 26:6,9
42:3,9
conspiring 42:13
consultants 48:20
consulting 17:4,20
22:16 58:2 60:4,7
60:18,20,22
61:16
contacted 73:13
contemporaries
53:8
contend 69:12
contention 10:7
11:14,22 13:16
53:16,18 73:17
context 26:19,22
54:22 69:7
continue 53:19
continuing 44:12
45:1
contract 53:23 54:6
54:8,9 56:13
contracts 54:13,17
54:24,25 55:15
56:9 57:5
contributed 11:7
11:10
contribution 11:10
control 44:18,22
controls 34:6
conversation 46:14
62:5
convicted 32:19,22

copied 45:22
copies 36:22
copy 7:13 10:14
76:14,17,20 77:8
77:12
Corporation 1:6,13
5:8
correct 6:23 7:21
8:20 9:2 11:25
14:13,23 17:7
20:3 25:12 27:9
27:14,15 28:25
31:21,22 33:2,19
39:11 40:16
51:18 52:2,22
56:19 66:20,23
70:18 74:21
78:21
Correction 78:5
costs 75:5
counsel 3:6,9,19
5:10 15:7,19
24:10,11,15,22
37:25 39:19
40:13 41:3,5,7
45:10 51:24,25
52:4,7,11,13
55:22 66:18
80:14,15
counseling 69:1
count 25:24,25
34:22 41:11,18
41:24 46:2,21
counter-claim 4:19
6:22 25:23 37:13
52:5 70:10
country 73:3
COUNTY 79:10
80:9
couple 27:21 39:11
course 9:12 15:10
41:23
court 1:2 5:16
37:14 42:23 64:5
66:13,16 76:1,6
76:12,15 77:4,7

79:11 80:10
cover 69:23
covered 12:6 57:16
65:11 72:23
co-defendant 7:15
11:19
co-defendants 29:6
66:14
co-managing 12:3
co-presenting 7:12
Craig 22:4,4,5
creams 68:20
credibility 11:21
12:4,17 16:9 59:7
65:19
credit 72:19
criminal 21:14,18
21:20,21 22:2
26:23
Cross-Examinati...
4:8
Croyton 19:3
culturally 69:10,16
culture 68:4 69:5
current 35:18
36:18,18
Curry 1:10 3:9,13
7:23 8:20 9:5
11:19 23:5,9 24:3
24:4,6 26:6,13,25
27:11,20 35:10
36:19 46:6,13
47:4 48:8 52:8
57:15 58:15
63:11,16,19,23
64:4,10 65:20
73:11 74:13
Curry's 40:18,21
52:10,19 54:3
71:5
custom 76:10

—— D ——
D 4:1 5:1
daily 44:16
damage 11:20,21

12:3 16:9 25:2
57:18,20 59:7
damaged 14:13
damages 14:16
15:2 24:16,19,25
damaging 11:10
12:16
data 44:16,17
date 2:2 5:4 44:20
75:3,5 78:24
dated 26:11 80:16
dates 44:18
Davies 45:11,20
day 27:16 32:1,4
79:13 80:16
days 45:6 76:19
deal 26:24 36:14,15
37:5 47:3,8 48:3
49:12,16,18,23
50:1 51:4,9,13,15
51:17 62:16
68:11,21 69:11
69:12
dealing 68:11
deals 36:24 38:23
43:15 46:18
deceived 33:12
December 72:10
79:17
decide 73:8
declare 78:20
defamation 63:17
63:21 64:11,14
64:17
Defendant 1:20
defendants 1:11,16
5:14 26:4
defense 4:19,20
22:2 25:19 28:17
define 54:8
delegates 7:14
deliberately 73:14
delivered 44:21
demonstrates
12:14
depends 64:13

depo 47:4 58:16
78:3
deponent 3:20 4:10
deposed 6:5
deposition 1:19
3:20 5:5 7:8 23:9
27:11 37:15 45:6
45:10,18,22
75:23,24 76:14
77:15 78:21
80:11
Depression 68:9
describe 37:6 67:14
described 8:3 36:6
description 36:14
designation 24:24
designed 16:6 54:2
55:4
desist 73:12
details 36:24 43:13
64:2
determination
43:14
determine 41:9
develop 59:19
60:25
developed 35:16,16
development 26:20
difference 21:1
71:4
different 21:3
54:16 68:4 69:5
74:11 75:20
difficult 34:7
Direct 4:7 5:23
directed 70:24
directly 21:3
disclose 36:16 48:2
50:15 51:2,5
disclosed 43:16
discovering 44:15
discovery 44:4,19
45:4
discredit 26:25
discrediting 65:19
discuss 24:22 36:23

41:3,4,6 43:1,12
46:4 50:13 55:18
**discussed** 14:10
31:20 46:12,19
**discussing** 46:2,15
**discussion** 15:6,19
25:5 28:2 39:18
**disgraced** 20:10,17
**dismiss** 40:10
66:17
**dispute** 9:1,10
**disputed** 9:12
**District** 1:2,5 76:11
**DIVISION** 1:3
**doctor** 67:16 68:7
68:10
**document** 28:20
29:2,3,5
**documentation**
12:13 13:9 14:7
26:11
**documents** 13:11
13:13 43:25
44:11,13,15,24
49:11
**doing** 17:17,18,18
17:19 39:21
59:18 60:11
**dollar** 21:11 47:3,8
51:4 71:10,24
**dollars** 23:17,22
24:7
**dried** 47:15 48:12
48:17
**drive** 44:10
**driver** 16:18,20
67:2
**dual** 62:22
**due** 38:14 42:10
46:23
**duly** 5:20 79:12
**dupe** 71:15
**duped** 21:1 33:12
**duty** 33:6,6 44:12
45:2

**E**

**E** 3:2,2 4:1,17 5:1,1
**ear** 67:8
**earlier** 57:17 60:1
71:13
**earshot** 7:13 8:4
10:1 28:6,11
29:20,25
**eczema** 67:15,17,19
67:20,21 68:13
**Edith** 1:10,10 3:9
3:13 8:20 27:11
**effect** 7:19 10:16
13:10 42:15 68:9
**effectively** 34:6
**effects** 32:7,8,8
**eight** 23:9
**eight-figure** 49:16
**either** 73:10 76:8
**elaborate** 10:13
**embarrassment**
11:20 73:14
**Emotionally** 16:17
**employ** 17:1 18:9
18:21 58:5
**employed** 17:16
57:9
**employee** 80:14,14
**employer** 63:19
**employment** 17:22
18:2,8 20:6,9
59:20
**ended** 44:4
**ends** 69:24
**engaged** 21:11
**enlighten** 64:25
**ENTER** 78:2
**entered** 78:21
**entities** 37:1
**entitled** 75:22,23
**entity** 54:10
**entries** 12:11
**equity** 62:7
**ERRATA** 4:10
78:1
**ESQUIRE** 3:3,8

**essentially** 19:14
71:24
**et** 5:6,7,8 57:12
**eternity** 56:6
**event** 7:11,24 11:5
11:9 12:15 28:2
48:24 57:10 73:9
73:20 74:14
**events** 37:9 68:24
**eventually** 26:21
**event's** 67:23
**Everybody** 75:20
**Everyone's** 68:4
**evidence** 13:8,19
13:21 14:1 26:8
61:7
**exact** 9:14,19
**exactly** 6:25 7:16
30:21 31:21 32:7
**Examination** 4:7
5:23
**example** 35:7,13,22
36:3,5 37:5,16,16
38:2,18 41:13
42:2,8,17 46:25
47:1 56:13 57:4
57:23 71:5
**examples** 12:6
47:13,18
**excess** 34:5
**exchange** 30:9
**exclaimed** 10:15
**excluded** 38:24
**excuse** 34:21 38:22
44:7 55:25 75:23
**executed** 9:16,18
53:23 54:6,8,17
54:19,23 56:13
57:5
**EXERCISED** 3:21
**Exhibit** 4:19,20
25:19,22 28:17
28:19
**exist** 34:17
**experience** 24:14
29:10 30:23 53:7

62:24 73:5 74:5
**expert** 24:16,18,24
24:25 34:3
**expertise** 57:19
62:21,25
**expired** 24:24
43:21
**Expires** 79:17
**explain** 64:23 67:6
68:2 75:17
**explaining** 18:4
**e-mail** 45:14,16
77:13
**e-mailed** 76:9
**e-mails** 13:9 26:10

**F**

**facilitated** 32:2
**facilitations** 27:22
**fact** 18:10 32:23
37:4 40:3 46:13
54:13
**factors** 16:18
**facts** 41:9 61:15
**factual** 37:16 46:4
**fair** 77:9
**Falls** 3:9
**familiar** 64:2
**family** 16:17 59:21
68:10
**far** 73:1
**faster** 55:10
**fax** 3:11
**features** 37:11
**federal** 21:14 37:13
42:23
**feel** 16:11 17:11
19:17 20:4,20
**feels** 23:5
**fees** 65:3,6 74:25
**fell** 19:17
**fellow** 47:11
**felt** 23:16
**fiduciary** 33:6
**fifteen** 19:13 46:15
**figure** 15:3 25:6

49:8
**figured** 15:11
**figures** 24:9,12
**filed** 12:25
**filing** 70:10
**final** 25:4
**financial** 16:2 41:1
41:5 48:21
**financially** 80:15
**find** 49:15 59:20
64:10 74:6
**fine** 18:13 43:5
**finish** 10:20
**firm** 16:24 60:5
**first** 5:20 7:11
25:25 28:5 36:20
43:23 44:2 58:1
61:5 72:9
**fit** 62:6
**five** 18:3 23:17,18
23:18,19 25:25
60:1 65:14 68:3
74:4
**FL** 79:16
**flares** 68:21
**flew** 73:3
**Florida** 1:2 2:7
79:9 80:8
**focus** 7:7 11:12
**following** 40:18
**follows** 5:21
**follow-up** 40:23
**foregoing** 80:12
**Forensic** 47:15
53:13
**form** 15:13 20:22
23:24 34:1 44:17
46:9 78:21
**former** 61:12 63:19
**found** 19:23 20:5
34:4,5 58:20
**Foundation** 19:20
**four** 11:6 16:24
32:24 47:25
56:21 68:3 73:9
**fourteen** 19:13

**fourth** 56:12
**Fox** 55:17
**frame** 32:22
**Frank** 1:9,14,19
   3:10 4:5 5:5,19
   6:2 21:21 63:2
   70:4,12,18 78:3
   78:24 79:12
   80:11
**fraud** 19:24 20:5
   21:7,12 32:19,22
   32:22 33:1,16,18
   33:24 34:2,4,5
   48:5,20 58:3 70:1
   70:5 71:10,25
   72:8
**fraudulent** 34:11
   71:19
**free** 55:18 60:16
**friends** 63:14
**front** 7:17 31:3,4
   31:11 73:15
**Frost** 3:4
**Fruit** 30:19
**funds** 63:23
**further** 41:9 80:13

**G**

**G** 5:1
**gain** 20:6
**general** 30:8 42:5
**generally** 29:23
   32:9 42:14
**generate** 59:21
   61:1
**getting** 16:24 19:19
   44:15 45:15 58:7
   58:11,13 66:25
**Giuliani** 22:5
**give** 6:13 20:11
   24:12 25:11 28:9
   32:1 35:7,13,22
   36:3,4 37:16 38:2
   38:4,10,18,21
   39:23 41:13,16
   42:2,8,17,20

**44**:12 46:25
   47:19 56:13 57:4
   57:23
**given** 44:17 45:3
   80:13
**global** 42:6,14
   57:21
**globally** 48:24 56:5
**go** 6:7 8:8 9:23
   10:21 15:14
   19:21 20:23
   23:25 28:8 29:21
   30:3 34:14 36:12
   41:11 43:6 46:21
   46:21 47:6,24
   49:6 54:21 61:20
   64:7 69:10,13,18
   74:6,12 75:10
   76:6,11,14
**goal** 39:19
**goes** 27:12 41:8,10
   65:9 74:11
**going** 14:15,18,20
   14:22 15:8 17:1
   18:9,15,16 21:7
   21:12 22:22,24
   29:11,16,21
   36:10 37:23 38:2
   40:24 41:1,4,6,13
   45:12 46:7,8
   47:21,24 48:25
   51:13,23 53:3
   58:1,3,5 62:19
   69:4 70:1 71:10
   72:3
**good** 5:3 31:13
   63:14
**Google** 18:12 58:4
**Googles** 18:8
**governance** 57:20
   58:2
**government** 21:17
   27:1 50:4,12 51:5
**grand** 21:15 22:8
**granted** 21:24
**GRC** 17:9,21

**ground** 6:7
**group** 1:9,14 3:10
   5:7 28:12 30:2
**guess** 32:20 49:16
**guessing** 30:6
**guidance** 40:13
**guilty** 19:23
**guys** 25:1

**H**

**H** 4:17
**Hailstones** 1:9,19
   3:10 4:5 5:5,15
   5:19 6:2,3 26:6
   36:16 37:3,4
   46:12 51:2 56:6
   76:5,15 78:3,24
   79:12 80:11
**halfway** 73:3
**hand** 25:22 79:13
**happened** 21:4
   34:9 67:12
**hard** 44:10
**harm** 10:8,11
   19:18 74:15
**Havener** 3:8 5:13
   5:13 9:22 15:13
   18:14 19:20
   20:22 22:4,10,12
   23:24 24:13,23
   25:3 27:17 31:19
   33:8 34:1,13
   35:17 36:7,10,13
   37:19 38:13,15
   38:22 39:9 40:12
   40:19 43:3,11
   44:7 45:8,17 46:8
   49:5,10,20 50:3,8
   50:11,15,17,24
   51:15 52:17,22
   52:25 54:20 55:6
   55:11,14,25
   58:24 59:15
   60:17 61:6 63:6
   63:25 64:6 67:19
   69:14 70:6 71:12

**72**:4 73:22 74:16
   74:18,19,24 75:8
   75:15,20 76:13
   76:18,25 77:12
**head** 74:23
**health-wise** 16:16
**hear** 9:16,23:14
   31:21 63:6 64:17
**heard** 7:22,23,23
   7:24 8:3,5,8,10
   8:12,16,19 9:20
   9:24 10:1 28:14
   29:6,12,14,17,18
   29:21,22,24 30:4
   73:25 74:7,12
**hearing** 67:4
**held** 7:12 10:14
   30:23 31:3
**hell** 72:3
**help** 23:4
**helped** 19:22 20:7
   35:10
**helping** 19:14
**Hengehold** 2:9
   79:11,16 80:10
   80:18
**he'll** 76:21
**hide** 50:25
**hire** 48:20
**hired** 24:18
**history** 59:11 60:3
**Hold** 36:8
**Holdings** 1:9 3:10
   26:7
**honest** 6:13
**honored** 62:12
**huh** 73:21
**hurt** 20:12 53:16
**hypothetically** 40:9

**I**

**ibuprofen** 68:5
**idea** 15:24 21:12
   33:18,24 34:11
   50:23 70:1
**identification**

**25**:20 28:18
**identifying** 37:11
**identities** 36:17
**immediately** 7:25
   8:13 10:3
**immunity** 21:24
**impact** 73:24
**implicates** 26:1
**impropriety** 48:22
**inability** 20:9,21
**inappropriate**
   51:22
**incident** 10:18
   11:16 14:12 17:2
   17:13,15 20:10
   20:14,19
**incidents** 11:17
**includes** 26:12
**including** 19:15
   26:5 55:15 71:15
**incorrect** 45:21
**indicating** 44:3
**indication** 72:9
**individually** 70:22
**individuals** 26:8
**industry** 17:1,5,21
**information** 22:18
   72:23
**infrequently** 68:7
**initially** 52:21 63:3
**injury** 78:20
**input** 21:19 22:7,15
**inside** 30:9
**instances** 11:23
   12:1,5
**instructing** 70:12
   70:25 71:2
**intellectual** 13:2
**Intelligence** 50:22
**intend** 6:13 25:6
   76:3,4
**intent** 16:9
**intention** 12:16
**intentional** 35:1
   41:24 46:24
   59:17

intentionally 35:4
  41:19
interested 36:13
  38:23,25 80:15
interests 27:4
interfere 41:19
  54:2 55:4
interfered 35:5,24
  38:3,5,19 41:14
  41:17 42:4,9,24
  53:24 54:7,10,14
  54:18,23 56:15
  57:6
interference 35:1
  38:12 39:7 41:25
  42:5 46:3,24
  47:22
interrupt 44:7
interview 18:24
interviews 18:23
introduce 5:10
investigation 72:10
invited 17:12 27:23
involved 27:3,5
  34:3,8 36:17
  63:16
involvement 19:18
involving 49:12
IP 12:12 13:15,21
  14:8 40:4,6 73:7
IRS 72:19
issue 12:19 66:15
issued 13:5 72:11
  72:12 73:11
issues 14:10 67:4,6

—————

**J**

J 3:3
JAMES 1:15
January 56:25
  59:12,12 60:2,12
job 19:19 20:21
  60:14,19
jobs 59:24
Joel 8:10,16 9:20
join 61:25

joined 26:5 56:25
joins 27:11
joint 52:14
jointly 52:7
journals 64:20
journey 11:2
judge 15:20 38:17
judgment 64:22,24
June 26:11 57:9,11
  57:13,14
jury 14:15,23,25
  15:1,20 20:8,20
  21:10,15 22:8
  23:13,22 25:6,9
  35:7 37:24 38:17
  39:3,22 40:25
  41:1 47:21 65:8,9
  65:9
jury's 31:6
justice 39:24,25
  40:1,24 65:17
justification 23:3

—————

**K**

Kathleen 3:8 5:13
  45:20
kbhavener@hav...
  3:11
keep 66:25
kicked 64:5
kind 30:19
Kingdom 76:6
knew 10:5 56:18,21
  56:25 57:1 71:5
know 14:4,6,17,21
  18:20 23:14
  28:14 35:14 37:3
  37:7,18 38:8
  42:12 47:25 49:9
  50:5,8 51:4,21
  55:19 56:5 60:23
  64:8,16,24 67:21
  74:11,11,23 75:3
known 56:23 63:11
  71:10
Kramer 7:24 8:10

8:16 9:20,24,25
  27:23 31:18,21
  31:23

—————

**L**

L 2:9 3:16 79:11,16
  80:10,18
large 47:7,8
lawsuit 6:22 7:1
  10:7 11:14 14:13
  15:8,21 22:23
  23:6 26:20 34:22
  37:10,13 39:1,3,5
  40:11,15,17
  42:23 54:22
  66:19,22 70:8,9
  70:11,15,17,21,23
lawyer 27:3 46:5
  65:12
lead 40:18 48:9
  49:21
lecture 33:22,23
led 62:14,18
left 46:1,15 56:25
  59:11
legal 24:11 33:8
  36:25 41:5,6
  51:25 52:4,7,11
  52:13 75:5
legally 65:5
legitimate 39:4
letter 71:17,21
letters 72:11,13
let's 25:13 46:21
level 31:7,8
liable 20:5
liberty 36:16 37:21
  38:4,9,21 41:16
  42:20 48:2
lied 33:12
life 73:21,24
light 41:9 63:1
limit 46:13
limiting 56:6
line 43:18 78:5
liquidation 62:12

list 4:21 29:19
listed 29:2
listen 6:15
Litchford 2:6
literally 44:4
litigation 26:12,17
little 39:4
lived 19:10 68:3
lives 74:12 76:5
living 18:25 59:22
LLC 1:9,9 3:10,10
  5:7
LLP 3:4
LOCATION 2:6
Loewy 3:3,4 4:7
  5:11,11,24 6:3
  8:14 25:1,7,13,21
  36:8,12 37:12,22
  38:25 42:7 43:5
  43:23 45:5,15,24
  45:25 46:20
  49:10,15,25
  50:10,14,16,18,24
  51:8 52:20,23
  53:1 54:4 55:9,13
  55:21 56:10,11
  69:17,22 74:21
  75:7,19 76:10,17
  76:23 77:6
logs 57:12
London 19:1,2
  59:22 60:9,10
long 15:8 56:23
  61:20 63:11
longer 43:22
look 28:3 31:12
  41:18
looking 18:18 30:3
  48:20 60:25 61:2
loose 69:24 72:3
lose 65:2
loss 40:7
lost 68:8
lot 64:18
Lou 63:4,5,7
loud 10:15 66:5

**M**

main 11:15 16:18
  16:20 65:23
  66:25
major 73:24
majority 46:14
making 9:2 16:1
  39:20
malice 16:8
malicious 23:1 40:2
  65:18
managed 59:8 60:6
management 18:7
  44:3 48:21 61:17
  62:19
managers 27:21
Managing 11:18
mark 25:22 28:19
marked 25:19
  28:17
Matt 7:20 13:5,19
  26:5 27:3 43:12
  70:22 71:2
matter 5:6 6:4
  52:24 54:3 75:1
matters 24:15
Matthew 1:15,20
  3:6 5:11 6:4,23
  26:1 42:10 68:23
maximum 73:14
mean 7:3 16:21
  22:16 32:20 39:1
  45:13 56:18
  64:17 66:4,5,5,22
  71:9 75:23
Meaning 14:2
means 6:11 7:4
  16:22 66:11
medical 67:11
  68:16
medication 68:4,6
meeting 43:18
meetings 34:17
member 36:20
memory 28:4 34:23
  41:21 48:5 61:24

mental 67:24 68:8
mentioned 52:15
57:17 60:1
met 26:5,8 56:24
middle 1:2 44:21
mid-to-late 9:25
million 7:18 10:16
10:25 12:21,24
23:17,18,18,19,20
23:22 24:2,7 31:2
31:5,12 40:6 47:3
47:7 51:4 61:24
mind 15:3 28:7
55:7
mining 44:16
minute 43:3
minutes 75:9
Mirabilis 1:5 5:6
13:2 19:11,12,14
19:16,17,18,23
20:25 21:8,18
22:9 32:13,17,19
33:6,15 34:9,12
34:17 44:10
55:16 56:25 57:9
59:11 61:5,9,25
62:6,7,11,15,17
62:20,25 69:25
71:18,24 72:21
Mirabilis's 44:14
misappropriated
63:23
mischaracterizat...
52:19 59:16 64:1
missing 7:18 10:16
12:24 31:2
misunderstanding
56:3
Mokwa 1:15,20 3:6
5:12 6:4,23 7:20
8:20 9:2,6,12
10:6,7,10,24 11:2
11:7,13 12:2,14
13:5,19 16:6
23:17 26:1,5,15
27:3,8 29:6 30:20

31:3,7 35:4 42:10
46:23 48:14
53:11,24 54:1,7
54:10,17,23 55:4
56:14,18,24 57:8
59:5,6 68:23
70:22 71:2,5
72:25 73:2,6,16
73:17 77:9
Mokwa's 8:21 11:9
12:13 45:10
48:11 49:3 53:21
59:3
moment 28:9 34:22
37:5
Monday 27:22
73:19
money 14:15 39:21
77:10
monies 26:23
months 12:15
19:13 32:25 44:4
73:8,9,9
Moodiness 68:9
morning 5:3
motives 40:3
move 55:10 61:2,4
61:8,10
moved 61:11
multi-million
21:11 71:10,24
M-9 50:21,21,22

N
N 3:2,16 4:1 5:1
name 5:25 6:3 8:6
16:19 28:13 29:5
29:14 37:6 38:4
38:10,21 41:16
48:8 49:19 50:5,6
51:13,23 53:23
54:6 61:13 65:24
67:1 73:25
names 36:15 37:10
48:2 49:2,7,8,13
Nancy 2:9 79:11,16

80:10,18
nature 51:2,3,9
NDAs 43:21
need 13:4 16:18
72:21 76:8
negatively 42:18
negotiation 38:24
49:21
negotiations 35:19
36:18 37:1 49:14
Negroponte 50:7
nerve 30:24
Nestle 63:19,24
64:5
network 62:17,20
never 18:22 40:5
45:7 62:11 71:21
73:12
Nexia 1:6 40:7
nh 78:25
Nicolette 45:13
nobody's 50:25
nondisclosure
35:20 36:23 38:7
43:13 46:17
50:12 51:20
nondisclosures
36:21
nonexecutive 47:12
53:8
nonresponsive
8:15 42:7 54:4
North 2:7
nose 33:25
Notary 79:12,16
note 40:17 44:2
notice 45:22
noticed 45:7,9,14
notices 45:17
number 8:4 10:23
10:24 11:2,6 15:4
15:11,18 19:8
25:2,9,11 26:10
26:22 33:11 35:9
39:13 41:2 53:7,8
62:18,21 71:15

numbers 71:18

O
O 3:16 5:1
oath 4:12 6:9 25:8
28:13 29:4 33:17
37:18 42:2,25
79:8
object 8:14 42:7
46:9 54:4
Objection 9:22
15:13 18:14
19:20 20:22
22:10 23:24
24:13 31:19 33:8
34:1,13 38:13,15
40:12,19 46:8
49:5 54:20 58:24
59:15 60:17 61:6
63:25 64:6 69:14
70:6 71:12 72:4
73:22 74:16,19
obvious 58:13,14
occasionally 68:21
occupying 13:22
13:24
occur 22:24 65:25
occurred 11:24,24
15:12 17:3 20:11
21:18 22:9 23:23
28:2 32:13,17,23
48:10 59:4 69:2
occurring 33:2,18
33:24 34:12
October 2:2 4:3 5:4
12:11,18 26:4
27:13 57:10,11
62:11 78:3 79:14
80:16
offer 64:21,24
offers 47:12
office 76:7,12,15
officers 20:25 31:1
33:11
offices 12:13
official 79:13

oh 18:19 45:11
Ohio 3:9
okay 7:7 8:14,23
9:20 10:17,22
11:12,23 12:5,18
14:22 16:4,14
17:11 18:21 20:4
20:16 22:15 27:2
28:10 29:13
31:14 32:21 33:1
34:24,24 36:2
37:12 38:17
39:25 40:15,23
41:18,22 43:23
45:5,15,24 46:21
47:6 48:3 50:1,3
54:15 55:22
56:10 57:2 59:12
60:2,16,23 61:10
62:9 67:11 70:23
70:25 71:9 77:13
ones 18:17 47:17
47:18,21
ongoing 11:8
operating 34:6
opinion 48:16,19
58:6,8
opportunities 35:9
59:20 60:25
Orange 2:7 79:10
80:9
orchestrated 26:14
order 36:24 44:3,6
44:23 75:5 76:14
77:8,11,12
ordering 77:4
organization 21:4
47:14 48:19,25
58:1
organizer 7:24
organizers 7:14
28:12 73:13
original 77:5
Orlando 1:3 2:7
7:13,18 10:14
13:17 18:20 31:4

31:11
outside 30:13,15,16
   30:17 55:7
overnight 16:24
owed 15:11,16 23:6
   23:17,17,18,19
   33:5 72:19
owned 13:2

**P**
P 3:2,2,16 5:1
page 4:6,18 7:17
   25:24 27:25 31:3
   31:5,11 34:21
   78:5
pages 80:12
paid 52:10,13,20
   72:18,21 74:22
   75:3
Palaxar 1:9,9 3:10
   3:10 5:7 26:13
   36:18,20
paragraph 26:3
   28:1
paragraphs 34:23
paramount 74:8
paraphrase 30:22
part 21:3 26:21
   32:24 62:16 70:9
participants 8:2
particular 5:14
   26:25 37:5 43:15
   64:20
particularly 48:21
   61:3
particulars 35:15
parties 3:19 23:1
   36:17 71:6 80:14
partner 16:23
partners 47:11
parts 46:18
party 8:22 9:13
   12:2 13:7 56:14
   59:6 71:7
part-time 17:4,19
   17:19 60:6,18,20

60:22,24
Pass 75:7
passed 46:16
Pathologies 53:13
Pathways 47:15
   53:14,15
pay 60:21 65:6
paying 51:25 52:4
   52:7,21 74:18,24
penalties 78:20
pending 74:17
people 8:8,19,21
   14:2 18:19 29:2
   29:11,16 30:2,5,7
   30:14 49:2 58:9
   58:17 62:22
   69:10,16 74:1,6
   74:11
percent 34:5 62:7
perfectly 18:13
performed 33:14
period 11:9,19 12:1
   12:11 16:8 19:13
   20:15 23:2 24:24
   40:3 45:4 55:1
   56:3,7,16,16,17
   57:1
Perlman 63:4,7
person 13:24 29:5
   34:8 45:9 48:6
   53:6 54:10
personal 47:10
   48:16
personally 45:13
   72:20 79:12
personnel 49:13
perspective 16:25
phone 45:13
pin 47:20
place 26:20 44:3
   50:13 57:10,11
   61:5 72:8
places 18:1
plaintiff 13:14
plaintiffs 1:7 57:8
plaintiff's 44:25

plan 24:21
planned 12:15 26:5
   26:14 73:8
planning 15:4
   26:12,17 57:11
   76:23
Plaxar 26:6
play 35:19 37:8
please 5:10,16,25
   9:4 46:8 55:7
   75:9 76:20 77:14
point 9:25 10:24
   13:1 16:19 18:4
   20:2 30:6 31:3,16
   48:2 54:25
pointed 45:19
POLLACK 1:15
pose 42:1
posed 23:12,12
position 14:12
   42:12 62:8 65:21
   70:19
positions 47:12
   53:9 58:22
possible 29:20,24
   76:22
posted 13:20
potential 27:1
   36:14 46:24
   54:15 73:15
precise 12:16
preliminary 25:5
present 3:13 46:13
presentations
   57:16
presenting 30:25
Presidion 13:18
press 11:6 12:8,9
   12:10,18,23 13:6
   14:11 20:19 59:8
   66:12,15 73:11
   74:14
presumably 70:24
presume 42:11
   74:9
presumption 16:1

prevented 17:12
previous 15:17
   20:13 38:20
Price 47:11
primary 39:19 67:2
prior 11:8 29:8,
   37:9 41:15,24
   42:19 53:25 56:8
   57:25
pro 52:23,24
probable 29:24
probably 28:21
   60:1 65:14
problem 12:19,20
   67:7,9 76:5
process 8:24 9:1,10
   9:13,15 11:3
   51:11 73:4,4
produce 45:2
produced 35:21
   37:10 43:25 44:5
   44:9 49:11
producing 44:11
production 44:14
   44:14,25
products 30:25
profession 58:9
   74:9
Professional 79:11
professionals 71:15
profitable 62:23
promote 18:19
promoted 23:2
pronounce 67:22
properly 18:5 76:2
   77:11
property 13:2 17:5
   60:4,5,7
proposals 35:16
   57:15
proposing 58:2
prosecuted 40:2
prosecution 21:20
   52:5
prosecutor 22:19
   22:20

provide 62:24
provided 22:15,18
   61:16
psychologist 69:4
public 47:8 50:1,2
   51:13 66:3,6,10
   66:12 79:12,16
published 66:1
pulling 70:5
purpose 65:19,20
   75:25
pursue 57:19,22,24
pursued 16:8 42:16
pursuing 35:10
   42:13
put 52:18 53:4
   65:20

**Q**
qualified 58:20,23
   58:25
question 9:4 12:22
   15:1,23 20:17
   23:12 24:5 28:5
   28:15 32:15
   35:25 36:11 37:7
   39:13 42:1 46:9
   52:9 54:5,16
   55:10,20 56:1,12
   65:14 66:9,21
   70:3,20 71:13
   74:3,16
questioned 22:20
   42:25
questioning 43:19
   54:12
questions 6:16,19
   46:22 66:8 75:15
quick 40:23 69:17
quickly 6:7
quit 52:21
quote 15:22,22

**R**
R 3:2 5:1
raised 7:25

ran 27:20
raw 44:17
reaction 72:14
read 34:22 64:19
  75:24 76:4,7,9
  78:20
reading 3:20
real 77:9
realize 37:12 40:15
  72:7
really 41:24 77:11
reason 43:17 58:18
  66:23 78:5
reasons 66:23
recall 9:13 13:12
  48:8
Recess 25:16 43:8
  69:19 75:12
recollection 23:16
record 5:9 6:1
  25:15,18 27:14
  43:7,10 44:2
  52:18 55:24
  69:18,21 75:11
  75:14 77:1,3
  80:12
recordings 44:1
recover 26:23
redacted 35:21
  36:24 37:11,11
  49:12
refer 15:17 20:13
  29:8 38:20 41:15
  42:19 53:25
  57:25
referenced 26:12
  40:5,6
refresh 28:3 34:23
  41:21
regarding 9:6 46:2
regards 13:15
  41:11 70:8
registration 30:6
regularly 74:24
relate 11:16,23
  12:1

related 41:24 54:12
relationship 35:8
  38:2,5,12,19
  41:12,13,17 42:3
  42:9,18,21 53:17
  53:19 55:5 63:13
relationships 35:2
  35:5,15,23 36:3
  39:6 41:20 42:12
  42:15,24 43:1,16
  46:25 47:10,23
  53:3 54:3,16
  57:14,14,19
relative 80:13,14
release 12:9,10,18
  12:23 13:6,7
  14:11 20:20 59:8
  66:12,15 73:11
releases 11:6 12:8
  74:14
rely 24:15
relying 24:11
remember 9:19
  45:15 49:19
remind 54:16 56:8
repeat 65:15
rephrase 6:20
  40:25
report 80:11
reporter 2:9 4:13
  5:16 76:1 77:4,7
  79:11 80:7,10
reporter's 76:7,12
  76:15
represent 6:4 24:23
  25:1,3,23 28:22
  35:17
representing 5:11
  11:1 27:4,6
reputation 7:4,10
  11:11,21 12:3,17
  16:5,10,20,23
  18:6 22:23 39:17
  39:20,23 40:20
  40:21 57:18 59:7
  65:19 74:8

reputation's 16:16
requested 80:12
requests 41:10
required 65:6
research 60:5
respect 23:7 69:3
respective 3:19
responded 70:10
response 15:22
  17:25 18:16 54:1
  55:3
responsible 20:21
  65:3
responsive 55:19
restate 6:20 9:4
  31:6
restriction 43:22
restrictions 36:25
result 48:10
revenue 59:21 61:1
review 23:8 41:21
  80:11
reviewed 34:19
reviewing 29:3
reviews 57:7
revisit 43:18
right 11:12 25:11
  31:10 33:24 38:1
  53:2 55:8 57:4
  60:14,19 67:7
risk 18:6 48:20
  61:17 62:19
Road 3:8
ROBERT 1:15
role 19:10,12 20:4
  20:10,17
room 66:4
roughly 29:1 30:14
roundabout 57:9
ruined 73:21
rule 75:20
rules 6:8
Russell 3:8

S

S 1:20 3:2,16 4:17

5:1
SADRIANNA 1:15
sake 31:6
sale 61:23
sarcastic 66:7
sat 53:11
saw 10:4,4
saying 9:16 39:8
  47:22 53:4,6
  69:15 77:7
says 11:4
scale 33:4
Scottsdale 7:12
  10:19 11:2,9,17
  11:24 12:15
  14:11,12 40:5
  57:10 73:8,15,20
seal 79:13
second 36:21 47:7
secondly 26:24
seconds 46:15
sector 48:21
secure 60:6
See 31:4,11
seeking 6:25 7:2
  15:21 22:22,23
  40:24 65:22 74:6
  74:25
seen 7:17 12:13
  13:9,9,11,13
  18:19 26:10
  28:20 67:16
self-employed
  17:19
send 45:19,21
  76:17,20,21
senior 16:23 33:11
  47:11 62:21
  71:15
seniority 53:7
sentencing 16:7
  26:24 65:21
Sentinel 7:13,18
  10:15 12:10
  13:17 18:20 31:4
  31:12

separation 71:5
September 44:21
served 21:17 30:17
server 8:24 9:1,10
  9:13,15 11:3 73:4
serving 11:5 30:18
  33:7,16 73:4
session 32:2
set 61:11 73:14
seven 23:9
seventy-five 29:1
seven-figure 49:18
shared 58:8
SHEET 4:10 78:1
short 29:13,15
show 14:23 28:19
showing 14:7
shrinks 69:6,13
side 21:18
sign 75:17,22,24
  76:4,7,9
signed 54:9,25 71:6
  71:17,21,22
signing 3:20
simply 6:19
Simpson 21:22
single 29:5
sit 28:13 29:3 42:2
  49:1 51:12 53:8
sitting 37:15 38:1
  41:12 62:13
situation 55:17,17
six 18:3 60:1 61:24
  64:11 74:4
sixties 10:1
slander 26:2,6 39:1
sleep 68:9
Socially 16:17
software 61:16
  62:11,19
sold 61:21,22 62:10
sole 65:20
solely 65:18
solutions 61:16
soon 76:19,21
sophisticated 34:2

sorry 9:4 12:21
  14:19 22:13 28:7
  28:10 32:14
  36:12 50:8,24
  52:3,17
sort 18:22
sorts 10:5 32:9
sought 67:11 69:1
southeast 60:10
speak 55:6
speaker 66:5
speaking 17:12
  40:9 55:7 60:4
specialist 33:21
  67:16
specific 11:23 12:1
  12:5 32:14 42:8
  42:21 53:23 54:6
  72:5
specifically 16:7
  30:3 42:5 53:12
specifics 13:12
specify 39:2 53:10
speculating 58:17
speculation 58:16
speech 32:1
spent 16:22
spoken 17:6,8
stage 18:24 51:22
stand 31:10
start 40:14 61:18
state 5:25 79:9,16
  80:8
statements 28:14
States 1:2 42:23
  50:12 68:3
stating 26:3
stealing 9:7
stenographically
  80:11
step 63:9
stipulated 3:18
stolen 40:4
stopped 48:12
straight 42:22
strange 49:15

64:10 74:12
Strategy 1:6,13 5:7
stress 67:15,17
  68:13
strings 70:5
stuff 18:12 59:7
subject 35:20 36:21
  78:21
subsequent 19:19
  20:6
substance 78:21
sued 63:19 74:2
suffered 16:16,16
sufficient 10:2
suggestion 46:10
suit 12:25 64:4
Suite 3:5
Sunday 27:21
  73:18
support 26:23
  35:10 59:21
supporting 57:15
supports 37:17
sure 32:10 39:12
  69:9 71:4 76:1
surely 20:7
Surprise 72:15
surprised 71:23
swear 5:1
sworn 79:12
sworn/affirmed
  5:20
_____
         T
_____
T 3:16,16 4:17
tad 23:21
take 16:18 18:15
  18:16 25:13 28:3
  34:22 37:25
  40:13 43:3 48:25
  51:24 63:6 68:18
  68:5,6 69:17 75:8
taken 1:20 5:5
  10:25 76:1 78:3
takes 66:13
talk 22:6,7 27:12

46:5 47:21 56:8
  65:12 72:2,16
talked 47:4
talking 13:16 20:16
  30:5 48:6
target 72:11,13
tax 72:17
taxes 72:18,21
tell 8:16 25:8 34:4
  38:17,18 40:24
  53:20 73:12
telling 15:20 21:10
terabytes 44:16
term 50:21 58:16
termination 55:16
terms 15:12,23
  20:12 72:5
TERRENCE 1:10
testified 5:20 49:20
  52:10
testify 21:21 22:8
  49:2
testifying 36:8,9
testimony 4:5
  26:16 29:4 33:17
  34:10 36:2,4
  52:19 55:11,12
  70:1,4 74:13
  75:25 80:13
Texas 3:6
text 76:8
Thank 10:22 31:15
  76:18
theft 12:21 21:2
  40:8 73:7 74:7
therapist 69:4
therapists 69:6,8,9
thereabouts 61:24
thereof 39:7
they'd 8:8 29:11
thievery 7:15 8:9
  8:11,17 9:7 16:25
  29:12,17,22
  32:11,12,17
thing 8:7 29:10,15
  30:19 45:5 58:1

65:23 66:25 74:6
things 9:6,10 11:15
  18:7 39:11 69:12
  69:23 71:1,3
  72:24 74:10
think 11:3 13:13
  15:11,16 20:20
  23:21 24:1,7
  26:12,18 28:15
  29:18 32:2 35:25
  39:4,5,22 43:18
  44:5,25 45:19
  48:23 50:6 52:18
  58:8,13 70:10,12
  70:14 71:13 74:3
  76:7 77:1
Third-Party 1:16
  1:20
thirty 76:19
thirty-five 7:5
  16:22 18:5
thirty-second 11:4
thoroughly 6:16
thought 54:12
three 11:2 15:9,10
  15:21 27:14 44:9
  45:17 46:16
  56:18 68:25 73:9
  74:13
Thursday 2:2 4:3
tie 69:23
time 2:4 8:7 9:25
  10:25 11:1,20
  12:2,12 16:8
  20:15 23:3 24:24
  25:14,17 27:2,9
  29:9 32:22,24
  33:3,15 35:19
  37:8 40:3 43:6,9
  46:3,12 48:2
  54:20 55:1,2 56:2
  56:3,5,5,7,13,16
  56:16,17 59:22
  62:24,25 65:15
  69:20 72:16
  75:10,13 77:2,5

times 39:14,14
  46:16 74:4,4
timing 72:6
tip-off 34:4
today 6:13 29:4
  72:24
today's 7:7
told 39:16,17,18
  46:6,10 55:22
  56:1 58:10,12
top 74:23
totally 55:17
Tower 3:4
traced 12:12 14:9
training 17:20
transactions 33:13
transcript 77:11,13
  78:2 80:12,12
transcripts 44:1
transpired 72:11
trashed 7:4,9
traumatic 29:10
  30:23 74:5
traumatization
  32:7
traumatized 32:4,6
treated 68:1,18
treatment 67:11,14
  68:10
trial 14:18,20,23
  21:22 41:10
  44:13 45:2 51:23
  65:2,2 76:24
tried 17:22 18:3,17
true 17:6,8 18:13
  19:23 20:1 32:21
  33:5,20 38:11,16
  45:8 71:17 78:21
  80:12
try 39:15 74:4
trying 47:20 50:25
  59:19 66:10
  68:11
turn 25:24 27:25
  34:21
turned 7:11 17:14

71:18,23
turning 30:24
  44:24
twelve 73:7
twenty 23:20,22
  24:2,7 46:15
twenty-five 30:14
  62:7
twenty-odd 11:4
  73:5
two 10:24 21:1
  43:25 44:4,16
  45:6,18 62:21
  64:11
two-fold 26:22
  62:17

**U**

U 3:16
understand 6:9,11
  6:19 9:5 14:22
  32:10 51:7 52:9
  66:10,19,21 74:8
understanding
  12:22 19:25 27:5
  28:23 57:7
understood 27:3
underway 49:24
unemployable
  16:25
United 1:2 42:23
  50:11 76:5
unprecedented
  11:3 73:5
unreasonable
  23:21 24:2,8
unusual 59:1,2
use 45:2
useful 44:25
utilized 62:22
U.K 47:14 57:13,17
  62:3 64:15,18
  69:7
U.S 21:24 22:16
  48:23 67:22

**V**

v 1:8,12
vague 54:20 56:2
validity 33:12
valuation 24:18
value 61:23
various 57:15
  59:20 71:15
vehicle 70:14
Ventures 1:5 5:6
verse 5:6,7
version 76:8
video 44:1
VIDEOGRAPH...
  5:3,16 25:14,17
  43:6,9 69:18,20
  75:10,13 77:2
videotape 14:23
Videotaped 1:19
videotapes 34:16
  34:19
view 51:22
Vilmos 45:14
violates 44:6
violation 44:23
voice 10:15
voices 7:25
volume 31:7

**W**

Wachovia 47:1,1
  48:3,7,13 49:2,12
  49:13,17
waive 75:17,22
  76:3
walk 29:11,16
  59:10
want 7:6,7 11:12
  15:1,23 16:5,5,10
  16:14,19,19 25:9
  25:22 26:3 31:9
  41:5 42:1 43:19
  44:2 52:17 55:14
  65:9,13,17,17,23
  66:1,4,7,8,16
  75:17 76:13 77:8

wanted 8:8 23:13
  39:16,16,18
  43:11,12 56:7
wanting 40:22
wants 39:3
warehouse 44:19
Warkol 22:5
wasn't 13:1 29:21
  36:20 49:21
  57:18 58:12
watching 14:25
Waterhouse 47:11
way 18:19 26:9
  39:15 68:2,12
ways 59:20 74:11
Web 66:2 74:10
week 27:17,18
weeks 23:10 44:9
weigh 20:8
weight 20:12 68:8
WELLINGTON
  1:14
went 19:15 62:3
weren't 30:25
  57:22 58:6
we'll 20:18 25:22
  43:6 46:21 69:18
  75:10 76:17
we're 5:9 20:16
  25:14 37:14 38:1
  38:25 41:12
  47:24 68:3 69:20
  75:13 77:1,1,2,10
we've 57:16 72:23
whatsoever 38:12
winning 22:25
withered 35:11
witness 5:14,17,22
  21:17 39:2,7,10
  49:17,19,20
  50:25 51:7 55:6
  75:7,16,18 78:24
  79:13 80:13
witnesses 27:1
wording 9:19
words 7:19 9:14

43:19 76:2
work 17:4 51:6
  58:2 59:10,13
  60:3,7,18,20,22
  61:4,8 62:4 63:4
worked 15:18 17:2
  17:15
working 32:2
  60:16 63:2
works 49:17
workshop 27:20
worry 32:9
worth 24:12
wouldn't 20:7
  58:21
WRITE 78:2
written 74:10
wrong 10:5 45:18
  72:25

**X**

X 4:1,17

**Y**

Yaniv 1:14 45:10
yeah 9:8 12:24
  17:10,14 33:22
  43:5 52:12 53:9
  68:14,17 74:4
year 57:2,3 59:14
  59:18,25 60:2
years 7:5 11:4 15:9
  15:10,21 16:22
  18:5 27:14 46:16
  56:18,21 64:11
  68:3,25 73:5
  74:14

**$**

$200 75:6
$250,000 75:6

**0**

01 80:12

**1**

1 4:19 25:19,22

10 19:9
10:11 43:6
10:18 43:9
10:53 69:18
11:09 69:20
11:16 75:10
11:25 75:13
11:26 77:2
11:30 2:4 77:15
111 34:23
117 34:23
14 12:18
14th 12:11
15 26:4 30:7
1540 3:5
15511 3:8

**2**

2 4:20 28:17,19
20 30:7
2001 61:19
2005 62:8 63:12
2006 56:24 61:21
  62:11 72:10
2007 26:4,11 27:13
  28:24 56:25 57:9
  57:10,11,11,13,14
  59:12 67:9
2008 59:12 60:2,12
2010 2:2 4:3 5:4
  78:3 79:14,17
  80:16
220 7:18 10:16,25
  12:21,24 31:2,5
  31:12 40:6
24 25:24
25 4:19 30:7
25,000 15:16
26 27:25
27 27:25
28 4:20

**3**

31 34:21
32801 2:7
390 2:7

**4**
**4th** 44:20
**401** 3:5
**440-893-0188** 3:11
**440-893-9326** 3:11
**44022** 3:9
**46** 47:7 51:4

**5**
**5** 4:7
**5th** 44:20
**56** 47:3

**6**
**6th** 44:20
**6:07-CV-1788-O...**
  1:4

**7**
**7** 2:2 4:3 5:4 78:3
**7th** 79:13 80:16
**70** 34:5
**71** 26:3
**75** 34:5
**78** 4:10
**78701** 3:6
**79** 4:12 28:1

**8**
**8** 34:22 41:11,24
  46:2,21
**80** 4:13 28:1 80:12
**81** 28:1

**9**
**9** 41:18 46:2
**9:10** 2:4 5:2
**9:11** 5:9
**9:37** 25:14
**9:43** 25:17